THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TERRY L. SNYDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 04-970-JJF |
| CITISTEEL USA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT CITISTEEL USA INC.'S OPENING BRIEF
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

Sheldon N. Sandler, Esquire (No. 245)
Margaret M. DiBianca, Esquire (No. 4539)
The Brandywine Building
1000 West Street, 17th Floor, P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6673; (302) 571-5008
Facsimile: (302) 576-3330; (302) 576-3476
Email: ssandler@ycst.com; mdibianca@ycst.com
Attorneys for Defendant

DATED:    November 22, 2006

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ v

NATURE AND STAGE OF THE PROCEEDINGS .................................................. 0

SUMMARY OF ARGUMENT ............................................................................ 1

STATEMENT OF FACTS ................................................................................ 2

    A.   Snyder Worked as a Clerk/Typist in the Melt Shop at CitiSteel ........................ 2

        1.  The Melt Shop Was a Physically Demanding and Dangerous Industrial Environment ........................................................................................ 2

        2.  The Operational Responsibilities of the Melt Shop Were Divided Between Two Supervisors ............................................................................... 3

        3.  As a Clerk/Typist, Snyder Provided Administrative Support to the Melt Shop ................................................................................................. 3

    B.   Snyder Was Confrontational and Aggressive and Regularly Displayed Disrespectful Behavior to Her Co-Workers and Superiors ................................. 4

    C.   Snyder's Job Performance Began to Deteriorate ............................................ 5

        1.  Snyder Was Counseled for Her Excessive Absences ..................................... 5

        2.  Snyder Spent Time Wandering the Facility and Socializing with Other Employees ......................................................................................... 7

    D.   Snyder Was Disciplined for Her Continued Poor Performance .......................... 7

        1.  Ford, Harris, and Buragino Collectively Agreed that a Written Discipline Was Appropriate ............................................................................... 8

        2.  Snyder Was Belligerent About the Discipline and Refused to Accept Any Responsibility for Her Actions ............................................................. 9

        3.  Snyder's Attitude and Performance Deteriorated Immediately After She Was Disciplined ............................................................................... 9

    E.   Snyder Was Aware of CitiSteel's Well Published Anti-Harassment Policy and Reporting Procedure ......................................................................... 10

    F.   Snyder Accused Harris of Sexual Harassment Almost Immediately After She Received the Disciplinary Memo .................................................... 11

    G.   CitiSteel Received Snyder's Complaint In Accordance with Its Policy ........... 12

        1.  Snyder's Complaint Was Reported to HR Immediately ............................... 12

        2.  Snyder Met With the Director of HR, Who Took Her Complaint Seriously and Assured Her that It Would Promptly and Properly Resolved ................ 13

        3.  Snyder Told Downie She Had Evidence to Support Her Claims and Then Spoke About the Disciplinary Memo ........................................ 14

4.  Downie and Buragino Questioned Harris Within Hours of Snyder's Complaint ................................................................. 15

5.  Snyder Had a History of Making Unfounded Claims and Wild Accusations 17

6.  Downie, Buragino and CitiSteel President, Warren Beiger, Met to Discuss Possible Options ......................................................... 18

H.  Snyder Refused to Cooperate in the Investigation Or Even Consider a Transfer to an Equivalent Position ............................................. 20

1.  Snyder Refused to Even Consider the Offer to Transfer ............................. 20

2.  Snyder Threatened Downie that She Would Consider the Transfer Only if He Gives Her  "What [She] Wants" ........................................... 21

3.  Snyder Never Produced the Tapes Or Any Other Evidence She Claimed Existed ....................................................................... 22

ARGUMENT ............................................................................... 24

I.  SNYDER CANNOT ESTABLISH THAT SHE WAS SUBJECT TO A HOSTILE WORK ENVIRONMENT ..................................................... 24

A.  Snyder's Allegations Are Not Sufficiently "Severe or Pervasive" .................. 24

1.  Snyder's Allegations, Especially in Light of the Working Environment, Are Not Objectively Severe and Pervasive .................................. 25

2.  Snyder's Allegations, Especially In Light of Her Responses, Are Not Subjectively Severe or Pervasive ......................................... 27

3.  Snyder's Vague and Evasive Descriptions of the Alleged Harassment Further Weakens Her Claim .............................................. 29

II.  SNYDER CANNOT ESTABLISH THE EXISTENCE OF RESPONDEAT SUPERIOR LIABILITY ..................................................... 29

A.  CitiSteel Exercised Reasonable Care to Prevent and Correct Harassment ....... 30

1.  CitiSteel Took Reasonable Steps to Prevent Sexual Harassment ................. 30

2.  CitiSteel Promptly Conducted an Appropriate Investigation in Accordance with Its Sexual Harassment Policy ...................................... 31

3.  CitiSteel Took Appropriate Action to Remedy the Alleged Harassment at the Conclusion of Its Investigation .......................................... 32

B.  Snyder Unreasonably Failed to Use Any of the Many Available Means to Avoid Harm ............................................................... 33

1.  Snyder's Failure to Timely Report the Alleged Conduct Was Unreasonable as a Matter of Law ..................................................... 34

2.  Snyder's Fear of Consequences, Without More, Does Not Excuse Her Failure to Report the Alleged Harassment ................................ 34

3.  Snyder's Refusal to Provide CitiSteel with Any of Her Alleged Evidence
    Was Unreasonable as a Matter of Law ........................................................ 35

**III.  SNYDER CANNOT ESTABLISH THAT SHE WAS CONSTRUCTIVELY
    DISCHARGED AND, THEREFORE, CANNOT ESTABLISH THAT A
    TANGIBLE JOB ACTION OCCURRED**........................................................ 36

**IV.  SNYDER IS PRECLUDED FROM ANY CLAIM OF PUNITIVE DAMAGES,
    OR DAMAGES AS FRONT OR BACK PAY** ............................................... 38

**CONCLUSION**............................................................................................................ 40

DB02:5573682.2                                                                                    064633.1002

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Terry L. Snyder was hired by Defendant CitiSteel USA, Inc. on August 3, 2001 as a Clerk/Typist in the Melt Shop Department.  On April 8, 2003, Snyder complained that she had been subject to sexual harassment by one of her supervisors.  Following a three-day investigation of the allegations, CitiSteel was unable to substantiate either parties' claims.  Snyder was offered a lateral transfer to the Clerk/Typist position in the Shipping Department.  The transfer would have enabled Snyder to keep the same job duties, the same salary, and the same shift but would have removed her from the physical environment of the Melt Shop where her alleged harasser worked.  Snyder refused the transfer and walked off the job.

Snyder initiated the present case by filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on April 29, 2003.  (A84-85).  The Charge alleged that Snyder had been subjected to discrimination based on gender and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII").  The EEOC's Senior Federal Investigator concluded that Snyder's allegations could not be confirmed and that the offer to transfer was an appropriate remedy that did not constitute retaliation.  (A141).  On June 2, 2004, the EEOC issued a No Cause Finding and dismissed the Charge.  (A142).

Plaintiff filed a *pro se* Complaint on August 24, 2004.  (D.I. 1).  Plaintiff later retained the law firm of Margolis Edelstein, which entered its appearance on June 16, 2005.  (D.I. 8).  Discovery began in earnest in January 2006.  (D.I. 19-22).  Discovery was highly contentious, involving document disputes and the last-minute cancellation of Plaintiff's deposition on three occasions.  Discovery has now concluded and CitiSteel has filed for Summary Judgment.  This is its Opening Brief in support thereof.

## SUMMARY OF ARGUMENT

CitiSteel is entitled to summary judgment because no genuine issues of material fact exist with respect to any of Snyder's claims that must be resolved by a jury.

1.    Snyder has failed to establish a *prima facie* case of discrimination.

2.    Snyder has not alleged actions sufficiently severe or pervasive to rise to the level of a hostile work environment.

3.    Snyder cannot prove that the behavior she alleges occurred would have detrimentally affected a reasonable woman in her position.

4.    Nor can Snyder prove that such behavior actually detrimentally affected her or created an offensive work environment.

5.    No tangible employment action occurred because Snyder was not constructively discharged but unreasonably resigned.

6.    Assuming, *arguendo*, that Snyder was subjected to a hostile environment, CitiSteel cannot be held liable where Snyder unreasonably delayed in reporting the harassment and otherwise failed to cooperate with CitiSteel's subsequent investigation and remedial measures.

7.    CitiSteel is able to prove the affirmative defense set forth in the <u>Ellerth</u> and <u>Faragher</u> decisions because, upon learning of Snyder's allegations, it took immediate action by conducting a prompt and thorough investigation and provided Snyder with an effective solution, which Snyder unreasonably refused to even consider.

8.    Snyder cannot prove the necessary elements of a retaliation claim because she suffered no adverse action as a result of her harassment complaint.

9.    Even if an adverse action were to exist in the form of the offered transfer, Snyder cannot demonstrate any evidence of pretext in support of a retaliation claim.

1

# STATEMENT OF FACTS

### A.    Snyder Worked as a Clerk/Typist in the Melt Shop at CitiSteel

Defendant CitiSteel USA, Inc, ("CitiSteel"), is a steel mill located in Claymont, Delaware.

CitiSteel hired Plaintiff Terry L. Snyder on August 3, 2001, as a temporary employee in the Melt Shop

department.  (A168; A1; A84).  Snyder applied to be a full-time employee on August 24, 2001, (A7-

9), and on her application, Snyder wrote:

> I have really enjoyed the challenges and the responsibilities since the first
> day – This is not a job to have just because you need a job – This is a job
> that requires hard work, commitment and loyalty – You must enjoy
> everything about it and I do.

(A7).  Snyder was offered a full-time position, which she accepted on September 17, 2001.

(A168; A169; A84).  Snyder worked as a Clerk/Typist in the Melt Shop until April 10, 2003, when she

refused a transfer and walked off the job.  (A84).

### 1.    The Melt Shop Was a Physically Demanding and Dangerous Industrial Environment

The environment in the Melt Shop was dangerous and physically demanding.  (A328).  Snyder

described the Melt Shop as a "dirty," (A207), and "dusty," (A207), "mill environment."  (A208).

Snyder testified that she had to cross through "filth" (A315), to get to her "stupid little office," (A314-

315), to do her "dumb, dirty little job."  (A314-315).  Her office was located just outside of the "5,000

degree" furnace."  (A175).  Indeed, the temperature in the Melt Shop was significantly higher than in

other areas of the mill, such as the Personnel Department and the Accounting Office.  (A525).

The Melt Shop was a very dangerous work environment.  (A58).  Employees in the Melt

Shop, including Snyder, were required to wear safety gear such as a fireproof suit, hard hats, and steel-

toed shoes.  (A).  The heat of the furnace also made for a loud environment.  (A58).  Voices were often

raised and tempers sometimes flared in the extreme heat.  (A328).  Adding to the physical demands of

the Melt Shop, employees were required to walk across a suspended catwalk to get back and forth

between various areas of the shop.  (A366).  Snyder, who was afraid of heights, had to cross the

catwalk regularly.  (A366; A158; A183; A185; A194; A122; A523; A537).

### 2.    The Operational Responsibilities of the Melt Shop Were Divided Between Two Supervisors

The Melt Shop is divided into sub-departments.  (A327).  During Snyder's employment, Randolph Harris was the general supervisor for the Furnace, (A420; A326), and Dennis Ford was the general supervisor in the Caster and Slab Yard.  (A420).  Harris and Ford were equals in job title and rank.  (A319-320; A508; A424: A170; A176; A334).  Both men reported to Gregory Buragino, the Vice President of Manufacturing, (A336; A418; A419; A423) with whom both men enjoyed a positive working relationship.  (A421; A422).

Although their duties and responsibilities were mutually exclusive, Harris and Ford shared the same physical work environment and had to interact regularly.  (A421).  It was no secret that Harris and Ford were fierce competitors in the workplace.  (A458-459; A508; A335).  Buragino intervened on more than one occasion and reminded them to make the best of their working relationship.  (A384-385).

Buragino worked with Harris for almost thirteen years at CitiSteel.  (A455).  Buragino testified that he had, and continues to have, "a very high opinion" of Harris' character and integrity.  (A455).  Buragino described Harris as a "very honest person" whom he could "always trust" and who would "give you the shirt off his back."  (A455).

### 3.    As a Clerk/Typist, Snyder Provided Administrative Support to the Melt Shop

The primary duty of a clerk/typist at CitiSteel was to provide clerical support to his or her department.  In the Melt Shop, this meant providing assistance to Harris and Ford, the two general supervisors, as well as providing assistance to the Shop as a whole.  (A424).  Snyder's responsibilities specifically included generating various reports, timesheet entry, managing schedules, updating certain procedure manuals, and general filing duties.  (A324-325; A345; A450).

Snyder, like other clerk/typists, was cross-trained to assist in other departments so she could act as a substitute when scheduling needs so required.  (A449; A371).  Snyder had provided such assistance in the Mechanical (A370), and Plate Mill Departments (A299; A371-372), and had been

3

offered regular overtime work in Maintenance. (A300). Snyder appreciated the opportunity to work

in other departments because she liked to "learn new things" and to "stay busy." (A301).

> **B.    Snyder Was Confrontational and Aggressive and Regularly Displayed Disrespectful Behavior to Her Co-Workers and Superiors**

Snyder was a self-described "tomboy" (A174), who did not "scare easily" (A470; A177), and

had no problem confronting others "if they did something she didn't think was right." (A467).

Indeed, Snyder was aggressive and outspoken. (A466; A388-389). Snyder was even more hot

tempered than the employees exposed to the extreme heat of the Melt Shop. (A388).

Snyder describes herself as a "naturally loud person," who would "rant and rave" when she

got mad. (A210-211). She also explained that she was exceptionally loud even though most CitiSteel

employees spoke at a normal volume. (A210-211).

Snyder was regularly disrespectful towards others in the workplace. This disrespect often

extended to her superiors. (A387-388). In addition to battles she started with her own supervisors,

Ford and Harris, Snyder also had confrontations with supervisors Jeff Blauvelt, Richard Joslyn, and

Michael English. (A374). On one occasion, Snyder verbally assaulted Blauvelt, cursing and yelling at

him in front of a visiting salesperson. (A375). Blauvelt reported this humiliating outburst to Harris

and Ford, who counseled Snyder about the need to maintain a respectful work environment. (A376).

Even after being counseled, Snyder's hostile behavior continued. (A387-388). Snyder admits

that she had an "attitude" towards Harris if he asked her to do something that she felt was outside of

her job description. (A105). Once, Buragino asked Harris to show Snyder how to download and print

certain reports. (A59). Harris called Snyder into the office to relay Buragino's instructions. (A59).

She responded by walking away "disgustedly," saying that she "did not have enough time" to do

something that "wasn't part of her job description." (A59). Snyder testified that she was "hateful"

and "mean" towards Harris. (A276-277). She admits that she yelled and cursed at him, (A209;

A210) to the point that he became scared of her. (A178; A467).

In January 2003, Snyder "flipped" at Harris in front of Mike English. (A33). She "went

storming down the hallway," and "went screaming into [Harris's] office," and as she turned the corner,

4

she "started hollering" and "cussing" and "yelling at him." (A308; A309; A310). English was in Harris's office at the time and witnessed the confrontation. (A452; A310).

At times, Snyder was even physically violent with Harris. She admits that she punched him on at least four occasions, (A272-273; A285; A200; A202), and pushed him out of her way once when he was standing in the doorway of the Melt Shop office. (A285).

### C.    Snyder's Job Performance Began to Deteriorate

When Snyder was first hired in September 2001, she was thought of as a "fairly good employee." (A456; A457). However, over time, Snyder began to develop problems and became the subject of various complaints. Buragino received negative feedback about Snyder's performance from Harris and Ford, (A424; A426; A415-416), who had the most regular interaction with Snyder, as well as from the Accounting Department and others. (A425; A457-458). Harris and Ford often had to complete the work she did not do. (A326).

Snyder first showed signs of serious performance problems in late 2002. Prior to that, however, she was slow to complete tasks because of her inability to use certain programs, such as Microsoft Excel, even though during her interview she had represented that she was proficient with the program. (A345-346). Snyder had to ask repeatedly for basic instructions for tasks she said she understood. (A345-346). Supervisors in the Melt Shop, including Em, Joslin and English, began to complain to Harris that Snyder was too slow and required too much assistance to competently execute her duties. (A345-346). By the latter part of 2002, Snyder also began to miss significant amounts of time at work (A340), and was no longer completing her duties. (A326).

### 1.    Snyder Was Counseled for Her Excessive Absences

Snyder's performance problems initially began with her attendance. (A340). She came to work late, left work early, and called off often. (A340). She also began to modify her schedule. (A356). Snyder's regular scheduled hours were from 7:00 a.m. until 3:00 p.m. However, Snyder "felt she would do better" working a 6:00 a.m. to 2:00 p.m. shift. (A356). Harris and Ford tried to be flexible in accommodating Snyder's scheduling requests and allowed her to alter the hours of her shift as she needed. (A356).

5

Snyder began to request time off in small blocks and would then request to make up that time during off-hours in the evenings and on weekends. (A356; A393-394). Snyder made such requests frequently, sometimes even daily. (A393-394). In fact, during the last six months of her employment, Snyder sent at least twenty-three e-mails to Harris and Ford changing her schedule.[1] (A172; A196; A197; A201; A292-293).

The requests were often complicated and difficult to monitor. For example, in one e-mail, Snyder wrote to Ford and Harris that,

> on Wednesday 1/15/03 I would like to take a lunch hr. from 11:00am to 12 noon, I will stay over an hour if that is okay.....that way I will still have 40 hrs., also the following day 1/16/02 I need to take a 40 minute lunch..at 11:45am till 12:30pm. Sorry to ask for 2 dys in a row, I hardly ever take a lunch at all, but I would like to for Wednesday and I need to for Thursday.

(A30) (punctuation from original). In a single e-mail, dated Thursday, August 22, 2002, Snyder: (1) note that she had come in early that morning to make up for the fifteen minutes she used when she left early the day before; (2) asked to leave early again that day to pick up her mother for an appointment; and (3) to take a long lunch the following Wednesday. (A22). In the same e-mail, Snyder wrote, "please keep in mind that I always try to schedule my personal errands" for after the end of her shift and, "I don't ask for much often." (A22). Snyder attempted to justify her actions by stating that she would only take off if "something important came up" and that she would make up the missed time by coming in early or staying late. (A304).

Snyder also missed an excessive number of regularly scheduled days. In 2002, Snyder missed a total of thirteen days for personal time off, not to mention the numerous schedule changes. (A39). This pattern continued into the new year, with Snyder missing two days in the first two months.

---

[1] During discovery, Snyder produced numerous documents purported to be e-mails she sent during her workday at CitiSteel, (A172; A196; A197; A201; A292-293), many of which also contain handwritten notes in the margins. Snyder testified that she printed the e-mails on April 9, 2003, the day before she walked off the job, and that she wrote the marginalia sometime thereafter. Defendant does not concede the validity or authenticity of these documents and preserves any possible objection to the admission of these e-mails as evidence and notes that several of the e-mails do not contain date and time stamps in the header text, indicating that they were never sent as implied by Snyder.

(A349-350).  At an average of one day absent per month, her unexcused absences  were excessive and were affecting her performance.  (A349-350).

Snyder frequently left the property during the middle of the workday.  (A36).  For safety purposes, supervisors needed to be able to account for the physical location of all employees at all times to ensure they had not been injured in the mill.  (A357).  Snyder made this difficult for Harris and Ford by sending a steady stream of e-mails marking her visits from one part of the mill to the other.

### 2.    Snyder Spent Time Wandering the Facility and Socializing with Other Employees

Often, when Snyder had not called off, had not left early or come in late, and had not left the plant property, she was socializing in other departments.  (A414).  Supervisors from other departments complained that Snyder spent too much time socializing in their departments and wasting time.  (A372).

Even when she was in her office in the Melt Shop, Snyder spent excessive amounts of time making personal phone calls.  (A354).  Supervisors complained that they could not get through to the Melt Shop because Snyder was always on the phone.  (A354-355).  Snyder admitted to the EEOC that she had made personal phone calls at work but felt that they were justified because she "would continue typing, filing, whatever [she] was doing" while on the phone.  (A104; A105).

Harris and Ford counseled Snyder several times about her attendance.  (A338; A339; A340; A353).  They hoped that the verbal counseling, as compared to a formal write-up, would motivate Snyder to improve.  (A337; A348).  A written discipline was a serious step and was not taken often nor lightly.  (A458; A429).

### D.    Snyder Was Disciplined for Her Continued Poor Performance

In February 2003, it became clear that Snyder had been unaffected by the verbal counseling she had received.  Ford and Harris agreed that a more formal disciplinary step was needed.  (A385-386; A344).  They discussed Snyder's performance problems and the steps they had taken to help her

7

improve.  (A343).  After deciding that a written warning was the appropriate course of action, Harris and Ford sought guidance from Buragino.  (A386).

### 1.    Ford, Harris, and Buragino Collectively Agreed that the Written Discipline Was Appropriate

To Buragino, the fact that Harris and Ford sought his help was strongly indicative of gravity of the problem.  Buragino testified that neither man was "the type to bring it to [Buragino's] attention unless [the problem] was very serious."  (A456-457).  Buragino explained that Harris and Ford "were pretty self-sufficient general supervisors," and, unless there was some need of [Buragino's] intervention or something that [Buragino] had to do to assist them, they generally wouldn't even bring it to [his] attention."  (A456-457).  That Harris and Ford, who's relationship was tenuous, had made the joint decision to seek Buragino's assistance, highlighted the severity of Snyder's performance problems.  Buragino knew that the situation had gotten "pretty bad," that Snyder "was not doing [her] job and that [her performance] was hurting them."  (A456-457).

However, to ensure fairness and impartiality, Buragino verified the veracity of Harris and Fords' complaints.  Buragino approached Carmella Patrone, to whom Snyder had been assigned to assist with inventory duties.  Patrone indicated that Snyder's performance was not good.  (A457-458).  This was in line with the increasing number of complaints about Snyder that Buragino had recently received.  (A455).

On Friday, February 28, 2003, Buragino, Ford and Harris met with Snyder to formally discuss the problems they had observed and that they expected her to correct.  (A39; A341-342; A427-428).  They reminded Snyder that, pursuant to CitiSteel policies, excessive absences, overuse of the telephone, and the overall poor quality of her work performance were each grounds for dismissal.  (A10-14).

Buragino memorialized the meeting and the issues that had been addressed in a disciplinary memo (the "Memo").  (A39).  He forwarded the Memo to Jerome Downie, the Director of Human Resources, for review.  (A430; A489).  The Memo addressed Snyder's attendance and performance

8

problems and stated that failure by Snyder to improve those issues would result in discipline, up to and including termination.  (A39).

### 2. Snyder Was Belligerent About the Discipline and Refused to Accept Any Responsibility for Her Actions

Buragino, Ford and Harris presented Snyder with the Memo, which Snyder refused to sign. (A179; A427-428; A347; A39).  Snyder refused to accept any responsibility for her actions and claimed that the Memo was filled with "nothing but lies."  (A180; A192; A234).  The intended message clearly did not reach Snyder.  She testified that she "wasn't worried about [being fired] because she knew she "wasn't doing anything wrong."[2]-  (A). (A194; A195; A307).

Obviously undeterred by the warning, Snyder e-mailed Harris and Ford the next morning and told them that if they needed her assistance, they needed to "let [her] know A.S.A.P.," because "a personal issue has came up" and she was "unable (sic) to stay no later than 3:00 p.m."  (A45).  Later that morning, she sent another e-mail to Harris, Ford, Blauvelt and Patrone.  (A44).  The apparent purpose of the e-mail is to organize a meeting about improving the inventory procedures.  She states, "I am not asking I am *demanding* that we get this under control."  (A44) (emphasis supplied).  Based on the tone of the e-mail, which was sent to her direct supervisors as well as to two other employees above her in rank, Snyder does not appear to have been motivated at all to improve her behavior by the Memo or the subsequent meeting.

### 3. Snyder's Attitude and Performance Deteriorated Shortly After She Was Disciplined

By all accounts, Snyder's attitude changed for the worse after she received the Memo.  (A466; A392).  She became defensive and uncooperative.  (A392).  She was confrontational and hard to get

---

[2] During her deposition, Snyder gave highly confusing testimony on this subject.  At first, she denied that any such meeting occurred on February 28, 2003.  (A189).  Subsequently, she testified that, although Buragino, Harris and Ford had indeed met with her on that date, they did not discuss any performance or attendance problems.  (A187-188).  Instead, they had called her in for a meeting because Downie caught her feeding a stray cat outside the personnel office and that the discussion during the meeting was limited to that incident.  (A186-187).  She claims that the portion of the Memo that states that they met with her to discuss more serious problems was incorrect.  (A188).  Finally, in a total about-face, Snyder testified that there had been a meeting on the 28th, that Harris, Ford and Buragino were in attendance, and that they had discussed her attendance and performance.  (A192-193).

along with. (A392). After she received the Memo on March 3, 2003, Snyder confronted Ford and

demanded to know the basis for the discipline. (A180-181). Snyder claims that Ford told her that "the

whole thing was Harris' idea."[3]    (A189; A163-164). Apparently ignoring the animosity that existed

between Ford and Harris, Snyder took Ford at his word and concluded that the disciplinary meeting

and subsequent Memo were based on false pretenses fabricated exclusively by Harris. (A181; A189;

A192; A194; A257; A198).

Armed with this information, Snyder "went storming to Mr. Harris" and yelled, "Why would

you [expletive] do that?" (A182). She described her tone as "hostile" as she "went screaming down

the hallway" and then "screaming into his office." (A308). Another supervisor was in Harris' office

at the time but that didn't stop Snyder as she demanded, "How dare you . . . try to have me written

up?" (A309). Snyder testified that she had no problem speaking up for herself when she thought that

Harris was behind the Memo. (A311-312).

Harris encouraged her to put the Memo behind her and to use it as a motivator for

improvement. (A365; A381; A387). Harris tried to respond positively to Snyder's accusations but

admitted that he found the confrontation to be quite upsetting. (A363; A364; A382).

Snyder was outraged. She subsequently told other employees, including Carmella Patrone,

Sam Lang, a furnace operator, and "several of the workers," that she was "mad" at Harris because she

believed he had fabricated the accusations in the Memo. (A305; A306). Lang observed that Snyder

became "obsessed for some time with the fact that she had been written up (A96), and, in April, left

him a voicemail saying that she "was going to get [Harris] for writing [her] up." (A97).

### E.    Snyder Was Aware of CitiSteel's Well Published Anti-Harassment Policy and Reporting Procedure

Sexual harassment is strictly prohibited at CitiSteel. (A551; A399). CitiSteel had a well-

established reporting procedure for employees who believed they had been subjected to unlawful

harassment. (A549-552; A205-206). Snyder testified that she received and reviewed a copy of the

---

[3] Harris apparently does not disagree. He testified that he believes that Ford, when cornered by
Snyder, probably did say that the Memo was entirely Harris' idea because of their tenuous
relationship. (A386-387).

CitiSteel employee handbook, which contained the anti-harassment policy, and that she signed the accompanying acknowledgment form when she was hired in 2001. (A203; A204; A205; A206; A15). Snyder further testified that she was familiar with the policy because "there is one of them everywhere." (A204).

Harris was also familiar with CitiSteel's sexual harassment policy. (A318; A323). In addition to the written policy, an earlier version of which was already in place when he started in 1990, (A318), Harris had also attended sexual harassment training. (A321-322). The training was held on-site at CitiSteel and was conducted by the Wilmington law firm of Richards, Layton & Finger. (A321-322). The on-site training focused on what constituted sexual harassment as well as how complaints should be handled under CitiSteel's procedures. (A322). In 2001, CitiSteel also provided Harris with tuition reimbursement for a management course he took at Delaware Technical Institute. (A367-368; A16). A portion of the class taught equal employment standards and included materials on how to prevent, identify, and eliminate sexual harassment in the workplace. (A317; A369).

      **F.**      **Snyder Accused Harris of Sexual Harassment Almost Immediately After She Received the Disciplinary Memo**

On the morning of April 8, 2003, exactly four weeks after she received the formal disciplinary memo, Snyder filed a formal complaint of sexual harassment against Randolph Harris. Snyder has provided varying explanations of why she made her complaint at this time.

During her deposition, Snyder testified that there wasn't any specific incident that triggered her to report the alleged harassment but that it was "just the right time," because Harris was not at work that day. (A214; A378). However, in her sworn statement to the EEOC, written in April 2004, Snyder explained that she actually decided to file her complaint on April 7, 2003, the day before she filed her complaint. She stated that her complaint was motivated by an incident where, "within a 27 minute period [Harris] ate 7 cough drops" from a bag of cough drops on her desk "like it was candy." (A109). Snyder testified that this incident made her "really, really angry," (A171-172), and that she expressed her "hatred" by "slamming the bag on the desk" and "telling him to get out of [her] office." (A277).

11

Snyder testified that she called the Equal Employment Opportunity Commission ("EEOC") after the cough drop incident on April 7th to inquire about "the proper steps" for reporting a claim of harassment. (A231). Describing her conversation with the EEOC agent, Snyder testified:

A. . . I was scared and nervous.
Q. Because you were going to report him?
A. Mm-hmm.
Q. I thought you didn't decide to report him until April 8th?
A. No, I knew it was coming. I knew it was coming. (A232).

### G.    CitiSteel Received Snyder's Complaint In Accordance with Its Policy

At 11:45 a.m. on the morning of April 8, 2003, Snyder told Ford that she was "having trouble with Randolph Harris" and she thought she was being sexually harassed. (A49; A214). She alleged four occurrences or types of conduct she claimed constituted sexual harassment: (1) Harris told her that he had feelings for her; (2) he stroked the side of her face; (3) touched her hair; and (4) on one occasion, he asked her to wear a dress with no underwear to work. (A49).

Ford indicated that the allegations were out of line with Harris' character and that he found them hard to believe. (A214; A215; A213: A459; A508; A84). Snyder told him that she had made a tape recording of a conversation with Harris that was sexual in nature. (A49). She also said that she kept a daily log detailing the allegations and providing exact dates for each occurrence. (A49).

### 1.    Snyder's Complaint Was Reported to HR Immediately

Ford told her that, in accordance with CitiSteel's sexual harassment policy, he was required to turn the information over to Buragino and Jerome Downie, the HR Director, for further investigation. (A214; A49). Snyder acknowledged that Ford followed CitiSteel policy by reporting the allegations. (A213; A215).

Snyder returned to the Melt Shop and Ford called Buragino. (A49; A57; A432-433). Pursuant to CitiSteel's policy, Buragino called Downie to apprise him of the situation. (A57; A432-433; A434; A215). After listening to Buragino's summary, Downie said that they would need to meet with each of the parties, notify management and conduct a full investigation. (A435; A472-473). At

12

Downie's direction, Ford documented what he had observed and then called Snyder, asking her to meet them in the HR office at 1:30 p.m.  (A49; A57; A216; A219).

> **2.  Snyder Met With the Director of HR, Who Took Her Complaint Seriously and Assured Her that It Would Be Promptly and Properly Resolved**

Downie had devoted his entire career to the practice of human resources management. (A519).  With thirty years of HR experience, Downie understood the gravity of Snyder's claims and initiated a thorough and impartial investigation immediately.  (A512-513; A451).  Downie recognized that claims of harassment are very personal and very emotional and that it is best for all involved to resolve the matter without delay.  (A512-513).  Downie dropped what he was doing to investigate Snyder's allegations, as did the rest of the management team involved in the investigation.  (A512-513).

Snyder arrived at the HR Office at 1:55 p.m.  (A216; A57).  Downie told her that Ford had informed them of her complaint and that, pursuant to the policy, they would need to investigate the claims.  (A57).  They asked her to tell them what had occurred.  (A217; A435).  Snyder repeated the allegations she had communicated to Ford earlier in the day.  She told Downie and Ford that Harris had occasionally touched her face or her hair, that he had expressed an interest in her, which she rebuffed, and that he asked her to come to work without underwear.  (A57).  She said that this behavior had been going on "for months," that she was familiar with the company policy on harassment, and that she knew she should have reported it sooner.  (A57).

Downie asked Snyder to put her allegations in writing.  (A162-163; A217; A248; A473; A435; A57-58).  At first, she was hesitant.  (A57).  She said that she kept a diary that documented the events but that it was at home.  (A57).  Snyder wrote a two-page summary of her allegations and was given a copy.  (A57; A53).  Her statement contains the same allegations she had asserted earlier in the day to Ford and had repeated for Downie and Buragino. She wrote that Harris had rubbed her cheek, run "his hand down [her] hair," told her she was pretty, asked her out many times, stared at her "with this little smirk," and asked her to come to work wearing a dress with no underwear.  (A53).  Snyder

continues to maintain the accuracy of her written statement and asserts that her statement would have been the same if she had been under oath at the time she wrote it.  (A217; A245).

Snyder testified that Downie believed her and that he "gave her the benefit of the doubt." (A220-221; A246-247).  Similarly, Buragino testified that he believed Snyder's story and that he gave her the benefit of the doubt as they moved to investigate.  (A439).  Snyder had no doubt that Downie would handle the situation professionally.  (A221-222).  Similarly, Buragino recognized that Downie would handle the investigation very professionally and in accordance with CitiSteel policies.  (A451). Downie followed policies as quickly and as closely as possible.  (A441).

### 3.      Snyder Told Downie She Had Evidence to Support Her Claims and Then Spoke About the Disciplinary Memo

She indicated that she had discussed her allegations with other employees, though no one had witnessed any of the alleged behavior.  (A57).  She told Downie and Buragino that she had evidence to prove everything in her statement.  (A228-229; A477).  She claimed to have a tape recording on which Harris apologized for bothering her.  (A57; A245; A246; A247).  She also said that she kept a diary, in which she had documented all of the "events of her life" and which contained exact dates of the alleged behavior.  (A57; A245; A246; A247).

When Snyder again mentioned the tapes, Downie told her that, at that point, he did not need to review her evidence.  (A478-479; A247).  Downie explained that he preferred to first meet with the parties face-to-face before reviewing any physical evidence.  (A478-479).  He was especially concerned about the authenticity of the tapes because there was no way for him to verify the voices or to know whether parts of the conversation were not taped or even whether the tape had been altered. (A478-479).

Notably, Snyder also raised the subject of the Disciplinary Memo during the meeting.  (A57). She said that she did not agree with the Memo and that her job performance had been satisfactory at all times.  (A57).  And, though she was angered by the "lies" in the Memo, she said that she did not want Harris to be fired or hurt in any way.  (A57; A118; A465; A302-303).  She said that she wanted Harris

14

to admit to her allegations and that, as long as the behavior stopped, she would be satisfied and would not pursue it any further.  (A57; A436-437).

They told her that "relocation" was one possible resolution but she answered that she did not want another job.  (A57).  She said she liked her job and her "dusty little office."  (A57).  She indicated that she would not be uncomfortable working near Harris.  (A57; A480).  Downie concluded the meeting and told Snyder that her allegations would be given the highest priority for investigation and that the matter would be taken very seriously.  (A481; A58; A221-222).  Downie told her that he would contact her with further developments.  (A474).  It was the end of her workday so Snyder left the property and went home.  At the end of the meeting, Downie had many questions but had not formed any conclusions.  (A476).

### 4.    Downie and Buragino Questioned Harris Within Hours of Snyder's Complaint

After his meeting concluded with Snyder, Downie called Harris, who was off for the day, and told him to report to work immediately.  (A481).  Harris' first thought was that there had been an injury or a fatality at the plant.  (A378).  While waiting for Harris, Downie and Buragino again met with Ford and asked him to document the facts from the morning setting out what Snyder had alleged.  (A434; A49).

Harris arrived at 3:45 p.m.  (A377; A438-439).  Downie confronted Harris with Snyder's allegations.  (A482; A48).  He asked Harris whether he had harassed Snyder in any way.  (A482).  Harris emphatically denied any inappropriate behavior, (A482; A48), but Buragino and Downie continued to grill him about Snyder's claims.  (A439-440; A58).  They made it very clear that Harris needed to be completely straightforward and honest with them and demanded that Harris "come clean" by telling them everything he knew.  (A440; A58).

They asked Harris repeatedly whether his relationship with Snyder had ever been anything but professional. (A58; A48).  They also told him that Snyder did not want him fired but that she did want him to admit what he had done.  (A58).  Harris continued to deny that he had done anything to harass Snyder and that he had never so much as implied that he had any feelings for her.  (A58; A48).

15

Harris tried to think of any incident that could explain the "dress with no underwear" accusation. He told Downie and Ford that Snyder had once told him that she was going to a "boga party."[4] (A). (A383). He asked her what a "boga party" was and she told him it was a party where everyone wears a sheet with no underwear.[5]- (A520-521). He remembered that she had become "visibly upset" once when he raised his voice about her job performance. (A58). Further, Harris told them that Snyder had been angry with him because of his participation in writing her up for poor attendance and performance. (A48).

Harris described feeling as if he had been "raped" when confronted with Snyder's allegations. (A390; 379). Harris felt that he had been "robbed of [his] character," and that his integrity and credibility had been called into doubt. (A390; A479).

Downie concluded the meeting with an instruction to Harris to keep the matter confidential and to use care in communicating with Snyder until they could meet with her again. (A48). The meeting ended after approximately forty-five minutes, shortly after 4:30 p.m. (A59; A48).

Downie then met with Warren Beiger, the President of CitiSteel, to inform him of the situation. (A482-483). Beiger and Downie agreed that Downie would meet with Harris again, this time off-site, in the hopes of getting more information. (A517; A518).

Downie called Harris and asked him to meet him at a local restaurant to discuss the allegations. (A389-390). At the restaurant, Downie asked Harris whether he had ever been romantically or physically involved with Snyder or whether the two had even been out together in public. (A390). Harris maintained that Snyder's allegations were entirely false and insisted that he had never had anything other than a professional relationship with Snyder. (A390). Downie was very direct with Harris and told him that if his denial was found to be untrue in any way, he would be

---

[4] Presumably, Snyder was talking about a "toga" party, though Harris was unfamiliar with the reference. (A379-80).

[5] Snyder made a similar comment to two visiting vendors. Max Smith, one of the vendors, testified that Snyder had approached him and a colleague while they were waiting for a meeting in the Melt Shop and invited them to a toga party. (A520-521). Mr. Smith, who had previously witnessed Snyder confronting other employees in a hostile and aggressive manner, felt that her question was inappropriate in a work environment. (A520-521).

16

terminated immediately.  (A509-510).  Harris again denied any inappropriate or unsavory conduct.

(A509-510).

5.    **Snyder Had a History of Making Unfounded Claims and Wild Accusations**

Later that evening, Harris sent an e-mail to Downie in which he responded in more detail to

Snyder's allegations.  (A50-51).  Harris stated that he had never been out with Snyder.  (A50-51).  He

said that he had called her at home no more than three times, each for work related reasons, and  that

he had not called her in at least a year.  (A50-51).  Harris also noted that this was not the first time

Snyder had been at the heart of workplace controversy nor was it the first time Snyder had made wild

accusations.  (A50-51).

Harris reminded Downie of a previous incident involving unconfirmed allegations made by

Snyder.  (A50-51).  In late 2002, Snyder called Harris from the CitiSteel parking lot and alleged that

someone had put a piece of tape on her car bumper.  (A298; A50).  She alleged that someone had

written, "Honk if you want to bonk me" on the tape.  (A297; A298; A358).  Harris investigated but

was not able to determine what was written on the tape  or even if had been put on her car before or

after she entered CitiSteel property for work that morning.  (A358; A361-362).  Harris turned the

information over to HR. (A360).  Downie arranged to get Snyder a reserved parking space near the

guard shack so the guards could monitor her car.  (A361).  Snyder refused the offer.  (A361).

Snyder had once complained to Harris that there was spray painted graffiti on a CitiSteel

building that made a  lewd reference about her.  (A359; A431; A50).  Again, Harris investigated but

no graffiti was ever found.  (A359).  In accordance with company policy, Harris turned the complaint

over to Downie.  (A359).

Finally, Harris reminded Downie of an incident when Snyder had left a voicemail message for

Ford saying that she would not be coming to work because she was at a motel with her boyfriend.

(A50).  Ford thought the message sounded sexual in nature so Harris and Ford forwarded the message

to Downie.  (A50; A412).

17

Downie recalled another accusation by Snyder, who complained that someone had been leaving her explicit voicemails. Harris and Ford had again involved Downie, who listened to the voicemails she had saved. (A492). The voicemails were so inaudible that Downie was not able to determine if the caller was a male or female, much less determine whether the messages were inappropriate in any way. (A492; A50). In addition to this history of unusual claims, Snyder had only recently been written up for her serious performance problems. (A50).

### 6. Downie, Buragino and CitiSteel President, Warren Beiger, Met to Discuss Possible Options

On April 9, 2003, at 9:15 a.m., less than twenty-four hours after Snyder made her complaint, Downie, Buragino and Warren Beiger, the President of CitiSteel, met to discuss the status of the investigation. (A55; A59; A483). They reviewed the facts as alleged by Snyder, as well as Harris' denials. (A55). They acknowledged that, as Snyder admitted, there were no witnesses to corroborate her claims. (A55; A483-483)

They summoned Harris to Beiger's office and gave him a final opportunity to "come clean." (AA380; A500-501). They asked him if he had thought of any additional information or facts since he had last spoken with Downie. (A380). Harris said that he had told Downie everything. (A380). They cautioned him that he would be discharged immediately if any evidence was discovered to the contrary. (A380). They told him that Snyder had tapes of her conversations with Harris but he remained firm in his denials. (A380). Harris was dismissed from the meeting and returned to work. (A380; A500).

The management team considered the credibility of both individuals. Harris, who had been with CitiSteel for thirteen years at the time, had an unblemished record and had never been the subject of a single discipline or complaint. (A385; A454-455; A508-509). Snyder, on the other hand, had a "history of wild claims and strange behavior." (A55). Further, there was great concern about Snyder's possible motives, especially given the fact that she brought up the Disciplinary Memo during her meeting with Downie and Buragino. (A55).

18

Given that Snyder's allegations could not be confirmed, they discussed possible options for a resolution.  (A59; A497-498; A444-445).  One option was to ask Snyder for additional information and to ask her to bring in the tapes and any other evidence she had for their review.  (A59; A486; A442).  They also discussed the need to remove Snyder from her current work environment.  (A59; A451-452; A442).  Pursuant to company policy, the alleged victim must be separated from her alleged harasser to ensure that she no longer felt harassed or threatened.  (A451-453).

Beiger told Downie and Buragino that the Clerk/Typist position in the Melt Shop was going to be eliminated and those duties would be reassigned  (A55; A444; A447; A498-499).  This was part of a widespread effort towards increased automation and efficiency resulting from a series of layoffs and plant closures CitiSteel had recently experienced.  (A55; A373; A498-499).  Similarly, when the Clerk/Typist in the Maintenance Department resigned, she was not replaced as a way to reduce costs.  (A373).  The duties were absorbed by another Clerk/Typist or a supervisor.

The duties of the Clerk/Typists were fundamentally the same in all departments.  (A334; A396; A398; A511).  Regardless of the department, the position involved the same duties—supervisors gave the Clerk/Typist certain data and the Clerk/Typist typef the data into a pre-defined format.  (A329; A331-332; A397).  The format was the same across all of the departments, only the data being entered was different.  (A330; A331; A406-407).  The Clerk/Typists in the Shipping Department and the Melt Shop were responsible for answering the phones, filing, typing memos, sending faxes, and communicating with employees.  (A396).  The Clerk/Typist could transfer between departments with virtually no training.  (A332-333).

The Management Team considered that Snyder's current position would likely be eliminated, requiring her to either transfer or be subject to lay off.  They also considered the need to remove her from a potentially threatening work environment.  In light of these factors, the management team decided that one viable resolution was to transfer Snyder to the position in Shipping.  (A55; A59; A486-487; A496-97; A448).  The Clerk/Typist position in the Shipping Department had been vacant for approximately a week and had not yet been posted.  (A407-408; A99).  The position in Shipping paid the same salary, had the same benefits, and was on the same shift.  (A510-511).

19

Unlike the transferable skills of the Clerk/Typists, Harris was not a modular employee.  His skills were highly specialized, having devoted his entire career to the processes involved in reformulating steel.  (A390-391).  There were no other positions that involved the skills or experience Harris had developed.  (A390-391).  To make him a supervisor in any other department, especially Shipping, would have been an incredible waste of resources and talent.  (A390-391).  Harris could stay in his role or be terminated, but transfer was not a viable option.

At the conclusion of the meeting, Downie, Buragino and Beiger agreed that Downie would review Snyder's tapes and diary.  (A486; A444).  If her evidence supported her claim, they would meet again to determine the next step.  (A484-485).  If her evidence did not support her claim, they would give Snyder the option to transfer to the Shipping Department.  (A484-485; A514).  Immediately after the meeting, Buragino and Downie met with Brett Weiss, the General Supervisor of the Shipping Department and told him that he would be gaining a second clerk and she would be starting right away.  (A59; A55).  They then called Ford and told him they needed to meet with Snyder in the HR Office.  (A59).  Downie told James Ryan, the Safety Manager, about Snyder's allegations and asked Ryan to be present as a witness during the meeting.  (A401-402; A409).

### H.    Snyder Refused to Cooperate in the Investigation Or Even Consider a Transfer to an Equivalent Position

Snyder arrived for the meeting on April 9, 2003 without any tapes or other alleged evidence.  (A55).  Immediately, Snyder demanded to know why Harris was not there.  (A251).  Snyder accused Downie of being a "liar" because she had not been present when he met with Harris.  (A220-A225).  Snyder claimed the investigation was a fraud, conducted by "a bunch of liars," because they did not allow her to confront Harris in person.  (A86).  She testified that she wanted to be present because, "I like to watch people lie, because I know that's what he's going to do."  (A218)

### 1.    Snyder Refused to Even Consider the Offer to Transfer

As decided in the management meeting, Downie offered Snyder the position in the Shipping Department.  (A250; A251; A255; A443).  Downie told her that the transfer would not affect her salary.  (A278-279; A89).  Snyder immediately rejected the offer.  (A254; A115; A404; A412).  She

got angry and demanded an explanation. (A251-252). Downie explained that, where two parties are employable but cannot function in the same work environment, the best course of action is to separate them. (A505-506). The transfer would enable Snyder to avoid having to share a physical environment with her alleged harasser. (A400; A403-405; A496-497).

Snyder insisted that she be allowed to return to the Melt Shop. She demanded that she work only for Ford. Downie told her that reporting to only one of two supervisors did not solve the problem of sharing a workspace with Harris. (A230; A251-252).

Downie told her that he had instructed Harris to never look at or speak to Snyder again. (A274-274; A88). According to Snyder that Downie did this for her protection because he believed her claims. (A274-275). Downie suggested she at least visit the Shipping Department, take a tour and talk to the employees before she rejected the idea. (A503). Again, Snyder refused. (A503). Downie told her that if she took the transfer but was truly unhappy with it, she could transfer again to a different department. (A504-505).

## 2. Snyder Threatened Downie that She Would Consider the Transfer Only if "He Gives Her What She Wanted"

Once she realized that returning to work in the the Melt Shop was not an option, Snyder's attitude became hostile. Snyder announced that she would not accept the transfer unless Downie gave her "what she wanted." (A114). First, she demanded that the Disciplinary Memo be removed from her file. (A234; A163). Second, she insisted that she be given a handwritten statement, signed by Downie and Harris, detailing the reasons for her transfer. (A234-235; A163; A257). Downie declined, explaining that the reasons for a transfer is never documented. (A505). It would not be in compliance with company policy to document the reasons for a transfer. (A507).

Snyder told him that she "would give him what he wants" only if "they give [her] what [she] wants." (A235; A257). Downie suggested that she go home and sleep on the idea. Snyder responded that *he* should go home and think about it, that she had nothing more to think about. (A235; A255-256). Snyder believed that CitiSteel had not properly investigated her complaints because Downie and Ryan are "liars and bad people." (A118).

21

. Snyder was "loud" and "not in control of herself." (A55). She was "waving her arms and criticizing" Downie and Ryan in a "crude way." (A55). She refused to listen to Downie and appeared to be having a "temper tantrum." (A455). Downie felt that she was trying to provoke him or bait him into terminating her. (A490-491).

Downie tried to diffuse the situation. He told Snyder that she could take the rest of the day off with pay and that she should go home and consider the transfer offer. (A232-235; A494-495; A507; A56). Downie asked her to report directly to his office when she came to work the next day. (A236-237; A265; A270). Snyder asked him if she should come dressed for work and Downie responded in the affirmative. (A258). Snyder then left the HR Office.

Shortly thereafter, Downie learned that Snyder was in the Finance Department talking to Carmella Patrone. (A55; 129-30; 515-16). Downie pulled Snyder aside and asked her to not be disruptive in the workplace and to remember the need for confidentiality. (AA493-94; 516). Snyder agreed to go home and left for the day. In fact, as CitiSteel later learned, Snyder proceeded directly to the EEOC office in Philadelphia, where she called the night before, and filed her Charge of Discrimination. (A84).

### 3. Snyder Never Produced the Tapes Or Any Other Evidence She Claimed Existed

Later that day, Downie called Snyder at home and asked her to bring her tapes and other evidence to their meeting the next day. (A119; 82; 486). Snyder agreed. (A82). However, when she arrived at the HR Office on the morning of Thursday, April 10, 2003, she did not bring the tapes. She claims that she did not bring the tapes because "they were liars" and "they could not be trusted with the only set of evidence." (A128; 490; 502-03). Instead, she brought a new tape recorder, which she used to secretly record the meeting. (A131; 83; 502-503).

Snyder testified that when she walked into the office, she noticed a "big pile of papers" on a table and she "assumed they were getting rid of [her]." (A252-53; 258). Snyder did not say why she drew this conclusion other than, "I just did." (A92).

Snyder admits that she did not provide CitiSteel with any evidence to support her allegations. (A92). Because of her refusal to provide any of the alleged evidence, Downie determined that the investigation was complete. (A92; 503-04). He concluded that the sexual harassment claim could not be substantiated, (A94), and that the two parties had to be separated. (A503-04).

At the start of the meeting, Snyder put her tape recorder on the table and began recording the discussion. (A83). Downie asked her to it turn off. (A267). At first she refused. (A490-91). Then she "pretended" to turn it off but turned it back on and continued to tape the meeting without Downie's or Ryan's knowledge or permission. (A267-69; 127-18; 131-32). Later in the meeting, Downie asked if he was still being recorded.. (A269). Snyder admitted that the recorder was still on but refused to turn it off.

Snyder was belligerent. (A490-91). She was combative, loud and insulting. (A515; 502; 490). She continuously interrupted and spoke over Downie as he tried to talk. Snyder repeatedly asked whether she was being fired, which Downie believed was an attempt to provoke him to terminate her. (A515; 503). She demanded that she be allowed to return to her job in the Melt Shop. (A405-06; 411).

Through all of this, Downie tried to remain calm and discuss the proposed transfer with Snyder. (A482). Without raising his voice, he explained that the position in Shipping was an equivalent job, that it paid the same, had the same duties, and would serve to separate her from Harris. (A515; 411). He also explained that it was the only available position, (A411), and that she could not return to the Melt Shop where she would be sharing a physical work environment with Harris. (A83). Downie even offered to remove the Disciplinary Memo from Snyder's file. (A488; 91; 83). Snyder rejected the compromise and demanded a signed admission of wrongdoing from Harris before she would consider the transfer. (A83).

Snyder indicated that she was being transferred only as a prelude to termination and that many employees have "disappeared" after disputes with Harris. (A83). She inquired if she was being asked to leave the premises. (A82-83). Downie stated that, if she refused to consider the position in Shipping, she should leave the property. (A549-551).

23

## ARGUMENT

## I.    SNYDER CANNOT ESTABLISH THAT SHE WAS SUBJECT TO A HOSTILE WORK ENVIRONMENT

In order to establish a claim for a hostile work environment under Title VII, the plaintiff must establish: (1) that she suffered intentional discrimination because of her sex; (2) that the discrimination was pervasive and regular; (3) that the discrimination detrimentally affected her; (4) that the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior.  See Weston v. Pa., 251 F.3d 420, 425-26 (3d 2001).  In short, an actionable hostile work environment requires proof that Snyder was subjected to a level of gender-based harassment which was "severe or pervasive" enough to create a working environment which is both subjectively and objectively abusive or hostile to female employees.  Snyder's sexual harassment claim against CitiSteel fails because the alleged conduct on which she bases her claim; (1) was not severe or pervasive enough to alter the conditions of her employment or create an abusive working environment; and (2) there is no basis on which to impose respondeat superior liability.  Consequently, summary judgment should be granted on Snyder's claim of gender discrimination.

### A.    Snyder's Allegations Are Not Sufficiently "Severe or Pervasive"

The existence of a hostile work environment is determined by examining the totality of the circumstances.  Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990).  Such circumstances may include "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it reasonably interferes with an employee's work performance.  Maurizio v. Fox Chapel Foods, Inc., 02-041168, 2006 U.S. Dist. LEXIS 62926, at *22 (W.D. Pa. Sept. 5, 2006).  The conduct "must be extreme to amount to a change in the terms and conditions of employment."  Id. (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998)).  The case law requires the plaintiff "to have been subjected to continued explicit propositions or sexual epithets or persistent offensive touching to make out a hostile environment claim."  Miller v. Aluminum Co. of Am., 679 F. Supp. 495, 501-502 (W.D. Pa. 1988), aff'd 856 F.2d 184 (3d Cir. 1988).

In order to evaluate Snyder's allegations, it must first be determined what exactly she has alleged. Snyder, however, has changed her allegations countless times. (A549-52) Snyder has claimed that the harassment started on her "second day of work," when Harris said "he would have to take [her] out for a beer sometime," which implies that she was subjected to a hostile environment for a year and a half, from August 2002 through April 2001. (A281). However, Snyder also testified that she did not start to "feel harassed," or "know for sure" that she was being harassed until the middle or end of 2002, which implies that she was harassed for between five and ten months. (A464-65; 281; 201).

Because summary judgment requires all inferences to be drawn in the light most favorable to Plaintiff, Defendant will presume that Snyder's initial statement to Ford, her written statement to CitiSteel, and her Charge of Discrimination reflect the most accurate descriptions of the conduct she alleges constitute harassment. When combined, these three documents allege the following conduct as the basis for Snyder's claim of hostile environment: (1) Harris told Snyder to wear a "dress with no panties;" (2) Harris stroked Snyder's cheek; (2) Harris touched Snyder's hair; (3) Harris stared at Snyder; (4) Harris "smelled" Snyder; and (5) Harris asked Snyder out. Even when considered in the aggregate, Snyder's allegations fail to meet the level of hostility required for a finding of gender discrimination.

### 1.    Snyder's Allegations, Especially in Light of the Working Environment, Are Not Objectively Severe and Pervasive

Once all of the iterations of Snyder's stories have been merged, even Snyder's worst allegations do not rise to the level of severity necessary to establish a claim of hostile work environment.

Of all the allegations, the "dress comment" is the most objectionable and even this does not withstand the required test of severity. Snyder claims that Harris walked into the office, made the comment, laughed, and then "dashed out." (A103; 173). Harris was four to five feet away from Snyder at the time. (A288). And, although she "wanted to tell him to shut up," (A288), she did not have the chance because he hurried out of the office "so he could get away from [her]." (A294).

25

Snyder alleges that the comment was made only once, (A294), and that she didn't think Harris could "be that stupid" to think Snyder would actually comply.  (A291).

In Mendoza v. Borden, Inc., the Eleventh Circuit affirmed judgment as a  matter of law for the employer under much more offensive conditions. 195 F.3d 1238, 1243 (11th Cir. 1999) (en banc), cert. denied, 120 S. Ct. 1674 (2000).  In Mendoza, the court held that the plaintiff's testimony that her supervisor made sniffing noises while looking at her crotch, followed her constantly, stared at her, and rubbed his hip against hers while touching her shoulder and smiling did not describe conduct severe or pervasive enough to constitute sexual harassment.  Id.

Snyder's next allegation, that Harris "sniffed" her, did not involve any physical contact or threats.  This allegation, therefore, is insufficient to establish a hostile work environment.  The only physical contact alleged by Plaintiff is that, on a single occasion, Harris "stroked" her cheek and that he had touched her hair.  (A103). Again, Snyder makes no suggestion that this conduct rose to level of a physical threat.  The absence of any physical threats to the plaintiff weighs heavily against a finding of severe and pervasive conduct.  See  McGraw v. Wyeth-Ayerst Labs, Inc., No. 96-5780, 1997 U.S. Dist. LEXIS 20813, at *4-5 (E.D. Pa. Dec. 30, 1997), aff'd by 2004 U.S. App. LEXIS 20592 (3d Cir. 30, 2004) (finding that allegations that plaintiff was subjected to unwelcome kissing, touching and constant requests for a date were not sufficiently severe or pervasive, granting summary judgment to defendant).  Additionally, as was the case in Mendoza, here, Snyder does not claim that Harris ever said anything to her during what she perceived to be the sniffing, nor the looking up and down. Mendoza, 195 F.3d 1243.  The court found this set of facts indicated that the plaintiff's workplace was not objectively severe or pervasive.  Id.

Snyder's final allegation is that Harris would "stand around staring" at her and would tell her "how good [she] looked."  (A284; 53).  Again, these allegations are plainly insufficient in the eyes of the law.  Staring, without more, does not make the workplace objectively intolerable.  In Mendoza, the alleged conduct involved staring at the plaintiff and looking at her in a sexually suggestive manner. 195 F.3d 1243.  This alleged behavior was insufficient to withstand summary judgment.  See also Adusumilli v. City of Chicago, 164 F.3d 353 (7th Cir. 1998) (affirming grant of summary judgment

26

where the alleged harassers repeatedly stared at the plaintiff's chest, plaintiff was the brunt of sexual

jokes, and on four occasions defendants made unwelcome contact with her arm, fingers and buttocks

were not sufficiently severe or pervasive).

      Comments that a plaintiff was "'looking pretty good,' may breach customary workplace

etiquette but do not rise to the level of severity required" for a claim of hostile environment.

Stephenson v. City of Phila., C.A. No. 05-1550, 2006 U.S. Dist. LEXIS 43998, at *33 (E.D. Pa. June

28, 006).  Far less complimentary statements have been found not to create an intolerable work

environment.  For example, in Garone v. UPS, use of the terms "office bitch," "Brooklyn bimbettes,"

and others, were neither severe, nor physically threatening, nor did it interfere with the plaintiff's job

performance. 436 F. Supp. 2d 448 (E.D.N.Y. 2006).

      Objective severity of harassment should be judged from the perspective of a reasonable person

in the plaintiff's position, considering 'all the circumstances.'"  Oncale v. Sundowner Offshore Servs.,

523 U.S. 75 (1998).  Such circumstances must include the background of the "social context in which

particular behavior occurs."

      For example, in Gross v. Burggraf Construction Company, the Tenth Circuit rejected a female

construction worker's hostile environment claim. 53 F.3d 1531 (10th Cir. 1995).  The court pointed

out that, in "the real world of construction work profanity and vulgarity are not perceived as hostile or

abuse."  Id. at 1542.  Here, it is the backdrop of the blue-collar environment of a steel mill that must be

"carefully considered" in evaluating Snyder's claim.  Id. at 1538.  And, it is wholly appropriate to

consider Snyder's "use of crude language herself while on the job."  Id. at 1542.

     **2.**      **Snyder's Allegations, Especially In Light of Her Responses, Are Not
Subjectively Severe or Pervasive**

      Snyder's behavior following the alleged dress comment demonstrates that Snyder was, in fact,

not subjectively harassed.  Snyder stated that, sometime after Harris "dashed out" of the office, he

"took me in Ford's office . . . to confirm me working Saturday, 1/11/03.  Ford said okay with him."

(A28; A289-90).  Then, after Ford approved the Saturday shift, Snyder sent an e-mail to Ryan, the

Safety Coordinator, copying Harris and Ford, to notify them of a loose floor tile outside her office.

(A28).  Snyder was not so subjectively distressed by the alleged comment as to even consider not working that Saturday, nor did the comment stop her from stepping outside of her chain of command to address a suddenly urgent floor tile problem.

Additionally, Snyder's handwritten notes on the bottom of the e-mail also indicate that, while she may not have appreciated the comment, she was, by no means, subjectively bothered by it to the point that it was "physically threatening or humiliating."  Snyder wrote:

> . . .that mother fucker is lucky I don't yell at him as his ass flying down the hall . . . he would shit if I did that w/someone else in there office . . . he would so scared thinking I am going to yell/tell the shit he says & does. (A28) (spelling and punctuation from original).

Two days later, on Friday, January 10, 2003, Snyder was back to standard operating procedure.  She e-mailed Harris and Ford that she wanted to take a two-hour lunch break the following Wednesday and stay late to make up the time and, on the following Thursday, she "need[ed]" to take another long lunch.  (A30).  The next week, Snyder sent another e-mail to Harris and Ford and, in all capital letters, writes:

> REMINDER.....SINCE I HEARD NOTHING BACK FROM THE BOTH OF YOU I AM ASSUMING IT IS OKAY FOR ME TO TAKE THE LUNCH HR. I REQUESTED W/CARMELLA...ONLY SHE WANTS TO GO AT 11:30 – 12:30

(A).  Such evidence precludes a finding that Snyder was subjected to "intolerable working conditions."  This conclusion is consistent with Snyder's repeated testimony that she was "not scared," (A469; 95; 535), of Harris and that she had no problem "confronting" him.  (A467).

Perhaps most indicative of Snyder's subjective tolerance for the alleged conduct was her response when asked about emotional state during her employment.  When asked whether she was depressed while employed at CitiSteel, Snyder replied, **"No. I had no reason to be depressed."** (A313).

Thus, Snyder cannot establish the subjective element required for a finding of a hostile environment.  Stephenson v. City of Phila., C.A. No. 05-1550, 2006 U.S. Dist. LEXIS 43998, at *36 (E.D. Pa. June 27, 2006) (granting summary judgment for employer where plaintiff, who did not present evidence of psychological injuries, had failed to demonstrate the requisite subjective

28

detrimental effects).   Though Snyder may have been annoyed or even angered by what she perceived, her reactions make clear that she never experienced the  intolerable conditions that form the foundation of any hostile environment claim.

### 3. Snyder's Vague and Evasive Descriptions of the Alleged Harassment Further Weakens Her Claim

Snyder is unable to point to the details of any of her allegations with specificity or detail as to the time or the nature of the alleged behavior.  Snyder either cannot recall any details or, the details she can recall, she contradicts in subsequent testimony.  (A523).  She is "unable to recall" when the alleged incidents occurred.  Her claims that Harris touched her hair "every single day," or sniffed her on a "daily basis" cannot be used to prove a hostile environment claim.

Earlier this year, the Third Circuit explained the requirement that a plaintiff be able to testify with specificity about the nature and number of occurrences.  Taylor v. Brandywine School District, No 05-4803, 2006 U.S. App. LEXIS 24643 (3d Cir. Sept. 29, 2006).   In Taylor, the court found that the plaintiff's "testimony on this topic is too vague" to infer discrimination.  Id.  The court cited the plaintiff's inability to recall specific dates of the alleged incidents as strong support for the defendant. Id.

Similarly, in Stephenson, the court would not "credit [Plaintiff's] unsubstantiated allegations that discriminatory treatment occurred 'all the time.'" 2006 U.S. Dist. LEXIS at *32 n.2.  Simply put, the Court is not required to ignore numerous holes in Plaintiff's story nor the fact that Snyder's testimony has changed dramatically over time.  Where "no reasonable juror could give credence to Plaintiff's testimony," the conduct alleged need not be considered.  Lisbon v. United Nat'l Group Ins. Co., C.A. 03-6207,2006 U.S. Dist. LEXIS 6676, at *19 (E.D. Pa. Feb. 21, 2006) (internal citations omitted).

## II.    SNYDER CANNOT ESTABLISH THE EXISTENCE OF RESPONDEAT SUPERIOR LIABILITY

To prevail on her hostile environment claim, there must be a basis from which to hold the employer liable for such conduct.  This analysis is dependent on whether (1) the alleged harasser was the plaintiff's supervisor; and (2) whether plaintiff suffered a tangible employment action.  If, as is the

case here, the alleged harasser is plaintiff's supervisor, and plaintiff has not suffered a tangible employment action, the employer will be liable for harassment unless it can prove (1) that it exercised reasonable care to prevent and promptly correct any sexually harassing behavior; and (2) that the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise.  Faragher v. City of Boca Raton, 524 U.S. 775, 807-808 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998); Cardenas v. Massey, 269 F.3d 251, 266 (3d Cir. 2001).

### A.    CitiSteel Exercised Reasonable Care to Prevent and Correct Harassment

A defendant satisfies the first prong of Ellerth/Faragher defense by demonstrating that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior.  Ellerth, 524 U.S. 742, 765 (1998).  The existence of an anti-harassment policy with complaint procedures, such as the one in place at CitiSteel during the relevant time period, is an important consideration in finding that an employer acted reasonably.  Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 295 (2d Cir. 1999).

### 1.    CitiSteel Took Reasonable Steps to Prevent Sexual Harassment

It is undisputed that CitiSteel had a sexual harassment policy in place at the time of Snyder's employment.  (AA204; 174; 206).  It is also undisputed that Snyder knew of the policy and the reporting mechanism it contained.  (A215). Snyder herself admits that she waited too long to report her allegations.  (A213). The existence of "an appropriate anti-harassment policy will often satisfy th[e] first prong [of the affirmative defense], because Title VII is designed to encourage the creation of anti-harassment policies and effective grievance mechanisms."  Watson v. Home Depot USA, Inc., at *23 (internal citations omitted).  The first prong, that CitiSteel exercised reasonable care in preventing harassment, therefore, is satisfied.  See Finnerty v. Wm. H. Sadlier, Inc., No. 05-4494, 2006 U.S. App. LEXIS 8620 (2d Cir. Apr. 7, 2006) ("One way for an employer to demonstrate that it exercised reasonable care is to show that it had an anti-harassment policy in place.")

### 2.    CitiSteel Promptly Conducted an Appropriate Investigation in Accordance with Its Sexual Harassment Policy

The steps taken by CitiSteel after it was made aware of the alleged harassment in April 2003 constituted a prompt and effective response, as required by law. CitiSteel immediately investigated Snyder's allegations and gave her several opportunities to provide copies of the evidence she claimed to have had. Even when Snyder became hostile and insubordinate, CitiSteel continued to extend her a truly lateral position. These corrective actions exceed the requirements of Title VII. There is no duty under the law to punish the alleged harasser. Cooper v. Wyeth Ayerst Lederle, 106 F. Supp. 2d 479, 495 (S.D.N.Y. 2000). "Title VII simply requires that the remedial action taken be a reasonably calculated to end the harassment." Id.

Snyder does not deny that CitiSteel followed its sexual harassment policy when she first filed her complaint with Ford. In fact, she notes that Ford "acted and followed the next steps as he should" when he turned her allegations over to his supervisor and to HR. (A281). Instead, Snyder alleges that CitiSteel's investigation did not satisfy her subjective demands. The subjective demands of a plaintiff will not strike down an otherwise appropriate investigation under Title VII.

First, Snyder claims that she should have been allowed to confront Harris face-to-face and that Downie should not have met with Harris without her. Second, Snyder claims that her father should have been permitted to be present at the meeting on April 10, 2003. Third, Snyder claims that Downie's desire to maintain confidentiality during the investigation was, in some way, indicative of a mishandled investigation. None of these allegations justifies Snyder's unreasonable refusal to cooperate with CitiSteel during the investigation or her adamant refusal to provide the numerous pieces of evidence she claimed to have had.

Snyder's first alleged deficiency with CitiSteel's investigation is that Harris was questioned on April 8, 2003, the same day Snyder filed her complaint. (A198). Snyder felt that she was "cheated," (A212), because CitiSteel was "sneaky," (A468), by calling Harris in on April 8, 2003 and addressing Snyder's allegations without her being there to "watch Downie question Harris." (A92; 260-61; 256; 265-66).

31

Snyder's second alleged deficiency with the investigation involves her father, Edward Vouras. Snyder claims that Downie wrongly declined to allow her father to be present during the meeting on April 10, 2003. (A259). Non-employees are not permitted to attend CitiSteel meetings and Vouras was no exception. Concerns for safety require that non-employees be prohibited from company property. It is unclear from Snyder's testimony whether Vouras had even agreed to drive to Claymont from his residence in Atlantic City to be present for a meeting, especially considering that the date and time of the meeting had not yet been chosen. Snyder said that; (1) she did not call Vouras on the 8th of April, (A), (2) she did she call him on the 8th, (A); and (3) and that she may have called him on the 7th. Vouras, however, testified that he did not talk to Snyder during the week before her termination. Regardless of whether Vouras was intending on attending, CitiSteel policies prohibited it.

Snyder's third alleged deficiency with the investigation was Downie's request that Snyder keep her allegations quiet until the investigation was complete. No reasonable employer would do otherwise. Confidentiality in any type of employee investigation is of the utmost importance.

### 3. CitiSteel Took Appropriate Action to Remedy the Alleged Harassment at the Conclusion of Its Investigation

Where the proof of the alleged harassment is weak and disputed, the employer does not have to take formal disciplinary action simply for the sake of proving that it is "serious" about enforcing its policy. Swenson v. Potter, 271 F.3d 1184 (9th Cir. 2001). Here, when faced with unsubstantiated claims of harassment, a claimant who refused to cooperate or to turn over any of her alleged evidence, and an alleged harasser with a reputation for honesty and unblemished employment history, CitiSteel made a reasonable decision in an attempt to remedy Snyder's concerns.

It is entirely appropriate under the law to reassign one employee to an equivalent position in order to distance the parties. Swenson, 271 F.3d at 1194. The employer has wide discretion in choosing how to minimize contact between the parties, so long as the accuser is not moved to an objectively less desirable position.

Further, Harris was instructed to cease all communication with Snyder and to avoid her entirely. This is an appropriate remedial measure. See Trunzo v. Ass'n of Property Owners of the

32

Hideoout, Inc., 2004 U.S. App. LEXIS 1639 (3d Cir. 2004) (instructing supervisor to avoid further

contact with plaintiff prevented a finding of severe or pervasive harassment).  Although this

instruction was appropriate, CitiSteel felt that it would not have been entirely effective because of the

physical proximity of Snyder and Harris in the Melt Shop.   To ensure that Snyder did not feel

threatened or harassed, Snyder was offered a lateral transfer to a equivalent position in a more

preferable department.

By all accounts, the Clerk/Typist position in the Shipping Department was materially

equivalent to the Clerk/Typist position in the Melt Shop.  It paid the same salary, required the same

schedule, and entailed the same job duties.  Snyder has failed to provide any evidence to the contrary.

There are only two differences between the positions: (1) the Shipping Department would not subject

Snyder to daily interaction with her alleged harasser; (2) the office environment of the Shipping

Department was less dangerous and less physically demanding that the Melt Shop.

Objectively, the Shipping Department was an all-around improved working environment.

Snyder would also have been able to avoid a potential layoff when the Clerk/Typist position in the

Melt Shop was subsequently eliminated.  Subjectively, Snyder would no longer have to confront her

alleged harasser and, additionally, would no longer have to address her fear of heights by being

required to cross the catwalk in the Melt Shop.  Objectively and subjectively, the lateral transfer to the

Shipping Department was at least as good, if not better, than the position in the Melt Shop.

**B.      Snyder Unreasonably Failed to Use Any of the Many Available Means to Avoid Harm**

A defendant satisfies the second prong of the Ellerth/Faragher defense by showing that the

employee unreasonably failed to take advantage of any preventative or corrective opportunities

provided by the employer or to otherwise avoid harm.  See Ellerth, 524 U.S. at 765.  Demonstrating

that the employee unreasonably failed to timely take advantage of her employer's complaint

procedures normally suffices to satisfy the employer's burden under the second prong.  See id.

The second prong is also easily satisfied in the present case.  Snyder's extended delay in

reporting the alleged behavior was unreasonable as a matter of law.  She has made no allegation and

33

has provided no evidence that would suggest she had any supportable reason for such a delay.

Snyder's failure to cooperate with CitiSteel (and later, with the EEOC when she refused to provide it

with copies of the infamous tapes (A101)), also shows that she unreasonably failed to take advantage

of CitiSteel's corrective procedures or to otherwise avoid the alleged harm.

### 1.    Snyder's Failure to Timely Report the Alleged Conduct Was Unreasonable as a Matter of Law

At the earliest, Snyder claims that the behavior started in August 2001, on her "second day of

work." If this was the case, Snyder waited nearly two years before filing her complaint. A delay of

two years is, as a matter of law, unreasonable. See e.g., Davis v. Visteon Sys., LLC, No. 00-133-C,

2001 U.S. Dist. LEXIS 22829, at *25, 7 (S.D. Ind. Dec. 14, 2001) (plaintiff failed to file her Charge

for nearly nine months after separation); Clegg v. Falcon Plastics, Inc., 2006 U.S. App. LEXIS 8576

(3d Cir. Apr.6, 2006) (delay of approximately four months found unreasonable); Garone , 436 F.

Supp. 2d 448 (delay of 18 months is "unreasonable as a matter of law); Dayes v. Pace Univ., 98-Civ-

3675, 2000 U.S. Dist. LEXIS 3698, *5 (S.D.N.Y. Mar. 24, 2000) (holding that 12 month delay in

reporting was unreasonable as a matter of law); aff'd, 2 Fed. Appx. 204 (2d Cir. 2001); O'Dell v.

Trans World Entm't Corp., 153 F. Supp. 2d 378, 391 (S.D.N.Y. 2001) (same).

At the latest, Snyder claims that the behavior started in "mid- to late 2002," and that the

alleged behavior had been ongoing for at least four months. As the Third Circuit decided eariery this

year in Clegg v. Falcon Plastics, a delay of four months before reporting the offensive conduct will

satisfy the employer's burden on the second prong. 2006 U.S. App. LEXIS 8576. Snyder, therefore,

failed to use CitiSteel's procedures to report any of the harassment she allegedly suffered, despite her

knowledge of those procedures, until months or even years had passed. Evidence that Snyder

unreasonably failed to use CitiSteel's complaint procedure satisfies CitiSteel's burden under the

second element of the defense.

### 2.    Snyder's Fear of Consequences, Without More, Does Not Excuse Her Failure to Report the Alleged Harassment

In order to preclude CitiSteel's affirmative defense, then, Snyder must prove that she failed to

report her allegations because of her "credible fear that her complaint would not be taken seriously or

that she would suffer some adverse employment action as a result of filing a complaint." Leopold v. Baccarat, Inc., 239 F.3d 243 (2d Cir. 2001). A credible fear, however, must be based on more than the employee's subjective belief. Id. The employee must produce evidence to the effect that the employer "has ignored or resisted similar complaints or has take adverse actions against employees in response to such complaints." Id.; see also Finnerty, 2006 U.S. App. LEXIS at *12-13 (rejecting plaintiff's argument that she did not report the conduct because it would not be kept confidential, she feared reprisal, and she held him in high esteem)

Snyder claims that she did not report Harris' behavior because: (1) she thought it would stop; and (2) because she didn't want to get Harris fired. Additionally, Carmella Patrone suggested that Snyder didn't report it because she didn't want to "make waves" and did not want others to know. None of these reasons is sufficient to preclude CitiSteel's affirmative defense. Snyder must produce evidence that CitiSteel has ignored or resisted similar complaints or has taken adverse actions against employees in response to such complaints. Leopold v. Baccarrat, Inc., 239 F.3d 243 (2d Cir. 2001). Such evidence must be more than Snyder's subjective belief. Id.; see also O'Dell v. Trans World Entm't Corp., 153 F. Supp. 2d 37,38 (S.D.N.Y. 2001) (finding the employee had failed to adduce any evidence that the employer ignored or resisted harassment complaints by others); Finnerty v. Wm. H. Sadlier, Inc., at 12-13 ("plaintiff's argument that she did not report the conduct because it wouldn't be kept confidential, she feared reprisal, and she held her harasser in high esteem" were insufficient to justify her lengthy delay).

### 3. Snyder's Refusal to Provide CitiSteel with Any of Her Alleged Evidence Was Unreasonable as a Matter of Law

Snyder admits that she never gave Downie any evidence to support her allegation other than her verbal word. Given the extensive evidence Snyder claimed to have, her failure to turn over any of that evidence was *per se* unreasonable. An alleged victim of harassment's refusal to cooperate with an internal investigation is unreasonable and will satisfy the second prong of the employer's affirmative defense. See O'Dell, 153 F. Supp. 2d at 38 (finding plaintiff's refusal to participate in her employer's internal investigation to be unreasonable, even though such refusal was upon the advice of counsel).

35

Snyder attempted to justify her failure to cooperate by claiming that she could not drop off the alleged tapes because Downie "would have deleted them." (A259). She does not, however, testify as to why she would not provide CitiSteel with copies of the tapes or alleged diary or notes. Instead, Snyder simply repeats her claim that "they are liars and bad people."[6] (A118). She also states that "once they started lying and changing everything around, I knew what they were doing. So, no, I wasn't dropping off tapes." (A262).

This does not explain Snyder's failure to provide CitiSteel with any one of the numerous other pieces of evidence that she claimed to have.[7] In fact, Snyder's unreasonableness continued even after her separation from CitiSteel. She refused to provide the EEOC with even copies of the tapes until a year later. (A101). Snyder's failure to cooperate with CitiSteel by refusing to turn over any of her alleged evidence was, as a matter of law, unreasonable. Lattimore v. Initial Security, Inc., No. 03-7579, 2005 U.S. Dist. LEXIS 16162, at *10 (S.D.N.Y. Aug. 3, 2005) (Plaintiff's refusal to obey proper orders and refusal to cooperate with his employer's investigation was unreasonable as a matter of law).

III.    SNYDER CANNOT ESTABLISH THAT SHE WAS CONSTRUCTIVELY DISCHARGED AND, THEREFORE, CANNOT ESTABLISH THAT A TANGIBLE JOB ACTION OCCURRED

Snyder has no claim for constructive discharge. Simply put, "Where an employer immediately begins an investigation upon being made aware of employee's sexual harassment complaints, offers to transfer an employee, and an employee simply refused transfer and failed to return to work, a constructive discharge has not occurred." Stewart v. Weis Markets, Inc., 890 F. Supp. 382 (M.D. Pa. 1995) (emphasis supplied).

---

[6] Aside from the company as a whole, Snyder claims that Ford , (A191), Downie, (A250), and Harris, (A218), were each liars, that the EEOC and Senior Investigator Wjasow are "liars," (A167; 264), that a subsequent employer was "lying to [her]," (A251), and that the complainant who pressed charges against her for assault in the third degree in 2002 had also "lied," but "they admitted to everybody that they lied," and the claim was dismissed. (A238)

[7] The fact that, as Snyder later admitted, she did not keep such a diary in the months leading to her termination may at least partially explain her refusal to turn over such evidence. (A522-526).

36

Without evidence sufficient to establish a viable claim for constructive discharge, Snyder cannot allege that she was subject to the requisite tangible employment action. And, because she cannot demonstrate that she was subject to a tangible employment action, her hostile environment claim will not withstand CitiSteel's affirmative defense.

An employer may assert the Ellerth/Faragher defense so long as the employee has suffered no tangible job consequences due to a supervisor's actions. Ellerth, 524 US at 765. It is undisputed that Snyder experienced no tangible job consequences while working for Harris. Therefore, Snyder is left with the argument that the corrective action CitiSteel took to address allegations of harassment was itself a materially adverse job consequence. However, as explained by the Second Circuit: "to be 'materially adverse,' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Galabya v. N.Y.C. Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000).

At the outset it should be noted that Snyder's constructive discharge claim must fail where she fails to establish the elements for a hostile environment claim. See Shahin v. College Mesicordia, 3:02-0925, 2006 U.S. Dist. LEXIS 65272, at *50-51 (M.D. Pa. Sept. 13, 2006) ("Where a plaintiff fails to substantiate an actionable hostile environment claim, it necessarily follows that [she] also fails to meet the more stringent requirement of a constructive discharge claim.").

Here, Snyder's resignation was not a constructive discharge since she was "offered another job at the same job grade and salary regardless of [her] subjective fears." Florkowski v. First Pa. Bank, N.A., 1991 U.S. Dist. LEXIS 18764 (E.D. Pa. Dec. 16, 1991). Snyder's reaction to CitiSteel's offer of transfer cannot be shown to have resulted from intolerable working conditions. See Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 169 (3d Cir. 2001).

In Cooper v. Wyeth Ayerst Lederle, the plaintiff was offered a transfer to another department where, just as with Snyder, she would have been placed in an area and environment where none of the

conditions or experiences she complained of would have been present. 106 F. Supp. 2d at 496. "Thus, a reasonable person would have taken some steps to determine if, in her mind, the new position would be satisfactory and would place her outside the reach" of the allegedly intolerable behavior." Id.

Snyder failed to even consider the position in Shipping and went so far as to refuse a tour of the building. This behavior is objectively unreasonable. Snyder had an obligation "not to assume the worst, and not to jump too conclusions too fast." Garner v. Wal-Mart Stores, Inc., 807 F2d 1536 (11th Cir. 1987) (holding that it is not reasonable for an employee to resign after "one day's disappointment"). Snyder failed to satisfy her obligations at even the most basic level and is, therefore, precluded from a constructive discharge claim.

In order to establish a claim for retaliation, a plaintiff must prove that she engaged in a protected activity, the employer took adverse employment action against her, and a causal connection exists between her participation in the activity and the action. Robinson v. City of Pittsburgh, 120 F.3d 1286, 1299 (3d Cir. 1997). As the argument above establishes, no hostile work environment existed after Snyder filed her complaint with HR. CitiSteel did not allow a hostile work environment to exist and, instead, took prompt and effective action to stop any harassment. Further, Snyder's own actions preclude a finding of retaliation. Because she walked off the job only three days after reporting her allegations, there was no opportunity for severe and pervasive discrimination to occur and, therefore, no adverse employment action. Because the occurrence is a necessary element of a retaliation element, Snyder has no viable retaliation claim as a matter of law.

## IV.    SNYDER IS PRECLUDED FROM ANY CLAIM OF PUNITIVE DAMAGES, OR DAMAGES AS FRONT OR BACK PAY

Snyder has failed to offer any evidence that would establish that CitiSteel's management had 'countenanced or approved' the offending behavior. Wilbur v. Correctional Servs. Corp., 1205 (11th Cir. 2004). Instead, the evidence clearly shows that CitiSteel's response to Snyder's complaint was immediate, thorough, and fair. And, even if CitiSteel's response had not been prompt, or even if it had been inappropriate, its well-publicized policy, of which Snyder was admittedly familiar, bars any claim for punitive damages. Hatley v. Hilton Hotels Corp., 308 F.3d 473 (5th Cir. 2002).

38

Snyder's termination from post-separation employment severely restricts her ability to collect back pay and front pay damages. Any claim Snyder may have to an award of back pay damages must be cut off as of May 18, 2004 when she was terminated from her job with American Flagging Company for gross insubordination after only a month of employment. While employed as a construction flagger, she worked 52 hours per week at the rate of $18 per hour, or $936 per week plus overtime pay. (A546-548). Snyder earned $475.60 per week at CitiSteel. (A546-548).

Snyder's termination from post-separation employment severely restricts her ability to collect back pay and front pay damages. Any claim Snyder may have to an award of back pay damages must be cut off as of May 18, 2004 when she was terminated from her job with American Flagging Company for gross insubordination after only a month of employment. While employed as a construction flagger, she worked 52 hours per week at the rate of $18 per hour, or $936 per week plus overtime pay. Snyder earned $475.60 per week at CitiSteel.

Bolstering this point, Snyder was subsequently terminated from Verizon after only a month of employment for repeated violations of the company's tardiness and absenteeism policies. (A241-243). See e.g., Quint v. A.E. Staley Mfg. Co., 172 F.3d 1, 16 (1st Cir. 1999); Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 54 (2d Cir. 1998); Tubari, Ltd., Inc. v. NLRB, 959 F.2d 451, 454 (3d Cir. 1992). Therefore, any back pay damages must be cut off as of May 18, 2004, when Snyder was terminated from American Flagging Company.

Similarly, Snyder's front pay, if any, must be cut-off as of April 2004 when she began working at American Flagging Company, where she earned a substantially higher salary than she had earned at CitiSteel. Additionally, Snyder earned a higher salary at Verizon. Finally, Snyder was also paid a higher wage when she worked at Franklin Company but only worked for two weeks before resigning because she "got another job." (A546-548). She earned $16 per hour and worked 40 hours per week, or $640 per week. (A546-548). Again, this income was significantly higher than her earnings at CitiSteel, precluding any front pay award past April 2004.

39

## CONCLUSION

For the reasons set forth in the brief above, Defendant CitiSteel USA, Inc. respectfully requests that summary judgment be granted and that Plaintiff Terry L. Snyder's Complaint be dismissed in its entirety.

Respectfully submitted,


YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Margaret M. DiBianca
Sheldon N. Sandler, Esquire (No. 245)
Margaret M. DiBianca, Esquire (No. 4539)
The Brandywine Building
1000 West Street, 17th Floor, P.O. Box 391
Wilmington, Delaware  19899-0391
Telephone: (302) 571-6673; (302) 571-5008
Facsimile: (302) 576-3330; (302) 576-3476
Email: ssandler@ycst.com; mdibianca@ycst.com
Attorneys for Defendant


DATED:  November 22, 2006

40