IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| TERRY L. SNYDER, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 04-970(JJF) |
| | ) | |
| v. | ) | |
| | ) | |
| CITISTEEL USA, INC. | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

PLAINTIFF'S ANSWERING BRIEF
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**MARGOLIS EDELSTEIN**
Jeffrey K. Martin (Del Bar. #2407)
Lori A. Brewington (Del Bar #
1509 Gilpin Avenue
Wilmington, DE  19806
Tel:  (302) 777-4680
Fax:  (302) 777-4682
Attorneys for Plaintiff

Dated:  December 22, 2006

**TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDINGS ..................................................................... 1

SUMMARY OF ARGUMENT ............................................................................................... 2

STATEMENT OF FACTS ...................................................................................................... 4

I.       Employment Relationship and Background ....................................................................... 4

II.      The Protracted Sexual Harassment .................................................................................. 4

III.     Randolph Harris's Preemptive Retaliation ....................................................................... 6

IV.      The Final Incident of Sexual Harassment by Harris  ........................................................ 9

V.       The Internal Complaint  ................................................................................................... 9

VI.      Management's Biased Response: The Attempted Retaliatory
         Transfer and Discharge ................................................................................................. 10

VII.     The Aftermath ............................................................................................................... 14

ARGUMENT  ...................................................................................................................... 15

I.       SNYDER CAN ESTABLISH THAT SHE WAS SUBJECT TO A
         HOSTILE WORK ENVIRONMENT BECAUSE HER ALLEGATIONS
         ARE SUFFICIENTLY SEVERE AND PERVASIVE  ..................................................... 15

II.      SNYDER CAN ESTABLISH THE EXISTENCE OF RESPONDEAT
         SUPERIOR LIABILITY  ............................................................................................... 23

         A.      Defendant Failed to Exercise Reasonable Care to Prevent and
                 Correct Harassment. Instead, Defendant Conducted A Biased
                 Investigation That Was Rigged With A Pre-Determined Conclusion ................. 24

         B.      Plaintiff's Delay In Using Preventative Or Corrective Opportunities
                 Was Reasonable Under the Circumstances ......................................................... 28

III.     SNYDER CAN ESTABLISH THAT SHE WAS CONSTRUCTIVELY
         DISCHARGED AND, THEREFORE, CAN ESTABLISH THAT A
         TANGIBLE JOB ACTION OCCURRED. ....................................................................... 31

IV.      PLAINTIFF HAS DILIGENTLY ATTEMPTED TO MITIGATE HER
         DAMAGES; THEREFORE SHE IS ENTITLED TO BACK PAY, FRONT
         PAY AND PUNITIVE DAMAGES AS A MATTER OF LAW. ...................................... 33

         A.      Plaintiff Has Diligently Searched For Substantially Equivalent
                 Interim Employment. ......................................................................................... 34

        B.      Ms. Snyder's Termination, From Post Separation Employment,
              Does Not Affect Her Ability To Collect Back Pay. ...........................................35

CONCLUSION ...............................................................................................................37

# TABLE OF AUTHORITIES

**PAGE**

Adusumili v. City of Wilmington,
  164 F. 3d 353 (7th Cir.).................................................................................................20

Anderson v. Delux Homes of Pa, Inc.,
  131 F. Supp. 2d 637, 646-47 (M.D. Pa. 2001).......................................................................21

Andrews v. City of Philadelphia,
  895 F. 2d 1469 (3d Cir. 1990)................................................................................. 15, 16, 17

Booker v. Taylor Milk Company, Inc.,
  64 F.3d 860, 870 (3rd Cir. 1995). .......................................................................................34

Burlington Indust., Inc. v. Ellerth,
  524 U.S. 742, 765, (1998). ................................................................................... 23, 24, 31

Calcote v. Texas Eductional Foundation, Inc.,
  578 F. 2d 95 (5th Cir. 1978). ............................................................................................32

Cardenas v. Massey,
  269 F. 3d 251, 266 (3rd Cir. 2001).....................................................................................31

Caufield v. The Center Area School District,
  133 Fed. Appx. 4 (3rd Cir. 2005).............................................................................34, 35, 36

Childress v. Dover Downs, Inc.,
  2000 WL 376419, at *9 (D.Del.Mar. 31, 2000)....................................................................15

Clowes v. Alleghany Valley Hosp.,
  991 F. 2d 1159, 1161 (3d Cir. 1993)....................................................................................31

Dienno v. Goodwill,
  162 F. 3d 235 (3rd Cir. 1998)............................................................................................31

Durham Life Ins. Co. v. Evans,
  166 F. 3d 139, 153 (3d Cir. 1999)........................................................................................31

Ellison v. Brady,
  924 F.2d 872, 882 (9th Cir. 1991)......................................................................................26

Faragher v. City of Boca Raton,
  524 U.S. 775 at 803.............................................................................................................23

Fuller v. City of Oakland,
  47 F.3d 1522,1529 (9th Cir. 1995)....................................................................................25

Galloway v. General Motors Service Parts Operations,
  78 F. 3d 1164, 1168 (7th Cir. 1996). ..................................................................................20

Grazioli v. Genuine Parts Co.
    409 F. Supp. 2d 569, 578-79 (D.N.J. 2005) .......................................................................... 21

Gross v. Burggraf Construction Company,
    53 F.3d 1531 (10th Cir. 1995) ............................................................................................ 22

Harris v. Forklift Sys., Inc.,
    510 U.S. 17, 23 (1993). ........................................................................................ 15, 20, 21

Hawk v. Americold Logistics, LLC,
    2003 U.S. Dist. LEXIS 3445 (E. D. Pa. 2003) .................................................................... 28

Hawkins v. 1115 Legal Service Care,
    163 F.3d 684 (2nd Cir. 1998). ............................................................................................ 34

Hostetler v. Quality Dining, Inc.,
    218 F. 3d 798, 811 (7th Cir. 2000) ..................................................................................... 27

Intlekofer v. Turnage,
    973 F 2d 773, 780-81 (9th Cir. 1992)................................................................................. 26

Johnson v. Spencer Press of Maine Inc.,
    364 F.3d 368,375 (1st Cir. 2004). ...................................................................................... 36

Krouse v. American Sterilizer Co.,
    126 F. 3d 494, 500 (3d Cir. 1997)....................................................................................... 33

Marlene Industries Corp.,
    234 N.L.R.B. 285 (1978)...................................................................................................... 34

McGraw v. Wyeth-Ayerst Labs, Inc.,
    1997 U.S. Dist. LEXIS 20813, at *4-5 (E.D. Pa. Dec. 30, 1997) ......................................... 18

Mendoza v. Borden, Inc.,
    95 F. 3d 1238, 1243 (11th Cir. 1999).................................................................................. 17

Meritor Sav. Bank, FSB v. Vinson,
    477 U.S. 57, 66 (1986) .................................................................................................. 15, 20

Miller v. Aluminum Co. of America,
    679 F. Supp. 495, 502 (W.D. Pa.)
    aff'd, 856 F. 2d 184 (3d Cir. 1988). .................................................................................... 16

Patterson v. P.H.P. Healthcare Co.,
    90 F.3d 927 (5th Cir. 1996)................................................................................................. 35

Price v. Delaware Dep't of Correction,
    40 F. Supp. 2d 544, 551 (D.Del. 1999) ............................................................................... 33

Quint v. A.E. Staley Manufacturing Co.,
    172 F.3d 23 (1st Cir. 1999) .................................................................................................. 34

Siegal Transfer, Inc. v. Carrier Express, Inc.,
    54 F. 3d 1125, 1127 (3d Cir. 1995) ....................................................................................... 23

Smith v. Pathmark Stores, Inc.,
    1998 U.S. Dist. LEXIS 8631 (E.D. Pa. 1998) ...................................................................... 17

Swenson v. Potter,
    271 F. 3d 1184, 1194 (9th Cir. 2001) .................................................................................... 26

Taylor v. Brandywine School District,
    No. 05-4803, 2006 U.S. App. LEXIS 24643 (3d Cir. Sept. 29, 2006) ................................... 22

Tubari Ltd., Inc. v. NLRB,
    959 F.2d 451,454 (3rd Cir. 1992) ......................................................................................... 34

## OTHER AUTHORITIES

42 U.S.C. § 2000e-2(a)(1) ................................................................................................................ 15

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff Terry L. Snyder was hired by Defendant CitiSteel USA, Inc. on August 3, 2001 as a temporary employee, and then was hired full-time on September 17, 2001, as a Clerk Typist for the Melt Shop. On April 8, 2003, Ms. Snyder complained of sexual harassment by one of her male supervisors. The next day, April 9, 2003, CitiSteel informed Ms. Snyder that she would be transferred from the Melt Shop to Shipping. No explanation for the transfer was given nor did CitiSteel provide Ms. Snyder with information concerning the terms and conditions of her transfer to shipping. Ms. Snyder refused to take the transfer without written explanation for job security and she was instructed to take the remainder of the day off. With two working hours free, Ms. Snyder went to the U.S. EEOC in Philadelphia to file a formal complaint against her supervisor and CitiSteel.

On April 10, 2003, Ms. Snyder reported to Human Resources. She was again asked to take a transfer to Shipping or she would be considered to have "voluntarily resigned." Ms. Snyder again refused. She emphasized that she had done nothing wrong and requested to return to her office. However, Human Resources had Ms. Snyder escorted off the grounds. Because she had been discharged, Ms. Snyder did not return to work on Friday, April 11, 2003. As was found in her unemployment appeal hearing, Ms. Snyder's employment was terminated by CitiSteel. She did not resign or otherwise voluntarily abandon her job.

Plaintiff filed a *pro se* Complaint on August 24, 2004. (D.I. 1). Plaintiff later retained the law firm of Margolis Edelstein, which entered its appearance on June 16, 2005. (D.I. 8). Discovery has now concluded and CitiSteel filed for Summary Judgment on November 22, 2006.

This is Plaintiff's Answering Brief in Opposition to Defendant's Motion for Summary Judgment because genuine issues of material fact exist and Defendant is not entitled to judgment as a matter of law.

1

## SUMMARY OF ARGUMENT

**I.**     Ms. Snyder can establish that she was subject to a hostile work environment because her allegations are sufficiently severe and pervasive. All of the incidents of harassment taken as a whole indicate that Harris's conduct grew in intensity throughout Ms. Snyder's employment at CitiSteel and the facts in the instant case, without a doubt, support a finding of a hostile work environment. Harris's harassment interfered with Ms. Snyder's job performance and ultimately, led to her termination for CitiSteel. Further, the medical records and deposition testimony of Ms. Snyder's therapist, Ms. Cynthia Wright, whom she treated with for several months, leave no question as to the psychological impact Harris's conduct had on Ms. Snyder.

**II.**    Ms. Snyder can establish the existence of respondeat superior liability because Harris was Ms. Snyder's direct supervisor. Ms. Snyder strongly contends that the Ellerth/Faragher affirmative defense is not available to Defendant because Defendant has taken a tangible adverse employment action against Ms. Snyder in the form of Constructive Discharge. Assuming arguendo that Ms. Snyder has not suffered a tangible adverse employment action, the employer will remain liable because it did not exercise reasonable care to prevent and promptly correct the harassment and Plaintiff's delay in informing CitiSteel of the harassment by Harris was not unreasonable under the circumstances.

**III.**   Ms. Snyder can establish that she was constructively discharged and, therefore, can establish that a tangible job action occurred. CitiSteel's actions constituted a constructive discharge because its harassment and discrimination against Ms. Snyder was so intolerable that a reasonable person in the same position would have felt compelled to resign.

**IV.**    Ms. Snyder can establish that a claim of retaliation because she engages in a protected activity by reporting the discrimination both to Ford and Downie. She then faced adverse employment action because Downie attempted to transfer her to a less desirable position the next day. When she requested a

2

written explanation, he escorted her off CitiSteel property.

V.      Ms. Snyder is not precluded from a claim of punitive damages or damages as front pay or back pay because she has made every effort to mitigate her damages.

### STATEMENT OF FACTS

**I.    Employment Relationship and Background**

By way of factual background and at all relevant times to this action, Plaintiff Terry Snyder was a 34 year old female who was initially employed by CitiSteel USA, Inc. as a temporary employee on August 3, 2001, and who then was hired full-time on September 17, 2001, as a Clerk Typist for the Melt Shop of its Claymont Steel Plant. (Snyder at 86, B-0001). She was discharged on April 10, 2003. (Snyder at 208, B-0172). Prior to a written reprimand in February of 2003, which the employer later retracted, Ms. Snyder never received any suspensions, written reprimands, or other disciplinary action from CitiSteel. (Snyder at 144, B-0156; Harris at 62, B-0421). In fact, even as late as April 3, 2003, Ms. Snyder was asked to work overtime on the weekends. (B-0036). In a taped conversation between Ms. Snyder and her supervisor, Randolph Harris ("Harris"), in January 2003, Harris praised Ms. Snyder for her job performance.

| | |
|---|---|
| **Ms. Snyder:** | **Tell me if I'm doing something wrong.** |
| **Mr. Harris:** | **No, no. Terry let me tell you something. I want to bragged on you ever since you been. That office has been more organized now than it ever has been.** |
| **Ms. Snyder:** | **Thank you very much.** |
| **Mr. Harris:** | **Oh, it has, believe me, I know. Yeah.** |

(Transcript at 10, B-0408).

**II.    The Protracted Sexual Harassment**

Ms. Snyder was sexually harassed by her male general supervisor, Harris, over a protracted period beginning on her second day of work as a temporary employee, Saturday, August 4, 2001. On that date, Harris told her, "I am going to take you out for a beer sometime." (Snyder at 375, B-0246; B-0039). He then asked Ms. Snyder if she wanted to become a CitiSteel employee. (B-0039). She responded that she wanted to wait and see to make sure she did well and could overcome her fear of heights. (B-0039). On Monday, August 6, 2001, Harris told Ms. Snyder that she "really brightened up the Melt Shop." (B-0039). On Saturday, August 11, 2001, Harris walked Plaintiff out to the parking lot and reminded her that he had not forgotten about that beer. (B-0040). On Monday, August 20, 2001, Harris began his week by telling Ms. Snyder that she really made the melt shop "glow." (B-0040). On Monday,

4

September 17, 2001, Ms. Snyder wore make-up to work because she was getting her picture taken for her CitiSteel photo ID. Harris stared at Ms. Snyder and commented several times on Ms. Snyder's beauty. (B-0042).

Virtually every Monday in the fall of 2001, Harris would ask Ms. Snyder what she did over the weekend. (B-0043). When she mentioned that her boyfriend had taken her away for the weekend, Harris replied, "I wish you would let me take you away one weekend." (B-0043). Ms. Snyder simply replied, "No", but tried to brush off the comments which were offensive. Unfortunately for Ms. Snyder, Harris's conduct escalated to the point where every time she went away for the weekend Harris would ask her if he could take her away when she returned to work on Monday. (Snyder at 377, B-0246). Sometimes Ms. Snyder would not respond and would walk away when Harris would ask what she did over the weekend. (Snyder at 322-378, B-0233-0248). Other times, Ms. Snyder would say "never" when Harris asked to take her away for the weekend. (Snyder at 322-378, B-0233-0248).

By mid-2002, Harris's verbal comments escalated from verbal comments to physical touching and battery. (Snyder at 376, B-0246). Almost every day, he would stand close to one side of her and smell her head, ear, neck, shoulder and arm, and ask Ms. Snyder, "What flavor [of perfume] [she] was today?" (Snyder at 194, B-0169). Harris would ask Ms. Snyder this question "practically daily. He may have missed one day out of the week." (Snyder at 396, B-0251). Other times, Harris would stand in Plaintiff's doorway and stare at Ms. Snyder for twenty minutes which made her very uncomfortable. (Snyder at 33, B-0128; B-0584-0585). Harris would refuse to move from her office doorway when she asked and therefore, she was forced to push her way out of her office just to walk down the hall. (B-0584-0585; Snyder at 33, B-0128). Harris would squeeze Ms. Snyder's cheek and stroke her hair. (Snyder at 33, B-0128). Harris would also go so far as to grab his genitals and squeeze them as he sat on the table. (Snyder at 33, B-0128). Although she would tell him to stop and he would agree to stop, his offensive behavior would continue. (B-0584-0585). "It was an all the time thing." (Snyder at 381,B-0247). Further, Harris instructed Ms. Snyder to do his non-work related school work for him. (Snyder at

5

321, B-0232). She drafted a report for Harris during work hours and at home entitled "Managing Diversity in the Workplace." (Snyder at 321, B-0232, B-0079 to B-0092)

In late 2002, Ms. Snyder went out to her car one day and someone had written on a piece of tape "Honk if you want to bonk me." (Snyder at 399, B-0252). She called Harris from her cell phone and he instructed her to peel it off without putting her fingerprints on it. (Snyder at 399, B-052). He then asked her to put it in a baggie and bring it to work the next morning before the morning meeting. (Snyder at 399, B-0252). The next morning Ms. Snyder brought him the handwritten note as Harris had instructed. But Harris threw it in the trash and yelled to her, "What do you want me to do about it?" (Snyder at 400, B-0252). At first, Ms. Snyder was not sure who put the sticker on her car, but after Harris's reaction, she started to think that perhaps he did it. (Snyder at 400, B-0252). Snyder also complained to Dennis Ford ("Ford"), Ms. Snyder's other supervisor, that there was a derogatory message about "Terry" which was spray-painted on a pallet. (Snyder at 398, B-252). Ford pointed out to Ms. Snyder that the writing on the pallet actually said "Jerry" not "Terry". (Snyder at 398, B-0252).

On January 7, 2003, Harris stood in Ms. Snyder's doorway and asked if she wanted to work overtime hours on Saturday, January 11, 2003. (Snyder at 383, B-0248). She responded "Yes." Harris then walked into Ms. Snyder's office and whispered, "By the way, when you come to work on Saturday, wear a dress with no panties."[1] After making Ms. Snyder feel discomforted and powerless, Harris darted out of her office. Id. In March of 2003, Ms. Snyder could not take it anymore. When he began to stroke her hair again, she slapped Harris's hand away. (Snyder at 168,169,170, B-0162-0163).

**III.    Randolph Harris's Preemptive Retaliation**

That same day, January 7, 2003, Ms. Snyder tripped on one of the broken floor tiles in the Melt Shop and she sent a routine email to the Manager of Health and Safety, Jim Ryan ("Ryan"). (Snyder at 384, B-0248; B-0046). Ryan was concerned about the tile and instructed Harris and Ford to repair it. (Ryan at 14, B-0542). Sometime thereafter, the tile was repaired. (Ryan at 15, B-0542). This minor

---

[1] Upon the advice of her father, Edward Vouras ("Mr. Vouras"), she taped a conversation with Harris on January 10, 2003, three days after Harris asked Ms. Snyder to come to work wearing a dress with no panties, confronting him about his "rude" behavior. (Transcript of tape 4-7,B-0005-0008;Vouras at 8,B-0505; Vouras at 20, B-0508).

6

complaint at the outset of January 2003 coupled with Ms. Snyder's reaction to his continued harassment caused Harris to feel threatened that she was attempting to get him in trouble.

In response to this perceived threat, Harris stopped talking to Ms. Snyder altogether (P-0060) and issued Ms. Snyder a written reprimand for allegedly poor work performance and unacceptable attendance on March 11, 2003. (B-0049). Despite Ryan's acknowledgment that CitiSteel's policy was to administer disciplinary actions to employees soon after the infraction occurs (Ryan at 16, B-0542), Ms. Snyder was not disciplined until March 11, 2003 for allegedly missing days from work in 2002. (B-0050). Moreover, Harris and Ford allowed Ms. Snyder to work a flexible schedule. (Harris at 100). Further, Harris admits that the alleged absences on the written warning may have been approved time off by Harris and Ford. (Harris at 78-79, B-0425).

The written reprimand states in part, "During the past several months, your work performance has deteriorated resulting in your not getting your work done on a timely basis." (B-0050). However, Ms. Snyder's work performance was greatly dependent on supervisors in the Melt Shop providing her with the necessary information to do her job. Ms. Snyder sent several emails requesting the necessary information from supervisors. (B-0051-0065). Ms. Snyder's emails requesting the pertinent information stated, in part,

**STOP CARDS PLEASE!!!!!!!!!!...THANK YOU, TERRI**

(B-0051)

> **Good morning,**
> **At the request of upper management, *(CitiSteel has requested I get more forceful)* that anyone that has in their possession an ISO Procedure (which I keep track of) is to move it along...Many, many times I have asked all of you at one time or another...are you done? where is it? did you loose it? should I reprint it for you?...ISO procedures are mandatory as we all know, so let's get them going!**

(B-0052) (emphasis added).

> **This is a reminder (which you all have received an individual email already..."several times") that upper management does not want anyone sitting on any procedures...we are going to get audited shortly so please get in touch w/me if you are unable to locate a procedure, do not be shy as many people has had to have them re-**

7

> **printed, but I must get some kind of feedback from you to know**
> **exactly where we stand with each one.**
> *PLEASE DO NOT IGNORE ME….I AM ONLY TRYING TO DO MY*
> *JOB.*
> **Thank You All For Your Time & Cooperation,**
> **Terri**

(B-0053) (emphasis added). Carmella Patrone ("Ms. Patrone"), an accountant in the Finance Department at CitiSteel, explained that it was difficult for Ms. Snyder to complete the alloy/flux usage verification before 7:30 a.m. because of other responsibilities she had like the ISO's and other morning reports. (B-0066). Ms. Patrone opined that Ms. Snyder was given too many responsibilities which made it hard for her to complete certain deadlines and that "[Ms. Snyder] can't do [her] job if other people don't provide [her] with the necessary information [she] need [sic], for i.e. physical inventory #'s." (B-0066).

Moreover, this alleged decline in Ms. Snyder's work performance is entirely consistent with her testimony that the sexual harassment increased to the point where she could no longer concentrate on her work. (Snyder at 197, B-0169). Further, it is CitiSteel's practice to place a written note in the employee's file when the employee is verbally counseled for his or her work performance. (Harris at 60, B-0420). Although Harris testified that Ms. Snyder was counseled verbally several times, Snyder testified that prior to March 2003, she never received any oral or written reprimands (Snyder at 144, B-0156 Harris at 62, B-0421) and the employer has failed to produce any documents in support of these alleged counseling sessions. What is perhaps most telling, Harris is caught on tape praising Ms. Snyder for her work performance. (Harris at 10, B-0408).

Ford informed Ms. Snyder that it was Harris's idea to issue her a write-up. (Snyder at 131, B-0153). When Ms. Snyder confronted Harris about the write-up, Harris explained that he needed to show her who had authority. (Snyder at 131, B-0153). On March 21, 2003, Harris apologized to Ms. Snyder for his behavior and informed Ms. Snyder that the reason he did not want other employees to ask for Ms. Snyder's assistance was because he had these "unexplainable emotions" for Ms. Snyder. (B-0045).

**IV.    The Final Incident of Sexual Harassment by Harris**

By April 2003, Harris would not stop his offensive behavior and Ms. Snyder was sickened to her stomach. (Snyder at 196, B-0169). On April 7, 2003, Ms. Snyder was harassed yet again when Harris brought a stop card into Ms. Snyder's office. (B-0056). She continued to work and held her hand out with an open palm. Harris proceeded to suggestively slide the stop cards across her hand and ask her what she does with her hair. Id. He then said to Ms. Snyder, "It looks good however you do it" and walked out. Id. By 9:07 a.m. Harris returned to Ms. Snyder's office for a cough drop and he returned for another cough drop at 9:28 a.m. This time he grabbed Ms. Snyder's cheek. Id. Frustrated, Ms. Snyder then gave him the entire bag of cough drops. Id. At 9:31 a.m. Harris reentered Ms. Snyder's office and said "pretty woman" as he picked up her phone. Ms. Snyder responded by giving Harris an evil look and Harris replied, "I wasn't talking to you." Id.

Ms. Snyder started "boiling" and getting madder and madder. (Snyder at 193, B-0168). On April 8, 2003, Ms. Snyder sat at her desk sick to her stomach and unable to concentrate on her work because of Harris's harassment. (Snyder at 197,198, B-0169-170). Ms. Patrone was pushing Ms. Snyder to tell Human Resources about Harris's sexual harassment saying, "If you don't tell, I'm going to." Id. Snyder now realized that Harris was not going to stop on his own. (Snyder at 197, B-0169). Harris did not come to work on April 8, 2003 and Ms. Snyder believed it was the best time to notify her employer. (Snyder at 198, B-0170).

**V.    The Internal Complaint**

Finally, on April 8, 2003, Ms. Snyder complained to Ford about Harris's sexual harassment. (Snyder at 174, B-0164; Snyder at 198, B-0170). Ford advised Ms. Snyder that he would contact Jerry Downie ("Downie), the Human Resources Manager, and then call her. (Snyder at 198, B-0170). Ford then called Ms. Snyder and asked her to report to Human Resources. When she arrived at Human Resources, Downie and Greg Buragino ("Buragino"), the vice-president of manufacturing and supervisor of both Harris and Ford, met with Ms. Snyder. She was asked to make a written statement and to sign and date it. (B-0093). That same day, Ms. Snyder submitted a two-page written statement to Downie

9

describing the specific words and actions that Harris had engaged in over the protracted period of time. (B-0067). Her statement included, but was not limited to, allegations that,

> Mr. Harris…walks in my office rubs my cheek and says how pretty, runs his hands down my hair and will tell me how it looks good. Mr. Harris has asked me to come to work on a Saturday (which was supposed to be the upcoming Sat. that would have been 1/11/03) wearing a dress with no panties and dashes out laughing…Many times I have yelled at Mr. Harris & asked him to leave [me] alone and at times he said he would comply with my wishes and to this day he still has not.

(B-0067). During this meeting on April 8, 2003, Ms. Snyder informed Downie that she could produce an audio tape of Harris's admission of the wrongfulness of his conduct, as well as diary entries. (B-0093; Downie at 20, B-0342). Downie indicated to Ms. Snyder that he "was not interested in the tapes" because he "didn't know that they would be relevant." (Downie at 22, B-0343). Downie also advised Ms. Snyder that he did not want to "reach those channels." (Snyder at 261, B-0217). Despite their unwillingness to review her evidence, Ms. Snyder was hopeful that Downie and Buragino could make Harris stop his harassing behavior. (B-0093). She told Buragino and Downie that she had discussed Harris's sexual harassment with another employee. (B-0093). When asked if she would be uncomfortable working around or near Harris, she said she would not. (B-0093). Downie told Ms. Snyder that she could have a witness of her choice in the next meeting. (Snyder at 265, B-0218; B-0055). Ms. Snyder stated that she wanted her father to be present at any future meetings. (Downie at 17, B-0341).

## VI.    Management's Biased Response: The Attempted Retaliatory Transfer and Discharge

That same day, on April 8, 2003, Downie and Buragino met with Randolph Harris in Human Resources at 3:45 p.m. to discuss the allegations made by Ms. Snyder. (B-0068). Harris stated that he "*did not recall* ever asking her to wear a dress or not to wear panties" and that he "never *intentionally* touched her face or her hair." (B-0094) (emphasis added). Buragino had known Harris for a number of years and he "felt bad for [Harris]." (Buragino at 57, B--0382).

Later that evening, Downie asked Harris to meet him at Bennigans' Bar & Restaurant for a beer, presumably to further discuss the situation at hand. (Downie at 73, B-0355, Harris at 179, B-0450).[2] Downie informed Harris that they would meet with upper management the next day. (Harris at 179, B-0450).

According to Buragino's written statement, the next day, on April 9, 2003 at Downie's office. (B-0095). Buragino, Downie, and Bieger asked Harris if he had given more thought to the claims and whether he could tell them anything new or different than what he told them the previous day. (B-0095). Harris said no. Id. In addition, the investigation team, consisting of "JD" (Downie), "GB" (Buragino), "RH" (Harris) and "WB" (Buragino) discussed the investigation results and proposed action with respect to the resolution of Ms. Snyder's allegations against Harris. (B-0095; B-0098). Ryan, the Safety Director, thought that Harris *should* be involved in the decision to transfer Ms. Snyder because "it involved his employee and taking action that would remove her from his department." (Ryan at 25, B-0544). Although Ms. Snyder indicated that she had previously told another employee about Harris's sexual harassment (B-0093), Downie declined to interview Carmella Patrone, Ms. Snyder's confident, indicating in his report that there were "no witnesses". (B-0096).

Ms. Patrone testified that Ms. Snyder informed her of Harris's sexual harassment as early as the wintertime in late 2002 or early 2003. (Patrone at 26, B-0484; Patrone at 47, B-0489). Ms. Snyder told Ms. Patrone that she was being sexually harassed and that she needed Ms. Patrone's advice. (Patrone at 24, B-0483). Beginning in late 2002, Ms. Snyder and Ms. Patrone spoke on at least four or five occasions about Harris's sexually inappropriate conduct and Ms. Snyder explained several incidents (Patrone at 27, 28, B-0484). The one incident that stands out in Ms. Patrone's mind is that Harris asked Ms. Snyder to "wear a dress with no panties." (Patrone at 29, B-0484). Ms. Patrone believed that Ms. Snyder was telling the truth and she described Harris as a "nutty" person. (Patrone at 30, B-0485; Patrone at 50, B-0490). Ms. Patrone recalled that Ms. Snyder was "pretty clear she didn't like it." (Patrone at 29, B-

---

[2] CitiSteel did not produce any documentation concerning the meeting between Harris and Downie at Bennigan's the evening of April 8, 2003.

0484).   Ms. Patrone sent an email to Ms. Snyder on April 7, 2003, explaining that she "certainly understood what [Ms. Snyder] was going through.  (B-0071).  "[Ms. Snyder] didn't want to report it to human resources.  At the same time her saying no wasn't stopping the whole thing either.  But she didn't want to lose--she didn't want to quit either.  She liked her job."  (Patrone at 36, B-0486).  There was always the risk that she could lose her job.  (Patrone at 61, B-0492).  Patrone opined that that may have been the reason she did not want to tell Human Resources.  (Patrone at 60-61, B-0492).

On April 9, 2003, at around 11:30 a.m., Downie and Ryan met with Ms. Snyder and informed her that she would be transferred to the Shipping Department which was located in a different building across Philadelphia Pike.  (Snyder at 269, B-0219).  She asked why she had to transfer to the Shipping Department.  (Snyder at 270, B-0220).  Downie explained to Snyder that if she did not accept the transfer she would have to "voluntarily resign."  (Snyder at 271, B-0220, Ryan at 28, B-0545).  Downie never told Ms. Snyder why she had to transfer to the Shipping Department nor did he tell Ms. Snyder that her job in the Melt Shop was being eliminated.  (Snyder at 270, B-0220 and Snyder at 397, B-0251)[3]  The only thing Downie told Ms. Snyder about the position in Shipping is that her pay would be the same.  (Snyder at 330, B-0235).    Although positions are generally posted, this alleged position in the Shipping Department was not posted and there was already a Clerk Typist serving in the Shipping Department in April 2003.  (Ryan at 29, B-0545; B-0093-0097).  Ms. Snyder expressed that she wanted to continue working in the Melt Shop.  (Ryan at 27, B-0545).

Ms. Snyder wanted her father to be in the meeting with her because she wanted someone there on her side.  (Snyder at 281, B-0222).  Downie instructed Ms. Snyder to go home and think about his offer to transfer her to the Shipping Department and report to Human Resources in the morning.  (Snyder at 267, B-0219).  He told Ms. Snyder that he wanted to "keep the dust down."  (B-0072).

---

[3] Buragino and Downie were not aware the Clerk Typist position was going to be eliminated until after Ms. Snyder complained that she was being sexually harassed by Harris.  (Buragino at 67. B-0385; Downie at 49, B-0349). Additionally, Ms. Patrone testified that she was not aware that this position was eliminated in the Melt Shop. (Patrone at 42, B-0488 ).

With two working hours free, Ms. Snyder went to the U.S. EEOC in Philadelphia to file a complaint against Harris and CitiSteel. Later that day, Downie contacted Ms. Snyder at her home and asked her to drop off her tape recordings of Harris. (Snyder at 274, B-0221). However, Ms. Snyder was terribly afraid that her only evidence of Harris's acknowledgement of wrongdoing would be deleted. (Snyder at 274, B-0221).

Ms. Snyder reported to Human Resources on April 10, 2003 at 6:30 a.m., as requested by Downie. (Snyder at 276, B-0221). Ms. Snyder brought a tape recorder and recorded the *entire* meeting. (Snyder at 282, B-0223). She only turned the tape recorder off for a brief second. (Snyder at 302, B-0228). During the meeting, Downie reiterated that Ms. Snyder could either transfer to the Shipping Department or voluntarily resign (Snyder at 277, B-0221). Ms. Snyder again refused. (B-0074-0079). She emphasized that she had done nothing wrong and requested to return to her office. (B-0074-0079; Snyder at 319, B-0232).

Ms. Snyder did not bring the tape of Harris to this meeting because she did not feel comfortable. (Snyder at 281, B-0222). She wanted her father to be there as a witness for her (Snyder at 287, B-0224). She told Downie that she would let him hear the tapes. (Ryan at 35, B-0547).

Ms. Snyder asked why she was being transferred several times during this conversation because she felt she had done nothing wrong, but her questions went unanswered by Downie. (B-0074-0079). She also requested Downie put the reason for the transfer to the Shipping Department in writing on at least two occasions in this conversation because she wanted job security but Downie refused. (B-0074-0079; Snyder at 413, B-0255, Snyder at 271, B-0220; Ryan at 43,44, B-0549). However, Downie did agree to retract the written disciplinary action from her file. (B-0074-0078, Ryan at 43, B-0549). Neither Downie nor Ryan informed Ms. Snyder that her job in the Melt Shop was being eliminated. (Ryan at 38, B-0548).

The recorded conversation between Downie and Ms. Snyder stated in pertinent part,

**Ms. Snyder:    You put it in writing and I will consider your transfer.**
**Mr. Downie:    I am not going to put anything in writing.**
**Ms. Snyder:    Why?**

13

| | |
|---|---|
| **Mr. Downie:** | **I am asking you, would you like to transfer to the shipping department?** |
| **Ms. Snyder:** | **No, I would not. I haven't done anything wrong. I came to you like your policy requests. Your policy says to report any sexual harassment. I did and look what you're trying to do to me.** |
| **Mr. Downie:** | **I'm not trying to do anything.** |
| **Ms. Snyder:** | **You're trying to terminate. You're trying to voluntary resign.** |
| **Ms. Snyder:** | **I want to know why you want me transferred .** |
| **Mr. Downie:** | **I am not going to write anything.** |

(B-0074-0079).

If Ms. Snyder did not accept the transfer, "she effectively resigned her position." (Ryan at 39, B-0548). Downie walked towards the door and asked Ms. Snyder to leave the premises (B-0093-B-0095, B-0095) and had the Safety Director, Ryan, escort Ms. Snyder off CitiSteel's property. (Snyder at 208, B-0172). Because she was terminated, Ms. Snyder did not return to work on April 11, 2003. According to Ryan, the tape recorded conversation accurately reflects the meeting of April 10, 2003. (Ryan at 43, B-0549).

## VII.    The Aftermath

Immediately following her discharge from CitiSteel on April 10, 2003, Ms. Snyder began to suffer from emotional distress as a result of the sexual harassment by Harris, her employer's ratification thereof, and the retaliatory discharge for her complaints of the harassment. She began treating with Cindy Wright, LPCMH, at Concord Wellness Center, L.L.C. beginning on April 28, 2003. (Wright at 8, B-0520). Ms. Snyder was diagnosed for the first time with paranoia, anxiety, and depression. (Wright at 8, B-0520, Wright at 11, B-0521). She experienced bouts of sleeplessness, crying and other symptoms. Ms. Snyder was prescribed Lexapro, Remeron, and Xanax to assist with her anxiety and depression. (Wright at 11, B0521). Ms. Wright opined that Ms. Snyder was intimidated and really scared of Harris. (Wright at 25, B-0524). According to Ms. Wright, Ms. Snyder is not as strong as she projects and is really very fragile. (Wright at 35, B-0527).

14

## ARGUMENT

**I.    SNYDER CAN ESTABLISH THAT SHE WAS SUBJECT TO A HOSTILE WORK ENVIRONMENT BECAUSE HER ALLEGATIONS ARE SUFFICIENTLY SEVERE AND PERVASIVE**

Title VII states that "it shall be an unlawful employment practice for an employer (1) to...discharge any individual, otherwise to discriminate against any individual with respect to h[er] compensation, terms, condition, or privileges of employment, because of such individual's...sex..." 42 U.S.C. § 2000e-2(a)(1). "The Supreme Court has recognized that Title VII is violated by a 'work environment abusive to employees because of their...gender...." Childress v. Dover Downs, Inc., 2000 WL 376419, at *9 (D.Del.Mar. 31, 2000)(quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993)). "[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986).

In order to establish a hostile work environment, a plaintiff must establish "by the totality of the circumstances", including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating; and whether it unreasonably interferes with an employee's work performance. Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). "Specifically, a plaintiff must demonstrate that: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability." Childress, 2000 WL 376419, at *10 (citing Andrews v. City of Philadelphia, 895 F. 2d 1469, 1482 (3d Cir. 1990)(citing Vance v. Southern Bell Tel. & Tel. Co., 863 F.2d 1503, 1510 (3d Cir. 1989) and Faragher v. City of Boca Raton, 524 U.S. 775, 786-88 (1998)). "An 'employer is vicariously liable for actionable discrimination caused by a supervisor...'" Childress, 2000 WL 376419, at *10 (quoting Faraher, 524 U.S. at 775).

The record is replete with evidence indicating that a hostile work environment existed wherein Ms. Snyder suffered severe and pervasive discrimination by Harris. The Third Circuit has held that

"harassment is pervasive when 'incidents of harassment occur in concert or with regularity.'" Andrews, 895 F. 2d at 1484 (quoting Lopez v. S.B. Thomas, Inc., 831 F.2d 1469, 1482 (3d Cir. 1990). Continued explicit propositions or sexual epithets or persistent offensive touchings support a claim for hostile work environment. Miller v. Aluminum Co. of America, 679 F. Supp. 495, 502 (W.D. Pa.) aff'd, 856 F. 2d 184 (3d Cir. 1988).

In support of its contention that Ms. Snyder's allegations are not sufficiently severe or pervasive, Defendant chose to ignore completely Ms. Snyder's deposition testimony and other documents in the record that support her claim. Instead, Defendant only points to Ms. Snyder's statements to Ford and two other documents. Based on this information alone, Defendant alleges that there were only five (5) incidents of sexual harassment. (Def's Mem. at 25). This contention is disingenuous at best. When looking at the totality of the circumstances and the entire record in this case, it is abundantly clear that Harris's harassment was both severe and pervasive.

Ms. Snyder has alleged the following conduct as the basis of her sexual harassment claim: **(1)** On the second day of work, Harris asked Ms. Snyder out for a beer and then asked her if she wanted to become a CitiSteel employee; **(2)** continuing in 2001, Harris told Ms. Snyder that she "really brightened up the Melt Shop" and that she really made the Melt Shop "glow"; **(3)** Harris commented several times about Ms. Snyder's beauty; **(4)** virtually every Monday in the fall of 2001 he would ask Ms. Snyder if he could take her away for the weekend **(5)** by mid-2002, almost every day, Harris would stand close to her and smell her head, ear, neck and shoulder and arm; **(6)** practically daily Harris would ask Ms. Snyder what flavor [of perfume] she was today; **(7)** Harris would stand in Ms. Snyder's doorway and stare for twenty minutes making Ms. Snyder feel uncomfortable; **(8)** Harris would refuse to move from her doorway when Ms. Snyder asked so she was forced to brush against him to leave her office; **(9)** Harris would squeeze Ms. Snyder's cheek; **(10)** Harris would stroke Ms. Snyder's hair; and **(11)** Harris grabbed his genitals and squeezed them as he sat on the table; **(12)** Harris had Ms. Snyder draft his non-work related school work for him; **(13)** Harris walked into Ms. Snyder office and said "Pretty woman;" **(14)** Harris asked Ms. Snyder to come to work wearing no panties. (Snyder at 375, B-0246; B-0039; B-0040;

16

B-0042; B-0043; Snyder at 376-378, B-0246-0247; Snyder at 194, B-0169; Snyder at 396, B-0128 33; Snyder at 381, B-0247, B-0584).

It is well-settled law that courts should not consider each incident of harassment in isolation. Andrews, 895 F. 2d at 1484. Overt sexual harassment is not necessary to establish a sexually hostile environment and each individual incident need not be sufficiently severe to detrimentally affect a female employee. Smith v. Pathmark Stores, Inc., 1998 U.S. Dist. LEXIS 8631 (E.D. Pa. 1998). Rather, a court must evaluate the sum of abuse over time. Arguably the first few instances alone are not severe and pervasive enough to constitute harassment under the law. However, all of these incidents taken as a whole indicate that Harris's harassment grew in intensity throughout Ms. Snyder's employment at CitiSteel and the facts in the instant case, without a doubt, support a finding of a hostile work environment.

In further support of its contention that Plaintiff's allegations do not rise the level of severe and pervasive, Defendant cites to Mendoza v. Borden, Inc., 95 F. 3d 1238, 1243 (11th Cir. 1999). In Mendoza, the plaintiff testified that her supervisor (1) made the statement "I'm fired up" one time; (2) rubbed his hip against plaintiff's hip while touching her shoulder and smiling one time; (3) made a sniffing sound two times, once while looking at her groin; and (4) followed and stared. Harris's conduct in the instant case is obviously more severe and pervasive than that of the supervisor in Mendoza. For example, the supervisor in Mendoza never said anything to the plaintiff except for "I'm fired up" *one time* which is hardly threatening or humiliating. Mendoza, 195 F.3d at 1249. However, in the instant case, Harris began asking Ms. Snyder out for a beer, then continued by asking to take her away for the weekend, followed by continuous requests to take her out, followed by an expression of his emotions for her, coupled with his daily questioning as to which flavor she was wearing, and culminating in a request for her to come to work wearing a dress with no panties. (B-0246; B-0039; B-0042; Snyder at 377, B-0246; Snyder at 194, B-0169; Snyder at 168, B-0162; B-0163). Also, in Mendoza, there was only *one* physical contact by plaintiff's supervisor. Mendoza, 195 F.3d 1243. In the instant case, however, there were several incidents of physical contact on the part of Ms. Snyder's supervisor. Harris refused to move from

17

her doorway when Ms. Snyder asked so she was forced to brush against him to leave her office. On occasion, Harris would squeeze Ms. Snyder's cheek (B-0584-0585; Snyder at 33, B-0128). On other occasions, Harris would stroke Ms. Snyder's hair (Snyder at 33, B-0128). Thus, the facts in Mendoza are clearly distinguishable from those in the instant case.

Further, Defendant cites McGraw v. Wyeth-Ayerst Labs, Inc., 1997 U.S. Dist. LEXIS 20813, at *4-5 (E.D. Pa. Dec. 30, 1997) (finding that allegations that plaintiff was subjected to unwelcome kissing, touching and constant requests for a date were not sufficiently severe or pervasive) for the proposition that Defendant is entitled to summary judgment. However, this case is also distinguishable from the facts at hand because in McGraw, the defendant was entitled to summary judgment because the plaintiff proffered no evidence indicating that her supervisor's actions were so pervasive, regular or severe as to alter the conditions of her job or interfere with her ability to do her job.

In the present case, Ms. Snyder has offered a myriad of evidence to prove that Harris's actions were severe and pervasive as shown, *infra*. Further, Harris's inappropriate conduct interfered with Ms. Snyder's ability to do her job as evidenced by several things in the record.

First, Harris instructed Ms. Snyder to write his non-work related school report during work hours and while she was at home. (Snyder at 321, B-0232; B-0079-0092). She drafted a report for Harris entitled "Managing Diversity in the Workplace." (Snyder at 321, B-0232; B-0079-0092). Harris took advantage of his status as Ms. Snyder's supervisor when he added this non-work related responsibility to Ms. Snyder's workload. Working on Harris's personal business, of course, had the effect of taking time out of Ms. Snyder's work schedule, making it extremely difficult for her to get her own work completed.

Second, Ms. Snyder's frustration with Harris's conduct grew to the point where she not only said "no" to his numerous unwanted advances, but she went so far as to slap his hand away when he reached to stroke her hair. (Snyder at 168, 169, 170, B-0162-0163).

Third, Harris's conduct adversely affected her employment when he issued Ms. Snyder a written reprimand for alleged performance issues, despite the fact that he was caught on tape praising her for her

18

performance just one month earlier. (Harris at 10, B-0408). Harris later admitted that he issued this performance evaluation because he wanted to show her who had authority. (Snyder at 131, B-0153).

Fourth, Harris's sexual harassment affected Ms. Snyder's job performance because she expressed her unhappiness and distress with Harris's conduct to Ms. Patrone on several occasions beginning in the winter of 2002-2003. (Patrone at 26, 27, 28, B-0484; Patrone at 47, B-0489). Ms. Snyder went to Ms. Patrone because she needed advice on how to handle the situation. (Patrone at 24, B-0483). Ms. Patrone explained that Ms. Snyder was concerned because she wanted the harassment to stop, but she did want to go to Human Resources because she feared she would lose her job. (Patrone 3, B-04866). But at the same time, Ms. Snyder did not want to quit. (Patrone 36, B-0486) In an email to Patrone on April 7, 2003, Ms. Snyder thanked Ms. Patrone for listening to her concerns and Ms. Patrone responded that she "certainly understood." (Email P-0210).

Fifth, Harris's conduct adversely affected Ms. Snyder's job performance to the point where she started "boiling" and getting madder and madder. (Snyder at 193, B-0168). On April 8, Ms. Snyder sat at her desk and felt sick to her stomach and unable to concentrate on her work because of Harris's harassment. (Snyder at 197-198, B-0169-0170).

Sixth, Ms. Snyder's job performance was negatively affected because the day after she advised her employer of Harris's inappropriate behavior, she was forced to either accept a transfer to the Shipping Department or face "voluntary" resignation. (Ryan at 28). Surely, Harris's harassment interfered with her job performance and ultimately led to her termination from CitiSteel.

Seventh, after Ms. Snyder's termination from CitiSteel, she immediately began to suffer from emotional distress as a result of the sexual harassment by Harris. She began treating with Cindy Wright, a therapist, at Concord Wellness Center, L.L.C., who diagnosed Ms. Snyder with paranoia, anxiety and depression. (Wright at 8, B-0520 Wright at 11, B0521; B-0559-0583). Without a doubt, the above-referenced incidents support Ms. Snyder's contention that Harris's conduct, unlike the conduct of the supervisor in McGraw, interfered with her job performance.

19

Defendant also cites <u>Adusumili v. City of Wilmington</u>, 164 F. 3d 353 (7th Cir.)( affirming grant of summary judgment where the alleged harasser repeatedly stared at the plaintiff's chest, plaintiff was the brunt of sexual jokes, and on four occasions defendants made unwelcome contact with her arm, fingers and buttocks) in support of its argument for summary judgment. However, the facts in this case, too, are far removed from the facts in the present case. The court in <u>Adusumili</u> determined that the misconduct was far too tepid or intermittent or equivocal because the most serious unwanted touching took the form of a *poke* and occurred *only once.* Id. at 362. In Ms. Snyder's case, however, there existed the daily sniffing of her head, ear, neck shoulder and arm as Harris stood close to one side of her and asked what flavor she was today, along with the squeezing of Ms. Snyder's cheek, the stroking of Ms. Snyder's hair and the standing in Ms. Snyder's doorway so that she was forced to brush up against him when she left the office. (Snyder at 396, B-0251; Snyder at 33, B-0128; B-0584). The aforementioned behavior is sufficient enough to make a reasonable person believe that she has been discriminated against based on her sex. <u>Galloway v. General Motors Service Parts Operations</u>, 78 F. 3d 1164, 1168 (7th Cir. 1996).

Defendant also points to incidents in the record wherein Ms. Snyder (1) sent an email to the Safety Manager concerning a broken floor tile, (2) requested an adjusted schedule, and (3) testified that she was not depressed while working at CitiSteel for the proposition that Ms. Snyder cannot establish the presence of psychological injuries required for a finding of a hostile environment. (Def's Mem. at 28). However, Defendant is mixing apples and oranges. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive, and the psychological harm, like any other relevant factor, may be taken into account. <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 23 (1993). But, *no single factor is required under Title VII of the Civil Rights Act of 1964.* Id. (emphasis added). So long as the environment would reasonably be perceived, and is perceived, as a hostile or abusive, <u>Meritor Sav. Bank, FSB v. Vinson</u>, 477 U.S. 57, 67 (1986), there is no need for it also to be psychologically injurious. <u>Harris v. Forklift Systems, Inc.</u>, 510 U.S. 17, 22 (1993). It suffices to prove that a reasonable person subjected to the discriminatory conduct would find, as Ms. Snyder did, that the harassment so altered working conditions as to "make it more difficult to do the job."

As noted, Harris v. Forklift Systems, Inc., 510 U.S. 17, 26 (1993). Harris's harassment interfered with Ms. Snyder's performance of her job to the point where she felt sick to her stomach so much so that she could no longer concentrate on her job. (Snyder at 197-198, B-0169-0170).

Notwithstanding the fact there is *no* requirement that Ms. Snyder's environment be psychologically injurious, the medical records and deposition testimony of Ms. Snyder's therapist, Ms. Cynthia Wright, LPMH, whom she treated with for several months, leaves no question as to the psychological impact Harris's conduct had on Ms. Snyder. (B-0559-0583 and transcript of Cindy Wright). Initially, Ms. Snyder was referred to Ms. Wright by her primary care physician, Dr. Goodman, on or about April 23, 2003. (B-0559-0583). The patient intake form completed by Ms. Wright on April 23, 2003, states in pertinent part, "Sexually harassed (sic) by supervisor-depressed, very down, life has stopped – can't resume normal activities. (B-0559-0583). Ms. Wright's records of April 28, 2003 indicate "recent work-related harrassment (sic) which led to termination has caused anxiety, depressed mood and powerlessness." (B-0559-0583; D172). Her records of May 5, 2003 indicate in part, "Arrived on time. Completed assessment. Terri (sic) *continues to be worried and fearful of ex-boss...*" (medical record, D176) (emphasis added). Medical records of May 19, 2003, indicate in part, "Focused on recent [increase] in depressed mood and anxiousness. Identified trigger as recent contact with ex-employer (*saw him at a distance*) (B-0559-0583) (emphasis added).

Ms. Wright was of the opinion that Ms. Snyder was intimidated and really scared of Harris (Wright at 25, B--0524). According to Ms. Wright, Ms. Snyder is not as strong as she projects and she is really very fragile. (Wright at 35, B-0527). (See Grazioli v. Genuine Parts Co. 409 F. Supp. 2d 569, 578-79 (D.N.J. 2005) (finding triable issue of fact where employee presented letter from a counselor as evidence of psychological harm); Anderson v. Delux Homes of Pa, Inc., 131 F. Supp. 2d 637, 646-47 (M.D. Pa. 2001) (finding evidence of psychological effects upon plaintiff where allegations are supported by documentation from her physician). Surely, Ms. Snyder's medical records from April 2003 through the beginning of 2004, as well as the testimony of her treating physician, Ms. Cynthia Wright, support

21

Ms. Snyder's contention that she suffered psychological injuries as a result of the hostile and abusive environment created by Harris.

Also, Defendant points to <u>Gross v. Burggraf Construction Company</u>, 53 F.3d 1531 (10th Cir. 1995) for the proposition that this Court should reject Ms. Snyder's hostile environment claim because "the backdrop of the blue-collar environment of a steel mill must be considered." (Def's Mem. at 27). However, the only person heard using sexual explicit language at CitiSteel was Harris and there was not much cursing at the Melt Shop. (Snyder at 192,191). Thus, the facts in <u>Gross</u>, and therefore, the court's holding in that case are inapplicable to the instant case.

Finally, CitiSteel cites <u>Taylor v. Brandywine School District</u>, No. 05-4803, 2006 U.S. App. LEXIS 24643 (3d Cir. Sept. 29, 2006) in support of its contention that it is entitled to summary judgment because Ms. Snyder's claim that Harris touched her hair "every single day" and sniffed her on a "daily basis" cannot be used to prove a hostile environment claim. (Def's Mem. at 29). The plaintiff in <u>Taylor</u>, however, could not establish a hostile environment claim because she (1) failed to name *any* specific job for which she applied and was rejected; (2) she could not provide *any* evidence of what promotions she did not obtain; (3) she could not identify *any* instances in which staff members were permitted to speak to her rudely; and (4) it did not appear that she actually applied for *any* available position. (Taylor, 2006 U.S. App. LEXIS 24643 at * 14, *16).

In the instant case, we do not have bare and unsubstantiated allegations of Ms. Snyder's hostile work environment claim. Harris was caught on tape apologizing for his "rude" behavior. (B-0005-0008). Also, Ms. Snyder has been entirely consistent with her detailed description of Harris's misconduct as shown in her deposition testimony, diary entries and written documents to CitiSteel and the EEOC. What is more, the sworn testimony of Ed Vouras, Ms. Snyder's father and Carmella Patrone, a CitiSteel employee, constitutes corroborative evidence that Ms. Snyder expressed to them on several occasions, contemporaneously with the harassment by Harris, that she was being harassed by her supervisor. (Transcript of Ed Vouras, B-0502-0516; Transcript of Carmella Patrone, B-0502-0516). Thus, the Defendant's reliance on <u>Taylor</u> is misplaced as the plaintiff in <u>Taylor</u> failed to provide *any* evidence of a

hostile environment. Furthermore, Ms. Snyder's testimony is that Harris would stand close to her, smell her and ask her what flavor she was today on a "practically daily" basis. (Snyder at 396, B-0251). "He may have missed one day out of the week." (Snyder at 396, B-0251). In considering Defendant's motion, it is not the time to resolve factual disputes or make credibility determinations, and all facts and inferences must be viewed in the light most favorable to Ms. Snyder. Siegal Transfer, Inc. v. Carrier Express, Inc., 54 F. 3d 1125, 1127 (3d Cir. 1995).

## II.    SNYDER CAN ESTABLISH THE EXISTENCE OF RESPONDEAT SUPERIOR LIABILITY

An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. Burlington Indust., Inc. v. Ellerth, 524 U.S. 742, 765, (1998); see also Faragher, 524 U.S. at 807-08 (1998). It makes sense to hold an employer vicariously liable for some tortuous conduct of a supervisor made possible by abuse of his supervisory authority. As the Supreme Court noted, the "agency relationship affords contact with an employee subjected to a supervisor's sexual harassment, and the victim may well be reluctant to accept the risks of blowing the whistle on a superior." Faragher v. City of Boca Raton, 524 U.S. 775 at 803. This rationale is particularly apt here where, Ms. Snyder indicated to Ms. Patrone that she feared she would lose her job if she reported Harris's behavior. (Patrone at 36, B-0486).

There can be little doubt that a jury could find that Harris, Ms. Snyder's supervisor actively misused his supervisory authority. For example, in the beginning, when Ms. Snyder was only a temporary employee, Harris asked Ms. Snyder out for a beer and then asked her if she wanted to become a full-time CitiSteel employee. (Snyder at 375, B-0221; P-0839). Harris also asked Ms. Snyder to do his personal school work for him. (Snyder at 321, B-0232; B-0079-0092). Further, Harris disciplined Ms. Snyder for alleged poor performance and then later admitted that he needed to show her who had authority (Snyder at 131, B-0153). Additionally, Harris instructed Ms. Snyder not to talk to any other CitiSteel employees because he had "unexplainable feelings" for her. (B-0058). In the context of this

behavior by Harris, such explicit use of authority constitutes misuse and therefore, liability on the part of CitiSteel.

Under the doctrine that has come to be known as the Ellerth/Faragher affirmative defense, an employer that has taken no tangible adverse employment action against an employee cannot be held liable for the creation of a hostile work environment.  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998).  No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action such as discharge, demotion, or undesirable reassignment.  Id.  It is Ms. Snyder's strong contention that this affirmative defense is not available to Defendant in this case because it has taken a tangible adverse employment action against Ms. Snyder in the form of constructive discharge.  The Supreme Court has defined a tangible employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  Ellerth, 524 U.S. at 761.  Although Defendant contends that Ms. Snyder was not terminated and that she "voluntarily" made the decision to resign her employment (Ryan at 39), Defendant cites no portion of the record which supports its assertion of voluntariness.

Assuming *arguendo* that Ms. Snyder has *not* suffered a tangible adverse employment action, the employer will be liable for harassment by its supervisor unless it can prove (1) that it exercised reasonable care to prevent and promptly correct any sexually harassing behavior; *and* (2) that the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer to avoid harm otherwise.  Faragher at 524 U.S. 775, 807-808 (1998); Burlington at 424 U.S. 742, 765 (1998).

## A.    Defendant Failed to Exercise Reasonable Care to Prevent and Correct Harassment. Instead, Defendant Conducted A Biased Investigation That Was Rigged With A Pre-Determined Conclusion

Defendant points to its sexual harassment policy as evidence that it took reasonable steps to prevent and correct the harassment.  (Def's Mem. at 30).  However, a policy is only effective if it is designed to get at the truth and its investigators are unbiased and impartial in their quest for the truth.  An

24

investigation that is rigged to reach a pre-determined conclusion or otherwise conducted in bad faith will not satisfy the employer's remedial obligation. Fuller v. City of Oakland, 47 F.3d 1522,1529 (9th Cir. 1995). "Denial does not constitute a remedy." Fuller, 47 F.3d 1522, 1529. Likewise, Downie's goal to "keep the dust down" and his unwillingness to "reach those channels" in no way constitutes a sufficient remedy. "An employer whose sole action is to conclude that no harassment occurred cannot in any meaningful sense be said to have "remedied" what happened. Id. at 1529. The "fact of investigation alone" is not enough. Id.

In Fuller, the alleged harasser asserted that he was not responsible for the hang-up calls plaintiff had received. Fuller, 47 F. 3d 1522, 1529. Instead, the employer accepted the harasser's assertion without checking his phone records for most of the months that plaintiff had received calls. Id. The court recognized that the employer's investigation was inadequate and did not constitute remedial action. Id. Similarly, in the instant case, the Defendant accepted Harris's assertion that he did not sexually harass Ms. Snyder and advised her that she would have to transfer to the Shipping Department *before* even listening to Ms. Snyder's tape and reviewing her documentation.

Further, Defendant errantly contends that the steps it took after it was made aware of the alleged harassment in April 2003 constitutes an effective response. (Def's Mem. at 31). As previously noted, Ms. Snyder met with Buragino and Downie on April 8, 2003 to discuss her allegations of sexual harassment (Snyder at 174, B-0164; Snyder at 198, B-0170). During this meeting, she drafted a two-page written statement describing in great detail the specific words and action that Harris engaged in over the protracted period of time. (B-0067-0068). She also informed Downie that she could also produce a tape of Harris's admission of wrong doing, as well as diaries but Downie "was not interested in the tapes" because he did not know whether they would be relevant. (Downie at 22, B-0343).

At the close of this meeting, Downie assured Ms. Snyder that they would conduct a thorough investigation and that they would meet with Ms. Snyder and her father on Thursday for a "complete meeting." (Snyder at 259, B-0217; Downie at 17, B-0341).

That same day, on April 8, 2003, Downie and Buragino met with Harris at 3:45 p.m. At that time Harris stated that he "*did not recall* ever asking her to wear a dress or not to wear panties and that he never "*intentionally* touched her face or her hair." (B-0094) (emphasis added). Buragino has known Harris for a number of years and he "felt bad for [Harris]." (B-0382.) Later that evening, Harris and Downie met at a local bar for a beer to further discuss the situation. (Downie at 73, B-0355; Harris at 179, B-0450). This just reeks of impropriety because an investigation of this magnitude should not be investigated at over a beer in a local bar. With Downie in charge of this investigation, Ms. Snyder did not stand a chance. Downie informed Harris that they would meet with "upper management" the next morning. (Harris at 179, B-0450).

The next morning, April 9, 2003, Buragino, Downie and Bieger met with Harris to discuss the investigation results and the proposed action to resolve the matter. (B-0095; B-0098). Why would Defendant allow the alleged harasser, Harris, to be involved in determining the outcome of an investigation wherein he is the accused? Once again, this reeks of impropriety. Ryan, the current Human Resources Manager, testified that Harris *should* be involved in the decision to transfer Ms. Snyder because "it involved his employee and taking action that would remove her from his department." (Ryan at 25, B-0544). After their meeting with Harris, Downie and Ryan, without requesting to see any of Ms. Snyder's evidence, then met with Ms. Snyder to inform her that she must transfer to the Shipping Department or voluntarily resign. (Snyder at 271, B-0220; Ryan at 28, B-0545). Then they sent her home to think about the offer. (Snyder 267, B-0219). However, harassment is to be remedied through actions targeted at the *harasser*, not the victim. Intlekofer v. Turnage, 973 F 2d 773, 780-81 (9th Cir. 1992). An employer's action is appropriate where it "fully remedies the conduct *without* adversely affecting the terms and conditions of the charging party's employment in some manner (for example, by requiring the charging party to work less desirable hours or in a less desirable location)." Swenson v. Potter, 271 F. 3d 1184, 1194 (9th Cir. 2001) (emphasis added). An employer does not satisfy its remedial obligation by transferring the victim to "a less desirable location." Ellison v. Brady, 924 F.2d 872, 882 (9th Cir. 1991) (employer gave the victim a choice of either working with her harasser or transferring to a

less desirable location). Such a transfer adversely affects the terms and conditions of the victim's employment, and may itself be the basis for employer liability. Hostetler v. Quality Dining, Inc., 218 F. 3d 798, 811 (7th Cir. 2000).

Failing to cite any CitiSteel policy in the record, Defendant contends that Downie could not meet with Ms. Snyder, as previously promised, because "concerns for safety require that non-employees be prohibited from company property. (Def's Mem. at 32). Unfortunately for Ms. Snyder, she was not afforded the same opportunity as Harris to have a meeting off-site at Bennigan's Restaurant. Had the company done so, Ms. Snyder would have been able to have a witness in the meeting as previously promised by Downie.

Further, Defendant wrongly contends that its decision to transfer Ms. Snyder to Shipping, along with the circumstances surrounding this transfer were appropriate. (Def's Mem. at 33). Given the fact that CitiSteel wanted Ms. Snyder to transfer or voluntarily resign just one day after complaining of sexual harassment, it was more than understandable that she would want something in writing explaining the terms and conditions of the new job, as well as the reason for the transfer. But Downie refused. (B-0336-0356). Although Defendant asserts at this stage in the litigation that the move to Shipping was a lateral move with the same terms and conditions of her previous employment in the Melt Shop, the only thing Downie told Ms. Snyder about the new position is that her salary would remain the same. (Snyder at 330, B-0235). She was not told (1) why she was being transferred, (2) whether she would have the same duties, or (3) whether she would work the same schedule. According to Buragino, the job responsibilities of a Clerk/Typist in Shipping "were quite a bit different." (Buragino at 67, B-0385). Neither Downie nor Ryan informed Ms. Snyder that her job was being eliminated in the Melt Shop. (Ryan at 38, B-0548). Apparently, the decision to eliminate Ms. Snyder's position came about only after she made complaints of sexual harassment because Downie, the Human Resources Director and Buragino, the Vice-President of Manufacturing in the Melt Shop were not aware of this alleged elimination of Ms. Snyder's position until the day after she complained of harassment. (Downie at 49, Buragino at 67). Further, there is a question of whether there was even an available position in the Shipping Department because there was already a

27

Clerk Typist serving in the Shipping Department and there was no positing for the position even though positions must be posted per CitiSteel policy. (Ryan at 29, Buragino's Statement). Objectively and subjectively, Defendant's remedy of this matter was far from an appropriate action.

**B.    Plaintiff's Delay In Using Preventative Or Corrective Opportunities Was Reasonable Under the Circumstances**

To satisfy the second prong of the affirmative defense, Defendant must show that Ms. Snyder *unreasonably* failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise. Ellerth, 524 U.S. at 765. Although Ms. Snyder was not prompt in bringing Harris's harassment to the attention of the appropriate authority at CitiSteel, she explained that her delay stemmed from fear that she would lose her job and also the hope that Harris would stop his inappropriate behavior. In Hawk v. Americold Logistics, LLC, 2003 U.S. Dist. LEXIS 3445 (E. D. Pa. 2003), the Court held that plaintiff's delay in reporting her supervisor's conduct was *not unreasonable* because (1) she feared she would lose her job; (2) she was a temporary employee when the harassment began; (3) the alleged harasser had direct authority over her and (4) she eventually identified her harasser and provided detailed examples of the harassing behavior). Id. at *27-28.

In the present case, Ms. Snyder confided in Ms. Patrone her fear that she might lose her job if she told CitiSteel about Harris's conduct. (Patrone at 61, B-0492). Harris was a supervisor who had direct authority over Ms. Snyder and the harassment began when Ms. Snyder was a temporary employee working for Harris. (Snyder at 128, B-0152; Snyder at 375, B-0246; B-0039). She was hopeful that Harris would stop his harassment because he apologized and said that he would stop. (B-0045). Ms. Snyder would tell Harris that she did not appreciate his conduct and according to Ms. Patrone, Ms. Snyder was "pretty clear that she didn't like it." (Patrone at 29, B-0484). Similar to the plaintiff in Hawk, Ms. Snyder's delay in notifying management was *not unreasonable* under these circumstances.

Unfortunately for Ms. Snyder, she began to realize that Harris was not going to stop on his own. (Snyder at 197, B-0169). "[Ms. Snyder] didn't want to report it to Human Resources. At the same time her saying no wasn't stopping the whole thing either. But she didn't want to lose—she didn't want to quit

28

either.    She liked her job."    (Patrone at 36, B-0486).    "But when he wouldn't stop and this [the harassment] wouldn't stop, [Ms. Snyder] was sickened to [her] stomach by it.    (Snyder at 196, B-0169). According to Ms. Patrone, there was always that risk that she could lose her job.    (Patrone at 61, B-0492). In fact, that is exactly what happened to Ms. Snyder just one day after she told CitiSteel about Harris's sexual harassment.    (Snyder at 271, B-0220; Ryan at 28, B-0545).    Apparently, Ms. Snyder's fears were totally justified.

Defendant contends that Ms. Snyder's fears of losing her job were not credible because she did not produce evidence to the effect that the employer has ignored or taken adverse action against other employees in response to similar complaints.    (Def's Mem. at 35).    The problem with this argument is that Ms. Snyder was one of only two women in the Melt Shop with 50 male employees.    (Ryan at 28, B-0545; Snyder at 188, B-0167).    The Melt Shop was almost exclusively male.    (Snyder at 188, B-0167).    Thus, the likelihood that Ms. Snyder would be able to provide evidence that the employer took adverse action against other women for their similar complaints of harassment is drastically decreased given the fact there was only one other woman working in the Melt Shop.    Further, it is more than reasonable that Ms. Snyder would be fearful of retaliation for her complaints of sexual harassment in a department that was exclusively male.

Defendant also asserts that Ms. Snyder failed to turn over any evidence to support her allegations other than her verbal word, and Defendant argues that this failure was *per se* unreasonable.    (Def's Mem. at 35).    When Ms. Snyder reported to CitiSteel that she was being sexually harassed by Harris, she advised both Buragino and Ford that she had diary entries and a tape of Harris apologizing for wrongdoing.    (B-0093, Downie at 20, B-0342).    Downie admits that he told Ms. Snyder that he did not want to hear the tapes because he "did not want to reach those channels."    (Downie at 22, B-0343; Snyder at 261 B-0217).    During this meeting, on April 8, 2003, Downie also told Ms. Snyder that he would agree to meet with Ms. Snyder and her father on Thursday for a "complete meeting."    (Snyder at 259, B-0217; Downie at 17, B-0341).

29

The very next day, on April 9, 2003, after Downie met with Harris at Bennigan's Restaurant for a beer to discuss Ms. Snyder's allegations, Downie instructed Ms. Snyder that she could (1) voluntarily resign, or (2) take a transfer to Shipping Department and (3) that he no longer had time to meet with her father. (Snyder at 271, B-0220; Snyder at 280; B-0222; Ryan at 28, B-0545). It was at this time that Downie told Ms. Snyder that he wanted to "keep the dust down." (B-0072). Because Ms. Snyder was obviously upset and angry at the thought of losing her job, Downie told her that she should go home and think about his offer and report to Human Resources the next morning to provide her answer. (Snyder at 267, B-0219). Ms. Snyder was not given the opportunity to provide Defendant with the evidence that she possessed. Moreover, the Defendant did not want to view Ms. Snyder's documents and tape, as evidenced by the fact that Defendant had already determined that Harris would remain at CitiSteel in the Melt Shop, and Ms. Snyder would be shipped to the Shipping Department *before* it even reviewed any of her evidence. Therefore, any alleged failure on Ms. Snyder's part to produce evidence was reasonable due to the Defendant's biased investigation and a rush to a pre-determined conclusion. Why would Ms. Snyder surrender the only evidence she had to prove Harris's harassment when Downie had already punished her by transferring her to another department and taking her job away?

Here, Ms. Snyder can easily establish a prima facie case. She suffered intentional discrimination because of her sex in the form of physical and verbal sexual advances by her supervisor, Harris. The discrimination was severe and pervasive because it continued on a nearly daily basis from mid-2002 until the termination of her employment in April of 2003. The discrimination detrimentally affected the plaintiff because she eventually lost her job and was forced to seek psychiatric counseling. Such discrimination would detrimentally affect a reasonable woman in the same position as Ms. Snyder. Finally, there is respondeat superior liability because the discrimination was caused by a CitiSteel supervisor.

**III.    SNYDER CAN ESTABLISH THAT SHE WAS CONSTRUCTIVELY DISCHARGED AND, THEREFORE, CAN ESTABLISH THAT A TANGIBLE JOB ACTION OCCURRED.**

The Supreme Court has defined a tangible employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). The Third Circuit has not resolved this issue, but has suggested that it might recognize constructive discharge as a tangible employment action. Durham Life Ins. Co. v. Evans, 166 F. 3d 139, 153 (3d Cir. 1999) (rejecting a theory under which any substantial adverse action would not be tangible adverse action if it led affected employee to quit before demotion took effect as "contrary to Title VII doctrine," which "recognizes a constructive discharge under such circumstances,") (finding a constructive discharge where the employee resigned when her office was stripped from her). Id. (See Clowes v. Alleghany Valley Hosp., 991 F. 2d 1159, 1161 (3d Cir. 1993) (noting that successful constructive discharge claims often involve employees that were asked to resign or threatened with firing). In Cardenas v. Massey, 269 F. 3d 251, 266 (3rd Cir. 2001) the court assumed that a constructive discharge could operate as a tangible employment action.

Here, Defendant argues that Ms. Snyder's constructive discharge claim fails "since she was offered another job at the same job grade and salary…" (Def's Mem. at 37). The fact that her pay and benefits were not reduced and that Defendant considered the jobs equivalent is not dispositive. Dienno v. Goodwill, 162 F. 3d 235 (3rd Cir. 1998). A reasonable jury could find that Ms. Snyder's employment was substantially worsened. CitiSteel's actions constituted a constructive discharge because its harassment and discrimination against Ms. Snyder was so intolerable that a reasonable person in the same position would have felt compelled to resign. Here, the harassment included: (1) involuntary transfer to a less desirable position, and (2) unsatisfactory job evaluation.

On April 9th and 10th, Downie attempted to transfer Ms. Snyder to a less desirable position in the Shipping Department without telling her anything about the position other than she would be making the same salary. (Snyder at 330, B-0235). When she asked for an explanation of why she was being removed from her original job, he refused. (B-0618-0622). When Ms. Snyder asserted that she had done

nothing wrong to justify a transfer and asked for documentation explaining the move, Downie again refused and had her escorted off CitiSteel property. (B-0074-0078;B-0095; Snyder at 24, B-0126; Snyder at 15, B-0124; Snyder at 18, B-0125). The recorded conversation between Downie and Ms. Snyder states, in pertinent part,

| | |
|---|---|
| **Ms. Snyder:** | **You put it in writing and I will consider your transfer.** |
| **Mr. Downie:** | **I am not going to put anything in writing.** |
| **Ms. Snyder:** | **Why?** |
| **Mr. Downie:** | **I am asking you, would you like to transfer to the shipping department?** |
| **Ms. Snyder:** | **No, I would not. I haven't done anything wrong. I came to you like your policy requests. Your policy says to report any sexual harassment. I did and look what you're trying to do to me.** |
| **Mr. Downie:** | **I'm not trying to do anything.** |
| **Ms. Snyder:** | **You're trying to terminate. You're trying to voluntary resign.** |
| | |
| **Ms. Snyder:** | **I want to know why you want me transferred .** |
| **Mr. Downie:** | **I am not going to write anything.** |

(Transcript 00618-00622). Further, Ms. Snyder's responsibilities in the Melt Shop consisted of more than just the standard Clerk/Typist job duties. Ms. Snyder had similar duties to that of an administrative assistant in the Melt Shop. (Snyder at 89, B-0142). In addition to her Clerk/Typist duties, Ms. Snyder was responsible for quality procedure. (Snyder at 94, B-0144). No longer having her current position in the Melt Shop and not knowing what to expect in the Shipping Department, Ms. Snyder wanted something in writing explaining the new terms of her employment but Downie refused and had her escorted off of CitiSteel's property. If the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee. Calcote v. Texas Eductional Foundation, Inc., 578 F. 2d 95 (5th Cir. 1978).

Also, Harris gave Ms. Snyder an unsatisfactory evaluation. In response to a routine e-mail to Harris's supervisor regarding some loose tiles outside her office and Ms. Snyder's reaction to Harris's continued harassment, Harris issued Ms. Snyder a written reprimand for allegedly poor work performance in February of 2003, and stopped talking to Ms. Snyder altogether. Later in early March 2003, Harris

admitted that the evaluation was not justified when he apologized for his conduct to Ms. Snyder. (Snyder at 131, B-0153; B-0045) On the day Ms. Snyder's employment ended, Downie agreed to remove the unjustified unsatisfactory evaluation from Ms. Snyder's file. (Ryan at 43, B-0549). However, by that time, the harassment by Harris and management's refusal to address the situation left Ms. Snyder with the reasonable belief that she had been discharged.

Defendant also contends that Ms. Snyder has no viable retaliation claim because "she walked off the job only...after reporting her allegations". (Def's Mem. at 38). "Title VII [also] prohibits discrimination [in the form of retaliation] against an employee who has exercised her rights under the Act. Price v. Delaware Dep't of Correction, 40 F. Supp. 2d 544, 551 (D. Del. 1999). "In order to state a prima facie case of retaliation..., the plaintiff must show (1) she engaged in a protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity and the employer's adverse action." Krouse v. American Sterilizer Co., 126 F. 3d 494, 500 (3d Cir. 1997).

Here, Ms. Snyder also can establish a retaliation claim. She engaged in protected employee activities by reporting the discrimination both to Ford and Downie on April 8, 2003. There was adverse action by the employer after or contemporaneous with Ms. Snyder's protected activity because Downie attempted to transfer her to a less desirable position on April 9th and again on the 10th. When she requested a written explanation, he escorted her off CitiSteel property. As was found in her unemployment appeal hearing, CitiSteel terminated Ms. Snyder's employment. Finally, there is a causal connection between the employee's protected activity and the employer's action because CitiSteel discharged Ms. Snyder just two days after she complained of sexual harassment to Ford and Downie and only one day after reporting to the EEOC to file a charge of discrimination.

## IV.    PLAINTIFF HAS DILIGENTLY ATTEMPTED TO MITIGATE HER DAMAGES; THEREFORE SHE IS ENTITLED TO BACK PAY, FRONT PAY AND PUNITIVE DAMAGES AS A MATTER OF LAW.

In order for the Defendant to avoid an award of back pay to the Plaintiff, they must prove Plaintiff did not attempt to mitigate her damages. Therefore, this Defendant must prove that Plaintiff did

not make reasonable efforts to either find or keep substantial interim employment. <u>Caufield v. The Center Area School District</u>, 133 Fed. Appx. 4 (3rd Cir. 2005). Defendant had not offered any evidence that suggests Plaintiff was anything but diligent in her search for interim employment. Furthermore, Defendant's accusations that Ms. Snyder was not diligent in keeping substantial interim employment are misguided, as the interim employment secured by Plaintiff was not substantially equivalent to her job with the Defendant.

A.     **Plaintiff Has Diligently Searched For Substantially Equivalent Interim Employment.**

To prove that Plaintiff failed to mitigate her damages the Defendant must prove that either: (1) "substantially equivalent positions were available to the Plaintiff and [she] failed to use reasonable diligence in attempting to secure those positions"; (2) "[Plaintiff] withdrew ***entirely*** from the employment market." <u>Caufield</u>, 133 Fed. Appx. 14 (emphasis supplied). A plaintiff, who makes "***No*** effort to secure suitable employment", is considered to have completely withdrawn from the employment market, thus, relieving the employer of their burden of proving the availability of substantially equivalent replacement employment. <u>Quint v. A.E. Staley Manufacturing Co.</u>, 172 F.3d 23 (1st Cir. 1999). (emphasis supplied)

A plaintiff's efforts to secure substantially equivalent interim employment does not need to be successful in order to be reasonable and diligent. <u>Hawkins v. 1115 Legal Service Care</u>, 163 F.3d 684 (2nd Cir. 1998). Nor is a plaintiff required to "go into another line of work, accept a demotion or take a demeaning position." <u>Booker v. Taylor Milk Company, Inc.</u>, 64 F.3d 860, 870 (3rd Cir. 1995). However, an unskilled laborer does not have to obtain a job in the same line of work. <u>Tubari Ltd., Inc. v. NLRB</u>, 959 F.2d 451,454 (3rd Cir. 1992). Rather, the plaintiff must show that she made some effort to secure replacement employment and that those efforts were reasonable, based on the individual characteristics of the plaintiff and the state of the job market. <u>Id.</u> Evidence of diligence may take the form of job seeking activities or securing interim employment. In <u>Marlene Industries Corp.</u>, 234 N.L.R.B. 285 (1978), the court found that the plaintiff was diligent and his efforts reasonable because he immediately secured replacement employment and held three different jobs during the post separation period.

Ms. Snyder has diligently searched for and repeatedly secured post-separation employment. During her post-separation employment period, Plaintiff has applied for two hundred and ninety jobs through the Delaware Department of Labor. (B-0586-0975). Additionally, Ms. Snyder has secured ten separate positions, compared to three subsequent positions in Marlene. (B-0976-0979). While employed by CitiSteel, Ms. Snyder worked as a secretary compared to the unskilled laborers in Tubari. However, only one of the ten jobs she held was a secretarial position. Therefore, Ms. Snyder has gone beyond her duties to mitigate, as the law does not require her to change her line of work in order to find employment, because she is not an unskilled laborer. Thus, Ms. Snyder has been vigorous in her search for employment going beyond the duty imposed by law. Because Ms. Snyder did not completely withdraw from the employment market, Defendant bears the burden of showing that equivalent employment existed and Ms. Snyder would have obtained this employment had she been diligent in her efforts. Caufield, 133 Fed. Appx. 4. The Defendants have not satisfied this burden, as they put forth no evidence that substantially equivalent employment was available to Plaintiff or that she has not been diligent in her efforts to secure replacement employment. Therefore, the Defendants have not met their burden on this issue.

**B.     Ms. Snyder's Termination, From Post Separation Employment, Does Not Affect Her Ability To Collect Back Pay.**

A plaintiff's duty to mitigate damages imposes a duty of diligence in seeking and keeping substantially equivalent employment. Patterson v. P.H.P. Healthcare Co., 90 F.3d 927 (5th Cir. 1996). As with the duty to seek, the duty to keep is limited to those positions that are substantially equivalent, as the law does not require a plaintiff to "change their line of work or take a demotion or demeaning position." Id. (Internal Citations Omitted).

Substantially equivalent employment is more than just a similar job or a job with the same title and duties. Caufield, 113 Fed. Appx. 4. A substantially equivalent job is "that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status." Caufield, 113 Fed. Appx. 15. (Internal Citations Omitted). Furthermore, a

35

determination that replacement employment is substantially similar is a factual determination, which is best left to a jury.

Plaintiff's termination from American Flagging was not a breach of her duty to mitigate damages because the job was not substantially equivalent to her employment with Defendant. Defendant has correctly observed that Plaintiff's employment with American Flagging Corporation was more lucrative then her job at CitiSteel. However, this observation alone does not mean the two jobs were substantially equivalent as compensation is one of several factors that must be "virtually identical." Caufield, 113 Fed. Appx. 19. (Internal Citations Omitted). While employed as a roadside flagger, Plaintiff worked outside and was exposed to the elements and faced numerous dangers that she did not have to endure while employed as a clerk typist/Administrative Assistant at CitiSteel, thus, the working conditions and job responsibilities of the two jobs were dissimilar. Therefore, her employment with American Flagging Corporation was not substantially equivalent to that which she enjoyed at CitiSteel. Thus, she had no duty to act diligently in keeping her job with American Flagging Corporation. Furthermore, when a Plaintiff breaches their duty to mitigate their damages, through the loss of interim employment, their right to receive back pay is not permanently cut off at the date of termination, it is merely suspended until the plaintiff finds another job. Johnson v. Spencer Press of Maine Inc., 364 F.3d 368,375 (1st Cir. 2004). Therefore, even if Ms. Snyder did breach her duty by losing her job with American Flagging, her right to receive back pay would merely be suspended, as she obtained interim employment shortly after her termination from American Flagging Corporation. Id.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment should be denied because there are genuine issues of material fact and Defendant is not entitled to judgment as a matter of law.

**MARGOLIS EDELSTEIN**

**/s/ Lori A. Brewington**

Jeffrey K. Martin (Del Bar. #2407)
Lori A. Brewington (Del Bar #4522)
1509 Gilpin Avenue
Wilmington, DE 19806
Tel: (302) 777-4680
Fax: (302) 777-4682
Attorneys for Plaintiff

Dated: December 22, 2006