IN THE UNITED STATES DISTRICT COURT
IN AND FOR THE DISTRICT OF DELAWARE

TERRY L. SNYDER,                    )
                                    )
        Plaintiff,                  )        C.A. No. 04-970(JJF)
                                    )
        v.                          )
                                    )
CITISTEEL USA, INC.                 )
                                    )
                                    )
        Defendant.                  )

COMPENDIUM OF UNREPORTED CASES IN
PLAINTIFF'S ANSWERING BRIEF
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MARGOLIS EDELSTEIN
Jeffrey K. Martin (Del Bar. #2407)
Lori A. Brewington (Del Bar #
1509 Gilpin Avenue
Wilmington, DE 19806
Tel: (302) 777-4680
Fax: (302) 777-4682
Attorneys for Plaintiff

Dated: December 22, 2006

| TAB | UNREPORTED CASE |
|-----|-----------------|

A     Marianne Caufield v. The Center Area School District
133 Fed. Appx. 4 (3rd Cir. 2005)

B     Donna Childress v. Dover Downs, Inc.
2000 WL 376419, at *9 (D.Del.Mar. 31, 2000)

C     Christine Hawk v. Americold Logistics, LLC
2003 U.S. Dist. LEXIS 3445 (E. D. Pa. 2003)

D     Paula G. McGraw v. Wyeth-Ayerst Laboratories, Inc.
1997 U.S. Dist. LEXIS 20813, at *4-5 (E.D. Pa. Dec. 30, 1997)

E     Sheila Smith v. Pathmark Stores, Inc.
1998 U.S. Dist. LEXIS 8631 (E.D. Pa. 1998)

F     Wanda G. Taylor v. Brandywine School District
No. 05-4803, 2006 U.S. App. LEXIS 24643 (3d Cir. Sept. 29, 2006)

A

Westlaw.

133 Fed.Appx. 4                                                                    Page 1
133 Fed.Appx. 4, 199 Ed. Law Rep. 123
**(Cite as: 133 Fed.Appx. 4)**

**Briefs and Other Related Documents**

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Marianne CAUFIELD, Appellant
v.
THE CENTER AREA SCHOOL DISTRICT; the
Center Area School District Board of
Directors
**No. 04-2538.**

Argued May 3, 2005.
Decided May 20, 2005.

**Background:** Substitute teacher who unsuccessfully sought full-time employment as full-time elementary school teacher on several occasions sued school district, alleging age discrimination in violation of Age Discrimination in Employment Act (ADEA) and Pennsylvania Human Relations Act (PHRA) and seeking declaratory and injunctive relief, compensation for emotional distress, liquidated damages under ADEA, attorney fees and costs, and other appropriate relief, including front pay. School district moved to dismiss for failure to state a claim. United States Magistrate Judge's report and recommendation that motion be granted only with regard to claim for punitive damages was adopted. School district then moved for partial summary judgment with regard to ADEA and PHRA claims arising prior to 1999, all claims for money damages, and all claims for compensation for emotional distress. The United States District Court for the Western District of Pennsylvania, Arthur J. Schwab, J., unilaterally converted motion into motion for complete summary judgment, which it granted. Teacher appealed.

**Holdings:** The Court of Appeals, Van Antwerpen, Circuit Judge, held that:

(1) mitigation of damages was not essential element of ADEA or PHRA claim, and district court erred in granting school district complete summary judgment on that basis, and

(2) with regard to its claim that teacher failed to mitigate damages, school district did not meet its burden of demonstrating the existence of substantially equivalent employment at other districts.

Reversed and remanded.

West Headnotes

**[1] Federal Courts** ☜15
170Bk15 Most Cited Cases

**[1] Federal Courts** ☜225
170Bk225 Most Cited Cases
District Court had original federal question jurisdiction over Age Discrimination in Employment Act (ADEA) claim, and supplemental jurisdiction over state claim under Pennsylvania Human Relations Act (PHRA), which had same factual nucleus so as to form part of same case or controversy. U.S.C.A. Const. Art. 3, § 2, cl. 1; 28 U.S.C.A. § § 1331, 1367(a); Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[2] Federal Courts** ☜776
170Bk776 Most Cited Cases
Court of Appeals reviews district court's grant of summary judgment de novo. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[3] Federal Courts** ☜611
170Bk611 Most Cited Cases

**[3] Federal Courts** ☜762
170Bk762 Most Cited Cases
It is within power of Court of Appeals to reverse and remand district court's final order on different grounds than those raised, regardless of whether they are argued by parties.

**[4] Civil Rights** ☜1201
78k1201 Most Cited Cases
To establish prima facie case of age discrimination

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 Fed.Appx. 4
133 Fed.Appx. 4, 199 Ed. Law Rep. 123
**(Cite as: 133 Fed.Appx. 4)**

Page 2

under Age Discrimination in Employment Act
(ADEA), job applicant must establish that (1) she
was over 40 at time she applied for position in
question, (2) she was qualified for position in
question, (3) despite her qualifications, she was
rejected, and (4) employer ultimately filled position
with someone sufficiently younger to permit
inference of age discrimination. Age Discrimination
in Employment Act of 1967, § 2 et seq., 29 U.S.C.A.
§ 621 et seq.

**[5] Civil Rights ☜1536**
78k1536 Most Cited Cases

**[5] Civil Rights ☜1544**
78k1544 Most Cited Cases
Under *McDonnell Douglas* burden-shifting
framework, if employee is successful in making out
prima facie case of discrimination, then burden shifts
to employer to articulate some legitimate,
nondiscriminatory reason for his action; should
employer carry this burden, employee then must have
opportunity to prove by preponderance of evidence
that legitimate reasons offered by employer were not
its true reasons, but were pretext for discrimination.

**[6] Federal Civil Procedure ☜2497.1**
170Ak2497.1 Most Cited Cases
For employee to avoid summary judgment on
employment discrimination claim after employer has
proffered legitimate, nondiscriminatory reasons for
adverse employment action, employee's evidence
rebutting proffered reasons must allow factfinder
reasonably to infer that each of proffered reasons was
either post hoc fabrication or otherwise did not
actually motivate employment action, i.e., was
pretextual. Fed.Rules Civ.Proc.Rule 56, 28 U.S.C.A.

**[7] Civil Rights ☜1118**
78k1118 Most Cited Cases

**[7] Civil Rights ☜1573**
78k1573 Most Cited Cases
Mitigation of damages is not an essential element of
employment discrimination claim; rather, mitigation
is claimant's duty that arises at damage stage of
discrimination case when amount is determined.

**[8] Civil Rights ☜1573**
78k1573 Most Cited Cases
Failure to mitigate is affirmative defense to claim for
money damages under the Age Discrimination in
Employment Act (ADEA). Age Discrimination in
Employment Act of 1967, § 2 et seq., 29 U.S.C.A. §

621 et seq.

**[9] Civil Rights ☜1203**
78k1203 Most Cited Cases

**[9] Civil Rights ☜1561**
78k1561 Most Cited Cases

**[9] Civil Rights ☜1761**
78k1761 Most Cited Cases

**[9] Declaratory Judgment ☜99**
118Ak99 Most Cited Cases
While finding that employee failed to mitigate her
damages might limit her recovery of back pay, and
completely bar any claim for forward pay, it had no
bearing on whether claim for discrimination could be
proven under Age Discrimination in Employment
Act (ADEA) and Pennsylvania Human Relations Act
(PHRA), or on employee's ability to receive
declaratory and injunctive relief. Age Discrimination
in Employment Act of 1967, § 2 et seq., 29 U.S.C.A.
§ 621 et seq.; 43 P.S. § 951 et seq.

**[10] Civil Rights ☜1535**
78k1535 Most Cited Cases
While discrimination claimant has duty to mitigate
her losses, employer has burden of proving failure to
mitigate. Civil Rights Act of 1964, § 706(g), as
amended, 42 U.S.C.A. § 2000e-5(g).

**[11] Civil Rights ☜1573**
78k1573 Most Cited Cases
To prove failure to mitigate in employment
discrimination case, employer must prove either that
other substantially equivalent positions were
available to employee and she failed to use
reasonable diligence in attempting to secure those
positions, or that employee withdrew entirely from
the employment market.

**[12] Labor and Employment ☜868(1)**
231Hk868(1) Most Cited Cases
When employer successfully proves a failure to
mitigate, any back-pay award to aggrieved employee
will be cut off or reduced beginning at time of the
employee's failure to mitigate and any front-pay
award will be foreclosed.

**[13] Federal Civil Procedure ☜2497.1**
170Ak2497.1 Most Cited Cases
With regard to its motion for partial summary
judgment, school district did not meet its burden of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

133 Fed.Appx. 4                                                                    Page 3
133 Fed.Appx. 4, 199 Ed. Law Rep. 123
(Cite as: 133 Fed.Appx. 4)

demonstrating that substitute teacher suing for age discrimination failed to mitigate damages; affidavits from officials at four random school districts in area indicating that each had some form of elementary teaching position open during period in which substitute unsuccessfully sought employment as full-time elementary teacher did not indicate whether those positions were "substantially equivalent," and there was insufficient evidence that teacher had removed herself from job market

entirely. Age Discrimination in Employment Act of 1967, § 2 et seq., 29 U.S.C.A. § 621 et seq.

**[14] Civil Rights** ☜1573
78k1573 Most Cited Cases
Employment discrimination claimants are not required to take lesser or dissimilar work during pendency of their claims to satisfy their duty to minimize damages.

**[15] Civil Rights** ☜1573
78k1573 Most Cited Cases
For purposes of Title VII litigation, "substantially equivalent employment" is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status. Civil Rights Act of 1964, § 701 et seq., as amended, 42 U.S.C.A. § 2000e et seq.

**[16] Civil Rights** ☜1573
78k1573 Most Cited Cases
Although employment discrimination claimant's efforts need not be successful, she must exercise good faith in attempting to secure a position.

**[17] Civil Rights** ☜1573
78k1573 Most Cited Cases
Employment discrimination plaintiff's failure to mitigate her monetary losses does not ipso facto bar all monetary relief in form of back-pay. Civil Rights Act of 1964, § 706(g)(1), as amended, 42 U.S.C.A. § 2000e-5(g)(1).

*6 On Appeal from the United States District Court for the Western District of Pennsylvania. (D.C. No. 02-cv-02135). District Judge: Honorable Arthur J. Schwab.

Bernard J. Rabik, (Argued), Reed, Luce, Tosh, Wolford & Douglass, Beaver, Pennsylvania, for Appellant.

Anthony G. Sanchez, (Argued), Leslie D. Heller, Andrews & Price, Pittsburgh, Pennsylvania, for Appellees.

Before McKEE, VAN ANTWERPEN, and WEIS, Circuit Judges.

*7 OPINION OF THE COURT

VAN ANTWERPEN, Circuit Judge.

The case before us presents an appeal of a District Court's grant of summary judgment in an age discrimination suit. For the following reasons, we reverse and remand.

I. Facts
The following facts are undisputed. Marianne Caufield ("Appellant") was born on May 10, 1944, and graduated from Duquesne University in 1976 with a Bachelor's degree in education. Appellant is certified to teach elementary education in the Commonwealth of Pennsylvania. She began working as a substitute teacher for Appellees Center Area School District and the Center Area School District Board of Directors (collectively "Center Area") in 1992, and unsuccessfully sought employment as a full-time elementary teacher at Center Area in 1995, 1996, 1997, 1999, and 2002. Between 1997 and 2004, Center Area hired approximately 18 full-time elementary teachers, 15 of whom were on the substitute list.

Appellant deliberately placed herself on the substitute list of only the Center Area School District. She believed this would enhance her opportunity for a teaching position there, as Center Area had hired the majority of its full-time teachers from the substitute list in the past. At all times relevant to this suit, Appellant was "occasionally" aware of openings for full-time elementary teachers at other school districts. She also stated that she had no intention of submitting applications to any other school districts in the future.

On May 24, 2000, Appellant signed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), presenting a case of age discrimination. The Charge indicates that the earliest date of discrimination took place on August 2, 1999, the latest occurred on March 29, 2000, and that this was a continuing action. On December 12, 2002, Appellant filed a complaint in the United States District Court for the Western District of Pennsylvania alleging age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA"), and the Pennsylvania Human Relations

Act, 43 Pa. Stat. § 951, et seq. ("PHRA"). In that complaint, Appellant demanded relief in the form of (1) a declaratory judgment that her right to be free of age discrimination both under the ADEA and PHRA had been violated; (2) a mandatory injunction directing Center Area to hire her as a full-time elementary teacher and make her whole with regard to lost earnings, insurance benefits, vacation and personal leave time, and any other emoluments of employment she had been deprived of; (3) compensation for emotional distress; (4) liquidated damages under the ADEA; (5) attorney's fees and costs; and (6) any other appropriate relief, including front pay, punitive and exemplary damages.

Center Area moved to dismiss all claims under Fed.R.Civ.P. 12(b)(6). A United States Magistrate Judge issued a Report and Recommendation on August 12, 2003, recommending that the District Court grant Center Area's motion to dismiss only with regard to Appellant's claim for punitive damages. This Report and Recommendation was adopted by the District Court on August 26, 2003. Center Area then moved for partial summary judgment on April 8, 2004, with regard to (1) any claims arising before 1999; (2) all claims for money damages; (3) and all claims for compensation for emotional distress. The District Court unilaterally converted this into a motion for complete summary judgment, which was granted in that Court's Memorandum Opinion of April 30, 2004. *8 The case was subsequently marked closed. This appeal followed.

II. Jurisdiction and Standard of Review

[1] The District Court had original subject matter jurisdiction over Appellant's ADEA claim under 28 U.S.C. § 1331, and had supplemental jurisdiction over Appellant's state PHRA claim under 28 U.S.C. § 1367(a), as the state claim had the same factual nucleus so as to "form part of the same case or controversy under Article III of the United States Constitution." See United Mine Workers of America v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Peter Bay Homeowners Ass'n, Inc. v. Stillman, 294 F.3d 524, 533 (3d Cir.2002). Our jurisdiction is grounded in 28 U.S.C. § 1291, as the District Court's Memorandum Opinion granting Center Area's motion for summary judgment was a final and appealable order.

[2] We review the District Court's grant of summary judgment in favor of Center Area de novo. Blair v. Scott Specialty Gases, 283 F.3d 595, 602-03 (3d Cir.2002); Torres v. McLaughlin, 163 F.3d 169, 170 (3d. Cir.1998). When reviewing the propriety of a grant of summary judgment, we apply the same test a district court should have applied. Bucks County Dept. of Mental Health/Mental Retardation v. Pennsylvania, 379 F.3d 61, 65 (3d Cir.2004); Morton Intern., Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 679 (3d Cir.2003); Olson v. Gen. Elec. Astrospace, 101 F.3d 947, 951 (3d Cir.1996). That is, a grant of summary judgment is appropriate only where the moving party has established that there is no genuine dispute of material fact, and "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Emory v. AstraZeneca Pharm. LP, 401 F.3d 174, 179 (3d Cir.2005). Where the defendant is the moving party, the initial burden is on the defendant to show that the plaintiff has failed to establish one or more essential elements to her case. See Celotex Corp., 477 U.S. at 323-24, 106 S.Ct. 2548. On a motion for summary judgment, a district court must view the facts in the light most favorable to the non-moving party and must make all reasonable inferences in that party's favor. Marzano v. Computer Sci. Corp., 91 F.3d 497, 501 (3d Cir.1996) (citing Armbruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir.1994)).

III. Discussion

[3] There are two issues presented by this case. The first, whether or not Appellant has satisfied her duty to mitigate monetary damages, has been briefed by both parties. The second, whether or not the District Court appropriately converted Center Area's motion for partial summary judgment into a motion for complete summary judgment, has not. With due respect to the litigants, we shall first address the issue that was not briefed before moving to the question of mitigation of damages. [FN1]

> FN1. Despite the fact that neither Appellant nor Center Area have devoted any discussion in their briefs to the District Court's grant of complete summary judgment, it is within our power to reverse and remand the District Court's final order on different grounds, regardless of whether or not they are argued by the parties. See Gambino v. Morris, 134 F.3d 156, 169 (3d Cir.1998) (noting that "appellate courts may in their discretion consider issues not properly raised in an opening brief ... if the error is so 'plain' that manifest injustice would otherwise result."); see also Herbert v. Nat'l Acad. of Sciences, 974 F.2d 192, 196 (D.C.Cir.1992) (cited in Gambino, 134 F.3d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

at 169); _United States v. Ullah,_ 976 F.2d 509, 514 (9th Cir.1992) (considering manifest injustice in the criminal context).

**\*9 A. The District Court's grant of complete summary judgment.**

Center Area's motion for partial summary judgment addressed only three areas for which they believed summary judgment in their favor was appropriate: (1) Appellant's ADEA and PHRA claims arising prior to 1999; (2) Appellant's failure to mitigate her monetary damages; and (3) Appellant's demand for compensation for emotional damages under the ADEA. The District Court found in favor of Center Area as to each of these areas. It then went a step further, granting complete summary judgment in favor of Center Area as to Appellant's ADEA and PHRA claims. [FN2]

> FN2. With regard to Appellant's PHRA claim, the District Court stated: "... a district court may decline to exercise supplemental jurisdiction over a claim if [it] has dismissed all claims over which it has original jurisdiction ... [t]herefore, the Court dismisses Plaintiff's claims arising under the PHRA without prejudice." Memorandum Opinion at 6.

The District Court did not explain why this was done. Excluding the charges of discrimination prior to 1999, [FN3] there is no indication in the record that any essential element of either Appellant's ADEA claim or her PHRA claim was challenged by Center Area's motion for partial summary judgment. As we see it, the District Court first rejected any claim for recovery for emotional distress, and then found that Appellant's failure to mitigate her monetary damages prevented her from recovering any front or back pay under the ADEA and PHRA.

> FN3. Center Area argued below that Appellant's ADEA and PHRA claims arising before 1999 should have been dismissed because she failed to exhaust her administrative remedies and/or because she failed to file timely administrative claims. Appellant consented to this dismissal in her Response to Defendants' Motion for Partial Summary Judgment.

**[4][5][6][7]** The Supreme Court has established a burden-shifting framework for claims under Title VII, including ADEA claims. _See McDonnell_ _Douglas Corp. v. Green,_ 411 U.S. 792, 802-03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiff must first establish a _prima facie_ case. [FN4] _Id._ Then, if the plaintiff is successful in making out a _prima facie_ case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for his action. _Id._ Finally, "should the defendant carry this burden, the plaintiff then must have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." _Tex. Dep't of Cmty Affairs v. Burdine,_ 450 U.S. 248, 252- 53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); _Williams v. Phila. Hous. Auth. Police Dep't,_ 380 F.3d 751, 760 n. 3 (3d Cir.2004); _Jones v. Sch. Dist. of Phila.,_ 198 F.3d 403, 410 (3d Cir.1999). [FN5] Our **\*10** research has not disclosed a case where mitigation of damages has been required as an essential element of a discrimination claim. Rather, mitigation is a claimant's duty that arises at the damage stage of a discrimination case when the amount is determined. _See, e.g., Anastasio v. Schering Corp.,_ 838 F.2d 701, 709 (3d Cir.1988).

> FN4. To establish a _prima facie_ case of age discrimination under the ADEA, a plaintiff must establish that: (1) she was over 40 at the time she applied for the position in question; (2) she was qualified for the position in question; (3) despite her qualifications, she was rejected; and (4) the employer ultimately filled the position with someone sufficiently younger to permit an inference of age discrimination. _Narin v. Lower Merion School Dist.,_ 206 F.3d 323, 331 (3d Cir.2000) (citing _Brewer v. Quaker State Oil Ref. Corp.,_ 72 F.3d 326, 330 (3d Cir.1995)); _Sempier v. Johnson & Higgins,_ 45 F.3d 724, 728 (3d Cir.1995). This framework is also used to analyze PHRA claims. _Gomez v. Allegheny Health Servs., Inc.,_ 71 F.3d 1079, 1084 (3d Cir.1995).

> FN5. We note that "to avoid summary judgment, a plaintiff's evidence rebutting an employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." _Fuentes v. Perskie,_ 32 F.3d 759, 764 (3d Cir.1994) (internal citations, emphasis and footnotes

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

omitted).

[8] Th District Court's Memorandum Opinion did not discuss the *McDonnell Douglas* framework. It appears that the District Court concluded that, because Appellant could not recover either back and forward pay or monetary damages for emotional distress, all of her claims under the ADEA and PHRA were defective in some manner. This conclusion, however, ignores both that the failure to mitigate is an affirmative defense to a claim for money damages under the ADEA, and that Appellant sought declaratory and injunctive relief in addition to her claims for monetary compensation.

The District Court's reliance on *Anastasio v. Schering Corp.* in support of summary judgment is inapposite. In *Anastasio,* an employer found liable for age discrimination challenged both the conclusion that the employee's age was a determinative factor in his termination and that the employee properly attempted to mitigate his losses. In that case, we first addressed the question of fault and *then* the question of monetary liability. Nowhere did we suggest that a failure to mitigate damages prevents a finding that age discrimination has occurred. Citing *Anastasio* as holding that mitigation was an essential element of an ADEA or PHRA claim was erroneous.

[9] While a finding that Appellant failed to mitigate her damages may limit her recovery of back-pay, and completely bar any claim for forward pay, it has no bearing on whether or not a claim for discrimination can be proven, or on Appellant's ability to receive declaratory and injunctive relief. The grant of summary judgment as to her claims under the ADEA and PHRA was erroneous and we will reverse.

*B. Appellant's duty to mitigate damages.*

[10][11][12] Center Area contends that Appellant failed in her duty to mitigate any damages that may have arisen because of alleged age discrimination. The Supreme Court has stated:

An unemployed or underemployed claimant, like all other Title VII claimants, is subject to the statutory duty to minimize damages set out in [42 U.S.C. § 2000e-5(g) ]. This duty, rooted in an ancient principle of law, requires the claimant to use reasonable diligence in finding other suitable employment. Although the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the

one he was denied.

*Ford Motor Co. v. EEOC,* 458 U.S. 219, 231-32, 102 S.Ct. 3057, 73 L.Ed.2d 721 (1982) (footnotes and internal citations omitted). While it is the duty of a discrimination claimant to mitigate her losses, it is the employer who has the burden of proving a failure to mitigate. *See Robinson v. Southeastern Pa. Transp. Auth., Red Arrow Div.,* 982 F.2d 892, 897 (3d Cir.1993); *Anastasio,* 838 F.2d at 707-08; *Goss v. Exxon Office Systems Co.,* 747 F.2d 885, 889 (3d Cir.1984). To prove a failure to mitigate, Center Area had to prove either that other substantially equivalent positions were available to Appellant and she *11 failed to use reasonable diligence in attempting to secure those positions, *Anastasio,* 838 F.2d at 708, or, alternatively, that Appellant withdrew entirely from the employment market. *Tubari, Ltd., Inc. v. NLRB,* 959 F.2d 451, 454 (3d Cir.1992). When an employer successfully proves a failure to mitigate, any back-pay award to an aggrieved employee will be cut off or reduced beginning at the time of the employee's failure to mitigate and any front-pay award will be foreclosed. *Ford Motor Co.,* 458 U.S. at 233-34, 102 S.Ct. 3057.

In their motion for partial summary judgment, Center Area argued that Appellant failed to exercise reasonable diligence to secure substantially equivalent positions and consequently that she had withdrawn from the employment market. This argument was supported by evidence presented by Center Area that a random sampling of four school districts in the area had elementary teacher openings between 1999 and 2004 to which Appellant did not apply. With this evidence in hand, the District Court concluded that there were substantially equivalent positions available at nearby school districts, and that Appellant failed to demonstrate that she applied for an elementary position at any school district except Center Area. It also concluded that Appellant made no efforts whatsoever to mitigate her damages, suggesting that the District Court believed she had withdrawn completely from the employment market.

[13] Viewing the evidence in the light most favorable to Appellant, we cannot agree that Center Area has met its burden of demonstrating the existence of substantially equivalent employment at other school districts.

"The reasonableness of a Title VII claimant's diligence should be evaluated in light of the individual characteristics of the claimant and the job market ... [g]enerally, a plaintiff may satisfy the reasonable diligence requirement by demonstrating a continuing commitment to be a member of the

work force and by remaining ready, willing, and available to accept employment."

*Booker v. Taylor Milk Co., Inc.,* 64 F.3d 860, 865 (3d Cir.1995) (internal citations and quotation marks omitted).

[14][15] The only evidence submitted by Center Area demonstrating that there were substantially equivalent positions available elsewhere consisted of four affidavits from officials at random school districts in the area indicating that each district had some form of elementary teaching positions open between 1999 and 2004. This, by itself, is insufficient evidence to carry Center Area's burden on summary judgment, as it does not indicate whether those positions were of substantial equivalence to teaching positions at Center Area. It is well-established that discrimination claimants are not required to take lesser or dissimilar work during the pendency of their claims to satisfy their duty to minimize damages. *Ford Motor Co.,* 458 U.S. at 232 n. 14, 102 S.Ct. 3057. "Substantially equivalent employment for purposes of Title VII litigation is that employment which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status ..." *Sellers v. Delgado Cmty. College,* 839 F.2d 1132, 1138 (5th Cir.1988)(internal quotation marks omitted). Based on the record before us, we have no idea whether the job positions cited by Center Area were of lesser quality or otherwise dissimilar employment opportunities. We cannot merely assume that all elementary teaching positions in the area are, by their nature, substantially equivalent. Indeed, it is conceivable that any number of the openings cited by Center Area *12 were in districts with dissimilar classroom sizes, pay scales, or student disciplinary problems, all of which are important factors in a teacher's employment decisions. We know nothing about these positions, except that they are all generically described as elementary teaching positions. Without more, Center Area has not met its burden of demonstrating that there existed substantially equivalent employment in other districts. [FN6]

> FN6. Our holding should not be taken to suggest that a claimant can defend against summary judgment by so circumscribing the workforce to which she is applying such that repeated application only to the job she was denied satisfies her mitigation duties. Indeed, the duty to mitigate would make little sense if we were to allow a discrimination claimant to artificially narrow

the workforce in this manner. However, because Center Area did not carry its burden of proof with regard to mitigation, we need not reach such a question.

[16] Moreover, there is insufficient evidence in the record to conclude that Appellant removed herself from the job market entirely. It is undisputed that she continued to remain on the substitute teacher list at Center Area, that she taught full time at a parochial school for four months, and that she continued to apply for permanent elementary openings at Center Area as they became available. Although a discrimination claimant's efforts need not be successful, she must exercise good faith in attempting to secure a position. *Taylor Milk,* 64 F.3d at 865 (quoting *Reilly v. Cisneros,* 835 F.Supp. 96, 99-100 (W.D.N.Y.1993)). Given that Appellant explained at deposition that she applied only in the vicinity of Center Area because she had to raise her daughter, we cannot say as a matter of law that her attempts to secure employment were not in good faith. At the very least, this is a question for a jury.

[17] As we see it, the evidence proffered by Center Area does not demonstrate that, as a matter of law, there was substantially equivalent employment which Appellant did not reasonably discover, or that she left the job market altogether. Therefore, the District Court erred in granting Center Area's motion for summary judgment with regard to Appellant's mitigation of damages. However, even if the District Court had been correct that Center Area had demonstrated that Appellant had failed in her duty to mitigate, *Ford Motor Co.* instructs that back-pay for an employee who has failed to mitigate losses will be cut off or reduced beginning *at the time of the employee's failure to mitigate. Ford Motor Co.,* 458 U.S. at 233-34, 102 S.Ct. 3057. The District Court made no findings with regard to the point in time when Appellant's failure to properly mitigate her monetary losses began to reduce her back-pay recovery. It merely concluded that Appellant's failure to mitigate damages completely barred all monetary relief. We rejected this reasoning in *Taylor Milk,* holding that:

> The plain language of section 2000e-5 shows that amounts that could have been earned with reasonable diligence should be used to *reduce or decrease* a back pay award, not to wholly cut off the right to any back pay. *See* 42 U.S.C. § 2000e-5(g)(1); *see also Tubari Ltd., Inc.,* 959 F.2d at 453-54; *Anastasio,* 838 F.2d at 708-09; 2 DAN B. DOBBS, LAW OF REMEDIES § 6.10(4), at 221-22 (2d ed.1993). Furthermore, Defendant's "no-

133 Fed.Appx. 4                                                                          Page 8
133 Fed.Appx. 4, 199 Ed. Law Rep. 123
**(Cite as: 133 Fed.Appx. 4)**

mitigation-no back pay" argument is inconsistent with the "make whole" purpose underlying Title VII.

 64 F.3d at 866 (emphasis in original). Similarly, we cannot agree with the District Court that an appellant's failure to mitigate her monetary losses *ipso facto* bars all monetary relief in the form of back-pay. In *Taylor Milk,* we noted that **\*13** back-pay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of Title VII. *Id.* On the record before us it is difficult, if not impossible, to conclude whether or not all back pay should have been barred. The ruling adverse to the plaintiff, therefore, was in error.

 For these reasons, we reverse both the District Court's conclusion that Appellant failed to mitigate her damages, as well as its grant of complete summary judgment. We remand this case for further proceedings consistent with this Opinion.

 133 Fed.Appx. 4, 199 Ed. Law Rep. 123

**Briefs and Other Related Documents (Back to top)**

• 2004 WL 5020992 (Appellate Brief) Reply Brief (Dec. 22, 2004)

• 2004 WL 5040631 (Appellate Brief) Brief for Appellees, the Center Area School District; the Center Area School District Board of Directors (Dec. 9, 2004)

• 2004 WL 5040630 (Appellate Brief) Brief and Appendix for Appellant Volume 1 of II (pg.1a-19a) (Nov. 9, 2004)

• 04-2538 (Docket) (Jun. 04, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

B

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 376419 (D.Del.)
(Cite as: 2000 WL 376419 (D.Del.))

Only the Westlaw citation is currently available.

United States District Court, D. Delaware.
Donna CHILDRESS, Plaintiff,
v.
DOVER DOWNS, INC., Defendant.
No. 98-206-SLR.

March 31, 2000.

Stephen A. Hampton, of Grady & Hampton, P.A., Dover, Delaware, for plaintiff.

James J. Sullivan, Jr., and Katherine R. Witherspoon, of Klett, Lieber, Rooney & Schorling, Wilmington, Delaware, for defendant.

MEMORANDUM OPINION

ROBINSON, J.

I. INTRODUCTION

*1 Plaintiff Donna Childress filed this action on April 23, 1998 against defendant Dover Downs, Inc. asserting injuries under the Civil Rights Act of 1964, 42 U.S.C. <section> 2000(e) et seq.. (D.I.1) This court has jurisdiction pursuant to 28 U.S.C. <section> 1343 and 42 U .S.C. <section> 2000e-5(f). Before this court is defendant's motion for summary judgment. (D.I.38)

For the reasons stated below, defendant's motion for summary judgment shall be granted. [FN1]

> FN1. The court's decision in this case has rendered defendant's argument for summary judgment as to punitive damages moot and, therefore, such will not be discussed in this memorandum opinion.

II. BACKGROUND [FN2]

> FN2. The record reviewed for purposes of this summary judgment proceeding includes defendant's opening brief and appendix, plaintiff's answering brief, and defendant's reply brief and appendix. Plaintiff's appendix to her answering brief was excluded from the record by the prior judicial officer for failure to comply with time limitations. The background section, therefore, is mainly comprised of plaintiff's allegations taken from her complaint and various deposition excerpts.

Plaintiff is a white female who is married with two children. (D.I. 40 at A-31) On September 9, 1995 plaintiff submitted an "application for employment" to work for defendant as a mutuel teller. (D.I. 40 at A-1-3) In order to become a mutuel teller, an applicant has to take a teller training class and pass an examination. (D.I.45, <paragraph> 2) An applicant would "learn to use the teller computers to properly place bets and pay winning ticket holders" during these training sessions. (D.I.45, <paragraph> 2) Plaintiff attended a training course in November of 1995. (D.I. 40 at A-75) On December 17, 1995

she began working for defendant as a part-time mutuel teller, primarily on the night shift. (D.I.1, <paragraph> 7, 8) As a mutuel teller, plaintiff's job was to "sell tickets to customers who placed bets on horse races, either held at Dover Downs' racetrack or 'simulcast' via television from other racetracks ." (D.I.45, <paragraph> 2) Adam Wise ("AW") was the mutuel manager who supervised the tellers at the time plaintiff began her job. (D.I.1, <paragraph> 9)

A. Alleged Incidents During Plaintiff's Training Session

On the first night of her training session in November 1995, AW greeted plaintiff "by looking her up and down from head to toe in a way that she found rude and disconcerting." (D.I.1, <paragraph> 10) On the second night of training, AW allegedly lingered around plaintiff all night and kept trying to talk to her. (D.I.1, <paragraph> 11) That same night AW allegedly kicked the back of plaintiff's boots and asked her if she had spurs at home. (D.I. 1, <paragraph> 12; D.I. 40 at A-45) Also that night, AW "started to massage her back and run his hands down her back." (D.I. 1, <paragraph> 12; D.I. 40 at A-41) Plaintiff claims she shrugged AW's hands off her back and he replied, "What, am I making you melt?" (D.I. 1, <paragraph> 12; D.I. 40 at A-41) Plaintiff's reply was "No, call me crazy but I'm one of those people who doesn't like to be touched." (D.I. 1, <paragraph> 12; D.I. 40 at A-41) During the rest of the training session AW displayed a "bad attitude" toward plaintiff and and belittled her when she posed questions to him regarding her training. (D.I. 1 at <paragraph> 13)

B. Alleged Incidents During Plaintiff's Employment

Plaintiff alleges that the problems did not stop after she began working for defendant as a mutuel teller on the night shift in December of 1995.

1. December 1995 to April 1996

Plaintiff's allegations during this time period continue to involve AW and the way he treated her and other female tellers. From January to April 1996, AW attempted on numerous occasions to hold plaintiff's hand. (D.I. 1, <paragraph> 14; D.I. 40 at A-42) He would attempt to reach over the counter to touch plaintiff's hand. (D.I. 40 at A-42) Plaintiff would pull her hand away, saying nothing at all. (D.I. 40 at A-42) AW would become irritated with plaintiff, ask her why she was so miserable, and comment that she always had an "attitude." (D.I. 1 at <paragraph> 17) AW also would hold other tellers' hands while talking to them. (D.I. 40 at A-42) AW never tried to touch plaintiff after April 1996. (D.I. 40 at A-43)

*2 On one occasion, AW asked plaintiff and another teller, Rebecca Thomas ("RT"), what color bras they were wearing. (D.I. 1, <paragraph> 18; D.I. 40 at 45-46) Plaintiff did not respond, but RT answered his question. (D.I. 1, <paragraph> 19; D.I. 40 at A-46) AW again told plaintiff that she was "always so miserable." (D.I.1, <paragraph> 19) AW also would tell "off-color sexual jokes" and jokes about minorities, especially blacks, around plaintiff and other female tellers. (D.I. 1, <paragraph> 27; D.I. 40 at A-46) Plaintiff approximated that this happened between five to ten times. (D.I. 40 at A-46)

On other occasions, AW allegedly would make derogatory comments to the female tellers. (D.I. 1, <paragraph> 28; D.I. 40 at A-46) For example, plaintiff claims AW would critique her attire or hairstyle. (D.I. 40 at A-46) Plaintiff alleges that some of AW's comments had a double meaning and that it was

obvious he wanted female tellers to take a sexual meaning from what he said.
(D.I. 1, <paragraph> 28; D.I. 40 at A-46)

 During this time period, plaintiff claims that AW tried to touch many of the
female tellers and give them "special attention." (D.I. 1, <paragraph> 20;
D.I. 43 at B-10-19, 761, 770, 778, 785) The female tellers who went along with
his behavior were treated with favoritism and were treated favorably. (D.I. 1,
<paragraph> 21; D.I. 43 at B-10-19, 770, 774, 775, 778, 798) For example, AW
frequently would come up behind RT while she was working to rub her shoulders
or put his chin on her shoulder. (D.I. 1, <paragraph> 23; D.I. 40 at A-111) He
told RT that he wished he were the father of her baby. (D.I. 1, <paragraph>
24; D .I. 40 at A-117) Plaintiff asserts that RT acquiesced in such treatment
and, as a result, she received special privileges. (D.I. 1, <paragraph> 25;
D.I. 43 at B-10-19) RT was "permitted to leave her work station and spend time
upstairs in the office area even though she was supposed to be working on the
line." (D.I. 1, <paragraph> 25; D.I. 43 at B-10-19) Plaintiff claims that AW
did not treat the male tellers in the same manner that he treated the female
tellers. (D.I. 1, <paragraph> 29; D.I. 43 at B-770)

 2. April 1996 to July 1996

 Plaintiff was laid off in April 1996 at the end of the live season and
returned to work at the end of July 1996. (D.I. 40 at A-61) In June 1996 ten
female tellers from the day shift had a meeting with Denis McGlynn ("DMcG")
(President of Dover Downs) and Frank Wise ("FW") (a general manager and also
AW's father) to voice their complaints about the work environment. (D.I. 43 at
B-10-19) The tellers present at the meeting included a teller named Susan
Keeler ("SK"). (D.I. 43 at B-10)

 Many of the complaints made at the meeting involved AW's conduct. (D.I. 43 at
B-10-19) Many of the women complained about the AW's favorable treatment of
RT. (D.I. 43 at B-10, B-12-16) They objected to AW's repeated threats to fire
them for different reasons, e.g., if they had too many cancellations. (D.I. 43
at B-11) They complained that AW would yell at tellers in front of customers
and allow customers to call the tellers vulgar names. (D.I. 43 at B-14-15)
They also expressed dissatisfaction with the supervisors' attitudes since RT
had quit, asserting that the supervisors had been rude and nasty to the
tellers. (D.I. 43 at B-15, B-18-19) DMcG delegated the resolution of this
situation to FW. (D.I. 43 at B-625)

 *3 In July 1996, FW implemented new mutuel employee guidelines. (D.I. 43 at
B-31-39) Changes included, but were not limited to, [FN3] the modification of
the dress code, the installment of a time clock, the addition of head tellers
for the night and weekend shifts, and the disallowance of mutuel employees in
the Casino and Simulcast Area while in uniform. (D.I. 43 at B-30- 39)
Employees were "required to treat all others, (patrons, co-workers), in a
courteous manner." (D .I. 43 at B-31) In a memorandum dated July 9, 1996, FW
informed the tellers of the new chain of command, i.e., head teller,
supervisors, general manager harness, and president. (D.I. 43 at B-37) If any
of the tellers on the line had a problem, they were to report it to the head
teller; if the head teller could not help, he or she would notify a
supervisor. (D.I. 43 at B-33)

      FN3. Plaintiff, in her complaint, lists the following changes:
      (a) tellers were told that now they [had] to keep their canceled tickets
      separate from the paid tickets, and that if they had too many
      cancellations, they could be fired. This, despite the fact that

cancellations were generally because the customer changed [his] mind and
decided to cancel the ticket.
(b) tellers were told that management was watching their ticket sales
and that if they [did] not sell as many tickets as the other tellers,
they [could] be fired. However, every window is not equally busy and the
number of tickets sold depends on the location of the ticket window.
(c) the tellers now [had] to punch a time clock and[,] in fact, were the
only department at Dover Downs that ha[d] one.
(d) tellers [were] no longer allowed to eat behind the line.
(e) tellers who smoke had been able to split up their fifteen minute
break so they could smoke a cigarette, now they ha[d] to take the entire
fifteen minutes at one time.
(f) the tellers were told that they [had] to button their shirts one
button down from the top and their shirts had to be tucked in.
(g) the pregnant tellers were told they had to wear the uniform with
black maternity pants, but female employees who work[ed] on the line
[and] handle [d] money [were] allowed to wear maternity clothes.
(h) the tellers [were] told they [could] no longer read behind the line,
even on the days when there [were] no tracks running and they [were] not
busy. The other people in the line such as program sellers and the
people who handle[d] money [were] allowed to read on the line.
(i) the reading material in the tellers break room was taken away and
they were only permitted to read racing forms.
(j) tellers were told that they [were] not allowed to fraternize with
customers....
(k) tellers were told that if they did not use the employee parking they
could be fired.
(l) tellers were told they could have no chewing gum or hard candy.
(m) the night shift tellers had their hours changed and had to work more
shifts to maintain full[-]time hours.
(n) the tellers were told that they [could] not leave their terminal
without signing in and out.
(D.I.1, <paragraph> 35(a)-(n))

Plaintiff returned to work in late July 1996. (D.I. 1, <paragraph> 31; D.I.
40 at A-61) On July 31, 1996, plaintiff signed the new mutuel department
regulations put into effect by FW. (D.I. 40 at A-60, A-12) Plaintiff and other
tellers were told that the rule changes and the installation of head tellers
were a result of the meeting the day shift women had had with management in
June 1996. (D.I. 1, <paragraph> 33; D.I. 43 at B-761) This information created
some hostility on the part of the night and weekend shift tellers towards the
day shift tellers. (D.I. 43 at B-761) Shortly thereafter, SK, one of the day
shift women who had met with management, had her hours changed from day shift
to night shift. (D.I. 43 at B-772) Plaintiff was the only night shift teller
who would associate with her; no other tellers would speak to her because of
the hostility. (D.I. 43 at B-772)


3. August 1996 to December 1996

Plaintiff worked with SK intermittently throughout the time period from July
1996 to November 1996, when SK was fired. (D.I.1, <paragraph> 49) While they
worked together, SK shared with plaintiff many of her complaints about
defendant. [FN4] SK had similar complaints to those made by plaintiff and, on
occasion, she brought them to the attention of management. (D.I. 43 at B-770-
776) According to SK, management did not make any effort to address the
problems and in October of 1996, she informed management she was going to file
a complaint with the Labor Board. (D.I. 43 at B-772) On November 22, 1996, SK

was fired, allegedly because she was not doing a good job and because of absenteeism. (D.I. 43 at B-772) Shortly before SK's termination, SK and plaintiff had lunch together. (D.I. 43 at B-772) The friendly relationship plaintiff and SK shared was closely watched by management. (D.I. 43 at B-772)

> FN4. SK told plaintiff:
> (a) From the time she began working at Dover Downs, she became the object of unwanted attention from AW.
> (b) On one occasion, AW grabbed SK's hair and said "you mean to tell me you actually got your hair cut like that." (c) On another occasion AW grabbed SK's finger and bent it back causing her severe pain.
> (d) AW would swear at SK.
> (e) That the stress at work had caused her health problems resulting in a leave of absence from work.
> (D.I.1, <paragraph> 49(a)-(e))

In October of 1996 a co-worker, Kristy Tyler ("KT"), became angry with plaintiff over a change in the work schedule. (D.I. 1, <paragraph> 55; D.I. 40 at A-21) Plaintiff alleges that later in the month, KT's boyfriend "keyed" her car while it was parked in the parking lot. (D.I. 40 at A-56) On the night plaintiff noticed her car had been keyed, KT's boyfriend came in to where they worked, looked at plaintiff, looked at KT, nodded in a "yes" motion, and walked back out. (D.I. 40 at A-21, 56) No words were spoken between KT and her boyfriend. (D.I. 40 at A-21, 56) After her boyfriend had left, KT announced to everyone that they had better watch their cars because she heard "cars are getting tore up in the parking lot." (D.I. 1, <paragraph> 56; D.I. 40 at A-21, 56)

*4 Plaintiff reported this incident to FW on October 28, 1996. (D.I. 1, <paragraph> 57; D.I. 40 at A-21, 56) Management was supportive of plaintiff, and FW even offered to allow her to park in a space that was monitored by a video camera. (D.I. 1, <paragraph> 57; D.I. 40 at A-21) A few days later, plaintiff and KT passed each other on the main line and KT said to plaintiff, "you asshole." (D.I. 40 at A-21) Plaintiff reported this incident to Jean Rawlings ("JR"), one of the supervisors. (D.I. 40 at A-21) JR never said another word to plaintiff about this incident, so plaintiff called FW about it two weeks later. (D.I. 40 at A-21) FW knew nothing about the incident when plaintiff called. (D.I. 40 at A-21)

Sometime in late November 1996, Carl Anderson ("CA"), a supervisor, asked plaintiff to write a letter about a male teller who CA thought was gay. (D.I. 43 at B-790) CA told plaintiff what he wanted her to say in the letter, but plaintiff had never seen or heard the teller do any of the things CA had mentioned. (D.I. 43 at B-790) CA became angry with plaintiff when she refused to write the letter he had requested. (D.I. 43 at B-790-791)

After SK was fired, she wrote a letter dated December 6, 1996 to defendant's president, DMcG. (D.I. 1, <paragraph> 53; D.I. 40 at A-5-7; D.I. 43 at B-773) In her letter, not only did SK express her own complaints, she let DMcG know that other female tellers had similar complaints. (D.I. 40 at A-5-7) SK did not name plaintiff in her letter, but she did make reference to situations that involved plaintiff. (D.I. 40 at A-5-7; D.I. 43 at B-773) For example, she wrote about a teller who recently had had her car "keyed." (D.I. 40 at A-7; D.I. 43 at B-773) Plaintiff is the only teller who had had this happen to her. (D.I. 43 at B-773) SK was referring to plaintiff when she wrote about a teller who "told [AW] she didn't like to be touched and that she didn't want him to hold her hand." (D.I. 40 at A-7; D.I. 43 at B-773) Plaintiff was not aware

that SK had written this letter until after she had left defendant's employ.
(D.I. 1, <paragraph> 54; D.I. 40 at A-25)

 In early to mid-December 1996, plaintiff's problems with KT began to
resurface. (D.I. 40 at A-22) Laura Kenton ("LK"), another teller, was working
with KT and plaintiff when KT called LK a "bitch." (D.I. 40 at A-21) Plaintiff
did not hear this, but when LK reported the incident to JR she implicated
plaintiff. (D.I. 40 at A-21-22) Another time that LK went to JR to complain
about KT, JR told LK to "stay out of it. [T]he whole thing was between [KT]
and [plaintiff]." (D.I. 40 at A-22) JR began to take KT and KT's sister under
her wing, and the more she favored them, the more plaintiff suffered. (D.I. 40
at A-22)

 4. January 1997 to March 1997

 Plaintiff claims that she always was one of the "most productive tellers and
had been told by management that she was one of the fastest tellers and that
she was pleasant to get along with." (D.I. 1 at <paragraph> 60) During this
time period, plaintiff was not aware that her file contained any written
documentation of deficiencies in her performance or that she had ever been
disciplined by management. (D.I. 1 at <paragraph> 60)

 *5 Plaintiff was given a yearly evaluation in the first or second week of
January 1997. (D.I. 40 at A-22, A-49) Her evaluation score was only one point
above satisfactory. (D.I. 1, <paragraph> 63; D.I. 40 at A-22) As a result of
this score, plaintiff was given a raise of twenty-five cents, rather than
fifty cents. (D.I. 40 at A-22) Plaintiff felt as though the evaluation was not
a fair assessment and, therefore, questioned it, although she never asked for
it to be changed. (D.I. 40 at A-49) CA and JR, plaintiff's supervisors, told
plaintiff the reason for her low score was the problems involving KT and the
complaints they had been receiving about plaintiff for months. (D.I. 40 at
A-22) Plaintiff was never called into the office regarding these complaints.
(D.I. 40 at A-22) Plaintiff only signed the evaluation after she was told she
could have a copy of it. (D.I. 40 at A-22) After all the evaluations were
done, plaintiff was told that no one could receive a copy of his/her
evaluation. (D.I. 40 at A-22)

 During the months of January through March 1997, plaintiff alleges that
management constantly harassed her by calling her to the office every week
with new complaints about her behavior. (D.I. 1, <paragraph> 102; D.I. 40 at
A-32) According to plaintiff, whenever she would file a complaint, management
would just sigh, roll their eyes, and stare at the wall. (D.I. 40 at A-44)

 When plaintiff reported to work on January 22, 1997, there was a mandatory
meeting for the employees. (D.I. 1 at <paragraph> 68, D.I. 40 at A-22) Prior
to this day, CA had told plaintiff that plaintiff could not attend the meeting
because she needed to remain working on the line. (D.I. 1, <paragraph> 68;
D.I. 40 at A-22) The head teller that night, Joan Biddle ("JB"), asked the
tellers whether they wanted to attend the meeting. (D.I. 40 at A-22) Plaintiff
responded that CA had told her to remain working and, therefore, she could not
attend the meeting. (D.I. 40 at A-22) About forty-five minutes after the
meeting had started, plaintiff was told to hurry up and turn her machine off
as she was wanted upstairs. (D.I. 1, <paragraph> 69; D.I. 40 at A-22)
Plaintiff thought she was wanted in the office. (D.I. 1, <paragraph> 69; D.I.
40 at A-22) Instead, plaintiff was brought into the middle of the meeting,
where everyone looked at her when she walked in. (D.I. 1, <paragraph> 69; D.I.
40 at A-22) One of the topics discussed at the meeting was the willingness of

employees to face the person about whom they make an accusation. (D.I. 1, <paragraph> 70; D.I. 40 at A-22-23)

After the meeting was over, plaintiff returned to the line. (D.I. 1, <paragraph> 71; D.I. 40 at A-23) While she was working, JB began to recap the meeting, especially making reference to discussions concerning gossiping, starting rumors, and the need for employees who make accusations to face the accused. (D.I. 1, <paragraph> 71, 72; D.I. 40 at A-23) At that point, plaintiff interjected "that management would not tell her who had been accusing her of things or allow her to face them." (D.I. 1, <paragraph> 73; D.I. 40 at A-23) JB began to scream loudly at plaintiff. (D.I. 1, <paragraph> 74; D.I. 40 at A-23) Immediately, JB began accusing plaintiff of constantly walking up and down the line gossiping about KT. (D.I. 1, <paragraph> 75; D.I. 40 at A-23) Plaintiff denied these allegations and offered that her computer printouts as proof that she was at her machine punching tickets and not walking up and down the line. (D.I. 1, <paragraph> 76; D.I. 40 at A-23)

*6 After the screaming incident, plaintiff went up to the third floor office to speak with her supervisors, CA and JR. (D.I. 1, <paragraph> 77; D.I. 40 at A-23) She told them about JB bringing her into the middle of the meeting and screaming at her in front of customers. (D .I. 1, <paragraph> 78; D.I. 40 at A-23) CA called JB to the office to find out what happened. (D.I. 1, <paragraph> 78; D.I. 40 at A-23) JB told CA that plaintiff was gossiping about KT, and "she had to shout to snap [her] out of it." (D.I. 1, <paragraph> 78; D.I. 40 at A-23) Eventually, although JB attempted to prevent him from doing so, CA agreed to go downstairs to speak with the other tellers who were present when the screaming incident occurred. (D.I. 1, <paragraph> 79; D.I. 40 at A-23) When CA returned, he stated that the two witnesses confirmed plaintiff's story; this angered JB. (D.I. 1, <paragraph> 80; D.I. 40 at A-23) JB pointed her finger at plaintiff and yelled, "I see how you are," then gave plaintiff a dirty look and stormed out of the room. (D.I. 1, <paragraph> 81; D.I. 40 at A-23) Plaintiff, JB, and the eye witnesses were told by management to pretend the whole thing had never happened and not to talk about it to anyone. (D.I. 1, <paragraph> 82; D.I. 40 at A-23) When everyone returned to the line, JB was slamming things and tried to close plaintiff's arm in her drawer every chance she could get. (D.I. 40 at A-23)

Throughout the months of January to March 1997, JB would elbow plaintiff in the back at least once a night whenever they worked together. (D.I. 1, <paragraph> 66; D.I. 40 at A-44) Plaintiff and JB worked together approximately every other week. (D.I. 40 at A-44) Plaintiff spoke with CA twice about these incidents. (D.I. 40 at A-44) The first time plaintiff spoke with CA, he told her he would talk to JB, but the elbowing did not stop. (D.I. 40 at A-44) The second time plaintiff spoke to CA was her last day at work. (D.I. 40 at A-44)

Another incident occurred in February 1997. (D.I. 1, <paragraph><paragraph> 87, 97; D.I. 40 at A-43) As plaintiff and a male manager were passing each other in the hallway, he "headed towards [her] at full speed [,] took his shoulders and forcibly hit [her] ... like a hockey player would give a body check." (D.I. 40 at A-43) He neither apologized, nor looked back at plaintiff. (D.I. 40 at A-43) Plaintiff did not report the incident to management. (D.I. 40 at A-43)

Sometime between January and March, most likely February, plaintiff was brought to the management office by this same male manager because he believed her to have been seven hundred and some dollars short when she turned in her

money bag. (D.I. 40 at A-51) He told plaintiff, "Luckily, for you, I went to your machine and you had left all your money at your machine and you had only turned in change." (D.I. 40 at A-51) Plaintiff insists that she did not forget to put the money in the bag, that her husband witnessed her putting the money in the bag, and that the entire story was fabricated. (D.I. 40 at A-51)

*7 Plaintiff worked the whole day on March 17, 1997. (D.I. 40 at A-24) AW was giving plaintiff dirty looks the entire day and plaintiff could not understand why. (D.I. 40 at A-24) That day she said "hello" to FW, and he just turned his head. (D.I. 40 at A-24) AW was flirting with another teller throughout the day. (D.I. 40 at A-24) AW was hugging and touching this teller, who allegedly was receptive to his advances. (D.I. 40 at A-24) For example, she handed AW a rolled up napkin and when he opened it a quarter fell out; the napkin read, "if you can't come call." (D.I. 40 at A-24) This teller was willing to go along with AW; therefore, she received more hours a week than others who had been there for over a year, such as plaintiff. (D.I. 40 at A-24)

At the end of the day, plaintiff was told to go up to the office after she finished work. (D.I. 40 at A-24) When she got to the office, CA handed her a counseling sheet. (D.I. 40 at A-10, A-24) The sheet stated that plaintiff had used foul language about a fellow teller and that she was spreading rumors about fellow tellers. (D.I. 40 at A-24) When plaintiff asked for an explanation, CA told her that JB had heard plaintiff call her a "black bitch." CA also told plaintiff that JB said plaintiff was talking about the incident that had occurred between the two of them in January and that there were other complaints regarding rumors about fellow tellers. (D.I. 40 at A-24) Plaintiff insisted that she never said these things and that JB was lying. (D.I. 40 at A-24) Plaintiff asked for a meeting to face her accusers, and CA said he would arrange it, but he never did. (D.I. 40 at A-24) Plaintiff did not want to sign the counseling sheet, but CA told her signing it was not an admittance of guilt but only an acknowledgment that he had spoken with her. (D.I. 40 at A-24) Plaintiff signed the letter and left the office crying. (D.I. 40 at A-24) When plaintiff called CA later that night to discuss her counseling sheet, she informed him that she felt she needed to contact a lawyer to find out her rights. (D.I. 40 at A-25)

On March 20, 1997 plaintiff went to Dr. John Asman's office to ask for a new medication for her stomach pain. [FN5] (D.I. 40 at A-25) Plaintiff explained to the doctor what she had endured at work and that the stress had worsened not only her stomach problem but also her neck and back problem. (D.I. 40 at A-25) The doctor advised plaintiff not to go back to her position and wrote a letter containing this advice. (D.I. 40 at A-25) Later that same day, plaintiff, accompanied by her husband, went to work. (D.I. 40 at A-25) As she and her husband walked in, AW was standing midway down the main line. (D.I. 40 at A-25) When he saw the two of them, AW ran back to the office and announced their arrival. (D.I. 40 at A-25) When plaintiff arrived at the office, plaintiff handed CA the note her doctor had written. She asked him to put it in her file as it was the reason she would not be back to work. (D.I. 40 at A-25)

FN5. Since approximately the spring of 1996, plaintiff has had a problem with her stomach. (D.I. 40 at 77-80) Her medication for this condition has changed three times since January 1997. (D.I. 40 at A-25) Beginning in January 1997, plaintiff also began taking muscle relaxers and anti-inflammatory pills for stress and tension in her back. (D.I. 40 at A-25)

III. STANDARD OF REVIEW

 *8 A party is entitled to summary judgment only when the court concludes "that there is no genuine issue of material fact and that the party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the burden of proving that no material issue of fact is in dispute. See Matushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n. 10 (1986).

 Once the moving party has carried its initial burden, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue for trial." ' Id. at 587 (quoting Fed.R.Civ.P. 56(e)). "Facts that could alter the outcome are 'material', and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Federal Kemper Life Assurance Co., 57 F.3d 300, 302 n. 1 (3d Cir.1995). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The mere existence of some evidence in support of the nonmoving party will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that factual issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). This court, however, must "view all the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir.1995). With respect to summary judgment in discrimination cases, the court's role is " 'to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the plaintiff, there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." ' Revis v. Slocomb Industries, Inc., 814 F.Supp. 1209, 1215 (D.Del.1993) (quoting Hankins v. Temple Univ., 829 F.2d 437, 440 (3d Cir.1987)).

 Generally, to state an employment claim under Title VII, a plaintiff may present either direct evidence of discriminatory intent under Price Waterhouse v. Hopkins, 490 U.S. 228 (1989) ("mixed motives" cases) or indirect evidence of discrimination under the framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248 (1981) ("pretext" cases). In a mixed motives case under Price Waterhouse, once the plaintiff has produced direct evidence that an illegitimate criterion was a motivating factor in an adverse employment decision, both the burden of production and the burden of persuasion shift to the defendant. See id., 490 U.S. 228 at 277. The defendant must show by a preponderance of the evidence that it would have made the same employment decision regardless of its discriminatory animus. See id. at 244-46. To come within the Price Waterhouse framework, the evidence presented by the plaintiff "must directly reflect a discriminatory ... animus on the part of a person involved in the decision making process." Armbruster v. Unisys Corp., 32 F.3d 768, 778 (3d Cir.1994); see also Ostrowski v. Atlantic Mutual Ins. Cos., 968 F.2d 171, 182 (2d Cir.1992). " 'Direct evidence is evidence which, if believed, proves the fact without inference or presumption ." ' Nixon v. Runyon, 856 F.Supp. 977, 983 (E.D.Pa.1994) (quoting Brown v. East Miss. Elec. Power Ass'n, 989 F.2d 858, 861 (5th Cir.1993)); Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1223 (11th Cir.1993) ("Evidence [of discrimination] is direct when it is sufficient to prove discrimination without inference or presumption.").

*9 In contrast, in pretext or indirect evidence cases, a plaintiff must first make a prima facie showing of discrimination. See Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir.1997) (en banc). A prima facie case is established when a plaintiff demonstrates the following: (1) she is a member of a protected class; (2) she was qualified for the employment position held or desired; (3) she suffered some form of adverse employment action; and (4) circumstances that give rise to an inference of unlawful discrimination. Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410- 412 (3d Cir.1999). Once the plaintiff has established a prima facie case of employment discrimination, the burden of going forward shifts to the defendant who then is required to articulate a legitimate, nondiscriminatory reason for the challenged employment action. See McDonnell Douglas, 411 U.S. at 802- 03; Burdine, 450 U.S. at 252-55; Bellissimo v. Westinghouse Elec. Corp., 764 F.2d 175, 179 (3d Cir.1985). The defendant need only present enough evidence to raise a genuine issue of fact "as to whether it discriminated against the plaintiff." Burdine, 450 U.S. at 254-55. If the defendant is successful in meeting its burden of production, the presumption of discrimination created by the prima facie showing drops from the case, and the plaintiff must show by a preponderance of the evidence that the defendant's proffered reason for the employment decision was merely pretext for discriminatory animus. See id. at 256. The plaintiff can satisfy her burden of proof "either directly by persuading the [fact finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Id.; see also Armbruster, 32 F.3d at 783 . At all times, the ultimate burden of persuading the trier of fact of the defendant's discriminatory intentions remains with the plaintiff. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

IV. DISCUSSION

 It is difficult to discern exactly what plaintiff claims in this lawsuit. Although she has enumerated in great detail a great number of facts, plaintiff has left it to defendant and, ultimately, the court to characterize the facts as legal causes of action. The court, as did the defendant, construes the facts and their legal consequences liberally.

A. Hostile Work Environment (Sexual Harassment)

 The Supreme Court has recognized that Title VII is violated by a "work environment abusive to employees because of their race, gender, religion, or national origin." [FN6] Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993) ; see also Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986) ( "[A] plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment."). To be cognizable within the meaning of Title VII, the harassment "must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment." ' Meritor Sav. Bank, FSB, 477 U.S. at 67 (quoting Henson v. Dundee, 682 F.2d 897, 904 (11th Cir.1982)). In order to establish a hostile work environment,

        FN6. It shall be an unlawful employment practice for an employer
        (1) to fail or refuse to hire or to discharge any individual, or
        otherwise to discriminate against any individual with respect to his
        compensation, terms, conditions, or privileges of employment, because of
        such individual's race, color, religion, sex, or national origin.
        42 U.S.C. <section> 2000e-2(a)(1).

*10 a plaintiff must establish "by the totality of the circumstances, the existence of a hostile or abusive working environment which is severe enough to affect the psychological stability of a minority employee."
  Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir.1990) (quoting Vance v. Southern Bell Tel. & Tel. Co., 863 F.2d 1503, 1510 (11th Cir.1989)). Specifically, a plaintiff must demonstrate that:
  (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability.
  Id.; see Faragher v. City of Boca Raton, 524 U.S. 775, 786-88 (1998). An "employer is vicariously liable for actionable discrimination caused by a supervisor, but subject to an affirmative defense looking to the reasonableness of the employer's conduct as well as that of the plaintiff victim." Faragher, 524 U.S. at 775.

  Under Title VII, a plaintiff must file a complaint with the EEOC within 180 days of the alleged discrimination or within 300 days of the alleged discrimination if the person has initially instituted proceedings with a state or local agency with authority to grant or seek relief form such practice. See 42 U.S.C. <section> 2000e-5(e). In the instant action, plaintiff filed her charge of discrimination on March 31, 1997 with the Delaware Department of Labor. Her Title VII action, therefore, would normally include only those incidents alleged to have occurred in the preceeding three hundred day period, i.e., those events occurring after June 4, 1996. Events occuring prior to this date are considered untimely. Therefore, plaintiff is precluded from averring in support of her hostile work environment claim any allegations of sexual harassment that occurred prior to June 4, 1996. (D.I. 40 at A-27) As a result, plaintiff's allegations that AW sexually harassed her from the time she started her training in November 1995 to the time defendant terminated her employment in April 1996 are time barred. [FN7] Plaintiff admits that AW never tried to touch her after April 1996, a concession that is supported by the record.

     FN7. Plaintiff does not allege a continuing violation, and even if she were to do so, the acts alleged to have occurred outside the limitations period are not continuous in time with the timely acts alleged. This discontinuity is fatal to a continuing violation argument.

  In light of the above, the only remaining basis for plaintiff's hostile work environment claim is her assertion that she was subjected to a continuing pattern of retaliation from management and supervisors. Plaintiff contends that this retaliation was a result of the meeting management had with female tellers in June 1996, regarding the alleged sexual harassment by AW. (D.I. 43 at B-10- 19) Although the discriminatory conduct forming the basis of a hostile work environment claim is "not necessarily required to include sexual overtones in every instance or that each incident be sufficiently severe to detrimentally affect a female employee," Andrews, 895 F.2d at 1485, the court finds that plaintiff has not established a prima facie case. Plaintiff did not participate in, and her name was never mentioned during, the June 1996 meeting. Moreover, the alleged retaliatory conduct did not begin until December 1996, six months after the tellers met with management. [FN8] Furthermore, the conduct plaintiff complains about involves treatment she received from female supervisors. Plaintiff has not provided the court with any evidence from which it could be reasonably inferred that the alleged

retaliatory actions were taken by defendant merely because of her gender.
Therefore, plaintiff has failed to establish the first element of a prima face
case. Accordingly, the court shall grant summary judgment in favor of
defendant on plaintiff's hostile work environment claim.

> FN8. Plaintiff admits that in October 1996 management was supportive
> when she went to them to complain about her car being keyed in the
> parking lot. (D.I. 40 at A-21) Plaintiff's first allegation that
> involves retaliatory conduct by management or a supervisor concern
> conduct that occurred in mid-December 1996. (D.I. 40 at A-22)

B. Retaliation

*11 Title VII prohibits discrimination against an employee who has exercised
her rights under the Act:
It shall be an unlawful employment practice for an employer to discriminate
against any of his employees ... because she [the employee] has opposed any
practice made an unlawful employment practice by this subchapter, or because
she has made a charge, testified, assisted, or participated, in any manner in
an investigation, proceeding, or hearing under this title.

42 U.S.C. <section> 2000e-3(a) (1997); Price v. Delaware Dep't of
Correction, 40 F.Supp.2d 544, 551 n. 5 (D.Del.1999). Courts analyze Title VII
retaliation claims under the same burden-shifting framework outlined earlier.
See Krouse v. American Sterilizer Co., 126 F.3d 494, 500 (3d Cir.1997). A
plaintiff, therefore, must first establish a prima facie case for retaliation
under Title VII. In order to state a prima facie case of retaliation under the
statute, the plaintiff must show (1) she engaged in a protected employee
activity; (2) adverse action by the employer either after or contemporaneous
with the employee's protected activity; and (3) a causal connection between
the employee's protected activity and the employer's adverse action. See id.;
Robinson v. City of Pittsburgh, 120 F.3d 1286, 1289 (3d Cir.1997); Woodson v.
Scott Paper Co., 109 F.3d 913, 920 (3d Cir.1997); Price, 40 F.Supp.2d at
551-52.

In the case at bar, plaintiff has failed to establish a prima facie showing
of retaliation. Plaintiff provides no evidence that she engaged in a protected
employee activity, the touchstone element of a retaliation claim. The record
demonstrates that plaintiff never "opposed any practice made an unlawful
employment practice by [Title VII];" moreover, plaintiff never "made a charge,
testified, assisted, or participated, in any manner in an investigation,
proceeding, or hearing under this title." 42 U.S.C. <section> 2000e-3(a).
Plaintiff did not complain to management that she was being sexually harassed;
she was not one of the female tellers who went to management in April 1996 and
her name was never mentioned in that meeting. (D.I. 43 at B-10) Although
filing a charge of discrimination with the EEOC is a protected activity,
plaintiff did not do so until after she resigned in March 1997. See Robinson,
120 F.3d at 1300; Woodson, 109 F.3d at 920.

Plaintiff contends that her "involuntary involvement" in SK's letter to the
president of defendant was a protected activity. In her December 1996 letter,
SK made reference to plaintiff, but never mentioned her by name. (D.I. 40 at
A-5-7; D.I. 43 at B-773) There is no evidence to show that management had any
idea the letter was referencing plaintiff. (D.I. 47 at <paragraph> 5; D.I. 48
at <paragraph> 2) Although plaintiff was friendly with SK and SK's sister,
that does not make her a participant, in any form, in a protected activity.
(D.I. 43 at B-772) Plaintiff argues that she engaged in a protected activity
when she refused to write a letter for management about a gay male teller.

(D.I. 43 at B-790-791) The court finds that this single nonevent does not constitute "oppos[ition to] any practice made an unlawful employment practice" by Title VII.

*12 Even if the court were to assume that plaintiff engaged in a protected activity, the court finds that plaintiff has not shown an adverse employment action taken by defendant sufficient to fulfill the second element of a prima facie case. "The Third Circuit has articulated that 'retaliatory conduct other than discharge or refusal to rehire is ... proscribed by Title VII only if it alters the employees' compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affect[s] his status as an employee." ' Price, 40 F.Supp.2d at 552 (citing Robinson, 120 F.3d at 1300) (emphasis added). According to the Third Circuit in Robinson, "not everything that makes an employee unhappy qualifies as retaliation, for otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." Robinson, 120 F.3d at 1300. The employer's retaliatory conduct must be both "serious and tangible." Id.

Plaintiff alleges that she received an unwarranted low performance review from defendant in January 1997. (D.I. 40 at A-49) There is no evidence to support plaintiff's claim that her review was unwarranted other than her own belief that she deserved a higher score. As a result of this review, plaintiff received a satisfactory score and a twenty-five cent raise. (D.I. 40 at A-22) Plaintiff did not quit when she received her evaluation. Although plaintiff did question management about her score, she never requested that it be changed. (D.I. 40 at A-49)

Constructive discharge may be an adverse employment action. See Durham Life Ins. Co. v. Evans, 166 F.3d 139, 149 (3d Cir.1999). Plaintiff at bar does not argue directly that she was constructively discharged; however, the court will address the issue, construing the claims and record liberally. Constructive discharge is found where an employer knowingly permits "conditions of discrimination in employment so unpleasant or difficult that a reasonable person would have felt compelled to resign." Conners v.. Chrysler Fin. Corp., 160 F.3d 971, 974 (3d Cir.1998). Plaintiff alleges that she was subjected to the following acts of reprisal: she received an unwarranted low performance review; she received several verbal counselings and one written counseling from management; her supervisor (a female) brought her into the middle of a meeting to embarrass her; her supervisor (a female) elbowed her in the back and tried to close her arm in the drawer approximately ten times; and another supervisor (a male) tried to "body check" her in the hallway. These incidents, coupled with her doctor's advice not to return to work, prompted plaintiff to resign. (D.I. 40 at A-25) The court finds that these allegations do not rise to the level of employer action that would "compel a reasonable person to resign." See generally Robinson, 120 F.3d 1286, 1300-01 (finding that plaintiff's alleged "unsubstantiated oral reprimands" and "unnecessary derogatory comments" did not rise to the level of what the Third Circuit has described as "adverse employment action").

*13 Even if the court were to find that plaintiff was constructively discharged, there is no causal connection between what she claims to have been the protected activity (her alleged involvement in SK's letter) and the problems that led to her resignation. Plaintiff argues that the substantial and continuous harassment she alleges was at the request of management, because of the letter sent by SK. However, as mentioned above, there is no evidence to suggest that management knew plaintiff was referenced in this

letter. Therefore, even if plaintiff were to have met element one by her "involuntary involvement" in SK's letter, and to have met element two through constructive discharge, this court finds that there is no causal connection between the protected activity and the adverse employment action to fulfill element three of a prima facie case of retaliation. [FN9]

> FN9. The Third Circuit has stated that "temporal proximity between the protected activity and the termination is sufficient to establish a causal link." Woodson, 109 F.3d at 920-21. The timing as alleged by plaintiff is SK's December 6, 1996 letter and plaintiff's March 20, 1997 resignation.

## C. Disparate Treatment

In an effort to predict what causes of action plaintiff might assert at trial, defendant has addressed the theory of disparate treatment. Plaintiff did not directly address a claim of disparate treatment in her charge of discrimination to the EEOC. (D.I. 40 at A-27) Courts generally are empowered to hear only those employment discrimination claims that have been the subject of a charge timely filed with the EEOC. See 42 U.S.C. <section> 2000e-5(f)(1), (3). However, the parameters of the resulting civil complaint that may follow a notice of a right to sue from the EEOC are " 'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination," ' regardless of the actual scope of the EEOC investigation. Hicks v. ABT Assocs., Inc., 572 F.2d 960, 966 (3d Cir.1978) (quoting Ostapowicz v. Johnson Bronze Co., 541 F.2d 394, 398-99 (3d Cir.1976) ). Therefore, a court may assume jurisdiction over additional charges only if "the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." Antol v. Perry, 82 F.3d 1291, 1295 (3d Cir.1996) (quoting Waiters v. Parsons, 729 F.2d 233, 237 (3d Cir.1984)). This standard must be applied in accord with the "sound and established policy that procedural technicalities should not be used to prevent Title VII claims from being decided on the merits." Revis, 814 F.Supp. at 1216 (quoting Gooding v. Warner-Lambert Co., 744 F.2d 354, 358- 59 (3d Cir.1984)).

Where the allegations in the complaint were sufficiently distinct from those presented in the EEOC charge and were not part of the EEOC investigation, courts have refused to entertain the expanded claims until administrative procedures have been exhausted. See Sandom v. Travelers Mortgage Servs., Inc., 752 F.Supp. 1240, 1246-48 (D.N.J.1990); Zalewski v. M.A.R.S. Enters., Ltd., 561 F.Supp. 601, 604-05 (D.Del.1982). Nonetheless, courts have heard claims not specifically mentioned in the prior EEOC charge where there was a close nexus between the facts supporting the claims raised in the charge and those in the complaints. See Howze v. Jones & Laughlin Steel Corp., 750 F.2d 1208, 1212 (3d Cir.1984); Ostapowicz, 541 F.2d at 398-99.

*14 Courts often have stated that " 'the nature of the required showing' to establish a prima facie case of disparate treatment based on indirect evidence 'depends on the circumstances of the case." ' Marzano v. Computer Science Corp.,, 91 F.3d 497, 503 (3d Cir.1996) (citing Torre v. Casio, Inc., 42 F.3d 825, 830 (3d Cir.1994) (citation omitted)). Generally, to state a disparate treatment in employment claim under Title VII, a plaintiff must demonstrate that she was "singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion." Equal Employment Opportunity Comm'n v. Metal Serv. Co., 892 F.2d 341, 347 (3d Cir.1990). Plaintiff must first state a prima facie case of gender discrimination. See

McDonnell Douglas, 411 U.S. at 802.; Marzano, 91 F.3d at 503. She can do so by
showing by a preponderance of the evidence that: (1) she is a member of the
protected class, (2) she suffered an adverse employment action, and (3) that
similarly situated members of the opposite sex were treated more favorably.
See McDonnell Douglas, 411 U.S. at 802; Stinson v. Delaware River Port Auth.,
935 F.Supp. 531, 539 (D.N.J.1996).

Plaintiff at bar fails to establish a prima facie case. Although plaintiff, a
female, is a member of a protected class, she has failed to show that
similarly situated males were treated more favorably and did not suffer
adverse employment actions. Plaintiff generally alleges that male tellers were
not treated in the same disrespectful manner that female tellers were, but she
fails to provide sufficient evidence for comparison of the treatment of
similarly situated female and male employees.

Plaintiff argues that she received several verbal counselings and one written
counseling, but the record reveals that both males and females received oral
and written counselings. (D.I. 40 at A-113) Plaintiff argues that qualified
females were passed up for promotions while less qualified males were
promoted. (D.I. 1 at <paragraph><paragraph> 37-40) As to this issue, the
record reveals that both male and female tellers received promotions to head
teller. Additionally, plaintiff alleges that her supervisors failed to oust
abusive customers at female tellers' requests, but did so when male tellers so
requested. (D.I. 1 at <paragraph><paragraph> 93-94) There is no evidence
supporting this allegation. In sum, aside from plaintiff's conclusory
allegations, there is no evidence in the record that males were treated more
favorably than females while employed by defendant. Therefore, plaintiff, has
not met her burden of proof to establish a prima facie case for a Title VII
disparate treatment claim.

Even assuming plaintiff has established a prima facie case, defendant has
provided a legitimate, non-discriminatory reason for its actions, shifting the
burden back to the plaintiff. Burdine, 450 U.S. at 254-56. Defendant has
stated that management received complaints about plaintiff from other tellers,
two of whom reduced their complaints to writing and, therefore, had reason to
counsel plaintiff. (D.I. 40 at A-8, 9) The record shows that plaintiff and
other tellers violated some of the mutuel department's regulations by being
discourteous to co-workers and, therefore, defendant had reason to counsel
them. The burden then shifts back to plaintiff to show by a preponderance of
the evidence that defendant's reasoning is pretextual. Burdine, 450 U.S. at
256. Plaintiff failed to address this claim in her answering brief and,
therefore, has failed to meet her burden of showing defendant's proffered
reason was merely pretext for discriminatory animus. See .

    V. CONCLUSION

*15 For the reasons stated above, the court concludes that there are no
genuine issues of material fact relating to plaintiff's claims of
discrimination under Title VII. Therefore, defendant's motion for summary
judgment shall be granted. An appropriate order shall issue.

Not Reported in F.Supp.2d, 2000 WL 376419 (D.Del.)

END OF DOCUMENT

C

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 929221 (E.D.Pa.)
(Cite as: 2003 WL 929221 (E.D.Pa.))

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Christine HAWK, Plaintiff,
v.
AMERICOLD LOGISTICS, LLC, Defendant.
No. 02-3528.

March 6, 2003.

Female former employee brought suit against former employer, alleging sex
discrimination and sexual harassment under Title VII, and discriminatory
discharge in violation of the Pennsylvania Human Relations Act (PHRA). On
employer's motion for summary judgment, the District Court, Schiller, J., held
that: (1) on Title VII sexually hostile work environment claim, fact question
as whether male supervisor's alleged harassing conduct towards employee over
eight month period was severe and pervasive, precluded summary judgment based
on failure to establish prima facie case; (2) fact questions precluded summary
judgment on issue of whether employer was vicariously liable for sexually
hostile work environment under Title VII, which was allegedly caused by same
supervisor's conduct; (3) discrimination claim under PHRA was governed by same
standard as employee's Title VII claim; and (4) there was no right to punitive
damages under PHRA.

Motion granted in part, and denied in part.

West Headnotes

[1] Federal Civil Procedure k2497.1
170Ak2497.1 Most Cited Cases
On Title VII sexually hostile work environment claim, fact question as whether
male supervisor's alleged harassing conduct towards female employee over eight
month period, which included sending employee unwelcome electronic and verbal
communication of a sexual nature at work, was severe and pervasive, precluded
summary judgment based on failure to establish prima facie case. Civil Rights
Act of 1964, <section> 701 et seq., 42 U.S.C.A. <section> 2000e et seq.

[2] Federal Civil Procedure k2497.1
170Ak2497.1 Most Cited Cases
Fact questions as to whether male supervisor actively misused his supervisory
authority to sexually harass female employee, as to whether employee was
subjected to hostile work environment, as to whether employee was
constructively discharged by supervisor's alleged harassment, and thus as to
whether employee suffered tangible employment action, precluded summary
judgment on issue of whether employer was strictly vicariously liable for
sexually hostile work environment under Title VII. Civil Rights Act of 1964,
<section> 701 et seq., 42 U.S.C.A. <section> 2000e et seq.

[3] Civil Rights k1528
78k1528 Most Cited Cases
    (Formerly 78k371)
If female employee was not subjected to tangible employment action by male
supervisor's alleged sexually harassing conduct, employer could assert
affirmative defense to vicarious liability for sexually hostile work
environment claim under Title VII. Civil Rights Act of 1964, <section> 701 et
seq., 42 U.S.C.A. <section> 2000e et seq.

[4] Federal Civil Procedure k2497.1
170Ak2497.1 Most Cited Cases
Fact questions as to whether employer exercised reasonable care to prevent and
correct promptly male supervisor's alleged sexually harassing behavior towards
female employee, and as to whether employee unreasonably failed to take
advantage of preventative or corrective opportunities provided by employer or
to avoid harm otherwise, precluded summary judgment on issue of whether
affirmative defense to vicarious liable for sexually hostile work environment
applied, under Title VII, to shield employer. Civil Rights Act of 1964,
<section> 701 et seq., 42 U.S.C.A. <section> 2000e et seq.

[5] Civil Rights k1744
78k1744 Most Cited Cases
    (Formerly 78k453)
Discrimination claims brought under the Pennsylvania Human Relations Act
(PHRA) are generally governed by same standard of proof as those governed by
Title VII. Civil Rights Act of 1964, <section> 701 et seq., 42 U.S.C.A.
<section> 2000e et seq.; 43 P.S. <section> 951 et seq.

[6] Civil Rights k1768
78k1768 Most Cited Cases
    (Formerly 78k454)
There is no right to punitive damages for sex discrimination under the
Pennsylvania Human Relations Act (PHRA). 43 P.S. <section> 951 et seq.

MEMORANDUM AND ORDER

SCHILLER, J.

 *1 Plaintiff Christine Hawk brought suit against her former employer,
Americold Logistics, alleging sex discrimination and sexual harassment in
violation of Title VII of the Civil Rights Act, discriminatory discharge in
violation of the Pennsylvania Human Relations Act ("PHRA"), and defamation and
intentional infliction of emotional distress under Pennsylvania common law.
Presently before the Court is Defendant's Motion for Summary Judgment. Because
I find that Plaintiff has set forth facts sufficient to create a genuine issue
for trial on her Title VII and PHRA claims, and for the reasons set forth
below, I deny Defendant's motion and will permit Plaintiff to proceed to trial
on her Title VII and PHRA claims, except to the extent Plaintiff seeks
punitive damages under the PHRA.

I. FACTUAL BACKGROUND

 Plaintiff Christine Hawk began working as a temporary employee making pallets
at Defendant Americold Logistics in June, 1999. Ms. Hawk became an Americold
employee, working as a forklift driver in the refrigerated facility, in
December, 1999. (Hawk Dep. at 164, 171.) For the majority of her employment,
Jack J. Bambary served as one of Ms. Hawk's direct supervisors. (Id. at 55,

198.)

Initially, Ms. Hawk and Mr. Bambary established a cordial friendship, but soon Mr. Bambary began to engage in harassing behavior. (Id. at 105.) During her first month as a temporary employee, Mr. Bambary joined Ms. Hawk and another individual from work to watch a third co-worker and friend of Ms. Hawk, Robin Zelner, perform exotic dance at a club. (Id. at 50-52.) Mr. Bambary commented to Ms. Hawk that she would "look better up there dancing," to which Ms. Hawk replied that she was not a dancer. (Id. at 53.) Ms. Zelner gave Ms. Hawk's pager number to Mr. Bambary, who began to page Ms. Hawk every day. (Id. at 105-107.) Mr. Bambary began to call Ms. Hawk at home, as well, although she told him not to. (Id. at 113.) At one point, Mr. Bambary showed up unannounced at Ms. Hawk's home, explaining that he had seen her car while driving through the area. (Id.) On another occasion, Mr. Bambary came to Ms. Hawk's house when she was sick, explaining that he had come to check on her. She asked him to leave. (Id. at 121.) On yet another occasion, Mr. Bambary came to Ms. Hawk's home and began to recite his affections for her and refused to leave despite her requests that he do so. (Id. at 125.) A short time after Mr. Bambary's eventual departure, Ms. Hawk saw a flashlight in one of her windows. Ms. Hawk's sister then called the police. (Id. at 127.)

At work, Mr. Bambary frequently called Ms. Hawk into the dock office when she worked the Saturday shift. (Id. at 73.) Ms. Hawk would ask her co-worker, Melody Christ to accompany her when Mr. Bambary would make such requests. (Id, Christ Dep. at 9-10.) Ms. Hawk's co-workers, including Ms. Christ, Jose Cruz, Chad Distler and Jeremy Voss regularly observed that Mr. Bambary followed her and asked her about it. (Id. at 72, 76.) Mr. Bambary made a practice of interrupting conversations that Ms. Hawk had with male co-workers. (Id. at 76.) In particular, Mr. Bambary instructed Jeremy Voss not to talk to Ms. Hawk. (Id. at 78.) Mr. Bambary also regularly confronted Ms. Hawk about her conversations with male co-workers. (Hawk Dep. at 108.) Mr. Bambary also sent Ms. Hawk suggestive messages on her forklift computer. (Id. at 115.)

Most seriously, Mr. Bambary frequently spoke to Ms. Hawk about her having sex with him and specifically told her he wanted her to have sex with him in his chair. (Id. at 85.) On one occasion, Mr. Bambary told Ms. Hawk to kiss him and grabbed her arm and tried to pull her toward him. (Id. at 85-86.) On another occasion, Mr. Bambary shoved Ms. Hawk up against a wall and asked her to have sex with him. (Id. at 87.)

*2 Ms. Hawk rebuffed Mr. Bambary's requests for sex. (Hawk.Aff. <paragraph> 1.) At one point, Ms. Hawk told Mr. Bambary that if he did not leave her alone, she would call his wife. (Hawk Dep. at 74.) Ms. Hawk inquired of her co-worker, Kathy Cates, whether Mr Bambary had ever made comments of a sexual nature to her, and Ms. Cates indicated that he had. (Id. at 89, 90.) Mr. Bambary's harassment caused Ms. Hawk's productivity to decline at work. (Id. at 109- 110.)

Ms. Hawk did not immediately report Mr. Bambary's behavior. [FN1] Ms. Hawk felt that Mr. Bambary "had control of the situation," (Id. at 115.) because he knew she could not leave her job because he was aware of her financial situation and of the fact that she had to raise her son by herself. (Id.) In August, 1999, Ms. Hawk told Eric Wilmont, a supervisor, that somone was harassing her but that she did not wish to discuss the matter further because she could handle it herself. (Id. at 68.) Mr. Wilmont and Ms. Hawk had no further conversation about the matter. (Id. at 72.) Finally, on March 3, 2000, after she left work, Ms. Hawk reported her allegations of sexual harassment to

Sheila Persing, Americold's Human Resource Manager by telephone. (Id. at 222.) That same day, Ms. Persing met with Mr. Bambary to discuss Ms. Hawk's allegations. Mr. Bambary denied the allegations of sexual harassment, but indicated that he and Ms. Hawk were friends. (Persing Dep. at 16, 19, 20.) On March 6, 2000, Ms. Hawk met with Ms. Persing and reported what had happened to her both verbally and in writing. (Hawk Dep. at 233.) Ms. Hawk asked to be permanently transferred to Americold's dry facility, which is about a mile from the refrigerated facility. (Id. at 241-42.) Ms. Persing informed Ms. Hawk that she and Mr. Bambary would be assigned to different shifts to minimize their contact. (Id. at 278-79.) At Ms. Persing's recommendation, Mr Bambary's shift was changed to minimize his contact with Ms. Hawk. (Persing Dep. at 28.) Ms. Persing conducted an investigation, interviewing individuals identified by Ms. Hawk and by Mr. Bambary. (Id. at 16.) On March 9, 2000, Plaintiff was temporarily transferred to Americold's dry facility, which is about a mile from the refrigerated facility. (Hawk Dep. at 242.)

> FN1. Americold maintains a Human Resources Guide and an Associate Handbook that set forth Defendant's Equal Employment Opportunity and Anti-Sexual Harassment policies. Americold also maintains a Code of Conduct that prohibits sexual harassment. Both Ms. Hawk and Mr. Bambary were made aware through various means of Defendant's sexual harassment policies. (Def's. Mem of Law at 4, 5.) Both attended sexual harassment training. (Hawk Dep. at 157, Persing Dep. at 26.)

On March 4, 2000, before Ms. Hawk began working in the dry facility, Pauline Ross, who would be Ms. Hawk's supervisor there, told Deborah Sandora, who would become a co-worker of Ms. Hawk, that Ms. Hawk was a "slut" and a "liar." (Sandorah Dep. at 57.) Ms. Ross also told Ms. Sandora that she had seen Ms. Hawk "hanging on" men in the refrigerated facility. (Id. at 57.) When Ms. Hawk began work in the dry facility on March 9, 2000, Ms. Sandora told Ms. Hawk what their supervisor, Ms. Ross, had said. (Hawk Dep. at 23.)

*3 On March 13, 2000 Americold concluded its investigation. Ms. Persing concluded that Mr. Bambary had been unprofessional at times but had not sexually harassed Ms. Hawk. (Persing Dep. at 48-49.) The next day, Ms. Persing met with Ms. Hawk and informed her of her findings. Ms. Persing also indicated that Mr. Bambary was to have no contact with Ms. Hawk, would never be on the same shift, and would receive discipline. (Id. at 53,59.) Americold placed Mr. Bambary on a "Last Chance Agreement." (Id.) Ms. Persing gave Ms. Hawk the option of returning to work in the refrigerated facility, to which Ms. Hawk agreed. (Persing Notes 3/14/00.) Ms. Hawk returned, however, only for one day, during which she had contact with Mr. Bambary. (Hawk Dep. at 327.)

On March 20, 2000, Plaintiff informed Ms. Persing by letter that she believed that she had been constructively discharged. (March 20, 2000 Hawk Letter.) Based on information contained in the letter, Ms. Persing conducted further interviews of Americold employees who were named in the letter. (Persing Dep. at 33, 35, 37, 39.) During those interviews, Ms. Persing heard from another female employee that Mr. Bambary had made comments to that employee that, in Ms. Persing's view, were not "appropriate." (Id. at 36-37.) On March 27, Americold terminated Mr. Bambary's employment, informed Ms. Hawk by letter that it had done so, and advised her that she could return to work at Americold. (Id. at 49, 65.) Subsequently, the United States Equal Employment Opportunity Commission ("EEOC") conducted an investigation and, on March 8, 2002, issued a Probable Cause Determination in Plaintiff's favor and a right to sue letter. (EEOC Probable Cause Determination, Charge No. 170A10669, March 8, 2002.) On April 26, 2002, Plaintiff filed a four count complaint, alleging

sex discrimination and sexual harassment in violation of Title VII,
discriminatory discharge of employment in violation of the Pennsylvania Human
Relations Act ("PHRA"), defamation, and intentional infliction of emotional
distress.   [FN2]

> FN2. Plaintiff has withdrawn her claims for defamation and intentional
> infliction of emotional distress.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record discloses no genuine issue of
material fact and the moving party is entitled to judgment as a matter of law.
Fed.R.Civ.P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing the record, "a
court must view the facts in the light most favorable to the nonmoving party
and draw all inferences in that party's favor." Armbruster v. Unisys Corp., 32
F.3d 768, 777 (3d Cir.1994). The moving party bears the burden of showing that
the record reveals no genuine issue as to any material fact and that the
moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c);
Anderson, 477 U.S. at 247. Once the moving party has met its burden, the
non-moving party must go beyond the pleadings to set forth specific facts
showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e);
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86, 106
S.Ct. 1348, 89 L.Ed.2d 538 (1986). "There is no issue for trial unless there
is sufficient evidence favoring the nonmoving party for a jury to return a
verdict for that party." Anderson, 477 U.S. at 249. "Such affirmative
evidence-- regardless of whether it is direct or circumstantial--must amount
to more than a scintilla, but may amount to less (in the evaluation of the
court) than a preponderance." Williams v. Borough of West Chester, 891 F.2d
458, 460-61 (3d Cir.1989).

A court may not consider the credibility or weight of the evidence in
deciding a motion for summary judgment, even if the quantity of the moving
party's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v.
BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir.1992). Nonetheless, a party
opposing summary judgment must do more than rest upon mere allegations,
general denials, or vague statements. Quiroga v. Hasbro, Inc., 934 F.2d 497,
500 (3rd Cir.1991). If the non-moving party's evidence " 'is merely colorable,
... or is not significantly probative, ... summary judgment may be granted.' "
Gray v. York Newspapers, 957 F.2d 1070, 1078 (3d Cir.1992) (quoting Liberty
Lobby, 477 U.S. at 249-50). [FN3] The non-movant does not need to produce
evidence in a form that would be admissible in order to avoid summary
judgment. See Celotex, 477 U.S. at 324. "As long as the evidence could be
later presented in a form that would be admissible at trial--i.e. reducible to
admissible form--it can be used to defeat summary judgment." J.F. Feeser, Inc.
v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir.1990). [FN4]

> FN3. Here, Plaintiff relies heavily on her own deposition testimony as
> evidentiary support for her opposition to summary judgment. As is shown
> below, however, her deposition testimony relates very specific,
> plausible material facts, not merely allegations. Moreover, as the Third
> Circuit has noted, "Title VII does not have a corroboration
> requirement." Durham Life Insurance v. Evans, 166 F.3d 139, 147 (3d
> Cir.1999).

> FN4. Here, Plaintiff relies on the EEOC Probable Cause Determination for
> evidentiary support in its opposition to summary judgment. As set forth

below, however, I find that, independent of the EEOC determination, Plaintiff has proffered facts sufficient to survive summary judgment. Thus, I need not determine whether the EEOC document could be presented in a form that would be admissible at trial.

III. DISCUSSION

A. Hostile Work Environment Sexual Harassment Under Title VII

*4 It is well established that plaintiff can demonstrate a violation of Title VII by proving that sexual harassment created a hostile or abusive work environment. Kunin v. Sears & Roebuck Co., 175 F.3d 289, 293 (3d Cir.1999) ( citing Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). To prove a hostile work environment claim, a plaintiff must establish that (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. Id. (citing Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir.1990)). Here, Defendant contends that Plaintiff cannot make out a genuine issue for trial on the second and fifth elements of her claim.

1. Severity and Pervasiveness of Discrimination

[1] Defendant argues that the Plaintiff cannot show that the conduct complained of was sufficiently severe or pervasive. A hostile work environment claim should be examined in view of the totality of the circumstances. West v. Philadelphia Elec. Co., 45 F.3d 744, 756 (3d Cir.1995); Andrews, 895 F.2d at 1485, and the court should consider (a) the frequency of the harassment, (b) its severity, (c) whether it is physically threatening or humiliating or merely an offensive utterance, (d) whether it unreasonably interferes with employee's work performance, and (e) its effect on an employee's psychological well being. Harris v. Forklift Sys., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Ms. Hawk alleges that Mr. Bambary engaged in a pattern of sexual harassment over an eight month period. The facts, viewed in a light most favorable to Plaintiff, bear out this allegation. The harassment was frequent in that it occurred regularly at work in the form of unwelcome electronic and verbal communication of a sexual nature. The harassment also occurred "every day" in the form of unwelcome phone calls to Ms. Hawk's home and pager. The harassment was also severe at points. Mr. Bambary told Ms. Hawk he wanted to have sex with her in his chair, grabbed her and tried to pull her toward him, and shoved her up against a wall while indicating his desire to have sex with her. The frequency and severity of these occurrences coupled with the fact that Ms. Hawk felt that Mr. Bambary was "in control" of the situation because he knew she could not lose her job indicate that this behavior was humiliating. In addition, Ms. Hawk's coworkers frequently asked her about the fact that Mr. Bambary followed her around the workplace and interrupted her conversations with male employees. This too, is indicative of the humiliation cause by Mr. Bambary's behavior. This harassment negatively affected Ms. Hawk's productivity on the job and affected her emotionally. In his interview with Ms. Persing, Ms. Hawk's co-worker, Jose Cruz, indicated that Ms. Hawk became "very upset" when discussing Mr. Bambary's behavior. (Cruz Statement, March 10, 2000.) A jury could certainly find that this harassment would detrimentally effect a reasonable person in the same position.

*5 In Keown v. Richfood Holding, to which Defendant directs me, this Court granted summary judgment for the defendant on a sexual harassment claim. Civ A. No. 01-2156, U.S. Dist. LEXIS 10835, at * 22, 2002 WL 1340311, at *4 (E.D.Pa.2002) (Schiller, J.). There, the plaintiff, a male, had received several pamphlets from coworkers relating to age and sexual function. See Keown, 2002 WL 1340311, at *4-5. The Court determined that although the pamphlets may have been offensive, they did not place him in a sexually threatening or humiliating position and that there was no reason why the pamphlets should have interfered with his work performance or had a significant impact on his psychological well being. Id. at *5. The Court also found that the pamphlets were sent too infrequently--eight or nine pamphlets in four months--to constitute harassment. Id. The alleged harassment in Keown does not begin to compare to that described here. Ms Hawk was daily subject to unwanted communication of a sexual nature, both at work and at home. Surely, such harassment must be viewed as severe and pervasive. I therefore find that Plaintiff has set forth facts sufficient to create a genuine issue for trial on the second element of her harassment claim.

2. Respondeat Superior Liability

*6 [2] Defendant also challenges Plaintiff's ability to show respondeat superior liability. In Meritor Savings Bank v. Vinson, the Supreme Court held that agency principles govern the liability analysis in hostile work environment sexual harassment cases. 477 U.S. 57, 72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Following Meritor, the Third Circuit has found that the Restatement (Second) of Agency <section> 219 provides three bases for liability in such cases:
 Section 219(1) holds employers responsible for torts committed by their employees within the scope of their employment ... Under <section> 219(2)(b), masters are liable for their own negligence or recklessness; in a harassment case, this is typically negligent failure to discipline or fire, or failure to take remedial action upon notice of harassment. Finally, under <section> 219(2)(d), if the servant relied upon apparent authority or was aided by the agency relationship, the master is required to answer.
 Bouton v. BMW of N. America, Inc., 29 F.3d 103, 106 (3d Cir.1994). Here, as noted, Mr. Bambary served as one of Ms. Hawk's direct supervisors. Following the Supreme Court's guidance Faragher v. City of Boca Raton, therefore, I will start with the <section> 219(2)(d) standard to determine whether Americold should be held liable for Mr. Bambary's conduct. 524 U.S. 775, 802, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), ("... [I]t makes sense to hold an employer vicariously liable for some tortious conduct of a supervisor made possible by abuse of his supervisory authority, and ... the aided-by-agency-relation principle embodied in <section> 219(2)(d) provides an appropriate starting point ..."). As the Supreme Court noted, the "agency relationship affords contact with an employee subjected to a supervisor's sexual harassment, and the victim may well be reluctant to accept the risks of blowing the whistle on a superior." Faragher, 524 U.S. at 803. This rationale is particularly apt here where, as noted, Ms. Hawk indicated that she feared she would lose her job if she reported Mr. Bambary's behavior. The Court has indicated the need for "active or affirmative" misuse of supervisory authority. Id. at 804.

 There can be little doubt that a jury could find that Mr. Bambary actively misused his supervisory authority. For example, Mr. Bambary would regularly call Ms. Hawk to the dock office as a means of gaining access to her. Mr. Bambary would also used his authority to prevent Ms. Hawk from engaging in conversation with male coworkers. In the context of Mr. Bambary's other

harassing behavior, such explicit use of authority constitutes misuse. I
therefore find that the Plaintiff can make out a genuine issue for trial as to
Defendant's liability.

a. Affirmative Defense Under Faragher and Ellerth

*7 Under a doctrine that has come to be known as the Ellerth/Faragher
affirmative defense, an employer that has taken no tangible adverse employment
action against an employee cannot be held liable for the creation of a hostile
work environment by that employee's supervisor if certain conditions are
manifest. As explained by the Supreme Court:
An employer is subject to vicarious liability to a victimized employee for an
actionable hostile environment created by a supervisor with immediate (or
successively higher) authority over the employee. When no tangible employment
action is taken, a defending employer may raise an affirmative defense to
liability or damages, subject to proof by a preponderance of the evidence....
The defense comprises two necessary elements: (a) that the employer exercised
reasonable care to prevent and correct promptly any sexually harassing
behavior, and (b) that the plaintiff employee unreasonably failed to take
advantage of any preventive or corrective opportunities provided by the
employer or to avoid harm otherwise.... No affirmative defense is available,
however, when the supervisor's harassment culminates in a tangible employment
action, such as discharge, demotion, or undesirable reassignment.
  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 141
L.Ed.2d 633 (1998); see also Faragher, 524 U.S. at 807-08 (1998).

Here, Plaintiff contends that Defendant took tangible employment action
towards her in the form of a constructive discharge. The Supreme Court has
defined a tangible employment action as "a significant change in employment
status, such as hiring, firing, failing to promote, reassignment with
significantly different responsibilities, or a decision causing a significant
change in benefits." Ellerth, 524 U.S. at 761. Other courts have split on the
question of whether a constructive discharge constitutes a tangible adverse
employment action. Compare Caridad v. Metro-North Commuter R.R., 191 F.3d 283,
294 (2d Cir.1999) (holding that "constructive discharge does not constitute a
'tangible employment action' as that term is used in Ellerth and Faragher ")
with Cherry v. Menard, Inc., 101 F.Supp.2d 1160, 1171-75 (N.D.Iowa 2000)
(explicitly disagreeing with the conclusion reached by the Caridad court). The
Third Circuit has not definitively resolved this issue, but has suggested that
it might recognize constructive discharge as a tangible employment action. See
Durham Life Ins. Co. v. Evans, 166 F.3d 139, 153 (3d Cir.1999) (rejecting a
theory under which any substantial adverse action would not be tangible
adverse action if it led affected employee to quit before demotion took effect
as "contrary to Title VII doctrine," which "recognizes a constructive
discharge under such circumstances,"). [FN5]

    FN5. Plaintiff contends that Goldberg v. City of Philadelphia, 1994 WL
    313030, at *6 (E.D.Pa.1994), may be read to support the proposition that
    "a constructive discharge action may be based on a hostile work
    environment claim." I cannot agree. The Goldberg court held that a
    plaintiff public employee who had shown that defendants made his working
    conditions so intolerable that a reasonable employee would have been
    forced to resign could survive summary judgment on his procedural due
    process claim. See id.

In Cardenas v. Massey, 269 F.3d 251, 266 n. 10 (3d Cir.2001) the court
reserved this question for resolution in the first instance by a district

court but assumed that a constructive discharge could operate as a tangible
employment action. Proceeding from that assumption, the court determined that
if the plaintiff could convince the jury that he was victimized by a hostile
work environment, "it is certainly possible that the same jury would find that
the hostile environment was severe enough to have precipitated [plaintiff's]
resignation, i.e., a constructive discharge." Cardenas, 269 F.3d at 266-67.
The court subsequently found that the plaintiff had presented sufficient
evidence to create a question of fact as to the existence of a hostile work
environment and, accordingly, found that plaintiff could survive summary
judgment on the constructive discharge issue. Id. at 267. Here, as noted,
Plaintiff has presented sufficient evidence to create a question of fact as to
the existence of a hostile work environment.

   *8 Assuming arguendo that she had not, Plaintiff can show constructive
discharge. Sex discrimination results in constructive discharge if "the
conduct complained of would have the foreseeable result that working
conditions would be so unpleasant or difficult that a reasonable person in the
employee's shoes would resign." Bonenberger v. Plymouth Twp., 132 F.3d 20, 28
(3d Cir.1997) (quoting Goss v. Exxon Office Sys. Co., 747 F.2d 885, 887-888
(3d Cir.1984)).

   Defendant contends that Plaintiff was not terminated or demoted and that she
"voluntarily" made the decision to resign her employment. Defendant cites no
portion of the record which supports its assertion of voluntariness. Plaintiff
can point to several facts in the record that support the opposite conclusion.
As noted, before Ms. Hawk began working in the dry facility, Pauline Ross, a
supervisor there, told Deborah Sandora, who would become a co-worker of Ms.
Hawk, that Ms. Hawk was a "slut" and a "liar" and that she had seen Ms. Hawk
"hanging on" men in the refrigerated facility. When Ms. Hawk began work in the
dry facility on March 9, 2000, Ms. Sandora told Ms. Hawk what their
supervisor, Ms. Ross, had said. The record shows at least a factual dispute
over whether Ms Hawk was ever given the option of a permanent position in the
dry facility. As noted, when Ms. Hawk returned to the refrigerated facility,
she encountered Mr. Bambary. Where a victim of harassment is required to work
in close proximity to the alleged harasser, it adds to the hostility of her
environment. See Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 717 (3d
Cir.1997) (assignment to work in close proximity to harassers is significant
factor in totality of circumstances inquiry).

   [3][4] Because Plaintiff has made out a genuine issue of material fact as to
the existence of hostile work environment, and has independently demonstrated
the existence of a genuine issue of fact as to whether any reasonable woman in
her position would have resigned, I conclude that Plaintiff has sufficiently
shown that she suffered a tangible employment action, so as to preclude
application of the Faragher/Ellerth affirmative defense. Because the existence
or nonexistence of a tangible employment action is an issue of fact for the
jury, however, I will examine whether the affirmative defense might afford
Defendant summary judgment. See Durham, 166 F.3d at 149, n. 5. (Discussing
appropriateness of examining Faragher/Ellerth affirmative defense where
constructive discharge created tangible employment action.)

   1. Defendant's Exercise of Reasonable Care

   *9 To satisfy the first prong of the affirmative defense, Defendant must show
that it exercised reasonable care to prevent and correct promptly any sexually
harassing behavior. Ellerth, 524 U.S. at 765. Defendant had a detailed,
well-developed and well-publicized anti-sexual harassment policy. Both Ms.

Hawk and Mr. Bambary attended Defendant's sexual harassment training. Ms Persing promptly commenced an investigation into Ms. Hawk's claims and temporarily transferred Ms. Hawk to a facility where she would not encounter Mr. Bambary. Defendant's March 13, 2000 report concluding its investigation into Ms. Hawk's claims states:

 Mr. Bambary was put on a last chance agreement, ordered to contact the EAP program and follow up with any counseling that was deemed appropriate. Mr. Bambary was also instructed not to have any contact with Ms. Hawk in or outside of work. Mr. Bambary was transferred to another shift where he would have no personal or professional contact with Ms. Hawk.

 (Americold Investigation Report, March 13, 2000.) Yet Plaintiff can point to evidence in the record that could create a genuine issue of material fact as to whether Defendant's actions meet the "reasonable care" standard. The deposition testimony of John Wilmont, who also supervised Ms. Hawk at Americold, testified that Ms. Persing told him that Americold was trying to "keep ... quiet" Ms. Hawk's harassment claim. (Wilmont. Dep at 40-41.) At her meeting with Ms. Hawk, Ms Persing said "I should not say this, but Jack has has been known to talk like this to women, that's just the way Jack is." Ms. Persing also asked Ms. Hawk if she "realize[d] Jack has a wife and kids this can affect."(Hawk Dep. at 244.) The record also appears to show that Ms Hawk was never given the option of a permanent position in the dry facility. As noted, when Ms. Hawk returned to the refrigerated facility, she encountered Mr. Bambary. Where a victim of harassment is required to work in close proximity to the alleged harasser, it adds to the hostility of her environment. See Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 717 (3d Cir.1997) (assignment to work in close proximity to harassers is significant factor in totality of circumstances inquiry). Mr. Bambary was ultimately terminated, but not before Plaintiff had indicated her belief that she had been constructively discharged.

 Moreover, both supervisors Wilmont and Cimino had information that arguably should have been brought to the attention of superiors. Ms. Hawk expressly told Mr. Wilmont that someone was harassing her and Mr. Cimino overheard Ms. Hawk say to Mr. Bambary "you can't talk to me that way." Neither supervisor took steps to follow up or report this information. These facts alone suffice to create a genuine issue of fact as to the first prong of the affirmative defense.

 2. Plaintiff's Failure to Use Preventive or Corrective Opportunities

 To satisfy the second prong of the affirmative defense, Defendant must show that Ms. Hawk unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Ellerth, 524 U.S. at 765. Ms. Hawk was far from prompt in bringing Mr. Bambary's harassment to the attention of the appropriate authorities at Americold. Further, Ms. Hawk's description of the Mr. Bambary's behavior was not detailed and her initial list of witnesses was limited. Indeed, where the alleged harassment began as early as June or July, 1999, Ms. Hawk did not take formal action until March of 2000. Ms. Hawk had attended anti-harassment training and was aware of Americold's anti-harassment policy.

 *10 In Matavia v. Bald Head Island Management, the Fourth Circuit found that an employee who waited three months to report sexual harassment had acted unreasonably. 259 F.3d 261, 273 (4th Cir.2001). There, the employee explained that her delay in reporting the harassment stemmed from a desire to gather evidence and a fear of social retaliation by co-workers. Matavia, 259 F.3d at 270. Here, Ms. Hawk explained that her delay stemmed from a fear that she

would lose her job. Ms. Hawk was a temporary employee when the harassment
began. Both she and Mr. Bambary knew the importance her job held for her. Mr.
Bambary had direct supervisory authority over her. Ms. Hawk's explanation of
her delay comports with her August, 1999 statement to Mr. Wilmont that
someone, whom she refused to identify, was harassing her.

  Defendant also argues that Plaintiff behaved unreasonably because she did not
"provide Americold with all relevant information at the start of its
investigation," and thereby deprived Defendant of an opportunity to properly
investigate and remedy the harassment. (Def.'s Mem. of Law at 41.) In
Sicalides v. Pathmark Stores, Inc., the court found that the plaintiff had
unreasonably obstructed the defendant employer's efforts to investigate and
remedy the situation. Civ A. No. 99-3465, 2000 U.S. Dist. LEXIS 8051, at *27
(E.D.Pa. June 12, 2000). There, the employer first received notice of the
problem through the plaintiff's filing of a claim with the EEOC. The plaintiff
also refused to meet with her employer despite its efforts to secure a
meeting. Sicalides, 2000 U.S. Dist. LEXIS 8051, at *26-27. Here, Ms. Persing's
notes from her March 3, 2000 phone conversation with Ms. Hawk, however,
suggest that Ms. Hawk identified her harasser and provided detailed examples
of the harassing behavior. (Persing Notes, March 3, 2000.) At least one
witness identified by Ms. Hawk during that conversation, Jose Cruz, told Ms.
Persing that Ms. Hawk had told him about Mr. Bambary's requests for sex and
about Mr. Bambary pushing Ms. Hawk against the wall. (Id., Cruz Statement,
March 10, 2000.) This does not approach the sort of obstruction encountered by
the Fourth Circuit in Sicalides. I therefore find that a jury could find that
Ms. Hawk did not unreasonably fail to take advantage of any preventive or
corrective opportunities provided by the employer or to avoid harm otherwise.

  b. Defendant's Remedial Action

  *11 Relying on Bouton and Kunin, Defendant asserts that, separate and apart
from the Faragher/Ellerth analysis, it cannot be held liable for alleged
hostile work environment sexual harassment because it maintained an effective
anti-harassment policy, engaged in a prompt investigation, and took effective
remedial measures in response to Plaintiff's complaint. As a matter of law,
Defendant's contention is misplaced.

  In Bouton, decided four years before Faragher and Ellerth, the court analysed
the applicability of each of the three aformentioned bases of agency liability
from the Restatement. There, the court wrote:
  In sum, we hold that an effective grievance procedure--one that is known to
  the victim and timely stops the harassment--shields the employer from Title
  VII liability for a hostile environment. By definition there is no negligence
  if the procedure is effective. A policy known to potential victims also
  eradicates apparent authority the harasser might otherwise possess.
  29 F.3d at 110. In Kunin, which was decided after Faragher and  Ellerth but
involved harassment by a non-supervisory co-worker, the court, relying on
Bouton, found that "when an employer's response stops harassment, there cannot
be Title VII liability." 175 F.3d at 294. The Kunin court, however, applied
only the negligence theory of agency to the case. See id. ("Sears will be
liable to Kunin only if she can establish that Sears had notice of harassment
... and yet failed to take adequate steps to stop it"). Citing to these
respective portions of Bouton and Kunin, Defendant argues that its policy,
investigation and remedial measures necessarily shield it from liability.
(Def.'s Mem. of Law at 42-43.)

  Faragher does not contemplate the assertion of a defense separate and apart

from the affirmative defense it provides. The first prong of the affirmative defense, namely that "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior," 524 U.S. at 807-08, must supercede the analysis in Bouton permitting "a policy known to potential victims" to "eradicate[ ]" apparent authority. 29 F.3d at 110. The negligence theory of liability under <section> 219(2)(b), moreover, is not at work in this case.

More importantly, as noted, an employer may succeed on a Faragher/Ellerth affirmative defense only where no tangible employment action has been taken and where both prongs of the defense are separately satisfied. I thus decline Defendant's invitation to permit an end run around the Faragher/Ellerth analysis that governs this case, and will dispose of the respondeat superior issue according to the analysis above.

B. Gender Discrimination Under PHRA

*12 [5] Discrimination claims brought under the PHRA are generally governed by the same standard of proof as those governed by Title VII. See Dici v. Pennsylvania, 91 F.3d 542, 552 (3d Cir.1996.) The Supreme Court has recognized that hostile work environment sexual harassment violates Title VII's prohibition of discrimination based on sex. See Farragher, 524 U.S. at 786. I have already found that Plaintiff has put forth facts sufficient to survive summary judgment on her Title VII claim. In so doing, I have found that Plaintiff has put forth facts sufficient to generate an issue for trial as to whether she was constructively discharged. Thus, I will also find that Plaintiff survives summary judgment on her PHRA claim.

C. Punitive Damages Under Title VII

A Title VII Plaintiff may obtain a punitive damage award where it can show that an employer acted with "malice or reckless indifference to the federally protected rights of an individual." Kolstad v. Am. Dental Ass'n, 527 U.S. 526, 536, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). It is true that Americold, through the establishment and dissemination of anti-harassment policy and its prompt response to Ms. Hawk's allegations, made a good faith effort to comply with the governing law. Yet there is evidence in the record that suggests the possibility of reckless indifference. Accordingly, I will hold Defendant's motion to dismiss Plaintiff's claim for punitive damages under Title VII in abeyance for ruling at trial.

D. Punitive Damages Under the PHRA

[6] There is no right to punitive damages under the PHRA. See Hoy v. Angelone, 554 Pa. 134, 142, 720 A.2d 745 (1998). Accordingly, I grant Defendant's motion with respect to Plaintiff's claims for punitive damages under the PHRA.

IV. CONCLUSION

For the foregoing reasons, I deny Defendant's motion for summary judgment as to Plaintiff's Title VII and PHRA claims. I hold in abeyance Defendant's motion to dismiss Plaintiff's punitive damage claim for resolution at trial. I grant Defendant's motion with respect to Plaintiff's claims for punitive damages under the PHRA.

ORDER

AND NOW, this day of March, 2003, upon consideration of Defendant's Motion
for Summary Judgment, and the response thereto, and for the foregoing reasons,
it is hereby ORDERED that:
1. Defendant's Motion for Summary Judgment is GRANTED IN PART AND DENIED IN
PART as follows:
a. Defendant's motion is granted only with respect to Plaintiff's claim for
punitive damages under the PHRA.
b. A ruling on Defendant's motion with respect to punitive damages under
Title VII shall be held in abeyance for resolution at trial.
c. Defendant's motion is denied in all other respects.
2. By agreement of the parties, Plaintiff's claims for defamation and
intentional infliction of emotional distress are withdrawn.

Not Reported in F.Supp.2d, 2003 WL 929221 (E.D.Pa.)

Motions, Pleadings and Filings (Back to top)

. 2:02cv03528 (Docket) (May. 30, 2002)

END OF DOCUMENT

D

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 799437 (E.D.Pa.)
(Cite as: 1997 WL 799437 (E.D.Pa.))

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Paula G. MCGRAW, Plaintiff,
v.
WYETH-AYERST LABORATORIES, INC. a division of American Home Products
Corporation, Defendant.
No. CIV. A. 96-5780.

Dec. 30, 1997.

MEMORANDUM

Reed, J.

*1 Plaintiff Paula G. McGraw ("McGraw") filed a complaint in this Court
against her former employer, Wyeth-Ayerst Laboratories, Inc. ("Wyeth")
alleging claims of quid pro quo sexual harassment, hostile work environment
sexual harassment, disparate treatment, and retaliation under Title VII of the
1964 Civil Rights Act, 42 U.S.C. <section> 2000e, and the Pennsylvania Human
Relations Act ("PHRA"), 43 Pa.C.S. <section> 951.    Wyeth brought a motion for
summary judgment (Document No. 10) on all of McGraw's claims.    This Court has
jurisdiction over this case under 28 U.S.C. <section> 1331.    Because I find
that there are genuine issues of material fact as to the claims of quid pro
quo sexual harassment and retaliation under Title VII and the PHRA, I will
deny Wyeth's motion as to those claims in Counts I, II, III, and IV of
McGraw's complaint.    Because I find that Wyeth is entitled to judgment as a
matter of law on McGraw's claims of hostile work environment sexual harassment
and disparate treatment under Title VII and the PHRA, I will grant Wyeth's
motion as to those claims in Counts I and II of McGraw's complaint.

I. BACKGROUND
The following facts are gleaned from the evidence of record and taken in the
light most favorable to McGraw, as required in a motion for summary judgment.
See Carnegie Mellon University v. Schwartz, 105 F.3d 863, 865 (3d Cir.1997).

McGraw began working for Wyeth in September of 1990.    In October of 1991,
McGraw transferred to the Department of Nutritional Regulatory Affairs at
Wyeth, where she worked as a regulatory coordinator.    Her direct supervisor
was Raymond Maggio ("Maggio").    Maggio, McGraw, and two secretaries were the
only employees in this department when McGraw started there.

McGraw received a performance evaluation from Maggio at the end of each year.
In October of 1992, Maggio rated McGraw's performance "below expectations."
McGraw submitted a rebuttal to Maggio's evaluation, objecting among other
things to Maggio's "subjective statement that I 'only get along with the men.'
"   (Def.'s Mem.Ex. G).    Upon receipt of McGraw's rebuttal, Maggio immediately
sent McGraw a memo indicating his disapproval of a misleading memo she had

sent to the field. (Pl.'s Mem.Ex. 23).

In 1993, the relationship between Maggio and McGraw began to change. Maggio asked McGraw to go out after working hours with him on repeated occasions. McGraw sought feedback on her work from another employee, Eric Young, from another department to reduce her interaction with Maggio. (Young dep. at 14; McGraw Aff. <paragraph> 3). In October of 1993, McGraw's evaluation indicated that her work was "at expectations." Despite this evaluation, however, Maggio expressed his dissatisfaction with McGraw to Thomas Beahm ("Beahm") of the Human Resources department on a number of occasions. (Beahm dep. at 25).

In 1994, Maggio's requests to McGraw that she go out with him increased. In the first three months, Maggio asked her to go out with him at least five times. Before Maggio left for a business trip, he took McGraw's face in his hands and expressed that he wished that he could take her with him. (McGraw dep. at 280). On March 17, 1994, McGraw's birthday, Maggio kissed McGraw without her consent, forcing his tongue into her mouth. (McGraw dep. at 110-111). When he returned from his business trip, he told McGraw that he had thought a lot about her while he was away. (McGraw dep. at 174). In April and May of 1994, Maggio's requests that McGraw go out with him became "constant." (McGraw dep. at 131, 277). After McGraw announced her engagement in the spring of 1994, Maggio told McGraw that she should have considered going out with him. (McGraw dep. at 176). McGraw rebuffed all of Maggio's advances.

*2 On May 9, 1994, Maggio gave McGraw a "verbal" warning, [FN1] criticizing what he characterized as poor work performance. (Ex. L). In October of 1994, McGraw received an evaluation of "below expectations" from Maggio, and Maggio placed her on a performance improvement plan ("PIP"). Shortly thereafter, while McGraw was discussing a rebuttal she had written to Maggio's recent evaluations with her mother on the phone after hours in her office cubicle, Maggio came to the cubicle and began to scream at her about the need for her to pay attention to her work and that he wanted to see her in his office immediately. (McGraw dep. at 189-202). McGraw feared for her physical safety because she felt Maggio was angry and out of control. At her mother's urging, she left work without stopping to see Maggio. (McGraw dep. at 189- 202).

> FN1. Although characterized by Maggio as a "verbal" warning, it was actually a typed document addressed to McGraw.

The following morning, McGraw spoke to Deborah Helmer ("Helmer") in Wyeth's Human Resources Department about Maggio's conduct of the previous afternoon and his history of personal advances toward her. She indicated that she wanted to file a complaint for sexual harassment. (Helmer dep. at 44-47). McGraw had not previously reported Maggio's conduct because she feared she would lose her job; however, she did relate the incidents to friends outside the company and to her husband. (McGraw dep. at 183-185, 228-230).

Helmer conducted an investigation of McGraw's complaint of sexual harassment. She talked to at least six people who were identified as witnesses by McGraw and Maggio. (Helmer dep. at 53). In some instances, she did not tell the witnesses to whom she talked the identity of the involved parties; instead she only asked them if they had seen any sexual harassment in the office. (Heisterkamp dep. at 24). On October 25, 1994, Helmer notified McGraw and Maggio that she found that McGraw's complaint was unsubstantiated and that

they were to keep the matter confidential. (Def.'s Exs. 6 and 7).   McGraw
claims that the investigation was too cursory and vague to yield any
information about her allegations.

 The same day that Helmer notified him with the result of the investigation,
Maggio met with Helmer and Beahm to discuss what should be done regarding
McGraw.   He wrote an agenda for the meeting listing two proposals;  his first
proposal was that McGraw should be immediately dismissed, and his second
proposal was that McGraw should be transferred.  (Maggio dep. at 302-304;
Pl.'s Mem.Ex. 25).   Helmer and Beahm advised him in the meeting to focus on
McGraw's performance and to continue with the PIP for a "reasonable time."
That same day, Maggio harshly critiqued a memo that McGraw had given him to
review.  (Pl.'s Mem.Ex. 27).   Three days later, she received similarly harsh
feedback from him on a report she wrote a month earlier.   In November of
1994, Maggio made a recommendation to personnel that McGraw be fired based on
her poor performance under the PIP. (Maggio dep. at 458).   This
recommendation was eventually approved, and McGraw was terminated on February
1, 1995.

## II. STANDARD FOR SUMMARY JUDGMENT

 *3 Rule 56(c) of the Federal Rules of Civil Procedure provides that "if the
pleadings, depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no genuine issue as
to any material fact and that the moving party is entitled to a judgment as a
matter of law" then a motion for summary judgment may be granted.

 The moving party has the initial burden of illustrating for the court the
absence of a genuine issue of material fact.   See Celotex Corp. v. Catrett,
477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Adickes v. S.H.
Kress & Co., 398 U.S. 144, 159-161, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).
The movant can satisfy this burden by "pointing out to the district court that
there is an absence of evidence to support the nonmoving party's case;"  the
movant is not required to produce affidavits or other evidence to establish
that there are no genuine issues of material fact.  Celotex, 477 U.S. at
323-25.

 Once the moving party has made a proper motion for summary judgment, the
burden switches to the nonmoving party.   Under Rule 56(e),
 [w]hen a motion for summary judgment is made and supported as provided in
 this rule, an adverse party may not rest upon the mere allegations or denials
 of the adverse party's pleading, but the adverse party's response, by
 affidavits or as otherwise provided in this rule, must set forth specific
 facts showing that there is a genuine issue for trial.   If the adverse party
 does not so respond, summary judgment, if appropriate, shall be entered
 against the adverse party.
 The court is to take all of the evidence of the nonmoving party as true and
to draw all reasonable inferences in his favor in determining if there is a
genuine issue of material fact.  See Adickes, 398 U.S. at 158-59.   In order
to establish that an issue is genuine, the nonmoving party must proffer
evidence such that a reasonable jury could return a verdict in her favor.  See
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49, 106 S.Ct. 2505, 91
L.Ed.2d 202 (1986).   A proper motion for summary judgment will not be
defeated by merely colorable or insignificantly probative evidence.   See id.
at 249- 50.

 McGraw alleged the following theories of liability under both Title VII and
the PHRA:  [FN2]  (1) quid pro quo sexual harassment, (2) hostile work

environment sexual harassment, (3) disparate treatment, (4) retaliation.
Each of these theories will be analyzed in turn to determine if there are any
genuine issues of material fact or if Wyeth is entitled to judgment as a
matter of law.

> FN2. Courts have uniformly interpreted the PHRA consistent with Title
> VII.    See Clark v. Commonwealth of Pennsylvania, 885 F.Supp. 694, 714
> (E.D.Pa.1995);  Violanti v. Emery Worldwide A-CF Co., 847 F.Supp. 1251,
> 1257 (M.D.Pa.1994).    Thus, I will analyze McGraw's claims only under
> Title VII;  however, my analysis and conclusions as to each type of
> claim are applicable to McGraw's claims under both Title VII and the
> PHRA.

### III. LEGAL STANDARDS AND ANALYSIS
A. Quid Pro Quo Sexual Harassment

 Title VII makes it unlawful to discharge or otherwise discriminate against an
employee on the basis of the employee's race, color, religion, sex or national
origin.    See 42 U.S.C. <section> 2000e-2.    Two forms of sexual harassment
are cognizable claims under Title VII:  quid pro quo sexual harassment and
hostile work environment sexual harassment.    See Meritor Savings Bank FSB v.
Vinson, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).    To make out a
claim for quid pro quo sexual harassment, an employee must show that a
supervisor conditioned tangible job benefits on the employee's submission to
unwelcome sexual conduct or penalized her for refusing to engage in such
conduct.    See Hurley v. Atlantic City Police Department, 933 F.Supp. 396, 407
(D.N.J.1996).    The Court of Appeals for the Third Circuit recently set forth
the test for a claim of quid pro quo sexual harassment in Robinson v. City of
Pittsburgh, 120 F.3d 1286, 1296 (3d Cir.1997)(quoting 29 C.F.R. <section>
1604.11(a)(1) and (2)):
 *4 Unwelcome sexual advances, requests for sexual favors, and other verbal or
 physical conduct of a sexual nature constitute sexual harassment when (1)
 submission to such conduct is made either explicitly or implicitly a term or
 condition of an individual's employment [or] (2) submission to or rejection
 of such conduct by an individual is used as the basis for employment
 decisions affecting such individual....
 The Robinson court assumed that an employer is strictly liable for any quid
pro quo sexual harassment committed by its supervisors, commenting that
"[c]ourts have unanimously held that an employer is strictly liable for quid
pro quo harassment by a supervisor having actual or apparent authority to
carry out the threat or promise that is made to the victim."  Id. at 1296 n.
9. Subsection (2)  [FN3] of the test encompasses cases in which an employee's
responses to a supervisor's advances are later used in a decision by the
supervisor regarding the employee's terms and conditions of employment.    Id.
at 1297.    An employee must demonstrate that "her response was in fact used
thereafter as a basis for a decision affecting ... her compensation, etc."  Id.

> FN3. Robinson was decided after the parties submitted their memoranda of
> law for this motion for summary judgment;  thus, neither party had the
> benefit of this test to guide their arguments on the quid pro quo claim.
>  Because the motion for summary judgment on the claim of quid pro quo
> sexual harassment can be resolved with an analysis of only the second
> prong of the Robinson test, I will only discuss whether McGraw survives
> the motion under section (2).    This does not, however, indicate any
> position of this Court as to whether McGraw may be able to make a claim
> for quid pro quo sexual harassment under subsection (1).

McGraw claims that Maggio became increasingly angry and harsher in his evaluations of her as she continued to refuse his advances.    McGraw points to Maggio's implementing the PIP and giving her a verbal warning as evidence that Maggio was reacting to McGraw's refusal to reciprocate his interest in her. See Robinson, 120 F.3d at 1298 (noting that conduct effecting compensation, terms, conditions, or privileges of employment could include formal reprimands that result in a notation in an employee's personnel file);  Rufo v. Metropolitan Life Insurance Company, 1997 WL 732859 (E.D.Pa.1997) (holding that genuine issue of material fact was present to preclude summary judgment on quid pro quo claim where supervisor gave employee verbal warnings and bad performance reviews after she reported an incident in which the supervisor touched her breast).    In addition, McGraw alleges that Maggio prefaced his requests for her to go out with him with talk about the future of the department, from which McGraw inferred that her future with the department depended on her acquiescence in Maggio's wishes.

Wyeth asserts that Maggio never requested any sexual favors of McGraw nor conditioned any benefits of McGraw's employment on her submission to his alleged sexual advances.    Wyeth argues that Maggio's requests to go out were in McGraw's own words "casual requests" and that McGraw never alleged that Maggio exerted pressure on her to submit to his requests.

Wyeth has failed to establish the absence of a genuine issue of material fact as to whether Maggio used McGraw's reactions to his advances as a basis in decisions regarding the terms and conditions of her employment.    McGraw has produced evidence such that a reasonable jury could find that her rejection of Maggio's advances resulted in her receiving poor evaluations from Maggio and ultimately being fired on Maggio's recommendation.    Thus, Wyeth's motion for summary judgment on these claims under Title VII and the PHRA will be denied.

B. Hostile Work Environment Sexual Harassment

*5 Five elements must be proven to support a hostile work environment claim: (1) that the employee suffered intentional discrimination because of her sex; (2) that the discrimination was pervasive and regular;  (3) that the discrimination detrimentally affected the plaintiff;  (4) that the discrimination would detrimentally affect a reasonable person of the same sex in that position;  and (5) the existence of respondeat superior liability. See Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir.1990).

In Meritor Savings Bank, the Supreme Court observed that the harassment must be pervasive or severe enough " 'to alter the conditions of' [the victim's] employment and create an abusive working environment.' "  477 U.S. at 67 (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir.1982)).    In making this determination, the totality of the circumstances must be considered, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it reasonably interferes with an employee's work performance.  Id.  These factors are to be viewed objectively and subjectively, such that "conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive--is beyond Title VII's purview."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 20, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

A plaintiff cannot rely upon casual, isolated, or sporadic incidents to support her claim of hostile work environment sexual harassment.    See

Andrews, 895 F.2d at 1482; Harris, 510 U.S. at 20.   While it is possible for
a single action to constitute a claim for hostile work environment sexual
harassment if the act is "of such a nature and occurs in such circumstances
that it may reasonably be said to characterize the atmosphere in which a
plaintiff must work," generally a plaintiff must show that she was subjected
to "repeated, if not persistent acts of harassment." Bedford v. Southeastern
Pennsylvania Transportation.   Authority, 867 F.Supp. 288, 297 (E.D.Pa.1994).
Indeed, courts have required a plaintiff to show that she has been "subjected
to continued explicit propositions or sexual epithets or persistent offensive
touchings." Miller v. Aluminum Co. of America, 679 F.Supp. 495, 502 (W.D.Pa.)
, aff'd, 856 F.2d 184 (3d Cir.1988).   A supervisor's criticism of an
employee's work, while not sexual in nature, may be considered in the totality
of the circumstances in determining whether the environment was hostile.   See
Aman v. Cort Furniture Rental Corporation, 85 F.3d 1074, 1083 (3d Cir.1996)
(noting in a racial harassment case that the alleged behavior does not have to
be overtly racial in nature to contribute to a pervasive and severely hostile
environment).   However, such criticism alone will not support a claim for
hostile work environment sexual harassment.   See Miller, 679 F.Supp. at 502
("Snubs and unjust criticisms of one's work are not poisonous enough to create
an actionable hostile work environment.").

*6 Wyeth attacks McGraw's claim of hostile work environment sexual harassment
on the second element of the Andrews test, the pervasiveness and regularity of
Maggio's behavior, and the fifth element, the existence of respondeat superior
liability.   To support her argument regarding the pervasiveness, regularity,
and severity of Maggio's advances, McGraw claims that Maggio's requests that
she go out with him occurred more than five times in the beginning of 1994 but
then became "constant" in April and May of that year.   Maggio also asked
McGraw repeatedly if she was happy with her marriage after his marriage in July
of 1994.   McGraw also notes the hostile consequences she met from Maggio when
she continually denied his advances, including a verbal warning letter on May
9, 1994, and her placement on a PIP on October 13, 1994.   McGraw also alleges
that other employees, noting Maggio's behavior toward her, began to scrutinize
her, report on her, and withhold communication from her.

Following the considerations outlined in Meritor Savings Bank, supra, I find
that, taking McGraw's evidence and allegations as true, McGraw has not as a
matter of law produced evidence sufficient to support her contention that
Maggio's actions were severe, pervasive, or regular.   In her deposition,
McGraw was unable to pin down how often the incidents occurred or even if they
occurred on a daily, weekly, or monthly basis.   The bulk of the actions of
Maggio were not severe.   Maggio's requests for a date, while undoubtedly
unwelcome, were not patently offensive or severe.   While his kissing her on
her birthday and touching her face are arguably more severe actions, these
events do not rise to the level of severity required to make a claim for
hostile work environment sexual harassment.   McGraw did not indicate that she
was humiliated or felt physically threatened by Maggio's kissing her or
touching her face.   Although McGraw claimed that she felt physically
threatened when Maggio yelled at her in her cubicle, that was a lone instance.
Finally, McGraw has proffered no evidence indicating that Maggio's actions
were so pervasive, regular, or severe as to alter the conditions of her work,
nor did she allege that Maggio's actions interfered with her ability to do her
job.   I conclude that a reasonable fact finder could not find that McGraw was
subject to the conduct necessary to prove this element of the hostile work
environment test.

Because I find that McGraw has failed to show that Maggio's alleged conduct

was severe, pervasive, and regular, it is unnecessary to reach Wyeth's
argument that McGraw has failed to establish the respondeat superior liability
of Wyeth.   Wyeth is entitled to judgment as a matter of law on McGraw's
hostile work environment sexual harassment claims under Title VII and the
PHRA.

## C. Disparate Treatment

 To establish a claim for disparate treatment under Title VII, a plaintiff
must show that: (1) she is a member of a protected class;  (2) she was
qualified for the position;  (3) she was discharged from or denied the
position;  and (4) that non-members of the protected class were treated more
favorably.   See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct.
1817, 36 L.Ed.2d 668 (1973).   In a situation in which an employee claims she
was discriminatorily discharged, she may show that similarly situated persons
outside of the protected class were retained.   See Phillips v. Dalton, 1997
WL 24846, *3 (E.D.Pa.) Wyeth argues that McGraw fails the second and forth
steps of this analysis, in that she was not qualified for the position from
which she was terminated, as evidenced by the poor performance reviews
throughout her employment and her placement on the PIP program, and that she
has not offered any evidence that male employees were treated more favorably
than she was treated at Wyeth or that similarly situated persons were not
terminated.

 *7 I find that McGraw has not come forth with evidence sufficient to survive
a motion for summary judgment on her claim of disparate treatment. Even if
McGraw can show a factual issue as to the first three elements of this claim,
as to the third element, the only evidence McGraw proffers is that Wyeth
replaced her with a male employee after she was terminated.   This is not
enough to demonstrate disparate treatment or raise an influence of unlawful
discrimination under Title VII.   See Phillips, 1997 WL at *3 (noting that
"plaintiff must show that [s]he was terminated 'under circumstances which give
rise to an inference of unlawful discrimination.' ")  (quoting Texas
Department of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089,
67 L.Ed.2d 207 (1981);  Carson v. Bethlehem Steel Corporation, 82 F.3d 157,
159 (7th Cir.1996) ("That one's replacement is of another race, sex, or age
may help to raise an inference of discrimination, but it is neither a
sufficient nor a necessary condition.").   Thus, summary judgment will be
granted to Wyeth on McGraw's disparate treatment claims under Title VII and
the PHRA.

## D. Retaliation

 Title VII prohibits employers from retaliating against employees who have
"opposed any practice made unlawful employment practice by [Title VII], or
because [the employee] has made a charge, testified, assisted, or participated
in any manner in an investigation, proceedings or hearing under [Title VII]."
42 U.S.C. <section> 2000e-3(a).   Under the applicable McDonnell Douglas
model, to establish a prima facie case of retaliation, an employee must show
(1) she engaged in activity protected under Title VII, (2) that the employer
took an adverse employment action against her, and (3) a causal connection
between her protected activity and the adverse employment action.   See Nelson
v. Upsala College, 51 F.3d 383, 386 (3d Cir.1995).   Once the plaintiff has
met this burden, the defendant has the burden to produce a legitimate,
nondiscriminatory reason for the employment action.   See Quiroga v. Hasbro,
Inc., 934 F.2d 497, 501 (3d Cir.), cert. denied, 502 U.S. 940, 112 S.Ct. 376,
116 L.Ed.2d 327 (1991).   After this, the plaintiff must then demonstrate that

the defendant's reason is a pretext for discrimination.    See Waddell v. Small
Tube Prods., Inc., 799 F.2d 69, 73 (3d Cir.1986).

 The Court of Appeals for the Third Circuit has held that informal protests of
discrimination, such as complaints to management, rise to the level of
protected activity.    See Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d
Cir.1995) (citing Sumner v. United States Postal Service, 899 F.2d 203, 209
(2d Cir.1990)).    An employee does not have to be correct on the underlying
merits of her discrimination claim for her actions to be protected activity;
an employee only need to act "under a good faith, reasonable belief that a
violation existed." Griffiths v. CIGNA Corp., 988 F.2d 457, 468 (3d Cir.1993)
.

 *8 It is clear that McGraw engaged in protected activity when she reported
Maggio's behavior to Helmer in the Human Resources Department as this was what
she was instructed to do under the sexual harassment policy at Wyeth.    The
adverse action McGraw suffered was her subsequent termination from Wyeth.

 The third element McGraw must show is that a causal connection exists between
the first two elements.    A causal connection between an employee's protected
activity and an adverse action by her employer may be inferred if the events
occurred close in temporal proximity to each other.    See Kachmer v. Sungard
Data Systems, Inc., 109 F.3d 173, 178 (3d Cir.1997) (holding that there are no
specific time parameters to raise an inference of causation and that "[w]hen
there may be valid reasons why the adverse employment action was not taken
immediately, the absence of immediacy between the cause and effect does not
disprove causation"); Jalil v. Avdel Corporation, 873 F.2d 701, 708 (3d
Cir.1989), cert. denied, 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990).

 Maggio met with Helmer and Beihm the same day that Helmer concluded her
investigation of McGraw's claim to discuss the top item on his agenda, which
was termination of McGraw.    Maggio made his recommendation that McGraw be
terminated within one month of her reporting his advances and other
discriminatory conduct to Helmer. (Maggio dep. at 458-59).    He resubmitted
the recommendation to personnel again in January of 1995. (Maggio dep. at
459).    Even though McGraw was not terminated until February of 1995, it is
reasonable to infer that the termination was based on Maggio's earlier
recommendation.    Indeed, it is reasonable to infer that although McGraw was
not terminated until February, Maggio made his decision to fire her within
hours after the conclusion of the investigation into McGraw's complaint and
that he persisted in that decision.    I find that McGraw has produced evidence
such that a reasonable jury could find she established the necessary causal
nexus between her termination and the exercise of the protected activity,
thus, she has established a prima facie case of retaliation.

 Once McGraw has satisfied her prima facie case of retaliation, the burden
shifts to the defendant at this stage of the case to come forward with a
nondiscriminatory reason for her termination.    Wyeth argues that McGraw was
terminated because of her poor job performance, not in retaliation for lodging
her sexual harassment complaint.    In support of this, Wyeth points to the
evaluations that McGraw received which rated her performance at "below
expectations," her verbal warning, and her placement on the PIP.    However,
giving McGraw all reasonable inferences from the facts in her favor, the
evaluative validity of this evidence is suspect because Maggio, the alleged
perpetrator, was her supervisor and the one who wrote the evaluations, gave
her the verbal warning, and decided to implement the PIP.    Indeed, McGraw
refutes the validity of Maggio's evaluations of her work and offers her

rebuttals to those evaluations as evidence of this.    I find that there is a
genuine issue of material fact as to the quality of McGraw's work performance,
which is the basis of Wyeth's purported nondiscriminatory reason for McGraw's
termination. Thus, summary judgment is precluded on McGraw's claims of
retaliation under Title VII and the PHRA.

### IV. CONCLUSION

*9 Based on the foregoing analysis, Wyeth's motion for summary judgment will
be granted in part and denied in part.

An appropriate Order follows.

### ORDER

AND NOW, this 23rd day of December, 1997, upon consideration of the motion of
defendant Wyeth-Ayerst Laboratories, Inc. ("Wyeth") for summary judgment
(Document No. 10), the response of plaintiff Paula G. McGraw ("McGraw")
(Document No. 13), and the reply by Wyeth (Document No. 16), as well as the
pleadings, depositions, affidavits, and admissions on file, and for the
reasons set forth in the foregoing memorandum, it is hereby ORDERED that the
motion is GRANTED IN PART and DENIED IN PART in accordance with the following:

1. SUMMARY JUDGMENT is hereby GRANTED in favor of Wyeth and against McGraw on
her claims of hostile work environment sexual harassment and disparate
treatment under Title VII and the Pennsylvania Human Relations Act ("PHRA") in
Counts I and II;

2. SUMMARY JUDGMENT is hereby DENIED on the claims of quid pro quo sexual
harassment and retaliation under Title VII and the PHRA in Counts I, II, III,
and IV;

IT IS FURTHER ORDERED that the parties shall submit a joint report to the
Court no later than January 19, 1998 as to the status of settlement.    If the
parties need the assistance of the Court in facilitating settlement
negotiations, the report should so indicate.    By said date, plaintiff shall
contact the Deputy Clerk to arrange a date for a final scheduling conference.

Not Reported in F.Supp., 1997 WL 799437 (E.D.Pa.)

Motions, Pleadings and Filings (Back to top)

. 2:96cv05780 (Docket) (Aug. 21, 1996)

END OF DOCUMENT

E

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 309916 (E.D.Pa.)
(Cite as: 1998 WL 309916 (E.D.Pa.))

Motions, Pleadings and Filings

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
Sheila SMITH, Plaintiff,
v.
PATHMARK STORES, INC. f/k/a Supermarkets General Corp. and William Greco,
Defendants.
No. CIV. A. 97-1561.

June 11, 1998.

MEMORANDUM

BUCKWALTER, J.

*1 Plaintiff, Sheila Smith ("Smith"), filed the instant sexual harassment
action against Defendants, Pathmark Stores, Inc. ("Pathmark") her employer,
and her former supervisor William Greco ("Greco"). Defendants request summary
judgment in their favor. Based on the following, Defendants' request is
granted in part and denied in part.

I. Background  [FN1]

> FN1. Neither party has presented the court with a comprehensive
> summation of the underlying facts, disputed or not. Additionally, the
> record is replete with conflicting evidence as to dates on which
> critical incidents occurred. Nonetheless, in an attempt to make some
> semblance of order and to properly review Defendants' motion I have
> gathered the following basic facts from exhibits attached to the
> parties' briefs and recite them in a light most favorable to Smith. See
> Bixler v. Central Pennsylvania Teamsters Health and Welfare Fund, 12
> F.3d 1292, 1297 (3d Cir.1993).

In March of 1995, Smith, a long time employee of Pathmark, worked as a
perishables clerk in the meat department of Pathmark's Willow Grove market
where she was responsible for stocking and organizing the meat case. Greco, a
recent Pathmark hire, became manager of the meat department and Smith's direct
supervisor. From their initial encounter onward Smith and Greco did not see
eye to eye. On his first day Greco directed Smith to reorganize the meat case.
She questioned his judgment and refused to follow his orders. A shouting match
followed. A few days after this altercation, on or about March 22 or 30, 1995,
Smith and Greco met with assistant store manager Frank Merz ("Merz"). Merz
advised Greco to acknowledge the value of Smith's input, as she had been with
the company for over ten years, and directed Smith to follow Greco's orders.
The two apologized and agreed to work together amicably. As they left the
meeting Greco placed his arm around Smith's shoulder stating: "how about if
the two of us just leave here and get naked and that would be water under the
bridge." (Complaint, <paragraph> 5(b); Plaintiff's Exhibit B(2)--Smith's

Deposition at 7- 9; Defendants' Exhibit A--Smith's Workers' Compensation
Complaint at 2; Defendants' Exhibit B--Smith's Workers' Compensation Hearing
Transcripts at 14).

According to Smith, soon after this incident she was stopped by Merz who said
"listen I just want you to work with Bill Greco, can you do that, show him
the ropes." (Plaintiff's Exhibit B(2)--Smith's Deposition at 8). Smith took
this opportunity to inform Merz of Greco's comments about "getting naked," to
which Merz responded "Sheila [Smith], come on, he was just kidding." Smith
then requested that Merz "tell him [Greco] not to make his remarks, to keep
his statements to himself and to keep his hands to himself." (Id.) According
to Smith, Merz ignored her request. (Id.) Deposition testimony from Merz,
which could confirm or refute Smith's account, has not been submitted by
either party.

Sometime between May 11th and May 18th Greco approached Smith as she was
leaned over the chicken case reorganizing stock, put his arm around her
shoulders and began talking. As Smith stood up Greco's hand slid down her back
and rested on her behind for about one minute. Smith moved away quickly.
(Defendants' Exhibit B--Workers' Compensation Hearing Transcript at 21;
Plaintiff's Exhibit B(2)Smith's Deposition at 41-44; Defendants' Exhibit C--
Pathmark Sexual Harassment Complaint Report).

Later on that same day, in front of her co-workers Greco shouted to Smith
"You know what your problem is, your problem is you need a man." (Plaintiff's
Exhibit B(2)--Smith's Deposition at 52). Smith testified, however, that she
took this comment as jest.

  *2 "Well it turned out to be a joke with the guys only because Bill Greco had
commented right before he hollered you need a man that oh, that is right you
worked with some better meat wrappers. And I said that's right. And he said
who was it, Pat Sherry and Goldy. So it was made out to be a joke between the
guys because these where old time meat wrappers who taught me what I know....
They were women."

(Id.)

During this same time period Greco approached Smith while in the back of the
meat department, informed her that he was getting divorced and asked Smith
whether she lived alone. (Defendants' Exhibit B--Workers' Compensation Hearing
Transcripts; Defendants' Exhibit A--Workers' Compensation Complaint at 2;
Plaintiff's Exhibit B(2)--Smith's Deposition at 31). [FN2]

    FN2. Smith claims that a further incident of sexual harassment took
    place on April 1, 1995, however, provides no description of such event.
    (Complaint <paragraph> 5(b); Defendants' Exhibit A--Worker's
    Compensation Complaint <paragraph> 3)

On May 15, 1995, Greco reassigned Smith from the meat case to the back of the
department to do meat wrapping. It was implied that the switch was due to an
ongoing problem--expired meat was not being removed from the case.
(Defendant's Exhibit D(1)--Smith's Deposition 59-65). Smith resisted the
switch and Greco immediately called a meeting with Merz. (Id. at 59-60).
During the meeting, in response to Merz's show of support for Greco's decision
to remove Smith from the meat case, Smith "opened up" about Greco's
harassment. (Id. at 62). After Smith's charges were relayed to the store
supervisor, William DeGrasse ("DeGrasse") an investigation was conducted.

Based on this investigation, management concluded that Greco had not acted inappropriately towards Smith, but, that the two were unable to work together. (Defendants' Exhibit C--Sexual Harassment Complaint Report). Thus, a decision was made to separate Smith and Greco. Smith was given the option of transferring to the deli department within the Willow Grove store or to the meat department of another Pathmark store in Bensalem, Pennsylvania. On May 25, 1995 Smith took disability leave for emotional and physical ailments she claimed to be suffering as a result of Greco's conduct. Prior to her departure, Smith decided that she would prefer to transfer to the Bensalem store. On her return, Smith began working in Bensalem where she continues to work. Smith suffered no loss in pay or position as a result of her transfer.

It appears from the record that soon after Smith's allegations, Greco was discharged. (Defendants' Reply Brief at 5). Internal investigations uncovered other questionable conduct. Two of Smith's female coworkers in Willow Grove had also been recipients of unwelcome comments from Greco. Greco offered Elen Klappa ("Klappa") "$200 for a blow job" and referred to Bonnie Penglase ("Penglase") as "the sexiest and prettiest girl in the store." (Plaintiff's Exhibit E--Klappa's Deposition at 12; Plaintiff's Exhibit F--Penglase's Deposition at 16).

Smith commenced this action by filing a complaint asserting claims for hostile work environment sexual harassment and retaliation in violation of Title VII, 42 U.S.C. <section><section> 2000e et seq. and the Pennsylvania Human Relations Act (PHRA), 43 Pa. Cons.Stat. Ann. <section><section> 951 et seq. (Counts I and III), for intentional and negligent infliction of emotional distress (Count II) and for assault and battery (Count II). Discovery is complete and Pathmark now requests summary judgment in its favor as to all counts.

## II. Summary Judgment

*3 Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In reviewing the record, the court must presume that the non-moving party's version of any disputed fact is correct and must draw all reasonable inferences in favor of the non-moving party. Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); Semper v. Johnson & Higgins, 45 F.3d 724, 727 (3d Cir.1995). To successfully challenge a motion for summary judgment, the non-moving party must be able to produce evidence that "could be the basis for a jury finding in that party's favor." Kline v. First Western Government Securities, 24 F.3d 480, 485 (3d Cir.1994).

## III. Discussion
### A. Counts I and III: Title VII and PHRA

Courts have uniformly interpreted the PHRA consistent with Title VII. See Clark v. Commonwealth of Pennsylvania, 885 F.Supp. 694, 714 (E.D.Pa.1995); Brennan v. National Tel. Directory Corp., 881 F.Supp. 986, 994 n. 5 (E.D.Pa.1995); Doe v. Kohn, Nast & Graf, P.C., 862 F.Supp. 1310, 1323 (E.D.Pa.1994). Smith alleges hostile work environment sexual harassment and retaliation under both statutes. See 42 U.S.C. <section> 2000e-2(a)(1), <section> 2000e-3(a); 43 Pa.Cons.Stat. Ann. <section><section> 955(a),(d). Thus, I analyze Smith's claims within the framework of Title VII, yet my conclusions, unless otherwise noted, apply equally to Smith's PHRA claims.

i. Greco's Liability

Defendants contend that Greco cannot be held individually liable under either Title VII or the PHRA. In Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061 (3d Cir.1996), the Third Circuit Court of Appeals in an en banc decision, joined the majority of other circuits in concluding "that Congress did not intend to hold individual employees liable under Title VII." Id. at 1077; see also Dici v. Commonwealth of Pennsylvania, 91 F.3d 542, 552 (3d Cir.1996). Accordingly, Smith's Title VII claims against Greco are dismissed.

Like Title VII, <section> 955(a) of the PHRA establishes liability solely for employers. See Dici, 91 F.3d at 552. However, the PHRA goes further than Title VII to establish accomplice liability for individual employees who aid and abet a <section> 955(a) violation by their employer. See 43 Pa.Cons.Stat.Ann. <section> 955(e) (Purdon Supp.1998) (providing liability for employees who "aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice"). Thus, several courts within this district have held that a supervisor, such as Greco, who fails to take action to prevent discrimination, even when it is his or her own conduct at issue, can be liable for aiding and abetting the employer under <section> 955. See Kohn v. Lemmon Company, 1998 WL 67540 *8 (E.D.Pa. Feb. 19, 1998); Frye v. Robinson Alarm Co., 1998 WL 57519 at *4 (E.D.Pa. Feb.11,1998) (citing Glickstein v. Neshaminy School Dist., 1997 WL 660636 at * 11-13 (E.D.Pa. Oct.22, 1997)); Wien v. Sun Co., Inc., 1997 WL 772810, at *7 (E.D.Pa. Nov.21, 1997). It is undisputed, Greco was Smith's supervisor as well as Smith's alleged harasser. Therefore, he is subject to liability under the PHRA. Compare Dici, 915 F.3d at 552-052 ((non-supervisory employee's direct acts of discrimination do not trigger <section> 955(e) because the employee "cannot be said to 'intend' that his employer fail to respond.") (quoting Tyson v. CIGNA Corp., 918 F.Supp. 836, 841 (D.N.J.1996)). Accordingly, Smith's PHRA claims against Greco remain.

ii. Hostile Work Environment

*4 Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex." 42 U.S.C. S 2000e2(a)(1). The United States Supreme Court has concluded that a plaintiff may establish a Title VII violation if she can show that gender-based discrimination created a hostile or abusive working environment. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986).

Our Court of Appeals has set forth a five part test for the district courts to apply in a hostile work environment case. Accordingly, a female Title VII plaintiff can successfully bring a gender-based discrimination claim against her employer only if she shows that (1) she suffered intentional discrimination on account of her gender; (2) the discrimination was pervasive and regular; (3) she was detrimentally affected by the discrimination; (4) the discrimination would detrimentally affect a reasonable woman in the plaintiff's position; and (5) the existence of respondeat superior liability. Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir.1990).

Defendants contend that Greco's conduct fails to meet prong two of the Andrews test in that his actions were neither pervasive nor regular.

In determining the nature of a work environment for purposes of a hostile work environment claim, courts are not to examine the scenario on an incident-by-incident basis, but are instead to consider the totality of the circumstances. Andrews, 895 F.2d at 1484; Stair v. Lehigh Valley Carpenters

Local 600, 813 F.Supp. 1116, 1119 (E.D.Pa.1993). These circumstances may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating; and whether it unreasonably interferes with an employee's work performance. Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Conduct that is merely offensive, or which has the effect of making an employee's life at work merely unpleasant or uncomfortable, is without more, not actionable. Harris, 510 U.S. at 21-22. A plaintiff cannot rely upon casual, isolated, or sporadic incidents to support her claim of hostile work environment sexual harassment. See Andrews, 895 F.2d at 1482.

As described in more detail above, Smith's claim is based on the following four incidents: 1) Greco's comment to Smith "lets get naked" while placing his arm around her shoulder; 2) Greco's comment to Smith "you need a man"; 3) Greco's inquires as to whether Smith lived alone; and 4) Greco's touching of Smith's behind. These incidents occurred in a two month span and arguably may be characterized as frequent. More difficult is whether they can be characterized as severe. Unlike other cases involving hostile work environments, there is no evidence of offensive gesturing by Greco, extensive physical touching, Greco made no comments about Smith's physical anatomy, no threatening conduct, and no evidence has been presented indicating that Greco either displayed pornography or sexual objects. See Andrews, 895 at 1486; Crumpton v. Runyon, 1998 WL 125547, *3 (E.D.Pa. March 19, 1998); Cooper-Nicholas v. City of Chester, 1997 WL 799443 *3 nn. 4-7 (E.D.Pa. Dec. 30, 1997) (citations omitted). Yet, I am mindful that the Andrews Court was careful to note that overt sexual harassment is not necessary to establish a sexually hostile environment and each individual incident need not be sufficiently severe to detrimentally affect a female employee. Andrews 895 F.2d at 1485. Accordingly I conclude that a fact finder could reasonably characterize Greco's conduct and comments towards Smith as pervasive and regular and thus Smith has established a genuine issue of material fact as to whether Greco created a hostile work environment.

*5 Defendants go on to argue that, even if this court where to find that Smith was subjected to a hostile work environment, evidence of Pathmark's prompt remedial action renders Smith unable to establish respondeat superior liability, prong five of the Andrews test. Commonly, in the context of a sexual hostile environment claim an employer is liable for their "negligent failure to discipline or fire, or failure to take remedial action upon notice of harassment." Bouton v. BMW of North America, Inc., 29 F.3d 103, 106 (3d Cir.1994). Defendants note that immediately after Smith reported Greco's behavior to management on May 15, 1995, an investigation was undertaken the upshot of which was a recommendation that Smith and Greco be separated. This recommendation was implemented when Smith transferred to the Bensalem store. Thus, Defendants contend that steps "reasonably calculated to prevent further harassment" were taken and therefore they should be relieved of liability. See Knabe v. Boury Corp., 114 F.3d 407, 413-414 (3d Cir.1997) (citations omitted).

If May 15, 1995 was the first date on which Pathmark became aware of Greco's actions, I would be inclined to agree, however, Smith submits, with evidentiary support, that Pathmark failed to respond to her earlier reports regarding Greco's conduct. Her initial report to Merz immediately after Greco's "let's get naked" comment constitutes actual notice that she was being subjected to sexual harassment and, therefore, Defendants' failure to take prompt remedial action based on this notice is evidence of Defendants' negligence. The adequacy and effectiveness of this notice is for a jury to determine, as it is not readily apparent from the record before me. Thus, I

find that Smith has established a material issue of fact as to whether
Pathmark, as Smith's employer, is responsible for Greco's offensive conduct.
Accordingly, Defendants' motion for summary judgment on Smith's claims of
sexual harassment in Counts I and II of her complaint are denied. [FN3]

>   FN3. I reach this decision, in part, due to apparent and important gaps
>   in the record. Despite seeking a order to compel Greco's deposition
>   neither party has submitted deposition testimony from Greco in support
>   of or against Pathmark's motion for summary judgment. It is not readily
>   apparent from the record that Greco's deposition was in fact ever
>   taken-- which is highly unusual given the fact that he is the accused
>   perpetrator. Additionally, testimony from another key witness, Frank
>   Merz, the allegedly negligent supervisor, is also absent.

### ii. Retaliation

 Smith alleges retaliation under Title VII and the PHRA. She claims that in
retaliation for reporting Greco's inappropriate behavior to upper management
on May 15, 1995, she was transferred to the Bensalem store and that no
disciplinary action was taken against Greco. She also claims that Greco's
decision on May 15, 1995 to relieve her of her duties working on the meat case
and to reassign her to work in the back of the meat department to do meat
wrapping was in retaliation for her rejection of his unwanted advances.
(Plaintiff's brief at 3, <paragraph> 10).

 Plaintiff bears the burden of establishing a prima facie case of retaliation.
The burden then shifts to defendants to articulate a legitimate
nondiscriminatory reason for the challenged action. If the defendants make
that articulation the burden shifts back to the plaintiff to prove that the
defendants proffered reason is pretextual. To establish the prima facie case a
plaintiff must demonstrate that 1) she engaged in protected activity; 2) the
employer took adverse action; and 3) there was a causal connection between her
participation in the protected activity and the adverse employment action.
[FN4] Nelson v. Upsala College, 51 F.3d 383, 386 (3d Cir.1995).

>   FN4. Title VII makes it unlawful for an employer to discriminate against
>   an employee "because [the employee] has opposed any practice made an
>   unlawful practice by [Title VII], or because [the employee] has made a
>   charge, testified, assisted, or participated in any manner in an
>   investigation, proceeding, or hearing under [Title VII]." 42 U.S.C.
>   <section> 2000e-3(a). The PHRA includes in its list of unlawful
>   discriminatory practices "For any person, employer, employment agency or
>   labor organization to discriminate in any manner against any individual
>   because such individual has made a charge, testified or assisted in any
>   manner, in any investigation, proceeding or hearing under this act." 43
>   P.S. <section> 955(d).

 *6 Neither party disputes that prong one has been satisfied, Smith engaged in
protected activity when she reported Greco's alleged harassment on May 15,
1995. As to prong two, retaliatory conduct is proscribed by Title VII only if
it alters the employee's compensation, terms, conditions, or privileges of
employment, deprives him of her of employment opportunities or adversely
affects his or her status as an employee. Robinson v. City of Pittsburgh, 120
F.3d 1286, 1300 (3d Cir.1997). It follows that not everything that makes an
employee unhappy qualifies as retaliation. Id at 1300. Pathmark contends that
Smith's transfer was simply managements way of resolving personality conflicts
between the two. Through the investigation of Smith's sexual harassment
charges, Pathmark investigator, Steve Radcliff, determined that there was "bad

blood" between Greco and Smith and recommended that Sheila should be
transferred. (Defendants' Exhibit C--Sexual Harassment Complaint Report).
Furthermore, Pathmark notes that Smith was offered the same position in the
deli department of the Willow Grove store, but turned it down, that her job in
Bensalem is actually closer to her home and that as a result of her transfer
Smith has suffered no loss in pay or status within Pathmark.

 Although, it is clear from the record that Smith's transfer did not involve a
decrease in pay or status, our court of appeals has noted that a transfer even
without loss of pay or benefits may, in some circumstances, constitute an
adverse job action. Torre v. Casio Inc., 42 F.3d 825, 831 n. 7 (3d Cir.1994)
(citing Collins v. State of Illinois, 830 F.2d 692, 702 n. 7 (7th Cir.1987)
(collecting cases)). Circumstances may range from moving an employee's office
to an undesirable location, transferring an employee to an isolated corner of
the workplace, requiring an employee to relocate her personal files while
forbidding her to use company stationary, and, as the Court in Torre noted,
transferring an employee to a "dead-end" job.

 Such attendant circumstances are absent in the instant case. Smith admits
that the transfer itself did not bother her and that she had been transferred
several times in her career with Pathmark. Upsetting was the fact that she
felt management had overlooked her loyalty to the company and instead sided
with Greco, a recent hire, when they failed to discipline him based on Smith's
complaints about his behavior. Smith testified "In all honesty ... I didn't
care about the transfer. I mean, I have been moved many times. There wasn't a
problem with going to another store. It was the reason behind it that upset
me.... I would have liked for them to treat me with respect being that I had
so many years...." (Defendant's Exhibit B--Smith's Deposition at 30). Smith
went on to note that had management at least formally reprimanded Greco she
would not have been troubled by the outcome. (Id. at 31). Thus, the crux of
Smith's dissatisfaction stems not from managements treatment of her, but
rather management's treatment of Greco. That Pathmark's allegedly lenient
treatment of Greco offended Smith cannot form the basis of a retaliation claim
as it does not constitute an adverse job action.

 *7 Furthermore, I am unpersuaded by Smith's argument that Greco's decision to
switch her from working on the meat case to a meat wrapper was retaliatory.
The facts indicate that this decision was never put into effect. As soon as
Greco announced the switch, Smith made known her opposition and the May 15,
1995 meeting with Merz ensued. The outcome of this meeting was that Smith
departed on disability leave and upon her return began working in the Bensalem
store. Compare Ferguson v. E.I. duPont de Nemours and Company, Inc., 560
F.Supp. 1172, 1200 (D.Del.1983) (temporary transfer not an adverse employment
action, although permanent transfer may be).

 Accordingly, I grant summary judgment in favor of Defendants on Smith's
claims of retaliation in Counts I and III of her complaint.

### B. Count II

 Count II of Smith's complaint contains state law claims of assault and
battery and intentional and negligent infliction of emotional distress.

### i. Pathmark's Liability

 Smith claims that her employer Pathmark is liable for Greco's conduct which
constituted assault, battery and intentional and negligent infliction of
emotional distress under the theory of respondeat superior. Before analyzing
the merits of these claims, I consider the issue of Pathmark's liability. For

purposes of this inquiry only, I assume that Greco's actions constituted both an assault and battery on Smith and amounted to intentional and negligent infliction of emotional distress. Respondeat superior provides that an employer is liable for the acts of its employee when those acts are committed during the course of and within the scope of that employee's employment. Fitzgerald v. McCutcheon, 270 Pa.Super. 102, 410 A.2d 1270 (Pa.Super.1979) Conduct of an employee is within the scope of employment if it is of a kind and nature that the employee is employed to perform; it occurs substantially within the authorized time and space limits; it is actuated, at least in part, by a purpose to serve the employer, and if force is intentionally used by the employee against another, it is not unexpected by the employer. Natt v. Labar, 117 Pa.Cmwlth. 207, 543 A.2d 223, 225 (Pa.Commw.1988). Where, however, the employee commits an act encompassing the use of force which is excessive and so dangerous as to be totally without responsibility or reason, the employer is not responsible as a matter of law. If an assault is committed for personal reasons or in an outrageous manner, it is not actuated by the intent of performing the business of the employer and is not done within the scope of employment. Fitzgerald, 410 A.2d at 1272.

All conduct complained of by Smith occurred within the confines of Pathmark, therefore I am left to determine whether such conduct occurred as a function of Greco's duties to Pathmark. I easily reach the conclusion that Greco's comments about his marital status, his touching of Smith's shoulders and behind as she leaned over the chicken case, and his comment that Smith needed a man were not related to his proscribed duties as a meat manager for Pathmark. More troublesome is his comment "let's get naked" while he rested his arm on Smith's shoulder. These acts appear to have been ill attempts at reconciliation after both Smith and Greco were directed by Merz to improve their working relationship. As a result of this direction it is conceivable that Pathmark expected Greco to make some token of reasonable reconciliation. Had Greco simply put his arm around Smith's shoulders, this gesture would fall within the purview of actions taken on behalf of the employer. However, by accompanying this gesture with a the comment "let's get naked" I find that Greco took his conduct out of the realm of that which is performed within the course of employment. Based on the fact Pathmark swiftly initiated an investigation when Smith informed them of Greco's actions on May 15, 1995 and that the company had formal sexual harassment grievance procedures in place, it is highly unlikely that they would condone such comments as a proper means of implementing Merz's directive. Accordingly, I find that because none of Greco's conduct was performed in the course of his employment, defendant Pathmark, his employer is not liable to Smith on her claims of assault and battery and intentional and negligent infliction of emotional distress.

### ii. State Law Claims
### a. Assault and Battery
*8 Under Pennsylvania law, an assault occurs when one acts with the unprivileged intent to put another in reasonable and immediate apprehension of a harmful or offensive conduct and does in fact cause such apprehension. Stilley v. University of Pittsburgh, 968 F.Supp. 252, 259 (W.D.Pa.1996) (quoting Proudfoot v. Williams, 803 F.Supp. 1048, 1054 (E.D.Pa.1992). Likewise, "the elements of the tort of battery are a harmful or offensive contact with a person, resulting from an act intended to cause the plaintiff or a third person to suffer such a contact, or apprehension that such a contact is imminent." Moser v. Bascelli, 865 F.Supp. 249, 252 (E.D.Pa.1994) (quoting Levenson v. Souser,384 Pa.Super. 132, 557 A.2d 1081, 1088 (Pa.Super.1989)).

The record reveals at least two instances of unconsented touching at least on of which can easily be characterized as offensive. At the end of March Greco placed his arm around Smith's shoulder and in May Greco let his hand slip down on to Smith's behind. Without other witnesses or testimony from Greco, I find that Smith's account of these events establishes that a genuine issue of fact exists as to whether or not Greco committed battery. Likewise, the fact that Smith's testimony gives the impression that prior to such touchings she was apprehensive leads me to conclude that she has also established a genuine issue of material fact as to whether or not Greco's conduct constituted assault. (Plaintiff's Exhibit B(1)--Smith's Deposition at 9; Plaintiff's Exhibit B(2)Smith's Deposition at 45). According, Smith's assault and battery claims against Greco survive summary judgment.

### b. Intentional Infliction of Emotional Distress

The Supreme Court of Pennsylvania has not explicitly recognized the tort of intentional infliction of emotion distress. However, lower Pennsylvania courts have allowed plaintiffs to proceed "where the conduct in question is so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Rinehimer v. Luzerne Co. Comm. College, 372 Pa.Super. 480, 539 A.2d 1298, 1305 (Pa.Super.1988). The Third Circuit has observed that "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." Andrews, 895 F.2d at 1487 (quoting Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir.1988)). "[T]he only instances in which courts applying Pennsylvania law have found conduct outrageous in the employment context is where an employer engaged in both sexual harassment and other retaliatory behavior against an employee." Id. (quoting Cox, 861 F.2d at 395-96). The incidents described by Smith are objectionable but far from outrageous and given my conclusion that neither Pathmark nor Greco retaliated against Smith, I find that Smith has failed to meet the high standards of an intentional infliction of emotional distress claim and accordingly dismiss the claim.

### c. Negligent Infliction of Emotional Distress

*9 Pennsylvania courts allow claims for negligent infliction of emotional distress under the following sets of circumstances. The first and most common situation is the "bystander" case in which the plaintiff actually observes the defendant injure a close relative. Sinn v. Burd, 486 Pa. 146, 404 A.2d 672 (Pa.1979). Second, situations in which the defendant owes a plaintiff a pre-existing duty of care, either through contract or a fiduciary duty. Crivellaro v. Pennsylvania Power & Light, 341 Pa.Super. 173, 491 A.2d 207 (Pa.Super.1985). Finally, the court in Brown v. Philadelphia College of Osteopathic Medicine, 449 Pa.Super. 667, 674 A.2d 1130 (Pa.Super.1996), identified a third way to sustain a claim for negligent infliction of emotional distress, the impact rule.

The impact rule has been stated as follows:

"[W]here the plaintiff ... sustains bodily injury, even though trivial or minor in character, which are accompanied by fright or mental suffering directly traceable to the peril in which the defendant's negligence placed the plaintiff, then mental suffering is a legitimate element of damages."

Id.

Smith did not observe an emotionally distressing incident as a bystander and

Greco owed no preexisting duty to her, therefore, the impact rule appears to be Smith's only avenue for recovery. Yet, because applicability of this rule in Pennsylvania courts is presently in a state of flux, I reserve judgment on the validity of this claim until both parties have been given further opportunity to flesh out their positions either before or during trial. Accordingly, Smith's negligent infliction of emotional distress claim against Greco survives summary judgment.

 An appropriate Order follows.

ORDER

 AND NOW, this 11th day of June, 1998, upon consideration of Defendants' motion for summary judgment (Docket No. 20); Plaintiff's response (Docket No. 22); Defendants' reply (Docket No.23); and Plaintiff's sur-reply (Docket No. 24), it is hereby ORDERED that Defendants' motion is DENIED in part and GRANTED in part, as follows:

 (1) Plaintiff's claims of retaliation are dismissed from Counts I and III of the complaint;

 (2) Defendant, William Greco ("Greco") is dismissed as to Count I of the complaint;

 (3) Defendant, Pathmark Stores, Inc. f/k/a Supermarkets General Corp. ("Pathmark"), is dismissed as to Count II of the complaint; and

 (4) Plaintiff's intentional infliction of emotional distress claim contained in Count II of the complaint is dismissed.

 Accordingly, the following claims and defendants remain:

 (1) Plaintiff's hostile work environment claim under Title VII against Defendant, Pathmark;

 (2) Plaintiff's hostile work environment claim under the PHRA against Defendants, Greco and Pathmark;

 *10 (3) Plaintiff's claims of assault, battery and negligent infliction of emotional distress against Defendant, Greco.

 TRIAL in this matter is set for Monday, August 17, 1998 at 9:30 a.m. in Courtroom 14A.

 Not Reported in F.Supp., 1998 WL 309916 (E.D.Pa.)

Motions, Pleadings and Filings (Back to top)

 . 2:97cv01561 (Docket) (Mar. 03, 1997)

END OF DOCUMENT

F

Slip Copy
Slip Copy, 2006 WL 2793071 (3rd Cir.(Del.)), 99 Fair Empl.Prac.Cas. (BNA) 27
(Cite as: 2006 WL 2793071 (3rd Cir.(Del.)))


Briefs and Other Related Documents

This case was not selected for publication in the Federal Reporter.

NOT PRECEDENTIAL

Please use FIND to look at the applicable circuit court rule before citing
this opinion. Third Circuit Local Appellate Rule 28.3(a) and Internal
Operating Procedure 5.3. (FIND CTA3 Rule 28.0 and CTA3 IOP APP I 5.3.)

United States Court of Appeals,
Third Circuit.
Wanda G. TAYLOR, Appellant,
v.
BRANDYWINE SCHOOL DISTRICT, Appellee.
No. 05-4803.

Submitted Under Third Circuit LAR 34.1(a) Sept. 11, 2006.
Filed Sept. 29, 2006.

Background: Former school employee brought an action against school district
under Title VII alleging racial discrimination, retaliation, constructive
discharge, and hostile work environment. The United States District Court for
the District of Delaware, Joseph J. Farnan, Jr., J., granted summary judgment
in favor of school district, and employee appealed.

 Holdings: The Court of Appeals held that:
  (1) employee failed to demonstrate a pattern or practice of continuing
discrimination;
  (2) employee failed to demonstrate that she suffered an adverse employment
action;
  (3) employee failed to establish a prima facie case of discrimination with
respect to her allegations that she was denied promotions, training, and pay;
and
  (4) employee failed to establish a prima facie case of retaliation.
 Affirmed.

[1] Civil Rights k0

78k0 k.
Former school employee, who brought an action for racial discrimination under
Title VII against school district, failed to demonstrate a pattern or practice
of continuing discrimination, and thus, her claims predicated on events
occurring before applicable 300-day period were time barred; employee failed
to describe even one incident of racially motivated harassment or
discrimination at work. Civil Rights Act of 1964, <section> 706(e)(1), 42
U.S.C.A. <section> 2000e-5(e)(1).

[2] Civil Rights k0
78k0 k.

Former school employee failed to demonstrate that she suffered an adverse
employment action, as required to establish a prima facie case of racial
discrimination under Title VII against school district; although employee
alleged that her resignation amounted to an adverse employment action in the
form of constructive discharge, the record demonstrated that she did not write
and deliver her resignation letter until school principal had given her a
termination letter, and there was nothing to indicate that whatever friction
arose between employee and her employer was the result of racial animus. Civil
Rights Act of 1964, <section> 703(a)(1), 42 U.S.C.A. <section> 2000e-2(a)(1).

[3] Civil Rights k0
78k0 k.
Former school employee failed to establish a prima facie case of racial
discrimination under Title VII with respect to her allegations that she was
denied promotions, training, and pay; facts demonstrated that employee's
salary complied with school district's seniority tables and pay grades, and
met or exceeded those of her peers who were similarly situated, and although
employee complained that she was denied promotions to available positions for
which she was qualified, her testimony on this topic was too vague to create
an inference of discrimination. Civil Rights Act of 1964, <section> 701(a), 42
U.S.C.A. <section> 2000e(a).

[4] Civil Rights k0
78k0 k.
Former school employee failed to establish a prima facie case of retaliation
under Title VII against school district; assuming employee's complaints to
administrators about racial discrimination were protected activity, and
assuming she did suffer adverse action, she failed to demonstrate any causal
connection between those complaints and her discharge nearly two years later.
Civil Rights Act of 1964, <section> 704(a), 42 U.S.C.A. <section> 2000e-3(a).
 On Appeal From the United States District Court for the District of Delaware,
 (D.C.Civ. No. 03-cv-814), District Judge: Honorable Joseph J. Farnan, Jr.

 Wanda G. Taylor, Wilmington, DE, pro se.

 William L. Doerler, White & Williams, Wilmington, DE, for Appellee.

 Before BARRY, CHAGARES and COWEN, Circuit Judges.

                              OPINION

 PER CURIAM.

 *1 Wanda G. Taylor, acting pro se, appeals from an order of summary judgment
in favor of Brandywine School District ("School District") in her action for
racial discrimination in employment under Title VII of the Civil Rights Act,
42 U.S.C. <section><section> 2000a-2000h-6. Taylor is an African-American
female who was employed as a secretary at Springer Middle School in
Wilmington, Delaware, from 1972 until 2002. She alleges that she was denied
promotions and ultimately constructively discharged on the basis of her race
and as retaliation for having complained of discriminatory treatment and
harassment.

 The District Court for the District of Delaware granted summary judgment to
the School District on September 30, 2005, holding that some of Taylor's
claims were time barred, that she had failed to satisfy her burden to
demonstrate a prima facie case of racial discrimination for those that were

not time barred, and that she had not demonstrated constructive discharge. The
District Court concluded in the alternative that even if Taylor had
established a prima facie case, the School District had put forth a
legitimate, nondiscriminatory rationale for her discharge that Taylor had not
shown to be pretextual.

Taylor timely appealed. The School District moves for summary affirmance
under Third Circuit L.A.R. 27.4 on the basis that the Taylor had failed to
present any substantial question in her brief. After considering the parties
briefs, we will affirm the grant of summary judgment for the reasons stated
below.

I.

Taylor began working as a clerk in the New Castle School District in 1972. In
1981, after the New Castle School District was partially merged into the
Brandywine School District, Taylor began working as a clerk in the Brandywine
District. In 1985, she was promoted to Attendance Clerk, and in 1990, she was
promoted to Secretary. In 1995, she was promoted to Guidance Secretary at
Springer Middle School ("Springer"), a position in which she also performed
duties normally associated with an Attendance Clerk.

In May 2000, Taylor sent a letter to Ned Brown, then-Principal of Springer,
alleging that she had suffered racially discriminatory and disrespectful
treatment by certain co-workers. In June 2000, she sent a letter to Dr. Joseph
P. DeJohn, then-Superintendent of the School District, asking him to address
the complaints raised in her letter to Brown and alleging that she had been
discriminated against with respect to promotion and pay. On or before August
29, 2000, Taylor met with DeJohn, Michael Gliniak, who had replaced Brown as
the Principal at Springer, and Donald Fantine, then-Assistant Superintendent
of Operations, to discuss her concerns. After this meeting, she wrote a letter
to DeJohn expressing her satisfaction with the results of the meeting and
stating that "[s]ince Mr. Gliniak has been acting principal at Springer Middle
School, I can see the improvement of the working atmosphere."

Beginning in November 2000, Gliniak received several complaints from parents
and other Springer employees regarding Taylor's allegedly rude behavior.
Gliniak met several times with Taylor to address these concerns, repeatedly
emphasizing the need to treat parents and other staff members with courtesy
and respect. Gliniak also offered to restructure Taylor's job or move the
location of her office in order to help ameliorate the problems, but Taylor
elected to preserve the status quo. On November 12, 2001, Gliniak reprimanded
Taylor for taking orders for her home business while at school.

*2 Sometime in late 2001 or early 2002, a student told Taylor that a teacher
had made inappropriate comments to her and that she was uncomfortable
attending his class. When Taylor told her to report the teacher's behavior to
the Assistant Principal, the student said that she did not feel comfortable
doing so because the Assistant Principal had made sexual comments to her.
Taylor did not immediately report this incident, and later reportedly refused
to provide investigators with a full account of what the student had told her
and when.

Taylor sent a letter to the President of the School Board dated March 14,
2002, tendering her resignation "due to personal reasons." The letter was
stamped "received" on March 15, 2002. On March 15, 2002, when she went to
work, Taylor was presented with a termination notice by Gliniak and instructed
to clean out her desk and exit the building. Taylor stated in her deposition

that she submitted a letter of resignation that day backdated to March 14 in
the hopes that the School Board would accept her resignation and she would be
able to preserve her benefits. Her retirement effective March 15 was approved
by the School Board on March 22, 2002.

 On April 19, 2002, she filed a charge with the Delaware Department of Labor
("DDOL"), alleging racial discrimination and retaliation. On February 28,
2003, DDOL concluded that there was "no reasonable cause to believe that [the
School District] engaged in an unlawful employment practice" in violation of
state law. On June 11, 2003, the Equal Opportunity Employment Commission
("EEOC") adopted DDOL's findings and issued a right to sue letter and position
statement finding that Taylor had been paid according to state salary
guidelines based on position, experience, and training, and that there was no
evidence of retaliation. The only secretary at Springer who received a higher
salary was the principal's secretary, who had a greater level of training than
Taylor. The EEOC also concluded that Taylor had violated School District
policy by failing to report the allegation of sexual harassment, and by
failing to cooperate with investigators by providing a complete account of her
conversations with the student.

 On October 7, 2003, Taylor filed a complaint in the District Court for racial
discrimination, retaliation, constructive discharge, and hostile work
environment. Upon the School District's motion for summary judgment, the
District Court held that Taylor's claims predicated on events occurring before
June 23, 2001, were time barred because she had not demonstrated a continuous
violation. With respect to later events, the District Court found that Taylor
had not established a prima facie case of racial discrimination because she
had not established that similarly situated employees were treated more
favorably, or that any adverse employment actions she suffered gave rise to an
inference of racial discrimination. The District Court further found that even
if she had established a prima facie case of racial discrimination, the School
District had legitimate, nondiscriminatory reasons for terminating her
employment. Specifically, the School District had produced evidence
demonstrating that Taylor had violated School Board Policy and state law by
failing to promptly report a student's complaint of sexual harassment, and
that she had failed to cooperate with the Delaware State Police investigating
the claim, both of which were grounds for termination of employment. The
District Court found that Taylor had not satisfied her burden to prove that
these legitimate reasons were pretextual.

 *3 The District Court also found Taylor's claims of discrimination in salary
unsubstantiated by the record. The School District had produced evidence
showing that Taylor was paid according to the standard salary schedule for
secretaries, and that during fiscal years 2000-01 and 2001-02, Taylor was in
fact the highest paid Attendance/Guidance secretary of all similarly situated
Attendance/Guidance secretaries in the School District. The District Court
additionally rejected Taylor's constructive discharge claim because she had
not satisfied her burden to show that working conditions were so unpleasant or
difficult because of racial animus that a reasonable person in her position
would resign.

 The District Court also granted summary judgment to Brandywine School
District on Taylor's retaliation claim. The District Court found that there
was no causal connection between the allegedly retaliatory action--her forced
retirement--and the protected activity--complaining about her salary and
treatment by co-workers nearly two years previously. The District Court found
in the alternative that the School District had offered a legitimate reason

for the decision to terminate Taylor, which was her failure to comply with
school policy and state law regarding the sexual harassment complaint.
According to the District Court, "[n]othing in the record suggests that the
School District invoked this policy or inconsistently applied it to Ms. Taylor
as a pretext for retaliation."

II.

 On appeal, Taylor argues that the District Court erred in finding claims
predicated on events occurring before June 23, 2001, time barred because her
claims were based on continuing violations. She also argues that the District
Court erred in granting summary judgment to the School District on her
retaliation claim because she had demonstrated that adverse employment
actions, including lack of promotions and inadequate pay, were taken against
her due to her complaints about racial discrimination, and that the School
District's stated reasons for adverse employment actions against her were
pretextual. She argues that the District Court also erred in granting summary
judgment to the School District on her constructive discharge claims because
she presented evidence, such as the termination letter signed by Michael
Gliniak, demonstrating that her workplace was so hostile that a reasonable
person would have had no choice but to resign. Finally, she argues that she
alleged sufficient evidence to create a prima facie case for racial
discrimination in pay, because she had shown that she was not the highest paid
secretary in the School District. [FN1]

 [1] We consider first whether the District Court erred in determining that
Taylor's claims predicated on events before June 23, 2001, were time barred.
Title VII requires a claimant to file a charge with the EEOC within 300 days
of the allegedly unlawful employment practice if the claimant has filed a
parallel proceeding with a state agency. 42 U.S.C. <section> 2000e-5(e)(1).
Taylor first filed a claim for racial discrimination and retaliation with the
DDOL on April 19, 2002.

 *4 A plaintiff may pursue an action for a continuing violation stretching
back before the 300-day period, however, if she can show that at least one
discriminatory act occurred during the 300-day period, and that the harassment
or discrimination was part of a continuing pattern of discrimination, as
opposed to isolated or sporadic acts of intentional discrimination. Rush v.
Scott Specialty Gases, Inc., 113 F.3d 476, 481 (3d Cir.1997). Taylor has not
met this burden, however, because she has not demonstrated a pattern or
practice of discrimination.

 As discussed in more detail below, Taylor has not convincingly described even
one incident of racially motivated harassment or discrimination at work. She
alleges that she was denied promotions, but denial of a promotion is generally
a discrete event whose consequences are immediate and permanent and require a
prompt response under Title VII. See id. at 484. In this case, Taylor has
failed to name any specific job for which she applied and was rejected. She
attests to a general feeling that she was being passed over for promotions,
but does not provide evidence of what those positions were, when they were
available, and whether she applied for them. Accordingly, we agree with the
District Court that Taylor does not demonstrate a pattern or practice of
continuing discrimination allowing her to avoid the 300-day time limit.

 [2] Narrowing our consideration to events occurring after June 23, 2001, we
also agree with the District Court's grant of summary judgment to the School
District on Taylor's racial discrimination claim. In order to establish a
prima facie case of racial discrimination, a claimant must demonstrate that

(1) she is a member of a protected class; (2) she was qualified for the position she held or sought; (3) she suffered an adverse employment action; and (4) similarly situated persons who are not members of the protected class were treated more favorably, or that the circumstances of her termination give rise to an inference of discrimination. Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir.1999). Taylor has met the first two criteria because she is African-American and the record establishes that she was qualified for the position of Guidance/Attendance secretary, which she had been performing since 1995.

Viewing the evidence in the light most favorable to Taylor, she has not alleged evidence sufficient to support an inference that the School District took an adverse employment decision based on any illegal discriminatory criterion. O'Connor v. Consol. Coin Caterers, Corp., 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). Taylor alleges that her resignation amounts to an adverse employment action in the form of constructive discharge. See 42 U.S.C. <section> 2000e-2(a)(1); Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir.1993). The record demonstrates that Taylor did not write and deliver her resignation letter until Gliniak had given her a termination letter. Taylor backdated the letter in order to preserve her benefits, and the School Board accepted her resignation effective March 15, 2002, awarding her all accrued benefits as if she had retired. We note also that Gliniak had previously suggested to Taylor in a memo that she retire or transfer. See Clowes, 991 F.2d at 1161 (noting that successful constructive discharge claims often involve employees that were asked to resign or threatened with firing).

*5 To establish constructive discharge, Taylor must put forth evidence that the School District, by illegal discriminatory acts, "knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084 (3d Cir .1996) (quoting Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir.1984)). She has failed to satisfy this burden. Simply put, there is no evidence that whatever friction arose between Taylor and her employer was the result of racial animus. Cf. Spulak v. K-Mart Corp., 894 F.2d 1150, 1154 (10th Cir.1990) (finding evidence sufficient to support constructive discharge where employee resigned in order to preserve retirement benefits because employee had been singled out "for unduly harsh and discriminatory treatment" over minor infractions that employer normally overlooked).

The record demonstrates that on several occasions, Gliniak discussed with Taylor complaints he had received regarding her rude treatment of parents and other employees. Gliniak offered her a chance to restructure her job in order to address some of the concerns, but Taylor's allegations that Gliniak harassed her or held her to a higher standard are not convincing. For example, Taylor says that Gliniak harassed her by stopping into her office every morning and subjecting her to higher degree of scrutiny, but she also says that he complimented her work frequently. She says that Gliniak permitted other staff members to speak to her rudely, but she does not provide an example of an instance in which this occurred. She also complains that he failed to discipline the school nurse after Taylor reported to him that the nurse was mishandling student files, and allowed other employees to loaf while she was working.

These bare and unsubstantiated allegations are not sufficient to meet Taylor's burden. As the Principal, Gliniak had a duty to address the

complaints of parents and staff members--there is no evidence that he failed to address complaints received about other staff members or subjected Taylor to a different standard. We cannot infer racial animus simply from the fact that he was doing his job. See Jones, 198 F.3d at 414 ("Overall, the circumstances of this case ... reflect a situation in which the employer should have been able to take adverse employment actions against the employee without fear of being embroiled in an expensive lawsuit.").

[3] We next consider whether the District Court erred in finding that Taylor had failed to establish a prima facie case of racial discrimination with respect to her allegations that she was denied promotions, training, and pay. 42 U.S.C. <section> 2000e(a). Although Taylor argues that she has met her burden because she has demonstrated that some secretaries in the School District made more money than she, the relevant question is whether she was paid less than those similarly situated. The facts demonstrate that Taylor's salary complied with the District's seniority tables and pay grades, and met or exceeded those of her peers who were similarly situated. [FN2] Secretaries who made more than Taylor either had a higher degree of training or were serving in positions with higher pay grades. Furthermore, of the three secretaries in Taylor's pay grade making higher salaries than she, two were African-American.

*6 Although Taylor complains that she was denied promotions to available positions for which she was qualified, her testimony on this topic is too vague to create an inference of discrimination. She is unable to name specific dates when positions were available, seems unaware whether positions were advertised, and does not appear to have actually applied for any of available position. Her complaints about denial of training are equally vague and unsubstantiated.

Accordingly, Taylor has not established a material question of fact whether she was discriminated against with respect to pay, promotions, training, or any other employment decisions. Because we agree with the District Court that Taylor has failed to demonstrate that adverse employment actions were taken against her in this regard, we need not address whether the School District provided a legitimate non-discriminatory reason for any adverse actions.

[4] The District Court also granted summary judgment to the School District on Taylor's retaliation claim. Taylor devotes most of her brief to arguing that she was not promoted and ultimately discharged as retaliation for having raised complaints of racial discrimination and poor working conditions in May and June of 2000 with her letters to Ned Brown (then Principal of Springer) and Joseph DeJohn (Superintendent of Brandywine Schools). In order to establish a prima facie case of retaliation, Taylor must show that (1) she engaged in a protected activity; (2) she suffered adverse action by the employer either after or contemporaneously with the protected activity; and (3) there is a causal connection between the adverse action and the protected activity. Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir.1997).

Assuming Taylor's complaints to administrators about racial discrimination were protected activity, see 42 U.S.C. <section> 2000e-3(a), and assuming she did suffer adverse action, Taylor has failed to demonstrate any causal connection between those complaints and her discharge nearly two years later. Rather, the record demonstrates that her initial complaints were amicably resolved by the meeting between Taylor, DeJohn, Donald Fantine (then Assistant Superintendent of Operations), and Gliniak (who had replaced Brown as Principal of Springer) at the end of August 2000. After the meeting, Taylor

wrote a letter to DeJohn expressing her satisfaction with the results of the meeting and with Gliniak as the new Principal at Springer. Taylor's resignation did not occur until about eighteen months later, and there is no evidence that it was precipitated by her complaints in 2000, nor is there evidence of racial animus surrounding the events leading to her resignation.

Even if Taylor were able to satisfy the prima facie test for retaliation, she cannot satisfy her burden to prove by a preponderance of the evidence that the School District's proffered non-discriminatory reason for her discharge was pretextual. In order to meet this burden, Taylor must adduce some evidence from which a factfinder would conclude "(1) that retaliatory animus played a role in the employer's decision making process and (2) that it had a determinative effect on the outcome of that process." Krause, 126 F.3d at 501.

*7 The School District claims that it was prepared to discharge Taylor because she violated school policy and state law by failing to immediately report a student's complaint of sexual harassment. The record establishes that a female student approached Taylor several times beginning in January 2002 to complain about a teacher who was "harassing" her. Taylor told her to talk to the Assistant Principal about being removed from the class, but the student told her he too had made sexual remarks to her and she did not feel comfortable approaching him. Taylor did not report either allegation until the student approached her again several months later. Taylor also allegedly refused to talk to the State Trooper investigating the allegations against the teacher. She claims, however, that she was never approached by any police officer or investigator.

Viewing the evidence in the light most favorable to Taylor, we will assume that the student's initial complaint about the teacher was too vague to amount to an accusation of sexual harassment, and we will credit Taylor's statement that she was never approached by investigators. Even so, by Taylor's own admission, the student told her that the Assistant Principal had made harassing sexual comments to her in January, and she did not report them, in violation of school policy, which requires investigation of every allegation of sexual harassment. There is no direct or circumstantial evidence that the School District's proffered reason for terminating Taylor was pretextual, or that racial animus was a likely motivating factor. See Krause, 126 F.3d at 500- 01. Accordingly, the School District was entitled to summary judgment on Taylor's retaliation claim.

III.

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor of Brandywine School District. In light of our disposition, the School District's motion for summary affirmance is denied as moot.

FN1. The School District argues in its briefs that because the only claims raised by Taylor before DDOL and EEOC were retaliation and racial discrimination in pay, Taylor has failed to satisfy the exhaustion requirement for her other claims. However, Taylor's racial discrimination and constructive discharge claims are fairly within the scope of the EEOC charge. See Waiters v. Parsons, 729 F.2d 233, 238 (3d Cir.1984). Accordingly, we will consider every issue decided by the District Court and raised in Taylor's appeal. We have jurisdiction under 28 U.S.C. <section> 1291 to review the District Court's grant of summary judgment. See Tomasso v. Boeing Co., 445 F.3d 702, 705 n. 3 (3d Cir.2006). We review an order granting summary judgment de novo, viewing

the evidence in the light most favorable to the non-moving party, in this case, Taylor. Id.

FN2. The record also demonstrates that Taylor received regular bonuses and raises. In 2000 and 2001, for example, she received 3% bonuses for excellent attendance, and in 2001, she received a 3% plus $550 raise of salary.

Slip Copy, 2006 WL 2793071 (3rd Cir.(Del.)), 99 Fair Empl.Prac.Cas. (BNA) 27

Briefs and Other Related Documents (Back to top)

. 05-4803 (Docket) (Nov. 4, 2005)

END OF DOCUMENT