MAY-09-03 03:31 PM   CITISTEEL HR                    3027916650

- How long was the incident, for example a few seconds, five minutes?

  *unknown*

- Where did the incidents of harassment take place?

  *alleged at work and on her phone at home.*

- Were there any witnesses to the incidents of harassment? If so, who were the witnesses?

  *No.*

- Does the Complainant know of any others subjected to the same behavior?

  *No*

- Does the Complainant know motive for harassment?

  *She thinks the alleged harasser likes her.*

B- 0101

D225

6

MAY-09-03 03:31 PM   CITISTEEL HR

How did the Complainant respond to the harassment?  Did (he) or she make any effort
to bring it to a halt?

*No  he denies it.*

Did the Complainant tell anyone else about the incidents of harassment: superiors, co-workers, family, friends, government representatives, attorneys?  If so, get details concerning who, what, when, where and the response, if any.

*She says she told her mother and father.*

Does the Complainant have any tangible evidence or records of harassment: notes, letters or memos to or from harasser, witnesses; calendar or (diary entries), memos, letters, notes etc. by Complainant; (tape recordings) surreptitious or otherwise; formal complaint forms to any agencies?

*She says she has diary entries and recordings but never produced them w/ requested.*

How did the Complainant feel about the harassment at the time it occurred?

*Unknown – she says it occured over 1½ years ago. She avoided the alleged harasser, pursued, keep her job and have a written warning expunged from her record.*

Does the Complainant feel the same way now?  If not, what is different about how the Complainant now feels, and what brought about the difference?

*Unknown – she is aggressive and wants his admission of guilt.*

Does the alleged harasser have ~~control~~ impact to over the ~~compensation~~, working conditions or future employment of the Complainant?

*Somewhat  to some degree yes but is subject to review by V.P.*

MAY-09-03 03:32 PM   CITISTEEL HR          3027916650

Has the alleged harasser made or carried out any threats or promises in connection with the alleged sexual harassment?

*No.*

Does the Complainant know or suspect there are other victims of harassment by the same person? If so, who are they?

*No    cot mentioned - no*

*alleged pattern (s)*

To what extent were others in control made aware of the situation?

*limited on a need to know basis.*

70  What action would the Complainant like to have taken?

*unknown*

71  Ask the employee to write and sign a detailed description of all events to support the harassment claim.

*did so. in the record.*

Date: *04/8,9,10.*

Interviewer: _____

Witness: _____                   Date: _____

Date: _____

B-0103                                        D227

P.06

MAY-09-03 03:32 PM  CITISTEEL HR                    3027916650

## Alleged Harasser Interview Form

Name: _R.C.+._____          Date: _0 7 / 0 8 / 0 3_

Position: _C.S. M.S._____          Supervisor: _G.B.,_

☑72  Prepare for the investigation meeting with the alleged harasser. This meeting should take place in private, although the company should have two representatives present. The investigator should outline the allegations in advance to ensure that all subjects are discussed.

☑73  Provide the alleged harasser with a copy of the company policy, emphasizing the employer's commitment to enforcing the policy. This step should be followed even if it is suspected that the allegations are not true.

☑74  Answer the alleged harasser's pre-interview concerns and suspicions about the investigation.

☑75  Advise the alleged harasser generally about the investigation and strict policies of confidentiality and avoidance of retaliation.

☐76  Ask direct and detailed questions based on information provided by all witnesses, such as:

- Were the alleged harasser and complainant working together on the date(s) complainant says harassment occurred?

  _unknown —_

- Does the alleged harasser recall any interaction with complainant on those dates? If so, what was the context of the interaction?

  _No touching or phone call._

- Were there any witnesses present?

  _NO._

B- 0104

9

D228

MAY-09-03 03:33 PM   CITISTEEL HR

• What was the substance of any conversation between the complainant and alleged harasser?

_fouly    fursniss    tevith,_

_fursive time    achter_

☐77  Expect an adamant denial. For each denial, request that the harasser identify corroborating witnesses or evidence, and detail any "alibi."

☐78  If the alleged harasser acknowledges any conduct, ascertain and document what occurred. Try to get as many details as possible, even though this may be uncomfortable for the alleged harasser.
Use additional pages if necessary. Ask open ended, non-judgmental questions, such as:

•  Did the alleged harasser touch the Complainant?

_He says NO_

•  If so, where was the Complainant touched?

_N/A_

•  Was the Complainant touched more than once?

_N/A_

•  Was the touching done at the direction of the Complainant or the alleged harasser?

_N/A_

MAY-09-03 03:33 PM   CITISTEEL HR                3027916658

Did the alleged harasser threaten the Complainant in any way?

*He says no.*

If so, what was the threat or threats?

*N/A*

How long was the incident, for example a few seconds, five minutes?

*N/A*

Where did the incident take place?

*N/A*

Were there any witnesses to the incident? If so, who were the witnesses?

*No*

How did the Complainant respond to the incident? Did he or she make any effort to bring it to a halt?

*N/A*

How did the alleged harasser feel about the incident at the time it occurred?

*N/A*

B- 0106

D230

11

MAY-09-03 03:34 PM   CITISTEEL HR                   3027916650                    P.09

- Did the alleged harasser do or say anything that could have been misunderstood or could be intentionally misrepresented?

  *He says no he did not.*

☑79  Ask the alleged harasser about his/her beliefs or suspicions as to why the reports or complaints have been made (*i.e.*, ulterior motives, prior consensual relationships, retaliation by the complaining employee, attempts at job security in the face of poor performance evaluations, etc.).

- Did the Complainant engage in any conduct which the alleged harasser felt was inappropriate or made the alleged harasser feel uncomfortable?

  *No*

☑80  Has the Complainant ever said or done anything that would lead the alleged harasser or others
to believe that the complained-of conduct was not "unwelcome?"

  *No    (unknown)*

☑81  What is the level of supervision between the alleged harasser and the complainant?

  *Direct and indirect.*

☑82  How frequently do the alleged harasser and the complainant work together?

  *all of the time but sporiodically during the work day*

B-0107

D231

MAY-09-03 03:34 PM   CITISTEEL HR                    3027916650                P.18

☐ 83   Has the alleged harasser been previously accused of harassment?

_No._

_____

         If so, what were the circumstances?

_NA._

_____

☐ 84   Advise that if the evidence establishes harassment, the company will take appropriate disciplinary
        action against the alleged harasser and the complainant will be fully informed about the
        company's determination.

☐ 85   Other:

B- 0108

Interviewer: _____          Date: _____

Witness: _____               Date: _____

13

D232

MAY-09-03 03:34 PM  CITISTEEL HR                    3027916650                    P.11

## Co-employee Interview Form

Name: _____DF._____                    Date: _____04/08_____

Position: _____GR MS_____              Supervisor: _____RB_____

☑ 86  Did the co-worker see any alleged harassing incident?          No

☐ 87  If so, what occurred?  Try to get as many details as possible (use additional pages if necessary),
asking open ended, non-judgmental questions such as:

- What happened?

  N/A
  _____

- What was said by the alleged harasser?

  N/A
  _____

- Did the alleged harasser touch the Complainant in any way?

  N/A
  _____

- When did all of this happen?

  N/A
  _____

- Who else was present?

  N/A
  _____

B-0109

D233

14

MAY-09-03 03:35 PM   CITISTEEL HR                    3027916650                    P.12

• What (if anything) did the Complainant say or do in response to the alleged harasser's conduct?

_____

_____

• Did anyone else say or do anything during the incident?

_____

_____

• Did the co-employee later tell anyone about the incident and if so who did you tell and what was their response?

N/A

_____

_____

☐ 88   Did the co-employee see more than one alleged harassing incident between the alleged harasser and the Complainant?  If so, ask questions such as those on the preceding list for each incident.

☐ 89   Did the Complainant ever discuss the issue of alleged harassment with the co-employee?

• How did the Complainant respond to the harassment?

_____

_____

• Did he or she make any effort to bring it to a halt?

_____

_____

B-0110

☐ 90   Did the co-worker notice any appreciable change in the Complainant's behavior?

D234

MAY-09-03 03:35 PM   CITISTEEL HR                  3027916650                    P.13

• Did the Complainant become more or less emotional, upset, or moody at work, specifically with or near the alleged harasser? Please specify.

_____

☐91  Has the co-employee personally seen or heard of sexual harassment by the alleged harasser against any other Company employees besides the Complainant? If so, try to get as many details about what occurred as possible, asking open ended, non-judgmental questions such as those listed above.  **NO**

☐92  Has the co-employee heard another co-employee speak or complain about sexual harassment
by the alleged harasser that the co-employee did not personally witness? If so:

• Who told the co-employee about the alleged harassment?

_____

*NA*

• Who was allegedly harassed?

_____

• What was the form of the alleged harassment?

_____

B-0111

**D235**

- What happened?

_____

_____

- When did it happen?

_____

_____

- Who else was present?

_____

_____

- What did anyone else allegedly say or do during the incident?

_____

_____

- Whom did the co-employee later tell about the incident and what was the response?

_____

_____

- Is there any reason the co-employee can think of why the alleged harasser would have
  thought that the conduct in question was welcomed?

_____

_____

B-0112

D236

- Does the co-employee know any reason why the Complainant would misrepresent allegations? Why harasser more-likely-than not committed misconduct?

_____

_____

- Who does the co-employee believe (in cases where harasser denies allegations outright)?
  Why?

_____

_____

☐93  Is the co-employee aware of any other incidents of sexual harassment by any other Company employees? If so:  *No.*

- Describe the incident.

_____

_____

- Who was involved?

_____

_____

- Identify all witnesses.

_____

_____

- When did it occur?

_____

_____

B-0113

- Was Company management advised about the incident promptly and what was

D237

the response?

_____

_____

- If Company management was not made aware of the incident promptly, why not?

_____

_____

☐94  Other:

B- 0114

Interviewer: _____    Date: ___04/08/03___

Witness: _____    Date: _____

D238

MAY-09-03 03:37 PM   CITISTEEL HR                3027916650

## REACHING A CONCLUSION

After you have interviewed the complainant, the alleged harasser and any relevant witnesses, the following questions will help you reach a conclusion and decide how best to respond to the complainant's allegations.

## MEETING WITH THE COMPLAINANT

Consider and discuss the following:

1. What did you discover?

   *[handwritten] Nothing except that the complainant was angry that she was disciplined recently*

2. What does the Complainant want as a remedy?

   *[handwritten] 1. expunge her personnel file of a warning 2. keep her job 3. demanded RH admit to harassment*

3. Is this a complaint under your policy?

   *[handwritten] No*

4. *[handwritten] Was* Is there enough here to begin an investigation?

   *[handwritten] Yes*

5. Is there evidence of sexual harassment?

   *[handwritten] No*

6. Should you consider a referral to the Company's Employee Assistance Plan?

   *[handwritten] No*

7. Is there a workers' compensation claim involved here? If so, does this change your response to the complaint?

   *[handwritten] No*

8. What didn't you learn?

   *[handwritten] if alleged harasser & type readings really exist and that the complainant did not seem to be reasonable or factual about the matter*

## MEETING WITH THE ALLEGED HARASSER

Consider and discuss the following:

1.  What did you discover?

    *Its denial and difficulty with complaints for work performance.*

2.  Do you think the alleged harasser's alibi has merit?

    *yes — no history, little work history, no evidence.*

3.  What didn't you learn?

    *facts*

4.  What, if anything, is the next step in the investigation process?

    *transfer the employee. No witnesses.*

## MEETING WITH THE COWORKER/WITNESS    *No witnesses.*

Consider and discuss the following:

1.  What did you discover?

    *No facts or allegations*

2.  Did this change your decision about whose story you believe?

    *NO*

3.  What didn't you learn from this witness?

    *Nothing other than employment is difficult to manage.*

4.  What, if anything, is the next step in the investigation process?

B-0116

D240

MAY-05-03 03:38 PM   CITISTEEL HR                3027916650                    P.19

## FINAL DETERMINATION AND REMEDIAL ACTION

Consider and discuss the following:

1. Which witnesses were credible?

   *R H, GB .*

2. Was sexual harassment committed?

   *No, Not proven,*

3. What would be appropriate remedial action?

   a) Documentation in personnel file. *of Terri Snyder*

   b) ~~Verbal warning.~~

   c) ~~Written warning.~~        *offer transfer to Ship Department*

   d) ~~Suspension.~~

   e) ~~Demotion.~~

   f) ~~Termination.~~

4. Why was the remedial action chosen?

   *To remove complainant from situation*

5. Is there anything the Company could do to prevent such harassment claims in the future?

   *Yes*

   If so, what?

   *action sooner for a problem employee*    *manage constructive disciplining*

B-0117

D241

MAY-09-03 03:49 PM   CITISTEEL HR                3027916650                    P.04

DOWNIE

EXHIBIT NO. 5

KWP 7-21-66

DATE:        July 10, 2001
TO:          Terri Snyder
FROM:        J. Downie
SUBJECT:     Meeting with Terri Snyder

(After Terri left yesterday, I called her home twice and spoke to her mother asking to speak to Terri. Her mother said she was shopping both times. At 5:15 Terri called me back and I asked her to bring any tapes she has for me to listen. She said she would do so.)

Jim and I met with Terri this morning. It was a very difficult meeting. She seemed agitated and unwilling to listen to anything. She demanded that Randolph admit what he had done. I asked her if there were any witnesses to the alleged discrimination. She said yes but it was only witnesses to Randolph telling employees to stay out of her office or witnesses seeing Randolph in her office. She became very belligerent and became loud. She acted like she wanted to leave the Company and wanted to be fired. I was finally able to offer her a job in the Shipping department again. She did not want to be moved and said she liked her job. She asked me why and I told her that it would be better for all parties if she left the Melt Shop and went to Shipping. She said that she would go only if there was a piece of paper that admitted something. I told her that was not necessary. She threatened me by saying that she would talk to other people about this. I stated that if she does not want the job in Shipping, we would take that as a voluntary resignation. She didn't like that and said then you are terminating me. I said that we would hope that you would accept the transfer. She said no and said "are you asking me to leave the premises" and I said yes if you do not want to work in Shipping. She left.

B- 0118

D381



## WILCOX & FETZER LTD.

In the Matter Of:

# Snyder

### v.

# Citi Steel, USA, Inc.

C.A. # 04-970-JJF

---

Transcript of:

Terry L. Snyder

May 31, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-0119

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TERRY L. SNYDER,                    )
                                    )
              Plaintiff,            )
                                    )  Civil Action
v.                                  )  No. 04-970-JJF
                                    )
CITI STEEL USA, INC.,               )
                                    )
              Defendant.            )


          Deposition of TERRY L. SNYDER taken pursuant to
notice at the law offices of Young, Conaway, Stargatt &
Taylor, 1000 West Street, Wilmington, Delaware, beginning
at 9:30 a.m. on Wednesday, May 31, 2006, before Eleanor
J. Schwandt, Registered Merit Reporter and Notary Public.


APPEARANCES:
          LORI A. BREWINGTON, ESQ.
          MARGOLIS EDELSTEIN
             1509 Gilpin Avenue
             Wilmington, Delaware  19801
             for the Plaintiff
          MARGARET M. DIBIANCA, ESQ.
          YOUNG, CONAWAY, STARGATT & TAYLOR
             1000 West Street
             Wilmington, Delaware  19801
             for the Defendant
ALSO PRESENT:
          DEBORAH L. COLES, Paralegal

B-0120

                    WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com

Page 2

1    TERRY L. SNYDER,
2  the witness herein, having first been
3  duly sworn on oath, was examined and
4  testified as follows:
5    EXAMINATION
6 BY MS. DIBIANCA:
7  Q. Good morning. I represent --
8  **A. Good morning.**
9  Q. -- CitiSteel.
10  **A. Yes.**
11  Q. And this is for a matter captioned Snyder versus
12 CitiSteel. Present today with us in the room, other than
13 myself and yourself, is Miss Lori Brewington, who is your
14 attorney in this matter; Miss Debbie Coles, who is the
15 paralegal for CitiSteel; and the court reporter, who will
16 be taking down everything we say today.
17    Could you please state and spell your name
18 for the record.
19  **A. Terry, T-E-R-R -- legally it is -- Y, on my birth**
20 **certificate, Lynn is my middle name, L-Y-N-N, and then**
21 **Snyder, S-N-Y-D-E-R.**
22  Q. Have you ever been known by any other names?
23  **A. No.**
24  Q. Have you brought any documents with you today?

Page 3

1  **A. No. My ID.**
2  Q. No, that's enough. I just meant like any notes
3 or anything like that?
4  **A. No.**
5  Q. Have you ever had your deposition taken before?
6  **A. No, no.**
7  Q. Okay. All right. Before we get started I just
8 want to go through some background questions, some
9 instructions sort of how this will work.
10  **A. Okay.**
11  Q. They might seem tedious. Just bear with me and
12 we will get through them.
13  **A. That's okay.**
14  Q. Now, do you understand that the oath that you
15 took is an oath to testify truthfully?
16  **A. Yes, ma'am.**
17  Q. And do you understand that even though we are in
18 an informal conference room today that your testimony has
19 the same force and effect as if you were testifying in a
20 court of law before a judge and jury?
21  **A. Yes, ma'am.**
22  Q. And do you understand that you will be subject to
23 perjury for any untruthful testimony you give today?
24  **A. Yes, ma'am.**

Page 4

1  Q. All right. I'm going to be asking a series of
2 questions that you will be required to answer. There is
3 going to be times that your attorney may object to a
4 question that I ask. Let her finish stating her
5 objection first, for the record, and then please
6 understand that on almost every circumstance you will be
7 required to answer that question anyway. But let her
8 kind of get it out on the record.
9    And then the same thing with me, if I ask a
10 question that you don't understand or you think it is
11 confusing, just tell me. I'll rephrase it, I'll restate
12 it, whatever I have to do to make sure it is clear,
13 because I want you to answer the correct question.
14  **A. I actually don't understand that. If she objects**
15 **I still answer?**
16  Q. Most of the time, and she will tell you if she
17 feels that you should answer.
18  **A. To answer or not, even though she objects.**
19  Q. Exactly, yes.
20  **A. Yes.**
21  Q. If you don't indicate to me that you don't
22 understand a question, I'm going to assume that you do
23 understand it. Is that okay? Do you understand that?
24  **A. If I don't understand something I will ask.**

Page 5

1  Q. Yes.
2  **A. Is that okay?**
3  Q. Yes.
4  **A. Yes.**
5  Q. And then because everything today is going to be
6 taken down by the court reporter, we will have to get all
7 the testimony in an oral way. So anything you say has to
8 be in words. The court reporter can't take down nods of
9 the head or mm-hmm. It has to be a verbal answer.
10  **A. I understand.**
11  Q. And please wait until I finish my entire question
12 before you begin to answer. And likewise, I'll extend
13 you the same courtesy and wait until after you have
14 finished your answer completely before I ask another
15 question.
16    If you feel that you have something to add
17 to your answer, that is fine. You can do that at any
18 time. Don't hesitate to speak up and I'll let you make
19 any additions that you need.
20  **A. Okay.**
21  Q. Do you understand those?
22  **A. Yes.**
23  Q. And if you need to take a break at any time,
24 please let me know. I'll be happy to oblige. It is not

2 (Pages 2 to 5)

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 6

1  intended to be a marathon session of any kind. We can
2  take a break as often as you like. If you are in the
3  middle of answering one of my questions I'll ask you to
4  finish answering and then we can take a break.
5    **A. Of course.**
6    Q. Do you understand all the instructions I have
7  given you?
8    **A. Yes.**
9    Q. Have you recently consumed any medication,
10  alcohol or any other substance which could interfere with
11  your ability to respond to a question?
12    **A. No. You mean this morning? I had a drink the**
13  **other day.**
14    Q. No.
15    **A. Holiday weekend.**
16    Q. Okay. Would there be any reason why you might
17  not be able to answer --
18    **A. No, ma'am.**
19    Q. I'm going to finish my question. Any reason why
20  you may not be able to answer my questions truthfully?
21    **A. No.**
22    Q. Do you have any questions?
23    **A. Not yet. Am I doing this right? Okay.**
24    Q. So far, so good.

Page 7

1    **A. Okay.**
2    Q. What have you done to prepare for your deposition
3  today?
4    **A. I don't understand.**
5    Q. Well, did you review any documents to help you
6  get ready for today?
7    **A. Lori and I went over a few things.**
8    Q. Okay. What documents did you review?
9      MS. BREWINGTON: I'm going to object to
10  that.
11      MS. DIBIANCA: I'm not asking as to the
12  substance of your discussions, just what documents that
13  you reviewed.
14      MS. BREWINGTON: Okay. That's fine.
15      THE WITNESS: None this morning.
16  BY MS. DIBIANCA:
17    Q. Just generally to prepare for today?
18    **A. Prior? You mean within the past couple weeks or**
19  **so forth? Is that what you mean?**
20    Q. Yes. Not every. Just to prepare for today.
21    **A. We have gone over many and several different**
22  **documents in the past several weeks.**
23    Q. Okay. Such as?
24    **A. My complaints, CitiSteel's rebuttals.**

Page 8

1    Q. Anything else?
2    **A. I can't remember.**
3    Q. Okay. Did reviewing the documents help you
4  remember the facts relating to the lawsuit?
5    **A. I'm not following you.**
6    Q. Okay. When you reviewed the documents did they
7  refresh your recollection?
8    **A. Of everything that has happened during my work**
9  **time at CitiSteel, is that?**
10    Q. Of anything that's happened during your work time
11  at CitiSteel?
12    **A. Truthfully, everything is still very fresh in my**
13  **mind, so I don't need to actually continue to go over**
14  **documents. I remember, you know, right at the tip of my**
15  **tongue a lot of the things that was done to me there and**
16  **a lot of the things that was said. But as far as**
17  **preparing or reviewing any documents as of this morning,**
18  **no.**
19    Q. Okay. And you said you reviewed your complaint?
20    **A. Several times, submitted copies of many different**
21  **things, including CitiSteel's procedures, the case of**
22  **sexual harassment occurrence, the handbook policies,**
23  **things that were said and done to myself.**
24    Q. Have you spoken with or interviewed or obtained

Page 9

1  any kind of statement from any former CitiSteel employees
2  regarding your lawsuit?
3    **A. Have I?**
4    Q. Yes.
5    **A. No.**
6    Q. Has anyone else spoken with any former or current
7  CitiSteel employees regarding your lawsuit on your
8  behalf?
9    **A. Supposedly EEOC, which they apparently didn't**
10  **tell the truth. They informed me they were going to come**
11  **to CitiSteel grounds, conduct an investigation, and they**
12  **did not. They may have done a few phone interviews.**
13  **Actually I'm not sure how they did it. They did not do**
14  **it the way they were supposed to do it.**
15    Q. What was the way they were supposed to do it?
16    **A. Come down to the grounds and interview many and**
17  **several people individually, such as you are doing with**
18  **myself as of now.**
19    Q. Okay. What about after you filed the lawsuit,
20  how about did anyone speak to anyone on your behalf at
21  that point, since then?
22    **A. Truthfully, I'm not sure. Should I say I don't**
23  **know? I don't know.**
24    Q. If you don't know, sure.

3 (Pages 6 to 9)

Snyder                                v.                    Citi Steel, USA, Inc.
Terry L. Snyder              C.A. # 04-970-JJF                      May 31, 2006

Page 10

1  A.  Okay.  I don't know.
2  Q.  Have you spoken to any of your friends regarding
3  the lawsuit?
4  A.  My significant other.
5  Q.  What is his name?
6  A.  James Tobin.  My mother and my father, whom are
7  my best friends.
8  Q.  What are their names?
9  A.  Clara Snyder.
10  Q.  Okay.
11  A.  Edward Vouras.
12  Q.  How do you spell his last name?
13  A.  V-O-U-R-A-S.
14  Q.  What have you discussed with them?
15  A.  Well, started telling them everything that
16  happened.  I actually told them the very first time, and
17  then as time went on with my employment there, I just, I
18  basically cried to them.
19  Q.  This is to each of the three people, Miss Snyder,
20  Mr. Vouras --
21  A.  Yes.  I didn't inform Mr. Tobin until January of
22  2003, because I knew how angry he would get.  And my
23  parents already, you know, they were upset enough.
24  But, you know, it would have -- he would

Page 11

1  have made me up and quit, and I wasn't prepared to do
2  that, and I didn't want to have to do that, and I didn't
3  feel I should have to do that because I, you know, wasn't
4  the one doing something wrong.
5  So my two best friends, they were the people
6  that brought me into the world, are actually the ones who
7  originally knew from the door.
8  Q.  From when?
9  A.  From the door.  From the very beginning.  I'm
10  sorry.
11  Q.  That's okay.  From when was the beginning?
12  A.  My first day of employment was, I'm pretty sure
13  it was a Friday, it was August 3rd, in 2001.  It was that
14  Saturday.  It was the very first time.
15  Am I on the right track here?
16  Q.  Yes, please.
17  A.  Was the very first time he said, "I'm going to
18  have to take you out for a beer some time."
19  At that moment I thought nothing of it, you
20  know, just somebody speaking in general to another, you
21  know, employee, supervisor to employee, just generally
22  speaking.
23  Q.  So that was what you think was the first time,
24  the first beginning of the sexual harassment?

Page 12

1  A.  That, I don't -- then I thought nothing of it.  I
2  didn't consider -- you know -- I didn't sit there and
3  think, oh, no, here is my future at CitiSteel, he is
4  going to harass me.
5  I just, to me that was just somebody
6  generally speaking.  I'm going to take you out for a
7  beer, I'm going to take you out for a drink, you know.  I
8  didn't like the way it sounded, but to me that wasn't,
9  you know -- I didn't think it was going to lead up to
10  everything that ended up happening exactly.
11  Q.  Why didn't you like the way that it sounded?
12  A.  Because it was my second day on the job and my
13  supervisor was saying, "I'm going to take you out for a
14  beer some time."
15  And not to mention, I went in there through
16  a temp service.  I had to overcome my fear of heights to
17  get to my office.  I had to climb a four- or five-story
18  steel cage, catwalk, stairs.  And I didn't know if I was
19  going to like it.  I didn't know if I was going to, you
20  know, enjoy, you know, the work and be able to overcome
21  my fear.
22  But he was already asking me to stay.  And I
23  said, "Well, why don't you give it some time, see if you
24  like me as an employee and I'm able to, you know,

Page 13

1  overcome my fear of heights," and, you know, so forth.
2  And I did.  I enjoyed my job.  I was very
3  busy all day.  And I overcame that fear of not looking
4  down through the steel cage stairwell.
5  Q.  Did you tell your parents then about him asking
6  you out for a beer?
7  A.  Yes, the first, the first day.  I sat at the top
8  of the steps.  I had a handicapped aunt.  She was
9  bedridden.  She has passed now.  And I just said, "You
10  are never going to believe," I said, "You know, here it
11  is my second day," I said, "and my boss is telling me he
12  wants to take me out, he is going to take me out for a
13  beer some time."
14  You know, I thought that was odd.  But I
15  didn't think, you know, bad bad.  Not the way things
16  ended up happening.  I just thought it was odd.
17  Q.  When we are talking about "him" I guess we should
18  say for the record who we are talking about.
19  A.  I'm sorry, Randolph Harris.
20  Q.  When you were sitting at the top of the steps was
21  that your aunt or your parents or --
22  A.  My mother was downstairs.  My aunt is bedridden.
23  So I was sitting at the top of the stairwell in my home
24  telling them both.

4 (Pages 10 to 13)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Snyder                                    v.                     Citi Steel, USA, Inc.
Terry L. Snyder              C.A. # 04-970-JJF                        May 31, 2006

Page 14

1    Q.   Okay.  Was your father there at that time?
2    A.   No, ma'am.
3    Q.   When was the first time you told your father
4    about this?
5    A.   I started calling him -- I'm not sure exactly
6    when.  I do not remember when I started telling him.  My
7    mother and my aunt knew first, actually.  But I informed
8    him over the phone, crying from CitiSteel parking lot.  I
9    don't like to talk on cell phones while I'm driving,
10   especially if I'm upset.  So...
11   Q.   Was that a few days later?  A matter of weeks?
12   Do you have an idea?
13   A.   I actually cannot remember.
14   Q.   Would it have been less than six months after you
15   told your mother?
16   A.   My mother?
17   Q.   Yes.
18   A.   No.  My mother knew --
19   Q.   I'm sorry, let me clarify.  From the time you
20   told your mother I guess on August 3rd until the time you
21   told your father, would it have been less than six
22   months?
23   A.   Yes.
24   Q.   Would it have been less than three months?

Page 15

1    A.   It could have been around there.  Because I was
2    scared he would make me quit or get very angry as well.
3    Q.   Since you have left CitiSteel have you talked to
4    any of the current or former employees there?
5    A.   No.  Carmella Patrone, we met a couple times for
6    dinner.  She started getting scared about losing her job,
7    so she informed me that she was going to stop calling me,
8    but she wanted me to continue calling her.
9         And I said, "Well, Carmella, if you are
10   worried about losing your job," I said -- and her father
11   wanted her to quit calling me -- I said, "What would be
12   the point in me calling you?"  I said, "If you are
13   worried about your job," I said, "we will just cut off
14   all ties for now, now."
15        She needed her job and liked her job.  I
16   said, "I'm not going to jeopardize you because of what
17   has happened to me," I said, "but it makes no sense, if
18   you are not going to call me, why should I call you?"
19        It makes no sense to me, so...
20   Q.   When was the last time you talked to her?
21   A.   Well, it has been probably almost three years.
22   Q.   Okay.
23   A.   Because we kept interacting for maybe a month or
24   two after.  When they escorted me off the grounds in

Page 16

1    April of 2003, her and I stayed in touch for maybe up to
2    two months afterwards.
3    Q.   Okay.
4    A.   We would go to book stores, read, have coffee, go
5    to dinner, such.
6    Q.   Have you ever filed any lawsuits against any of
7    your previous employers?
8    A.   No, ma'am.
9    Q.   No.  What about administrative agency complaints
10   regarding employment, similar to the EEOC complaint that
11   you filed, have you filed any other administrative agency
12   complaints?
13   A.   Can you explain that in more detail?
14   Q.   Any governmental agencies that you reported --
15   A.   CitiSteel to?
16   Q.   Any employer other than CitiSteel.
17   A.   Oh, no, no.
18   Q.   Have you filed any lawsuits of any kind?
19   A.   There was two car accidents.  These kids hit me
20   years ago.
21   Q.   What year?  Do you know what year that was?
22   A.   One, excuse me, one was in '92.  I wasn't
23   driving.  I was actually a passenger there.
24        And the other one, when the children hit me,

Page 17

1    it was in '98.  They were car accidents.  It wasn't
2    employee -- I didn't work with them or something like
3    that.
4    Q.   Did you file like a personal injury lawsuit?  Is
5    that what it was then?
6    A.   Yes.  I had messed up this in my neck.  And it is
7    very stiff today, so forgive me if I'm -- I can hardly
8    turn it this way.  And also herniated disk in my back.
9    Q.   Did you settle those cases?
10   A.   Yes.
11   Q.   They didn't go to trial?
12   A.   No.  They ended up being settled through
13   mediation.
14   Q.   Mediation for both of them?
15   A.   Yes.
16   Q.   Have you ever been sued before?
17   A.   No, ma'am.
18   Q.   And excluding the CitiSteel matter, have you ever
19   been sexually harassed by anyone?
20   A.   No.
21   Q.   What is your current address?
22   A.   30, that's three-zero, just three-zero, North
23   Rodney, R-O-D-N-E-Y, Drive, Wilmington -- would you like
24   for me to spell that?  -- Delaware.  I'm just trying to

5 (Pages 14 to 17)

Snyder                                 v.                    Citi Steel, USA, Inc.
Terry L. Snyder                  C.A. # 04-970-JJF                    May 31, 2006

Page 18

1  do everything. Delaware, 19809.
2     Q.  Okay. And who lives with you at that address?
3     A.  My mother. Would you like her name?
4     Q.  No, that's all right. I have it.
5     A.  Okay. I have a cousin who has a disability. Let
6  me know if you want names.
7     Q.  I'll take the name on that.
8     A.  Roy, R-O-Y, Hicks, H-I-C-K-S.
9     Q.  Have you spoken to Roy about this CitiSteel
10  matter?
11     A.  No. But he has overheard -- he hears what goes
12  on in the house. He is a little -- you know, I believe
13  we are all different in our own way, but he is, you know,
14  he is different.
15     Q.  Is he mentally challenged?
16     A.  He had an accident, which I think this is
17  irrelevant, but, he is not mentally challenged, but he
18  had a problem many years ago and so something had
19  occurred with him.
20     Q.  Anyone else that lives at that address?
21     A.  Yes, my significant other now resides with me.
22     Q.  How long has he been at that address?
23     A.  Almost two years.
24     Q.  How long have you been there?

Page 19

1     A.  My entire life. Sometimes I would live with my
2  father, but my main address was my mother's. I would
3  just go and stay with him for awhile and things such
4  as -- you know, the majority of my friends were mother's
5  location. And that's where my animals were. I didn't
6  have animals at my father's.
7     Q.  Where does your father live? In Delaware?
8     A.  Now he does. Well, yes. But he also has
9  property down in Atlantic City, New Jersey. But, yes,
10  his address, he lives in Delaware, yes.
11     Q.  Date of birth?
12     A.  12/20/68.
13     Q.  Without me doing the math, how old does that make
14  you?
15     A.  I'm 37. Young, spring chicken.
16     Q.  You are not married to Mr. Tobin, that's correct?
17     A.  No ma'am.
18     Q.  Have you ever been married?
19     A.  No, ma'am.
20     Q.  How long have you been in a relationship with Mr.
21  Tobin?
22          MS. BREWINGTON: Objection, relevance.
23          MS. DIBIANCA: Well, there is no objection
24  to relevance in depositions. I mean form, obviously, but

Page 20

1  not to relevancy. So do you want to tell her to answer?
2          MS. BREWINGTON: You can go ahead and answer
3  that. How about we do this, unless I instruct her not to
4  answer she can assume she can go ahead and answer the
5  questions. Unless I look to you and say --
6          THE WITNESS: If you say "I object" --
7          MS. BREWINGTON: If I say "do not answer"
8  don't answer the question, okay?
9          THE WITNESS: Okay.
10  BY MS. DIBIANCA:
11     Q.  That way we will save some energy.
12          How long have you been involved with Mr.
13  Tobin?
14     A.  We have been dating for the first six years. But
15  we have been boyfriend and girlfriend in August will be
16  six. For the first six years, you know, we were just
17  dating.
18     Q.  So is that 12 years total?
19     A.  Well, you can take it -- I'm just trying to
20  answer honestly. For the first six years we just were
21  dating. I was always very busy, school, you know, home
22  life. I did not want a significant other. The past six
23  years we have been together.
24     Q.  Okay. So 12 years total, complete?

Page 21

1     A.  Total.
2     Q.  Okay.
3     A.  Since October 9th, 1994, actually.
4     Q.  Okay. Do you have any children?
5     A.  No, ma'am, not yet. Hopefully one day.
6     Q.  And any worker's comp claims?
7     A.  No.
8     Q.  Any Social Security benefits for disability?
9     A.  No.
10     Q.  Ever been arrested?
11     A.  Kind of. 14 years ago. I had a DUI. I drank
12  one drink. I don't drink that much. I drank one drink.
13  It was a strong drink. I blew right on the line. I
14  guess you would call that being arrested.
15          And then, I don't know what year, many years
16  ago, there was a disorderly conduct. But it was
17  dismissed because the person lied, and they admitted,
18  they ended up admitting, so everyone --
19     Q.  So it was dismissed?
20     A.  It was dismissed, yes.
21     Q.  What happened? What was the outcome of the DUI?
22     A.  Oh -- excuse me, I didn't mean to say "oh."
23          I think I paid a fine. I took a class. Had
24  to take a bus and walk past my car, of course, every day.

6 (Pages 18 to 21)

Snyder                                        v.                    Citi Steel, USA, Inc.
Terry L. Snyder                        C.A. # 04-970-JJF                    May 31, 2006

Page 22

1  **And my license was taken for six months or something.**
2  **You could easily look that up. That's the most I can**
3  **remember.**
4      Q.   That's fine. Any other times you have been
5  arrested?
6      **A.  Not that I can recall.**
7      Q.   Let's take a look at the complaint.
8           (Snyder Deposition Exhibit 1 was marked for
9  identification.)
10     Q.   Actually, if you just take a minute, look through
11 it, and then you can just let me know when you are
12 finished.
13          Have you had a chance to look them over?
14     **A.  Yes. I remember all of them. Yes, ma'am.**
15     Q.   All right. Let me just say, this is the first
16 exhibit. What I have done is just put page numbers at
17 the bottom right-hand corner of each of them so we can
18 refer to, so you have an idea of what page I'm talking
19 about. We can get to them easily and that's how it is
20 for all the documents.
21     **A.  Yes.**
22     Q.   Have you seen these first two pages, it looks
23 like, before?
24     **A.  Yes, ma'am. Well, of course, that's my**

Page 23

1  **handwriting, yes.**
2      Q.   Can you tell me what this is?
3      **A.  A piece of paper asking me questions and me**
4  **answering them. Application to Proceed Without**
5  **Prepayment, yes. This is a form I had to fill out to**
6  **proceed in suit.**
7      Q.   Did you fill this out for the court?
8      **A.  Yes.**
9      Q.   And then there are some handwritten notes here.
10 If you could just explain some of them to me. For
11 example, under question number 1, where your handwritten
12 notes start, it says, "Mid July Verizon called."
13     **A.  Wait a minute. Okay.**
14     Q.   Could you tell me what that means?
15     **A.  Verizon called to make me an offer.**
16     Q.   A job offer?
17     **A.  Yes, ma'am.**
18     Q.   And then sort of to the right-hand side of that--
19     **A.  Yes.**
20     Q.   -- can you tell me what that means?
21     **A.  Let me read the question.**
22     Q.   I believe that this is referring to question
23 number 2 which asks, "Are you currently employed?"
24     **A.  I don't know. I'm just answering their question.**

Page 24

1      Q.   Well, it says, "Got a job for temp," it looks
2  like.
3      **A.  Okay.**
4      Q.   Is that what it says?
5      **A.  Yes. Okay. Hercules, I think I had a one-week**
6  **position offered through Franklin, I think it may be,**
7  **through a temp service, to work for a law firm for a**
8  **week.**
9      Q.   And that was Hercules?
10     **A.  Yes. I think I'm explaining this here because,**
11 **you know, letting them know I had a job for a week and**
12 **now I'll be starting a real job.**
13     Q.   And that was at Verizon?
14     **A.  Verizon, yes.**
15     Q.   And it says, it looks like, "For over a year,"
16 and then it is circled, "have all doc," I guess
17 documents, "proving looked." Is that referring to like
18 your job search?
19     **A.  Yes.**
20     Q.   Can you tell me what that means in your own
21 words?
22     **A.  Since CitiSteel escorted me off the grounds, on**
23 **my own, I don't know why, which I think it was a smart**
24 **move, I keep a lot of records, even bank deposit slips.**

Page 25

1  **I don't know why. They call me a pack rat. But I have**
2  **faxes of my job search since CitiSteel let me go.**
3      Q.   Have all those documents been produced?
4      **A.  I don't have them here.**
5      Q.   Have you produced them to your attorney?
6      **A.  No.**
7      Q.   So I'll put a formal document request on the
8  record for all the faxes relating to job search that
9  haven't already been produced or faxes or other documents
10 relating to your job search that have not already been
11 produced.
12     **A.  That's fine.**
13     Q.   It looks like the last sort of handwritten part
14 here, it says "Since CitiSteel," do you see that part?
15     **A.  Yes, ma'am.**
16     Q.   Is that referring to the same thing where you
17 say, "I have all faxes"?
18     **A.  Yes, ma'am. I assume so. It looks that way,**
19 **yes.**
20     Q.   Is there anything else it could be referring to?
21     **A.  No.**
22     Q.   Question number 3 says, "In the past 12 months
23 have you received any money from any of the following
24 sources?" And you have indicated that you have received

7 (Pages 22 to 25)

B- 0126

Snyder                                v.                    Citi Steel, USA, Inc.
Terry L. Snyder              C.A. # 04-970-JJF                   May 31, 2006

Page 26

1  money from other sources.
2  A. The Department of Labor, unemployment.
3  Q. Any other sources?
4  A. No. Oh. I'm sorry. 401(k).
5  Q. Okay.
6  A. I apologize.
7  Q. That's fine. Then we will go to your complaint
8  which starts on page 3. And you said that you recall the
9  complaint? You have seen this before?
10  A. Yes.
11  Q. And the date on page 4, the date that the
12  discrimination, in this case the sexual harassment,
13  occurred was April 10th, 2004?
14  A. No. There was actually many times throughout all
15  this time as far as sexual harassment. But I --
16  actually, they let me go, if you notice how I wrote
17  everything in detail, because I couldn't give all the
18  exact dates, so that's why I wrote that, what I did
19  there, and then I just let them know the date of the
20  termination.
21  Q. So the term --
22  MS. BREWINGTON: Can she finish? I wanted
23  her to make that clear on the record.
24  A. That's the date actually of the termination, I

Page 27

1  have the arrow pointing to.
2  Q. So April 10th, 2004 was your termination date?
3  A. Yes, ma'am.
4  Q. Okay.
5  A. That's the day they wouldn't let me go back to my
6  office.
7  Q. Then we are going to skip ahead. Page 6 looks
8  like you are indicating some things that you attached to
9  the complaint.
10  A. Okay.
11  Q. These were documents that you attached?
12  A. This page here is actually a listing of the
13  following, I guess.
14  Q. So page 6 indicates what actually you submitted
15  with your complaint?
16  A. Yes, ma'am.
17  Q. So page 7 is what?
18  A. Page 7 is what?
19  Q. Yes.
20  A. This is what I had to submit to the Department of
21  Labor to have a, what do you call it, a meeting, an
22  appeal.
23  I think CitiSteel tried to say I quit, and
24  which I did not quit, and so I think I had to do this to

Page 28

1  explain to them why I was fighting for my unemployment.
2  Because CitiSteel was wrong, and they tried lying.
3  So I submitted this to them to explain to
4  them why I was -- I wanted to fight back and I was
5  appealing. And after this, then they gave me a date to
6  meet with CitiSteel's lawyer, arbitrate. I can't
7  remember what that was called. But it was something, we
8  all sat in there.
9  Q. A hearing, maybe?
10  A. Okay. A hearing. I'm sorry.
11  Q. That's fine. So do you have an idea what date
12  this was filled out?
13  A. The date is not on there?
14  Q. I'm not sure.
15  A. Well, it says "4/10, yesterday," so I filled this
16  out on the 11th. Yes. I went in there immediately, the
17  next day.
18  Q. So this was April 11, 2003 then?
19  A. Yes, ma'am. And I'm pretty sure that was a
20  Friday. Because at the very tippy top it says "4/10,
21  Yesterday I, Terry Snyder, was terminated." So it was
22  4/11.
23  Q. Then the next couple pages, what are they?
24  A. This page here, 1 of 2, Tuesday, April the 8 th,

Page 29

1  Jerry Downie asked me in writing, he had a couple pieces
2  of blank paper and a pen, and asked me to write down what
3  I informed him of what Randolph Harris was actually doing
4  to me.
5  So it is actually a brief summary of some of
6  the stuff that Mr. Harris had been doing.
7  Q. So this is your written --
8  A. To CitiSteel. This was for CitiSteel, at their
9  request. The first day I turned them in. Forgive me.
10  Q. That's okay. It takes a little practice to get
11  used to it, back and forth, doesn't it?
12  A. Yes.
13  Q. So this was then completed at CitiSteel? You
14  wrote this at CitiSteel?
15  A. Yes, in the, one of the offices. Human resources
16  actually has two offices, one in one building and up at
17  the next red light in the mansion is the main -- was
18  Jerry Downie's main office. This was done in the little
19  administration office, one red light down, where the
20  nurse; Jim Ryan, who was then the assistant manager, he
21  had a little office; and then Jerry Downie also had a
22  little office down there.
23  Q. Who was there when you filled this out or wrote
24  this?

8 (Pages 26 to 29)

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 30

1   A.  Jerry Downie and Greg Buragino, B-U-R-A-G-I-N-O,
2   whom was the vice president at the time.  They were
3   sitting in there when I walked in.  They asked me what
4   had happened.  I explained.  Jerry Downie asked me to
5   please write it down on paper.  He got up and walked out.
6   Greg Buragino was still sitting there while I wrote this.
7   Q.  Okay.  All right.  And then the next exhibit is
8   page 10.
9   A.  Yes.
10  Q.  Could you tell me what that is?
11  A.  This is to -- well, with EEOC, the day they
12  followed me around, which was on the 9th, they followed
13  me around, and they made me go home early to sleep on
14  things.  And I said, "No.  I have nothing to sleep on."
15  I said, "You sleep on it."
16      They said, "We want to keep the dust down."
17  I said, "I'll keep the dust down if you give me in
18  writing why you are trying to make me take a new
19  position, and I want that lie of a piece of paper.
20      Because Mr. Harris, the month prior, tried
21  to have me written up, and he, Mr. Ford told me it was
22  all Randolph's idea, because Randolph was scared, because
23  he noticed I was getting angrier as each day occurred,
24  the more he was, you know --

Page 31

1   Q.  Mr. Ford?  I'm sorry.
2   A.  Mr. Ford informed me it was Mr. Harris' idea to
3   try to have me written up, and I would not sign that
4   write-up because I had done nothing wrong.  So I refused.
5      So they were following me around.  They
6   followed me from one office, one red light up to the
7   other, begging me to just go home and think about things.
8      And I said, "I have nothing to think about."
9   And they refused to let me go back to my office, on
10  Wednesday, the 9th.  Okay.
11     So I immediately -- you know, I wasn't going
12  to push them out of my way, you know.  I wasn't going to,
13  you know, let them try to drag me down the stairwell or
14  whatever, you know.  They just, they wouldn't leave me
15  alone.
16     So I went ahead.  I left.  I called my
17  significant other.  He came and picked me up.  We shot --
18  I knew that they were doing.  They were slowly trying to
19  get rid of me.  They weren't letting me back to do my
20  job.  So I called my significant other, and he took me up
21  to EEOC.
22     Meanwhile, my cell phone is in the vehicle
23  in silence, so forth, whatnot.  Jerry Downie continuously
24  called my mother.  My mother told him she did not know

Page 32

1   where I was.  My mother wasn't going to tell him.  And he
2   wouldn't leave me alone.  So I went to EEOC.  And EEOC's
3   proceeding steps are they screen you first, so they
4   screened me on the 9th of April, which was a Wednesday.
5   And if they believe you and feel you have a case, then
6   they set you up with a date to come back to take a formal
7   statement.
8      This is the date they gave me and this here,
9   you asked me what this document was, this is the formal
10  statement to EEOC then.
11  Q.  Okay.  And so this was completed on the 29th?
12  A.  Yes, ma'am.
13  Q.  If you could just point out the parts where you
14  allege that you were sexually harassed in the charge.
15  A.  You are asking me to point that out, even though
16  you have a copy in front of you?
17  Q.  For the record.
18  A.  Well, I think a supervisor starting to tell me he
19  was going to start taking him away -- well, let's see.
20  Should we start with when he started touching me?
21  Something like that?
22  Q.  Anywhere you want.  I just want to make sure we
23  can get all the allegations on the record.
24  A.  Making lewd comments.  Smelling me.  Asking me

Page 33

1   what flavor I was today.  Squeezing my cheeks.  Standing
2   in my doorway, not letting me out of my office.  I had to
3   push my way through.  Is that an answer for you?
4   Q.  Is there anything else?
5   A.  Well, there is tons more.
6   Q.  Let me ask you this:  Is there anything else
7   that's not in the charge that you feel would be the basis
8   of a sexual harassment claim?
9   A.  Asking -- well, is it on here?  Asking me to come
10  to work wearing a dress with no panties.
11  Q.  That's on the second page, page 11.
12  A.  Then you found it for me.  Thank you.
13  Q.  Is there anything else that should go in here, do
14  you think?
15  A.  Let's see.  All the rude comments.  Telling me he
16  wants to make me away.  Squeezing me, smelling me, asking
17  me to come to work wearing a dress with no panties,
18  standing there staring at me for twenty minutes, telling
19  me how pretty I am.  Grabbing down below his area,
20  squeezing as he sits up on the table.  Maybe -- I think
21  that might do it.
22     Stroking my hair.  Oh, yes.
23  Q.  Then on page 18.
24  A.  Yes, ma'am.

9 (Pages 30 to 33)

Snyder
Terry L. Snyder

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 34

1   Q.  Can you tell me what that is?
2   A.  I think this is me asking for help.
3   Q.  To whom?
4   A.  I think this is part of to the court.
5       Wait a minute.  I don't know if this is the
6   end of another page.  I'm assuming, because of the way
7   they are stapled, if I'm not mistaken, to the court.
8       Okay.  I needed a case number.  Okay.
9   Mm-hmm.
10  Q.  Does the date on there, 8/24/04, does that help?
11  A.  Well, what day did I submit it to the court?
12  Yes.  Mm-hmm.  Maybe this was the first page, actually,
13  of -- see, you have two copies of it in here.  One has
14  lines under it and one doesn't.  Okay.  To the court.
15  Q.  Okay.  And then the next page, also dated the
16  same --
17  A.  To the court.
18  Q.  Let me finish real quick.  -- also dated the same
19  day, August 24, 2004 --
20  A.  Yes, ma'am.  Oh, I'm sorry.
21  Q.  -- that's to the court?
22  A.  Yes.
23  Q.  Then on page 21, have you seen that before?
24  A.  I'm sure I have.  I have seen so many documents.

Page 35

1   But yes, I'm sure I have.
2   Q.  Well, I'll submit to you that these are your
3   answers to CitiSteel's first set of interrogatories.
4   A.  Okay.  From the courthouse or from EEOC or from
5   whom?
6   Q.  This would have been after your lawsuit was filed
7   that CitiSteel would have submitted these interrogatories
8   to your counsel, and then you would have answered with
9   them and sent it back to CitiSteel.  So it wouldn't have
10  been from the EEOC or necessarily from the court.  It
11  would have been the questions were being asked by
12  CitiSteel.
13  A.  From the original lawyer?
14  Q.  Well, I'm not sure.  Probably --
15  A.  I mean somebody asked these questions.  You know
16  how I was answering your questions, this is for or to and
17  from this court.  This is to the Department of Labor.
18      Who is this to or from is what I'm not
19  following.  This is District of Delaware.
20  Q.  This was signed by Miss Brewington, so it would
21  have been CitiSteel submitted it March 20th or it was
22  responded to on March 20th of this year.  Does that help?
23      And the next page, page 36 is your
24  verification to the interrogatories.

Page 36

1   A.  Who is this from?  Okay.  This is my answers to
2   CitiSteel's set.  Okay.  So CitiSteel answered my
3   lawyer's questions?  Or this is my answers to what
4   CitiSteel had to say to my lawyer?  Is that correct?
5   Q.  CitiSteel propounded questions to you through
6   your attorney.  And you responded through your attorney
7   with this.
8   A.  Okay.  Okay.  Thank you.
9   Q.  You got it.
10  A.  Was I supposed to go to page 36?
11  Q.  I want to run through the questions very quickly
12  and see if there is anything in here you want to add to
13  at this time or correct at this time.
14  A.  On page 36, ma'am?
15  Q.  No.  Just through the answers.  So probably start
16  at page 26, it looks like the first actual question and
17  answer.
18  A.  Yes, okay.
19  Q.  For example, the first question is asking for you
20  to identify any kind of document that you have relating
21  to the claims in this case, and you stated that all
22  documents had already been provided, plus some additional
23  documents that were submitted.
24      Now today apparently there were some faxes

Page 37

1   out there, some other documents.  Is there any other
2   documents, other than the ones we talked about today,
3   relating to your job search that you have not submitted?
4   A.  No.
5   Q.  Then, for example, question number 3 is just
6   basically asking for witnesses, anyone who would have any
7   kind of factual knowledge, and you provided a list here.
8   Is there anyone that is not on this list that you believe
9   may have some knowledge?  And the list continues on to
10  the next page.
11  A.  No, but every time, I mean -- no, no.  I hope I'm
12  doing this properly.  No.
13      Through work, because other than that, my
14  parents and my significant other, so --
15  Q.  You listed that on the next page.
16  A.  Okay.  Okay.  I just wanted to make sure.  I was
17  trying to do it properly.
18  Q.  Okay.  Then on page 30, the answer to number 10,
19  which is asking for any non-monetary relief that you are
20  seeking --
21  A.  Forgive me.  I'm sorry.  Page 30?  Number 10?
22  Q.  Yes.
23  A.  Thank you.  I don't have a page 30.
24      MS. BREWINGTON:  Can I just?  I think she is

10 (Pages 34 to 37)

B-0129

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 38

1 going by this number right here.
2     THE WITNESS: Yes. I do. Forgive me.
3 Okay. I'm sorry.
4 BY MS. DIBIANCA:
5     Q. That's okay. Number 10 is non-monetary relief,
6 in other words, non-financial relief, non-economic relief
7 that you are seeking.
8     A. May I please interrupt? I don't think I have a
9 number 10. Excuse me. This is number 9. And then there
10 is -- oh, here is number 10. I'm sorry.
11     Q. It is not in bold. So it does sort of blend in
12 there. Okay. So you see number 10 and the answer there?
13     A. Yes, ma'am.
14     Q. The last part of that is you would like Mr.
15 Harris to be sent to the shipping department of
16 CitiSteel.
17     A. Of course. Why should I be shipped? He should
18 be shipped. He did the harassing.
19     Q. Okay. And you felt that the shipping department
20 was some place he should have been transferred to?
21     A. That's where they were trying to ship me, out,
22 way back in the neck of the woods away from society,
23 basically. So, sure.
24     Q. Okay.

Page 39

1     A. I was kind of being sarcastic when I said that to
2 them because that's the way they were treating me.
3         So, but, sure, why should he be a general
4 supervisor up there, taking his authority for granted?
5     Q. Do you still feel that that is an appropriate
6 request?
7     A. I definitely feel they need a sexual harassment
8 refresher training course.
9     Q. And about Mr. Harris being transferred to
10 shipping, is that appropriate still?
11     A. I don't think he should be a general supervisor
12 at all.
13     Q. So did you want to change this answer at this
14 time?
15     A. No. Ship him to shipping.
16     Q. Okay. Then question, it is on page 34.
17     A. Yes, ma'am.
18     Q. Question 19, did you want to change the answer to
19 that question at this time?
20     A. I don't understand.
21     Q. Well, it says, "Describe all criminal, civil, and
22 administrative actions"... "to which you have been a
23 party or a witness, including, but not limited to, the
24 identity of the parties, the date the action was brought

Page 40

1 or filed," etcetera.
2         At that time your answer was that you had
3 been involved in no other actions other than the
4 unemployment hearing.
5     A. Okay. So, in other words, has anything taken
6 place involving CitiSteel and myself other than so far
7 the hearing at the Department of Labor? Is that what
8 this means?
9     Q. No. It means have you ever been involved in any
10 criminal, civil or administrative actions.
11     A. No.
12     Q. What about the criminal actions we discussed
13 today?
14     A. Such as?
15     Q. I believe it was a DUI and --
16     A. Oh. Oh. I thought you meant related.
17         Okay. What about it?
18     Q. Would you like to supplement this answer at this
19 time to include those matters?
20     A. So, in other words, you want me to change my
21 answer -- stop me when I'm wrong.
22     Q. I'm going to stop you when you are wrong. I
23 don't want you to change anything other than I want to
24 verify the --

Page 41

1     A. In other words --
2     Q. Let me finish, please. I want to verify the
3 accuracy of your answer here.
4     A. Apparently, I guess I didn't understand at the
5 time, such as I am learning now, as you are clearly
6 helping me learn, so, in other words, with total
7 irrelevancy, that I had a DUI 14 years ago, in other
8 words, sure. You can stick that in there.
9         But as far as any relations to CitiSteel and
10 the matter at hand, no, I would not like to change that
11 answer. But if you are talking about throughout my
12 entire life, I assume so. You may change it if you like.
13     Q. Well, I don't want to change it unless it is
14 wrong. I do want to have you change it or supplement if
15 it is wrong.
16     A. If this question right here is asking me -- see,
17 when it mentions EEOC, the Department of Labor, so forth,
18 we are talking about CitiSteel and what Randolph Harris
19 and Jerry Downie did to me. I'm not sitting around
20 thinking about what happened to me 14 years ago. So if
21 this is the wrong answer to this kind of question, then
22 change it.
23         Throw that DUI in there from 14 years ago,
24 that will be fine with me.

11 (Pages 38 to 41)

Snyder
Terry L. Snyder

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 42

1  But, my answer to this question, with
2  CitiSteel matters, no, it should remain the same. That's
3  what I understand. And now there is my answer.
4  Q.  Did anyone help you fill this out, explain this
5  to you?
6  A.  Yes.
7  Q.  Who helped you?
8  A.  A young lady named Katherine.
9  Q.  And is she a legal representative? Is she an
10 attorney?
11 A.  No longer. I don't know. I don't know how to
12 answer that. What was she? Paralegal.
13 Q.  Okay. For who? What attorney's office?
14 A.  Mine.
15 Q.  Okay. Miss Brewington's office?
16 A.  Yes, ma'am.
17 Q.  And then page 36.
18 A.  If this question here means my entire life, then
19 I answered it wrong, and whether or not it was explained
20 to me properly, throughout my entire life, then, you
21 know, maybe I answered it wrong.
22 But, as far as CitiSteel goes, this is the
23 correct answer. But throughout my entire life, DUI 14,
24 add on, whatever, feel free.

Page 43

1  Q.  We talked about today the two criminal instances
2  that were many years ago.
3  A.  Okay.
4  Q.  And then we talked about the two personal injury
5  car accident cases?
6  A.  So you want that on there too? You tell me.
7  Because I'm totally naive to this.
8  Q.  Well, I'm not your attorney, but I will represent
9  to you that when it says "all criminal, civil, and
10 administrative actions" --
11 A.  Well, as far as the car accidents, I was not at
12 fault in any way.
13 Q.  Let me interrupt you for just one minute. In no
14 way does it indicate you were at fault by any stretch of
15 the imagination.
16 A.  Okay.
17 Q.  It is simply getting a record of your involvement
18 as a party or a witness. So it could be something that
19 you were a witness to and involved in through that.
20 A.  Okay. The two car accidents and the DUI then, I
21 guess.
22 Q.  Okay. Any other administrative actions, civil
23 lawsuits, criminal cases of any kind that you were a
24 party to or a witness to? Do you understand that

Page 44

1  question?
2  A.  Kind of. Not to my knowledge, no, ma'am.
3  Q.  Would you for any reason not have knowledge of
4  things you were a party to?
5  A.  I have never gone up on a witness stand for
6  somebody, if that's what you mean.
7  Q.  Have you ever been interviewed by any
8  administrative agency --
9  A.  No.
10 Q.  Let me finish. -- on behalf of someone else, not
11 just in a witness stand?
12 A.  No, other than several people because of
13 CitiSteel. So the answer to that question is no.
14 Q.  Okay. And no other civil matters? Civil just
15 means not criminal. So any other civil matters like a
16 lawsuit where you were a witness to?
17 A.  No.
18 Q.  Okay. Then 36.
19 A.  Excuse me.
20 Q.  There is your verification for the
21 interrogatories. That's just your signature attesting
22 that you believed all the answers were full and complete
23 and true to the best of your knowledge.
24 A.  Okay.

Page 45

1  Q.  And you signed that; is that correct?
2  A.  Yes, ma'am.
3  Q.  In addition to what we have added today, and
4  talked about today, is there anything else that you would
5  like to add to the interrogatory answers to make them
6  full and complete and true answers?
7  A.  No, not to my knowledge, no. Unless you pinpoint
8  something or would like to reask me, no, as far as I
9  know.
10 Q.  We are done with that for now.
11     Are you under the care of a doctor or other
12 healthcare professional at this time?
13 A.  Anything specific or --
14 Q.  Anything.
15 A.  Yes. I have a family physician. I'm getting
16 ready to, through him, with a referral, I have to have an
17 MRI done, and then I have an appointment the end of June
18 to see, I think it is called a neurological surgeon.
19 Q.  What is your family doctor's name?
20 A.  Goodman.
21 Q.  What is the first name?
22 A.  Ronald.
23 Q.  Where does he practice?
24 A.  As far as I know, he has two locations. It is

12 (Pages 42 to 45)

Snyder                         v.                    Citi Steel, USA, Inc.
Terry L. Snyder          C.A. # 04-970-JJF               May 31, 2006

Page 46

1  called Total Care Physicians. Because there were several
2  doctors in each. One is located -- forgive me for not
3  knowing the exact address. I just drive there. I can't
4  remember the number on the building. Philadelphia Pike.
5  And then there is another one, Ogletown. It is right
6  near the Christiana Hospital, across from there.
7       Q. And the MRI is for what?
8       A. It is going to be done for my back. No one
9  informed me, I was younger when they happened, that as
10  you get older everything is going to get worse and hurt
11  you more. So here I am.
12      Q. And the appointment at the end of June, is that
13  also for your back?
14      A. The MRI is going to -- I forget. I just found
15  out the appointment yesterday. My mother actually has it
16  written down. So forgive me for that. But the
17  appointment with Dr. Sugarman is on the 21st.
18      I have a lot of things dated in my cell
19  phone, which broke and I had to send back to Texas the
20  other day.
21      Q. Dr. Sugarman is a neurological --
22      A. Yes.
23      Q. What is his or her first name?
24      A. I do not know.

Page 47

1       Q. What group does -- is it a he or she?
2       A. It is a he. I do not know the group. Like
3  Goodman is with Total Care. I cannot recall.
4       Q. The back condition, what is that called exactly?
5       A. When I was -- well, let me see. When I was a
6  child I had scoliosis really bad. I would have been
7  hunch back by 17. I would have crushed all my organs.
8  So I had to have a spinal fusion done. I have a
9  Harrington rod, it is either stainless steel or titanium,
10  screwed to my entire spine, from neck to lower buttocks,
11  which is fine and healthy.
12      But then when the car accidents, the first
13  car hit, I was a passenger, hit a telephone pole. But I
14  always wore my seat belt. I even had a little seat belt
15  scar. You can't find it now. I could. That
16  gave me a herniated disk and a bulging disk. I was stuck
17  bent over.
18      And then in '98, the kids hit me, and now my
19  neck, I have four messed up disks in my neck. I'm going
20  to see Sugarman and try to deal with my lower back first
21  because of the pain that shoots down my leg and so forth.
22      I'm not done yet. So trying to get it fixed
23  to keep on ticking, keep on going, keep on working. I'm
24  doing what I got to do.

Page 48

1       Q. So has this been a constant problem since the
2  first car accident?
3       A. No. I mean, there is days I'm in pain, such as I
4  think everybody in life.
5       But has it stopped me? No. I still used to
6  go to the gym 5:00 o'clock in the morning. I would go
7  back 8:00 to 10:00 at night, 9:00 to 10:00 at night,
8  whenever they closed.
9       Those were actually CitiSteel days. I would
10  go five -- I didn't have to be at work until 6:30. My
11  gym opened at 5:00 a.m.
12      The pain sometimes, it may slow you down,
13  but actually I feel a lot of people won't try it, but if
14  you are in pain, if you work it more, it actually helps
15  the pain a little bit.
16      Q. So you've had pain, though, throughout that time?
17      A. Sure. Sure. Like just yesterday -- my neck
18  hasn't bothered me in weeks, months. Just yesterday
19  morning, my neck, I can hardly turn it. All day
20  yesterday, you know. This morning, woke up, pain is
21  still there. I'm in pain now as we speak. But tomorrow
22  it may go away. And then, you know. But life goes on.
23      Q. And that's from the second car accident, 1998?
24      A. Yes.

Page 49

1       Q. What other doctors do you currently see?
2       A. Oh, well. I have a gastro -- please forgive me
3  on my pronunciation of things -- gastroenterology doctor.
4       Q. What is his or her name?
5       A. The main doctor is Dr. Beswick.
6       Q. How do you spell that?
7       A. B-E-S-W-I-C-K.
8       Q. First name?
9       A. May I ask you a question?
10      Q. Sure.
11      A. Do I have to answer these, in my personal
12  doctor-related issues actually?
13      Q. Yes.
14      A. May I ask why? How it is relevant?
15      MS. DIBIANCA: Do you want to say something?
16      MS. BREWINGTON: Can we perhaps go under
17  seal for certain questions? Is that something we can do?
18      MS. DIBIANCA: Like a confidentiality order?
19      MS. BREWINGTON: Maybe. Because there are
20  some things that I don't think she is going to feel
21  comfortable discussing, and I understand that -- it is
22  just a sticky issue. Is it possible we can maybe go
23  under seal for some of these questions pertaining to her
24  medical condition?

13 (Pages 46 to 49)

Snyder                                      v.                    Citi Steel, USA, Inc.
Terry L. Snyder                    C.A. # 04-970-JJF                        May 31, 2006

Page 50

1    THE WITNESS: In other words --
2    MS. DIBIANCA: Do you want to go off the
3 record for a minute.
4        (Discussion off the record.)
5        (Recess taken.)
6    MS. DIBIANCA: We will go back on the
7 record.
8 BY MS. DIBIANCA:
9    Q.  So the gastroenterology, maybe, Dr. Beswick?
10    A.  Yes, that's a man. Dr. Beswick. He is the head
11 man.
12    Q.  Do you know what the group is called?
13    A.  Gastroenterology Associates. I have their phone
14 number and kind of their address. They are at the
15 Medical Arts Pavilion I. Would you like their phone
16 number? Am I volunteering too much?
17    Q.  I don't need it anyway.
18    A.  Stop me.
19    Q.  When was your last appointment with that group?
20    A.  March, beginning of March maybe.
21    Q.  March of this year?
22    A.  Yes.
23    Q.  When is your next appointment with them?
24    A.  Well, Dr. Beswick, he is the main doctor. But it

Page 51

1 is Mrs., Dr. Stacey Mandichak is the one I usually meet
2 with. Beswick I met with a couple times. But, you know,
3 and she reports to Beswick. He is the thing.
4    Q.  Do you know how to spell her last name?
5    A.  Now she got married. But I know how --
6 Mandichak. M-A-N-I-C-H-E-K.
7    Q.  And what do you see them for?
8    A.  Blood disorder.
9    Q.  What other doctors?
10    A.  None.
11    Q.  Since 2001 what other doctors have you seen?
12    A.  A therapist.
13    Q.  Why don't we get to that later. Any other
14 physical doctors?
15    A.  Physical meaning --
16    Q.  Like non-mental health.
17    A.  No, not that I can...
18    Q.  Any person that would be a specialist for your
19 neck injury or your back injury?
20    A.  Oh, there was a Sharp.
21    Q.  S-H-A-R-P?
22    A.  Yes. He moved his office. I ended up -- I
23 called Goodman. I went back to Goodman. Now I'm getting
24 ready to go see Sugarman because of the disk.

Page 52

1    But as far as I can remember -- honestly,
2 you can look that up. I think I signed a release. You
3 can look up anything you want. I really can't remember.
4 But if I have been to any other doctors other than
5 because of CitiSteel, no, I don't remember. I'm pretty
6 sure not. But don't hold me to that.
7    Q.  Well, I'll just ask you if you remember anyone
8 else could you just let us know that?
9    A.  Yes, ma'am, I will.
10    Q.  And then what medications are you currently
11 taking?
12    A.  As of now because of my back or --
13    Q.  For anything.
14    A.  For anything. Actually just like Aleve.
15    Q.  Prescriptions?
16    A.  It is called Endocet, E-N -- but I don't take
17 them like I'm supposed to. I may take a half once in
18 awhile. E-N-D-O-C-E-T.
19    Q.  What is that medicine for?
20    A.  Pain. I'm scared of being addicted to anything,
21 like even as far as Tylenol PMs, I won't even take them
22 two nights in a row.
23    Q.  Who prescribed the Endocet?
24    A.  Dr. Goodman, until, you know, just in case I need

Page 53

1 them or in case my pain gets too bad. Sometimes I have
2 to hold on, when I'm getting a shower to get ready for
3 work, so -- but if I take a half one it is like it blocks
4 my pain for days at a time.
5    So, but until I get to Sugarman and he sees
6 what he is going to -- how he is going to help me, for
7 now Dr. Goodman gave me them.
8    Q.  So it is for your back pain?
9    A.  Basically, yes. But I don't take them like I'm
10 supposed to. I just live in the pain.
11    Q.  When were they prescribed first initially?
12    A.  One time, I think he gave me a prescription last
13 year, and then a couple months ago I think he gave me a
14 prescription.
15    Q.  Any other medications you are currently on?
16    A.  No. I take Tylenol P.M. once in awhile.
17    Q.  What about, are you currently under the care of a
18 mental health professional?
19    A.  No. I think everybody in the world should be,
20 but no. Just kidding.
21    Q.  Have you ever seen a mental health professional?
22    A.  Well, you told me not to talk about that. But a
23 therapist.
24    Q.  Oh, yes. I'm sorry. Now I just wanted to kind

14 (Pages 50 to 53)

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 54

1   of go in order. That's all. I'm sorry. Yes, right now
2   we are back to mental health then or starting mental
3   health officially.
4       A.  Okay. Don't you drive me crazy.
5       Q.  So have you ever seen a mental health
6   professional?
7       A.  Yes.
8       Q.  Who was that?
9       A.  Cindy Wright.
10      Q.  When was the last time you saw her?
11      A.  I actually have all the receipts from my thing
12  when I was going there. I think it may have been soon
13  after my Cobra. Maybe 2004. Don't hold me to that. We
14  can easily find out the exact date so I can answer you
15  properly, more accurately.
16      Q.  You say you have the receipts for her office
17  visits?
18      A.  Yes.
19      Q.  Have those been produced?
20      A.  I think.
21      Q.  I'll just put an official document request on the
22  record for any records that you have relating to medical
23  treatment, including, but not limited to, receipts that
24  indicate treatment dates.

Page 55

1           When did you first start seeing -- is she a
2   doctor, Cindy Wright?
3       A.  I don't think she is a psychiatrist. I think she
4   is the next thing.
5       Q.  Like maybe a therapist?
6       A.  Yes, yes.
7       Q.  Do you know when you started to see her first?
8       A.  No. But I think that's all in the records.
9       Q.  Do you know why you started to seek treatment
10  with her?
11      A.  Yes, because I was depressed. Yes, because I was
12  depressed.
13      Q.  Okay. What kind of problems were you
14  experiencing?
15      A.  Crying. I'm not going to -- better watch my
16  mouth. Pissed off. Upset. Amazed. Paranoid.
17      Q.  Did you experience any kind of improvements when
18  you saw her?
19      A.  She was a big help. Yes. Got me out of the
20  house more. You know, got me trying to get back to my
21  normal routines except for, you know, not being able to
22  go to work because I didn't have a job to go to. But
23  sure.
24      Q.  Anybody else? Any other mental health

Page 56

1   professionals that you have seen?
2       A.  No.
3       Q.  What high school did you attend?
4       A.  Mt. Pleasant. And it was hard to sit there in a
5   body brace after my operation, I was in a body cast for a
6   year, and then I was in body braces, and things, you
7   know, just got difficult.
8           So I ended up going back to Wilmington High
9   School through the James Groves program, and I continued
10  to go for two years because I wanted full, my full
11  credits. I wanted a diploma, not just a GED.
12      Q.  When did you leave Mt. Pleasant, the year?
13      A.  I cannot remember.
14      Q.  Okay. Did you get your diploma?
15      A.  I graduated in '93. I had to take a semester
16  off. I had a medical issue at that time.
17      Q.  This was at Wilmington?
18      A.  Yes.
19      Q.  Do you think between the time you left Mt.
20  Pleasant and the time you graduated at Wilmington would
21  that have been three years? Five years? Any idea?
22      A.  I don't know. But you are more than welcome to
23  look that up as well.
24      Q.  Would it have been less than ten years?

Page 57

1       A.  Yes.
2       Q.  Less than five years?
3       A.  Around that, maybe.
4       Q.  That's fine. Then did you go to college after
5   that?
6       A.  I took courses. I actually started to take a
7   psychology course, and I took accounting clerk course.
8   It was actually a training program at Delaware Tech which
9   I completed.
10          I also started to take a computer repair
11  course. I forget the name of the school. It was on
12  Route 40 in lower Delaware. I think that would be
13  considered lower Delaware.
14          I love going to school, love learning.
15  Always trying to stick my nose in something.
16      Q.  So the psychology and the computer repair course,
17  those you didn't finish; is that right?
18      A.  No, no, I did not.
19      Q.  And then the Delaware Tech training program you
20  did finish?
21      A.  Yes, ma'am.
22      Q.  And when was that? When did you finish?
23      A.  '96.
24      Q.  What was that program called? Was there a name?

15 (Pages 54 to 57)

Snyder                                    v.                    Citi Steel, USA, Inc.
Terry L. Snyder                    C.A. # 04-970-JJF                  May 31, 2006

Page 58

1    A. It was '96, because I -- yes, '96. Automated
2  accounting, that was the name of the class.
3    Q. Was there some kind of certificate provided?
4    A. Yes, ma'am.
5    Q. How long did the course last?
6    A. It was a three-month program.
7    Q. Any other kind of education after high school?
8    A. Other than that, not to my knowledge. No.
9    Q. Any kind of --
10   A. I was getting ready, on the side, I wanted to do
11  -- I think a variety is good in life, and for some reason
12  I was always interested, even though you can't understand
13  doctor's handwritings too well, I wanted to do medical
14  transcription. And I was going to do that through Dawn
15  Institute, actually, and I was preparing to go there at
16  night after I would leave work at CitiSteel, and I was
17  going to do the night class and/or slash-weekend,
18  whatever we ended up coming up with.
19        We didn't make it that far. I ended up
20  putting everything on hold after that happened with
21  CitiSteel.
22   Q. And the Dawn Training --
23   A. Please forgive me. Excuse me.
24   Q. That's okay. The Dawn Training program, that was

Page 59

1  after you left CitiSteel. Do you know how long after?
2    A. No. I was getting ready to start that while I
3  was still working there. But when they let me go, and I
4  was sitting around crying, I thought about nothing. I
5  was mad and angry and steadily crying like it was the end
6  of my world. So that was out the window.
7    Q. Did you get accepted into the program?
8    A. Yes. Everything was fine. Everything was --
9  yes. You can contact them as well.
10        Forgive me for saying that, but if I can't
11  remember, I figured, you know, you can find out anything
12  you need or want to.
13   Q. But you were formally accepted into the program?
14   A. Yes.
15   Q. And had you paid any money for that?
16   A. No. I forget how that was actually going to
17  work. Again, you can contact them. There is a financial
18  young lady there, if she is still there, by the name of
19  Stephanie.
20        MS. DIBIANCA: Do you want to take a break?
21        MS. BREWINGTON: That's fine.
22        (Recess taken.)
23  BY MS. DIBIANCA:
24   Q. Dawn Training Centre was where we left off. I'll

Page 60

1  mark this as Snyder 2.
2        (Snyder Deposition Exhibit 2 was marked for
3  identification.)
4    Q. Have you had a chance to review this?
5    A. Yes. May I say something? I actually started
6  speaking with them, my original register with them was
7  the, either the end of 2002 or the very beginning of
8  2003.
9        And it may have been then, as far as the up
10  in the air of what course I was going to take, so that's
11  not listed on here. This just tells when eventually my
12  class was going to start.
13   Q. So you started the registration process --
14   A. Before, while I was still at CitiSteel, yes.
15  What this tells you here is when the class was
16  originally, actually, this class here that I ended up
17  choosing was going to begin.
18        But if you call them and ask them to fax or
19  so forth, whatnot, by your choice, my original
20  registration meeting with them, so forth, it all was
21  actually originally supposed to begin in 2003.
22        After collecting myself for awhile, I'm
23  thinking I could still do this. By this time I ended up
24  changing my mind. But my original start date, my

Page 61

1  original register with them, application, so forth, was
2  not in 2004. It was the end of 2002 or the beginning of
3  2003.
4    Q. End of 2002?
5    A. Or the beginning of 2003. They should have all
6  that listed in their file. I don't know how long they
7  keep their files.
8    Q. Do you have any other documents from them?
9    A. No. No.
10   Q. So you actually applied one year and eight months
11  before you -- no -- two years and eight months before you
12  started?
13   A. I wasn't exactly sure -- see, sometimes, I didn't
14  just --
15   Q. I'm going to ask: When did you first apply to
16  Dawn Training Centre?
17   A. I do not remember the date.
18   Q. Was it 2002? 2003?
19   A. The end of 2002 or the beginning of 2003.
20   Q. What happened for that --
21   A. I was supposed to start that year. And I had to
22  put it on hold, collect myself, get myself together
23  dealing with CitiSteel.
24        Now I'm thinking I'm going to go back and go

16 (Pages 58 to 61)

Snyder                                    v.                    Citi Steel, USA, Inc.
Terry L. Snyder                    C.A. # 04-970-JJF                  May 31, 2006

Page 62

1   ahead and go through this with this. Which that's --
2   this is actually the second date. This is not the
3   original start date of what this class was supposed to
4   be, because that's why I picked at night.
5        Granted, if I may have to stay after work or
6   if I'm willing to stay after work, my hours at CitiSteel
7   was to get off at 2:30. I'm thinking I could go home,
8   still maybe go to the gym, get a shower, eat dinner, go
9   to school. That's why I chose 5:30 at night.
10       This is not the original start date of which
11  I was supposed to begin that course.
12       Q.  So you originally intended to go --
13       A.  While I was at work.
14       Q.  I got to finish my question. I'm sorry.
15       A.  That's okay. Because you just interrupted me a
16  minute ago, but I forgave you, so please forgive me.
17       Q.  You originally intended to attend the classes at
18  Dawn Training Centre as a night course, while you were
19  still employed at CitiSteel?
20       A.  Yes, ma'am.
21       Q.  And then when did you officially decline to go?
22       A.  You mean to put it on hold? I cannot remember.
23  I assume they would have -- maybe they kept record of it,
24  all the dates.

Page 63

1   Q.  Would it have been before the semester started?
2   A.  I'm sorry, I'm not following you. That I put it
3   on hold?
4   Q.  Yes.
5   A.  Well, after that happened with CitiSteel I
6   couldn't mentally function. I was upset. Besides going
7   to the Department of Labor and, you know, I would go --
8   which I have copies of the faxes and start to try look
9   for a job. But I basically locked myself in the house
10  for two, three weeks after that happened with CitiSteel.
11  Q.  After what happened are we talking about? Are we
12  talking about a specific incident?
13  A.  Them escorting me off the grounds, after giving
14  me the benefit of the doubt of what Mr. Harris did. I
15  put it on hold. There was no way I could concentrate.
16  Q.  So that would have been after April 9th, around?
17  A.  10th. You know, I had to explain to them, I was
18  not mentally ready to bring something like that on.
19  Q.  Let me just make sure I have the dates right.
20  A.  Yes.
21  Q.  Sometime late 2002/early 2003 you first applied
22  to Dawn Training Centre?
23  A.  One time I went in there in my work clothes, my
24  steel-toe boots, fire uniform, yes.

Page 64

1   Q.  Did you send in an official application?
2   A.  I -- like I said, they should have everything on
3   file. Everything was -- I didn't send in. I met with
4   the owner of that school. Her name is Fran. So, I don't
5   know. Please feel free to call them.
6   Q.  We will. But you are here today. What we need
7   to do is get as much information as we can.
8   A.  I cannot remember.
9   Q.  Okay. Did you submit any kind of application?
10  A.  I filled out stuff for them, yes.
11  Q.  And that would have been late 2002/early 2003?
12  A.  Yes, ma'am.
13  Q.  I don't know Dawn Training Centre. So is it you
14  have to apply and they have to accept you or you just
15  have to register? Is there some kind of application
16  process?
17  A.  I think it is a little of everything, if I'm not
18  mistaken. Again, I did not know all their regulations
19  and their proceedings.
20  Q.  Did you get a notice that you had been accepted,
21  for example?
22  A.  Yes. I was going to start. I was supposed to
23  begin.
24  Q.  And the classes were scheduled to begin when?

Page 65

1   A.  I do not recall. In 2003. I think that course
2   may have been eight months long, if I'm not mistaken. I
3   do not recall the information on that course.
4   Q.  Was that the same kind of course, the medical --
5   A.  Yes.
6   Q.  -- medical transcriptionist?
7   A.  Yes. There may have been another course I had
8   been interested in. That's why then at this point I
9   couldn't. I'm pretty sure it was still the medical
10  transcription.
11  Q.  And you intended to take that class at night
12  also, so that you could have worked at CitiSteel during
13  the day and gone to that at night; is that right?
14  A.  That's what my intentions were, yes.
15  Q.  And then you put it on hold, decided not to
16  attend?
17  A.  Exactly.
18  Q.  And then you put it on hold again after you got
19  terminated on 4/10?
20  A.  No. I didn't put it on hold until after they
21  terminated me.
22  Q.  But the class was ongoing at night. You said you
23  were going to work at CitiSteel --
24  A.  I was going to work and go at night. And that's

17 (Pages 62 to 65)

Snyder                                  v.                      Citi Steel, USA, Inc.
Terry L. Snyder                  C.A. # 04-970-JJF                      May 31, 2006

Page 66

1  when I had to stop it. I couldn't do it at that time. I
2  didn't want to start something new when I was crying and
3  sitting around paranoid because --
4      Q. Was the class -- go ahead, please.
5      A. You go ahead, please.
6      Q. No, I don't want to interrupt you. I'm sorry.
7      A. Well, I already told you, I canceled it. Had to
8  stop it. I was upset when they escorted me off the
9  grounds. There was no way I could start a whole new
10  thing in my life such as taking a course when I just got
11  terminated after being sexually harassed and they escort
12  me off their grounds.
13          I did nothing wrong. I was fiercely upset.
14  So I did not want anything new in my life such as taking
15  a class.
16          And besides that, the main thing as far as
17  priorities go, would be seeking employment before taking
18  a new course. So, yes, after CitiSteel escorted me off
19  the grounds, I stopped the course.
20      Q. So it is safe to say, then, that the course was
21  not scheduled to start until after 4/10/03?
22      A. There was -- no. No, there was a course to start
23  that year. In 2003. Not 2004.
24      Q. Right. So that's what I'm trying to nail down is

Page 67

1  the time that the class was supposed to start.
2      A. I do not know.
3      Q. But it would have had to have been after April
4  10th?
5      A. April 10th, 2004, yes, ma'am.
6      Q. That's exactly all I'm looking for.
7      A. I thought I answered that, but I guess not.
8      Q. Okay. When did you first contact legal counsel?
9      A. A couple weeks or maybe a week. I'm not exactly
10  sure. It is all documented. I can't remember
11  everything. I was upset at that time so I cannot
12  remember the exact date and time.
13      Q. Let me ask you, who is the first legal counsel
14  that you did contact?
15      A. Neuberger, Thomas Neuberger.
16      Q. What is the time frame of contacting Mr.
17  Neuberger's office? For example, were you involved with
18  the EEOC charge or were you at the complaint stage?
19      A. I did the EEOC on the 9th, the day before they
20  escorted me off. I did unemployment. I went to the
21  Department of Labor the day after they escorted me off.
22  So the 9th was EEOC. 10th they got rid of me. The 11th
23  I went to the Department of Labor. Neuberger was after
24  that. The exact date and time, I...

Page 68

1      Q. I'm not looking for an exact date and time at
2  all?
3      A. Very good.
4      Q. I'm just trying to get a sequence of events.
5      A. I understand.
6      Q. So you would have said Neuberger would have been
7  within maybe a month?
8      A. Oh, definitely.
9      Q. Maybe even as little as a week?
10      A. Could be. Please look it up.
11      Q. Well, I can't look it up. I don't have the
12  answers. That's why I need to have you deposed.
13      A. Well, I can't remember, so I'll have to maybe do
14  some studying so I can answer these properly the next
15  time I'm being recorded, so I can recall.
16          Because all I did was cry and sit around and
17  call people mean names for being so disgustingly rude to
18  me. To myself I called them that.
19      Q. So Neuberger would have been less than a month
20  then after April 10th?
21      A. Mm-hmm.
22      Q. Is that a yes?
23      A. Yes.
24      Q. Obviously, he is not representing you today.

Page 69

1  When did his representation of you end?
2      A. Excuse me. Eight months later.
3      Q. Why did it end?
4      A. Because I didn't --
5          MS. BREWINGTON: I object.
6          MS. DIBIANCA: Go ahead.
7          MS. BREWINGTON: I don't know if she should
8  be answering that question. Attorney-client privilege.
9          MS. DIBIANCA: Well, I would say no
10  attorney-client privilege. I'm not asking what they
11  discussed.
12          MS. BREWINGTON: Well, I want to make sure
13  she doesn't discuss anything that they have discussed.
14          MS. DIBIANCA: Do you want to instruct her
15  to that?
16          MS. BREWINGTON: I instruct you not to
17  discuss anything that you discussed with your former
18  attorney.
19          THE WITNESS: Okay. Am I allowed to answer
20  why he is not my attorney?
21          MS. BREWINGTON: If it is something that you
22  discussed with your attorney, you cannot answer that
23  question. Attorney-client privilege.
24          THE WITNESS: I guess I can't answer that.

18 (Pages 66 to 69)

| Snyder | v. | Citi Steel, USA, Inc. |
| Terry L. Snyder | C.A. # 04-970-JJF | May 31, 2006 |

Page 70

1  BY MS. DIBIANCA:

2  Q.  Who ended it?  Did Mr. Neuberger?

3  **A.  I did.**

4  Q.  You did.  Okay.  So then if it was your decision

5  I'm going to say that was safe to assume that it was not

6  something that he discussed with you, that you discussed

7  with him.  So if you made the decision what was the

8  decision based on?

9  **A.  I don't -- him and I discussed it, and you are**

10  **telling me not to repeat anything that him and I**

11  **discussed.**

12      MS. BREWINGTON:  Exactly.

13  **A.  Then I guess I'm unable to answer that question**

14  **for you, ma'am.**

15  Q.  Well --

16  **A.  You are asking me why I got rid of him.**

17  Q.  I am.

18  **A.  And him and I discussed why I was getting rid of**

19  **him, and she told me not to answer anything that was**

20  **discussed in private with that attorney.  So since we did**

21  **talk about it, am I correct by saying I should not answer**

22  **that question?**

23      MS. BREWINGTON:  You should not answer that

24  question.

Page 71

1  **A.  Okay.  Then, I won't.**

2  Q.  I'm not going to waste our time.  Hold us up

3  anymore.

4      Then who was your next counsel?  Eight

5  months would have been December, if I'm counting right.

6  **A.  Give or take.  Again, it is documented.  It was**

7  **not an entire year.  So...**

8  Q.  Who was the next counsel?

9  **A.  Myself.  That's when I contacted the federal**

10  **court.**

11  Q.  Was there another lawyer before Miss Brewington's

12  representation of you?

13  **A.  No, no, ma'am.**

14  Q.  Then if you can look on the complaint, which is

15  Exhibit 1 --

16  **A.  Do I have that?**

17      MS. BREWINGTON:  It is part of this.

18  **A.  Is it the same booklet?**

19  Q.  Yes.  Number 1, the sticker at the bottom should

20  say Snyder 1.

21  **A.  Yes, ma'am.**

22  Q.  I believe it referred to Mr. Aber --

23  **A.  Oh --**

24  Q.  -- in this document.

Page 72

1  **A.  Forgive me.  I spoke with him.**

2  Q.  Okay.  Did he represent you?

3  **A.  No.  I didn't go back to see him.  I didn't go**

4  **back to see him.**

5  Q.  And then --

6  **A.  Forgive me for that.  I spoke to him over the**

7  **phone, and I met with him once.  That was it.**

8  Q.  And you declined to hire him?

9  **A.  Exactly.**

10  Q.  And then when did Miss Brewington's office become

11  involved?

12  **A.  I can't remember the date.  I cannot recall at**

13  **this time.**

14  Q.  Would it have been less than a year after Mr.

15  Neuberger and you ended your relationship?

16  **A.  I'm not sure.**

17  Q.  Have you spoken with any other attorneys about

18  this case other than Mr. Neuberger's office and Mr.

19  Aber's office and, of course, your current counsel?

20  **A.  No, ma'am.**

21  Q.  How did you come to pick Margolis Edelstein as a

22  firm?

23  **A.  Actually they called me.  A lawyer referral, I**

24  **did.**

Page 73

1  Q.  Okay.  I'm going to jump to your employment with

2  CitiSteel now.

3      When did you first -- actually, you said

4  that I was supposed to look at some records for

5  Neuberger.  You said look it up.  Those documents have

6  been submitted already?  Produced already?

7      MS. BREWINGTON:  Objection, vague.

8      MS. DIBIANCA:  I can go back and have her

9  pull it if you want.

10      MS. BREWINGTON:  I don't think she knows

11  what you are talking about.

12      MS. DIBIANCA:  That's fine.  Can you look

13  for me, the deponent said something about I should look

14  it up, I can look it up.  I want to look it up to make sure.

15      THE WITNESS:  If you are allowed.

16      You mean of the dates he was my lawyer?

17      MS. DIBIANCA:  You said on the record that

18  I, meaning me, myself, should look it up, referring to

19  Mr. Neuberger --

20      MS. BREWINGTON:  Can you actually read the

21  context of the conversation.

22      THE WITNESS:  The dates, not why I got rid

23  of him, the dates.

24      (Ms. DiBianca reviewing reporter's computer

19 (Pages 70 to 73)

Page 74

```
 1   screen.)
 2        MS. BREWINGTON: Can you read it instead? I
 3   want to understand what you are talking about here.
 4        (The record was read:
 5        Q. I'm not looking for an exact date and
 6   time at all.
 7        A. Very good.
 8        Q. I'm just trying to get a sequence of
 9   events.
10        A. I understand.
11        Q. So you would have said Neuberger would
12   have been within maybe a month?
13        A. Oh, definitely.
14        Q. Maybe even as little as a week?
15        A. Could be. Please look it up.)
16   BY MS. DIBIANCA:
17        Q. So are there documents that have not been
18   produced relating to that? Your words "please look it
19   up" indicates to me --
20        A. You can look up the date when I first contacted
21   Neuberger.
22        Q. Where would I look that up?
23        A. I guess I could look it up in my file when I get
24   home.
```

Page 75

```
 1        Q. That's what I'm asking. Are there other things
 2   that haven't been produced at this point?
 3        A. I hand over anything that is requested of me,
 4   whatever I have in my possession. So whether I have
 5   already submitted it, I don't know if Katherine made
 6   copies. I do not know.
 7        Q. Okay. So if there are additional documents that
 8   you think you have, certainly not as to the nature of
 9   your representation with Mr. Neuberger, but any
10   additional documents relating to this case, they have to
11   be produced. So if you go home and you think there is
12   something that you haven't either turned over, then I'm
13   going to ask that you do that to your counsel and then
14   she will make sure that they get to me.
15        A. Yes.
16        Q. I'll do Snyder 3.
17        (Snyder Deposition Exhibit 3 was marked for
18   identification.)
19        A. What is this? What is this?
20        Q. I'll submit to you that this was produced by what
21   is called a FOIA request, where the EEOC turns over their
22   file regarding their investigation and this, I believe,
23   my understanding is a telephone call that someone at the
24   EEOC received from you on March 1st, 2004.
```

Page 76

```
 1        A. Who is T/C?
 2        Q. That indicates telephone call.
 3        A. From Carmella Patrone.
 4        Q. No. CP means charging party. That's just short
 5   for charging party, which you would have been at the
 6   time. You would have been charging party and CitiSteel
 7   would have been respondent. This is the legal
 8   terminology for --
 9        A. I'm not following you. This is a telephone call
10   that was recorded? I made a telephone call?
11        Q. I believe that is correct, that the person
12   at the EEOC received a telephone call from charging
13   party, which would have been you, in the --
14        A. Why would I ask, "Did you come do inventory yet?"
15   Why would I ask EEOC that?
16        Q. I believe it means investigation. Did you --
17        A. Oh, investigate yet, okay, correct. Thanks for
18   helping me understand. I'm sorry, I don't understand.
19        Q. If you have never seen it before it is not
20   obvious, certainly.
21        A. Okay.
22        Q. Now, the second paragraph that says, "My lawyer
23   knows my dad has indicates money - wants to hire his
24   shrink (wants $20,000 up front!) --
```

Page 77

```
 1        A. His shrink?
 2        MS. BREWINGTON: I'm going to object on the
 3   record and instruct her not to discuss any conversations
 4   that she had with her attorney.
 5        MS. DIBIANCA: Okay. Well, third parties
 6   being told about it breaks privilege.
 7        MS. BREWINGTON: That's fine. But I'm
 8   asking her not to discuss anything she discussed with her
 9   attorney.
10        MS. DIBIANCA: Except for what is not
11   privileged, which privilege has been broken when the
12   matter is discussed outside the attorney/client
13   relationship.
14        MS. BREWINGTON: Well, I'm not sure what we
15   are about to discuss. But I'm asking her not to discuss
16   -- let me put it on the record -- anything that she has
17   discussed with her attorney that she has not discussed
18   with anyone else.
19        MS. DIBIANCA: That's fine. Yes, that's
20   fine.
21   BY MS. DIBIANCA:
22        Q. Do you understand that to mean that once it has
23   been discussed, in other words, if you discussed your
24   appointment that you took, you know, a dog to a groomer
```

20 (Pages 74 to 77)

Snyder                                      v.                    Citi Steel, USA, Inc.
Terry L. Snyder                    C.A. # 04-970-JJF                    May 31, 2006

Page 78

1  with your attorney, that would not be attorney/client
2  privileged if you turn around and talk to the groomer
3  about that appointment.
4      **A. Okay.**
5      Q.  So if it is solely limited to you and your
6  attorney, then that is privileged information. You are
7  not going to discuss that.
8      **A. Okay.**
9      Q.  If I seem to be asking about it, I'm not asking
10 about it. But anything that you discussed with someone
11 other than your attorney is not privileged. Does that
12 make sense?
13     **A. Yes.**
14         MS. DIBIANCA:  Lori, does that sound correct
15 to you?
16         MS. BREWINGTON:  That's fair. So anything
17 you discussed with others, other than your attorney, you
18 can certainly discuss if she has asked you about that.
19 BY MS. DIBIANCA:
20     Q.  That's the only extent I'm going to be asking.
21         So this indicates that you had a discussion
22 with someone from the EEOC?
23         MS. BREWINGTON:  Actually I'm going to
24 object to that. That doesn't indicate that. Where does

Page 79

1  it say that?
2          THE WITNESS:  It says something about a
3  shrink. I never talked about no shrink with anybody.
4          MS. BREWINGTON:  It doesn't say anything
5  from the EEOC. There is no authentication in terms of
6  who wrote it.
7          THE WITNESS:  It is handwritten.
8          MS. BREWINGTON:  I don't know whether she
9  had this discussion with an EEOC person or not.
10         THE WITNESS:  I have never even probably
11 said the word shrink throughout these, all these years.
12         MS. BREWINGTON:  That's my concern.
13         THE WITNESS:  I don't know who got this from
14 where. I don't know.
15         MS. DIBIANCA:  Well, I'll submit to you that
16 this is from the EEOC. It came with a letter, that I can
17 certainly produce to you, as part of the FOIA request.
18         I'll also tell you that, and I can pull this
19 document as well, that the file from Mr. Neuberger was
20 produced to us as well, from Mr. LaRosa. Do you want me
21 to pull that?
22         MS. BREWINGTON:  Are you asking me?
23         MS. DIBIANCA:  Yes.
24         MS. BREWINGTON:  What I want is for my

Page 80

1  client to be aware she is not to discuss anything that
2  happened between her and her attorney. Your
3  representation that this matter occurred, I don't know
4  whether -- she doesn't seem to know anything about this
5  document and this conversation with an EEOC rep and
6  that's my concern. I know you say that the privilege is
7  broken if she has discussed it, but she is saying she
8  never discussed this with anyone.
9  BY MS. DIBIANCA:
10     Q.  Is that what you are stating?
11         MS. BREWINGTON:  Well, I don't know.
12     **A. What? I'm sorry?**
13     Q.  Are you stating that you have never had a
14 discussion with an EEOC representative relating to this
15 information?  Is that what you are stating on the record?
16     **A. I do not recall. I'm not saying no. But it is**
17 **fabricated. It is not true. Maybe you can cut some of**
18 **this stuff out because I have no clue what they are**
19 **talking about. Wants us to hire his shrink. This makes**
20 **no sense to me.**
21     Q.  Okay. So let me ask you --
22     **A. I don't know what you are talking about.**
23     Q.  Let me ask just a very clear, short question.
24 Have you ever discussed with any representative from the

Page 81

1  EEOC any matter relating to a request from your lawyer to
2  hire a shrink or a psychiatrist and to pay $20,000 up
3  front?
4      **A. I'm not allowed to answer.**
5          MS. BREWINGTON:  Can I object in terms of a
6  compound question. But she can certainly answer that.
7          THE WITNESS:  Are you telling me to answer
8  it? No.
9          MS. BREWINGTON:  I'm objecting in terms of
10 the compound question. But you can answer that question.
11         THE WITNESS:  In other words, what?
12         MS. BREWINGTON:  Do you understand the
13 question? Do you want her to repeat it?
14         THE WITNESS:  Yes. Do you want me to answer
15 it? I will if you tell me to.
16 BY MS. DIBIANCA:
17     Q.  I can rephrase. Have you ever discussed with any
18 representative from the EEOC, ever had a conversation
19 with any representative from the EEOC that your lawyer
20 wants you to hire his shrink and to pay $20,000 up front?
21     **A. No. Am I allowed to answer this?**
22         MS. BREWINGTON:  I don't know what you are--
23         THE WITNESS:  Am I allowed to answer this,
24 yes or no?

21 (Pages 78 to 81)

Snyder                                     v.                        Citi Steel, USA, Inc.
Terry L. Snyder                   C.A. # 04-970-JJF                        May 31, 2006

Page 82

1          MS. BREWINGTON: I don't know what you are
2    about to say. Again, I'm concerned --
3          MS. DIBIANCA: You may not discuss with your
4    attorney during this deposition.
5          THE WITNESS: There is only one thing that's
6    true.
7    BY MS. DIBIANCA:
8     Q.   On this?
9     A.   On this entire page, pointblank.
10    Q.   Tell me what that is.
11    A.   Am I allowed?
12    Q.   You are allowed to answer unless she tells you
13   not to.
14    A.   They wanted $20,000 after they found out my
15   father was rich.
16    Q.   Who is "they"?
17    A.   Neuberger.
18    Q.   So nothing else on this document --
19    A.   Nothing, nothing. I have no clue what a friend
20   of a friend. Play and let me hear my voice. Maybe I'll
21   remember.
22          I have no clue. Nobody ever talked about
23   hiring, hiring somebody's shrink. None of this makes any
24   sense to me at all, no.

Page 83

1     Q.   Did you contact the EEOC and inquire as to
2    whether they had conducted an investigation yet?
3     A.   Yes, I did, because I knew they never came down
4    to CitiSteel grounds. They lied and they said they were
5    coming down, on the grounds. And I said, "Physically on
6    the grounds you are coming?" They never did.
7          And so I called them up, asking why, you
8    know, that's what part of their job is, is to protect
9    people like me from things like this happening. And
10   nobody showed up on the grounds, physically with their
11   body and soul, and conducted an investigation.
12          So, yes, I did. But, there is only one
13   little thing in here that is true, and that is them
14   wanting $20,000 out of the blue. So I, immediately, I
15   felt, well, I can't trust this lawyer. I said no.
16          My father says, he says, "Look, I'll give --
17   how about if you take some time and think about it?" My
18   father says, "Terry will think about it for two weeks."
19          I was angry. I knew right then, if I can't
20   trust you, why would I want you.
21          So I already knew. And I told my father,
22   "If you cut them a check for $20,000, you are wasting
23   your money because I'm not coming back here to see them."
24    Q.   Did you tell an EEOC representative that your

Page 84

1    lawyers were no longer fighting for you?
2     A.   At my request, maybe I did, maybe I didn't. I'm
3    sure I did because I told them about they wanted $20,000.
4    So if I told them that I was refusing to pay them
5    $20,000, because to me, that's untrustworthy, so yes,
6    I'm sure I did. Because I knew that they were no longer
7    going to fight for me because I did not want them to.
8     Q.   Did the EEOC ever advise you that they had
9    received a position statement from CitiSteel and that
10   they would send it to you?
11    A.   I received statements, some kind of a package
12   like this from CitiSteel stating what people has said,
13   which is filled with nothing but lies, of course. And I
14   had to rebuttal back. If I'm using -- if I'm saying it
15   correctly.
16    Q.   What I'm trying to determine is whether this
17   document is, in fact, fabricated, as you claimed?
18    A.   Mm-hmm.
19          MS. BREWINGTON: Objection,
20   mischaracterization.
21    A.   Excuse me.
22    Q.   So I'm just going --
23    A.   Swallowing my juice. Forgive me.
24    Q.   I'm just going through line by line to determine

Page 85

1    what indicates to you that this may have been fabricated.
2     A.   About a shrink. Nobody -- nobody -- my lawyer --
3    I don't know what anybody is talking about a shrink.
4    What else? The thing is true is I no longer wanted them
5    to fight for me because out of the blue they wanted
6    $20,000. So whatever this whole thing...
7          "A friend of a friend is a lawyer." I have
8    no clue. I don't have a friend that has a friend that
9    has a lawyer friend. That's not true.
10    Q.   Okay. So you did not tell an EEOC representative
11   that you have friend of a friend who is a lawyer?
12    A.   No. Unless you can produce that with me saying
13   that, no. I do not recall that, no.
14    Q.   No, or you do not recall it?
15    A.   No.
16    Q.   When did you first start working for CitiSteel?
17    A.   It may have been August 3rd. It was a Friday.
18   Because I even went in the next day, which was a
19   Saturday, which is the day he said he was going to take
20   me out for a beer. He walked me out to the parking lot.
21   It was around 1:00 o'clock. I still actually have my
22   time sheets from that.
23    Q.   Did you work for them as a temp first?
24    A.   Yes, ma'am. I became an official -- never mind.

22 (Pages 82 to 85)

B-0141

Snyder
Terry L. Snyder

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

---

Page 86

1  I'll wait for you to ask.
2      Q.  Go ahead.
3      A.  Would you like?
4      Q.  You worked for them?
5      A.  I became an official employee, I finally took
6  them up on their offer on the 17th of September, 2003.
7      Q.  September 17?
8      A.  Yes, ma'am.
9      Q.  What was the temp company?
10     A.  On the -- they are called Bernard Personnel, but
11  when you receive your paycheck it says Delaware Temporary
12  Services Or Incorporated.  But if you called them or so
13  forth, two names, Delaware Temps and Bernard.
14     Q.  And then so when you started August 3rd that
15  would have been through the temp agency?
16     A.  Yes, ma'am.
17     Q.  And then you say you finally took them up on
18  their offer.  What are you referring to with regard to
19  that?
20     A.  CitiSteel.  CitiSteel's offer.
21     Q.  Offer for what?
22     A.  To become an official employee, for me to stay.
23     Q.  When did they make you that offer?
24     A.  Well, Mr. Harris started asking me if I would

---

Page 87

1  stay the second day.  I did not comply.  I said, "Well,
2  let's give it some time.  Let me see if I can overcome my
3  fear of heights.  See if I like the job, if you like my
4  work, so forth."
5          So be it.  I learned to just look straight
6  ahead and not down climbing them steps.  Still had the
7  fear when I had to walk the catwalk.  You know, somebody
8  would usually like hold on to like my fire jacket or I
9  would hold on if somebody was walking in front of me,
10  like I would hold, they would let me hold on.  Somebody
11  would stand behind me and somebody stand in front
12  of me usually and kind of like hold on to the fire
13  jacket.  But I get real nervous being up that high,
14  actually.
15     Q.  Did they give you any type of official offer, job
16  offer to be permanent?
17     A.  Yes, ma'am.
18     Q.  Who gave you that?
19     A.  Well, I informed Mr. Harris that I would accept
20  the offer, and I guess he called Mr. Downie and they
21  started the hiring process.
22     Q.  What was that?  What did that involve, the hiring
23  process?
24     A.  I can't recall, if I had to watch a movie.

---

Page 88

1          Just basically interview, filling out a lot
2  of paperwork, pictures taken, badges, gear.  Well, I
3  already had some gear.  You have to wear a hard hat to
4  walk through.  Just basically that stuff.
5      Q.  So official full-time employment with CitiSteel
6  was September 17, 2001?
7      A.  '1, ma'am.
8      Q.  Did your job change between the time you were a
9  temp and the full-time position?  Did you have any other
10  changes?
11     A.  More was added to my job description.
12     Q.  Can you tell me about that?
13     A.  Just more to do.
14     Q.  Let's start with when you started as a temp in
15  August.  What was your job description then?
16     A.  Well, they never showed me -- once I became an
17  official employee I cleaned out the desk and, you know, I
18  wouldn't come in here and just start cleaning out your
19  desk and throwing your stuff away because what may mean
20  nothing to me may mean a whole lot to you.  So I didn't
21  touch anything basically unless I was told.
22          At first I was just informed and what I
23  would do is filing, a lot of filing, keeping binders,
24  cleaning up and reorganizing.  There was no organization

---

Page 89

1  up there at all.  Nobody could never find anything.  And
2  just basically informed I would be running some reports
3  and keeping a few things in the computer for them.
4      Q.  What was your job title?
5      A.  Actually, actually, clerk typist.  But it was more
6  like administrative assistant as well.  It was
7  actually -- in my eyes it was all of the above because I
8  did more than just clerk typist.
9      Q.  Who did you report to?
10     A.  My two supervisors, my main supervisor was the
11  general supervisor, Randolph Harris, and my second
12  supervisor, Dennis Ford.
13     Q.  General supervisor, general of what?  Was that of
14  a department?
15     A.  Yes.
16     Q.  What department?
17     A.  The furnace, actually, department.
18          Mr. Harris felt he was above Mr. Ford.  Mr.
19  Ford did not feel he was above him.  He felt they were
20  equal.  But all I know is I tried to stay out of it.  All
21  I know is they both were my supervisors.
22     Q.  But you said "he" a lot.  I want to make sure I'm
23  getting the right people.
24     A.  Forgive me.

23 (Pages 86 to 89)

Snyder                                  v.                      Citi Steel, USA, Inc.
Terry L. Snyder                    C.A. # 04-970-JJF                May 31, 2006

Page 90

1    Q.  That's okay.  If you want to restate it, you may.
2    A.  Mr. Harris was the general supervisor.
3    Q.  Okay.
4    A.  Mr. Ford was a supervisor.  They both were my
5    supervisor.  Mr. Harris felt he was above Mr. Ford.  Mr.
6    Ford did not agree, and he felt Mr. Harris wasn't his
7    boss.  I tried to stay out of it and just did what I was
8    told.
9    Q.  Officially were they equals or was one above the
10   other?
11   A.  Mr. Harris seemed to feel he was above Mr. Ford.
12   Truthfully, legally and on their job titles and their
13   pays, I do not know.  I know they would argue sometimes
14   because they would not agree, and when Mr. Harris wasn't
15   getting his way.
16        But I do not know legally by CitiSteel's, in
17   CitiSteel's eyes what they were.  All I know is Harris
18   thought he was at the very tippy top and Ford thought
19   they were equal.
20   Q.  Did anyone ever tell you that you should report
21   to one or the other?  You should give preference to one
22   or the other as far as who was higher in the hierarchy?
23   A.  After I yelled and I got really, really angry at
24   Mr. Harris at one point, he would not -- he was bothering

Page 91

1    me.  He stood there eating cough drops for 20 minutes at
2    one point.  He started -- he got scared.  I'm not sure if
3    that cough drop incident was right before or right after,
4    but there was an entire month Mr. Harris wouldn't speak
5    to me.  And I'm his employee.  You have to speak to your
6    employee.
7         And at one point I sent an e-mail requesting
8    or letting them know I needed a day off next week.  I
9    always usually let them know or request in advance.
10   Usually I never took lunch.  If I did, I would go with
11   Carmella and I would ask and request in advance.
12        And I always, you know, I always did this by
13   e-mail.  And at one point I received an e-mail, I think
14   it was from Harris.  I tried before I -- once they
15   started following me, I knew that they were going to get
16   me out of there.  That morning I started printing as many
17   e-mails as I could without them realizing that, you know,
18   showing proof that I requested when I needed a day off or
19   when I had to leave early.
20        Well, there is an e-mail of Mr. Harris -- I
21   don't know if it is Harris or Ford.  I'm pretty sure it
22   is -- I'm pretty sure it is Ford, stating -- or no,
23   Harris.  Please forgive me.  That he is -- I'm not to
24   report to him.  He didn't want me reporting to him

Page 92

1    anymore, you know.
2         Mr. Harris was a paranoid person, so, which
3    he should have been.  You shouldn't be paranoid if you
4    are not doing anything wrong.  So just he was trying to
5    -- he started to try to stay away.  He got scared, which
6    he should have been.
7         So I did receive instructions to only start
8    reporting to one supervisor.
9    Q.  When was that?
10   A.  I'm going to say February.  It was after Mr.
11   Harris -- when I yelled at him, he ran out of my office.
12   That was in January, when he said about coming to work
13   wearing a dress with no panties.  He ended up going an
14   entire month without speaking to me.  I think that was in
15   February, and I'm pretty sure I received that e-mail
16   during that month, of 2003.  Forgive me.
17   Q.  What made you think Harris thought he was above
18   Ford?
19   A.  Well, he would say so, you know, behind closed
20   doors.  Him and Mr. Ford would argue.  They would have
21   their disagreements.  Randolph wanted things done one
22   way, and Ford -- you know, Mr. Harris tried to make it
23   very clear he is the top dog.
24   Q.  How did he do that?

Page 93

1    A.  By saying, "I am the top dog."
2    Q.  Did he say that in front of Mr. Ford?
3    A.  I don't recall.  I was always steadily busy, on
4    the move.  I would have to go from one office down the
5    hall to the next.  So I'm sure Mr. Ford heard him plenty
6    of times.
7    Q.  Did they ever have a disagreement that you saw
8    about this?
9    A.  I kept my mouth shut.  I didn't get involved.
10   The most I would say, if they were doing it in the
11   hallway, you know, or if it had something to do with me,
12   I would just say, "You two sound like a married couple
13   and don't bring me into it."  I did not want to be in the
14   middle of that kind of stuff.
15   Q.  So you say they sound like a married couple.
16   They were like arguing?
17   A.  Yes.
18   Q.  Did they get along?
19   A.  Sometimes they would.  I mean, they would have
20   each other's back, I guess, to put it like that.  But
21   then they wouldn't, if the disagreement came along.
22        They would act unfond of each other, but
23   then they would.  I guess like a married couple as an
24   example kind of.

24 (Pages 90 to 93)

Snyder                          v.                    Citi Steel, USA, Inc.
Terry L. Snyder          C.A. # 04-970-JJF                  May 31, 2006

Page 94

1    Q.  Was it work-related?
2    A.  Oh, yes.
3    Q.  Then did your job duties change when you went to
4    full-time with CitiSteel?
5    A.  See, not change change.  But, I mean, because I
6    was still in the learning process, you know, and but I
7    wasn't aware in the beginning and I never -- I didn't see
8    the job description in the beginning.
9    Q.  Did you see it later?
10   A.  Yes, sure.  Yes.
11   Q.  That was the job description for the clerk
12   typist?
13   A.  Yes.  And then I started having to do quality
14   procedure, and I would have to revise them, and then they
15   would have to be pass around, get signatures from each
16   supervisor, come back to me.
17         I would have to make umpteen copies going
18   around to different office and putting the new revised
19   procedures in their binder that stays in their office.
20   Everybody had to have one.
21         Things were added, which I didn't mind, you
22   know.
23   Q.  I guess I should be clear.  The quality
24   procedures part, was that added right after you became

Page 95

1    full-time or just later, eventually?
2    A.  Later, eventually.  I kept learning as time came
3    about, mm-hmm, yes.
4    Q.  Between Mr. Ford and Mr. Harris, did you have
5    equal contact with them?  Were they both interacting with
6    you daily?  I'm just trying to figure out how it works
7    with two supervisors.
8    A.  Sure.  Well, one would tell you to do something
9    one way and the other one would come along and tell you
10   to do it another way.
11         For me to stay out of it, I would have to
12   stand right outside -- one office was here and one office
13   was here (indicating).  So I would say, "You two decide,
14   you two figure it out, and then you tell me."  Because I
15   didn't want to choose sides or make one feel like, you
16   know, I was choosing the other or going to do something
17   wrong or not listening to my supervisor, in other words.
18         But when you have two, I think, my beliefs
19   is they need to agree and decide and understand before
20   they approach me.  So...
21   Q.  Did you interact --
22   A.  Yes.
23   Q.  Did you interact with one more than the other?
24   A.  A lot it was Randolph Harris.  I guess after I

Page 96

1    freaked out on him --
2    Q.  When was that?
3    A.  Started in January.  I had enough.  He backed
4    away.  So it was like Mr. Ford was interacting with me
5    even more so.
6         Now, but please forgive me, as far as
7    inventory is concerned, Ford, I worked directly with
8    Carmella and Ford a lot on the inventory, from the get
9    go.  Mainly more so, you know, of course than Mr. Harris.
10   Q.  Okay.  And then before you went to CitiSteel
11   where did you work?
12   A.  Well, I always stayed certified as a flagger,
13   flagger for a construction company.  Excuse me.  I don't
14   recall.
15   Q.  The last job you had prior to CitiSteel?
16   A.  I don't recall.  No.
17   Q.  How about in the previous five years before
18   CitiSteel?
19   A.  Oh, a bank.
20   Q.  Okay.
21   A.  A bank.  April, I think.
22   Q.  That would have been April before you went to
23   CitiSteel?
24   A.  Yes.

Page 97

1    Q.  Do you know the name of the bank?
2    A.  No.
3    Q.  Any other places that you recall working prior to
4    CitiSteel?
5    A.  Oh, throughout my life?
6    Q.  No.  Just the past maybe five years.
7    A.  Delaware Park.  I worked at Delaware Park.
8    Q.  Doing what?
9    A.  I was -- the judges that judge the horse racing,
10   they are called the stewards.  I worked -- I was their
11   secretary.
12   Q.  Was that full-time work?
13   A.  Yes, ma'am.
14   Q.  Do you have any recollection as to when that
15   would have been?
16   A.  Actually, they called me on a Saturday morning,
17   it was May the 11th of '96, the day after my graduation
18   of the automated accounting.  Well, the graduation
19   ceremony may have been a little bit before, but it was --
20   something happened on May 10th.  It may have been that
21   graduation ceremony.
22         And I couldn't believe somebody called on a
23   Saturday to interview me, but, see, I wasn't aware, a
24   Saturday for the horses at Delaware Park is like a Monday

25 (Pages 94 to 97)

Snyder                                    v.                      Citi Steel, USA, Inc.
Terry L. Snyder                    C.A. # 04-970-JJF                    May 31, 2006

Page 98

1 for the rest of society. And they called me in for an
2 interview for that day. And I went.
3           And I stayed there until -- did you want to
4 know this?
5     Q.  Yes, please.
6     A.  -- November of '98.
7     Q.  Why did you leave Delaware Park?
8           MS. BREWINGTON:  Objection, relevance.
9           MS. DIBIANCA:  There is no objection for
10 relevancy for depositions purposes, Lori.
11          MS. BREWINGTON:  We have to preserve the
12 record.
13          MS. DIBIANCA:  No, you don't. If you want
14 me to pull the local rule, I'll be happy to do that.
15 There is no objection for relevancy in deposition
16 testimony.
17          MS. BREWINGTON:  I object. Go ahead. You
18 can certainly answer.
19          THE WITNESS:  Excuse me for saying. One day
20 I was coming down the hall -- see, I could have came into
21 my office -- I work side by side with a secretary that
22 had been the judge's secretary for over 13 years.
23          Now, I could have came in this way
24 (indicating) where my door, my desk is right here at this

Page 99

1 office. Janet and I, we had two desks in our office, and
2 then our office connected to the stewards.
3           Well, I came in this way (indicating). As I
4 was coming down the little corridor, Janet walked out of
5 the steward's office with a gold piece of paper. And by
6 the time she came across, by the time I got down the
7 little corridor, the gold piece of paper was on my desk.
8           And I said, "What is this?" And she said,
9 "I don't know, but it better not be a merit increase."
10 And I said, "What?"
11          And so I went to the director of finance,
12 Mr. John Rooney, and I said, "Would you please tell me
13 what this is?" And he said, "Yes, I gave you a raise."
14          And I said, "Wait a minute," I said, "the
15 stewards haven't had a raise." I said, "Janet is upset."
16 I said, "She hasn't had a raise in 13 years." I said, "I
17 don't want the raise."
18          He said, "You got the raise. You are going
19 to take it, and it is none of Janet's business and she
20 shouldn't have been snooping on your desk."
21          Janet kind of quit talking to me. Things we
22 should have interacted with on a daily work basis, we had
23 to tend to the jockeys, the horse owners, the trainers
24 and so forth, and so, you know, slowly but surely, I

Page 100

1 just, I didn't want to be there anymore, basically. They
2 were treating me different. And I felt guilty for having
3 a raise and she didn't get one. So...
4     Q.  Did you resign?
5     A.  Actually, no.
6     Q.  What happened?
7     A.  I slowly but surely quit going there. I didn't
8 want to be there anymore. So...
9     Q.  Like did you just stop going?
10    A.  I stopped going. And then they officially
11 terminated me, yes.
12    Q.  Okay. So when you said you didn't resign, you
13 mean you didn't give a resignation notice or something?
14    A.  No.
15    Q.  And then after that where did you go?
16    A.  I don't recall.
17    Q.  That would have been November 1998; is that what
18 you said?
19    A.  Yes.
20    Q.  That's the year that you had your car accident,
21 correct?
22    A.  I think it -- yes, I think may have -- it was in,
23 yes, it was in '98, I'm pretty sure. And may have been
24 right after or right before, yes.

Page 101

1     Q.  Right before or right after what?
2     A.  Delaware Park.
3     Q.  Did it prevent you from working, the car
4 accident?
5     A.  Forgive me. When I worked at Delaware Park, I
6 was driving one of my father's black Cadillacs. When the
7 kids hit me, I then -- he gave me a blue Oldsmobile. So
8 I actually still have the registration and stuff from the
9 Oldsmobile. I could find out for you.
10          So give or take, as far as that last car
11 accident, which that should also be in my medical records
12 as well. When that happened, when I was at Delaware Park
13 I had a black Cadillac. When the kids hit me it totaled
14 my Oldsmobile. So it was after Delaware Park,
15 definitely, because that's when I had the Oldsmobile.
16    Q.  Your car accident must have been in 1999?
17    A.  I'm pretty sure it was the end of '98. I didn't
18 go long without a vehicle. It could have been the
19 beginning of '99. So forgive me for that.
20    Q.  That's fine. No, that's fine.
21    A.  Yes.
22    Q.  So did the car accident prevent you from working?
23    A.  Well, I don't recall. I know I was in pain, a
24 lot of pain for awhile, the very beginning. Eventually

26 (Pages 98 to 101)

B-0145

Snyder                                    v.                    Citi Steel, USA, Inc.
Terry L. Snyder                    C.A. # 04-970-JJF                    May 31, 2006

Page 102

1   you learn to live with pain.
2       Q.   Was there ever a time that you didn't hold a job?
3       A.   That I did not?
4       Q.   Yes.
5       A.   What do you mean?
6       Q.   Did you not work?
7       A.   Sure. In between.
8       Q.   I don't mean for a period of a week, but say a
9   period of more than a month.
10      A.   Yes.
11      Q.   When was that?
12      A.   Such as April to August, in between the bank and
13  CitiSteel. Such as --
14      Q.   Go ahead.
15      A.   Such as that.
16      Q.   I thought you were going to say such as something
17  else and give another example. But you definitely worked
18  after Delaware Park; is that correct?
19      A.   Yes.
20      Q.   Do you recall where that was, where your
21  employment was after Delaware Park?
22      A.   Bank. I answered that.
23      Q.   Oh, I'm sorry.
24      A.   That's okay.

Page 103

1       Q.   When was the bank?
2       A.   After Delaware Park.
3       Q.   When?
4       A.   I don't recall. It is on record too probably.
5   Right there.
6       Q.   I'm just asking you. Did you go from --
7       A.   Well, I already answered that.
8       Q.   Could you repeat it again for me?
9       A.   Can't we look it up again like we did earlier?
10           MS. BREWINGTON: I'm going to object on the
11  grounds of asked and answered. You can go ahead.
12      Q.   I just want to clarify. I understood that you
13  testified that you went to work at the bank prior to
14  CitiSteel.
15      A.   No.
16      Q.   That's incorrect.
17      A.   That's incorrect.
18      Q.   So correct me.
19      A.   Or -- yes, prior, before.
20      Q.   Yes.
21      A.   Can we look it up?
22      Q.   I would like you to just answer the question as
23  to what your sequence of employment is.
24      A.   The bank -- yes, but I think we should only ask a

Page 104

1   question once and then --
2       Q.   But it hasn't been answered.
3       A.   Well, yes, it has, because it is on here. So if
4   you are remembering what I already told you, then it has
5   been answered. Yes, yes. I'm assuming you are correct.
6   So --
7       Q.   I don't want to assume I'm correct. I don't know
8   what the answer is.
9       A.   Well, if it is prior, you have already asked it
10  once, though. That's how you already knew the answer to
11  it.
12      Q.   Ma'am, I'm going to ask you on the record to
13  please --
14      A.   Which you already did, yes, prior.
15      Q.   I'm going to ask you on the record to please
16  state for me your employment history.
17      A.   I do not remember. Bank prior. No. Prior to --
18  prior to CitiSteel, after Delaware Park. That's what I
19  was --
20      Q.   That makes sense. That is what I called
21  employment history. Delaware Park, which we established
22  you left November 1998. Is that correct?
23      A.   Yes.
24      Q.   You started in CitiSteel in August of 2001. Is

Page 105

1   that correct?
2       A.   Yes.
3       Q.   And the bank was in between?
4       A.   Yes.
5       Q.   The bank's name you do not recall; is that
6   correct?
7       A.   Yes.
8       Q.   So you worked at the bank for over two years; is
9   that correct?
10      A.   I do not recall.
11      Q.   You do not recall where you worked?
12      A.   No, no.
13      Q.   Is there any reason why you would not recall
14  where you worked for a period of two years?
15      A.   But you are more than welcome to look it up.
16      Q.   I'm asking you.
17      A.   I don't remember. I was not there for two years,
18  though, no.
19      Q.   Okay. Where else were you other than there, the
20  bank, for two years?
21      A.   Nowhere. I don't --
22      Q.   You didn't work?
23      A.   I don't think so. I am not sure.
24           Well, there was two banks I actually worked

27 (Pages 102 to 105)

Snyder
Terry L. Snyder

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 106

1  at.
2  Q. During the same period?
3  A. Yeah. Yes.
4  Q. What was your salary when you started full-time
5  at CitiSteel?
6  A. Well, I actually lowered it by a couple cents,
7  not realizing. When I started the temp service I think I
8  started at 12 or 12 something, and once I became an
9  official employee, they asked me what I wanted, and I, I
10 don't know how or why I did that, and I said 11.50, and
11 I'm pretty sure that that is what they started me at, was
12 11.50.
13 Q. That was an hourly rate?
14 A. Yes, ma'am.
15 Q. Who interviewed you for the job? Was it someone
16 at Bernard or someone at CitiSteel?
17 A. Well, I was registered with Bernard, and Mike --
18 I do not recall his last name, but he used to run the
19 little HR building where Jim Ryan's office was.
20 McConnahan, maybe something like that. Unless there is
21 another McConnahan up there and that just popped into my
22 head. He did, he gave me some tests.
23        Because a lot of people use Excel nowadays,
24 which I know Lotus and Excel. So that was part of

Page 107

1  basically, you know, just to see if I was going to be
2  able to perform what they needed. So basically I just
3  took some Lotus test.
4  Q. Like a skills test?
5  A. Yes, for Lotus.
6  Q. Okay. You did that at CitiSteel?
7  A. Yes, ma'am.
8  Q. Was your salary the same when you left in August?
9  A. I think they gave me a little raise. I think it
10 was like 11.84.
11       Wait a minute. You said in August? You
12 mean in April?
13 Q. I'm sorry, yes, April.
14 A. That's okay. You are only human.
15       I think it was 11.84.
16 Q. Do you remember when you got the raise, any time
17 frame on that?
18 A. No.
19 Q. Who gave you the raise?
20 A. I don't even know.
21 Q. Do you remember if it was in the context of like
22 a yearly review or something like that?
23 A. I'm assuming. I don't -- I'm sorry.
24 Q. No, that's fine.

Page 108

1  A. Can't assume anything in life. I'm unable to
2  answer that.
3  Q. I'm sorry. Are you finished?
4  A. Yeah. I said yeah and I should have said yes.
5  Q. Yeah works just as well as long as it is not a
6  nod of the head. That's all the court reporter is
7  concerned with.
8        Who do you work for now?
9  A. The name of my employer is Skelly Group.
10 Q. How do you spell Skelly?
11 A. S-K-E-L-L-Y. We contract for Sun Oil.
12 Q. What is your position there?
13 A. I am a truck driver and an operator. I am in
14 training to operate as well, professional truck driver.
15 Q. Are you an owner/operator?
16 A. No, ma'am. I contract. I work for Skelly. I
17 don't own any of the vehicles.
18 Q. Okay. When did you get your CDL license?
19 A. My first one, the first time I took the test, I
20 took the man out in the tractor trailer right before
21 Christmas, December. I passed first round.
22       But then I kept studying for a further
23 endorsement such as tankers. It is a different style
24 tractor trailer. And then I continued to study to be

Page 109

1  legally authorized to carry explosives and chemicals
2  state to state and to be checked out by the FBI. So as I
3  continued to study they added endorsements, I
4  continued to get my CDL.
5        I was at work when the letter officially
6  came in April from the FBI, so now if you look at my
7  license it says issue date in April, but I have actually
8  had the original CDL license to drive tractor trailers
9  over 2600 -- thousand pounds since December.
10 Q. Is that 2005 I guess?
11 A. 2005. Yes, ma'am.
12 Q. What is your salary at Skelly Group?
13 A. $18 an hour for now. Three weeks after June 20th
14 it goes up to 22.
15 Q. Is that because you have gotten those
16 endorsements, the further endorsements?
17 A. Actually, no. I may start -- well, that was the
18 original offer to begin with, because eventually I'm
19 going to be training in equipment, heavy equipment, and
20 driving, it is a different kind of tractor trailer called
21 a low boy, where I will be hauling giant equipment state
22 to state.
23 Q. You said that was the original offer. What was
24 the original offer?

28 (Pages 106 to 109)

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 110

1   A.  18 to start, and then once I learn to finish
2   operating these types of trucks, then they want to start
3   training me in equipment and to carry, travel, pick up
4   and deliver state to state.  Not overnight, of course.
5   I'll make it back home every night, I hope every night.
6   But, oh, well.
7       Q.  And then when did you start with them?
8       A.  March 14th, 2005.  I graduated the school in
9   December, beginning of December.  I started the hiring
10  process the very beginning, March 14th, the week of.
11          I physically -- because I had to travel, you
12  know, take several tests, go through several
13  interviews -- forgive me -- I physically started on March
14  the 20th.
15          So I was hired the week of March 14th.  I
16  physically started, physically working, March the 20th.
17      Q.  And you said the school, the school was in
18  December.  Is that the --
19      A.  I went to tractor trailer school.  I figured I
20  needed a whole new fresh start, and so...
21      Q.  Was that December 2005?  That was after you
22  started?
23      A.  What was after?
24      Q.  I'm sorry, that wasn't very clear.  Skelly, date

Page 111

1   of hire, started March 14th?
2       A.  Of this year.
3       Q.  Oh, okay.  I'm sorry.
4       A.  2006.  No, my fault.
5       Q.  Truck driver school came first?
6       A.  Yes.
7       Q.  In December?
8       A.  Yes.
9       Q.  And once you had the license, you went then after
10  that?
11      A.  Yes, ma'am.
12      Q.  That makes sense.  Got it.
13      A.  Yes.
14      Q.  So at $18, that's a few dollars more than at
15  CitiSteel.  Is it better benefits at Skelly?
16      A.  Forgive me.  I didn't get my new hire package
17  yet.  I will in three weeks.
18      Q.  Do you expect, do you have an idea what that will
19  include?
20      A.  Well, I plan on joining the teamsters union.  You
21  can't -- just I'm trying to learn everything.  A lot.
22      Q.  A 401(k)?
23      A.  I don't know.  Yes.  Well --
24      Q.  Does it have healthcare?

Page 112

1       A.  Now, what -- it sounds so horrible by saying, and
2   naive, but I don't know, until I open that package.
3       Q.  Well, have you gone to the doctor since you
4   started?  Did they give you like a co-pay?  Or how do you
5   pay for it when you go?
6       A.  Well, Medicaid.  I still have Medicaid.
7       Q.  When do you expect to get the new hire package?
8       A.  After June the 20th.
9       Q.  I just didn't hear the date.  Sorry.
10      A.  That's okay.
11      Q.  Does that mark some kind of end of a probationary
12  period or something?
13      A.  Yes.
14      Q.  So far are you liking operating the truck?
15      A.  Yes, ma'am.
16      Q.  And Skelly, do you like them as an employer?
17      A.  Yes.  I do not have any kind of sick feeling in
18  my stomach at all when I wake up or when going to sleep.
19      Q.  You mean as compared to something else?
20      A.  Yes, ma'am.
21      Q.  Do you like it better than CitiSteel?
22      A.  Yes, ma'am.
23      Q.  Are you planning on staying at Skelly?
24      A.  Yes, ma'am.  My exact location, like I said, you

Page 113

1   know, they eventually want me to start learning the big,
2   heavy equipment, but still with the same company and so
3   forth, but just learning more.
4       Q.  So the nature of the job?
5       A.  Yes, ma'am, yes.
6       Q.  No plans to go back to CitiSteel, correct?
7       A.  No.  Would you?
8       Q.  No desire to return to CitiSteel?
9       A.  Never.
10      Q.  And then I guess for the record I should ask for
11  a formal document request for the package once you
12  receive it, to turn that over and then your attorney will
13  produce that to us.
14      A.  Fine.
15      Q.  And then before Skelly, before March 14th, where
16  were you employed then?
17      A.  I wasn't.  I was still studying.  I was studying
18  chemicals.
19      Q.  Can you just tell me what that means exactly.
20      A.  I continued to study a book and I would continue,
21  just so I wouldn't lose base, tractor trailer if you want
22  to back up right, you turn left.  So I didn't want to
23  lose touch with anything.  So I would just continue to go
24  to the school.

29 (Pages 110 to 113)

Snyder                                    v.                    Citi Steel, USA, Inc.
Terry L. Snyder              C.A. # 04-970-JJF                        May 31, 2006

Page 114

1    But I was studying chemical charts, because
2    I had to take tests on all the chemicals to get that
3    endorsement. So you just kept studying.
4        Q.  So that was between the time, December 2005?
5        A.  '5. And then I finally, I took -- I finally
6    passed, I should say -- I actually have -- February or
7    March. And then that was a process, I had to go to
8    Dover, get finger printed.
9        Q.  When you say passed --
10       A.  For the HAZMAT, for the chemicals.
11       Q.  Okay. Then when did you apply to Skelly?
12       A.  Second week of March. Actually I had an
13   interview and something happened, they had to reschedule
14   with me. And so I did the first interview the third week
15   of March. Well, the week of the 14th. I shouldn't be
16   saying second, because I don't have a calendar in front
17   of me. It was around the second week of March. I had an
18   interview.
19       Something happened with them. They called,
20   apologizing, they had to reschedule that following week,
21   which would be the week of the 14th.
22       I interviewed. If you get through that they
23   pass you on. They passed me on. That day they had me --
24   they had people come meet me and follow me to take

Page 116

1    is a manager. He is a supervisor there.
2        Q.  So you actually got kind of referred? You didn't
3    apply; is that right?
4        A.  Well, no. I had to get who through the interview
5    and then I had to take a few tests and so forth. But,
6    yes.
7        I mean sometimes you get in somewhere, it is
8    not what you know but who you know. But when he found
9    out I had a class A license, you know, with all
10   endorsements, you know, he asked me if I wanted a job.
11       Q.  Do you know what their address -- I'm sorry.
12       A.  I'm sorry. Go ahead. It is all right. I've
13   done it to you.
14       Q.  Do you know what their address is or even what
15   town that is? Is it Delaware?
16       A.  Yes. Let me see -- it is -- they all even get it
17   confused. Some say 601 and some say 610. Believe it or
18   not, they don't even have an address on their building.
19   610 West State Street, Media, Pennsylvania. And I don't
20   know zip code.
21       Q.  That's fine. Then before that you were studying
22   for your license. When did you decide to go for your CDL
23   license?
24       A.  Well, in 2005.

Page 115

1    alcohol and drug testing, once he decided he wanted to
2    keep me, once I got through the other interviews. Then I
3    had to go back the following day for a lot of paperwork,
4    proceedings.
5        So I applied. I don't know how to really
6    answer that. My first interview was the week of March
7    14th. It was supposed to be the week prior. It was not.
8    They had to cancel and reschedule with me.
9        So I guess my answer should be March, week
10   of March 14th.
11       Q.  Well, you would have applied before because they
12   called you, right?
13       A.  Well --
14       Q.  Did you drop it off, an application?
15       A.  Maybe I'm messing up the question. No. Oh, no,
16   no.
17       Actually, I got an interview. My friend's
18   husband actually asked me, when he found out what I had,
19   and what I had been studying for, he asked me if I had
20   like an interview.
21       So actually, and then he called and gave me
22   the interview date. Then he ended up calling back, then
23   he called back and said that they apologized -- you know,
24   he is a manager there. So he still -- Skelly, I mean, he

Page 117

1        Q.  Well, you said --
2        A.  I don't know the day.
3        Q.  That's okay. Did you graduate in December?
4        A.  Yes. Yes.
5        Q.  How long was the class, the program?
6        A.  Four weeks. I took the four-week one since I had
7    so much time on my hands.
8        Q.  I'm just going to guess, but maybe December
9    through, beginning of December to the end of December,
10   does that sound about right?
11       A.  For what?
12       Q.  That the class actually went on.
13       A.  No, the class actually started the beginning --
14   November 7th or 6th, and lasted through until --
15       Q.  Beginning of December?
16       A.  Yes, ma'am. They had to set up, like, the school
17   would set up when you are scheduled to meet with motor
18   vehicle to take tests for them, and so I knew soon in the
19   beginning my test date was towards the end of December.
20       So, in other words, once you graduate, you
21   know, your school, if you get a good -- I got an 89.9
22   percent on my grade average with the school. So, but
23   even though you are done with the school, you still have
24   to go back to take the man, to test for the man at motor

30 (Pages 114 to 117)

Snyder
Terry L. Snyder

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 118

1  vehicle. I had the name, all the parts on the truck.
2         Are you following me?
3         So there was a gap in between me graduating
4  from the school and what -- the date and time they set me
5  up for, to test for the man at motor vehicle, and name
6  all the parts and what they are for, and then take him
7  for a ride, which occurred at the end of December.
8     Q.  Okay. So if the class started November 6th or
9  7th, was early November --
10    A.  Yes.
11    Q.  -- when did you decide to do that? Was that that
12  month? That year?
13    A.  No. A couple months in advance I assume. Yes.
14    Q.  Where was the class offered?
15    A.  19 B Davidson Lane.
16    Q.  What is that?
17    A.  New Castle.
18    Q.  Is it like a private school?
19    A.  Oh, American Driving Academy.
20    Q.  Is there an application process for that? Did it
21  take a long time to get accepted?
22    A.  I filled out paperwork. As long as you have a
23  good driving record and no points and so forth,
24  basically.

Page 119

1         Well, I'm sorry. No felons, no drug
2  charges, didn't kidnap somebody, you know, all that kind
3  of stuff.
4     Q.  What made you decide to do the CDL stuff?
5     A.  Well, I love to drive. I'm a good driver. I'm a
6  safe driver. And I like the challenge, you know. I
7  guess you should say little tomboy'ish.
8         To tell you the truth, I got -- you know, I
9  was fed up with the whole office thing actually, period.
10  Very good to be a little bit more alone being a truck
11  driver.
12        Don't get me wrong. I love people, you
13  know, society and socializing. But I just -- I didn't
14  want to be confined. I didn't really want to work
15  directly in a...
16        MS. BREWINGTON:  Off the record.
17        (Discussion off the record.)
18        (Lunch recess taken.)
19  BY MS. DIBIANCA:
20    Q.  We will go back on the record. Did you talk to
21  your attorney about the topic of the deposition over the
22  lunch break?
23    A.  No.
24    Q.  Okay.

Page 120

1     A.  Was I supposed to?
2     Q.  No, you weren't. So that's correct.
3     A.  Okay.
4     Q.  When we left off I think we were at Skelly Group.
5  Then before Skelly you were taking your class to get
6  certified, and I will put a formal document request on
7  the record for just a copy of your CDL license.
8     A.  Would you like to make a copy now? I have it.
9     Q.  We can do it on the next break if you want, sure.
10    A.  You would want to do front and back because of
11  all the endorsements.
12    Q.  Right. Exactly.
13        And then before the class, where was the
14  last position you worked before that?
15    A.  I would accept temporary positions if available.
16  So, again, I cannot recall. I flagged again as back-up,
17  it is a temporary flagging agency, so I would flag 7:00
18  at night until 7:00 in the morning. Pretty good pay.
19        But, again, it was through a temporary, you
20  know, until I --
21    Q.  What was the name of the temporary flagging
22  agency?
23    A.  I think American Flag. I have some pay stubs at
24  home if they have a proper name on it. But I think it

Page 121

1  was American Flagging.
2     Q.  And then any pay stubs that haven't been produced
3  already, I believe I have seen some that said something
4  about American Flag, so I believe some have been
5  produced --
6     A.  Okay.
7     Q.  -- but if any haven't, I will ask you to produce
8  them as well.
9     A.  Okay.
10    Q.  And then you said, in addition to the temporary
11  flagging agency were there other temporary companies that
12  you worked with?
13    A.  Throughout the period, from what happened with
14  CitiSteel, you know, if a job was offered to me I took
15  it. There was one company that needed someone for a
16  week, whatnot. But other than that, as far as
17  employment, no.
18    Q.  Who was the temp agency, though, that you went
19  through?
20    A.  Well, I actually put my resume, cover letter on
21  careerbuilder.com and monster, actually.
22    Q.  But who was the temp agency that got you the
23  temporary jobs?
24    A.  Well, there was a couple of them. I don't

31 (Pages 118 to 121)