Snyder                                    v.                    Citi Steel, USA, Inc.
Terry L. Snyder              C.A. # 04-970-JJF                          May 31, 2006

Page 122

1  recall. You said you have copies of the pay stubs?
2     Q.  Some have been produced.
3     A.  Forgive me for answering you like that. But I
4  cannot recall, so if we could peek at the pay stubs.
5     Q.  So you don't remember any temporary agency that
6  you worked for that sent you to jobs other than American
7  Flag Systems or something like that?
8     A.  There was one. Accounting clerk. But the name
9  of that company -- I actually drove to Pennsylvania or
10 Philadelphia to apply and fill out paperwork for them and
11 to register with them, and they called me one day and
12 said they had a one-week job in Delaware.
13    Q.  So other than the one-week job in Delaware as an
14 accounting clerk and the American Flag as a temp company,
15 any other places, any other employment you've had since
16 CitiSteel?
17    A.  No, not that I recall.
18    Q.  Did you have any other jobs when you worked at
19 CitiSteel?
20    A.  I actually for awhile, I worked for Pyramid,
21 which is a, it is a temp agency, but I think they temp
22 CNAs and flaggers.
23    Q.  Was it CNE?
24    A.  CNA, Certified Nursing Assistant. But I didn't

Page 123

1  do that. I worked for the side of Pyramid for flagging.
2  So I would flag for her on the weekends. A couple times
3  I flagged at night.
4        Like I was able to -- because at CitiSteel
5  to get to my office I had to wear the steel-toe boots and
6  fireproof uniforms. There was a couple times when I left
7  work I would go flag for her from like 4:00 at night,
8  4:00 in the afternoon until 9:00 at night a couple times,
9  and then on the weekends, unless CitiSteel still needed
10 me in there.
11    Q.  And when was that? Was it right before the end
12 of your term, end of your employment at CitiSteel?
13    A.  That was actually in the beginning.
14    Q.  2001?
15    A.  Into 2002. Please don't hold me to that. I
16 would have to look that up for me to be able to answer
17 you accurately, because I can't remember every single
18 date. I apologize.
19    Q.  Any other employment or sources of income during
20 that time, CitiSteel time?
21    A.  While working at CitiSteel?
22    Q.  Yes.
23    A.  No, not that I recall, no.
24    Q.  Did you apply for any jobs when you were working

Page 124

1  at CitiSteel that you didn't go and actually take them
2  but you applied?
3     A.  No.
4     Q.  You weren't looking for any other employment
5  while at CitiSteel?
6     A.  No.
7     Q.  Who is Sam Lang?
8     A.  He is a -- I don't know his exact title. He is a
9  worker at CitiSteel.
10    Q.  What is your relationship with him?
11    A.  None. I knew him because he worked there. When
12 people had a problem with their paychecks, excuse me,
13 they would come into my office. I would have to call
14 payroll for them.
15    Q.  Did he work in payroll?
16    A.  No, but I dealt -- like I said earlier, my title
17 was clerk typist, but really it was also more like
18 administrative assistant, because even though I had two
19 supervisors I did many things, and when one of the
20 employees had a problem, they would come to me.
21        And they weren't allowed to call payroll,
22 they weren't allowed to just start dealing directly with
23 people at the main office. They would, so forth, go
24 through me.

Page 125

1        So they would stand there with their
2  paycheck in their hand, and then I would have to call
3  payroll and tell them the issue at hand. If payroll
4  said, "Put them on," or if payroll said, "Send them up,"
5  then they were. But unauthorized, they would just stand
6  there and tell me their problem or what they were
7  missing.
8     Q.  Did he come to you with a problem like that?
9     A.  Before, sure. And also, a lot of times, because
10 my office was right outside the furnace, 5,000 or --
11 5,000-degree furnace, they would be burning up, pouring
12 in sweat. It could be winter out. The water cooler is
13 right outside my door in the hallway. So basically when
14 they would come to take a break and drink a lot of cold
15 fluids, they would just stand in my doorway. How are you
16 doing, you know, chitchat, can't wait to go home. Just
17 basic, I guess you hear the term on television sometimes
18 water cooler talk.
19    Q.  Okay. We will mark this as 4.
20        (Snyder Deposition Exhibit 4 was marked for
21 identification.)
22    Q.  Just go ahead and take a few minutes to look that
23 over and let me know when you are ready to begin.
24    A.  May I ask who this is from? Who I filled it out

32 (Pages 122 to 125)

Snyder
Terry L. Snyder

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 126

1    for?
2        Q.  The EEOC, I believe.
3        A.  Oh, okay.  Do you want me to review the whole
4    thing?
5        Q.  No.  Just review it so you have an idea what it
6    is.
7        A.  Okay.
8        Q.  Did you have an opportunity to do that or do you
9    want to take a few minutes?
10        A.  I know everything he did and what happened, so
11    that's fine.
12        Q.  Do you recall filling out the Charge
13    Questionnaire which is page 1 on Exhibit 4?
14        A.  I don't remember the day I sat there and did it.
15    But I know I did, because it is my handwriting.  But I
16    don't remember -- I couldn't tell you the color of the
17    walls, you know.  I remember -- I know I filled it out.
18    I don't remember the exact moment while I was filling it
19    out.  Yes.
20        Q.  Okay.  And the date here is April 9th, on page 2,
21    April 9th, 2003.
22        A.  Oh, okay.  That's when the EEOC had to do the
23    screening, and if they believed you, that's why they gave
24    -- then they gave you a second date to come back and

Page 127

1    that's why this one says the 29th.
2        Q.  Right.
3        A.  Okay.  Yes, ma'am.
4        Q.  So this was like the in-take interview?
5        A.  This was the screening, yes, ma'am.
6        Q.  Okay.  And then on page 4, the Sexual Harassment
7    Questionnaire, this is dated 4/28, so that would have
8    been the second time you returned to the EEOC?
9        A.  No.  I returned on the 29th.  That's the date
10    they gave me.
11        Q.  Did you take these papers home with you maybe and
12    fill them out to bring them back with you on the 29th?
13        A.  No, not that I recall.  Why that says the 28th, I
14    don't -- maybe I just wrote the wrong date.
15        Q.  Maybe you had the date wrong on the 29th?
16        A.  Possibly.  I'm unable to answer that question.
17        Q.  That's fine.  It says on page 4 of Exhibit number
18    4, there is a little Bates stamp there, it says D338.
19        A.  Yes, ma'am.
20        Q.  Number 1 (b) it says, "Mr. Randolph Harris" and
21    "Mr. Ford" and then it says, "Mr. Ford, whom is a notch
22    down from Harris."
23        A.  Yes.
24        Q.  Is that correct?

Page 128

1        A.  In Mr. Harris' eyes, you know.  Me, I tried to
2    show them both the most, utmost respect.  I would never
3    say to Mr. Ford you are beneath Mr. Harris.
4            But Randolph Harris was the general
5    supervisor of the furnace and caster.  You see that
6    above.  Mr. Ford was actually the supervisor of the slab
7    yard.  So one says "potato" and the other says "potato."
8    You know, I just, I would never say to Mr. Ford, you
9    know, you are a notch below him.  In my eye, yes, Mr.
10    Harris was the general supervisor.
11        Q.  Didn't you testify earlier that they were the
12    same?
13        A.  To me they are the same.  They are both my
14    bosses.  You know, if you -- not you.  In general, if
15    Ford says do this, and if Randolph, Mr. Harris, excuse
16    me, says this, and then if that is a disagreement, I make
17    them, you know, work it out and then they can retell me
18    when they agree.
19            You know, as far as legally CitiSteel, you
20    know, Mr. Harris is the general supervisor.  But, you
21    know, that's of the furnace and caster.
22        Q.  Did Harris have the ability to direct --
23        A.  Fire --
24        Q.  Wait one second.  Sorry.

Page 129

1        A.  I'm sorry.
2        Q.  That's okay.  Did Harris have the ability or
3    authority, I guess, to direct Mr. Ford in any way?  Was
4    he his supervisor?
5        A.  If Ford ever did listen to him, if he did direct
6    him, he didn't do so in front of me.  And if he did
7    behind closed doors and whether Ford listened, I do not
8    know.
9        Q.  Let me ask you this:  How was your performance at
10    CitiSteel as an employee?
11        A.  As an employee, I think fine.  If I don't know
12    something, I will ask.  Just like they had to ask me a
13    few things or I had to find, you know, some files for
14    them.  Like I said, we are all only human.
15            But if I don't something, I don't know if
16    you have noticed by now, but I'm not shy.  I'm not
17    willing to keep my hand down.  I raise my hand if I don't
18    understand and I need to learn, then that's what I do.
19        Q.  You mean --
20        A.  And I think I am a pretty quick and good learner,
21    especially when you are enjoying something, you know.  So
22    as far as an employee, I loved me as an employee.  How
23    you may feel about me being an employee, I don't know.
24        Q.  I'm asking you as an employee at CitiSteel.

33 (Pages 126 to 129)

Wilcox & Fetzer, Ltd.

Professional Court Reporters

(302)655-0477

Snyder                                  v.                     Citi Steel, USA, Inc.
Terry L. Snyder                   C.A. # 04-970-JJF                  May 31, 2006

Page 130

1    A. Well, I was good enough for them to want to
2  continue to keep me, so -- until I turned them in. So I
3  think I was a wonderful employee and they must have too.
4    Q. Okay. Did you ever get any reviews or
5  performance evaluations?
6    A. They tried to write me up, like I told you
7  earlier, and it was not true.
8    Q. Okay.
9    A. And I would not sign. When I'm wrong, I admit
10  it. I have no problem with that. I would not sign that.
11    Q. Let me ask you, when was the date of this?
12    A. I don't want to -- it was beginning of February,
13  maybe. Please forgive me for saying this, but I know
14  there is a copy of this stuff somewhere.
15    Q. We can look for it.
16    A. And I even have one, so please forgive me as far
17  as my memory when it comes to these exact dates.
18    Q. I'm sure we will come across it, so we will nail
19  down the date, the definite date eventually here when we
20  get to it.
21    A. I apologize for having to answer like that, but I
22  don't want to lie. I don't want to say something that I
23  am not absolutely sure of.
24    Q. That's fine. We will get to the actual date.

Page 131

1  Why don't you tell me what happened with that, with the
2  write-up. What was the write-up for?
3    A. Well, he ended up -- he, I'm sorry -- sorry for
4  saying "sorry" too.
5       Mr. Harris ended up telling me -- Mr. Ford
6  informed me that it was Mr. Harris' idea.
7    Q. I want to back up though and start in the
8  beginning so we can kind of walk through the whole story.
9    A. Why I got written up I have no clue.
10    Q. Who told you about the write-up?
11    A. Mr. Ford.
12    Q. What did he say?
13    A. That it was Mr. Harris' idea. And once I said
14  something, I said, "Well, why would you do this?" He
15  said, "Well, I needed to show you who has authority."
16       Because when I yelled at him in January, he
17  got scared. He quit talking to me for a whole month
18  leading into that. You have to talk to your employee.
19  You have to -- you know, I made charts every single
20  morning of the production of CitiSteel's performance, and
21  I had to post them charts in several areas. You know,
22  even then, you have to interact with your employee.
23       And he wouldn't talk to me for me yelling,
24  and I guess he got scared and paranoid, and he wanted to

Page 132

1  show me that, those were his words, he wanted to show me
2  who had authority. So, we can ask him why he tried to
3  have a write-up.
4    Q. What did the memo say?
5    A. There is no copy of it here?
6    Q. What is your recollection of what the memo said?
7    A. Well, nothing but a bunch of lies. Disgusted me.
8  I do not remember everything. But nothing but a bunch of
9  lies.
10    Q. Mr. Ford is the one that presented you with the
11  write-up?
12    A. No. Mr. Harris, Buragino and Ford were all three
13  in a room and they called me in the room.
14    Q. Okay.
15    A. At one point, there was one part which was kind
16  of true, but, see, Ford was giving me permission.
17       There was a problem going on, if I'm not
18  mistaken, which I still have the receipts. The company
19  that installs new pipes in homes, Geico, there was
20  something going on with my mother, at my mother's home,
21  so Mr. Ford, which I would always ask permission, and he
22  would allow me to make a few personal phone calls because
23  my mother had to go without water at the house, at her
24  home. My father had to bring me some blank checks.

Page 133

1       So, you know, I had -- I had to make a few
2  personal phone calls. But I always asked. Mr. Ford
3  always gave me permission.
4       But I don't think it states that in there.
5  I cannot recall.
6    Q. Mr. Harris, Mr. Ford, Mr. Buragino, those were
7  the three people?
8    A. That were in the room.
9    Q. Who called you down? Who called you to the
10  meeting?
11    A. Oh, I don't recall.
12    Q. What was discussed at the meeting? Just the
13  write-up only or was there another reason for the
14  meeting?
15    A. No, not to my recollection, no.
16    Q. Just the write-up?
17    A. Yes. They tried to write me up. But on what
18  basis?
19    Q. Did you say that at the time?
20    A. Yes, I did. Yes, I did.
21    Q. Did you have some kind of discussion with them
22  about the write-up?
23    A. I said, "I'll sign it if you cut out all the
24  lies." And Mr. Harris ended up even telling me how

34 (Pages 130 to 133)

Snyder                                     v.                    Citi Steel, USA, Inc.
Terry L. Snyder                    C.A. # 04-970-JJF                    May 31, 2006

Page 134

1  nervous he was thinking that I was going to be so angry
2  about him trying to have me written up, he thought that I
3  was going to tell right then and there about what he had
4  been doing. And I said, "That's because you are paranoid
5  and scared, because you are doing something wrong and you
6  know you are."
7      Q. At the meeting you said that you wouldn't sign it
8  or you would sign? What happened at the meeting?
9      A. I would not sign it. I refused.
10     Q. What was their response, if any?
11     A. I don't know. Nothing. They didn't scream or
12 jump up and down. What could they do? It was nothing
13 but lies, so I'm not signing something that isn't true.
14 If I do something wrong, I'll tell you. I admit it. I
15 have no problem.
16     Q. Did you just go back to work then, I guess?
17     A. Yes, ma'am. They made copies and they wrote on
18 there "Terry refused to sign." I have a copy of it.
19     Q. And then --
20     A. That was the end of it.
21     Q. Okay. And then you confronted Mr. Ford about it
22 later?
23     A. Mr. Ford actually confronted me. I'm sure I, you
24 know, probably said something sarcastic, "Where would

Page 135

1  you's get this?" And Mr. Ford said, "It was all
2  Randolph's" -- he didn't call Randolph Mr. Harris. He
3  called him Randolph. He said, "It was all Randolph's
4  idea."
5          So then I yelled at him. I said, "What
6  would you do this for?"
7      Q. But Mr. Ford said it was Randolph's, Mr. Harris'
8  idea?
9      A. Randolph's idea, the whole thing, yes.
10     Q. Did you ask Mr. Ford why he would sign something
11 that he did not agree with?
12     A. No, because I know they are all going to
13 stick together anyway. They are all going to cover for
14 each other.
15     Q. And Mr. Buragino?
16     A. He was a vice president. He left. He left the
17 office hall. He just, he left.
18     Q. But do you think he would sign something that was
19 lies?
20     A. Well, how can he prove they are lies. He is
21 going by what two supervisors are telling him. I don't
22 even know if he signed it. Is his signature on there? I
23 think -- I don't think his signature is on there.
24     Q. Okay.

Page 136

1      A. Even though Ford and Harris couldn't stand each
2  other, they are going to stick together. They will go
3  against you in a heartbeat to stick together, just like
4  you and your assistant.
5      Q. Even though they couldn't stand each other?
6      A. Yes, ma'am. Certainly. That's everywhere, isn't
7  it?
8      Q. And then did you confront Mr. Harris about what
9  Mr. Ford had said?
10     A. Yes, I did.
11     Q. Let me ask you, when did you talk to Mr. Ford
12 about it?
13     A. I don't recall. It was soon after. It could
14 have been that day, later that day. It could have been
15 the next day. It could have been a week. I don't
16 recall.
17         But as soon as I found out, I went storming
18 to Mr. Harris, and I said, "Why would you," I'm going to
19 leave that word out, "do that?"
20         And he said, "I needed to show you who has
21 authority."
22     Q. Is that a problem?
23     A. Is what a problem? I already knew he was my
24 boss. In my eyes your boss is your third parent.

Page 137

1          But he was scared that I was going to tell
2  on him for me yelling at him back in January over stupid
3  floor tiles, which I was only trying to do my job and
4  protect other people. There was lose floor tiles all
5  over the place and nobody was doing nothing about it. So
6  once I sent an e-mail to the safety manager, safety
7  manager, which was Jim Ryan at the time -- he now moved
8  up into Jerry Downie's place -- I sent him an e-mail, but
9  I copied it, I sent both my supervisors a copy, letting
10 them know, I always let them know, every move I make, if
11 I'm going to down to finance in the main building, I let
12 them know, let them know, let them know.
13         Mr. Harris took that as a paranoid thing,
14 and I said to him, "Why would you get paranoid and think
15 I'm going to tell on you through a tile e-mail?"
16         I mean, in other words, he is thinking I'm
17 doing something behind his back. Well, if I'm doing
18 something behind your back, why would I send you a copy
19 of it, first of all. But I'm only doing my job in
20 looking out for the safety of others.
21         There was a line of people out there that
22 day. He had meetings going on and there was a line of
23 vendors out that waiting, and one of them was out there
24 playing with the floor tiles. And I tripped. And I

35 (Pages 134 to 137)

Page 138

1   tripped on one, but I caught myself. The next person may
2   not.
3      I thought I was doing the right thing,
4   without permission, and I sent an e-mail to Mr. Jim Ryan,
5   and I cc'd it to Dennis Ford and to Harris, just to let
6   them know that I let the safety manager know about the
7   floor tiles. And somehow in Mr. Randolph Harris'
8   paranoid mind he thought that was an indication that I'm
9   getting closer to finally telling on him.
10   Q. I'll put this in as Snyder 5.
11      (Snyder Deposition Exhibit 5 was marked for
12   identification.)
13   Q. Is this the e-mail that you are referring to?
14   A. Yes, ma'am.
15   Q. So the date is what?
16   A. January 7th.
17   Q. 2003?
18   A. Oh, yes, ma'am.
19   Q. All right. So January 7, 2003 is the floor tile
20   situation, which I do want to discuss. But I'm going to
21   try to set up our time frame a bit better.
22   A. Okay.
23   Q. So let me see if I can come up with the write-up.
24   We are going to do Snyder 6 while we are at it.

Page 139

1      (Snyder Deposition Exhibit 6 was marked for
2   identification.)
3   Q. I'll just submit to you that this Snyder 6 that I
4   just handed you, the bigger packet, is the position
5   statement that CitiSteel submitted. We had discussed it
6   a little bit earlier. We are not going to go through
7   this whole thing right now.
8   A. What is it? I don't understand.
9   Q. It is what is called a position statement. It is
10   their response to your charge that you filed.
11   A. Okay. I understand that. Yes, ma'am.
12   Q. So I'm going to only use this for now for the
13   purpose of I think the disciplinary write-up is in the
14   back. Let me see if I can come up with that so maybe we
15   can get some dates. Page 18.
16      Just for the record sake, Snyder 6, which is
17   at page 18, also marked as D205.
18   A. This isn't --
19   Q. Is this it? Maybe it is not.
20   A. No. No. This isn't what I have at home.
21   This isn't what they gave me that day.
22   Q. Could this be a copy without the signatures?
23   A. Oh, it could be. Wait a minute.
24   Q. What do you think?

Page 140

1   A. Well, I think, number one, I did very well
2   getting over my fear of heights. And if they put up with
3   me holding on to their fire jacket or them holding on to
4   my fire jacket all this time, takes, it takes all this
5   time, that makes no sense to me. There was never a
6   problem.
7      Also, as far as, you know how earlier we
8   said we may have to continue this until tomorrow. How
9   many people in the world is their work done in one day?
10   Once you look at my job description, a million and one
11   things to be done in between 6:30 and 2:30, in the
12   morning.
13      And let me tell you something. I never -- I
14   hardly charged them over time. I would stay if something
15   was definitely needed for that early morning meeting, to
16   prepare, I stayed for free.
17      This is nothing but a bunch of crap. And
18   where they come up with this, I don't know and I don't
19   care. But you will never see my signature on it.
20      If they were worried about me having a fear
21   of heights, why did they keep having me cross that
22   catwalk? Why did they keep holding my hand, one guy
23   standing behind me, Terry, breathe, your knees are
24   wobbling? What does it take all this time?

Page 141

1      And because Mr. Randolph Harris is trying to
2   dig at any little thing. So what if I was scared of
3   heights? I still did it. Because he is backed into a
4   corner and because he knows all the dirty rotten and
5   nasty little things he did, he thinks he can bring up me
6   being scared of heights to throw on a piece of paper.
7   Whippy.
8      Sure, okay, I have my attendance record too.
9   13 days. Well, that was last year. Why are you waiting
10   until March of the following year to discuss that?
11      And the majority of the time, just as I do
12   my boss now, I let people know and I have e-mails
13   proving, may I please have off two, three weeks in
14   advance.
15      So now I didn't get to print them all, but I
16   have some proving how I do, how I am as an employee.
17      So if they didn't like me that much what did
18   they wait for? What did they wait for?
19      And what does this prove? What does this
20   have to do with that man sticking his nasty fingers all
21   over me and saying to me the things he did. It has
22   nothing to do with it and we can discuss it all everyone
23   wants.
24      Because I was still an employee there until

36 (Pages 138 to 141)

Snyder
Terry L. Snyder

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 142

1  I turned him in and would not accept the transfer. I
2  don't care if my signature is on something or not. And
3  it definitely is not going to be nothing that consists of
4  a bunch of crap, period.
5       I complained I was scared of heights. Yes,
6  from the very first day I entered your grounds. Exactly.
7  You knew that then. Thank you. Whoopy.
8       Pour work performance. I don't know how
9  many things I had to show Mr. Ford on the computer.
10  Sure, I asked questions. Who doesn't? That's what
11  teamwork is about, in my eyes. Certainly. Poor work
12  performance.
13       Well, I see I was still an employee there
14  until I refused their transfer. So I wasn't that poorly
15  of an employee, poor work performance, now was I?
16       They didn't escort me off those grounds
17  until I turned in Mr. Harris, so I don't think I was that
18  bad, apparently.
19       Did I answer the question? I think so.
20  Q.  Is this what you recall the write-up being?
21  A.  Well, I would have to match it up to what I have
22  at home. Because I got a copy immediately after. That's
23  it. I see them signatures.
24  Q.  I can show it to you. I'm not going to admit it

Page 143

1  as an exhibit. But it is P161.
2  A.  As long as it matches this.
3  Q.  And I'll let the deponent just review it to
4  compare the two documents.
5  A.  See, he went -- where I said earlier, I think it
6  is in our little laptop computer here, I was kind of
7  right on the dates. He went the month of February
8  without talking to me. He wouldn't speak to me. He was
9  scared and paranoid, which he states that, and that's
10  when he tried to have me written up. Yes, it came after.
11       Yes, this looks to be the exact word for
12  word. I think it is just shrunken over here. And it is
13  missing the signatures. But so far just looking at it,
14  it looks to be the exact. Yes, ma'am.
15       Did you want that back?
16  Q.  I'll take that one back. All right. So this is
17  the only discipline that you received while you were at
18  CitiSteel; is that correct?
19  A.  False.
20  Q.  Okay.
21  A.  Discipline. False attempted discipline. They
22  needed discipline. That's the discipline. They still
23  need it probably.
24  Q.  Did you get any other written disciplines?

Page 144

1  A.  No.
2  Q.  Any oral disciplines?
3  A.  No.
4  Q.  What about the meeting on Friday, February 28th,
5  2003, that's mentioned in this document?
6  A.  Well, what you see, that's it. Whatever that
7  states, yes.
8       It was over a cat, apparently. And Carmella
9  knows about this cat. A cat had been living in the
10  main -- okay. I don't know if you are familiar with
11  Claymont. CitiSteel consists of a red light, big mansion
12  to the left is the main administrative building. That's
13  where all the offices are. It is where Carmella's office
14  is, you know, for the finance department.
15       Down one red light to the right you have a
16  little administrative building. Across the street you
17  have a slab yard, furnace, caster, which I was down -- up
18  in that.
19       I went up there one day to deliver -- pick
20  up, I think that day, that morning, I was picking up
21  paper, boxes of paper to load in my car, and then drive
22  it back down to the furnace part, okay, down one red
23  light, and then they would send someone out with a
24  forklift, and then the guys would carry the box of paper

Page 145

1  or whatever supplies the office needed, where my office
2  was, up all those steps for me. Okay.
3       And when I went up there one day, they had a
4  cat. All the ladies had a cat inside the door. They are
5  holding it.
6       No, no, no. No, no, no. They weren't
7  holding it yet. I walk up, there is a cat sitting there.
8  They are all standing at the door, with its back to me,
9  and I'm standing outside. And I said, "What is this?"
10       And they pick it up. They hold it inside
11  the door. They said, "This cat has been living here for
12  about two, three weeks."
13       I just met this cat. Only a couple minutes
14  goes by. They are telling me about how nice it is. They
15  all take turns, they all bring it in something to eat.
16  It is basically living, but they keep hiding it from
17  Jerry Downie because he was very mean and aggressive and
18  treated his employees like dirt beneath the soil of his
19  shoes. I couldn't stand to be around the way he would
20  treat some of his employees. I didn't want to hear him
21  belittle all the employees in front of me.
22       You know, I felt like opening my mouth,
23  which is not my business and I have no right to.
24       They set the cat back outside. And it just

37 (Pages 142 to 145)

Snyder                        v.                    Citi Steel, USA, Inc.
Terry L. Snyder          C.A. # 04-970-JJF              May 31, 2006

Page 146

1  so happens, I usually, nine out of ten, I will have cat
2  food in my cab. I feel sorry for stray animals. Yes, I
3  do. And my significant other had a lot of stray cats at
4  his apartment complex, and they knew my car and I
5  couldn't help it, so I would feed them.
6        Well, I had cat food. And I ran over. My
7  car is right outside the door, but on this side of the
8  street, right, you know, a little path. You drive, here
9  is the door. And I ran over to get my little thing of
10 cat food.
11       And one of the employees went -- Carmella,
12 as a matter of fact, went to get a Styrofoam little bowl
13 or cup, whatever. And I come back and just as I am --
14 all the employees left the doorway now. Just as I'm
15 bending down, I'm putting the cat food in the dish, Jerry
16 Downie comes around. And after all the weeks of this cat
17 living there, it was unbelievable he catches me feeding
18 this cat.
19       So that was the only other thing, they had a
20 talk with me.
21 Q.  When was that?
22 A.  Right. It was --
23 Q.  Is that what they are talking about, February
24 28th?

Page 147

1  A.  Yes, yes, yes.
2  Q.  So February --
3  A.  Yes, ma'am.
4  Q.  So February 28th he is upset with you about the
5  cat?
6  A.  Yes. And I tried -- you know, it sounds totally
7  crazy, but I had just met a cat that had literally been
8  living up there with all of these women for two to three
9  weeks, and here I'm the one that got caught feeding it.
10       They all actually had been feeding it, but I
11 happen to be the one Jerry Downie found. I look up and
12 nobody is at the door. They all -- of course, they know
13 to run.
14 Q.  When Downie saw you with the cat, that was the
15 same day --
16 A.  He said, "Oh" --
17 Q.  Let me finish my question.
18 A.  Forgive me.
19 Q.  When he saw you with the cat, did he have a
20 meeting with you that day? Is that what he is referring
21 to? Yes?
22 A.  Later. He called -- may I talk?
23 Q.  Yes, yes, please.
24 A.  He called Buragino. Buragino called Harris and

Page 148

1  Ford. So it was a couple hours later.
2        When Jerry Downie come pulling up, he looks
3  at me, he shakes his head. I'm like, no, right. And he
4  comes walking in and he storms in the building and he
5  said, "Oh, no, we are not having this."
6        And I'm trying to explain to him. He kept
7  on marching. So by the time I got in my car, back down
8  to my office, Mr. Harris of course said what happened,
9  and I explained to him, I said, you know, they weren't
10 going to tell on all the girls, you know. Jeeze, I mean.
11       Jerry Downie was an officer of the state.
12 He could hire and fire. Then again, Delaware is at-will
13 state. You can be fired for the wrong color hairpiece.
14 You are not supposed to be escorted off the grounds, you
15 know, once you sexually harass somebody, but I'm the one
16 that got caught feeding the cat. They said, "Now we have
17 to have a talk with you about feeding the dumb cat."
18       I said, "Okay." And Mr. Ford and Mr. Harris
19 said, "Listen, when Mr. Buragino comes down here, just
20 agree with him, say I'm sorry, I'm never going to feed
21 another animal here, and just agree with everything and
22 get it done and over with."
23       So that's what I did. I agreed.
24 Q.  And so for that meeting it was Mr. Harris, Mr.

Page 149

1  Ford and Mr. Buragino?
2  A.  Yes, yes.
3  Q.  That was the only thing that was discussed, was
4  the cat?
5  A.  That was it.
6  Q.  Did they discuss your work performance?
7  A.  No, nothing.
8  Q.  So this is not true where it states in page 18 of
9  Snyder 6, it says, "As we discussed last Friday, February
10 28, 2003, in a meeting with Randolph Harris and Dennis
11 Ford, your attendance and work performance have been
12 unacceptable to the company and must improve
13 immediately," that was not discussed?
14 A.  No. It was about the cat.
15 Q.  Was it discussed at any time?
16 A.  Not that I recall. We had a meeting about a cat.
17 Q.  Would there be any reason that you would not
18 recall having work performance issues discussed?
19 A.  I think I would, if that was a problem. I'm not
20 going to do a job if I don't know how to do it. Or if I
21 need help with something, I will continue to ask for
22 help.
23       Just like they would ask me for help, so as
24 a team. No. And that was one of the things that stunned

38 (Pages 146 to 149)

Wilcox & Fetzer, Ltd.       Professional Court Reporters        (302)655-0477

B-0157

Snyder                                    v.                      Citi Steel, USA, Inc.
Terry L. Snyder                    C.A. # 04-970-JJF                    May 31, 2006

Page 150

1  me the most. I said, I cannot believe these people are
2  going to waste their time having a meeting over feeding a
3  cat that had actually -- but I wasn't going to tell on
4  the girls, you know, because I felt sorry for the nice
5  little cat. So, yes, that's how petty --
6      Q.  The next line down it says, "During the past
7  several months and on several occasions, Randolph Harris
8  and Dennis Ford have discussed these two subjects with
9  you."
10     A.  No, no.
11     Q.  That's false?
12     A.  The entire things is false. That's why you don't
13 see my signature on it, yes.
14     Q.  You believe that Mr. Buragino created this
15 information?
16     A.  No, Randolph. Randolph. This whole thing was
17 Randolph's idea, period.
18             Buragino was the vice president. He just
19 kind of had to be there. Buragino, no, he didn't work
20 directly in any of them office with us. He would pop in
21 and out. His office was on the main, main floor. So
22 no. He is going by what Randolph is telling him.
23     Q.  But he is saying in the first sentence that he
24 was at the meeting on Friday, February 28th.

Page 151

1      A.  Who is saying that?
2      Q.  Mr. Buragino. This memo is written by him.
3      A.  He may have typed this up. This was written --
4  he, he -- this letter here is going by everything that
5  Randolph Harris created. So he can type up anything he
6  wants. These are not Mr. Buragino's words. They are
7  Harris' words.
8      Q.  Okay.
9      A.  And Ford, I guess.
10     Q.  So both of them, Mr. Ford and Mr. Harris?
11     A.  I guess. Ford just went along with Randolph.
12 Ford didn't even want to, want to do that.
13     Q.  What makes you think that?
14     A.  Well, he told me. He told me that the whole
15 thing was Harris' idea.
16     Q.  Mr. Ford told you this?
17     A.  Yes, he did.
18     Q.  And the next line down, "During 2002" it starts,
19 it talks about attendance. Was your attendance an issue?
20     A.  Well, I did call out a couple days. But there
21 also, I asked off in advance.
22         Like my boss has known about today for a
23 couple of weeks. So, you know, they can put in here and
24 bring up and say whatever they would like. They can tell

Page 152

1  you the sky is pink and it is blue.
2      Q.  So they are liars?
3      A.  Yes.
4      Q.  All of them?
5      A.  Oh, and a lot of the things that I've read, that
6  I have received from them.
7      Q.  Is Mr. Ford a liar?
8      A.  Well, if he lied to me by saying this was Harris'
9  idea. I mean, you know, rightfully I don't think anybody
10 should come out and call anybody a liar.
11     Q.  Do you think he is dishonest?
12     A.  Yeah. Yes.
13     Q.  Do you think Mr. Buragino is dishonest?
14     A.  Well, I'm not saying that. I'm saying that I
15 think Buragino was listening to two gentlemen that work
16 for him, so he typed up something for his supervisor.
17     Q.  But him saying that he was at a meeting --
18     A.  I can't, I can't --
19     Q.  Let me finish my question please. By Mr.
20 Buragino typing on this letter, this memo, that he was at
21 a meeting with Mr. Harris and Mr. Ford on February 28th
22 wherein they discussed your attendance and work
23 performance as being unacceptable to the company, that's
24 an untruth; is that correct?

Page 153

1      A.  See, let me tell you, this day, this here --
2      Q.  March 3, 2003?
3      A.  -- is because of the cat. I'm hoping we are
4  understanding each other.
5          There was two issues. One was this.
6      Q.  Can you say what you are --
7          MS. BREWINGTON: Yes. For the record, what
8  are you pointing to when you say "this"?
9          THE WITNESS: The day they tried to have --
10 the day that they tried to have me sign this.
11         MS. BREWINGTON: What date? I'm sorry.
12         MS. DIBIANCA: Go ahead, Lori. That's
13 exactly what I'm going to say. That's fine.
14         MS. BREWINGTON: What date was that? What
15 date?
16         THE WITNESS: Okay. They had a meeting,
17 okay, and then they didn't present this -- okay. So the
18 meeting may have been, okay, the 28th, but they didn't
19 type this and print this and want me to sign it until the
20 cat.
21         MS. BREWINGTON: Okay.
22 BY MS. DIBIANCA:
23     Q.  I understand what you are saying.
24     A.  Is that better?

                                         39 (Pages 150 to 153)

Snyder                                      v.                    Citi Steel, USA, Inc.
Terry L. Snyder                      C.A. # 04-970-JJF                    May 31, 2006

Page 154

1    Q. Let me restate it and you tell me if I've got it
2  wrong. February 28th was one incident. March 3rd --
3    A. Because he wanted to show me authorization.
4  Okay. And then since Jerry Downie caught me with the
5  cat, that's when it became in black and white and that's
6  what we are getting here.
7    Q. Mr. Buragino didn't document the February 28th
8  meeting until March 3rd?
9    A. Exactly.
10   Q. Got it. So --
11   A. Did I do it right?
12   Q. He was saying here that there was a meeting, had
13  been already previously a meeting on February 28th
14  wherein Harris, Ford and Buragino discussed your work
15  performance as being unacceptable to the company. Is
16  that untrue?
17   A. All -- is what untrue?
18   Q. That there was a meeting on February 28th?
19   A. No, there was a meeting.
20   Q. Okay. Was Mr. Buragino --
21   A. But it was on false pretences. It was because of
22  Mr. Harris wanting to show me who had authority.
23   Q. Instead of the reason why the meeting was called,
24  what I'm just looking for, was there a meeting on the

Page 155

1  28th of February? Yes or no?
2    A. Yes.
3    Q. Okay. Was Mr. Harris, Mr. Ford, Mr. Buragino
4  present at that meeting?
5    A. Yes.
6    Q. And then the final part of that is, was your
7  attendance and work performance discussed as being
8  unacceptable to the company during that meeting?
9    A. Yes.
10   Q. So Mr. Buragino is not speaking an untruth for
11  that sentence?
12   A. As far as my work -- in other words, it was
13  discussed, but it was nothing but a lie. It was typed
14  up, but it is nothing but a lie.
15   Q. So you disagree that your work performance --
16   A. Exact, exactly.
17   Q. You got to let me finish.
18   A. Oh.
19   Q. So you disagree that your work performance -- you
20  disagree with what they said on 28th, but you agree that
21  it was said?
22   A. Yes.
23   Q. Okay. Got it. Anything else in this document
24  that you feel is a lie or an untruth?

Page 156

1    A. No. If I went up them escalators right now and
2  you are by my side, you are going to hear me say "I am
3  scared of heights." It still comes out.
4        I said ten times how good that salad was
5  while I was eating it. So, you know, I guess I am one of
6  them people to continue to repeat myself. I say, I still
7  climb them heights and I still go up them escalators if I
8  had to. So that's true.
9        Let me see. Well, I did tolerate him and I
10  continued to tolerate him, so...
11        Let's see. I think that was the only thing
12  in there that had truth to it.
13   Q. And then the last sentence it says, "Failure on
14  your part to improve your attendance and work performance
15  immediately and on a sustained basis will result in
16  disciplinary action that may include termination from the
17  Company." Is that the message that was communicated to
18  you at this time?
19   A. I don't recall that, but I wasn't worried about
20  it, because I knew I wasn't doing anything wrong and I
21  knew the whole report was false. And I know why I
22  actually ended up being escorted off the grounds, which
23  had nothing to do with this fake piece of paper, all the
24  false accusations.

Page 157

1    Q. Did you anticipate at this time that you were
2  going to be terminated?
3    A. No, no, I wasn't worried about that. Not at all.
4  If you are going to terminate somebody you ought to do it
5  right away. Not after they tell you what is going on.
6    Q. Let's do this as 7.
7        (Snyder Deposition Exhibit 7 was marked for
8  identification.)
9    Q. I'm going to submit to you that these are some of
10  the e-mails that were produced during discovery.
11   A. Yes.
12   Q. This stack happens to be limited only to ones
13  that are between you and Carmella Patrone.
14   A. Okay.
15   Q. So I just want to go through them briefly. The
16  first one, it is marked as Snyder Exhibit 7, page 1, it
17  is also identified as P228. The handwritten notes that
18  take up the bulk of this page, are those your notes?
19   A. Yes, ma'am.
20   Q. And when did you write those notes?
21   A. I don't know. I cannot remember.
22   Q. When did you print the e-mails?
23   A. I think, well, after they started following me
24  around.

40 (Pages 154 to 157)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

B-0159

Snyder
Terry L. Snyder

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 158

1    Q. Who was following you around?
2    A. Jerry Downie and Jim Ryan, his assistant.
3    Q. What were they following you around for?
4    A. Trying to get me to go home.
5    Q. Was this on a specific day or a sequence of days?
6    A. It was the day I went to EEOC, the 9th.
7    Q. April 9?
8    A. Yes. I told on the 8th. I came back in. They
9    had their morning meeting and they called me down and
10   then they begged me to go home and just think about
11   things.
12   Q. Okay. So these notes would have been written
13   after you left CitiSteel, after April 9?
14   A. Yes. They wouldn't let me go back to my office.
15   Was it the morning? I'm unable to answer that.
16   Q. That's fine. I just want to make sure --
17   A. Please forgive me because I can't remember.
18   Q. I just want to make sure they are not written the
19   same date as the e-mail, which is March 11.
20   A. I don't know.
21   Q. You don't know?
22   A. No, I don't.
23   Q. I thought they were written after April 9.
24   A. Oh, no. I don't know. When I wrote on the

Page 159

1    e-mails, I do not know.
2    Q. Well, there is a date here part way down, that
3    says something, "it takes three hours (11:20 p.m. on
4    4/9/03)", so you are discussing apparently an event that
5    occurred at 11:20 p.m.?
6    A. That's when they hid him. Wait a minute.
7    Q. So if you are documenting an event that
8    occurred--
9    A. Well, they --
10   Q. Let me finish. If you are documenting an event
11   that occurred on the 9th of April, is it safe to assume
12   that these notes were taken after the 9th or the day of
13   April 9th or some time thereafter?
14   A. I'm unable to say when I printed them. But it
15   was -- I printed them for a reason. And I tried to just
16   start hitting print, print, print, through all my
17   e-mails, because I knew what they were trying to do to
18   me.
19        So, but they hid Randolph Harris for like
20   three hours. They wouldn't let him back up into the
21   office until they got me out of the office.
22   Q. We are going to verify that. I just want to try
23   to set up a date.
24   A. Well, I --

Page 160

1    Q. Let's forget for a moment about when you printed
2    the e-mails.
3    A. Yes.
4    Q. Let's just assume that that is not relevant for
5    these purposes. Just limiting to the handwritten note
6    at the bottom of this page, is it safe to assume this was
7    written on or after April 9th, 2003?
8    A. After.
9    Q. Fair enough. Then on the next page --
10   A. I can't swear to that, though.
11   Q. Well, let's talk about that, because it says, you
12   date an event --
13   A. Yes, but if you read what I'm dating --
14   Q. Could it have been possible for you to discuss an
15   event that took place before it took place?
16   A. How can you discuss something that takes place
17   before it takes place?
18   Q. That's exactly what I'm asking.
19   A. No.
20   Q. Right. So it would have had to have been after
21   the event on 4/9/03 that you are referencing?
22   A. Okay. I understand. Yes.
23   Q. Okay. So the next page, page 2, can you tell me
24   what this is about?

Page 161

1    A. I found out that they said I wasn't doing my
2    share of the inventory.
3    Q. Who is "they"?
4    A. Well, I guess they had a meeting and somebody
5    tried to say I wasn't doing the share of my inventory.
6    Q. Who is "they" though? Who are we talking about?
7    A. Ford, Buragino, Blauvelt. I'm not good with his
8    name. Harris.
9        Carmella sometimes would do more than, you
10   know, just like I tried to do more than what I was
11   supposed to. But she was the main thing for the
12   inventory.
13   Q. That was her job?
14   A. No, that wasn't just her job. I mean, all of the
15   jobs consisted of, you know, several job duties. The job
16   description. But I walked every inch of that mill eight
17   with them, so...
18   Q. So this e-mail to Carmella, talking about --
19   A. I was offended she didn't tell me, yes.
20   Q. Can you just tell me, it says, "Harris, Ford,
21   Blauvelt" -- I'm not sure how to pronounce that --
22   "Buragino and yourself," meaning Carmella, "had a meeting
23   in regards," so your understanding was that those people
24   had a meeting about you and your job performance?

41 (Pages 158 to 161)

Wilcox & Fetzer, Ltd.

Professional Court Reporters

(302)655-0477

Snyder                                    v.                    Citi Steel, USA, Inc.
Terry L. Snyder              C.A. # 04-970-JJF                         May 31, 2006

Page 162

1   A. Yes. That's what I thought.
2   Q. Who told you --
3   A. Well, not my job performance. Not doing my share
4   of the inventory.
5   Q. Okay.
6   A. Because, see -- did I interrupt?
7   Q. No, not at all.
8   A. They all, everybody, we all took our own counts.
9   We all walked every inch of that mill, all of us, and 90
10  percent of the time together.
11        If Ford was going to be busy, he would do
12  his and then meet up. And they will all turn their
13  numbers into Carmella and myself.
14        So we are -- yes, we all did the inventory
15  together.
16  Q. Who told you that they had this metering?
17  A. You know, I can't remember how I found out. But
18  I was -- yes, I was offended. And whoever said that, you
19  can't point a finger, but I know who said it in my heart.
20  Q. Who do you believe said it?
21  A. Harris.
22  Q. So you believe that he called a meeting?
23  A. Sure. He was scared to death of me.
24  Q. Who is Blauvelt?

Page 163

1   A. Jeff Blauvelt. He was a purchasing agent.
2   Q. Is he an honest person?
3   A. I'm sorry?
4   Q. Is he an honest person, Mr. Blauvelt?
5   A. I assume. I don't know. Then again, we all
6   assume everybody is honest.
7   Q. You don't have any reason to believe he is not?
8   A. Never say never, I was taught.
9   Q. Do you have any reason to believe that he is not
10  honest?
11  A. To my face, I don't know.
12  Q. Do you have any reason to believe he is not
13  honest?
14  A. I never caught him in a lie. Then again, what he
15  says behind closed doors, like I said, never say never.
16  Have I ever caught him in a lie to be able to call him
17  dishonest, no.
18  Q. What did Carmella respond, if anything?
19  A. I don't know. I can't remember. She felt bad.
20  She felt bad and whatever.
21  Q. Did she say that there was a meeting?
22  A. Yes.
23  Q. Did she say that they had, in fact, discussed you
24  doing your share of the inventory?

Page 164

1   A. I don't recall that whole conversation.
2   Q. At the bottom of this it says "Tracking." You
3   had sent a receipt request on your e-mail to Carmella?
4   A. Yes.
5   Q. Why is that?
6   A. Oh, the computer I think automatically does that.
7   What do you mean, a receipt request? What do you mean?
8   Q. What do I mean?
9   A. Yes.
10  Q. Where it says "Tracking"?
11  A. Yes.
12  Q. "Recipient, delivery, read."
13  A. Okay.
14  Q. Looks like a read receipt?
15  A. She read it.
16  Q. Yes.
17  A. Yes. I sent it to her, and she read it.
18  Q. Do you normally turn tracking on for e-mails?
19  A. It stays on.
20  Q. Why wasn't it on the first page then?
21  A. I don't know. I have no clue. I didn't sit
22  there and go track every single e-mail. No, I don't
23  know.
24  Q. On page 3 it is not there either.

Page 165

1   A. What is page 3? I have no clue. I'm unable to
2   answer that.
3   Q. You said Harris is the one who called the meeting
4   with Carmella.
5       I'm sorry, you didn't say that. You didn't
6   say he called the meeting. You said you believed?
7   A. I am unable to answer that because I do not know.
8   Q. And you did say that earlier. I apologize. But
9   you said that you believed that he --
10  A. In my heart, yes.
11  Q. Go ahead. In your heart what?
12  A. I already answered that just a few moments ago.
13  Q. I don't know if we are on the same page. In your
14  heart you believed what?
15  A. Whose idea it was.
16  Q. To call the meeting?
17  A. Yes.
18  Q. Okay. Just wanted to make sure we are on the
19  same page.
20  A. But I don't know. Because I was not there and I
21  wasn't called to the meeting, so I cannot honestly answer
22  that. I'm just stipulating I believe in my heart.
23  Q. Did you tell Carmella that you thought you were
24  being harassed?

42 (Pages 162 to 165)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Snyder
Terry L. Snyder

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 166

1  A. Yes, I told that to her.
2  Q. When did you tell her?
3  A. I think -- well, middle of March. Soon, right
4  around these e-mails here. Yes.
5  Q. How long at that point do you claim harassment
6  had been going on?
7  A. Well, if you consider saying I'm going to take
8  you out for a beer some day, I guess you would say day
9  two --
10  Q. I'm asking you what you consider.
11  A. Well, he started sniffing me, telling me he wants
12  to take me away, squeezing my cheek, stroking my hair.
13  Q. When was that?
14  A. Mid, mid-2002. Somewhere around there.
15  Q. Mid-2002?
16  A. Well, it just continued to escalate.
17  Q. Well, at what point did you feel that you were
18  being harassed? Not looking back now, but at what point
19  during that time?
20  A. Standing there staring.
21  Q. When was that?
22  A. Oh, I don't know. 2002. Really, I mean, he
23  would give looks, you know. Like we are looking at each
24  other now, we could be looking at each other in the exact

Page 167

1  same way, but you are looking at me meaning something
2  totally different. So you can't just jump -- are you
3  following me?
4  But once it started becoming, you are such a
5  pretty woman, you know, and then it just kept escalating,
6  coming in stroking my hair.
7  Q. And that's kind of what I want to narrow down as
8  far as time frame, is when did you say to yourself, this
9  is not just a friendly look or whatever the circumstance
10  is? I want to know when it was that you said to yourself
11  I am being harassed.
12  A. Probably before I finally punched my boss.
13  Q. Okay. Which was?
14  A. Well, way before I punched my boss.
15  Q. When did you punch your boss?
16  A. March 2003.
17  Q. Which boss did you punch?
18  A. Mr. Harris.
19  Q. When you say "punch" you mean physically hit him?
20  A. Yes, ma'am.
21  Q. Where did you physically hit him?
22  A. His hand.
23  Q. Okay. So that was in March 2003. So before that
24  you felt that you were being harassed?

Page 168

1  A. Yes.
2  Q. When did you start feeling that you had been
3  harassed, that you were being harassed?
4  A. Knowing for sure, 2002, middle.
5  Q. I mean, we have to narrow it down to a time
6  frame. We can't say just for the whole year or for the
7  middle. We have to get a better idea of when.
8  A. Well, not the very beginning of 2002, but more,
9  you know, towards the -- not the beginning, but the
10  middle, towards the middle.
11  Q. Was there a specific event that made you decide
12  that this was over a line, crossed over a line of some
13  kind?
14  A. Sure.
15  Q. Okay.
16  A. Every time, like especially on a Monday, how was
17  your weekend, what did you do, I eventually just stopped
18  telling him.
19  My boyfriend, they own property up in the
20  mountains, and just got to a point, never failed, all the
21  time, especially on Mondays, when you going to let me
22  take you away for the weekend, just etcetera.
23  Q. So Monday mornings regularly he would ask you
24  what you did over the weekend?

Page 169

1  A. Not every single Monday morning, but the majority
2  of Monday mornings. Because I went away a lot on the
3  weekends.
4  Q. He would ask you --
5  A. Always asked me what I did over the weekend.
6  Q. And at what point did you say, did you decide for
7  yourself that that question was inappropriate?
8  A. Probably after the -- I don't know how many
9  times. After him saying it many times. So I just quit
10  answering him. I would just say nothing, act like I went
11  nowhere. I wouldn't tell him anymore. Because then I
12  knew, you know, it would just turn into a bunch of crap
13  coming out of his mouth.
14  Q. Is that when you punched him?
15  A. Oh, no.
16  Q. Why did you punch him?
17  A. I don't know what he was grabbing at, but he was
18  grabbing. I don't know if it was -- I guess it was one
19  of the times when he went to stroke my hair. I didn't
20  literally -- I didn't, you know, but like (indicating).
21  MS. BREWINGTON: Describe what you are doing
22  for the record.
23  THE WITNESS: Don't describe?
24  MS. BREWINGTON: No, please describe.

43 (Pages 166 to 169)

Snyder
Terry L. Snyder

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 170

1 THE WITNESS: I punched back at him, from
2 stroking my head, my hair. I don't know what you want me
3 to do. I don't know what to do. (Indicating).
4 BY MS. DIBIANCA:
5 Q. So this e-mail on Snyder 7, page 6, also marked
6 as page P211, dated April 7th, 2003, from you to Carmella
7 Patrone, would this be around the time that you first
8 told Carmella about what you felt was sexual harassment?
9 A. No. We went to -- yes. This was a Monday. We
10 went to -- she knew a week or two in advance. Because we
11 went to dinner this night. We met at, right over the --
12 I don't know if it is over the Pa. line. We met at, I
13 think there is an Outback right off of 202. I went home,
14 showered and changed. Her and I met for dinner.
15 Q. On the 7th?
16 A. On the 7th, that evening. She knew.
17 Q. For about a week, you said?
18 A. Maybe a week or so, yes.
19 Q. Why didn't you tell her prior to that?
20 A. I'm sorry?
21 Q. Why did you not tell her prior to that time?
22 A. I really didn't want to drag her or anybody else
23 into anything, you know.
24 Q. Would you say -- go ahead.

Page 171

1 A. I'm sorry. You go ahead.
2 Q. You said the harassment had been going on at this
3 point I guess for over a year or about a year?
4 A. Sure. She wanted to tell -- she said, "If you
5 don't tell, I'm going to." Carmella was furious.
6 Q. For a year you didn't tell anyone?
7 A. No. My parents. My boyfriend didn't even find
8 out until, what was it, January 2003.
9 Q. I suppose I'm just trying to figure out why that
10 is.
11 A. Why what is? Well, I figured he would stop. No
12 means no. I loved my job. I had a routine. I was at
13 the gym every morning at 5:00 o'clock. I went to work.
14 You know, I had a routine. I wasn't going to let
15 somebody just blow me out of there because I'm a female.
16 That didn't give him the right to sniff and
17 grab me everyday, and stand there and stare at me for as
18 long as he wants. There is a million phones up there and
19 he always had to come in my office and stand there and
20 use my phone.
21 Q. Did you get a handbook when you started at
22 CitiSteel?
23 A. Yes, ma'am. Once I became an official employee.
24 Q. In the handbook did it discuss the sexual

Page 172

1 harassment policy?
2 A. Yes, ma'am.
3 Q. Did you review the handbook?
4 A. Yes, ma'am.
5 Q. When did you review it? When you started?
6 A. Yes. Did I remember every single thing in it?
7 No. I don't think anybody does.
8 Q. Did you know there was a sexual harassment policy
9 in place?
10 A. Yes. There is one of them everywhere, yes.
11 Q. Did you ever receive any training from CitiSteel
12 on sexual harassment?
13 A. No.
14 Q. Any kind of posters or anything in place about
15 sexual harassment in the work place?
16 A. No, ma'am.
17 (Snyder Deposition Exhibit 8 was marked for
18 identification.)
19 MS. DIBIANCA: I'm going to move that in and
20 then we can take a break.
21 (Recess taken.)
22 BY MS. DIBIANCA:
23 Q. Before the break we had just admitted Snyder 8,
24 which was the handbook. Do you have that one?

Page 173

1 A. Yes.
2 Q. Have you seen that before?
3 A. Yes.
4 Q. Does this appear to be part of the handbook that
5 you received at CitiSteel?
6 A. Yes.
7 Q. And if you turn to page 22 of Snyder 8, also
8 marked as P69.
9 A. I'm sorry, what?
10 Q. 22, page 22.
11 A. Oh, I'm sorry.
12 Q. At the top it says "Sexual and Other Prohibited"
13 --
14 A. Yes, "General Policy Manual."
15 Q. Is this the sexual harassment policy that you are
16 familiar with from CitiSteel?
17 A. Yes, it looks to be, yes.
18 Q. On page 23, the second paragraph under
19 "Procedures" --
20 A. Yes.
21 Q. -- could you just read the first sentence for me,
22 please?
23 A. "All employees will be" --
24 Q. Actually the next paragraph down. I'm sorry.

44 (Pages 170 to 173)

Snyder
Terry L. Snyder

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 174

1 "Any employee"?

2     **A. "Any employee who believes he or she has been the**

3 **subject of harassment in violation of this policy should**

4 **report the alleged act immediately to his or her direct**

5 **Supervisor. Be directed to either the Department Manager**

6 **or the Director of Human Resources."**

7     Q. And the next page, page 24, also marked as D15,

8 is that your signature acknowledging receipt of the

9 handbook?

10     **A. Yes, ma'am.**

11     Q. All right. Even though the policy said that all

12 employees should report it to the department manager or

13 the --

14     **A. Supervisor, immediate supervisor.**

15     Q. Even though it said that you did not do that?

16     **A. Immediately I did not, you are correct.**

17     Q. And it was how long before you did report it to a

18 manager?

19         Let me --

20     **A. A year. A year.**

21     Q. The first time you reported it would be April 8th

22 or 9th?

23     **A. Yes, ma'am.**

24     Q. 8th?

Page 175

1     **A. Yes.**

2     Q. Of 2003?

3     **A. Yes.**

4     Q. Let's do this as Snyder 9.

5     (Snyder Deposition Exhibit 9 was marked for

6 identification.)

7     **A. Here is the answer to some of your questions**

8 **earlier. I knew we had it somewhere.**

9     Q. All right. Can you tell me what this document

10 is?

11     **A. I'm sorry, ma'am?**

12     Q. Tell me what the document is for the record.

13     **A. I assume it is an application. It looks to be an**

14 **application.**

15     Q. An application or is this your job application to

16 CitiSteel?

17     **A. Yes.**

18     Q. I just need to get you to say it on the record.

19     **A. Job application to CitiSteel, yes.**

20     Q. And this is dated 8/24/2001, is that right, on

21 D2, the second page?

22     **A. I'm not following.**

23     Q. On the second page, right next to your signature

24 there is a date. Could you tell me what the date says?

Page 176

1     **A. It says, yes, August 24th, 2001, yes.**

2     Q. And let's run through your employment history.

3 Maybe this will help refresh your recollection.

4     **A. Yes.**

5     Q. Once you've had an opportunity to look at it then

6 maybe you can let me know if there is anything on here

7 you would like to talk about that you couldn't recall

8 before.

9         Anything on here to supplement your prior

10 answers?

11     **A. These were actually the answers I couldn't**

12 **remember to be exact for you earlier. So no. It is all**

13 **correct.**

14     Q. Oh, no, I didn't mean it is not correct. I just

15 mean before you couldn't recall the names of some of the

16 places and times.

17     **A. Yes, well, see -- yes, I recall now with**

18 **everything right in my face.**

19     Q. So Associates is listed here as an employer prior

20 to CitiSteel.

21     **A. Yes.**

22     Q. What was the nature of that employment?

23     **A. I was a customer support representative.**

24     Q. Was this a bank?

Page 177

1     **A. Yes.**

2     Q. Okay.

3     **A. Forgive me.**

4     Q. That's okay. Then the next employer you listed

5 is First USA. So would that have been the second bank

6 that you mentioned?

7     **A. Yes.**

8     Q. And then Delaware Park is also listed here,

9 which you did mention previously.

10     **A. Yes.**

11     **(Discussion off the record.)**

12     Q. So Delaware Park Racetrack, you had mentioned

13 that earlier, and your last date of employment there is

14 listed as November 1998, which you did testify to

15 earlier. But then First USA it says you started in April

16 2001 until August of 2001. Is that what it says here?

17     **A. Yes. I had taken a -- it was located on almost**

18 **Greenhill and 4th Street. I had taken a class there as**

19 **well, and they actually got me offered -- First USA**

20 **offered us students interviews, and as soon as my class**

21 **was over I started immediately with First USA. I**

22 **remember that, yes.**

23     Q. You were unemployed from 1998 to 2001, November

24 1998?

45 (Pages 174 to 177)

Wilcox & Fetzer, Ltd.

Professional Court Reporters

(302)655-0477

Snyder                        v.                        Citi Steel, USA, Inc.
Terry L. Snyder          C.A. # 04-970-JJF             May 31, 2006

Page 178

1   A. Well, no. I don't know what I did, but, no, I
2   wasn't just completely unemployed, no. I do not recall.
3       I know I took a class in the beginning of
4   2001, because that school --
5   Q. What is the school's name?
6   A. I do not recall.
7   Q. What was the program for?
8   A. CP -- I think the school is still there. It is
9   actually, it is at the very end of 4th Street on the
10   left. The next road down intercepts with Greenhill, I
11   think. It was letters, the name of the school was
12   actually letters.
13   Q. How long was the program?
14   A. A couple months.
15   Q. And you don't know what kind of class you took?
16   A. No. It was a mixture of stuff. At one point
17   they even -- at one point they wanted to, which I already
18   knew, I had plenty of business attire, but for some
19   people who had never applied for an interview and so
20   forth, they, you know, would show people how to sit and
21   behave even during the interview.
22       Please forgive me. I can't remember
23   anything about it. But I remember that that school got
24   me an interview with First USA.

Page 179

1   Q. So the couple of months that the program was,
2   that was all about interviewing or --
3   A. No, no. I don't remember, as horrible as that
4   sounds.
5   Q. Do you have any documents at home that would
6   refresh your recollection?
7   A. If I do, they are packed away somewhere. If you
8   want, for you's, if I'm allowed, I'll do a drive-by. I'm
9   pretty sure the school is still there. I'll do a
10   drive-by for you.
11   Q. Is there a reason that you can't remember?
12   A. No. The school -- it was nothing but initials.
13   That's -- yes.
14   Q. Okay. And is there any reason here that you
15   would have not indicated any additional employment?
16   A. No.
17   Q. Okay. So is it fair to assume then that there
18   was not employment from --
19   A. Maybe through temp services. Other than that,
20   no, no. My answer to your question is no.
21   Q. So other than temp services, from November 1998
22   until April 2001 were you gainfully employed?
23   A. What you see.
24   Q. I see that you were not employed during that

Page 180

1   period. Is that correct?
2   A. Isn't there some kind of search we do where we
3   punch in my Social Security and find out? Because I'm
4   fine with that. I don't see what really -- I mean, I
5   know this is part of everybody's job, but I think this
6   stuff is totally irrelevant from what them people did to
7   me. But I'm more than willing to sign and you can find
8   out anything. Because I, I apologize, I do not have
9   exact answers and dates for you. So you may feel free to
10   look up anything you choose about me.
11   Q. But I'm asking you for over two years, you don't
12   remember whether you were employed?
13   A. No, no, I do not.
14   Q. Do you know if you collected unemployment, ever?
15   A. After the racetrack I think I did for a little
16   bit. Mm-hmm.
17   Q. What is "a little bit"?
18   A. I do not recall.
19   Q. A year?
20   A. I do not recall.
21   Q. Did you collect disability?
22   A. No, ma'am.
23   Q. Social Security?
24   A. No, ma'am.

Page 181

1   Q. Would you have any way to support yourself during
2   a two-year period without income?
3   A. You mean source of money?
4   Q. Yes.
5   A. Well, my significant other. My father would help
6   me if and when I needed it.
7   Q. Rene Nye, she is listed as a professional
8   reference.
9   A. Yes.
10   Q. Is that a personal friend?
11   A. Yes.
12   Q. And do you still keep in contact with her?
13   A. Yes. Periodically. I have been so busy.
14   Q. Have you talked to her since the lawsuit has been
15   filed?
16   A. Oh, of course.
17   Q. Have you discussed the lawsuit with her?
18   A. Yes.
19   Q. Okay. Earlier I asked you if you had discussed
20   it with any of your friends and you said with your
21   significant other and your parents. Did you need to
22   supplement that answer at this time?
23   A. I must have forgot, yes, because she is my very
24   best friend.

46 (Pages 178 to 181)

Snyder                              v.                  Citi Steel, USA, Inc.
Terry L. Snyder              C.A. # 04-970-JJF                 May 31, 2006

Page 182

1    Q.  Anybody else you need to supplement at this
2  point?
3    A.  No.
4    Q.  The medicine you are currently taking, the
5  prescription medicine you said earlier, what is it that
6  you are currently on?
7    A.  You mean the pain pill that I take a half a pill?
8  E-N-D-O -- Endocet, E-N-D-O-C-E-T.
9    Q.  And no other prescriptions at this time?
10   A.  No. Now, which they are all still in the bottle,
11 alprazolam. That's one of the things that he was giving
12 me when -- because I also had trouble sleeping. I was
13 crying, just little mental mess. Saw one of them mental
14 doctors when I thought my whole little life was over. So
15 I actually submitted labels, copies of the labels.
16   Q.  Submitted them where?
17   A.  To my lawyer's office.
18   Q.  In this case. I'm sorry. I understand.
19   A.  Yes.
20   Q.  So you produced them, I understand. The last
21 time you had that prescription filled was when?
22   A.  He gave me another one a couple -- excuse me -- a
23 couple months ago or a month ago.
24   Q.  Who? Which doctor would this be?

Page 183

1    A.  But I still have them all.
2    Q.  The prescription bottle or the prescription form
3  you still have?
4    A.  The pills. All the pills are still in the
5  bottle.
6    Q.  What is the doctor that prescribes that?
7    A.  Dr. Goodman. It is for anxiety.
8    Q.  When was the first time you got that prescribed?
9    A.  After CitiSteel.
10   Q.  Do you have to report to Skully what prescription
11 medicines you are taking?
12   A.  Skelly.
13   Q.  Skelly, I'm sorry, Skelly.
14   A.  I don't know. They didn't ask.
15   Q.  Have you ever reported to them what prescription
16 medicines you are currently taking?
17   A.  If they ask me, I will.
18   Q.  No. Have you ever?
19   A.  No.
20   Q.  Okay.
21   A.  But like I said, they are all still in the
22 bottle.
23       You mean let them know that they were
24 prescribed to me even though I haven't taken them?

Page 184

1  Either way, the answer would be no.
2    Q.  Okay. What pharmacy do you go to?
3    A.  Happy Harry's.
4    Q.  Which Happy Harry's is that?
5    A.  Usually the one on Philadelphia Pike, which I
6  brought a copy -- I actually have a copy of that with me.
7    Q.  Of what?
8    A.  Never mind.
9        MS. BREWINGTON: What is wrong?
10       THE WITNESS: My -- I don't know if I'm
11 allowed. I don't know.
12       MS. BREWINGTON: I don't know what you are
13 about to say. You have what?
14       THE WITNESS: The thing from Happy Harry's.
15       MS. BREWINGTON: Where is it?
16       THE WITNESS: In my pocketbook.
17       MS. BREWINGTON: It is up to you guys. It
18 is her medicine, prescriptions I think. Do you guys want
19 that?
20       MS. DIBIANCA: Yes.
21       THE WITNESS: Nobody will be mad.
22       (Discussion off the record.)
23 BY MS. DIBIANCA:
24   Q.  You just handed me a document. Can you just tell

Page 185

1  me what the document is?
2    A.  It is a list of medicines the therapist was --
3  from Happy Harry's on the Philadelphia Pike, forgive me,
4  from April 2003 to December 2004.
5    Q.  I'm going to write that down. April 2003 until
6  December 2004?
7    A.  Yes, ma'am.
8    Q.  What is it listing?
9    A.  Well, Dr. -- that was for my back. The
10 therapist, therapists are not allowed to give
11 prescriptions. So Dr. Goodman was giving me
12 prescriptions. Lexapro, it helps you stop being
13 depressed and helps you stop crying. And alprazolam
14 calms you down.
15   Q.  So it is a listing of the medications and I guess
16 dates, is it?
17   A.  Yes. Sorry.
18   Q.  That's okay. When did you get this document? Is
19 this something you just requested recently from them or
20 did you already have it and just come across it again?
21   A.  A couple of days after my lawyer and I met last.
22   Q.  So it is something you requested for the
23 litigation?
24   A.  Yes, ma'am.

47 (Pages 182 to 185)

Snyder                                      v.                         Citi Steel, USA, Inc.
Terry L. Snyder                    C.A. # 04-970-JJF                        May 31, 2006

Page 186

1    Q.  And when I asked you today if you had any
2    documents you said no.  Is this the only document you
3    brought with you today?
4        A.  Yes.  Let me look.  I got my checkbook.
5    No, that's just dates.  Checkbook.  License.
6    Crystal Light.  That is it, ma'am.
7            MS. COLES:  What was the dates?
8            MS. BREWINGTON:  It was deposition dates.
9    BY MS. DIBIANCA:
10   Q.  Let's go back to CitiSteel.  What was the nature
11   of --
12           MS. COLES:  Is that going to come in as an
13   exhibit?
14           MS. DIBIANCA:  We can do that, as the next
15   exhibit.
16           (Discussion off the record.)
17   Q.  Let's go to the work place of CitiSteel.  Can you
18   tell me just the nature of the work place where you were
19   in?  Correct me if I'm wrong.  Furnace caster or melt
20   shop, is that the same thing?
21       A.  Yes.
22   Q.  Okay.  Was it a casual environment?
23       A.  Casual dress?
24   Q.  I understand you were in a uniform?

Page 187

1        A.  Yes.
2    Q.  So I just mean the interaction between employees.
3    Like I would say we have a somewhat formal environment
4    here at the law office.  So would you say it was a casual
5    environment?
6        A.  Yes.
7    Q.  You tell me in your own words what the
8    environment was.
9        A.  It was a dirty environment.  A lot of dust.
10   Everybody had a job to do.  But just like every other
11   work place, there is water cooler talk.  There is hello,
12   how is your family, how is your day.
13   Q.  Casual small talk?
14       A.  And the more you get to know someone, you know,
15   more and more so casual.
16   Q.  Was it friendly?
17       A.  Yes.  Yes.  A lot of people talk about each other
18   a lot behind each other's back.  Again, that's everywhere
19   you go in life I guess.
20   Q.  Would it be fair to describe it as a shop?
21       A.  Shock?
22   Q.  Shop?
23       A.  Shop.
24   Q.  I'm trying to think of a correct word.

Page 188

1        A.  A mill.
2    Q.  A mill, okay.  Were there other women in melt
3    shop?
4        A.  No.
5    Q.  You were the only woman employee?
6        A.  As far as I know.  If there was, I -- there may
7    have been.  There may have been one other -- yes, there
8    was one other.  I think I may have seen her pass by once.
9    Her name may have been Tracey.  I think CitiSteel may be
10   able to answer that more accurately.
11   Q.  It was almost exclusively males, I suppose?
12       A.  Yes.
13   Q.  And that was because of the nature of what they
14   were doing?
15       A.  I would say so.
16   Q.  Where does Mr. Tobin work?
17       A.  For IMS.
18   Q.  What is that?
19       A.  It is a contractor that works for CitiSteel.
20   Q.  So he works on the site, the CitiSteel site, but
21   he is not actually employed by CitiSteel?
22       A.  Exactly, yes.
23   Q.  What does he do for them?
24       A.  He is a pit loader.

Page 189

1            (Discussion off the record.)
2            (Snyder Deposition Exhibit 10 was marked for
3    identification.)
4    BY MS. DIBIANCA:
5    Q.  When did he start that job?
6        A.  April 2002.
7    Q.  So that was after you started at CitiSteel?
8        A.  Yes, ma'am.
9    Q.  Did you help him get a job there?
10       A.  Well, kind of, sort of.  I got him the
11   interviews.
12   Q.  Okay.  Did you recommend him to someone?
13       A.  I overheard or Mr. Harris may have said do I know
14   actually anybody looking for a job.  And I know Mr. Tobin
15   wasn't happy.  I think -- don't hold me to it.  I think
16   at that time he was doing concrete.  I'm not positive.
17           But, at the same time, Mr. Tobin happened to
18   had read an article in the paper about IMS.  Kind of both
19   happened right about the same time.  So when I told Mr.
20   Harris I know someone, and so he informed Skip, which
21   is -- I'm sorry, I don't know Skip's real name.  He is
22   the boss at IMS.  Then he come and talked to me and said,
23   you know, can you get him in here and have him come in at
24   this day and time or whatever.

48 (Pages 186 to 189)

Snyder
Terry L. Snyder

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 190

1    And he did so, and I guess he filled out an
2    application, and then they sent him for drug and
3    physical, alcohol, whatever. All companies take
4    different tests. And then he started his training.
5        Q. Now, did you work the same shift?
6        A. No.
7        Q. What shift did he work?
8        A. He worked 11:00 o'clock at night until 7:00
9    o'clock in the morning, where I worked 6:30 to 2:30 in
10   the afternoon.
11       Q. So did you usually see him in the morning for
12   that period, sort of overlap?
13       A. If he was digging -- when you come down the
14   alley, even though it is outdoor, a mill is a mill. It
15   is indoor, but it is outdoor, holes all over the metal.
16   There is no closed doors.
17       So once you come down the alley and you come
18   in, for me to walk over and to go up the steps, say a
19   little bit past that wall, over, down, down there
20   (indicating) far away -- I don't know the feet distance
21   so it can't be recorded. If somebody can guess that feet
22   distance is where the pit loader would dig a pit.
23       So once in a great while, as I was all
24   geared up -- and, of course, there is smoke everywhere.

Page 191

1    Sometimes you may -- I could see the pit loader, but I
2    couldn't necessarily -- you could have been driving that
3    pit loader, because of all the dust, because of all the
4    smoke, because of the goggles, my goggles fogging up,
5    because of the gear.
6        But if you know it is -- if I know your
7    shift, nine out of ten it is you inside that pit loader.
8    So kind of, sort of would, I would pass because I had to
9    get to my office, climb the steps.
10       Q. Was there cursing at the work place for the melt
11   shop?
12       A. Not, not much. It is that type of environment.
13   If somebody was mad and arguing, I guess, they would say
14   what they say. I didn't run around cussing until I got
15   to a certain point, basically, with Mr. Harris.
16       Q. But other, like the shop workers, I mean, did
17   they cuss?
18       A. I'm sure they did. Everybody didn't just run
19   around every day saying F you and things like that. I
20   mean, curse words came out, you know. A mill shop, a
21   steel mill, a hundred percent different than this
22   environment here.
23       Q. That's exactly what I'm looking for, kind of an
24   idea of the nature of the shop. Did Harris cuss, curse?

Page 192

1        A. Sure.
2        Q. More common than others?
3        A. I'm not going to say that. I can't say that. I
4    don't know.
5        Q. Did Ford curse?
6        A. I don't know.
7        Q. What about sexually explicit language, was that
8    used?
9        A. No.
10       Q. No?
11       A. No. By one.
12       Q. By who?
13       A. Mr. Randolph Harris.
14       Q. He used sexually explicit language?
15       A. Is there a certain definition by you saying it in
16   that term, explicit?
17       Q. No.
18       A. What is the difference between sexual harassing
19   me and explicit? I don't know the difference.
20       Q. Sexually explicit. That's good that you asked.
21   Sexually explicit, I mean sort of vulgarities or
22   profanities not directed at a person necessarily but, for
23   example, telling sexually natured jokes would be an
24   example of that?

Page 193

1        A. No, no.
2        Q. No, okay.
3        A. Not that I recall, no.
4        Q. How would you describe your language as compared
5    to the other employees?
6        A. Just normal.
7        Q. Did you use more profanities?
8        A. Than?
9        Q. Than others, than the general?
10       A. Actually, I didn't cuss until, I said, I started
11   cussing at Mr. Harris.
12       Q. When did you start cussing at work?
13       A. I thought over a matter of time it would -- you
14   know, he was going to stop. I mean, when does somebody
15   finally take no and leave me alone seriously. But I just
16   -- I started boiling. I started getting madder and
17   madder, especially as time came about. So, I don't know.
18   Towards the end I guess.
19       Q. 2003?
20       A. Well, I'm going to say I cursed in 2002.
21       Q. And then were people loud at work? Did they
22   speak in a normal voice? What was sort of the
23   temperature among employees?
24       A. I'm naturally a loud person. I guess it

49 (Pages 190 to 193)

Page 194

1  depended. Sometimes, you know, you can't help but hear
2  if two people sitting outside your office trying to
3  whisper about the person two offices down from you. I
4  mean I guess it depended on the conversation. But just a
5  normal voice tone, besides loud me. I'm naturally loud.
6         Until I got mad, then I was a ranting,
7  raving.
8     Q. You mean on a specific incident or just after a
9  certain period of time you were permanently --
10    A. No, specific things.
11    Q. Did you have specific instances at work where you
12 were, as you said, ranting?
13    A. Sure. Yes.
14    Q. Can you tell me when they were?
15    A. As far as dates and times exactly to be specific,
16 not at the moment. But after sometimes even in the
17 morning when he would sniff me.
18    Q. How often did you have instances where you were,
19 what did you say --
20    A. I didn't say anything at first, when he first
21 started sniffing me. And then every day he would ask me
22 what flavor I was.
23    Q. Every day?
24    A. Almost every day, it got to be. It just kept

Page 195

1  building up.
2     Q. When did it get to be that?
3     A. Well, towards, every day, about 2003, the end of
4  2002. Sometimes he would miss a day or two, though, you
5  know.
6     Q. So he was asking you almost daily or at least
7  regularly --
8     A. Sniffing.
9     Q. -- smelling you and you never reported that to
10 anyone; is that correct?
11    A. That's correct.
12    Q. And why is that?
13    A. Well, I thought he would stop. I mean, I didn't
14 want to see anybody fired. I really didn't.
15    Q. Did you believe he would be fired if you reported
16 that?
17    A. Yes. I didn't want to see anybody fired. I
18 wasn't trying -- you know, and I heard he just bought a
19 house with his family, you know. I wasn't trying to
20 destroy anybody's life. I just wanted to be left alone
21 and do my job.
22    Q. Did you feel he should have been fired?
23    A. Now, after he is still gloating around up there
24 and here I did nothing wrong, and I'm not there, and then

Page 196

1  the way they treated me, trying to ship me to shipping,
2  something should be done with someone, because I did
3  nothing.
4         The wrongest thing I did was reported a
5  little late and that's because I was hoping that he would
6  stop. Who would continue to do that? And why?
7         So, you know, I felt sorry, I actually felt
8  sorry for him, and, yes, I did think he was going to lose
9  his job. I don't want to see anybody ever lose their
10 job. He loved his little girl. He spoke of her often.
11 You know, and apparently they just -- they got a house.
12 I didn't want to hurt anybody. I wasn't trying to
13 disrupt anybody. But when he wouldn't stop and this
14 wouldn't stop, I was sickened to my stomach by it.
15        So that's the wrongest thing I did, was tell
16 late. But once I did tell, I followed the steps in the
17 handbook. I went to my other supervisor, and then he
18 went to HR, and then so forth and whatnot.
19    Q. You went to Ford?
20    A. Yes, ma'am.
21    Q. Do you want to talk about that? We can skip
22 ahead to that.
23    A. We have talked about everything under the sun.
24 We can talk about whatever is required.

Page 197

1     Q. Well, we can. We can skip ahead to that if you
2  would like. You reported it to Ford. Tell me what
3  happened. Tell me what the date was and --
4     A. April the 7th. Randall didn't come to work that
5  day.
6     Q. When did you decide to report it?
7     A. I was sitting there and I couldn't concentrate on
8  my work anymore.
9     Q. It was that morning?
10    A. Nobody was around. And Dennis was in and out of
11 the office.
12        When you walk in, you have an office to the
13 right, second door was mine, third door was Randolph's,
14 straight on down was Ford.
15        So Randolph -- Ford, you know, he would go
16 down and check on the slab yard, you know, just mosey
17 around, check on employees, make sure they are doing
18 their job.
19        So, it was dead up there. And I was just
20 sitting there sickened to my stomach, and I couldn't
21 concentrate, and Carmella had kept pushing me, saying,
22 "If you don't tell, I'm going to." It was to the point
23 it was on my mind even before, after, during. It was
24 getting to be an unstopped thing. So I figured nobody

50 (Pages 194 to 197)

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 198

1   was around, I figured it was best to tell.
2       Q.   There wasn't like a specific instance that
3   triggered it as much as it was just you felt it was the
4   right time; is that right?
5       A.   Yes.
6       Q.   And then you went --
7       A.   Well, it hit me because, you know, I couldn't
8   concentrate.
9       Q.   And then you went and talked to Mr. Ford. And
10  what did you tell him?
11      A.   I told him that Randolph had been harassing me.
12      Q.   Can you tell me --
13      A.   I don't remember word for word. But basically,
14  you know, what he had been doing and so forth. He said,
15  okay, he said -- well, actually at first he said, "I
16  don't believe you." And I said, "I don't care what you
17  believe. It doesn't matter what you believe," I said, "I
18  know what he has been doing, and I'm informing you like
19  I'm supposed to."
20           And he said, "Okay," he said, "well, I have
21  to let Jerry Downie know and then we will call you." It
22  was a couple hours.
23      Q.   Jerry Downie, he was the HR manager at the time?
24      A.   Yes, ma'am.

Page 199

1       Q.   So was that in line with what the policy was as
2   far as what Mr. Ford was supposed to do, how he was
3   supposed to handle your complaint?
4       A.   I assume so. He told Jerry Downie -- it took him
5   awhile to call me down. By the time -- well, Mr. Ford
6   actually called and said, "Terry, can you come down to
7   HR?"
8            And when I got down there, Ford actually
9   wasn't there. Ford had left by the time I got there. It
10  was actually just Greg Buragino and Dennis Ford sitting
11  there. And that's when Mr. Downie had a couple blank
12  pieces of paper and a pen and asked me to write down
13  everything that I told him.
14      Q.   So I'm just going to back up just to make sure I
15  get everything right. This is April 7th. You went to
16  Ford and reported to him what your experience had been?
17      A.   Yes.
18      Q.   And at first he said that he didn't believe the
19  allegations; is that right?
20      A.   Yes.
21      Q.   And then he said he was going to have to report
22  it to Mr. Downie?
23      A.   Yes.
24      Q.   And then --

Page 200

1       A.   After I told him I didn't care what you believe,
2   you are not here to judge, you know. He is not there to
3   believe me or not, you know. He shouldn't be talking to
4   me like that.
5       Q.   And then who was the one that actually called
6   you? I'm sorry?
7       A.   Mr. Ford called.
8       Q.   Ford called and you went to the office and --
9       A.   I thought he --
10      Q.   Go ahead.
11      A.   Forgive me. I thought he was actually down
12  there, the way he said, "Can you come down here?"
13           But when I got down there, because you have
14  to walk down all the steps, walk all the way out to your
15  car, which is down the big alley, out to the parking lot,
16  and get your car or walk across the road, one, when I got
17  over there it was just Greg Buragino and Jerry Downie in
18  the HR office.
19      Q.   Was Jim Ryan there?
20      A.   No, not that time.
21      Q.   And then that's when you wrote your written
22  statement?
23      A.   Yes.
24      Q.   We looked at the statement earlier. It is in

Page 201

1   here if you want to find it. We can definitely do that.
2   Did you write down everything as you believed it to be
3   true at that time in your written statement?
4       A.   Everything that is true, yes. Yes, ma'am.
5       Q.   That's exactly what I'm asking you. So there is
6   nothing in that statement that needs to be changed at
7   this point; is that correct?
8       A.   Not at all.
9       Q.   And then what happened? What happened in the
10  meeting?
11      A.   Jerry Downie asked me to put on paper everything
12  that I told him. I told him everything that's on the
13  paper, then he asked me to put it down on paper.
14      Q.   So you discussed with him first?
15      A.   I told him. And then he said -- he already had
16  the paper ready for me and a pen. And he asked me to put
17  on paper what I had just told him.
18      Q.   Told him or Ford? Told Downie?
19      A.   I even told Downie, yes.
20      Q.   So when you got to the office then you talked to
21  Downie first?
22      A.   Yes. But Buragino was in there as well. Before
23  coming down there Ford was not in there. Downie and
24  Buragino was in there.

51 (Pages 198 to 201)

Page 202

1   Q.   Okay.
2   A.   Told them. They already had the paper and pen
3   ready for me. He asked me to write it down, write down
4   what I told him. He got up and walked out. Buragino sat
5   in the room with me while I wrote it.
6   Q.   Okay. Okay. And then what happened?
7   A.   He told me --
8   Q.   Who is "he"?
9   A.   I'm sorry.
10  Q.   That's okay.
11  A.   Jerry Downie informed me that -- he actually
12  punched the table and said that Mr. Harris better not try
13  denying it. He said that when he walks in first thing in
14  the morning they are going to have him in his office.
15       He, Jerry Downie said that -- are you
16  telling me to hold on?
17  Q.   No. I'm just saying he, I want to make sure,
18  there are so many "he's" going on, I want to make sure we
19  got it.
20  A.   I'm trying to remember. Mr. Jerry Downie said he
21  was going to call for Randolph Harris to come down to his
22  office first thing in the morning.
23  Q.   The next day?
24  A.   The next day.

Page 203

1   Q.   Okay.
2   A.   And I said, "I want to be there." And he said,
3   "That's fine. You can have here whoever you want." And
4   I said, "Okay."
5   Q.   He said it was okay for you to be there when they
6   talked to Harris?
7   A.   Yes.
8   Q.   Okay.
9   A.   Yes. I like to watch people lie, because I know
10  that's what he was going to do.
11       So what happened was in the morning -- Mr.
12  Harris usually comes in -- Tuesday, on April the 8th --
13  Q.   Okay.
14  A.   -- everybody is outside in the hallway, big
15  morning meeting. They always have a big morning meeting.
16  And I get the reports prepared. Okay.
17       Mr. Harris, usually he is either already in
18  there or comes rushing in. Always, if he is running
19  late, if he is not there ahead of other people, say if he
20  didn't get there at 5:00 or so forth, he always has a
21  briefcase and he comes rushing in with it, rushing, you
22  know, hurrying everybody up because he is running late.
23       And when he come in that morning, he stopped
24  and he stood outside my doorway, with no briefcase and

Page 204

1   with his head down, and I knew he knew.
2   Q.   He knew what?
3   A.   I knew that he knew I told.
4   Q.   Okay.
5   A.   Just, I'm sitting at my desk like this, and you
6   can hear the big steel door open to the offices, to come
7   down the hallway, and he is standing outside my office in
8   a little hallway with his head down.
9   Q.   Okay. So was this a bad thing, that Harris knew
10  that you --
11  A.   No, but that told me right there that they lied.
12  That told me either they called him the night before or
13  he went and had to go in there. He went in there. And
14  it turns out -- well, let me -- so they went on about
15  with their morning meeting and he didn't have his
16  briefcase in his hand, so I knew something was going to
17  be going on.
18       They went on with their morning meeting.
19  And around 11:30 that morning is when they called me and
20  wanted to see me.
21  Q.   11:30 on April 8th?
22  A.   Yes. And they told me -- well, no. Wait a
23  minute.
24       I said, "Where is Randolph Harris? Had he

Page 205

1   hid him all morning?"
2       "Don't worry about where he is."
3       I said, "What did he have to say?" I said,
4   "You told me I can have anybody at this meeting I want,"
5   I said, and "you," you meaning Jerry Downie, the main
6   one, and I guess Buragino, they said, "We called him last
7   night, we had him come in."
8       So he didn't come to work on the 7th.
9   Actually, after I turned him in they go and call him at
10  home. So he knew Monday night that I turned him in.
11  That's why he looked the way he did on the morning of
12  April the 8th. He was sad, standing outside my office
13  with his big head down, trying to make somebody feel
14  sorry for him.
15       So they lied to me, once again. They tell
16  me I can have whoever I want at that meeting, and yes, I
17  can watch and listen to Randolph Harris' version. This
18  is after Jerry Downie punches a desk saying, "He better
19  not try denying it."
20  Q.   So Jerry Downie was angered at your --
21  A.   Angered at Randolph Harris.
22  Q.   Because he believed you?
23  A.   Yes. Which it states he gives me the benefit of
24  the doubt, yes.

52 (Pages 202 to 205)

B-0171

Snyder                                     v.                    Citi Steel, USA, Inc.
Terry L. Snyder                    C.A. # 04-970-JJF                    May 31, 2006

Page 206

1    Q.  Where does he state that?

2    A.  On the 10th.

3    Q.  So Downie told you that he did believe you and he

4    was giving you the benefit of the doubt?

5    A.  Yes.  Well, he said it a couple times, but again

6    on the 10th.

7    Q.  So you felt it was a problem.  Tell me why you

8    felt it was a problem that they had told Harris or

9    someone had told Harris.

10    A.  I felt that they were trying to be sneaky about

11    it and come up with a way -- one of the things that Mr.

12    Downie said was, "We need to keep the dust down."

13    Q.  What do you think that meant?

14    A.  Not letting everybody know.

15    Q.  About your allegations?

16    A.  Yes.

17    Q.  Do you think there is something wrong with that?

18    A.  I think there is something wrong with what they

19    wanted to do with me.  They wanted to ship me to shipping

20    and I didn't do anything.  It isn't like I would stand in

21    the middle of CitiSteel and scream, you know, what he did

22    or what they were trying to do, which at this point now

23    I'm ready to.

24        But, he acted like he was going to be on my

Page 207

1    side.  No, scratch that.  Not on my side but going to

2    handle it professionally.

3        I think if somebody does not show up for

4    work, why would you call them and have them come in that

5    night to tell them what they are being accused of?  Why

6    don't you stick to your word and let everybody meet

7    together that next morning like it is supposed to be?

8    Q.  Okay.

9    A.  And they didn't do that.

10    Q.  So part of the problem with the investigation

11    from your perspective is, one, that they notified Harris

12    the same day that --

13    A.  The night before.  As soon as I walked out that

14    door.

15    Q.  The same day that you had made the allegation

16    initially, right?

17    A.  Yes.

18    Q.  And then another part of it was that you felt

19    that the investigation had been improperly conducted

20    would be him saying he wanted to kind of keep the dust

21    down, in quotes, in other words, keep it quiet?  That's a

22    problem also?  I just want to make sure.

23    A.  Would you feel it was a problem?

24    Q.  I'm asking you.

Page 208

1    A.  Sure.  I think the whole stinky situation is a

2    major problem.

3    Q.  Okay.  I just want to --

4    A.  Yes.

5    Q.  So we have the giving notice to the alleged

6    harasser, and the confidentiality issue, keeping it

7    confidential.  Any other things that were problematic

8    with the investigation?

9    A.  Yes.  They didn't conduct an investigation.

10    Q.  Okay.

11    A.  They didn't do anything.  They hid Randolph

12    Harris and tried to ship me to shipping.  That's all they

13    did.  That is it.  That's all they -- and then they escort

14    me off the grounds, bottom line.

15    Q.  Okay.  What else?  Before we get to the transfer

16    part and the shipping part and the escorting part, what

17    should they have done to make it an investigation, so

18    that you would have felt it was done properly?

19    A.  Have us all sit down just like this, nobody

20    lying, nobody being sneaky, going behind backs.  I don't

21    think they handled it in a professional manner at all.

22    They didn't oblige by their handbook, did they?

23    Q.  That's exactly what I want to know.  So if they

24    had not told Harris and instead had brought him in and

Page 209

1    everyone sat at a table together to discuss, you and

2    Harris and the appropriate people from HR or management

3    to discuss it, that would have been an appropriate

4    investigation, in your opinion?

5        MS. BREWINGTON:  Objection.

6        MS. DIBIANCA:  Too compound?

7        MS. BREWINGTON:  Calls for speculation and

8    compound.

9    BY MS. DIBIANCA:

10    Q.  I'm really not asking you to speculate at all.

11    You have already stated in your opinion there was no

12    investigation.  If it was done at all, it was done

13    improperly.  So I'm trying to specifically understand

14    what would have been a proper investigation.

15    A.  I'm unable to answer that.  I don't know.  I'm

16    not an employer.  I don't know.

17    Q.  Well, you do know, you did state for the record

18    that --

19    A.  I know I feel lied to and cheated.

20    Q.  Let me finish my question, please.  Okay?

21    A.  I felt they followed me around and pushed me off

22    the grounds.  That's exactly what happened.  So how would

23    anybody else feel?

24    Q.  I'm just asking for your side of the story.

53 (Pages 206 to 209)

Snyder
Terry L. Snyder

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 210

1  That's all I'm asking for.
2  A.  There is my answer.
3  Q.  Here is my question: You stated that there was
4  no investigation done; is that correct?
5  A.  Yes, ma'am.
6  Q.  What would have been done to conduct an
7  investigation?
8  A.  You would have to ask Jerry Downie and then I --
9  I do not have an answer for you.
10  Q.  You have already stated that it is an improper --
11  A.  They lied. They lied. I do not know what their
12  procedures would be to conduct an investigation. But all
13  I know is they lied.
14  Q.  So if they had been truthful --
15  A.  Like they --
16  Q.  -- would that be a proper --
17  A.  A proper investigation, quote, I cannot define
18  their investigation. But I think they should have kept
19  their word. They lied straight to my face. And they
20  just tried to toss me to the side, like what has happened
21  is nothing, it was nothing, and no big deal.
22       So, no, they did not conduct a proper
23  investigation. What a proper investigation would have
24  been, I can't answer that.

Page 211

1  Q.  Just to be clear, I'm not asking what would have
2  been proper according to their procedures. I'm asking
3  you: What would have been proper to satisfy you?
4  A.  First of all, not lying.
5  Q.  Okay.
6  A.  They should have kept their word and sit down,
7  you know, and did what they said they were going to do.
8       I also wanted my father by my side, because
9  when you are working for a company, especially them,
10  people has caught on fire up will and they made everybody
11  be quiet. One guy had to shave off his entire beard. He
12  has got little scars here. And I kept asking for the
13  accident report and Mr. Harris kept telling me to hold on
14  and not to mention it again. He will hand it to me when
15  he is ready. They never handed it to me. There is an
16  accident binder that should still be up there.
17       They are liars. They hide things. And I
18  wanted my father there to be -- so I could have somebody
19  on my side, so that they couldn't all go against me and
20  try lying, like they are trying to do now and like they
21  already did.
22  Q.  So there was a conspiracy to cover up that
23  accident?
24  A.  Looks of -- I don't know. I don't know. They

Page 212

1  never handed me the accident report, and that has nothing
2  to do with it.
3       I'm just letting you know, I wanted my
4  father by my side. I wanted to watch as Randolph, as
5  Jerry Downie asked him question and as Randolph Harris
6  answered. I wanted to sit there just like I am now. And
7  I didn't get that opportunity. I was lied to and
8  cheated.
9  Q.  Where was your father living at this time?
10  A.  He lives in Delaware.
11  Q.  At 2003, April 8th, 2003, he lived in Delaware?
12  A.  He has always lived in Delaware.
13  Q.  You said Atlantic City earlier?
14  A.  He goes to Atlantic City. He has a place down
15  there. It is totally irrelevant. It takes less than two
16  hours. All I have to do is call him.
17  Q.  Did you call him on the 8th?
18  A.  No.
19  Q.  When did you call him?
20  A.  He was supposed to be there on the 9th. But they
21  followed me around and wouldn't let me go back to my
22  office. We didn't get to have no more meetings.
23  Nothing, from the day I told, nothing happened the way it
24  was supposed to.

Page 213

1  Q.  When did you call your father then?
2  A.  Oh, I was calling him almost every single day,
3  actually.
4  Q.  When did you call him about coming down to
5  oversee this meeting or be involved in this meeting?
6  A.  On, actually, on the 7th or the 8th. I think it
7  may have been the 8th, because I don't -- because as far
8  as -- on the 7th when I left work, to my knowledge, I was
9  going to get to sit there while Jerry Downie asked
10  Randolph Harris questions. We didn't set up a date and
11  time yet, from Jerry Downie's request. He was going to
12  decide the date and time. Instead, they followed me
13  around, would not let me go back to my office.
14  Q.  But I'm just trying to figure out, how did you
15  tell your father to be there?
16  A.  Call. Call. Well, I didn't have a time.
17  Q.  Yes. That's what I mean.
18  A.  I didn't have a time. They never gave me a time.
19  They didn't give me a chance to do anything.
20  Q.  So was there three meetings? I think I'm
21  confused, because April 7th was the day you reported it
22  to Mr. Ford, right?
23  A.  Yes. Yes, there was three meetings, 7th, 8th,
24  9th.

54 (Pages 210 to 213)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

B-0173

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 214

1     Wait a minute. Maybe, was there four? They
2 got rid of me on the fourth, on the fourth day. Whatever
3 that Thursday was. I don't know.
4     Q. Let's walk through it. On the 7th you reported
5 to work. Did you work the whole day on the 7th? Did you
6 finish the shift?
7     A. Yes. Well, I -- once they called me down, and I
8 informed them, and then I had to write it, which we all
9 have a copy of, by the time they were done with me, my
10 shift was over anyway, so...
11     Q. Okay. And then the next day you saw Mr. Harris
12 in the morning?
13     A. Standing there with his head down. And he never
14 returned.
15     They ended up calling me, they ended up
16 calling me down. That's the day they fired -- they
17 followed me around. I don't know. You's got all the
18 dates and everything written down, so I -- all I know is
19 they didn't do what they were supposed to do with Mr.
20 Harris and they didn't let me -- they never gave me a
21 time to tell my father what time to be there. They just
22 started trying to get me to leave, wouldn't let me go
23 back to my office, and then they tried making me take an
24 offer which made absolutely no sense to the Department of

Page 215

1 Labor, as well as myself.
2     Q. What was that offer?
3     A. Either you let us ship you to shipping or you are
4 voluntarily resigning.
5     Q. Who told you that?
6     A. An ultimatum.
7     Q. Who gave you that message?
8     A. Mr. Jerry Downie.
9     Q. Do you know the date of that? Maybe this will
10 help. That would have been the last day. Would that
11 have been the same day you went to the EEOC?
12     A. No. I went to the -- it was pouring down rain.
13 I went to EEOC the day they followed me around, saying
14 they wanted to keep the dust down. Think about our
15 offer.
16     Okay. Forgive me. That was the first time
17 they started offering about a different position,
18 shipping me to shipping.
19     Q. Oh, I'm just waiting for dates. I'm sorry.
20     A. For what?
21     Q. I don't think I have a very good idea of how many
22 meetings or how many days.
23     A. I don't either. I'm just as tired as everybody
24 else.

Page 216

1     You know what? Give me a minute. Wait a
2 minute a here. Let me see if I can do this.
3     MS. BREWINGTON: What are you looking for?
4     THE WITNESS: What is the day --
5     MS. BREWINGTON: EEOC charge?
6     THE WITNESS: No, this is it. I turned him
7 in April the 8th. That was a Tuesday. That's the day I
8 turned him in. Scratch the 7th. The 7th -- okay.
9 That's why we are off a day. Forgive me. I'm tired too.
10 Okay.
11     The day I wrote this is the day I turned him
12 in.
13 BY MS. DIBIANCA:
14     Q. Wrote what? Could you give me the document
15 number? What exhibit is it? Look for the sticker --
16     A. Snyder Exhibit Page 008.
17     Q. Look on the very first page, the sticker.
18     A. Snyder 1.
19     Q. Okay. Snyder 1 at page 8?
20     A. Yes.
21     Q. Okay. Go ahead.
22     A. This the day, Tuesday, April the 8th is the day I
23 told Ford. Ford asked me to come down to Downie's
24 office. I got down there. I tell Downie. He had these

Page 217

1 couple pieces of paper and a pen. He asked me if I would
2 write it down.
3     The 9th, on Wednesday, is the day they
4 wanted to keep the dust down. They were following me
5 around, wouldn't let me go -- okay. The 9th, we are back
6 on track, the 9th, would not let me go back to my office.
7     Q. Is that the morning that you saw Mr. Harris in
8 the morning?
9     A. The 9th, yes. Because I called my father at
10 night, the night -- the day I wrote this.
11     Q. Snyder 1, page 8, okay, your written statement?
12     A. Snyder page 1, 8. When I wrote this, Tuesday,
13 April the 8th, for Jerry Downie for HR, I was supposed to
14 be able to have whomever I wanted at that meeting. I was
15 allowed, Mr. Downie told me I could attend when he
16 approaches Randolph Harris. Instead they call him that
17 night.
18     Now, he didn't come to work that day but yet
19 they call him to come all the way up there.
20     Q. Don't you think it was a serious allegation that
21 they should have called him immediately?
22     A. I don't think they should have lied to me. I
23 think they should have had me sit right there.
24     Let me tell you something, they didn't think

55 (Pages 214 to 217)

Snyder                                        v.                    Citi Steel, USA, Inc.
Terry L. Snyder                        C.A. # 04-970-JJF                    May 31, 2006

Page 218

1  it was serious enough because I offered to drive down to
2  my house, get the tapes and let them hear them.
3         Now, I was not handing over my tapes so all
4  they had to do was hit delete. I was willing to let them
5  hear. And he said to me, "We do not want to reach those
6  channels yet."
7    Q. When was this? What day?
8    A. The same day.
9    Q. The written statement day?
10   A. Written statement day to CitiSteel, yes.
11   Q. Okay. So April 8th you told them that you had
12  tapes?
13   A. Yes.
14   Q. Did you tell them you had anything else as far as
15  evidence goes?
16   A. Just my little notes. Like, I've always kept a
17  diary, but then sometimes -- you know, like the other day
18  I sat down and looked at my book, I'm like, okay, I went
19  here that day, you know, and then I just backtrack a
20  little.
21   Q. So you told them that, you said, "Look, I have
22  this" --
23   A. Diary.
24   Q. -- "evidence," right? I mean like I've got

Page 219

1  proof?
2    A. Yes.
3    Q. And he said he was not ready to reach those
4  channels at that time?
5    A. He did not want to reach those channels.
6    Q. And then the 9th you said he wanted to keep the
7  dust down and they followed you around. What does that
8  mean, they followed you around?
9    A. They got in their vehicle and followed me to the
10  next building, followed me into where Carmella's cubicle
11  is.
12   Q. Who is "they"?
13   A. I'm sorry. Jerry Downie and Jim Ryan. Jim Ryan
14  was his assistant at that time.
15        I was -- when you walk in, it is a big
16  office, it is a big room with cubicles. Carmella had a
17  cubicle and then there are some other desks. Her boss
18  had his own little office. To get into this area you
19  have to walk through the one door.
20        Carmella -- I'm facing that way and Carmella
21  is facing me, so her back is to that door. Carmella is
22  deaf. She has to read lips. Jerry Downie is hanging
23  over her cubicle going like this (indicating).
24   Q. Going like what?

Page 220

1    A. Waving his hands to me, waving for me to come
2  here.
3    Q. Jerry Downie is calling you over?
4    A. Both hands, yes, come here, after they just asked
5  me not to go back to my office. At the other human
6  resources, they wouldn't stop. They wouldn't leave me
7  alone.
8        I already told them no. I already told them
9  I'm going back. I have another supervisor up there and
10  I'm allowed to go back to my desk. Because EEOC, I
11  called them Monday, right after work, before I met
12  Carmella, and I spoke to a Mrs. Smith up there and I was
13  informed that if you have two supervisors, you are
14  allowed to go back to your office. They cannot force you
15  off those grounds.
16   Q. I got to back up because I'm getting confused I
17  think. April 7th you called the EEOC?
18   A. Yes.
19   Q. And that was the night before you told Mr. Ford?
20   A. Yes.
21   Q. Why did you call the EEOC?
22   A. I really don't know. I really don't know.
23   Q. What was the nature of the call?
24   A. I don't know if Carmella -- Carmella was trying

Page 221

1  to push me along, which I thought I understood her
2  concern from me being upset all the time, but I really
3  don't know. Equal opportunity employer, whatever that
4  means.
5    Q. Did you have a specific question for them? Did
6  you want to file a report? Did you want to ask about the
7  procedures?
8    A. The proper steps, so forth, yes. I guess
9  everything actually.
10   Q. What time did you call them?
11   A. It was after work, before I met Carmella for
12  dinner. So I only -- it takes eight minutes, around
13  eight minutes to drive from my home to CitiSteel. So
14  I'll say somewhere around maybe 3:00 o'clock, give or
15  take, depending on the exact time of day.
16   Q. Someone, Mrs. Smith at the EEOC told you that you
17  could go, if you had two supervisors you can work?
18   A. I can remain exactly where I am. I will not lose
19  my job, yes.
20   Q. I mean, I'm just trying to think, that's a very
21  specific statement for someone to say over the phone.
22  I'm trying to come up for some reason that would have
23  been brought up.
24   A. Pending whatever question I asked. I was scared

56 (Pages 218 to 221)

Snyder
Terry L. Snyder

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 222

1 and nervous.
2    Q. Because you were going to report him?
3    A. Mm-hmm.
4    Q. I thought you didn't decide to report him until
5 April 8th?
6    A. No, I knew it was coming. I knew it was coming.
7 But the time, on April the 8th the time was right.
8 Nobody was around. He didn't come to work. If he would
9 have went to work I wouldn't have told on April the 8th,
10 most definitely.
11    Q. And then the 9th you had a meeting with someone;
12 is that right? You said they followed you around?
13    A. No. They followed me, they followed me up to
14 Carmella's office.
15    Q. So you had --
16    A. There is two offices for HR. There is one right
17 across from where Carmella's area is and then there is
18 one in the original building. I never seen them in my
19 rear view mirror. I don't know. They were a car or two
20 behind me. And they were trying to beg me to just go
21 home and think about things. And I said, "There is
22 nothing to think about."
23    Q. When were they begging you to do this? In
24 Carmella's office?

Page 223

1    A. No. In the original HR, in the building, the
2 little building, the little HR building.
3    Q. What time was that? Was that first thing? I'm
4 trying to get a sequence of events.
5    A. Maybe about 11:00. It was probably about 11:00
6 or I'm going to say 11:30. Because it took -- see, like
7 I said, they have that morning meeting and Randolph
8 Harris never returned. It took them three hours to call
9 me down to HR.
10    Now, what were they doing? And that's when
11 I walked in, I said, "Where is Randolph Harris?"
12    Randolph Harris never returned to the melt
13 shop.
14    Q. This is the morning you saw him with his head
15 down?
16    A. This is the morning I saw him with his head down.
17 He never returned. He never returned. So they called me
18 around 11:15, 11:30, something. It took them over three
19 hours.
20    So I go down there to the first little HR
21 building, and I asked, "Where is he?" I said, "He has
22 lied to me." He already knew. I knew he knew. And he
23 admitted it.
24    Q. Right.

Page 224

1    A. He said, "We had him come in last night. We
2 called him."
3    I said, "But why?" I said, "You told me I
4 could be here." I said, "Where is he and what did he
5 say?" He said, "None of your business."
6    Q. Who said that?
7    A. Jerry Downie. He said, "None of your business."
8 He said, "I don't have to answer that," whatnot, "none of
9 your concern," whatever.
10    He wanted me to go home. They wanted to
11 make me an offer. They wanted me to go home and think
12 about things. I said, "There is nothing to think about."
13    Q. Did he actually mention the shipping department
14 at this point?
15    A. Yes, yes.
16    Q. So Downie brings up the shipping department
17 transfer.
18    A. And he -- I told -- I told him what I wanted. I
19 wanted the lie of a piece of paper removed from my file.
20    Q. You are meaning the disciplinary write-up?
21    A. Yes. And I want it on paper stating why and I
22 wanted both their signatures on it, Mr. Downie and
23 Randolph Harris, I wanted two pieces of paper. And one
24 is the lie, the false write-up. Two, I wanted in

Page 225

1 writing, not typed up, in writing, just like I did for
2 them, with both their signatures on it, Jerry Downie and
3 Randolph Harris, why they wanted me -- why they wanted to
4 ship me to shipping, why.
5    Q. Okay.
6    A. In handwriting, not typed. I wanted those two
7 pieces of paper.
8    Q. You told them that at this time?
9    A. Yes, I did. And he said, "Why don't you go
10 home"--
11    Q. "He" means?
12    A. He, Jerry Downie. I'm going to get good at this.
13    He, Jerry Downie said, "We need to keep the
14 dust down."
15    Q. Okay.
16    A. And I said, "We can keep the dust down. You give
17 me what I want and I'll give you what you want."
18    And he said, "Terry, just go home and sleep
19 on it." I said, "No, Mr. Downie," I said, "you go home
20 and sleep on it. I have nothing more to think about."
21    And that was that. That's the day I ran to
22 EEOC, because I knew it was coming, because if they
23 wouldn't let me go back to my office, then they weren't
24 going to let me finish performing my job. He asked me to

57 (Pages 222 to 225)

Snyder                                    v.                    Citi Steel, USA, Inc.
Terry L. Snyder                    C.A. # 04-970-JJF                    May 31, 2006

Page 226

1  show up, report directly to him first thing in the
2  morning on the 10th and that was that.
3      Q.  So you implied you will give him what he wants if
4  he gives you what you want.  He says, "Go home and sleep
5  on it."  You say, "I don't have to sleep on it."  Is that
6  right?
7      A.  Yes.  "You sleep on it," I told him.
8      Q.  And then you insisted that you were going to go
9  back to your office at that point?
10     A.  No.  No.  Well, they wouldn't let me.  And that's
11  all he kept saying.  So I finally agreed to at 1:00
12  o'clock.  I'm sitting there, a little red light bulb came
13  on inside my little head, and I said to myself, you know
14  what, don't even sit here and argue with these people.  I
15  knew what they were trying to do.  I know what was
16  coming.
17     Q.  What was coming?
18     A.  I figured it gave me plenty of time to get on up
19  to EEOC.
20     Q.  Okay.  When did they see you at Carmella's
21  office?
22     A.  The 9th.
23     Q.  The same day?
24     A.  Yes.  I had to deliver, it is called a bill of

Page 227

1  lading.
2      Q.  I mean, in the sequence of events, all these
3  things we have talked about, did he say --
4      A.  Somewhere around noon.
5      Q.  After, before or after --
6      A.  It may be quarter of 12:00.
7          Let me tell you, Carmella keeps good files.
8  It might take forever for her to find it, but she has
9  been very well organized.  And I delivered a bill of
10  lading to her on August 9th in between quarter after
11  11:00 and 12:00 o'clock noon.  So there is a bill of
12  lading there with our signatures.
13     Q.  Was it after Mr. Downie said, "We need to keep
14  the dust down"?
15     A.  Was what after?
16     Q.  Him seeing you in Carmella's office?
17     A.  No, he followed me to Carmella's office.  He was
18  behind her waving his hands, for me to come here.  See,
19  she didn't see him.  He is back here.  Here is the
20  doorway (indicating).
21     Q.  That's all right.  Let me ask you this --
22     A.  The doorway is back there, then you have a
23  cubicle going around.  He is standing right inside the
24  doorway, leaning over her cubicle wall.  Her back is

Page 228

1  facing her cubicle wall versus I am facing her and the
2  front door, the entrance.
3      Q.  All of the discussion that took place, does that
4  all take place in Carmella's office?
5      A.  No.
6      Q.  That's what I'm trying to figure out.  What did
7  you discuss there versus --
8      A.  As he waved me to come here, he said, "Would you
9  mind stepping in my other office," and he needed to speak
10  with me again for a moment.
11     Q.  So that's where --
12     A.  Yes, ma'am.  We walked across the hall and went
13  into his other office.  He has -- that's his main office,
14  human resource office at the main building, at the
15  administrative building.
16     Q.  Okay.  So then between that time and 1:00
17  o'clock, an hour'ish or maybe two hours, where were you,
18  before the red light went off and you decided to go to
19  the EEOC?
20     A.  I was in my office.  They called me down.
21     Q.  So you did go back to your office?
22     A.  No.  Randolph Harris came in with his head
23  hanging down.  I knew right then he knew.  Three hours
24  later they call me down.  I go down.  They try to ask me

Page 229

1  to go home.  I said that I'm allowed to go back to my
2  office.  They did not want me to.
3          I went ahead and started to complete my job.
4  I got in my car.  I did not know they were a car or two
5  behind me.  I drove on up to CitiSteel, which he has
6  another office up there which is his main office.
7          As I go around Carmella Patrone's cubicle
8  wall, I hand her the bill of lading, and Jerry Downie is
9  standing behind her waving for me to come here.  So I had
10  to stop Carmella from talking.  I said, "Excuse me."  She
11  turned around and she seen Jerry Downie standing there.
12  As I walk on out he said, "Terry, may I speak with you
13  again in my office?"
14          I walk across the hall.  He then said, "We
15  need to keep the dust down."  I said, "I want to go back
16  to my office."  I said, "I will keep the dust down."  I
17  said, "We can keep the dust down if you give me what I
18  want."
19          That all happened on the 9th, on -- or, yes,
20  Wednesday, the 9th.
21     Q.  Where did you get the bill of lading from?
22     A.  Well, I find them in my mailbox sometimes.
23  Sometimes the truckers don't do what they are supposed to
24  do with them.  Things get delivered all through the

58 (Pages 226 to 229)

B- 0177

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 230

1  night. Sometimes, excuse me for saying -- some people
2  will --
3      Q.  Let me ask you --
4      A.  Some people will get them from a truck driver and
5  bring them up to me and say "Here."
6      Q.  Did you have to go back to your office to get the
7  bill of lading?
8      A.  No. I had it with me.
9      Q.  When?
10     A.  I knew I was going to deliver it to her exactly.
11     Q.  So when they called you at 11:00 --
12     A.  I had it on me.
13     Q.  Okay. Got it.
14         (Discussion off the record.)
15         (Recess taken.)
16         MS. DIBIANCA:  Back on the record. I'm
17  going to move in Snyder 11.
18         (Snyder Deposition Exhibit 11 was marked for
19  identification.)
20  BY MS. DIBIANCA:
21     Q.  I'll just represent to you that these are your
22  criminal records that were pulled.
23     A.  Okay.
24     Q.  The first page of this indicates an arrest for

Page 231

1  assault in the third degree. Can you tell me about that?
2      A.  No. Who did I assault? No.
3          Oh. Is this the one that was dismissed?
4      Q.  Arrest date, 2/17/2002.
5      A.  A couple days after Valentine's Day, yes. That
6  was the one that admitted he lied.
7      Q.  Come again.
8      A.  Remember, I told you earlier, they admitted to
9  everybody that they lied.
10     Q.  Who?
11     A.  I got arrested, but it was a lie. It wasn't
12  true. So it got dismissed.
13     Q.  It says here defendant pled not guilty?
14     A.  Because I was not guilty, that's correct.
15     Q.  The earlier assault you mentioned was for
16  disorderly conduct.
17     A.  I thought disorderly conduct. I just -- I was
18  mixed up. All I knew was that they lied. Told the truth
19  and it got dismissed. That's all I know.
20     Q.  The next page is for two arrests, it looks like
21  resisting arrest and menacing charges. You didn't
22  mention this earlier either?
23     A.  In '88? Is that what it says? 1988.
24     Q.  9/7/1988, yes.

Page 232

1      A.  Well, forgive me for not remembering almost 20
2  years ago. If that's what it says, that's what it says.
3      Q.  Okay.
4      A.  I have never actually fought a cop. Maybe I was
5  going to turn around -- I don't know what. I don't know.
6  I have no clue. Menacing?
7          You know what, well, I didn't turn 21. I
8  don't know.
9      Q.  Okay. Then if you skip ahead a few pages --
10     A.  Menacing. Forgive me. Menacing means failure --
11  withholding information. I never had any information. I
12  really -- I had nothing to do.
13     Q.  I believe menacing is sort of like a threat.
14     A.  No. It is trying to interfere with police
15  conducting their business, withholding information, isn't
16  it?
17     Q.  I can't tell you that I know for sure.
18     A.  Okay.
19     Q.  I really don't know.
20         If you skip the next two lined pages then we
21  are back to a similar page, a little tiny number 3 at the
22  top handwritten in.
23     A.  Yes, ma'am.
24     Q.  That's the DUI you referred to earlier?

Page 233

1      A.  Yes. '95. Maybe I was -- maybe it was 12 years
2  ago.
3      Q.  There was only one DUI arrest, though?
4      A.  Yes. For some reason 14 years ago keeps sticking
5  in my head. But forgive me for the wrong date.
6      Q.  And then the next page, what is this for?
7      A.  They all were dismissed.
8      Q.  I know. But the question was, the statement on
9  the interrogatories, from this morning, was: Have you
10  ever been arrested.
11     A.  Yes, and I told you about them. On one I had the
12  date wrong and on the other I had the description, as far
13  as I remember.
14     Q.  Well, you told me about two arrests today and
15  now I'm seeing one, two, two charges on the single
16  arrest, that's three, four here, five here.
17     A.  Are you talking about 20 years ago? 1988, well,
18  forgive me, forgive me for not remembering.
19     Q.  Did you only answer recent charges?
20     A.  I answered what I remembered. I cannot remember
21  everything that took place in 1988. This is now 2006,
22  May.
23     Q.  Generally people remember when they are arrested.
24     A.  No.

59 (Pages 230 to 233)

B-0178

Snyder                                      v.                    Citi Steel, USA, Inc.
Terry L. Snyder                        C.A. # 04-970-JJF              May 31, 2006

Page 234

1    Q.  That doesn't apply to you?
2    A.  No, it does not.
3        MS. BREWINGTON:  Objection, argumentative.
4    Q.  You don't remember either the two years of your
5    life that went by without employment; is that correct?
6    A.  Correct, I do not remember where I worked.
7    Q.  Tell me, is there any reason that you would not
8    be able to remember these things?
9    A.  None that I know of.
10   Q.  How about on page 7, disorderly conduct?  Is this
11   refreshing your recollection now?
12   A.  No.  In 1989.  Forgive me, no.
13   Q.  Don't remember getting arrested for that?
14   A.  No, ma'am.
15   Q.  Do you think this might be an error?
16   A.  I think all this is actually irrelevant.  If you
17   want to ask me a question and get a good answer, I think
18   all this is irrelevant.  But, no, I doubt very much if it
19   is an error.  But you can't hold something against
20   somebody for not remembering something either.
21   Q.  The next record is record eight, offensive
22   touching.  Do you recall being arrested for that?
23   A.  No.
24   Q.  Record number nine, hindering prosecution, that

Page 235

1    was in 1993.  Do you have a recollection of that
2    incident?
3    A.  Where?  I'm sorry, where are you?
4    Q.  Record number nine, it is indicated on the top
5    right-hand corner.  It says "Court of Common Pleas for
6    the State of Delaware, Municipal Court Disposition."
7    A.  You know what, I assume I'm going to say you are
8    right.  Hindering prosecution, and I remember this now
9    that I'm seeing it in my face.  You are correct, when you
10   said something about menacing, because it is called
11   hindering prosecution when you withhold information.
12   That's correct.
13       I was at a dance club with some of my
14   friends, and other females started a big fight with them,
15   and there was a big giant fight, and I tried to break
16   them up, and I tried to stop it, and every single one of
17   all the females that was with me and all the females that
18   started this fight, they all were thrown out and made to
19   leave the premises except for myself, because I did
20   nothing.  I was actually trying to get them to stop.
21       And when I walked outside, out the front
22   door, all them other girls were out there waiting for me,
23   and they were going to jump me, and I ran back in the bar
24   and I said, "You are going to have to call the police."

Page 236

1    One of them said they were going to knock my teeth down
2    my throat.  And the bartender said, "The police are
3    already on the way."
4        And when he came -- now, I did not know some
5    of the females that was actually sitting with us.  Yes, I
6    knew my cousin Mandy, yes, my friend Renee, so forth.
7    But I did not -- just because I know you doesn't mean I
8    know every single body that you know.
9        And apparently a couple of the girls knew
10   that police officer that showed up, and they put
11   handcuffs on me and put me in that cop car.  And it got
12   nolle processed.
13   Q.  So what happened?  They arrested you and nolle
14   prosed?
15   A.  They took me to the Wilmington police station,
16   and I just, I spent the night in there and that was the
17   end of it, yes, because I did nothing wrong.  It was
18   late, you know, because it was late.  They let me go
19   immediately that next morning.
20   Q.  And the Renee, that was the same, that's Rene
21   Nye?
22   A.  Yes, yes.  Mandy Hitchens, Marie Hitchens.  But
23   because there was other people there, you know, I guess
24   in the back, amongst our tables, you know, sometimes some

Page 237

1    people will meet in a bar and have a conversation and
2    then you talk about things like you knew each other for
3    many years, but I did not know every single body in the
4    back of the bar.
5        And this police officer, he had dark hair.
6    I don't remember his name.  He knew two of the girls that
7    was fighting with my friends and my cousins.  They knew
8    each other.
9    Q.  And then the next record, next two records,
10   actually, are both driving records?
11   A.  Excuse me.  May I ask you something?
12   Q.  You can ask after you answer the question.
13   A.  Oh, okay.
14   Q.  Inattentive driving and driving during
15   suspension.
16   A.  Wait a minute.  I'm sorry, I'm lost.
17   Q.  Probably because I didn't mention they are two on
18   two different pages.  The first one is inattentive
19   driving.
20   A.  Okay.
21   Q.  And then the next one is driving during
22   suspension.
23   A.  Okay.
24   Q.  Were those arrests?

60 (Pages 234 to 237)

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 238

1    A. I don't think I got hauled off to a jail, no.

2    Q. Or taken to the police station?

3    A. I think I got a ticket. Actually in '92,

4    somebody else actually yanked the steering wheel out of

5    my hand, but I just -- and another car was coming along,

6    and the gentleman that I was dating at the time, I didn't

7    want to get him in trouble, and I didn't tell that he

8    yanked the steering wheel out of my hand, so I got a 25

9    dollar -- I don't remember paying 30. I thought it was a

10   25 dollar fine for it.

11          But another car was coming along, and when

12   he yanked the steering wheel it actually tapped the right

13   buttocks of another car, and I didn't want to tell on

14   him, so I got inattentive driving ticket.

15   Q. So you said that you did it?

16   A. Yeah. I didn't want to tell on him.

17   Q. Then back to the first page, the assault third,

18   assault in the third degree?

19   A. Oh, I told -- as years came about, I've learned

20   my lesson. Yes. What about it?

21   Q. Well, I'm just curious why you didn't mention it

22   today. This was 2002.

23   A. Mention what?

24   Q. The arrest for assault in the third.

Page 239

1    A. I did, but I said it wrong. I said disorderly

2    conduct, but I meant this. I meant the one that got

3    dismissed where he admitted the truth. This is what I

4    actually meant.

5    Q. Okay.

6    A. I was mistaken in the way I stated the charge.

7    Q. Okay.

8    A. Okay.

9    Q. And then have you ever done illegal drugs?

10   A. No. Am I allowed to ask my question now before

11   we move on?

12   Q. Oh, yes. I'm sorry.

13   A. When something says nolle prosed, what does that

14   mean? It means no charge held, correct?

15   Q. I don't really know exactly, honestly.

16   A. Nothing was done to me. Correct?

17          MS. BREWINGTON: It means it wasn't

18   prosecuted, meaning they dropped the charges.

19          THE WITNESS: What does any of this --

20   BY MS. DIBIANCA:

21   Q. Well, I think that's a question you should really

22   ask your lawyer when I'm --

23   A. You are asking me questions about it. So I don't

24   have the right to ask you?

Page 240

1    Q. Well, I would say that it goes to your

2    credibility, because I've asked you now several times as

3    to whether you have ever been arrested and your answer

4    has been limited to two instances. However, this record

5    reflects that, in fact, there have been several

6    instances, so that really seems to go to your credibility

7    to remember.

8    A. Can you remember every single thing that has

9    happened to you throughout your entire life? Every

10   single thing?

11          MS. DIBIANCA: I'm going to ask counsel to

12   instruct the witness that this is not the time or the

13   place to --

14    .     MS. BREWINGTON: I completely agree. I

15   think we will have to talk about this later.

16          THE WITNESS: Okay, then.

17          MS. DIBIANCA: One of the requests for

18   production was all records reflecting income received

19   during the past seven years, and the answer was that tax

20   information for 2005 has been provided, process of

21   obtaining the rest of the tax info. Have we gotten

22   those?

23          MS. BREWINGTON: What we did was send you a

24   release. Terry signed off on a release.

Page 241

1          Do you remember that? You signed off on a

2    release for you guys to go ahead and get her tax records,

3    because she doesn't have them.

4    BY MS. DIBIANCA:

5    Q. You do not have any tax records?

6    A. No.

7    Q. You keep all these documents but no tax records?

8    A. Let me tell you something. I have things packed

9    so far back in my closet, and I know you are a busy

10   person, but so am I. Now, and so you are more than

11   welcome to retrieve anything you like on me, just as I

12   have said --

13   Q. If they are in your possession they need to be

14   produced.

15   A. Well, I don't have them in my possession, I

16   guess.

17   Q. You guess? I want to be very clear here.

18   A. No, I do not.

19   Q. I want to be very clear. You stated --

20   A. No, I do not.

21   Q. You have stated on the record you have kept

22   receipts for medical treatments for visits to doctors

23   from as many as four years ago, but that you do not have

24   in your possession copies of your tax returns?

61 (Pages 238 to 241)

Snyder                                    v.                    Citi Steel, USA, Inc.
Terry L. Snyder                   C.A. # 04-970-JJF                    May 31, 2006

Page 242

1   A.  It has been less than three years ago, and them
2   receipts are in exact order because they came from a
3   therapist due to CitiSteel, and that has been less than
4   three years.
5   Q.  But last year's tax returns you do not have?
6   A.  Not four years, that --
7   Q.  Tax returns?
8   A.  No.
9       MS. BREWINGTON:  Can we go off the record.
10      (Discussion off the record.)
11      MS. DIBIANCA:  We are going to agree that
12  defense will send plaintiff's counsel the proper form to
13  request the tax returns.
14      MS. BREWINGTON:  Yes.
15      MS. DIBIANCA:  And that if the receipt of
16  those tax returns is a long period of time and we would
17  need to redepose her, depose plaintiff, that would be
18  agreeable.
19      MS. BREWINGTON:  With respect to the taxes,
20  yes.
21      MS. DIBIANCA:  Yes.
22      MS. BREWINGTON:  Thank you.
23      MS. DIBIANCA:  However, if she does have the
24  taxes and we can save the effort of making those requests

Page 243

1   and redeposing, I definitely think --
2       MS. BREWINGTON:  Okay.
3       MS. DIBIANCA:  Got you.  Okay.
4   BY MS. DIBIANCA:
5   Q.  Did you use an accountant for the tax returns?
6   Who did your tax returns?
7   A.  No.  One year I went to, this is this past year,
8   to one of the places that do them for free.  I couldn't
9   afford it.
10  Q.  What place?
11  A.  One place was a church in town, west --
12  Q.  West --
13  A.  This year I went to Claymont Community Center. I
14  had them done.  I couldn't afford to get them done.
15      The year I think prior I went to, there is a
16  church in town, west, west -- no.  It is off of --
17  Q.  Have you ever had anybody professional do it?
18  A.  Well, Jackson Hewitt.  I would never let just
19  another human being, in case they made a mistake.
20  Q.  Jackson Hewitt?
21  A.  Yes.
22  Q.  When did they do the tax returns?
23  A.  Usually I would go to them.  I have been to H&R
24  Block too, though, a couple times.

Page 244

1   Q.  In the past seven years have you been to either
2   of those places?  They would have copies of them so we
3   could save a lot of time and energy by --
4   A.  Jackson Hewitt.  I don't think I have been to H&R
5   Block in the past seven years.
6   Q.  Which Jackson Hewitt, do you know?
7   A.  I know one on Market Street.  And Elsmere.  They
8   used to be right on --
9   Q.  Go ahead.
10  A.  They used to be right -- the beginning of
11  Kirkwood Highway is actually Elsmere.  But then they
12  moved into Value City, that Value City that was in
13  Elsmere.  Now, I don't know where they are.
14  Q.  Which of the locations did you go to?  You went
15  to both?
16  A.  Each, yes.
17      MS. DIBIANCA:  All right.  Let's wrap up for
18  today.  I think that's about as much as we can do.
19      MS. BREWINGTON:  Okay.
20      (Discussion off the record.)
21      MS. DIBIANCA:  We are going to continue the
22  deposition, date yet to be determined, but next week.
23      MS. BREWINGTON:  Yes.
24      THE WITNESS:  I thought it was the 6th.

Page 245

1       MS. BREWINGTON:  That's next week.  If it is
2   okay with you, we can confirm.
3       (Proceedings conclude at 5:44 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22      B- 0181
23
24

62 (Pages 242 to 245)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 246

1          I N D E X
2
DEPONENT:  TERRY L. SNYDER          PAGE
3
   Examination by Ms. DiBianca        2
4
5
        E X H I B I T S
6
SNYDER DEPOSITION EXHIBITS          MARKED
7
8  1 - Exhibit Page 001 - 042         22
   2 - 8/3/04 Dawn Training Centre letter   60
9  3 - 3/1/04 Handwritten note        75
   4 - EEOC documents                125
10 5 - 1/7/03 Snyder to Ryan e-mail   138
   6 - 2/25/04 Jauffret to WJasow letter  139
11 7 - 3/11/03 Snyder to Patrone e-mail  157
   8 - Job Information Handbook       172
12 9 - Application for employment     175
   10 - Happy Harry's report          189
13 11 - Criminal history              230
14 REQUEST FOR DOCUMENTS
15 25.8 - Faxes relating to job search
   54.22 - Medical treatment
16 75.9 - Neuberger representation
   113.12 - Skelly employment package
17 120.6 - CDL information
   121.4 - Pay stubs
18
19 ERRATA SHEET/DEPONENT'S SIGNATURE   PAGE 247
20 CERTIFICATE OF REPORTER            PAGE 248
21
22
23
24

Page 248

State of Delaware )
              )
New Castle County )

        CERTIFICATE OF REPORTER

      I, Eleanor J. Schwandt, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 31st day of May,
2006, the deponent herein, TERRY L. SNYDER, who was duly
sworn by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me in
Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.
      I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.
      I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

        Eleanor J. Schwandt
        Certification No. 125-RPR
        (Expires January 31, 2008)

DATED:

Page 247

REPLACE THIS PAGE
WITH THE ERRATA SHEET
AFTER IT HAS BEEN
COMPLETED AND SIGNED
BY THE DEPONENT.

B- 0182

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 249

**A**

Aber 71:22
Aber's 72:19
ability 6:11 128:22
129:2
able 6:17,20 12:20
12:24 55:21 107:2
123:4,16 163:16
188:10 217:14
234:8
about 9:19,20 13:5
13:17,18 14:4
15:6,10,13 16:9
18:9 20:3 22:19
31:7,8 37:2 39:9
40:12,17 41:11,18
41:20 43:1,4 45:4
53:17,22 59:4
63:11,12 70:21
72:17 73:11,13
74:3 77:6,15 78:3
78:9,10,18 79:2,3
80:4,19,22 82:2
82:22 83:17,17,18
84:3 85:2,3 88:12
92:12 93:8 95:3
96:17 117:10
119:21 121:4
129:23 131:10
133:22 134:2,3,21
136:8,12 137:5
138:6 140:20
142:11 144:4,9
145:12,14 146:23
147:4 148:17
149:14,16 151:19
151:22 156:19
157:3 158:10
160:1,11,24 161:6
161:18,24 170:8
170:17 171:3
172:14 176:7
178:23 179:2
180:10 184:13
187:17 189:18,19
192:7 193:17
194:3 195:3
196:21,23,24
204:14 205:2
206:10,15 213:4
215:14,17 221:6
222:21,22 223:5,5
224:12,12 225:20
227:3 231:1
233:11,14,17
234:10 235:10

237:2 238:19,20
239:23 240:15
244:18
above 89:7,18,19
90:5,9,11 92:17
128:6
absolutely 130:23
214:24
Academy 118:19
accept 64:14 87:19
120:15 142:1
accepted 59:7,13
64:20 118:21
accident 18:16 43:5
48:2,23 100:20
101:4,11,16,22
211:13,16,23
212:1
accidents 16:19
17:1 43:11,20
47:12
according 211:2
accountant 243:5
accounting 57:7
58:2 97:18 122:8
122:14
accuracy 41:3
accurately 54:15
123:17 188:10
accusations 156:24
accused 207:5
acknowledging
174:8
across 46:6 99:6
130:18 144:16
185:20 200:16
222:17 228:12
229:14
act 93:22 169:10
174:4
acted 206:24
action 1:4 39:24
156:16
actions 39:22 40:3
40:10,12 43:10,22
actual 36:16 130:24
actually 4:14 8:13
9:13 10:16 11:6
14:7,13 16:23
21:3 22:10 26:14
26:16,24 27:12,14
29:3,5,16 34:12
46:15 48:9,13,14
49:12 52:14 54:11
57:6,8 58:15
59:16 60:5,16,21
61:10 62:2 72:23

73:3,20 78:23
85:21 87:14 89:5
89:7,17 97:16
100:5 101:8
105:24 106:6
109:7,17 114:6,12
115:17,18,21
116:2 117:12,13
119:9 121:20,21
122:9,20 123:13
124:1 128:6
134:23 147:10
150:3 156:22
173:24 176:11
177:19 178:9,12
182:15 184:6
188:21 189:14
193:10 196:7
198:15 199:6,8,10
200:5,11 202:11
205:9 213:3,6
221:9 224:13
232:4 234:16
235:20 236:5
237:10 238:3,4,12
239:4 244:11
add 5:16 36:12
42:24 45:5
added 45:3 88:11
94:21,24 109:3
addicted 52:20
addition 45:3
121:10
additional 36:22
75:7,10 179:15
additions 5:19
address 17:21 18:2
18:20,22 19:2,10
46:3 50:14 116:11
116:14,18
administration
29:19
administrative 16:9
16:11 39:22 40:10
43:10,22 44:8
89:6 124:18
144:12,16 228:15
admit 130:9 134:14
142:24
admitted 21:17
172:23 223:23
231:6,8 239:3
admitting 21:18
advance 91:9,11
118:13 141:14
151:21 170:10
advise 84:8

afford 243:9,14
after 5:13 9:19
14:14 15:24 28:5
35:6 54:13 56:5
57:4 58:7,16,20
59:1,1 60:22 62:5
62:6 63:5,10,11
63:13,16 65:18,20
66:11,18,21 67:3
67:21,23 68:20
72:14 82:14 90:23
91:3 92:10 94:24
95:24 97:17
100:15,24 101:1
101:14 102:18,21
103:2 104:18
109:13 110:21,23
111:9 112:8
136:13 142:22
143:10 146:16
157:5,23 158:13
158:13,23 159:12
160:7,8,20 169:8
169:9 180:15
183:9 185:21
189:7 194:8,16
195:23 197:23
200:1 205:9,18
220:4,11 221:11
227:5,5,10,13,15
231:5 237:12
247:6
afternoon 123:8
190:10
afterwards 16:2
again 59:17 64:18
65:18 71:6 82:2
103:8,9 120:16,16
120:19 148:12
163:5,14 185:20
187:18 205:15
206:5 211:14
228:10 229:13
231:7
against 16:6 136:3
211:19 234:19
agencies 16:14
agency 16:9,11 44:8
86:15 120:17,22
121:11,18,22
122:5,21
agent 163:1
aggressive 145:17
ago 16:20 18:18
21:11,16 41:7,20
41:23 43:2 53:13
62:16 165:12

182:23,23 232:2
233:2,4,17 241:23
242:1
agree 90:6,14 95:19
128:18 135:11
148:20,21 155:20
240:14 242:11
agreeable 242:18
agreed 148:23
226:11
ahead 20:2,4 27:7
31:16 62:1 66:4,5
69:6 86:2 87:6
98:17 102:14
103:11 116:12
125:22 153:12
165:11 170:24
171:1 196:22
197:1 200:10
203:19 216:21
229:3 232:9 241:2
244:9
air 60:10
alcohol 6:10 115:1
190:3
Aleve 52:14
allegation 207:15
217:20
allegations 32:23
199:19 206:15
allege 32:14
alleged 174:4 208:5
alley 190:14,17
200:15
allow 132:22
allowed 69:19 73:15
81:4,21,23 82:11
82:12 124:21,22
179:8 184:11
185:10 217:15
220:10,14 229:1
239:10
almost 4:6 15:21
18:23 177:17
188:11 194:24
195:6 213:2 232:1
alone 31:15 32:2
119:10 193:15
195:20 220:7
along 93:18,21 95:9
151:11 221:1
238:5,11
alprazolam 182:11
185:13
already 10:23 12:22
25:9,10 36:22
66:7 73:6,6 75:5

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 250

| | | | | |
|---|---|---|---|---|
| 83:21 88:3 103:7 | 123:16 127:16 | 213:19 218:14 | **arbitrate** 28:6 | 12:22 13:5 23:3 |
| 104:4,9,10,14 | 130:21 142:19 | 241:11 | **area** 33:19 219:18 | 32:15,24 33:9,9 |
| 121:3 136:23 | 158:15 165:2,7,21 | **anyway** 4:7 50:17 | 222:17 | 33:16 34:2 36:19 |
| 154:13 165:12 | 175:7 179:20 | 135:13 214:10 | **areas** 131:21 | 37:6,19 41:16 |
| 178:17 185:20 | 181:22 184:1 | **Anywhere** 32:22 | **argue** 90:13 92:20 | 69:10 70:16 75:1 |
| 201:15 202:2 | 188:10 209:15 | **apartment** 146:4 | 226:14 | 77:8,15 78:9,9,20 |
| 203:17 209:11 | 210:2,9,24 224:8 | **apologize** 26:6 | **arguing** 93:16 | 79:22 83:7 86:24 |
| 210:10 211:21 | 233:19 234:17 | 123:18 130:21 | 191:13 | 103:6 105:16 |
| 220:8,8 223:22 | 237:12 240:3,19 | 165:8 180:8 | **argumentative** | 129:24 160:18 |
| 236:3 | **answered** 35:8 36:2 | **apologized** 115:23 | 234:3 | 166:10 180:11 |
| **always** 20:21 47:14 | 42:19,21 67:7 | **apologizing** 114:20 | **around** 15:1 30:12 | 195:6 201:5 |
| 57:15 58:12 91:9 | 102:22 103:7,11 | **apparently** 9:9 | 30:13 31:5 41:19 | 207:24 209:10,24 |
| 91:12,12 93:3 | 104:2,5 165:12 | 36:24 41:4 142:18 | 57:3 59:4 63:16 | 210:1 211:1,2,12 |
| 96:12 132:21 | 212:6 233:20 | 144:8 159:4 | 66:3 68:16 78:2 | 239:23 |
| 133:2,3 137:10 | **answering** 6:3,4 | 196:11 236:9 | 85:21 94:15,18 | **asks** 23:23 |
| 169:5 171:19 | 23:4,24 35:16 | **appeal** 27:22 | 114:17 145:19 | **assault** 231:1,2,15 |
| 203:15,18,20 | 69:8 122:3 169:10 | **appealing** 28:5 | 146:16 157:24 | 238:17,18,24 |
| 212:12 218:16 | **answers** 35:3 36:1,3 | **appear** 173:4 | 158:1,3 166:4,14 | **assistant** 29:20 89:6 |
| **Amazed** 55:16 | 36:15 44:22 45:5 | **APPEARANCES** | 170:7 191:14,19 | 122:24 124:18 |
| **American** 118:19 | 45:6 68:12 176:10 | 1:12 | 195:23 197:10,17 | 136:4 158:2 |
| 120:23 121:1,4 | 176:11 180:9 | **application** 23:4 | 198:1 204:19 | 219:14 |
| 122:6,14 | 248:8 | 61:1 64:1,9,15 | 209:21 212:21 | **Associates** 50:13 |
| **among** 193:23 | **anticipate** 157:1 | 115:14 118:20 | 213:13 214:17 | 176:19 |
| **amongst** 236:24 | **anxiety** 183:7 | 175:13,14,15,15 | 215:13 217:5 | **assume** 4:22 20:4 |
| **and/or** 58:17 | **anybody** 55:24 79:3 | 175:19 190:2 | 219:7,8 221:12,14 | 25:18 41:12 62:23 |
| **angered** 205:20,21 | 85:3 152:9,10 | 246:12 | 222:8,12 223:18 | 70:5 104:7 108:1 |
| **angrier** 30:23 | 170:22 172:7 | **applied** 61:10 63:21 | 227:4,23 229:7,11 | 118:13 159:11 |
| **angry** 10:22 15:2 | 182:1 189:14 | 115:5,11 124:2 | 232:5 | 160:4,6 163:5,6 |
| 59:5 83:19 90:23 | 195:14,17 196:9 | 178:19 | **arrest** 230:24 231:4 | 175:13 179:17 |
| 134:1 | 196:12,13 205:4 | **apply** 61:15 64:14 | 231:21 233:3,16 | 199:4 235:7 |
| **animal** 148:21 | 209:23 243:17 | 114:11 116:3 | 238:24 | **assuming** 34:6 |
| **animals** 19:5,6 | **anybody's** 195:20 | 122:10 123:24 | **arrested** 21:10,14 | 104:5 107:23 |
| 146:2 | **anymore** 71:3 92:1 | 234:1 | 22:5 231:11 | **Atlantic** 19:9 |
| **another** 5:14 11:20 | 100:1,8 169:11 | **appointment** 45:17 | 233:10,23 234:13 | 212:13,14 |
| 34:6 46:5 65:7 | 197:8 | 46:12,15,17 50:19 | 234:22 236:13 | **attached** 27:8,11 |
| 71:11 95:10 | **anyone** 9:6,20,20 | 50:23 77:24 78:3 | 240:3 | **attempted** 143:21 |
| 102:17 106:21 | 17:19 18:20 37:6 | **approach** 95:20 | **arrests** 231:20 | **attend** 56:3 62:17 |
| 133:13 148:21 | 37:8 42:4 52:7 | **approaches** 217:16 | 233:14 237:24 | 65:16 217:15 |
| 182:22 207:18 | 77:18 80:8 90:20 | **appropriate** 39:5 | **arrow** 27:1 | **attendance** 141:8 |
| 220:9 229:6 238:5 | 171:6 195:10 | 39:10 209:2,3 | **article** 189:18 | 149:11 151:19,19 |
| 238:11,13 243:19 | **anything** 3:3 5:7 8:1 | **April** 16:1 26:13 | **Arts** 50:15 | 152:22 155:7 |
| **answer** 4:2,7,13,15 | 8:10 25:20 33:4,6 | 27:2 28:18,24 | **asked** 29:1,2 30:3,4 | 156:14 |
| 4:17,18 5:9,12,14 | 33:13 36:12 40:5 | 32:4 63:16 67:3,5 | 32:9 35:11,15 | **attesting** 44:21 |
| 5:17 6:17,20 20:1 | 40:23 45:4,13,14 | 68:20 96:21,22 | 78:18 103:11 | **attire** 178:18 |
| 20:2,4,4,7,8,20 | 52:3,13,14,20 | 102:12 107:12,13 | 104:9 106:9 | **attorney** 2:14 4:3 |
| 33:3 36:17 37:18 | 59:11 66:14 69:13 | 109:6,7 126:20,21 | 115:18,19 116:10 | 25:5 36:6,6 42:10 |
| 38:12 39:13,18 | 69:17 70:10,19 | 158:7,13,23 | 133:2 142:10 | 43:8 69:18,20,22 |
| 40:2,18,21 41:3 | 75:3 77:8,16 | 159:11,13 160:7 | 151:21 169:5 | 70:20 77:4,9,17 |
| 41:11,21 42:1,3 | 78:10,16 79:4 | 170:6 174:21 | 181:19 186:1 | 78:1,6,11,17 80:2 |
| 42:12,23 44:13 | 80:1,4 88:21 89:1 | 177:15 179:22 | 192:20 199:12 | 82:4 113:12 |
| 49:11 54:14 68:14 | 92:4 108:1 113:23 | 185:4,5 189:6 | 201:11,13,16 | 119:21 248:13 |
| 69:19,22,24 70:13 | 151:5 155:23 | 197:4 199:15 | 202:3 212:5 213:9 | **attorneys** 72:17 |
| 70:19,21,23 81:4 | 156:20 163:18 | 203:12 204:21 | 216:23 217:1 | **attorney's** 42:13 |
| 81:6,7,10,14,21 | 170:23 172:14 | 205:12 212:11 | 220:4 221:24 | **attorney-client** 69:8 |
| 81:23 82:12 98:18 | 176:6,9 178:23 | 213:21 216:7,22 | 223:21 225:24 | 69:10,23 |
| 103:22 104:8,10 | 180:8,10 194:20 | 217:13 218:11 | 240:2 248:8 | **attorney/client** |
| 108:2 115:6,9 | 206:20 208:11 | 220:17 222:5,7,9 | **asking** 4:1 7:11 | 77:12 78:1 |

B-0184

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 251

| | | | | |
|---|---|---|---|---|
| **at-will** 148:12 | 146:13 148:7 | 166:8 | 166:18 167:11,24 | 219:15,16 235:14 |
| **August** 11:13 14:20 | 158:8,14 159:20 | **before** 1:10 3:5,7,20 | 168:3 185:12 | 235:15 |
| 20:15 34:19 85:17 | 166:18 170:1 | 5:12,14 17:16 | 207:5 208:20 | **bigger** 139:4 |
| 86:14 88:15 | 185:9 186:10 | 22:23 26:9 34:23 | 221:2 234:22 | **bill** 226:24 227:9,11 |
| 102:12 104:24 | 187:18 199:14 | 60:14 61:11,11 | 243:19 | 229:8,21 230:7 |
| 107:8,11 176:1 | 212:21 213:13 | 63:1 66:17 67:19 | **beliefs** 95:18 | **binder** 94:19 |
| 177:16 227:10 | 214:23 217:5,6 | 71:11 76:19 91:3 | **believe** 13:10 18:12 | 211:16 |
| **aunt** 13:8,21,22 | 219:21 220:5,9,10 | 91:14 95:19 96:10 | 23:22 32:5 37:8 | **binders** 88:23 |
| 14:7 | 220:14,16 225:23 | 96:17,22 97:19 | 40:15 71:22 75:22 | **birth** 2:19 19:11 |
| **authentication** 79:5 | 226:9 227:19,22 | 100:24 101:1 | 76:11,16 97:22 | **bit** 48:15 97:19 |
| **authority** 39:4 | 227:24 228:21 | 103:19 108:20 | 116:17 121:3,4 | 119:10 138:21 |
| 129:3 131:15 | 229:1,15 230:6,16 | 113:15,15 115:11 | 126:2 150:1,14 | 139:6 180:16,17 |
| 132:2 136:21 | 232:21 235:23 | 116:21 120:5,13 | 162:20,22 163:7,9 | 190:19 |
| 154:22 | 236:24 237:4 | 120:14 123:11 | 163:12 165:22 | **black** 101:6,13 |
| **authorization** 154:3 | 238:17 241:9 | 125:9 160:15,17 | 195:15 198:16,17 | 154:5 |
| **authorized** 109:1 | **backed** 96:3 141:3 | 167:12,14,23 | 198:17 199:18 | **blank** 29:2 132:24 |
| **automated** 58:1 | **background** 3:8 | 172:23 173:2 | 200:1,3 206:3 | 199:11 |
| 97:18 | **backs** 208:20 | 174:17 176:8,15 | 232:13 | **Blauvelt** 161:7,21 |
| **automatically** 164:6 | **backtrack** 218:19 | 197:23 201:22 | **believed** 44:22 | 162:24 163:1,4 |
| **available** 120:15 | **back-up** 120:16 | 204:12 207:13 | 126:23 165:6,9,14 | **blend** 38:11 |
| **Avenue** 1:14 | **bad** 13:15,15 47:6 | 208:15 220:11,19 | 201:2 205:22 | **blew** 21:13 |
| **average** 117:22 | 53:1 142:18 | 221:11 227:5 | **believes** 174:2 | **Block** 243:24 244:5 |
| **aware** 80:1 94:7 | 163:19,20 204:9 | 228:18 239:10 | **belittle** 145:21 | **blocks** 53:3 |
| 97:23 | **badges** 88:2 | 248:6 | **below** 33:19 128:9 | **Blood** 51:8 |
| **away** 32:19 33:16 | **bank** 24:24 96:19 | **beg** 222:20 | **belt** 47:14,14 | **blow** 171:15 |
| 38:22 48:22 88:19 | 96:21 97:1 102:12 | **begged** 158:10 | **bending** 146:15 | **blue** 83:14 85:5 |
| 92:5 96:4 157:5 | 102:22 103:1,13 | **begging** 31:7 | **beneath** 128:3 | 101:7 152:1 |
| 166:12 168:22 | 103:24 104:17 | 222:23 | 145:18 | **body** 56:5,5,6 83:11 |
| 169:2 179:7 | 105:3,8,20 176:24 | **begin** 5:12 60:17,21 | **benefit** 63:14 | 236:8 237:3 |
| 190:20 | 177:5 | 62:11 64:23,24 | 205:23 206:4 | **boiling** 193:16 |
| **awhile** 19:3 52:18 | **banks** 105:24 | 109:18 125:23 | **benefits** 21:8 | **bold** 38:11 |
| 53:16 60:22 | **bank's** 105:5 | **beginning** 1:9 11:9 | 111:15 | **book** 16:4 113:20 |
| 101:24 122:20 | **bar** 235:23 237:1,4 | 11:11,24 50:20 | **bent** 47:17 | 218:18 |
| 199:5 | **bartender** 236:2 | 60:7 61:2,5,19 | **Bernard** 86:10,13 | **booklet** 71:18 |
| **a.m** 1:10 48:11 | **base** 113:21 | 94:7,8 101:19,24 | 106:16,17 | **boots** 63:24 123:5 |
| | **based** 70:8 | 110:9,10 117:9,13 | **besides** 63:6 66:16 | **boss** 13:11 90:7 |
| **B** | **basic** 125:17 | 117:15,19 123:13 | 194:5 | 136:24,24 141:12 |
| **b** 118:15 127:20 | **basically** 10:18 37:6 | 130:12 131:8 | **best** 10:7 11:5 44:23 | 151:22 167:12,14 |
| 246:5 | 38:23 53:9 63:9 | 168:8,9 178:3 | 181:24 198:1 | 167:15,17 189:22 |
| **back** 17:8 27:5 28:4 | 88:1,4,21 89:2 | 244:10 | **Beswick** 49:5 50:9 | 219:17 |
| 29:11 31:9,19 | 100:1 107:1,2 | **behalf** 9:8,20 44:10 | 50:10,24 51:2,3 | **bosses** 128:14 |
| 32:6 35:9 38:22 | 118:24 125:13 | **behave** 178:21 | **better** 55:15 99:9 | **both** 13:24 17:14 |
| 46:8,13,19 47:4,7 | 145:16 191:15 | **behind** 87:11 92:19 | 111:15 112:21 | 89:21 90:4 95:5 |
| 47:20 48:7 50:6 | 198:13 | 129:7 137:17,18 | 138:21 153:24 | 128:2,13 137:9 |
| 51:19,23 52:12 | **basis** 33:7 99:22 | 140:23 163:15 | 168:7 202:12 | 151:10 189:18 |
| 53:8 54:2 55:20 | 133:18 156:15 | 187:18 208:20 | 205:18 | 220:4 224:22 |
| 56:8 61:24 72:3,4 | **Bates** 127:18 | 222:20 227:18 | **between** 56:19 80:2 | 225:2 237:10 |
| 73:8 83:23 84:14 | **bear** 3:11 | 229:5,9 | 88:8 95:4 102:7 | 244:15 |
| 93:20 94:16 110:5 | **beard** 211:11 | **being** 112 21:14 | 102:12 105:3 | **bothered** 48:18 |
| 113:6,22 115:3,22 | **became** 85:24 86:5 | 35:11 39:1,9 | 114:4 118:3 | **bothering** 90:24 |
| 115:23 117:24 | 88:16 94:24 106:8 | 52:20 55:21 66:11 | 140:11 157:13 | **bottle** 182:10 183:2 |
| 119:20 120:10 | 154:5 171:23 | 68:15,17 77:6 | 187:2 192:18 | 183:5,22 |
| 126:24 127:12 | **become** 72:10 86:22 | 87:13 119:10 | 227:10 228:16 | **bottom** 22:17 71:19 |
| 131:7 134:16 | **becoming** 167:4 | 129:23 141:6 | **big** 55:19 113:1 | 160:6 164:2 |
| 137:2,17,18 | **bedridden** 13:9,22 | 142:20 152:23 | 144:11 200:15 | 208:14 |
| 139:14 143:15,16 | **beer** 11:18 12:7,14 | 154:15 155:7 | 203:14,15 204:6 | **bought** 195:18 |
| 144:22 145:8,24 | 13:6,13 85:20 | 156:22 165:24 | 205:13 210:21 | **bowl** 146:12 |

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 252

box 144:24
boxes 144:21
boy 109:21
boyfriend 20:15
  168:19 171:7
brace 56:5
braces 56:6
break 5:23 6:2,4
  59:20 119:22
  120:9 125:14
  172:20,23 235:15
breaks 77:6
breathe 140:23
Brewington 1:13
  2:13 7:9,14 19:22
  20:2,7 26:22
  35:20 37:24 49:16
  49:19 59:21 69:5
  69:7,12,16,21
  70:12,23 71:17
  73:7,10,20 74:2
  77:2,7,14 78:16
  78:23 79:4,8,12
  79:22,24 80:11
  81:5,9,12,22 82:1
  84:19 98:8,11,17
  103:10 119:16
  153:7,11,14,21
  169:21,24 184:9
  184:12,15,17
  186:8 209:5,7
  216:3,5 234:3
  239:17 240:14,23
  242:9,14,19,22
  243:2 244:19,23
  245:1
Brewington's 42:15
  71:11 72:10
brief 29:5
briefcase 203:21,24
  204:16
briefly 157:15
bring 63:18 93:13
  127:12 132:24
  141:5 145:15
  151:24 230:5
brings 224:16
broke 46:19
broken 77:11 80:7
brought 2:24 11:6
  39:24 184:6 186:3
  208:24 221:23
building 29:16 46:4
  106:19 116:18
  137:11 144:12,16
  148:4 150:21
  195:1 219:10

222:18 223:1,2,2
  223:21 228:14,15
bulb 226:12
bulging 47:16
bulk 157:18
bunch 132:7,8
  140:17 142:4
  169:12
Buragino 30:1,6
  132:12 133:6
  135:15 147:24,24
  148:19 149:1
  150:14,18,19
  151:2 152:13,15
  152:20 154:7,14
  154:20 155:3,10
  161:7,22 199:10
  200:17 201:22,24
  202:4 205:6
Buragino's 151:6
burning 125:11
bus 21:24
business 99:19
  145:23 178:18
  224:5,7 232:15
busy 13:3 20:21
  93:3 162:11
  181:13 241:9
buttocks 47:10
  238:13
B-E-S-W-I-C-K
  49:7
B-U-R-A-G-I-N-O
  30:1

_____C_____
cab 146:2
Cadillac 101:13
Cadillacs 101:6
cage 12:18 13:4
calendar 114:16
call 15:18,18 21:14
  25:1 27:21 60:18
  64:5 68:17 75:23
  76:2,9,10,12
  124:13,21 125:2
  135:2 151:20
  152:10 163:16
  165:16 198:21
  199:5 202:21
  205:9 207:4
  212:16,17,19
  213:1,4,16,16
  217:16,19 220:21
  220:23 221:10
  223:8 228:24
  235:24

called 23:12,15 28:7
  31:16,20,24 45:18
  46:1 47:4 50:12
  51:23 52:16 57:24
  68:18 72:23 75:21
  83:7 86:10,12
  87:20 97:10,16,22
  98:1 104:20
  109:20 114:19
  115:12,21,23
  122:11 132:13
  133:9,9 135:3
  139:9 147:22,24
  147:24 154:23
  158:9 162:22
  165:3,6,21 199:6
  200:5,7,8 204:12
  204:19 205:6
  214:7 217:9,21
  220:11,17 223:17
  224:2 226:24
  228:20 230:11
  235:10
calling 14:5 15:7,8
  15:11,12 115:22
  213:2 214:15,16
  220:3
calls 132:22 133:2
  209:7
calms 185:14
came 31:17 79:16
  83:3 93:21 95:2
  98:20,23 99:3,6
  109:6 111:5
  143:10 158:8
  191:20 193:17
  226:12 228:22
  236:4 238:19
  242:2 248:6
cancel 115:8
canceled 66:7
captioned 2:11
car 16:19 17:1
  21:24 43:5,11,20
  47:12,13 48:2,23
  100:20 101:3,10
  101:16,22 144:21
  146:4,7 148:7
  200:15,16 222:19
  229:4,4 236:11
  238:5,11,13
care 45:11 46:1
  47:3 53:17 140:19
  142:2 198:16
  200:1
careerbuilder.com
  121:21

Carmella 15:5,9
  76:3 91:11 96:8
  144:8 146:11
  157:13 161:9,18
  161:22 162:15
  163:18 164:3
  165:4,23 170:6,8
  171:5 197:21
  219:16,20,20,21
  220:12,24,24
  221:11 227:7
  229:7,10
Carmella's 144:13
  219:10 222:14,17
  222:24 226:20
  227:16,17 228:4
carry 109:1 110:3
  144:24
case 8:21 26:12
  32:5 34:8 36:21
  52:24 53:1 72:18
  75:10 182:18
  243:19
cases 17:9 43:5,23
cast 56:5
caster 128:5,21
  144:17 186:19
Castle 118:17 248:2
casual 186:22,23
  187:4,13,15
cat 144:8,9,9 145:4
  145:4,7,11,13,24
  146:1,6,10,15,16
  146:18 147:5,7,14
  147:19 148:16,17
  149:4,14,16 150:3
  150:5 153:3,20
  154:5
catches 146:17
cats 146:3
catwalk 12:18 87:7
  140:22
caught 138:1 147:9
  148:16 154:4
  163:14,16 211:10
cc'd 138:5
CDL 108:18 109:4
  109:8 116:22
  119:4 120:7
  246:17
cell 14:9 31:22
  46:18
Center 243:13
Centre 59:24 61:16
  62:18 63:22 64:13
  246:8
cents 106:6

ceremony 97:19,21
certain 49:17
  191:15 192:15
  194:9
certainly 75:8 76:20
  78:18 79:17 81:6
  98:18 136:6
  142:11
certificate 2:20 58:3
  246:20 248:4
Certification
  248:18
certified 96:12
  120:6 122:24
certify 248:6,11,13
challenge 119:6
challenged 18:15,17
chance 22:13 60:4
  213:19
change 39:13,18
  40:20,23 41:10,12
  41:13,14,22 88:8
  94:3,5,5
changed 170:14
  201:6
changes 88:10
changing 60:24
channels 218:6
  219:4,5
charge 32:14 33:7
  67:18 126:12
  139:10 216:5
  239:6,14
charged 140:14
charges 119:2
  231:21 233:15,19
  239:18
charging 76:4,5,6
  76:12
charts 114:1 131:19
  131:21
cheated 209:19
  212:8
check 83:22 197:16
  197:17
checkbook 186:4,5
checked 109:2
checks 132:24
cheek 166:12
cheeks 33:1
chemical 114:1
chemicals 109:1
  113:18 114:2,10
chicken 19:15
child 47:6
children 16:24 21:4
chitchat 125:16

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 253

choice 60:19
choose 95:15
  180:10
choosing 60:17
  95:16
chose 62:9
Christiana 46:6
Christmas 108:21
church 243:11,16
Cindy 54:9 55:2
circled 24:16
circumstance 4:6
  167:9
CITI 1:6
CitiSteel 2:9,12,15
  8:9,11 9:1,7,11
  12:3 14:8 15:3
  16:15,16 17:18
  18:9 24:22 25:2
  25:14 27:23 28:2
  29:8,8,13,14 35:7
  35:9,12,21 36:2,4
  36:5 38:16 40:6
  41:9,18 42:2,22
  44:13 48:9 52:5
  58:16,21 59:1
  60:14 61:23 62:6
  62:19 63:5,10
  65:12,23 66:18
  73:2 76:6 83:4
  84:9,12 85:16
  86:20 88:5 94:4
  96:10,15,18,23
  97:4 102:13
  103:14 104:18,24
  106:5,16 107:6
  111:15 112:21
  113:6,8 121:14
  122:16,19 123:4,9
  123:12,20,21
  124:1,5,9 128:19
  129:10,24 139:5
  143:18 144:11
  158:13 171:22
  172:11 173:5,16
  175:16,19 176:20
  183:9 186:10,17
  188:9,19,20,21
  189:7 206:21
  218:10 221:13
  229:5 242:3
CitiSteel's 7:24
  8:21 28:6 35:3
  36:2 86:20 90:16
  90:17 131:20
City 19:9 212:13,14
  244:12,12

civil 1:4 39:21
  40:10 43:9,22
  44:14,14,15
claim 33:8 166:5
claimed 84:17
claims 21:6 36:21
Clara 10:9
clarify 14:19 103:12
class 21:23 58:2,17
  60:12,15,16 62:3
  65:11,22 66:4,15
  67:1 116:9 117:5
  117:12,13 118:8
  118:14 120:5,13
  177:18,20 178:3
  178:15
classes 62:17 64:24
Claymont 144:11
  243:13
cleaned 88:17
cleaning 88:18,24
clear 4:12 26:23
  80:23 92:23 94:23
  110:24 211:1
  241:17,19
clearly 41:5
clerk 57:7 89:5,8
  94:11 122:8,14
  124:17
client 80:1
climb 12:17 156:7
  191:9
climbing 87:6
closed 48:8 92:19
  129:7 163:15
  190:16
closer 138:9
closet 241:9
clothes 63:23
club 235:13
clue 80:18 82:19,22
  85:8 131:9 164:21
  165:1 232:6
CNA 122:24
CNAs 122:22
CNE 122:23
Cobra 54:13
code 116:20
coffee 16:4
cold 125:14
Coles 1:20 2:14
  186:7,12
collect 61:22 180:21
collected 180:14
collecting 60:22
college 57:4
color 126:16 148:13

come 9:10,16 32:6
  33:9,17 72:21
  76:14 88:18 94:16
  95:9 114:24
  124:13,20 125:8
  125:14 126:24
  130:18 138:23
  139:14 140:18
  146:13 148:2
  152:10 171:19
  185:20 186:12
  189:22,23 190:13
  190:17,17 197:4
  199:6 200:12
  202:21 203:23
  204:6 205:7,8
  206:11 207:4
  216:23 217:18,19
  220:1,4 221:22
  222:8 224:1
  227:18 228:8
  229:9 231:7
comes 130:17
  146:16 148:4,19
  156:3 203:12,18
  203:21
comfortable 49:21
coming 58:18 83:5
  83:6,23 92:12
  98:20 99:4 167:6
  169:13 201:23
  213:4 222:6,6
  225:22 226:16,17
  238:5,11
comments 32:24
  33:15
common 192:2
  235:5
communicated
  156:17
Community 243:13
comp 21:6
companies 121:11
  190:3
company 86:9
  96:13 113:2
  121:15 122:9,14
  132:18 149:12
  152:23 154:15
  155:8 156:17
  211:9
compare 143:4
compared 112:19
  193:4
complained 142:5
complaint 8:19
  16:10 22:7 26:7,9

27:9,15 67:18
  71:14 199:3
complaints 7:24
  16:9,12
complete 20:24
  44:22 45:6 229:3
completed 29:13
  32:11 57:9 247:7
completely 5:14
  178:2 240:14
complex 146:4
comply 87:1
compound 81:6,10
  209:6,8
computer 57:10,16
  73:24 89:3 142:9
  143:6 164:6 248:9
computer-aided
  248:9
Conaway 1:9,16
concentrate 63:15
  197:7,21 198:8
concern 79:12 80:6
  221:2 224:9
concerned 82:2
  96:7 108:7
conclude 245:3
concrete 189:16
condition 47:4
  49:24
conduct 9:11 21:16
  208:9 210:6,12,22
  231:16,17 234:10
  239:2
conducted 83:2,11
  207:19
conducting 232:15
conference 3:18
confidential 208:7
confidentiality
  49:18 208:6
confined 119:14
confirm 245:2
confront 136:8
confronted 134:21
  134:23
confused 116:17
  213:21 220:16
confusing 4:11
connected 99:2
consider 12:2 166:7
  166:10
considered 57:13
consisted 161:15
consists 142:3
  144:11
conspiracy 211:22

constant 48:1
construction 96:13
consumed 6:9
contact 59:9,17
  67:8,14 83:1 95:5
  181:12
contacted 71:9
  74:20
contacting 67:16
context 73:21
  107:21
continue 8:13 15:8
  113:20,23 130:2
  140:8 149:21
  156:6 196:6
  244:21
continued 56:9
  108:24 109:3,4
  113:20 156:10
  166:16
continues 37:9
continuously 31:23
contract 108:11,16
contractor 188:19
conversation 73:21
  80:5 81:18 164:1
  194:4 237:1
conversations 77:3
  187:11
cooler 125:12,18
cop 232:4 236:11
copied 137:9
copies 8:20 34:13
  63:8 75:6 94:17
  122:1 134:17
  182:15 241:24
  244:2
copy 32:16 120:7,8
  130:14 132:5
  134:18 137:9,18
  139:22 142:22
  184:6,6 214:9
corner 22:17 141:4
  235:5
correct 4:13 19:16
  36:4,13 42:23
  45:1 70:21 76:11
  76:17 78:14
  100:21 102:18
  103:18 104:5,7,22
  105:1,6,9 113:6
  120:2 127:24
  143:18 152:24
  174:16 176:13,14
  180:1 186:19
  187:24 195:10,11
  201:7 210:4

Snyder
Terry L. Snyder

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 254

231:14 234:5,6
235:9,12 239:14
239:16 248:11
**correctly** 84:15
**corridor** 99:4,7
**cough** 91:1,3
**counsel** 35:8 67:8
67:13 71:4,8
72:19 75:13
240:11 242:12
248:7,13
**counting** 71:5
**counts** 162:8
**County** 248:2
**couple** 7:18 15:5
28:23 29:1 51:2
53:13 67:9 93:12
93:15,23 106:6
118:13 121:24
123:2,6,8 145:13
148:1 151:20,23
178:14 179:1
182:22,23 185:21
198:22 199:11
206:5 217:1 231:5
236:9 243:24
**course** 6:5 21:24
22:24 38:17 39:8
57:7,7,11,16 58:5
60:10 62:11,18
65:1,3,4,7 66:10
66:18,19,20,22
72:19 84:13 96:9
110:4 147:12
148:8 181:16
190:24
**courses** 57:6
**court** 1:1 2:15 3:20
5:6,8 23:7 34:4,7
34:11,14,17,21
35:10,17 71:10
108:6 235:5,6
**courtesy** 5:13
**courthouse** 35:4
**cousin** 18:5 236:6
**cousins** 237:7
**cover** 121:20
135:13 211:22
**co-pay** 112:4
**CP** 76:4 178:8
**crap** 140:17 142:4
169:12
**crazy** 54:4 147:7
**created** 150:14
151:5
**credibility** 240:2,6
**credits** 56:11

**cried** 10:18
**criminal** 39:21
40:10,12 43:1,9
43:23 44:15
230:22 246:13
**cross** 140:21
**crossed** 168:12
**crushed** 47:7
**cry** 68:16
**crying** 14:8 55:15
59:4,5 66:2
182:13 185:13
**Crystal** 186:6
**cubicle** 219:10,17
219:23 227:23,24
228:1 229:7
**cubicles** 219:16
**cup** 146:13
**curious** 238:21
**current** 9:6 15:4
17:21 72:19
**currently** 23:23
49:1 52:10 53:15
53:17 182:4,6
183:16
**curse** 191:20,24
192:5
**cursed** 193:20
**cursing** 191:10
**cuss** 191:17,24
193:10
**cussing** 191:14
193:11,12
**customer** 176:23
**cut** 15:13 80:17
83:22 133:23

---

## D

**D** 246:1
**dad** 76:23
**daily** 95:6 99:22
195:6
**dance** 235:13
**dark** 237:5
**date** 19:11 26:11,11
26:19,24 27:2
28:5,11,13 32:6,8
34:10 39:24 54:14
60:24 61:17 62:2
62:3,10 67:12,24
68:1 72:12 74:5
74:20 109:7
110:24 112:9
115:22 117:19
118:4 123:18
126:20,24 127:9
127:14,15 130:11

130:19,19,24
138:15 153:11,14
153:15 158:19
159:2,23 160:12
175:24,24 177:13
197:3 213:10,12
215:9 231:4 233:5
233:12 244:22
**dated** 34:15,18
46:11 127:7 170:6
175:20 248:20
**dates** 26:18 54:24
62:24 63:19 73:16
73:22,23 130:17
139:15 143:7
180:9 185:16
186:5,7,8 194:15
214:18 215:19
**dating** 20:14,17,21
160:13 238:6
**Davidson** 118:15
**Dawn** 58:14,22,24
59:24 61:16 62:18
63:22 64:13 246:8
**day** 6:13 11:12
12:12 13:3,7,11
21:5,24 27:5
28:17 29:9 30:11
30:23 34:11,19
46:20 48:19 65:13
67:19,21 85:18,19
87:1 91:8,18
97:17 98:2,19
114:23 115:3
117:2 122:11
126:14 136:14,14
136:15 137:22
139:21 140:9
142:6 144:19,20
145:3 147:15,20
153:1,9,10 158:5
158:6 159:12
166:8,8 187:12
189:24 191:19
194:21,23,24
195:3,4 197:5
202:23,24 207:12
207:15 212:23
213:2,21 214:2,5
214:11,16 215:10
215:11,13 216:4,7
216:9,11,11,22,22
217:3,10,18 218:7
218:8,9,10,17,19
221:15 225:21
226:23 231:5
248:6

**days** 14:11 48:3,9
53:4 141:9 151:20
158:5 185:21
215:22 231:5
**dead** 197:19
**deaf** 219:22
**deal** 47:20 210:21
**dealing** 61:23
124:22
**dealt** 124:16
**death** 162:23
**Debbie** 2:14
**DEBORAH** 1:20
**December** 71:5
108:21 109:9
110:9,9,18,21
111:7 114:4 117:3
117:8,9,9,15,19
118:7 185:4,6
**decide** 95:13,19
116:22 118:11
119:4 168:11
169:6 197:6
213:12 222:4
**decided** 65:15 115:1
228:18
**decision** 70:4,7,8
**decline** 62:21
**declined** 72:8
**defendant** 1:7,18
231:13
**defense** 242:12
**define** 210:17
**definite** 130:19
**definitely** 39:7 68:8
74:13 101:15
102:17 140:15
142:3 201:1
222:10 243:1
**definition** 192:15
**degree** 231:1
238:18
**Delaware** 1:2,9,14
1:17,22 17:24
18:1 19:7,10
35:19 57:8,12,13
57:19 86:11,13
97:7,7,24 98:7
101:2,5,12,14
102:18,21 103:2
104:18,21 116:15
122:12,13 148:12
177:8,12 212:10
212:11,12 235:6
248:1
**delete** 218:4
**deliver** 110:4

144:19 226:24
230:10
**delivered** 227:9
229:24
**delivery** 164:12
**Dennis** 89:12 138:5
149:10 150:8
197:10 199:10
**denying** 202:13
205:19
**department** 26:2
27:20 35:17 38:15
38:19 40:7 41:17
63:7 67:21,23
89:14,16,17
144:14 174:5,12
214:24 224:13,16
**depended** 194:1,4
**depending** 221:15
**deponent** 73:13
143:3 246:2 247:8
248:7,8
**depose** 242:17
**deposed** 68:12
**deposit** 24:24
**deposition** 1:8 3:5
7:2 22:8 60:2
75:17 82:4 98:15
119:21 125:20
138:11 139:1
157:7 172:17
175:5 186:8 189:2
230:18 244:22
246:6
**depositions** 19:24
98:10
**depressed** 55:11,12
185:13
**describe** 39:21
169:21,23,24
187:20 193:4
**description** 88:11
88:15 94:8,11
140:10 161:11
233:12
**desire** 113:8
**desk** 88:17,19 98:24
99:7,20 204:5
205:18 220:10
**desks** 99:1 219:17
**destroy** 195:20
**detail** 16:13 26:17
**determine** 84:16,24
**determined** 244:22
**diary** 218:17,23
**DiBianca** 1:16 2:6
7:11,16 19:23

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 255

20:10 38:4 49:15
49:18 50:2,6,8
59:20,23 69:6,9
69:14 70:1 73:8
73:12,17,24 74:16
77:5,10,19,21
78:14,19 79:15,23
80:9 81:16 82:3,7
98:9,13 119:19
153:12,22 170:4
172:19,22 184:20
184:23 186:9,14
189:4 209:6,9
216:13 230:16,20
239:20 240:11,17
241:4 242:11,15
242:21,23 243:3,4
244:17,21 246:3
**difference** 192:18
192:19
**different** 7:21 8:20
18:13,14 94:18
100:2 108:23
109:20 167:2
190:4 191:21
215:17 237:18
**difficult** 56:7
**dig** 141:2 190:22
**digging** 190:13
**dinner** 15:6 16:5
62:8 170:11,14
221:12
**diploma** 56:11,14
**direct** 128:22 129:3
129:5 174:4
**directed** 174:5
192:22
**direction** 248:10
**directly** 96:7 119:15
124:22 150:20
226:1
**director** 99:11
174:6
**dirt** 145:18
**dirty** 141:4 187:9
**disability** 18:5 21:8
180:21
**disagree** 155:15,19
155:20
**disagreement** 93:7
93:21 128:16
**disagreements**
92:21
**disciplinary** 139:13
156:16 224:20
**discipline** 143:17,21
143:21,22,22

**disciplines** 143:24
144:2
**discovery** 157:10
**discrimination**
26:12
**discuss** 69:13,17
77:3,8,15,15 78:7
78:18 80:1 82:3
138:20 141:10,22
149:6 160:14,16
171:24 209:1,3
228:7
**discussed** 10:14
40:12 69:11,13,17
69:22 70:6,6,9,11
70:18,20 77:8,12
77:17,17,23,23
78:10,17 80:7,8
80:24 81:17
133:12 139:5
149:3,9,13,15,18
150:8 152:22
154:14 155:7,13
163:23 181:17,19
201:14
**discussing** 49:21
159:4
**discussion** 50:4
78:21 79:9 80:14
119:17 133:21
177:11 184:22
186:16 189:1
228:3 230:14
242:10 244:20
**discussions** 7:12
**Disgusted** 132:7
**disgustingly** 68:17
**dish** 146:15
**dishonest** 152:11,13
163:17
**disk** 17:8 47:16,16
51:24
**disks** 47:19
**dismissed** 21:17,19
21:20 231:3,12,19
233:7 239:3
**disorder** 51:8
**disorderly** 21:16
231:16,17 234:10
239:1
**Disposition** 235:6
**disrupt** 196:13
**distance** 190:20,22
**District** 1:1,2 35:19
**doc** 24:16
**doctor** 45:11 49:3,5
50:24 55:2 112:3

182:24 183:6
**doctors** 46:2 49:1
51:9,11,14 52:4
182:14 241:22
**doctor's** 45:19
58:13
**doctor-related**
49:12
**document** 25:7 32:9
36:20 54:21 71:24
79:19 80:5 82:18
84:17 113:11
120:6 144:5 151:2
154:7 155:23
175:9,12 184:24
185:1,18 186:2
216:14
**documented** 67:10
71:6
**documenting** 159:7
159:10
**documents** 2:24 7:5
7:8,12,22 8:3,6,14
8:17 22:20 24:17
25:3,9 27:11
34:24 36:22,23
37:1,2 61:8 73:5
74:17 75:7,10
143:4 179:5 186:2
241:7 246:9,14
**dog** 77:24 92:23
93:1
**doing** 6:23 9:17
11:4 19:13 29:3,6
31:18 37:12 47:24
92:4 93:10 97:8
125:16 134:4,5
137:5,17,17,19
138:3 156:20
161:1,5 162:3
163:24 169:21
188:14 189:16
197:17 198:14,18
223:10
**dollar** 238:9,10
**dollars** 111:14
**done** 7:2 8:15,23
9:12 22:16 29:18
46:8 47:8,22
92:21 116:13
117:23 140:9,11
148:22 196:2
208:17,18 209:12
209:12 210:4,6
214:9 239:9,16
243:14,14

**door** 11:7,9 98:24
125:13 145:4,8,11
146:7,9 147:12
197:13,13 204:6
207:14 219:19,21
228:2 235:22
**doors** 92:20 129:7
163:15 190:16
**doorway** 33:2
125:15 146:14
203:24 227:20,22
227:24
**doubt** 63:14 205:24
206:4 234:18
**Dover** 114:8
**down** 2:16 5:6,8
9:16 13:4 19:9
29:2,19,22 30:5
30:16,17 31:13
33:19 46:16 47:21
48:12 66:24 83:3
83:5 87:6 93:4
98:20 99:4,6
127:22 129:17
130:19 133:9
134:12 137:11
144:15,17,22,22
146:15 148:7,19
150:6 151:18
158:9 159:2 167:7
168:5 173:24
178:10 185:5,14
190:13,17,19,19
194:3 197:14,16
199:5,6,8,12
200:11,12,13,14
200:15 201:2,13
201:23 202:3,3,21
204:1,7,8 205:13
206:12 207:21
208:19 211:6
212:14 213:4
214:7,13,16,18
215:12,14 216:23
216:24 217:2,4
218:1,18 219:7
223:9,15,16,20
225:14,16 227:14
228:20,23,24,24
229:15,16,17
236:1 248:8
**Downie** 29:1,21
30:1,4 31:23
41:19 87:20
145:17 146:16
147:11,14 148:2
148:11 154:4

158:2 198:21,23
199:4,11,22
200:17 201:11,18
201:19,21,23
202:11,15,20
205:5,18,20 206:3
206:12 210:8
212:5 213:9 215:8
216:24 217:13,15
219:13,22 220:3
224:7,16,22 225:2
225:12,13,19
227:13 229:8,11
**Downie's** 29:18
137:8 213:11
216:23
**downstairs** 13:22
**Dr** 46:17,21 49:5
50:9,10,24 51:1
52:24 53:7 183:7
185:9,11
**drag** 31:13 170:22
**drank** 21:11,12
**dress** 33:10,17
92:13 186:23
**drink** 6:12 12:7
21:12,12,12,13
125:14
**drive** 17:23 46:3
54:4 109:8 119:5
144:21 146:8
218:1 221:13
**driver** 108:13,14
111:5 119:5,6,11
230:4
**drive-by** 179:8,10
**driving** 14:9 16:23
101:6 109:20
118:19,23 191:2
237:10,14,14,19
237:21 238:14
**drop** 91:3 115:14
**dropped** 239:18
**drops** 91:1
**drove** 122:9 229:5
**drug** 111:5 119:1
190:2
**drugs** 239:9
**due** 242:3
**DUI** 21:11,21 40:15
41:7,23 42:23
43:20 232:24
233:3
**duly** 2:3 248:7
**dumb** 148:17
**during** 8:8,10 65:12
82:4 92:16 106:2

Snyder                              v.                    Citi Steel, USA, Inc.
Terry L. Snyder              C.A. # 04-970-JJF                  May 31, 2006

Page 256

123:19 150:6
151:18 155:8
157:10 166:19
178:21 179:24
181:1 197:23
237:14,21 240:19
**dust** 30:16,17 187:9
191:3 206:12
207:20 215:14
217:4 219:7
225:14,16 227:14
229:15,16,17
**duties** 94:3 161:15
**D15** 174:7
**D2** 175:21
**D205** 139:17
**D338** 127:18

**E**

**E** 246:1,5
**each** 10:19 22:17
30:23 46:2 93:20
93:22 94:15
135:14 136:1,5
153:4 166:23,24
187:17,18 237:2,8
244:16
**earlier** 103:9
124:16 128:11
130:7 139:6 140:7
143:5 165:8 175:8
176:12 177:13,15
181:19 182:5
200:24 212:13
231:8,15,22
232:24
**early** 30:13 91:19
118:9 140:15
**easily** 22:2,19 54:14
**eat** 62:8 145:15
**eating** 91:1 156:5
**Edelstein** 1:13
72:21
**education** 58:7
**Edward** 10:11
**EEOC** 9:9 16:10
30:11 31:21 32:2
32:10 35:4,10
41:17 67:18,19,22
75:21,24 76:12,15
78:22 79:5,9,16
80:5,14 81:1,18
81:19 83:1,24
84:8 85:10 126:2
126:22 127:8
158:6 215:11,13
216:5 220:10,17

220:21 221:16
225:22 226:19
228:19 246:9
**EEOC's** 32:2
**effect** 3:19
**effort** 242:24
**eight** 61:10,11 65:2
69:2 71:4 221:12
221:13 234:21
**either** 47:9 60:7
75:12 164:24
174:5 184:1
203:17 204:12
215:3,23 231:22
234:4,20 244:1
248:13
**Eleanor** 1:10 248:5
248:17
**Elsmere** 244:7,11
244:13
**employed** 23:23
62:19 113:16
179:22,24 180:12
188:21
**employee** 11:21,21
12:24 17:2 86:5
86:22 88:17 91:5
91:6 106:9 129:10
129:11,22,22,23
129:24 130:3
131:18,22 141:16
141:24 142:13,15
171:23 174:1,2
188:5
**employees** 9:1,7
15:4 124:20
145:18,20,21
146:11,14 173:23
174:12 187:2
193:5,23 197:17
**employer** 16:16
108:9 112:16
176:19 177:4
209:16 221:3
**employers** 16:7
**employment** 10:17
11:12 16:10 66:17
73:1 88:5 102:21
103:23 104:16,21
121:17 122:15
123:12,19 124:4
176:2,22 177:13
179:15,18 234:5
**end** 34:6 45:17
46:12 59:5 60:7
61:2,4,19 69:1,3

101:17 112:11
117:9,19 118:7
123:11,12 134:20
178:9 193:18
195:3 236:17
**ended** 12:10 13:16
17:12 21:18 51:22
56:8 58:18,19
60:16,23 70:2
72:15 92:13
115:22 131:3,5
133:24 156:22
214:15,15
**Endocet** 52:16,23
182:8
**endorsement**
108:23 114:3
**endorsements** 109:3
109:16,16 116:10
120:11
**energy** 20:11 244:3
**enjoy** 12:20
**enjoyed** 13:2
**enjoying** 129:21
**enough** 3:2 10:23
96:3 130:1 160:9
218:1
**entered** 142:6
**entire** 5:11 19:1
41:12 42:18,20,23
47:10 71:7 82:9
91:4 92:14 150:12
211:11 240:9
**entrance** 228:2
**environment**
186:22 187:3,5,8
187:9 191:12,22
**equal** 89:20 90:19
95:5 221:3
**equals** 90:9
**equipment** 109:19
109:19,21 110:3
113:2
**ERRATA** 246:19
247:6
**error** 234:15,19
**escalate** 166:16
**escalating** 167:5
**escalators** 156:1,7
**escort** 66:11 142:16
208:13
**escorted** 15:24
24:22 66:8,18
67:20,21 148:14
156:22
**escorting** 63:13
208:16

**especially** 14:10
129:21 168:16,21
193:17 211:9
**ESQ** 1:13,16
**established** 104:21
**etcetera** 40:1
168:22
**evaluations** 130:5
**even** 3:17 4:18
24:24 32:15 47:14
52:21,21 58:12
68:9 74:14 79:10
85:18 96:5 107:20
116:14,16,18
117:23 124:18
130:16 131:22
133:24 135:22
136:1,5 151:12
171:7 174:11,15
178:17,21 183:24
190:14 194:16
197:23 201:19
226:14
**evening** 170:16
**event** 159:4,7,10
160:12,15,21
168:11 248:14
**events** 68:4 74:9
223:4 227:2
**eventually** 60:11
95:1,2 101:24
109:18 113:1
130:19 168:17
**ever** 2:22 3:5 16:6
17:16,18 19:18
21:10 40:9 44:7
53:21 54:5 80:24
81:17,18 82:22
84:8 90:20 93:7
102:2 129:5 130:4
163:16 172:11
180:14 183:15,18
196:9 233:10
239:9 240:3
243:17
**every** 4:6 7:20
21:24 37:11 110:5
110:5 123:17
131:19 137:10
161:16 162:9
164:22 168:16
169:1 171:13
172:6 187:10
191:19 194:21,23
194:24 195:3
213:2 235:16
236:8 237:3 240:8

240:9
**everybody** 48:4
53:19 94:20 162:8
163:6 187:10
191:18 203:14,22
206:14 207:6
211:10 215:23
231:9
**everybody's** 180:5
**everyday** 171:17
**everyone** 21:18
141:22 209:1
**everything** 2:16 5:5
8:8,12 10:15
12:10 18:1 26:17
46:10 58:20 59:8
59:8 64:2,3,17
67:11 111:21
126:10 132:8
148:21 151:4
176:18 196:23
199:13,15 201:2,4
201:11,12 214:18
221:9 233:21
**everywhere** 136:6
172:10 187:18
190:24
**evidence** 218:15,24
**exact** 26:18 46:3
54:14 67:12,24
68:1 74:5 112:24
124:8 126:18
130:17 143:11,14
155:16 166:24
176:12 180:9
221:15 242:2
**exactly** 4:19 12:10
14:5 47:4 61:13
65:17 67:6,9
70:12 72:9 113:19
120:12 142:6
153:13 154:9
155:16 160:18
188:22 191:23
194:15 201:5
208:23 209:22
221:18 230:10
239:15
**examination** 2:5
246:3 248:12
**examined** 2:3 248:7
**example** 23:11
36:19 37:5 64:21
67:17 93:24
102:17 192:23,24
**Excel** 106:23,24
**except** 55:21 77:10

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 257

| | | | | |
|---|---|---|---|---|
| 235:19 | fabricated 80:17 | 149:9 150:24 | 16:11,18 35:6 | 214:16 |
| excluding 17:18 | 84:17 85:1 | 152:21 154:2,7,13 | 40:1 139:10 | fireproof 123:6 |
| exclusively 188:11 | face 163:11 176:18 | 154:18 155:1 | 181:15 | firm 24:7 72:22 |
| excuse 16:22 21:22 | 210:19 235:9 | fed 119:9 | files 61:7 129:13 | first 2:2 4:5 10:16 |
| 38:9 44:19 58:23 | facing 219:20,21 | federal 71:9 | 227:7 | 11:12,14,17,23,24 |
| 69:2 84:21 96:13 | 228:1,1 | feed 146:5 148:20 | filing 88:23,23 | 13:7,7 14:3,7 |
| 98:19 124:12 | fact 84:17 146:12 | feeding 146:17 | fill 23:5,7 42:4 | 20:14,16,20 22:15 |
| 128:15 182:22 | 163:23 240:5 | 147:9,10 148:16 | 122:10 127:12 | 22:22 29:9 32:3 |
| 229:10 230:1 | facts 8:4 | 148:17 150:2 | filled 28:12,15 | 34:12 35:3 36:16 |
| 237:11 | factual 37:7 | feel 5:16 11:3 32:5 | 29:23 64:10 84:13 | 36:19 45:21 46:23 |
| exhibit 22:8,16 30:7 | failed 168:20 | 33:7 39:5,7 42:24 | 118:22 125:24 | 47:12,20 48:2 |
| 60:2 71:15 75:17 | failure 156:13 | 48:13 49:20 64:5 | 126:17 182:21 | 49:8 53:11 55:1,7 |
| 125:20 126:13 | 232:10 | 89:19 90:11 95:15 | 190:1 | 61:15 63:21 67:8 |
| 127:17 138:11 | fair 78:16 160:9 | 129:23 146:2 | filling 88:1 126:12 | 67:13 73:3 74:20 |
| 139:1 143:1 157:7 | 179:17 187:20 | 155:24 166:17 | 126:18 | 85:16,23 88:22 |
| 157:16 172:17 | fake 156:23 | 180:9 195:22 | final 155:6 | 108:19,19,21 |
| 175:5 186:13,15 | false 143:19,21 | 205:13 207:23 | finally 86:5,17 | 111:5 114:14 |
| 189:2 216:15,16 | 150:11,12 154:21 | 209:19,23 | 114:5,5 138:9 | 115:6 137:19 |
| 230:18 246:8 | 156:21,24 224:24 | feeling 112:17 | 167:12 193:15 | 142:6 150:23 |
| EXHIBITS 246:6 | familiar 144:10 | 168:2 | 226:11 | 157:16 164:20 |
| expect 111:18 112:7 | 173:16 | feels 4:17 | finance 99:11 | 170:7 173:21 |
| experience 55:17 | family 45:15,19 | feet 190:20,21 | 137:11 144:14 | 174:21 177:5,15 |
| 199:16 | 187:12 195:19 | felons 119:1 | financial 59:17 | 177:19,21 178:24 |
| experiencing 55:14 | far 6:24 8:16 26:15 | felt 38:19 83:15 | find 47:15 54:14 | 183:8 194:20,20 |
| Expires 248:19 | 40:6 41:9 42:22 | 89:18,19 90:5,6 | 59:11 89:1 101:9 | 198:15 199:18 |
| explain 16:13 23:10 | 43:11 45:8,24 | 100:2 145:22 | 129:13 171:7 | 201:14,21 202:13 |
| 28:1,3 42:4 63:17 | 52:1,21 58:19 | 150:4 163:19,20 | 180:3,7 201:1 | 202:22 211:4 |
| 148:6 | 60:9 66:16 90:22 | 167:24 170:8 | 227:8 229:22 | 215:16 216:17 |
| explained 30:4 | 96:6 101:10 | 196:7,7 198:3 | fine 5:17 7:14 21:23 | 223:3,20 226:1 |
| 42:19 148:9 | 112:14 121:16 | 206:7,8,10 207:18 | 22:4 25:12 26:7 | 230:24 237:18 |
| explaining 24:10 | 128:19 129:22 | 208:18 209:21 | 28:11 41:24 47:11 | 238:17 |
| explicit 192:7,14,16 | 130:16 140:7 | female 171:15 | 57:4 59:8,21 | five 48:10 56:21 |
| 192:19,20,21 | 143:13 155:12 | females 235:14,17 | 73:12 77:7,19,20 | 57:2 96:17 97:6 |
| explosives 109:1 | 167:8 188:6 | 235:17 236:5 | 101:20,20 107:24 | 233:16 |
| extend 5:12 | 190:20 194:15 | FETZER 1:22 | 113:14 116:21 | five-story 12:17 |
| extent 78:20 | 199:2 213:7 | few 7:7 9:12 14:11 | 126:11 127:17 | fixed 47:22 |
| eye 128:9 | 218:14 233:12 | 89:3 111:14 116:5 | 129:11 130:24 | flag 120:17,23 |
| eyes 89:7 90:17 | 241:9 | 125:22 126:9 | 153:13 158:16 | 121:4 122:7,14 |
| 128:1 136:24 | father 10:6 14:1,3 | 129:13 132:22 | 180:4 203:3 | 123:2,7 |
| 142:11 | 14:21 15:10 19:2 | 133:1 165:12 | 238:10 | flagged 120:16 |
| e-mail 91:7,13,13 | 19:7 82:15 83:16 | 232:9 | finger 114:8 162:19 | 123:3 |
| 91:20 92:15 137:6 | 83:18,21 132:24 | fiercely 66:13 | fingers 141:20 | flagger 96:12,13 |
| 137:8,15 138:4,13 | 181:5 211:8,18 | fight 28:4 84:7 85:5 | finish 4:4 5:11 6:4 | flaggers 122:22 |
| 158:19 161:18 | 212:4,9 213:1,15 | 235:14,15,18 | 6:19 26:22 34:18 | flagging 120:17,21 |
| 164:3,22 170:5 | 214:21 217:9 | fighting 28:1 84:1 | 41:2 44:10 57:17 | 121:1,11 123:1 |
| 246:10,11 | father's 19:6 101:6 | 237:7 | 57:20,22 62:14 | flavor 33:1 194:22 |
| e-mails 91:17 | fault 43:12,14 111:4 | figure 95:6,14 | 110:1 147:17 | floor 137:3,4,24 |
| 141:12 157:10,22 | fax 60:18 | 171:9 213:14 | 152:19 155:17 | 138:7,19 |
| 159:1,17 160:2 | faxes 25:2,8,9,17 | 228:6 | 159:10 209:20 | fluids 125:15 |
| 164:18 166:4 | 36:24 63:8 246:15 | figured 59:11 | 214:6 225:24 | fogging 191:4 |
| E-N 52:16 | FBI 109:2,6 | 110:19 171:11 | finished 5:14 22:12 | FOIA 75:21 79:17 |
| E-N-D-O 182:8 | fear 12:16,21 13:1,3 | 197:24 198:1 | 108:3 | follow 114:24 |
| E-N-D-O-C-E-T | 87:3,7 140:2,20 | 226:18 | fire 63:24 87:8,12 | followed 30:12,12 |
| 52:18 182:8 | February 92:10,15 | file 17:4 61:6 64:3 | 128:23 140:3,4 | 31:6 196:16 |
| | 114:6 130:12 | 74:23 75:22 79:19 | 148:12 211:10 | 209:21 212:21 |
| ___F___ | 143:7 144:4 | 221:6 224:19 | fired 148:13 195:14 | 213:12 214:17 |
| F 191:19 | 146:23 147:2,4 | filed 9:11 16:6,11 | 195:15,17,22 | 215:13 219:7,8,9 |

Snyder
Terry L. Snyder

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 258

219:10 222:12,13
222:13 227:17
**following** 8:5 25:23
27:13 31:5 35:19
63:2 76:9 91:15
114:20 115:3
118:2 141:10
157:23 158:1,3
167:3 175:22
217:4
**follows** 2:4
**food** 146:2,6,10,15
**force** 3:19 220:14
**Ford** 30:21 31:1,2
89:12,18,19 90:4
90:5,6,11,18
91:21,22 92:18,20
92:22 93:2,5 95:4
96:4,7,8 127:21
127:21 128:3,6,8
128:15 129:3,5,7
131:5,11 132:10
132:12,16,21
133:2,6 134:21,23
135:1,7,10 136:1
136:9,11 138:5
142:9 148:1,18
149:1,11 150:8
151:9,10,11,12,16
152:7,21 154:14
155:3 161:7,20
162:11 192:5
196:19 197:2,14
197:15 198:9
199:2,5,8,9,10,16
200:7,8 201:18,23
213:22 216:23,23
220:19
**foregoing** 248:11
**forever** 227:8
**forgave** 62:16
**forget** 46:14 57:11
59:16 160:1
**forgive** 17:7 29:9
37:21 38:2 46:2
46:16 49:2 58:23
59:10 62:16 72:1
72:6 84:23 89:24
91:23 92:16 96:6
101:5,19 110:13
111:16 122:3
130:13,16 147:18
158:17 177:3
178:22 185:3
200:11 215:16
216:9 232:1,10
233:5,18,18

234:12
**forgot** 181:23
**forklift** 144:24
**form** 19:24 23:5
183:2 242:12
**formal** 25:7 32:6,9
113:11 120:6
187:3
**formally** 59:13
**former** 9:1,6 15:4
69:17
**forth** 7:19 13:1
29:11 31:23 41:17
47:21 60:19,20
61:1 86:13 87:4
99:24 113:3 116:5
118:23 124:23
178:20 196:18
198:14 203:20
221:8 236:6
**fought** 232:4
**found** 33:12 46:14
82:14 115:18
116:8 136:17
147:11 161:1
162:17
**four** 12:17 47:19
117:6 214:1
233:16 241:23
242:6
**fourth** 214:2,2
**four-week** 117:6
**frame** 67:16 107:17
138:21 167:8
168:6
**Fran** 64:4
**Franklin** 24:6
**freaked** 96:1
**free** 42:24 64:5
140:16 180:9
243:8
**fresh** 8:12 110:20
**Friday** 11:13 28:20
85:17 144:4 149:9
150:24
**friend** 82:19,20
85:7,7,8,8,9,11,11
181:10,24 236:6
**friendly** 167:9
187:16
**friends** 10:2,7 11:5
19:4 181:20
235:14 237:7
**friend's** 115:17
**from** 9:1 11:7,8,9,9
11:11 14:8,19
25:23 26:1 31:6

35:4,4,4,10,10,13
35:17,18 36:1
38:22 41:23 46:6
47:10 48:23 54:11
61:8 75:24 76:3
76:12 78:22 79:5
79:13,16,19,20
80:24 81:1,18,19
83:9 84:9,12
85:22 91:14 93:4
94:15 96:8 101:3
101:8,22 103:6
109:6 118:4
121:13 123:7
125:24 127:22
142:6 145:16
152:6 156:16
170:1,6 172:11
173:16 177:23
179:18,21 180:6
184:14 185:3,4,19
194:3 207:11
209:2 212:23
213:11 221:2,13
222:17 224:19
229:10,21 230:4
233:9 241:23
242:2
**front** 32:16 76:24
81:3,20 87:9,11
93:2 114:10
120:10 129:6
145:21 228:2
235:21
**full** 44:22 45:6
56:10,10
**full-time** 88:5,9
94:4 95:1 97:12
106:4
**function** 63:6
**furious** 171:5
**furnace** 89:17
125:10,11 128:5
128:21 144:17,22
186:19
**further** 108:22
109:16 248:11,13
**fusion** 47:8
**future** 12:3

_____ **G** _____

**gainfully** 179:22
**gap** 118:3
**gastro** 49:2
**gastroenterology**
49:3 50:9,13
**gave** 28:5 32:8

47:16 53:7,12,13
87:18 99:13 101:7
106:22 107:9,19
115:21 126:23,24
127:10 133:3
139:21 182:22
213:18 214:20
215:7 226:18
**gear** 88:2,3 191:5
**geared** 190:24
**GED** 56:11
**Geico** 132:19
**general** 11:20 39:3
39:11 89:11,13,13
90:2 128:4,10,14
128:20 173:14
193:9
**generally** 7:1
11:21 12:6 233:23
**gentleman** 238:6
**gentlemen** 152:15
**gets** 53:1
**getting** 15:6 30:23
43:17 45:15 51:23
53:2 58:10 59:2
70:18 89:23 90:15
138:9 140:2 154:6
193:16 197:24
220:16 234:13
**giant** 109:21 235:15
**Gilpin** 1:14
**girl** 196:10
**girlfriend** 20:15
**girls** 148:10 150:4
235:22 236:9
237:6
**give** 3:23 12:23
26:17 30:17 71:6
83:16 87:2,15
90:21 100:13
101:10 102:17
112:4 166:23
171:16 185:10
213:19 216:1,14
221:14 225:16,17
226:3 229:17
**given** 6:7 248:8,11
**gives** 205:23 226:4
**giving** 63:13 132:16
182:11 185:11
206:4 208:5
**gloating** 195:23
**go** 3:8 8:13 16:4,4
17:11 19:3 20:2,4
25:2 26:7,16 27:5
30:13 31:7,9
33:13 36:10 48:6

48:6,10,22 49:16
49:22 50:2,6
51:24 54:1 55:22
55:22 56:10 57:4
58:15 59:3 61:24
61:24 62:1,7,8,8
62:12,21 63:7
65:24 66:4,5,17
69:6 72:3,3 73:8
75:11 86:2 91:10
93:4 96:9 98:17
100:15 101:18
102:14 103:6,11
110:12 112:5
113:6,23 114:7
115:3 116:12,22
117:24 119:20
123:7 124:1,23
125:16,22 132:23
134:16 136:2
139:6 153:12
156:7 157:15
158:4,10,14
164:22 165:11
170:24 171:1
184:2 186:10,17
187:19 190:18
197:15 200:10
204:13 205:9
211:19 212:21
213:13 214:22
216:21 217:5,6
220:5,10,14
221:17 222:20
223:20 224:10,11
225:9,18,19,23
226:4,8 228:18,21
228:24 229:1,1,7
229:15 230:6
236:18 240:6
241:2 242:9
243:23 244:9,14
**goes** 18:11 42:22
48:22 109:14
145:14 212:14
218:15 240:1
**goggles** 191:4,4
**going** 4:1,3,22 5:5
6:19 7:9 9:10
11:17 12:4,6,7,9
12:13,19,19 13:10
13:12 15:7,16,18
27:7 31:11,12
32:1,19 38:1
40:22 46:8,10,14
47:19,23 49:20
53:6,6 54:12

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 259

| | | | | |
|---|---|---|---|---|
| 55:15 56:8 57:14 | 185:11 | 171:13 | 203:11 209:22 | 204:24 205:17,21 |
| 58:14,17 59:16 | **gotten** 109:15 | | 210:20 212:23 | 206:8,9 207:11 |
| 60:10,12,17 61:15 | 240:21 | **H** | 229:19 236:13 | 208:12,24 209:2 |
| 61:24 63:6 64:22 | **governmental** | H 246:5 | 240:9 | 211:13 212:5 |
| 65:23,24 70:5 | 16:14 | **hair** 33:22 166:12 | **happening** 12:10 | 213:10 214:11,20 |
| 71:2 73:1 75:13 | **grab** 171:17 | 167:6 169:19 | 13:16 83:9 | 217:7,16 223:8,11 |
| 77:2 78:7,20,23 | **grabbing** 33:19 | 170:2 237:5 | **happens** 146:1 | 223:12 224:23 |
| 84:7,22,24 85:19 | 169:17,18 | **hairpiece** 148:13 | 157:12 | 225:3 228:22 |
| 91:15 92:10,13 | **grade** 117:22 | **half** 52:17 53:3 | **happy** 5:24 98:14 | **Harry's** 184:3,4,14 |
| 94:17 95:16 99:18 | **graduate** 117:3,20 | 182:7 | 184:3,4,14 185:3 | 185:3 246:12 |
| 100:7,9,10 102:16 | **graduated** 56:15,20 | **hall** 93:5 98:20 | 189:15 246:12 | **hat** 88:3 |
| 103:10 104:12,15 | 110:8 | 135:17 228:12 | **harass** 12:4 148:15 | **hauled** 238:1 |
| 107:1 109:19 | **graduating** 118:3 | 229:14 | **harassed** 17:19 | **hauling** 109:21 |
| 112:18 117:8 | **graduation** 97:17 | **hallway** 93:11 | 32:14 66:11 | **having** 2:2 94:13 |
| 132:17,20 134:1,3 | 97:18,21 | 125:13 203:14 | 165:24 166:18 | 100:2 130:21 |
| 135:12,13,21 | **granted** 39:4 62:5 | 204:7,8 | 167:11,24 168:3,3 | 140:20,21 148:5 |
| 136:2,18 137:1,11 | **great** 190:23 | **hand** 41:10 75:3 | **harasser** 208:6 | 149:18 150:2 |
| 137:15,22 138:20 | **Greenhill** 177:18 | 125:2,3 129:17,17 | **harassing** 38:18 | **HAZMAT** 114:10 |
| 138:24 139:6,12 | 178:10 | 140:22 167:22 | 192:18 198:11 | **head** 5:9 50:10 |
| 142:3,24 148:10 | **Greg** 30:1,6 199:10 | 204:16 211:14 | **harassment** 8:22 | 106:22 108:6 |
| 148:20 149:20 | 200:17 | 229:8 238:5,8 | 11:24 26:12,15 | 148:3 170:2 204:1 |
| 150:2,3,22 151:4 | **groomer** 77:24 78:2 | **handbook** 8:22 | 33:8 39:7 127:6 | 204:8 205:13 |
| 153:13 156:2 | **grounds** 9:11,16 | 171:21,24 172:2 | 166:5 170:8 171:2 | 214:13 223:14,16 |
| 157:2,4,5,9 | 15:24 24:22 63:13 | 172:24 173:4 | 172:1,8,12,15 | 226:13 228:22 |
| 159:22 162:11 | 66:9,12,19 83:4,5 | 174:9 196:17 | 173:15 174:3 | 233:5 |
| 166:6,7 168:21 | 83:6,10 103:11 | 208:22 246:11 | **hard** 56:4 88:3 | **health** 51:16 53:18 |
| 171:2,5,14 172:19 | 142:6,16 148:14 | **handcuffs** 236:11 | **hardly** 17:7 48:19 | 53:21 54:2,3,5 |
| 185:5 186:12 | 156:22 208:14 | **handed** 139:4 | 140:14 | 55:24 |
| 192:3 193:14,20 | 209:22 220:15 | 184:24 211:15 | **Harrington** 47:9 | **healthcare** 45:12 |
| 196:8 197:22 | **group** 47:1,2 50:12 | 212:1 | **Harris** 13:19 29:3,6 | 111:24 |
| 199:14,21 202:14 | 50:19 108:9 | **handicapped** 13:8 | 30:20 31:2 38:15 | **healthy** 47:11 |
| 202:18,21 203:10 | 109:12 120:4 | **handing** 218:3 | 39:9 41:18 63:14 | **hear** 82:20 112:9 |
| 204:16,17 206:24 | **Groves** 56:9 | **handle** 199:3 207:2 | 86:24 87:19 89:11 | 125:17 156:21 |
| 207:1 208:20 | **guess** 13:17 14:20 | **handled** 208:21 | 89:18 90:2,5,6,11 | 156:2 194:1 204:6 |
| 211:7 213:9,11 | 21:14 24:16 27:13 | **hands** 117:7 220:1,4 | 90:14,17,24 91:4 | 218:2,5 |
| 219:23,24 220:9 | 41:4 43:21 67:7 | 227:18 | 91:14,20,21,23 | **heard** 93:5 195:18 |
| 222:2 223:6 | 69:24 70:13 74:23 | **handwriting** 23:1 | 92:2,11,17,22 | **hearing** 28:9,10 |
| 225:12,24 226:8 | 87:20 93:20,23 | 126:15 225:6 | 95:4,24 96:9 | 40:4,7 |
| 227:23 230:10,17 | 94:23 95:24 | **handwritings** 58:13 | 127:20,22 128:1,3 | **hears** 18:11 |
| 232:5 235:7,23,24 | 109:10 113:10 | **handwritten** 23:9 | 128:4,10,15,20,22 | **heart** 162:19 165:10 |
| 236:1 240:11 | 115:9 117:8 119:7 | 23:11 25:13 79:7 | 129:2 131:5,6,13 | 165:11,14,22 |
| 242:11 244:21 | 125:17 129:3 | 157:17 160:5 | 132:12 133:6,24 | **heartbeat** 136:3 |
| **gold** 99:5,7 | 131:24 134:16 | 232:22 246:9 | 135:2,7 136:1,8 | **heavy** 109:19 113:2 |
| **gone** 7:21 44:5 | 151:9,11 156:5 | **hanging** 219:22 | 136:18 137:13 | **heights** 12:16 13:1 |
| 65:13 112:3 | 161:4 166:8 | 228:23 | 138:5,7 141:1 | 87:3 140:2,21 |
| **good** 2:7,8 6:24 | 169:18 171:3 | **happen** 147:11 | 142:17 147:24 | 141:3,6 142:5 |
| 58:11 68:3 74:7 | 185:15 187:19 | **happened** 8:8,10 | 148:8,18,24 | 156:3,7 |
| 117:21 118:23 | 190:1,21 191:13 | 10:16 15:17 21:21 | 149:10 150:7 | **held** 239:14 |
| 119:5,10 120:18 | 193:18,24 194:4 | 30:4 41:20 46:9 | 151:5,7,10,15 | **hello** 187:11 |
| 129:20 130:1 | 205:6 221:8 | 58:20 61:20 63:5 | 152:8,21 154:14 | **help** 7:5 8:3 34:2,10 |
| 156:4 161:7 | 236:23 241:16,17 | 63:10,11 80:2 | 154:22 155:3 | 35:22 42:4 53:6 |
| 192:20 215:21 | **guilty** 100:2 231:13 | 97:20 100:6 | 159:19 161:8,20 | 55:19 146:5 |
| 225:12 227:7 | 231:14 | 101:12 114:13,19 | 162:21 165:3 | 149:21,22,23 |
| 234:17 | **guy** 140:22 211:11 | 121:13 126:10 | 167:18 189:13,20 | 176:3 181:5 189:9 |
| **Goodman** 45:20 | **guys** 144:24 184:17 | 131:1 134:8 148:8 | 191:15,24 192:13 | 194:1 215:10 |
| 47:3 51:23,23 | 184:18 241:2 | 189:17,19 197:3 | 193:11 202:12,21 | **helped** 42:7 |
| 52:24 53:7 183:7 | **gym** 48:6,11 62:8 | 201:9,9 202:6 | 203:6,12,17 204:9 | **helping** 41:6 76:18 |

Snyder
Terry L. Snyder

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 260

**helps** 48:14 185:12
185:13
**her** 4:4,4,7 15:6,8
15:10,11,15,15,20
16:1 18:3 20:1,3
26:23 32:2 46:23
49:4,23 51:4
54:10,16 55:7,10
55:18 64:4 69:14
73:8 77:3,4,8,8,15
77:17 80:2,2
81:13 123:2,7
132:23 161:13,14
164:17 166:1,2
170:14,19,21,22
174:4 181:12,14
181:17 184:18
188:8,9 196:10
219:17,21,23
221:1 227:8,10,18
227:24,24 228:1,1
229:8,9 230:10
241:2 242:17
**Hercules** 24:5,9
**herniated** 17:8
47:16
**hesitate** 5:18
**Hewitt** 243:18,20
244:4,6
**Hicks** 18:8
**hid** 159:6,19 205:1
208:11
**hide** 211:17
**hiding** 145:16
**hierarchy** 90:22
**high** 56:3,8 58:7
87:13
**higher** 90:22
**Highway** 244:11
**him** 13:5,17 14:5,6
14:8 18:19 19:3
29:3 31:24 32:1
32:19 39:15 45:16
70:7,9,10,16,18
70:19 72:1,3,4,6,7
72:8 73:23 89:19
91:24,24 92:11,20
93:5 96:1 118:6
124:10,11 128:9
129:5,6 131:16
132:2 134:2 135:3
135:5,21 137:2,2
137:8,14 138:9
142:1 145:20
148:6,9,20 150:22
151:2 152:16,17
156:9,10 159:6,20

163:14,16,16
167:19,21 168:18
169:9,10,11,14,16
170:1 171:16
189:9,10,12,23,23
190:2,11 196:8
198:10,11 199:4
199:13,16 200:1
201:12,12,14,15
201:17,18 202:4
202:14 204:12
205:1,6,7,9,9,10
205:14 207:20
208:24 212:5,16
212:17,19 213:2,4
216:6,8,11 217:16
217:19,21 222:2,4
223:14,16 224:1,2
224:18 226:1,3,7
227:16,19 238:7
238:14,16
**hindering** 234:24
235:8,11
**hire** 72:8 76:23
80:19 81:2,20
111:1,16 112:7
148:12
**hired** 110:15
**hiring** 82:23,23
87:21,22 110:9
**history** 104:16,21
176:2 246:13
**hit** 16:19,24 47:13
47:13,18 101:7,13
167:19,21 198:7
218:4
**Hitchens** 236:22,22
**hitting** 159:16
**hold** 52:6 53:2
54:13 58:20 61:22
62:22 63:3,15
65:15,18,20 71:2
87:8,9,10,10,12
102:2 123:15
145:10 189:15
202:16 211:13
234:19
**holding** 140:3,3,22
145:5,7
**holes** 190:15
**Holiday** 6:15
**home** 13:23 20:21
30:13 31:7 62:7
74:24 75:11 110:5
120:24 125:16
127:11 132:20,24
139:20 142:22

158:4,10 170:13
179:5 205:10
221:13 222:21
224:10,11 225:10
225:18,19 226:4
229:1
**homes** 132:19
**honest** 163:2,4,6,10
163:13
**honestly** 20:20 52:1
165:21 239:15
**hope** 37:11 110:5
**Hopefully** 21:5
**hoping** 153:3 196:5
**horrible** 112:1
179:3
**horse** 97:9 99:23
**horses** 97:24
**Hospital** 46:6
**hour** 109:13
**hourly** 106:13
**hours** 62:6 148:1
159:3,20 198:22
212:16 223:8,19
228:17,23
**hour'ish** 228:17
**house** 18:12 55:20
63:9 132:23
195:19 196:11
218:2
**HR** 106:19 196:18
198:23 199:7
200:18 209:2
217:13 222:16
223:1,2,9,20
**human** 29:15
107:14 129:14
174:6 220:5
228:14 243:19
**hunch** 47:7
**hundred** 191:21
**hurrying** 203:22
**hurt** 46:10 196:12
**husband** 115:18
**H&R** 243:23 244:4
**H-I-C-K-S** 18:8

**I**

**ID** 3:1
**idea** 14:12 22:18
28:11 30:22 31:2
56:21 111:18
126:5 131:6,13
135:4,8,9 150:17
151:15 152:9
165:15 168:7
191:24 215:21

**identification** 22:9
60:3 75:18 125:21
138:12 139:2
157:8 172:18
175:6 189:3
230:19
**identified** 157:17
**identify** 36:20
**identity** 39:24
**illegal** 239:9
**imagination** 43:15
**immediate** 174:14
**immediately** 28:16
31:11 83:14
142:22 149:13
156:15 174:4,16
177:21 217:21
236:19
**implied** 226:3
**improper** 210:10
**improperly** 207:19
209:13
**improve** 149:12
156:14
**improvements**
55:17
**IMS** 188:17 189:18
189:22
**inappropriate**
169:7
**inattentive** 237:14
237:18 238:14
**INC** 1:6
**inch** 161:16 162:9
**incident** 63:12 91:3
154:2 194:8 235:2
**include** 40:19
111:19 156:16
**including** 8:21
39:23 54:23
**income** 123:19
181:2 240:18
**Incorporated** 86:12
**incorrect** 103:16,17
**increase** 99:9
**indicate** 4:21 43:14
54:24 78:24
**indicated** 25:24
179:15 235:4
**indicates** 27:14
74:19 76:2,23
78:21 85:1 230:24
**indicating** 27:8
95:13 98:24 99:3
169:20 170:3
190:20 219:23
227:20

**indication** 138:8
**individually** 9:17
**indoor** 190:15
**info** 240:21
**inform** 10:21
**informal** 3:18
**information** 64:7
65:3 78:6 80:15
150:15 232:11,11
232:15 235:11
240:20 246:11,17
**informed** 9:10 14:7
15:7 29:3 31:2
46:9 87:19 88:22
89:2 131:6 189:20
202:11 214:8
220:13
**informing** 198:10
**initially** 53:11
207:16
**initials** 179:12
**injury** 17:4 43:4
51:19,19
**inquire** 83:1
**inside** 145:4,10
191:7 226:13
227:23
**insisted** 226:8
**installs** 132:19
**instance** 198:2
**instances** 43:1
194:11,18 240:4,6
**instead** 74:2 154:23
208:24 213:12
217:16
**Institute** 58:15
**instruct** 20:3 69:14
69:16 77:3 240:12
**instructions** 3:9 6:6
92:7
**intended** 6:1 62:12
62:17 65:11
**intentions** 65:14
**interact** 95:21,23
131:22
**interacted** 99:22
**interacting** 15:23
95:5 96:4
**interaction** 187:2
**intercepts** 178:10
**interested** 58:12
65:8 248:14
**interfere** 6:10
232:14
**interrogatories**
35:3,7,24 44:21
233:9

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 261

**interrogatory** 45:5
**interrupt** 38:8
  43:13 66:6 162:6
**interrupted** 62:15
**interview** 9:16 88:1
  97:23 98:2 114:13
  114:14,18 115:6
  115:17,20,22
  116:4 127:4
  178:19,21,24
**interviewed** 8:24
  44:7 106:15
  114:22
**interviewing** 179:2
**interviews** 9:12
  110:13 115:2
  177:20 189:11
**inventory** 76:14
  96:7,8 161:2,5,12
  162:4,14 163:24
**investigate** 76:17
**investigation** 9:11
  75:22 76:16 83:2
  83:11 207:10,19
  208:8,9,17 209:4
  209:12,14 210:4,7
  210:12,17,18,23
  210:23
**involve** 87:22
**involved** 20:12 40:3
  40:9 43:19 67:17
  72:11 93:9 213:5
**involvement** 43:17
**involving** 40:6
**in-take** 127:4
**irrelevancy** 41:7
**irrelevant** 18:17
  180:6 212:15
  234:16,18
**issue** 49:22 56:16
  109:7 125:3
  151:19 208:6
**issues** 49:12 149:18
  153:5

**J**

**J** 1:10 248:5,17
**jacket** 87:8,13
  140:3,4
**Jackson** 243:18,20
  244:4,6
**jail** 238:1
**James** 10:6 56:9
**Janet** 99:1,4,15,21
**Janet's** 99:19
**January** 10:21
  92:12 96:3 131:16

137:2 138:16,19
  171:8 248:19
**Jauffret** 246:10
**Jeeze** 148:10
**Jeff** 163:1
**jeopardize** 15:16
**Jerry** 29:1,18,21
  30:1,4 31:23
  41:19 137:8
  145:17 146:15
  147:11 148:2,11
  154:4 158:2
  198:21,23 199:4
  200:17 201:11
  202:11,15,20
  205:5,18,20 210:8
  212:5 213:9,11
  215:8 217:13
  219:13,22 220:3
  224:7 225:2,12,13
  229:8,11
**Jersey** 19:9
**Jim** 29:20 106:19
  137:7 138:4 158:2
  200:19 219:13,13
**job** 12:12 13:2 15:6
  15:10,13,15,15
  23:16 24:1,11,12
  24:18 25:2,8,10
  31:20 37:3 55:22
  63:9 83:8 87:3,15
  88:8,11,15 89:4
  90:12 94:3,8,11
  96:15 102:2
  106:15 113:4
  116:10 121:14
  122:12,13 137:3
  137:19 140:10
  149:20 161:13,14
  161:15,15,24
  162:3 171:12
  175:15,19 180:5
  187:10 189:5,9,14
  195:21 196:9,10
  197:18 221:19
  225:24 229:3
  246:11,15
**jobs** 121:23 122:6
  122:18 123:24
  161:15
**jockeys** 99:23
**John** 99:12
**joining** 111:20
**jokes** 192:23
**judge** 3:20 97:9
  200:2
**judges** 97:9

**judge's** 98:22
**juice** 84:23
**July** 23:12
**jump** 73:1 134:12
  167:2 235:23
**June** 45:17 46:12
  109:13 112:8
**jury** 3:20
**just** 3:2,7,11 4:11
  7:12,17,20 10:17
  11:20,21 12:5,5
  13:9,16 15:13
  17:22,24 19:3
  20:16,19,20 22:10
  22:11,15,16 23:10
  23:24 26:19 31:7
  31:14 32:13,22
  36:15 37:5,16,24
  43:13 44:11,14,21
  46:3,14 48:17,18
  49:22 52:7,8,14
  52:24 53:10,20,24
  54:21 56:7,11
  60:11 61:14 62:15
  63:19 64:14 66:10
  68:4 74:8 76:4
  80:23 84:22,24
  87:5 88:1,4,13,18
  88:22 89:2,8 90:7
  92:4 93:12 95:1,6
  97:6 100:1,9
  103:6,12,22
  106:21 107:1,2
  108:5 111:21
  112:9 113:3,19,21
  113:23 114:3
  117:8 119:13
  120:7 124:22
  125:5,15,16,22
  126:5 127:14
  128:8 129:12
  133:12,16 134:16
  135:17 136:3
  138:5 139:3,4,16
  141:11 143:3,12
  143:13 145:13,24
  146:13,14 147:7
  148:19,21 149:23
  150:18 151:11
  154:24 157:15
  158:10,16,18
  159:15,22 160:4,5
  161:10,14,20
  165:12,18,22
  166:16 167:2,5,9
  168:6,17,20,22
  169:9,10,12 171:9

171:15 172:23
  173:21 175:18
  176:14 178:2
  182:13 184:24,24
  185:19,20 186:5
  186:18 187:2,10
  191:18 193:6,15
  194:4,8,24 195:18
  195:20 196:11
  197:16,19 198:3
  199:10,14,14
  200:17 201:17
  202:17 204:5
  207:22 208:3,19
  209:24 210:20
  211:1 212:3,6
  213:14 214:21
  215:19,23 218:16
  218:19 220:4
  221:20 222:20
  225:1,18 230:21
  231:17 236:7,16
  238:5,21 241:11
  243:18

**K**

**Katherine** 42:8
  75:5
**keep** 24:24 30:16,17
  47:23,23,23 61:7
  115:2 129:17
  130:2 140:21,22
  145:16 181:12
  206:12 207:20,21
  215:14 217:4
  219:6 225:13,16
  227:13 229:15,16
  229:17 241:7
**keeping** 88:23 89:3
  208:6
**keeps** 227:7 233:4
**kept** 15:23 62:23
  93:9 95:2 108:22
  114:3 148:6 167:5
  194:24 197:21
  210:18 211:6,12
  211:13 218:16
  226:11 241:21
**kidding** 53:20
**kidnap** 119:2
**kids** 16:19 47:18
  101:7,13
**kind** 4:8 6:1 9:1
  16:18 21:11 36:20
  37:7 39:1 41:21
  43:23 44:2 50:14
  53:24 55:13,17

58:3,7,9 64:9,15
  65:4 84:11 87:12
  93:14,24 99:21
  109:20 112:11,17
  116:2 119:2 131:8
  132:15 133:21
  143:6 150:19
  167:7 168:13
  172:14 178:15
  180:2 189:10,18
  191:8,23 207:20
**King** 1:22
**Kirkwood** 244:11
**knees** 140:23
**knew** 10:22 11:7
  14:7,18 31:18
  83:3,19,21 84:6
  91:15 104:10
  117:18 124:11
  136:23 142:7
  146:4 156:20,21
  159:17 169:12
  170:10,16 175:8
  178:18 204:1,1,2
  204:3,3,9,16
  205:10 222:6,6
  223:22,22,22
  225:22 226:15
  228:23,23 230:10
  231:18 236:6,9
  237:2,6,7
**knock** 236:1
**know** 5:24 8:14
  9:23,23,24 10:1
  10:23,24 11:3,20
  11:21 12:2,7,9,18
  12:19,20,20,24
  13:1,10,14,15
  16:21 18:6,12,13
  19:4 20:16,21
  21:15 22:11 23:24
  24:11,11,23 25:1
  26:19 30:24 31:11
  31:12,13,14,24
  34:5 35:15 42:11
  42:11,21 45:9,24
  46:24 47:2 48:20
  48:22 50:12 51:2
  51:4,5 52:8,24
  55:7,9,20,21 56:7
  56:22 59:1,11
  61:6 63:7,17 64:5
  64:13,18 67:2
  69:7 75:5,6 77:24
  79:8,13,14 80:3,4
  80:6,11,22 81:22
  82:1 83:8 85:3

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 262

87:7 88:17 89:20
89:21 90:13,13,16
90:17 91:8,9,12
91:17,21 92:1,19
92:22 93:11 94:6
94:22 95:16 96:9
97:1 98:4 99:9,24
101:23 104:7
106:10,24 107:1
107:20 110:12
111:23 112:2
113:1 115:5,23
116:8,8,9,10,11
116:14,20 117:2
117:21 119:2,6,8
119:13 120:20
121:14 124:8
125:16,23 126:10
126:15,17,17
128:1,8,9,14,17
128:19,20,21
129:8,11,13,15,21
129:23 130:13
131:19,21 133:1
134:6,11,24
135:12,22 137:10
137:10,12,12,12
138:6,6 140:7,18
141:12 142:8
144:10,14 145:22
146:8 147:6,12
148:9,10,15
149:20 150:4
151:23 152:9
156:5,21 157:21
158:20,21,24
159:1 161:10,15
162:17,19 163:5
163:11,19 164:21
164:23 165:7,13
165:20 166:22,23
167:5,10 168:9
169:8,12,17,18,20
170:2,3,12,23
171:14 172:8
176:6 178:1,3,15
178:20 180:5,14
183:14,23 184:10
184:11,12 187:14
187:14 188:6
189:13,14,20,21
189:23 190:20
191:6,6,20 192:4
192:6,19 193:14
193:17 194:1
195:5,18,19 196:7
196:11 197:15,16

198:7,14,18,21
200:2,3 203:9,22
206:14,21 208:23
209:15,16,17,19
210:11,13 211:7
211:24,24 212:3
214:3,17,18 215:9
216:1 218:17,19
220:22,22,24
221:3 222:19
226:13,15 229:4
231:19 232:5,5,7
232:8,17,19 233:8
234:9 235:7 236:4
236:7,8,8,18,23
236:24 237:3
239:15 241:9
244:6,7,13
**knowing** 46:3 168:4
**knowledge** 37:7,9
44:2,3,23 45:7
58:8 213:8
**known** 2:22 151:22
**knows** 73:10 76:23
141:4 144:9

**L**

**L** 1:3,8,20 2:1 246:2
248:7
**labels** 182:15,15
**Labor** 26:2 27:21
35:17 40:7 41:17
63:7 67:21,23
215:1
**ladies** 145:4
**lading** 227:1,10,12
229:8,21 230:7
**lady** 42:8 59:18
**Lane** 118:15
**Lang** 124:7
**language** 192:7,14
193:4
**laptop** 143:6
**LaRosa** 79:20
**last** 10:12 15:20
25:13 38:14 50:19
51:4 53:12 54:10
58:5 96:15 101:10
106:18 120:14
141:9 149:9
156:13 177:13
182:20 185:21
205:6 215:10
224:1 242:5
**lasted** 117:14
**late** 63:21 64:11
196:5,16 203:19

203:22 236:18,18
**later** 14:11 51:13
69:2 94:9 95:1,2
134:22 136:14
147:22 148:1
228:24 240:15
**law** 1:9 3:20 24:7
187:4
**lawsuit** 8:4 9:2,7,19
10:3 17:4 35:6
44:16 181:14,17
**lawsuits** 16:6,18
43:23
**lawyer** 28:6 35:13
36:4 71:11 72:23
73:16 76:22 81:1
81:19 83:15 85:2
85:7,9,11 185:21
239:22
**lawyers** 84:1
**lawyer's** 36:3
182:17
**lead** 12:9
**leading** 131:18
**leaning** 227:24
**learn** 41:6 102:1
110:1 111:21
129:18
**learned** 87:5 238:19
**learner** 129:20
**learning** 41:5 57:14
94:6 95:2 113:1,3
**least** 195:6
**leave** 31:14 32:2
56:12 58:16 91:19
98:7 136:19
193:15 214:22
220:6 235:19
**left** 15:3 31:16
56:19 59:1,24
104:22 107:8
113:22 120:4
123:6 135:16,16
135:17 144:12
146:14 158:13
178:10 195:20
199:9 213:8
**leg** 47:21
**legal** 42:9 67:8,13
76:7
**legally** 2:19 89:5
90:12,16 109:1
128:19
**less** 14:14,21,24
56:24 57:2 68:19
72:14 212:15
242:1,3

**lesson** 238:20
**let** 4:4,7 5:18,24
14:19 18:5 22:11
22:15 23:21 25:2
26:16,19 27:5
31:9,13 33:6
34:18 41:2 43:13
44:10 47:5 52:8
59:3 63:19 67:13
77:16 80:21,23
82:20 87:2,10
91:9 116:16
125:23 129:9
130:11 136:11
137:10,11,12,12
138:5,6,23 139:14
140:13 141:12
143:3 147:17
152:19 153:1
154:1 155:17
156:9 158:14
159:10,20 168:21
171:14 174:19
176:6 183:23
186:4 198:21
204:14 207:6
209:20 212:21
213:13 214:20,22
215:3 216:2 217:5
217:6,24 218:2,4
225:23,24 226:10
227:7,21 230:3
236:18 241:8
243:18
**letter** 79:16 109:5
121:20 151:4
152:20 246:8,10
**letters** 178:11,12
**letting** 24:11 31:19
33:2 91:8 137:9
206:14 212:3
**let's** 22:7 32:19
33:15 87:2 88:14
156:11 157:6
160:1,4,11 175:4
176:2 186:10,17
214:4 244:17
**lewd** 32:24
**Lexapro** 185:12
**liar** 152:7,10
**liars** 152:2 211:17
**license** 22:1 108:18
109:7,8 111:9
116:9,22,23 120:7
186:5
**lie** 30:19 130:22
155:13,14,24

163:14,16 203:9
224:19,24 231:11
**lied** 21:17 83:4
152:8 204:11
205:15 209:19
210:11,11,13,19
212:7 217:22
223:22 231:6,9,18
**lies** 84:13 132:7,9
133:24 134:13
135:19,20
**life** 19:21 20:22
41:12 42:18,20,23
48:4,22 58:11
66:10,14 97:5
108:1 182:14
187:19 195:20
234:5 240:9
**light** 29:17,19 31:6
144:11,15,23
186:6 226:12
228:18
**like** 3:2 6:2 12:8
12:11,19,24 14:9
17:2,4,23 18:3
22:23 24:2,15,17
25:13 27:8 32:21
36:16 38:14 40:18
41:10,12 44:15
45:5,8 47:2 48:17
49:18 50:15 51:16
52:14,17,21 53:3
53:9 55:5 59:5
63:18 64:2 83:9,9
84:12 86:3 87:3,3
87:8,8,10,12 89:6
93:12,15,16,20,23
95:15 96:4 97:24
100:9 103:9,22
106:20 107:4,10
107:21,22 112:4
112:16,21,24
115:20 117:16
118:18 119:6
120:8 122:3,7
123:4,7 124:16,17
125:8 127:4
129:12,14 130:6
130:21 136:3
141:17 145:18,22
148:3 149:23
151:22,24 159:19
161:10 163:15
164:14 166:23
168:16 169:10,20
176:7 183:21
187:3,10 191:16

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 263

191:19 197:2
198:2,18 200:4
203:9 204:5
206:20,24 207:7
208:19 210:15,20
211:20,20 212:6
218:16,17,18,24
219:23,24 223:6
225:1 231:20
232:13 237:2
241:11
**liked** 15:15
**likewise** 5:12
**liking** 112:14
**limited** 39:23 54:23
78:5 157:12 240:4
**limiting** 160:5
**line** 21:13 84:24,24
137:21,22 150:6
151:18 168:12,12
170:12 199:1
208:14
**lined** 232:20
**lines** 34:14
**lips** 219:22
**list** 37:7,8,9 185:2
**listed** 37:15 60:11
61:6 176:19 177:4
177:8,14 181:7
**listen** 129:5 148:19
205:17
**listened** 129:7
**listening** 95:17
152:15
**listing** 27:12 185:8
185:15
**literally** 147:7
169:20
**litigation** 185:23
**little** 18:12 29:10,18
29:21,22 47:14
48:15 64:17 68:9
74:14 83:13 97:19
99:4,7 106:19
107:9 119:7,10
127:18 139:6
141:2,5 143:6
144:16 146:8,9,12
150:5 180:15,17
182:13,14 190:19
196:5,10 204:8
211:12 218:16,20
219:18 223:2,2,20
226:12,13 232:21
**live** 19:1,7 53:10
102:1
**lived** 212:11,12

**lives** 18:2,20 19:10
212:10
**living** 144:9 145:11
145:16 146:17
147:8 212:9
**load** 144:21
**loader** 188:24
190:22 191:1,3,7
**local** 98:14
**located** 46:2 177:17
**location** 19:5
112:24
**locations** 45:24
244:14
**locked** 63:9
**locking** 216:3
**long** 18:22,24 19:20
20:12 58:5 59:1
61:6 65:2 101:18
108:5 117:5
118:21,22 143:2
166:5 171:18
174:17 178:13
242:16
**longer** 42:11 84:1,6
85:4
**look** 20:5 22:2,7,10
22:13 52:2,3
56:23 63:8 68:10
68:11 71:14 73:4
73:5,12,13,14,18
74:15,18,20,22,23
83:16 87:5 103:9
103:21 105:15
109:6 123:16
125:22 130:15
140:10 147:11
167:9 176:5
180:10 186:4
216:15,17 218:21
**looked** 24:17
200:24 205:11
218:18
**looking** 13:3 67:6
68:1 74:5 124:4
137:20 143:13
154:24 166:18,23
166:24 167:1
189:14 191:23
**looks** 22:22 24:1,15
25:13,18 27:7
36:16 143:11,14
148:2 164:14
166:23 173:17
175:13 211:24
231:20
**Lori** 1:13 2:13 7:7

78:14 98:10
153:12
**lose** 113:21,23
137:4 196:8,9
221:18
**losing** 15:6,10
**lost** 237:16
**lot** 8:15,16 14:8
24:24 46:18 48:13
85:20 88:1,20,23
89:22 95:24 96:8
101:24 106:23
111:21 115:3
125:9,14 146:3
152:5 169:2 187:9
187:17,18 200:15
244:3
**Lotus** 106:24 107:3
107:5
**loud** 193:21,24
194:5,5
**love** 57:14,14 119:5
119:12
**loved** 119:22 171:12
196:10
**low** 109:21
**lower** 47:10,20
57:12,13
**lowered** 106:6
**lunch** 91:10 119:18
119:22
**lying** 28:2 208:20
211:4,20
**Lynn** 2:20
**L-Y-N-N** 2:20

_____
**M**
**M** 1:16
**mad** 59:5 184:21
191:13 194:6
**madder** 193:16,17
**made** 11:1 30:13
70:7 75:5 76:10
92:17 119:4
131:19 134:17
168:11 207:15
211:10 214:24
235:18 243:19
**mailbox** 229:22
**main** 19:2 29:17,18
49:5 50:24 66:16
89:10 124:23
137:11 144:10,12
150:21,21 161:11
205:5 228:13,14
229:6
**Mainly** 96:9

**major** 208:2
**majority** 19:4
141:11 169:1
**make** 4:12 5:18
15:2 19:13 23:15
26:23 30:18 32:22
33:16 37:16 45:5
58:19 63:19 69:12
73:14 75:14 78:12
86:23 89:22 92:22
94:17 95:15 110:5
120:8 128:16
132:22 133:1
137:10 158:16,18
165:18 197:17
199:14 202:17,18
205:13 207:22
208:17 224:11
**makes** 15:17,19
80:19 82:23
104:20 111:12
140:5 151:13
**making** 32:24
214:23 242:24
**males** 188:11
**man** 50:10,11
108:20 117:24,24
118:5 141:20
**management** 209:2
**manager** 29:20
115:24 116:1
137:6,7 138:6
174:5,12,18
198:23
**Mandichak** 51:1,6
**Mandy** 236:6,22
**manner** 208:21
**mansion** 29:17
144:11
**Manual** 173:14
**many** 7:21 8:20
9:16 18:18 21:15
26:14 34:24 43:2
91:16 124:19
140:9 142:9 169:8
169:9 202:18
215:21,22 237:3
241:23
**marathon** 6:1
**March** 35:21,22
50:20,20,21 75:24
110:8,10,13,15,16
111:1 113:15
114:7,12,15,17
115:6,9,10 141:10
153:2 154:2,8
158:19 166:3

167:16,23
**marching** 148:7
**MARGARET** 1:16
**Margolis** 1:13
72:21
**Marie** 236:22
**mark** 60:1 112:11
125:19
**marked** 22:8 60:2
75:17 125:20
138:11 139:1,17
157:7,16 170:5
172:17 173:8
174:7 175:5 189:2
230:18 246:6
**Market** 244:7
**married** 19:16,18
51:5 93:12,15,23
**match** 142:21
**matches** 143:2
**math** 19:13
**matter** 2:11,14
14:11 17:18 18:10
41:10 77:12 80:3
81:1 146:12
193:13 198:17
**matters** 40:19 42:2
44:14,15
**may** 1:10 4:3 6:20
9:12 24:6 37:9
38:8 41:12 48:12
48:22 49:9,14
52:17 54:12 60:5
60:9 62:5 65:2,7
82:3 85:1,17
88:19,20 90:1
97:17,19,20,20
100:22,23 109:17
125:24 129:23
138:1 140:8
141:13 147:22
151:3 153:18
156:16 180:9
188:6,7,8,9,9
189:13 191:1
213:7 227:6
229:12 233:22
237:11 248:6
**maybe** 15:23 16:1
28:9 33:20 34:12
42:21 49:19,22
50:9,20 54:13
55:5 57:3 62:8,23
67:9 68:7,9,13
74:12,14 80:17
82:20 84:2,2 97:6
106:20 115:15

Snyder
Terry L. Snyder

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 264

117:8 127:11,14
127:15 130:13
139:14,19 170:18
176:3,6 179:19
214:1 215:9
221:14 223:5
228:17 232:4
233:1,1
ma'am 3:16,21,24
6:18 14:2 16:8
17:17 19:17,19
21:5 22:14,24
23:17 25:15,18
27:3,16 28:19
32:12 33:24 34:20
36:14 38:13 39:17
42:16 44:2 45:2
52:9 57:21 58:4
62:20 64:12 67:5
70:14 71:13,21
72:20 85:24 86:8
86:16 87:17 88:7
97:13 104:12
106:14 107:7
108:16 109:11
111:11 112:15,20
112:22,24 113:5
117:16 127:3,5,19
134:17 136:6
138:14,18 139:11
143:14 147:3
157:19 167:20
171:23 172:2,4,16
174:10,23 175:11
180:22,24 185:7
185:24 186:6
189:8 196:20
198:24 201:4
210:5 228:12
232:23 234:14
McConnahan
106:20,21
mean 6:12 7:18,19
19:24 21:22 35:15
37:11 44:6 48:3
62:22 68:17 73:16
77:22 88:19,20
93:19 94:5 100:13
102:5,8 107:12
112:19 115:24
116:7 129:19
137:16 145:17
148:10 152:9
161:14 164:7,7,8
166:22 167:19
168:5 176:14,15
180:4 181:3 182:7

183:23 187:2
191:16,20 192:21
193:14 194:4,8
195:13 213:17
218:24 219:8
221:20 227:2
236:7 239:14
meaning 51:15
73:18 161:22
167:1 205:5
224:20 239:18
means 23:14,20
24:20 40:8,9
42:18 44:15 76:4
76:16 113:19
171:12 221:4
225:11 232:10
239:14,17
meant 3:2 40:16
206:13 239:2,2,4
Media 116:19
mediation 17:13,14
Medicaid 112:6,6
medical 49:24 50:15
54:22 56:16 58:13
65:4,6,9 101:11
241:22 246:15
medication 6:9
medications 52:10
53:15 185:15
medicine 52:19
182:4,5 184:18
medicines 183:11
183:16 185:2
meet 28:6 51:1
114:24 117:17
162:12 207:6
237:1
meeting 27:21
60:20 133:10,12
133:14 134:7,8
140:15 144:4
147:20 148:24
149:10,16 150:2
150:24 152:17,21
153:16,18 154:8
154:12,13,18,19
154:23,24 155:4,8
158:9 161:4,22,24
162:22 163:21
165:3,6,16,21
201:10 203:15,15
204:15,18 205:4
205:16 213:5,5
217:14 222:11
223:7
meetings 137:22

212:22 213:20,23
215:22
melt 186:19 188:2
191:10 223:12
memo 132:4,6
152:20
memory 130:17
menacing 231:21
232:6,10,10,13
235:10
mental 53:18,21
54:2,2,5 55:24
182:13,13
mentally 18:15,17
63:6,18
mention 12:15
177:9 211:14
224:13 231:22
237:17 238:21,23
mentioned 144:5
177:6,12 231:15
mentions 41:17
merit 1:10 99:9
mess 182:13
message 156:17
215:7
messed 17:6 47:19
messing 115:15
met 15:5 51:2 64:3
72:7 145:13 147:7
170:11,12,14
185:21 220:11
221:11
metal 190:15
metering 162:16
Mid 23:12 166:14
middle 2:20 6:3
93:14 166:3 168:4
168:7,10,10
206:21
mid-2002 166:14,15
might 3:11 6:16
33:21 227:8
234:15
Mike 106:17
mill 161:16 162:9
188:1,2 190:14,14
191:20,21
million 140:10
171:18
mind 8:13 60:24
85:24 94:21 138:8
184:8 197:23
228:9
mine 42:14 197:13
minute 22:10 23:13
34:5 43:13 50:3

62:16 99:14
107:11 139:23
159:6 204:23
214:1 216:1,2
237:16
minutes 33:18 91:1
125:22 126:9
145:13 221:12,13
mirror 222:19
mischaracterizati...
84:20
miss 2:13,14 10:19
35:20 42:15 71:11
72:10 195:4
missing 125:7
143:13
mistake 243:19
mistaken 34:7
64:18 65:2 132:18
239:6
mixed 231:18
mixture 178:16
mm-hmm 5:9 34:9
34:12 68:21 84:18
95:3 180:16 222:3
moment 11:19
126:18 160:1
194:16 228:10
moments 165:12
Monday 97:24
168:16,23 169:1,2
170:9 205:10
220:11
Mondays 168:21
money 25:23 26:1
59:15 76:23 83:23
181:3
monster 121:21
month 15:23 30:20
68:7,19 74:12
91:4 92:14,16
102:9 118:12
131:17 143:7
182:23
months 14:14,22,24
16:2 22:1 25:22
48:18 53:13 61:10
61:11 65:2 69:2
71:5 118:13 150:7
178:14 179:1
182:23
more 16:13 30:24
33:5 46:11 48:14
54:15 55:20 56:22
88:11,13 89:5,8
95:23 96:5,9
102:9 105:15

111:14 113:3
119:10 124:17
161:9,10 168:8
180:7 187:14,15
187:15 188:10
192:2 193:7
212:22 225:20
241:10
morning 2:7,8 6:12
7:15 8:17 48:6,19
48:20 91:16 97:16
120:18 131:20
140:12,15 144:20
158:9,15 169:1
171:13 190:9,11
194:17 197:9
202:14,22 203:11
203:15,15,23
204:15,18,19
205:1,11 207:7
214:12 217:7,8
223:7,14,16 226:2
233:9 236:19
mornings 168:23
169:2
mosey 197:16
most 4:16 22:2
93:10 128:2 150:1
222:10
mother 10:6 13:22
14:7,15,16,18,20
18:3 31:24,24
32:1 46:15 132:20
132:23
mother's 19:2,4
132:20
motor 117:17,24
118:5
mountains 168:20
mouth 55:16 93:9
145:22 169:13
move 24:24 93:4
137:10 172:19
230:17 239:11
moved 51:22 137:7
244:12
movie 87:24
MRI 45:17 46:7,14
Mt 56:4,12,19
much 21:12 50:16
64:7 117:7 141:17
191:12 198:3
234:18 244:18
Municipal 235:6
must 101:16 130:3
149:12 181:23
myself 2:13 8:23

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 265

9:18 40:6 60:22
61:22,22 63:9
68:18 71:9 73:18
138:1 156:6
162:13 215:1
226:13 235:19
**M-A-N-I-C-H-E-K**
51:6

**N**

N 246:1
**nail** 66:24 130:18
**naive** 43:7 112:2
**name** 2:17,20 10:5
10:12 18:3,7
45:19,21 46:23
49:4,8 51:4 57:11
57:24 58:2 59:18
64:4 97:1 105:5
106:18 108:9
118:1,5 120:21,24
122:8 161:8 178:5
178:11 188:9
189:21 237:6
**named** 42:8
**names** 2:22 10:8
18:6 68:17 86:13
176:15
**narrow** 167:7 168:5
**nasty** 141:5,20
**naturally** 193:24
194:5
**nature** 75:8 113:4
176:22 186:10,18
188:13 191:24
220:23
**natured** 192:23
**near** 46:6
**necessarily** 35:10
191:2 192:22
**neck** 17:6 38:22
47:10,19,19 48:17
48:19 51:19
**need** 5:19,23 8:13
39:7 50:17 52:24
59:12 64:6 68:12
95:19 129:18
143:23 149:21
175:18 181:21
182:1 206:12
225:13 227:13
229:15 241:13
242:17
**needed** 15:15 34:8
91:8,18 107:2
110:20 121:15
123:9 131:15

136:20 140:15
143:22 145:1
181:6 228:9
**needs** 201:6
**nervous** 87:13
134:1 222:1
**Neuberger** 67:15,15
67:23 68:6,19
70:2 72:15 73:5
73:19 74:11,21
75:9 79:19 82:17
246:16
**Neuberger's** 67:17
72:18
**neurological** 45:18
46:21
**never** 13:10 44:5
76:19 79:3,10
80:8,13 83:3,6
85:24 88:16 89:1
91:10 94:7 113:9
128:2,8 140:5,13
140:19 148:20
163:8,8,14,15,15
168:20 178:19
184:8 195:9
211:15 212:1
213:18 214:13,20
222:18 223:8,12
223:17,17 232:4
232:11 243:18
**new** 19:9 30:18 66:2
66:9,14,18 94:18
110:20 111:16
112:7 118:17
132:19 248:2
**next** 28:17,23 29:17
30:7 34:15 35:23
37:10,15 50:23
55:4 68:14 71:4,8
85:18 91:8 93:5
120:9 136:15
138:1 150:6
151:18 160:9,23
173:24 174:7
175:23 177:4
178:10 186:14
202:23,24 207:7
214:11 219:10
231:20 232:20
233:6 234:21
236:19 237:9,9,21
244:22 245:1
**nice** 145:14 150:4
**night** 48:7,7 58:16
58:17 62:4,9,18
65:11,13,22,24

110:5,5 120:18
123:3,7,8 170:11
190:8 204:12
205:7,10 207:5,13
217:10,10,17
220:19 224:1
230:1 236:16
**nights** 52:22
**nine** 146:1 191:7
234:24 235:4
**nobody** 82:22 83:10
85:2,2 89:1 137:5
147:12 184:21
197:10,24 208:19
208:20 222:8
**nod** 108:6
**nods** 5:8
**nolle** 236:12,13
239:13
**none** 7:15 51:10
82:23 99:19
124:11 224:5,7,8
234:9
**non-economic** 38:6
**non-financial** 38:6
**non-mental** 51:16
**non-monetary**
37:19 38:5
**noon** 227:4,11
**normal** 55:21 193:6
193:22 194:5
**normally** 164:18
**North** 17:22
**nose** 57:15
**Notary** 1:10 248:6
**notch** 127:21 128:9
**note** 246:9
**notes** 3:2 23:9,12
157:17,18,20
158:12 159:12
160:5 218:16
248:9
**nothing** 11:19 12:1
30:14 31:4,8 59:4
66:13 82:18,19,19
84:13 88:20 132:7
132:8 134:11,12
137:5 140:17
141:22 142:3
149:7 155:13,14
156:23 169:10
179:12 195:24
196:3 201:6
210:21,21 212:1
212:23,23 222:22
224:12 225:20
232:12 235:20

236:17 239:16
**notice** 1:9 26:16
64:20 100:13
208:5
**noticed** 30:23
129:16
**notified** 207:11
**November** 98:6
100:17 104:22
117:14 118:8,9
177:14,23 179:21
**nowadays** 106:23
**nowhere** 105:21
169:11
**number** 23:11,23
25:22 34:8 37:5
37:18,21 38:1,5,9
38:9,10,12 46:4
50:14,16 71:19
127:17,20 140:1
216:15 232:21
234:24 235:4
**numbers** 22:16
162:13
**nurse** 29:20
**Nursing** 122:24
**Nye** 181:7 236:21

**O**

**oath** 2:3 3:14,15
**object** 4:3 7:9 20:6
69:5 77:2 78:24
81:5 98:17 103:10
**objecting** 81:9
**objection** 4:5 19:22
19:23 73:7 84:19
98:8,9,15 209:5
234:3
**objects** 4:14,18
**oblige** 5:24 208:22
**obtained** 8:24
**obtaining** 240:21
**obvious** 76:20
**obviously** 19:24
68:24
**occasions** 150:7
**occurred** 18:19
26:13 30:23 80:3
118:7 159:5,8,11
**occurrence** 8:22
**October** 21:3
**odd** 13:14,16
**off** 15:13,24 24:22
50:2,4 55:16
56:16 59:24 62:7
63:13 66:8,12,18
67:20,21 91:8,18

115:14 119:16,17
120:4 141:13
142:16 148:14
151:21 156:22
170:13 177:11
184:22 186:16
189:1 208:14
209:21 211:11
216:9 220:15
228:18 230:14
238:1 240:24
241:1 242:9,10
243:16 244:20
**offended** 161:19
162:18
**offensive** 234:21
**offer** 23:15,16 86:6
86:18,20,21,23
87:15,16,20
109:18,23,24
214:24 215:2,15
224:11
**offered** 24:6 118:14
121:14 177:19,20
218:1
**offering** 215:17
**office** 12:17 27:6
29:18,19,21,22
31:6,9 33:2 42:13
42:15 51:22 54:16
67:17 72:10,18,19
92:11 93:4 94:18
94:19 95:12,12
98:21 99:1,1,2,5
106:19 119:9
123:5 124:13,23
125:10 135:17
144:13 145:1,1
148:8 150:20,21
158:14 159:21,21
171:19 182:17
187:4 191:9 194:2
197:11,12 200:8
200:18 201:20
202:14,22 204:7
205:12 212:22
213:13 214:23
216:24 217:6
219:16,18 220:5
220:14 222:14,24
225:23 226:9,21
227:16,17 228:4,9
228:13,13,14,20
228:21 229:2,6,6
229:13,16 230:6
**officer** 148:11
236:10 237:5