Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 266

**offices** 1:9 29:15,16
144:13 194:3
204:6 222:16
**official** 54:21 64:1
85:24 86:5,22
87:15 88:5,17
106:9 171:23
**officially** 54:3 62:21
90:9 100:10 109:5
**often** 6:2 194:18
196:10
**Ogletown** 46:5
**oh** 12:3 16:17 21:22
21:22 26:4 33:22
34:20 38:10 40:16
40:16 49:2 51:20
53:24 68:8 71:23
74:13 76:17 94:2
96:19 97:5 102:23
110:6 111:3
115:15 118:19
126:3,22 133:11
138:18 139:23
147:16 148:5
152:5 155:18
158:24 164:6
166:22 169:15
173:11 176:14
181:16 213:2
215:19 231:3
237:13 238:19
239:12
**Oil** 108:11
**okay** 3:7,10,13 4:23
5:2,20 6:16,23 7:1
7:8,14,23 8:3,6,19
9:19 10:1,10
11:11 14:1 15:22
16:3 18:2,5 20:8,9
20:24 21:2,4
23:13 24:3,5 26:5
27:4,10 28:10
29:10 30:7 31:10
32:11 34:8,8,14
34:15 35:4 36:1,2
36:8,8,18 37:16
37:16,18 38:3,5
38:12,19,24 39:16
40:5,17 42:13,15
43:3,16,20,22
44:14,18,24 54:4
55:13 56:14 58:24
62:15 64:9 67:8
69:19 70:4 71:1
72:2 73:1 75:7
76:17,21 77:5
78:4,8 80:21

85:10 90:1,3
96:10,20 100:12
102:14 105:19
107:6,14 108:18
111:3 112:10
114:11 117:3
118:8 119:24
120:3 121:6,9
125:19 126:3,7,20
126:22 127:3,6
129:2 130:4,8
132:14 134:21
135:24 138:22
139:11 141:8
143:20 144:10,22
145:2 148:18
151:8 153:16,17
153:17,18,21
154:4,20 155:3,23
157:14 158:12
160:22,23 162:5
164:13 165:18
167:13,23 168:15
177:2,4 179:14,17
181:19 183:20
184:2 185:18
186:22 188:2
189:12 193:2
198:15,20 202:1,6
202:6,10 203:1,4
203:5,8,13,16
204:4,9 207:8
208:3,10,15
209:20 211:5
214:11 215:16
216:8,10,19,21
217:5,11 218:11
218:18 225:5,15
226:20 228:16
230:13,23 232:3,9
232:18 237:13,20
237:23 239:5,7,8
240:16 243:2,3
244:19 245:2
**old** 19:13
**older** 46:10
**Oldsmobile** 101:7,9
101:14,15
**once** 52:17 53:16
72:7 77:22 88:16
91:14 104:1,10
106:8 110:1 111:9
113:11 115:1,2
117:20 131:13
137:6 140:10
148:15 167:4
171:23 176:5

188:8 190:17,23
196:16 205:15
214:7
**one** 6:3 11:4 16:22
16:22,24 21:5,12
21:12 29:15,16,16
29:19 31:6,16
34:13,14 43:13
46:2,5,8 51:1 53:3
53:12 61:10 63:23
82:5 83:12 90:9
90:21,21,24 91:2
91:7,13 92:8,21
93:4 94:20 95:8,9
95:9,12,12,15,23
98:19 100:3 101:6
108:19 117:6
121:15 122:8,11
124:19 127:1
128:7,24 130:16
132:10,15,15
137:23 138:1
140:1,9,10,22
143:16 144:15,19
144:22 145:3
146:11 147:9,11
148:15 149:24
153:5 154:2 156:5
157:16 165:3
169:18 172:10,24
178:16,17 182:11
182:13,22 184:5
188:7,8 192:11
200:5,16 205:6
206:11 207:11
211:11 219:19
222:16,18 224:23
231:3,6 233:3,11
233:15 235:16
236:1 237:18,21
239:2 240:17
243:7,8,11 244:7
**ones** 11:6 37:2
157:12
**one-week** 24:5
122:12,13
**ongoing** 65:22
**only** 78:20 82:5
83:12 92:7 103:24
107:14 129:14
133:13 137:3,19
139:12 143:17
145:13 146:19
149:3 156:11
157:12 186:2
188:5 221:12
233:3,19

**open** 112:2 204:6
**opened** 48:11
**opening** 145:22
**operate** 108:14
**operating** 110:2
112:14
**operation** 56:5
**operator** 108:13
**opinion** 209:4,11
**opportunity** 126:8
176:5 212:7 221:3
**oral** 5:7 144:2
**order** 49:18 54:1
242:2
**organization** 88:24
**organized** 227:9
**organs** 47:7
**original** 35:13 60:6
60:19,24 61:1
62:3,10 109:8
109:23,24 222:18
223:1
**originally** 11:7
60:16,21 62:12,17
**other** 2:12,22 6:10
6:13 10:4 16:11
16:16,24 18:21
20:22 22:4 25:9
26:1,3 31:7,17,20
37:1,1,2,13,14
38:6 40:3,3,5,6,20
40:23 41:1,6,7
43:22 44:12,14,15
45:11 46:20 49:1
50:1 51:9,11,13
52:4,4 53:15
55:24 58:7,8 61:8
72:17,18 75:1
77:23 78:11,17
81:11 88:9 90:10
90:21,22 93:22
95:9,16,17,23
97:3 105:19 115:2
117:20 121:11,16
122:6,13,15,15,18
123:19 124:4
128:7 135:14
136:2,5 137:14,20
143:24 146:3,19
153:4 155:12
166:24,24 173:12
179:19,21 181:5
181:21 182:9
187:10,17 188:2,7
188:8 191:16
193:5 196:17
203:19 207:21

208:7 218:17
219:17 220:5
228:9,13 233:12
235:14,22 236:23
237:2,8
**others** 78:17 137:20
192:2 193:9
**otherwise** 248:13
**other's** 93:20
187:18
**ought** 157:4
**out** 4:8 11:18 12:6,7
12:13 13:6,12,12
23:5,7 28:12,16
29:23 30:5 31:12
32:13,15 33:2
37:1 38:21 44:2
46:15 54:14 55:19
59:6,11 64:10
80:18 82:14 83:14
85:5,20,20 88:1
88:17,18 89:20
90:7 91:16 92:11
95:6,11,14 96:1
99:4 101:9 108:20
109:2 115:18
116:9 118:22
122:10 125:12,24
126:12,17,19
127:12 128:17
133:23 136:17,19
137:20,21,23,23
144:23 146:1
150:21 151:20
152:10 156:3
159:21 161:1
162:17 166:8
169:13 171:8,9,15
180:3,8 190:1
191:7,20 197:10
200:14,15 202:4
204:14 207:13
213:14 228:6
229:12 235:18,21
235:22 238:4,8
**Outback** 170:13
**outcome** 21:21
**outdoor** 190:14,15
**outside** 77:12 95:12
125:10,13 145:9
145:24 146:7
194:2 203:14,24
204:7 205:12
235:21
**over** 7:7,21 8:13
14:8 22:13 24:15
47:17 72:6 75:3

Snyder                                v.                    Citi Steel, USA, Inc.
Terry L. Snyder                C.A. # 04-970-JJF                      May 31, 2006

Page 267

| | | | | |
|---|---|---|---|---|
| 75:12,21 98:22 | 157:16,18 160:6,9 | 83:8 94:24 106:24 | 187:17 193:21 | 110:11,13,16,16 |
| 105:8 109:9 | 160:23,23 164:20 | 132:15 144:22 | 194:2 203:9,19 | 167:19,21 |
| 113:12 119:21 | 164:24 165:1,13 | 155:6 156:14 | 209:2 211:10 | **physician** 45:15 |
| 125:23 137:2,5 | 165:19 170:5,6 | 159:2 173:4 180:5 | 226:14 230:1,4 | **Physicians** 46:1 |
| 140:2,14 141:21 | 173:7,10,18 174:7 | 207:10,18 208:16 | 233:23 236:23 | **pick** 72:21 110:3 |
| 143:12 144:8 | 174:7 175:21,23 | 208:16,16 | 237:1 | 144:19 145:10 |
| 146:6,9 148:22 | 216:16,17,19 | **parties** 39:24 77:5 | **percent** 117:22 | **picked** 31:17 62:4 |
| 150:2 168:12,12 | 217:11,12 230:24 | 248:8 | 162:10 191:21 | **picking** 144:20 |
| 168:24 169:5 | 231:20 232:21 | **parts** 32:13 118:1,6 | **perform** 107:2 | **pictures** 88:2 |
| 170:11,12 171:3 | 233:6 234:10 | **party** 39:23 43:18 | **performance** 27:19 | **piece** 23:3 30:19 |
| 177:21 180:11 | 238:17 246:2,8,19 | 43:24 44:4 76:4,5 | 130:5 131:20 | 99:5,7 141:6 |
| 182:14 190:15,18 | 246:20 247:4 | 76:6,13 248:13 | 142:8,12,15 149:6 | 156:23 224:19 |
| 190:19 193:13 | **pages** 22:22 28:23 | **pass** 94:15 114:23 | 149:11,18 152:23 | **pieces** 29:1 199:12 |
| 200:17 214:10 | 232:9,20 237:18 | 188:8 191:8 | 154:15 155:7,15 | 217:1 224:23 |
| 218:3 219:23 | **paid** 21:23 59:15 | **passed** 13:9 108:21 | 155:19 156:14 | 225:7 |
| 220:3 221:21 | **pain** 47:21 48:3,12 | 114:6,9,23 | 161:24 162:3 | **Pike** 46:4 184:5 |
| 223:18 227:24 | 48:14,15,16,20,21 | **passenger** 16:23 | **performing** 225:24 | 185:3 |
| **overcame** 13:3 | 52:20 53:1,4,8,10 | 47:13 | **perhaps** 49:16 | **pill** 182:7,7 |
| **overcome** 12:16,20 | 101:23,24 102:1 | **past** 7:18,22 20:22 | **period** 102:8,9 | **pills** 183:4,4 |
| 13:1 87:2 | 182:7 | 21:24 25:22 97:6 | 105:14 106:2 | **pink** 152:1 |
| **overheard** 18:11 | **panties** 33:10,17 | 150:6 190:19 | 112:12 119:9 | **pinpoint** 45:7 |
| 189:13 | 92:13 | 240:19 243:7 | 121:13 142:4 | **pipes** 132:19 |
| **overlap** 190:12 | **paper** 23:3 29:2 | 244:1,5 | 150:17 180:1 | **Pissed** 55:16 |
| **overnight** 110:4 | 30:5,19 99:5,7 | **path** 146:8 | 181:2 190:12 | **pit** 188:24 190:22 |
| **oversee** 213:5 | 141:6 144:21,21 | **Patrone** 15:5 76:3 | 194:9 242:16 | 190:22 191:1,3,7 |
| **own** 18:13 24:20,23 | 144:24 156:23 | 157:13 170:7 | **Periodically** 181:13 | **place** 38:20 40:6 |
| 108:17 162:8 | 189:18 199:12 | 246:11 | **perjury** 3:23 | 137:5,8 160:15,15 |
| 168:19 187:7 | 201:11,13,13,16 | **Patrone's** 229:7 | **permanent** 87:16 | 160:16,17 172:9 |
| 219:18 | 201:17 202:2 | **Pavilion** 50:15 | **permanently** 194:9 | 172:14,15 186:17 |
| **owner** 64:4 | 217:1 224:19,21 | **pay** 81:2,20 84:4 | **permission** 132:16 | 186:18 187:11 |
| **owners** 99:23 | 224:23 225:7 | 112:5 120:18,23 | 132:21 133:3 | 191:10 212:14 |
| **owner/operator** | **papers** 127:11 | 121:2 122:1,4 | 138:4 | 228:3,4 233:21 |
| 108:15 | **paperwork** 88:2 | 246:17 | **person** 21:17 51:18 | 240:13 243:10,11 |
| **o'clock** 48:6 85:21 | 115:3 118:22 | **paycheck** 86:11 | 76:11 79:9 92:2 | **places** 97:3 122:15 |
| 171:13 190:8,9 | 122:10 | 125:2 | 138:1 163:2,4 | 176:16 243:8 |
| 221:14 226:12 | **paragraph** 76:22 | **paychecks** 124:12 | 192:22 193:24 | 244:2 |
| 227:11 228:17 | 173:18,24 | **paying** 238:9 | 194:3 241:10 | **plaintiff** 1:4,15 |
| | **paralegal** 1:20 2:15 | **payroll** 124:14,15 | **personal** 17:4 43:4 | 242:17 |
| **P** | 42:12 | 124:21 125:3,3,4 | 49:11 132:22 | **plaintiff's** 242:12 |
| **Pa** 170:12 | **paranoid** 55:16 | **pays** 90:13 | 133:2 181:10 | **plan** 111:20 |
| **pack** 25:1 | 66:3 92:2,3 | **peek** 122:4 | **Personnel** 86:10 | **planning** 112:23 |
| **package** 84:11 | 131:24 134:4 | **pen** 29:2 199:12 | **perspective** 207:11 | **plans** 113:6 |
| 111:16 112:2,7 | 137:13,14 138:8 | 201:16 202:2 | **pertaining** 49:23 | **Play** 82:20 |
| 113:11 246:16 | 143:9 | 217:1 | **petty** 150:5 | **playing** 137:24 |
| **packed** 179:7 241:8 | **parent** 136:24 | **Pending** 221:24 | **pharmacy** 184:2 | **Pleas** 235:5 |
| **packet** 139:4 | **parents** 10:23 13:5 | **Pennsylvania** | **Philadelphia** 46:4 | **Pleasant** 56:4,12,20 |
| **page** 22:16,18 26:8 | 13:21 37:14 171:7 | 116:19 122:9 | 122:10 184:5 | **please** 2:17 4:5 5:11 |
| 26:11 27:7,12,14 | 181:21 | **people** 9:17 10:19 | 185:3 | 5:24 11:16 30:5 |
| 27:17,18 28:24 | **Park** 97:7,7,24 98:7 | 11:5 44:12 48:13 | **phone** 9:12 14:8 | 38:8 41:2 49:2 |
| 30:8 33:11,11,23 | 101:2,5,12,14 | 68:17 83:9 84:12 | 31:22 46:19 50:13 | 58:23 62:16 64:5 |
| 34:6,12,15,23 | 102:18,21 103:2 | 89:23 106:23 | 50:15 72:7 132:22 | 66:4,5 68:10 |
| 35:23,23 36:10,14 | 104:18,21 177:8 | 114:24 119:12 | 133:2 171:20 | 74:15,18 91:23 |
| 36:16 37:10,15,18 | 177:12 | 124:12,23 133:7 | 221:21 | 96:6 98:5 99:12 |
| 37:21,23 39:16 | **parking** 14:8 85:20 | 137:4,21 140:9 | **phones** 14:9 171:18 | 104:13,15 123:15 |
| 42:17 82:9 126:13 | 200:15 | 141:12 150:1 | **physical** 51:14,15 | 130:13,16 141:13 |
| 126:20 127:6,17 | **part** 25:13,14 34:4 | 156:6 161:23 | 190:3 | 147:23 152:19 |
| 139:15,17 149:8 | 38:14 71:17 79:17 | 178:19,20 180:6 | **physically** 83:5,10 | 158:17 169:24 |

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 268

173:22 178:22
209:20
**pled** 231:13
**plenty** 93:5 178:18
226:18
**plus** 36:22
**PMs** 52:21
**pocketbook** 184:16
**point** 9:21 15:12
32:13,15 65:8
75:2 90:24 91:2,7
91:13 132:15
162:19 166:5,17
166:18 168:20
169:6 171:3
178:16,17 182:2
191:15 197:22
201:7 206:22
224:14 226:9
**pointblank** 82:9
**pointing** 27:1 153:8
**points** 118:23
**pole** 47:13
**police** 232:14
235:24 236:2,10
236:15 237:5
238:2
**policies** 8:22
**policy** 172:1,8
173:14,15 174:3
174:11 199:1
**poor** 142:11,15
**poorly** 142:14
**pop** 150:20
**popped** 106:21
**position** 24:6 30:19
84:9 88:9 108:12
120:14 139:4,9
215:17
**positions** 120:15
**positive** 189:16
**possession** 75:4
241:13,15,24
**possible** 49:22
160:14
**Possibly** 127:16
**post** 131:21
**posters** 172:14
**potato** 128:7,7
**pounds** 109:9
**Pour** 142:8
**pouring** 125:11
215:12
**practice** 29:10
45:23
**preference** 90:21
**premises** 235:19

**prepare** 7:2,17,20
140:16
**prepared** 11:1
203:16
**preparing** 8:17
58:15
**Prepayment** 23:5
**prescribed** 52:23
53:11 183:8,24
**prescribes** 11:8
**prescription** 53:12
53:14 182:5,21
183:2,2,10,15
**prescriptions** 52:15
182:9 184:18
185:11,12
**present** 1:19 2:12
153:17 155:4
**presented** 132:10
**preserve** 98:11
**president** 30:2
135:16 150:18
**pretences** 154:21
**pretty** 11:12 28:19
33:19 52:5 65:9
91:21,22 92:15
100:23 101:17
106:11 120:18
129:20 167:5
179:9
**prevent** 101:3,22
**previous** 16:7 96:17
**previously** 154:13
177:9
**print** 141:15 153:19
157:22 159:16,16
159:16
**printed** 114:8
159:14,15 160:1
**printer** 248:9
**printing** 91:16
**prior** 7:18 30:20
96:15 97:3 103:13
103:19 104:9,14
104:17,17,18
115:7 170:19,21
176:9,19 243:15
**priorities** 66:17
**private** 70:20
118:18
**privilege** 69:8,10,23
77:6,11 80:6
**privileged** 77:11
78:2,6,11
**probably** 15:21
35:14 36:15 79:10
103:4 134:24

143:23 167:12
169:8 223:5
237:17
**probationary**
112:11
**problem** 18:18 48:1
124:12,20 125:6,8
130:10 132:17
134:15 136:22,23
140:6 149:19
206:7,8 207:10,22
207:23 208:2
**problematic** 208:7
**problems** 55:13
**procedure** 94:14
**procedures** 8:21
94:19,24 173:19
210:12 211:2
221:7
**proceed** 23:4,6
**proceeding** 32:3
**proceedings** 64:19
115:4 245:3
**process** 60:13 64:16
87:21,23 94:6
110:10 114:7
118:20 240:20
**processed** 236:12
**produce** 79:17
85:12 113:13
121:7
**produced** 25:3,5,9
25:11 54:19 73:6
74:18 75:2,11,20
79:20 121:2,5
122:2 157:10
182:20 241:14
240:18
**production** 131:20
240:18
**profanities** 192:22
193:7
**professional** 45:12
53:18,21 54:6
108:14 181:7
208:21 243:17
248:6
**professionally**
207:2
**professionals** 56:1
**program** 56:9 57:8
57:19,24 58:6,24
59:7,13 117:5
178:7,13 179:1
**Prohibited** 173:12
**pronounce** 161:21
**pronunciation** 49:3
**proof** 91:18 219:1

**proper** 120:24
209:14 210:16,17
210:22,23 211:2,3
221:8 242:12
**properly** 37:12,17
42:20 54:15 68:14
208:18
**property** 19:9
168:19
**propounded** 36:5
**prosecuted** 239:18
**prosecution** 234:24
235:8,11
**prosed** 236:14
239:13
**protect** 83:8 137:4
**prove** 135:20
141:19
**provided** 36:22
37:7 58:3 240:20
**proving** 24:17
141:13,16
**psychiatrist** 55:3
81:2
**psychology** 57:7,16
**Public** 1:10 248:6
**pull** 73:9 79:18,21
98:14
**pulled** 230:22
**pulling** 148:2
**punch** 167:15,17,19
169:16 180:3
**punched** 167:12,14
169:14 170:1
202:12
**punches** 205:18
**purchasing** 163:1
**purpose** 139:13
**purposes** 98:10
160:5
**pursuant** 1:8
**push** 31:12 33:3
221:1
**pushed** 209:21
**pushing** 197:21
**put** 22:16 25:7
54:21 61:22 62:22
63:2,15 65:15,18
65:20 77:16 93:20
120:6 121:20
125:4 138:10
140:2 151:23
201:11,13,16
236:10,11
**putting** 58:20 94:18
146:15
**Pyramid** 122:20

123:1
**p.m** 53:16 159:3,5
245:3
**P161** 143:1
**P211** 170:6
**P228** 157:17
**P69** 173:8

      **Q**

**quality** 94:13,23
**quarter** 227:6,10
**question** 4:4,7,10
4:13,22 5:11,15
6:11,19 20:8
23:11,21,22,24
25:22 36:16,19
37:5 39:16,18,19
41:16,21 42:1,18
44:1,13 49:9
62:14 69:8,23
70:13,22,24 80:23
81:6,10,10,13
103:22 104:1
115:15 127:16
142:19 147:17
152:19 169:7
179:20 209:20
210:3 212:5 221:5
221:24 233:8
234:17 237:12
239:10,21
**Questionnaire**
126:13 127:7
**questions** 3:8 4:2
6:3,20,22 20:5
23:3 35:11,15,16
36:3,5,11 49:17
49:23 142:10
175:7 213:10
239:23 248:8
**quick** 34:18 129:20
**quickly** 36:11
**quiet** 207:21 211:11
**quit** 11:1 15:2,11
27:23,24 99:21
100:7 131:17
169:9
**quote** 210:17
**quotes** 207:21

      **R**

**racetrack** 177:12
180:15
**racing** 97:9
**rain** 215:12
**raise** 99:13,15,16,17
99:18 100:3 107:9

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 269

| | | | | |
|---|---|---|---|---|
| 107:16,19 129:17 | 154:23 159:15 | 139:16 141:8 | 74:18 75:10 80:14 | 183:10 197:6 |
| **ran** 92:11 146:6,9 | 163:7,9,12 179:11 | 153:7 169:22 | 81:1 246:15 | 199:21 211:13 |
| 225:21 235:23 | 179:14 221:22 | 175:12,18 177:11 | **relations** 41:9 | 212:1 221:6 222:2 |
| **Randall** 197:4 | 233:4 234:7 | 184:22 186:16 | **relationship** 19:20 | 222:4 226:1 |
| **Randolph** 13:19 | **rebuttal** 84:14 | 189:1 209:17 | 72:15 77:13 | 246:12 |
| 29:3 30:22 41:18 | **rebuttals** 7:24 | 230:14,16 234:21 | 124:10 | **reported** 16:14 |
| 89:11 92:21 95:24 | **recall** 22:6 26:8 | 234:21,24 235:4 | **relative** 248:13 | 174:21 183:15 |
| 127:20 128:4,15 | 47:3 65:1,3 68:15 | 237:9 240:4 | **release** 52:2 240:24 | 195:9,15 196:4 |
| 135:2,3 138:7 | 72:12 80:16 85:13 | 241:21 242:9,10 | 240:24 241:2 | 197:2 199:16 |
| 141:1 149:10 | 85:14 87:24 93:3 | 244:20 | **relevance** 19:22,24 | 213:21 214:4 |
| 150:7,16,16,22 | 96:14,16 97:3 | **recorded** 68:15 | 98:8 | **reporter** 1:10 2:15 |
| 151:5,11 159:19 | 100:16 101:23 | 76:10 190:21 | **relevancy** 20:1 | 5:6,8 108:6 |
| 192:13 197:15 | 102:20 103:4 | **records** 24:24 54:22 | 98:10,15 | 246:20 248:4,6 |
| 198:11 202:21 | 105:5,10,11,13 | 55:8 73:4 101:11 | **relevant** 49:14 | **reporter's** 73:24 |
| 204:24 205:17,21 | 106:18 120:16 | 230:22 237:9,10 | 160:4 | **reporting** 91:24 |
| 208:11 212:4,5 | 122:1,4,17 123:23 | 240:18 241:2,5,7 | **relief** 37:19 38:5,6,6 | 92:8 |
| 213:10 217:16 | 126:12 127:13 | **red** 29:17,19 31:6 | **remain** 42:2 221:18 | **reports** 51:3 89:2 |
| 223:7,11,12 | 133:5,11 136:13 | 144:11,15,22 | **remember** 8:2,4,14 | 203:16 |
| 224:23 225:3 | 136:16 142:20 | 226:12 228:18 | 14:6,13 22:3,14 | **represent** 2:7 43:8 |
| 228:22 | 149:16,18 156:19 | **redepose** 242:17 | 28:7 46:4 52:1,3,5 | 72:2 230:21 |
| **Randolph's** 30:22 | 164:1 176:7,15,17 | **redeposing** 243:1 | 52:7 56:13 59:11 | **representation** 69:1 |
| 135:2,3,7,9 | 178:2,6 180:18,20 | **refer** 22:18 | 61:17 62:22 64:8 | 71:12 75:9 80:3 |
| 150:17 197:13 | 193:3 234:22 | **reference** 181:8 | 67:10,12 68:13 | 246:16 |
| **ranting** 194:6,12 | **receipt** 164:3,7,14 | **referencing** 160:21 | 72:12 82:21 | **representative** 42:9 |
| **rat** 25:1 | 174:8 242:15 | **referral** 45:16 | 104:17 105:17 | 80:14,24 81:18,19 |
| **rate** 106:13 | **receipts** 54:11,16,23 | 72:23 | 107:16,21 122:5 | 83:24 85:10 |
| **raving** 194:7 | 132:18 241:22 | **referred** 71:22 | 123:17 126:14,16 | 176:23 |
| **reach** 218:5 219:3,5 | 242:2 | 116:2 232:24 | 126:17,18 132:8 | **representing** 68:24 |
| **read** 16:4 23:21 | **receive** 86:11 92:7 | **referring** 23:22 | 157:21 158:17 | **request** 25:7 29:9 |
| 73:20 74:2,4 | 113:12 172:11 | 24:17 25:16,20 | 162:17 163:19 | 39:6 54:21 75:21 |
| 152:5 160:13 | **received** 25:23,24 | 73:18 86:18 | 172:6 176:12 | 79:17 81:1 84:2 |
| 164:12,14,15,17 | 75:24 76:12 84:9 | 138:13 147:20 | 177:22 178:22,23 | 91:9,11 113:11 |
| 173:21 189:18 | 84:11 91:13 92:15 | **reflecting** 240:18 | 179:3,11 180:12 | 120:6 164:3,7 |
| 219:22 | 143:17 152:6 | **reflects** 240:5 | 198:13 202:20 | 213:11 242:13 |
| **ready** 7:6 45:16 | 173:5 240:18 | **refresh** 8:7 176:3 | 231:8 233:13,20 | 246:14 |
| 51:24 53:2 58:10 | **recent** 233:19 | 179:6 | 233:23 234:4,6,8 | **requested** 75:3 |
| 59:2 63:18 125:23 | **recently** 6:9 185:19 | **refresher** 39:8 | 234:13 235:8 | 91:18 185:19,22 |
| 201:16 202:3 | **recess** 50:5 59:22 | **refreshing** 234:11 | 237:6 238:9 240:7 | **requesting** 91:7 |
| 206:23 211:15 | 119:18 172:21 | **refused** 31:4,9 | 240:8 241:1 | **requests** 240:17 |
| 219:3 | 230:15 | 134:9,18 142:14 | **remembered** | 242:24 |
| **real** 24:12 34:18 | **Recipient** 164:12 | **refusing** 84:4 | 233:20 | **required** 4:2,7 |
| 87:13 189:21 | **recollection** 8:7 | **regard** 86:18 | **remembering** 104:4 | 196:24 |
| **realizing** 91:17 | 97:14 132:6 | **regarding** 9:2,7 | 232:1 233:18 | **reschedule** 114:13 |
| 106:7 | 133:15 176:3 | 10:2 16:10 75:22 | 234:20 | 114:20 115:8 |
| **really** 47:6 52:3 | 179:6 234:11 | **regards** 161:23 | **removed** 224:19 | **resides** 18:21 |
| 90:23,23 115:5 | 235:1 | **register** 60:6 61:1 | **Rene** 181:7 236:20 | **resign** 100:4,12 |
| 119:14 124:17 | **recommend** 189:12 | 64:15 122:11 | **Renee** 236:6,20 | **resignation** 100:13 |
| 166:22 170:22 | **record** 2:18 4:5,8 | **registered** 1:10 | **reorganizing** 88:24 | **resigning** 215:4 |
| 180:4 195:14 | 13:18 25:8 26:23 | 106:17 248:5 | **rep** 80:5 | **resisting** 231:21 |
| 209:10 220:22,22 | 32:17,23 43:17 | **registration** 60:13 | **repair** 57:10,16 | **resource** 228:14 |
| 221:2 232:12,19 | 50:3,4,7 54:22 | 60:20 101:8 | **repeat** 70:10 81:13 | **resources** 29:15 |
| 239:15,21 240:6 | 62:23 73:17 74:4 | **regularly** 168:23 | 103:8 156:6 | 174:6 220:6 |
| **rear** 222:19 | 77:3,16 80:15 | 195:7 | **rephrase** 4:11 81:17 | **respect** 128:2 |
| **reask** 45:8 | 98:12 103:4 | **regulations** 64:18 | **REPLACE** 247:4 | 242:19 |
| **reason** 6:16,19 44:3 | 104:12,15 113:10 | **related** 40:16 | **report** 89:9 90:20 | **respective** 248:8 |
| 58:11 105:13 | 118:23 119:16,17 | **relating** 8:4 25:8,10 | 91:24 156:21 | **respond** 6:11 |
| 133:13 149:17 | 119:20 120:7 | 36:20 37:3 54:22 | 174:4,12,17 | 163:18 |

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 270

**responded** 35:22
36:6
**respondent** 76:7
**response** 134:10
139:10
**rest** 98:1 240:21
**restate** 4:11 90:1
154:1
**result** 156:15
**resume** 121:20
**retell** 128:17
**retrieve** 241:11
**return** 113:8
**returned** 127:8,9
214:14 223:8,12
223:17,17
**returns** 241:24
242:5,7,13,16
243:5,6,22
**review** 7:5,8 60:4
107:22 126:3,5
143:3 172:3,5
**reviewed** 7:13 8:6
8:19
**reviewing** 8:3,17
73:24
**reviews** 130:4
**revise** 94:14
**revised** 94:18
**rich** 82:15
**rid** 31:19 67:22
70:16,18 73:22
214:2
**ride** 118:7
**right** 3:7 4:1 6:23
8:14 11:15 18:4
21:13 22:15 30:7
38:1 41:16 46:5
54:1 57:17 63:19
65:13 66:24 71:5
83:19 89:23 91:3
91:3 94:24 95:12
98:24 100:24,24
101:1,1 103:5
108:20 113:22
115:12 116:3,12
117:10 120:12
123:11 125:10,13
127:2 134:3 138:3
138:19 139:7
143:7,16 144:15
145:23 146:7,8,22
148:3 154:11
156:1 157:5
160:20 161:16
166:3 170:11,13
171:16 174:11

175:9,20,23
176:18 189:19
197:13 198:4,4
199:15,19 204:11
207:16 213:22
217:23 218:24
220:11 222:7,12
222:16 223:24
226:6 227:21,23
228:23 235:8
238:12 239:24
244:8,10,17
**rightfully** 152:9
**right-hand** 22:17
23:18 235:5
**road** 178:10 200:16
**rod** 47:9
**Rodney** 17:23
**Ronald** 45:22
**room** 2:12 3:18
132:13,13 133:8
202:5 219:16
**Rooney** 99:12
**rotten** 141:4
**round** 108:21
**Route** 57:12
**routine** 171:12,14
**routines** 55:21
**row** 52:22
**Roy** 18:8,9
**rude** 33:15 68:17
**rule** 98:14
**run** 36:11 106:18
147:13 176:2
191:14,18
**running** 89:2
203:18,22
**rushing** 203:18,21
203:21
**Ryan** 29:20 137:7
138:4 158:2
200:19 219:13,13
246:10
**Ryan's** 106:19
**R-O-D-N-E-Y**
17:23
**R-O-Y** 18:8

**S**

**S** 246:5
**sad** 205:12
**safe** 66:20 70:5
119:6 159:11
160:6
**safety** 137:6,6,20
138:6
**sake** 139:16

**salad** 156:4
**salary** 106:4 107:8
109:12
**Sam** 124:7
**same** 3:19 4:9 5:13
25:16 34:16,18
42:2 65:4 71:18
106:2 107:8 113:2
128:12,13 147:15
158:19 165:13,19
167:1 186:20
189:17,19 190:5
207:12,15 215:11
218:8 226:23
236:20
**sarcastic** 39:1
134:24
**sat** 13:7 28:8 126:14
202:4 209:1
218:18
**satisfy** 211:3
**Saturday** 11:14
85:19 97:16,23,24
**save** 20:11 242:24
244:3
**saw** 54:10 55:18
93:7 147:14,19
182:13 214:11
217:7 223:14,16
**saying** 12:13 59:10
70:21 80:7,16
84:14 85:12 93:1
98:19 112:1
114:16 130:13
131:4 141:21
150:23 151:1
152:8,14,14,17
153:23 154:12
166:7 169:9
191:19 192:15
197:21 202:17
205:18 207:20
215:13 226:11
230:1
**says** 23:12 24:1,4,15
25:14,22 28:15,20
39:21 43:9 76:22
79:2 83:16,16,18
86:11 109:7 127:1
127:13,17,18,20
127:21 128:7,7,15
128:16 149:9
150:6 156:13
159:3 160:11
161:20 163:15
164:2,10 173:12
175:24 176:1

177:15,16 226:4
231:13,23 232:2,2
235:5 239:13
**scar** 47:15
**scared** 15:2,6 30:22
52:20 91:2 92:5
131:17,24 134:5
137:1 141:2,6
142:5 143:9 156:3
162:23 221:24
**scars** 211:12
**scheduled** 64:24
66:21 117:17
**school** 20:21 56:3,9
57:11,14 58:7
62:9 64:4 110:8
110:17,17,19
111:5 113:24
117:16,21,22,23
118:4,18 178:4,8
178:11,23 179:9
179:12
**school's** 178:5
**Schwandt** 1:10
248:5,17
**scoliosis** 47:6
**scratch** 207:1 216:8
**scream** 134:11
206:21
**screen** 32:3 74:1
**screened** 32:4
**screening** 126:23
127:5
**screwed** 47:10
**seal** 49:17,23
**search** 24:18 25:2,8
25:10 37:3 180:2
246:15
**seat** 47:14,14
**second** 12:12 13:11
33:11 48:23 62:2
76:22 87:1 89:11
114:12,16,17
126:24 127:8
128:24 173:18
175:21,23 177:5
197:13
**secretary** 97:11
98:21,22
**Security** 21:8 180:3
180:23
**see** 12:23 25:14
32:19 33:15 34:13
36:12 38:12 41:16
45:18 47:5,20
49:1 51:7,24 55:7
61:13 72:3,4

83:23 87:2,3 94:5
94:7,9 97:23
98:20 107:1
116:16 128:5
132:16 138:23
139:14 140:19
142:13,23 143:5
144:6 150:13
153:1 156:9,11
162:6 176:17
179:23,24 180:4
190:11 191:1
195:14,17 196:9
204:20 216:2
223:6 226:20
227:18,19
**seeing** 55:1 227:16
233:15 235:9
**seek** 55:9
**seeking** 37:20 38:7
66:17
**seem** 3:11 78:9 80:4
**seemed** 90:11
**seems** 240:6
**seen** 22:22 26:9
34:23,24 51:11
53:21 54:5 56:1
76:19 121:3 173:2
188:8 222:18
229:11
**sees** 53:5
**semester** 56:15 63:1
**send** 46:19 64:1,3
84:10 125:4
137:18 144:23
240:23 242:12
**sense** 15:17,19
78:12 80:20 82:24
104:20 111:12
140:5 214:24
**sent** 35:9 38:15 91:7
122:6 137:6,8,9
138:4 164:3,17
190:2
**sentence** 150:23
155:11 156:13
173:21
**September** 86:6,7
88:6
**sequence** 68:4 74:8
103:23 158:5
223:4 227:2
**series** 4:1
**serious** 217:20
218:1
**seriously** 193:15
**service** 12:16 24:7

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 271

106:7
services 86:12
    179:19,21
session 6:1
set 32:6 35:3 36:2
    117:16,17 118:4
    138:21 145:24
    159:23 213:10
settle 17:9
settled 17:12
seven 240:19 244:1
    244:5
several 7:21,22 8:20
    9:17 44:12 46:1
    110:12,12 131:21
    150:7,7 161:15
    240:2,5
sexual 8:22 11:24
    26:12,15 33:8
    39:7 127:6 170:8
    171:24 172:8,12
    172:15 173:12,15
    192:18
sexually 17:19
    32:14 66:11
    148:15 192:7,14
    192:20,21,23
shakes 148:3
share 161:2,5 162:3
    163:24
Sharp 51:20
shave 211:11
SHEET 247:5
sheets 85:22
SHEET/DEPON...
    246:19
shift 190:5,7 191:7
    214:6,10
ship 38:21 39:15
    196:1 206:19
    208:12 215:3
    225:4
shipped 38:17,18
shipping 38:15,19
    39:10,15 196:1
    206:19 208:12,16
    215:3,18,18
    224:13,16 225:4
Shock 187:21
shoes 145:19
shoots 47:21
shop 186:20 187:20
    187:22,23 188:3
    191:11,16,20,24
    223:13
short 76:4 80:23
shot 31:17

show 128:2 131:15
    132:1,1 136:20
    142:9,24 154:3,22
    178:20 207:3
    226:1
showed 83:10 88:16
    236:10
shower 53:2 62:8
showered 170:14
showing 91:18
shrink 76:24 77:1
    79:3,3,11 80:19
    81:2,20 82:23
    85:2,3
shrunken 143:12
shut 93:9
shy 129:16
sick 112:17
sickened 196:14
    197:20
side 23:18 58:10
    98:21,21 123:1
    146:7 156:2 207:1
    207:1 209:24
    210:20 211:8,19
    212:4
sides 95:15
sign 31:3 130:9,10
    133:23 134:7,8,9
    134:18 135:10,18
    153:10,19 180:7
signature 44:21
    135:22,23 140:19
    142:2 150:13
    174:8 175:23
    246:19
signatures 94:15
    139:22 142:23
    143:13 224:22
    225:2 227:12
signed 35:20 45:1
    52:2 135:22
    240:24 241:1
    247:7
significant 10:4
    18:21 20:22 31:17
    31:20 37:14 146:3
    181:5,21
signing 134:13
silence 31:23
similar 16:10
    232:21
simply 43:17
since 9:21 15:3 21:3
    24:22 25:2,14
    48:1 51:11 70:20
    109:9 112:3 117:6

122:15 154:4
    181:14
single 123:17
    131:19 164:22
    169:1 172:6 213:2
    233:15 235:16
    236:8 237:3 240:8
    240:10
sit 12:2 56:4 68:16
    164:21 178:20
    208:19 211:6
    212:6 213:9
    217:23 226:14
site 188:20,20
sits 33:20
sitting 13:20,23
    30:3,6 41:19 59:4
    66:3 145:7 194:2
    197:7,20 199:10
    204:5 226:12
    236:5
situation 138:20
    208:1
six 14:14,21 20:14
    20:16,16,20,22
    22:1
Skelly 108:9,10,16
    109:12 110:24
    111:15 112:16,23
    113:15 114:11
    115:24 120:4,5
    183:12,13,13
    246:16
skills 107:4
skip 27:7 189:20
    196:21 197:1
    232:9,20
Skip's 189:21
Skully 183:10
sky 152:1
slab 128:6 144:17
    197:16
slash 58:17
sleep 30:13,14,15
    112:18 225:18,20
    226:4,5,7
sleeping 182:12
slips 24:24
slow 48:12
slowly 31:18 99:24
    100:7
small 187:13
smart 24:23
smelling 32:24
    33:16 195:9
Smith 220:12
    221:16

smoke 190:24 191:4
sneaky 206:10
    208:20
sniff 171:16 194:17
sniffing 166:11
    194:21 195:8
snooping 99:20
Snyder 1:3,8 2:1,11
    2:21 10:9,19 22:8
    28:21 60:1,2
    71:20 75:16,17
    125:20 138:10,11
    138:24 139:1,3,16
    149:9 157:7,16
    170:5 172:17,23
    173:7 175:4,5
    189:2 216:16,18
    216:19 217:11,12
    230:17,18 246:2,6
    246:10,11 248:7
Social 21:8 180:3
    180:23
socializing 119:13
society 38:22 98:1
    119:13
soil 145:18
solely 78:5
some 3:8,8 11:18
    12:14,23 13:13
    20:11 23:9,10
    27:8 29:5 36:22
    36:24 37:1,9
    38:20 49:20,23
    58:3,11 64:15
    68:14 73:4 80:17
    83:17 84:11 87:2
    88:3 89:2 106:22
    107:3 112:11
    116:17,17 120:23
    121:3,4 122:2
    129:13 132:24
    133:21 139:15
    141:16 145:20
    157:9 159:13
    166:8 168:12
    175:7 176:15
    178:18 180:2
    219:17 221:22
    230:1,4 233:4
    235:13 236:4,24
    somebody 11:20
    12:5 35:15 44:6
    87:7,9,10,11
    97:22 119:2
    148:15 157:4
    161:4 171:15
    190:21 191:13

193:14 205:13
    207:3 211:18
    234:20 238:4
somebody's 82:23
somehow 138:7
someone 44:10
    75:23 78:10,22
    106:15,16 121:15
    144:23 187:14
    189:12,20 196:2
    206:9 221:16,21
    222:11
something 4:24
    5:16 11:4 17:2
    18:18 22:1 28:7
    32:21 43:18 45:8
    49:15,17 57:15
    60:5 63:18 66:2
    69:21 70:6 73:13
    75:12 79:2 93:11
    95:8,16 97:20
    100:13 102:16
    106:8,20 107:22
    112:12,19 114:13
    114:19 121:3
    122:7 129:12,15
    129:21 130:22
    131:14 132:20
    134:5,13,14,24
    135:10,18 137:17
    137:18 140:13,14
    142:2 145:15
    149:21 152:16
    159:3 160:16
    167:1 185:19,22
    196:2 204:16
    206:17,18 217:24
    223:18 234:19,20
    235:10 237:11
    239:13 241:8
Sometime 63:21
sometimes 19:1
    48:12 53:1 61:13
    90:13 93:19 116:7
    125:17 161:9
    191:1 194:1,16
    195:4 218:17
    229:22,23 230:1
    236:24
somewhat 187:3
somewhere 116:7
    130:14 166:14
    175:8 179:7
    221:14 227:4
soon 54:12 117:18
    136:13,17 166:3
    177:20 207:13

Snyder
Terry L. Snyder

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 272

sorry 11:10 13:19
  14:19 26:4 28:10
  31:1 34:20 37:21
  38:3,10 53:24
  54:1 62:14 63:2
  66:6 76:18 80:12
  102:23 107:13,23
  108:3 110:24
  111:3 112:9
  116:11,12 119:1
  128:24 129:1
  131:3,3,4 146:2
  148:20 150:4
  153:11 163:3
  165:5 170:20
  171:1 173:9,11,24
  175:11 182:18
  183:13 185:17
  189:21 196:7,8
  200:6 202:9
  205:14 215:19
  219:13 235:3
  237:16 239:12
sort 3:9 23:18 25:13
  38:11 189:10
  190:12 191:8
  192:21 193:22
  232:13
soul 83:11
sound 78:14 93:12
  93:15 117:10
sounded 12:8,11
sounds 112:1 147:6
  179:4
source 181:3
sources 25:24 26:1
  26:3 123:19
speak 5:18 9:20
  48:21 91:4,5
  143:8 193:22
  228:9 229:12
speaking 11:20,22
  12:6 60:6 92:14
  155:10
specialist 51:18
specific 45:13 63:12
  158:5 168:11
  194:8,10,11,15
  198:2 221:5,21
specifically 209:13
speculate 209:10
speculation 209:7
spell 2:17 10:12
  17:24 49:6 51:4
  108:10
spent 236:16
spinal 47:8

spine 47:10
spoke 72:1,6 196:10
  220:12
spoken 8:24 9:6
  10:2 18:9 72:17
spring 19:15
squeezing 3:1,16
  33:20 166:12
Stacey 51:1
stack 157:12
stage 67:18
stainless 47:9
stairs 12:18
stairwell 13:4,23
  31:13
stamp 127:18
stand 44:5,11 87:11
  87:11 95:12 125:1
  125:5,15 136:1,5
  145:19 171:17,19
  206:20
standing 33:1,18
  140:23 145:8,9
  166:20 204:7
  205:12 214:13
  227:23 229:9,11
stapled 34:7
stare 171:17
Stargatt 1:9,16
  166:20
start 23:12 32:19,20
  36:15 55:11 59:2
  60:12,24 61:21
  62:3,10 63:8
  64:22 66:2,9,21
  66:22 67:1 85:16
  88:14,18 92:7
  109:17 110:1,2,7
  110:20 113:1
  124:22 131:7
  159:16 168:2
  189:5 193:12
started 3:7 10:15
  14:5,6 15:6 32:20
  55:7,9 57:6,10
  60:5,13 61:12
  63:1 86:14,24
  87:21 88:14 91:2
  91:15,16 92:5
  94:13 96:3 104:24
  106:4,7,8,11
  110:9,13,16,22
  111:1 112:4
  117:13 118:8
  157:23 166:11
  167:4 171:21

172:5 177:15,21
  189:7 190:4
  193:10,16,16
  194:21 214:22
  215:17 229:3
  235:14,18
starting 24:12
  32:18 54:2
starts 26:8 151:18
state 2:17 177:6
  109:2,2,21,22
  110:4,4 116:19
  148:11,13 206:1
  209:17 235:6
  248:1
stated 36:21 209:11
  210:3,10 239:6
  241:19,21
statement 9:1 32:7
  32:10 84:9 139:5
  139:9 200:22,24
  201:3,6 217:11
  218:9,10 221:21
  233:8
statements 84:11
states 1:1 133:4
  143:9 144:7 149:8
  205:23
stating 4:4 80:10,13
  80:15 84:12 91:22
  224:21
station 236:15
  238:2
stay 12:22 19:3 62:5
  62:6 86:22 87:1
  89:20 90:7 92:5
  95:11 140:14
stayed 16:1 96:12
  98:3 140:16
staying 112:23
stays 94:19 164:19
steadily 59:5 93:3
steel 1:6 12:18 13:4
  47:9 191:21 204:6
steel-toe 63:24
  123:5
steering 238:4,8,12
Stenotype 248:9
Stephanie 59:19
stepping 228:9
steps 13:8,20 32:3
  87:6 145:2 190:18
  191:9 196:16
  200:14 221:8
stewards 97:10 99:2
  99:15
steward's 99:5

stick 41:8 57:15
  135:13 136:2,3
  207:6
sticker 71:19
  216:15,17
sticking 141:20
  233:4
sticky 49:22
stiff 17:7
still 4:15 8:12 30:6
  39:5,10 48:5,21
  59:3,18 60:14,23
  62:8,19 65:9
  85:21 87:6 94:6
  101:8 112:6 113:2
  113:17 115:24
  117:23 123:9
  132:18 141:3,24
  142:13 143:22
  156:3,6,7 178:8
  179:9 181:12
  182:10 183:1,3,4
  183:21 195:23
  211:16
stinky 208:1
stipulating 165:22
stomach 112:18
  196:14 197:20
stood 91:1 203:24
stop 15:7 40:21,22
  50:18 66:1,8
  100:9 171:11
  185:12,13 193:14
  195:13 196:6,13
  196:14 220:6
  229:10 235:16,20
stopped 48:5 66:19
  100:10 168:17
  203:23
stores 16:4
storming 136:17
storms 148:4
story 131:8 209:24
straight 87:5
  197:14 210:19
stray 146:2,3
street 1:9,17,22
  116:19 144:16
  146:8 177:18
  178:9 244:7
stretch 43:14
stroke 169:19
stroking 33:22
  166:12 167:6
  170:2
strong 21:13
stubs 120:23 121:2

122:1,4 246:17
stuck 47:16
students 177:20
study 108:24 109:3
  113:20
studying 68:14
  108:22 113:17,17
  114:1,3 115:19
  116:21
stuff 29:6 64:10
  80:18 88:4,19
  93:14 101:8 119:3
  119:4 130:14
  178:16 180:6
stunned 149:24
stupid 137:2
style 108:23
Styrofoam 146:12
subject 3:22 174:3
subjects 150:8
submit 27:20 34:11
  35:2 64:9 75:20
  79:15 139:3 157:9
submitted 8:20
  27:14 28:3 35:7
  35:21 36:23 37:3
  73:6 75:5 139:5
  182:15,16
substance 6:10 7:12
sued 17:16
Sugarman 46:17,21
  47:20 51:24 53:5
suit 23:6 248:14
summary 29:5
sun 108:11 196:23
supervisor 11:21
  12:13 32:18 39:4
  39:11 89:10,11,12
  89:13 90:2,4,5
  92:8 94:16 95:17
  116:1 128:5,6,10
  128:20 129:4
  152:16 174:5,14
  174:14 196:17
  220:9
supervisors 89:10
  89:21 95:7 124:19
  135:21 137:9
  220:13 221:17
supplement 40:18
  41:14 176:9
  181:22 182:1
supplies 145:1
support 176:23
  181:1
suppose 171:9
  188:11

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 273

**supposed** 9:14,15
  36:10 52:17 53:10
  60:21 61:21 62:3
  62:11 64:22 67:1
  73:4 115:7 120:1
  148:14 161:11
  198:19 199:2,3
  207:7 212:20,24
  214:19 217:13
  229:23
**Supposedly** 9:9
**sure** 4:12 9:13,22
  9:24 11:12 14:5
  28:14,19 32:22
  34:24 35:1,14
  37:16 38:23 39:3
  41:8 48:17,17
  49:10 52:6 55:23
  61:13 63:19 65:9
  67:10 69:12 72:16
  73:14 75:14 77:14
  84:3,6 89:22 91:2
  91:21,22 92:15
  93:5 94:10 95:8
  100:23 101:17
  102:7 105:23
  106:11 120:9
  125:9 130:18,23
  134:23 141:8
  142:10 158:16,18
  161:21 162:23
  165:18 168:4,14
  171:4 179:9
  191:18 192:1
  194:13 197:17
  199:14 202:17,18
  207:22 208:1
  232:17
**surely** 99:24 100:7
**surgeon** 45:18
**suspension** 237:15
  237:22
**sustained** 156:15
**Swallowing** 84:23
**swear** 160:10
**sweat** 125:12
**sworn** 2:3 248:7
**Systems** 122:7
**S-H-A-R-P** 51:21
**S-K-E-L-L-Y**
  108:11
**S-N-Y-D-E-R** 2:21

---

**T**

**T** 246:5
**table** 33:20 202:12
  209:1
**tables** 236:24
**take** 5:8,23 6:2,4
  11:18 12:6,7,13
  13:12,12 18:7
  20:19 21:24 22:7
  22:10 30:18 32:6
  52:16,17,21 53:3
  53:9,16 56:15
  57:6,10 59:20
  60:10 65:11 71:6
  83:17 85:19 99:19
  101:10 110:12
  114:2,24 116:5
  117:18,24 118:6
  118:21 124:1
  125:14,22 126:9
  127:11 140:24
  143:16 145:15
  157:18 166:7,12
  168:22 172:20
  182:7 190:3
  193:15 214:23
  221:15 227:8
  228:4
**taken** 1:8 3:5 5:6
  22:1 40:5 50:5
  59:22 88:2 119:18
  159:12 172:21
  177:17,18 183:24
  230:15 238:2
  248:8
**takes** 29:10 140:4,4
  159:3 160:16,17
  212:15 221:12
**taking** 2:16 32:19
  39:4 52:11 66:10
  66:14,17 120:5
  182:4 183:11,16
**talk** 14:9 53:22
  70:21 78:2 119:20
  125:18 131:18,23
  136:11 146:20
  147:22 148:17
  160:11 176:7
  187:11,13,17
  196:21,24 237:2
  240:15
**talked** 15:3,20 37:2
  43:1,4 45:4 79:3
  82:22 181:14
  189:22 196:23
  198:9 201:20
  203:6 227:3
**talking** 13:17,18
  22:18 41:11,18
  63:11,12 73:11
  74:3 80:19,22

---

85:3 99:21 131:17
  143:8 146:23
  161:6,18 200:3
  229:10 233:17
**talks** 151:19
**tankers** 108:23
**tapes** 218:2,3,12
**tapped** 238:12
**taught** 163:8
**tax** 240:19,21 241:2
  241:5,7,24 242:5
  242:7,13,16 243:5
  243:6,22
**taxes** 242:19,24
**Taylor** 1:9,16
**team** 149:24
**teamsters** 111:20
**teamwork** 142:11
**Tech** 57:8,19
**tedious** 3:11
**teeth** 236:1
**telephone** 47:13
  75:23 76:2,9,10
  76:12
**television** 125:17
**tell** 4:11,16 9:10
  13:5 20:1 23:2,14
  23:20 24:20 30:10
  32:1,18 34:1 43:6
  79:18 81:15 82:10
  83:24 85:10 88:12
  90:20 95:8,9,14
  99:12 113:19
  119:8 125:3,6
  126:16 131:1
  134:3,14 137:11,11
  140:13 148:10
  150:3 151:24
  153:1 154:1 157:5
  160:23 161:19,20
  165:23 166:2
  169:11 170:19,21
  171:4,5,6 175:9
  175:12,24 184:24
  186:18 187:7
  194:14 196:15,16
  197:2,3,22 198:1
  198:10,12 205:15
  206:7 207:5
  213:15 214:21
  216:24 217:24
  218:14 227:7
  231:1 232:17
  234:7 238:7,13,16
  241:8
**telling** 10:15 13:11
  13:24 14:6 33:15

---

33:18 70:10 81:7
  131:5 133:24
  135:21 138:9
  145:14 150:22
  166:11 168:18
  192:23 202:16
  211:13
**tells** 60:11,15 82:12
**temp** 12:16 24:1,7
  85:23 86:9,15
  88:9,14 106:7
  121:18,22 122:14
  122:21,21 179:19
  179:21
**temperature** 193:23
**temporary** 86:11
  120:15,17,19,21
  121:10,11,23
  122:5
**Temps** 86:13
**ten** 56:24 146:1
  156:4 191:7
**tend** 99:23
**term** 26:21 123:12
  125:17 192:16
**terminate** 157:4
**terminated** 28:21
  65:19,21 66:11
  100:11 157:2
**termination** 26:20
  26:24 27:2 156:16
**terminology** 76:8
**terms** 79:5 81:5,9
**Terry** 1:3,8 2:1,19
  28:21 83:18
  134:18 140:23
  199:6 225:18
  229:12 240:24
  246:2 248:7
**test** 107:3,4 108:19
  117:19,24 118:5
**testified** 2:4 103:13
**testify** 3:15 128:11
  177:14
**testifying** 3:19
**testimony** 3:18,23
  5:7 98:16 248:11
**testing** 115:1
**tests** 106:22 110:12
  114:2 116:5
  117:18 190:4
**Texas** 46:19
**th** 28:24
**Thank** 33:12 36:8
  37:23 142:7
  242:22
**Thanks** 76:17

---

**their** 10:8 23:24
  29:8 50:13,14,15
  61:6,7 64:18,19
  66:12 75:21,22
  83:8,10 86:6,18
  90:12,12 92:21
  94:19,19 97:10
  116:11,14,18
  124:12 125:1,2,6
  134:10 139:10
  140:3,9 142:14
  150:2 158:9
  162:12 196:9
  197:18 204:15,18
  208:22 210:11,18
  210:19 211:2,6
  219:9 224:22
  225:2 232:15
**therapist** 51:12
  53:23 55:5 185:2
  185:10 242:3
**therapists** 185:10
**thing** 4:9 25:16 51:3
  54:11 55:4 66:10
  66:16 82:5 83:13
  85:4,6 119:9
  126:4 135:9
  137:13 138:3
  139:7 141:2 146:9
  146:19 149:3
  150:16 151:15
  156:11 161:11
  172:6 184:14
  186:20 196:4,15
  197:24 202:13,22
  204:9 223:3 226:1
  240:8,10
**things** 7:7 8:15,16
  8:21,23 13:15
  19:3 27:8 30:14
  31:7 44:4 46:18
  49:3,20 56:6 75:1
  83:9 89:3 92:21
  94:21 99:21
  124:19 129:13
  140:11 141:5,21
  142:9 149:24
  150:12 152:5
  158:11 182:11
  191:19 194:10
  206:11 208:7
  211:17 222:21
  224:12 227:3
  229:24 234:8
  237:2 241:8
**think** 4:10 11:23
  12:3,9 13:15

Snyder                                    v.                    Citi Steel, USA, Inc.
Terry L. Snyder                    C.A. # 04-970-JJF                    May 31, 2006

Page 274

| | | | |
|---|---|---|---|
| 18:16 21:23 24:5 | 117:23 121:18 | **ticket** 238:3,14 | 240:2 243:24 | 232:22 235:4 |
| 24:6,10,23 27:23 | 124:18 131:7 | **ticking** 47:23 | **tiny** 232:21 | **topic** 119:21 |
| 27:24 31:7,8 | 136:1,5 160:10 | **ties** 15:14 | **tip** 8:14 | **toss** 210:20 |
| 32:18 33:14,20 | 161:6 174:11,15 | **tile** 137:15 138:19 | **tippy** 28:20 90:18 | **total** 20:18,24 21:1 |
| 34:2,4 37:24 38:8 | 183:24 190:14 | **tiles** 137:3,4,24 | **tired** 215:23 216:9 | 41:6 46:1 47:3 |
| 39:11 45:18 48:4 | 195:4 233:3 | 138:7 | **titanium** 47:9 | **totaled** 101:13 |
| 49:20 52:2 53:12 | 243:24 | **time** 4:16 5:18,23 | **title** 89:4 124:8,16 | **totally** 43:7 147:6 |
| 53:13,19 54:12,20 | **thought** 11:19 12:1 | 8:9,10 10:16,17 | **titles** 90:12 | 167:2 180:6 |
| 55:3,3,8 56:19 | 13:14,16 40:16 | 11:14,17,18,23 | **Tobin** 10:6,21 19:16 | 212:15 |
| 57:12 58:11 64:17 | 59:4 67:7 90:18 | 12:14,23 13:13 | 19:21 20:13 | **touch** 16:1 88:21 |
| 65:1 73:10 75:8 | 90:18 92:17 | 14:1,3,19,20 | 188:16 189:14,17 | 113:23 |
| 75:11 83:17,18 | 102:16 134:2 | 15:20 26:15 30:2 | **today** 2:12,16,24 | **touching** 32:20 |
| 91:13 92:14,17 | 138:3,8 158:23 | 36:13,13 37:11 | 3:18,23 5:5 7:3,6 | 234:22 |
| 95:18 96:21 | 162:1 165:23 | 39:14,19 40:2,19 | 7:17,20 17:7 33:1 | **towards** 117:19 |
| 100:22,22 103:24 | 182:14 193:13 | 41:5 45:12 48:16 | 36:24 37:2 40:13 | 168:9,10 193:18 |
| 105:23 106:7 | 195:13 200:9,11 | 53:4,12 54:10 | 43:1 45:3,4 64:6 | 195:3 |
| 107:9,9,15 120:4 | 221:1 222:4 | 56:16,19,20 60:23 | 68:24 151:22 | **town** 116:15 243:11 |
| 120:23,24 122:21 | 231:17 238:9 | 63:23 66:1 67:1 | 186:1,3 233:14 | 243:16 |
| 129:11,20 130:3 | 244:24 | 67:11,12,16,24 | 238:22 244:18 | **Tracey** 188:9 |
| 133:4 135:18,23 | **thousand** 109:9 | 68:1,15 71:2 | **together** 20:23 | **track** 11:15 164:22 |
| 135:23 137:14 | **threat** 232:13 | 72:13 74:6 76:6 | 61:22 135:13 | 217:6 |
| 139:13,24 140:1 | **three** 10:19 14:24 | 83:17 85:22 87:2 | 136:2,3 162:10,15 | **tracking** 164:2,10 |
| 142:17,19 143:5 | 15:21 56:21 63:10 | 88:8 95:2 99:6,6 | 207:7 209:1 | 164:18 |
| 143:12 144:20 | 109:13 111:17 | 102:2 107:16 | **told** 10:16 14:3,15 | **tractor** 108:20,24 |
| 149:19 151:13 | 132:12 133:7 | 108:19 114:4 | 14:20,21 30:21 | 109:8,20 110:19 |
| 152:9,11,13,15 | 141:13 145:12 | 117:7 118:4,21 | 31:24 53:22 66:7 | 113:21 |
| 156:11 157:23 | 147:8 159:3,20 | 123:20,20 127:8 | 70:19 77:6 83:21 | **trailer** 108:20,24 |
| 158:10 164:6 | 213:20,23 223:8 | 133:19 137:7 | 84:3,4 88:21 90:8 | 109:20 110:19 |
| 166:3 170:13 | 223:18 228:23 | 138:21 140:4,5,14 | 104:4 130:6 | 113:21 |
| 172:7 178:8,11 | 233:16 242:1,4 | 140:24 141:11 | 131:10 151:14,14 | **trailers** 109:8 |
| 180:5,15 184:18 | **three-month** 58:6 | 148:7 149:15 | 151:16 158:8 | **trainers** 99:23 |
| 187:24 188:8,9 | **three-zero** 17:22,22 | 150:2 156:18 | 162:2,16 166:1 | **training** 39:8 57:8 |
| 189:15,15 196:8 | **throat** 236:2 | 157:1 159:13 | 170:8 189:19 | 57:19 58:22,24 |
| 206:13,17,18 | **through** 3:8,12 | 162:10 166:19 | 198:11 199:4,13 | 59:24 61:16 62:18 |
| 207:3 208:1,21 | 12:15 13:4 17:12 | 167:8 168:5,16,21 | 200:1 201:12,12 | 63:22 64:13 |
| 210:18 213:6,20 | 22:10 24:6,7 33:3 | 170:7,21 174:21 | 201:15,17,18,18 | 108:14 109:19 |
| 215:14,21 217:20 | 36:5,6,11,15 | 181:22 182:9,21 | 201:19 202:2,4,7 | 110:3 172:11 |
| 217:22,23,24 | 37:13 43:19 45:16 | 183:8 189:16,17 | 204:3,11,12,22 | 190:4 246:8 |
| 220:17 221:20 | 56:9 58:14 62:1 | 189:19,24 193:13 | 205:4 206:3,8,9 | **transcribed** 248:9 |
| 222:21,22 224:11 | 84:24 86:15 88:4 | 193:17 194:9 | 208:24 212:23 | **transcript** 248:11 |
| 224:12 225:20 | 110:12 114:22 | 198:4,23 199:5,9 | 215:5 216:23 | **transcription** 58:14 |
| 234:15,16,17 | 115:2 116:4 117:9 | 200:20 201:3 | 217:15 218:11,21 | 65:10 248:9 |
| 238:1,3 239:21 | 117:14 120:19 | 212:9 213:11,12 | 220:8,8,19 221:16 | **transcriptionist** |
| 240:15 243:1,15 | 121:19 124:24 | 213:16,18,18 | 222:9 224:3,18,18 | 65:6 |
| 244:18 | 131:8 137:15 | 214:9,21,21 | 225:8 226:7 231:8 | **transfer** 142:1,14 |
| **thinking** 41:20 | 139:6 157:15 | 215:16 219:4,14 | 231:18 233:11,14 | 208:15 224:17 |
| 60:23 61:24 62:7 | 159:16 176:2 | 221:2,10,15 222:7 | 238:19 | **transferred** 38:20 |
| 134:1 137:16 | 179:19 214:4 | 222:7 223:3 225:8 | **tolerate** 156:9,10 | 39:9 |
| **thinks** 141:5 | 219:19 229:24 | 226:18 228:16 | **tomboy'ish** 119:7 | **travel** 110:3,11 |
| **third** 77:5 114:14 | **throughout** 26:14 | 238:6 240:12 | **tomorrow** 48:21 | **treat** 145:20 |
| 136:24 197:13 | 41:11 42:20,23 | 242:16 244:3 | 140:8 | **treated** 145:18 |
| 231:1 238:17,18 | 48:16 79:11 97:5 | **times** 4:3 8:20 15:5 | **tone** 194:5 | 196:1 |
| 238:24 | 121:13 240:9 | 22:4 26:14 51:2 | **tongue** 8:15 | **treating** 39:2 100:2 |
| **Thomas** 67:15 | **throw** 41:23 141:6 | 93:6 123:2,6,8 | **tons** 33:5 | **treatment** 54:23,24 |
| **though** 3:17 4:18 | **throwing** 88:19 | 125:9 156:4 169:9 | **top** 13:7,20,23 | 55:9 246:15 |
| 32:15 48:16 58:12 | **thrown** 235:18 | 169:9,19 176:16 | 28:20 90:18 92:23 | **treatments** 241:22 |
| 104:10 105:18 | **Thursday** 214:3 | 194:15 206:5 | 93:1 173:12 | **trial** 17:11 |

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 275

| | | | | |
|---|---|---|---|---|
| **tried** 27:23 28:2<br>30:20 89:20 90:7<br>91:14 92:22 130:1<br>130:6 132:2<br>133:17 143:10<br>147:6 153:9,10<br>159:15 161:5,10<br>208:12 210:20<br>214:23 235:15,16<br>**triggered** 198:3<br>**tripped** 137:24<br>138:1<br>**trouble** 182:12<br>238:7<br>**truck** 108:13,14<br>111:5 112:14<br>118:1 119:10<br>230:4<br>**truckers** 229:23<br>**trucks** 110:2<br>**true** 44:23 45:6<br>80:17 82:6 83:13<br>85:4,9 130:7<br>132:16 134:13<br>149:8 156:8 201:3<br>201:4 231:12<br>248:11<br>**trust** 83:15,20<br>**truth** 9:10 119:8<br>156:12 231:18<br>239:3<br>**truthful** 210:14<br>**truthfully** 3:15 6:20<br>8:12 9:22 90:12<br>**try** 31:3,13 47:20<br>48:13 63:8 92:5<br>138:21 159:22<br>202:12 205:19<br>211:20 228:24<br>**trying** 17:24 20:19<br>30:18 31:18 37:17<br>38:21 47:22 55:20<br>57:15 66:24 68:4<br>74:8 84:16 92:4<br>95:6 111:21 134:2<br>137:3 141:1 148:6<br>158:4 159:17<br>171:9 187:24<br>194:2 195:18,19<br>196:1,12 202:20<br>205:13 206:10,22<br>209:13 211:20<br>213:14 214:22<br>220:24 221:20,22<br>222:20 223:4<br>226:15 228:6<br>232:14 235:20 | **Tuesday** 28:24<br>203:12 216:7,22<br>217:12<br>**turn** 17:8 48:19<br>78:2 113:12,22<br>162:12 164:18<br>169:12 173:7<br>232:5,7<br>**turned** 29:9 75:12<br>130:2 142:1,17<br>205:9,10 216:6,8<br>216:11 229:11<br>**turns** 75:21 145:15<br>204:14<br>**twenty** 33:18<br>**two** 11:5 15:24 16:2<br>16:19 18:23 22:22<br>29:16 34:13 43:1<br>43:4,20 45:24<br>52:22 56:10 61:11<br>63:10 83:18 86:13<br>89:10 93:12 95:7<br>95:13,14,18 99:11<br>105:8,14,17,20,24<br>124:18 135:21<br>141:13 143:4<br>145:12 147:8<br>150:8 152:15<br>153:5 166:9<br>170:10 180:11<br>194:2,3 195:4<br>212:15 220:13<br>221:17 222:16,19<br>224:23,24 225:6<br>228:17 229:4<br>231:20 232:20<br>233:14,15,15<br>234:4 237:6,9,17<br>237:18 240:4<br>**two-year** 181:2<br>**Tylenol** 52:21 53:16<br>**type** 87:15 151:5<br>153:19 191:12<br>**typed** 151:3 152:16<br>155:13 225:1,6<br>**types** 110:2<br>**typing** 152:20<br>**typist** 89:5,8 94:12<br>124:17<br>**T-E-R-R** 2:19<br>**T/C** 76:1<br><br>_____ **U** _____<br>**ultimatum** 215:6<br>**umpteen** 94:17<br>**unable** 70:13 108:1<br>127:16 158:15 | 159:14 165:1,7<br>209:15<br>**unacceptable**<br>149:12 152:23<br>154:15 155:8<br>**unauthorized** 125:5<br>**unbelievable**<br>146:17<br>**under** 23:11 34:14<br>45:11 49:16,23<br>53:17 173:18<br>196:23 248:9<br>**understand** 3:14,17<br>3:22 4:6,10,14,22<br>4:23,23,24 5:14<br>5:21 6:6 7:4 39:20<br>41:4 42:3 43:24<br>49:21 58:12 68:5<br>74:3,10 76:18,18<br>77:22 81:12 95:19<br>129:18 139:8,11<br>153:23 160:22<br>182:18,20 186:24<br>209:13<br>**understanding**<br>75:23 153:4<br>161:23<br>**understood** 103:12<br>221:1<br>**unemployed** 177:23<br>178:2<br>**unemployment** 26:2<br>28:1 40:4 67:20<br>180:14<br>**unfond** 93:22<br>**uniform** 63:24<br>186:24<br>**uniforms** 123:6<br>**union** 111:20<br>**UNITED** 1:1<br>**unless** 20:3,5 41:13<br>45:7 82:12 85:12<br>88:21 106:20<br>123:9<br>**unstopped** 197:24<br>**until** 5:11,13 10:21<br>14:20 48:10 52:24<br>53:5 65:20 66:21<br>98:3 112:17 114:10<br>120:18,20 123:8<br>130:2 140:8<br>141:10,24 142:14<br>142:17 153:19<br>154:8 159:21<br>171:8 177:16<br>179:22 185:5<br>190:8 191:14 | 193:10 194:6<br>222:4<br>**untrue** 154:16,17<br>**untrustworthy** 84:5<br>**untruth** 152:24<br>155:10,24<br>**untruthful** 3:23<br>**upset** 10:23 14:10<br>55:16 63:6 66:8<br>66:13 67:11 99:15<br>147:4 221:2<br>**USA** 1:6 177:5,15<br>177:19,21 178:24<br>**use** 106:23 139:12<br>171:20 193:7<br>243:5 248:9<br>**used** 29:11 48:5<br>106:18 192:8,14<br>244:8,10<br>**using** 84:14<br>**usually** 51:1 87:8,12<br>91:9,10 146:1<br>184:5 190:11<br>203:12,17 243:23<br>**utmost** 128:2<br><br>_____ **V** _____<br>**v** 1:5<br>**vague** 73:7<br>**Valentine's** 231:5<br>**Value** 244:12,12<br>**variety** 58:11<br>**vehicle** 31:22<br>101:18 117:18<br>118:1,5 219:9<br>**vehicles** 108:17<br>**vendors** 137:23<br>**verbal** 5:9<br>**verification** 35:24<br>44:20<br>**verify** 40:24 41:2<br>159:22<br>**Verizon** 23:12,15<br>24:13,14<br>**version** 205:17<br>**versus** 2:11 228:1,7<br>**very** 8:12 10:16<br>11:9,14,17 13:2<br>15:2 17:7 20:21<br>28:20 36:11 60:7<br>68:3 74:7 80:23<br>90:18 92:23<br>101:24 110:10,24<br>119:10 140:1<br>142:6 145:17<br>168:8 178:9<br>181:23 215:21 | 216:17 221:20<br>227:9 234:18<br>241:17,19<br>**vice** 30:2 135:16<br>150:18<br>**view** 222:19<br>**violation** 174:3<br>**visits** 54:17 241:22<br>**voice** 82:20 193:22<br>194:5<br>**voluntarily** 215:4<br>**volunteering** 50:16<br>**Vouras** 10:11,20<br>**vulgarities** 192:21<br>**V-O-U-R-A-S**<br>10:13<br><br>_____ **W** _____<br>**wait** 5:11,13 23:13<br>34:5 86:1 99:14<br>107:11 125:16<br>128:24 139:23<br>141:18,18 159:6<br>204:22 214:1<br>216:1 237:16<br>**waiting** 137:23<br>141:9 215:19<br>235:22<br>**wake** 112:18<br>**walk** 21:24 87:7<br>88:4 131:8 145:7<br>190:18 197:12<br>200:14,14,16<br>214:4 219:15,19<br>229:12,14<br>**walked** 30:3,5 85:20<br>99:4 161:16 162:9<br>202:4 207:13<br>223:11 228:12<br>235:21<br>**walking** 87:9 148:4<br>**walks** 202:13<br>**wall** 190:19 227:24<br>228:1 229:8<br>**walls** 126:17<br>**want** 3:8 4:13 11:2<br>18:6 20:1,22<br>30:16,19 32:22,22<br>36:11,12 39:13,18<br>40:20,23,23 41:2<br>41:13,14 43:6<br>49:15 50:2 52:3<br>59:12,20 66:2,6<br>66:14 69:12,14<br>73:9,14 74:3<br>79:20,24 81:13,14<br>83:20 84:7 89:22 |

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 276

| | | | | |
|---|---|---|---|---|
| 90:1 91:24 93:13 | 171:14 178:2 | **welcome** 56:22 | 32:2 51:23 63:23 | 222:23 223:10 |
| 95:15 98:3,13 | 189:15 195:18,19 | 105:15 241:11 | 67:20,23 85:18 | 226:8,15 228:17 |
| 99:17 100:1,8 | 196:12 198:2 | **well** 7:5 10:15 12:23 | 94:3 96:10,22 | 229:4 230:22 |
| 103:12 104:7 | 199:9 231:11 | 15:2,9,21 19:8,23 | 98:2 99:11 103:13 | 233:7 235:18,22 |
| 110:2 113:1,21,22 | 239:17 | 20:19 22:24 24:1 | 110:19 111:9 | 235:23 236:1 |
| 119:14,14 120:9 | **waste** 71:2 150:2 | 28:15 30:11 32:18 | 117:12 121:18 | 237:24 248:8 |
| 120:10 126:3,9 | **wasting** 83:22 | 32:19 33:5,9 | 136:17 143:5,7 | **weren't** 31:19 120:2 |
| 130:1,12,22,22 | **watch** 55:15 87:24 | 34:11 35:2,14 | 144:19 145:3 | 124:4,21,22 145:6 |
| 131:7 138:20 | 203:9 205:17 | 39:21 41:13 43:8 | 146:11,12 151:11 | 148:9 225:23 |
| 143:15 145:20 | 212:4 | 43:11 47:5 49:2 | 156:1 158:6 169:2 | **west** 1:9,17 116:19 |
| 151:12,12 153:19 | **water** 125:12,18 | 50:24 52:7 53:22 | 169:10,19 170:9 | 243:11,12,16,16 |
| 157:15 158:16,18 | 132:23 187:11 | 56:23 58:13 59:9 | 170:10,11,13 | **whatnot** 31:23 |
| 159:22 167:7,10 | **waved** 228:8 | 63:5 66:7 68:11 | 171:13 196:17,18 | 60:19 121:16 |
| 170:2,22 179:8 | **waving** 220:1,1 | 68:13 69:9,12 | 196:19 198:6,9 | 196:18 224:8 |
| 184:18 195:14,17 | 227:18 229:9 | 70:15 77:5,14 | 199:15 200:8 | **wheel** 238:4,8,12 |
| 196:9,12,21 201:1 | **way** 5:7 9:14,15 | 79:15,19,20 80:11 | 204:13,13,14,18 | **while** 14:9 30:6 |
| 202:17,18 203:2,3 | 12:8,11 13:15 | 83:15 86:24 87:1 | 215:11,12,13 | 59:2 60:14 62:13 |
| 205:4,16 207:22 | 17:8 18:13 20:11 | 87:19 88:2,16 | 218:18 222:9 | 62:18 123:21 |
| 208:3,23 218:5 | 25:18 31:12 33:3 | 89:6 91:20 92:19 | 228:12,18 229:3 | 124:5 126:18 |
| 219:5 221:6,6 | 34:6 38:22 39:2 | 95:8 96:12 97:18 | 234:5 243:7,13,15 | 138:24 143:17 |
| 224:21 225:17,17 | 43:12,14 63:15 | 99:3 101:12,23 | 244:14 | 156:5 190:23 |
| 226:4 229:2,15,18 | 66:9 90:15 92:22 | 103:7 104:3,9 | **were** 3:19 8:23 9:10 | 202:5 213:9 |
| 234:17 238:7,13 | 95:9,10 98:23 | 105:24 106:6,17 | 9:14,15 10:23 | **Whippy** 141:7 |
| 238:16 241:17,19 | 99:3 129:3 145:19 | 108:5,14 109:17 | 11:5 13:20 17:1 | **whisper** 194:3 |
| **wanted** 15:8,11 | 159:2 167:1,14 | 110:6 111:20,23 | 19:4,5 20:16,20 | **white** 154:5 |
| 26:22 28:4 37:16 | 181:1 184:1 196:1 | 112:3,6 114:15 | 27:11 30:2 31:5 | **whole** 66:9 85:6 |
| 53:24 56:10,11 | 200:12,14 205:11 | 115:11,13 116:4 | 31:18,18 32:14 | 88:20 110:20 |
| 58:10,13 82:14 | 206:11 212:23 | 116:24 117:1 | 35:11 36:23,24 | 119:9 126:3 131:8 |
| 84:3 85:4,5 92:21 | 217:19 219:20 | 119:1,5 121:8,20 | 38:21 39:2 43:2 | 131:17 135:9 |
| 106:9 115:1 | 236:3 239:6 | 121:24 130:1 | 43:14,19,23 44:4 | 139:7 150:16 |
| 116:10 131:24 | **wear** 88:3 123:5 | 131:3,14,15 132:7 | 44:16,22 46:1 | 151:14 156:21 |
| 132:1 154:3 | **wearing** 33:10,17 | 135:20 137:17 | 48:9 53:11 55:13 | 164:1 168:6 |
| 165:18 171:4 | 92:13 | 140:1,1 141:9 | 59:13 62:18 64:24 | 182:14 208:1 |
| 178:17 195:20 | **Wednesday** 1:10 | 142:13,21 144:6 | 65:14,23 67:17,18 | 214:5 |
| 204:20 206:19,19 | 31:10 32:4 217:3 | 146:6 151:14,20 | 83:4 84:1,6 88:8 | **Whoopy** 142:7 |
| 207:20 211:8,18 | 229:20 | 152:8,14 156:9 | 89:19,21 90:4,9 | **WILCOX** 1:22 |
| 212:3,4,6 215:14 | **week** 24:8,11 67:9 | 157:23 159:2,9,24 | 90:17,19 91:15 | **willing** 62:6 129:17 |
| 217:4,14 219:6 | 68:9 74:14 91:8 | 160:11 161:4 | 93:10,16 94:21 | 180:7 218:4 |
| 224:10,10,11,18 | 102:8 110:10,15 | 162:3 166:3,7,11 | 95:5 100:2 102:16 | **Wilmington** 1:9,14 |
| 224:19,22,23,24 | 114:12,14,15,17 | 166:16,17 167:14 | 105:19 113:16 | 1:17,22 17:23 |
| 225:3,3,6 | 114:20,21 115:6,7 | 168:8 171:11 | 116:21 120:4,5 | 56:8,17,20 236:15 |
| **wanting** 83:14 | 115:9 121:16 | 176:17 177:19 | 121:11 123:24 | **window** 59:6 |
| 154:22 | 136:15 170:10,17 | 178:1 181:5 185:9 | 125:5,6 128:11 | **winter** 125:12 |
| **wants** 13:12 33:16 | 170:18 244:22 | 189:10 193:20 | 132:1,12 133:6,8 | **withhold** 235:11 |
| 76:23,24 80:19 | 245:1 | 195:3,13 197:1 | 140:20 143:17 | **withholding** 232:11 |
| 81:20 141:23 | **weekend** 6:15 58:17 | 198:7,15,20 199:5 | 157:1,10 158:3,23 | 232:15 |
| 151:6 166:11 | 168:17,22,24 | 201:22 204:14,22 | 159:12,17 165:23 | **witness** 2:2 7:15 |
| 171:18 226:3 | 169:5 | 206:5 209:17 | 166:17 167:24 | 20:6,9 38:2 39:23 |
| **wasn't** 11:1,3 12:8 | **weekends** 123:2,9 | 213:16 214:7 | 168:3 176:11 | 43:18,19,24 44:5 |
| 16:22 17:1 31:11 | 169:3 | 215:1 226:10 | 177:23 179:22,24 | 44:11,16 50:1 |
| 31:12 32:1 61:13 | **weeks** 7:18,22 14:11 | 227:9 229:22 | 180:12 183:23 | 69:19,24 73:15,22 |
| 90:6,14 94:7 | 48:18 63:10 67:9 | 232:1,7 233:14,17 | 186:18,24 188:2,5 | 79:2,7,10,13 81:7 |
| 97:23 110:24 | 83:18 109:13 | 238:21 239:21 | 188:14 193:21 | 81:11,14,23 82:5 |
| 113:17 142:14 | 111:17 117:6 | 240:1 241:15 | 194:9,12,14 18 | 98:19 153:9,16 |
| 150:3 156:19,20 | 141:13 145:12 | 243:18 | 206:10,22 208:7 | 169:23 170:1 |
| 157:3 161:1,5,14 | 146:16 147:9 | **went** 7:7 10:17 | 211:7 214:9,19 | 184:10,14,16,21 |
| 164:20 165:21 | 151:23 | 12:15 28:16 31:16 | 217:4 222:2,19,20 | 216:4,6 239:19 |

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 277

240:12,16 244:24
248:12
**witnesses** 37:6
**Wjasow** 246:10
**wobbling** 140:24
**woke** 48:20
**woman** 167:5 188:5
**women** 147:8 188:2
**wonderful** 130:3
**woods** 38:22
**word** 79:11 136:19
143:11,12 187:24
198:13,13 207:6
210:19 211:6
**words** 5:8 24:21
38:6 40:5,20 41:1
41:6,8 50:1 74:18
77:23 81:11 95:17
117:20 132:1
137:16 151:6,7
155:12 187:7
191:20 207:21
**wore** 47:14
**work** 3:9 8:8,10
12:20 17:2 24:7
33:10,17 37:13
48:10,14 53:3
55:22 58:16 59:17
62:5,6,13 63:23
65:23,24 85:23
87:4 92:12 96:11
97:12 98:21 99:22
102:6 103:13
105:22 108:8,16
109:5 119:14
123:7 124:15
128:17 134:16
140:9 142:8,11,15
149:6,11,18
150:19 152:15,22
154:14 155:7,12
155:15,19 156:14
171:13 172:15
186:17,18 187:11
188:16 190:5,7
191:10 193:12,21
194:11 197:4,8
205:8 207:4 213:8
214:5,5 217:18
220:11 221:11,17
222:8,9
**worked** 65:12 86:4
96:7 97:7,10
101:5 102:17
105:8,11,14,24
120:14 121:12
122:6,18,20 123:1

124:11 190:8,9
234:6
**worker** 124:9
**workers** 191:16
**worker's** 21:6
**working** 47:23 59:3
85:16 97:3 101:3
101:22 110:16
123:21,24 211:9
**works** 95:6 108:5
188:19,20
**work-related** 94:1
**world** 11:6 53:19
59:6 140:9
**worried** 15:10,13
140:20 156:19
157:3
**worry** 205:2
**worse** 46:10
**wouldn't** 27:5 31:14
32:2 35:9 88:18
91:4 93:21 113:21
131:23 134:7
143:8 158:14
159:20 169:11
196:13,14 212:21
214:22 217:5
220:6,6 222:9
225:23 226:10
**wrap** 244:17
**Wright** 54:9 55:2
**write** 29:2 30:5
130:6 133:17
157:20 185:5
199:12 201:2
202:3,3 214:8
217:2
**write-up** 31:4 131:2
131:2,10 132:3,11
133:13,16,22
138:23 139:13
142:20 224:20,24
**writing** 29:1 30:18
225:1,1
**written** 29:7 30:21
31:3 46:16 131:9
134:2 143:10,24
151:2,3 158:12,18
158:23 160:7
200:21 201:3
214:18 217:11
218:9,10
**wrong** 11:4 28:2
31:4 40:21,22
41:14,15,21 42:19
42:21 66:13 92:4
95:17 119:12

127:14,15 130:9
134:5,14 148:13
154:2 156:20
184:9 186:19
195:24 206:17,18
233:5,12 236:17
239:1
**wrongest** 196:4,15
**wrote** 26:16,18
29:14,23 30:6
79:6 127:14
134:17 158:24
200:21 202:5
216:11,14 217:10
217:12
**www.wilfet.com**
1:24

—————

**X**

X 246:1,5

—————

**Y**

Y 2:19
**yanked** 238:4,8,12
**yard** 128:7 144:17
197:16
**yeah** 106:3 108:4,4
108:5 152:12
238:16
**year** 16:21,21 21:15
24:15 35:22 50:21
53:13 56:6,12
61:10,21 66:23
71:7 72:14 100:20
111:2 118:12
141:9,10 168:6
171:3,3,6 174:20
174:20 180:19
243:7,7,13,15
**yearly** 107:22
**years** 15:21 16:20
18:18,23 20:14,16
20:18,20,23,24
21:11,15 41:7,20
41:23 43:2 56:10
56:21,21,24 57:2
61:11 79:11 96:17
97:6 98:22 99:16
105:8,14,17,20
180:11 232:2
233:1,4,17 234:4
237:3 238:19
240:19 241:23
242:1,4,6 244:1,5
**year's** 242:5
**yelled** 90:23 92:11
131:16 135:5

**yelling** 131:23
137:2
**yesterday** 28:15,21
46:15 48:17,18,20
**young** 1:9,16 19:15
42:8 59:18
**younger** 46:9
**you's** 135:1 179:8
214:17

—————

**Z**

**zip** 116:20

—————

**$**

**$18** 109:13 111:14
**$20,000** 76:24 81:2
81:20 82:14 83:14
83:22 84:3,5 85:6

—————

**0**

**001** 246:8
**008** 216:16
**04-970-JJF** 1:5
**042** 246:8

—————

**1**

**1** 22:8 23:11 28:24
71:15,19,20 88:7
126:13 127:20
157:16 216:18,19
217:11,12 246:8
**1st** 75:24
**1/7/03** 246:10
**1:00** 85:21 226:11
228:16
**10** 30:8 37:18,21
38:5,9,10,12
189:2 246:12
**10th** 26:13 27:2
63:17 67:4,5,22
68:20 97:20 206:2
206:6 226:2
**10:00** 48:7,7
**1000** 1:9,17
**11** 28:18 33:11
158:19 230:17,18
246:13
**11th** 28:16 67:22
97:17
**11.50** 106:10,12
**11.84** 107:10,15
**11:00** 190:8 223:5,5
227:11 230:11
**11:15** 223:18
**11:20** 159:3,5
**11:30** 204:19,21
223:6,18

**113.12** 246:16
**12** 20:18,24 25:22
106:8,8 233:1
**12/20/68** 19:12
**12:00** 227:6,11
**120.6** 246:17
**121.4** 246:17
**125** 246:9
**125-RPR** 248:18
**13** 98:22 99:16
141:9
**1330** 1:22
**138** 246:10
**139** 246:10
**14** 21:11 41:7,20,23
42:23 233:4
**14th** 110:8,10,15
111:1 113:15
114:15,21 115:7
115:10
**1509** 1:14
**157** 246:11
**17** 47:7 86:7 88:6
**17th** 86:6
**172** 246:11
**175** 246:12
**18** 33:23 110:1
139:15,17 149:8
**189** 246:12
**19** 39:18 118:15
**19801** 1:14,17,22
**19809** 18:1
**1988** 231:23 233:17
233:21
**1989** 234:12
**1993** 235:1
**1994** 21:3
**1998** 48:23 100:17
104:22 177:14,23
177:24 179:21
**1999** 101:16

—————

**2**

**2** 23:23 28:24 60:1,2
126:20 160:23
246:3,8
**2/17/2002** 231:4
**2/25/04** 246:10
**2:30** 62:7 140:11
190:9
**20** 91:1 232:1
233:17
**20th** 35:21,22
109:13 110:14,16
112:8
**2001** 11:13 51:11
88:6 104:24

B- 0211

Snyder
Terry L. Snyder

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
May 31, 2006

Page 278

| | | | |
|---|---|---|---|
| 123:14 176:1<br>177:16,16,23<br>178:4 179:22<br>**2002** 60:7 61:2,4,18<br>61:19 123:15<br>151:18 166:22<br>168:4,8 189:6<br>193:20 195:4<br>238:22<br>**2002/early** 63:21<br>64:11<br>**2003** 10:22 16:1<br>28:18 60:8,21<br>61:3,5,18,19<br>63:21 64:11 65:1<br>66:23 86:6 92:16<br>126:21 138:17,19<br>144:5 149:10<br>153:2 160:7<br>167:16,23 170:6<br>171:8 175:2 185:4<br>185:5 193:19<br>195:3 212:11,11<br>**2004** 26:13 27:2<br>34:19 54:13 61:2<br>66:23 67:5 75:24<br>185:4,6<br>**2005** 109:10,11<br>110:8,21 114:4<br>116:24 240:20<br>**2006** 1:10 111:4<br>233:21 248:7<br>**2008** 248:19<br>**202** 170:13<br>**21** 34:23 232:7<br>**21st** 46:17<br>**22** 109:14 173:7,10<br>173:10 246:8<br>**23** 173:18<br>**230** 246:13<br>**24** 34:19 174:7<br>**24th** 176:1<br>**247** 246:19<br>**248** 246:20<br>**25** 238:8,10<br>**25.8** 246:15<br>**26** 36:16<br>**2600** 109:9<br>**28** 149:10<br>**28th** 127:13 144:4<br>146:24 147:4<br>150:24 152:22<br>153:18 154:2,7,13<br>154:18 155:1,20<br>**29th** 32:11 127:1,9<br>127:12,15 | **3**<br>**3** 25:22 26:8 37:5<br>75:16,17 153:2<br>164:24 165:1<br>232:21 246:9<br>**3rd** 11:13 14:20<br>85:17 86:14 154:2<br>154:8<br>**3/1/04** 246:9<br>**3/11/03** 246:11<br>**3:00** 221:14<br>**30** 17:22 37:18,21<br>37:23 238:9<br>**302** 1:23<br>**31** 1:10 248:19<br>**31st** 248:6<br>**34** 39:16<br>**36** 35:23 36:10,14<br>42:17 44:18<br>**37** 19:15<br><br>**4**<br>**4** 26:11 125:19,20<br>126:13 127:6,17<br>127:18 246:9<br>**4th** 177:18 178:9<br>**4/10** 28:15,20 65:19<br>**4/10/03** 66:21<br>**4/11** 28:22<br>**4/28** 127:7<br>**4/9/03** 159:4 160:21<br>**4:00** 123:7,8<br>**40** 57:12<br>**401(k)** 26:4 111:22<br><br>**5**<br>**5** 114:5 138:10,11<br>246:10<br>**5,000** 125:10<br>**5,000-degree**<br>125:11<br>**5:00** 48:6,11 171:13<br>203:20<br>**5:30** 62:9<br>**5:44** 245:3<br>**54.22** 246:15<br><br>**6**<br>**6** 27:7,14 138:24<br>139:1,3,16 149:9<br>170:5 246:10<br>**6th** 117:14 118:8<br>244:24<br>**6:30** 48:10 140:11<br>190:9<br>**60** 246:8 | **601** 116:17<br>**610** 116:17,19<br>**655-0477** 1:23<br><br>**7**<br>**7** 27:17,18 138:19<br>157:6,7,16 170:5<br>234:10 246:11<br>**7th** 117:14 118:9<br>138:16 170:6,15<br>170:16 197:4<br>199:15 205:8<br>213:6,8,21,23<br>214:4,5 216:8,8<br>220:17<br>**7:00** 120:17,18<br>190:8<br>**75** 246:9<br>**75.9** 246:16<br><br>**8**<br>**8** 28:24 172:17,23<br>173:7 216:19<br>217:11,12 246:11<br>**8th** 158:8 174:21,24<br>203:12 204:21<br>205:12 212:11,17<br>213:6,7,23 216:7<br>216:22 217:13<br>218:11 222:5,7,9<br>**8/24/04** 34:10<br>**8/24/2001** 175:20<br>**8/3/04** 246:8<br>**8:00** 48:7<br>**88** 231:23<br>**89.9** 117:21<br><br>**9**<br>**9** 38:9 158:7,13,23<br>175:4,5 246:12<br>**9th** 21:3 30:12<br>31:10 32:4 63:16<br>67:19,22 126:20<br>126:21 158:6<br>159:11,12,13<br>160:7 174:22<br>212:20 213:24<br>217:3,5,6,9 219:6<br>222:11 226:22<br>227:10 229:19,20<br>**9/7/1988** 231:24<br>**9:00** 48:7 123:8<br>**9:30** 1:10<br>**90** 162:9<br>**92** 16:22 238:3<br>**93** 56:15<br>**95** 233:1 | **96** 57:23 58:1,1<br>97:17<br>**98** 17:1 47:18 98:6<br>100:23 101:17<br>**99** 101:19 |

B-0212



**WILCOX & FETZER LTD.**

In the Matter Of:

# Snyder

## v.

# Citi Steel, USA, Inc.

### C.A. # 04-970-JJF

---

Transcript of:

# Terry L. Snyder
### Volume # 2
### June 6, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B- 0213

Snyder
Terry L. Snyder, Volume 2

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 6, 2006

Page 249

VOLUME TWO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TERRY L. SNYDER,                     )
                                     )
              Plaintiff,             )
                                     )   Civil Action
v.                                   )   No. 04-970-JJF
                                     )
CITI STEEL USA, INC.,                )
                                     )
              Defendant.             )

          Continued deposition of TERRY L. SNYDER taken
pursuant to notice at the law offices of Young, Conaway,
Stargatt & Taylor, 1000 West Street, Wilmington,
Delaware, beginning at 9:08 a.m. on Tuesday, June 6,
2006, before Eleanor J. Schwandt, Registered Merit
Reporter and Notary Public.

APPEARANCES:

          LORI A. BREWINGTON, ESQ.
          MARGOLIS EDELSTEIN
            1509 Gilpin Avenue
            Wilmington, Delaware  19801
            for the Plaintiff

          MARGARET M. DIBIANCA, ESQ.
          YOUNG, CONAWAY, STARGATT & TAYLOR
            1000 West Street
            Wilmington, Delaware  19801
            for the Defendant

ALSO PRESENT:

                                              B-0214

          DEBORAH L. COLES, Paralegal
                WILCOX & FETZER
     1330 King Street -  Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com

Snyder                                    v.                    Citi Steel, USA, Inc.
Terry L. Snyder, Volume 2          C.A. # 04-970-JJF                  June 6, 2006

Page 250

```
 1        (TERRY L. SNYDER, having been previously
 2   duly sworn, was examined and testified further as
 3   follows:)
 4        CONTINUED EXAMINATION
 5   BY MS. DIBIANCA:
 6        Q.  This is a continuation of Terry Snyder's
 7   deposition, day two, and present in the room today are
 8   myself, Margaret DiBianca, representing CitiSteel; Lori
 9   Brewington, on behalf of plaintiff; and Terry Snyder,
10   plaintiff; and Debbie Coles, paralegal representing
11   CitiSteel.
12        Miss Snyder, have you discussed this
13   deposition or last week's deposition with your attorney
14   or anyone from your attorney's office since we last met?
15        A.  No.
16        Q.  Have you done anything since last week when we
17   met to refresh your recollection as to any of the topics
18   we discussed last week?
19        A.  There was one.  I was at work the next day, and I
20   don't know what or how, something popped into my head.
21        That package of e-mails from Carmella, if
22   you look at the second page, it is her apologizing for
23   not spending more time with me.  She is behind in
24   training me.
```

Page 251

```
 1        She -- in standard costs, I was supposed to
 2   be taking over standard costs as a part of my job
 3   description, and she apologizes for not spending enough
 4   time with me and getting me caught up-to-date.  Maybe not
 5   those exact words, but if you look at it, so...
 6        Q.  Anything else?
 7        A.  No, not that I can think of at the moment.
 8        Q.  That was Snyder Exhibit 7, and you are
 9   referencing page 2.
10        A.  Yes.
11        Q.  If you just want to point it out to me, that will
12   be fine.
13        A.  No, not this one.  The one from Carmella.
14        Oh, I'm sorry.  It must have been page --
15   well in this e-mail from Carmella it says --
16        Q.  Can you tell me the page number?  At the very
17   bottom it says Snyder Exhibit Page and then a number.
18        A.  Snyder page 004.  It says, "Anyway, I didn't read
19   your e-mail carefully the first time."  This is from
20   Carmella.  "I thought you said 'they' said I came up to
21   them and complained about your job performance.  I didn't
22   read carefully that it was Greg who went around asking
23   everyone about you.  That part is true, he did ask me
24   that about a week ago but I know I didn't say anything
```

Page 252

```
 1   that indicated you weren't doing your job.  Greg wanted
 2   to know if you were doing everything you were supposed to
 3   do and I told him that you're doing everything that you
 4   can do under the circumstances and the example I gave him
 5   was that it was difficult for you to complete the
 6   alloy/flux usage verification before 7:30 a.m. because of
 7   other responsibilities you had like ISOs," they are ISO
 8   procedures actually is what they are, "and other morning
 9   reports.  I also said that you don't get the Melter's
10   report till after 7:30 a.m.  I told him that I thought
11   you were given too much responsibilities that makes it
12   hard for you to try to meet certain deadlines.  Also, you
13   can't do your job if other people don't provide you with
14   the necessary information you need," such as the physical
15   inventory numbers.
16        It just goes on to say, "Greg didn't ask
17   specifically about the morning reports, that was just an
18   example I gave him to make him understand that it wasn't
19   'you' but rather the 'various responsibilities &
20   deadlines' 'they' demanded on you was the issue but I
21   guess he didn't interpret it that way.  But that's not a
22   problem, I have no problem whatsoever in going to Greg
23   and straightening that out but I won't go against your
24   wish.  If you don't want me to say anything because you
```

Page 253

```
 1   feel they might hold that against you, I will respect
 2   your wish.  But any time you need me to straighten this
 3   out just let me know and I'll do it."
 4        Excuse me for one moment.  There is a part
 5   about her mentioning the standard costs.  Well, I
 6   actually have a copy of it at home.  I could have sworn I
 7   seen it in here the other day.
 8        Q.  Do you think there is another document that's not
 9   in this exhibit?
10        A.  I'm not saying.  I know I seen the word standard
11   costs.  Maybe I'm just missing it right now.
12        MS. BREWINGTON:  Here it is.  Can I?
13        A.  Okay.  By the way, since -- forgive me.  I'm
14   skipping down a couple paragraphs.
15        "By the way, since they're giving you a hard
16   time about coming over here," see, I had to go up to her
17   office, I had to try find time in the day for her to try
18   to train me on standard costs, "coming over here, that's
19   no problem...I'll just come up to your office instead
20   when I'm ready to train you with the supplies in Standard
21   Costs.  Okay with you?  Rats, gotta get back to work."
22        There was more.  "Good thing I saved a
23   bunch."
24        Q.  When did you recall this?  Is this document
```

2 (Pages 250 to 253)

B-0215

Snyder
Terry L. Snyder, Volume 2

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 6, 2006

Page 254

1　something you reviewed over the week?
2　　　A. I was at work the next day and I just, I
3　remembered seeing the word "standard costs" and I
4　remembered Carmella always apologizing for not training
5　me quick enough in standard costs, because she had a lot
6　to do and I had a lot to do. And some of the reports
7　that I had to do, I can't get them done if the other --
8　if the melters don't supply me with the numbers of the
9　usage and so forth. So my report can't be done unless
10　you report to me.
11　　　　　But, one, part of my job description, I was
12　supposed to be taking over standard costs. If you are
13　not training me quick enough or well enough in it, then I
14　don't know it yet.
15　　　Q. Who were you taking it over from?
16　　　A. Carmella. She was the one that was supposed to
17　be -- maybe I have it at home. But she apologizes for
18　that.
19　　　　　Okay. Wait a minute. I'm sorry. If I may
20　continue on another paragraph. Well, there is the first
21　line and then there is -- it is the fourth
22　paragraph down. "Let's definitely do lunch on Friday so
23　we can talk about this in details. Also, we might as
24　well take advantage of outlining notes and issues to

Page 255

1　discuss when we do have that inventory meeting. Does
2　that sound good to you? This would be a good opportunity
3　for me to set the record straight about your job
4　performance because I can print out 'their' problems and
5　not yours. The storeroom receipts of course is still an
6　issue which you did point out."
7　　　　　Sometimes, if I may, I'm saying this in
8　general now because myself, if truck drivers, delivery
9　and so forth, if the storeroom didn't get their receipts,
10　if I don't get copies, if they are not put in my box,
11　that also can, you know, reflect me being able to do, you
12　know, one of my jobs. That's another, as far as the
13　storeroom supplying the receipts.
14　　　　　"Good thing I saved a bunch of them to show
15　them so they know we're not just making this up. Till we
16　meet on Friday, do whatever you have to do to 'cover your
17　you butt', even if that means you have to send me
18　'formal' e-mails with 'cc' to everyone else, that's fine
19　with me. Got no problem with that."
20　　　Q. Those e-mails show that you had not been properly
21　trained or not trained at that time; is that correct?
22　　　A. In the one field. But that also shows -- would
23　you like that back, ma'am? That also is her stating that
24　I cannot get my job, meet all deadlines until I receive

Page 256

1　receipts and such as from others.
2　　　Q. Did anyone, did a supervisor give you any kind of
3　problems about not turning in those reports in a timely
4　fashion?
5　　　A. I don't know if you have copies of, but I know I
6　do. I have copies of e-mails that I sent out to melters
7　stating, such as ISO procedures -- once an ISO procedure
8　is redone, rewritten, I have to do it, so, but then say
9　if there is three or four names of supervisors on that
10　ISO, as long as they all verify -- if one of them makes
11　one change on it, I have to redo the whole thing, send it
12　back out to the three, four different supervisors, and
13　that's the original copy.
14　　　　　I have copies myself of e-mails showing that
15　I sent them supervisors, please read and sign, review, if
16　you want it redone.
17　　　Q. What supervisors?
18　　　A. Not just supervisors, such as Randolph Harris.
19　　　Q. He is head supervisor, correct?
20　　　A. General supervisor. Whatever he is supposed to
21　be.
22　　　　　What was the gentleman's name in charge of
23　the ISO procedures? I can't believe I can't remember his
24　name.

Page 257

1　　　Q. Did anybody --
2　　　A. Melters, such as melters, Greg Buragino, he had
3　to review.
4　　　Q. But my question is: Did any supervisor express
5　any kind of concern about the reports being generated
6　late?
7　　　A. No. I did. I did, because if they didn't review
8　them and revise them -- see, say three of you ladies
9　sitting there, all three of you had a say in how a ISO
10　procedure was supposed to be done, and say if supervisor
11　A wants it done this way, then I have to pass it on to
12　the others, and once you read it, if you don't like the
13　way she did it, say you are supervisor B, you will
14　scratch that off, you will revise it. I have to retype
15　it, send it back around, and get all three of your
16　signatures until all three of you agree on the way that
17　ISO procedure is to be done.
18　　　　　Sometimes ISO procedures wouldn't be signed,
19　including by Randolph Harris. They would just sit there,
20　and I would repeatedly ask for them, and I have e-mails
21　showing that I need them and I want them.
22　　　　　I forget the gentleman's name who actually
23　ran the ISO procedure. I have it at home. I can't
24　believe -- because I would work directly with him

3 (Pages 254 to 257)

Page 258

1  sometimes. I can't believe I can't remember his name,
2  but...
3      Q.  Well, we can get to that later. I wanted to see,
4  did you have an opportunity to review any other kind of
5  documents or speak to anyone that would help you recall
6  the things that we discussed last time or anything
7  related to this case?
8      A.  No.
9      Q.  No?
10     A.  No.
11     Q.  Are you on any kind of medication or anything
12  that would cloud your mind and limit your ability to
13  testify truthfully today?
14     A.  No. Besides maybe not remembering every little
15  detail of my past entire life.
16     Q.  Any medicines that would prevent you from doing
17  that?
18     A.  No.
19     Q.  Let's pick up at the date when you first met,
20  after you reported your allegations to Mr. Ford.
21     A.  Excuse me.
22     Q.  And you met with I believe it was Mr. Downie.
23  Was that April 8th or 9th?
24     A.  It was Tuesday, April 8th.

Page 259

1      Q.  Okay. Now, I think you testified last time that
2  you wrote and signed a written statement. Is that
3  correct?
4      A.  Yes.
5      Q.  Let's have a look at it.
6      A.  Oh. You asked me earlier if there was anything
7  else I remembered, and the one was Carmella. The second
8  was actually Jerry Downie told me that he would be glad
9  to meet with my father, because I wanted someone there.
10  We weren't supposed to have a complete meeting until
11  Thursday.
12     Q.  Actually, that's what we are going to talk about
13  right now.
14     A.  Okay, that's good.
15     Q.  Let's do that and we will do it in chronological
16  order as the sequence of events went. So let's start
17  with the statement, and I believe that we admitted it
18  last time so let me just see. It was Snyder 6, at page
19  22, also referenced as D207.
20          MS. COLES:  It is Exhibit 6?
21          MS. BREWINGTON:  Can I see the cover? I
22  think mine are numbered wrong.
23          MS. DIBIANCA:  That's it.
24          MS. BREWINGTON:  I have it labeled as 7.

Page 260

1  Okay.
2  BY MS. DIBIANCA:
3      Q.  All right. Just for the record, you wrote and
4  signed this statement; is that correct?
5      A.  Yes, ma'am.
6      Q.  And these are your own words; is that correct?
7      A.  Yes, ma'am.
8      Q.  And if you had been under oath at the time you
9  wrote this and signed this, would your statements have
10  been any different?
11     A.  No, ma'am.
12     Q.  And at this time is there anything that you would
13  like to change or alter in this statement?
14     A.  No, ma'am.
15     Q.  Then when did the topic of the tapes first come
16  up?
17     A.  I'm not following your question.
18     Q.  Let me clarify it for you. Did you at any time
19  tell Mr. Downie that you had audio tapes that would
20  support your allegations?
21     A.  Yes.
22     Q.  And when did you first mention them?
23     A.  When I wrote this for him.
24     Q.  What was his response?

Page 261

1      A.  Well, I offered -- well, actually, I told Mr.
2  Ford, when Mr. Ford said he didn't believe me, and I
3  said, "I don't care what you believe and it is not your
4  place to judge me like that," I'm pretty sure I informed
5  Mr. Ford as well that I had him on tape, once they called
6  me down, and I offered to go down to my house and let him
7  hear the tapes.
8      Q.  Let who hear the tapes?
9      A.  Well, they could all listen to them. But the
10  people that was in the room at the moment, Jerry Downie
11  and Greg Buragino.
12     Q.  Okay. Not Mr. Ford?
13     A.  He wasn't in the room when I got down there. He
14  called for me to come down, but he wasn't there.
15     Q.  Okay.
16     A.  And Mr. Downie didn't want to reach those
17  channels.
18     Q.  Were those his words?
19     A.  Yes, ma'am.
20     Q.  What do you think he meant by that, he did not
21  want to reach those channels? How did you understand
22  those words at the time?
23     A.  He didn't want to hear them. He believed me,
24  especially, also giving me the benefit of the doubt.

4 (Pages 258 to 261)

B- 0217

Snyder
Terry L. Snyder, Volume 2

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 6, 2006

Page 262

1  Q. Did he indicate that?
2  A. Yes.
3  Q. Did he say that he would never want to listen to
4  the tapes or just he did not need to go down those
5  channels yet?
6  A. He didn't want to reach those channels yet.
7  Q. Yet?
8  A. Yet, yes.
9  Q. Did you tell him you had any other kind of
10 tangible evidence such as diaries or notes?
11 A. Yes. A few notes. Like I would be sporadic with
12 my diary. Like sometimes, you know, I'm tired or I just
13 don't feel like, sometimes even now, like I don't go home
14 every single day and sit there and write in my diary.
15 You know what I mean?
16      Like my book in my car, I'll have a little
17 note, and then like say maybe like five days I'll go, you
18 know, after writing a bunch of little things here and
19 there, then I will go back and fill in things.
20 Q. Did you tell Mr. Downie that you had these notes?
21 A. Yeah. A few notes of a few dates, specific
22 dates, yes.
23 Q. And why did you tell him that?
24 A. Whatever he was asking me at the time.

Page 263

1  Q. Why did you tell him that?
2  A. Whatever he was asking me at the time.
3  Q. Oh, it was just relevant to what he was asking?
4  A. Yes.
5  Q. To support your claim?
6  A. Yes, yes.
7  Q. And what was his response?
8  A. He just wanted it on paper.
9  Q. The written statement?
10 A. Mm-hmm. He just wanted what Mr. Harris had been
11 doing to me on paper. That's all he asked.
12 Q. And what happened after you discussed the tapes?
13 A. Well, it was the end of the day, my workday, so I
14 went home.
15      Now, in the morning -- do you want this? In
16 the morning when Randolph came in and then three hours
17 later, when they called me down to the first building,
18 that's when they ended up following me and so forth.
19 Q. Are we on the next day right now or the same day?
20 A. This day ended.
21 Q. Okay. Let's finish that day then. Your workday
22 ended so you went home?
23 A. By the time they were done with me, the day was
24 done. Okay. He wanted me -- then the next day after

Page 264

1  they followed me around --
2  Q. I want to finish that day.
3  A. I'm trying get to the point where he wanted me to
4  hand him the tapes.
5  Q. Well, let's finish the day, though.
6  A. That was it.
7  Q. Okay. Did you go? Did you leave? Did someone
8  come pick you up? Did you go directly home? What
9  happened?
10 A. Yes, I went home.
11 Q. And you drove yourself home?
12 A. Yes.
13 Q. And how did you conclude the meeting? Was there
14 some discussion as to what would happen the next day or
15 as a next step?
16 A. Yes.
17 Q. What was that?
18 A. We all were -- they were supposed to call me --
19 he was supposed to call Mr. Harris first thing in the
20 morning.
21 Q. Mr. Downie?
22 A. Yes. To come down to his office. And he was
23 going to let me sit in while he spoke with him and so
24 forth.

Page 265

1      When Randolph came in, I knew he knew.
2  Q. Let's stay with the one day. I just want to
3  finish that day.
4  A. That day was done, so I don't know.
5  Q. What did he tell you that day?
6  A. That's what he told me.
7  Q. And then did he say, Be here at 8:00 o'clock? Or
8  did he say, I'll call you when I'm ready for you? That's
9  what I'm trying to out. What else did he say? How did
10 the meeting end?
11 A. I don't -- I assume they were just calling me,
12 yes.
13 Q. Okay.
14 A. He was supposed to call Randolph down first, and
15 I wanted to be there, and he told me I could be there,
16 and he told me I could have anybody there.
17 Q. Did you specifically request to be in the meeting
18 with Mr. Harris?
19 A. Yes.
20 Q. And he agreed, Mr. Downie agreed to that?
21 A. Yes.
22 Q. Did you specifically request to have anybody else
23 present at the next day's meeting?
24 A. Not the next day, because my father, see, is down

5 (Pages 262 to 265)

Page 266

1  New Jersey a lot.

2  Q. So that would have come up later but not the

3  first day?

4  A. Exactly.

5  Q. And then any mention of this idea of your

6  transferring to the shipping department, did that come up

7  that day?

8  A. No.

9  Q. That came up for the first time when?

10  A. Wednesday, when they were following me around.

11  Q. Wednesday was the following day?

12  A. Yes, ma'am. The 9th.

13  Q. Okay. So let's go ahead and jump to that then,

14  the 9th. Tell me what happened on the 9th. You did

15  testify quite a bit about this last time so we don't need

16  to rehash all of it, but if you can do your best to

17  summarize it, and then I'll --

18  A. They lied. Nothing took place the way they said

19  it was going to take place.

20  Q. Who lied?

21  A. Mr. Downie.

22  Q. Is Mr. Downie generally a truthful person?

23  A. I have no clue.

24  Q. Did you consider him to be a truthful person at

Page 267

1  that time?

2  A. I have no clue. I didn't work for him. I

3  considered him to be a very rude and arrogant person

4  towards other people, especially in front of other

5  people. But as far as even having this long of a

6  conversation with him, we never did so, so...

7  Q. All right. So, go ahead.

8  A. When they called me down, I said, "Where is

9  Randolph Harris?" I said, "Nothing went as you said it

10  was going to be. You said I could be there. What did he

11  say?"

12  "None of your business. I don't have to

13  tell you anything."

14  Q. Who is saying this?

15  A. Mr. Downie.

16  Q. So Mr. Downie said, "I don't have to tell you

17  what Mr. Harris said"?

18  A. Exactly. It is none of my business.

19  Q. Okay.

20  A. He wanted me to go home and think about things

21  for the day. He, well, he offered to ship me to

22  shipping. And I got angry and I said, "For what?" I

23  said, "I didn't do anything." I said, "Ship him to

24  shipping." And I said, "I want to go back to my office."

Page 268

1  I said, "I have another supervisor up there." I said,

2  "This is wrong."

3  And they begged me not to go back. And I

4  said, "You told me I could be in a meeting." And I

5  wanted my father there. My father, we all -- it was

6  going to be for Thursday. He told -- I had a bill of

7  lading to deliver to Carmella. I told him this meeting

8  was over because I wanted my father there. I wanted

9  somebody there on my side so they couldn't try to turn

10  around and just get rid of me.

11  Q. So let's talk about that, because we didn't talk

12  too much about that last time, so let's elaborate there.

13  A. Yes.

14  Q. When you went down to the meeting, Mr. Downie was

15  there and who else?

16  A. Jim Ryan.

17  Q. Jim Ryan was there, okay. Anybody else?

18  A. No, ma'am.

19  Q. Who spoke first? Did you speak first? Did Mr.

20  Downie speak first?

21  A. I don't remember.

22  Q. What was the first thing you remember about the

23  meeting?

24  A. Well, when I walked in, there was a big pile of

Page 269

1  papers -- when you walk in, there is a desk here, and a

2  little round table here, and there was a big pile of

3  papers. I don't think I said anything, but I just

4  remembered seeing a big pile of papers, and I assumed

5  they were getting rid of me.

6  Q. Why did you assume that?

7  A. I don't know. Because they wouldn't -- the way,

8  just -- I don't know. I just did.

9  Q. Then what was the first statement you remember?

10  A. Wait a minute. That might have been on Thursday.

11  Wait a minute. Wait a minute. Wait a minute.

12  No, that was Thursday morning. The pile of

13  papers was Thursday morning, because that is when he

14  asked me to come straight to him before I reported to my

15  office.

16  Wednesday, when I went down -- Wednesday,

17  when I went down there at 11:00, it was around 11:30 is

18  when they started following me around, that's the first

19  offer they made to ship me to shipping.

20  I had to deliver a bill of lading to

21  Carmella. I went up to Carmella's office. That's when

22  they were standing behind Carmella. Carmella was facing

23  me.

24  Q. Okay. We heard about this last time so I want,

6 (Pages 266 to 269)

Snyder                                    v.                    Citi Steel, USA, Inc.
Terry L. Snyder, Volume 2         C.A. # 04-970-JJF                 June 6, 2006

Page 270

1  just because I want to try to not take all day today,
2  because we don't want to be here until 5:00 o'clock, if
3  there is stuff you testified about last time, I'm going
4  to let you skip it. I'll indicate that to you.
5      A. I ended the meeting and that's why they followed
6  me. I ended the meeting because he lied and told me that
7  my father could be there. I wanted a witness.
8      Q. Let's talk about that. What came first? Did you
9  say something about Mr. Harris being conferenced with
10  prior? Did the transfer to shipping come up first? What
11  was the sequence of events during the meeting?
12      A. They tried to make me an offer to ship me to
13  shipping and I said no.
14      Q. That was the first thing that you can recall --
15  wait one second -- that occurred during the meeting?
16      A. Yes.
17      Q. Okay. Did he say, and I do want to get to the
18  transfer issue, but did Mr. Downie talk to you about why
19  he wanted to transfer, why he had come to that
20  suggestion?
21      A. Well, it is on tape. He never would answer it.
22  I asked him, I said, "Why transfer me to shipping?" I
23  said, "Why not him?" I said, "Randolph is the harasser."
24  I said, "I'm the, you know, the one being harassed or

Page 271

1  harassee," however you say it.
2      Q. Did he give you an explanation?
3      A. No, he didn't. No, he didn't.
4      Q. So did he provide you with any information as to
5  why he wanted to --
6      A. Well --
7      Q. -- why he wanted to make the transfer?
8      A. No, none at all. He told me if I did not accept
9  the transfer that I am voluntarily resigning. And I
10  said, "No, I'm not." I said, "I'm going back to my
11  office." And I ended that meeting.
12      Q. Was that the first time the issue of the transfer
13  had come up?
14      A. Yes, ma'am.
15      Q. Then the issue of you wanting to have another
16  party there on your behalf, when was that raised?
17      A. Well, Wednesday. And he told me -- no, the first
18  time I mentioned it may have been Tuesday, on the 8th,
19  before I left. But I wanted to be there when Randolph
20  made his statement Wednesday morning. But he told me
21  that we all could meet and anybody can be in the meeting,
22  whomever I like.
23          Well, when they called me down on Wednesday,
24  after meeting with Randolph, when they were trying to

Page 272

1  stop me from going back to my office, and that's when
2  they were following me, I finally, once I realized they
3  weren't letting me go back to my office, I went home. He
4  said, "You sleep on it." I said, "No, you sleep on it."
5      Q. We are on the 9th now?
6      A. Now it is back on the 9th, yes. And that is when
7  I knew that they -- by them following me around and not
8  letting me go back to my office, I knew what they were
9  going to try to do to me.
10          So that day, it was pouring down rain, and I
11  went to EEOC, and that's when Jerry Downie kept calling
12  my home, and he wanted me to drop the tapes off to him.
13  And I wasn't going to do that. I would have let him
14  listen to them, but I wasn't going to just hand them my
15  tape recorders.
16      Q. How long after you left the meeting did he call
17  you?
18      A. Well, I don't know. My mother said he called
19  about six times. Maybe you could call the phone company
20  and get some phone records or something. I don't know.
21      Q. Do you recall --
22      A. I was up at EEOC in Philadelphia. But he kept
23  calling my mother.
24      Q. What would have been the earliest he called?

Page 273

1      A. I have no idea.
2      Q. What time did you leave work?
3      A. You mean what time wouldn't they let me go back
4  to my office? I guess this would have been after 12:00,
5  a little after 12:00 maybe.
6      Q. 12:00 noon?
7      A. Yes.
8      Q. And this is when your significant other --
9      A. 12:30, 1:00. I'm going to say in between 12:00
10  and 1:00. I don't know the exact time.
11      Q. And Mr. Tobin came and picked you up at that
12  time?
13      A. Yes, ma'am.
14      Q. And then when did you first speak with your
15  mother that day?
16      A. After I -- I always leave my cell phone on
17  vibrate or in a vehicle, you know, when I'm going in
18  somewhere important. I don't take the cell phone.
19      Q. So when was --
20      A. Once I was done in EEOC and got back in the
21  vehicle, I called my mother. I always call her to check
22  on her, wherever I'm going and whenever I'm leaving
23  something. And she was all hysterical saying Mr. Downie
24  wouldn't stop calling.

7 (Pages 270 to 273)

Snyder                                                                    v.                                   Citi Steel, USA, Inc.
Terry L. Snyder, Volume 2                         C.A. # 04-970-JJF                                            June 6, 2006

Page 274

1    Q.  When did you call your mother?
2    A.  As soon as I was done in EEOC.
3    Q.  Can you give me an estimate as to that time?
4    A.  I was there for a couple hours. I'm really not
5    sure.
6    Q.  So before 5:00 o'clock, would you think that's --
7    A.  Yes, yes.
8    Q.  So Mr. Downie called, would have had to have
9    called no more than a few hours after you left the
10   property; is that correct?
11   A.  Yes.
12   Q.  Now, Mr. Downie asked your mother to please have
13   you bring the tapes with you to your meeting?
14   A.  No. After she told me he kept calling, I called
15   him, and I said, "You called?"
16        And he said, "Yes," he said, "Terry, if you
17   like," he said, "you can drop those tapes off."
18        And I was not dropping those tapes off. I
19   would have sat there and let him listen to the tapes, but
20   I would not drop them off. They were my only tape
21   recorders and my only copies. And he wasn't -- I wasn't
22   letting anybody have them actually.
23   Q.  Okay. At this time had you decided to have
24   another meeting on the 10th? You were supposed to go

Page 275

1    home and sleep about it, come back the next day?
2    A.  He, he asked me not to go directly to my office.
3    And I said to him, well, that day, on the 9th, when he
4    followed me, got me in the second office, which is up on
5    the hill where he followed me to, he is telling me he
6    wants to keep the dust down.
7        I said, "I'll keep the dust down, but," I
8    said, "in writing, if you give me those two papers, that
9    lie you made up about me."
10   Q.  You are referring to what?
11   A.  They tried to have me written up a month or two
12   prior, whatever it was, which was totally false.
13   Q.  Okay.
14   A.  And the second one was why, with his and Jerry
15   Downie, with his and Randolph Harris's signatures, I
16   wanted in writing why they wanted to transfer me and I
17   wanted Randolph Harris to admit, and that's the day he
18   told me to keep the dust down and they wanted me to sleep
19   on it. They wouldn't let me go back to my office.
20        They just sat there -- he sat there begging
21   me. Jim Ryan didn't. Jim Ryan never said one word
22   throughout Wednesday and throughout Thursday. Jim Ryan
23   was quiet as a mouse. And he never said one word. And I
24   sat there and I'm looking at him and I realized, a little

Page 276

1    red light came on and I realized they were not letting me
2    go back to my office.
3    Q.  This is the 10th or the 9th?
4    A.  This is the 9th.
5    Q.  And I'm asking on the 9th --
6    A.  He said to me --
7    Q.  Wait.
8    A.  -- "Will you please report to me when you first
9    come in?" And I said, "Should I come dressed for work?"
10   And he said, "Yes."
11        So Thursday morning, on the 10th, I came
12   dressed for work, and when I walked in, on the little
13   round table was a big pile of papers.
14   Q.  And from that you concluded that they were going
15   to terminate you?
16   A.  Yes.
17   Q.  Is that what you concluded?
18   A.  In my mind. I kind of thought maybe he just said
19   for me to come dressed for work because he didn't want to
20   let me know in advance if I didn't take him up on his
21   offer that they were going to remove me from the grounds.
22   Q.  This offer was what?
23   A.  You want me to repeat it again? Because you said
24   you wanted to save time throughout the day. So you want

Page 277

1    me to repeat it again?
2    Q.  The offer was to transfer?
3    A.  Yes. Or I'm voluntarily resigning.
4    Q.  Okay. That was the offer?
5    A.  That was my choice. I had a choice.
6        And I said, "There is no such thing as
7    voluntarily resigning." And so the arbitrator at. The
8    mediator at the Department of Labor, they even said that
9    there is no such thing as voluntarily resigning.
10   Q.  When he called your house and then you called him
11   back on the 9th, regarding the tapes, he asked you to
12   drop the tapes off?
13   A.  Yes.
14   Q.  You declined to do that; is that correct?
15   A.  Yes.
16   Q.  Tell me why that is. Why did you decline?
17   A.  Well, in my mind, I wasn't dropping the tapes
18   off. Just, I let him think whatever he wanted to think,
19   actually.
20   Q.  I'm asking you in your mind, why did you not want
21   to drop the tapes off?
22   A.  Because he would have deleted it.
23   Q.  He would have deleted them?
24   A.  Sure.

8 (Pages 274 to 277)

Snyder                                    v.                    Citi Steel, USA, Inc.
Terry L. Snyder, Volume 2        C.A. # 04-970-JJF                        June 6, 2006

Page 278

1    Q.  Did you have reason to believe that he would
2    delete them?
3    A.  Would you drop off your only set of tapes?  Would
4    you drop off the only thing that you had against hundreds
5    of men and an entire company of what was happening?
6    Would you drop it off?
7    Q.  Who are hundreds of men you are referring to?
8    A.  I'm just saying, you are the only female up in
9    this giant refinery -- not refinery but mill. Would you
10   drop off the only thing that you had to prove what they
11   said and did versus, now, one little you? Would you drop
12   them off? I wouldn't and I wasn't.
13   Q.  Okay.
14   A.  But what you may do is very different from what I
15   may do, so....
16   Q.  He didn't ask you to bring them to the meeting on
17   the 10th; is that correct?
18   A.  No, he didn't.
19   Q.  Would you have brought them to the meeting on the
20   10th had he asked you?
21   A.  Yes.
22   Q.  Why? What would have been the difference?
23   A.  Well, they would have been in my possession. I
24   would have been right there.

Page 279

1    Q.  You would have been comfortable with that?
2    A.  Sure.
3    Q.  What about the diary and notes, did he ask you to
4    bring those?
5    A.  And my father was also going to be there.
6        No. He may have. But he didn't ask me to
7    bring anything. When I left on Wednesday he didn't ask
8    me to bring anything.
9    Q.  You mean the next day?
10   A.  Now, when he called, when he called me, he told
11   me I can on Thursday, if I want, and I did not.
12   Q.  Come again. He told you can what?
13   A.  He said, "You can bring."
14   Q.  Bring what?
15   A.  The tapes. He may have mentioned the diaries as
16   well, on Thursday.
17   Q.  And you declined?
18   A.  No, I didn't decline.
19   Q.  Did you bring the tapes on Thursday?
20   A.  He said if you feel -- I think he said, "If you
21   feel comfortable," but I didn't bring them.
22   Q.  Why?
23   A.  I just didn't.
24   Q.  Why?

Page 280

1    A.  I didn't want to. I don't know. I guess I
2    didn't want to. I wanted my father there. I didn't take
3    them with me.
4    Q.  Did the tapes support your claim?
5    A.  Yes.
6    Q.  Did you not want to provide Mr. Downie with the
7    opportunity just to believe you?
8    A.  I just didn't -- I just didn't take them. I
9    didn't want to -- I really didn't want to be there by
10   myself with my stuff. I wanted my father there. And I
11   told him that, and he told me -- then he changed his mind
12   and told me he decided he was too busy and didn't want to
13   meet with my father.
14       So he reneged on everything. He reneged on
15   the whole entire -- everything he promised me, he reneged
16   on everything, so --
17   Q.  I just want to get to the bottom of the tapes and
18   the other evidence.
19   A.  I did not take them. He said, "If you feel
20   comfortable" -- first he wanted me to drop them off, and
21   I wasn't about to drop them off on Wednesday. It was
22   pouring down rain. It was late. I was on my way home
23   from EEOC.
24       But he said to me, "If you feel comfortable

Page 281

1    you can bring them tomorrow." But I did not.
2    Q.  When did you change your mind to not feel
3    comfortable? You just testified that you did feel
4    comfortable?
5    A.  But I wanted to have my father there. I wanted
6    my father there with me. I wanted somebody there that I
7    knew was going to protect me and on my side.
8        MS. DIBIANCA: Let's read the record back
9    for a moment. I want to scroll back to the part of the
10   record where she testified about she was not comfortable
11   dropping them off, but she would have been comfortable
12   bringing them with her the next day.
13       (The record was read:
14       Q.  Would you have brought them to the
15   meeting on the 10th had he asked you?
16       A.  Yes.
17       Q.  Why? What would have been the
18   difference?
19       A.  Well, they would have been in my
20   possession. I would have been right there.
21       Q.  You would have been comfortable with
22   that?
23       A.  Sure.
24       Q.  What about the diary and notes, did he

9 (Pages 278 to 281)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

B-0222

Snyder
Terry L. Snyder, Volume 2

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 6, 2006

Page 282

1  ask you to bring those?
2      A.  And my father was also going to be
3  there.
4          No.  He may have.  But he didn't ask me to
5  bring anything.  When I left on Wednesday he didn't
6  ask me to bring anything.)
7  BY MS. DIBIANCA:
8      Q.  So is that answer now different?  Are you saying
9  that you would not have for some reason felt comfortable
10  bringing the tapes with you?
11     A.  I decided not to.  I decided to take a whole new
12  recorder, and I recorded that meeting from the
13  moment I walked in, all of our names, just as you do
14  when we all join together here, and I set it down.
15         And he got very upset, which it is all on
16  tape, not wanting the recorder on, saying about none of
17  my business about Randolph.  He doesn't -- hey, he lied
18  to me and I knew what they were doing, so that's what I
19  did.  I did bring a tape recorder, but I brought one that
20  was ready just for him.
21     Q.  But you did not bring the tape --
22     A.  No, I did not.
23     Q.  You did not --
24     A.  No, I did not.

Page 283

1      Q.  I'm going to have to finish my question.  Did you
2  bring the tapes with you to the meeting on the 10th that
3  had what you claim to be evidence in support of your
4  allegations?
5      A.  No, I did not.  The meeting was not supposed to
6  be at 6:00 o'clock in the morning.  The meeting was
7  supposed to take place when my father came down, and we
8  were trying to confirm a time, and Jerry Downie changed
9  his mind and said, "I do not want to meet with your
10  father."
11         He doesn't have time.  His schedule is too
12  busy.  So, therefore, I did not bring nothing.  I brought
13  nothing but a blank tape recorder to tape record him.
14     Q.  When did you first find out that your father was
15  not going to be present at the meeting?
16     A.  Jerry Downie didn't want him to come down that
17  day.
18     Q.  When did you first find that out?
19     A.  That morning.
20     Q.  That morning, the morning of the 10th?
21     A.  Yes, or, no.  Wednesday, when I adjourned the
22  meeting, I said, "This meeting is over," and I walked
23  out.  That's why they followed me, on Wednesday.  I said
24  to him, I said, "You said I could have my father with

Page 284

1  me."  So I think it was Wednesday that I first -- I'm not
2  sure.
3      Q.  But when did you find out that your father was
4  not going to be in the meeting, that Mr. Downie said he
5  did not have time, you said?
6      A.  Yes.  I don't know.  That may be on one of my
7  tapes.  So it was Wednesday or Thursday morning.
8      Q.  Well, that's exactly what I'm trying to find out.
9      A.  I think it was Wednesday.
10     Q.  When would you have found out Wednesday?
11     A.  When I walked out of the meeting.  When I walked
12  out.  I walked out.  I said, "This meeting is over."
13     Q.  Okay.  And at that point you were willing to
14  bring the tapes with you the next day; is that correct?
15     A.  No.  He never mentioned the tapes that day.
16  That's the day he said he did not want to reach those
17  channels.
18     Q.  By Wednesday night when you spoke with him you
19  were not willing to drop them off, but you were willing
20  to bring them the next day; is that correct?
21     A.  He said, "If you feel comfortable."
22     Q.  Is that correct?  You were willing to do that?
23     A.  He didn't me if I was willing.
24     Q.  I'm asking you:  Were you willing at that time?

Page 285

1      A.  Was I willing to what?
2      Q.  You can't speak over me because the court
3  reporter can't take that down.  We have to take turns.
4      A.  Okay.
5      Q.  I'm asking you, after you spoke with Mr. Downie
6  on the phone Wednesday evening, at that time were you
7  willing to bring the tapes with you the next day?  You
8  testified that you changed your mind at some point?
9      A.  He didn't ask me.  He didn't ask.  He said, "If
10  you feel comfortable."
11     Q.  Right.  I got that.  Now, when he said, "If you
12  feel comfortable," at that time in your mind, did you
13  decide to bring the tapes at that point?
14     A.  To myself?
15     Q.  Yes.  To yourself, not to him.  Exactly.
16     A.  I went and got a whole brand-new tape recorder.
17     Q.  But what about the tapes that already existed?
18     A.  No, I wasn't letting him nowhere near them at
19  that time moment.
20     Q.  That's what I'm asking you.  You testified you
21  changed your mind.  I'm trying to find out at what point
22  did you first say to yourself I am willing to bring them,
23  and then at what point did you change your mind to no, I
24  am not willing to bring them?

10 (Pages 282 to 285)

Snyder
Terry L. Snyder, Volume 2

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 6, 2006

Page 286

```
1    A.  Somewhere on 95 I guess.
2    Q.  When was that?  After leaving the EEOC?
3    A.  Mm-hmm, yes.
4    Q.  But at this point you did not know -- my
5    understanding is that you were expected to bring the
6    tapes?
7    A.  He didn't expect anything.
8    Q.  Or was willing to let you bring the tapes?
9    A.  What do you mean?
10   Q.  I mean --
11   A.  He said, "If you feel comfortable bringing them,
12   you can."
13   Q.  At that point --
14   A.  I wasn't.
15   Q.  Okay.  When were you willing to bring the tapes?
16   A.  I don't know.  I don't, I don't know.  He started
17   switching up.  If you are chasing me around and making me
18   leave my office, why should I bring something?  Why
19   should I keep my word, you know, or let you hear anything
20   if you are chasing me around and going to throw me off
21   your property anyway.
22   Q.  Did you at any point consider producing the tapes
23   to Mr. Downie?
24   A.  Well, at one point.
```

Page 287

```
1    Q.  What point --
2    A.  Not when my father -- I don't know.
3    Q.  Do you know for certain --
4    A.  If my father was going to be there on Thursday,
5    yes, I would have.
6    Q.  I'm going to repeat my instruction that you
7    cannot interrupt my question and you cannot speak over
8    me.  Otherwise, we can't get a clear record.
9    A.  Okay.
10   Q.  Okay.  At what point were you willing to produce
11   the tapes to Mr. Downie?
12   A.  When we all were going to meet for Thursday.
13   Q.  What day was that?
14   A.  My father was going to be there.  The 10th.
15   Q.  On the 10th you were willing to produce the
16   tapes?
17   A.  No.  Actually from the first day I told him.
18   They could have heard the tapes at any given time.  But I
19   wanted my father with me.
20        But when they started changing things
21   around, when they called Randolph Harris Tuesday night,
22   brought him in, then didn't call me until 11:30 on
23   Wednesday, the 9th, followed me around, had called me in
24   two offices, they don't want to reach these channels of
```

Page 288

```
1    hearing the tapes, lati-dati, then they wanted me to come
2    directly to his office, once they started lying and
3    changing everything around, I knew what they were doing.
4    So, no, I wasn't dropping off tapes.
5         And sure, I would have loved to let them
6    hear them as long as my -- they kept their word and my
7    father could have been by my side.  Does that answer
8    everything yet?
9    Q.  Not quite.  Did you tell the EEOC intake officer
10   about the tapes?
11   A.  Yes.
12   Q.  Did you tell the intake officer about the diary
13   or notes?
14   A.  Yes.
15   Q.  Were you willing to share the diary with them?
16   A.  I did.
17   Q.  You did share the diary with them?
18   A.  Mm-hmm.
19   Q.  You had it in your possession on the 9th?
20   A.  Yes, I went home and got everything.
21   Q.  Okay.  You testified earlier that --
22   A.  Or, no, no.  I'm sorry.  You are right.  That may
23   have been on the 29th.  I'm pretty sure I took everything
24   up there.  But, see, I don't think I knew at the
```

Page 289

```
1    beginning you had to be screened.  I think I just went up
2    there.  Because on the 7th I talked to a Mrs. Smith, and
3    she was trying to tell me, you know, how to protect
4    myself, and I didn't know what to do, you know.
5         But I just knew I was sick of Randolph
6    Harris, and once he didn't show up for work on Tuesday,
7    April the 8th, I knew I felt comfortable telling, so I
8    just --
9    Q.  Did you tell the EEOC intake officer on the 9th
10   that you had the tapes?
11   A.  Yes.
12   Q.  And did you share the tapes with him at that
13   time?
14   A.  I don't think on the 9th.  It was the 29th when
15   they had me come back.
16   Q.  And you shared the tapes with them on the 29th.
17   A.  Yes.
18   Q.  With Miss, I believe her name is pronounced
19   Wjasow or --
20   A.  W-J-A-S or W-Z.
21   Q.  A strange spelling, yes.
22   A.  Elizabeth something.
23   Q.  And you did share them with her?
24   A.  Yes.  Or -- yes.  And I think that was before I
```

11 (Pages 286 to 289)

Snyder
Terry L. Snyder, Volume 2

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 6, 2006

Page 290

1  sent a copy. But, yes, I let her listen to them, and she
2  was appalled.
3  Q. Did you play the tapes with her present?
4  A. Yes.
5  Q. And why were you comfortable playing the tapes in
6  front of Miss Wjasow and not in front of Mr. Downie or
7  Mr. Ryan?
8  A. I knew she wouldn't attack me or try to take
9  them.
10  Q. But you subsequently learned that the EEOC was
11  liars; isn't that correct?
12  A. Liars?
13  Q. That's what you testified to last time?
14  A. They ended up, they ended up being liars.
15  Q. So you learned that later?
16  A. Well, if they came down to CitiSteel grounds
17  physically, with their feet, like they said they were
18  going to, then forgive me for calling them a liar.
19  Q. Miss Wjasow?
20  A. Anyone. Whomever was supposed to come down.
21  Nobody from EEOC came down to CitiSteel. Nobody walked
22  around there.
23  Q. So Miss Wjasow did lie about her investigation?
24  A. Well, if she is the one that was supposed to walk

Page 291

1  on the grounds, I guess so.
2  Q. What about the diary and the notes, did you bring
3  them to the meeting on the 10th?
4  A. On the 10th?
5  Q. Yes.
6  A. No.
7  Q. Why not?
8  A. I didn't. What did he want to meet with me for
9  at 6:00 o'clock in the morning without my father, if they
10  begged me to go home Wednesday and wouldn't let me go
11  back to my office, what were they going to do with me
12  Thursday morning?
13          What do you think they would have did with
14  you, if they followed you around on Wednesday and begged
15  you to go home and sleep on things, would not let you go
16  back to your office to do your job, why would they want
17  you or why, should I say why would they let you go back
18  and do your job Thursday if, after saying come directly
19  to my office at 6:00 a.m. in the morning.
20          My father wasn't going to be able to be
21  there at 6:00 a.m. in the morning. He decided he didn't
22  want to meet with my father, his schedule was too busy.
23  Q. When did you find out the meeting was going to be
24  at 6:00 a.m.?

Page 292

1  A. When, the day, I finally, I'm sitting there
2  staring at him when he is going like this, "Please keep
3  the dust down." (Indicating)
4  Q. Which day, 9th or 10th?
5  A. The 9th he was saying he wanted to keep the dust
6  down, doing all this with his hands down to the ground.
7  Q. When did you find out the meeting was going to be
8  a meeting at 6:00 a.m.?
9  A. It wasn't a meeting. He said, "You report to my
10  office before -- report directly to me before you go up
11  to your office."
12  Q. And then so it was not supposed to be a meeting
13  on the 10th, right in the morning?
14  A. Not in the morning.
15  Q. Okay. But when you got there, then he did want
16  to talk to you about it, Mr. Downie?
17  A. No, he gave me an ultimatum.
18  Q. The resign or the transfer?
19  A. Yes.
20  Q. Okay.
21  A. It is all on tape so you can listen to it.
22  Q. So why did you not bring the diary and the notes
23  with you if you thought there was going to be a meeting
24  on the 10th?

Page 293

1          MS. BREWINGTON: Objection, asked and
2  answered.
3  Q. Go ahead. You can answer.
4  A. I didn't feel like that was a meeting at 6:00
5  a.m. in the morning.
6  Q. But there was supposed to be a meeting later?
7  A. Sure.
8  Q. So why didn't you bring them for the meeting
9  later?
10  A. No, no, no, no. You mean the meeting later on in
11  the day?
12  Q. Yes.
13  A. Oh, well, I just didn't take them in his office.
14  Q. But you had them on the property?
15  A. Oh, yes, I had everything.
16  Q. You had the tapes and the diary or notes; is that
17  correct?
18  A. I'm pretty sure I put them, I carried -- I have
19  this big briefcase filled with everything, so other than
20  that I would have went home and got them at lunch. I
21  don't really recall. But I knew that I wasn't going to
22  have a full pleasant day at CitiSteel on the 10th.
23  That's why I took a blank tape recorder there.
24  Q. You remember bringing a blank tape recorder?

12 (Pages 290 to 293)

Snyder
Terry L. Snyder, Volume 2

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 6, 2006

Page 294

1   A.  Yes.
2       Q.  But you don't recall if you brought the tapes
3   that were your, quote, smoking gun, if I can say those
4   words?
5   A.  My spoke smoking gun?
6       Q.  Your evidence.
7   A.  Whoever said smoking gun?
8       Q.  I'm saying that for the first time.  Your
9   evidence.  You don't recall bringing them?
10  A.  No.
11      Q.  And the notes, you do not recall bringing them
12  either; is that correct?
13  A.  Correct.
14      Q.  Who was present at the meeting you attempted to
15  tape?
16  A.  Mr. Downie and Jim Ryan and myself.
17      Q.  Okay.  And why did you attempt to tape that
18  meeting?
19  A.  Because my father wasn't with me and I needed
20  some kind of proof.
21      Q.  Okay.  And --
22  A.  Why did he call, suddenly want me in there at
23  6:00 o'clock in the morning after following me around and
24  wouldn't let me go back to my office?

Page 295

1       Q.  You taped the 6:00 a.m. meeting?
2   A.  Yes.
3       Q.  Okay.
4   A.  I'm sorry, it may have been 6:30.
5       Q.  That's fine.  I just want to get a general idea
6   of the time frame.
7           So you brought the tape recorder with the
8   blank tapes because you thought that he was going to
9   deceive you in some way?  I'm trying to understand why.
10  A.  Because of what they did on Wednesday, that's
11  why.
12      Q.  What did you think they were going to do on
13  Thursday?
14  A.  Not let me go back to my office and give me an
15  ultimatum, and I knew I wasn't accepting either because I
16  did nothing wrong.
17      Q.  Did you think that there was a conspiracy between
18  them?  Do you think they had made decisions ahead of time
19  without you?
20  A.  I knew that they were not going to let me go back
21  to my office, yes.
22      Q.  And that was a decision they had made before you
23  got there, you believe?
24  A.  Yes, ma'am.

Page 296

1       Q.  You believe?
2   A.  Yes, ma'am.
3       Q.  How did Mr. Downie and Mr. Ryan respond to your
4   attempt to tape the meeting?
5   A.  Mr. Downie was upset.  And Mr. Ryan never said
6   one word.
7       Q.  Did Mr. Downie indicate he was upset?
8   A.  He didn't want it taped.
9       Q.  Why?
10  A.  I don't know.  He wouldn't answer me.  I said,
11  "Why not?  What is the big deal?"  I said, "EEOC told me
12  I can do so."
13      Q.  Who told you at the EEOC?
14  A.  Who told me I could do that?
15      Q.  Yes.
16  A.  No, no, I'm sorry.  It was a lawyer actually.  I
17  called a lawyer up, out of the blue, out of a book, and
18  asked a bunch of questions.
19      Q.  What was that lawyer's name?
20  A.  I don't recall.
21      Q.  When did you call the lawyer?
22  A.  I think Monday also as well, when I called EEOC.
23          But they may have also told me that, you
24  know, I'm allowed to tape the conversation.  And

Page 297

1   especially if they are doing nothing wrong, they
2   shouldn't have been opposed to it.  They should have no
3   problem being recorded if they were doing nothing wrong.
4       Q.  But where you asked a bunch of questions too, was
5   that a Delaware attorney?
6   A.  I'm sure it was.
7       Q.  Did you meet with him or her in person?
8   A.  No. No.
9       Q.  Was it he or she?
10  A.  Actually, I asked a secretary, and then -- well,
11  I spoke -- I don't know exactly what I asked the
12  secretary.  I spoke to a secretary for awhile, or a
13  paralegal, whatever, whatever she is, and then a
14  gentleman got on the phone.
15      Q.  And you spoke with him and you believe he was an
16  attorney?
17  A.  Yes.
18      Q.  Was there any charge for that phone call?
19  A.  What do you mean?
20      Q.  Did you submit or remit any kind of payment to
21  the attorney?
22  A.  Oh, no.
23      Q.  So he gave you free legal advice on the phone; is
24  that correct?

13 (Pages 294 to 297)

Snyder
Terry L. Snyder, Volume 2

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 6, 2006

Page 298

1    A.  Mm-hmm, yes.
2    Q.  How long was your conversation?
3    A.  Just a couple moments.
4    Q.  And during that conversation the attorney or the
5  secretary told you that you could tape record a
6  conversation with a third person?
7    A.  Well, actually, I also knew in advance.
8    Q.  But answer the question.
9    A.  I'm sorry.  What was your question again?
10    Q.  The question was:  Did a lawyer and/or a
11  secretary tell you you could tape record the
12  conversation?
13    A.  Yes.  Well, actually a couple people did.
14    Q.  Which one at this time, the lawyer and/or the
15  secretary?
16    A.  I don't recall.
17    Q.  And you don't recall the lawyer's name; is that
18  correct?
19    A.  Not at this moment, I don't.
20    Q.  Were you represented at that time by Mr.
21  Neuberger?
22    A.  No, ma'am.
23        But also, I was informed that you may tape
24  anyone as long as there is one willing party and the one

Page 299

1  willing party, all that it really has to be is yourself,
2  so --
3    Q.  Who told you that?
4    A.  I don't recall.  I've asked many questions
5  because I didn't know what to do about Randolph and I
6  knew he would never admit.
7    Q.  You said several people told you that?  Let's
8  hear some of the several.
9    A.  I don't know.  I would just, you know, make phone
10  calls and ask questions.
11    Q.  To whom?
12    A.  Sporadically.
13    Q.  To whom?
14    A.  Just legal advice, so forth.
15    Q.  To whom?
16    A.  I don't know.
17    Q.  You made --
18    A.  No one in particular.
19    Q.  You made several phone calls to several people on
20  several occasions to get legal advice, but you cannot
21  recall any of those people or any of the occasions; is
22  that correct?
23        MS. BREWINGTON:  Objection, mischaracterizes
24  testimony.

Page 300

1    A.  Correct.
2    Q.  That's correct?
3    A.  I would just open the phone book.
4    Q.  And look for whom?
5    A.  Just called numbers.  Dialed numbers.
6    Q.  Domino's Pizza, for example?
7        MS. BREWINGTON:  Objection.
8    A.  Sure.
9    Q.  That's what I'm asking you.  I want to know, what
10  are you looking for in the phone book to call?
11    A.  I wanted just somebody to help me figure out how
12  I protect myself.
13    Q.  Where are those people listed in the phone book?
14    A.  Well, I'm not sure.  Well, I guess under A,
15  attorney, or L for lawyer.  I just would browse around.
16    Q.  That's what I'm asking.  It is an attorney?
17    A.  Like if you need a windshield you call around and
18  you ask questions, like that.
19    Q.  And lawyers gave you legal advice via the phone;
20  is that correct?
21    A.  Yes.  I asked questions and they would just
22  answer basically yes or no.  But a lot of times I think
23  it was a secretary or a paralegal.  I really don't know
24  the difference.

Page 301

1    Q.  During our last session last week you testified
2  that the first time you sought legal counsel was Mr.
3  Neuberger, so is that statement still correct?
4    A.  Yes.
5    Q.  Did you ask the advice of other attorneys before
6  you sought counsel from Mr. Neuberger?
7    A.  No.
8    Q.  How would you characterize these several
9  conversations on several occasions with several different
10  people?
11    A.  I'm sorry, I'm not following you.
12    Q.  How would you characterize these phone calls when
13  you looked up people in the Yellow Pages?
14    A.  What do you mean by characterize?
15    Q.  Would you characterize them as legal counsel,
16  seeking legal counsel?
17    A.  Just somebody trying to help me.  Because I
18  didn't have anybody.
19    Q.  Was Mr. Neuberger trying to help you?
20    A.  Well, I didn't know him at that time.
21    Q.  But I'm just trying to determine, you testified
22  that Mr. Neuberger was the first legal counsel you
23  sought.
24    A.  Yes.

14 (Pages 298 to 301)

B-0227

Snyder                                          v.                          Citi Steel, USA, Inc.
Terry L. Snyder, Volume 2              C.A. # 04-970-JJF                            June 6, 2006

Page 302

1  Q.  Now, today I'm hearing that there were several
2  attorneys involved, and I'm trying to clarify as to which
3  statement is accurate.
4       MS. BREWINGTON:  I'm going to object.  That
5  mischaracterizes her testimony.
6  Q.  You can go ahead and answer.
7  A.  As far as seeking legal counsel, yes. Neuberger.
8  But as far as calling up and asking questions, I never
9  met Neuberger until after August.
10  Q.  But were you asking legal questions?
11  A.  Well, I guess, if that's what you want to
12  consider legal questions.  Am I allowed to do this, you
13  know, and --
14  Q.  What other kind of questions were there?
15  A.  Well, actually none.  Just really about the
16  tapes.  I needed some kind of proof.
17  Q.  Did you tell Mr. Downie you turned the tape
18  recorder off?
19  A.  Yes. Well, no.  He was asking me to.  And then
20  he -- you can hear, I stopped, paused it for a second,
21  but I turned it right back on, and you can here him
22  asking me if it is still on.
23  Q.  Did you --
24  A.  Yes, I did.

Page 303

1       MS. BREWINGTON:  What was the question?
2       MS. DIBIANCA:  I didn't ask a question. I
3  just said "Did you."
4       MS. BREWINGTON:  Did you know what she was
5  going to say? I didn't know what you were going to say.
6       MS. DIBIANCA:  I didn't know what I was
7  going to say either.
8       MS. BREWINGTON:  But you knew.
9  BY MS. DIBIANCA:
10  Q.  Now I have to put it in words.  Did you tell Mr.
11  Downie you had turned it off, turned the tape recorder
12  off?
13  A.  Probably -- maybe.  I may have.  You can listen
14  to it.  You will probably hear whether I --
15  Q.  I'm just asking you.
16  A.  I don't recall.
17  Q.  Mr. Downie, he did ask you to turn it off; is
18  that correct?
19  A.  Yes.
20  Q.  And you did not turn the tape off, stop
21  recording; is that correct or --
22       MS. BREWINGTON:  Objection, asked and
23  answered.
24  A.  No, I did for a second.

Page 304

1  Q.  You did turn it off for a second?
2  A.  One second.
3  Q.  And then you turned it back on?
4  A.  Yes, ma'am.
5  Q.  Did you tell him you were turning it back on?
6  A.  No, ma'am.
7  Q.  Did you pretend to have it turned off?
8  A.  I didn't pretend anything.  He just kept on
9  talking, I kept on talking back.  And then a few moments
10  later he said, "Is the tape recorder still on?"  And I
11  said, "Yes, it is."
12  Q.  What did he say?
13  A.  He said -- we can listen to it.  He said, "I
14  don't want to be recorded."  And I said, "Well, why not?"
15  I said, "That's too bad."  I said, "I already know that
16  I'm allowed to tape this."
17       Whatever, whatever is on there.  We can
18  listen to it.  I can't recall.
19  Q.  I don't want to listen to it.  I want you to tell
20  us.
21  A.  Well, I can't remember every single word.  I
22  can't remember things that happened 20 years ago.
23  Q.  You can't?
24  A.  Not everything.

Page 305

1  Q.  Is this 20 years ago?
2  A.  No, but I think you expect everybody's mind to
3  remember every little single word or page number and
4  detail.  And I do not, so...
5  Q.  So you are having some inability to recall the
6  details of this discussion?
7  A.  The exact word for word.
8       MS. BREWINGTON:  Okay.  Off the record one
9  second.
10       (Discussion off the record.)
11  BY MS. DIBIANCA:
12  Q.  So is your memory clear as to the events of this
13  meeting on the 10th?
14  A.  Somewhat, yes.
15  Q.  Yes?
16  A.  Yes.
17  Q.  Did you pretend to turn the tape off?
18       MS. BREWINGTON:  I'm going to object.
19  A.  He asked me to --
20       MS. BREWINGTON:  Asked and answered.  But
21  she can go ahead, certainly.
22  A.  Well, you asked me that once, and I guess I'll
23  answer again.  He asked me to turn it off, and I did so
24  for a second, and I turned it right back on.

15 (Pages 302 to 305)

Snyder                                          v.                        Citi Steel, USA, Inc.
Terry L. Snyder, Volume 2              C.A. # 04-970-JJF                           June 6, 2006

Page 306

1    Q.  Okay.  Did he know that you turned it right back
2  on?
3    A.  I don't think so.  I don't know.  I don't know
4  what he knew.
5          MS. DIBIANCA:  All right.  Let's admit next,
6  we will do Snyder 12.
7          (Snyder Deposition Exhibit 12 was marked for
8  identification.)
9  BY MS. DIBIANCA:
10   Q.  Have you seen this --
11   A.  Yes.
12   Q.  Have you seen this before?
13   A.  Yes, ma'am.
14   Q.  What is it, in your own words?
15   A.  It looks like a piece of paper with my
16  handwriting.
17   Q.  Do you recall when you wrote this?
18   A.  Yes, but I think I've had to rewrite several
19  things several times for different people.  So, yes, it
20  was my rebuttal.
21   Q.  To the position statement of respondent at the
22  time of CitiSteel?
23   A.  Yes.  I assume so.  Like I said, I had to write
24  several things, several times.

Page 307

1    Q.  You had to rewrite this document?
2    A.  I thought I had to write two rebuttals, so --
3    Q.  Two rebuttals to whom?
4    A.  I don't recall.  I don't know.
5    Q.  Would there have been another --
6    A.  I --
7    Q.  Go ahead.
8    A.  I thought from Richards, Layton & Finger as well.
9        I don't know, I am assuming this is from
10  EEOC.  This one here in my hand, Snyder 12.
11   Q.  Yes.  I believe that this was, let's see, this
12  was submitted to the EEOC.  If you see on the very front
13  page there, page 1 of Snyder 12, there is a date stamp at
14  the top where it says "Received EEOC Philadelphia."
15   A.  Okay, yes.
16   Q.  Okay.  Did you write another document similar to
17  this, you think?
18   A.  I thought I may have.  I don't know.  I know this
19  one was 30 some pages.
20   Q.  Do you remember writing another document that
21  would have been 30 pages or more?
22   A.  No, I guess not.
23   Q.  Let's look at the top of page 30.  Snyder
24  Exhibit 12, page 30, also marked as D311.  Let me know

Page 308

1  when you are there.
2    A.  It is marked what?
3    Q.  30.
4    A.  Snyder Exhibit page 030.
5    Q.  Yes.  The first sentence at top it says, "As far
6  as the meeting," could you read that sentence, please?
7    A.  "As far as the meeting on the morning of 4/10/03
8  - the entire meeting I have on tape - when Downie begged
9  me to turn it off - I pretended - I hit the button and
10  immediately hit it again."
11       In other words, to turn it back on.
12       "You can hear him asking me that as well."
13   Q.  Okay.  So you did, in fact, this document does
14  say that you pretended to turn the tape off; is that
15  correct?
16   A.  Well, I, like it also says, I did hit it, I
17  turned it off, but then I turned it right back on.
18   Q.  Does it say you pretended to turn it off?
19   A.  Yes.
20   Q.  Okay.  I just thought that might help since you
21  cannot recall.
22   A.  Thank you.  It did very much.
23   Q.  Let's go to page 17 on the same exhibit.  There
24  is some discussion there by you regarding the tapes and

Page 309

1  diary, and Mr. Downie's request for you to produce those
2  tapes and diaries.  Why don't you have a look at that and
3  then we can talk about it.
4    A.  Yes.
5    Q.  Does this help you recollect this time period?
6    A.  Yes.  I said that earlier.  I offered to run down
7  to my mom's, mm-hmm.
8    Q.  And then at the bottom, almost the very bottom of
9  the page there is a Bates stamp there that says 298 on
10  the right-hand side.  Do you see that?
11   A.  D298, yes.
12   Q.  The sentence right above that it says, "On my way
13  back - she informed me Downie called 3 times looking for
14  me from 3 different extensions," maybe.
15   A.  Oh, okay.  Yes, ma'am.
16   Q.  And then the next sentence reads what starting "I
17  called"?
18   A.  "I called," is that where you want me to
19  begin?
20   Q.  Yes, please.
21   A.  "I called him and he said, 'If you want bring
22  your evidence (tapes) to me tomorrow morning, which prior
23  to finally leaving on 4/9, before coming there, EEOC, he
24  also begged me not to come to work until 8:00 a.m., to

16 (Pages 306 to 309)

Snyder                                              v.                        Citi Steel, USA, Inc.
Terry L. Snyder, Volume 2          C.A. # 04-970-JJF                          June 6, 2006

Page 310

1  come directly to HR," I thought I met with him first
2  thing in the morning.
3      Q.   I mean, the time frame is not necessarily
4  relevant, but as far as him asking you to or, I'm sorry,
5  not asking you but saying, "If you want to bring your
6  evidence (tapes) to me tomorrow morning," is that what
7  you recall him saying to you on the phone that evening?
8      A.   Yes. And you know what, also, I apologize. I
9  also recall him saying he doesn't get there that early.
10 That's correct. So I am wrong.
11     Q.   Okay. That's fine. So at that time, now seeing
12 this, maybe it does in fact help you recollect --
13     A.   Yes.
14     Q.   -- do you recall what your response was to him at
15 that time? When he said, "If you want to bring your
16 evidence (tapes) to me tomorrow morning," do you recall
17 what your response was to him at that time?
18     A.   No, I don't.
19     Q.   Do you recall what your thinking was at that
20 time, whether you would, in fact, bring the tapes?
21     A.   No. I didn't really, truthfully didn't want to
22 tape them the way they were behaving without my father
23 being there. So...
24     Q.   Okay. And then as far as the EEOC goes, when was

Page 311

1  the first time you told the EEOC about the tapes? Was
2  that the 29th, did you testify?
3      A.   Well, I probably told them on the 9th.
4      Q.   You probably told them first on the 9th and then
5  actually let them listen to the tapes later?
6      A.   Yes.
7      Q.   What was the circumstances of playing the tapes
8  back for them? Were you at the EEOC at that time?
9      A.   Yes.
10     Q.   Who were you with? Who was present at that time?
11     A.   Miss Wjasow.
12     Q.   Anyone else in the room?
13     A.   No.
14     Q.   Did she ask you to bring the tapes?
15     A.   I assume. I can't remember.
16     Q.   And you had no problem producing the tapes to her
17 and letting her listen to them?
18     A.   I played them for her. Yes.
19     Q.   Under protest, or you were willing to do that?
20     A.   No, no. I was willing.
21     Q.   At the meeting on the 10th with Mr. Downie, did
22 Mr. Downie tell you he did not believe your allegations?
23     A.   No.
24     Q.   Did he tell you that he believed Harris?

Page 312

1      A.   I don't think he really said anything about that.
2      Q.   Did he ever tell you that he didn't believe you?
3      A.   No, he never said he didn't believe me.
4      Q.   The day before, on the 9th, did he say he was
5  giving you the benefit of the doubt or he did believe
6  you, something to that effect?
7      A.   He was giving me the benefit of the doubt in the
8  beginning. On the 8th he slammed his hand on the desk
9  and said, "He better, he better admit this, admit to
10 this."
11     Q.   Mr. Harris should admit to it?
12     A.   Yes.
13     Q.   And Mr. Downie was the one who slammed his hand
14 down?
15     A.   Yes.
16     Q.   On page 14 of this Snyder 12, at the very bottom
17 of the page there is a bullet and it says in capital
18 letters, you wrote the word "True," T-R-U-E, do you see
19 that?
20     A.   Yes.
21     Q.   What follows that?
22     A.   "I yelled - I cursed - and the one time I punched
23 at his hand after squeezing me."
24     Q.   And do you know what this is referring to?

Page 313

1      A.   I guess when I hit him.
2      Q.   When you hit Mr. Harris?
3      A.   Yes. The way I did this -- sorry for
4  interrupting -- was I, like the package from EEOC --
5      Q.   The position statement?
6      A.   Yes. So I would just, see, because you can't see
7  the question, so then I would just write in the answer,
8  so yes.
9      Q.   We can actually do that in a little more detail
10 after the break, but when you said that, yelled and
11 cursed and punched, could that have been during the
12 meeting on the 9th, did you yell?
13     A.   Mr. Harris?
14     Q.   No, no. Did you yell and curse and punch during
15 the meeting on the 9th?
16     A.   No. Harris wasn't there. By the time they
17 called me down Harris was down.
18     Q.   I don't mean did you punch Mr. Harris at that
19 time. We did talk about that. But this is a separate
20 incident without Mr. Harris. Were you upset at the
21 meeting on the 9th?
22     A.   Well, how could I punch Mr. Harris if he wasn't
23 there? I'm not following you.
24     Q.   Okay. I understand. I'm not asking you if you

17 (Pages 310 to 313)

Snyder                                      v.                        Citi Steel, USA, Inc.
Terry L. Snyder, Volume 2              C.A. # 04-970-JJF                      June 6, 2006

Page 314

1   punched Mr. Harris. We are talking about a separate
2   incident. Let me break it out into little pieces so we
3   are on the same page. You yelled and cursed and punched
4   Mr. Harris on one occasion; is that correct?
5       **A. Yes.**
6       Q. Okay. Now, putting that occasion aside, now we
7   are at the meeting on April 9th, on Wednesday. Did you
8   yell or curse at that meeting?
9       **A. No.**
10      Q. No?
11      **A. No.**
12      Q. Slam your hands on the table during that meeting?
13      **A. No. Mr. Downie slammed, punched the table on the**
14  **8th.**
15      Q. But during the meeting on the 9th, you weren't
16  physically upset; is that right?
17      **A. No.**
18      Q. What about the meeting on the 10th?
19      **A. No.**
20      Q. You weren't physically upset there?
21      **A. No.**
22      Q. Yelling?
23      **A. No.**
24      Q. Cursing?

Page 316

1   here.
2       Q. Was that a consideration for you?
3       **A. No, not at all.**
4       Q. Because why?
5       **A. Because I didn't want to move. I did nothing.**
6       Q. Are there any witnesses to your allegations
7   regarding Mr. Harris' behavior?
8       **A. Of course not.**
9       Q. Did you ever give Mr. Downie any evidence other
10  than your verbal word to support your allegations against
11  Mr. Harris?
12      **A. No.**
13      Q. What was Mr. Harris' reputation at CitiSteel?
14      **A. Like did people like him or not?**
15      Q. Yes.
16      **A. I guess some of the employees didn't like him.**
17  **But, you know, he just --**
18      Q. Did people think he was honest?
19      **A. I don't what people really thought about him.**
20  **You know, a lot of people don't like their job and a lot**
21  **of people complain about their boss. But sometimes**
22  **bosses are just trying to be a boss and trying to get the**
23  **production for the company done. So I guess it depends**
24  **on the individual and how they look at it.**

Page 315

1       **A. No.**
2       Q. Physically violent?
3       **A. No.**
4           MS. DIBIANCA: Let's take a break.
5           (Recess taken.)
6   BY MS. DIBIANCA:
7       Q. We are going to go back on the record. During
8   the break did you discuss this deposition or the case
9   with your attorney?
10      **A. No, ma'am.**
11      Q. Snyder Exhibit 12, the written statement you
12  submitted to the EEOC, is this statement honest?
13      **A. Yes.**
14      Q. If you were under oath at the time that you wrote
15  this statement would it have been any different?
16      **A. No.**
17      Q. Would you stand by this statement today?
18      **A. Yes, ma'am.**
19      Q. Would the transfer have affected your salary?
20      **A. I don't know. I didn't care. I wasn't**
21  **transferring.**
22      Q. Was that ever discussed with you?
23      **A. I don't know. I don't know if he mentioned it or**
24  **not. I'm sure he did. Maybe he did. It is probably in**

Page 317

1       Q. Did you tell Mr. Harris that he was one of the
2   nicest bosses ever?
3       **A. Maybe in the beginning.**
4       Q. At any time?
5       **A. I don't remember.**
6       Q. Would you have told him that?
7       **A. I don't remember.**
8       Q. Did you think that?
9       **A. Well, in the beginning, aren't all bosses nice?**
10      Q. I'm asking you a question, ma'am. I'm going to
11  ask that you answer it.
12      **A. I don't remember.**
13      Q. You don't remember?
14      **A. No.**
15      Q. Okay. If you will look at page 33 of Snyder
16  Exhibit 12, maybe that will help you refresh your
17  recollection.
18          MS. BREWINGTON: Page 33?
19          MS. DIBIANCA: 33, also marked as D314.
20  BY MS. DIBIANCA:
21      Q. The first sentence at the top of the page, ma'am,
22  what does that say?
23      **A. Ford?**
24      Q. Mm-hmm.

18 (Pages 314 to 317)

Snyder                                    v.                    Citi Steel, USA, Inc.
Terry L. Snyder, Volume 2        C.A. # 04-970-JJF                      June 6, 2006

Page 318

1    A. Do you want me to say his first name or just

2  read?

3    Q. You can read the thing and then you can explain.

4    A. "Ford was one of the nicest bosses ever - At one

5  time," in a parenthesis, "(soon after employment," EMP,

6  period, "I felt the same about Harris - but his

7  disgusting unprofessional behavior towards me changed

8  that."

9    Q. When did you stop thinking that Mr. Harris was

10  one of the nicest bosses ever?

11    A. I guess when he started bothering me.

12    Q. Do you have an idea when?

13    A. I guess when he started turning my stomach.

14  2002, actually I guess.

15    Q. At the meeting on the 10th or on the 9th, if I

16  have the date wrong, did Mr. Downie tell you that he had

17  instructed Mr. Harris to never look at or speak to you

18  again?

19    A. Yes.

20    Q. He did. And could you elaborate on that for me a

21  little bit?

22    A. That's what he told me.

23    Q. Did he say why?

24    A. No. I don't recall.

Page 319

1    Q. Okay. So I just want to —

2    A. I assume it is because he believed me.

3    Q. Okay. Would it have been for your protection?

4    A. I would think so.

5    Q. Did that make you feel more comfortable in the

6  work place or less comfortable in the work place?

7    A. What, him telling me that he told Randolph not to

8  look at me or speak to me ever again?

9    Q. Right.

10    A. Yes, and at the same time he wants to ship me to

11  shipping though. So...

12    Q. Did you think that that was not an improvement

13  for Mr. Harris, who you had alleged had harassed you, was

14  not to have contact with you, was that an improvement?

15    A. I think shipping him to shipping would have kept

16  him far away from me, like they were going to try to do

17  to me.

18    Q. Well, did you tell Mr. Downie that?

19    A. I told him I did not want to go to shipping. I

20  told him I wanted to go back to my office and do my job,

21  yes, I did.

22    Q. And did you tell him that, did you tell Mr.

23  Downie that Mr. Harris should be moved to shipping?

24    A. Yes.

Page 320

1    Q. You did?

2    A. Yes.

3      MS. DIBIANCA: Let's do D40 as Exhibit 13.

4      (Discussion off the record.)

5      MS. DIBIANCA: We will move forward. Let

6  her check it out. Come back to it if we need to. Let me

7  just mark my place in my notes.

8      (Discussion off the record.)

9  BY MS. DIBIANCA:

10    Q. Now, you testified that you wanted Mr. Harris to

11  be shipped to shipping, correct, transferred to shipping?

12    A. Yes.

13    Q. And you told Mr. Downie that, correct?

14    A. Yes.

15    Q. And did you want him to be fired?

16    A. No.

17    Q. What if Mr. Downie had told you that that was the

18  only option, Mr. Harris could be fired or you could be

19  transferred?

20      MS. BREWINGTON: Objection. Calls for

21  speculation. You can answer.

22    A. Well, so be it.

23    Q. What would you have chosen?

24    A. Him being fired.

Page 321

1    Q. Okay.

2    A. I still wouldn't have took the transfer.

3    Q. Okay. What was your attitude like towards Mr.

4  Harris?

5    A. It was nice. I mean, I treat people the way they

6  treat me.

7    Q. Okay.

8    A. Until the time went on, people started to act

9  different and do different things so that's going to make

10  you react different to them, and it is going to make your

11  attitude towards them change.

12    Q. When did your attitude towards him change?

13    A. Well, 2002, you know, it got worse.

14    Q. Tell me about it.

15    A. Well, even from the very beginning, which I

16  didn't think nothing of it, he had me do personal things

17  for him such as I guess his homework. I got his report

18  home on my computer from November 2001.

19      I sat at home and did a whole report for him

20  on my personal computer. He even had me do it during

21  work hours.

22    Q. So that would have been —

23      MS. BREWINGTON: Wait. Can she finish her

24  answer?

19 (Pages 318 to 321)

Page 322

1          MS. DIBIANCA: She can, she can. She is
2    actually not being responsive to my question.
3          MS. BREWINGTON: Oh, okay.
4    BY MS. DIBIANCA:
5      Q.  My question just is: When did your attitude
6    become means towards him?
7      A.  When he started staring, talking nasty and
8    grabbing at me.
9      Q.  When was that?
10     A.  It got worse 2002. It was little things here and
11   there. I want to take you out. And then he started
12   asking me about the weekends and things like that. And I
13   just, I started not telling him that I went away.
14         As time went on. There is the answer. I,
15   my attitude just continued to change. I would still do
16   what I was told as an employee. I couldn't stand him.
17     Q.  What was the change in attitude? How would you
18   have characterized your attitude after the change?
19     A.  I couldn't stand him.
20     Q.  But your attitude towards him?
21     A.  My attitude towards him, my behavior towards him
22   as long as he stayed professional was fine. But, you
23   know, behind closed doors or when he would say something
24   nasty or stand there and give me that stare, no, my

Page 323

1    attitude wasn't fine. It was hateful.
2      Q.  How did you express this hate?
3      A.  Well, which point? When I hit him?
4      Q.  That was one example which you gave. What else
5    would there have been?
6      A.  Just telling him to get out of my office. Picked
7    up a bag of cough drops -- I was sick. And he just stood
8    there for like, I don't know, 20 minutes eating them, one
9    after another. And just I picked up the bag of cough
10   drops and I slammed them down on my desk and I said,
11   "Just take them all. Get out." I mean, like that type
12   of disposition. You know, he was just standing there
13   staring at me, eating cough drop after cough drop. How
14   pretty you are, you know, so it is going to make you not
15   like somebody.
16     Q.  So him having the cough drops, was that sexual
17   harassment?
18     A.  Standing there staring at me, telling me how
19   pretty I am, and his little chuckles and giggles.
20     Q.  Is that a yes?
21     A.  I think that's part of it, yes, because I knew
22   him and I knew what he was doing.
23     Q.  So let's clarify which part of the cough drop
24   incident was, in fact, sexual harassment in your opinion.

Page 324

1      A.  It was him standing there staring at me.
2      Q.  While he ate the cough drops? I'm sorry. I'm
3    sorry.
4      A.  And he was standing there, and then he would --
5    then he even came back later in the day, why not go two
6    doors down to your office and use your phone, and just
7    standing there staring at me, looking me up and down and
8    telling me how pretty I am.
9      Q.  So the staring was the part that you felt was
10   harassment?
11     A.  Not just staring. Like staring. If you look at
12   me I'll show you like a look.
13     Q.  I want to get it on the record, so it is going to
14   be hard for us to get on the record --
15     A.  You can take my picture along with my voice then,
16   if you would like.
17     Q.  Okay.
18     A.  That way you can have the look.
19     Q.  You can certainly look at me with the look. That
20   doesn't bother me one bit. However, what I would like to
21   get is get your words on the record.
22     A.  I'm trying to give you an example.
23     Q.  On the record, words on the record --
24     A.  A nasty look.

Page 325

1      Q.  A nasty look. Okay.
2      A.  Not a mean nasty. A nasty.
3      Q.  Okay.
4          MS. BREWINGTON: Can I ask her to describe
5    what she means? Will that help?
6          MS. DIBIANCA: If nasty is the description
7    that you want to stick with, that's fine. I'm
8    comfortable with that. I just wanted an adjective.
9          MS. BREWINGTON: Okay.
10   BY MS. DIBIANCA:
11     Q.  And was this one of the more serious allegations
12   of harassment?
13     A.  Well, I think that's more of the least.
14     Q.  Okay.
15     A.  But I think, you know, if you stand there and
16   stare at somebody all that time, eat umpteen cough drops
17   over and over, standing there staring at them with that
18   look, as your employee, I'm not going to be able to
19   concentrate and perform my job duties as I normally
20   would.
21     Q.  How long was he in your office with the cough
22   drops?
23     A.  20 minutes.
24     Q.  All right.

B- 0233

20 (Pages 322 to 325)

Snyder                                    v.                            Citi Steel, USA, Inc.
Terry L. Snyder, Volume 2         C.A. # 04-970-JJF                        June 6, 2006

Page 326

1    A.  Maybe a little longer.  Give or take.
2    Q.  Let's look at page 11 of Snyder 12, identified as
3    D292.  If you could just read the first paragraph down to
4    the first bullet point.
5    A.  At the very tippy top.
6    Q.  Yes.
7    A.  "Maybe compared to all of Harris," I think I
8    forgot an S, should have been Harris's, "actions I have
9    been dealing with - the cough drops weren't as serious.
10   And yes he did come into my office later - picked up my
11   phone," and in a parenthesis, "(why not walk 2 doors down
12   and use your own phone) and said pretty woman - he didn't
13   need to use any phone -  he is a fake and a horrible man.
14   I looked up at him and he said not you - I said nothing"
15   -- oh, yes, I remember.  When he picked up the phone.
16   Q.  Let's finish reading first, please.  I'm sorry.
17   A.  "He said not you - I said nothing but asked
18   myself then who in the F were you directing" --
19   Q.  Please read the words.
20   A.  "Who in the fuck were you directing that at - no
21   one else was around and if so it was only men up there -
22   but he never would make a comment or attempt to touch me
23   in front of anyone of course - why would."  Should have
24   been he, "ask the workers how Harris was in my office too

Page 327

1    much."
2    Q.  Okay.  So did you tell Mr. Harris then who in the
3    fuck were you directing that at?
4    A.  No, I said it to myself, if you read that.
5    Q.  Okay.
6    A.  I asked myself that.  When he picked up the
7    phone, there was nobody on the phone.  He was just
8    standing there with the phone up to his ear staring at
9    me, and then I heard him say "pretty woman" and I looked
10   up at him and he said, "Oh, I'm not talking to you."
11   Q.  Okay.
12   A.  I asked myself that, as you see.  See where it
13   says that in that paragraph.
14   Q.  Yes.
15   A.  I asked myself.  "I said nothing but asked myself
16   then who in the fuck were you directing it to."
17   Q.  Yes, okay.  So do you think there was no one on
18   the other end of the phone?  Is that what you understand?
19   A.  He never talked to nobody.
20   Q.  Did you understand that there was, did you
21   believe there was no one at the other end of the phone?
22   A.  Yes, I do believe that.
23   MS. DIBIANCA:  Let's do this as Snyder 13.
24   (Snyder Deposition Exhibit 13 was marked for

Page 328

1    identification.)
2    BY MS. DIBIANCA:
3    Q.  Now, I'm going to represent to you that what this
4    is is pieces of the transcript from your Department of
5    Labor unemployment insurance appeal.  This is not the
6    entire transcript, just parts I'm going to reference,
7    only because it is such a big transcript to copy.  But we
8    do have the full version here if you need it.  This is
9    Snyder 13.
10        Let's go to page 18, which is D58.  It is
11   the first actually page past the cover.
12        Do you recall attending the appeal, the
13   unemployment insurance appeal?
14   A.  Yes.
15   Q.  Who else was there?
16   A.  John LaRosa.
17   Q.  Who is that?
18   A.  That was -- I guess Neuberger was the lawyer.
19   Mr. LaRosa was assistant or lawyer as well.  I guess
20   Neuberger owned the firm.  He is the one -- I don't know
21   how it works.  I don't know.
22   Q.  Was Mr. Neuberger -- I'm sorry -- Mr. LaRosa
23   representing you at this time?
24   A.  Yes.

Page 329

1    Q.  Who else was there other than yourself and Mr.
2    LaRosa?
3    A.  Jennifer, I can't remember her last name.
4    Q.  Was she the attorney representing CitiSteel at
5    the time?
6    A.  Yes.
7    Q.  Who else?
8    A.  The arbitrator or referee, I guess as you call
9    it.
10   Q.  Anybody else?
11   A.  No.  Jerry Downie didn't show up.  And the
12   referee said, "Oh, as always."
13   Q.  Okay.  Line 7 Mr. LaRosa says, "Would there,
14   would there be any change in pay with this transfer?"
15        Do you see that?
16   A.  Yes, ma'am.
17   Q.  What did you respond?
18   A.  What do you mean?
19   Q.  I'm sorry.  That's probably not clear.  What do
20   you recall Mr. LaRosa was talking about at the time when
21   he says "with this transfer"?
22   A.  I assume he was asking me if there would have
23   been a change of pay in my transfer.
24   Q.  To the shipping department?

21 (Pages 326 to 329)

Page 330

1　A.　Yes.

2　Q.　And what was your response, line 10?

3　A.　"When he first said that he" -- you want me to

4　continue on to 11, 12, read the whole thing?

5　Q.　That would be great.

6　A.　"When he first said that he wants me to transfer

7　basically he didn't say anything as far as hours or

8　anything. He said that, he said your salary will remain

9　the same. Basically that's all he said about the job.

10　He went straight to money you know."

11　Q.　And then at line 17 the referee asks you a

12　question. Could you read 17, 18 and 19?

13　A.　What was the question?

14　Q.　The referee starts at 17, if you could read that.

15　A.　"So he said basically your salary would be, will

16　remain the same; is that correct?"

17　Q.　And then your response was?

18　A.　"Yeah, that's all he said about it."

19　Q.　So does that help you reflect --

20　A.　Yes, it does very much. You are very helpful.

21　Appreciate it.

22　Q.　What would be helpful is if I could finish my

23　questions and then you can answer. So I'll say it again

24　just for the record. Does that help you recollect the

Page 331

1　meeting?

2　A.　Yes, ma'am, very much.

3　Q.　Now, do you recall whether Mr. Downie talked to

4　you about whether there would be salary change if you

5　transferred to shipping?

6　A.　Yes, ma'am, very much.

7　Q.　Could you tell us about that?

8　A.　Tell you what?

9　Q.　Did Mr. Downie say that there would be no change

10　in your salary if you transferred to shipping?

11　A.　No. I guess he did say it would remain the same.

12　But I don't think I cared.

13　Q.　Okay. And then on the next page, which is 102,

14　D102, it is referenced on the transcript as page 62,

15　though, line 2, you are responding there. Could you read

16　that?

17　A.　Okay. Well, whatever I'm responding to --

18　Q.　I can look it up if it is not clear after we read

19　it.

20　A.　If you want me to read what it says then I will

21　do so.

22　Q.　Okay.

23　A.　Line 2, from Terry Snyder, I reply to whatever

24　question or whatever was said to me, my statement reads,

Page 332

1　"I figured they would transfer or take some type of

2　behavior action against that man because I didn't do

3　nothing wrong."

4　Q.　And then Miss Jauffret asks, "Did they ever, did

5　you ever tell CitiSteel what you wanted done to Mr.

6　Harris?"

7　And what was your response to Miss Jauffret?

8　A.　It says, I responded, "No, once they tried to

9　make me move without telling me why. I said why use? I

10　said transfer him. Why should I transfer me."

11　I think there is a typo there.

12　Q.　Transcripts, they read really difficult.

13　When was the first time after you left

14　CitiSteel, which would have been April 10th, I believe,

15　okay, when was the first time you sought other

16　employment?

17　A.　I guess it was within a week or two, even though

18　I didn't -- I was upset. I kind of like trapped myself

19　in the house a little bit. But then at the same time,

20　you know, I needed a job and I wanted to start, you know.

21　So maybe a week or two.

22　Q.　Where did you first seek employment?

23　A.　I don't recall. I have all the faxes.

24　Q.　Did you bring any documents with you today?

Page 333

1　A.　No, I didn't.

2　Q.　The faxes, have you produced any of those?

3　A.　No.

4　Q.　Why not?

5　A.　Well, when you want them you just say so and I'll

6　give them to you, copies of them.

7　Q.　Have you turned them over to your attorney at

8　this point or you are the only person that has them?

9　A.　I still have them.

10　MS. DIBIANCA:　Let's go off the record for

11　one second.

12　(Discussion off the record.)

13　MS. DIBIANCA:　We are on the record and we

14　are discussing what documents need to still be produced.

15　MS. BREWINGTON:　Yes.

16　MS. DIBIANCA:　Lori, what is out there?

17　MS. BREWINGTON:　After speaking with Miss

18　Snyder, we will be producing documents regarding her job

19　search, specifically faxes.

20　In addition, we will be producing receipts

21　from Cynthia Wright and other medical providers for the

22　past ten years.

23　Pay stubs from previous employers within the

24　past ten years have already been provided. All those in

22 (Pages 330 to 333)

Snyder                                          v.                    Citi Steel, USA, Inc.
Terry L. Snyder, Volume 2            C.A. # 04-970-JJF                        June 6, 2006

Page 334

1   her possession have been produced.
2          All documents in her possession concerning
3   schools and/or training institutes, including Dawn
4   Institute and American Driving Academy have been
5   produced.
6          Or you don't have them?  Is that what you
7   are saying?
8          THE WITNESS:  No, but I'll sign.
9          MS. BREWINGTON:  Miss Snyder does not have
10  in her possession a benefits package from the Skelly
11  Group.  If she is to obtain that she will produce that.
12         And in terms of the IRS form, once we
13  receive the form from defense we will sign it today so
14  that you guys can get that.
15         So we have agreed to allow Miss Snyder to be
16  redeposed with respect to the additional documents that
17  we will produce.
18         MS. DIBIANCA:  That's agreeable to CitiSteel
19  as well.
20         MS. BREWINGTON:  Okay.
21  BY MS. DIBIANCA:
22     Q.  We are back at job search.  So the first time you
23  sought employment after CitiSteel was when?
24     A.  I do recall, I actually called -- the first thing

Page 335

1   I did was call Bernard Personnel up again, and she had me
2   come in and re-register.  I informed her that I needed a
3   job again.
4      Q.  I'm sorry, I just didn't hear you.
5      A.  I informed her I needed a job again because the
6   first -- his name is Barney.  He is the one that got me
7   the job or sent me to CitiSteel originally, back in 2001.
8   When I re-registered I called the other office and spoke
9   with a Vicky Collins.  So I re-registered with her.
10     Q.  When was that?
11     A.  The end of April.  I'm not exactly sure.  She has
12  that documented.  She had me come in.  I don't know when
13  I made the phone call, but she had me come in soon after
14  the phone call and I had to refill out forms and stuff,
15  so they have a file on me.  So they could tell you the
16  exact time and date.
17     Q.  And then did you get employment through them?
18  Did they find you work, Bernard?
19     A.  I can't recall.  I don't think so.  I kept
20  calling her.
21     Q.  To follow up?
22     A.  Yes.
23     Q.  And what was her name?
24     A.  Vicky Collins.

Page 336

1      Q.  C-O-L-L-I-N-S?
2      A.  I-N-S, yes.
3      Q.  And the other person that you worked with was
4   Bernie?
5      A.  Barney.
6      Q.  Barney.
7      A.  Well, he is the one, he got me the job originally
8   -- well, he sent me to CitiSteel, because CitiSteel was
9   still using Lotus programs before they started
10  transferring over to Excel, like all the other companies,
11  and so he originally sent me to CitiSteel.  Barney did.
12     Q.  When was the first time you started to work?
13     A.  I don't recall.  I can look at pay stubs.
14     Q.  Well, you have testified or my understanding is
15  that you don't have all the pay stubs; is that correct?
16     A.  No, submitted all the pay stubs.
17     Q.  That you had?
18     A.  Yes.
19     Q.  The pay stubs that you submitted, were they for
20  every place that you worked subsequent to CitiSteel,
21  after CitiSteel?
22     A.  Yes.
23     Q.  So if I don't have --
24     A.  As far as --

Page 337

1      Q.  I'm sorry to interrupt.  If pay stubs have not
2   been produced, they don't exist; is that correct?
3      A.  I should think not.  I usually always kept them
4   in -- if you go in Staples and you see one of them little
5   file boxes, some people use them as recipe things such
6   as, I would put them all in there.  So everything that
7   was in there is what I handed over.
8      Q.  Okay.  So just to be clear -- I'm sorry if this
9   is repetitive -- all, every place that you worked after
10  CitiSteel, up until let's say at least 2005, I don't want
11  to say until today, but until 2005, you kept all
12  the pay stubs for that and have produced them; is that
13  correct?
14     A.  Yes.  I hope I produced them.
15     Q.  Well, that's what I'm asking.
16     A.  I'm pretty sure I did.
17     Q.  I mean, I do recall seeing some documents from
18  Bernard Personnel.  I don't know if that was before
19  CitiSteel, like the first when you became a temp maybe at
20  CitiSteel or after.  But they were in there.  There were
21  some.
22     A.  I know I did do a job for them afterwards also.
23     Q.  What was that one?
24     A.  I hate to say this, but I do not remember.

23 (Pages 334 to 337)

Snyder                                                    v.                         Citi Steel, USA, Inc.
Terry L. Snyder, Volume 2              C.A. # 04-970-JJF                              June 6, 2006

Page 338

1    Q.  Do you remember where you had to drive to get to
2  it?
3    A.  Oh, wait.  One of them was FEMA, the storm.  It
4  was from November to December of -- I don't recall what
5  year.  I had to drive down to Continental Drive, right
6  near Christiana Hospital.
7    Q.  And that was a job through Bernard?
8    A.  Yes.  Because those pay stubs I would -- those
9  paychecks I picked up over off of Kirkwood Highway, which
10  is where she is located.  Barney is located at 4th and
11  Greenhill.  Different office sites.
12    Q.  Any other jobs you can remember after CitiSteel
13  other than the one with Skelly?
14    A.  Just temporary positions.  I was accepting
15  anything I could get actually.
16    Q.  Were they all through Bernard?
17    A.  No.
18    Q.  What other temporary agencies did you use?
19    A.  I don't -- I think one -- I cannot remember.  I
20  think one was called the Franklin Company.
21    Q.  Franklin, is that right?
22    A.  Yes.
23    Q.  Where was that located?
24    A.  Can't we look on the pay stubs for all this?

Page 339

1  Since I produced the pay stubs, can't we just look on the
2  pay stubs?  Wouldn't that make more sense?
3    Q.  Well, I don't know if I have all of them here,
4  but I can see what I do have.  I would like you to
5  recall.
6    A.  Well, they are probably better than me sitting
7  here recalling and trying to sit here and count back
8  every moment of every day of every year.
9    Q.  Well, instead of doing that what I would like you
10  to do is give me any information that you have, not
11  necessarily every moment of every year, but any places
12  that you worked.  Is that more reasonable?
13    A.  Hercules, the Franklin Company.
14    Q.  How long were you at Hercules?  Was that a
15  temporary?
16    A.  It was like two weeks, I think.
17    Q.  Was it through a temp agency?
18    A.  I think I would rather say I don't recall or I
19  don't remember instead of somebody trying to turn it
20  around, you know.  Because if you don't answer properly,
21  what happens?  You know, what does that get turned into?
22  So if I don't have the proper and correct information for
23  you and can't remember every little date, time and detail
24  then, you know, I just can't recall.  So that's the

Page 340

1  answer.
2    Q.  I agree, if you do not have a recollection of the
3  information, I do not want you to speculate.
4    A.  But I told you, you are more than welcome to
5  whatever you can get your hands on.
6    Q.  So between the time you left CitiSteel on April
7  10th, 2004, and the time that you started testing for the
8  truck driving school in late 2005, at this point you have
9  testified that you were employed at Bernard Personnel,
10  Franklin Company and perhaps Hercules.  At this time do
11  you recall any other places that you have worked?
12    A.  I flagged.  Construction company.
13    Q.  A construction company?
14    A.  Yes.
15    Q.  Do you recall the name of that?
16    A.  Excuse me.  May I, am I allowed to ask a
17  question?
18    Q.  No.
19    A.  Well, don't you have copies of the pay stubs?
20    Q.  Ma'am, I'm just asking you --
21    A.  But you asked me this last week also.  It is
22  called the American Flag I think.
23    Q.  Yes, that --
24    A.  American Flaggers.

Page 341

1    Q.  And that's perfectly sufficient.  That's quite
2  enough.  You are giving me enough information, so long as
3  you explain that.  Is the construction company the same
4  thing as the American Flagging Company or were they
5  separate employers?
6    A.  The same.
7    Q.  Any other employers?
8    A.  Accounting clerk.
9    Q.  Was that through a temporary agency?
10    A.  Yes.
11    Q.  Do you recall which one?
12    A.  I can't remember the name.
13    Q.  A different one than Bernard?
14    A.  Yes.
15    Q.  Any other employers?
16    A.  I do not recall, ma'am.
17    Q.  Have you ever sought medical treatment for your
18  inability to recall?
19    A.  No, not at all.
20    Q.  Have you ever taken any medication for your
21  inability to recall?
22    A.  No.
23    Q.  Are there any people who could help you recall
24  this information?

24 (Pages 338 to 341)

Snyder                                    v.                    Citi Steel, USA, Inc.
Terry L. Snyder, Volume 2        C.A. # 04-970-JJF                    June 6, 2006

Page 342

1    A. No. Once I start looking at something, you know,
2    it all comes back to you. Just like a diary, if you flip
3    open a diary and you read a sentence out of it you can
4    remember almost the whole entire day.
5        You know, I don't -- I just think
6    everybody's ability is different in many ways such as
7    remembering every single little thing.
8    Q. Just to be clear, I'm asking about the 2003 to
9    2005 period. Is that what your understanding has been
10   thus far?
11   A. No. Actually I think I have been asked questions
12   that happened 20 -- when I was 16 and 17 years old also,
13   so --
14   Q. Relating to the job search?
15   A. No, no. Just questions, digging 20 years ago,
16   what does that have --
17   Q. So for these purposes I am asking you about the
18   limited period from 2003 to 2005. Do you understand that
19   going forward?
20   A. I will now.
21   Q. Okay. And are you unable to recall for this
22   limited period any additional employers?
23   A. I gave you the pay stubs that I have. As far as
24   remembering right now at this moment, tip of my tongue,

Page 343

1    no, I do not.
2    Q. And that is my question. Have you ever sought
3    medical treatment for the inability to recall the last
4    three years of your employment?
5    A. No.
6    Q. Have you taken any medication for your inability
7    to recall the last three years of your employment?
8        MS. BREWINGTON: Objection, asked and
9    answered.
10   A. I already answered that.
11   Q. Actually, she didn't. She testified she believed
12   that was for the period going back 20 years, so I just
13   want to restate.
14   A. We ought to hit rewind on that because I did
15   answer that. I said no, no, I have never sought
16   treatment. No, I have never taken medication for my
17   ability to remember. It is on there.
18   Q. Okay. And is there any people who would help you
19   be able to recall the period from 2003 to 2005 of your
20   employment?
21   A. No.
22   Q. Any documents that would help you recall the
23   period of your employment from 2003 to 2005?
24   A. Show me a pay stub that I do not have in my

Page 344

1    possession, sure, maybe that would help me recall.
2    Q. Any documents that you know exist?
3    A. No.
4    Q. Okay. Let's jump over to the tapes. We have
5    talked a lot about the tapes. Can you describe them for
6    me? When were they recorded?
7    A. A couple different dates. January and then
8    April.
9    Q. Of what year?
10   A. 2003.
11   Q. 2003?
12   A. Yes.
13   Q. How many tapes are there? That's not very clear.
14   Not how many physical tapes but how many different
15   conversations were recorded?
16   A. Three? I'm asking you.
17   Q. I don't know. If you don't recall, that's okay.
18   A. I think it is three.
19   Q. Okay. Who were the conversations between?
20   A. One Randolph Harris. And then two, Jerry Downie.
21   Q. Two with Jerry Downie?
22   A. Yes.
23   Q. One tape with Randolph Harris or one conversation
24   I mean?

Page 345

1    A. Yes, I think, yes.
2    Q. What are on those tapes that support your
3    allegations?
4    A. Which one?
5    Q. Any of them?
6    A. Which tape would you like to know?
7    Q. Any of them.
8    A. The one of Randolph harassing me?
9    Q. Okay. That would be fine, if you think that
10   there is one tape that describes, that demonstrates Mr.
11   Harris, supports your claim that Mr. Harris harassed you.
12   A. Asked me to come to work wearing a dress with no
13   panties.
14   Q. I want to go slow because this is very important.
15   A. Okay.
16   Q. There is a tape of Mr. Harris asking you? Go
17   ahead.
18   A. Him saying, "Shhh. Why are you saying that?"
19   Q. He says S-H-H-H?
20   A. Shhh.
21   Q. Okay.
22   A. Or "Why are you saying that?" He looks around.
23   He admits to being scared.
24   Q. Did Mr. Harris -- I'm sorry. I want to back up

25 (Pages 342 to 345)

Snyder                                      v.                    Citi Steel, USA, Inc.
Terry L. Snyder, Volume 2          C.A. # 04-970-JJF                    June 6, 2006

Page 346

1  for one second. Did he say, did he say the words "dress
2  with no panties"?
3      A. He said it to me three days prior.
4      Q. Okay. So on the tape it is being referenced but
5  it is not --
6      A. I think that's the correct date. But he said
7  that to me on the 7th of January. I brought it up.
8  Whatever date is on the January tape, the first one, I
9  brought it up.
10     Q. Okay. Did he respond when you brought it up on
11 the tape?
12     A. He looked around. He says, "Why are you saying
13 that?"
14     Q. Did he agree that he had said that?
15     A. He asked me why I was saying it. He didn't deny
16 it.
17     Q. Okay. Did he know he was being taped?
18     A. No.
19     Q. What else on that tape is important to your
20 claim?
21     A. Well, him trying to whisper. Well, see, it is a
22 voice-activated recorder. So to you I'm louder, which
23 I'm a naturally loud person anyway. It was right here,
24 on my inside jacket pocket. But he was trying to be

Page 347

1  quiet anyway. But he would come near me. He stood in my
2  doorway and he kept looking up and down the hall. And he
3  had this big long tube in his hand and you could here him
4  tapping it. You can here him laughing at one point,
5  saying he is going to turn his self in, picking up the
6  phone.
7      Q. He is going to turn his self in?
8      A. Yes.
9      Q. For what?
10     A. I guess sexually harassing me.
11     Q. Is that what it says on the tape?
12     A. Yes. He said he didn't -- well, I don't remember
13 exactly word for word. But whatever was being said. And
14 I said, "Well, what about all this time you have been
15 sexually harassing me?" And he said, "I'm sorry, I
16 didn't know you felt that way."
17         I said, "What would you call it?"
18         He even had a class in March. If you all
19 want to call up Del Tech college and look up the class
20 that he had in March, I know exactly -- the reason I know
21 he had a sexual harassment class in March is because he
22 came into my office, grabbed his gentile area and sat up
23 on the table behind my desk, the very next day after the
24 sexual harassment class that he had at Del Tech, and he

Page 348

1  said to me, "You know, I thought about you last night."
2  He said, "I had a sexual harassment class," he said, "and
3  I'm sorry if that's the way I make you feel, or if that's
4  what I have been doing to you."
5          And I said, "You are not sorry because you
6  are going to do it again, just like you have been doing
7  it."
8      Q. Is that on the tape?
9      A. About his class, no. I'm telling you that
10 myself. So if we could put on our list to look up at Del
11 Tech and get permission from Randolph Harris to have him
12 sign a release to get his classes here, like we got to
13 get everything about me, that would be good to add to our
14 list.
15         How would I know he had a sexual harassment
16 class unless he come into my office telling me about the
17 night before?
18     Q. I do want to get back to that, but let's return
19 to the tapes.
20     A. Him not denying it, and him admitting to being
21 scared and feeling guilty.
22     Q. What was he scared for? Did he say?
23     A. Of me.
24     Q. He was scared of you?

Page 349

1      A. Yes.
2      Q. Why? Did he say why?
3      A. I don't recall. You can listen to it.
4      Q. What else? He was scared. What else?
5      A. Guilty.
6      Q. He says he was guilty?
7      A. However he says it, yes.
8      Q. Like a guilty conscience? I'm trying to
9  understand the context.
10     A. Mm-hmm, yes.
11     Q. Did he say on the tape what he had a guilty
12 conscience for?
13     A. I can't recall.
14     Q. Anything else on that tape that supports your
15 claims?
16     A. Well, we can listen to it. I know we can record
17 it on to that.
18     Q. I'm pretty sure we have been through this enough
19 times you know what my response is going to be. I'm
20 asking you for what you recall.
21     A. And I think you know what my response is going to
22 be.
23     Q. What is your response?
24     A. I cannot remember every little single detail and

26 (Pages 346 to 349)

Snyder                                    v.                        Citi Steel, USA, Inc.
Terry L. Snyder, Volume 2         C.A. # 04-970-JJF                        June 6, 2006

Page 350

1  word. So if you give me a document, and then maybe that
2  will trigger my little memory.
3        MS. DIBIANCA: Counsel might want to
4  instruct the witness that cooperation is key in this
5  process.
6        THE WITNESS: I'm cooperating the best of my
7  ability.
8        MS. BREWINGTON: Miss Snyder, just on the
9  record, I want to instruct you to answer the questions
10  that you are being asked to the best of your ability.
11       THE WITNESS: I am. Okay.
12  BY MS. DIBIANCA:
13  Q.  Is there anything else on the first tape that you
14  can recall that would help support your claim of
15  harassment?
16  A.  Just him laughing and not denying about the
17  sexual -- about sexually harassing me, and us -- him
18  whispering or asking me to whisper, shh, however he says
19  it, laughing, picking up the phone.
20  Q.  So anything else on that one?
21  A.  No. I can't recall. No.
22  Q.  So I'm just going to restate them and you tell me
23  if I'm incorrect in any way. This is the list that you
24  gave us today for the first tape which reflects a

Page 351

1  conversation in January.
2  A.  Yes.
3  Q.  One, that he was whispering.
4        I'm sorry, I don't know if I said this.
5  This list is the list you have given us of things on that
6  tape that will support the claims. I don't know if I
7  said that before or not.
8        Okay. Him whispering, Mr. Harris
9  whispering. Mr. Harris laughing. Mr. Harris said he had
10  a guilty conscience. Mr. Harris said he was scared of
11  Miss Snyder. Mr. Harris did not deny it when Miss Snyder
12  stated, the dress with no panties incident, we will say
13  that and keep it broad. He did not deny that when she
14  stated that. And Mr. Harris said he was going to turn
15  himself in. Is that all correct?
16  A.  Yes.
17  Q.  Anything in there you want me to correct?
18  A.  No.
19  Q.  Okay.
20  A.  I don't think so.
21  Q.  Anything else to add to that list?
22  A.  I don't think so at the time.
23  Q.  If you think of something later certainly say at
24  that time.

Page 352

1  A.  Yes.
2  Q.  And then the second tape is what?
3  A.  Jerry Downie.
4  Q.  Do you know the time frame for that?
5  A.  April.
6  Q.  April 2003?
7  A.  Yes, ma'am.
8  Q.  What on that list or what on that tape, rather,
9  supports your claims?
10  A.  Of Jerry Downie trying to make me move?
11  Q.  I don't know. Is that what the conversation is?
12  A.  Yes.
13  Q.  Is this the April 10th meeting?
14  A.  Giving me an ultimatum. Yes.
15  Q.  So this is the one we talked about before?
16  A.  Yes.
17  Q.  Prior, today?
18  A.  Yes.
19  Q.  Where he asked you to turn it off and you did for
20  a moment and then turned it back on?
21  A.  Yes.
22  Q.  Okay. Unless there is something you want to add,
23  I feel like we have covered that meeting enough.
24  A.  Mm-hmm, yes.

Page 353

1  Q.  And then the third tape or third conversation,
2  when did that take place?
3  A.  That was also Jerry Downie.
4  Q.  When was it?
5  A.  I think it was the same day.
6  Q.  Was that in the same meeting, on the 10th?
7  A.  Yes. I think so, yes.
8  Q.  So the only taped conversation that you have of
9  Mr. Harris is one in January 2003; is that correct?
10  A.  Yes.
11  Q.  And the EEOC heard that tape?
12  A.  Yes.
13  Q.  What was Miss Wjasow's response?
14  A.  Whatever, she was just appalled at listening to
15  them. That's what she said to me. She said, "This is
16  appalling."
17  Q.  Okay.
18  A.  But then --
19  Q.  Did you have something else? I'm sorry.
20  A.  When, then it states -- never mind. It is
21  totally irrelevant to your question.
22  Q.  Okay.
23  A.  I'm going to try to do what I'm supposed to do.
24  Q.  Do you remember what the EEOC's finding was in

27 (Pages 350 to 353)

Snyder
Terry L. Snyder, Volume 2

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 6, 2006

Page 354

1  your charge of discrimination?
2      A.  That Mr. Harris behaved unappropriately and
3  unprofessionally, which I asked not only myself but
4  everyone else in the world, what is the difference, tell
5  me the difference when you sexually harass somebody, that
6  is unprofessional and unappropriate.  And then they gave
7  me the right to sue letter.
8      Q.  So did they conclude that although he had behaved
9  inappropriately and unprofessionally that there was no
10  sexual harassment?
11      A.  I don't know who felt -- I guess.  I don't know
12  what they felt.  I know what I felt.
13      Q.  Do you recall what the finding was?
14      A.  I remember those words.  Show me something that
15  helps trigger, trigger me.  We have teamed up here.  Show
16  me something.
17      Q.  Do you recall what the official finding was by
18  the EEOC?
19          MS. BREWINGTON:  Objection, asked and
20  answered.
21          MS. DIBIANCA:  She hasn't answered.
22          MS. BREWINGTON:  She said I don't recall.
23  But you can certainly ask her again.
24          THE WITNESS:  They said unprofessionally and

Page 355

1  unappropriate, and the right to sue letter.  They gave me
2  the right to sue.  So there is that answer.
3          MS. DIBIANCA:  Let me see if I can find it.
4  That will help.
5          (Recess taken.)
6          MS. DIBIANCA:  We are going to look at
7  Snyder 4 from last time.  See if Lori has a copy of that.
8          MS. BREWINGTON:  I believe I do.  If my 4 is
9  the right 4.
10          MS. DIBIANCA:  The EEOC package.
11          MS. BREWINGTON:  Yes, I have that.
12  BY MS. DIBIANCA:
13      Q.  On page 29.  This is Snyder 4, marked as
14  Exhibit page 29, and had already previously been marked
15  as D262.  Do you recall that document?
16      A.  Yes.
17      Q.  Can you tell me what it is?
18      A.  A letter from EEOC.
19      Q.  This was written by Miss Wjasow?
20      A.  Yes.
21      Q.  What does it say, if you can summarize it?  If
22  not, you can read it.
23      A.  "I have completed my review of your charge of
24  discrimination alleging that Respondent sexually harassed

Page 356

1  you, and then retaliated against you for complaining by
2  forcing you to transfer to another position.  When you
3  refused (because you believed that you should not have
4  been the one to transfer), you were then discharged.  In
5  order for you to prevail, you must show that not only
6  that the sexual harassment actually occurred, but that
7  the transfer demand was made solely to punish you for
8  making your complaint."
9          The next paragraph states, "The evidence
10  shows that your allegation of sexual harassment cannot be
11  confirmed.  The taped conversations that you submitted to
12  the EEOC clearly demonstrate unprofessional behavior, but
13  do not meet the definition of sexual harassment as stated
14  by law.  The evidence also shows that although Respondent
15  tried to conduct a thorough investigation into your
16  complaints, you declined to completely participate by
17  refusing to allow Respondent to hear the tapes, which you
18  claimed" -- which claimed -- wait a minute -- "which you
19  claimed proved your case.  Finally, Respondent's transfer
20  offer was made not in retaliation for your complaint, but
21  as an attempt to keep you employed at Respondent and
22  avoid any future problems.  It was appropriate for the
23  company to transfer you to another department where there
24  was an available position."

Page 357

1          No there was not a position open there.
2          "For these reasons it is recommended that
3  this matter be dismissed and a Dismissal/Notice of Rights
4  be issued to you.  We appreciate the opportunity to serve
5  you to the extent based on the available evidence."
6          They did give me a right to sue and there is
7  not a position open there.  That is false.
8      Q.  So for the record purposes, real quick, when you
9  stated there was not a position available, that was your
10  commentary?  That was not in letter, correct?
11      A.  I don't care what is in this letter.
12      Q.  Right.  I'm just asking so when the transcript
13  reads we can understand that you were saying, not reading
14  the words on the transcript or on the letter.
15      A.  I was saying that myself.
16      Q.  Right.
17      A.  There was not a position open.  That's correct.
18      Q.  Let's talk about that.  What do you disagree with
19  in this letter?
20      A.  Everything.
21      Q.  Is that because Miss Wjasow was being untruthful?
22      A.  She didn't come down and conduct an
23  investigation.
24      Q.  So her letter was untruthful?

28 (Pages 354 to 357)

Page 358

1    A.  **If that's how you want to put it, you put it that**
2  **way.**
3    Q.  I don't want to put it any way.  I just want you
4  to tell me what you think.
5    A.  **I know it was untruthful.**
6    Q.  Okay.
7    A.  **He was sexually harassing me, period.  I don't**
8  **care if I got a video of him doing it or not.  I know he**
9  **did it.  He knows he did it.  He doesn't deny it.**
10   **And the Department of Labor also stated that**
11  **Mr. Downie -- they did not make me voluntarily resign.**
12  **There is no such thing.**
13   Q.  And that is --
14   A.  **And that is what they did.**
15   Q.  And the Department of Labor, that was the
16  unemployment insurance group?
17   A.  **Yes.**
18   Q.  Okay.  So do you want to point to specific things
19  in here that you disagree with?
20   A.  **The whole page.**
21   Q.  Okay.  Then you did receive a right to sue, which
22  is actually on page 12 of the same exhibit.
23   I'm sorry.  No, it is not.  It is in a
24  different exhibit.  I don't need to say anything about it

Page 359

1  so I'm not going to talk about it.  It was in Snyder 1,
2  for the record, if that makes it easier for reading
3  purposes.
4   The last time we talked about pharmacies you
5  said you produced some records from Happy Harry's.  They
6  were from Philadelphia Pike.
7   A.  **Yes.**
8   Q.  Is there any other Happy Harry's that you went
9  to?
10   A.  **No.  No.**
11   Q.  Is there any other pharmacies that you used?
12   A.  **No.**
13   Q.  Let's jump to damages.  How about that.  I'm
14  jumping around.  I apologize.
15   Do you understand that you are claiming
16  damages for emotional distress?
17   A.  **Yes.**
18   Q.  Can you tell me what the injuries that you
19  have suffered for those damages?
20   A.  **Besides crying all the time and feeling invaded.**
21  **What else is there?**
22   Q.  I don't know.  Crying is one?
23   A.  **Crying.  Shocked, disbelief.  Made me a mess,**
24  **that's what he did.**

Page 360

1    Q.  And when did you first start to have those
2  symptoms?
3    A.  **I sat in the parking lot and cried a couple of**
4  **times and called my dad.**
5    Q.  When?
6    A.  **2002.**
7    Q.  What part of the year?
8    A.  **I think it is -- I don't know.  November,**
9  **October.  Somewhere around that.**
10   Q.  Crying, shock, disbelief, those all occurred in
11  November, October 2002?
12   A.  **2002, yes.  And continued on.**
13   Q.  Okay.  When did they stop?
14   A.  **The day they opened the door and escorted me off**
15  **the grounds.**
16   Q.  April 10th, 2003 those symptoms stopped; is that
17  correct?
18   A.  **Yes.**
19   Q.  What other injuries or how else have your damages
20  manifested themselves?
21   A.  **Just made me a little basket case.  My boss**
22  **fondling and sniffing me every day, I think that gets to**
23  **a person.**
24   Q.  I mean, I don't want to guess for you.  I just

Page 361

1  want to make sure you get an opportunity to express all
2  the systems that you had.
3    A.  **Angry.**
4    Q.  When did you experience anger?
5    A.  **When he started putting his hands on me, sniffing**
6  **me, stroking my hair.  I usually, because I had to wear a**
7  **hard hat, I usually turn my hair into one solid braid.**
8    Q.  Do you know a time frame for that?
9    A.  **No.  Various.  Various.**
10   Q.  When did it end?
11   A.  **The day they opened the door and escorted me off**
12  **the grounds.**
13   Q.  What else during that time?
14   A.  **Just a little basket case.**
15   Q.  Did you have any symptoms after April 10th, 2003?
16   A.  **Yes, just crying all the time and complaining and**
17  **in a state of shock, couldn't believe they did that.**
18   Q.  That was after April 10th, 2003?
19   A.  **Yeah.  Oh, my God, I couldn't drive.  The day**
20  **they did that, I sat on the side of the road for like two**
21  **hours.  I was hysterical.  I was crying.  I called my dad**
22  **from the side of the road.  I called Carmella too.**
23   Q.  How long did that last?
24   A.  **I don't know.  I sat there for awhile.  I**

29 (Pages 358 to 361)

Page 362

1   couldn't drive. I couldn't see.
2      Q.  Did you seek any treatment?
3      A.  Yes. I ended up going to my doctor. I ended up
4   calling him because I wouldn't stop crying. He gave me
5   that stuff to help stop me from crying all the time.
6      Q.  Which doctor?
7      A.  Goodman.
8      Q.  Dr. Goodman. When did you call him?
9      A.  I don't know. Soon after. I don't know how
10  soon. It could have been a couple weeks.
11     Q.  Okay. Do you want to say less than a month? Or
12  is that fair? Maybe not?
13     A.  Maybe around there. Because all I did was sit in
14  the house and cry. I had called Vicky, you know. My
15  boyfriend and my dad was saying, you know, get over it,
16  you know, you got to get a job, you know, you can't just
17  lock yourself away, you know, and just, you know, wanted
18  me to go seek professional help such as a lawyer for
19  them, you know, just tossing me to the side like that.
20     Q.  Who is that? Oh --
21     A.  Mr. Harris and Mr. Downie.
22     Q.  I thought you were referencing an attorney. I'm
23  sorry.
24     A.  I guess they got scared of me crying all the

Page 363

1   time, you know what I mean.
2      Q.  When did you stop crying all the time?
3      A.  I guess once I started taking that Lexapro stuff.
4   Made me stop crying. I was able to handle things better.
5          I mean to this day I still can't believe
6   they did it.
7      Q.  Shock?
8      A.  Any of them, yes.
9      Q.  Yes.
10     A.  But, you know, it is true. Life does go on.
11     Q.  Anybody else besides Dr. Goodman? Did you see
12  any other healthcare professionals for the crying all the
13  time?
14     A.  Miss Wright.
15     Q.  Miss Wright, Cynthia Wright?
16     A.  Yes, ma'am.
17     Q.  When did you see her?
18     A.  I'm going to produce those receipts to you.
19     Q.  Oh, okay. Were you already seeing her when you
20  worked at CitiSteel?
21     A.  No.
22     Q.  No, okay. So you started seeing her for the
23  first time after April 10, 2003?
24     A.  Yes.

Page 364

1      Q.  Do you remember if it was before or after when
2   Dr. Goodman prescribed the Lexapro?
3      A.  I don't remember if it was before or after.
4      Q.  Okay. Which practice group was she with at the
5   time? I know she has since changed.
6      A.  She was with Concord Wellness. But now she is on
7   Limestone Road, and I do not recall the name of it, but I
8   think Concord Wellness -- I did talk to her one time
9   while he was she was on Limestone Road. That's how I
10  found out she moved. And I think all you have to do, if
11  you call Concord Wellness Center, they will tell you
12  exactly how to locate Mrs. Wright.
13     Q.  So you did not see her at her new practice on
14  Limestone Road?
15     A.  No.
16     Q.  What did you seek treatment from Miss Wright for?
17     A.  Somebody to talk to. Mr. Goodman -- Dr. Goodman,
18  I'm sorry, you know, thought it would be a good idea,
19  talk to somebody.
20     Q.  He recommended you seek therapy of some kind?
21     A.  Yes.
22     Q.  So it would have been -- I won't speculate.
23  Okay. And how did it go with Miss Wright? Did she give
24  you counseling?

Page 365

1      A.  Yes.
2      Q.  How often did you see her?
3      A.  Usually once a week.
4      Q.  Do you remember for how long?
5      A.  Until I couldn't afford the Cobra anymore, I
6   think.
7      Q.  Specifically, what was she treating you for?
8   What were your complaints or problems that you were
9   discussing with her?
10     A.  CitiSteel, Randolph Harris, Jerry Downie. Well,
11  CitiSteel. They are CitiSteel.
12     Q.  Obviously, CitiSteel wasn't in the counseling
13  session, so what was she discussing with you? What
14  emotions were you discussing with her? What problems
15  were you trying to solve? That might be a better way to
16  put it.
17     A.  She was just trying to help me cope with things,
18  somebody to talk to.
19     Q.  Were you having difficulty coping?
20     A.  Yes, at first. I mean, you know, I grabbed back
21  on. Got out of the house.
22     Q.  When did you start to improve?
23     A.  A couple months later I guess, started. But I
24  mean, like I said, to this day, now, I mean I was -- then

30 (Pages 362 to 365)

B- 0243

Snyder                                          v.                    Citi Steel, USA, Inc.
Terry L. Snyder, Volume 2              C.A. # 04-970-JJF                   June 6, 2006

Page 366

1  it was more being upset. You know, and just the way they
2  treated a human, you know.
3         I've seen things on TV where -- you know,
4  but they are TV shows. Just in a state of disbelief.
5  You know, I couldn't believe it happened.
6         But now, as time comes about, it is more
7  anger. So I got upset for a long time, sure. I still
8  get upset about it. Little things here and there trigger
9  me. It pisses me off.
10  Q.  Did Cynthia Wright help you with the anger
11  issues?
12  A.  Yes. Well, she -- you know, she was somebody to
13  talk to. She helped me calm down. Just crying all the
14  time. I was paranoid a lot.
15  Q.  How so?
16  A.  I don't know. I thought that if they did all
17  that to me, Lord knows what else they were capable of. I
18  thought they might want to come and get me. I was
19  paranoid.
20  Q.  CitiSteel?
21  A.  Yes. Especially once I, you know, started
22  seeking legal counsel, I thought that might really make
23  them mad, that I was fighting back. So...
24  Q.  When did you first seek legal counsel? With Mr.

Page 367

1  LaRosa?
2  A.  Yes. You should have it dated somewhere. I
3  don't recall.
4  Q.  I thought it was right after the EEOC, you filed
5  your EEOC charge.
6  A.  Somewhere.
7  Q.  Well, we don't have any --
8  A.  I didn't meet with LaRosa before EEOC. So I
9  don't know them then.
10  Q.  I don't have any documents to help you refresh
11  your memory on this one.
12  A.  For who?
13  Q.  For when you first engaged Mr. Neuberger's
14  office. Do you recall when that was? You said it was
15  after --
16  A.  It was after.
17  Q.  -- the EEOC?
18  A.  Yes. I'm going to just take a guess, say maybe
19  around May.
20  Q.  So once you sought legal counsel then you became
21  more paranoid?
22  A.  Yes.
23  Q.  Had you ever experienced paranoia before?
24  A.  No, no.

Page 368

1  Q.  Did you take any medicine that could make you
2  paranoid as a side effect?
3  A.  No.
4         MS. BREWINGTON:  Off the record.
5         (Discussion off the record.)
6  BY MS. DIBIANCA:
7  Q.  Had you ever sought healthcare treatment or any
8  kind of related treatment for paranoia prior to Miss
9  Wright?
10  A.  No.
11  Q.  Did you work with Miss Wright for paranoia?
12  A.  I told her I was paranoid. I mean what do you
13  mean by work with her?
14  Q.  That's what I mean.
15  A.  Yes.
16  Q.  Did she give you any exercises or anything to
17  help you cope with the paranoia?
18  A.  I think there was pamphlets to read.
19  Q.  Did you feel that that improved?
20  A.  As time went on, I, you know, I wasn't paranoid
21  like that. In the very beginning I was very, very
22  paranoid. But as time went on, no.
23  Q.  Do you recall when you first started noticing the
24  symptoms of paranoia?

Page 369

1  A.  Yes, when I locked myself in my boyfriend's house
2  and I kept double checking the windows and the doors, and
3  then I would want to talk to him. I couldn't sleep.
4  Q.  When was that?
5  A.  A lot during the first several weeks.
6  Q.  Immediately --
7  A.  After they, yes, yes.
8  Q.  Sorry. Immediately after CitiSteel?
9  A.  Yes.
10  Q.  What about at the end of your employment at
11  CitiSteel, did you feel concerned about paranoia at that
12  time?
13  A.  No. I had nothing to be paranoid about.
14  Q.  For example, when you walked in and you saw the
15  pile of papers in the meeting of the 10th, were you
16  paranoid at that time?
17  A.  No, I had nothing to be paranoid about.
18  Q.  Did you believe they were going to terminate you?
19  A.  Yes, because I knew I wasn't giving them their
20  way. In the back of my mind, I mean, I believe never say
21  never, but I knew I wasn't giving up, because I did
22  nothing wrong. But I knew what they were trying to do.
23  They were trying to push me into a corner.
24         Let me tell you, really, I don't know, you

31 (Pages 366 to 369)

Snyder
Terry L. Snyder, Volume 2

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 6, 2006

Page 370

1  are the lawyer here, and I may not know what you know,
2  but I do know that Delaware is an at-will state and they
3  can fire you for wearing the wrong color hair piece.
4        But when you turn in your supervisor for
5  sniffing you and for grabbing you and talking all that
6  nasty trash that he does and doing, no, they are not
7  supposed to give you an ultimatum and/or let you go.
8        They were not letting me go back to my
9  office. And I knew that. And I knew I wasn't going
10 anywhere besides back to my office. Because when I'm
11 right, I'll fight to the end. I did nothing wrong. I
12 said nothing wrong. He did and they did.
13       So when I seen that pack of papers, I don't
14 really know what was in that pack of papers, but in the
15 back of my mind I believe never say never, and anything
16 is possible, and I'll be darned if it wasn't true. Look
17 what happened. Look where I sit today.
18       After all this trash they throw at me, they
19 want to open a door and toss me out the door like I'm
20 nothing. They want to sit there and print up all them
21 handbooks for employees to have. Well, they need to
22 reread them handbooks. They need to retake some classes.
23   Q.  What else, what other symptoms did you have or do
24 you have still, if you do still have some?

Page 371

1   A.  Anger.
2   Q.  The anger is the one you still have?
3   A.  Oh, yes.
4   Q.  Do you take anything for the anger?
5   A.  No, not anger to where I -- you know, it just,
6  sitting out, sitting here, answering a million questions,
7  you know, I'm sitting here thinking to myself, my God,
8  why am I going through this. I didn't do nothing to
9  nobody. You know, just anger to where -- I think you
10 know the kind of anger. I think everybody here knows the
11 kind of anger. But, you know, angry to where I'm not
12 letting them get away with it. They are not treating me
13 like that.
14   Q.  Did the anger ever cause you any kind of problems
15 in your day-to-day life?
16   A.  The anger, no. The being upset and the paranoia,
17 it did. But mostly in the beginning.
18   Q.  What else caused you trouble in your daily life,
19 if anything?
20   A.  It was all CitiSteel. Nothing --
21   Q.  I'm sorry, I wasn't clear. I just mean similar
22 to being upset, and you said the anger didn't cause you
23 problems in your daily life but --
24   A.  Just crying all the time, just sitting around.

Page 372

1   Q.  Can you tell me anything that impaired you from
2  doing, prevented you from doing or being upset?
3        MS. BREWINGTON: I'm going to say objection
4  to that to form.
5        MS. DIBIANCA: Do you want me to rephrase
6  it?
7        MS. BREWINGTON: Yes.
8  BY MS. DIBIANCA:
9   Q.  Sure. Was there anything after you left
10 CitiSteel, was there anything that you couldn't do any
11 longer that you had done before because of being upset?
12   A.  Well, I couldn't really leave the house. You
13 know, I had to force myself, you know, when I first
14 started, you know, seeking employment. I mean, and then
15 it just, it took a lot out of me to get a shower and get
16 dressed and get out of the house. Once I did, I went
17 right back to the house.
18   Q.  So how long was it before you could leave the
19 house?
20   A.  Well, I went to see Vicky. That was soon after.
21 And then once I was done with Vicky, I went right back
22 home.
23   Q.  Vicky is Bernard Personnel?
24   A.  Yes, ma'am.

Page 373

1   Q.  How long did you collect unemployment for?
2   A.  I don't know. I even asked -- I ended up asking
3  for an extension because I couldn't find employment. I
4  had the unemployment stubs.
5   Q.  Actually they have been produced. I do recall
6  them.
7   A.  Okay.
8   Q.  How long after you left CitiSteel did
9  unemployment start, did you get your first unemployment
10 check?
11   A.  I got one or two, and then they stopped.
12 Stopped. We went to arbitration. I don't know what you
13 call it.
14   Q.  The appeal?
15   A.  The appeal.
16   Q.  Okay.
17   A.  And then after that was over, the referee -- I
18 said that right -- finally sent me a letter stating he
19 found all facts in my favor, and then they sent me some
20 checks and so forth.
21   Q.  Now, the Snyder 13, that was one small piece of
22 that appeal hearing. The date on that appears to be May
23 12th, 2003?
24   A.  Yes.

32 (Pages 370 to 373)

Snyder                                              v.                    Citi Steel, USA, Inc.
Terry L. Snyder, Volume 2              C.A. # 04-970-JJF                         June 6, 2006

Page 374

1    Q.  Now, at that time were you able to go out of the
2    house?
3    A.  Well, I did.  I had to.
4    Q.  Regularly?
5    A.  Well, no.  When I had to see LaRosa and the
6    Department of Labor.
7    Q.  So were you able to leave your house for any
8    reason other than --
9    A.  I would go to un --  I'm sorry.
10   Q.  That's okay.  Other than to see your attorney or
11   the Department of Labor?
12   A.  I would go to the Department of Labor to use
13   their fax machine, because you are allowed to get a job
14   through them.
15   Q.  Okay.
16   A.  That's it.
17   Q.  Actually, let's just go quickly, or not quickly,
18   whatever you prefer, through the various allegations that
19   Mr. Harris did to you, said to you, etcetera, that form
20   the basis for your harassment claim.  Let's talk about
21   those.  Actually, I don't think we have really touched on
22   them yet.
23       Do you remember what the first incident was?
24   A.  Well, I didn't look at it as an incident.  I

Page 375

1    don't know how you want to label it.  But my second day
2    there he said he was going to take me out for a beer.  He
3    didn't say "Will you?"  He said, "I'm going to take you
4    out for a beer sometime."
5        I didn't think nothing of it, not like that,
6    at that time.  But when I went home, I did tell my mother
7    and my aunt, I said, "Well, my boss said he was going
8    take me out for a beer," because I just thought that was
9    -- I thought it was odd, but I didn't think bad bad, you
10   know what I mean.
11   Q.  Did you think it was friendly?
12   A.  Now I don't.  Then, I thought to myself, which I
13   said to my aunt and my mother, you know, "My boss said he
14   is going to take me out for a beer sometime," why would a
15   boss say that to somebody their second day of work?  I
16   mean, really.
17   Q.  So you were confused, do you think, on the second
18   day as to what the motivation was?
19   A.  Yes, motivation, yes.
20   Q.  And then later you decided that, you concluded
21   that that was harassment?
22   A.  I guess part of it or maybe his intent.  I don't
23   know.  I really don't know.  I didn't even ask Mr.
24   Harris.

Page 376

1    Q.  Do you recall that that supports your claim of
2    harassment, that incident?
3    A.  No.
4    Q.  What do you think supports your claim of
5    harassment?
6    A.  Him squeezing my checks.
7    Q.  Let's talk about that.  He squeezed, stroked?
8    What would be the correct word?
9    A.  Do you want to take my picture again?
10   Q.  Pinched?
11   A.  Squeeze.
12   Q.  Squeezed?
13   A.  Squeezed.
14   Q.  Okay.  When did that happen?
15   A.  A couple times.
16   Q.  More than once?
17   A.  Yes.
18   Q.  Do you know when the first time was?
19   A.  No.
20   Q.  Can you give me any description of the time
21   frame?
22   A.  Maybe end of 2002, beginning of 2003.  Maybe
23   somewhere around there.  I know I do not recall.
24   Q.  It is just important that we form a chronology of

Page 377

1    the allegations of Mr. Harris' alleged actions so that we
2    can get them in order.  So I want to make sure we get the
3    first one first, the second one next, etcetera.  So if
4    you remember something else and you want to fill it in,
5    that's totally fine.  You can do that at any time.
6    A.  He didn't squeeze my checks first, is that what
7    you are saying to me?
8    Q.  Yes, that is.
9    A.  No.
10   Q.  I want to know what came first.  Obviously, the
11   beer, asking you out for a beer?
12   A.  Then telling me he is going to take me away, when
13   am I going to let him take me away for the weekend.
14   Q.  When did that happen?
15   A.  Well, within my first year there he said
16   something, but to the exact date, no, I don't know.
17       But then it got to be every time I would go
18   away, when I would come back on Monday, so I just quit
19   telling him -- I just started saying nothing when he
20   would ask what I did over the weekend.  He always asked
21   on Monday what I did over the weekend.
22   Q.  And you think that supports your claim of
23   harassment?
24   A.  Him, when am I going -- him asking me when he is

33 (Pages 374 to 377)

Page 378

1  going to let me -- when am I going to let him take me
2  away. Yes.
3      Q.  Did he say this to you on more than one occasion?
4      A.  Yes.
5      Q.  What was your response?
6      A.  I never really responded at all. I just walked
7  away.
8      Q.  That's a response, walking away.
9      A.  But I also would say "never," and I don't know
10  how many times I would have to tell him no, I'm not going
11  out with him.
12      Q.  In response to him asking you to go away for the
13  weekend?
14      A.  Just when are we going out. Every other day the
15  man was saying or doing something to me. You can put in
16  whatever word you want. The squeezing of my cheeks came
17  later.
18      Q.  What came after him asking you when are you going
19  out? What was the next incident?
20      A.  When am I going out, what?
21      Q.  Asking you to go out or going away for the
22  weekend, something along those lines?
23      A.  Just always telling me how good I looked, and
24  just staring at me with his nasty stares, and then when

Page 379

1  he started squeezing me and sniffing me and stroking my
2  hair.
3      Q.  What about the --
4      A.  When he stood in my doorway and I had to push him
5  out of the way, is that the one you were going to ask me?
6      Q.  Whatever one is next.
7      A.  I really don't know what order they came in.
8  When I pushed, that was definitely after 2003 because I
9  was getting really pissed off.
10      Q.  Okay. The doorway incident?
11      A.  Yes.
12      Q.  Tell me about that.
13      A.  He wouldn't get out of my way, so I pushed my way
14  through.
15      Q.  Did you ask him to move?
16      A.  Yes.
17      Q.  How did you ask him?
18      A.  I asked him to please get out of my way.
19      Q.  Did he say anything?
20      A.  I don't recall. He always just stared at me with
21  his nasty little smirk.
22          Sometimes when he would say something, he
23  would hurry up and he did this dash thing, he would run
24  away from me.

Page 380

1      Q.  Dash?
2      A.  A dash, like a ballerina, like a dash. He would
3  dash out of the office.
4      Q.  Was it done to be funny?
5      A.  I, I think he did it to run, knowing I wanted to
6  knock his block off actually. I don't know why he did
7  it. He always did it. He knew he was being a smart -- I
8  am allowed to cuss now?
9      Q.  Mm-hmm.
10      A.  Smart ass. He knew he was being a smart ass.
11      Q.  Did he do it before your relationship went south?
12  Did he do it in a friendly context ever?
13      A.  No.
14      Q.  No.
15      A.  Not until after he started being the little
16  pervert he is.
17      Q.  Okay. Literally, when you say dashed, explain it
18  again to me. I'm sorry. I understand the ballerina
19  part.
20      A.  It was like he was kind of running from me with a
21  dash (Indicating.)
22          I told you you could take my picture while
23  I'm trying to describe to you if you wanted. I don't
24  know how else to tell you.

Page 381

1      Q.  That's good enough. Okay. What else? Doorway
2  incident. That was after 2003. What else? The cheeks,
3  pinching your cheek or squeezing your cheek?
4      A.  Squeezing my cheek.
5      Q.  When did that happen?
6      A.  A couple times.
7      Q.  Do you know around what times?
8      A.  No.
9      Q.  What happened during that incident?
10      A.  Nothing. I probably smacked at him there too. I
11  always just told him to get off and get away from me.
12      Q.  Okay. Did he?
13      A.  Yes, but then he would always end up coming back.
14      Q.  What else? Squeezing of the cheek? There was
15  hair I think, stroking hair?
16      A.  Stroking, smelling me.
17      Q.  Is that all the same incident?
18      A.  No.
19      Q.  Tell me about the hair?
20      A.  It was an all-the-time thing.
21      Q.  Stroking your hair?
22      A.  He didn't just do all this in one day.
23      Q.  Okay. Go ahead and explain.
24      A.  That's it. Sniffing, touching me, talking nasty,

34 (Pages 378 to 381)
(302)655-0477

B-0247

Snyder
Terry L. Snyder, Volume 2

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 6, 2006

Page 382

1 staring at me nasty, asking me to come to work wearing a
2 dress with no panties. What do you call this? I don't
3 know what you call it. I call it sexual harassment.
4       Asking me out, when am I going to let him
5 take me out. What do you people call it? Right in your
6 minds, all of you answer yourselves, what do you call it?
7   Q.  Stroking the hair?
8   A.  What about it?
9   Q.  How many times did he do that?
10  A.  I don't know. Several. Many.
11  Q.  More than five?
12  A.  20 million.
13  Q.  Are you taking this seriously?
14  A.  Yes. I don't know. I never -- I didn't count.
15 You know, I didn't sit there and count. I didn't all of
16 a sudden stop my job and write down, okay, he did stroke
17 my hair at this moment.
18       I was busy. I had two bosses and I did all
19 that work for the melters. So I don't know the exact
20 date when he stroked my hair. I don't know the exact
21 date on which occasion, how many times I punched at him.
22 All I know is he was a major interruption to my job.
23  Q.  Any other incidences that you believe support
24 your allegations?

Page 383

1       We have asking you out for a beer on your
2 second day of work, asking to take you out regularly, the
3 doorway incident where he would not move out of your way,
4 squeezing of the cheek, stroking your hair --
5   A.  Taking me away for the weekends. Sniffing me.
6 Asked me to come to work wearing a dress with no panties.
7 Always telling me how good I look.
8   Q.  Let's talk about the dress incident. Can you
9 tell me about that? When did that occur?
10  A.  January 7th. I do remember that.
11  Q.  Why is it that you remembered that date?
12  A.  Because he asked me -- I never turn down work.
13 And he asked me -- that was the date of the floor tiles.
14 Well, he asked me if I would come into work that
15 Saturday, and I think that Saturday was going to be the
16 10th. I'm not sure. I can look at the calendar.
17       And I said yes, and then I think he asked me
18 that in the hallway. There was other people around.
19 Now, when he came in to the office, he said, "By the way,
20 when you come to work on Saturday, wear a dress with no
21 panties," and he did his little chuckle thing and hurry
22 up and ran out and ran down there with the other people,
23 down the little hall, it is a little hallway.
24       Well, now, the floor tiles -- he had vendors

Page 384

1 standing in the hallway, lined up, and he had to meet
2 with them. So he would shut his door and have a meeting
3 with one and others were standing out there. Well, I
4 tripped on one.
5   Q.  On one what?
6   A.  On a floor tile. So I caught myself. So I
7 decided to send the safety manager, coordinator, whatever
8 he called his self, Jim Moran at that time, that's what
9 his title was, I sent him a copy -- excuse me. I sent
10 him an e-mail about the floor tiles and I cc'd it over to
11 Dennis Ford and Randolph Harris.
12       Well, even the vendors were in the hallway
13 saying something about the floor tiles. But, now, before
14 this floor tile thing was that he asked me if I wanted to
15 work on Saturday.
16  Q.  Where was he in relationship to you when he said
17 the comment?
18  A.  Come to work wearing a dress with no panties?
19  Q.  Yes.
20  A.  When you walked in my office, there was this
21 shelf thing with printers on it, various printers.
22  Q.  Okay.
23  A.  It read numbers all through the night. Okay.
24 They are the numbers that helped me figure out my report

Page 385

1 in the morning.
2       And to the right was a shelf up here with
3 all the binders, and a table. Here is my desk to the
4 left.
5       I was actually at the table behind, not
6 behind the door but a little bit down over. He was
7 inside -- he was here. I was here. Here is the door.
8 So he was not -- he was inside the office, but he was
9 closer to the door. He was in between myself and the
10 door.
11  Q.  So how many feet would that have been away from
12 you, an estimate?
13  A.  Four or five.
14  Q.  Four or five feet, okay.
15  A.  Maybe not even.
16  Q.  Okay. Is that a problematic question for you?
17  A.  No.
18  Q.  Okay. What did you respond?
19  A.  I went to tell him to shut up, but he done ran
20 out of the office. He did his little ballerina dance,
21 and chuckled and laughed and ran out.
22  Q.  So you did not say anything to him in response?
23  A.  I started to, but he ran out.
24  Q.  And then the next time you saw him after that,

35 (Pages 382 to 385)

Snyder                                    v.                Citi Steel, USA, Inc.
Terry L. Snyder, Volume 2          C.A. # 04-970-JJF              June 6, 2006

Page 386

1  how long was it until you saw him next?
2      A.  When he was freaking out because I sent an
3  e-mail.
4      Q.  So you sent the e-mail about the tiles after he
5  made this comment about the dress with no panties?
6      A.  Yes.
7      Q.  And you sent the e-mail to Mr. Ryan?
8      A.  Yes.
9      Q.  And that was actually admitted last time, Snyder
10  5, just for record keeping purposes.
11         Why didn't you mention the comment to Mr.
12  Ryan at that time in the e-mail?
13      A.  Mention what comment?
14      Q.  Well, the dress with no panties comments by Mr.
15  Harris.
16      A.  Why would I tell Mr. Ryan?
17      Q.  Why wouldn't you?
18      A.  Because I didn't.  Why would I tell Mr. Ryan, a
19  safety coordinator, why would I send out an e-mail
20  stating what Randolph Harris just said to me?
21      Q.  I don't know.  I'm asking you.
22      A.  Because I didn't.  Why would I?
23      Q.  Did you think it was important?
24      A.  What Randolph said to me?

Page 387

1      Q.  Yes.
2      A.  I think it was nasty and disgusting.
3      Q.  Yes.
4      A.  I don't think it had anything to do with the
5  floor tiles.  The floor tiles got sent, you know, aways
6  after that comment.  That was done in his office, with
7  visitors, with vendors he buys supplies.
8      Q.  How long after?
9      A.  I don't know.
10      Q.  Let me look.
11      A.  I don't know.  Because he had a line of vendors
12  in the hallway, and when they kept playing with him, and
13  one of them said -- now, I done tripped on it, but I
14  caught myself.  And one of them said, "Something ought to
15  be done about the floor tiles," that's when I decided to
16  take it upon myself and contact Mr. Ryan.  I sent him an
17  e-mail, and I wanted Ford and Harris to see that I was
18  trying to get the floor tiles fixed.  I thought I was
19  doing a good thing.  And Mr. Harris got paranoid and
20  thought I sent a floor tile to Jim Ryan because of the
21  comment he made to me.
22      Q.  Okay.  So the dress and panties comment, was that
23  in the morning?  In the afternoon?  What time of day was
24  that?

Page 388

1      A.  I really don't recall.  I think it was either
2  late in the morning or early, early afternoon.  I'm
3  pretty sure.
4      Q.  When was the tile e-mail?
5      A.  It was after.
6      Q.  After the panties comment?
7      A.  Yes, because then he didn't want me -- he said,
8  "Never mind, you don't have to come to work on Saturday,"
9  I'm assuming because he got mad at me for sending in an
10  e-mail to Mr. Ryan.
11      Q.  Mr. Harris?
12      A.  Yes.  So now he wouldn't let me work on Saturday,
13  because I sent a floor tile, e-mail about tiles, which
14  made no sense to me at all.
15      Q.  So you think he was mad about the incident?
16      A.  He was paranoid.  Mad and paranoid, yes.
17      Q.  And that you had sent the e-mail about the tiles?
18      A.  Yes.  And that's also what we discussed on that
19  tape made of Randolph Harris.
20      Q.  Okay.  Why do you think he said the comment about
21  wearing a dress with no panties?
22      A.  Probably because he is a pig.
23      Q.  Any other reason?
24      A.  He is just a nasty, ignorant person.  And I think

Page 389

1  he takes his position, you know, his authority, I think
2  it has gone to his head.
3      Q.  I mean, did you believe at that time that he
4  expected you to do that?  Or did he say it for some other
5  reason?
6      A.  I don't think he could be that stupid to think
7  I'm really going to walk in there with a dress wearing no
8  panties, but deep down, yes, he did mean it.  Yeah, he
9  meant it.
10         Haven't you met the man yet?  Oh, that's
11  right.  He is probably pretending to be somebody else.
12         MS. BREWINGTON:  Okay.  I want to go on the
13  record one more time.  I need you to only answer the
14  question that are being asked, please.
15         THE WITNESS:  Okay.
16         MS. BREWINGTON:  So we can get this to move
17  along.  Okay.
18  BY MS. DIBIANCA:
19      Q.  Let's look at Snyder 5.  It is a single page
20  e-mail.  I'll have to get it back.
21         Let me ask you this.  Snyder 5, which has
22  been previously marked as P285, is this the e-mail that
23  you sent to Mr. Ryan regarding the tiles?
24      A.  Yes.

36 (Pages 386 to 389)

Page 390

1    Q.  Do you notice that below the e-mail there are
2  handwritten notes?
3    A.  Yes.
4    Q.  And are those your handwritten notes?
5    A.  Yes.
6    Q.  Let me ask you this:  When were these notes
7  written?
8    A.  I don't know.
9    Q.  Do you know if you would have written them the
10  day you wrote the e-mail?
11    A.  The day I did the e-mail?
12    Q.  Right.
13    A.  At that time I was very busy and there was a lot
14  of people in the hallway, so maybe not that moment.
15    Q.  Okay.
16    A.  It could have been done that day.  I don't know.
17    Q.  Do you remember testifying that you had printed
18  out, towards the end of your employment you had printed
19  out a bunch of e-mails?
20    A.  Tried, tried to get as many as I can.
21    Q.  Okay.  Do you think maybe you wrote some notes on
22  the e-mails then as you went back, looking through them
23  later?
24    A.  I could have.

Page 391

1    Q.  Okay.
2    A.  But I also, you know, I printed periodically,
3  actually.
4      I mean, the majority of them was on my, you
5  know, stayed on my computer, stayed on the hard drive.
6  If they kept them, I doubt it.
7    Q.  When you printed out that group of e-mails, you
8  printed out as many as you could at that time and then
9  you took them home with you; is that right?
10    A.  Not in January.
11    Q.  Right.  In April?
12    A.  Yes.
13    Q.  And then do you remember whether you did write
14  notes on them or make notes about them as you kind of
15  went through in your memory?
16    A.  Like I said, I'm always jotting down little
17  things.  So I don't know.
18    Q.  That's fair enough.  I would like you to go ahead
19  and read the statement.  Since it is your handwriting you
20  will probably do a better job.
21    A.  Would you like for me to read the --
22    Q.  I'm sorry, the handwritten statement.  And then
23  we can talk about it afterwards.
24    A.  "Prior to Randolph reading his copy of this

Page 392

1  e-mail he took me in Ford's office (after he was in mine)
2  to confirm me working Saturday," parenthesis -- wait a
3  minute -- "in Ford's office (after he was in mine) to
4  confirm me working Saturday, January 11th, 2003.  Ford
5  said okay with him.  When Randolph was in my office prior
6  to asking me to go to Ford's with him he came in and
7  asked, 'Do you want to work Saturday?'  Of course I said
8  'Yes.'  He started to walk towards the door, turned
9  around, pointed at me and said, 'By the way wear a dress
10  with no panties,' quickly turned and dashed out like a
11  ballerina. (He did that often.)  I got so pissed off and
12  he thinks it is funny and he dashes out laughing really
13  makes me sick to my stomach."
14      Yes, this was all true.
15      "He does that before I can yell at him.
16  That mother fucker is lucky I don't yell at him as his
17  ass is flying down the hall.  He would have shit if I did
18  that with someone else in their office.  He would so
19  scared -- that's a handwritten typo on my behalf, "he
20  would so scared."  He was, should have been "was",
21  "scared thinking I was going to yell/tell the shit he
22  says and does."
23    Q.  Does that help you recollect the incident on
24  January 7?

Page 393

1    A.  Sure.
2    Q.  Now, do you think that he was dashing out of the
3  office because he was scared?
4    A.  I think he was dashing out as he always did to
5  get away from me, but besides that, there was many people
6  there that day.  They should have lots of records because
7  they kept records of vendors as well.
8    Q.  So your testimony is that he left the office
9  after he said the comment so that he could get away from
10  you?
11    A.  Mm-hmm, yes.
12    Q.  And did he ever say this incident to you again
13  about wearing a dress with no panties?
14    A.  What about it?
15    Q.  I'm sorry.  Did he ever say that after January
16  7th?
17    A.  No.
18    Q.  Did he ever say it before January 7th?
19    A.  No.
20    Q.  Any other comments similar to that?
21    A.  Coming to work wearing a dress with no panties,
22  no.
23      MS. DIBIANCA:  Okay.  Do you want to take a
24  break?

37 (Pages 390 to 393)