Snyder
Terry L. Snyder, Volume 2

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 6, 2006

Page 511

377:2,4,10 378:16
388:7 389:12
392:7 393:23
395:8 399:10
400:12,13 402:17
403:13,14,16,16
404:11,13 408:13
413:21 414:9
421:4,24 423:19
427:1 438:6,7
443:20 444:2,7,17
445:6 446:8
454:21,22 455:24
457:16 459:7
460:24 462:7
468:24 470:3,11
474:24 475:21
476:3 477:13,14
478:17
**wanted** 252:1 258:3
259:9 263:8,10,24
264:3 265:15
267:20 268:5,8,8
270:7,19 271:5,7
271:19 272:12
275:16,16,17,18
276:24 277:18
280:2,10,20 281:5
281:5,6 287:19
288:1 292:5
300:11 319:20
320:10 325:8
332:5,20 362:17
380:5,23 384:14
387:17 396:11
400:14 403:23
405:7 407:1
408:18 413:6,7,11
413:24 414:14
421:5 422:21
438:7,14 443:1,13
443:16 444:9
448:10,11,18
453:14 462:1,8,10
466:23
**wanting** 271:15
282:16 477:7
**wants** 257:11 275:6
319:10 330:6
453:16
**wasn't** 252:18
261:13,14 272:13
272:14 274:21,21
277:17 278:12
280:21 285:18
286:14 288:4
291:20 292:9

293:21 294:19
295:15 313:16,22
315:20 323:1
365:12 368:20
369:19,21 370:9
370:16 371:21
402:11 404:6
413:23 436:17,17
438:15 442:10,12
448:19 454:8
464:10 479:19
**waste** 465:22
**water** 441:12 442:3
456:5,5 457:19
**way** 252:21 253:13
253:15 257:11,13
257:16 266:18
269:7 280:22
295:9 309:12
310:22 313:3
321:5 324:18
347:16 348:3
350:23 358:2,3
365:15 366:1
369:20 379:5,13
379:13,18 383:3
383:19 392:9
420:22 443:17
456:18 457:2
**ways** 342:6 439:22
**wear** 361:6 383:20
392:9
**wearing** 345:12
370:3 382:1 383:6
384:18 388:21
389:7 393:13,21
395:19
**Wednesday** 266:10
266:11 269:16,16
271:17,20,23
275:22 279:7
280:21 282:5
283:21,23 284:1,7
284:9,10,18 285:6
287:23 291:10,14
295:10 314:7
421:6 423:22
**week** 250:16,18
251:24 254:1
301:1 332:17,21
340:21 365:3
396:8 410:2 412:4
420:11 424:1
441:4
**weekend** 377:13,20
377:21 378:13,22
**weekends** 322:12

383:5 404:2
405:18
**weeks** 339:16
362:10 369:5
409:24
**week's** 250:13
**weird** 438:23
**welcome** 340:4
**well** 251:15 253:5
254:13,20,24
258:3 261:1,1,5,9
263:13 264:5
267:21 268:24
270:21 271:6,17
271:23 272:18
275:3 277:17
278:23 279:16
281:19 284:8
286:24 290:16,24
293:13 296:22
297:10 298:7,13
300:14,14 301:20
302:11,15,19
304:14,21 305:22
307:8 308:12,16
311:3 313:22
317:9 319:18
320:22 321:13,15
323:3 325:13
328:19 331:17
333:5 334:19
336:7,8,14 337:15
339:3,6,9 340:19
346:21,21 347:12
347:14 349:16
365:10 366:12
367:7 370:21
372:12,20 374:3,5
374:24 375:7
377:15 383:14,24
384:3,12 386:14
393:7 398:9,16
399:9 400:9
403:14,15 404:9
408:6 409:15
410:3 415:15,19
417:18 420:5
423:3 425:22
429:2,5 430:10,20
431:2,4,6 432:15
433:22 436:6,9
438:2 444:16
448:8,15 449:11
452:19 453:20
455:12 456:22
464:23 467:24
**Wellness** 364:6,8,11

461:9
**well-being** 479:4
**went** 251:22 259:16
263:14,22 264:10
267:9 268:14
269:16,17,21
272:3,11 285:16
288:20 289:1
293:20 321:8
322:13,14 330:10
359:8 368:20,22
372:16,20,21
373:12 375:6
380:11 385:19
390:22 391:15
396:16 398:17
399:8 403:23
407:4 413:16
414:21 430:5
437:23 450:16,16
451:4,6 457:20
458:1 465:15
480:24 481:1,2
**were** 252:2,2,11
254:15 261:18
263:23 264:18,18
265:11 266:10
269:5,22 271:24
272:2,8 274:20,24
276:1,14,21
282:18 283:8
284:13,19,19,22
284:24 285:6
286:5,15 287:10
287:12,15 288:3
288:15 290:5,17
291:11 294:3
295:12,20 297:3
298:20 302:1,10
302:14 303:5
304:5 310:22
311:8,10,19
313:20 315:14
319:16 326:18,20
327:3,16 336:19
337:20,20 338:16
339:14 340:9
341:4 344:6,15,19
356:4 357:13
359:6 362:22
363:19 365:8,8,14
365:15,19 366:17
369:15,18,22,23
370:8 374:1,7
375:17 379:5
384:3,12 390:6
399:24 402:8

406:2 407:11,13
409:11,19 416:6
416:21 419:3
426:9 428:1,22
429:9,13 431:11
432:8 433:6
436:18 437:11,22
437:24 438:13,19
438:21,21 439:3
439:24 440:13,20
440:21 441:11
442:7,19 445:5,8
445:8 448:7
458:20,23 459:19
460:21,21 461:7
461:19,21 462:14
463:21 465:16
466:24 467:2,6
468:7 471:19,24
472:7,8 474:8
475:11 476:3,23
478:21 480:6
484:8
**weren't** 252:1
259:10 272:3
314:15,20 326:9
396:12 444:15
445:3
**West** 249:12,20
**we're** 255:15
**whatnot** 416:20
**whatsoever** 252:22
**whichever** 420:15
421:12
**while** 264:23 324:2
364:9 380:22
423:12 429:13
457:18 461:16
**whisper** 346:21
350:18
**whispering** 350:18
351:3,8,9 438:23
**whole** 256:11
280:15 282:11
285:16 321:19
330:4 342:4
358:24 403:10
436:20 440:3
443:23 447:10,21
448:16 458:22
480:23
**WILCOX** 249:24
**willing** 284:13,19
284:19,22,23,24
285:1,7,22,24
286:8,15 287:10
287:15 288:15

Snyder
Terry L. Snyder, Volume 2

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 6, 2006

Page 512

298:24 299:1
311:19,20 453:20
**Wilmington** 249:12
249:18,21,24
**windows** 369:2
464:16
**windshield** 300:17
**wish** 252:24 253:2
**witness** 270:7 334:8
350:4,6,11 354:24
389:15 431:13
468:16,20,22
469:2 470:10
484:12
**witnesses** 316:6
396:9
**Wjasow** 289:19
290:6,19,23
311:11 355:19
357:21
**Wjasow's** 353:13
**woke** 476:12
**woman** 326:12
327:9
**wondering** 456:12
**word** 253:10 254:3
275:21,23 286:19
288:6 296:6
304:21 305:3,7,7
312:18 316:10
347:13,13 350:1
376:8 378:16
417:14 444:4,22
458:16,18 464:21
476:3,5,14 477:12
479:23,24
**words** 251:5 260:6
261:18,22 294:4
303:10 306:14
308:11 324:21,23
326:19 346:1
354:14 357:14
402:7 403:2 414:8
423:4 450:14
**work** 250:19 253:21
254:2 257:24
267:2 273:2 276:9
276:12,19 289:6
309:24 319:6,6
321:21 335:18
336:12 345:12
368:11,13 375:15
382:1,19 383:2,6
383:12,14,20
384:15,18 388:8
388:12 392:7
393:21 395:18

397:16,21 400:2
406:24 408:4
411:13 412:5
420:7,19 421:2
423:1 428:5
429:13,15 430:4,6
432:12 435:12
438:15 441:20
445:19 481:1,1
**workday** 263:13,21
**worked** 336:3,20
337:9 339:12
340:11 363:20
405:4 422:19
423:12
**worker** 442:2
**workers** 326:24
441:18 445:15
**working** 392:2,4
401:13 404:8,11
405:13 406:17,18
439:1
**works** 328:21
**work-related**
422:14
**world** 354:4
**worried** 413:23
**worse** 321:13
322:10 395:9
**worst** 394:4,6,7
395:2,4,5,18
479:14,15
**wouldn't** 257:18
269:7 273:3,24
275:19 278:12
290:8 291:10
294:24 296:10
321:2 339:2 362:4
379:13 386:17
388:12 395:22
409:15 437:7
438:8 440:11,14
442:13 443:22
444:12 448:13,17
464:23
**wounds** 466:12,12
**Wright** 333:21
363:14,15,15
364:12,16,23
366:10 368:9,11
460:1,19 461:3,5
461:15 463:5,21
474:19,22 478:1
481:6,10
**write** 262:14 306:23
307:2,16 313:7
382:16 391:13

421:14 426:3
429:3,22 431:7
434:7 442:8
**write-up** 437:10
441:7,15 443:9,11
445:4,17 446:12
450:6 457:18
458:7,13 459:5,10
**writing** 262:18
275:8,16 307:20
407:20 413:8
429:1 436:2,10
**writings** 432:14
**written** 259:2 263:9
275:11 315:11
355:19 390:7,9
400:17 403:4
442:6 443:1,19
447:15 448:24
451:12 454:9
**wrong** 259:22 268:2
295:16 297:1,3
310:10 318:16
332:3 369:22
370:3,11,12 414:8
418:19 435:20
439:23 453:15
464:17 465:3
475:14 480:15
**wronged** 454:2
**wrote** 259:2 260:3,9
260:23 306:17
312:18 315:14
390:10,21 399:10
408:3 414:4
425:19 429:2,22
443:2,8
**www.wilfet.com**
249:25
**W-J-A-S** 289:20
**W-Z** 289:20

**X**

**X** 482:2,6

**Y**

**Yeah** 262:21 330:18
361:19 389:8
398:23
**year** 338:5 339:8,11
344:9 360:7
377:15 426:1
461:17,19,22
462:4,8 463:4,14
465:18 469:18
479:6
**years** 304:22 305:1

333:22,24 342:12
342:15 343:4,7,12
**yell** 313:12,14 314:8
392:15,16 394:20
**yelled** 312:22
313:10 314:3
**yelling** 314:22
451:10
**Yellow** 301:13
**yell/tell** 392:21
**young** 249:12,20
403:22 407:2

**$**

**$20,000** 448:11

**0**

**004** 251:18
**012** 434:6
**013** 434:19
**017** 434:23
**030** 308:4
**04-970-JJF** 249:8

**1**

**1** 307:13 359:1
427:16 432:9
477:12,17,23
478:5 479:13
**1:00** 273:9,10
420:11
**1:41** 424:21
**10** 330:2 363:23
424:19 428:10
477:12,12,23
478:5,5 479:13,13
**10th** 274:24 276:3
276:11 278:17,20
281:15 283:2,20
287:14,15 291:3,4
292:4,13,24
293:22 305:13
311:21 314:18
318:15 332:14
340:7 352:13
353:6 360:16
361:15,18 369:15
383:16 449:12
460:12
**10:30** 423:23
**1000** 249:12,20
**102** 331:13
**11** 326:2 330:4
**11th** 392:4 422:6
**11:00** 269:17 421:5
421:6 423:16
**11:30** 269:17

287:22
**12** 306:6,7 307:10
307:13,24 312:16
315:11 317:16
326:2 330:4
358:22 412:22
415:3 425:6
446:24 447:1
454:13 478:2
482:8
**12th** 373:23 449:12
449:13 467:24
468:1,8 469:8
**12:00** 273:4,5,6,9
**12:30** 273:9 420:11
420:12
**125-RPR** 484:18
**13** 320:3 327:23,24
328:9 373:21
435:4,10 482:8
**13th** 423:18,22
**1330** 249:24
**14** 312:16 402:14,15
408:13 435:10
482:9
**15** 415:24 416:2,24
418:10 421:11
437:15 482:9
**1509** 249:17
**16** 342:12 412:23
426:14,15 427:16
433:19 482:10
**17** 308:23 330:11,12
330:14 342:12
434:23 435:14
**18** 328:10 330:12
**18th** 418:24
**19** 330:12
**19801** 249:18,21,24

**2**

**2** 251:9 326:11
331:15,23 427:17
429:8 430:1 432:6
432:19
**2nd** 425:23
**2:30** 416:12
**20** 304:22 305:1
323:8 325:23
342:12,15 343:12
382:12 475:23
**20th** 424:21 434:13
**20,000** 448:11
**2001** 321:18 335:7
430:16,17 432:13
432:14,15,22
433:1,2 472:9

Snyder
Terry L. Snyder, Volume 2

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 6, 2006

Page 513

| | | |
|---|---|---|
| **2002** 318:14 321:13 | **31** 484:19 | 312:8 314:14 |
| 322:10 360:6,11 | **327** 482:8 | **8:00** 265:7 309:24 |
| 360:12 376:22 | **33** 317:15,18,19 | **8:30** 422:16 |
| 396:19 401:4,5 | 454:13 | |
| 402:2 417:3 419:1 | **36** 447:1,19 | **9** |
| 422:6 423:16,23 | | **9** 428:10 |
| **2003** 342:8,18 | **4** | **9th** 258:23 266:12 |
| 343:19,23 344:10 | **4** 355:7,8,9,13 419:9 | 266:14,14 272:5,6 |
| 344:11 352:6 | 423:22,24 424:7 | 275:3 276:3,4,5 |
| 353:9 360:16 | 430:24 431:5,21 | 277:11 287:23 |
| 361:15,18 363:23 | **4th** 338:10 430:16 | 288:19 289:9,14 |
| 373:23 376:22 | **4/01** 430:15 | 292:4,5 311:3,4 |
| 379:8 381:2 392:4 | **4/1** 409:2 | 312:4 313:12,15 |
| 396:20,24 401:3,4 | **4/1/03** 404:20 | 313:21 314:7,15 |
| 409:12 414:11,13 | **4/10/03** 308:7 | 318:15 421:6 |
| 414:14 425:21 | **4/7/03** 482:9 | **9:08** 249:13 |
| 429:12 430:8,14 | **4/9** 309:23 | **95** 286:1 |
| 432:16,18,21,23 | **4:25** 481:15 | |
| 433:4 434:13 | **402** 482:9 | |
| 461:1 | **416** 482:9 | |
| **2004** 340:7 413:20 | **426** 482:10 | |
| 413:21 414:2,4 | **449.7** 482:12 | |
| 466:17,18,19,21 | **483** 482:14 | |
| 468:1,8 469:8,14 | **485** 482:15 | |
| 469:18 | | |
| **2005** 337:10,11,11 | **5** | |
| 340:8 342:9,18 | **5** 386:10 389:19,21 | |
| 343:19,23 470:19 | 419:15 431:5,21 | |
| 473:7,7,16 474:15 | **5:00** 270:2 274:6 | |
| **2006** 249:13 470:24 | | |
| 471:10 473:19 | **6** | |
| 484:7 | **6** 249:13 259:18,20 | |
| **2008** 484:19 | 430:17 431:5,21 | |
| **21** 435:10 | 432:15 | |
| **21st** 423:15 436:11 | **6th** 484:6 | |
| **22** 259:19 | **6:00** 283:6 291:9,19 | |
| **22nd** 413:20,21 | 291:21,24 292:8 | |
| **23rd** 417:3 | 293:4 294:23 | |
| **25** 415:3 | 295:1 | |
| **250** 425:6,20 482:4 | **6:30** 295:4 | |
| **252** 424:17,18 | **62** 331:14 | |
| **256** 421:10 | **655-0477** 249:25 | |
| **257** 420:2,2 | | |
| **27** 474:15 | **7** | |
| **29** 355:13,14 | **7** 251:8 259:24 | |
| **29th** 288:23 289:14 | 329:13 392:24 | |
| 289:16 311:2 | 421:11 431:5,21 | |
| **298** 309:9 | 432:15,22 | |
| | **7th** 289:2 346:7 | |
| **3** | 383:10 393:16,18 | |
| **3** 309:13,14 418:10 | 429:12 430:8,14 | |
| 429:8 430:1,16,24 | **7:30** 252:6,10 | |
| 431:5,17 | | |
| **30** 307:19,21,23,24 | **8** | |
| 308:3 | **8** 427:21 428:10 | |
| **302** 249:25 | **8th** 258:23,24 | |
| **306** 482:8 | 271:18 289:7 | |

B-0302



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Snyder

## v.

# CitiSteel, USA, Inc.

### C.A. # 04-970 (JJF)

---

### Transcript of:

# Terry L. Snyder

**Volume # 3**

**October 16, 2006**

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B-0303

Snyder
Terry L. Snyder, Volume 3

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
October 16, 2006

Page 237

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TERRY L. SNYDER,                    )
                                    )
            Plaintiff,              )   Volume 3
                                    )   Civil Action
v.                                  )   No. 04-970(JJF)
                                    )
CITISTEEL USA, INC.,                )
                                    )
            Defendant.              )

      Continued deposition of TERRY L. SNYDER taken
pursuant to notice at the law offices of Young Conaway
Stargatt & Taylor LLP, The Brandywine Building, 1000
West Street, 17th Floor, Wilmington, Delaware,
beginning at 10:15 a.m. on Monday, October 16, 2006,
before Lucinda M. Reeder, RDR, CRR and Notary Public.
APPEARANCES:
            LORI A. BREWINGTON, ESQ.
            MARGOLIS EDELSTEIN
              1509 Gilpin Avenue
              Wilmington, Delaware  19801
              for the Plaintiff,
            MARGARET DiBIANCA, ESQ.
            YOUNG CONAWAY STARGATT & TAYLOR LLP
              The Brandywine Building
              1000 West Street, 17th Floor
              Wilmington, Delaware 19801
              for the Defendant.


      ALSO PRESENT:

      DEBBIE COLES, YOUNG, CONAWAY, STARGATT & TAYLOR LLP
      JEFF CASTELLANO, YOUNG, CONAWAY, STARGATT & TAYLOR LLP

- - - - - - - - - - - - - - - - - - - - - - - - - --
            WILCOX & FETZER, LTD.
      1330 King Street - Wilmington, Delaware  19801
                  (302) 655-0477
                  www.wilfet.com

B-0304

Snyder                                    v.                    CitiSteel, USA, Inc.
Terry L. Snyder, Volume 3          C.A. # 04-970 (JJF)          October 16, 2006

Page 238

1    TERRY L. SNYDER,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5    BY MS. DiBIANCA:
6    Q.  Good morning.
7    **A.  Good morning.**
8    Q.  Hi.
9    **A.  How you doing?**
10   Q.  Very well.  How about you?
11   **A.  Good.**
12   Q.  We're back today for the continuation of your
13   deposition, which we ended last on June 6th, I believe
14   is the date, and we're here today just for damages
15   information that came out of the tax returns.
16   **A.  Okay.**
17   Q.  The first thing I'm going to give you we're
18   going to mark as an exhibit.
19       (Snyder Deposition Exhibit No. 17 was
20   marked for identification.)
21   BY MS. DiBIANCA:
22   Q.  This, I am not sure you have been seen this
23   before, this is I'll represent to you is a letter from
24   your counsel, dated back in March of this year

Page 239

1    spelling out your damages.  This is primarily what
2    we're going to be discussing today.
3        Did you have any input into the calculation
4    of these damages?
5    **A.  I don't understand.**
6    Q.  Let's see.  The first, the second sentence
7    states that: "Our computation of damages is follows:
8    $68,487 in back pay and $45,658 for future losses,
9    $100,000 for pain and suffering, 4100,000 in punitive
10   damages and $4,000 for out-of-pocket medical
11   expenses." Did you help come up with those figures?
12   **A.  I don't recall.**
13   Q.  Okay.  45,000, approximately, dollars for
14   future losses.  That's the second number there.
15   **A.  Okay.**
16   Q.  Can you tell me what that represents?
17   **A.  No.  I can't remember.**
18   Q.  $100,000 for pain and suffering, can you tell
19   me what that represents?
20   **A.  Yeah, the torture they put me through.  Mm-hmm.**
21   Q.  Okay.  Anything sort of more specific than
22   that, sort of --
23   **A.  Being tormented and harassed and fondled and**
24   **then being pushed off the grounds, yeah.**

Page 240

1    Q.  Okay.
2    **A.  Mm-hmm.**
3    Q.  And then the $4,000 for out-of-pocket medical
4    expenses, who were those costs paid to?
5    **A.  Well, I would assume the doctors and the**
6    **therapists.**
7    Q.  Okay.
8    **A.  Mm-hmm.**
9    Q.  So that would be which doctors and therapists?
10   **A.  Cindy Wright, Goodman.**
11   Q.  Those are the costs you incurred with them?
12   **A.  I'm assuming.  Whatever I provided.**
13   Q.  Say again.
14   **A.  Whatever it came to, yeah, so.**
15   Q.  I am just going to give you some copies of tax
16   returns.  Let's start with 2000.  Actually maybe I
17   should move all of these in at once.  It might be
18   easier.  Let's do that.  I am going to hand you Snyder
19   18, and that will be the 2,000 tax returns.
20       (Snyder Deposition Exhibit No. 18 was
21   marked for identification.)
22   BY MS. DiBIANCA:
23   Q.  Have you seen these recently?
24   **A.  No.  Recently, no.**

Page 241

1    Q.  Okay.  Do you want a minute to go over them?
2    **A.  No.**
3    Q.  Okay.
4    **A.  Tell me what you want me to look at.  I'll look**
5    **at it.**
6    Q.  Let's get to the W-2s.  The W-2s.  Just flip
7    through; there should be W-2s.
8    **A.  Okay.**
9    Q.  If you want to go through and tell me the
10   places where you worked according to that.
11   **A.  Bank One.**
12   Q.  Where was Bank One?
13   **A.  202, Concord Pike.**
14   Q.  Okay.
15   **A.  The Brandywine Building.**
16   Q.  Okay.  And how long did you work there for?
17   **A.  Four months.**
18   Q.  Did you work there for -- through a temporary
19   agency, or --
20   **A.  No.**
21   Q.  Applied directly?
22   **A.  Yes.**
23   Q.  And then the next one?  They're double-sided
24   printed, so there is one on the back there.

B- 0305

2 (Pages 238 to 241)

Snyder
Terry L. Snyder, Volume 3

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
October 16, 2006

Page 242

1    A.  Mm-hmm.
2    Q.  What was that one?
3    A.  Associates.
4    Q.  What was that?
5    A.  A bank.
6    Q.  A bank?
7    A.  Mm-hmm.
8    Q.  Where was it?
9    A.  Newark.
10   Q.  Did you apply directly there or through a --
11   A.  Yes.
12   Q.  You did?
13   A.  Mm-hmm.
14   Q.  How long did you work there for?
15   A.  Four months.
16   Q.  Why did you leave?
17   A.  I was terminated, actually. They let me no.
18   Q.  For what?
19   A.  I got in an argument with a girl.
20   Q.  Okay. Then the next one.
21   A.  TCIM Service.
22   Q.  Do you know what that is?
23   A.  I think it's a phone ... it was on the phones
24   or something.

Page 243

1    Q.  Like a telemarketing?
2    A.  Something, yeah. Yeah.
3    Q.  How long was that for?
4    A.  That wasn't long.
5    Q.  Like less than six months, do you think?
6    A.  Definitely.
7    Q.  Okay.
8    A.  Yeah.
9    Q.  And what happened there?
10   A.  I really don't recall that at all. Yeah.
11   Q.  And then the next one?
12   A.  Is that all of them?
13   Q.  It might be.
14   A.  Do you want me to keep flipping till I find a
15   W- --
16   Q.  I think that might be --
17   A.  2?
18   Q.  I think that's all of them.
19   A.  Okay.
20   Q.  Then we'll do this one as the next version.
21   A.  Do you want these back?
22   Q.  No. But let me give you a stapler, actually.
23         (Snyder Deposition Exhibit No. 19 was
24   marked for identification.)

Page 244

1    BY MS. DiBIANCA:
2    Q.  These are the same thing, but for the year 2001
3    so we're going to do exactly the same thing again.
4    A.  Okay.
5    Q.  If you want to go to the first W-2.
6    A.  Okay.
7    Q.  And what is that?
8    A.  Delaware Temp Systems, but it's actually
9    Bernard. They go by two names.
10   Q.  Do they go by any other names that you know of?
11   A.  No.
12   Q.  Okay. Where are they located?
13   A.  Well, there's two locations, one on 4th &
14   Greenhill, and the other one is right off Woodmill.
15   It looks like a bunch of houses, but they're offices.
16   Woodmill something. Like a little office circular
17   thing, and it's off Kirkwood Highway?
18   Q.  And how long did you work with them?
19   A.  Well, I have been registered with them since
20   2001, actually.
21   Q.  So this was the first year you started working
22   with them, was 2001?
23   A.  This was the first year?
24   Q.  This meaning 2001.

Page 245

1    A.  Yes.
2    Q.  Okay.
3    A.  Working for them, yeah.
4    Q.  How many jobs did you get with them?
5    A.  I can't recall.
6    Q.  How about -- do you remember how often you got
7    jobs through them?
8    A.  Whenever they called, if they said go, I'd go.
9    Q.  Okay. Do you think it was maybe -- do you
10   think -- would you say you were regularly employed
11   through them?
12   A.  I think there was too many gaps.
13   Q.  Okay.
14   A.  I didn't have -- I didn't get as many
15   assignments as I would like. You know, for every
16   job that one person applies 500 more applicants are
17   applying. I just applied with DART, and they told me
18   thousands applied, so, you know. But I got called to
19   take the test. Anyway, that's irrelevant. Sorry.
20   Q.  Okay. And then you continued to work with
21   Bernard or Temporary Systems for how long? When was
22   the last time you worked with them or did a job
23   through them?
24   A.  Last year, I am going to say.

3 (Pages 242 to 245)

Snyder
Terry L. Snyder, Volume 3

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
October 16, 2006

Page 246

1  Q.  Then who is the next one on there?
2  A.  Priority One Staffing.
3  Q.  Who is that?
4  A.  I don't recall at all.
5  Q.  Okay. Who is the next one on there?
6  A.  I can see why. I guess I didn't do much for
7  them. This is supposed to say, "Pyramid, I think. It
8  says "Myriad."
9  Q.  Okay. What's Pyramid?
10  A.  It's a staffing agency for C and Es and
11  flaggers, flagging for construction companies. Flag
12  persons. Sorry.
13  Q.  Did they place you in jobs?
14  A.  Yes.
15  Q.  Do you recall how many?
16  A.  No. Various. I even worked for them while I
17  was working at CitiSteel. I would work at night
18  sometimes a couple hours and on the weekends.
19  Q.  Okay.
20  A.  Whenever she called.
21  Q.  Is it usually the same or I guess it would be a
22  flagging company or is it the government? Depends
23  on --
24  A.  No government. It's a temp agency, but they

Page 247

1  only -- they give assignments to C and Es.
2  Q.  Okay.
3  A.  And flag persons.
4  Q.  Okay.
5  A.  Two completely different occupations she ran.
6  Q.  Okay.
7  A.  Mm-hmm.
8  Q.  Who are the companies that were hiring through
9  Pyramid?
10  A.  You mean who she contract for?
11  Q.  Right.
12  A.  I can't recall. Various construction. And I
13  was with her for a few years.
14  Q.  Do you remember the last time you went through
15  her?
16  A.  During, I think CitiSteel days. So I am going
17  to say, maybe the beginning of 2003 or the end of
18  2002. I really can't honestly answer that. I don't
19  recall, period.
20  Q.  But you don't think you've worked for them
21  since you left CitiSteel?
22  A.  I said, "I don't recall."
23  Q.  Okay. I thought you said ... Okay. Then is
24  there another one after that?

Page 248

1  A.  CitiSteel.
2  Q.  Okay. Is there another one?
3  A.  No questions for CitiSteel, huh?
4  Q.  We already know you worked there.
5  A.  Uh-huh. Associates National Bank again.
6  Q.  Do you think that's the same as the other one
7  that said just "Associates"?
8  A.  Yeah.
9  Q.  Okay.
10  A.  Keeping going?
11  Q.  Yes, please. Oh, no, you are fine at that
12  point. That would be all the W-2s.
13      The first part is the one we got from the
14  IRS. The second one is the same thing from Jackson
15  Hewitt. So it's a duplicate.
16  A.  Okay.
17  Q.  Okay. We'll do 2002.
18      (Snyder Deposition Exhibit No. 20 was
19  marked for identification.)
20  BY MS. DiBIANCA:
21  Q.  I am just going to do the exact same thing.
22  A.  Okay. Do you want me to flip?
23  Q.  Yes.
24  A.  CitiSteel.

Page 249

1  Q.  Okay. So that there is no Pyramid W-2 there.
2  So do you think that that is correct or do you think
3  that is incorrect?
4  A.  I -- that question sounds so twisted.
5  Q.  Let me rephrase it then. The only W-2 attached
6  to the 2002 tax return is for CitiSteel.
7  A.  Okay.
8  Q.  My understanding is that you thought you had
9  worked at Pyramid --
10  A.  Okay.
11  Q.  -- sometime on and off during --
12  A.  Yes. Okay.
13  Q.  -- the CitiSteel employment? But probably not
14  in 2002; do you think that might be accurate?
15  A.  Guess not.
16  Q.  Okay.
17  A.  It says not, it's not.
18      MS. DiBIANCA: I am going to do '03.
19      (Snyder Deposition Exhibit No. 21 was
20  marked for identification.)
21  BY MS. DiBIANCA:
22  Q.  And what's the W-2 there?
23  A.  CitiSteel.
24  Q.  Anything else?

B-0307

4 (Pages 246 to 249)

Snyder                                    v.                    CitiSteel, USA, Inc.
Terry L. Snyder, Volume 3          C.A. # 04-970 (JJF)              October 16, 2006

Page 250

1   A.  Fidelity Investments.
2   Q.  Might that have been like a 401(k), maybe?
3   A.  Oh, yeah.
4   Q.  Or pension, probably?
5   A.  Yeah.
6   Q.  So you think that's right?
7   A.  Yes.
8   Q.  Then no other?
9   A.  Yes.  If that's what the government says, you
10  can't get any clearer than that.
11         MS. DiBIANCA:  This is 2004.
12         (Snyder Deposition Exhibit No. 22 was
13  marked for identification.)
14         THE WITNESS:  Is this a W-2 from
15  Pennsylvania?  It doesn't say "W-2."
16         MS. DiBIANCA:  I'm not sure what it is.
17  But if it doesn't say "W-2," we can probably skip it.
18  BY MS. DIBIANCA:
19  Q.  Did you work in Pennsylvania in 2004?
20  A.  I have done assignments in Pennsylvania, so I
21  don't know.  Some of the agencies I registered with
22  was out of Pennsylvania.
23  Q.  So that is probably why, then.
24  A.  I mean, it says I did, so.  You have to tell me

Page 251

1   here, so.
2   Q.  I would just flip until you get to a W-2.
3   Okay?
4   A.  Do you want me to start talking on my own?  The
5   Franklin Company.
6   Q.  What was that?
7   A.  A temp agency.
8   Q.  Where are they?
9   A.  Broomall, Pennsylvania.
10  Q.  How long did you work for them?
11  A.  I think I did only one assignment for them at
12  Hercules.
13  Q.  How long was that?  How long did the project
14  last?
15  A.  It was just a few weeks, I think.
16  Q.  What happened when you left there?
17  A.  What do you mean?  I don't understand.
18  Q.  How did your end of employment come to be?
19  A.  I stopped.  I ended up working in Verizon,
20  Pennsylvania.  Wait a minute.  Was it Pennsylvania?
21  Yeah, I guess.  Yeah.
22  Q.  So you resigned?
23  A.  Yeah.  I left the assignment a little early.
24  Q.  Was that a problem for them?

Page 252

1   A.  Well, they didn't say they hated me.  They
2   thanked me for my time.
3   Q.  Okay.
4   A.  And thanked me for letting them know in
5   advance.
6   Q.  How long was the project supposed to last?
7   A.  I only left like a week early, so.
8   Q.  And then you said Verizon?
9   A.  Yes.
10  Q.  Where was that?
11  A.  Philly.
12  Q.  This was 2004.  Do you know what part of 2004
13  it would have been?
14  A.  Well, whatever this -- whenever I was here at
15  Hercules, right after.  I mean, I started there.  I
16  went from here to there.  So whenever this was,
17  somewhere maybe August or September, something, I
18  guess.
19  Q.  What were you doing at Verizon?
20  A.  I started to do calls.
21  Q.  And then when did you leave there?  How long
22  did that last?
23  A.  Maybe a month.
24  Q.  Why did you leave?

Page 253

1   A.  A little more.  I missed the train.  You
2   weren't allowed to miss any time in the period, in the
3   training period, or something.
4   Q.  Like a probationary period you mean?
5   A.  Something -- well, yeah.
6   Q.  Or introductory period, maybe?
7   A.  Something like that, yes.
8   Q.  So it was a termination because of absenteeism?
9   A.  Well, I don't think it was that.  Here it is
10  right here.  I don't know.  I missed the train and --
11  so.  That's all I know.
12  Q.  Which one are you pointing out there?
13  A.  Well, I just noticed that it said "Verizon."  I
14  didn't -- I thought half of it was missing because I
15  had it turned this way.
16  Q.  So the next W-2 is Verizon?
17  A.  Yes, ma'am.  Upper Darby.
18  Q.  Then did you call -- did you call in after you
19  were late or did you return to work or did they call
20  you?
21  A.  Yeah.  Well, I missed the train and I got there
22  late, and I missed it again, I think, or something.
23  Yeah.
24  Q.  So did they tell you that --

5 (Pages 250 to 253)

Page 254

1   A. Yes, yes, they did.
2   Q. Okay. Then what's the next one?
3   A. Okay. This is Bernard again. Instead of it
4   saying, "Delaware Temporary Staffing," it just --
5   "Delaware" is missing. They go by Bernard and
6   Delaware Temporary Services or Staffing. Here it just
7   says, "Temporary Staffing."
8   Q. So it says, "Temporary Staffing" on there?
9   A. Yeah. Woodmill. Yeah, okay, because that's
10  their address, yeah, Woodmill Drive.
11  Q. How many projects did you get through them this
12  year?
13  A. I don't recall.
14  Q. Okay. Do you remember any of the places where
15  they sent you?
16  A. They sent me all over. One time I was on Broad
17  Street working for some architect.
18  Q. That would have been in Philadelphia?
19  A. Broad Street is, yes.
20  Q. Broad Street. Mm-hmm.
21  A. No, I don't recall. They sent me all over. If
22  you contact them, I am sure maybe they have a list or
23  something like that. You got all this other
24  information. I am sure you can find it.

Page 255

1   Q. How long were the projects generally?
2   A. One could be a week. One could be months.
3   Q. Months?
4   A. It varied. Varied. There is the answer,
5   varied.
6   Q. How long would you say the longest one was?
7   A. CitiSteel. I ended up becoming a permanent
8   employee through them.
9   Q. Any other ones that you didn't become a
10  permanent employee at?
11  A. That I did?
12  Q. That you did not become a permanent employee?
13  A. All of them. I did not. I just did
14  assignments.
15  Q. Right. How long was the longest of those?
16  A. I don't recall, period.
17  Q. Would you say any of them lasted for more than
18  a month?
19  A. I already answered that. I don't recall,
20  period.
21  Q. Okay.
22  A. Uh-huh.
23  Q. Any other W-2s in that one?
24  A. CitiSteel, again. Oh. Fidelity Investments,

Page 256

1   again.
2   Q. If you want to flip back. I think it's
3   probably the second page or the third page, maybe,
4   where it's the actual return.
5   A. This or this?
6   Q. That first page.
7   A. This?
8   Q. I'm sorry. The first page of the return. Yes,
9   that one.
10  A. This?
11  Q. Yeah. The dependents there, could you tell me
12  who they are, please?
13  A. My mother, Clara Snyder, and Samantha and
14  Ashley King.
15  Q. Who are they?
16  A. Clara Snyder is my mother, and Ashley and
17  Samantha are my little cousins.
18  Q. Okay. And --
19  A. It says, "niece" and "nephew." They're
20  females. Neither one of them is my niece or nephew.
21  I don't have any brothers or sisters to have nieces or
22  nephews, but. It's a typo.
23  Q. It should say "cousins"?
24  A. Yes.

Page 257

1   Q. Okay.
2   A. Mm-hmm.
3   Q. Why were they your dependents this year, in
4   2004?
5   A. Well, their mother was homeless.
6   Q. Okay.
7   A. And they were homeless and the mom had to stay
8   at her mom's, and there was too many people there, and
9   so I let them stay with me.
10  Q. Okay.
11  A. And she told me to claim them, so I did. She
12  would come down, too, during the day. Basically, she
13  would just sleep at her mother's, the mother of them.
14  Q. Okay. All right. We're done with that one.
15      I am just going to do 2005.
16      (Snyder Deposition Exhibit No. 23 was
17  marked for identification.)
18  BY MS. DiBIANCA:
19  Q. Okay. What do we have on this one?
20  A. Bayshore Ford Truck Sales.
21  Q. When did you work there?
22  A. I don't know. Well, it says, "2005," so 2005.
23  Q. How long did you work there?
24  A. Not long. Maybe a week. Something like that.

B-0309

6 (Pages 254 to 257)

Snyder
Terry L. Snyder, Volume 3

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
October 16, 2006

Page 258

1  Q.  What happened when you left there?
2  A.  I wasn't -- why did I leave?
3  Q.  Mm-hmm.
4  A.  I wasn't -- they said that I wasn't doing it
5  quick enough. Some girl had to train me. So they let
6  me go.
7  Q.  Okay.
8  A.  Mm-hmm. Who can learn all this in -- it wasn't
9  even a week. How can -- you know, I think there
10  should be a training period. A good time frame, so.
11  Q.  Would you call that a voluntary resignation or
12  a termination?
13  A.  I don't know. Call it whatever you want. I
14  don't know.
15  Q.  Did you quit or were you fired?
16  A.  They let me go. I already told you that just a
17  moment ago.
18  Q.  Okay, okay. Where else?
19  A.  I'm sorry?
20  Q.  What's the next one?
21  A.  Keep going? Vintage Properties.
22  Q.  Tell me about that.
23  A.  It's a company that owns apartment complexes,
24  and I would rent apartments, a leasing agent.

Page 259

1  Basically, it was on the weekends and sometimes it
2  would be one day on a weekend. It wasn't enough time.
3  I wanted to work full-time, you know, and it wasn't.
4  Q.  How did you find that job? Was that through a
5  placement service?
6  A.  No. In the News Journal, under "leasing
7  consultants," you know, when they have the ads.
8  Q.  So you applied to them direct?
9  A.  Yes.
10  Q.  How long did that last?
11  A.  I don't recall.
12  Q.  But it was weekends only?
13  A.  I may have worked during the week or they may
14  have called me once or twice during the week. I
15  really don't recall. If they called me, I would go
16  in, period, so.
17  Q.  Then was there another one after that or is
18  that the last one?
19  A.  Well, it says, "Delaware Temp Services."
20  That's Bernard.
21  Q.  This would have been for 2005. Do you remember
22  how many places you got placed with Bernard --
23  A.  No.
24  Q.  -- in 2005?

B- 0310

Page 260

1  A.  No, I don't remember.
2  Q.  Okay. And Vintage Properties, where did you
3  go -- I know that in the taxes one comes after
4  another, but. What was the sequence of time? Which
5  came first, Vintage Properties, Bayshore?
6  A.  I don't know.
7  Q.  You don't remember?
8  A.  No, I don't.
9  Q.  Do you remember if you worked any place after
10  Vintage Properties?
11  A.  No. I don't remember.
12  Q.  Okay.
13  A.  One came after another, so.
14  Q.  Do you recall if you had other -- not a
15  specific place, but other employment when you left
16  Vintage Properties?
17  A.  I don't recall. Whatever this stuff says.
18  Q.  That doesn't indicate any time frames.
19  A.  We can call them and ask them. I don't recall.
20  Q.  Oh, no. I mean for -- when you left there, did
21  you go from there to another job?
22  A.  I said, I don't recall.
23  Q.  Okay.
24  A.  Okay.

Page 261

1  Q.  Okay. So we're done with taxes. Let's talk
2  about job search. This is -- we're only going to talk
3  about after CitiSteel, so April 2003 to the current.
4  A.  Mm-hmm.
5  Q.  When you left CitiSteel, do you recall when the
6  first time was that you looked for work?
7  A.  No, I don't recall.
8  Q.  Okay. Do you recall what you did to look for
9  work?
10  A.  Go on the Internet, faxes, calls, go around
11  places and apply.
12  Q.  You produced a lot of faxes to various
13  employers, and I believe they were from the Department
14  of Labor, sent from the Department of Labor?
15  A.  Yeah. I still even go there and use their
16  equipment. When you are looking for a job, you are
17  welcome to go there, use their computers and their fax
18  machines and stuff. I think I supplied all this
19  information to you before. I think you have asked me
20  these questions before.
21  Q.  You did supply all the faxes?
22  A.  Yeah. But I think you have even asked me all
23  these exact same questions before in our previous
24  deposition and now you are asking again, so.

7 (Pages 258 to 261)

Snyder                                    v.                     CitiSteel, USA, Inc.
Terry L. Snyder, Volume 3          C.A. # 04-970 (JJF)           October 16, 2006

Page 262

1    Q.  For the job search part?
2    A.  Yeah, yeah.  Yeah, you did.
3    Q.  Okay.  So --
4    A.  So you should have all that on record, my
5    answers.
6    Q.  At the time I believe you didn't recall.
7    A.  I don't think you recall asking me these
8    questions.
9    Q.  But if you do your search throughout your
10   documents that you have, you'll find that you have
11   asked me these questions before.
12   A.  Okay.
13   Q.  But today, the reason we're here today is for
14   damages testimony.
15   A.  Okay.  To repeat ourselves, repeat the same
16   questions?
17   Q.  No.  Today, we're here for damages testimony to
18   give you the opportunity to put on the record what
19   damages you have.
20         MS. BREWINGTON:  Okay.  If I could just
21   interrupt.  I think what Terry is saying, you did ask
22   her specifically about the faxes.
23         THE WITNESS:  And job searches.
24         MS. BREWINGTON:  I don't know if she went

Page 263

1    through taxes, I don't recall that, but I know you did
2    ask her about that.  But I just --
3          MS. DiBIANCA:  Because at that time,
4    remember, you had actually produced the job search
5    faxes as a supplement.  So that was actually produced
6    after the deposition.
7          MS. BREWINGTON:  But I do remember you
8    asked her about --
9          THE WITNESS:  But you did ask me about when
10   I first did my job search before in one of the
11   previous depositions, and it's documented somewhere.
12   It's on the transcriptions and all that.  You have
13   asked me that before already.
14         MS. BREWINGTON:  How about we try to
15   continue to go forward without trying to repeat what
16   we did before.
17         THE WITNESS:  Yes.  Exactly.
18   BY MS. DiBIANCA:
19   Q.  Where was the last place that you worked?
20   A.  Driving a tractor -- just recently?
21   Q.  Yes.
22   A.  Driving a tractor-trailer.
23   Q.  Where was that?
24   A.  The name of the company or the address?  D and

Page 264

1    E or DE.  Delaware -- DVE, Delaware Valley Express,
2    Hay Road, Wilmington, Delaware.  But I didn't drive in
3    Delaware.  Well, I would leave out of Delaware.
4    Q.  It's on Hay Road?
5    A.  Hay Road.
6    Q.  H-A-Y?
7    A.  Yes, ma'am.
8    Q.  When did you work there?
9    A.  June -- not even a week after Skelly.  The very
10   beginning of June.  Maybe June 10th.
11   Q.  You still --
12   A.  Wait a minute, wait a minute.
13   Q.  Sorry.
14   A.  2nd, 3rd -- not even a week after Skelly.  The
15   very beginning of June 2006.
16   Q.  Are you still working there now?
17   A.  No.
18   Q.  When did you leave there?
19   A.  Soon after.  Every day I called in, they didn't
20   have any runs for me.  One day they called, my mother
21   and I was in a doctor's office, and demanding, you
22   know, get here now and go on a run.  I said, "That is
23   impossible."  I wasn't going to walk out of the
24   doctor's office.  I had an appointment there, too, or

Page 265

1    leave my mother, so I just never contacted them again.
2    Q.  How did you get -- what was your rate of pay?
3    Was it pay per run?
4    A.  It was supposed to be $18 an hour.
5    Q.  Okay.
6    A.  He paid me for the run $135, which I think one
7    of the truckers told me it was lower than what I was
8    supposed to get for it.
9    Q.  Do you still have the pay stubs for that
10   employment?
11   A.  I should, yes.  Well, no.  He paid me in cash,
12   and there was just a receipt.  There was no pay stub.
13   He didn't give me a pay stub.
14   Q.  So I'll just put on the record an official
15   document request:  If there is anything relating to
16   your wages or earnings at Delaware Valley Express for
17   the 2006 year, that they be produced.
18   A.  I think I have the receipt.  If not, maybe they
19   have a copy.
20   Q.  Are they still in business?
21   A.  I couldn't tell you.
22   Q.  But they were when you left?
23   A.  Yeah.
24   Q.  Okay.  Who was your supervisor there or your

B- 0311

8 (Pages 262 to 265)

Snyder                                          v.                    CitiSteel, USA, Inc.
Terry L. Snyder, Volume 3              C.A. # 04-970 (JJF)              October 16, 2006

Page 266

1  contact person?
2      A. The owner's name is Charlie. His brother's
3  name was Walter. Walter was the one I continued to
4  call every day for a run.
5      Q. So you would call into him?
6      A. Yes.
7      Q. Okay. What's the last name?
8      A. Oh. I don't know. I don't recall.
9      Q. Did you apply directly there?
10     A. Yes.
11     Q. And Skelly, what -- you said June was the last
12 date there?
13     A. Yes. Sorry. I'm sorry. My head is killing
14 me. I'm sorry.
15     Q. What happened for you to leave Skelly?
16     A. Well, I had a deposition with you that week,
17 and when I went in the next day, I think we had some
18 other dates set up or something, and when I went in
19 and told them, try to let them know in advance, he
20 wasn't happy. He smacked his leg and sighed, "huh."
21 And, I don't know, the next day my badge didn't work.
22 He came out and said he was letting me go. That was
23 it.
24     Q. Who is "he"?

Page 267

1      A. His name was Lou.
2      Q. What's his last name?
3      A. I don't know. I don't recall.
4      Q. Do you know what the date was when you were let
5  go?
6      A. June 2nd.
7      Q. That was the only reason was the needed time
8  off?
9      A. He really didn't give me a reason. I don't
10 know. I don't think he liked me, to be honest with
11 you. I don't know. I kept mentioning benefits and
12 asking about a benefits package. I think they were
13 lying to me. They never produced nothing to me. They
14 never gave me nothing.
15     Q. You think it might have been because they
16 didn't want to pay benefits?
17     A. I don't know. I really don't know. I can't
18 answer that.
19     Q. And then now, are you working now?
20     A. I wish. No.
21     Q. Are you seeking work now?
22     A. Yes.
23     Q. What are you doing to seek work?
24     A. Well, I go to unemployment. I go on the

Page 268

1  Internet. I send a cover letter and a resume to
2  companies. I use their fax machine. I make calls. I
3  just actually called a couple companies actually last
4  night.
5      Q. What companies?
6      A. One is called U.S. Express. Another one is --
7  I couldn't leave a message on this one -- Global
8  Limousine Service. I actually did leave my name and
9  number on U.S. Express even though it was a Sunday
10 night. I feel if you want a job, you are going to
11 look; it doesn't really matter what time of day, you
12 know. If they answer, you can talk to them; if not,
13 you can leave a message. It says "leave a message."
14     Q. There was -- you produced -- actually I guess I
15 should just move this in. I'm sorry for the delay. I
16 don't have it in front of me, so let me just ask.
17        I'll represent that I believe there was a
18 discovery response produced that said you had gotten
19 money from your father sometime between now and the
20 time that you had left CitiSteel. Can you tell me
21 approximately how much?
22     A. He already answered them questions for you.
23     Q. I know, but I'm asking you.
24     A. 200, maybe 300 sometimes.

Page 269

1      Q. And that was how often?
2      A. Maybe once every other week. Sometimes if and
3  when he came to Delaware.
4      Q. When did that stop?
5      A. I don't know. He just helped me out not too
6  long ago. As a matter of fact, he answered that
7  question for you right soon before you seen him. When
8  you met with him. So whatever that date was that you
9  met with him. Maybe a week prior or a couple days
10 prior to the day you met with him.
11     Q. Since your father's deposition, you haven't
12 received any moneys from him; is that correct?
13     A. No, that's not correct.
14     Q. Okay.
15     A. No.
16        What does that have to do with any of this?
17 What does that have to do with this case?
18        MS. BREWINGTON: Terry, can you answer the
19 question, please?
20        THE WITNESS: I just answered it. Yes, I
21 have received money from him since.
22        MS. BREWINGTON: What is the question?
23        MS. DiBIANCA: The question was: When was
24 the last time that she got the moneys from her father?

9 (Pages 266 to 269)

Snyder
Terry L. Snyder, Volume 3

v.

C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
October 16, 2006

Page 270

1  And I think she said he testified to that when he was
2  here that day; that it hasn't been since then.
3        THE WITNESS: I didn't say it hasn't been
4  since then.
5        MS. DiBIANCA: That's what I am just ready
6  to clarify.
7        THE WITNESS: No.
8        MS. DiBIANCA: That's what I want to
9  clarify.
10        MS. BREWINGTON: All right. The
11  question --
12        THE WITNESS: Then I didn't understand that
13  question. No. Yes, I have received moneys since you
14  met with him. Okay.
15  BY MS. DiBIANCA:
16  Q.  Okay. When was the last time?
17  A.  Last Thursday.
18  Q.  How much was that?
19  A.  500.
20  Q.  And the time before that?
21  A.  That was a couple days prior to when you met
22  him, whatever his deposition was.
23  Q.  Okay.
24  A.  Sorry if I was confused.

Page 271

1  Q.  That's what I wanted to clarify. How much was
2  that at that time?
3  A.  I don't recall. It was maybe 200 or 300.
4  Q.  Okay.
5  A.  Mm-hmm.
6  Q.  I am just going to move -- these are the
7  discovery responses that you submitted since we last
8  met. We'll do all this as one.
9        (Snyder Deposition Exhibit No. 24 was
10  marked for identification.)
11  BY MS. DiBIANCA:
12  Q.  Just take a minute to look those over and see
13  if you recall answering them. Are you done with them?
14        Lori, do you want a minute?
15        MS. BREWINGTON: No. I'm good.
16  BY MS. DiBIANCA:
17  Q.  Do you remember answering those questions?
18  A.  Not really.
19  Q.  Do you remember being asked the questions or
20  reviewing the questions?
21  A.  I have been asked so many questions and given
22  so many answers, I really can't remember be every
23  detail with you and your associates, no. So, no.
24  Q.  Do you remember pretty recently signing a

Page 272

1  verification form?
2  A.  In regards?
3  Q.  It would have been in regards to those three
4  documents saying that those were truthful statements.
5        MS. BREWINGTON: I have four documents. So
6  which ones are you talking about? The three that she
7  has?
8        MS. DiBIANCA: It should be three I think.
9        MS. BREWINGTON: You gave me four. Do you
10  want me to compare mine with hers and give you back
11  one?
12        MS. DiBIANCA: Yes. It should be RVs,
13  supplemental RVs, request for production, I want to
14  say, and maybe there is a second interrogatory, too.
15        MS. BREWINGTON: Okay. I am giving you
16  this one back.
17        MS. DiBIANCA: Okay. Actually I will just
18  put this with yours, and so --
19        MS. BREWINGTON: Okay. Since the last
20  deposition. That way it's all current.
21        MS. BREWINGTON: Okay.
22  BY MS. DiBIANCA:
23  Q.  The verification would have said -- I'm sorry,
24  you might have answered this. Did you say you did

Page 273

1  recall signing that?
2        THE WITNESS: When I came into the office
3  and --
4        MS. BREWINGTON: I can't answer.
5        THE WITNESS: Oh.
6        MS. BREWINGTON: Just try your best to
7  remember.
8        THE WITNESS: Oh, sorry. I don't know. I
9  don't know. If you tell me or show me what it was.
10  You know what I mean? Help me out a little.
11        MS. DiBIANCA: I don't know that I do have
12  it here or I would. But it was a one-page
13  verification form. A lot of papers. Nothing that I
14  am looking for.
15        MS. COLES: Do you want me to go get it?
16        MS. DiBIANCA: No, I don't. If you don't
17  mind. That way she can actually see it.
18        MS. COLES: For which one?
19        MS. DiBIANCA: It was for all three. It
20  says, "Plaintiff's responses to defendant's discovery
21  requests." It incorporated all of them. It gave the
22  docket number, too.
23        THE WITNESS: The package where it was a
24  lot of questions asking me true or false, was it

10 (Pages 270 to 273)

Page 274

1   something like that?
2          MS. DiBIANCA: That's actually in there.
3          THE WITNESS: I remember signing that.
4          MS. DiBIANCA: Okay.
5          THE WITNESS: So --
6          MS. DiBIANCA: This would have just
7   been --
8          THE WITNESS: I don't know what else you
9   are talking about.
10         MS. DiBIANCA: It's just a one-page that
11  says -- normally, lawyers sign them, but in this case
12  for discovery requests, the actual party has to sign,
13  so that's why it's a separate piece of paper.
14         THE WITNESS: What did that piece of paper
15  say?
16         MS. DiBIANCA: Just that you were verifying
17  the accuracy of --
18         THE WITNESS: My answers, of the true or
19  false answers?
20         MS. DiBIANCA: Yes.
21         THE WITNESS: Okay.
22         MS. DiBIANCA: All right. Well, she'll get
23  that. In the meantime, we can go backwards.
24  BY MS. DiBIANCA:

Page 275

1   Q.   Now, at this time looking at those that are
2   there, anything in there that you need to change or
3   supplement that you see?
4   A.   I haven't read all these. You just handed them
5   to me two seconds ago, two minutes ago, so I can't
6   actually answer that.
7   Q.   Okay.
8   A.   You know.
9   Q.   Okay. Let's return that for now.
10  A.   Do you mean to hand them back to you?
11  Q.   No.
12  A.   Flip them?
13  Q.   I just mean move on. You can throw them back
14  in her pile.
15  A.   We can move right along.
16  Q.   You were here when Cynthia Wright testified at
17  her deposition?
18  A.   No. I wasn't here.
19  Q.   No?
20         MS. BREWINGTON: No.
21  Q.   Oh, I'm sorry.
22  A.   That's okay.
23  Q.   I thought you were here. I'm sorry.
24  A.   Who has a perfect memory? Ms. Molly. My God.

Page 276

1   Q.   Well, okay. You weren't here. I'm sorry.
2   A.   Mm-hmm.
3   Q.   When she was here, she testified about having
4   seen you.
5   A.   Yeah.
6   Q.   And she went through various things that were
7   causing you to be depressed.
8   A.   Mm-hmm.
9   Q.   Source of stress.
10  A.   Like this stuff now is, just dragging it out,
11  stressing me out, driving me crazy. CitiSteel and the
12  associates are just continuing to drive me up the
13  wall. You are correct.
14  Q.   That was actually one of them, was her -- was
15  the lawsuit being a source of stress; is that right?
16  A.   Yeah. Sure. I think anybody would feel that
17  way.
18  Q.   Looking for a job, that was a source of stress;
19  is that right?
20  A.   Well, not having a job, I think also, you know.
21  Q.   I have her exhibit here, so we can use that
22  since you weren't here.
23  A.   Okay.
24  Q.   So you can actually see.

Page 277

1   A.   Did you want that?
2   Q.   You produced these, so you have seen these
3   before.
4   A.   Okay. Sure.
5   Q.   But this way you have something to reference.
6   A.   Okay. Thank you. Do you want to go backwards
7   or did you want to continue with Ms. Wright for now?
8   Q.   We can do this really quick.
9   A.   Yes. Did you want to do this first?
10  Q.   We'll do verification first.
11  A.   Okay.
12         (Snyder Deposition Exhibit No. 25 was
13  marked for identification.)
14  BY MS. DiBIANCA:
15  Q.   So this is -- do you want to tell me what it
16  is?
17  A.   Do you want me to read it?
18  Q.   Do you recall signing it?
19  A.   To tell you the truth, I have been having bad
20  headaches these past couple weeks, and -- but it says
21  I signed it on October 2nd, 2006, so I did. It's my
22  signature, so.
23  Q.   Okay. Do you now recall what the document is?
24  A.   It's saying that, when I answered yes or no to

11 (Pages 274 to 277)

Snyder
Terry L. Snyder, Volume 3

v.

C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
October 16, 2006

Page 278

1  another document, it's true or not. I don't know if I
2  am saying it right.
3  Q.  Do you understand that to mean that the answers
4  that you provided were truthful?
5  A.  To the best of my ability, yes. Yeah.
6  Q.  Yeah. Absolutely.
7  A.  Yeah.
8  Q.  Okay. We're done with that.
9  A.  Okay.
10  Q.  That was an easy one.
11  A.  All right.
12  Q.  Now we're going back to Cynthia Wright. So why
13  don't you, if you would like, why don't you tell me in
14  your own words, what -- obviously, you know you were
15  being treated at that time, 2000 -- after leaving
16  CitiSteel, 2003 April and then onward from that time
17  with Cynthia Wright.
18  A.  What?
19  Q.  Sorry. That was a twisted way to say it.
20  Okay. You started seeing Cynthia Wright?
21  A.  Why did I seek her?
22  Q.  I was laying foundation by saying that you
23  started seeing Cynthia Wright in April of 2003 after
24  you left CitiSteel.

Page 279

1  A.  Correct. Okay.
2  Q.  And you were seeing her, as she testified last
3  time, for depression and similar emotions. Is that
4  right?
5  A.  Yes.
6  Q.  And you talked -- I would like you to talk
7  about, in your own words, instead of Ms. Wright's
8  words, what the sources of that stress was.
9  A.  CitiSteel.
10  Q.  Okay. And being unemployed, was that one?
11  A.  CitiSteel, basically. I mean, who doesn't get
12  depressed for -- or bothered or something if they
13  don't have a job? I mean, but, no. My objective and
14  need of her was to help me, you know, overcome
15  CitiSteel's torture. Bottom line, period.
16  Q.  What about stress from the lawyers and the
17  lawsuit?
18  A.  Well, what about it? It's still stressful.
19  Q.  Mm-hmm. And she helped you --
20  A.  You're not an easy load, Molly, you know.
21  Q.  I have heard that before.
22  A.  You know.
23  Q.  She was helping you with that?
24  A.  Yes, ma'am.

Page 280

1  Q.  I believe she talked about there was, in July
2  of 2003, stress from your relationship with your
3  significant other. Do you recall that?
4  A.  Aren't all men stressful? No, no, I don't
5  recall, actually. They're all stressful every day,
6  whether it's in a good way or bad way, so.
7  Q.  Then, I believe, in October there was some -- a
8  very serious family crisis.
9  A.  I don't recall. You'd have to tell me or show
10  me where it is or something.
11  Q.  I believe it was relating to your cousin.
12  A.  I don't -- which one?
13  Q.  Well, let me see. I believe there was a cousin
14  who might have attempted suicide.
15  A.  Oh. Yeah. He jumped off the bridge, yeah.
16  Q.  So that was, obviously, a source of stress at
17  that time?
18  A.  Sure. A family member, they killed theirself.
19  You're not going to laugh about it, not going to be
20  happy about it.
21  Q.  Any other major life events over that period
22  between the time you started seeing her April 2003 and
23  we'll say, maybe the end of 2004?
24  A.  Can you repeat that? I'm sorry.

Page 281

1  Q.  Sure. I think you saw her through February
2  2004. But just to be on the safe side, we'll say,
3  April 2003 until the end of 2004.
4  A.  Well, I think my things with her expired or
5  something, so whenever this ended. Yeah, I don't
6  know.
7  Q.  Okay.
8  A.  You have to repeat that question. I'm really
9  sorry.
10  Q.  I didn't ask a question yet.
11  A.  Okay.
12  Q.  I think it's on the front page there what the
13  dates were.
14  A.  Okay. Very good.
15  Q.  For that period of time, did you have any other
16  major life events or sources of stress besides the
17  ones we just talked about?
18  A.  I don't recall. Maybe if you trigger my memory
19  a little bit.
20  Q.  No, there is no secret answer. I am just ...
21  A.  So.
22  Q.  Okay. And then, let's see, Friday, or last
23  week -- I'm not sure it was Friday -- counsel sent me
24  this. We'll mark that as 26.

12 (Pages 278 to 281)

Snyder                                         v.                    CitiSteel, USA, Inc.
Terry L. Snyder, Volume 3          C.A. # 04-970 (JJF)                 October 16, 2006

Page 282

1    (Snyder Deposition Exhibit No. 26 was
2    marked for identification.)
3    BY MS. DiBIANCA:
4    Q.  Have you seen that before?
5    A.  Yes. I supplied it to you.
6    Q.  Oh, okay. Could you tell me what it is, then?
7    A.  It is a form, an evaluation, from a -- I don't
8    know much of the difference between a psychiatrist --
9    I think I am saying it right. It's a form of an
10   evaluation from a psychiatrist.
11   Q.  And what was the psychiatrist's name?
12   A.  Well, it says, "David Kalkstein."
13   Q.  Then something is marked out there and then it
14   says, "& Associates"?
15   A.  Comma M.D. -- Something is blurred out -- &
16   Associates.
17   Q.  Is Dr. Kalkstein the psychiatrist that you saw?
18   A.  You know what, I don't even recall his face. I
19   don't even remember going to him. It was a one-time
20   visit for an evaluation.
21   Q.  Okay.
22   A.  So I think I answered you improperly before
23   because you asked me that before and I told you, no,
24   and apparently I did. So I think I answered you

Page 283

1    untruthfully or wrong last time.
2    Q.  Okay.
3    A.  You asked me if I ever seen a psychiatrist. I
4    don't know that -- I didn't remember this. It was a
5    one-time evaluation. So I apologize.
6    Q.  Okay.
7    A.  So. I didn't know about this at all. I didn't
8    remember.
9    Q.  When did you recall it?
10   A.  I think they called me telling me that you were
11   trying to get some information and would I release it.
12   Q.  Okay.
13   A.  Okay. I said, "Yes." I said, "Send me the
14   form so I can sign it." I said, "Can you send me a
15   copy of whatever you have, too?" Like you gave me
16   copies. And so I decided to make it quicker for
17   everybody and I just took this into their office and
18   made a copy for you guys.
19   Q.  Okay.
20   A.  You may have received something from them. I
21   don't know.
22   Q.  No, not yet.
23   A.  But this is what you are going to receive.
24   Q.  Right.

Page 284

1    A.  So I just thought I'd make it quicker. Sorry.
2    Q.  And whoever the psychiatrist was in this
3    office, whether it was Kalkstein or someone else, why
4    did you see them?
5    A.  I needed to get on some medicine. I needed to
6    be approved that I wasn't going to kill another
7    human-being or kill myself. I needed to be approved
8    that I wasn't that depressed or -- even though we're
9    all crazy in our own way -- I wasn't out there, you
10   know.
11   Q.  How did you find their office?
12   A.  I don't know. I think my liver doctor might
13   have called them or set me up with an appointment.
14   You know how like if one doctor will say, okay, I want
15   you to go to this doctor for a test and like the
16   receptionist will just set you up with an appointment
17   and point you in that direction. I think they just
18   set me up with them. I don't know. I didn't look for
19   them.
20   Q.  Were you experiencing depression at this time?
21   A.  Well, no. I mean, I wasn't depressed, you
22   know, in -- about life in general, but I was still
23   bothered by -- which I still very much am -- CitiSteel
24   but that's not enough to want to kill yourself or want

Page 285

1    to kill somebody else. You know what I mean? There
2    is a borderline. When it comes to your health, you
3    have to continue on and take care of yourself no
4    matter what is going on in life. You know, you are
5    not going to neglect your health, so.
6        Did I answer that okay? There's my answer.
7    Q.  I can't read his or her handwriting.
8    A.  Ain't no doctors you can read their
9    handwriting, period. So.
10   Q.  So he or she -- is it he?
11   A.  Well, I guess. His name is David.
12   Q.  Okay. Did he then give you clearance to go --
13   A.  Yes.
14   Q.  I'm sorry. I am going to finish the question.
15   A.  Oh. Sorry.
16   Q.  Did he give you clearance to go back to the
17   liver doctor saying you were not depressed and you
18   were able to take the medicine?
19   A.  Yes. He approved me, yes.
20   Q.  He did not require any kind of follow-up
21   treatment?
22   A.  To come back with him?
23   Q.  Right.
24   A.  No.

B-0316

13 (Pages 282 to 285)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Snyder                                        v.                              CitiSteel, USA, Inc.
Terry L. Snyder, Volume 3          C.A. # 04-970 (JJF)                  October 16, 2006

Page 286

1    Q.  He didn't prescribe any kind of medication?
2    A.  No.
3    Q.  When did the liver doctor -- what's the name of
4    that doctor?  It's Beswick?
5    A.  Yeah, it's Beswick.  But I only met with him
6    like maybe once or twice.  He, I think he's the main
7    doctor for Gastroenterology Associates.  Forgive me
8    for not being able to pronounce that either correctly.
9    It was Stacey Mandichak that I would see every time,
10   you know.
11   Q.  When was the last time you talked to Stacey
12   Mandichak?
13   A.  A week before she was leaving.  She was going
14   up to a university in Philadelphia.  She was leaving.
15   She was going to start doing something else or
16   something.
17   Q.  Okay.  So when did --
18   A.  July.  I'm sorry.  Did I say that?
19   Q.  That's fine.  July is fine.
20   A.  This year, 2006.
21   Q.  So when did she first tell you, either her or
22   Dr. Beswick, tell you that you needed an evaluation
23   from a psychiatrist or a therapist?
24   A.  Well, I guess when I first went to them because

Page 287

1    I wanted to do the medicine, you know, to help myself,
2    to lock the disease into remission, you know.  I guess
3    in the very beginning when I went to them because they
4    wouldn't let me get on the medicine until I got
5    approved by Kalkstein.  The psychiatrist.  Put it that
6    way.
7    Q.  That would have been when?
8    A.  I don't know.  Well, the date that I seen him
9    says, that I seen a psychiatrist, says, "12/21/04."
10   So whenever -- I don't know how long it took for me,
11   like -- how do I say it?  I seen a doctor, when they
12   give you an appointment, it takes a month.  You don't
13   get to see him, he's that booked.  So whenever the
14   last time I seen the liver doctor, whatever they set
15   me up for for this date, appointment -- in other
16   words, I don't remember the date when they recommended
17   me to go there.  Put it that way.  I don't remember.
18   Q.  Okay.  When you -- okay.  Let's see.  Did you
19   have Cynthia Wright contact them?
20   A.  Cynthia Wright had nothing to do with them.  He
21   was appointed from the liver doctor.  Do you see what
22   I am saying?
23   MS. BREWINGTON:  Who is "he," Kalkstein?
24   THE WITNESS:  Yes.  I'm sorry.  I have to

Page 288

1    say this out loud on the record.  The psychiatrist,
2    Kalkstein was appointed -- the liver doctor pulled
3    him, did him.  I don't know how else to say it.
4    MS. DiBIANCA:  Recommended --
5    THE WITNESS:  Recommended.  There you go.
6    Yeah.  Like I had no choice.  You know what I mean?  I
7    didn't -- I don't know a psychiatrist.  When they told
8    me, they just set me up with him or called.  I don't
9    know how -- I don't remember at all.
10   BY MS. DiBIANCA:
11   Q.  Who was your -- who diagnosed you with, first,
12   with the liver disease?
13   A.  Dr. Goodman.
14   Q.  Then he referred you to gastroenterology?
15   A.  No.  I think he recommended to Benes.  I think
16   I only went to him once or twice.  And to be honest, I
17   don't even know why I didn't continue and stay with
18   him, but I quickly moved on to gastroenterology or let
19   me say, Beswick, but I don't know how or why I moved
20   on to him.  I remember walking -- I don't remember
21   Benes's face, put it that way, if I even did need him.
22   Maybe one of his associates.  You know, sometimes how
23   they have their interns or something that may refer --
24   I don't remember.  I remember going in there and

Page 289

1    signing something to get my records to give them to
2    Beswick.  That's all I remember.  Or having them sent
3    to Beswick.  That's all I remember, to be honest with
4    you.
5    Q.  So that first doctor, Benes was -- how do you
6    spell it?
7    A.  B-E-N-N-I-S, I guess is what it sounds like.
8    Q.  He or his office, you were not there for any
9    significant treatment?
10   A.  No.  I don't even remember being back in a
11   doctor's room.  I do remember being in the waiting
12   room, once.  And that was to sign a release, so I ...
13   If you have a document saying that I seen him, then I
14   seen him.  I apologize.
15   Q.  No.  It's not a trick question.
16   So when you --
17   A.  Oh, I know when you are throwing a trick
18   question.  Believe that, Molly.
19   Q.  There is no trick questions.
20   When you saw Mandichak and Beswick from the
21   time you started until the time you stopped seeing
22   them, was it 2006?
23   A.  I still see them.
24   Q.  Okay.  When you were on the medication, did

B-0317

14 (Pages 286 to 289)

Snyder                                    v.                      CitiSteel, USA, Inc.
Terry L. Snyder, Volume 3          C.A. # 04-970 (JJF)            October 16, 2006

Page 290

1    they have to continue to monitor you for symptoms of
2    depression?
3        A. Well, they would ask me questions. But they
4    monitored my blood, actually.
5        Q. Okay. Were you -- did you have symptoms of
6    depression during the time you were being seen by
7    them?
8        A. Like I said, even to this day, I'm still
9    bothered by you and CitiSteel. I mean, I think it's
10   all bull crap, you know. But, other than that, like I
11   said, there is nothing in life to make you want to
12   jump off a bridge, or shouldn't be. You have to deal
13   with your health, so, you know. Yeah, still
14   depressed, even now, over CitiSteel.
15       Q. But they let you continue on the medicine?
16       A. Yes, ma'am.
17       Q. So that you were not serious --
18       A. Crazy enough or suicidal, yeah, so.
19       Q. Okay.
20       A. Whether you are depressed or not, you have to
21   do what you have to do for your health, so.
22       Q. Okay. So you were -- I'll go ahead and admit
23   this.
24           (Snyder Deposition Exhibit No. 27 was

Page 291

1    marked for identification.)
2           (Discussion off the record.)
3    BY MS. DiBIANCA:
4        Q. Okay. These are, I'll represent to you these
5    are the records we received from Gastroenterolgy.
6        A. Yes.
7        Q. The first page here is dated November 19th,
8    2003.
9        A. Okay.
10       Q. It's signed by Stacey Mandichak?
11       A. Where? This is Goodman's form. Are you on the
12   top form?
13       Q. The first page of that carried onto the second
14   page, it looks like. There's a page 2.
15       A. Okay.
16       Q. It looks like Stacey Mandichak there.
17       A. Okay.
18       Q. Sorry. I didn't mean to switch. The first
19   page actually is what we're going to talk about. It
20   says in the second sentence, "She was diagnosed,"
21   "she" referring to you, back in July 2003." Is that
22   correct to your recollection?
23       A. Yes.
24       Q. And this is all sort of background information

Page 292

1    here. But at the very bottom where it says, "Review
2    of Symptoms" in capital letters --
3        A. I'm sorry. Where are you at?
4        Q. "Review of Symptoms."
5        A. Oh, okay, okay. Yeah.
6        Q. "Significant only for depression."
7        A. Okay.
8        Q. So you were depressed when you saw her in July
9    2003?
10       A. Sure.
11       Q. And you were -- it says, "She is currently
12   seeing a counselor by the name of Cindy Wright."
13   Correct?
14       A. Correct, yes.
15       Q. So does this help you recall when you went to
16   meet with them for the first time in July sort of the
17   circumstances around that?
18       A. I do not remember meeting them for the very
19   first time. No, I don't.
20       Q. Then when you went back -- July, and then this
21   letter is dated November the same year. So
22   approximately four months. Why did you have to wait
23   four months to go back?
24       A. I don't understand.

Page 293

1           MS. BREWINGTON: Did she go to them in
2    July?
3           MS. DiBIANCA: No, Lori, I'm sorry.
4           MS. BREWINGTON: Okay.
5           MS. DiBIANCA: You are correct. She was
6    diagnosed in July.
7           MS. BREWINGTON: Right.
8    BY MS. DiBIANCA:
9        Q. I'm sorry. So this would have been the first
10   time then. Okay. Then that's my error. Let me
11   correct myself on the record. You were diagnosed in
12   July but didn't see Gastroenterology until November.
13       A. I guess. If that's what it says.
14       Q. You don't have any reason to think that's
15   incorrect?
16       A. No. I have no reason.
17       Q. Okay. Then if you would turn one, two, three
18   pages.
19       A. Do you want me to flip the third or go on the
20   third?
21       Q. Flip the third.
22       A. Okay.
23       Q. The last full paragraph states.
24       A. I'm sorry. The last four paragraphs?

15 (Pages 290 to 293)

Snyder                                    v.                           CitiSteel, USA, Inc.
Terry L. Snyder, Volume 3        C.A. # 04-970 (JJF)                  October 16, 2006

Page 294

1   Q. Full, I'm sorry, full paragraph. The third
2   paragraph down.
3   A. Four paragraphs. What?
4   Q. Third paragraph. I'm sorry?
5   A. Where it says, "She will follow up"?
6   Q. Yes.
7   A. Okay. What about it?
8   Q. This was December. So it was about a month
9   later, again, by Stacey Mandichak. It states there is
10  some concern that "she," meaning you, "may not be a
11  candidate for treatment due to her mental illness
12  history." Is that referring to depression?
13  A. I honestly don't know why they put that. If
14  you notice, the date is two days before I had to be
15  evaluated.
16  Q. Okay.
17  A. I think they say that about, you know, just in
18  regards to anybody. You have to be a good candidate,
19  an okay candidate to get on the treatment. So this is
20  dated December 19th where I got evaluated on the 21st.
21  Q. That's the Snyder 26?
22  A. Yes.
23  Q. Right?
24  A. So I -- you know, I think they just said that

Page 295

1   in regards to everybody. You can call them and ask
2   why they have that there. I really don't know. I
3   don't have a past record of a mental illness, so you
4   know, other than being depressed and being tortured by
5   CitiSteel.
6   Q. Do you think that's what they were referring
7   to?
8   A. I have no clue.
9          MS. BREWINGTON: I object. Speculation.
10         THE WITNESS: I have no clue.
11         MS. BREWINGTON: Can I object? Calls for
12  speculation. Ms. Snyder, you can answer the question.
13         THE WITNESS: I have no clue. You would
14  have to ask them, ma'am.
15  BY MS. BREWINGTON:
16  Q. Then we'll just skip. Try three more. Four
17  more. There is a "C1" down at the bottom.
18  A. Yes. Keep going ?
19  Q. It's the next line written note.
20         MS. BREWINGTON: Okay.
21  Q. February 11th.
22  A. Okay.
23  Q. So this would have been less than two months
24  after you had seen Dr. Kalkstein's office for the

Page 296

1   psychiatric evaluation?
2   A. The date on this form, on C1, says.
3   "February 11th, 2004." So.
4   Q. Okay. So it states in here -- this is actually
5   by Dr. Beswick, just saying that you had already come
6   in for treatment, and then it says, "The decision
7   treat is complicated by her ongoing depression and her
8   unwillingness to have any communication done between
9   us and her treating psychiatrist in terms of her
10  therapy," et cetera. End quote.
11  A. I'm sorry. Can you, please -- I don't even
12  know where you are reading.
13  Q. Sure.
14  A. Can you either show me or read it again?
15  Q. Starting right here.
16  A. Okay.
17  Q. And then carrying on.
18  A. Okay. I never had a treating psychiatrist, so,
19  again, I don't -- everybody in the world makes
20  mistakes every day. So why they put to "have any
21  communication between us and her treating
22  psychiatrist," I don't know why they put that because
23  I never had a psychiatrist. I went to a psychiatrist
24  one time in my life, and that was Kalkstein because

Page 297

1   they sent me there. So I don't -- I have no clue. I
2   don't know why they put any of that. You'd have to
3   ask them and then they'd have to, I don't know,
4   produce something.
5   Q. Did you get -- so you wouldn't have turned
6   in -- would you have turned in that Kalkstein
7   evaluation form at that time?
8   A. Well, they got it from them. He had to approve
9   me to them. So I didn't have nothing to turn in. I
10  just received this in the mail a couple weeks ago, so.
11  Q. So Kalkstein's office would have sent it
12  directly to Beswick?
13         MS. BREWINGTON: Objection. Calls for
14  speculation.
15  A. Well, yeah, because they sent me to him.
16  They're the ones that sent me to him.
17  Q. I can re-ask it better than that. Kalkstein
18  did not send the evaluation to you directly?
19  A. No. Just a couple weeks ago.
20  Q. Right, right. But I mean at that time they
21  didn't?
22  A. No.
23  Q. Okay. I'm just trying to figure out why they
24  wouldn't have gotten the clearance at this point.

16 (Pages 294 to 297)

Snyder                                    v.                         CitiSteel, USA, Inc.
Terry L. Snyder, Volume 3        C.A. # 04-970 (JJF)              October 16, 2006

Page 298

1   A. Well, eventually they did because they let me
2   start the medicine.
3   Q. Right.
4   A. So they had to have gotten something.
5   Q. Right. They do, definitely.
6   A. So I think that's a big little error. I don't
7   know.
8   Q. What about that same paragraph there, but the
9   last sentence where it states, "I'm hesitant to
10  consider her for treatment at this time until her
11  depression is under better control. (She" --
12  A. They were worried about me because of
13  CitiSteel. I interrupted you. I'm sorry.
14  Q. That's okay. I'll finish the sentence just for
15  the record. "(She was sobbing in our waiting room),"
16  et cetera. Go ahead.
17  A. They were worried about me because of
18  CitiSteel.
19  Q. Okay.
20  A. Yeah. That I wouldn't be strong enough to
21  maintain and take care of my health. You know, I had
22  to take a grip, in other words.
23  Q. So at this time when he wrote this progress
24  report here on February 11th, 2004, you were still

Page 300

1   A. Of course. Well, yeah, because of the dates,
2   yes.
3   Q. Okay. So for him to say "your depression at
4   this time" meaning February 11th, that's inaccurate;
5   is that right?
6   A. What?
7   Q. He's saying here in this note on February 11th,
8   2004 that you were depressed.
9   A. Well, I was still depressed; I still am now.
10  Q. But in Kalkstein's letter, then, you are not.
11  I am trying to figure out which one is right.
12  A. Like I said, I have been depressed the entire
13  time. Look at these people. Look what's going on up
14  to this moment, this very moment here and now. I
15  am -- yeah. I am bothered by it --
16  Q. Right?
17  A. -- point-blank, but. Yeah, I got approved to
18  be on the medicine. I am not thinking about killing
19  myself. There is nothing in this world to make me
20  even think about being unappreciative of the gift I
21  was given, and that's to breathe this air. But, yeah,
22  I was okay enough to get on the medicine to take care
23  of my health. Wouldn't you?
24  Q. So why did he think that, Kalkstein, and then

Page 299

1   upset at this time?
2   A. With CitiSteel? Sure.
3   Q. It says, "She was sobbing in our waiting room."
4   A. I have never sat in their waiting room and
5   cried. I don't know where they get that.
6   Q. No?
7   A. And at that the doctor never came out directly
8   and got me. It was always a little medical assistant,
9   so. Unless he seen me crying, I don't know how he
10  could type that.
11  Q. So you weren't crying in their waiting room?
12  A. I don't recall ever crying in any waiting room,
13  to be honest with you.
14  Q. At this time would you agree with him writing
15  here --
16  A. I wouldn't agree, basically, with any of this
17  stuff so far.
18  Q. Okay.
19  A. I don't know where he gets it.
20  Q. I'm sorry. I cut you off that time.
21  A. That's all right. I've done you.
22  Q. At this time you already had the note -- well,
23  you didn't have the note, but you had already seen
24  Kalkstein?

Page 301

1   Goodman --
2   A. Think what?
3       MS. BREWINGTON: Objection calls for
4   speculation.
5   Q. -- Beswick did not --
6   A. Well, it doesn't matter because he ended up,
7   eventually, letting me get on the medicine. So why
8   wrote any of this or typed it, you'll have to call him
9   and ask him.
10  Q. Okay.
11  A. Because I don't know. This here totally
12  collides with him letting me get on the medicine. So
13  he's saying one thing, but he did another.
14  Q. Yes.
15  A. He gave me the medicine. Right? So why I
16  don't know.
17  Q. Okay.
18  A. You know. I think as time passes, time heals
19  all wounds, you know, so. I didn't start the medicine
20  till January 2005. So I think they gave me time to
21  think about it and let me overcome CitiSteel ripping
22  my whole little world out from under me, you know. I
23  don't think they jump and let anybody start on
24  medicine. You would have to call and ask them. It's

17 (Pages 298 to 301)

Snyder
Terry L. Snyder, Volume 3

v.

C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
October 16, 2006

Page 302

1  a big thing, that medicine, so, you know.
2  Q. Okay.
3  A. That's the best answer I can give you. I'm
4  sorry.
5  Q. Okay. Then let's go three more pages, on the
6  third page after that, marked 237. This appears to be
7  the date you were just referring to, January 2005,
8  when they did approve you for the treatment.
9  A. Yes, ma'am. Yes.
10  Q. And so at this point, they must have received
11  Dr. Kalkstein's note that says -- I am reading, going
12  to read from here -- that "She has no signs or
13  symptoms of depression currently and does not need any
14  medications or follow-up at this time."
15  A. Yes. That's what it says, yes.
16  Q. So there must have been some delay in him
17  getting them the note, I suppose.
18  A. I don't know. I have no clue.
19  Q. No. I'm sorry. I wasn't -- speculating
20  myself.
21      Let's skip way ahead. We'll do, say, like
22  five pages. I apologize that these aren't in order.
23  A. Five pages. Keep flipping them up?
24  Q. Yes. Where the date is April 8, 2005 up at the

Page 303

1  top. Maybe not.
2  A. It says, "March 18th." Okay. All right.
3  April 8th.
4  Q. Perfect. That's fine. In the first paragraph
5  it says -- the last sentence of the first paragraph --
6  "She denies depression, suicidal or homicidal
7  ideation." She states, "She is having 'no
8  side-effects' from her medication."
9  A. Yeah.
10  Q. That was consistent throughout your course of
11  treatment?
12  A. I didn't go to jail for killing nobody, so,
13  yeah. Yes. The answer is yes.
14  Q. Okay.
15  A. It didn't make me freak out.
16  Q. It did not?
17  A. It did not.
18  Q. Okay.
19  A. Still here. So is everybody else I know, so.
20  Q. I think that's all I have for that one.
21      Now, had you ever been treated for
22  depression prior to Citi -- prior to April 2003?
23  A. No. Not that I know of, no.
24  Q. Do you recall a prescription for Wellbutrin?

Page 304

1  Ever been on Wellbutrin?
2  A. Yeah. But I think that was for not smoking or
3  something, and it made my mouth taste funny or
4  something. And I remember asking -- I don't even know
5  who it was -- Somebody at CitiSteel, was taking it for
6  depression or something. But I saw on commercials it
7  would show for depression and not smoking, so I was
8  confused on that. I don't know who somebody --
9  whatever doctor gave that to me, yeah.
10  Q. Do you recall being on it?
11  A. I remember taking it. I quit taking it
12  immediately because it made my mouth taste weird and
13  didn't make me stop smoking. It may have been
14  Dr. Goodman gave it to me to try to help me quit
15  smoking, even though like one pack of cigarettes will
16  last me three days. I am not a chain smoker. I don't
17  smoke a lot, so. Every time I go in there,
18  Dr. Goodman will say, "Did you quit smoking yet?"
19  Q. So nothing other than that, then?
20  A. No. Not that I recall.
21  Q. How about the tapes? Have you done those yet?
22  Have you had an opportunity to review the transcripts?
23  A. You know what. I do apologize. I am not done.
24  Yeah, I am not done. I do apologize. I swear, I will

Page 305

1  get them done within the week. Can we try a week,
2  something? Promise.
3  Q. You tell me. I am eagerly awaiting their
4  return.
5  A. It is so much, it is so much. I am not a
6  lawyer. You guys work around the clock, I mean, you
7  know. I have been getting headaches lately. I do
8  apologize deeply.
9  Q. Do you understand what we're asking --
10  A. Yes.
11  Q. -- you to do with them?
12  A. Yes.
13  Q. You do?
14  A. Yes. Sit there and listen to them and read
15  word for word.
16  Q. Right. Because I'll just tell you so you hear
17  it from me. I had them done here just in our word
18  processing department. So there is going to be
19  likely, I would presume, errors.
20  A. Oh, God. Well, I started --
21  Q. Go ahead.
22  A. I started to go through with it. And whatever
23  that name is Michael Holt or Haut, whatever, I never
24  heard it before in my life. I know there is no way

18 (Pages 302 to 305)

Snyder                                    v.                        CiteSteel, USA, Inc.
Terry L. Snyder, Volume 3        C.A. # 04-970 (JJF)              October 16, 2006

Page 306

1  it's on any of the tapes. I understand what you are
2  saying, there is going to be errors, period.
3    Q.  Yes. That way you can just go through it and
4  make sure. Because you were actually there, so you
5  would know better than us guessing.
6    A.  I understand. I know.
7    Q.  So we'll look for those. Can I take a break?
8  I don't think I have any more questions. I want to
9  skim through for a minute or two to make sure I am not
10 leaving anything out.
11   A.  You had a document to go back to, remember.
12   Q.  No. We got it.
13   A.  You got it.
14   Q.  So we'll just take a few more minutes?
15   A.  You mean we're almost done for the day?
16   Q.  Mm-hmm.
17   A.  Oh.
18      (Recess taken.)
19      MS. DiBIANCA: What we'll do is we'll move
20 one into the record just so there is a copy attached
21 to the transcript so the you have it later if you need
22 it.
23      THE WITNESS: I couldn't remember. So.
24 There you go. That's all.

Page 307

1      MS. DiBIANCA: This is, for the record, a
2  signed medical authorization and release by
3  Ms. Snyder, dated January 20th, 2006.
4      (Snyder Deposition Exhibit No. 28 was
5  marked for identification.)
6      MS. DiBIANCA: We're going to move these in
7  as Snyder 29.
8      (Snyder Deposition Exhibit No. 29 was
9  marked for identification.)
10 BY MS. DiBIANCA:
11   Q.  So these are a few pages from Dr. Goodman's
12 file or your file with Dr. Goodman. The date on the
13 first page -- this is one of the documents you gave
14 us. You can see there is a "P" at the bottom of the
15 page.
16   A.  Huh? In what? No.
17   Q.  Bottom right-hand corner. Maybe this is not on
18 your copy. I'm sorry. I'm looking at the second
19 page, Terry. I'm sorry.
20   A.  Flip it?
21   Q.  Back up. I'm sorry. The first page is dated
22 January 9?
23   A.  It's stamped "January 9, 2002." Yes.
24   Q.  And about halfway down it says,

Page 308

1  "psychological."
2    A.  Okay.
3    Q.  "No anxiety or depression." That's the
4  typewritten part.
5    A.  Yes.
6    Q.  Then on the line under that, can you read what
7  that says?
8    A.  No.
9    Q.  It appears to say, "Depression - mild"?
10   A.  It says what?
11   Q.  "Depression - mild"?
12   A.  I can't make it out at all. I don't know.
13   Q.  Do you remember having mild depression in
14 January 2002?
15   A.  No. There could have been something going on
16 in life that upset me for a little bit or something.
17 I don't really know.
18   Q.  And then it says -- it indicates that your sort
19 of follow-up plan with that was going to be start
20 working out in the gym and lose weight.
21   A.  Maybe I was bothered by me putting on weight or
22 something like that.
23   Q.  Okay. Right at the top, "Chief Complaint," it
24 says, "Test Results, Gaining Weight."

Page 309

1    A.  Well, my boyfriend was feeding me at night, so,
2  while I was actually sleeping and I put on a few
3  pounds. And I'd usually go to the gym regularly. And
4  especially during my CitiSteel years, I would go at
5  5:00 in the morning and then I would go 9:00 at night,
6  usually. Sometimes 7:00 or 8:00. But I have always
7  been a gym girl, and, you know, things like that. I
8  thought something may have been wrong with me why I
9  was putting on weight. I found out that he was
10 feeding me while I was sleeping.
11   Q.  Really feeding you while you were sleeping?
12   A.  Swear, yeah.
13   Q.  How so?
14   A.  He said that I would lay there and go,
15 (demonstrating) I would go along with it. He kept
16 doing it. He started asking me if I enjoyed what I
17 had last night. Yeah, and so. I actually woke up
18 when he was putting peanuts in my mouth and got very
19 angry. You could die. You can't feed somebody
20 peanuts... Excuse my language -- sleeping, you know.
21 I was mad. Just bothered by putting on a few pounds.
22 Who wouldn't be? You know. I wasn't depressed, stuff
23 like -- you know. I don't know why, you know.
24   Q.  And then the only other question I have for

19 (Pages 306 to 309)

B-0322

Snyder
Terry L. Snyder, Volume 3

v.

C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
October 16, 2006

Page 310

1    today is for the last -- we've had a few cancellations
2    for today. Were you able to go to the doctor for any
3    of those cancellations?
4        A.  What does that mean?
5        Q.  Did you -- when you canceled the last
6    deposition --
7        A.  Oh, yes. I apologize. Yes, yes.
8        Q.  You did go to the doctor's?
9        A.  Oh, yes.
10       Q.  When did you go to the doctor's?
11       A.  It was on a Monday. I was going to go to the
12   Emergency Room. Well, I asked my cousin that I do
13   everything for. I do anything for anybody. She never
14   showed up. She was going to drive me because I was
15   scared to drive. I couldn't drive. And I was going
16   to go to the Emergency Room. And actually the more I
17   thought about it, I was glad she didn't show up
18   because I probably wouldn't have survived in an
19   Emergency Room. I don't know if you hear me over here
20   moaning and groaning and just, you know, my whole head
21   neck and head is hot. I think you can see it in my
22   face. You know how you don't feel good it comes out
23   of you. I don't feel good now, either. They were
24   really bad. I didn't want to move my jaw. I went in

Page 311

1    the doctor's office. I drove myself on, it was a
2    Monday, I guess it was. Whatever date that was.
3        Q.  I don't know the date either. Was that
4    Dr. Goodman's office?
5        A.  It was his office. But I -- I wanted -- he
6    wasn't in. I wanted to see any doctor. Or did I go
7    on that Saturday? No. I seen Christine something.
8    She works with him. She's one of the doctors in his
9    office.
10       Q.  Okay. Did she give you any medicine or
11   prescription?
12       A.  Yeah.
13       Q.  What did she give you?
14       A.  She said that she thinks that I could be
15   getting them from sinus, you know, maybe some type of
16   sinus infection --
17       Q.  Okay.
18       A.  -- or allergies. She gave me nose spray and
19   Claritin D, which I just took another one today and I
20   just felt ... see anything working. She didn't x-ray
21   my head. That's what I actually wanted, you know.
22           MS. DiBIANCA:  That's all I have. We're
23   done for today.
24           (Deposition concluded at 12:04 p.m.)

Page 312

1
2              -- -- -- --
3              I N D E X
   WITNESS: TERRY L. SNYDER              PAGE
4  EXAMINATION BY MS. DiBIANCA           238
5       SNYDER DEPOSITION EXHIBITS
6  NO.                                 MARKED
7  17   Letter from L. Brewington          238
8  18   2000 tax returns of T. L. Snyder,  240
        stamped D00803 - D00807 and
9       D00816 - D00823
10 19   2001 tax returns of T. L. Snyder,  243
        stamped D00824 - D00842
11
   20   2002 tax returns of T. L. Snyder,  248
12      stamped D00846 - D00851
13 21   2003 tax returns of T. L. Snyder,  249
        stamped D00852 - D00855
14
   22   2004 tax returns of T. L. Snyder,  250
15      stamped D00858 - D00873
16 23   2005 tax returns of T. L. Snyder,  257
        stamped D00808 - D00814 and D00875
17
   24   Plaintiff's Responses to Defendant's   271
18      Second Request for Production;
        Plaintiff's Amended/Supplemental Response
19      to Defendant's First Request for Admissions;
        Plaintiff's Response to Defendant's First
20      Request for Admissions; Plaintiff's Answers to
        Defendant's Second Set of Interrogatories
21
   25   Verification of Plaintiff's Answers    277
22      to Defendant's Discovery Requests
        signed by Terry L. Snyder, dated 10/2/06
23
   26   Notes of Dr. Kalkstein, M.D., dated    281
24      12/21/04, re: Terry Snyder

Page 313

1        SNYDER DEPOSITION EXHIBITS
2  NO.                                 MARKED
3  27   Multi-page document consisting of     290
        records from Gastroenterolgy Associates
4       re: Terry Snyder
5  28   Medical authorization and release by  307
        Terry L. Snyder, dated 1/20/06
6
7  29   Document dated 1/9/02 from Dr. Goodman  307
        re: Terry L. Snyder
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

20 (Pages 310 to 313)



Snyder
Terry L. Snyder, Volume 3

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
October 16, 2006

Page 314

```
 1
 2
              REPLACE THIS PAGE
 3
              WITH THE ERRATA SHEET
 4
              AFTER IT HAS BEEN
 5
              COMPLETED AND SIGNED
 6
              BY THE DEPONENT.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 315

```
 1   State of Delaware   )
                         )
 2   New Castle County   )
 3
 4        CERTIFICATE OF REPORTER
 5
          I, Lucinda M. Reeder, Registered Diplomate
 6   Reporter, Certified Real-time Reporter and Notary
     Public, do hereby certify that there came before me on
 7   October 16, 2006, the witness herein, TERRY L. SNYDER,
     who was first duly sworn by me and thereafter examined
 8   by counsel for the respective parties; that the
     questions asked of said witness and the answers given
 9   were taken down by me in Stenotype notes and
     thereafter transcribed by use of computer-aided
10   transcription and computer printer under my direction.
11        I further certify that the foregoing is a true
     and correct transcript of the testimony given at said
12   examination of said witness.
13        I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
14   interested in the event of this suit.
15
16
17              Lucinda M. Reeder, RDR, CRR
                Certification No. 132-RPR
18              (Expires January 31, 2008)
19
20
     DATED:  10-28-06
21
22
23
24
```

Snyder
Terry L. Snyder, Volume 3

v.

C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
October 16, 2006

Page 316

**A**

ability 278:5
able 285:18 286:8
  310:2
about 238:10 245:6
  258:22 261:2,3
  262:22 263:2,8,9
  263:14 267:12
  272:6 274:9 276:3
  279:7,16,18 280:1
  280:19,20 281:17
  283:7 284:22
  291:19 294:7,8,17
  298:8,12,17
  300:18,20 301:21
  304:21 307:24
  310:17
absenteeism 253:8
Absolutely 278:6
according 241:10
accuracy 274:17
accurate 249:14
Action 237:4
actual 256:4 274:12
actually 240:16
  242:17 243:22
  244:8,20 263:4,5
  268:3,3,8,14
  272:17 273:17
  274:2 275:6
  276:14,24 280:5
  290:4 291:19
  296:4 306:4 309:2
  309:17 310:16
  311:21
address 254:10
  263:24
Admissions 312:19
  312:20
admit 290:22
ads 259:7
advance 252:5
  266:19
after 247:24 252:15
  253:18 259:17
  260:3,9,13 261:3
  263:6 264:9,14,19
  278:15,23 295:24
  302:6 314:4
again 240:13 244:3
  248:5 253:22
  254:3 255:24
  256:1 261:24
  265:1 294:9
  296:14,19
agencies 250:21

agency 241:19
  246:10,24 251:7
agent 258:24
ago 258:17 269:6
  275:5,5 297:10,19
agree 299:14,16
ahead 290:22
  298:16 302:11
  305:21
Ain't 285:8
air 300:21
allergies 311:18
allowed 253:2
almost 306:15
along 275:15
  309:15
already 248:4
  255:19 258:16
  263:13 268:22
  296:5 299:22,23
always 299:8 309:6
Amended/Supple...
  312:18
angry 309:19
another 247:22
  248:2 259:17
  260:4,13,21 268:6
  278:1 284:6
  301:13 311:19
answer 247:18
  255:4 267:18
  268:12 269:18
  273:4 275:6
  281:20 285:6,6
  295:12 302:3
  303:13
answered 255:19
  268:22 269:6,20
  272:24 277:24
  282:22,24
answering 271:13
  271:17
answers 262:5
  271:22 274:18,19
  278:3 312:20,21
  315:8
anxiety 308:3
anybody 276:16
  294:18 301:23
  310:13
anything 239:21
  249:24 265:15
  275:2 306:10
  310:13 311:20
Anyway 245:19
apartment 258:23
apartments 258:24

apologize 283:5
  289:14 302:22
  304:23,24 305:8
  310:7
apparently 282:24
APPEARANCES
  237:11
appears 302:6
  308:9
applicants 245:16
applied 241:21
  245:17,18 259:8
applies 245:16
apply 242:10
  261:11 266:9
applying 245:17
appointed 287:21
  288:2
appointment
  264:24 284:13,16
  287:12,15
approve 297:8
  302:8
approved 284:6,7
  285:19 287:5
  300:17
approximately
  239:13 268:21
  292:22
April 261:3 278:16
  278:23 280:22
  281:3 302:24
  303:3,22
architect 254:17
argument 242:19
around 261:10
  292:17 305:6
Ashley 256:14,16
asked 261:19,22
  262:11 263:8,13
  271:19,21 282:23
  283:3 310:12
  315:8
asking 261:24 262:7
  267:12 268:23
  273:24 304:4
  305:9 309:16
assignment 251:11
  251:23
assignments 245:15
  247:1 252:20
  255:14
assistant 299:8
associates 242:3
  248:5,7 271:23
  276:12 282:14,16
  286:7 288:22

313:3
assume 240:5
assuming 240:12
attached 249:5
  306:20
attempted 280:14
attorney 315:13
August 252:17
authorization 307:2
  313:5
Avenue 237:13
awaiting 305:3
a.m 237:9

**B**

back 238:12,24
  239:8 241:24
  243:21 256:2
  272:10,16 275:10
  275:13 278:12
  285:16,22 289:10
  291:21 292:20,23
  306:11 307:21
background 291:24
backwards 274:23
  277:6
bad 277:19 280:6
  310:24
badge 266:21
bank 241:11,12
  242:5,6 248:5
basically 257:12
  259:1 279:11
  299:16
Bayshore 257:20
  260:5
become 255:9,12
becoming 255:7
before 237:10
  238:23 261:19,20
  261:23 262:11
  263:10,13,16
  269:7 270:20
  277:3 279:21
  282:4,22,23
  286:13 294:14
  305:24 315:6
beginning 237:9
  247:17 264:10,15
  287:3
being 239:23,24
  271:19 276:15
  278:15 279:10
  286:8 289:10,11
  290:6 295:4,4
  300:20 304:10
believe 238:13

261:13 262:6
268:17 280:1,7,11
  280:13 289:18
benefits 267:11,12
  267:16
Benes 288:15 289:5
Benes's 288:21
Bernard 244:9
  245:21 254:3,5
  259:20,22
besides 281:16
best 273:6 278:5
  302:3
Beswick 286:4,5,22
  288:19 289:2,3,20
  296:5 297:12
  301:5
better 297:17
  298:11 306:5
between 268:19
  280:22 282:8
  296:8,21
big 298:6 302:1
bit 281:19 308:16
blood 290:4
blurred 282:15
booked 287:13
borderline 285:2
bothered 279:12
  284:23 290:9
  300:15 308:21
  309:21
bottom 279:15
  292:1 295:17
  307:14,17
boyfriend 309:1
Brandywine 237:8
  237:16 241:15
break 306:7
breathe 300:21
Brewington 237:12
  262:20,24 263:7
  263:14 269:18,22
  270:10 271:15
  272:5,9,15,19,21
  273:4,6 275:20
  287:23 293:1,4,7
  295:9,11,15,20
  297:13 301:3
  312:7
bridge 280:15
  290:12
Broad 254:16,19,20
Broomall 251:9
brothers 256:21
brother's 266:2
Building 237:8,16

241:15
bull 290:10
bunch 244:15
business 265:20
B-E-N-N-I-S 289:7

**C**
C 246:10 247:1
calculation 239:3
call 253:18,18,19
  258:11,13 260:19
  266:4,5 295:1
  301:8,24
called 245:8,18
  246:20 259:14,15
  264:19,20 268:3,6
  283:10 284:13
  288:8
calls 252:20 261:10
  268:2 295:11
  297:13 301:3
came 238:15 240:14
  260:5,13 266:22
  269:3 273:2 299:7
  315:6
canceled 310:5
cancellations 310:1
  310:3
candidate 294:11
  294:18,19
capital 292:2
care 285:3 298:21
  300:22
carried 291:13
carrying 296:17
case 269:17 274:11
cash 265:11
CASTELLANO
  237:20
Castle 315:2
causing 276:7
CERTIFICATE
  315:4
Certification
  315:17
Certified 315:6
certify 315:6,11,13
cetera 296:10
  298:16
chain 304:16
change 275:2
Charlie 266:2
Chief 308:23
choice 288:6
Christine 311:7
cigarettes 304:15
Cindy 240:10

292:12
circular 244:16
circumstances
  292:17
Citi 303:22
CitiSteel 237:5
  246:17 247:16,21
  248:1,3,24 249:6
  249:13,23 255:7
  255:24 261:3,5
  268:20 276:11
  278:16,24 279:9
  279:11 284:23
  290:9,14 295:5
  298:13,18 299:2
  301:21 304:5
  309:4
CitiSteel's 279:15
Civil 237:4
claim 257:11
Clara 256:13,16
clarify 270:6,9
  271:1
Claritin 311:19
clearance 285:12,16
  297:24
clearer 250:10
clock 305:6
clue 295:8,10,13
  297:1 302:18
COLES 237:19
  273:15,18
collides 301:12
come 239:11 251:18
  257:12 285:22
  296:5
comes 260:3 285:2
  310:22
Comma 282:15
commercials 304:6
communication
  296:8,21
companies 246:11
  247:8 268:2,3,5
company 246:22
  251:5 258:23
  263:24
compare 272:10
Complaint 308:23
COMPLETED
  314:5
completely 247:5
complexes 258:23
complicated 296:7
computation 239:7
computer 315:10
computers 261:17

computer-aided
  315:9
Conaway 237:8,15
  237:19,20
concern 294:10
concluded 311:24
Concord 241:13
confused 270:24
  304:8
consider 298:10
consistent 303:10
consisting 313:3
construction 246:11
  247:12
consultants 259:7
contact 254:22
  266:1 287:19
contacted 265:1
continuation
  238:12
continue 263:15
  277:7 285:3
  288:17 290:1,15
continued 237:7
  245:20 266:3
continuing 276:12
contract 247:10
control 298:11
copies 240:15
  283:16
copy 265:19 283:15
  283:18 306:20
  307:18
corner 307:17
correct 249:2
  269:12,13 276:13
  279:1 291:22
  292:13,14 293:5
  293:11 315:11
correctly 286:8
costs 240:4,11
counsel 238:24
  281:23 315:8,13
counselor 292:12
County 315:2
couple 246:18 268:3
  269:9 270:21
  277:20 297:10,19
course 300:1 303:10
COURT 237:1
cousin 280:11,13
  310:12
cousins 256:17,23
cover 268:1
crap 290:10
crazy 276:11 284:9
  290:18

cried 299:5
crisis 280:8
CRR 237:10 315:17
crying 299:9,11,12
current 261:3
  272:20
currently 292:11
  302:13
cut 299:20
Cynthia 275:16
  278:12,17,20,23
  287:19,20
C1 295:17 296:2

**D**
D 263:24 311:19
  312:2
damages 238:14
  239:1,4,7,10
  262:14,17,19
Darby 253:17
DART 245:17
date 238:14 266:12
  267:4 269:8 287:8
  287:15,16 294:14
  296:2 302:7,24
  307:12 311:2,3
dated 238:24 291:7
  292:21 294:20
  307:3,21 312:22
  312:23 313:5,6
  315:20
dates 266:18 281:13
  300:1
David 282:12
  285:11
day 257:12 259:2
  264:19,20 266:4
  266:17,21 268:11
  269:10 270:2
  280:5 290:8
  296:20 306:15
days 247:16 269:9
  270:21 294:14
  304:16
DE 264:1
deal 290:12
DEBBIE 237:19
December 294:8,20
decided 283:16
decision 296:6
deeply 305:8
Defendant 237:6,17
defendant's 273:20
  312:17,19,19,20
  312:22
definitely 243:6

298:5
Delaware 237:1,9
  237:13,17,22
  244:8 254:4,5,6
  259:19 264:1,1,2
  264:3,3 265:16
  269:3 315:1
delay 268:15 302:16
demanding 264:21
demonstrating
  309:15
denies 303:6
department 261:13
  261:14 305:18
dependents 256:11
  257:3
Depends 246:22
DEPONENT 314:6
deposition 237:7
  238:13,19 240:20
  243:23 248:18
  249:19 250:12
  257:16 261:24
  263:6 266:16
  269:11 270:22
  271:9 272:20
  275:17 277:12
  282:1 290:24
  307:4,8 310:6
  311:24 312:5
  313:1
depositions 263:11
depressed 276:7
  279:12 284:8,21
  285:17 290:14,20
  292:8 295:4 300:8
  300:9,12 309:22
depression 279:3
  284:20 290:2,6
  292:6 294:12
  296:7 298:11
  300:3 302:13
  303:6,22 304:6,7
  308:3,9,11,13
detail 271:23
diagnosed 288:11
  291:20 293:6,11
DiBIANCA 237:15
  238:5,21 240:22
  244:1 248:20
  249:18,21 250:11
  250:16,18 257:18
  263:3,18 269:23
  270:5,8,15 271:11
  271:16 272:8,12
  272:17,22 273:11
  273:16,19 274:2,4

Snyder
Terry L. Snyder, Volume 3

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
October 16, 2006

Page 318

274:6,10,16,20,22
274:24 277:14
282:3 288:4,10
291:3 293:3,5,8
306:19 307:1,6,10
311:22 312:4
**die** 309:19
**difference** 282:8
**different** 247:5
**Diplomate** 315:5
**direct** 259:8
**direction** 284:17
315:10
**directly** 241:21
242:10 266:9
297:12,18 299:7
**discovery** 268:18
271:7 273:20
274:12 312:22
**discussing** 239:2
**Discussion** 291:2
**disease** 287:2
288:12
**DISTRICT** 237:1,1
**docket** 273:22
**doctor** 284:12,14,15
285:17 286:3,4,7
287:11,14,21
288:2 289:5 299:7
304:9 310:2 311:6
**doctors** 240:5,9
285:8 311:8
**doctor's** 264:21,24
289:11 310:8,10
311:1
**document** 265:15
277:23 278:1
289:13 306:11
313:3,6
**documented** 263:11
**documents** 262:10
272:4,5 307:13
**doing** 238:9 252:19
258:4 267:23
286:15 309:16
**dollars** 239:13
**done** 250:20 257:14
261:1 271:13
278:8 296:8
299:21 304:21,23
304:24 305:1,17
306:15 311:23
**double-sided**
241:23
**down** 257:12 294:2
295:17 307:24
315:9

**Dr** 282:17 286:22
288:13 295:24
296:5 302:11
304:14,18 307:11
307:12 311:4
312:23 313:6
**dragging** 276:10
**drive** 254:10 264:2
276:12 310:14,15
310:15
**driving** 263:20,22
276:11
**drove** 311:1
**due** 294:11
**duly** 238:3 315:7
**duplicate** 248:15
**during** 247:16
249:11 257:12
259:13,14 290:6
309:4
**DVE** 264:1
**D00803** 312:8
**D00807** 312:8
**D00808** 312:16
**D00814** 312:16
**D00816** 312:9
**D00823** 312:9
**D00824** 312:10
**D00842** 312:10
**D00846** 312:12
**D00851** 312:12
**D00852** 312:13
**D00855** 312:13
**D00858** 312:15
**D00873** 312:15
**D00875** 312:16

**E**

**E** 264:1 312:2
**eagerly** 305:3
**early** 251:23 252:7
**earnings** 265:16
**easier** 240:18
**easy** 278:10 279:20
**EDELSTEIN**
237:12
**either** 286:8,21
296:14 310:23
311:3 315:13
**Emergency** 310:12
310:16,19
**emotions** 279:3
**employed** 245:10
**employee** 255:8,10
255:12
**employers** 261:13
**employment** 249:13

251:18 260:15
265:10
**end** 247:17 251:18
280:23 281:3
296:10
**ended** 238:13
251:19 255:7
281:5 301:6
**enjoyed** 309:16
**enough** 258:5 259:2
284:24 290:18
298:20 300:22
**entire** 300:12
**equipment** 261:16
**ERRATA** 314:3
**error** 293:10 298:6
**errors** 305:19 306:2
**Es** 246:10 247:1
**especially** 309:4
**ESQ** 237:12,15
**et** 296:10 298:16
**evaluated** 294:15
294:20
**evaluation** 282:7,10
282:20 283:5
286:22 296:1
297:7,18
**even** 246:16 258:9
261:15,22 264:9
264:14 268:9
282:18,19 284:8
288:17,21 289:10
290:8,14 296:11
300:20 304:4,15
**event** 315:14
**events** 280:21
281:16
**eventually** 298:1
301:7
**ever** 283:3 299:12
303:21 304:1
**every** 245:15
264:19 266:4
269:2 271:22
280:5 286:9
296:20 304:17
**everybody** 283:17
295:1 296:19
303:19
**everything** 310:13
**exact** 248:21 261:23
**exactly** 244:3
263:17
**examination** 312:4
315:12
**examined** 238:3
315:7

**Excuse** 309:20
**exhibit** 238:18,19
240:20 243:23
248:18 249:19
250:12 257:16
271:9 276:21
277:12 282:1
290:24 307:4,8
**EXHIBITS** 312:5
313:1
**expenses** 239:11
240:4
**experiencing**
284:20
**expired** 281:4
**Expires** 315:18
**Express** 264:1
265:16 268:6,9

**F**

**face** 282:18 288:21
310:22
**fact** 269:6
**false** 273:24 274:19
**family** 280:8,18
**far** 299:17
**father** 268:19
269:24
**father's** 269:11
**fax** 261:17 268:2
**faxes** 261:10,12,21
262:22 263:5
**February** 241:1
295:21 296:3
298:24 300:4,7
**feed** 309:19
**feeding** 309:1,10,11
**feel** 268:10 276:16
310:22,23
**felt** 311:20
**females** 256:20
**FETZER** 237:22
**few** 247:13 251:15
306:14 307:11
309:2,21 310:1
**Fidelity** 250:1
255:24
**figure** 297:23
300:11
**figures** 239:11
**file** 307:12,12
**find** 243:14 254:24
259:4 262:10
284:11
**fine** 248:11 286:19
286:19 303:4
**finish** 285:14

298:14
**fired** 258:15
**first** 238:2,17 239:6
244:5,21,23
248:13 256:6,8
260:5 261:6
263:10 277:9,10
286:21,24 288:11
289:5 291:7,13,18
292:16,19 293:9
303:4,5 307:13,21
312:19,19 315:7
**five** 302:22,23
**flag** 246:11 247:3
**flaggers** 246:11
**flagging** 246:11,22
**flip** 241:6 248:22
251:2 256:2
275:12 293:19,21
307:20
**flipping** 243:14
302:23
**Floor** 237:9,16
**follow** 294:5
**follows** 238:4 239:7
**follow-up** 285:20
302:14 308:19
**fondled** 239:23
**Ford** 257:20
**foregoing** 315:11
**Forgive** 286:7
**form** 272:1 273:13
282:7,9 283:14
291:11,12 296:2
297:7
**forward** 263:15
**found** 309:9
**foundation** 278:22
**four** 241:17 242:15
272:5,9 292:22,23
293:24 294:3
295:16
**frame** 258:10
**frames** 260:18
**Franklin** 251:5
**freak** 303:15
**Friday** 281:22,23
**from** 238:23 248:13
248:14 250:14
252:16 260:21
261:13,14 268:19
269:12,21,24
278:16 279:16
280:2 282:7,10
283:20 286:23
287:21 289:20
291:5 297:8

Snyder
Terry L. Snyder, Volume 3

v.

C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
October 16, 2006

Page 319

301:22 302:12
303:8 305:17
307:11 311:15
312:7 313:3,6
front 268:16 281:12
full 293:23 294:1,1
full-time 259:3
funny 304:3
further 315:11,13
future 239:8,14

**G**

Gaining 308:24
gaps 245:12
Gastroenterolgy
291:5 313:3
gastroenterology
286:7 288:14,18
293:12
gave 267:14 272:19
273:21 283:15
301:15,20 304:9
304:14 307:13
311:18
general 284:22
generally 255:1
gets 299:19
getting 302:17
305:7 311:15
gift 300:20
Gilpin 237:13
girl 242:19 258:5
309:7
give 238:17 240:15
243:22 247:1
262:18 265:13
267:9 272:10
285:12,16 287:12
289:1 302:3
311:10,13
given 271:21 300:21
315:8,11
giving 272:15
glad 310:17
Global 268:7
go 241:1,9 244:5,9
244:10 245:8,8
254:5 258:6,16
259:15 260:3,21
261:10,10,15,17
263:15 264:22
266:22 267:5,24
267:24 273:15
274:23 277:6
284:15 285:12,16
287:17 288:5
290:22 292:23

293:1,19 298:16
302:5 303:12
304:17 305:21,22
306:3,11,24 309:3
309:4,5,14,15
310:2,8,10,11,16
311:6
God 275:24 305:20
going 238:17,18
239:2 240:15,18
244:3 245:24
247:16 248:10,21
249:18 257:15
258:21 261:2
264:23 268:10
271:6 278:12
280:19,19 282:19
283:23 284:6
285:4,5,14 286:13
286:15 288:24
291:19 295:18
300:13 302:11
305:18 306:2
307:6 308:15,19
310:11,14,15
good 238:6,7,11
258:10 271:15
280:6 281:14
294:18 310:22,23
Goodman 240:10
288:13 301:1
304:14,18 307:12
313:6
Goodman's 291:11
307:11 311:4
gotten 268:18
297:24 298:4
government 246:22
246:24 250:9
Greenhill 244:14
grip 298:22
groaning 310:20
grounds 239:24
guess 246:6,21
249:15 251:21
252:18 268:14
285:11 286:24
287:2 289:7
293:13 311:2
guessing 306:5
guys 283:18 305:6
gym 308:20 309:3,7

**H**

half 253:14
halfway 307:24
hand 240:18 275:10

handed 275:4
handwriting 285:7
285:9
happened 243:9
251:16 258:1
266:15
happy 266:20
280:20
harassed 239:23
hated 252:1
Haut 305:23
having 238:2 276:3
276:20 277:19
289:2 303:7
303:18
Hay 264:2,4,5
head 266:13 310:20
310:21 311:21
headaches 277:20
305:7
heals 301:18
health 285:2,5
290:13,21 298:21
300:23
hear 305:16 310:19
heard 279:21
305:24
help 239:11 273:10
279:14 287:1
292:15 304:14
helped 269:5
279:19
helping 279:23
her 247:13,15 257:8
257:13 262:22
263:2,8 269:24
275:14,17 276:14
276:21 278:21
279:2,14 280:22
281:1,4 285:7
286:21 292:8
294:11 296:7,7,9
296:9,21 298:10
298:10 303:8
Hercules 251:12
252:15
hesitant 298:9
Hewitt 248:15
Hi 238:8
Highway 244:17
him 266:5 269:7,8,9
269:10,12,21
270:14,22 282:19
285:22 286:5
287:8,13 288:3,3
288:8,16,18,20,21
289:13,14 297:15

297:16 299:14
300:3 301:8,9,12
302:16 311:8
hiring 247:8
history 294:12
Holt 305:23
homeless 257:5,7
homicidal 303:6
honest 267:10
288:16 289:3
299:13
honestly 247:18
294:13
hot 310:21
hour 265:4
hours 246:18
houses 244:15
huh 248:3 266:20
307:16
human-being 284:7
H-A-Y 264:6

**I**

ideation 303:7
identification
238:20 240:21
243:24 248:19
249:20 250:13
257:17 271:10
277:13 282:2
291:1 307:5,9
illness 294:11 295:3
immediately 304:12
impossible 264:23
improperly 282:22
inaccurate 300:4
INC 237:5
incorporated
273:21
incorrect 249:3
293:15
incurred 240:11
indicate 260:18
indicates 308:18
infection 311:16
information 238:15
254:24 261:19
283:11 291:24
input 239:3
instead 254:3 279:7
interested 315:14
Internet 261:10
268:1
interns 288:23
Interrogatories
312:20
interrogatory

272:14
interrupt 262:21
interrupted 298:13
introductory 253:6
Investments 250:1
255:24
irrelevant 245:19
IRS 248:14

**J**

Jackson 248:14
jail 303:12
January 301:20
302:7 307:3,22,23
308:14 315:18
jaw 310:24
JEFF 237:20
job 245:16,22 259:4
260:21 261:2,16
262:1,23 263:4,10
268:10 276:18,20
279:13
jobs 245:4,7 246:13
Journal 259:6
July 280:1 286:18
286:19 291:21
292:8,16,20 293:2
293:6,12
jump 290:12 301:23
jumped 280:15
June 238:13 264:9
264:10,10,15
266:11 267:6
just 238:14 240:15
241:6 245:17
248:7,21 251:2,15
253:13 254:4,6
255:13 257:13,15
258:16 262:20
263:2,20 265:1,12
265:14 268:3,15
268:16 269:5,20
270:5 271:6,12
272:17 273:6
274:6,10,16 275:4
275:13 276:10,12
281:2,17,20
283:17 284:1,16
284:17 288:8
294:17,24 295:16
296:5 297:10,19
297:23 298:14
302:7 305:16,17
306:3,14,20
309:21 310:20
311:19,20

Snyder
Terry L. Snyder, Volume 3

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
October 16, 2006

Page 320

**K**

Kalkstein 282:12
282:17 284:3
287:5,23 288:2
296:24 297:6,17
299:24 300:24
312:23
Kalkstein's 295:24
297:11 300:10
302:11
keep 243:14 258:21
295:18 302:23
Keeping 248:10
kept 267:11 309:15
kill 284:6,7,24
285:1
killed 280:18
killing 266:13
300:18 303:12
kind 285:20 286:1
King 237:22 256:14
Kirkwood 244:17
know 242:22
244:10 245:15,18
248:4 250:21
252:4,12 253:10
253:11 257:22
258:9,13,14 259:3
259:7 260:3,6
262:24 263:1
264:22 266:8,19
266:21 267:3,4,10
267:11,17,17
268:12,23 269:5
273:8,9,10,11
274:8 275:8
276:20 278:1,14
279:14,20,22
281:6 282:8,18
283:4,7,21 284:10
284:12,14,18,22
285:1,4 286:10
287:1,2,8,10
288:3,6,7,9,17,19
288:22 289:17
290:10,13 294:13
294:17,24 295:2,4
296:12,22 297:2,3
298:7,21 299:5,9
299:19 301:11,16
301:18,19,22
302:1,18 303:19
303:23 304:4,8,23
305:7,24 306:5,6
308:12,17 309:7
309:20,22,23,23

309:23 310:19,20
310:22 311:3,15
311:21

**L**

L 237:2,7 238:1
312:3,7,8,10,11
312:13,14,16,22
313:5,7 315:7
Labor 261:14,14
language 309:20
last 238:13 245:22
245:24 247:14
251:14 252:6,22
259:10,18 263:19
266:7,11 267:2
268:3 269:24
270:16,17 271:7
272:19 279:2
281:22 283:1
286:11 287:14
293:23,24 298:9
303:5 304:16
309:17 310:1,5
lasted 255:17
late 253:19,22
lately 305:7
later 294:9 306:21
laugh 280:19
law 237:8
lawsuit 276:15
279:17
lawyer 305:6
lawyers 274:11
279:16
lay 309:14
laying 278:22
learn 258:8
leasing 258:24
259:6
leave 242:16 252:21
252:24 258:2
264:3,18 265:1
266:15 268:7,8,13
268:13
leaving 278:15
286:13,14 306:10
left 247:21 251:16
251:23 252:7
258:1 260:15,20
261:5 265:22
268:20 278:24
leg 266:20
less 243:5 295:23
let 242:17 243:22
249:5 257:9 258:5
258:16 266:19

267:4 268:16
280:13 287:4
288:18 290:15
293:10 298:1
301:21,23
letter 238:23 268:1
292:21 300:10
312:7
letters 292:2
letting 252:4 266:22
301:7,12
let's 239:6 240:16
240:18 241:6
261:1 275:9
281:22 287:18
302:5,21
life 280:21 281:16
284:22 285:4
290:11 296:24
305:24 308:16
like 243:1,5 244:15
244:16 245:15
250:2 252:7 253:4
253:7 254:23
257:24 274:1
276:10 278:13
279:6 283:15
284:14,15 286:6
287:11 288:6
289:7 290:8,10
291:14,16 295:19
300:12 302:21
304:15 308:22
309:7,23
liked 267:10
likely 305:19
Limousine 268:8
line 279:15 308:6
list 254:22
listen 305:14
little 244:16 251:23
253:1 256:17
273:10 281:19
298:6 299:8
301:22 308:16
liver 284:12 285:17
286:3 287:14,21
288:2,12
LLP 237:8,15,19,20
load 279:20
located 244:12
locations 244:13
lock 287:2
long 241:16 242:14
243:3,4 244:18
245:21 251:10,13
251:13 252:6,21

255:1,6,15 257:23
257:24 259:10
269:6 287:10
longest 255:6,15
look 241:4,4 261:8
268:11 271:12
284:18 300:13,13
306:7
looked 261:6
looking 261:16
273:14 275:1
276:18 307:18
looks 244:15 291:14
291:16
Lori 237:12 271:14
293:3
lose 308:20
losses 239:8,14
lot 261:12 273:13
273:24 304:17
Lou 267:1
loud 288:1
lower 265:7
LTD 237:22
Lucinda 237:10
315:5,17
lying 267:13

**M**

M 237:10 315:5,17
machine 268:2
machines 261:18
mad 309:21
made 283:18 304:3
304:12
mail 297:10
main 286:6
maintain 298:21
major 280:21
281:16
make 268:2 283:16
284:1 290:11
300:19 303:15
304:13 306:4,9
308:12
makes 296:19
Mandichak 286:9
286:12 289:20
291:10,16 294:9
many 245:4,12,14
246:15 254:11
257:8 259:22
271:21,22
March 238:24
303:2
MARGARET
237:15

MARGOLIS
237:12
mark 238:18 281:24
marked 238:20
240:21 243:24
248:19 249:20
250:13 257:17
271:10 277:13
282:2,13 291:1
302:6 307:5,9
312:6 313:2
matter 268:11
269:6 285:4 301:6
may 259:13,13
283:20 288:23
294:10 304:13
309:8
maybe 240:16
245:9 247:17
250:2 252:17,23
253:6 254:22
256:3 257:24
264:10 265:18
268:24 269:2,9
271:3 272:14
280:23 281:18
286:6 288:22
303:1 307:17
308:21 311:15
ma'am 253:17
264:7 279:24
290:16 295:14
302:9
mean 247:10
250:24 251:17
252:15 253:4
260:20 273:10
275:10,13 278:3
279:11,13 284:21
285:1 288:6 290:9
291:18 297:20
305:6 306:15
310:4
meaning 244:24
294:10 300:4
medical 239:10
240:3 299:8 307:2
313:5
medication 286:1
289:24 303:8
medications 302:14
medicine 284:5
285:18 287:1,4
290:15 298:2
300:18,22 301:7
301:12,15,19,24
302:1 311:10

Snyder
Terry L. Snyder, Volume 3

v.

C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
October 16, 2006

Page 321

meet 292:16
meeting 292:18
member 280:18
memory 275:24
  281:18
men 280:4
mental 294:11
  295:3
mentioning 267:11
message 268:7,13
  268:13
met 269:8,9,10
  270:14,21 271:8
  286:5
Michael 305:23
might 240:17
  243:13,16 249:14
  250:2 267:5,17
  272:24 280:14
  284:12
mild 308:9,11,13
mind 273:17
mine 272:10
minute 241:1
  251:20 264:12,12
  271:12,14 306:9
minutes 275:5
  306:14
miss 253:2
missed 253:1,10,21
  253:22
missing 253:14
  254:5
mistakes 296:20
Mm-hmm 239:20
  240:2,8 242:1,7
  242:13 247:7
  254:20 257:2
  258:3,8 261:4
  271:5 276:2,8
  279:19 306:16
moaning 310:20
Molly 275:24
  279:20 289:18
mom 257:7
moment 258:17
  300:14,14
mom's 257:8
Monday 237:9
  310:11 311:2
money 268:19
  269:21
moneys 269:12,24
  270:13
monitor 290:1
monitored 290:4
month 252:23

255:18 287:12
  294:8
months 241:17
  242:15 243:5
  255:2,3 292:22,23
  295:23
more 239:21 245:16
  253:1 255:17
  295:16,17 302:5
  306:8,14 310:16
morning 238:6,7
  309:5
mother 256:13,16
  257:5,13 264:20
  265:1
mother's 257:13
mouth 304:3,12
  309:18
move 240:17 268:15
  271:6 275:13,15
  306:19 307:6
  310:24
moved 288:18,19
much 246:6 268:21
  270:18 271:1
  282:8 284:23
  305:5,5
Multi-page 313:3
must 302:10,16
Myriad 246:8
myself 284:7 287:1
  293:11 300:19
  302:20 311:1
M.D 282:15 312:23

N

N 312:2
name 263:24 266:2
  266:3,7 267:1,2
  268:8 282:11
  285:11 286:3
  292:12 305:23
names 244:9,10
National 248:5
neck 310:21
need 275:2 279:14
  288:21 302:13
  306:21
needed 267:7 284:5
  284:5,7 286:22
neglect 285:5
Neither 256:20
nephew 256:19,20
nephews 256:22
never 265:1 267:13
  267:14 296:18,23
  299:4,7 305:23

310:13
New 315:2
Newark 242:9
News 259:6
next 241:23 242:20
  243:11,20 246:1,5
  253:16 254:2
  258:20 266:17,21
  295:19
niece 256:19,20
nieces 256:21
night 246:17 268:4
  268:10 309:1,5,17
nobody 303:12
normally 274:11
nose 311:18
Notary 237:10
  315:6
note 295:19 299:22
  299:23 300:7
  302:11,17
notes 312:23 315:9
nothing 267:13,14
  273:13 287:20
  290:11 297:9
  300:19 304:19
notice 237:8 294:14
noticed 253:13
November 291:7
  292:21 293:12
number 239:14
  268:9 273:22

O

oath 238:3
object 299:5,11
Objection 297:13
  301:3
objective 279:13
obviously 278:14
  280:16
occupations 247:5
October 237:9
  277:21 280:7
  315:7
off 239:24 244:14
  244:17 249:11
  267:8 280:15
  290:12 291:2
  299:20
office 244:16
  264:21,24 273:2
  283:17 284:3,11
  289:8 295:24
  297:11 311:1,4,5
  311:9
offices 237:8 244:15

official 265:14
often 245:6 269:1
Oh 248:11 250:3
  255:24 260:20
  266:8 273:5,8
  275:21 280:15
  282:6 285:15
  289:17 292:5
  305:20 306:17
  310:7,9
okay 238:16 239:13
  239:15,21 240:1,7
  241:1,3,8,14,16
  242:20 243:7,19
  244:4,6,12 245:2
  245:9,13,20 246:5
  246:9,19 247:2,4
  247:6,23,23 248:2
  248:9,16,17,22
  249:1,7,10,12,16
  251:3 252:3 254:2
  254:3,9,14 255:21
  256:18 257:1,6,10
  257:14,19 258:7
  258:18,18 260:2
  260:12,23,24
  261:1,8 262:3,12
  262:15,20 265:5
  265:24 266:7
  269:14 270:14,16
  270:23 271:4
  272:15,17,19,21
  274:4,21 275:7,9
  275:22 276:1,23
  277:4,6,11,23
  278:8,9,20 279:1
  279:10 281:7,11
  281:14,22 282:6
  282:21 283:2,6,12
  283:13,19 284:14
  285:6,12 286:17
  287:18,18 289:24
  290:5,19,22 291:4
  291:9,15,17 292:5
  292:5,7 293:4,10
  293:17,22 294:7
  294:16,19 295:20
  295:22 296:4,16
  296:18 297:23
  298:14,19 299:18
  300:3,22 301:10
  301:17 302:2,5
  303:2,14,18 308:2
  308:23 311:10,17
once 240:17 259:14
  269:2 286:6
  288:16 289:12

one 241:11,12,23,24
  242:2,20 243:11
  243:20 244:13,14
  245:16 246:1,2,5
  247:24 248:2,6,13
  248:14 251:11
  253:12 254:2,16
  255:2,2,6,23
  256:9,20 257:14
  257:19 258:20
  259:2,17,18 260:3
  260:13 263:10
  264:20 265:6
  266:3 268:6,6,7
  271:8 272:11,16
  273:18 276:14
  278:10 279:10
  280:12 284:14
  287:11 288:22
  293:17 296:24
  300:11 301:13
  303:20 304:15
  306:20 307:13
  311:8,19
ones 255:9 272:6
  281:17 297:16
one-page 273:12
  274:10
one-time 282:19
  283:5
ongoing 296:7
only 247:1 249:5
  251:11 252:7
  259:12 261:2
  267:7 286:5
  288:16 292:6
  309:24
onto 291:13
onward 278:16
opportunity 262:18
  304:22
order 302:22
other 244:10,14
  248:6 250:8
  254:23 255:9,23
  260:14,15 266:18
  269:2 280:3,21
  281:15 287:15
  290:10 295:4
  298:22 304:19
  309:24
otherwise 315:13
ourselves 262:15
out 238:15 239:1
  250:22 253:12
  264:3,23 266:22
  269:5 273:10

Snyder
Terry L. Snyder, Volume 3

v.

C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
October 16, 2006

Page 322

276:10,11 282:13
282:15 284:9
288:1 297:23
299:7 300:11
301:22 303:15
306:10 308:12,20
309:9 310:22
**out-of-pocket**
239:10 240:3
**over** 241:1 254:16
254:21 271:12
280:21 290:14
310:19
**overcome** 279:14
301:21
**own** 251:4 278:14
279:7 284:9
**owner's** 266:2
**owns** 258:23

_____

**P**
**P** 307:14
**pack** 304:15
**package** 267:12
273:23
**page** 256:3,3,6,8
281:12 291:7,13
291:14,14,19
302:6 307:13,15
307:19,21 312:3
314:2
**pages** 293:18 302:5
302:22,23 307:11
**paid** 240:4 265:6,11
**pain** 239:9,18
**paper** 274:13,14
**papers** 273:13
**paragraph** 293:23
294:1,2,4 298:8
303:4,5
**paragraphs** 293:24
294:3
**part** 248:13 252:12
262:1 308:4
**parties** 315:4
**party** 274:12
315:13
**passes** 301:18
**past** 277:20 295:3
**pay** 239:8 265:2,3,9
265:12,13 267:16
**peanuts** 309:18,20
**Pennsylvania**
250:15,19,20,22
251:9,20,20
**pension** 250:4
**people** 257:8 300:13

**per** 265:3
**perfect** 275:24
303:4
**period** 247:19 253:2
253:3,4,6 255:16
255:20 258:10
259:16 279:15
280:21 281:15
285:9 306:2
**permanent** 255:7
255:10,12
**person** 245:16
266:1
**persons** 246:12
247:3
**Philadelphia**
254:18 286:14
**Philly** 252:11
**phone** 242:23
**phones** 242:23
**piece** 274:13,14
**Pike** 241:13
**pile** 275:14
**place** 246:13 260:9
260:15 263:19
**placed** 259:22
**placement** 259:5
**places** 241:10
254:14 259:22
261:11
**Plaintiff** 237:3,14
**Plaintiff's** 273:20
312:17,18,19,20
312:21
**plan** 308:19
**please** 248:11
256:12 269:19
296:11
**point** 248:12 284:17
297:24 302:10
**pointing** 253:12
**point-blank** 300:17
**pounds** 309:3,21
**prescribe** 286:1
**prescription** 303:24
311:11
**PRESENT** 237:18
**presume** 305:19
**pretty** 271:24
**previous** 261:23
263:11
**primarily** 239:1
**printed** 241:24
**printer** 315:10
**prior** 269:9,10
270:21 303:22,22
**Priority** 246:2

**probably** 249:13
250:4,17,23 256:3
310:18
**probationary** 253:4
**problem** 251:24
**processing** 305:18
**produce** 297:4
**produced** 261:12
263:4,5 265:17
267:13 268:14,18
277:2
**production** 272:13
312:18
**progress** 298:23
**project** 251:13
252:6
**projects** 254:11
255:1
**Promise** 305:2
**pronounce** 286:8
**Properties** 258:21
260:2,5,10,16
**provided** 240:12
278:4
**psychiatric** 296:1
**psychiatrist** 282:8
282:10,17 283:3
284:2 286:23
287:5,9 288:1,7
296:9,18,22,23,23
**psychiatrist's**
282:11
**psychological** 308:1
**Public** 237:10 315:6
**pulled** 288:2
**punitive** 239:9
**pursuant** 237:8
**pushed** 239:24
**put** 239:20 262:18
265:14 272:18
287:5,17 288:21
294:13 296:20,22
297:2 309:2
**putting** 308:21
309:9,18,21
**Pyramid** 246:7,9
247:9 249:1,9
**p.m** 311:24

_____

**Q**
**question** 249:4
269:7,19,22,23
270:11,13 281:8
281:10 285:14
289:15,18 295:12
309:24
**questions** 248:3

261:20,23 262:8
262:11,16 268:22
271:17,19,20,21
273:24 289:19
290:3 306:8 315:8
**quick** 258:5 277:8
**quicker** 283:16
284:1
**quickly** 288:18
**quit** 258:15 304:11
304:14,18
**quote** 296:10

_____

**R**
**ran** 247:5
**rate** 265:2
**RDR** 237:10 315:17
**re** 312:24 313:4,7
**read** 275:4 277:17
285:7,8 296:14
302:12 305:14
308:6
**reading** 296:12
302:11
**ready** 270:5
**really** 243:10
247:18 259:15
267:9,17 268:11
271:18,22 277:8
281:8 295:2
308:17 309:11
310:24
**Real-time** 315:6
**reason** 262:13
267:7,9 293:14,16
**recall** 239:12
243:10 245:5
246:4,15 247:12
247:19,22 254:13
254:21 255:16,19
259:11,15 260:14
260:17,19,22
261:5,7,8 262:6,7
263:1 266:8 267:3
271:3,13 273:1
277:18,23 280:3,5
280:9 281:18
282:18 283:9
292:15 299:12
303:24 304:10,20
**receipt** 265:12,18
**receive** 283:23
**received** 269:12,21
270:13 283:20
291:5 297:10
302:10
**recently** 240:23,24

263:20 271:24
**receptionist** 284:16
**Recess** 306:18
**recollection** 291:22
**recommended**
287:16 288:4,5,15
**record** 262:4,18
265:14 288:1
291:2 293:11
295:3 298:15
306:20 307:1
**records** 289:1 291:5
313:3
**Reeder** 237:10
315:5,17
**refer** 288:23
**reference** 277:5
**referred** 288:14
**referring** 291:21
294:12 295:6
302:7
**regards** 272:2,3
294:18 295:1
**registered** 244:19
250:21 315:5
**regularly** 245:10
309:3
**relating** 265:15
280:11
**relationship** 280:2
**relative** 315:13
**release** 283:11
289:12 307:2
313:5
**remember** 239:17
245:6 247:14
254:14 259:21
260:1,7,9,11
263:4,7 271:17,19
271:22,24 273:7
274:3 282:19
283:4,8 287:16,17
288:9,20,20,24,24
292:3,3,10,11
292:18 304:4,11
306:11,23 308:13
**remission** 287:2
**rent** 258:24
**repeat** 262:15,15
263:15 280:24
281:8
**rephrase** 249:5
**REPLACE** 314:2
**report** 291:3
**Reporter** 315:4,6,6
**represent** 238:23
268:17 291:4

Snyder
Terry L. Snyder, Volume 3

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
October 16, 2006

Page 323

represents 239:16
  239:19
request 265:15
  272:13 312:18,19
requests 273:21
  274:12 312:22
require 285:20
Requst 312:20
resignation 258:11
resigned 251:22
respective 315:8
response 268:18
  312:18,19
responses 271:7
  273:20 312:17
Results 308:24
resume 268:1
return 249:6 253:19
  256:4,8 275:9
  305:4
returns 238:15
  240:16,19 312:8
  312:10,11,13,14
  312:16
review 292:1,4
  304:22
reviewing 271:20
re-ask 297:17
right 244:14 247:11
  250:6 252:15
  253:10 255:15
  257:14 269:7
  270:10 274:22
  275:15 276:15,19
  278:2,11 279:4
  282:9 283:24
  285:23 293:7
  294:23 296:15
  297:20,20 298:3,5
  299:21 300:5,11
  300:16 301:15
  303:2 305:16
  308:23
right-hand 307:17
ripping 301:21
Road 264:2,4,5
room 289:11,12
  298:15 299:3,4,11
  299:12 310:12,16
  310:19
run 264:22 265:3,6
  266:4
runs 264:20
RVs 272:12,13

S

safe 281:2

Sales 257:20
Samantha 256:13
  256:17
same 244:2,3
  246:21 248:6,14
  248:21 261:23
  262:15 292:21
  298:8
sat 299:4
Saturday 311:7
saw 281:1 282:17
  289:20 292:8
  304:6
saying 254:4 262:21
  272:4 277:24
  278:2,22 282:9
  285:17 287:22
  289:13 296:5
  300:7 301:13
  306:2
says 246:8 249:17
  250:9,24 254:7,8
  256:19 257:22
  259:19 260:17
  268:13 273:20
  274:11 277:20
  282:12,14 287:9,9
  291:20 292:1,11
  293:13 294:5
  296:2,6 299:3
  302:11,15 303:2,5
  307:24 308:7,10
  308:18,24
scared 310:15
search 261:2 262:1
  262:9 263:4,10
searches 262:23
second 239:6,14
  248:14 256:3
  272:14 291:13,20
  307:18 312:18,20
seconds 275:5
secret 281:20
see 239:6 246:6
  271:12 273:17
  275:3 276:24
  280:13 281:22
  284:4 286:9
  287:13,18,21
  289:23 293:12
  307:14 310:21
  311:6,20
seeing 278:20,23
  279:2 280:22
  289:21 292:12
seek 267:23 278:21
seeking 267:21

seen 238:22 240:23
  269:7 276:4 277:2
  282:4 283:3 287:8
  287:9,14 289:13
  289:14 290:6
  295:24 299:9,23
  311:7
send 268:1 283:13
  283:14 297:18
sent 254:15,16,21
  261:14 281:23
  289:2 297:1,11,15
  297:16
sentence 239:6
  291:20 298:9,14
  303:5
separate 274:13
September 252:17
sequence 260:4
serious 280:8
  290:17
service 242:21
  259:5 268:8
Services 254:6
  259:19
set 266:18 284:13
  284:16,18 287:14
  288:8 312:20
SHEET 314:3
she'll 274:22
show 273:9 280:9
  296:14 304:7
  310:17
showed 310:14
side 281:2
side-effects 303:8
sighed 266:20
sign 274:11,12
  283:14 289:12
signature 277:22
signed 277:21
  291:10 307:2
  312:22 314:5
significant 280:3
  289:9 292:6
signing 271:24
  273:1 274:3
  277:18 289:1
signs 302:12
similar 279:3
since 244:19 247:21
  269:11,21 270:2,4
  270:13 271:7
  272:19 276:22
sinus 311:15,16
sisters 256:21
Sit 305:14

six 243:5
Skelly 264:9,14
  266:11,15
skim 306:9
skip 250:17 295:16
  302:21
sleep 257:13
sleeping 309:2,10
  309:11,20
smacked 266:20
smoke 304:17
smoker 304:16
smoking 304:2,7,13
  304:15,18
Snyder 237:2,7
  238:1,19 240:18
  240:20 243:23
  248:18 249:19
  250:12 256:13,16
  257:16 271:9
  277:12 282:1
  290:24 294:21
  295:12 307:3,4,7
  307:8 312:3,5,8
  312:10,11,13,14
  312:16,22,24
  313:1,4,5,7 315:7
sobbing 298:15
  299:3
some 240:15 250:21
  254:17 258:5
  266:17 280:7
  283:11 284:5
  294:10 302:16
  311:15
somebody 285:1
  304:5,8 309:19
someone 284:3
something 242:24
  243:2 244:16
  252:17 253:3,5,7
  253:22 254:23
  257:24 266:18
  274:1 277:5
  279:12 280:10
  281:5 282:13,15
  283:20 286:15,16
  288:23 289:1
  297:4 298:4 304:3
  304:4,6 305:2
  308:15,16,22
  309:8 311:7
sometime 249:11
  268:19
sometimes 246:18
  259:1 268:24
  269:2 288:22

309:6
somewhere 252:17
  263:11
soon 264:19 269:7
sorry 245:19 246:12
  256:8 258:19
  264:13 266:13,13
  266:14 268:15
  270:24 272:23
  273:8 275:21,23
  276:1 278:19
  280:24 281:9
  284:1 285:14,15
  286:18 287:24
  291:18 292:3
  293:3,9,24 294:1
  294:4 296:11
  298:13 299:20
  302:4,19 307:18
  307:19,21
sort 239:21,22
  291:24 292:16
  308:18
sounds 249:4 289:7
source 276:9,15,18
  280:16
sources 279:8
  281:16
specific 239:21
  260:15
specifically 262:22
speculating 302:19
speculation 295:9
  295:12 297:14
  301:4
spell 289:6
spelling 239:1
spray 311:18
Stacey 286:9,11
  291:10,16 294:9
staffing 246:2,10
  254:4,6,7,8
stamped 307:23
  312:8,10,12,13,15
  312:16
stapler 243:22
Stargatt 237:8,15
  237:19,20
start 246:19 251:4
  286:15 298:2
  301:19,23 308:19
started 244:21
  252:15,20 278:20
  278:23 280:22
  289:21 305:20,22
  309:16
Starting 296:15

Snyder
Terry L. Snyder, Volume 3

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
October 16, 2006

Page 324

**State** 315:1
**statements** 272:4
**states** 237:1 239:7
  293:23 294:9
  296:4 298:9 303:7
**stay** 257:7,9 288:17
**Stenotype** 315:9
**still** 261:15 264:11
  264:16 265:9,20
  279:18 284:22,23
  289:23 290:8,13
  298:24 300:9,9
  303:19
**stop** 269:4 304:13
**stopped** 251:19
  289:21
**Street** 237:9,16,22
  254:17,19,20
**stress** 276:9,15,18
  279:8,16 280:2,16
  281:16
**stressful** 279:18
  280:4,5
**stressing** 276:11
**strong** 298:20
**stub** 265:12,13
**stubs** 265:9
**stuff** 260:17 261:18
  276:10 299:17
  309:22
**submitted** 271:7
**suffering** 239:9,18
**suicidal** 290:18
  303:6
**suicide** 280:14
**suit** 315:11
**Sunday** 268:9
**supervisor** 265:24
**supplement** 263:5
  275:3
**supplemental**
  272:13
**supplied** 261:18
  282:5
**supply** 261:21
**suppose** 302:17
**supposed** 246:7
  252:6 265:4,8
**sure** 238:22 250:16
  254:22,24 276:16
  277:4 280:18
  281:1,23 292:10
  296:13 299:2
  306:4,9
**survived** 310:18
**swear** 304:24
  309:12

**switch** 291:18
**sworn** 238:3 315:7
**symptoms** 290:1,5
  292:2,4 302:13
**Systems** 244:8
  245:21

_____

**T**

**T** 312:8,10,11,13,14
  312:16
**take** 245:19 271:12
  285:3,18 298:21
  298:22 300:22
  306:7,14
**taken** 237:7 306:18
  315:9
**takes** 287:12
**taking** 304:5,11,11
  279:6 291:19
**talked** 279:6 280:1
  281:17 286:11
**talking** 251:4 272:6
  274:9
**tapes** 304:21 306:1
**taste** 304:3,12
**tax** 238:15 240:15
  240:19 249:6
  312:8,10,11,13,14
  312:16
**taxes** 260:3 261:1
  263:1
**Taylor** 237:8,15,19
  237:20
**TCIM** 242:21
**telemarketing**
  243:1
**tell** 239:16,18 241:4
  241:9 250:24
  253:24 256:11
  258:22 265:21
  268:20 273:9
  277:15,19 278:13
  280:9 282:6
  286:21,22 305:3
  305:16
**telling** 283:10
**temp** 244:8 246:24
  251:7 259:19
**temporary** 241:18
  245:21 254:4,6,7
  254:8
**terminated** 242:17
**termination** 253:8
  258:12
**terms** 296:9
**Terry** 237:2,7 238:1

**262:21** 269:18
  307:19 312:3,22
  312:24 313:4,5,7
  315:7
**test** 245:19 284:15
  308:24
**testified** 238:4
  270:1 275:16
  276:3 279:2
**testimony** 262:14
  262:17 315:11
**Thank** 277:6
**thanked** 252:2,4
**their** 254:10 257:5
  261:15,17,17
  268:2 283:17
  284:11 285:8
  288:23 299:4,11
  305:3
**theirself** 280:18
**therapist** 286:23
**therapists** 240:6,9
**therapy** 296:10
**they'd** 297:3
**thing** 238:17 244:2
  244:3,17 248:14
  248:21 301:13
  302:1
**things** 276:6 281:4
  309:7
**think** 242:23 243:5
  243:16,18 245:9
  245:10,12 246:7
  247:16,20 248:6
  249:2,2,14 250:6
  251:11,15 253:9
  253:22 256:2
  258:9 261:18,19
  261:22 262:7,21
  265:6,18 266:17
  267:10,12,15
  270:1 272:8
  276:16,20 281:1,4
  281:12 282:9,22
  282:24 283:10
  284:12,17 286:6
  288:15,15 290:9
  293:14 294:17,24
  295:6 298:6
  300:20,24 301:2
  301:18,20,21,23
  303:20 304:2
  306:8 310:21
**thinking** 300:18
**thinks** 311:14
**third** 256:3 293:19
  293:20,21 294:1,4

**302:6**
**though** 268:9 284:8
  304:15
**thought** 247:23
  249:8 253:14
  275:23 284:1
  309:8 310:17
**thousands** 245:18
**three** 272:3,6,8
  273:19 293:17
  295:16 302:5
  304:16
**through** 239:20
  241:7,9,18 242:10
  245:7,11,23 247:8
  247:14 254:11
  255:8 259:4 263:1
  276:6 281:1
  305:22 306:3,9
**throughout** 262:9
  303:10
**throw** 275:13
**throwing** 289:17
**Thursday** 270:17
**till** 243:14 301:20
**time** 245:22 247:14
  252:2 253:2
  254:16 258:10
  259:2 260:4,18
  261:6 262:6 263:3
  267:7 268:11,20
  269:24 270:16,20
  271:2 275:1
  278:15,16 279:3
  280:17,22 281:15
  283:1 284:20
  286:9,11 287:14
  289:21,21 290:6
  292:16,19 293:10
  296:24 297:7,20
  298:10,23 299:1
  299:14,20,22
  300:4,13 301:18
  301:18,20 302:14
  304:17
**today** 238:12,14
  239:2 262:13,13
  262:17 310:1,2
  311:19,23
**told** 245:17 257:11
  258:16 265:7
  266:19 282:23
  288:7
**top** 291:12 303:1
  308:23
**tormented** 239:23
**torture** 239:20

**279:15**
**tortured** 295:4
**totally** 301:11
**tractor** 263:20
**tractor-trailer**
  263:22
**train** 253:1,10,21
  258:5
**training** 253:3
  258:10
**transcribed** 315:9
**transcript** 306:21
  315:11
**transcription**
  315:10
**transcriptions**
  263:12
**transcripts** 304:22
**treat** 296:7
**treated** 278:15
  303:21
**treating** 296:9,18
  296:21
**treatment** 285:21
  289:9 294:11,19
  296:6 298:10
  302:8 303:11
**trick** 289:15,17,19
**trigger** 281:18
**Truck** 257:20
**truckers** 265:7
**true** 273:24 274:18
  278:1 315:11
**truth** 277:19
**truthful** 272:4
  278:4
**try** 263:14 266:19
  273:6 295:16
  304:14 305:1
**trying** 263:15
  283:11 297:23
  300:11
**turn** 293:17 297:9
**turned** 253:15
  297:5,6
**twice** 259:14 286:6
  288:16
**twisted** 249:4
  278:19
**two** 244:9,13 247:5
  275:5,5 293:17
  294:14 295:23
  306:9
**type** 299:10 311:15
**typed** 301:8
**typewritten** 308:4
**typo** 256:22

Snyder
Terry L. Snyder, Volume 3

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
October 16, 2006

Page 325

| U | | | | |
|---|---|---|---|---|
| **U** | visit 282:20 | **well** 238:10 240:5 | 311:22 | 287:19,20 292:12 |
| **Uh-huh** 248:5 | **Volume** 237:3 | 244:13,19 252:1 | **we've** 310:1 | **Wright's** 279:7 |
| 255:22 | **voluntary** 258:11 | 252:14 253:5,9,13 | **while** 246:16 309:2 | **writing** 299:14 |
| **unappreciative** | | 253:21 257:5,22 | 309:10,11 | **written** 295:19 |
| 300:20 | **W** | 259:19 264:3 | **whole** 301:22 | **wrong** 283:1 309:8 |
| **under** 259:6 298:11 | W 243:15 | 265:11 266:16 | 310:20 | **wrote** 298:23 301:8 |
| 301:22 308:6 | **wages** 265:16 | 267:24 274:22 | **WILCOX** 237:22 | **www.wilfet.com** |
| 315:10 | **wait** 251:20 264:12 | 276:1,20 279:18 | **Wilmington** 237:9 | 237:24 |
| **understand** 239:5 | 264:12 292:22 | 280:13 281:4 | 237:13,17,22 | **W-2** 244:5 249:1,5 |
| 251:17 270:12 | **waiting** 289:11 | 282:12 284:21 | 264:2 | 249:22 250:14,15 |
| 278:3 292:24 | 298:15 299:3,4,11 | 285:11 286:24 | **wish** 267:20 | 250:17 251:2 |
| 305:9 306:1,6 | 299:12 | 287:8 290:3 297:8 | **witness** 238:2 | 253:16 |
| **understanding** | **walk** 264:23 | 297:15 298:1 | 250:14 262:23 | **W-2s** 241:6,6,7 |
| 249:8 | **walking** 288:20 | 299:22 300:1,9 | 263:9,17 269:20 | 248:12 255:23 |
| **unemployed** 279:10 | **wall** 276:13 | 301:6 305:20 | 270:3,7,12 273:2 | |
| **unemployment** | **Walter** 266:3,3 | 309:1 310:12 | 273:5,8,23 274:3 | **X** |
| 267:24 | **want** 241:1,4,9 | **Wellbutrin** 303:24 | 274:5,8,14,18,21 | X 312:2 |
| **UNITED** 237:1 | 243:14,21 244:5 | 304:1 | 287:24 288:5 | **X-ray** 311:20 |
| **university** 286:14 | 248:22 251:4 | **went** 247:14 252:16 | 295:10,13 306:23 | |
| **Unless** 299:9 | 256:2 258:13 | 262:24 266:17,18 | 312:3 315:7,8,12 | **Y** |
| **until** 251:2 281:3 | 267:16 268:10 | 276:6 286:24 | **woke** 309:17 | **yeah** 239:20,24 |
| 287:4 289:21 | 270:8 271:14 | 287:3 288:16 | **Woodmill** 244:14 | 240:14 243:2,2,8 |
| 293:12 298:10 | 272:10,13 273:15 | 292:15,20 296:23 | 244:16 254:9,10 | 243:10 245:3 |
| **untruthfully** 283:1 | 277:1,6,7,9,15,17 | 310:24 | **word** 305:15,15,17 | 248:8 250:3,5 |
| **unwillingness** 296:8 | 284:14,24,24 | **were** 240:4 245:10 | **words** 278:14 279:7 | 251:21,21,23 |
| **Upper** 253:17 | 290:11 293:19 | 247:8 252:19 | 279:8 287:16 | 253:5,21,23 254:9 |
| **upset** 299:1 308:16 | 306:8 310:24 | 253:19 255:1 | 298:22 | 254:9,10 256:11 |
| **USA** 237:5 | **wanted** 259:3 271:1 | 257:3,7 258:15 | **work** 241:16,18 | 261:15,22 262:2,2 |
| **use** 261:15,17 268:2 | 287:1 311:5,6,21 | 261:13 265:22 | 242:14 244:18 | 262:2 265:23 |
| 276:21 315:9 | **wasn't** 243:4 258:2 | 267:4,12 272:4 | 245:20 246:17 | 276:5,16 278:5,6 |
| **usually** 246:21 | 258:4,4,8 259:2,3 | 274:16 275:16,23 | 250:19 251:10 | 278:7 280:15,15 |
| 309:3,6 | 264:23 266:20 | 276:6 278:4,14 | 253:19 257:21,23 | 281:5 286:5 288:6 |
| **U.S** 268:6,9 | 275:18 284:6,8,9 | 279:2 281:13 | 259:3 261:6,9 | 290:13,18 292:5 |
| | 284:21 302:19 | 283:10 284:20 | 264:8 266:21 | 297:15 298:20 |
| **V** | 309:22 311:6 | 285:17,18 289:8 | 267:21,23 305:6 | 300:1,15,17,21 |
| **v** 237:4 | **way** 253:15 272:20 | 289:24 290:5,6,17 | **worked** 241:10 | 303:9,13 304:2,9 |
| **Valley** 264:1 265:16 | 273:17 276:17 | 290:22 292:8,11 | 245:22 246:16 | 304:24 309:12,17 |
| **varied** 255:4,4,5 | 277:5 278:19 | 293:11 295:6 | 247:20 248:4 | 311:12 |
| **various** 246:16 | 280:6,6 284:9 | 298:12,17,24 | 249:9 259:13 | **year** 238:24 244:2 |
| 247:12 261:12 | 287:6,17 288:21 | 300:8 302:7 306:4 | 260:9 263:19 | 244:21,23 245:24 |
| 276:6 | 302:21 305:24 | 309:11 310:2,23 | **working** 244:21 | 254:12 257:3 |
| **verification** 272:1 | 306:3 | 315:9 | 245:3 246:17 | 265:17 286:20 |
| 272:23 273:13 | **week** 252:7 255:2 | **weren't** 253:2 276:1 | 251:19 254:17 | 292:21 |
| 277:10 312:21 | 257:24 258:9 | 276:22 299:11 | 264:16 267:19 | **years** 247:13 309:4 |
| **verifying** 274:16 | 259:13,14 264:9 | **West** 237:9,16 | 308:20 311:20 | **Young** 237:8,15,19 |
| **Verizon** 251:19 | 264:14 266:16 | **we'll** 243:20 248:17 | **works** 311:8 | 237:20 |
| 252:8,19 253:13 | 269:2,9 281:23 | 271:8 277:10 | **world** 296:19 | |
| 253:16 | 286:13 305:1,1 | 280:23 281:2,24 | 300:19 301:22 | **$** |
| **version** 243:20 | **weekend** 259:2 | 295:16 302:21 | **worried** 298:12,17 | **$100,000** 239:9,18 |
| **very** 238:10 264:9 | **weekends** 246:18 | 306:7,14,19,19 | **wouldn't** 287:4 | **$135** 265:6 |
| 264:15 280:8 | 259:1,12 | **we're** 238:12,14,17 | 297:5,24 298:20 | **$18** 265:4 |
| 281:14 284:23 | **weeks** 251:15 | 239:2 244:3 | 299:16 300:23 | **$4,000** 239:10 240:3 |
| 287:3 292:1,18 | 277:20 297:10,19 | 257:14 261:1,2 | 309:22 310:18 | **$45,658** 239:8 |
| 300:14 309:18 | **weight** 308:20,21 | 262:13,17 278:8 | **wounds** 301:19 | **$68,487** 239:8 |
| **Vintage** 258:21 | 308:24 309:9 | 278:12 284:8 | **Wright** 240:10 | |
| 260:2,5,10,16 | **weird** 304:12 | 291:19 305:9 | 275:16 277:7 | **0** |
| | **welcome** 261:17 | 306:15 307:6 | 278:12,17,20,23 | **03** 249:18 |

Snyder
Terry L. Snyder, Volume 3

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
October 16, 2006

Page 326

**04-970(JJF)** 237:4

**1**

**1/20/06** 313:5
**1/9/02** 313:6
**10th** 264:10
**10-28-06** 315:20
**10/2/06** 312:22
**10:15** 237:9
**1000** 237:8,16
**11th** 295:21 296:3
  298:24 300:4,7
**12/21/04** 287:9
  312:24
**12:04** 311:24
**132-RPR** 315:17
**1330** 237:22
**1509** 237:13
**16** 237:9 315:7
**17** 238:19 312:7
**17th** 237:9,16
**18** 240:19,20 312:8
**18th** 303:2
**19** 243:23 312:10
**19th** 291:7 294:20
**19801** 237:13,17,22

**2**

**2** 243:17 291:14
**2nd** 264:14 267:6
  277:21
**2,000** 240:19
**20** 248:18 312:11
**20th** 307:3
**200** 268:24 271:3
**2000** 240:16 278:15
  312:8
**2001** 244:2,20,22,24
  312:10
**2002** 247:18 248:17
  249:6,14 307:23
  308:14 312:11
**2003** 247:17 261:3
  278:16,23 280:2
  280:22 281:3
  291:8,21 292:9
  303:22 312:13
**2004** 250:11,19
  252:12,12 257:4
  280:23 281:2,3
  296:3 298:24
  300:8 312:14
**2005** 257:15,22,22
  259:21,24 301:20
  302:7,24 312:16
**2006** 237:9 264:15
  265:17 277:21

**286**:20 289:22
  307:3 315:7
**2008** 315:18
**202** 241:13
**21** 249:19 312:13
**21st** 294:20
**22** 250:12 312:14
**23** 257:16 312:16
**237** 302:6
**238** 312:4,7
**24** 271:9 312:17
**240** 312:8
**243** 312:10
**248** 312:11
**249** 312:13
**25** 277:12 312:21
**250** 312:14
**257** 312:16
**26** 281:24 282:1
  294:21 312:23
**27** 290:24 313:3
**271** 312:17
**277** 312:21
**28** 307:4 313:5
**281** 312:23
**29** 307:7,8 313:6
**290** 313:3

**3**

**3** 237:3
**3rd** 264:14
**300** 268:24 271:3
**302** 237:23
**307** 313:5,6
**31** 315:18

**4**

**4th** 244:13
**401(k)** 250:2
**4100,000** 239:9
**45,000** 239:13

**5**

**5:00** 309:5
**500** 245:16 270:19

**6**

**6th** 238:13
**655-0477** 237:23

**7**

**7:00** 309:6

**8**

**8** 302:24
**8th** 303:3
**8:00** 309:6

**9**

**9** 307:22,23
**9:00** 309:5

B- 0335



**WILCOX & FETZER LTD.**

In the Matter Of:

# Snyder

## v.

# CitiSteel, USA, Inc.

C.A. # 04-970 (JJF)

———————————

Transcript of:

Jerome Downie

July 21, 2006

———————————

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B- 0336

Snyder                                    v.                        CitiSteel, USA, Inc.
Jerome Downie                    C.A. # 04-970 (JJF)                    July 21, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TERRY L. SNYDER,                         )
                                         )
                    Plaintiff,           )
                                         )   Civil Action
        v.                               )   No. 04-970
                                         )      (JJF)
CITISTEEL USA, INC.,                     )
                                         )
                    Defendant.           )

            Telephonic deposition of JEROME DOWNIE
taken pursuant to notice at the law offices of
Margolis Edelstein, 1509 Gilpin Avenue, Wilmington,
Delaware, beginning at 1:05 p.m. on Friday, July 21,
2006, before Kathleen White Palmer, Registered Merit
Reporter and Notary Public.

APPEARANCES:

            LORI A. BREWINGTON, ESQUIRE
            MARGOLIS EDELSTEIN
              1509 Gilpin Avenue
              Wilmington, Delaware   19806
              for the Plaintiff

            (Via teleconference):
            MARGARET M. DiBIANCA, ESQUIRE
            YOUNG CONAWAY STARGATT & TAYLOR
              1000 West Street - 17th Floor
              Wilmington, Delaware   19899-0391
              for the Defendant

ALSO PRESENT:                                    B-0337
            TERRY L. SNYDER
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
            WILCOX & FETZER, LTD.
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com

Snyder                                      v.                          CitiSteel, USA, Inc.
Jerome Downie                         C.A. # 04-970 (JJF)                      July 21, 2006

Page 2

1        JEROME DOWNIE,
2     the witness herein, having first been
3     duly sworn on oath, was examined and
4     testified as follows:
5  BY MS. BREWINGTON:
6     Q.  Good afternoon, Mr. Downie.  How are you?
7     A.  Fine.
8     Q.  Good.  I'm going to ask you a series of
9  questions today.  My name is Lori Brewington and I
10  represent Terry Snyder in a discrimination or sexual
11  harassment action against CitiSteel.
12        I'm going to ask you a series of questions
13  and I'll make every effort to ask them one at a time.
14  We definitely have to make sure that, because we are
15  taking your deposition by phone, that we take turns
16  speaking so that the court reporter can clearly
17  transcribe everything that we're saying.
18        If at any time you need to take a break
19  today, just let me know and we will go off the record.
20        Please start by stating your name for the
21  record?
22     A.  My name is Jerome Downie.
23     Q.  Where do you currently work?
24     A.  I am retired.  I am a consultant with CitiSteel

Page 3

1  ending this month.
2     Q.  Why is your consulting work ending with
3  CitiSteel this month?
4     A.  Because I was on a one-year contract extended
5  one more year and the year is concluding this July,
6  this month.
7     Q.  Where do you currently reside?
8     A.  I live in Celebration, Florida.
9     Q.  Tell me about your work as a consultant for
10  CitiSteel beginning with when you started and -- well,
11  let's just start with when you started.
12     A.  I don't understand the question.
13     Q.  Okay.
14     A.  When I started at CitiSteel or when I started
15  as a consultant?
16     Q.  Consultant.
17     A.  I voluntarily -- I retired from CitiSteel in
18  2004, end of July, at which time CitiSteel requested
19  me to be a consultant to follow and answer
20  questions from time to time.
21     Q.  What type of questions would you be answering?
22     A.  Anything that pertained to my job.
23     Q.  What would that be?
24     A.  Various things.

Page 4

1     Q.  As a consultant, what are some of your job
2  responsibilities?
3     A.  I am available for them to ask me questions,
4  period.
5     Q.  What did the questions pertain to?
6     A.  What I did.
7     Q.  What did you do?
8     A.  I was director of human resources and corporate
9  secretary.
10     Q.  So as a consultant, is it fair to say that
11  CitiSteel would consult with you on human
12  resources-related matters?
13     A.  Yes.
14     Q.  Did you consult them on any other matters
15  besides human resources-related matters?
16     A.  No.
17     Q.  How often are you used as a consultant?
18     A.  Periodically.
19     Q.  What does "periodically" mean to you?
20     A.  It is varied.  From time to time.
21     Q.  It's varied from time to time and periodically.
22  So now I'm going to ask you:  Once a month?  Twice a
23  month?  Can you give me an example?
24     A.  That would be difficult for me to do.

Page 5

1     Q.  Why would it be difficult?
2     A.  I just don't remember.
3     Q.  Well, when is the last time you consulted with
4  CitiSteel?
5     A.  Maybe a month ago.
6     Q.  And before that?
7     A.  I don't remember.
8     Q.  So because you don't remember, is it fair to
9  say that it was more than a month ago?
10     A.  No.
11     Q.  Was it so long ago that you can't remember?
12     A.  I'm busy with other things.  It's hard for me
13  to remember exactly the frequency.
14     Q.  A month ago you consulted with CitiSteel; is
15  that correct?
16     A.  Yes.
17     Q.  What was that with respect to?
18     A.  I was called by Jim Ryan and told that I may be
19  deposed in a case and that I may be getting a call
20  from an attorney.
21     Q.  What case was that?
22     A.  The one we're discussing now.
23     Q.  So you were called by Jim Ryan and advised that
24  you may be called concerning Terry Snyder's case?

2 (Pages 2 to 5)

B- 0338

Snyder
Jerome Downie

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
July 21, 2006

Page 6

1    A.  That is correct.
2    Q.  What else did Jim Ryan tell you?
3    A.  Nothing more than that.
4    Q.  How long was the conversation?
5    A.  I don't recall.
6    Q.  Do you recall whether it was an hour?
7    A.  No.
8    Q.  Do you recall whether it was like a half hour?
9    A.  No.
10   Q.  Do you recall whether it was like 15 to
11   20 minutes?
12   A.  I would say it was in minutes.
13   Q.  Okay.
14   A.  I don't remember how long.
15   Q.  So as I understand it, he called you and told
16   you that you may get a call concerning the Terry
17   Snyder matter from an attorney.  Did he say anything
18   else?
19   A.  No.
20   Q.  Did you respond in any way?
21   A.  No.
22   Q.  Do you have any other jobs currently besides
23   consulting with CitiSteel?
24   A.  No.  I'm retired.

Page 7

1    Q.  Why did you resign from CitiSteel in July of
2    2004?
3    A.  Because I retired.  I voluntarily retired from
4    the corporation.
5    Q.  Now, when were you hired with CitiSteel?
6    A.  In September of 1988.
7    Q.  You worked at CitiSteel through July of 2004;
8    is that correct?
9    A.  As a permanent employee, yes.
10   Q.  As a what?  I'm sorry.
11   A.  Permanent employee.
12   Q.  Okay.
13   A.  Yes.
14   Q.  Prior to that, were you a temporary employee?
15   A.  No, but I have been a part-time employee or
16   consultant from July of '04 to now.
17   Q.  Oh, okay.  I understand.  So let's talk about
18   your employment at CitiSteel from September 1988
19   through July of 2004.  Okay?
20   A.  (No response.)
21   Q.  Is that okay with?  Can you hear me?
22   A.  Yes.
23   Q.  Okay.  Great.
24       When you started in September of 1988, what

Page 8

1    were you hired as?
2    A.  My position was director of human resources.
3    Q.  Is that the position you held throughout July
4    of 2004?
5    A.  Yes.
6    Q.  Terry Snyder was employed with CitiSteel from
7    August of 2001 through April of 2003.  Am I correct
8    that you were the director of human resources at that
9    time?
10   A.  You're correct that I was director of human
11   resources while she was employed.  I don't exactly
12   remember -- I don't remember the exact dates of her
13   employment.  Yes.
14   Q.  What were some of your primary job
15   responsibilities as the director of human resources?
16   A.  Any and all matters related to the human
17   resources function of the corporation.
18   Q.  Would that include employee investigations?
19   A.  Yes.
20   Q.  Would it also include hiring and firing of
21   employees?
22   A.  Yes.
23   Q.  Would it also include the transfer of
24   employees?

Page 9

1    A.  Yes.
2    Q.  Prior to this deposition today, did you receive
3    documentation or exhibits that I intend to use today?
4    A.  Yes, I did.
5    Q.  Were you going to say something else?
6    A.  I received -- I received documents and printed
7    them from my computer yesterday.
8    Q.  Have you had an opportunity to review the
9    documents?
10   A.  A little bit.
11   Q.  Let me ask you a question.  Have you talked
12   with anyone besides Miss DiBianca in preparation for
13   your testimony today?
14   A.  No.
15   Q.  When is the last time you spoke with Jim Ryan?
16   A.  I don't remember.  It was the time he called
17   me.
18   Q.  The time that we spoke about earlier?
19   A.  Yes.
20   Q.  One month ago?
21   A.  As I recall, yes.
22   Q.  When was the last time you spoke with Randolph
23   Harris?
24   A.  I have no idea.  It's been awhile.

3 (Pages 6 to 9)

Snyder                                     v.                          CitiSteel, USA, Inc.
Jerome Downie                    C.A. # 04-970 (JJF)                       July 21, 2006

Page 10

1    Q.   Let me ask you a question.  Were you a
2    consultant for CitiSteel during the last time you
3    spoke with Randolph Harris?
4    **A.  No.**
5    Q.   Were you the director of human resources during
6    the last time you spoke with Randolph Harris?
7    **A.  Yes.**
8    Q.   How about Greg Buragino, when is the last time
9    you spoke with Mr. Buragino?
10   **A.  I have no idea.**
11   Q.   Were you employed with CitiSteel as the
12   director of human resources the last time you spoke
13   with him?
14   **A.  Yes.**
15   Q.   As I'm sure you are aware, Terry Snyder has
16   alleged in this case that Randolph Harris sexually
17   harassed her.  Are you aware of that?
18   **A.  I am aware of the allegation.**
19   Q.   When did you first become aware of the sexual
20   harassment allegations against Randolph Harris by
21   Terry Snyder?
22   **A.  I don't remember the date.**
23   Q.   I'll represent to you that Miss Snyder's
24   employment ended -- I know there's some dispute as to

Page 11

1    whether she was terminated or not -- but her
2    employment ended April 10th of 2003.
3         Is it fair to say that you learned about
4    these allegations prior to April 10th, 2003?
5    **A.  Yes.**
6    Q.   Would it also be fair that you learned about
7    these allegations a few days prior to April 10th,
8    2003?
9    **A.  Yes.**
10   Q.   How did you first become aware of these
11   allegations?
12   **A.  To the best of my recollection, Mr. Buragino**
13   **came to my office and told me about that.**
14   Q.   What did he say?
15   **A.  I don't remember the words.**
16   Q.   You don't remember the words.
17        Do you remember anything that he may have
18   said during that time?  And I don't need the exact
19   wording.
20   **A.  The thrust of what I recall he said was that**
21   **Terry Snyder alleged that Randolph Harris had harassed**
22   **her.**
23   Q.   Then what did you do next?
24   **A.  I listened to what he said, which I would**

Page 12

1    **normally do, and then I discussed with him a path**
2    **forward to investigate the matter.**
3    Q.   Did you have this discussion with him over the
4    phone or face-to-face?
5    **A.  I believe it was face-to-face.**
6    Q.   In terms of your discussion of the path
7    forward, I believe that's what you said, what was your
8    path forward?
9    **A.  Meet the parties -- meet with -- notify**
10   **management, meet with the parties involved, and**
11   **investigate the matter, find out what happened.**
12   Q.   Did you meet with Terry Snyder the same day
13   that you learned of the allegations?
14   **A.  I can't remember.**
15   Q.   Do you recall whether or not you met with
16   Miss Snyder with Mr. Buragino?
17   **A.  I don't remember.**
18   Q.   Do you recall whether or not you had
19   Miss Snyder make a statement of the alleged incidents
20   of sexual harassment?
21   **A.  Yes, only because that would be my habit.  In**
22   **other words, I would always ask someone to please**
23   **write down and document what they knew to be the facts**
24   **or alleged facts in any matter.**

Page 13

1    Q.   I want to actually direct your attention to one
2    of the exhibits that was sent to you.  If you look at
3    the bottom, the documents are Bates stamped with
4    certain numbers, and the one that I want you to focus
5    on is Bates stamped D373 and D374.
6         MS. BREWINGTON:  I'd like to have those
7    marked, if I could.
8         (Downie Exhibit 1 was marked for
9    identification.)
10   BY MS. BREWINGTON:
11   Q.   Do you have that document in front of you?
12   **A.  I have two pieces of paper.  One is D373 and**
13   **D374.**
14   Q.   Have you had an opportunity to review this
15   document yet?
16   **A.  No.**
17   Q.   Can you go ahead and do that for me?  I want to
18   ask you about it.
19   **A.  (The witness reviews the document.)  Yes.**
20   Q.   You've had an opportunity to review it.  Okay.
21        Do you see that this document is dated
22   Tuesday, and I think that that is April 8th, 2003?  Do
23   you see that at the top?
24   **A.  Yes.**

4 (Pages 10 to 13)

B- 0340

Snyder
Jerome Downie

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
July 21, 2006

Page 14

1    Q.  It's a document written by Terry Snyder?
2    **A.  Yes.**
3    Q.  Does this document look familiar to you?
4    **A.  No.**
5    Q.  So you don't know whether or not you've ever
6    seen it before?
7    **A.  I had to have seen it before.  It's just been**
8    **several years.  I just don't remember it now.**
9    Q.  Is it fair to say that this is a statement that
10   she drafted when you met with her?
11   **A.  Yes.**
12   Q.  Now I'd like to direct your attention to a
13   document that is Bates stamped D375, D376, and D377.
14   **A.  I have them.**
15        MS. BREWINGTON:  We are going to have this
16   marked as Downie 2.
17        (Downie Exhibit 2 was marked for
18   identification.)
19   BY MS. BREWINGTON:
20   Q.  Take some time to review that document and let
21   me know when you've had an opportunity to review it.
22   **A.  (The witness reviews the document.)  I can see**
23   **what it is.**
24   Q.  You can't see it?

Page 15

1    **A.  I can -- I understand what it is.**
2    Q.  Okay.  Tell me what it is.
3    **A.  This was written by Greg Buragino and is a**
4    **documentation of events, as the title says,**
5    **surrounding Terry Snyder's harassment charges.**
6    Q.  It's almost halfway down the page.  It is a
7    little above that, but it says: "Terry was called at
8    the melt shop and asked to come to the personnel
9    building to meet with Jerry and I.  She arrived about
10   1:55.  Jerry told her that Dennis had informed us of
11   her complaint and that we were following up, per
12   policy, to investigate her claim and to help."
13        Then it says: "From the conversation,
14   these are the salient points I recall."
15        Now, me reading that, does that help
16   refresh your recollection as to whether or not
17   Mr. Buragino was in the meeting with you on that date?
18   **A.  Yes, that's what it says.**
19   Q.  Do you have any reason to dispute that?
20   **A.  No.**
21   Q.  At the top of the page it says "On 4/8," so
22   that would have been April 8th; is that correct?
23   **A.  That's what it says.**
24   Q.  Now, in that meeting, can you tell me anything

Page 16

1    that Ms. Snyder said to you?
2    **A.  Is your question can I tell you anything other**
3    **than what's stated on these two exhibits?**
4    Q.  No.  I actually don't want you to tell me based
5    on those exhibits.  If you can just tell me what you
6    remember.
7    **A.  Okay.**
8        **It has been some time since this happened,**
9    **so I really don't recall the conversation much from my**
10   **recollection.**
11       **The thrust of, as I recall, the**
12   **conversation was that Ms. Snyder was upset and wanted**
13   **the company to know some information.  And I told -- I**
14   **listened.  I listened and I indicated to her that this**
15   **was -- this type of allegation is very serious.  As a**
16   **representative of the company, I would have to notify**
17   **the president, and then I would have to investigate**
18   **this.  And I took it very seriously.  And that we**
19   **would get back to her on this matter.**
20   Q.  Did she mention anything about her father in
21   that meeting?
22   **A.  Not that I recall.**
23   Q.  So she didn't request to have her father
24   involved in the meeting, in any future meetings?

Page 17

1    **A.  Are you asking me did --**
2    Q.  I'm sorry.  I'll just go ahead and repeat or
3    rephrase.
4        Did Miss Snyder ask you if she could have
5    her father in the meeting, any future meetings?
6    **A.  Okay.  Let me respond this way.**
7    Q.  Okay.
8    **A.  In this particular meeting, I don't recall her**
9    **mentioning her father.**
10   Q.  Okay.
11   **A.  In a future meeting, I do recall her mentioning**
12   **her father.**
13   Q.  What do you recall about that meeting just with
14   respect to her father?  Because we'll get to that
15   meeting.
16   **A.  What do I recall?**
17   Q.  Yes, about her father.
18   **A.  She stated that she -- it was something about**
19   **she wanted her father to be present.**
20   Q.  In the meeting?
21   **A.  In a meeting, yes.**
22   Q.  Did you allow her to have her father present at
23   the meeting?
24   **A.  No, I did not.**

5 (Pages 14 to 17)

Snyder                                          v.                    CitiSteel, USA, Inc.
Jerome Downie                          C.A. # 04-970 (JJF)                   July 21, 2006

Page 18

1  Q.  Did she mention to you why she wanted her
2  father present at the meeting?
3  **A.  There was no clear reason stated to me.**
4  Q.  Did you have an understanding of why she may
5  want her father involved in the meeting?
6  **A.  My understanding would just be that she wanted**
7  **someone else there to assist her.**
8  Q.  Why did you decline?
9  **A.  It's the practice of the company not to permit**
10 **that.**
11 Q.  Not to permit her father or not to permit
12 anyone to be in there as a witness for the person?
13 **A.  Not to permit -- my answer is not to permit**
14 **people outside the company in company meetings.**
15 Q.  Did you offer or allow Terry to bring in a
16 representative of her choice from CitiSteel to come
17 into the meeting?
18 **A.  There was one there.  There was one already**
19 **there.**
20 Q.  Meaning Jim Ryan?
21 **A.  Yes.**
22 Q.  Was that a representative of Terry's choice?
23 **A.  No.**
24 Q.  Who asked Jim Ryan to attend this meeting?

Page 19

1  **A.  I did.**
2  Q.  So was Jim Ryan a representative of your
3  choice?
4  **A.  Yes.**
5  Q.  Have you told me everything that you can recall
6  about your initial meeting with Miss Snyder?
7  **A.  The only thing I would say otherwise was there**
8  **were lot of questions in my mind about things, so I**
9  **made no conclusions or I really -- things were up in**
10 **the air.  I -- you know, I don't -- I didn't have any**
11 **type of closure in my mind.  That's the only thing I**
12 **could say.**
13 Q.  So at the end of your meeting with Terry on the
14 8th, you had no conclusion as to whether the sexual
15 harassment had occurred or not?  Is that fair to say?
16 **A.  Yes.**
17 Q.  Is it fair to say that the investigation had
18 not ended at that point?
19 **A.  It hadn't begun.**
20 Q.  It hadn't begun.  Okay.  Is that because you
21 still had other people to talk to; namely, Randolph
22 Harris?
23 **A.  Yes.**
24 Q.  You said it hadn't begun, but it did, didn't,

Page 20

1  it, because you did speak with Terry?  Or was that not
2  part of the investigation?
3  **A.  I believe you're right.**
4  Q.  Okay.
5  **A.  I agree with you.**
6  Q.  Now, we're still on that first meeting that you
7  had with Terry.  Do you know or do you recall whether
8  Terry mentioned tapes or diaries as evidence of the
9  harassment at that point?
10 **A.  I don't know -- I don't remember when all that**
11 **came up.**
12 Q.  You don't remember when it came up, but is it
13 fair to say that you did know that it did come up?
14 **A.  Yes.**
15 Q.  How did it come up?
16 **A.  I don't remember.**
17 Q.  Is it fair to say that Miss Snyder volunteered
18 the fact that she had tapes and diaries?
19 **A.  Yes.**
20 Q.  Did you ask to see these tapes and diaries on
21 April 8th?
22     MS. DiBIANCA:  I'm just going to object
23 just because I don't know that we've established the
24 dates yet.  But if we want to move forward on the

Page 21

1  presumption that April 8th is the date, that's fine.
2     MS. BREWINGTON:  Okay.
3     Jerry, I'm sorry.  You can go ahead and
4  answer.
5  **A.  Ma'am, would you please restate the question?**
6     MS. BREWINGTON:  I don't really remember
7  what I asked.
8     What did I ask?
9     (The reporter read from the record as
10 requested.)
11 BY MS. BREWINGTON:
12 Q.  Do you recall whether or not you asked to see
13 the diaries or tapes?
14 **A.  I -- I don't remember the exact language about**
15 **what I said or didn't say about the tapes.**
16 Q.  Okay.
17 **A.  I don't know if it came up on that date.**
18 Q.  Are you saying that it came up, but you're just
19 not sure it came up on the 8th?
20 **A.  Yes.  It didn't come up because I've said that**
21 **already, it came up at one point in time, yes.**
22 Q.  Do you know whether it came up early on in your
23 investigation?
24 **A.  I honestly don't remember.**

6 (Pages 18 to 21)

B-0342

Snyder
Jerome Downie

v.

C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
July 21, 2006

Page 22

1    Q. Were you interested in hearing the tapes after
2    you heard her allegations of sexual harassment?
3    **A. I -- initially I was not interested in the**
4    **tapes because at some point in time when I learned**
5    **about them, I -- based on lack of any other**
6    **information, I didn't know whether they would be**
7    **relevant.**
8    Q. So initially you weren't interested in the
9    tapes because you weren't sure whether they'd be
10   relevant. Is that accurate?
11   **A. Yes.**
12   Q. Well, is it fair to say in doing an
13   investigation the best way to determine whether these
14   tapes would be relevant is to listen to them?
15   **A. Yes, if I thought that they -- I had a concern**
16   **that any tape I would listen to would be -- could be**
17   **doctored.**
18   Q. Doctored by Ms. Snyder?
19   **A. I didn't name anyone. I just -- I have no way**
20   **to prove -- it's very difficult to prove who or what**
21   **is on an audiotape, ma'am.**
22   Q. But is it fair to say that listening to the
23   tape would help you determine at least whether or not
24   the information on the tape is relevant?

Page 23

1    **A. I would just say that I'm not a sound expert**
2    **and tapes can be -- any tape can be -- I just had a**
3    **concern at that time initially.**
4    Q. Well, could you have presented the tape to
5    Mr. Harris and asked him if that was his voice on the
6    tape?
7         MS. DiBIANCA: I'm just going to object to
8    the extent it calls for speculation.
9         You can go ahead and answer.
10   **A. My answer is that's a possibility.**
11   Q. But you chose not to do that?
12   **A. Not initially, ma'am.**
13   Q. Did you tell Terry when she offered to provide
14   you with the tapes that you wanted to hold off on
15   reaching those channels yet?
16   **A. I don't recall saying that.**
17   Q. But is it, in fact, true that you wanted to
18   hold off on reaching those channels yet?
19   **A. I wouldn't say it was holding off.**
20   Q. We're still on the April 8th meeting. Did she
21   tell you during that meeting that she did not want to
22   lose her job?
23   **A. I don't know that, but it seemed to me that**
24   **Miss Snyder wanted to continue her employment with**

Page 24

1    **CitiSteel.**
2    Q. Continue her employment with CitiSteel in the
3    melt shop or continue her employment, period?
4    **A. Continue her employment in the melt shop.**
5    Q. Did she tell you in that meeting on April 8th
6    that she didn't want Randolph Harris fired, she just
7    wanted the sexual harassment to stop?
8    **A. My answer is that Miss Snyder said so many**
9    **things in such a short span of time, it was hard to**
10   **discern exactly what she wanted. I wasn't sure.**
11   Q. Did you ask her what she wanted?
12   **A. Not -- not at -- in that meeting, no.**
13   Q. But did you ask her at some point what she
14   wanted?
15   **A. Yes.**
16   Q. What was her response?
17   **A. At some future time, as I best recall, she**
18   **wanted Randolph Harris to be punished and to be**
19   **transferred from his job.**
20   Q. Do you know whether or not that was after you
21   gave her the option to either transfer to shipping or
22   resign?
23   **A. That came before that. Miss Snyder was --**
24   **appeared to be, without being ad hominem, appeared to**

Page 25

1    **be angry about Mr. Harris.**
2    Q. Do you think that was a reasonable reaction to
3    her experience of sexual harassment?
4         MS. DiBIANCA: Well, I'm going to object as
5    to the form.
6         You can go ahead and answer, Jerry. Sorry.
7    **A. I have no basis to make an evaluation on that**
8    **because I found no evidence of sexual harassment.**
9    Q. So I'm not sure I understand your answer.
10        I guess my question is: Is anger a
11   reasonable reaction to sexual harassment?
12   **A. In the broad sense, absolutely.**
13   Q. Okay.
14   **A. If it, indeed, occurs.**
15   Q. Did she tell you during this meeting, and by
16   "this meeting" I mean April 8th, that she would feel
17   comfortable going back to the melt shop and working
18   around Harris?
19   **A. Ma'am, I don't recall that, but I got the**
20   **impression she would have been.**
21   Q. How did you get that impression?
22   **A. Because she wanted to go back to her job. She**
23   **wanted to go back to work after she made this**
24   **allegation, ma'am.**

7 (Pages 22 to 25)

Snyder                                    v.                          CitiSteel, USA, Inc.
Jerome Downie                      C.A. # 04-970 (JJF)                      July 21, 2006

Page 26

1    Q.  Did you tell Terry Snyder at any time that
2    Randolph Harris better confess or admit that he
3    sexually harassed her?
4    **A.  Would you restate that question?**
5    Q.  Yes.  Sure.  Certainly.
6         Did you tell Terry Snyder at any time
7    during any of your meetings with her concerning the
8    sexual harassment allegations that Randolph Harris
9    should admit it or better confess to this?
10   **A.  No.**
11   Q.  Now, Terry, you met with her on April 8th.  I
12   think that's been established.
13        Do you recall when the first time or when
14   you initially met with Randolph Harris?
15   **A.  No.**
16   Q.  Can I refer you back to the exhibit?  It's
17   labeled D375, D376, and I believe D377.  It's the same
18   time of Greg Buragino and we've marked it as Downie 2,
19   I believe.  Do you have that in front of you?
20   **A.  Yes.**
21   Q.  Go ahead and turn to the next page.  I'm going
22   to just start reading.  It's close to the top and it
23   says: "Jerry and I returned to the room and Terry had
24   completed 2 pages of summary.  She was allowed to make

Page 27

1    a copy for herself.
2         "We expressed to her that this would be
3    given a high priority for investigation and that we
4    took this matter very seriously.  She was then allowed
5    to leave."
6         And then the next line is: "Jerry
7    contacted Randolph via cell phone.  Randolph was at
8    jury duty this day and Randolph agreed to come into
9    the plant for a meeting at approximately 3:45."
10        Then it says: "Jerry and I met with
11   Randolph and discussed the claims that Terry had
12   made."
13        Now, I've read you the statement of
14   Mr. Buragino.  Do you have any reason to dispute that
15   you met with Mr. Randolph Harris soon after you met
16   with Terry Snyder?
17   **A.  No.**
18   Q.  Does that help refresh your recollection in any
19   way regarding your second meeting?
20   **A.  My answer is I held a lot of meetings**
21   **between -- I did the investigation between April 8th**
22   **and April 10th based on, you know, what -- you can**
23   **refresh my recollection with these documents.  The**
24   **exact times of when this occurred, I don't remember.**

Page 28

1    Q.  But you did meet with Randolph Harris at some
2    time?
3    **A.  I did meet with Mr. Harris, yes, ma'am.**
4    Q.  Was Mr. Buragino involved in that meeting, as
5    well?
6    **A.  I don't remember.**
7    Q.  Tell me what happened or what you can recall
8    about what happened in the meeting with Randolph
9    Harris.
10   **A.  Randolph was asked by me directly whether he**
11   **was involved in any type of sexual harassment, verbal**
12   **or otherwise, with Ms. Snyder.  He emphatically denied**
13   **it.**
14   Q.  Then what did you tell him?
15   **A.  I don't remember.**
16   Q.  After you met with Randolph Harris, was your
17   investigation complete at that point?
18   **A.  No.**
19   Q.  What was the next step?
20   **A.  I don't remember.**
21   Q.  But you know it wasn't complete?
22   **A.  Right.**
23   Q.  How do you know it wasn't complete?
24   **A.  I believe I talked to Dennis Ford.  I believe I**

Page 29

1    **talked with Greg Buragino.  I believe I talked to Jim**
2    **Ryan.  I believe I talked to my boss.**
3    Q.  Who is your boss?
4    **A.  His name was Warren Bieger.**
5    Q.  Warren Bieger.  At some point did you have a
6    meeting with Warren Bieger?
7    **A.  Yes.**
8    Q.  Couldn't have been the next day, April 9th,
9    2003?
10   **A.  I don't remember when.**
11   Q.  I'd like you to take a look at what's been
12   Bates stamped D382 and D383.
13        MS. BREWINGTON:  We are going to have that
14   marked as Downie 3.
15        (Downie Exhibit 3 was marked for
16   identification.)
17   BY MS. BREWINGTON:
18   Q.  This document is a memo.  It's dated April 9th,
19   2003, and it's from you and the subject of it is
20   "Meeting regarding Terry Snyder allegations."
21        Do you see that it says that?
22   **A.  Yes.**
23   Q.  The first sentence says: "Today I met with the
24   management team from 9:15 to about 9:45 to discuss the

8 (Pages 26 to 29)

Snyder                              v.                              CitiSteel, USA, Inc.
Jerome Downie              C.A. # 04-970 (JJF)                        July 21, 2006

Page 30

1    subject."
2        Who's involved in the management team?
3    A. People in the management team in the
4    corporation at that time would have been Mr. Buragino,
5    people like him and me and the president.
6    Q. So Mr. Buragino, Jerry Downie, and Mr. Bieger,
7    Warren Bieger. Is that accurate?
8    A. As I can recall, because they're on the
9    management team.
10   Q. Now, do you recall what was discussed in this
11   meeting?
12   A. Well, other than just reading this, this
13   summarizes -- I really don't remember. I mean,
14   probably the major thrust of this was that there was
15   an allegation made and each of the two parties
16   involved had different stories. There were no
17   witnesses. And each of the parties held fast to their
18   views. So some type of decision had to be made.
19   Q. Okay.
20   A. That's what I recall.
21   Q. Do you know whether your investigation was
22   complete after meeting with the management team?
23   A. I -- no, no, it was not complete.
24   Q. How do you know it wasn't complete yet?

Page 31

1    A. One reason I know is because I decided that I
2    would ask to see the tapes and diaries even though I
3    was dubious.
4    Q. Why did you think it was dubious?
5        MS. DiBIANCA: I'll object to the extent
6    that you're mischaracterizing.
7        MS. BREWINGTON: I don't mean to
8    mischaracterize. I mean, that's what he said.
9        MS. DiBIANCA: No. He said that he thought
10   that he was dubious, not that the tapes were dubious.
11       MS. BREWINGTON: Oh, okay.
12       MS. DiBIANCA: A technicality.
13       MS. BREWINGTON: Sorry. I didn't hear
14   that.
15       MS. DiBIANCA: Jerry. Go ahead and answer.
16   Sorry about that.
17       THE WITNESS: No. That's okay.
18   A. I've already stated what my concerns were about
19   the tapes, and I decided that before any final
20   decisions were made, I would ask to review those,
21   which I eventually did.
22   BY MS. BREWINGTON:
23   Q. When you say which you eventually did, you
24   asked to see the tapes. Is that what you're saying?

Page 32

1    A. Yes, ma'am.
2    Q. At this point, at the end of your meeting here,
3    you decided that your investigation was not complete
4    and that you would review the tapes. Is that
5    accurate?
6    A. That's one of the issues of the meeting.
7    Q. Why was it decided that she be transferred to
8    the shipping department as of this April 9th, 2003,
9    meeting?
10   A. That was not decided in the meeting.
11   Q. It wasn't decided.
12   A. No.
13   Q. Let me take you to this --
14   A. It was -- I'm sorry. It was an option that was
15   discussed.
16   Q. Let me take you to the second paragraph. It's
17   the first sentence. It says: "Given there was no
18   concrete proof of sexual harassment, it was decided
19   that Terry be transferred to the shipping department."
20   A. Yes, ma'am, absent any other information.
21   Q. You just forgot to put that part in there?
22   A. I feel comfortable in saying that's true, but I
23   think it's also true by anyone's account that in my --
24   prior to my last meeting with Miss Snyder, I did ask

Page 33

1    her to bring information to the meeting. If I asked
2    for more information in the meeting, that means that I
3    still am not complete with my investigation and that I
4    still reserved my judgment to do the best job I could.
5    Q. Well, did Terry tell you that she wanted her
6    father to be involved in the meeting so that she could
7    show you the tapes with someone on her side there?
8    A. I do not recall the linkage of her father being
9    there and the reason was the tapes. I don't recall
10   that linkage at all.
11   Q. Was it your opinion as of April 9th that
12   Miss Snyder may or may not be telling the truth?
13   A. Of course. One never knows who is telling the
14   truth in a broad sense. I had no evidence.
15       If I may, I'll explain that the only
16   evidence I had was first the allegations and I
17   interviewed the parties involved, and I had knowledge
18   of Mr. Randolph's history with the company, which was
19   exemplary, and I had knowledge of Ms. Snyder's history
20   with the company, which was -- which contained a lot
21   of incidents that were confusing and which also
22   involved poor job performance.
23       So that's -- I had to look at this matter
24   in the context of the background and performance and

9 (Pages 30 to 33)

Snyder                                          v.                        CitiSteel, USA, Inc.
Jerome Downie                          C.A. # 04-970 (JJF)                      July 21, 2006

Page 34

1    record of the parties involved.
2    Q.  When you talk about Miss Snyder and her poor
3    performance, are you talking about the write-up that
4    she was given in March of 2003?
5    A.  That's partially it.
6    Q.  This write-up, you voluntarily retracted this
7    write-up, did you not?
8    A.  I -- the answer is I did.
9    Q.  Okay.
10   A.  It was not voluntarily.  It was requested.
11   Q.  But you agreed to retract the write-up; is that
12   correct?
13   A.  I would agree to that, yes.
14   Q.  Okay.
15   A.  The write-up.
16   Q.  The write-up.  Yes.  That's what I mean.
17   That's what I said, I thought.
18   A.  I did not voluntarily agree to forget all of
19   the incidents that Miss Snyder was involved in, a
20   couple of which were two other allegations that there
21   was no proof of happening.
22   Q.  Were those two things mentioned in the
23   write-up?
24   A.  I don't remember.

Page 35

1    Q.  Were you involved in the write-up of Terry
2    Snyder?
3    A.  Yes.
4    Q.  What was your involvement in that write-up?
5    A.  Any -- okay.  As was my habit, when someone
6    needs a written warning, the management people
7    involved can deal with HR, human resources, myself,
8    and/or Mr. Ryan and/or both, and we wanted to make
9    sure that the facts were clear and that this is
10   appropriate and fair and consistent with what should
11   be put on paper and how it's communicated so it's done
12   in a fair and proper way with employees.  That was the
13   context of my involvement, as I recall.
14   Q.  Were you actually present when Miss Snyder was
15   administered the written warning?
16   A.  No, I was not.
17   Q.  Do you see where it says, it's the third
18   paragraph down, and we're looking at your memo of
19   April 9th, 2003.  It's the sentence that begins with
20   "She."  It's four lines from the bottom of the
21   paragraph and it's paragraph three.  Do you see where
22   it says: "She wanted me to meet with her father at
23   1 p.m. and I declined"?
24   A.  Yes.

Page 36

1    Q.  Now, is that in reference to the fact that she
2    asked for her father to be in the meeting but you
3    declined?
4    A.  Yes.
5    Q.  Okay.  From what we discussed earlier.
6        Now, the beginning of that paragraph says:
7    "Following that short meeting, Jim Ryan and I met with
8    Terri at about 10:30 in the Plant Personnel office."
9        So is it fair to say that you met with the
10   management team in the morning and then met with Terry
11   at around 10:30?
12   A.  Yes.
13   Q.  Do you recall anything that happened in that
14   meeting?
15   A.  From my recollection, it was a very emotional
16   meeting from the standpoint that Terry was very upset.
17   Initially I got the impression that Terry wanted the
18   company to fire her.
19   Q.  Why did you get that impression?
20   A.  We were being provoked.
21   Q.  Okay, but earlier you said she wanted her job
22   and she liked her job and she wanted to go back to the
23   melt shop.
24   A.  Yes, ma'am, I did state that.

Page 37

1    Q.  Okay.
2        MS. DiBIANCA:  I don't know that he
3    finished his answer.
4        Jerry, you finished with the word
5    "provoked" and was there something else after that?
6        THE WITNESS:  Yes, yes.
7    A.  Ms. Snyder did not bring the tapes.  Ms. Snyder
8    was insulting to us and was loud and she had a tape
9    recorder there and I asked her to please turn it off.
10   She said she did.  Apparently she had not.
11   BY MS. BREWINGTON:
12   Q.  Are you sure that that was the meeting on
13   April 9th and not the meeting on April 10th?
14   A.  Then I'm at the wrong meeting.
15   Q.  Stay with me on the 9th and I'll let you speak
16   about all that you can remember about the meeting on
17   the 10th.  I know it's difficult to remember that far
18   back.
19       On April 9th, 2003, did you discuss with
20   Terry a decision to either transfer her to shipping or
21   voluntarily resigning?
22   A.  Ma'am, I have to say to you that I believe that
23   it says "Following that short meeting" -- I am
24   confused of the meeting in the plant personnel office.

10 (Pages 34 to 37)

Snyder                                    v.                        CitiSteel, USA, Inc.
Jerome Downie                    C.A. # 04-970 (JJF)                      July 21, 2006

Page 38

1   I just do not recall what happened there.
2   Q.   So you don't recall whether or not you
3   mentioned the transfer at that point?
4   A.   I really don't and I apologize for that.
5   Q.   That's fine.
6   A.   I just don't recall.
7   Q.   Is it fair to say you mentioned this transfer
8   at some point?
9   A.   If it says here I did, I must have, so I'll go
10  with the record.  I don't want to challenge the
11  record.
12  Q.   Do you not have any recollection of talking to
13  her about transferring to shipping?
14  A.   I must have.  As I said, I'm embarrassed.  As I
15  said, the meeting that was on the 9th, I just don't
16  recall really what was done at that meeting.
17  Q.   Is it fair to say that you recall that she was
18  upset in that meeting?
19  A.   No, I don't recall that in this meeting, no.
20  Q.   So you recall her being upset in the April 10th
21  meeting?
22  A.   Yes, ma'am.
23       MS. BREWINGTON:  Is everybody okay?  Do you
24  want to take a break?

Page 39

1        MS. DiBIANCA:  It's been an hour.  I'm, of
2   course, ready whenever you are.
3        MS. BREWINGTON:  Do you want to do ten
4   minutes?  Five minutes?
5        MS. DiBIANCA:  Five is fine with me.
6        (A recess was taken at this time.)
7   BY MS. BREWINGTON:
8   Q.   Question:  I was looking at the first paragraph
9   here in your memo.  It's dated April 9th, 2003.  It
10  says: "Messrs. Ford, Buragino and I listened to the
11  voice mail she left which sounded sexual in nature."
12  Do you see where it says that?
13  A.   Which one was this?
14  Q.   We're looking at -- it's D382.
15  A.   Yes.
16  Q.   The first paragraph there.
17  A.   Yes.
18  Q.   It says: "Messrs. Ford, Buragino and I
19  listened to the voice mail she left which sounded
20  sexual in nature."
21  A.   Yes.
22  Q.   What do you recall about that?
23  A.   I recall that we were told that someone was --
24  that Miss Snyder, someone was calling her on the phone

Page 40

1   constantly.  We investigated it.
2   Q.   You were told by whom?
3   A.   (No response.)
4   Q.   Did you hear the question?
5   A.   I heard the question.
6   Q.   Oh, okay.
7   A.   I -- I don't -- I don't remember how all this
8   came up, but it seems to me, as I recall, that
9   Miss Snyder alleged that she was getting some phone
10  calls from someone.  That's all I can remember.
11  Q.   That she was getting phone calls for someone,
12  not that she left a voice mail on someone's answering
13  machine.
14  A.   Yes, yes.
15  Q.   "Yes" to what?
16  A.   The first.
17  Q.   So for clarification purposes, you recall
18  something with respect to Miss Snyder telling someone
19  that someone was calling her?
20  A.   Yes.
21  Q.   But not that she was leaving voice mails?
22  A.   Yes.
23  Q.   Did you investigate this?
24  A.   Yes.  We listened to this.

Page 41

1   Q.   You listened to what?
2   A.   This message.
3   Q.   It was a message on Terry's voice mail?
4   A.   I think so.  I don't remember whose voice mail
5   it was on.
6   Q.   What did you learn after listening to the
7   message?
8   A.   Nothing.
9   Q.   Who was on the message?
10  A.   I don't know.
11  Q.   Was it a female or male?
12  A.   I don't recall.
13  Q.   Did you question Terry about the voice mail?
14  A.   I did not.
15  Q.   Did anyone question Terry?
16  A.   Her management.
17  Q.   Who is --
18  A.   Her managers.  I think, as I recall, it was
19  Mr. Buragino and -- excuse me.  Maybe -- I'm not sure
20  who did.  It was either Dennis or Randolph or Greg
21  Buragino.
22  Q.   Was she written up for this?
23  A.   No.
24  Q.   Now I'd like to take you to the fourth

11 (Pages 38 to 41)

Snyder                                          v.                      CitiSteel, USA, Inc.
Jerome Downie                          C.A. # 04-970 (JJF)                    July 21, 2006

Page 42

1  paragraph down. It's the last paragraph on the first
2  page. It's the second sentence and it says: "I
3  noticed that Terri was whispering to an employee in
4  the finance department and asked her to come to my
5  office which she did do where Jim and I met with her
6  again."
7        My question is: Was she whispering to
8  Carmella Patrone?
9  A.  I don't remember.
10  Q.  Do you know who Carmella Patrone is?
11  A.  Oh, sure.
12  Q.  Is she in the finance department?
13  A.  Yes.
14  Q.  Could she have been whispering to Carmella
15  Patrone?
16  A.  Yes.
17  Q.  Were you concerned that she was talking to
18  another employee?
19  A.  I was concerned that there wouldn't be any more
20  business disruption.
21  Q.  I don't understand. You were concerned --
22  A.  We -- when we started this investigation, all
23  the parties were told to please keep this
24  confidential, as is our practice, and we just felt

Page 43

1  that we -- I still do feel it's appropriate that when
2  there's an EEO problem or sexual harassment charge or
3  whatever, that all the parties involved should keep
4  the matter confidential. We all agreed to that.
5  Q.  Did you hear her say anything to Carmella
6  Patrone?
7  A.  I don't remember.
8  Q.  But that's not noted in your statement, is it?
9  A.  I don't see it.
10  Q.  Did you ask Terry to take the rest of the day
11  off that day?
12  A.  I don't remember.
13  Q.  Excuse me?
14  A.  I don't remember, ma'am.
15  Q.  Turn to the second page for me, please, if you
16  would. It's part of the last sentence on the first
17  page and it says: "Given the events during these two
18  meetings, I asked her to take the rest of the day off
19  with pay to diffuse the situation."
20        Is that accurate?
21  A.  If I -- if I wrote it down, it would be
22  accurate, yes.
23  Q.  Do you know whether Randolph Harris worked that
24  day?

Page 44

1  A.  I don't know.
2  Q.  Is there a reason why you would send Terry
3  Snyder home and leave Randolph Harris working?
4  A.  Miss Harris was very, very upset.
5  Q.  Miss Snyder?
6  A.  Excuse me.
7        Miss Snyder was very, very upset and I
8  don't recall the context of what happened, really, but
9  if -- not "if," but when I did this, I must have done
10  it because I felt that it would be best for her, we
11  would pay her for the time and she just, you know,
12  could take it easy just to try to diffuse, if that is
13  the word, the situation.
14  Q.  Do you know whether she was upset because she
15  was given the option to transfer or resign?
16        MS. DiBIANCA:  I'm sorry. Could you repeat
17  the question?
18  A.  Yeah. Would you repeat that question?
19  Q.  I guess my question is:  Do you know whether
20  the reason for why she was upset, and I asked do you
21  know whether she was upset because she was asked to
22  resign or transfer to shipping?
23  A.  I don't recall her asking that.
24  Q.  Okay.

Page 45

1  A.  That kind of question to me is -- I --
2  Q.  You don't recall asking her why she was upset?
3  Is that what you're saying?
4  A.  No.
5  Q.  Okay.
6  A.  The question you just asked me begged several
7  other questions, and it's difficult for me to answer,
8  but I don't -- go ahead.
9  Q.  Were you finished?
10  A.  Yes.
11  Q.  Did you and Jim Ryan follow Miss Snyder to the
12  finance department?
13  A.  I don't recall that. I don't remember that.
14  Q.  Did you have business in the finance department
15  that day?
16  A.  It's a small building. I walk around. All of
17  us walk around the building, so I don't recall.
18  Q.  So Terry was sent home that day.
19        Was she given any instructions at the end
20  of that second meeting?
21  A.  I really don't remember much about that
22  meeting. All I can say is, as would be my habit, if
23  someone -- if I would suggest, and I've done it
24  before, that someone just go who home they're too

12 (Pages 42 to 45)

Snyder
Jerome Downie

v.

C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
July 21, 2006

Page 46

1  upset or to diffuse the situation, I would have
2  probably said, look, I'll be in contact with you.
3  That's all I can say.
4    Q.  So you don't know whether you told her to
5  report to human resource the next day?
6    A.  I don't remember, ma'am.
7    Q.  When did this option to transfer Miss Snyder to
8  shipping come about?
9    A.  As an idea or as a discussion, question?
10    Q.  You're asking me?
11    A.  Yes, ma'am.
12    Q.  When did it come about as an idea or when did
13  it come about as a discussion?
14    A.  Yes, ma'am.
15    Q.  I guess I'm asking you both. We can go with:
16  When did the idea come about first?
17    A.  Well, the idea came about, we had two employees
18  who had different stories. We have an allegation that
19  we believe that separation of the two individuals was
20  the best, absent any other further information that
21  may have been gleaned that last day I saw her. If
22  there's nothing else to come up with any further
23  investigation, discussions, whatever, we felt that the
24  best thing to do would be to have separation. And so

Page 47

1  it came up in our discussions about, you know, what to
2  do about the situation.
3    Q.  What discussions?
4    A.  This was a discussion with the management
5  committee members, me and Greg and the boss,
6  Mr. Bieger. And when it was first discussed, I don't
7  remember, with Terry, with Ms. Snyder. I don't
8  recall.
9    Q.  Was there a position open in the shipping
10  department?
11    A.  Technically, no, but we were going to be
12  increasing a person over there because of workload.
13    Q.  How many people are in the shipping department?
14    A.  I have no idea. I can't remember.
15    Q.  Are there more people in the melt shop than the
16  shipping department?
17        MS. DIBIANCA:  I object because you said
18  "are there" versus was there.
19        MS. BREWINGTON:  I'm sorry. Yes.
20  BY MS. BREWINGTON:
21    Q.  Was there? I'm talking about specifically the
22  time when Terry was employed.
23    A.  You know, that's a good question because we
24  increased the shipping. I think slightly more than

Page 48

1  the melt shop, but I really don't remember.
2    Q.  So there was already a clerk-typist in the
3  shipping department, so she would have been the second
4  one?
5    A.  There might have been two at that time. I just
6  don't remember.
7    Q.  Terry's position, was she going to be laid off
8  from her position?
9    A.  Laid off?
10    Q.  Yes.
11    A.  That was never discussed.
12    Q.  It was never discussed with anyone?
13    A.  Not that I know of. We never used the word --
14  that didn't come up.
15    Q.  It didn't come up that the clerk-typist job was
16  going to be eliminated in the melt shop?
17    A.  That's a different -- ma'am, I beg to say that
18  that's different. Elimination of a position and
19  laying someone off are two different questions.
20    Q.  Okay. Okay. That's fair.
21    A.  So it was organizationally not discussed
22  openly, but behind the scenes it was discussed that
23  the -- there could be a reorganization. One of the
24  reasons was is that a hope that some work, a lot more

Page 49

1  work could be -- what do you call that when you use
2  computers? You know, you engineer out so we didn't
3  have to have ways to do it. So that's how all that
4  came about.
5    Q.  When did that conversation come about regarding
6  the reorganization?
7    A.  It came about in the meeting with my boss. He
8  said that this is something he was thinking about. I
9  think we documented that somewhere in this. I can't
10  remember where.
11    Q.  So you're saying in that management meeting?
12    A.  I believe it was there, yes.
13    Q.  So prior to that time, the notion of
14  eliminating the clerk-typist job in the melt shop had
15  not been discussed?
16    A.  With me I think. I think it had been discussed
17  with other management people, but not with me.
18    Q.  It hadn't been discussed with you?
19    A.  That's right.
20    Q.  Who had it been discussed with?
21    A.  I have no idea.
22    Q.  So you don't know whether or not it had been
23  discussed?
24    A.  I was told it had been.

13 (Pages 46 to 49)

Snyder                                    v.                    CitiSteel, USA, Inc.
Jerome Downie                    C.A. # 04-970 (JJF)            July 21, 2006

Page 50

1  Q. Who were you told it had been discussed by?
2  A. My boss.
3  Q. Warren Bieger told you he had previously
4  discussed it with someone?
5  A. Yes. Thinking about it, yes.
6  Q. You don't know the name of the person?
7  A. No.
8  Q. Greg Buragino, what was his position?
9  A. He was the vice president of operations.
10 Q. In the melt shop?
11 A. In the melt shop.
12 Q. In the melt shop; is that right? Or just
13 vice president of operations, total?
14 A. I believe -- it's been a couple years ago. I
15 believe he was vice president of operations for the
16 entire company, but maybe I'm wrong, but I think so.
17 Either that or he was just in the melt shop. I cannot
18 remember.
19 Q. Well, would it surprise you that we took his
20 deposition previously and he testified that he was not
21 aware until this management meeting that the
22 clerk-typist job was going to be eliminated in the
23 meting shop?
24 A. No, it wouldn't surprise me because maybe

Page 51

1  Mr. Bieger discussed it with some other people and
2  there's other people.
3  Q. Okay.
4  A. No, that wouldn't surprise me. He sounded
5  surprised -- he looked surprised when it was brought
6  up.
7  Q. "He," Mr. Buragino?
8  A. Yes.
9  Q. You recall that?
10 A. I think -- I think in the context of that
11 meeting this was new information to us.
12 Q. Okay.
13 A. But I -- you know, maybe he -- maybe
14 Mr. Buragino discussed with Greg -- I know he
15 discussed with Greg the fact that he wanted to
16 automate -- there's the word -- automate some more
17 work. So that was not a new issue.
18      So if we can separate the issue of
19 automation, the clerk-typist issue, I think they are
20 two different issues.
21 Q. Take a look at a document that was sent to you.
22 It starts with D-220 and it's a fairly thick document
23 through D241.
24      MS. BREWINGTON: We are going to mark this

Page 52

1  as Downie 4.
2      (Downie Exhibit 4 was marked for
3  identification.)
4  BY MS. BREWINGTON:
5  Q. It's entitled "CitiSteel USA Incorporated,
6  Sexual Harassment Investigation Checklist."
7      I'd like you to flip to page 13 of this
8  document. Is that your signature there?
9  A. Is that D-232?
10 Q. D220. Oh, yes, you're right. Page 13 is D232.
11 A. That's my signature.
12 Q. The date is 4/8 and 4/9 of 2003?
13 A. Mm-hmm.
14 Q. Turn to page 19. It's D238. Is that also your
15 signature there? It's dated 4/8/03.
16 A. Yes.
17 Q. Now, tell me what this document represents.
18 A. This is merely a guide that I used in the
19 situation to assist me to -- in my investigation.
20 Q. On the first page there's two initials
21 together. Do you see where it says that?
22 A. Mm-hmm.
23 Q. "JD" and "GB"? Is that accurate?
24 A. Yes.

Page 53

1  Q. Whose initials are JD?
2  A. Me.
3  Q. Jerry Downie. And GB?
4  A. That would be Greg Buragino.
5  Q. Then next to it, I think there's a slash and
6  then it says "JD & JWR."
7  A. Yes.
8  Q. Is JD you again?
9  A. Yes.
10 Q. And JWR is --
11 A. Jim Ryan.
12 Q. Let me take you to the next page. It's labeled
13 D221. Do you see where it says "Alleged harasser"?
14 A. Yes.
15 Q. "RH"?
16 A. Yes.
17 Q. Who is that?
18 A. Randolph Harris.
19 Q. "Complainant's supervisor: GB"?
20 A. Greg Buragino.
21 Q. "Alleged harasser's supervisor"?
22 A. Is there a question?
23 Q. Yes. Those signatures, RH, DF stand for --
24 A. Yeah. Randolph Harris and Dennis Ford.

14 (Pages 50 to 53)