Snyder                                    v.                    CitiSteel, USA, Inc.
Jerome Downie                    C.A. # 04-970 (JJF)                July 21, 2006

Page 54

1    Q. Let me take to you the next page, D222.
2    There's signatures on this page underneath 31 that's
3    checked off.  Who's that first person, "JD"?
4    **A. Me.**
5    Q. And the second, "GB"?
6    **A. Yes.**
7    Q. Who is that?
8    **A. Greg Buragino.**
9    Q. And the third, "RH"?
10   **A. Randolph Harris.**
11   Q. And the fourth, "WB"?
12   **A. Warren Bieger.**
13   Q. My question is:  Are these the names of the
14   people that were involved in the meeting?
15   **A. Which meeting?**
16   Q. The management meeting.
17   **A. To the best of my recollection, it was me,**
18   **Greg, and Warren, and I think during the meeting we**
19   **called Randolph in and asked him some questions and he**
20   **left.**
21   Q. Okay.
22   **A. So I think that's my recollection.**
23   Q. So where it says:  "Discussed investigation
24   results and proposed action with investigation team,"

Page 55

1    you didn't mean to put Randolph Harris there?
2    **A. Well, I put him there because I'm pretty**
3    **positive we called him in and the president of the**
4    **company wanted to ask him some questions directly**
5    **face-to-face, and then he left.**
6         **So to the extent he was part of that**
7    **meeting, I put his initials down.  That's my**
8    **recollection.**
9    Q. Now I'd like to take you to that final meeting
10   with Ms. Snyder.  If you could turn to document D381.
11        MS. BREWINGTON:  I'd like to have that
12   marked as Downie 5.
13        (Downie Exhibit 5 was marked for
14   identification.)
15   BY MS. BREWINGTON:
16   Q. Take a look at this document.  It's dated
17   July 10th, 2003.  Do you think this was an error on
18   your part or was it completed on July 10th, 2003?
19   **A. You know, I have no idea.**
20   Q. Okay.
21   **A. I don't know.**
22   Q. It is a memo from you to Terry Snyder's file
23   and the subject is "Meeting with Terri Snyder."  Okay.
24        Tell me about your conversation with her on

Page 56

1    that day.
2    **A. Well, whatever I put down here, you know, it**
3    **could refresh my memory.  If you want me to give you**
4    **the thrust of the conversation in broadbrush, I will.**
5    **Is that what you want me to do?**
6    Q. I kind of just want you to tell me what you can
7    recall.
8    **A. What I can recall.  Okay.**
9    Q. Yes.
10   **A. I beg to say that I got another meeting**
11   **confused with this one, and so I'll be a little**
12   **repetitive.**
13        **At this meeting I believe I expected that**
14   **Terry was going to bring in the tapes or whatever**
15   **she -- you know, diaries or whatever and she didn't**
16   **have it and it was her right.**
17        **And so without any other further**
18   **information, we, the company, suggested that -- I'm**
19   **looking back at this piece of paper.  There was some**
20   **upsetedness in here and this and that.  Terry was**
21   **upset, and some of that is understandable.  Both doors**
22   **in my office were open and Terry was pretty loud.  The**
23   **tape recorder incident, she had a tape recorder.  I**
24   **asked her to please turn it off.  She said she did.**

Page 57

1    **Apparently she didn't.**
2         **But, anyway, we -- the thrust of the**
3    **conversation was that absent no other information, we**
4    **suggested that she consider the job in shipping.  And**
5    **as I stated before, she had been -- I felt like I was**
6    **being provoked and she wanted to be fired.  At one**
7    **point she said, "Are you firing me?"  And I said,**
8    **"No."  I remember that.**
9         **And she was offered the position in**
10   **shipping.  And I told her, you know, if you want to go**
11   **think about it, go over there, talk to someone, see**
12   **what it's like or whatever and -- and as far as I can**
13   **remember, she really just didn't want to consider it.**
14   Q. Was your investigation complete at that time?
15   **A. I think -- yes, yes.**
16   Q. What were the findings of your investigation?
17   **A. Well, the findings were that there was no**
18   **evidence of sexual harassment and the company felt**
19   **that these two individuals needed to be separated and**
20   **that -- this is a conclusion -- and that -- do you**
21   **want to hear the conclusion or just the findings?**
22   Q. I want to hear whatever you want to tell me.
23   **A. Those are our findings.**
24   Q. So you don't want to tell me the conclusion?

15 (Pages 54 to 57)

Snyder                                 v.                        CitiSteel, USA, Inc.
Jerome Downie                   C.A. # 04-970 (JJF)                    July 21, 2006

Page 58

1  A. Well, the conclusion -- if you want to know the
2  conclusion, I would be happy to. The conclusion was
3  they have to be separated. The other conclusion was
4  is that we did not intend for Terry to leave the
5  company. We wanted Terry to have an opportunity to
6  work elsewhere in the company.
7  Q. Did you give her the option of returning to the
8  melt shop?
9  A. No.
10 Q. So it was the shipping department or
11 resignation?
12 A. Actually, I never said that and I -- I did say
13 that if you went to the shipping department, something
14 like -- I don't know what I exactly said, but people
15 transfer from time to time around the plant and maybe
16 if she went to the shipping department for a while and
17 didn't like it, she had the options of perhaps going
18 elsewhere.
19 Q. That's what you told her in the meeting?
20 A. I -- I believe I left the door open. I believe
21 I did.
22 Q. Wait, wait, wait. I'm sorry, but I want to get
23 this very clear.
24     You believe you left the door open meaning

Page 59

1  you said that or you didn't say that?
2  A. People in the company -- I think I made it
3  clear that people in the company have a right to
4  request transfers, so that was it.
5  Q. Did she request a transfer?
6  A. No.
7  Q. Are you aware that that conversation was taped?
8  A. I guess so. Whatever I said is what I said,
9  so -- I've never heard the tape.
10 Q. Okay.
11 A. No one has -- no one -- I guess -- I guess
12 Miss Snyder didn't want me to hear the tape, but
13 whatever it says, it says, but -- and as I understand
14 it, part of my conversation was taped, not all of it.
15 So that's another issue, but -- so...
16 Q. Did she ask you to put the transfer in writing
17 and that she'd consider it after you put it in
18 writing?
19 A. I don't -- I don't remember that.
20 Q. Well, did you put the transfer information in
21 writing?
22 A. No.
23 Q. Did you give her a reason why she was being
24 transferred?

Page 60

1  A. It's my understanding I did, or my
2  recollection, and that was that if two parties can't
3  get along and they're both employable in the company,
4  some language like this, that we have to have
5  separation. I believe I explained that to her.
6  Q. Okay.
7  A. I tried to.
8  Q. Do you see where it says here: "I stated that
9  if she does not want the job in shipping, we would
10 take that as a voluntary resignation"?
11 A. Yes.
12 Q. Is it fair to say that based on this statement,
13 that you actually stated to her that she could either
14 transfer to shipping or voluntarily resign?
15 A. Yes. At that particular point in time that is
16 correct.
17 Q. Did she ask you in that meeting why she should
18 have to transfer if she did nothing wrong?
19 A. I think so. I think -- I can't remember
20 exactly, but I think so.
21 Q. How did you respond?
22 A. I don't remember.
23 Q. Okay.
24 A. If you would like to ask me why that didn't

Page 61

1  happen, I can certainly answer that question, but I
2  really don't remember.
3  Q. Why not put the details of the transfer in
4  writing?
5  A. We never do. It's our practice not to do that.
6  I mean, there will be paperwork. You know, when
7  people transfer from one job to another, there is a
8  paper trail. We have to have a form in the human
9  resource department. It's got to be signed by various
10 people, including me. So there would be a paper trail
11 on that.
12 Q. Is it fair to say that those are people that
13 have actually requested transfers?
14 A. No. This is a matter of course as far as I
15 recall.
16 Q. Did you ask her to leave the premises that day?
17 A. I did. I think so. It got -- the -- the
18 emotional pitch in the meeting was pretty high and,
19 yes, I think I said, gee, you know -- yes.
20 Q. Do you recall getting up and walking to the
21 door?
22 A. I don't remember what happened. I can tell you
23 this: We did not do any checkout procedure or
24 anything like that, and I've been in meetings with

16 (Pages 58 to 61)

Snyder                                    v.                    CitiSteel, USA, Inc.
Jerome Downie                    C.A. # 04-970 (JJF)                    July 21, 2006

Page 62

1  employees where there's been an emotional pitch and
2  five hours later we've gotten together again or they
3  called me on the telephone the next day and a
4  different conclusion occurred. So, I mean -- so we
5  didn't take -- it was not -- we were hoping for better
6  closure on this situation.
7    Q.  Okay.
8        MS. BREWINGTON:  I don't have anything
9  further at this time.
10        MS. DiBIANCA:  I have a couple of
11  questions. Could we take a short break? Do you mind?
12        MS. BREWINGTON:  Not a problem.
13        MS. DiBIANCA:  Five minutes would be good.
14        MS. BREWINGTON:  Okay.
15        (A recess was taken at this time.)
16  BY MS. DiBIANCA:
17    Q.  Hi, Mr. Downie. This Molly DiBianca for
18  CitiSteel and I'm going to be asking you a few
19  follow-up questions.
20        First, could you tell me about the nature
21  of the relationship between Mr. Harris and Mr. Ford?
22    A.  Mr. Ford and Mr. Harris were peers. They both
23  were what we call general supervisors of the melt shop
24  and they had -- not shared responsibilities, although

Page 63

1  they shared responsibilities. They really had an
2  expertise, Mr. Ford in the casting area and Mr. Harris
3  in the furnace area, but they also overlapped.
4    Q.  As between personalities between the two of
5  them, was there any personal conflict that you are
6  aware?
7    A.  Yes. They both expressed to me personally as a
8  witness to it that at times they found it difficult to
9  work with each other, and I would say that Dennis
10  perhaps was a little bit more vocal.
11    Q.  So would it be your testimony that Mr. Ford
12  harbored ill will towards Mr. Harris?
13    A.  I would say so.
14    Q.  Were you aware that Mr. Ford indicated to
15  Miss Snyder that he did not believe her allegations?
16    A.  He told me that.
17    Q.  What was your opinion at the time of Mr. Harris
18  as far as his character goes?
19    A.  Well, as a personal director, I have to be
20  careful about my opinions. They have to be based on
21  facts.
22        And Mr. Harris has good points and bad
23  points, but, I mean, I thought he had good character.
24  I knew him since 1988, so that's -- we helped found

Page 64

1  the company together and I just never knew of any
2  behavior on his part that would suggest any kind of
3  sexual harassment or this kind of situation.
4        So, you know, as it relates to this
5  particular situation, it would be -- I just was, you
6  know -- I just was surprised that this allegation
7  would come about.
8    Q.  Was it your opinion that Mr. Harris was honest?
9    A.  Yes. My boss, the president of the company,
10  asked me to meet with Mr. Harris privately, which I
11  did off site, and I was very direct with him about his
12  job, his position, and a lot of other things.
13        And Mr. Harris told me that he did not
14  sexually harass Ms. Snyder and he had a lot to lose
15  because of -- this was early on in the investigation
16  because I told him if we found out otherwise, it would
17  be very serious for him.
18    Q.  Found out otherwise in the sense that if he
19  told you --
20        (Discussion off the record.)
21  BY MS. DiBIANCA:
22    Q.  It was grave consequences or something like
23  that?
24    A.  My response is this, to be more clear:

Page 65

1  Mr. Harris was told by me as conveyed from my boss
2  that if he did lie, there would be grave consequences
3  to Mr. Harris.
4    Q.  Okay.
5    A.  If he lied about this issue in any way.
6    Q.  There seems to be some dispute about when
7  and/or if Miss Snyder requested that her father be
8  present at one of the meetings, that if she had
9  requested her father to be present during a meeting
10  with you and her, Miss Snyder, why would you have
11  objected to that?
12    A.  The main reason is our company is private. We
13  just don't do that as practice.
14        The second is security. And in regard to
15  security, we don't -- we don't grant tours to
16  families. Some companies do it. It's too dangerous.
17  It's our practice that people not related to the
18  company business are not on our premises, period.
19    Q.  The clerk-typist position in shipping, is it
20  your testimony that that position was equivalent in
21  all material respects to the clerk-typist position in
22  the melt shop?
23    A.  Yes, in the basic duties, yes.
24    Q.  Would it have been the same salary?

17 (Pages 62 to 65)

B- 0353

Page 66

1   A. Yes.
2   Q. Would it have been the same shift, day shift?
3   A. Day shift. To be honest, I don't know if it
4   would be a little later in the day. I think there may
5   be -- I can't remember. But, yes, essentially the
6   same, day shift, yes.
7   Q. It would consist of the same job duties?
8   A. Basic. Different departments. They have
9   different things to do, but basically yes.
10  Q. When the complaint was first brought to you and
11  you first met with Miss Snyder, did you communicate to
12  her that you were taking her complaint seriously?
13  A. I did, and that's my job and that's a policy of
14  the company. And I told her point-blank that I would
15  investigate this matter.
16  Q. And --
17  A. And I also told her that I was sorry that she
18  was upset.
19  Q. You met with Mr. Harris that same day, was it
20  your testimony, that Miss Snyder brought forth her
21  allegations?
22  A. I believe so, yes.
23  Q. Okay.
24  A. I'm very fuzzy on the dates.

Page 67

1   Q. Okay.
2   A. It's been a few years, but I think the best, as
3   I mentioned to the other attorney, I think the best
4   way for me to say firmly is if the day of the 10th was
5   the 10th -- let me back up to the other day.
6       Somewhere in that two- or three-day period
7   is when they were taking -- occurring. I just don't
8   remember.
9   Q. Is there a reason for conducting the
10  investigation within several days? I shouldn't say
11  investigating or conducting it. Rather, I should say:
12  Is there a reason for concluding it within several
13  days and not leaving it longer?
14  A. Yes, yes.
15  Q. What is that reason?
16  A. It was our belief that these things are very
17  serious and get out of hand and it's emotional, it's
18  personal, and there -- and we should make all haste to
19  get it resolved as quickly as possible. And I just
20  had to drop what I was doing. All of us who were
21  involved with this were involved in other things and
22  we had to drop them and cancel meetings and do what we
23  did.
24       And so it's important to have quick

Page 68

1   resolution, and I think we owe that to all the parties
2   involved.
3   Q. When you first met with Mr. Harris, whether it
4   was the first day or second day, when you first met
5   with him, did you meet with him in private?
6   A. I don't remember.
7   Q. Was Miss Snyder present at that meeting?
8   A. No.
9   Q. Why is that?
10  A. I refuse to meet with two people in a meeting
11  like that. Never do that. The reason is I want to
12  get -- many reasons, but one of which is to hear
13  people, you know -- how should I put this? To give
14  people an opportunity to tell confidentially what they
15  know, how they feel; and secondly, to avoid flare-ups
16  and -- among those reasons. So that's my answer.
17  Q. Then also was it important to you that the
18  matter be kept confidential during the investigation?
19  A. Yes, and we told everybody that. And it's for
20  everybody's protection.
21       And not only that, but, of course, these
22  things detract from the workplace. We -- you know,
23  people need to -- we're all very busy, so -- yes, it
24  was.

Page 69

1   Q. When was the actual decision made regarding the
2   transfer opportunity?
3   A. The morning we did it. You know, I was given
4   authorization by the president with what the options
5   were and I wanted -- and I wanted to see if there's
6   any other evidence, any other information. I reviewed
7   this with counsel at the time and got their input.
8       And that's something I've not mentioned,
9   but those are attorney/client privileged, but I did
10  seek other advice. And I waited the last possible
11  time.
12  Q. So in other words, that would have been after
13  she had been given the opportunity to bring her
14  evidence, the tapes in?
15  A. That is correct. As I so stated earlier, that
16  was that morning or whenever -- whenever after I last
17  met with Miss Snyder.
18  Q. You did provide some testimony on the meeting
19  with Miss Snyder where Mr. Ryan was also present and
20  during which Miss Snyder secretly -- or I don't want
21  to characterize it, but taped the meeting, tape
22  recorded the meeting against your wishes. Is that a
23  fair characterization?
24  A. It is. And quite frankly, I didn't know about

18 (Pages 66 to 69)

Snyder
Jerome Downie

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
July 21, 2006

Page 70

1  this until way after the fact. It's okay. It was
2  against my wishes, yes.
3     Q. Can you describe for us her attitude, her
4  demeanor during that meeting?
5     A. I'm hesitating because I don't want to
6  overcharacterize it and sound defensive.
7           She was very emotional, very provoking, and
8  very combative. And I made an effort to, you know, to
9  say, you know, let's -- I don't know if I said calm
10 down. I said okay, okay. And I was trying to -- I
11 don't think I raised my voice in the meeting. And as
12 I said, both of the doors were opened in my office.
13    Q. Was Miss Snyder hostile? Would that be a fair
14 description?
15    A. I -- that may be even not reached to the level
16 of what happened, but yes.
17    Q. Then was there some testimony, if you could
18 elaborate for us, regarding subsequent to one of the
19 meetings, and I'm not sure which one, but she was
20 instructed to go home for the rest of the day to
21 consider the transferring; is that correct?
22    A. Yes.
23    Q. Did she follow those instructions?
24    A. No.

Page 71

1     Q. What did she do?
2     A. Well, I don't know how we found out. Someone
3  called us on the phone or something or whatever, but
4  she was still in the building and -- but, anyway, we
5  had hoped to keep this matter confidential and calm.
6  The building is a small building. It's an old
7  building. It has high ceilings. You know, voices
8  carry. I don't remember. I think it was maybe Jim
9  Ryan who asked her to please go home.
10          But at no time were we aggressive or rude
11 with Ms. Snyder. I can say that.
12    Q. By not leaving when instructed to go home for
13 the day --
14    A. She was insubordinate.
15    Q. Okay.
16    A. Clear and simple.
17    Q. Disruptive to the workplace?
18    A. Yes.
19          MS. DiBIANCA: That's all I have, Lori.
20          MS. BREWINGTON: Okay. One second. Just
21 give me one second.
22          MS. DiBIANCA: Sure.
23 BY MS. BREWINGTON:
24    Q. You mentioned just a few seconds ago that

Page 72

1  Randolph Harris had some good points and some bad
2  points; is that right?
3     A. Yes, like we all do.
4     Q. What were some of Randolph Harris' bad points?
5     A. I think it's fair to say that at times Randolph
6  Harris was aggressive or loud on the manufacturing
7  floor, and this is not uncommon in factories where
8  people can die. Two people during the time that I was
9  there, my tenure with the corporation, two men died in
10 the melt shop. One was our employee and one was a
11 contractor. And it's very, very dangerous out there.
12    Q. So would you consider him being loud in the
13 manufacturing floor a bad point?
14    A. Well, maybe for some people -- it's good and
15 bad. For some people maybe they might not like a
16 loud -- someone speaking more loudly to them even
17 though there's a lot of noise around them, or it's a
18 good point that people realize that in the space of
19 seconds, if you don't follow direction quickly, you
20 can be harmed.
21    Q. So are we talking about Randolph giving
22 instructions and being loud to his employees? Is that
23 what you're talking about?
24    A. Yes.

Page 73

1     Q. So you're saying some employees may not like
2  being talked to in a loud vice?
3     A. Yes.
4     Q. How about this being aggressive? Was he
5  aggressive with his employees?
6     A. In terms of telling people to move out of the
7  way, do this quickly, do that quickly, I would call
8  that being aggressive.
9     Q. You say you would call that being aggressive?
10    A. Yes.
11    Q. You also mentioned that you met him again off
12 site.
13    A. Yes.
14    Q. When was that?
15    A. I don't recall.
16    Q. Where did you meet him?
17    A. At Bennington's restaurant. My choice.
18    Q. Your choice restaurant or your choice to meet
19 him off site?
20    A. Both.
21    Q. Why did you choose to meet him off site as
22 opposed to meeting him at CitiSteel?
23    A. Because we are very, very, very busy and I
24 wanted to be in a quiet atmosphere and I wanted to --

19 (Pages 70 to 73)

Snyder                                    v.                          CitiSteel, USA, Inc.
Jerome Downie                    C.A. # 04-970 (JJF)                       July 21, 2006

Page 74

1   which is not unlike other business situations where
2   you would ask an employee out to lunch or dinner or
3   whatever to talk about a serious matter. That's why.
4   Q.  Did you have dinner?
5   A.  No.
6   Q.  Did you have drinks?
7   A.  I did not.
8   Q.  Did Randolph Harris drink?
9   A.  I believe he had a beer.
10  Q.  So you discussed the serious allegations of
11  sexual harassment over a beer?
12       MS. DiBIANCA: I'm going to object to the
13  extent that that's a little argumentative, but go
14  ahead and answer.
15  A.  Yes.
16  Q.  Why wasn't this meeting with Randolph Harris
17  notated in any of the records?
18  A.  I don't know.
19  Q.  Did you tell anyone about your meeting with
20  Randolph Harris?
21  A.  Yes.
22  Q.  Who did you tell?
23  A.  My supervisor.
24  Q.  Warren Bieger?

Page 75

1   A.  Yes.
2   Q.  In your final meeting with Miss Snyder on the
3   10th, wasn't there a tape recorder on the table?
4   A.  No.
5   Q.  So you never saw a tape recorder?
6   A.  She -- the answer is I saw it by accident when
7   she was holding it flipping something in a certain
8   direction and I asked her directly, "Do you have a
9   tape recorder?" And she finally admitted it.
10  Q.  But you did see a tape recorder?
11  A.  Yes, I did.
12       MS. BREWINGTON: I don't have anything
13  further.
14       MS. DiBIANCA: I just have one more.
15  BY MS. DiBIANCA:
16  Q.  Mr. Downie, could you tell me in short form
17  what is your professional experience is in the human
18  resources field?
19  A.  I have a degree from Shippensburg University,
20  St. Francis University, industrial relations.
21  Q.  Is that a master's degree?
22  A.  Yes.
23  Q.  Okay.
24  A.  And a master's degree from the Wharton School.

Page 76

1   I worked in private industry in human resources since
2   1973 and I've been in management since 1975.
3   Q.  So your professional career has been devoted to
4   the practice of human resources management; is that
5   correct?
6   A.  That is correct.
7       MS. DiBIANCA: Lori, that's all I have.
8       MS. BREWINGTON: I have nothing further.
9   We're done.
10      THE WITNESS: Thank you, all.
11      MS. BREWINGTON: Mr. Downie, would you like
12  to read and sign?
13      MS. DiBIANCA: We'll read. Sorry, Lori.
14      MS. BREWINGTON: Okay. Thank you, guys.
15      (The deposition was then concluded at
16  3:05 p.m.)
17          - - - - -
                    INDEX TO TESTIMONY
18
19  JEROME DOWNIE                              PAGE
20
    Examination by Ms. Brewington                2
21  Examination by Ms. DiBianca                 62
    Examination by Ms. Brewington               71
22  Examination by Ms. DiBianca                 75
23
          - - - - -
24

Page 77

1           INDEX TO EXHIBITS
2
    DOWNIE EXHIBIT NO.:              PAGE
3
4   1  A two-page copy of a handwritten statement
       dated Tuesday, April 8, 2003, signed by
5      Terry L. Snyder              13
6   2  A three-page copy of a document entitled
       "Events surrounding Terri Snyder harassment
7      charges described by Greg Buragino
       4/10/03"                     14
8
    3  A two-page copy of a memo dated April 9,
9      2003, to "Memo to file of Terri Snyder"
       from J. Downie               29
10
    4  A multipage copy of a Sexual Harassment
11     Investigation Checklist      52
12  5  A one-page copy of a memo dated July 10,
       2003, to Terri Snyder from J. Downie    55
13
14         - - - - -
15
16
17
18
19
20
21
22                                      B-0356
23
24

Snyder
Jerome Downie

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
July 21, 2006



Page 78

```
 1
 2
 3
 4
 5
 6
 7
 8          REPLACE THIS PAGE
 9
10          WITH THE ERRATA SHEET
11
12          AFTER IT HAS BEEN
13
14          COMPLETED AND SIGNED
15
16          BY THE DEPONENT.
17
18
19
20
21
22
23
24
```

Page 79

```
 1   State of Delaware )
 2              )
 3   New Castle County )
 4
 5
 6          CERTIFICATE OF REPORTER
 7
 8          I, Kathleen White Palmer, Registered
     Professional Reporter and Notary Public, do hereby
 9   certify that there came before me on the 21st day of
     July, 2006, the deponent herein, JEROME DOWNIE, who
10   was duly sworn by me and thereafter examined by
     counsel for the respective parties; that the questions
11   asked of said deponent and the answers given were
     taken down by me in Stenotype notes and thereafter
12   transcribed into typewriting under my direction.
13          I further certify that the foregoing is
     a true and correct transcript of the testimony given
14   at said examination of said witness.
15          I further certify that I am not counsel,
     attorney, or relative of either party, or otherwise
16   interested in the event of this suit.
17
18
19
20          _____
21          Kathleen White Palmer, RPR, RMR, CLR
            Certification No. 149-RPR
22          (Expires January 31, 2008)
23
     DATED: July 28, 2006
24
```

B-0357

21 (Pages 78 to 79)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Snyder
Jerome Downie

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
July 21, 2006

Page 80

## A

about 3:9 7:17 9:18
  10:8 11:3,6,13
  13:18 15:9 16:20
  17:13,17,18 19:6
  19:8 21:14,15
  22:5 25:1 28:8
  29:24 31:16,18
  34:2,3 36:8 37:16
  37:16 38:13 39:22
  41:13 45:21 46:8
  46:12,13,16,17
  47:1,2,21 49:4,5,7
  49:8 50:5 55:24
  57:11 62:20 63:20
  64:7,11 65:5,6
  69:24 72:21,23
  73:4 74:3,19
above 15:7
absent 32:20 46:20
  57:3
absolutely 25:12
accident 75:6
account 32:23
accurate 22:10 30:7
  32:5 43:20,22
  52:23
action 1:5 2:11
  54:24
actual 69:1
actually 13:1 16:4
  35:14 58:12 60:13
  61:13
ad 24:24
administered 35:15
admit 26:2,9
admitted 75:9
advice 69:10
advised 5:23
after 22:1 24:20
  25:23 27:15 28:16
  30:22 37:5 41:6
  59:17 69:12,16
  70:1 78:12
afternoon 2:6
again 42:6 53:8
  62:2 73:11
against 2:11 10:20
  69:22 70:2
aggressive 71:10
  72:6 73:4,5,8,9
ago 5:5,9,11,14 9:20
  50:14 71:24
agree 20:5 34:13,18
agreed 27:8 34:11
  43:4

ahead 13:17 17:2
  21:3 23:9 25:6
  26:21 31:15 45:8
  74:14
air 19:10
allegation 10:18
  16:15 25:24 30:15
  46:18 64:6
allegations 10:20
  11:4,7,11 12:13
  22:2 26:8 29:20
  33:16 34:20 63:15
  66:21 74:10
alleged 10:16 11:21
  12:19,24 40:9
  53:13,21
allow 17:22 18:15
allowed 26:24 27:4
almost 15:6
along 60:3
already 18:18 21:21
  31:18 48:2
although 62:24
always 12:22
among 68:16
and/or 35:8,8 65:7
anger 25:10
angry 25:1
another 42:18
  56:10 59:15 61:7
answer 3:19 18:13
  21:4 23:9,10 24:8
  25:6,9 27:20
  31:15 34:8 37:3
  45:7 61:1 68:16
  74:14 75:6
answering 3:21
  40:12
answers 79:11
anyone 9:12 18:12
  22:19 41:15 48:12
  74:19
anyone's 32:23
anything 3:22 6:17
  11:17 15:24 16:2
  16:20 36:13 43:5
  61:24 62:8 75:12
anyway 57:2 71:4
apologize 38:4
Apparently 37:10
  57:1
APPEARANCES
  1:12
appeared 24:24,24
appropriate 35:10
  43:1
approximately 27:9

April 8:7 11:2,4,7
  13:22 15:22 20:21
  21:1 23:20 24:5
  25:16 26:11 27:21
  27:22 29:8,18
  32:8 33:11 35:19
  37:13,13,19 38:20
  39:9 77:4,8
area 63:2,3
argumentative
  74:13
around 25:18 36:11
  45:16,17 58:15
  72:17
arrived 15:9
asked 15:8 18:24
  21:7,12 23:5
  28:10 31:24 33:1
  36:2 37:9 42:4
  43:18 44:20,21
  45:6 54:19 56:24
  64:10 71:9 75:8
  79:11
asking 17:1 44:23
  45:2 46:10,15
  62:18
assist 18:7 52:19
atmosphere 73:24
attend 18:24
attention 13:1
  14:12
attitude 70:3
attorney 5:20 6:17
  67:3 79:15
attorney/client 69:9
audiotape 22:21
August 8:7
authorization 69:4
automate 51:16,16
automation 51:19
available 4:3
Avenue 1:10,14
avoid 68:15
aware 10:15,17,18
  10:19 11:10 50:21
  59:7 63:6,14
awhile 9:24

## B

back 16:19 25:17,22
  25:23 26:16 36:22
  37:18 56:19 67:5
background 33:24
bad 63:22 72:1,4,13
  72:15
based 16:4 22:5
  27:22 60:12 63:20

basic 65:23 66:8
basically 66:9
basis 25:7
Bates 13:3,5 14:13
  29:12
become 10:19 11:10
beer 74:9,11
before 1:11 5:6 14:6
  14:7 24:23 31:19
  45:24 57:5 79:9
beg 48:17 56:10
begged 45:6
beginning 1:10 3:10
  36:6
begins 35:19
begun 19:19,20,24
behavior 64:2
behind 48:22
being 24:24 33:8
  36:20 38:20 57:6
  59:23 72:12,22
  73:2,4,8,9
belief 67:16
believe 12:5,7 20:3
  26:17,19 28:24,24
  29:1,2 37:22
  46:19 49:12 50:14
  50:15 56:13 58:20
  58:20,24 60:5
  63:15 66:22 74:9
Bennington's 73:17
besides 4:15 6:22
  9:12
best 11:12 22:13
  24:17 33:4 44:10
  46:20,24 54:17
  67:2,3
better 26:2,9 62:5
between 27:21,21
  62:21 63:4,4
Bieger 29:4,5,6 30:6
  30:7 47:6 50:3
  51:1 54:12 74:24
bit 9:10 63:10
boss 29:2,3 47:5
  49:7 50:2 64:9
  65:1
both 35:8 46:15
  56:21 60:3 62:22
  63:7 70:12 73:20
bottom 13:3 35:20
break 2:18 38:24
  62:11
Brewington 1:13
  2:5,9 13:6,10
  14:15,19 21:2,6
  21:11 29:13,17

31:7,11,13,22
37:11 38:23 39:3
39:7 47:19,20
51:24 52:4 55:11
55:15 62:8,12,14
71:20,23 75:12
76:8,11,14,20,21
bring 18:15 33:1
  37:7 56:14 69:13
broad 25:12 33:14
broadbrush 56:4
brought 51:5 66:10
  66:20
building 15:9 45:16
  45:17 71:4,6,6,7
Buragino 10:8,9
  11:12 12:16 15:3
  15:17 26:18 27:14
  28:4 29:1 30:4,6
  39:10,18 41:19,21
  50:8 51:7,14 53:4
  53:20 54:8 77:7
business 42:20
  45:14 65:18 74:1
busy 5:12 68:23
  73:23

## C

call 5:19 6:16 49:1
  62:23 73:7,9
called 5:18,23,24
  6:15 9:16 15:7
  54:19 55:3 62:3
  71:3
calling 39:24 40:19
calls 23:8 40:10,11
calm 70:9 71:5
came 11:13 20:11
  20:12 21:17,18,19
  21:21,22 24:23
  40:8 46:17 47:1
  49:4,7 79:9
cancel 67:22
career 76:3
careful 63:20
Carmella 42:8,10
  42:14 43:5
carry 71:8
case 5:19,21,24
  10:16
casting 63:2
Castle 79:3
ceilings 71:7
Celebration 3:8
cell 27:7
certain 13:4 75:7
certainly 26:5 61:1

Snyder
Jerome Downie

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
July 21, 2006

Page 81

| | | | | |
|---|---|---|---|---|
| **CERTIFICATE** 79:6 | 55:4 56:18 57:18 58:5,6 59:2,3 60:3 | continue 23:24 24:2 24:3,4 | defensive 70:6 definitely 2:14 | 63:19 discern 24:10 |

**CERTIFICATE** 79:6
**Certification** 79:21
**certify** 79:9,13,15
**challenge** 38:10
**channels** 23:15,18
**character** 63:18,23
**characterization** 69:23
**characterize** 69:21
**charge** 43:2
**charges** 15:5 77:7
**checked** 54:3
**Checklist** 52:6 77:11
**checkout** 61:23
**choice** 18:16,22 19:3 73:17,18,18
**choose** 73:21
**chose** 23:11
**CitiSteel** 1:6 2:11 2:24 3:3,10,14,17 3:18 4:11 5:4,14 6:23 7:1,5,7,18 8:6 10:2,11 18:16 24:1,2 52:5 62:18 73:22
**Civil** 1:5
**claim** 15:12
**claims** 27:11
**clarification** 40:17
**clear** 18:3 35:9 58:23 59:3 64:24 71:16
**clearly** 2:16
**clerk-typist** 48:2,15 49:14 50:22 51:19 65:19,21
**close** 26:22
**closure** 19:11 62:6
**CLR** 79:21
**combative** 70:8
**come** 15:8 18:16 20:13,15 21:20 27:8 42:4 46:8,12 46:13,16,22 48:14 48:15 49:5 64:7
**comfortable** 25:17 32:22
**committee** 47:5
**communicate** 66:11
**communicated** 35:11
**companies** 65:16
**company** 16:13,16 18:9,14,14 33:18 33:20 36:18 50:16

55:4 56:18 57:18 58:5,6 59:2,3 60:3 64:1,9 65:12,18 66:14
**Complainant's** 53:19
**complaint** 15:11 66:10,12
**complete** 28:17,21 28:23 30:22,23,24 32:3 33:3 57:14
**completed** 26:24 55:18 78:14
**computer** 9:7
**computers** 49:2
**CONAWAY** 1:17
**concern** 22:15 23:3
**concerned** 42:17,19 42:21
**concerning** 5:24 6:16 26:7
**concerns** 31:18
**concluded** 76:15
**concluding** 3:5 67:12
**conclusion** 19:14 57:20,21,24 58:1 58:2,2,3 62:4
**conclusions** 19:9
**concrete** 32:18
**conducting** 67:9,11
**confess** 26:2,9
**confidential** 42:24 43:4 68:18 71:5
**confidentially** 68:14
**conflict** 63:5
**confused** 37:24 56:11
**confusing** 33:21
**consequences** 64:22 65:2
**consider** 57:4,13 59:17 70:21 72:12
**consist** 66:7
**consistent** 35:10
**constantly** 40:1
**consult** 4:11,14
**consultant** 2:24 3:9 3:15,16,19 4:1,10 4:17 7:16 10:2
**consulted** 5:3,14
**consulting** 3:2 6:23
**contact** 46:2
**contacted** 27:7
**contained** 33:20
**context** 33:24 35:13 44:8 51:10

continue 23:24 24:2 24:3,4
**contract** 3:4
**contractor** 72:11
**conversation** 6:4 15:13 16:9,12 49:5 55:24 56:4 57:3 59:7,14
**conveyed** 65:1
**copy** 27:1 77:4,6,8 77:10,12
**corporate** 4:8
**corporation** 7:4 8:17 30:4 72:9
**correct** 5:15 6:1 7:8 8:7,10 15:22 34:12 60:16 69:15 70:21 76:5,6 79:13
**counsel** 69:7 79:10 79:15
**County** 79:3
**couple** 34:20 50:14 62:10
**course** 33:13 39:2 61:14 68:21
**court** 1:1 2:16
**currently** 2:23 3:7 6:22

**D**
**dangerous** 65:16 72:11
**date** 10:22 15:17 21:1,17 52:12
**dated** 13:21 29:18 39:9 52:15 55:16 77:4,8,12 79:23
**dates** 8:12 20:24 66:24
**day** 12:12 27:8 29:8 43:10,11,18,24 45:15,18 46:5,21 56:1 61:16 62:3 66:2,3,4,6,19 67:4 67:5 68:4,4 70:20 71:13 79:9
**days** 11:7 67:10,13
**deal** 35:7
**decided** 31:1,19 32:3,7,10,11,18
**decision** 30:18 37:20 69:1
**decisions** 31:20
**decline** 18:8
**declined** 35:23 36:3
**Defendant** 1:7,19

defensive 70:6
**definitely** 2:14
**degree** 75:19,21,24
**Delaware** 1:2,10,15 1:18,22 79:1
**demeanor** 70:4
**denied** 28:12
**Dennis** 15:10 28:24 41:20 53:24 63:9
**department** 32:8,19 42:4,12 45:12,14 47:10,13,16 48:3 58:10,13,16 61:9
**departments** 66:8
**deponent** 78:16 79:9,11
**deposed** 5:19
**deposition** 1:9 2:15 9:2 50:20 76:15
**describe** 70:3
**described** 77:7
**description** 70:14
**details** 61:3
**determine** 22:13,23
**detract** 68:22
**devoted** 76:3
**DF** 53:23
**diaries** 20:8,18,20 21:13 31:2 56:15
**DiBIANCA** 1:17 9:12 20:22 23:7 25:4 31:5,9,12,15 37:2 39:1,5 44:16 47:17 62:10,13,16 62:17 64:21 71:19 71:22 74:12 75:14 75:15 76:7,13,21 76:22
**die** 72:8
**died** 72:9
**different** 30:16 46:18 48:17,18,19 51:20 62:4 66:8,9
**difficult** 4:24 5:1 22:20 37:17 45:7 63:8
**diffuse** 43:19 44:12 46:1
**dinner** 74:2,4
**direct** 13:1 14:12 64:11
**direction** 72:19 75:8 79:12
**directly** 28:10 55:4 75:8
**director** 4:8 8:2,8 8:10,15 10:5,12

63:19
**discern** 24:10
**discrimination** 2:10
**discuss** 29:24 37:19
**discussed** 12:1 27:11 30:10 32:15 36:5 47:6 48:11 48:12,21,22 49:15 49:16,18,20,23 50:1,4 51:1,14,15 54:23 74:10
**discussing** 5:22
**discussion** 12:3,6 46:9,13 47:4 64:20
**discussions** 46:23 47:1,3
**dispute** 10:24 15:19 27:14 65:6
**disruption** 42:20
**Disruptive** 71:17
**DISTRICT** 1:1,2
**doctored** 22:17,18
**document** 12:23 13:11,15,19,21 14:1,3,13,20,22 29:18 51:21,22 52:8,17 55:10,16 77:6
**documentation** 9:3 15:4
**documented** 49:9
**documents** 9:6,9 13:3 27:23
**doing** 22:12 67:20
**done** 35:11 38:16 44:9 45:23 76:9
**door** 58:20,24 61:21
**doors** 56:21 70:12
**down** 12:23 15:6 35:18 42:1 43:21 55:7 56:2 70:10 79:11
**Downie** 1:9 2:1,6,22 13:8 14:16,17 26:18 29:14,15 30:6 52:1,2 53:7 55:12,13 62:17 75:16 76:11,19 77:2,9,12 79:9
**drafted** 14:10
**drink** 74:8
**drinks** 74:6
**drop** 67:20,22
**dubious** 31:3,4,10 31:10
**duly** 2:3 79:10

Snyder
Jerome Downie

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
July 21, 2006

Page 82

during 10:2,5 11:18
  23:21 25:15 26:7
  43:17 54:18 65:9
  68:18 69:20 70:4
  72:8
duties 65:23 66:7
duty 27:8
D-220 51:22
D-232 52:9
D220 52:10
D221 53:13
D222 54:1
D232 52:10
D238 52:14
D241 51:23
D373 13:5,12
D374 13:5,13
D375 14:13 26:17
D376 14:13 26:17
D377 14:13 26:17
D381 55:10
D382 29:12 39:14
D383 29:12

**E**
each 30:15,17 63:9
earlier 9:18 36:5,21
  69:15
early 21:22 64:15
easy 44:12
Edelstein 1:10,14
EEO 43:2
effort 2:13 70:8
either 24:21 37:20
  41:20 50:17 60:13
  79:15
elaborate 70:18
eliminated 48:16
  50:22
eliminating 49:14
Elimination 48:18
elsewhere 58:6,18
embarrassed 38:14
emotional 36:15
  61:18 62:1 67:17
  70:7
emphatically 28:12
employable 60:3
employed 8:9,11
  10:11 47:22
employee 7:9,11,14
  7:15 8:18 42:3,18
  72:10 74:2
employees 8:21,24
  35:12 46:17 62:1
  72:22 73:1,5
employment 7:18

8:13 10:24 11:2
  23:24 24:2,3,4
end 3:18 19:13 32:2
  45:19
ended 10:24 11:2
  19:18
ending 3:1,2
engineer 49:2
entire 50:16
entitled 52:5 77:6
equivalent 65:20
ERRATA 78:10
error 55:17
ESQUIRE 1:13,17
essentially 66:5
established 20:23
  26:12
evaluation 25:7
even 31:2 70:15
  72:16
event 79:16
events 15:4 43:17
  77:6
eventually 31:21,23
ever 14:5
every 2:13
everybody 38:23
  68:19
everybody's 68:20
everything 2:17
  19:5
evidence 20:8 25:8
  33:14,16 57:18
  69:6,14
exact 8:12 11:18
  21:14 27:24
exactly 5:13 8:11
  24:10 58:14 60:20
examination 76:20
  76:21,21,22 79:14
examined 2:3 79:10
example 4:23
excuse 41:19 43:13
  44:6
exemplary 33:19
exhibit 13:8 14:17
  26:16 29:15 52:2
  55:13 77:2
exhibits 9:3 13:2
  16:3,5 77:1
expected 56:13
experience 25:3
  75:17
expert 23:1
expertise 63:2
Expires 79:22
explain 33:15

explained 60:5
expressed 27:2 63:7
extended 3:4
extent 23:8 31:5
  55:6 74:13

**F**
face-to-face 12:4,5
  55:5
fact 20:18 23:17
  36:1 51:15 70:1
factories 72:7
facts 12:23,24 35:9
  63:21
fair 4:10 5:8 11:3,6
  14:9 19:15,17
  20:13,17 22:12,22
  35:10,12 36:9
  38:7,17 48:20
  60:12 61:12 69:23
  70:13 72:5
fairly 51:22
familiar 14:3
families 65:16
far 37:17 57:12
  61:14 63:18
fast 30:17
father 16:20,23
  17:5,9,12,14,17
  17:19,22 18:2,5
  18:11 33:6,8
  35:22 36:2 65:7,9
feel 25:16 32:22
  43:1 68:15
felt 42:24 44:10
  46:23 57:5,18
female 41:11
FETZER 1:22
few 11:7 62:18 67:2
  71:24
field 75:18
file 55:22 77:9
final 31:19 55:9
  75:2
finally 75:9
finance 42:4,12
  45:12,14
find 12:11
findings 57:16,17
  57:21,23
fine 2:7 21:1 38:5
  39:5
finished 37:3,4 45:9
fire 36:18
fired 24:6 57:6
firing 8:20 57:7
firmly 67:4

first 2:2 10:19
  11:10 20:6 26:13
  29:23 32:17 33:16
  39:8,16 40:16
  42:1 43:16 46:16
  47:6 52:20 54:3
  62:20 66:10,11
  68:3,4,4
five 39:4,5 62:2,13
flare-ups 68:15
flip 52:7
flipping 75:7
floor 1:18 72:7,13
Florida 3:8
focus 13:4
follow 3:19 45:11
  70:23 72:19
following 15:11
  36:7 37:23
follows 2:4
follow-up 62:19
Ford 28:24 39:10
  39:18 53:24 62:21
  62:22 63:2,11,14
foregoing 79:13
forget 34:18
forgot 32:21
form 25:5 61:8
  75:16
forth 66:20
forward 12:2,7,8
  20:24
found 25:8 63:8,24
  64:16,18 71:2
four 35:20
fourth 41:24 54:11
Francis 75:20
frankly 69:24
frequency 5:13
Friday 1:10
from 3:17,20 4:20
  4:21 5:20 6:17 7:1
  7:3,16,18 8:6 9:7
  15:13 16:9 18:16
  21:9 24:19 29:19
  29:24 35:20 36:5
  36:15,16 40:10
  48:8 55:22 58:15
  61:7 65:1 68:22
  75:19,24 77:9,12
front 13:11 26:19
function 3:17
furnace 63:3
further 46:20,22
  56:17 62:9 75:13
  76:8 79:13,15
future 16:24 17:5

17:11 24:17
fuzzy 66:24

**G**
gave 24:21
GB 52:23 53:3,19
  54:5
gee 61:19
general 62:23
getting 5:19 40:9,11
  61:20
Gilpin 1:10,14
give 4:23 56:3 58:7
  59:23 68:13 71:21
given 27:3 32:17
  34:4 43:17 44:15
  45:19 69:3,13
  79:11,13
giving 72:21
gleaned 46:21
go 2:19 13:17 17:2
  21:3 23:9 25:6,22
  25:23 26:21 31:15
  36:22 38:9 45:8
  45:24 46:15 57:10
  57:11 70:20 71:9
  71:12 74:13
goes 63:18
going 2:8,12 4:22
  9:5 14:15 20:22
  23:7 25:6,17
  26:21 29:13 47:11
  48:7,16 50:22
  51:24 56:14 58:17
  62:18 74:12
good 2:6,8 47:23
  62:13 63:22,23
  72:1,14,18
gotten 62:2
grant 65:15
grave 64:22 65:2
Great 7:23
Greg 10:8 15:3
  26:18 29:1 41:20
  47:5 50:8 51:14
  51:15 53:4,20
  54:8,18 77:7
guess 25:10 44:19
  46:15 59:8,11,11
guide 52:18
guys 76:14

**H**
habit 12:21 35:5
  45:22
half 6:8
halfway 15:6

Snyder
Jerome Downie

v.

C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
July 21, 2006

Page 83

**hand** 67:17
**handwritten** 77:4
**happen** 61:1
**happened** 12:11
16:8 28:7,8 36:13
38:1 44:8 61:22
70:16
**happening** 34:21
**happy** 58:2
**harass** 64:14
**harassed** 10:17
11:21 26:3
**harasser** 53:13
**harasser's** 53:21
**harassment** 2:11
10:20 12:20 15:5
19:15 20:9 22:2
24:7 25:3,8,11
26:8 28:11 32:18
43:2 52:6 57:18
64:3 74:11 77:6
77:10
**harbored** 63:12
**hard** 5:12 24:9
**harmed** 72:20
**Harris** 9:23 10:3,6
10:16,20 11:21
19:22 23:5 24:6
24:18 25:1,18
26:2,8,14 27:15
28:1,3,9,16 43:23
44:3,4 53:18,24
54:10 55:1 62:21
62:22 63:2,12,17
63:22 64:8,10,13
65:1,3 66:19 68:3
72:1,4,6 74:8,16
74:20
**haste** 67:18
**having** 2:2
**hear** 7:21 31:13
40:4 43:5 57:21
57:22 59:12 68:12
**heard** 22:2 40:5
59:9
**hearing** 22:1
**held** 8:3 27:20
30:17
**help** 15:12,15 22:23
27:18
**helped** 63:24
**her** 8:12 10:17 11:1
11:22 14:10 15:10
15:11,12 16:14,19
16:20,23 17:5,8,9
17:11,12,14,17,19
17:22,22 18:1,5,7

18:11,16 22:2
23:22,24 24:2,3,4
24:11,13,16,21
25:3,22 26:3,7,11
27:2 33:1,5,7,8
34:2 35:22 36:2
36:18,21,22 37:9
37:20 38:13,20
39:24 40:19 41:16
41:18 42:4,5 43:5
43:18 44:10,11,23
45:2 46:4,21 48:8
55:24 56:16,24
57:10 58:7,19
59:23 60:5,13
61:16 63:15 65:7
65:9,10 66:12,12
66:14,17,20 69:13
70:3,3 71:9 75:8
**herself** 27:1
**hesitating** 70:5
**Hi** 62:17
**high** 27:3 61:18
71:7
**him** 10:13 12:1,3
23:5 28:14 30:5
54:19 55:2,3,4
63:24 64:11,16,17
68:5,5 72:12
73:11,16,19,21,22
**hired** 7:5 8:1
**hiring** 8:20
**history** 33:18,19
**hold** 23:14,18
**holding** 23:19 75:7
**home** 44:3 45:18,24
70:20 71:9,12
**hominem** 24:24
**honest** 64:8 66:3
**honestly** 21:24
**hope** 48:24
**hoped** 71:5
**hoping** 62:5
**hostile** 70:13
**hour** 6:6,8 39:1
**hours** 62:2
**HR** 35:7
**human** 4:8,11,15
8:2,8,10,15,16
10:5,12 35:7 46:5
61:8 75:17 76:1,4

**I**

**idea** 9:24 10:10
46:9,12,16,17
47:14 49:21 55:19
**identification** 13:9

14:18 29:16 52:3
55:14
**ill** 63:12
**important** 67:24
68:17
**impression** 25:20
25:21 36:17,19
**INC** 1:6
**incident** 56:23
**incidents** 12:19
33:21 34:19
**include** 8:18,20,23
**including** 61:10
**Incorporated** 52:5
**increased** 47:24
**increasing** 47:12
**indeed** 25:14
**INDEX** 76:17 77:1
**indicated** 16:14
63:14
**individuals** 46:19
57:19
**industrial** 75:20
**industry** 76:1
**information** 16:13
22:6,24 32:20
33:1,2 46:20
51:11 56:18 57:3
59:20 69:6
**informed** 15:10
**initial** 19:6
**initially** 22:3,8 23:3
23:12 26:14 36:17
**initials** 52:20 53:1
55:7
**input** 69:7
**instructed** 70:20
71:12
**instructions** 45:19
70:23 72:22
**insubordinate**
71:14
**insulting** 37:8
**intend** 9:3 58:4
**interested** 22:1,3,8
79:16
**interviewed** 33:17
**investigate** 12:2,11
15:12 16:17 40:23
66:15
**investigated** 40:1
**investigating** 67:11
**investigation** 19:17
20:2 21:23 22:13
27:3,21 28:17
30:21 32:3 33:3
42:22 46:23 52:6

52:19 54:23,24
57:14,16 64:15
67:10 68:18 77:11
**investigations** 8:18
**involved** 12:10
16:24 18:5 28:4
28:11 30:2,16
33:6,17,22 34:1
34:19 35:1,7 43:3
54:14 67:21,21
68:2
**involvement** 35:4
35:13
**issue** 51:17,18,19
59:15 65:5
**issues** 32:6 51:20

**J**

**J** 77:9,12
**January** 79:22
**JD** 52:23 53:1,6,8
54:3
**Jerome** 1:9 2:1,22
76:19 79:9
**Jerry** 15:9,10 21:3
25:6 26:23 27:6
27:10 30:6 31:15
37:4 53:3
**Jim** 5:18,23 6:2
9:15 18:20,24
19:2 29:1 36:7
42:5 45:11 53:11
71:8
**JJF** 1:6
**job** 3:22 4:1 8:14
23:22 24:19 25:22
33:4,22 36:21,22
48:15 49:14 50:22
57:4 60:9 61:7
64:12 66:7,13
**jobs** 6:22
**judgment** 33:4
**July** 1:10 3:5,18 7:1
7:7,16,19 8:3
55:17,18 77:12
79:9,23
**jury** 27:8
**just** 2:19 3:11 5:2
14:7,8 16:5 17:2
17:13 18:6 20:22
20:23 21:18 22:19
23:1,2,7 24:6
26:22 30:12 32:21
38:1,6,15 42:24
44:11,12 45:6,24
48:5 50:12,17
56:6 57:13,21

64:1,5,6 65:13
67:7,19 71:20,24
75:14
**JWR** 53:6,10

**K**

**Kathleen** 1:11 79:8
79:21
**keep** 42:23 43:3
71:5
**kept** 68:18
**kind** 45:1 56:6 64:2
64:3
**King** 1:22
**knew** 12:23 63:24
64:1
**know** 2:19 10:24
14:5,21 16:13
19:10 20:7,10,13
20:23 21:17,22
22:6 23:23 24:20
27:22 28:21,23
30:21,24 31:1
37:2,17 41:10
42:10 43:23 44:1
44:11,14,19,21
46:4 47:1,23
48:13 49:2,22
50:6 51:13,14
55:19,21 56:2,15
57:10 58:1,14
61:6,19 64:4,6
66:3 68:13,15,22
69:3,24 70:8,9,9
71:2,7 74:18
**knowledge** 33:17,19
**knows** 33:13

**L**

**L** 1:3,21 77:5
**labeled** 26:17 53:12
**lack** 22:5
**laid** 48:7,9
**language** 21:14
60:4
**last** 5:3 9:15,22 10:2
10:6,8,12 32:24
42:1 43:16 46:21
69:10,16
**later** 62:2 66:4
**law** 1:9
**laying** 48:19
**learn** 41:6
**learned** 11:3,6
12:13 22:4
**least** 22:23
**leave** 27:5 44:3 58:4

Snyder
Jerome Downie

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
July 21, 2006

Page 84

| | | | | |
|---|---|---|---|---|
| 61:16 | **M** 1:17 | **mean** 4:19 25:16 | **message** 41:2,3,7,9 | **never** 33:13 48:11 |
| **leaving** 40:21 67:13 | **machine** 40:13 | 30:13 31:7,8 | **Messrs** 39:10,18 | 48:12,13 58:12 |
| 71:12 | **made** 19:9 25:23 | 34:16 55:1 61:6 | **met** 12:15 14:10 | 59:9 61:5 64:1 |
| **left** 39:11,19 40:12 | 27:12 30:15,18 | 62:4 63:23 | 26:11,14 27:10,15 | 68:11 75:5 |
| 54:20 55:5 58:20 | 31:20 59:2 69:1 | **meaning** 18:20 | 27:15 28:16 29:23 | **new** 51:11,17 79:3 |
| 58:24 | 70:8 | 58:24 | 36:7,9,10 42:5 | **next** 11:23 26:21 |
| **let** 2:19 9:11 10:1 | **mail** 39:11,19 40:12 | **means** 33:2 | 66:11,19 68:3,4 | 27:6 28:19 29:8 |
| 14:20 17:6 32:13 | 41:3,4,13 | **meet** 12:9,9,10,12 | 69:17 73:11 | 46:5 53:5,12 54:1 |
| 32:16 37:15 53:12 | **mails** 40:21 | 15:9 28:1,3 35:22 | **meting** 50:23 | 62:3 |
| 54:1 67:5 | **main** 65:12 | 64:10 68:5,10 | **might** 48:5 72:15 | **noise** 72:17 |
| **let's** 3:11 7:17 70:9 | **major** 30:14 | 73:16,18,21 | **mind** 19:8,11 62:11 | **normally** 12:1 |
| **level** 70:15 | **make** 2:13,14 12:19 | **meeting** 15:17,24 | **minutes** 6:11,12 | **Notary** 1:11 79:8 |
| **lie** 65:2 | 25:7 26:24 35:8 | 16:21,24 17:5,8 | 39:4,4 62:13 | **notated** 74:17 |
| **lied** 65:5 | 61:8 67:18 | 17:11,13,15,20,21 | **mischaracterize** | **noted** 43:8 |
| **like** 6:8,10 13:6 | **male** 41:11 | 17:23 18:2,5,17 | 31:8 | **notes** 79:11 |
| 14:12 29:11 30:5 | **management** 12:10 | 18:24 19:6,13 | **mischaracterizing** | **nothing** 6:3 41:8 |
| 41:24 52:7 55:9 | 29:24 30:2,3,9,22 | 20:6 23:20,21 | 31:6 | 46:22 60:18 76:8 |
| 55:11 57:5,12 | 35:6 36:10 41:16 | 24:5,12 25:15,16 | **Miss** 9:12 10:23 | **notice** 1:9 |
| 58:14,17 60:4,24 | 47:4 49:11,17 | 27:9,19 28:4,8 | 12:16,19 17:4 | **noticed** 42:3 |
| 61:24 64:22 68:11 | 50:21 54:16 76:2 | 29:6,20 30:11,22 | 19:6 20:17 23:24 | **notify** 12:9 16:16 |
| 72:3,15 73:1 | 76:4 | 32:2,6,9,10,24 | 24:8,23 32:24 | **notion** 49:13 |
| 76:11 | **managers** 41:18 | 33:1,2,6 36:2,7,14 | 33:12 34:2,19 | **numbers** 13:4 |
| **liked** 36:22 | **manufacturing** | 36:16 37:12,13,14 | 35:14 39:24 40:9 | |
| **line** 27:6 | 72:6,13 | 37:16,23,24 38:15 | 40:18 44:4,5,7 | |
| **lines** 35:20 | **many** 24:8 47:13 | 38:16,18,19,21 | 45:11 46:7 59:12 | **O** |
| **linkage** 33:8,10 | 68:12 | 45:20,22 49:7,11 | 63:15 65:7,10 | **oath** 2:3 |
| **listen** 22:14,16 | **March** 34:4 | 50:21 51:11 54:14 | 66:11,20 68:7 | **object** 20:22 23:7 |
| **listened** 11:24 16:14 | **MARGARET** 1:17 | 54:15,16,18 55:7 | 69:17,19,20 70:13 | 25:4 31:5 47:17 |
| 16:14 39:10,19 | **Margolis** 1:10,14 | 55:9,23 56:10,13 | 75:2 | 74:12 |
| 40:24 41:1 | **mark** 51:24 | 58:19 60:17 61:18 | **Mm-hmm** 52:13,22 | **objected** 65:11 |
| **listening** 22:22 41:6 | **marked** 13:7,8 | 65:9 68:7,10 | **Molly** 62:17 | **occurred** 19:15 |
| **little** 9:10 15:7 | 14:16,17 26:18 | 69:18,21,22 70:4 | **month** 3:1,3,6 4:22 | 27:24 62:4 |
| 56:11 63:10 66:4 | 29:14,15 52:2 | 70:11 73:22 74:16 | 4:23 5:5,9,14 9:20 | **occurring** 67:7 |
| 74:13 | 55:12,13 | 74:19 75:2 | **more** 3:5 5:9 6:3 | **occurs** 25:14 |
| **live** 3:8 | **master's** 75:21,24 | **meetings** 16:24 17:5 | 33:2 42:19 47:15 | **off** 2:19 23:14,18,19 |
| **long** 5:11 6:4,14 | **material** 65:21 | 18:14 26:7 27:20 | 47:24 48:24 51:16 | 37:9 43:11,18 |
| **longer** 67:13 | **matter** 6:17 12:2,11 | 43:18 61:24 65:8 | 63:10 64:24 72:16 | 48:7,9,19 54:3 |
| **look** 13:2 14:3 | 12:24 16:19 27:4 | 67:22 70:19 | 75:14 | 56:24 64:11,20 |
| 29:11 33:23 46:2 | 33:23 43:4 61:14 | **melt** 15:8 24:3,4 | **morning** 36:10 69:3 | 73:11,19,21 |
| 51:21 55:16 | 66:15 68:18 71:5 | 25:17 36:23 47:15 | 69:16 | **offer** 18:15 |
| **looked** 51:5 | 74:3 | 48:1,16 49:14 | **move** 20:24 73:6 | **offered** 23:13 57:9 |
| **looking** 35:18 39:8 | **matters** 4:12,14,15 | 50:10,11,12,17 | **much** 16:9 45:21 | **office** 11:13 36:8 |
| 39:14 56:19 | 8:16 | 58:8 62:23 65:22 | **multipage** 77:10 | 37:24 42:5 56:22 |
| **Lori** 1:13 2:9 71:19 | **may** 5:18,19,24 | 72:10 | **must** 38:9,14 44:9 | 70:12 |
| 76:7,13 | 6:16 11:17 18:4 | **members** 47:5 | **myself** 35:7 | **offices** 1:9 |
| **lose** 23:22 64:14 | 33:12,12,15 46:21 | **memo** 29:18 35:18 | | **often** 4:17 |
| **lot** 19:8 27:20 33:20 | 66:4 70:15 73:1 | 39:9 55:22 77:8,9 | **N** | **Oh** 7:17 31:11 40:6 |
| 48:24 64:12,14 | **maybe** 5:5 41:19 | 77:12 | **name** 2:9,20,22 | 42:11 52:10 |
| 72:17 | 50:16,24 51:13,13 | **memory** 56:3 | 22:19 29:4 50:6 | **okay** 3:13 6:13 7:12 |
| **loud** 37:8 56:22 | 58:15 71:8 72:14 | **men** 72:9 | **namely** 19:21 | 7:17,19,21,23 |
| 72:6,12,16,22 | 72:15 | **mention** 16:20 18:1 | **names** 54:13 | 13:20 15:2 16:7 |
| 73:2 | **ma'am** 21:5 22:21 | **mentioned** 20:8 | **nature** 39:11,20 | 17:6,7,10 19:20 |
| **loudly** 72:16 | 23:12 25:19,24 | 34:22 38:3,7 67:3 | 62:20 | 20:4 21:2,16 |
| **LTD** 1:22 | 28:3 32:1,20 | 69:8 71:24 73:11 | **need** 2:18 11:18 | 25:13 30:19 31:11 |
| **lunch** 74:2 | 36:24 37:22 38:22 | **mentioning** 17:9,11 | 68:23 | 31:17 34:9,14 |
| | 43:14 46:6,11,14 | **merely** 52:18 | **needed** 57:19 | 35:5 36:5,21 37:1 |
| **M** | 48:17 | **Merit** 1:11 | **needs** 35:6 | 38:23 40:6 44:24 |
| | | | | 45:5 48:20,20 |

Snyder
Jerome Downie

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
July 21, 2006

Page 85

51:3,12 54:21
55:20,23 56:8
59:10 60:6,23
62:7,14 65:4
66:23 67:1 70:1
70:10,10 71:15,20
75:23 76:14
old 71:6
Once 4:22
one 2:13 3:5 5:22
9:20 13:1,4,12
18:18,18 21:21
31:1 32:6 33:13
39:13 48:4,23
56:11 57:6 59:11
59:11 61:7 65:8
68:12 70:18,19
71:20,21 72:10,10
75:14
one-page 77:12
one-year 3:4
only 12:21 19:7,11
33:15 68:21
open 47:9 56:22
58:20,24
opened 70:12
openly 48:22
operations 50:9,13
50:15
opinion 33:11 63:17
64:8
opinions 63:20
opportunity 9:8
13:14,20 14:21
58:5 68:14 69:2
69:13
opposed 73:22
option 24:21 32:14
44:15 46:7 58:7
options 58:17 69:4
organizationally
48:21
other 4:14 5:12
6:22 12:22 16:2
19:21 22:5 30:12
32:20 34:20 45:7
46:20 49:17 51:1
51:2 56:17 57:3
58:3 63:9 64:12
67:3,5,21 69:6,6
69:10,12 74:1
otherwise 19:7
28:12 64:16,18
79:15
out 12:11 49:2 61:8
64:16,18 67:17
71:2 72:11 73:6

74:2
outside 18:14
over 12:3 47:12
57:11 74:11
overcharacterize
70:6
overlapped 63:3
owe 68:1

**P**
page 15:6,21 26:21
42:2 43:15,17
52:7,10,14,20
53:12 54:1,2
76:19 77:2 78:8
pages 26:24
Palmer 1:11 79:8
79:21
paper 13:12 35:11
56:19 61:8,10
paperwork 61:6
paragraph 32:16
35:18,21,21 36:6
39:8,16 42:1,1
part 20:2 32:21
43:16 55:6,8
59:14 64:2
partially 34:5
particular 17:8
60:15 64:5
parties 12:9,10
30:15,17 33:17
34:1 42:23 43:3
60:2 68:1 79:10
party 79:15
part-time 7:15
path 12:1,6,8
Patrone 42:8,10,15
43:6
pay 43:19 44:11
peers 62:22
people 18:14 19:21
30:3,5 35:6 47:13
47:15 49:17 51:1
51:2 54:14 58:14
59:2,3 61:7,10,12
65:17 68:10,13,14
68:23 72:8,8,14
72:15,18 73:6
per 15:11
performance 33:22
33:24 34:3
perhaps 58:17
63:10
period 4:4 24:3
65:18 67:6
periodically 4:18,19

4:21
permanent 7:9,11
permit 18:9,11,11
18:13,13
person 18:12 47:12
50:6 54:3
personal 63:5,19
67:18
personalities 63:4
personally 65:1
personnel 15:8 36:8
37:24
pertain 4:5
pertained 3:22
phone 2:15 12:4
27:7 39:24 40:9
40:11 71:3
piece 56:19
pieces 13:12
pitch 61:18 62:1
Plaintiff 1:4,15
plant 27:9 36:8
37:24 58:15
please 2:20 12:22
21:5 37:9 42:23
43:15 56:24 71:9
point 19:18 20:9
21:21 22:4 24:13
28:17 29:5 32:2
38:3,8 57:7 60:15
72:13,18
points 15:14 63:22
63:23 72:1,2,4
point-blank 66:14
policy 15:12 66:13
poor 33:22 34:2
position 8:2,3 47:9
48:7,8,18 50:8
57:9 64:12 65:19
65:20,21
positive 55:3
possibility 23:10
possible 67:19
69:10
practice 18:9 42:24
61:5 65:13,17
76:4
premises 61:16
65:18
preparation 9:12
present 1:20 17:19
17:22 18:2 35:14
65:8,9 68:7 69:19
presented 23:4
president 16:17
30:5 50:9,13,15
55:3 64:9 69:4

presumption 21:1
pretty 55:2 56:22
61:18
previously 50:3,20
primary 8:14
printed 9:6
prior 7:14 9:2 11:4
11:7 32:24 49:13
priority 27:3
private 65:12 68:5
76:1
privately 64:10
privileged 69:9
probably 30:14
46:2
problem 43:2 62:12
procedure 61:23
professional 75:17
76:3 79:8
proof 32:18 34:21
proper 35:12
proposed 54:24
protection 68:20
prove 22:20,20
provide 23:13 69:18
provoked 36:20
37:5 57:6
provoking 70:7
Public 1:11 79:8
punished 24:18
purposes 40:17
pursuant 1:9
put 32:21 35:11
55:1,2,7 56:2
59:16,17,20 61:3
68:13
p.m 1:10 35:23
76:16

**Q**
question 3:12 9:11
10:1 16:2 21:5
25:10 26:4 39:8
40:4,5 41:13,15
42:7 44:17,18,19
45:1,6 46:9 47:23
53:22 54:13 61:1
questions 2:9,12
3:20,21 4:3,5 19:8
45:7 48:19 54:19
55:4 62:11,19
79:10
quick 67:24
quickly 67:19 72:19
73:7,7
quiet 73:24
quite 69:24

**R**
raised 70:11
Randolph 9:22 10:3
10:6,16,20 11:21
19:21 24:6,18
26:2,8,14 27:7,7,8
27:11,15 28:1,8
28:10,16 41:20
43:23 44:3 53:18
53:24 54:10,19
55:1 72:1,4,5,21
74:8,16,20
Randolph's 33:18
Rather 67:11
reached 70:15
reaching 23:15,18
reaction 25:2,11
read 21:9 27:13
76:12,13
reading 15:15 26:22
30:12
ready 39:2
realize 72:18
really 16:9 19:9
21:6 30:13 38:4
38:16 44:8 45:21
48:1 57:13 61:2
63:1
reason 15:19 18:3
27:14 31:1 33:9
44:2,20 59:23
65:12 67:9,12,15
68:11
reasonable 25:2,11
reasons 48:24 68:12
68:16
recall 6:5,6,8,10
9:21 11:20 12:15
12:18 15:14 16:9
16:11,22 17:8,11
17:13,16 19:5
20:7 21:12 23:16
24:17 25:19 26:13
28:7 30:8,10,20
33:8,9 35:13
36:13 38:1,2,6,16
38:17,19,20 39:22
39:23 40:8,17
41:12,18 44:8,23
45:2,13,17 47:8
51:9 56:7,8 61:15
61:20 73:15
receive 9:2
received 9:6,6
recess 39:6 62:15
recollection 11:12

Snyder
Jerome Downie

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
July 21, 2006

Page 86

15:16 16:10 27:18
27:23 36:15 38:12
54:17,22 55:8
60:2
**record** 2:19,21 21:9
34:1 38:10,11
64:20
**recorded** 69:22
**recorder** 37:9 56:23
56:23 75:3,5,9,10
**records** 74:17
**refer** 26:16
**reference** 36:1
**refresh** 15:16 27:18
27:23 56:3
**refuse** 68:10
**regard** 65:14
**regarding** 27:19
29:20 49:5 69:1
70:18
**Registered** 1:11
79:8
**related** 8:16 65:17
**relates** 64:4
**relations** 75:20
**relationship** 62:21
**relative** 79:15
**relevant** 22:7,10,14
22:24
**remember** 5:2,7,8
5:11,13 6:14 8:12
8:12 9:16 10:22
11:15,16,17 12:14
12:17 14:8 16:6
20:10,12,16 21:6
21:14,24 22:24
28:6,15,20 29:10
30:13 34:24 37:16
37:17 40:7,10
41:4 42:9 43:7,12
43:14 45:13,21
46:6 47:7,14 48:1
48:6 49:10 50:18
57:8,13 59:19
60:19,22 61:2,22
66:5 67:8 68:6
71:8
**reorganization**
48:23 49:6
**repeat** 17:2 44:16
44:18
**repetitive** 56:12
**rephrase** 17:3
**REPLACE** 78:8
**report** 46:5
**reporter** 1:11 2:16
21:9 79:6,8

**represent** 2:10
10:23
**representative**
16:16 18:16,22
19:2
**represents** 52:17
**request** 16:23 59:4
59:5
**requested** 3:18
21:10 34:10 61:13
65:7,9
**reserved** 33:4
**reside** 3:7
**resign** 7:1 24:22
44:15,22 60:14
**resignation** 58:11
60:10
**resigning** 37:21
**resolution** 68:1
**resolved** 67:19
**resource** 46:5 61:9
**resources** 4:8 8:2,8
8:11,15,17 10:5
10:12 35:7 75:18
76:1,4
**resources-related**
4:12,15
**respect** 5:17 17:14
40:18
**respective** 79:10
**respects** 65:21
**respond** 6:20 17:6
60:21
**response** 7:20 24:16
40:3 64:24
**responsibilities** 4:2
8:15 62:24 63:1
**rest** 43:10,18 70:20
**restate** 21:5 26:4
**restaurant** 73:17,18
**results** 54:24
**retired** 2:24 3:17
6:24 7:3,3
**retract** 34:19
**retracted** 34:6
**returned** 26:23
**returning** 58:7
**review** 9:8 13:14,20
14:20,21 31:20
32:4
**reviewed** 69:6
**reviews** 13:19 14:22
**RH** 53:15,23 54:9
**right** 20:3 28:22
49:19 50:12 52:10
56:16 59:3 72:2
**RMR** 79:21

**room** 26:23
**RPR** 79:21
**rude** 71:10
**Ryan** 5:18,23 6:2
9:15 18:20,24
19:2 29:2 35:8
36:7 45:11 53:11
69:19 71:9

_____
**S**
**salary** 65:24
**salient** 15:14
**same** 12:12 26:17
65:24 66:2,6,7,19
**saw** 46:21 75:5,6
**saying** 2:17 21:18
23:16 31:24 32:22
45:3 49:11 73:1
**says** 15:4,7,13,18,21
15:23 26:23 27:10
29:21,23 32:17
35:17,22 36:6
37:23 38:9 39:10
39:12,18 42:2
43:17 52:21 53:6
53:13 54:23 59:13
59:13 60:8
**scenes** 48:22
**School** 75:24
**second** 27:19 32:16
42:2 43:15 45:20
48:3 54:5 65:14
68:4 71:20,21
**secondly** 68:15
**seconds** 71:24 72:19
**secretary** 4:9
**secretly** 69:20
**security** 65:14,15
**see** 13:21,23 14:22
14:24 20:20 21:12
29:21 31:2,24
35:17,21 39:12
43:9 52:21 53:13
57:11 60:8 69:5
75:10
**seek** 69:10
**seemed** 23:23
**seems** 40:8 65:6
**seen** 14:6,7
**send** 44:2
**sense** 25:12 33:14
64:18
**sent** 13:2 45:18
51:21
**sentence** 29:23
32:17 35:19 42:2
43:16

**separate** 51:18
**separated** 57:19
58:3
**separation** 46:19,24
60:5
**September** 7:6,18
7:24
**series** 2:8,12
**serious** 16:15 64:17
67:17 74:3,10
**seriously** 16:18 27:4
66:12
**several** 14:8 45:6
67:10,12
**sexual** 2:10 10:19
12:20 19:14 22:2
24:7 25:3,8,11
26:8 28:11 32:18
39:11,20 43:2
52:6 57:18 64:3
74:11 77:10
**sexually** 10:16 26:3
64:14
**shared** 62:24 63:1
**SHEET** 78:10
**she'd** 59:17
**shift** 66:2,2,3,6
**Shippensburg**
75:19
**shipping** 24:21 32:8
32:19 37:20 38:13
44:22 46:8 47:9
47:13,16,24 48:3
57:4,10 58:10,13
58:16 60:9,14
65:19
**shop** 15:8 24:3,4
25:17 36:23 47:15
48:1,16 49:14
50:10,11,12,17,23
58:8 62:23 65:22
72:10
**short** 24:9 36:7
37:23 62:11 75:16
**show** 33:7
**side** 33:7
**sign** 76:12
**signature** 52:8,11
52:15
**signatures** 53:23
54:2
**signed** 61:9 77:4
78:14
**simple** 71:16
**since** 16:8 63:24
76:1,2
**site** 64:11 73:12,19

73:21
**situation** 43:19
44:13 46:1 47:2
52:19 62:6 64:3,5
**situations** 74:1
**slash** 53:5
**slightly** 47:24
**small** 45:16 71:6
**Snyder** 1:3,21 2:10
6:17 8:6 10:15,21
11:21 12:12,16,19
14:1 16:1,12 17:4
19:6 20:17 22:18
23:24 24:8,23
26:1,6 27:16
28:12 29:20 32:24
33:12 34:2,19
35:2,14 37:7,7
39:24 40:9,18
44:3,5,7 45:11
46:7 47:7 55:10
55:23 59:12 63:15
64:14 65:7,14
66:11,20 68:7
69:17,19,20 70:13
71:11 75:2 77:5,6
77:9,12
**Snyder's** 5:24 10:23
15:5 33:19 55:22
**some** 4:1 8:14 10:24
14:20 16:8,13
22:4 24:13,17
28:1 29:5 30:18
38:8 40:9 48:24
51:1,16 54:19
55:4 56:19,21
60:4 65:6,16
69:18 70:17 72:1
72:1,4,14,15 73:1
**someone** 12:22 18:7
33:7 35:5 39:23
39:24 40:10,11,18
40:19 45:23,24
48:19 50:4 57:11
71:2 72:16
**someone's** 40:12
**something** 9:5
17:18 37:5 40:18
49:8 58:13 64:22
69:8 71:3 75:7
**somewhere** 49:9
67:6
**soon** 27:15
**sorry** 7:10 17:2
21:3 25:6 31:13
31:16 32:14 44:16
47:19 58:22 66:17

Snyder
Jerome Downie

v.

C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
July 21, 2006

Page 87

76:13
**sound** 23:1 70:6
**sounded** 39:11,19
  51:4
**space** 72:18
**span** 24:9
**speak** 20:1 37:15
**speaking** 2:16 72:16
**specifically** 47:21
**speculation** 23:8
**spoke** 9:15,18,22
  10:3,6,9,12
**St** 75:20
**stamped** 13:3,5
  14:13 29:12
**stand** 53:23
**standpoint** 36:16
**STARGATT** 1:17
**start** 2:20 3:11
  26:22
**started** 3:10,11,14
  3:14 7:24 42:22
**starts** 51:22
**state** 36:24 79:1
**stated** 16:3 17:18
  18:3 31:18 57:5
  60:8,13 69:15
**statement** 12:19
  14:9 27:13 43:8
  60:12 77:4
**STATES** 1:1
**stating** 2:20
**Stay** 37:15
**Stenotype** 79:11
**step** 28:19
**still** 19:21 20:6
  23:20 33:3,4 43:1
  71:4
**stop** 24:7
**stories** 30:16 46:18
**Street** 1:18,22
**subject** 29:19 30:1
  55:23
**subsequent** 70:18
**suggest** 45:23 64:2
**suggested** 56:18
  57:4
**suit** 79:16
**summarizes** 30:13
**summary** 26:24
**supervisor** 53:19,21
  74:23
**supervisors** 62:23
**sure** 2:14 10:15
  21:19 22:9 24:10
  25:9 26:5 35:9
  37:12 41:19 42:11

70:19 71:22
**surprise** 50:19,24
  51:4
**surprised** 51:5,5
  64:6
**surrounding** 15:5
  77:6
**sworn** 2:3 79:10

_____
**T**

**table** 75:3
**take** 2:15,18 14:20
  29:11 32:13,16
  38:24 41:24 43:10
  43:18 44:12 51:21
  53:12 54:1 55:9
  55:16 60:10 62:5
  62:11
**taken** 1:9 39:6
  62:15 79:11
**taking** 2:15 66:12
  67:7
**talk** 7:17 19:21 34:2
  57:11 74:3
**talked** 9:11 28:24
  29:1,1,2 73:2
**talking** 34:3 38:12
  42:17 47:21 72:21
  72:23
**tape** 22:16,23,24
  23:2,4,6 37:8
  56:23,23 59:9,12
  69:21 75:3,5,9,10
**taped** 59:7,14 69:21
**tapes** 20:8,18,20
  21:13,15 22:1,4,9
  22:14 23:2,14
  31:2,10,19,24
  32:4 33:7,9 37:7
  56:14 69:14
**TAYLOR** 1:17
**team** 29:24 30:2,3,9
  30:22 36:10 54:24
**technicality** 31:12
**Technically** 47:11
**teleconference** 1:16
**telephone** 62:3
**Telephonic** 1:9
**tell** 3:9 6:2 15:2,24
  16:2,4,5 23:13,21
  24:5 25:15 26:1,6
  28:7,14 33:5
  52:17 55:24 56:6
  57:22,24 61:22
  62:20 68:14 74:19
  74:22 75:16
**telling** 33:12,13

40:18 73:6
**temporary** 7:14
**ten** 39:3
**tenure** 72:9
**terminated** 11:1
**terms** 12:6 73:6
**Terri** 36:8 42:3
  55:23 77:6,9,12
**Terry** 1:3,21 2:10
  5:24 6:16 8:6
  10:15,21 11:21
  12:12 14:1 15:5,7
  18:15 19:13 20:1
  20:7,8 23:13 26:1
  26:6,11,23 27:11
  27:16 29:20 32:19
  33:5 35:1 36:10
  36:16,17 37:20
  41:13,15 43:10
  44:2 45:18 47:7
  47:22 55:22 56:14
  56:20,22 58:4,5
  77:5
**Terry's** 18:22 41:3
  48:7
**testified** 2:4 50:20
**testimony** 9:13
  63:11 65:20 66:20
  69:18 70:17 76:17
  79:13
**Thank** 76:10,13
**their** 30:17 69:7
**they'd** 22:9
**thick** 51:22
**thing** 19:7,11 46:24
**things** 3:24 5:12
  19:8,9 24:9 34:22
  64:12 66:9 67:16
  67:21 68:22
**think** 13:22 25:2
  26:12 31:4 32:23
  41:4,18 47:24
  49:9,16,16 50:16
  51:10,10,19 53:5
  54:18,22 55:17
  57:11,15 59:2
  60:19,19,20 61:17
  61:19 66:4 67:2,3
  68:1 70:11 71:8
  72:5
**thinking** 49:8 50:5
**third** 35:17 54:9
**though** 31:2 72:17
**thought** 22:15 31:9
  34:17 63:23
**three** 35:21
**three-day** 67:6

**three-page** 77:6
**through** 7:7,19 8:7
  51:23
**throughout** 8:3
**thrust** 11:20 16:11
  30:14 56:4 57:2
**time** 2:13,18 3:18
  3:20,20 4:20,20
  4:21,21 5:3 8:9
  9:15,16,18,22
  10:2,6,8,12 11:18
  14:20 16:8 21:21
  22:4 23:3 24:9,17
  26:1,6,13,18 28:2
  30:4 39:6 44:11
  47:22 48:5 49:13
  57:14 58:15,15
  60:15 62:9,15
  63:17 69:7,11
  71:10 72:8
**times** 27:24 63:8
  72:5
**title** 15:4
**today** 2:9,19 9:2,3
  9:13 29:23
**together** 52:21 62:2
  64:1
**told** 5:18 6:15 11:13
  15:10 16:13 19:5
  39:23 40:2 42:23
  46:4 49:24 50:1,3
  57:10 58:19 63:16
  64:13,16,19 65:1
  66:14,17 68:19
**top** 13:23 15:21
  26:22
**total** 50:13
**tours** 65:15
**towards** 63:12
**trail** 61:8,10
**transcribe** 2:17
**transcribed** 79:12
**transcript** 79:13
**transfer** 8:23 24:21
  37:20 38:3,7
  44:15,22 46:7
  58:15 59:5,16,20
  60:14,18 61:3,7
  69:2
**transferred** 24:19
  32:7,19 59:24
**transferring** 38:13
  70:21
**transfers** 59:4
  61:13
**tried** 60:7
**true** 23:17 32:22,23

79:13
**truth** 33:12,14
**try** 44:12
**trying** 70:10
**Tuesday** 13:22 77:4
**turn** 26:21 37:9
  43:15 52:14 55:10
  56:24
**turns** 2:15
**Twice** 4:22
**two** 13:12 16:3
  30:15 34:20,22
  43:17 46:17,19
  48:5,19 51:20
  52:20 57:19 60:2
  63:4 67:6 68:10
  72:8,9
**two-page** 77:4,8
**type** 3:21 16:15
  19:11 28:11 30:18
**typewriting** 79:12

_____
**U**

**uncommon** 72:7
**under** 79:12
**underneath** 54:2
**understand** 3:12
  6:15 7:17 15:1
  25:9 42:21 59:13
**understandable**
  56:21
**understanding** 18:4
  18:6 60:1
**UNITED** 1:1
**University** 75:19,20
**unlike** 74:1
**until** 50:21 70:1
**upset** 16:12 36:16
  38:18,20 44:4,7
  44:14,20,21 45:2
  46:1 56:21 66:18
**upsetedness** 56:20
**USA** 1:6 52:5
**use** 9:3 49:1
**used** 4:17 48:13
  52:18

_____
**V**

**v** 1:5
**varied** 4:20,21
**various** 3:24 61:9
**verbal** 28:11
**versus** 47:18
**very** 16:15,18 22:20
  27:4 36:15,16
  44:4,4,7,7 58:23
  64:11,17 66:24

Snyder
Jerome Downie

v.
C.A. # 04-970 (JJF)

CitiSteel, USA, Inc.
July 21, 2006

Page 88

| | | | |
|---|---|---|---|
| 67:16 68:23 70:7 | went 58:13,16 | 35:1,4 | 32:8 34:4 35:19 |
| 70:7,8 72:11,11 | were 5:23 7:5,14 | writing 59:16,18,21 | 37:19 39:9 52:12 |
| 73:23,23,23 | 8:1,8,14 9:5 10:1 | 61:4 | 55:17,18 77:4,9 |
| via 1:16 27:7 | 10:5,11 15:11 | written 14:1 15:3 | 77:12 |
| vice 50:9,13,15 73:2 | 19:8,9 22:1 30:16 | 35:6,15 41:22 | 2004 3:18 7:2,7,19 |
| views 30:18 | 31:10,18,20 33:21 | wrong 37:14 50:16 | 8:4 |
| vocal 63:10 | 34:20,22 35:1,9 | 60:18 | 2006 1:11 79:9,23 |
| voice 23:5 39:11,19 | 35:14 36:20 39:23 | wrote 43:21 | 2008 79:22 |
| 40:12,21 41:3,4 | 40:2 42:17,21,23 | www.wilfet.com | 21 1:10 |
| 41:13 70:11 | 45:9 47:11 50:1 | 1:24 | 21st 79:9 |
| voices 71:7 | 54:14 56:22 57:16 | | 28 79:23 |
| voluntarily 3:17 7:3 | 57:17 62:5,22,23 | **Y** | 29 77:9 |
| 34:6,10,18 37:21 | 63:14 66:12 67:7 | Yeah 44:18 53:24 | |
| 60:14 | 67:20,21 69:5 | year 3:5,5 | **3** |
| voluntary 60:10 | 70:12 71:10 72:4 | years 14:8 50:14 | 3 29:14,15 77:8 |
| volunteered 20:17 | 79:11 | 67:2 | 3:05 76:16 |
| | weren't 22:8,9 | yesterday 9:7 | 3:45 27:9 |
| **W** | West 1:18 | YOUNG 1:17 | 302 1:23 |
| wait 58:22,22,22 | we'll 17:14 76:13 | | 31 54:2 79:22 |
| waited 69:10 | we're 2:17 5:22 | **0** | |
| walk 45:16,17 | 20:6 23:20 35:18 | 04 7:16 | **4** |
| walking 61:20 | 39:14 68:23 76:9 | 04-970 1:5 | 4 52:1,2 77:10 |
| want 13:1,4,17 16:4 | we've 20:23 26:18 | | 4/10/03 77:7 |
| 18:5 20:24 23:21 | 62:2 | **1** | 4/8 15:21 52:12 |
| 24:6 38:10,24 | Wharton 75:24 | 1 13:8 35:23 77:4 | 4/8/03 52:15 |
| 39:3 56:3,5,6 | while 8:11 58:16 | 1:05 1:10 | 4/9 52:12 |
| 57:10,13,21,22,22 | whispering 42:3,7 | 1:55 15:10 | |
| 57:24 58:1,22 | 42:14 | 10 77:12 | **5** |
| 59:12 60:9 68:11 | White 1:11 79:8,21 | 10th 11:2,4,7 27:22 | 5 55:12,13 77:12 |
| 69:20 70:5 | WILCOX 1:22 | 37:13,17 38:20 | 52 77:11 |
| wanted 16:12 17:19 | Wilmington 1:10,15 | 55:17,18 67:4,5 | 55 77:12 |
| 18:1,6 23:14,17 | 1:18,22 | 75:3 | |
| 23:24 24:7,10,11 | wishes 69:22 70:2 | 10:30 36:8,11 | **6** |
| 24:14,18 25:22,23 | witness 2:2 13:19 | 1000 1:18 | 62 76:21 |
| 33:5 35:8,22 | 14:22 18:12 31:17 | 13 52:7,10 77:5 | 655-0477 1:23 |
| 36:17,21,22 51:15 | 37:6 63:8 76:10 | 1330 1:22 | |
| 55:4 57:6 58:5 | 79:14 | 14 77:7 | **7** |
| 69:5,5 73:24,24 | witnesses 30:17 | 149-RPR 79:21 | 71 76:21 |
| warning 35:6,15 | word 37:4 44:13 | 15 6:10 | 75 76:22 |
| Warren 29:4,5,6 | 48:13 51:16 | 1509 1:10,14 | |
| 30:7 50:3 54:12 | wording 11:19 | 17th 1:18 | **8** |
| 54:18 74:24 | words 11:15,16 | 19 52:14 | 8 77:4 |
| wasn't 24:10 28:21 | 12:22 69:12 | 1973 76:2 | 8th 13:22 15:22 |
| 28:23 30:24 32:11 | work 2:23 3:2,9 | 1975 76:2 | 19:14 20:21 21:1 |
| 74:16 75:3 | 25:23 48:24 49:1 | 19801 1:22 | 21:19 23:20 24:5 |
| way 6:20 17:6 22:13 | 51:17 58:6 63:9 | 19806 1:15 | 25:16 26:11 27:21 |
| 22:19 27:19 35:12 | worked 7:7 43:23 | 1988 7:6,18,24 | |
| 65:5 67:4 70:1 | 76:1 | 63:24 | **9** |
| 73:7 | working 25:17 44:3 | 19899-0391 1:18 | 9 77:8 |
| ways 49:3 | workload 47:12 | | 9th 29:8,18 32:8 |
| WB 54:11 | workplace 68:22 | **2** | 33:11 35:19 37:13 |
| well 3:10 5:3 22:12 | 71:17 | 2 14:16,17 26:18,24 | 35:15,19 38:15 |
| 23:4 25:4 28:5 | wouldn't 23:19 | 76:20 77:6 | 39:9 |
| 30:12 33:5 46:17 | 42:19 50:24 51:4 | 20 6:11 | 9:15 29:24 |
| 50:19 55:2 56:2 | write 12:23 | 2001 8:7 | 9:45 29:24 |
| 57:17 58:1 59:20 | write-up 34:3,6,7 | 2003 8:7 11:2,4,8 | |
| 63:19 71:2 72:14 | 34:11,15,16,23 | 13:22 29:9,19 | |



**WILCOX & FETZER LTD.**

In the Matter Of:

# Snyder

## v.

# CitiSteel, USA, Inc.

## C.A. # 04-970-JJF

---

Transcript of:

Gregory Buragino

June 16, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B- 0367

Snyder
Gregory Buragino

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TERRY L. SNYDER,                    )
                                    )
            Plaintiff;              )
                                    ) Civil Action
    v.                              ) No. 04-970-JJF
                                    )
CITISTEEL USA, INC.,                )
                                    )
            Defendant.              )


            Telephonic deposition of GREGORY BURAGINO
taken pursuant to notice at the Law Offices of
Margolis Edelstein, 1509 Gilpin Avenue, Wilmington,
Delaware, beginning at 12:30 p.m. on Friday, June 16,
2006, before Ann M. Calligan, Registered Merit
Reporter and Notary Public.

APPEARANCES:
            LORI A. BREWINGTON, Esquire
            MARGOLIS EDELSTEIN
               1509 Gilpin Avenue
               Wilmington, Delaware  19806
               on behalf of the Plaintiff;
            MARGARET M. DiBIANCA, Esquire (BY TELEPHONE)
            YOUNG CONAWAY STARGATT & TAYLOR, LLP
               The Brandywine Building - 17th Floor
               1000 West Street
               P.O. Box 391
               Wilmington, Delaware  19899-0391
               on behalf of the Defendant.

                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477

Page 2

1      GREGORY BURAGINO,
2      the witness herein, having first been
3      duly sworn on oath, was examined and
4      testified as follows:
5            EXAMINATION
6  BY MS. BREWINGTON:
7      Q.  Good afternoon, Mr. Buragino. My name is Lori
8  Brewington, and I have the privilege of taking your
9  deposition today. And we are actually taking your
10 deposition by phone in connection with Terri Snyder's
11 action against CitiSteel.
12         Have you ever testified in a deposition
13 before?
14     A.  No.
15     Q.  What happens, I'm going to ask you a series of
16 questions. I'll make every effort to ask them one at
17 a time. If, for some reason, you don't understand the
18 question, just let me know and I'll go ahead and
19 repeat it for you.
20         At times, Ms. DiBianca will object, and
21 that's entirely proper. All I ask is that you answer
22 the question anyway unless she specifically advises
23 you not to answer the question. Do you understand?
24     A.  Yes.

Page 3

1      Q.  We have a court reporter here, and she will be
2  taking down your responses to my questions. All I ask
3  is that you make sure that your answers are audible,
4  meaning that they are yes or no, and not the mm-hmm or
5  uh-huhs, because it's difficult to kind of translate
6  those into the record. Okay?
7      A.  Okay.
8      Q.  Would you please state your name for the
9  record?
10     A.  My full name is Gregory Buragino.
11     Q.  And what did you do in preparation for your
12 testimony today?
13     A.  I received information from the lawyer, Molly.
14     Q.  Did you do anything else?
15     A.  No.
16     Q.  Did you review any documents?
17     A.  The documents that were sent to me, yes.
18     Q.  Where are you currently working?
19     A.  I work at Air Products and Chemicals in
20 Allentown, Pennsylvania.
21     Q.  How long have you worked there?
22     A.  Not quite two months.
23     Q.  And where did you work prior to Air Products in
24 Allentown, Pennsylvania?

Page 4

1      A.  I owned my own business.
2      Q.  And what was the name of the business?
3      A.  FastFrame.
4      Q.  I'm sorry?
5      A.  FastFrame.
6      Q.  And how long did you own your own business?
7      A.  I opened the business in 2004.
8      Q.  What type of business is that?
9      A.  It is a picture framing franchise.
10     Q.  And what did you do prior to working at
11 FastFrame?
12     A.  I worked at CitiSteel.
13     Q.  What years were you working at CitiSteel?
14     A.  I worked at CitiSteel 1990 to 2003.
15     Q.  And what was the position when you were hired?
16     A.  I was hired as manager, quality in metallurgy.
17     Q.  How long were you in that position?
18     A.  About four years, until 1994.
19     Q.  And then after that?
20     A.  I became manager of the melt shop.
21     Q.  And is that where you worked through 2003?
22     A.  No.
23     Q.  Okay.
24     A.  I held several positions.

Page 5

1      Q.  Tell me about that.
2      A.  Okay. In 1994, I became melt shop manager.
3      Q.  Okay.
4      A.  Around 19 -- and I don't remember the dates
5  specifically, so...
6      Q.  That's okay. You can give me approximates.
7      A.  Okay. Around 1997, I went back to -- either
8  '97 or '98. I forget which dates. I went back to
9  being manager of QA in metallurgy. Our manager of QA
10 in metallurgy had left the company, and I went back to
11 that position.
12     Q.  Okay.
13     A.  In 2000 I was promoted to vice-president,
14 manufacturing services, and then later that same year,
15 I was promoted to vice-president, manufacturing. And
16 that's the last position I held.
17     Q.  So in later 2000, you were placed in the
18 position of vice-president of manufacturing, and
19 that's the position you held throughout 2003?
20     A.  Until I left in 2003.
21     Q.  Okay.
22     A.  August of 2003.
23     Q.  That was my next question. When did you leave,
24 August of 2003?

2 (Pages 2 to 5)

B-0369

Snyder
Gregory Buragino

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

Page 6

1    A. Physically I left in August of 2003. The
2  company retained me as a consultant for six months.
3    Q. What did you consult them on?
4    A. I'm sorry. I didn't hear.
5    Q. What did you do in terms of your consulting?
6    A. I made myself available for any questions, you
7  know, regarding what I was doing prior so that the
8  company could, you know, utilize anything that I did.
9    Q. Oh, okay. And why did you leave CitiSteel?
10   A. I left for personal reasons, to pursue other
11 opportunities.
12   Q. Generally what were some of your job
13 responsibilities as vice-president of manufacturing?
14   A. Melt shop personnel, Randolph Harris, Dennis
15 Ford, reported to me. Plate mill personnel reported
16 to me. Shipping personnel reported to me. And in
17 fact, the quality personnel at the time did, I recall.
18 So I had various departments reporting to me, that I
19 had responsibility for.
20   Q. So is it fair to say that the supervisors and
21 managers reported to you or just the managers or how
22 would you characterize the title of those that
23 reported to you?
24   A. General supervisor was our title for positions

Page 7

1  held by Randolph Harris or Dennis Ford, or plate mill
2  supervisor, general supervisors, and the shipping
3  general supervisors.
4    Q. And Randolph Harris was a general supervisor as
5  was Dennis Ford, correct?
6    A. That's correct.
7    Q. And what were some of Randolph Harris's job
8  responsibilities?
9    A. Randolph's responsibility was to run the
10 melting aspect of the shop. And it changed over time.
11 I mean, in those couple of years, we changed
12 responsibilities somewhat. But for the most part, he
13 ran the melting, so the furnace -- what we call our
14 furnace, and handled that.
15   Q. Did he manage the employees in that area?
16   A. Yes.
17   Q. How about Dennis Ford, what were some of his
18 primary job responsibilities?
19   A. Melt shop has a furnace and a caster and a slab
20 yard associated with it, among other things. So
21 Dennis ran the caster and also had some other duties,
22 such as the slab yard.
23   Q. Did Randolph Harris have any management of the
24 caster and slab yard?

Page 8

1    A. I can't recall when we changed some of the
2  duties, but at one point we did where Randolph was to
3  take over the caster. And I don't remember that real
4  well right now.
5    Q. But I guess my question is, when Dennis Ford
6  was responsible for the caster and slab yard, is it
7  fair to say that Randolph Harris wasn't?
8    A. Yes. That's correct.
9    Q. And how would you characterize your
10 relationship with Randolph Harris in April of 2003?
11   A. I had a good relationship with Randolph
12 throughout my tenure there.
13       Randolph and I started about the same time
14 with the company.
15   Q. Did you have a personal relationship with
16 Randolph?
17   A. Not outside of work, no. But I mean, I would
18 say we were personable.
19   Q. Personable while in work?
20   A. Personable, meaning that we had a good
21 relationship.
22   Q. While at work, right?
23   A. Yes. We did not, you know, really -- I can't
24 recall him and I out together outside of work other

Page 9

1  than the suppliers or, you know, a dinner here or
2  there.
3    Q. And how would you characterize your present
4  relationship with Mr. Harris?
5    A. We keep in touch.
6    Q. What does that mean, keep in touch?
7    A. I call him on occasion to see how he is doing,
8  and he calls me on occasion to see how I am doing.
9    Q. Have you seen him since you've left CitiSteel?
10       MS. DiBIANCA: I don't know that he was
11 finished.
12       MS. BREWINGTON: I'm sorry.
13       MS. DiBIANCA: Greg, were you finished?
14   A. Yeah. I mean, that's essentially it. I mean,
15 we stayed in touch. And I mean, I had done
16 consulting, other consulting work for CitiSteel
17 involving Randolph as well. So professionally we
18 worked together within the last year and a half. But
19 in addition to that, we've stayed in touch.
20   Q. How about Dennis Ford, did you have a
21 relationship with Dennis?
22   A. Yes. You know, we were also friendly but,
23 again, not outside of work. You know, I treated both
24 gentlemen the same.

3 (Pages 6 to 9)

Snyder                              v.                        CitiSteel, USA, Inc.
Gregory Buragino          C.A. # 04-970-JJF                    June 16, 2006

Page 10

1    Q.  And since you've left CitiSteel, have you
2    maintained contact with Dennis Ford?
3      A.  Initially, I did. And the same was true for
4    him. I heard from him on occasion, and I spoke to him
5    on occasion. But since he has left CitiSteel, I have
6    not heard from him.
7    Q.  Do you recall when Dennis left CitiSteel?
8      A.  I don't because I wasn't there. I mean, he was
9    still there when I was there. And I remember people
10   telling me he left, but I don't remember when that
11   was, whether that was last year or the year before, or
12   I don't -- I don't recall to be honest with you. I
13   haven't heard from him since.
14   Q.  So he left sometime after August of 2003 then?
15     A.  Yes.
16   Q.  Were annual performance evaluations in the
17   melting shop completed for all salaried employees?
18     A.  We were pretty good about doing annual
19   appraisals. I was pretty good at that, I believe.
20   Maybe not perfect, but I always did appraisals for my
21   direct reports, which included Randolph and Dennis.
22   So I did appraisals on those men, if that's what
23   you're asking.
24   Q.  That's part of what I'm asking. Were salaried

Page 11

1    employees supposed to get annual performance
2    evaluations?
3      A.  Not all salaried employees. As I recall,
4    salaried non-exempt did not get. The supervisor
5    generally did.
6    Q.  So to give you an example, with Randolph
7    Harris, he's salaried, non-exempt, is that correct?
8    Exempt. I'm sorry.
9      A.  I'm sorry?
10   Q.  Is Randolph Harris exempt?
11     A.  Yes. Randolph's -- that position, general
12   supervisor, was a salaried exempt position.
13   Q.  And Terri Snyder, is she non-exempt?
14     A.  I believe that's a non-exempt position, but you
15   know, I don't recall exactly. But I'm pretty sure
16   that's a non-exempt position, if not an hourly
17   position. I'm not even sure if it was salaried, but I
18   think it was.
19   Q.  Is it your understanding that non-exempt
20   employees do not receive performance evaluations?
21     A.  It was not a general requirement if I'm
22   correct, but I don't recall completely whether that's
23   a true statement or not. I mean, I don't believe we
24   did appraisals on everybody who was salaried

Page 12

1    non-exempt.
2    Q.  Do you know whether performance reviews were
3    completed for Terri Snyder on an annual basis?
4      A.  I don't think so. I don't remember seeing any.
5    Q.  And why is that?
6      A.  I'm sorry?
7    Q.  Why is that?
8      A.  I don't know that we did any, again, for
9    non-exempt personnel. So if we didn't do any, I don't
10   think I would have seen any.
11   Q.  While working at CitiSteel, did you have any
12   personal, firsthand knowledge of Terri Snyder's work
13   performance?
14     A.  Other than observation, personal observation.
15   Mostly I would get feedback from others. We didn't
16   work directly in the same area.
17   Q.  So is it fair to say there was some personal
18   observation?
19     A.  Yes.
20   Q.  Okay.
21     A.  Sure. You know, I would be in each area some
22   portion of the day. You know, people that were -- I
23   was responsible for, I would see them once a day
24   generally. Sometime more, sometime less, but...

Page 13

1    Q.  So you didn't have a direct reporting
2    relationship with Terri Snyder?
3      A.  No.
4    Q.  And you mentioned that others would provide
5    feedback to you, is that correct?
6      A.  Yes.
7    Q.  And who were you speaking of?
8      A.  The general supervisors really had the
9    shared -- the clerical -- let me rephrase that.
10        The duties of clerical administrator,
11   whatever you want to call that position, that position
12   shared -- was shared between the general supervisors,
13   meaning that Dennis had work for Terri, Randolph had
14   work for Terri, the shop as a whole had work. I
15   believe Jeff Blauvelt. I don't remember. I mean
16   there was another supervisor.
17   Q.  Were you finished? I'm sorry.
18     A.  Yes.
19   Q.  So did you receive feedback from Dennis Ford
20   and Randolph Harris about her job performance?
21     A.  Yes.
22   Q.  And did you receive feedback from anyone else
23   about her job performance?
24     A.  You know, I don't recall real well. I mean,

4 (Pages 10 to 13)

Snyder                                  v.                    CitiSteel, USA, Inc.
Gregory Buragino              C.A. # 04-970-JJF                    June 16, 2006

Page 14

1  those were the two guys who would bring to my
2  attention issues. I may have gotten other feedback
3  from others. I don't personally recall that. Okay?
4  I mean, it wouldn't have been a lot of other people to
5  report back. I mean, some of it went through
6  accounting. And I think there may have been something
7  there, but I don't -- I can't recall.
8      Q. I want to direct your attention to the first
9  exhibit, if I could have that marked as Buragino 1.
10         (Buragino Deposition Exhibit 1 was marked
11  for identification.)
12         MS. DiBIANCA: Just for clearing purposes,
13  can you ID the page number when you say 1?
14         MS. BREWINGTON: Yes.
15  BY MS. BREWINGTON:
16     Q. Mr. Buragino, I'm looking at what's been
17  previously Bates stamped as P-0274 and P-0275.
18     A. I just got this, so -- okay. I see what you're
19  looking at P-274. It's an e-mail.
20     Q. Yes.
21     A. Okay.
22     Q. I want to give you an opportunity to review the
23  document before I ask you about it. So you can go
24  ahead and do that. Let me know when you are finished.

Page 15

1     A. Well, I did look at it briefly before you
2  called.
3     Q. Okay.
4     A. So, you know, I see it, and...
5     Q. Can I ask you about it now?
6     A. Sure.
7     Q. Tell me what you're looking at first.
8     A. It appears to be an e-mail from Carmella
9  Patrone to Terri Snyder.
10     Q. What's the date of the e-mail?
11     A. March 12th, 2003.
12     Q. And the subject?
13     A. It says, "miscellaneous," "misc."
14     Q. If I could have you read that first full
15  paragraph there beginning with the word "anyway" out
16  loud for me.
17     A. "Anyway, I didn't read your e-mail carefully
18  the first time. I thought you said 'they,'" in
19  quotes, "said I came up to them and complained about
20  your job performance. I didn't read carefully that it
21  was Greg who went around asking everyone about you.
22  That part is true. He did ask me that about a week
23  ago. But I know I didn't say anything that indicated
24  you weren't doing your job. Greg wanted to know if

Page 16

1  you were doing everything you were supposed to do, and
2  I told him that you're doing everything that you can
3  do under the circumstances, and the example I gave him
4  was that it was difficult for you to complete the
5  alloy/flux usage verification before 7:30 a.m. because
6  of other responsibilities you have like isos and other
7  morning reports. I also said that you don't get the
8  Melter's report till after 7:30 a.m. I told him that
9  I felt you were given too much responsibilities that
10  makes it hard for you to try to meet certain
11  deadlines. Also, you can't do your job if other
12  people don't provide you with the necessary
13  information you need for, i.e., physical inventory
14  numbers."
15     Q. Okay. Do you recall a conversation similar to
16  this with Carmella Patrone?
17     A. I don't recall that specifically. If I try and
18  remember that now, I think it goes to -- accounting is
19  a question about getting certain numbers, but I can't
20  recall specifically, no.
21     Q. Are you saying that accounting asked you for
22  numbers?
23     A. Accounting, consisting of the accounting group,
24  had certain numbers that the clerk needed to provide.

Page 17

1     Q. Is it true that this conversation may have
2  taken place?
3     A. I'm sure it did. I just don't remember.
4     Q. Could you tell me who Carmella Patrone is?
5     A. She worked for Allan Eiger, who was
6  controller -- he wasn't controller. I'm sorry. He
7  was the -- at the time he was the -- he was her boss.
8     Q. Okay. That's fine.
9     A. I can't remember his title. I'm sorry.
10     Q. Do you remember what her job title was or what
11  she did?
12     A. Not 100 percent, but she was involved in or
13  some of what she did for operations-related data was
14  physical inventory, part of the cost accounting
15  system. So she had to keep track of all that data.
16     Q. And was she responsible for training Terri
17  Snyder?
18     A. I don't recall that. I mean, that may -- I'm
19  sure that's true -- okay? -- in certain parts of the
20  accounting portion of what Terri was to provide.
21     Q. In the e-mail that I had you read that first
22  paragraph, it indicates that you, quote, went around
23  asking everyone, end quote, about Ms. Snyder. Did you
24  ask anyone else about Ms. Snyder?

5 (Pages 14 to 17)

Snyder                                    v.                              CitiSteel, USA, Inc.
Gregory Buragino                  C.A. # 04-970-JJF                        June 16, 2006

Page 18

1  A. I honestly don't remember. I don't think I
2  would have asked everyone about Ms. Snyder. I think I
3  asked people who either had work being done by her or
4  were expecting something from her as part of her job
5  performance.
6  Q. Did Carmella tell you that she felt that
7  Ms. Snyder was given too much responsibility that
8  makes it hard to meet certain deadlines?
9         MS. DiBIANCA: I'm going to object very
10 quickly just because it's already been asked and
11 answered that he doesn't recall the conversation, but
12 please do answer the question.
13 A. I'm sorry. What was the question?
14 Q. My question is, did Carmella tell you that she
15 felt Ms. Snyder was given too much responsibility that
16 it makes it hard to meet certain deadlines?
17 A. I honestly don't remember that.
18 Q. Do you know whether or not Ms. Snyder had
19 difficulty meeting certain deadlines?
20 A. I recall that she did have problems, and that
21 was one of the issues with her job performance.
22 Q. Did you ever inquire to anyone as to why she
23 would have problems meeting these deadlines?
24 A. I'm sure I did. That's probably why I was

Page 19

1  talking to Carmella and others, but I don't recall
2  them specifically now. I mean, you know, that I
3  don't -- I couldn't tell you who else I'd talked to or
4  whatever, and what the answers were.
5  Q. Carmella also stated in this e-mail that she
6  told you that Terri could not do her job if other
7  people don't provide her with the necessary
8  information she needs and then she indicates, i.e.,
9  physical inventory numbers. Do you see where it says
10 that?
11 A. Yes.
12 Q. Okay. My question is, do you have an
13 understanding of what she meant by this statement?
14 A. I can suppose, you know, based on her e-mail
15 here --
16 Q. Well, tell me --
17 A. -- she sent, but I don't recall the
18 conversation, so I don't --
19 Q. That's fine. If you can't recall the
20 conversation, I understand that. But I'm trying to
21 understand whether you have an understanding of what
22 she may have meant by that.
23 A. What she may have meant, sure. I mean, I can
24 guess, but I don't know as a fact.

Page 20

1  Q. That's fine. Tell me what you know.
2  A. I don't know anything. I could guess, is what
3  I told you.
4  Q. Well, tell me what you're thinking.
5  A. Well, I mean, either herself was not getting
6  information to her or -- meaning Carmella, or people
7  in the shop were not getting the information to her
8  which included melters from all shifts and, you know,
9  supervisors to your -- to clarify for you, supervisors
10 and probably general supervisors is my guess is what
11 Carmella meant. I don't know that. In our
12 conversation right at this moment, I can't recall who
13 she would have meant.
14 Q. Let me ask you this. Is it a fair statement
15 that Ms. Snyder would not be able to do her job if
16 others don't provide her with the necessary
17 information?
18 A. That's difficult to answer. I don't know that
19 that's a simple yes or no.
20 Q. Okay. Well, can you explain?
21 A. Sometimes people make an excuse that they don't
22 get information that they could get themselves, and I
23 think some of this involved that type of thing where,
24 you know, I can't do something because someone didn't

Page 21

1  get it to me. But the information may have been
2  available. I don't remember specifically, but I think
3  that that's not always a valid reason to not be able
4  to do your work. But, in general, sometimes that is
5  true -- okay -- that people don't get you something in
6  time. You have to change what other people do.
7  Q. And I know you're speaking generally. I'd like
8  to kind of narrow the question down to Terri Snyder
9  specifically. And I guess my question is, could Terri
10 get her job done if others didn't provide her with the
11 necessary information?
12 A. You want specifics, but you'd have to provide
13 me specifics when you say "her job." I mean, it
14 depends. She had several responsibilities, if I
15 recall.
16 Q. Well, the example that the e-mail gives is
17 physical inventory numbers.
18 A. All right. As an example, physical inventory?
19 Q. Mm-hmm.
20 A. Some of that was being done, if I remember, on
21 a daily basis. Now, where to get that information
22 from and what time needed to get into the system, I
23 don't remember all of the details. So I can't -- I
24 can't answer the question very well. It was just that

6 (Pages 18 to 21)

B-0373

Snyder                                v.                    CitiSteel, USA, Inc.
Gregory Buragino              C.A. # 04-970-JJF                    June 16, 2006

Page 22

1  that's an example of one where -- could she do her
2  job? I don't know. I mean, was she getting the
3  proper information? I can't answer that.
4    Q.  Were you concerned as the vice-president
5  whether she was able to do her job?
6    A.  Well, if people brought to my attention that
7  she wasn't doing her job, then it was my concern.
8    Q.  So you said that it was probably true that
9  Carmella did discuss this with you, correct?
10   A.  Yes. I don't deny that we did. I met with
11 Carmella many times. So it wasn't -- it wouldn't have
12 been the first time I met with her, no, or the only
13 instance to meet with Carmella.
14   Q.  Did you do anything to insure that Terri have
15 the necessary information she needed to do her job?
16   A.  It was my habit to try and make sure people had
17 what they needed to do their job. Can I recall
18 specifically what I did here? No, I can't. Okay?
19 It's too long ago.
20   Q.  What are the physical inventory reports, do you
21 recall that?
22   A.  The specific report, no. I do -- the physical
23 inventory is somebody has to count something or weigh
24 something.

Page 23

1    Q.  Is that something that Terri does? Does she
2  weigh the things and count the things?
3    A.  My recollection is, no, she didn't do that.
4  Certainly not for everything. I think that she did
5  have some things she was supposed to count, but I
6  don't -- it wouldn't be everything, no.
7    Q.  So some things she would count, other things
8  someone else would count?
9    A.  If I remember -- well, that -- yes.
10   Q.  Who would those other people be?
11   A.  Shop supervisors.
12   Q.  Anyone else?
13   A.  Boy, I'm trying to think, and I can't -- mostly
14 it's supervisors who are responsible for that. When I
15 see the supervisors -- I mean, we had many
16 supervisors. We had factory supervisors. We had
17 melters. We had caster supervisors.
18   Q.  Okay.
19   A.  Generally they would be responsible for
20 physical inventories as well as the general
21 supervisors --
22   Q.  Okay.
23   A.  -- do some of that.
24   Q.  And would these general supervisors provide

Page 24

1  physical inventory numbers to Terri Snyder.
2    A.  My recollection is that data got input into the
3  system, the computer system, and she was the melt shop
4  administration clerk, so she would generally do it.
5        Now, accounting did it as well, and there
6  was times when accounting was doing it and operations
7  was not doing it, if I remember right. Some of that
8  may have been at the heart of whether she was doing it
9  or wasn't doing it or getting it done timely. And
10 there was a time period, and I don't recall if it was
11 this time period, meaning March of 2003 -- that's just
12 way too specific for me to remember. But there were
13 issues about physical inventory relative to accounting
14 getting their numbers on time.
15   Q.  And did you meet with anyone concerning Terri's
16 performance?
17   A.  Both Randolph and Dennis brought to my
18 attention performance issues. And I think I may have
19 asked others who had occasion to utilize her services,
20 but I don't specifically -- I know I met with Randolph
21 and Dennis and probably others, but I don't -- I don't
22 remember that specifically just like I don't remember
23 this with Carmella.
24   Q.  Do you know approximately how many times you

Page 25

1  met with Randolph Harris and/or Dennis Ford concerning
2  Terri's job performance.
3    A.  No. I couldn't say how many times. We met
4  every day, Randolph, Dennis, and I. So I can't say
5  how many times those meetings -- the issue of her
6  performance came up.
7    Q.  Did you specifically have meetings regarding
8  Terri Snyder?
9    A.  I'm sorry. Could you say that again?
10   Q.  Yeah, I know that you met with Randolph Harris
11 and Dennis Ford every day. My question to you is, did
12 you ever meet with them specifically to discuss Terri
13 Snyder?
14   A.  Well, you know, I don't recall that. I believe
15 we did after other complaints of theirs, but whether
16 it was a specific meeting that we said let's have a
17 meeting about this, I don't remember that. I'll --
18 I'm going to say that, more than likely, we discussed
19 it over several occasions and finally just agreed that
20 some action needed to be taken. But, you know, does
21 that constitute a meeting about her and her alone? I
22 can't say. I don't remember that.
23   Q.  When you indicated that you met to discuss her
24 job performance, would these meetings be with both

7 (Pages 22 to 25)

Snyder                                      v.                    CitiSteel, USA, Inc.
Gregory Buragino                      C.A. # 04-970-JJF                June 16, 2006

Page 26

1   Randolph Harris and Dennis Ford at the same time?
2   **A.  Every morning we had a morning meeting with**
3   **multiple general supervisors and plant manager, and**
4   **afterwards I would meet with job supervisors, general**
5   **supervisors, which is Randolph and Dennis together.**
6   **Occasionally I would meet with them individually if**
7   **there was a need for that.  But every morning we met**
8   **together.**
9          MS. BREWINGTON:  Now, I'd like you to turn
10  to another exhibit.  It's labelled D-371, and D-371.
11  Two pages -- no.  It's actually just one, if I can
12  have this marked as Buragino 2.
13         (Buragino Deposition Exhibit 2 was marked
14  for identification.)
15  BY MS. BREWINGTON:
16     Q.  Mr. Buragino, could you tell me what this
17  document is that I put in front of you?
18     **A.  This is an unacceptable attendance and work**
19  **performance write-up from me to Terri Snyder dated**
20  **March 3rd, 2003.**
21     Q.  Would this also be characterized as a written
22  warning?
23     **A.  Yes.  I'm sorry, write-up, written warning,**
24  **correct.**

Page 27

1      Q.  And it's cc-ed to Randolph Harris, Dennis Ford,
2   and her personnel file?
3      **A.  That's correct.**
4      Q.  And did you have a meeting with Ms. Snyder on
5   February 28, 2003, to discuss her attendance and work
6   performance?
7      **A.  The date I don't remember.  But since it says**
8   **that here, I know we had meeting, and I do remember**
9   **parts of that meeting, yes.  So we did have a meeting**
10  **with her, and then this is the write-up that she**
11  **received.**
12     Q.  And my question is, why didn't she receive the
13  write-up on February 28, 2003?
14     **A.  I don't recall.  It was just we had the**
15  **meeting, and you all get a written warning as a result**
16  **of this meeting to -- I can't tie -- I can't recall**
17  **that.**
18     Q.  So the discussion on February 28th, 2003, was
19  not a verbal warning?
20     **A.  This is a written warning.  So in essence, the**
21  **discussion was this, and this was the written warning**
22  **of that.**
23     Q.  Okay.
24     **A.  I don't think -- you know, I don't think that**

Page 28

1   **sounded clear.  But in other words, the warning given**
2   **was written.  We just had to -- the verbal portion of**
3   **that before this was given to her.**
4      Q.  Okay.
5      **A.  So that's considered a written warning.**
6   **Someone is given a write-up versus someone who's just**
7   **talked to in which case nothing in writing is put**
8   **down.**
9      Q.  Well, on February 28, she was just talked to,
10  is that correct?
11     **A.  In reading your -- yes.  In other words,**
12  **February 28, if I read this -- and I'm presuming we**
13  **wrote correctly that we had a meeting with her.  This**
14  **documents that and the warning.**
15     Q.  And was she told on February 28, 2003, that she
16  was going to be written up?
17     **A.  I believe so.  I don't recall.  I'm fairly**
18  **certain of that, but I don't recall specifically in**
19  **the conversation.**
20     Q.  You don't recall who said it, but you believe
21  it was said?
22     **A.  That's -- I mean, in other words, all I'm**
23  **saying is I can't recall, but saying to her**
24  **specifically, this meeting is about a written**

Page 29

1   **warning -- okay?  But in general, when they were going**
2   **to receive a written warning, people were told they**
3   **were going to get a written warning.  So I can't**
4   **recall that being said specifically.**
5      Q.  Generally, are they given the written warning
6   on the date that they meet to discuss it?
7      **A.  We didn't give out too many written warnings**
8   **that I recall.  So I can't say that that was -- that**
9   **is unusual.  I can't recall where someone was given a**
10  **written warning at the same time that they had a**
11  **meeting with them.  So I can't -- I can't answer that**
12  **to say that this is any different than anything else.**
13     Q.  And this document is dated March 3, 2003.  Do
14  you see that at the top?
15     **A.  Yes.**
16     Q.  Do you know whether this document was given to
17  Terri Snyder on March 3rd, 2003, that you gave her a
18  copy?
19     **A.  I can't say I know that.  I can't recall that**
20  **specifically, no.  I mean, I don't recall either date**
21  **specifically.  You know, I can look at the sheet and**
22  **read it, but, you know, I can't recall that she was**
23  **given it on the 3rd of March, no.**
24     Q.  Were you present when the actual written

8 (Pages 26 to 29)

Snyder
Gregory Buragino

v.

C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

Page 30

1  warning was given?
2  A. You mean physically, this piece of paper?
3  Q. Yes.
4  A. To be honest with you, I don't remember that.
5  I just remember an issue of her not wanting to sign
6  it. Whether I was there at the time, it sounds crazy,
7  but I don't -- I don't remember. It's just --
8  Q. So you may have been told that?
9  A. I'm sorry?
10  Q. I'm sorry. Maybe I moved away from the phone.
11  You may have been told that she didn't
12  want to sign it?
13  A. No. It wasn't signed by her. That's all I do
14  remember, something like that, and I'm trying to
15  remember whether she refused to sign it in front of
16  me. I honestly don't remember, you know, that
17  instance. So it's -- you know, I'm just telling you
18  what I remember and don't remember.
19  Q. Did you draft this document?
20  A. These documents were always drafted with Jerry
21  Downie who is our HR director because the language in
22  these documents is always very specific.
23  Q. So Jerry Downie was also involved in this
24  write-up?

Page 31

1  A. Yes.
2  Q. Okay.
3  A. He was involved in all write-ups because, as HR
4  director, they were issued by HR.
5  Q. Did he draft this?
6  A. The format of a write-up is essentially the way
7  he wants a write-up to be written. So if you want to
8  call that a draft, did he draft it? I mean, this is
9  his method of writing. This was the procedure for
10  having a write-up.
11  Q. I want to take baby steps here. Did he or a
12  person from human resources type this memo?
13  A. I don't recall specifically who typed it.
14  Q. Did you?
15  A. I don't remember whether I typed it or not. I
16  mean, I -- I don't think I did. I think -- usually we
17  did not type these. HR typed these.
18  Q. And who would -- I'm sorry.
19  A. The issue or mention the issue and the wording
20  for that was very specific and how it to be worded in
21  a write-up. That was pretty much standard HR policy.
22  Q. Who provided the information in the write-up to
23  human resources?
24  A. That information would have to come from us,

Page 32

1  meaning operations in the melt shop. Now, when you
2  say who, it would have to come from Randolph and
3  Dennis and I at that time.
4  How did it come specifically from which
5  one of us, in other words, each piece of this here, I
6  don't recall.
7  Q. Did you have any personal knowledge that Terri
8  missed this 13 days in 2002 and that she missed two
9  days in 2004?
10  A. When you say, did I have personal knowledge, I
11  don't know what you mean by that.
12  Q. I guess I mean, did you --
13  A. There are records of people's attendance. So
14  if somebody brought forward that record, that would be
15  personal knowledge, but I didn't personally know which
16  days she was off.
17  Q. So you may have looked at a record that may
18  have indicated that.
19  A. Yes. We kept attendance records on people.
20  But personally I wouldn't know, you know, I wouldn't
21  know which days are -- different employees are in work
22  or out of work without an attendance record.
23  Q. So you need attendance records to actually know
24  what days she missed, what days she came in, correct?

Page 33

1  A. Correct.
2  Q. How about the next paragraph where it indicates
3  "you have been shown how to perform tasks repeatedly
4  and you have required additional instruction."
5  Did you have any personal knowledge that
6  Terri required additional instruction?
7  A. At the time I'm sure I had involvement with it,
8  I mean, just as the record of me talking to Carmella.
9  But do I personally recall that at the moment or did I
10  have personal -- did I personally see that she was
11  trained? I can't say that now. I don't remember all
12  that. But it was -- part of my job was to try and
13  make sure that people were given the proper training,
14  so if...
15  Q. Did you have to show her how to perform tasks
16  repeatedly?
17  A. Me personally?
18  Q. Yeah.
19  A. I don't think I would have done that, no.
20  Q. Do you know of anyone who had to show her how
21  to perform tasks repeatedly?
22  A. Those who would have trained her in her job.
23  Q. But did you notice that? Were you present at
24  that time? Do you recall anything like that?

9 (Pages 30 to 33)

Page 34

1    A.  I mean, do I know right now that I can recall
2    whether she was shown and when she was shown? No. I
3    can't recall that?
4        Q.  What can you recall about the fact that this
5    memo from you indicates that "you have been shown how
6    to perform tasks repeatedly and you have required
7    additional instruction"?
8        A.  I can recall that we discussed these issues, as
9    I mentioned to you, in various -- you know, over a
10   period of time.  And these issues were brought to my
11   attention by primarily Dennis and Randolph who she was
12   reporting to.  So you rely on your people who work for
13   you to tell you what's going on.
14       Q.  That's all I wanted to know.
15           You've stated that someone put -- I'm
16   reading actually not the next one down but the next
17   one.  If indicates, "You have stated that someone put
18   a sticker on your car and wrote graffiti about you on
19   a wall.  Following investigations, we have concluded
20   that there is no evidence that these things happened
21   at CitiSteel."
22           Is that statement true?
23       A.  Is it true?
24       Q.  Mm-hmm.  Yes.

Page 35

1    A.  I don't think we would say it if it wasn't
2    true.  When you say that, she did claim that people
3    wrote graffiti, I do remember that, although, you
4    know, I don't recall ever seeing anything myself, and
5    I know people did look to see if they could find
6    something and didn't.  So that's true, but...
7        Q.  How many clerk/typists were in the melting shop
8    when Terri was employed?
9        A.  I think -- you're saying when she was employed?
10       Q.  Yeah.  Mm-hmm.
11       A.  I think she was -- at least generally only had
12   one.  So would have been just her.
13       Q.  And how many employees are in the melt shop?
14       A.  Oh, gees.
15       Q.  I'm talking about at the time of Terri's
16   employment.  And I don't need exact.  If you can just
17   recall approximately, you can give me a range if that
18   would be helpful.
19       A.  Well, okay.  You said that a number is probably
20   about 100.  That includes maintenance as well as
21   operations, and that's everybody, you know, working in
22   or around melt shop.  So the number would be about
23   100, you could say.
24       Q.  And the typist/clerk, which was Terri Snyder at

Page 36

1    the time, would support basically the whole staff in
2    the melt shop?
3        A.  Would do what?  What did you just say?
4        Q.  I'm sorry.  Would support the entire melt shop
5    department?
6        A.  Her job was to act as clerk or support,
7    administrative support for the melt shop.
8            MS. BREWINGTON:  I'd like you to turn to
9    the next set of documents.  It's D375, D376, D377.
10   I'd like to have that marked as Buragino 3.
11           (Buragino Deposition Exhibit 3 was marked
12   for identification.)
13   BY MS. BREWINGTON:
14       Q.  Do you have that document in front of you?
15       A.  Yes.
16       Q.  What is this document?
17       A.  It is events surrounding Terri Snyder's
18   harassment charges described by Greg Buragino, April
19   10, 2003, and I signed it.
20       Q.  When did you first learn of Terri Snyder's
21   allegations of sexual harassment?
22       A.  Well, if I read the first line of this, on
23   April 8th at approximately 12:00 a.m.
24       Q.  Okay.

Page 37

1    A.  I don't remember that specifically, but I wrote
2    this, so I'll trust myself.
3        Q.  I'm just wondering about something.  It does
4    indicate 12:00 a.m.  Would that be in the middle of
5    the night or should that say 12:00 p.m.?
6        A.  12:00 p.m. sounds more reasonable.  I don't
7    think you would call me in the middle of the night for
8    that.
9        Q.  I was just with wondering about that.
10       A.  Good catch.
11       Q.  So that's the time that you first learned of
12   Terri Snyder's allegation, probably around 12:00 p.m.
13   on April 8th, 2003, correct?
14       A.  I'll trust this as...
15       Q.  Okay.  Tell me what happened, when you received
16   a call from Dennis Ford?
17       A.  Well, again, I'm going on what I wrote, which I
18   can trust implicitly.
19       Q.  Well, let me ask you something before you go
20   on.  Based on what you wrote, do you remember anything
21   about what Dennis Ford said to you?
22       A.  Maybe not the specifics.  I just remember he
23   came to me and said that, you know, Terri was claiming
24   that Randolph had harassed her.  And our policy or

10 (Pages 34 to 37)

B-0377

Snyder                                      v.                          CitiSteel, USA, Inc.
Gregory Buragino                    C.A. # 04-970-JJF                        June 16, 2006

Page 38

1  procedure was that that was to be brought to HR
2  attention as soon as possible. And that's what we
3  did. I don't remember the specifics of the
4  conversation, no.
5      Q.  Do you want to tell me anything else based on
6  what you have in front of you, only with respect to
7  your conversation with Dennis Ford, though.
8      A.  I mean, I don't remember, you know, that
9  specific conversation other than that he brought it to
10  my attention.
11     Q.  I just wanted to give you the opportunity to
12  add something if you wanted to based on refreshed
13  recollection based on the writing here.
14     A.  Well, I mean, my memory is not that good. I
15  mean, that's why I wrote a lot.
16     Q.  Okay. I want to ask you about what happened
17  next. You contacted Dennis Ford. I mean, Dennis Ford
18  contacted you, and then what happened?
19     A.  Well, we went to Jerry Downie or contacted
20  Jerry Downie, I should say, and that was our policy
21  was that he needed to be informed as soon as possible.
22     Q.  Did you call him on the phone?
23     A.  I think I called him on the phone, that we need
24  to talk, whatever. I mean, that's -- you know, again

Page 39

1  I -- I don't remember specifically what I did. I
2  mean, I don't. I just remember we had to get a hold
3  of Jerry Downie. And he was there that day, so we
4  found him, and let's get together right away or as
5  soon as possible. I don't remember what happened
6  between noon and one-thirty as it says here. I
7  couldn't tell you.
8         But the idea was we needed to speak about
9  this as soon as possible.
10     Q.  And did you do that?
11     A.  Yes.
12     Q.  Tell me what happened in that meeting.
13     A.  Again, specifically, I don't remember other
14  than that, you know, we asked Dennis to tell us what
15  she told him. I mean, at that point, both Jerry and I
16  didn't know the details, if I remember, and other than
17  what Dennis told me briefly. So, again, we instructed
18  Dennis to tell us everything he was told.
19     Q.  And he did that, I assume?
20     A.  Yeah.
21        And then Jerry -- it says it here. I
22  mean, do I remember him doing it? I mean, because it
23  says here, I do remember that part of it, but he wants
24  everybody to document at that point, tell us, put it

Page 40

1  down in writing what you were told --
2      Q.  Okay.
3      A.  -- what happened, et cetera, that -- you know,
4  that was again part of the procedure was to document
5  from that point what was being said and by whom.
6      Q.  What happened after that?
7      A.  Jerry was called over, and you know, Jerry
8  wanted to meet with Terri, you know, right -- as soon
9  as possible.
10     Q.  Do you remember meeting with Terri?
11     A.  I remember her coming over to the HR building,
12  yes, and Jerry and I speaking with her and then Jerry
13  asking her to put it in writing after the -- you know,
14  after she talked to us, to put in writing in her own
15  words what -- what happened or what the issues were,
16  you know, in her own way. She was allowed to do that.
17     Q.  Do you remember anything else?
18     A.  No. I mean, again, not the specifics other
19  than that, that was kind of the sequence of events.
20     Q.  Did you say anything during that meeting.
21     A.  Did I specifically say anything to her?
22     Q.  Yes. Did you talk, did you participate in the
23  meeting at all?
24     A.  Well, sure. I guess we both asked questions.

Page 41

1  I think Jerry did most of the asking, and mostly I was
2  an observer, but I'm sure we had -- I recall being a
3  participant. Can I recall specifically what I said
4  then? No.
5      Q.  Did Terri say to you that she felt that you and
6  Downie could help her and that you could get
7  Mr. Harris to stop?
8      A.  I don't remember her saying that she thought we
9  could help her. That I don't recall.
10     Q.  Okay.
11     A.  The words, "I'd just like him to stop," or "I'd
12  like to get him to stop," I do remember something like
13  that, her saying something like that, you know, that
14  rings a bell with those words. But whether she
15  thought that we could help her, I don't remember that.
16  I'm not saying she didn't. I'm just saying I don't
17  remember that.
18     Q.  If I could direct your attention to -- I'm
19  looking at D375, and it's the fourth bullet from the
20  bottom of those bullets. Does it indicate there, "She
21  felt that we could help her and we could get Randolph
22  to stop."
23     A.  Again, that's what I wrote, so I'll have to
24  presume that it was exactly what she said or something

11 (Pages 38 to 41)

Snyder                                v.                    CitiSteel, USA, Inc.
Gregory Buragino              C.A. # 04-970-JJF                    June 16, 2006

Page 42

1  like that. Do I remember that specifically today?
2  No. I mean, but, again, I wrote this, so I don't deny
3  that that's what she said.
4      Q.  Did she tell you that she didn't want Randolph
5  Harris fired?
6      A.  I think that came out. Again, I think that it
7  was, you know, something like that. I didn't want to
8  hurt him or whatever. I don't -- again, I don't
9  remember the exact words, but I think there was
10  something like that said as well.
11     Q.  Did she tell that you as long as he stopped,
12  she would be satisfied?
13     A.  Again, I don't remember exact words. Again,
14  you know, she wanted him to stop, but you know,
15  whether she'd be satisfied, I don't remember, you
16  know, specific words like that. I can't say. I wrote
17  something here that sounds like that. I mean, if I
18  look through this in detail, again, I'll try and
19  recollect based on that. But, you know, sitting here,
20  right at this moment, I can't recall exactly things
21  that she said.
22     Q.  I'll direct your attention to the third bullet
23  from the bottom. It indicates, quote, she said that
24  she didn't want Randolph to be fired or hurt, but she

Page 43

1  wanted to let -- she wanted him to admit what he was
2  doing. Wait. I'm sorry. I'm reading this wrong.
3  Wanted him to admit that he was doing this and that he
4  should stop. As long as he stops, she'd be satisfied
5  and she would not want to pursue this any further.
6          Is that an accurate statement?
7      A.  You read it accurately off the page.
8      Q.  Okay.
9      A.  Without reading it, but you know, I'm sure I
10  said what I thought at the time she meant. I mean, I
11  tried to recollect -- meaning even -- I say here, from
12  the conversation, these are the points I recall.
13     Q.  Okay,
14     A.  That's what I tried to do. I mean, this was
15  written a couple days later. So even two days later,
16  I may have not gotten it exact, but I tried to be as
17  thorough as I could, but three years later, I don't
18  remember exactly, no.
19     Q.  Did you or Downie ask her if she would feel
20  uncomfortable working around or near Randolph Harris?
21     A.  Again, I don't recall that specifically, but I
22  know that, as part of the policy, you know, Jerry --
23  Jerry's job was to do that, to determine a level of
24  comfort or discomfort.

Page 44

1      Q.  And why would he --
2      A.  I believe that he did say that. Do I recall
3  him specifically saying that right at this moment?
4  No, I don't. But I do believe that was something that
5  came up, yes.
6      Q.  And why would you ask about a level of comfort?
7          MS. DiBIANCA:  I'm going to object. That
8  mischaracterizes the witness' prior testimony.
9          You can go ahead and answer.
10     A.  Well, when you say comfort, you say working
11  around Randolph, or being -- whatever, I mean, I think
12  the -- you know, the point was to, you know, see if
13  she wanted to go back to the shop, I think, or not.
14  You know, would she feel comfortable or was there any
15  reason not to? I mean, that's -- I think those were
16  things that were brought up, but I don't recall the
17  exact words, whether comfort or not was used. I mean,
18  that is -- I hope I'm not saying a bad -- you know, a
19  wrong word because I don't recall exact words, but
20  those things are things that Jerry was trying to
21  ascertain during the interview.
22     Q.  Did you think it was important to ascertain
23  whether she would feel uncomfortable working in the
24  same environment as Randolph Harris?

Page 45

1      A.  You know, I'm not an HR person, but I know that
2  there are things that are required in such an
3  investigation to try to determine. So, you know, I --
4  that was my understanding is that, you know, that is
5  important and it certainly seems like a reasonable
6  thing to find out, that, you know, a person feels
7  harassed, you're trying to ascertain just how
8  uncomfortable they are?
9      Q.  Why would that be reasonable?
10     A.  I'm sorry?
11     Q.  Why would that be reasonable to ascertain?
12     A.  I don't know. Logically, if one is claiming
13  harassment, you want to find out what they are being
14  harassed for, whether they are comfortable or
15  uncomfortable, isn't that what harassment is? Maybe
16  I'm not following your question?
17     Q.  I guess my question is you indicated it would
18  be rational or logical to ask whether Terri would feel
19  uncomfortable still working around or near Randolph.
20  Is that what you indicated?
21         MS. DiBIANCA:  I don't know that it was,
22  and I'm going to object. That mischaracterizes his
23  testimony.
24     Q.  You can answer that question.

12 (Pages 42 to 45)

Snyder
Gregory Buragino

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

Page 46

1      MS. DiBIANCA: Go ahead. Sorry.
2    A. I'm sorry. Can you repeat the question?
3      MS. BREWINGTON: Court Reporter, can you
4  repeat that last question I asked?
5      (Record read.)
6    A. Yeah. Sure. I mean, that would be a rational
7  thing to ask somebody who said that they -- they are
8  harassed, but they still want to work with the person,
9  wouldn't it? I mean, I guess in my own head. I don't
10  know. I'm just saying my own head. Whether he was
11  specifically asked, A, I don't know. I wrote
12  something here that said -- that says that. So I
13  don't know what it is you're expecting me to say if I
14  don't recall specifically what was said other than
15  what I wrote here.
16    Q. Would this question be important to ask -- and
17  the question I'm talking about is whether Terri would
18  be uncomfortable working with Randolph Harris. Would
19  this question be important to ask in determining how
20  to resolve this situation?
21    A. Yes, I believe it would.
22    Q. Why is that?
23    A. Well, if you're asking my opinion, again, on
24  what constitutes harassment, it's a person's uncomfort

Page 47

1  level with some situation. So if a person says, I
2  just want them to stop it and it will be okay, I think
3  it behooves the company to say, well, going forward
4  how -- you know, what is the best way to resolve it?
5  How uncomfortable or comfortable would it be? And if
6  uncomfortable, change that somehow.
7    Q. And if comfortable?
8    A. Just by -- you know, that's just my thought on
9  that. If you ask me about resolution, I mean, I think
10  the company has some responsibility, any company has a
11  responsibility to try and resolve it if, indeed, it's
12  a problem.
13    Q. Do you recall Terri indicating to you that she
14  did not or would not feel uncomfortable working around
15  or near Randolph?
16    A. Again, I don't recall her saying that exactly.
17  You know, I recall her just saying about the part
18  where she didn't want him to be hurt or something like
19  that. But I don't -- you know -- you know, she just
20  wanted him to stop, but I don't recall her saying,
21  "I'd be fine working around him." I don't remember
22  that exactly, no.
23    Q. Let me take you to the second bullet from the
24  bottom. It indicates, quote, "She liked her job and

Page 48

1  her dusty little office. And when asked if she would
2  be uncomfortable still working around/near Randolph,
3  she said she would not."
4      Do you see where it says that?
5    A. Yeah.
6    Q. Does that help refresh your recollection in any
7  way?
8    A. Well, again, I don't remember her saying,
9  "Dusty little office" but if I put it in quotes,
10  that's probably the way she phrased it. But do I
11  remember that specifically? No. I mean, if I said
12  here she said she would not, she probably said she
13  would not. But, again, you know, I believe I wrote
14  what I recollected at that time two days after the
15  event, you know.
16    Q. Did she tell you that she did not want another
17  job at that time?
18    A. I think that she argued about moving to another
19  position elsewhere in the facility. I think that she
20  didn't want to do that.
21    Q. Did she say why she didn't want to do that?
22    A. I don't remember why. I just remember she
23  didn't want to, but I don't remember why she didn't
24  want to, no.

Page 49

1    Q. Did you or Downie bring up moving her to
2  another location at that time?
3    A. I think Jerry did as, again, as a possible
4  solution. And I think that what was ultimately what -- you
5  know, what he was proposing was, you know, there were
6  other -- you know, move to another position. But,
7  again, I don't -- I don't remember how that came up or
8  exactly what he said at the time, but that was a
9  possible resolution.
10    Q. And was that discussed with Terri on April 8th,
11  do you know?
12    A. Again, you know, I can't recall that today.
13  But, again, in this writing you have here by me I
14  said -- you know, it says these are points I recall
15  from this meeting, so I'll have to believe that it
16  was.
17    Q. On April 8th, 2003, that's when you talked to
18  Terri, correct?
19    A. Yes.
20    Q. Okay.
21    A. It is, yes.
22    Q. Do you know or can you recall whether the idea
23  of relocating her to shipping came about on April 8th?
24    A. Yeah. I don't remember that specifically. You

13 (Pages 46 to 49)

Snyder                                    v.                           CitiSteel, USA, Inc.
Gregory Buragino                   C.A. # 04-970-JJF                      June 16, 2006

Page 50

1  know, I know -- you know, I know that topic came up.
2  You know, in what order it came up in, I'm not sure.
3  I can't recall that today. I remember, you know,
4  vaguely the movement to shipping. Whether that was on
5  Jerry's mind that day or came up specifically, that I
6  don't remember.
7     Q. I think you mentioned earlier -- and correct me
8  if I'm wrong -- you allowed Terri to write down or to
9  provide a statement about the sexual harassment?
10    A. Yes. I think Jerry directed her to write down
11 everything, basically everything she wanted to write.
12    Q. And if I could turn your attention for a brief
13 moment to another one of the exhibits you have in
14 front of you, D373, and D374. It's dated Tuesday,
15 April 8th.
16    A. Okay. I have D374, which looks like it page
17 2 of 2. I see D373 now. Okay. I didn't see
18 D373, but I have page 1 of 2 here. It's cut off, but
19 go ahead. I'm --
20        MS. DIBIANCA: It's cut off on our copy
21 too.
22        MS. BREWINGTON: Yeah. Me too.
23    Q. I'm not really going to ask you about it. I
24 just want to know if this is the statement that Terri

Page 51

1  wrote that day?
2     A. It I believe it is. It looks like it. I mean,
3  I'll -- again, do I remember specifically watching
4  over her as she wrote it? No. But it's -- looks like
5  her -- you know, this is what she did.
6        MS. BREWINGTON: Okay. I'm just going to
7  have that marked as 4 if I could.
8        (Buragino Deposition Exhibit 4 was marked
9  for identification.)
10 BY MS. BREWINGTON:
11    Q. Did you meet with Randolph Harris that very
12 same day?
13    A. Yes, I believe we did.
14    Q. Was he at work that day?
15    A. I'm sorry?
16    Q. Was he at work that day?
17    A. Again, some of this was refreshed for me by
18 that, but I did recall then that he was not, you know,
19 but did he come in after -- he had jury duty or
20 something. He was out work, but he was able to come
21 to the HR office later that day.
22    Q. And what were your thoughts about the sexual
23 harassment after you spoke with Terri?
24        Do I need to be a little bit more specific

Page 52

1  or --
2     A. Well, I don't know what you mean by what are my
3  thoughts?
4     Q. I thought I was being kind of general. I guess
5  my question is, did you have any inclination as to
6  whether she was sincere or telling the truth?
7     A. Well, I believe she -- we gave her the benefit
8  of the doubt, you know, as in any case like this.
9  She -- you know, if not sure during the initial
10 fact-finding, whatever, you know, what's true or
11 what's not true. You have to find out more
12 information. I mean, I think we attempted to, you
13 know, as best as we could, take her at face value,
14 whatever she wrote or said, okay, let's vet it
15 further. I mean, I can't say specifically my thoughts
16 were other than that. You know, we were -- attempted
17 to get to the bottom of it.
18    Q. And you met with Randolph that same day, April
19 8, 2003, correct?
20    A. Yes.
21    Q. And who was present during that meeting?
22    A. I think it was just Jerry, myself, and
23 Randolph, if I'm not mistaken.
24    Q. And tell me what you recall about that meeting?

Page 53

1     A. I just remember us grilling Randolph. You
2  know, I say grilling. Maybe that's not a good word.
3  But I mean, asking him about this situation and trying
4  to find out whether it was anything about this that
5  was true from, you know, his point of view or whether,
6  I guess you would say, he would admit to, yes, I
7  agree, or you know.
8     Q. Do you remember anything about Randolph's
9  response?
10    A. Well, I remember he was, I guess, hard to
11 describe. I think Randolph seemed very, like anyone
12 would, a bit shocked, I guess, or a little
13 disappointed or -- you know, I don't know what word to
14 use. But I just think he was surprised by it, you
15 know, genuinely concerned about it.
16    Q. Did you or Downie tell Randolph that he, quote,
17 needed to come clean now, end quote?
18    A. I don't recall using that expression or whether
19 Jerry used that expression. But I think the -- I said
20 that in my words over here. Maybe that's what we
21 said. But I think the idea was, you know, be honest
22 with us, tell us, tell us, you know, what's happening.
23 I mean, I think we were trying to be very straight
24 with him and wanted him to be very straight with us.

14 (Pages 50 to 53)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Snyder                                    v.                        CitiSteel, USA, Inc.
Gregory Buragino                  C.A. # 04-970-JJF                     June 16, 2006

Page 54

1    Q.  Did Randolph tell you that he raised his voice
2  on one occasion and that Terri Snyder was visibly
3  upset?
4         MS. DiBIANCA:  Did what, Lori?  I'm sorry.
5  I didn't quite hear you.
6    Q.  Did Randolph tell you that he raised his voice
7  on one occasion and that Terri Snyder was visibly
8  upset?
9         MS. DiBIANCA:  What was the question?
10  Something about his boys?
11        MS. BREWINGTON:  I'm sorry.  I'll repeat
12  it.
13        MS. DiBIANCA:  I'm sorry, Lori.  It's
14  probably my end.  I heard you say something about
15  raped boys?
16        MS. BREWINGTON:  No.  Raised his voice.
17        MS. DiBIANCA:  Pardon me for the
18  interruption.  I'm sorry.
19        MS. BREWINGTON:  That's okay.
20  BY MS. BREWINGTON:
21    Q.  Mr. Buragino, can you hear me?
22    A.  Yes.  I hear you.
23    Q.  Can I repeat the question for you?
24    A.  I heard you.

Page 55

1    Q.  Okay.
2    A.  If you want to repeat it, you can, but...
3    Q.  No.  I'm good.  I've said it a couple times.
4         MS. DiBIANCA:  Sorry, Lori.
5         MS. BREWINGTON:  That's okay.
6    A.  I don't remember.  I don't remember him saying
7  that.  Again, if I wrote that here somewhere -- I'm
8  not looking at the points exactly.  It may very well
9  have been that he said that.  But I don't recall him
10  saying that exactly.
11  BY MS. BREWINGTON:
12    Q.  Do you recall telling Randolph -- and when I
13  say you, I guess I mean Downie and yourself because
14  I'm not sure, based on your writing which one said
15  what, if it was said.
16        But in your writing, it indicates that you
17  emphasized that Terri said that she didn't want him
18  fired.  Do you remember telling Randolph that?
19    A.  No.  I mean, I don't.  Again, I'll just admit
20  that we probably -- you know, we did.  If I wrote it,
21  we would probably say -- said it, but I don't recall
22  it personally right now as having said it or, you
23  know, I can't say I recall Jerry saying that to him
24  specifically.

Page 56

1    Q.  Is it also fair to say that you probably said
2  that Terri would be satisfied if only he admitted what
3  he was doing and if it would stop?
4    A.  Again, I don't -- I don't remember that.  There
5  were -- you know, there's not much of any of these
6  conversations specifically that I remember.  There's
7  bits and pieces.  So, you know, those particular
8  comments, I don't -- you know, I don't recall, but I
9  will -- you know, again, if it was part of what I
10  wrote here, I will say that I -- I'll stand behind
11  what I wrote.  You know, I endeavored to say what I
12  recalled of those particular meetings as best I could.
13    Q.  I'd like to take you to the next morning.
14  That's April 9, 2003.
15    A.  Okay.
16    Q.  Did you have a meeting that morning?
17        Wait.  Before you answer that, let me ask
18  you a question.  What were your thoughts about Terri
19  Snyder's allegations after speaking with Randolph?  If
20  I could be a little more specific, I want to know if
21  they changed at all from earlier when you were going
22  to give her the benefit of the doubt?
23    A.  Specifically what were my thoughts?  You mean
24  after?

Page 57

1    Q.  Did you have any -- you may not have had any.
2  I don't know.  I'm just asking.
3    A.  You know, there's just no way I can recall what
4  I was thinking at the time other than you have to
5  understand, you know, I knew Randolph a lot longer
6  than I knew or, you know, worked with this woman.  I
7  mean, I didn't work with her all that close at all
8  even.  I worked with Randolph a lot of years.  So, you
9  know, that -- you know, I'm sure my thoughts were
10  tempered by knowing him so well.
11    Q.  Did you feel bad for Randolph?
12    A.  Well, again, if I can -- I can't necessarily
13  recall exactly what I felt at the time.  But would I
14  have felt bad for him?  I'm sure I would.  You know,
15  that -- sure.  I mean...
16    Q.  And I asked you a question and then I
17  interrupted you by asking another question.  But I
18  want to go to the next morning.  That's April 9, 2003.
19  And my question to you is, did you have a meeting that
20  morning?
21    A.  I think that's when we met with Warren Beiger.
22  I think Jerry wanted to meet with Warren right away,
23  who was the president.  So he was my boss and Jerry's
24  boss.

15 (Pages 54 to 57)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Snyder                                    v.                        CitiSteel, USA, Inc.
Gregory Buragino                    C.A. # 04-970-JJF                    June 16, 2006

Page 58

1    Q.  He was the president of CitiSteel?
2    A.  He was the president at the time, yes.
3    Q.  What was the purpose of this meeting?
4    A.  Again, I can only try and recollect that. You
5    know, it's like anything else, Jerry's a very
6    informative guy and wanted to follow all possible
7    policy procedures as quickly as possible. I mean, I
8    think he was very good at that, and I think that --
9    you know, we had to, you know, make the president
10   aware of this situation. So I think that was his
11   intention.
12   Q.  So essentially the purpose of this meeting was
13   to keep the president informed of what's going on?
14   A.  Again, I specifically -- I think that it was --
15   I can't recall specifically but I know that that was
16   certainly part of it. And whether the original intent
17   was to get his disposition or so I don't recall at the
18   time, you know, right at the moment, but you know,
19   part of the policy was to, you know, elevate that, you
20   know, to a highest level to get, you know, disposition
21   and resolve it, so...
22   Q.  So is it fair to say that you were seeking the
23   input of Warren Beiger to determine how to resolve the
24   situation?

Page 59

1    A.  Well, yeah. I mean, sure, I mean, you're --
2    you use the word "input." Absolutely. I mean,
3    whether, you know, we were just looking to him to
4    resolve it, I don't think that -- you know, I don't
5    think that would have been our intention, but I think
6    that input, yes, sure.
7    Q.  Do you know whether the investigation was
8    completed by that point, the next morning?
9    A.  I don't remember that because I know there was
10   more involved than that. I mean, I -- yeah, I don't
11   recall whether someone did something later after I
12   left, or whether it was Jim Ryan or, I mean, Jerry
13   might have done other things. I don't remember.
14   Specifically what happened after I left for the day or
15   left with Jerry, you know, after meeting with
16   Randolph. I don't remember.
17       You know, when you say, was the
18   investigation complete, I don't think so but, you
19   know, I'm not -- you know, without going back over
20   these notes, I don't know. To say I know exactly when
21   it was completed, it was very quickly. We were trying
22   to get things resolved as quickly as we can.
23   Q.  But this meeting was basically to determine
24   CitiSteel's response to the allegations?

Page 60

1        MS. DiBIANCA: I'm going to object to the
2    extent it mischaracterizes his prior answer. Go ahead
3    and answer.
4    A.  Again, I don't remember exactly what, you know,
5    the full extent of the meeting with Warren was. You
6    know, again, I can't recall exactly.
7    Q.  Okay.
8    A.  You know, whether -- everything is part of the
9    investigation, whether it was, you know, to get input,
10   to get -- to form -- all of the above.
11   Q.  Was Randolph Harris involved in this meeting?
12   A.  I don't think so. I don't remember. I don't
13   think that Randolph was, but -- you know what? Again,
14   I'm -- I don't recall that. I know -- I know Jerry
15   and I were there, and whether Randolph was there or
16   not, I'm not sure.
17   Q.  Well, if I could take you to -- I'm on D-377,
18   and I guess it's the fourth paragraph, and it's one
19   sentence. It says, "The next day, 4/9, at
20   approximately 9:15, Jerry, myself, and Warren Beiger
21   met with Randolph in Jerry's office."
22       Does that refresh your recollection?
23   A.  Well, it doesn't specifically. And that's why
24   I'm saying I don't remember entirely, you know,

Page 61

1    meeting. I just remember meeting with Warren, and I'm
2    not so sure, you know, I can remember looking at
3    everybody around the room and saying, yeah, I
4    remember, Randolph being there or whether Randolph was
5    invited in later. I don't remember that.
6    Q.  Okay. How about the next line: "We asked
7    Randolph if he had given more thought to the claims
8    and whether he could tell us anything new or different
9    than what he had told us the previous day"?
10       Is it fair to say Randolph was present
11   during the meeting?
12   A.  Well, again, I'll say that, if this is what
13   I've written here, then that's what -- that's what
14   happened. You know, I don't remember that, you know,
15   specifically. No, I don't.
16   Q.  Why would Randolph Harris be involved in a
17   meeting discussing possible options?
18       MS. DiBIANCA: I'm going to object to the
19   extent you've already asked and he answered that he
20   does not recollect that Randolph was involved.
21       MS. BREWINGTON: But he also indicated
22   that's what it says there, and he was, so I'm just
23   simply --
24       MS. DiBIANCA: Then I'll object to the

16 (Pages 58 to 61)

Snyder                                v.                    CitiSteel, USA, Inc.
Gregory Buragino              C.A. # 04-970-JJF                    June 16, 2006

Page 62

1  extent you're asking him to speculate.
2  BY MS. BREWINGTON:
3    Q.  You can go ahead and answer.
4    A.  I'm sorry.  Can you repeat the question?
5    Q.  I'm asking, why would Randolph Harris be
6  involved in the meeting to discuss possible solutions
7  to this issue?
8    A.  I don't know if that's what the meeting was
9  for.  So I'm -- you know, again, I don't recollect
10  specifically what that meeting with Warren or initial
11  meeting with Warren or follow-up meeting with
12  Warren -- like I said, I think part of it was to get
13  input.  Part of it may have been just to inform.  I
14  mean -- so I don't -- you know, I can't answer your
15  question.  If you say why was he there to create a
16  resolution, I don't know that that was the intent of
17  the meeting.  I don't recall that.
18    Q.  If I take you to the next sentence, it says,
19  "We discussed possible options."  It says, "One, ask
20  Terri for more information/facts such as the tape
21  recording, and, two, remove Terri from the work
22  environment so that she would not be feel threatened."
23        Why was Randolph in a meeting to discuss
24  those options?

Page 63

1        MS. DiBIANCA:  I'm going to object on the
2  same two grounds again.  You can go ahead and answer,
3  if there is an answer.
4    A.  I mean, I don't know.  I mean, I don't recall
5  meeting, was Randolph even still in the meeting at
6  that point?  I don't know.  I don't remember that.  So
7  I mean, I can't answer you why he would be in a
8  meeting with that if I don't remember he was there at
9  that specific moment.
10    Q.  Do you indicate anywhere in here that Randolph
11  left the room?
12        MS. DiBIANCA:  Lori, I think you're
13  mischaracterizing his testimony here, and I'll object
14  on that grounds.
15    A.  I don't know.  I mean, I'm not -- again, I can
16  only read this as well as you can right now.  If I
17  didn't indicate it, I either didn't indicate it
18  because I forgot -- I mean, it's -- you know, this is
19  what I wrote.  So that doesn't mean I can recollect
20  everything on here.  So did he leave the room?  I
21  don't know.  I apparently didn't say it specifically,
22  if that's what you're asking.  So does that mean he
23  didn't leave the room?  I don't remember whether he
24  was in the room.  But I guess he was if I said he was

Page 64

1  there at some point.  So what can I tell you?  I don't
2  know whether he was still in the room or not.
3    Q.  When did the option to transfer Terri to
4  shipping come about?
5    A.  Well, specifically to shipping?  I don't -- I
6  think that came up -- again, I mean, according to
7  this, the next day.  I know it came up at some point.
8    Q.  So the 9th?
9    A.  I'm sorry?
10    Q.  I'm sorry.  I didn't know whether you were
11  finished.  I think I jumped in.  But I said, "So the
12  9th?" because you said the next day and I just wanted
13  to get clarification.
14    A.  Well, I'm saying that, according to this, you
15  know, what I've written here, apparently it came up
16  then, you know, specifically shipping.
17    Q.  On the 9th?
18    A.  Yeah.  Okay.  The next day, 4/9.
19    Q.  Okay?
20    A.  And I'll -- okay.  Yeah.
21    Q.  Did you want to add something else?
22    A.  No.  I was just -- no.
23    Q.  What was said about transferring Terri to
24  shipping?

Page 65

1    A.  I mean, I don't remember what specifically was
2  said other than that I guess it was an idea or a --
3  you know, here was a potential solution or resolution,
4  if you will.  But, you know, this would...
5    Q.  Whose idea was it?
6    A.  Again, I don't remember.  I think it says -- I
7  say here in writing, "Warren indicated he was already
8  planning to eliminate the position."  I guess he
9  was -- already indicated that then -- whether Jerry
10  said, "Well, I've got an idea," I don't know.
11    Q.  Was it your idea?
12    A.  I don't -- you know, I don't remember.  I don't
13  think -- maybe it was a collective idea.  But I don't
14  recall specifically how it came up that shipping was a
15  good possible resolution.  I don't know.  I don't
16  remember who brought it up initially.
17    Q.  Do you have an understanding of why she would
18  be transferred to shipping as a solution?
19    A.  Other than, again, what was written here, which
20  somewhat jogged my memory, but I don't remember.  The
21  specifics of it was that Warren wanted to eliminate
22  those positions anyhow.  You know, that was -- and
23  that ultimately did come about at some point.  So all
24  I can say is, you know, there's as good a reason as

17 (Pages 62 to 65)

Snyder                                    v.                          CitiSteel, USA, Inc.
Gregory Buragino                    C.A. # 04-970-JJF                      June 16, 2006

Page 66

1  any. But I -- you know with respect to the charge,
2  then, I don't know what to tell you, you know.
3       You know, what's your question again? Why
4  is that a good solution or --
5    Q.  Yeah.  Why would you transfer Terri to the
6  shipping department?
7    A.  Again, you know, the paper said that he was
8  going to eliminate those positions anyhow.  And the
9  idea is to still have a job, I guess.
10   Q.  Do you recall how many employees are in the
11 shipping department at the time of Terri's employment.
12   A.  Again, hard to recall exactly.  I'm going to
13 say 40 maybe.
14   Q.  And was there a --
15   A.  A little less than that.
16   Q.  I'm sorry.  40 or less than that?
17   A.  Yeah.  I don't recall specifically, but I mean,
18 again, it would be in that order -- you know, in that
19 order of magnitude.
20   Q.  Was there a clerk/typist already in the
21 shipping department?
22   A.  You know I'm trying to think of the role of the
23 clerk or who we called the clerk there.  Having a hard
24 time recollecting that.  Understand, I didn't have

Page 67

1  shipping throughout my period as vice-president of
2  operations.  I was only given shipping so many months
3  earlier.  So I don't recall that department even as
4  well as I don't recall the other places where I spent
5  a lot more of my time.
6       So, I mean, again, it says here, they
7  would gain a second clerk, but job responsibilities
8  there clerk-wise were quite a bit different.
9    Q.  The job responsibilities where?
10   A.  In shipping.  In other words, they -- I don't
11 remember the specific duties of the clerk.  They were
12 just different than those in the melt shop.  So I
13 don't recall right at the moment what -- you know,
14 what exactly a clerk did there.
15   Q.  But she would be the second clerk in the
16 shipping department?
17   A.  That's what it says here.  I mean, you know,
18 again, do I remember that specifically?  No.
19   Q.  And when did you first learn that Warren was
20 planning to eliminate Terri Snyder's position?
21   A.  I'm guessing it was this meeting, but I can't
22 say that with any degree of confidence either.  You're
23 asking about a specific position of all operations,
24 and I don't know.  I mean, here I wrote, "Warren

Page 68

1  indicated he was already planning to eliminate the
2  clerical position."  So was that the first time I
3  heard about it?  Maybe it was.
4    Q.  If you know this, let me know.  If you don't,
5  just say I don't know.  Was the position in the
6  shipping department posted?  And the position meaning
7  the typist/clerical position that Terri was to do.
8    A.  I certainly don't remember that.  If it was,
9  you know, there might be some record of it, but I
10 don't -- I don't remember that.
11   Q.  Do you know whether she was taking over for
12 someone else?
13   A.  Again, that I don't recall either.
14   Q.  Okay.
15   A.  I mean, I don't remember all the positions in
16 the shipping department that were there.  I mean, I
17 couldn't tell you how many people exactly worked
18 there.  I couldn't tell you all the different
19 positions that were there.
20   Q.  Did you provide Terri with a reason for why she
21 was being transferred?
22   A.  I don't remember talking with her about that
23 or, you know, personally being involved with that to
24 be honest with you, so I don't know.

Page 69

1    Q.  Was anything given to Terri in writing
2  outlining the terms of the transfer?
3    A.  I don't remember.  I mean, if it was, again,
4  I'm assuming you'd have something in writing in one of
5  these -- you know, you'd have it, but you know, I
6  certainly don't remember somebody giving something to
7  her because I don't think I was involved at that
8  point.  That something was physically given in writing
9  to her, I didn't do it.  I don't think.
10   Q.  Was Terri allowed to return to her position in
11 the melt shop if she didn't want to transfer?
12   A.  Again, my recollection is that she was not
13 going to go back to the melt shop.  I don't -- you
14 know, again, I don't know whether she was allowed to.
15 I don't know.  I don't remember that specifically
16 about, you know, that day or afternoon or whatever.
17   Q.  Would you have allowed her to return to the
18 melt shop?
19   A.  Would I have allowed her to return to the melt
20 shop?
21   Q.  Mm-hmm.
22   A.  Me personally?
23   Q.  Yes.
24   A.  I really don't think that that's relevant.

18 (Pages 66 to 69)

Snyder
Gregory Buragino

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

Page 70

1    MS. DiBIANCA:  And I'll object to the
2    extent it requires speculation.
3    Q.  You can answer that question.  Go ahead.
4        MS. DiBIANCA:  You can answer.
5    A.  Well, I mean, the decision, again, involving a
6    harassment case would not be up to me.  How it gets
7    resolved, I wasn't -- you know, I wouldn't have that
8    position making authority.  It has to be ultimately
9    decided by the company.  You know, I was -- which I
10   was an officer, but I couldn't allow somebody to do
11   anything simply because I wanted something to happen.
12   That's not really relevant.
13   Q.  Did you personally want her back in the melt
14   shop?
15   A.  Again, you know, how did I feel at that time,
16   you know, I don't recall specifically.  You know, I
17   think I wanted the situation to be resolved to
18   everybody's satisfaction.  That's all.  I mean, I
19   think that's what everybody wants.  But sometimes you
20   don't get what you want, so...
21   Q.  What was the alternative if Terri chose not to
22   accept the transfer?
23   A.  Again, I mean, when and how it was positioned,
24   I don't recall that, but the alternative was,

Page 71

1    obviously, there's not going to be a job in the melt
2    shop since the position was going to be eliminated.
3    So I don't recall what other alternatives might have
4    been discussed with her, but...
5    Q.  When was the position eliminated in the plate
6    mill?
7    A.  You know, that I don't remember.  I know
8    that -- you know, again, we were going to create some
9    different type of -- again, eliminate positions to
10   consolidate positions, you know, in clerical type
11   roles.  Again, clerical roles weren't exactly at the
12   high end of my list of things to worry about.  So I
13   didn't.  I can't remember specifically dates or
14   people, you know, when that job changed specifically,
15   but...
16   Q.  You mentioned in your writing that Warren
17   indicated that he was planning to eliminate the
18   clerical position in both the melt shop and plate
19   mill, correct?
20   A.  Like I said, that's what I wrote.  So I'll say
21   that's what transpired that day or what my
22   understanding of what he said transpired.
23   Q.  Was the clerical position in the melt shop,
24   specifically Terri's position, was that eliminated

Page 72

1    when she left on April 10th?
2    A.  I don't believe we hired anybody for that job,
3    no.
4    Q.  And the plate mill, was that eliminated that
5    same day?
6    A.  Again, I don't remember specifically how the
7    plate mill position was handled.  You say eliminated,
8    they might have been informed that they were going to
9    do something different from that point forward.  But I
10   don't -- that day or the next day, I don't know.  I
11   don't remember that.
12   Q.  Who was the clerk/typist in the plate mill?
13   A.  I'm sorry.  I don't remember that either.
14   Q.  You don't know who it was?
15   A.  I honestly can't remember who that was.  I
16   mean, that's --
17   Q.  After Terri's employment ended, after her
18   employment ended, who completed her job duties?
19   A.  Again, you're -- you know, you're saying like
20   the next day or following day or whatever.  I mean, we
21   always had -- I mean, it was not like a person
22   couldn't be sick or take vacation or something.  We
23   always had people able to fill in.  And I mean, it was
24   supervisors.  Again, specifically who took them over,

Page 73

1    whether it was even when people go on vacation, the
2    plate mill clerk used to sub for the melt shop.
3    Again, when -- you know, that was throughout my
4    tenure.  So there was always people who could fill in
5    and do certain functions.  So who specifically filled
6    in immediately following, I don't remember.
7    Q.  Okay.  That's fine if you don't remember who
8    immediately stepped in.  But how about long term, do
9    you remember who did anything in terms of running the
10   reports, anything that she used to do?  Who would be
11   the person that did it?
12   A.  I don't remember that either.  I mean, I can't
13   remember the plate mill person's name.  So whether it
14   was them or whether -- again, there's a --
15   Q.  Well, I guess I'm asking, would they be
16   supervisors, general employees?  Do you have any
17   inclination about who did her job?
18       And I'm not talking about immediately
19   after the next day, but just in general.
20   A.  Well, boy, I'm really struggling to remember
21   that.  I think we just combined the position somehow,
22   and you know, but I really -- I don't remember it.  I
23   really don't.
24   Q.  What positions did you combine?

19 (Pages 70 to 73)

Snyder                                          v.                        CitiSteel, USA, Inc.
Gregory Buragino                     C.A. # 04-970-JJF                         June 16, 2006

Page 74

1   A.  Well, whatever duties that the clerks were
2   doing, you know, trying to combine those into other
3   functions, either other people take up those
4   functions, and have one person do both, or -- I don't
5   even remember. I mean that's what I'm saying. I
6   don't remember how they -- obviously a lot of those
7   duties still remain, but who exactly wound up doing
8   them, I don't remember.
9   Q.  I don't really need you to tell me who exactly.
10  I just wanted to know the role of the person. You
11  mentioned people --
12  A.  I understood that's what you meant. I don't
13  remember. I mean, whether -- you know, parts of those
14  might have went into some of the supervisor duties.
15  Q.  Okay.
16  A.  I seem to recall like time sheets -- again, I'm
17  trying to recollect. So I'll give you one piece of
18  what I may recollect is supervisors may have started
19  putting in their own time sheets. You know, that was
20  one of the duties, and I don't even remember whether
21  it was a duty at the time of Terri or the plate mill
22  because we did back -- you know, when did that take
23  over? I don't remember. Those are the type of things
24  we ultimately were doing.

Page 75

1   Q.  Was Terri told at any time that her position
2   was going to be eliminated?
3   A.  I don't think so, but I don't know. Prior to
4   that -- I don't recall even being told prior to that.
5   But maybe I was. I just don't remember.
6   Q.  But do you recall telling Terri that her job
7   was --
8   A.  I don't recall telling Terri, no.
9   Q.  And do you know whether anyone else told Terri
10  that her job was going to be eliminated?
11  A.  No. I don't know whether anyone else did.
12  Q.  Was Terri terminated from her position at
13  CitiSteel?
14  A.  I don't think that technically is true. I
15  think -- I think technically she just left. That's
16  what I recall in my poor memory.
17  Q.  Can I take you to the last sentence on D377?
18  "At approximately 8:45 a.m. on Thursday, Jerry called
19  to tell me that Terri continued to be upset and 'out
20  of control' and that he again asked her to leave."
21  A.  Okay.
22  Q.  Do you know whether Jerry asked her to leave
23  the premises that day?
24  A.  Again, I don't think I was there or physically

Page 76

1   witnessed that. I said that he asked her to leave.
2   Then that's what he told me. But my memory isn't
3   telling me that.
4       MS. BREWINGTON:  I don't have anything
5   further.
6       MS. DiBIANCA:  All right. Mr. Buragino, I
7   know you are on a crunch for time, so I'm not going to
8   hold you up, but I do have a few follow-up questions.
9                 EXAMINATION
10  BY MS. DiBIANCA:
11  Q.  Do you know what the job duties were for the
12  clerk/typist in the melt shop.
13  A.  You know, I know -- recall some of them. I
14  can't recall all of them, no.
15  Q.  Can you give me a general sort of layman's
16  description of the function of that position?
17  A.  Okay. Time, you know, keeping track of time
18  sheets, vacations, you know, schedule, schedule-type
19  information, data, such as inventory data, you know,
20  we talked about that earlier. There was some other
21  data that pieces of equipment generated information
22  they were required to keep up.
23  Q.  And then as far as data entry and time sheets
24  go, were those also duties of the clerk/typist in the

Page 77

1   shipping department?
2   A.  You know, I don't remember specifically who was
3   doing what in shipping. Again, I had a lot less time
4   involved in shipping.
5   Q.  Okay.
6   A.  So I don't remember what that clerk was doing.
7   They may have been doing other things relative to the
8   shipping function, just had the title of clerk. I
9   don't remember. I don't remember who that was even.
10  Q.  What was Jerry Downie's reaction when you and
11  Mr. Ford informed him of Ms. Snyder's allegations?
12  A.  His reaction, again -- again, I don't remember.
13  You know, shocked, surprised. I don't remember
14  exactly, you know, a reaction. I just remember that,
15  you know, Jerry, I thought, you know, knew what to do
16  and initiated a fairly thorough investigation, you
17  know, according to our policy. I think he was pretty
18  good at that.
19  Q.  Did he take the allegations seriously?
20  A.  Yes. I mean, that -- yes. Sure. I mean, I
21  would say that. Reacting, I don't know, I mean. But
22  I think he did what he was supposed to do in that
23  situation very professionally.
24  Q.  Was it policy of CitiSteel to put an alleged

20 (Pages 74 to 77)

Snyder
Gregory Buragino

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

Page 78

1 victim and alleged harasser in the same typical
2 working environment? Would that be a policy of
3 CitiSteel?
4    A. I don't recall, you know, that specific portion
5 of the policy. So I can't -- I can't say that,
6 whether it would have or wouldn't have. I guess, you
7 know, with regard to policy, I can't say.
8    Q. I'm just trying to go back to the earlier
9 testimony about whether Ms. Snyder was comfortable,
10 was the word that was used, working in an environment
11 with Mr. Harris.
12    A. Well, I mean, I think if I can -- you know, you
13 hate to say something that's untrue, and I don't want
14 to say something untrue, but I mean, I do think there
15 was something about -- you know, in the policy or the
16 procedure of, you know, one of the first things you're
17 supposed to do or should do is make sure that -- you
18 know, there's a short-term thing you should do, and
19 that's get the person away from that environment. I
20 don't know. That seems to be -- but I don't remember
21 that specifically, so I don't really know what to say
22 that as if I know that as a fact, but for some reason
23 that, you know, keeps popping into my head.
24    Q. Does that make sense to you now, sort of in

Page 79

1 retrospect that that would be a good policy to have,
2 to keep the alleged victim away from her alleged
3 harasser?
4    A. Well, I think that's -- maybe that's why I used
5 term "rational" before, not because I fully recalled
6 the policy, but just because I think, well, you know,
7 right. Ask me here today, and I knew nothing. I'd
8 say, well, certainly in the interim, the first thing
9 you want to do is make sure that the person is not
10 still feeling harassed or not feeling -- you know,
11 they are not feeling like they are being threatened by
12 being around the person that they are claiming
13 harassment from. So it seems like the rational thing
14 to do as possibly a short-term or long-term
15 resolution.
16    Q. Part of that would have been to protect the
17 alleged victim, is that correct?
18    A. Sure. Yes.
19    Q. Up to the document identified at D377, I
20 believe, where it states that you, Mr. Downie, and
21 Warren, Mr. Warren Beiger, met with Randolph. Could
22 there have been two meetings where you met with
23 Mr. Beiger and Mr. Downie during one meeting and then
24 a separate meeting where Mr. Harris was also present?

Page 80

1    A. That's possible. Again, I don't recall
2 specifically the timing. I mean, to be honest with
3 you, for some reason, I thought we were in Warren's
4 office, and now -- I mean, I'm reading this and I can
5 take it as a fact that we were speaking with -- you
6 know, in Jerry's office, this says.
7    Q. I think you recalled meeting in Mr. Beiger's
8 office with Randolph or just with Mr. Beiger and
9 Mr. Downie?
10    A. Well, again, I don't recall the meeting
11 specifically at all. You know, I just remember
12 meeting with Warren with Jerry, and I guess -- again,
13 I'm reading what I said here, so I have to take it at
14 face value that Randolph was there at least for some
15 portion, but I didn't remember that. So could there
16 have been two separate meetings? I guess there could
17 have. You know, maybe I just didn't write that well
18 enough. I don't know. You know, without -- if it's
19 not on this sheet of paper, it's hard enough, to be
20 quite frank with you, even remembering it reading it.
21 So I don't remember it not reading it.
22    Q. And your opinion of Mr. Harris, can you give me
23 your opinion of his character?
24    A. You know, I worked with Randolph a long time.

Page 81

1 Okay? Up to that point was almost 13 years. And I
2 had, and continue to have, a very high opinion of
3 Randolph as a person, as an employee. I mean, it
4 just -- you know, very few people that I would rank as
5 high as I rank Randolph. That's not always in terms
6 of job performance, but in terms of just his demeanor,
7 his way he goes about what he does, his dedication,
8 loyalty, all of those things that, you know, bosses
9 like to have, and even colleagues like, you know. I
10 was -- you know, I have a lot of good words I could
11 say about Randolph. I just have a very high opinion
12 of him.
13    Q. Would one of those descriptions of Mr. Harris,
14 would it be -- would he be honest?
15    A. I always thought Randolph was a very honest
16 person. And again, I still do. Knowing him, I mean
17 he is just the type of guy -- I mean, I felt I could
18 always trust. He's just that type of guy. I mean,
19 that's his character, his nature. Just he'd be the
20 type of person to give you the shirt off his back.
21 And he did. Just the way he is.
22    Q. What about Ms. Snyder's performance? You did
23 testify a bit earlier about her performance to some
24 extent, but I'd like to have you elaborate, to the

21 (Pages 78 to 81)

Snyder
Gregory Buragino

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

Page 82

1 extent that you can recall, what problems there were
2 with her performance and/or who had problems with her
3 performance. If you could just elaborate on that for
4 me, that would be great.
5   A. You know, what I recollect, which is, you know,
6 very general in nature -- can I -- I can't say that I
7 specifically followed the performance of every
8 individual in the shop, but was that this person
9 started out as a fairly good employee and, over time,
10 deteriorated and, you know, was missing more days and
11 not doing as well and, you know, had changed, you
12 know, for whatever reason. I don't know. You know, I
13 don't know the person. So I don't know what evolved,
14 but this person had changed their performance and that
15 kept, you know, coming to my attention. Ultimately it
16 came to a head. And I don't even recall whether there
17 were verbal warnings prior to the written warnings. I
18 mean, again, many times thing were not documented we
19 were verbal. Things were discussed with individuals.
20 That was the whole point of a verbal warning was it
21 didn't necessarily go into your record. But you
22 know -- so I don't recall all that.
23       But it escalated to the point of my
24 involvement. Believe me, these are -- neither Dennis

Page 83

1 nor Randolph would be the type to bring it to my
2 attention unless it was very serious. These guys were
3 pretty self-sufficient general supervisors. And
4 unless they felt that there was some need of my
5 intervention or something that I had to do to assist
6 them, they generally wouldn't even bring it to my
7 attention. So, you know, that just, to me, highlights
8 in retrospect why it became important that this was,
9 you know, getting pretty bad. The person was not
10 doing their job, and it was hurting them.
11   Q. Do you recall Mr. Ford and Mr. Harris bringing
12 Ms. Snyder's performance to your attention?
13   A. Again, I only can remember that, you know,
14 prior to this, there was good performance and prior --
15 it got bad. They told me about than. Then it -- you
16 know, it got to this level. You know, how many
17 specific times it came up, I don't know. I just
18 remember it came up and went from being a non-issue to
19 an issue and, you know, not like overnight but over
20 time.
21   Q. Okay.
22   A. And there were other people who had said
23 things, and again, I don't think I would have talked
24 to Carmella in hindsight or asked her about Terri's

Page 84

1 performance if there wasn't a reason to ask her about
2 Terri's performance. For some reason I recall she
3 told me, it wasn't that good, but again, I didn't
4 see -- never saw this note before, so maybe she told
5 Terri something different. But I can't recall exactly
6 whether, you know, whether it was prior to this and I
7 was trying to fact find. I don't know.
8   Q. Okay.
9   A. I don't remember all that.
10   Q. And did you testify earlier that employees are
11 not often issued a written discipline?
12   A. You know, we -- I wasn't -- you know, for the
13 amount of employees we had, you know, we didn't -- we
14 weren't writing people up all the time. It wasn't
15 like every day there was disciplines, and so, you
16 know, I think that it didn't get to that level until
17 the employee was -- you know, there was trouble and
18 they had -- at that point, it was -- you know, they
19 needed to know that this was very serious.
20   Q. Okay. Mr. Ford and Mr. Harris, could you
21 characterize the nature of their relationship for me,
22 their working relationship?
23   A. Well, you know, everyone knew that Randolph and
24 Dennis did not get along, and I think -- you know, I

Page 85

1 certainly knew it. Unfortunately had to sit in the
2 middle of that many a time and try to manage it the
3 best I could. I mean, as two very hard working and, I
4 think, very good individuals, I certainly tried to
5 appreciate, utilize each of their talents
6 respectively. But personally, they were two different
7 types of personalities. And for whatever reason --
8 and I can't even tell you. I mean, they just didn't
9 get along.
10   Q. Do you recall if Mr. Ford believed Ms. Snyder's
11 allegations?
12   A. I don't really -- can't say I recall exactly,
13 but I don't think that Dennis felt comfortable with
14 that, that I -- I seem to recall he didn't feel that
15 it was -- didn't make sense to him or whatever. But
16 I, you know, I don't recall exactly what he thought of
17 it. I don't know. Dennis was a very quiet man,
18 wasn't one to tell you what he felt all the time. You
19 know, very professional man but, again, a little more
20 reserved.
21   Q. And do you recall whether Ms. Snyder asked
22 Mr. Downie if she could have her father present at one
23 of the meetings?
24   A. That doesn't ring a bell. I'm not saying that

22 (Pages 82 to 85)

Snyder
Gregory Buragino

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

Page 86

1  she didn't say it, but...
2      Q.   Okay.
3      A.   She might have said that, but I don't recall
4  that.
5      Q.   That's fine.
6            MS. DiBIANCA:  That's all the questions
7  that I have.
8            MS. BREWINGTON:  I don't have anything
9  further.
10           (Deposition ended at approximately
11  2:40 p.m.)
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 88

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT.

Page 87

1              INDEX TO TESTIMONY
2
3    GREGORY BURAGINO                    PAGE
4      Examination by Ms. Brewington      2
5      Examination by Ms. DiBianca       76
6
                  -----
7
8              INDEX TO EXHIBITS
9
     BURAGINO DEPOSITION EXHIBIT NO.      PAGE
10
     1    E-mails stamped P-0274 and P-0275    14
11
     2    Document titled "Unacceptable
12        Attendance and Work Performance"
          stamped D371                         26
13
     3    Document Titled "Events Surrounding
14        Terri Snyder Harassment Charges"
          stamped D375, D376, and D377         36
15
     4    Handwritten document stamped D373
16        and D374                        51
17
18
19
20
21
22
23
24

Page 89

State of Delaware  )
                   )
New Castle County  )

CERTIFICATE OF REPORTER

I, Ann M. Calligan, Registered Merit
Reporter and Notary Public, do hereby certify that
there came before me on the 16th day of June, 2006,
the deponent herein, GREGORY BURAGINO, who was duly
sworn by me and thereafter examined by counsel for the
respective parties; that the questions asked of said
deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use
of computer-aided transcription and computer printer
under my direction.
    I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.
    I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

                    Ann M. Calligan, RMR
                    (Certification No. 186-RPR)
                    (Expires January 31, 2008)

23 (Pages 86 to 89)

Snyder
Gregory Buragino

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

Page 90

---

**A**

**able** 20:15 21:3
  22:5 51:20 72:23
**about** 4:18 5:1 7:17
  8:13 9:20 10:18
  13:20,23 14:23
  15:5,19,21,22
  16:19 17:23,24
  18:2 24:13 25:17
  25:21 28:24 33:2
  34:4,18 35:15,20
  35:22 37:3,9,21
  38:16 39:8 44:6
  46:17 47:9,17
  48:18 49:23 50:9
  50:23 51:22 52:24
  53:3,4,8,15 54:10
  54:14 56:18 61:6
  64:4,23 65:23
  67:23 68:3,22
  69:16 71:12 73:8
  73:17,18 76:20
  78:9,15 81:7,11
  81:22,23 83:15,24
  84:1
**above** 60:10
**Absolutely** 59:2
**accept** 70:22
**according** 64:6,14
  77:17
**accounting** 14:6
  16:18,21,23,23
  17:14,20 24:5,6
  24:13
**accurate** 43:6
**accurately** 43:7
**act** 36:6
**action** 1:5 2:11
  25:20
**actual** 29:24
**actually** 2:9 26:11
  32:23 34:16
**add** 38:12 64:21
**addition** 9:19
**additional** 33:4,6
  34:7
**administration** 24:4
**administrative** 36:7
**administrator**
  13:10
**admit** 43:1,3 53:6
  55:19
**admitted** 56:2
**advises** 2:22
**after** 4:19 10:14
  16:8 25:15 40:6

40:13,14 48:14
  51:19,23 56:19,24
  59:11,14,15 72:17
  72:17 73:19 88:18
**afternoon** 2:7 69:16
**afterwards** 26:4
**again** 9:23 12:8
  25:9 37:17 38:24
  39:13,17 40:4,18
  41:23 42:2,6,8,13
  42:13,18 43:21
  46:23 47:16 48:8
  48:13 49:3,7,12
  49:13 51:3,17
  55:7,19 56:4,9
  57:12 58:4,14
  60:4,6,13 61:12
  62:9 63:2,15 64:6
  65:6,19 66:3,7,12
  66:18 67:6,18
  68:13 69:3,12,14
  70:5,15,23 71:8,9
  71:11 72:6,19,24
  73:3,14 74:16
  75:20,24 77:3,12
  77:12 80:1,10,12
  81:16 82:18 83:13
  83:23 84:3 85:19
**against** 2:11
**ago** 15:23 22:19
**agree** 53:7
**agreed** 25:19
**ahead** 21:18 44:24
  44:9 46:1 50:19
  60:2 62:3 63:2
  70:3
**Air** 3:19,23
**Allan** 17:5
**allegation** 37:12
**allegations** 36:21
  56:19 59:24 77:11
  77:19 85:11
**alleged** 77:24 78:1
  79:2,2,17
**Allentown** 3:20,24
**allow** 70:10
**allowed** 40:16 50:8
  69:10,14,17,19
**alloy/flux** 16:5
**almost** 81:1
**alone** 25:21
**along** 84:24 85:9
**already** 18:10 61:19
  65:7,9 66:20 68:1
**alternative** 70:21
  70:24
**alternatives** 71:3

**although** 35:3
**always** 10:20 21:3
  30:20,22 72:21,23
  73:4 81:5,15,18
**among** 7:20
**amount** 84:13
**and/or** 25:1 82:2
**Ann** 1:11 89:5,17
**annual** 10:16,18
  11:1 12:3
**another** 13:16
  26:10 48:16,18
  49:2,6 50:13
  57:17
**answer** 2:21,23
  18:12 20:18 21:24
  22:3 29:11 44:9
  45:24 56:17 60:2
  60:3 62:3,14 63:2
  63:3,7 70:3,4
**answered** 18:11
  61:19
**answers** 3:3 19:4
  89:8
**anybody** 72:2
**anyhow** 65:22 66:8
**anyone** 13:22 17:24
  18:22 23:12 24:15
  33:20 53:11 75:9
  75:11
**anything** 3:14 6:8
  15:23 20:2 22:14
  29:12 33:24 35:4
  37:20 38:5 40:17
  40:20,21 53:4,8
  58:5 61:8 69:1
  70:11 73:9,10
  76:4 86:8
**anyway** 2:22 15:15
  15:17
**anywhere** 63:10
**apparently** 63:21
  64:15
**APPEARANCES**
  1:14
**appears** 15:8
**appraisals** 10:19,20
  10:22 11:24
**appreciate** 85:5
**approximately**
  24:24 35:17 36:23
  60:20 75:18 86:10
**approximates** 5:6
**April** 8:10 36:18,23
  37:13 49:10,17,23
  50:15 52:18 56:14
  57:18 72:1

**area** 7:15 12:16,21
**argued** 48:18
**around** 5:4,7 15:21
  17:22 35:22 37:12
  43:20 44:11 45:19
  47:14,21 61:3
  79:12
**around/near** 48:2
**ascertain** 44:21,22
  45:7,11
**asked** 16:21 18:2,3
  18:10 24:19 39:14
  40:24 46:4,11
  48:1 57:16 61:6
  61:19 75:20,22
  76:1 83:24 85:21
  89:8
**asking** 10:23,24
  15:21 17:23 40:13
  41:1 46:23 53:3
  57:2,17 62:1,5
  63:22 67:23 73:15
**aspect** 7:10
**assist** 83:5
**associated** 7:20
**assume** 39:19
**assuming** 69:4
**attempted** 52:12,16
**attendance** 26:18
  27:5 32:13,19,22
  32:23 87:12
**attention** 14:2,8
  22:6 24:18 34:11
  38:2,10 41:18
  42:22 50:12 82:15
  83:2,7,12
**attorney** 89:13
**audible** 3:3
**August** 5:22,24 6:1
  10:14
**authority** 70:8
**available** 6:6 21:2
**Avenue** 1:10,16
**aware** 58:10
**away** 30:10 39:4
  57:22 78:19 79:2
**a.m** 16:5,8 36:23
  37:4 75:18

**B**

**baby** 31:11
**back** 5:7,8,10 14:5
  44:13 59:19 69:13
  70:13 74:22 78:8
  81:20
**bad** 44:18 57:11,14
  83:9,15

**based** 19:14 37:20
  38:5,12,13 42:19
  55:14
**basically** 36:1 50:11
  59:23
**basis** 12:3 21:21
**Bates** 14:17
**became** 4:20 5:2
  83:8
**before** 1:11 2:13
  10:11 14:23 15:1
  16:5 28:3 37:19
  56:17 79:5 84:4
  89:6
**beginning** 1:11
  15:15
**behalf** 1:17,21
**behind** 56:10
**behooves** 47:3
**Beiger** 57:21 58:23
  60:20 79:21,23
  80:8
**Beiger's** 80:7
**being** 5:9 18:3
  21:20 29:4 40:5
  41:2 44:11 45:13
  52:4 61:4 68:21
  68:23 75:4 79:11
  79:12 83:18
**believe** 10:19 11:14
  11:23 13:15 25:14
  28:17,20 44:2,4
  46:21 48:13 49:15
  51:2,13 52:7 72:2
  79:20 82:24
**believed** 85:10
**bell** 41:14 85:24
**benefit** 52:7 56:22
**best** 47:4 52:13
  56:12 85:3
**between** 13:12 39:6
  bit 51:24 53:12 67:8
  81:23
**bits** 56:7
**Blauvelt** 13:15
**boss** 17:7 57:23,24
**bosses** 81:8
**both** 9:23 24:17
  25:24 39:15 40:24
  71:18 74:4
**bottom** 41:20 42:23
  47:24 52:17
**Box** 1:20
**boy** 23:13 73:20
**boys** 54:10,15
**Brandywine** 1:19
**Brewington** 1:15

---

Snyder
Gregory Buragino

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

Page 91

2:6,8 9:12 14:14
15:4,15 26:9,15
36:8,13 46:3
50:22 51:6,10
54:11,16,19,20
55:5,11 61:21
62:2 76:4 86:8
87:4
**brief** 50:12
**briefly** 15:1 39:17
**bring** 14:1 49:1
83:1,6
**bringing** 83:11
**brought** 22:6 24:17
32:14 34:10 38:1
38:9 44:16 65:16
**building** 1:19 40:11
**bullet** 41:19 42:22
47:23
**bullets** 41:20
**Buragino** 1:9 2:1,7
3:10 14:9,10,16
26:12,13,16 36:10
36:11,18 51:8
54:21 76:6 87:3,9
89:7
**business** 4:1,2,6,7,8

**C**
**call** 7:13 9:7 13:11
31:8 37:7,16
38:22
**called** 15:2 38:23
40:7 66:23 75:18
**Calligan** 1:11 89:5
89:17
**calls** 9:8
**came** 15:19 25:6
32:24 37:23 42:6
44:5 49:7,23 50:1
50:2,5 64:6,7,15
65:14 82:16 83:17
83:18 89:6
**car** 34:18
**carefully** 15:17,20
**Carmella** 15:8
16:16 17:4 18:6
18:14 19:1,5 20:6
20:11 22:9,11,13
24:23 33:8 83:24
**case** 28:7 52:8 70:6
**caster** 7:19,21,24
8:3,6 23:17
**Castle** 89:2
**catch** 37:10
**cc-ed** 27:1
**certain** 16:10,19,24

17:19 18:8,16,19
28:18 73:5
**certainly** 23:4 45:5
58:16 68:8 69:6
79:8 85:1,4
**CERTIFICATE**
89:4
**Certification** 89:17
**certify** 89:6,11,13
**cetera** 40:3
**change** 21:6 47:6
**changed** 7:10,11 8:1
56:21 71:14 82:11
82:14
**character** 80:23
81:19
**characterize** 6:22
8:9 9:3 84:21
**characterized** 26:21
**charge** 66:1
**charges** 36:18 87:14
**Chemicals** 3:19
**chose** 70:21
**circumstances** 16:3
**CitiSteel** 1:6 2:11
4:12,13,14 6:9 9:9
9:16 10:1,5,7
12:11 34:21 58:1
75:13 77:24 78:3
**CitiSteel's** 59:24
**Civil** 1:5
**claim** 35:2
**claiming** 37:23
45:12 79:12
**claims** 61:7
**clarification** 64:13
**clarify** 20:9
**clean** 53:17
**clear** 28:1
**clearing** 14:12
**clerical** 13:9,10
68:2 71:10,11,18
71:23
**clerk** 16:24 24:4
36:6 66:23,23
67:7,11,14,15
73:2 77:6,8
**clerks** 74:1
**clerk-wise** 67:8
**clerk/typist** 66:20
72:12 76:12,24
**clerk/typists** 35:7
**close** 57:7
**colleagues** 81:9
**collective** 65:13
**combine** 73:24 74:2
**combined** 73:21

**come** 31:24 32:2,4
51:19,20 53:17
64:4 65:23
**comfort** 43:24 44:6
44:10,17
**comfortable** 44:14
45:14 47:5,7 78:9
85:13
**coming** 40:11 82:15
**comments** 25:15
**company** 5:10 6:2,8
8:14 47:3,10,11
70:9
**complained** 15:19
**complaints** 25:15
**complete** 16:4 59:18
**completed** 10:17
12:3 59:8,21
72:18 88:21
**completely** 11:22
**computer** 24:3 89:9
**computer-aided**
89:9
**CONAWAY** 1:18
**concern** 22:7
**concerned** 22:4
53:15
**concerning** 24:15
25:1
**concluded** 34:19
**confidence** 67:22
**connection** 2:10
**considered** 28:5
**consisting** 16:23
**consolidate** 71:10
**constitute** 25:21
**constitutes** 46:24
**consult** 6:3
**consultant** 6:2
**consulting** 6:5 9:16
9:16
**contact** 10:2
**contacted** 38:17,18
38:19
**continue** 81:2
**continued** 75:19
**control** 75:20
**controller** 17:6,6
**conversation** 16:15
17:1 18:11 19:18
19:20 20:12 28:19
38:4,7,9 43:12
**conversations** 56:6
**copy** 29:18 50:20
**correct** 7:5,6 8:8
11:7,22 13:5 22:9
26:24 27:3 28:10

32:24 33:1 37:13
49:18 50:7 52:19
71:19 79:17 89:11
**correctly** 28:13
**cost** 17:14
**counsel** 89:7,13
**count** 22:23 23:2,5
23:7,8
**County** 89:2
**couple** 7:11 43:15
55:3
**court** 1:1 3:1 46:3
**crazy** 30:6
**create** 62:15 71:8
**crunch** 76:7
**currently** 3:18
**cut** 50:18,20

**D**
**daily** 21:21
**data** 17:13,15 24:2
76:19,19,21,23
**date** 15:10 27:7
29:6,20
**dated** 26:19 29:13
50:14
**dates** 5:4,8 71:13
**day** 12:22,23 25:4
25:11 39:3 50:5
51:1,12,14,16,21
52:18 59:14 60:19
61:9 64:7,12,18
69:16 71:21 72:5
72:10,10,20,20
73:19 75:23 84:15
89:6
**days** 32:8,9,16,21
32:24,24 43:4,15,15
48:14 82:10
**deadlines** 16:11
18:8,16,19,23
**decided** 70:9
**decision** 70:5
**dedication** 81:7
**Defendant** 1:7,21
**degree** 67:22
**Delaware** 1:1,11,16
1:20,23 89:1
**demeanor** 81:6
**Dennis** 6:14 7:1,5
7:17,21 8:5 9:20
9:21 10:2,7,21
13:13,19 24:17,21
25:1,4,11 26:1,5
27:1 32:3 34:11
37:16,21 38:7,17
38:17 39:14,17,18

82:14 84:24 85:13
85:17
**deny** 22:10 42:2
**department** 36:5
66:6,11,21 67:3
67:16 68:6,16
77:1
**departments** 6:18
**depends** 21:14
**deponent** 88:24
89:7,8
**deposition** 1:9 2:9
2:10,12 14:10
26:13 36:11 51:8
86:10 87:9
**describe** 53:11
**described** 36:18
**description** 76:16
**descriptions** 81:13
**detail** 42:18
**details** 21:23 39:16
**deteriorated** 82:10
**determine** 43:23
45:3 58:23 59:23
**determining** 46:19
**DiBIANCA** 1:18
2:20 9:10,13
14:12 18:9 44:7
45:21 46:1 50:20
54:4,9,13,17 55:4
60:1 61:18,24
63:1,12 70:1,4
76:6,10 86:6 87:5
**different** 29:12
32:21 61:8 67:8
67:12 68:18 71:9
72:9 84:5 85:6
**difficult** 3:5 16:4
20:18
**difficulty** 18:19
**dinner** 9:1
**direct** 10:21 13:1
14:8 41:18 42:22
**directed** 50:10
**direction** 89:10
**directly** 12:16
**director** 30:21 31:4
**disappointed** 53:13
**discipline** 84:11
**disciplines** 84:15
**discomfort** 43:24
**discuss** 22:9 25:12
25:23 27:5 29:6
62:6,23
**discussed** 25:18
34:8 49:10 62:19
71:4 82:19

Snyder
Gregory Buragino

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

Page 92

| | | | F | 8:5 9:20 10:2 |
|---|---|---|---|---|
| discussing 61:17 | 79:19 87:14 | 57:8 63:5 67:3 | **face** 52:13 80:14 | 13:19 25:1,11 |
| **discussion** 27:18,21 | | 73:1 74:5,20 75:4 | **facility** 48:19 | 26:1 27:1 37:16 |
| **disposition** 58:17 | **E** | 77:9 80:20 81:9 | **fact** 6:17 19:24 34:4 | 37:21 38:7,17,17 |
| 58:20 | **each** 12:21 32:5 | 82:16 83:6 85:8 | 78:22 80:5 84:7 | 77:11 83:11 84:20 |
| **DISTRICT** 1:1,1 | 85:5 | **event** 48:15 89:14 | **factory** 23:16 | 85:10 |
| **document** 14:23 | **earlier** 50:7 56:21 | **events** 36:17 40:19 | **fact-finding** 52:10 | **foregoing** 89:11 |
| 26:17 29:13,16 | 67:3 76:20 78:8 | 87:13 | **fair** 6:20 8:7 12:17 | **forget** 5:8 |
| 30:19 36:14,16 | 81:23 84:10 | **ever** 2:12 18:22 | 20:14 56:1 58:22 | **forgot** 63:18 |
| 39:24 40:4 79:19 | **Edelstein** 1:10,15 | 25:12 35:4 | 61:10 | **form** 60:10 |
| 87:11,13,15 | **effort** 2:16 | **every** 2:16 25:4,11 | **fairly** 28:17 77:16 | **format** 31:6 |
| **documented** 82:18 | **Eiger** 17:5 | 26:2,7 82:7 84:15 | 82:9 | **forward** 32:14 47:3 |
| **documents** 3:16,17 | **either** 5:7 18:3 20:5 | **everybody** 11:24 | **far** 76:23 | 72:9 |
| 28:14 30:20,22 | 29:20 63:17 67:22 | 35:21 39:24 61:3 | **FastFrame** 4:3,5,11 | **found** 39:4 |
| 36:9 | 68:13 72:13 73:12 | 70:19 | 85:22 | **four** 4:18 |
| **doing** 6:7 9:7,8 | 74:3 89:13 | **everybody's** 70:18 | **father** 85:2 | **fourth** 41:19 60:18 |
| 10:18 15:24 16:1 | **elaborate** 81:24 | **everyone** 15:21 | **February** 27:5,13 | **framing** 4:9 |
| 16:2 22:7 24:6,7,8 | 82:3 | 17:23 18:2 84:23 | 27:18 28:9,12,15 | **franchise** 4:9 |
| 24:9 39:22 43:2,3 | **elevate** 58:19 | **everything** 16:1,2 | **feedback** 12:15 | **frank** 80:20 |
| 56:3 74:2,7,24 | **eliminate** 65:8,21 | 23:4,6 39:18 | 13:5,19,22 14:2 | **Friday** 1:11 |
| 77:3,6,7 82:11 | 66:8 67:20 68:1 | 50:11,11 60:8 | **feel** 43:19 44:14,23 | **friendly** 9:22 |
| 83:10 | 71:9,17 | 63:20 | 45:18 47:14 57:11 | **from** 3:13 10:4,6,13 |
| **done** 9:15 18:3 | **eliminated** 71:2,5 | **evidence** 34:20 | 62:22 70:15 85:14 | 12:15 13:19,22 |
| 21:10,20 24:9 | 71:24 72:4,7 75:2 | **evolved** 82:13 | **feeling** 79:10,10,11 | 14:3 15:8 18:4 |
| 33:19 59:13 | 75:10 | **exact** 35:16 42:9,13 | **feels** 45:6 | 20:8 21:22 26:19 |
| **doubt** 52:8 56:22 | **elsewhere** 48:19 | 43:16 44:17,19 | **felt** 16:9 18:6,15 | 30:10 31:12,24 |
| **down** 3:2 21:8 28:8 | **emphasized** 55:17 | **exactly** 11:15 41:24 | 41:5,21 57:13,14 | 32:2,4 34:5 37:16 |
| 34:16 40:1 50:8 | **employed** 35:8,9 | 42:20 43:18 47:16 | 81:17 83:4 85:13 | 40:5 41:19 42:23 |
| 50:10 89:8 | **employee** 81:3 82:9 | 47:22 49:8 55:8 | 85:18 | 43:11 47:23 49:15 |
| **Downie** 30:21,23 | 84:17 | 55:10 57:13 59:20 | **FETZER** 1:23 | 53:5 56:21 62:21 |
| 38:19,20 39:3 | **employees** 7:15 | 60:4,6 66:12 | **few** 76:8 81:4 | 72:9 75:12 78:19 |
| 41:6 43:19 49:1 | 10:17 11:1,3,20 | 67:14 68:17 71:11 | **file** 27:2 | 79:2,13 83:18 |
| 53:16 55:13 79:20 | 32:21 35:13 66:10 | 74:7,9 77:14 84:5 | **fill** 72:23 73:4 | **front** 26:17 30:15 |
| 79:23 80:9 85:22 | 73:16 84:10,13 | 85:12,16 | **filled** 73:5 | 36:14 38:6 50:14 |
| **Downie's** 77:10 | **employment** 35:16 | **examination** 2:5 | **finally** 25:19 | **full** 3:10 15:14 60:5 |
| **draft** 30:19 31:5,8,8 | 66:11 72:17,18 | 76:9 87:4,5 89:12 | **find** 35:5 45:6,13 | **fully** 79:5 |
| **drafted** 30:20 | **end** 17:23 53:17 | **examined** 2:3 89:17 | 52:11 53:4 84:7 | **function** 76:16 77:8 |
| **duly** 2:3 89:7 | 54:14 71:12 | **example** 11:6 16:3 | **fine** 17:8 19:19 20:1 | **functions** 73:5 74:3 |
| **during** 40:20 44:21 | **endeavored** 56:11 | 21:16,18 22:1 | 47:21 73:7 86:5 | 74:4 |
| 52:9,21 61:11 | **ended** 72:17,18 | **excuse** 20:21 | **finished** 9:11,13 | **furnace** 7:13,14,19 |
| 79:23 | 86:10 | **exempt** 11:8,10,12 | 13:17 14:24 64:11 | **further** 45:3 52:15 |
| **dusty** 48:1,9 | **enough** 80:18,19 | **exhibit** 14:9,10 | **fired** 42:5,24 55:18 | 76:5 86:9 89:11 |
| **duties** 7:21 8:2 | **entire** 36:4 | 26:10,13 36:11 | **first** 2:2 14:8 15:7 | 89:13 |
| 13:10 67:11 72:18 | **entirely** 2:21 60:24 | 51:8 87:9 | 15:14,18 17:21 | |
| 74:1,7,14,20 | **entry** 76:23 | **exhibits** 50:13 87:8 | 22:12 36:20,22 | **G** |
| 76:11,24 | **environment** 44:24 | **expecting** 18:4 | 37:11 67:19 68:2 | **gain** 67:7 |
| **duty** 51:19 74:21 | 62:22 78:2,10,19 | 46:13 | 78:16 79:8 | **gave** 16:3 29:17 |
| **D-371** 26:10,10 | **equipment** 76:21 | **Expires** 89:18 | **firsthand** 12:12 | 52:7 |
| **D-377** 60:17 | **ERRATA** 88:15 | **explain** 20:20 | **Floor** 1:19 | **gees** 35:14 |
| **D371** 87:12 | **escalated** 82:23 | **expression** 53:18,19 | **follow** 58:6 | **general** 6:24 7:2,3,4 |
| **D373** 50:14,17,18 | **Esquire** 1:15,18 | **extent** 60:2,5 61:19 | **followed** 82:7 | 11:11,21 13:8,12 |
| 87:15 | **essence** 27:20 | 62:1 70:2 81:24 | **following** 34:19 | 20:10 21:4 23:20 |
| **D374** 50:14,16 | **essentially** 9:14 | 82:1 | 45:16 72:20 73:6 | 23:24 26:3,4 29:1 |
| 87:16 | 31:6 58:12 | **e-mail** 14:19 15:8 | **follows** 2:4 | 52:4 73:16,19 |
| **D375** 36:9 41:19 | **et** 40:3 | 15:10,17 17:21 | **follow-up** 62:11 | 76:15 82:6 83:3 |
| 87:14 | **evaluations** 10:16 | 19:5,14 21:16 | 76:8 | **generally** 6:12 11:5 |
| **D376** 36:9 87:14 | 11:2,20 | **E-mails** 87:10 | **Ford** 6:15 7:1,5,17 | 12:24 21:7 23:19 |
| **D377** 36:9 75:17 | **even** 11:17 43:11,15 | | | |

Snyder
Gregory Buragino

v.

C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

Page 93

24:4 29:5 35:11
83:6
generated 76:21
gentlemen 9:24
genuinely 53:15
gets 70:6
getting 16:19 20:5,7
22:2 24:9,14 83:9
Gilpin 1:10,16
give 5:6 11:6 14:22
29:7 35:17 38:11
56:22 74:17 76:15
80:22 81:20
given 16:9 18:7,15
28:1,3,6 29:5,9,16
29:23 30:1 33:13
61:7 67:2 69:1,8
89:8,11
gives 21:16
giving 69:6
go 2:18 14:23 37:19
44:9,13 46:1
50:19 57:18 60:2
62:3 63:2 69:13
70:3 73:1 76:24
78:8 82:21
goes 16:18 81:7
going 2:15 18:9
25:18 28:16 29:1
29:3 34:13 37:17
44:7 45:22 47:3
50:23 51:6 56:21
58:13 59:19 60:1
61:18 63:1 66:8
66:12 69:13 71:1
71:2,8 72:8 75:2
75:10 76:7
good 2:7 8:11,20
10:18,19 37:10
38:14 53:2 55:3
58:8 65:15,24
66:4 77:18 79:1
81:10 82:9 83:14
84:3 85:4
gotten 14:2 43:16
graffiti 34:18 35:3
great 82:4
Greg 9:13 15:21,24
36:18
Gregory 1:9 2:1
3:10 87:3 89:7
grilling 53:1,2
grounds 63:2,14
group 16:23
guess 8:5 19:24 20:2
20:10 21:9 32:12
40:24 45:17 46:9

52:4 53:6,10,12
55:13 60:18 63:24
65:2,8 66:9 73:15
78:6 80:12,16
guessing 67:21
guy 58:6 81:17,18
guys 14:1 83:2

**H**

habit 22:16
half 9:18
handled 7:14 72:7
Handwritten 87:15
happen 70:11
happened 34:20
37:15 38:16,18
39:5,12 40:3,6,15
59:14 61:14
happening 53:22
happens 2:15
harassed 37:24 45:7
45:14 46:8 79:10
harasser 78:1 79:3
harassment 36:18
36:21 45:13,15
46:24 50:9 51:23
70:6 79:13 87:14
hard 16:10 18:8,16
53:10 66:12,23
80:19 85:3
Harris 6:14 7:1,4
7:23 8:7,10 9:4
11:7,10 13:20
25:1,10 26:1 27:1
41:7 42:5 43:20
44:24 46:18 51:11
60:11 61:16 62:5
78:11 79:24 80:22
81:13 83:11 84:20
Harris's 7:7
hate 78:13
having 2:2 31:10
55:22 66:23
head 46:9,10 78:23
82:16
hear 6:4 54:5,21,22
heard 10:4,6,13
54:14,24 68:3
heart 24:8
held 4:24 5:16,19
7:1
help 41:6,9,15,21
48:6
helpful 35:18
her 13:20,23 17:7
17:10 18:3,4,4,21
19:6,7,14 20:6,7

20:15,16 21:10,10
21:13 22:1,5,7,12
22:15 24:19 25:5
25:21,21,23 27:2
27:5,10 28:3,13
28:23 29:17 30:5
30:13 33:15,20,22
33:22 35:12 36:6
37:24 40:11,12,13
40:14,16,21 41:6
41:8,9,13,15,21
43:19 47:16,17,20
47:24 48:1,8 49:1
49:23 50:10 51:4
51:5 52:7,13
56:22 57:7 68:22
69:7,9,10,17,19
70:13 71:4 72:17
72:18 73:17 75:1
75:6,10,12,20,22
76:1 79:2 81:23
82:2,3 83:24 84:1
85:22
herself 20:5
high 71:12 81:2,5
81:11
highest 58:20
highlights 83:7
him 8:24 9:7,9 10:4
10:4,4,6,13 16:2,3
16:8 38:22,23
39:4,15,22 41:11
41:12 42:8,14
43:1,3 44:3 47:18
47:20,21 53:3,24
53:24 55:6,9,17
55:23 57:10,14
59:3 62:1 77:11
81:12,16 85:15
hindsight 83:24
hired 4:15,16 72:2
hold 39:2 76:8
honest 10:12 30:4
53:21 68:24 80:2
81:14,15
honestly 18:1,17
30:16 72:15
hope 44:18
hourly 11:16
HR 30:21 31:3,4,17
31:21 38:1 40:11
45:1 51:21
human 31:12,23
hurt 42:8,24 47:18
hurting 83:10

**I**

ID 14:13
idea 39:8 49:22
53:21 65:2,5,10
65:11,13 66:9
identification 14:11
26:14 36:12 51:9
identified 79:19
immediately 73:6,8
73:18
implicitly 37:18
important 44:22
45:5 46:16,19
83:8
INC 1:6
inclination 52:5
73:17
included 10:21 20:8
includes 35:20
indeed 47:11
INDEX 87:1,8
indicate 37:4 41:20
63:10,17,17
indicated 15:23
25:23 32:18 45:17
45:20 61:21 65:7
65:9 68:1 71:17
indicates 17:22 19:8
33:2 34:5,17
42:23 47:24 55:16
indicating 47:13
individual 82:8
individually 26:6
individuals 82:19
85:4
inform 62:13
information 3:13
16:13 19:8 20:6,7
20:17,22 21:1,11
21:21 22:3,15
31:22,24 52:12
76:19,21
information/facts
62:20
informative 58:6
informed 38:21
58:13 72:8 77:11
initial 52:9 62:10
initially 10:3 65:16
initiated 77:16
input 24:2 58:23
59:2,6 60:9 62:13
inquire 18:22
instance 22:13
30:17
instructed 39:17
instruction 33:4,6
34:7

insure 22:14
intent 58:16 62:16
intention 58:11
59:5
interested 89:14
interim 79:8
interrupted 57:17
interruption 54:18
intervention 83:5
interview 44:21
inventories 23:20
inventory 16:13
17:14 19:9 21:17
21:18 22:20,23
24:1,13 76:19
investigation 45:3
59:7,18 60:9
77:16
investigations 34:19
invited 61:5
involved 17:12
20:23 30:23 31:3
59:10 60:11 61:16
61:20 62:6 68:23
69:7 77:4
involvement 33:7
82:24
involving 9:17 70:5
isos 16:6
issue 25:5 30:5
31:19,19 62:7
83:19
issued 31:4 84:11
issues 14:2 18:21
24:13,18 34:8,10
40:15
i.e 16:13 19:8

**J**

January 89:18
Jeff 13:15
Jerry 30:20,23
38:19,20 39:3,15
39:21 40:7,7,12
40:12 41:1 43:22
44:20 49:3 50:10
52:22 53:19 55:23
57:22 59:12,15
60:14,20 65:9
75:18,22 77:10,15
80:12
Jerry's 43:23 50:5
57:23 58:5 60:21
80:6
Jim 59:12
job 6:12 7:7,18
13:20,23 15:20,24

Wilcox & Fetzer, Ltd.

Professional Court Reporters

(302)655-0477

Snyder
Gregory Buragino

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

Page 94

| | | | | |
|---|---|---|---|---|
| 16:11 17:10 18:4 | 29:21,22 30:16,17 | 85:16,17,19 | **LLP** 1:18 | **may** 14:2,6 17:1,18 |
| 18:21 19:6 20:15 | 32:11,15,20,20,21 | **knowing** 57:10 | **location** 49:2 | 19:22,23 21:1 |
| 21:10,13 22:5,7 | 32:23 33:20 34:1 | 81:16 | **logical** 45:18 | 24:8,18 30:8,11 |
| 22:15,17 25:2,24 | 34:9,14 35:4,5,21 | **knowledge** 12:12 | **Logically** 45:12 | 32:17,17 43:16 |
| 26:4 33:12,22 | 37:23 38:8,24 | 32:7,10,15 33:5 | **long** 3:21 4:6,17 | 55:8 57:1 62:13 |
| 36:6 43:23 47:24 | 39:14,16 40:3,7,8 | | 22:19 42:11 43:4 | 74:18,18 77:7 |
| 48:17 66:9 67:7,9 | 40:13,16 41:13 | **L** | 73:8 80:24 | **maybe** 10:20 30:10 |
| 71:1,14 72:2,18 | 42:7,14,14,16,19 | **L** 1:3 | **longer** 57:5 | 37:22 45:15 53:2 |
| 73:17 75:6,10 | 43:9,22,22 44:12 | **labelled** 26:10 | **long-term** 79:14 | 53:20 65:13 66:13 |
| 76:11 81:6 83:10 | 44:12,14,18 45:1 | **language** 30:21 | **look** 15:1 29:21 | 68:3 75:5 79:4 |
| **jogged** 65:20 | 45:1,3,4,6,12,21 | **last** 5:16 9:18 10:11 | 35:5 42:18 | 80:17 84:4 |
| **jumped** 64:11 | 46:10,11,13 47:4 | 46:4 75:17 | **looked** 32:17 | **mean** 7:11 8:17 9:6 |
| **June** 1:11 89:6 | 47:8,17,19,19 | **later** 5:14,17 43:15 | **looking** 14:16,19 | 9:14,14,15 10:8 |
| **jury** 51:19 | 48:13,15 49:5,5,6 | 43:15,17 51:21 | 15:7 41:19 55:8 | 11:23 13:15,24 |
| **just** 2:18 6:21 14:12 | 49:11,12,14,22 | 59:11 61:5 | 59:3 61:2 | 14:4,5 17:18 19:2 |
| 14:18 17:3 18:10 | 50:1,1,1,2,3,24 | **Law** 1:10 | **looks** 50:16 51:2,4 | 19:23 20:5 21:13 |
| 21:24 24:11,22 | 51:5,18 52:2,8,9 | **lawyer** 3:13 | **Lori** 1:15 2:7 54:4 | 22:2 23:15 28:22 |
| 25:19 26:11 27:14 | 52:10,13,16 53:2 | **layman's** 76:15 | 54:13 55:4 63:12 | 29:20 30:2 31:8 |
| 28:2,6,9 30:5,7,17 | 53:5,7,13,13,15 | **learn** 36:20 67:19 | **lot** 14:4 38:15 57:5 | 31:16 32:11,12 |
| 33:8 35:12,16 | 53:21,22 55:20,23 | **learned** 37:11 | 57:8 67:5 74:6 | 33:8 34:1 38:8,14 |
| 36:3 37:3,9,22 | 56:5,7,8,9,11,20 | **least** 35:11 80:14 | 77:3 81:10 | 38:15,17,24 39:2 |
| 38:11 39:2 41:11 | 57:2,3,5,6,9,9,14 | **leave** 5:23 6:9 63:20 | **loud** 15:16 | 39:15,22,22 40:18 |
| 41:16 45:7 46:10 | 58:5,9,9,15,18,18 | 63:23 75:20,22 | **loyalty** 81:8 | 42:2,17 43:10,14 |
| 47:2,8,8,17,19 | 58:19,20,20 59:3 | 76:1 | | 44:11,15,17 46:6 |
| 48:22 50:24 51:6 | 59:4,7,9,15,17,19 | **left** 5:10,20 6:1,10 | **M** | 46:9 47:9 48:11 |
| 52:22 53:1,14 | 59:19,20,20 60:4 | 9:9 10:1,5,7,10,14 | **M** 1:11,18 89:5,17 | 51:2 52:2,12,15 |
| 55:19 57:2,3 59:3 | 60:6,8,9,13,14,14 | 59:12,14,15 63:11 | **made** 6:6 | 53:3,23 55:13,19 |
| 61:1,22 62:13 | 60:24 61:2,14,14 | 72:1 75:15 | **magnitude** 66:19 | 56:23 57:7,15 |
| 64:12,22 67:12 | 62:8,9,14,16 63:4 | **less** 12:24 66:15,16 | **maintained** 10:2 | 58:7 59:1,1,2,10 |
| 68:5 73:19,21 | 63:6,15,18,21 | 77:3 | **maintenance** 35:20 | 59:12 62:14 63:4 |
| 74:10 75:5,15 | 64:2,7,10,15,16 | **let** 2:18 13:9 14:24 | **make** 2:16 3:3 | 63:4,7,15,18,19 |
| 77:8,14 78:8 79:6 | 65:3,4,10,12,15 | 20:14 37:19 43:1 | 20:21 22:16 33:13 | 63:22 64:6 65:1 |
| 80:8,11,17 81:4,6 | 65:22,24 66:1,2,2 | 47:23 56:17 68:4 | 58:9 78:17,24 | 66:17 67:6,17,24 |
| 81:11,17,18,19,21 | 66:3,7,18,22 | **let's** 25:16 39:4 | 79:9 85:15 | 68:15,16 69:3 |
| 82:3 83:7,17 85:8 | 67:13,17,24 68:4 | 52:14 | **makes** 16:10 18:8 | 70:5,18,23 72:16 |
| | 68:4,5,9,11,23,24 | **level** 43:23 44:6 | 18:16 | 72:20,21,23 73:12 |
| **K** | 69:5,5,14,14,15 | 47:1 58:20 83:16 | **making** 70:8 | 74:5,13 77:20,20 |
| **keep** 9:5,6 17:15 | 69:16 70:7,9,15 | 84:16 | **man** 85:17,19 | 77:21 78:12,14 |
| 58:13 76:22 79:2 | 70:16,16 71:7,7,8 | **like** 16:6 21:7 24:22 | **manage** 7:15 85:2 | 80:2,4 81:3,16,17 |
| **keeping** 76:17 | 71:10,14 72:10,14 | 26:9 30:14 33:24 | **management** 7:23 | 81:18 82:18 85:3 |
| **keeps** 78:23 | 72:19 73:3,22 | 36:8,10 41:11,12 | **manager** 4:16,20 | 85:8 |
| **kept** 32:19 82:15 | 74:2,10,13,19,22 | 41:12,13 42:1,7 | 5:2,9,9 26:3 | **meaning** 3:4 8:20 |
| **kind** 3:5 21:8 40:19 | 75:3,9,11,22 76:7 | 42:10,16,17 45:5 | **managers** 6:21,21 | 13:13 20:6 24:11 |
| 52:4 | 76:11,13,13,17,18 | 47:18 50:16 51:2 | **manufacturing** | 32:1 43:11 68:6 |
| **King** 1:23 | 76:19 77:2,13,14 | 51:4 52:8 53:11 | 5:14,15,18 6:13 | **meant** 19:13,22,23 |
| **knew** 57:5,6 77:15 | 77:15,15,17,21 | 56:13 58:5 62:12 | **many** 22:11 23:15 | 20:11,13 43:10 |
| 79:7 84:23 85:1 | 78:4,7,12,15,16 | 71:20 72:19,21 | 24:24 25:3,5 29:7 | 74:12 |
| **know** 2:18 6:7,8 | 78:18,20,21,22,23 | 74:16 79:11,13 | 35:7,13 66:10 | **meet** 16:10 18:8,16 |
| 8:23 9:1,10,22,23 | 79:6,10 80:6,11 | 81:9,9,24 83:19 | 67:2 68:17 82:18 | 22:13 24:15 25:12 |
| 11:15 12:2,8,21 | 80:17,18,18,24 | 84:15 | 83:16 85:2 | 26:4,6 29:6 40:8 |
| 12:22 13:24 14:24 | 81:4,8,9,10 82:5,5 | **liked** 47:24 | **March** 15:11 24:11 | 51:11 57:22 |
| 15:4,23,24 18:18 | 82:10,11,12,12,12 | **likely** 25:18 | 26:20 29:13,17,23 | **meeting** 18:19,23 |
| 19:2,14,24 20:1,2 | 82:13,13,15,22 | **line** 36:22 61:6 | **MARGARET** 1:18 | 25:16,17,21 26:2 |
| 20:8,11,18,24 | 83:7,9,13,16 | **list** 71:12 | **Margolis** 1:15,17 | 27:4,8,9,9,15,16 |
| 21:7 22:2 24:20 | 83:17,19 84:6,7 | **little** 48:1,9 51:24 | **marked** 14:9,10 | 28:13,24 29:11 |
| 24:24 25:10,14,20 | 84:12,12,13,16,17 | 53:12 56:20 66:15 | 26:12,13 36:10,11 | 39:12 40:10,20,23 |
| 27:8,24 29:16,19 | 84:18,19,23,24 | 85:19 | 51:7,8 | 49:15 52:21,24 |

Snyder
Gregory Buragino

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

Page 95

56:16 57:19 58:3
58:12 59:15,23
60:5,11 61:1,1,11
61:17 62:6,8,10
62:11,11,17,23
63:5,5,8 67:21
79:23,24 80:7,10
80:12
**meetings** 25:5,7,24
56:12 79:22 80:16
85:23
**melt** 4:20 5:2 6:14
7:19 24:3 32:1
35:13,22 36:2,4,7
67:12 69:11,13,18
69:19 70:13 71:1
71:18,23 73:2
76:12
**melters** 20:8 23:17
**Melter's** 16:8
**melting** 7:10,13
10:17 35:7
**memo** 31:12 34:5
**memory** 38:14
65:20 75:16 76:2
**men** 10:22
**mention** 31:19
**mentioned** 13:4
34:9 50:7 71:16
74:11
**Merit** 1:11 89:5
**met** 22:10,12 24:20
25:1,3,10,23 26:7
52:18 57:21 60:21
79:21,22
**metallurgy** 4:16 5:9
5:10
**method** 31:9
**middle** 37:4,7 85:2
**might** 59:13 68:9
71:3 72:8 74:14
86:3
**mill** 6:15 7:1 71:6
71:19 72:4,7,12
73:2,13 74:21
**mind** 50:5
**misc** 15:13
**miscellaneous** 15:13
**mischaracterizes**
44:8 45:22 60:2
**mischaracterizing**
63:13
**missed** 32:8,8,24
**missing** 82:10
**mistaken** 52:23
**mm-hmm** 3:4 21:19
34:24 35:10 69:21

**Molly** 3:13
**moment** 20:12 33:9
42:20 44:3 50:13
58:18 63:9 67:13
**months** 3:22 6:2
67:2
**more** 12:24 25:18
37:6 51:24 52:11
56:20 59:10 61:7
62:20 67:5 82:10
85:19
**morning** 16:7 26:2
26:2,7 56:13,16
57:18,20 59:8
**most** 7:12 41:1
**mostly** 12:15 23:13
41:1
**move** 49:6
**moved** 30:10
**movement** 50:4
**moving** 48:18 49:1
**much** 16:9 18:7,15
31:21 56:5
**multiple** 26:3
**myself** 6:6 35:4 37:2
52:22 60:20

___

**N**

**name** 2:7 3:8,10 4:2
73:13
**narrow** 21:8
**nature** 81:19 82:6
84:21
**near** 43:20 45:19
47:15
**necessarily** 57:12
82:21
**necessary** 16:12
19:7 20:16 21:11
22:15
**need** 16:13 26:7
32:23 35:16 38:23
51:24 74:9 83:4
**needed** 16:24 21:22
22:15,17 25:20
38:21 39:8 53:17
84:19
**needs** 19:8
**neither** 82:24
**never** 84:4
**new** 61:8 89:2
**next** 5:23 33:2
34:16,16 36:9
38:17 56:13 57:18
59:8 60:19 61:6
62:18 64:7,12,18
72:10,20 73:19

**night** 37:5,7
**non-exempt** 11:4,7
11:13,14,16,19
12:1,9
**non-issue** 83:18
**noon** 39:6
**Notary** 1:12 89:6
**note** 84:4
**notes** 59:20 89:9
**nothing** 28:7 79:7
**notice** 1:10 33:23
**number** 14:13
35:19,22
**numbers** 16:14,19
16:22,24 19:9
21:17 24:1,14

___

**O**

**oath** 2:3
**object** 2:20 18:9
44:7 45:22 60:1
61:18,24 63:1,13
70:1
**observation** 12:14
12:14,18
**observer** 41:2
**obviously** 71:1 74:6
**occasion** 9:7,8 10:4
10:5 24:19 54:2,7
**Occasionally** 26:6
**occasions** 25:19
**off** 32:16 43:7 50:18
50:20 81:20
**office** 48:1,9 51:21
60:21 80:4,6,8
**officer** 70:10
**Offices** 1:10
**often** 84:11
**Oh** 6:9 35:14
**okay** 3:6,7 4:23 5:2
5:3,6,7,12,21 6:9
12:20 14:3,18,21
15:3 16:15 17:8
17:19 19:12 20:20
21:5 22:18 23:18
23:22 27:23 28:4
29:1 31:2 35:19
36:24 37:15 38:16
40:2 41:10 43:8
43:13 47:2 49:20
50:16,17 51:6
52:14 54:19 55:1
55:5 56:15 60:7
61:6 64:18,19,20
68:14 73:7 74:15
75:21 76:17 77:5
81:1 83:21 84:8

84:20 86:2
**once** 12:23
**one** 2:16 8:2 18:21
22:1 26:11 32:5
34:16,17 35:12
45:12 50:13 54:2
54:7 55:14 60:18
62:19 69:4 74:4
74:17,20 78:16
79:23 81:13 85:18
85:22
**one-thirty** 39:6
**only** 22:12 35:11
38:6 56:2 58:4
63:16 67:2 83:13
**opened** 4:7
**operations** 24:6
32:1 35:21 67:2
67:23
**operations-related**
17:13
**opinion** 46:23 80:22
80:23 81:2,11
**opportunities** 6:11
**opportunity** 14:22
38:11
**option** 64:3
**options** 61:17 62:19
62:24
**order** 50:2 66:18,19
**original** 58:16
**other** 6:10 7:20,21
8:24 9:16 12:14
14:2,4 16:6,6,11
19:6 21:6 23:7,10
25:15 28:1,11,22
32:5 38:9 39:13
39:16 40:18 46:14
49:6 52:16 57:4
59:13 65:2,19
67:4,10 71:3 74:2
74:3 76:20 77:7
83:22
**others** 12:15 13:4
14:3 19:1 20:16
21:10 24:19,21
**otherwise** 89:13
**out** 8:24 15:15 29:7
32:22 42:6 45:6
45:13 51:20 52:11
53:4 75:19 82:9
**outlining** 69:2
**outside** 8:17,24 9:23
**over** 7:10 8:3 25:19
34:9 40:7,11 51:4
53:20 59:19 68:11
72:24 74:23 82:9

83:19
**overnight** 83:19
**own** 4:1,6,6 40:14
40:16 46:9,10
74:19
**owned** 4:1

___

**P**

**page** 14:13 43:7
50:16,18 87:3,9
88:12
**pages** 26:11
**paper** 30:2 66:7
80:19
**paragraph** 15:15
17:22 33:2 60:18
**Pardon** 54:17
**part** 7:12 10:24
15:22 17:14 18:4
33:12 39:23 40:4
43:22 47:17 56:9
58:16,19 60:8
62:12,13 79:16
**participant** 41:3
**participate** 40:22
**particular** 56:7,12
**parties** 89:8
**parts** 17:19 27:9
74:13
**party** 89:13
**Patrone** 15:9 16:16
17:4
**Pennsylvania** 3:20
3:24
**people** 10:9 12:22
14:4 16:12 18:3
19:7 20:6,21 21:5
21:6 22:6,16
23:10 29:2 32:19
33:13 34:12 35:2
35:5 68:17 71:14
72:23 73:1,4 74:3
74:11 81:4 83:22
84:14
**people's** 32:13
**percent** 17:12
**perfect** 10:20
**perform** 33:3,15,21
34:6
**performance** 10:16
11:1,20 12:2,13
13:20,23 15:20
18:5,21 24:16,18
25:2,6,24 26:19
27:6 81:6,22,23
82:2,3,7,14 83:12
83:14 84:1,2

Snyder
Gregory Buragino

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

Page 96

87:12
period 24:10,11
  34:10 67:1
person 31:12 45:1,6
  46:8 47:1 72:21
  73:11 74:4,10
  78:19 79:9,12
  81:3,16,20 82:8
  82:13,14 83:9
personable 8:18,19
  8:20
personal 6:10 8:15
  12:12,14,17 32:7
  32:10,15 33:5,10
personalities 85:7
personally 14:3
  32:15,20 33:9,10
  33:17 55:22 68:7
  69:22 70:13 85:6
personnel 6:14,15
  6:16,17 12:9 27:2
person's 46:24
  73:13
phone 2:10 30:10
  38:22,23
phrased 48:10
physical 16:13
  17:14 19:9 21:17
  21:18 22:20,22
  23:20 24:1,13
physically 6:1 30:2
  69:8 75:24
picture 4:9
piece 30:2 32:5
  74:17
pieces 56:7 76:21
place 17:2
placed 5:17
places 67:4
Plaintiff 1:4,17
planning 65:8 67:20
  68:1 71:17
plant 26:3
plate 6:15 7:1 71:5
  71:18 72:4,7,12
  73:2,13 74:21
please 3:8 18:12
point 8:2 39:15,24
  40:5 44:12 53:5
  59:8 63:6 64:1,7
  65:23 69:8 72:9
  81:1 82:20,23
  84:18
points 43:12 49:14
  55:8
policy 31:21 37:24
  38:20 43:22 58:7

58:19 77:17,24
  78:2,5,7,15 79:1,6
poor 75:16
popping 78:23
portion 12:22 17:20
  28:2 78:4 80:15
position 4:15,17
  5:11,16,18,19
  11:11,12,14,16,17
  13:11,11 48:19
  49:6 65:8 67:20
  67:23 68:2,5,6,7
  69:10 70:8 71:2,5
  71:18,23,24 72:7
  73:21 75:1,12
  76:16
positioned 70:23
positions 4:24 6:24
  65:22 66:8 68:15
  68:19 71:9,10
  73:24
possible 38:2,21
  39:5,9 40:9 49:3,9
  58:6,7 61:17 62:6
  62:19 65:15 80:1
possibly 79:14
posted 68:6
potential 65:3
premises 75:23
preparation 3:11
present 9:3 29:24
  33:23 52:21 61:10
  79:24 85:22
president 57:23
  58:1,2,9,13
presume 41:24
presuming 28:12
pretty 10:18,19
  11:15 31:21 77:17
  83:3,9
previous 61:9
previously 14:17
primarily 34:11
primary 7:18
printer 89:9
prior 3:23 4:10 6:7
  44:8 60:2 75:3,4
  82:17 83:14,14
  84:6
privilege 2:8
probably 18:24
  20:10 22:8 24:21
  35:19 37:12 48:10
  48:12 54:14 55:20
  55:21 56:1
problem 47:12
problems 18:20,23

82:1,2
procedure 31:9
  38:1 40:4 78:16
procedures 58:7
Products 3:19,23
professional 85:19
professionally 9:17
  77:23
promoted 5:13,15
proper 2:21 22:3
  33:13
proposing 49:5
protect 79:16
provide 13:4 16:12
  16:24 17:20 19:7
  20:16 21:10,12
  23:24 50:9 68:20
provided 31:22
Public 1:12 89:6
purpose 58:3,12
purposes 14:12
pursuant 1:10
pursue 6:10 43:5
put 26:17 28:7
  34:15,17 39:24
  40:13,14 48:9
  77:24
putting 74:19
P-0274 14:17 87:10
P-0275 14:17 87:10
P-274 14:19
p.m 1:11 37:5,6,12
  86:11
P.O 1:20

Q

QA 5:9,9
quality 4:16 6:17
question 2:18,22,23
  5:23 8:5 16:19
  18:12,13,14 19:12
  21:8,9,24 25:11
  27:12 45:16,17,24
  46:2,4,16,17,19
  52:5 54:9,23
  56:18 57:16,17,19
  62:4,15 66:3 70:3
questions 2:16 3:2
  6:6 40:24 76:8
  86:6 89:8
quickly 18:10 58:7
  59:21,22
quiet 85:17
quite 3:22 54:5 67:8
  80:20
quote 17:22,23
  42:23 47:24 53:16

53:17
quotes 15:19 48:9

R

raised 54:1,6,16
ran 7:13,21
Randolph 6:14 7:1
  7:4,7,23 8:2,7,10
  8:11,13,16 9:17
  10:21 11:6,10
  13:13,20 24:17,20
  25:1,4,10 26:1,5
  27:1 32:2 34:11
  37:24 41:21 42:4
  42:24 43:20 44:11
  44:24 45:19 46:18
  47:15 48:2 51:11
  52:18,23 53:1,11
  53:16 54:1,6
  55:12,18 56:19
  57:5,8,11 59:16
  60:11,13,15,21
  61:4,4,7,10,16,20
  62:5,23 63:5,10
  79:21 80:8,14,24
  81:3,5,11,15 83:1
  84:23
Randolph's 7:9
  11:11 53:8
range 35:17
rank 81:4,5
raped 54:15
rational 45:18 46:6
  79:5,13
Reacting 77:21
reaction 77:10,12
  77:14
read 15:14,17,20
  17:21 28:12 29:22
  36:22 43:7 46:5
  63:16
reading 28:11 34:16
  43:2,9 80:4,13,20
  80:21
real 8:3 13:24
really 8:23 13:8
  50:23 69:24 70:12
  73:20,22,23 74:9
  78:21 85:12
reason 2:17 21:3
  44:15 65:24 68:20
  78:22 80:3 82:12
  84:1,2 85:7
reasonable 37:6
  45:5,9,11
reasons 6:10
recall 6:17 8:1,24

10:7,12 11:3,15
  11:22 13:24 14:3
  14:7 16:15,17,20
  17:18 18:11,20
  19:1,17,19 20:12
  21:15 22:17,21
  24:10 25:14 27:14
  27:16 28:17,18,20
  28:23 29:4,8,9,19
  29:20,22 31:13
  32:6 33:9,24 34:1
  34:3,4,8 35:4,17
  41:2,3,9 42:20
  43:12,21 44:2,16
  44:19 46:14 47:13
  47:16,17,20 49:12
  49:14,22 50:3
  51:18 52:24 53:18
  55:9,12,21,23
  56:8 57:3,13
  58:15,17 59:11
  60:6,14 62:17
  63:4 65:14 66:10
  66:12,17 67:3,4
  67:13 68:13 70:16
  70:24 71:3 74:16
  75:4,6,8,16 76:13
  76:14 78:4 80:1
  80:10 82:1,16,22
  83:11 84:2,5
  85:10,12,14,16,21
  86:3
recalled 56:12 79:5
  80:7
receive 11:20 13:19
  13:22 27:12 29:12
received 3:13 27:11
  37:15
recollect 42:19
  43:11 58:4 61:20
  62:9 63:19 74:17
  74:18 82:5
recollected 48:14
recollecting 66:24
recollection 23:3
  24:2 38:13 48:6
  60:22 69:12
record 3:6,9 32:14
  32:17,22 33:8
  46:5 68:9 82:21
recording 62:21
records 32:13,19,23
refresh 48:6 60:22
refreshed 38:12
  51:17
refused 30:15
regard 78:7

Snyder
Gregory Buragino

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

Page 97

regarding 6:7 25:7
Registered 1:11
  89:5
relationship 8:10
  8:11,15,21 9:4,21
  13:2 84:21,22
relative 24:13 77:7
  89:13
relevant 69:24
  70:12
relocating 49:23
rely 34:12
remain 74:7
remember 5:4 8:3
  10:9,10 12:4
  13:15 16:18 17:3
  17:9,10 18:1,17
  21:2,20,23 23:9
  24:7,12,22,22
  25:17,22 27:7,8
  30:4,5,7,14,15,16
  30:18,18 31:15
  33:11 35:3 37:1
  37:20,22 38:3,8
  39:1,2,5,13,16,22
  39:23 40:10,11,17
  41:8,12,15,17
  42:1,9,13,15
  43:18 47:21 48:8
  48:11,22,22,23
  49:7,24 50:3,6
  51:3 53:1,8,10
  55:6,6,18 56:4,6
  59:9,13,16 60:4
  60:12,24 61:1,2,4
  61:5,14 63:6,8,23
  65:1,6,12,16,20
  67:11,18 68:8,10
  68:15,22 69:3,6
  69:15 71:7,13
  72:6,11,13,15
  73:6,7,9,12,13,20
  73:22 74:5,6,8,13
  74:20,23 75:5
  77:2,6,9,9,12,13
  77:14 78:20 80:11
  80:15,21 83:13,18
  84:9
remembering 80:20
remove 62:21
repeat 2:19 46:2,4
  54:11,23 55:2
  62:4
repeatedly 33:3,16
  33:21 34:6
rephrase 13:9
REPLACE 88:12

report 14:5 16:8
  22:22
reported 6:15,15,16
  6:21,23
reporter 1:12 3:1
  46:3 89:4,6
reporting 6:18 13:1
  34:12
reports 10:21 16:7
  22:20 73:10
required 33:4,6
  34:6 45:2 76:22
requirement 11:21
requires 70:2
reserved 85:20
resolution 47:9 49:9
  62:16 65:3,15
  79:15
resolve 46:20 47:4
  47:11 58:21,23
  59:4
resolved 59:22 70:7
  70:17
resources 31:12,23
respect 38:6 66:1
respective 89:8
respectively 85:6
response 53:9 59:24
responses 3:2
responsibilities
  6:13 7:8,12,18
  16:6,9 21:14 67:7
  67:9
responsibility 6:19
  7:9 18:7,15 47:10
  47:11
responsible 8:6
  12:23 17:16 23:14
  23:19
result 27:15
retained 6:2
retrospect 79:1
  83:8
return 69:10,17,19
review 3:16 14:22
reviews 12:2
right 8:4,22 20:12
  21:18 24:7 34:1
  39:4 40:8 42:20
  44:3 55:22 57:22
  58:18 63:16 67:13
  76:6 79:7
ring 85:24
rings 41:14
RMR 89:17
role 66:22 74:10
roles 71:11,11

room 61:3 63:11,20
  63:23,24 64:2
run 7:9
running 73:9
Ryan 59:12

S
salaried 10:17,24
  11:3,4,7,12,17,24
same 5:14 8:13 9:24
  10:3 12:16 26:1
  29:10 44:24 51:12
  52:18 63:2 72:5
  78:1
satisfaction 70:18
satisfied 42:12,15
  43:4 56:2
saw 84:4
saying 16:21 28:23
  28:23 35:9 41:8
  41:13,16,16 44:3
  44:18 46:10 47:16
  47:17,20 48:8
  55:6,10,23 60:24
  61:3 64:14 72:19
  74:5 85:24
says 15:13 19:9
  27:7 39:6,21,23
  46:12 47:1 48:4
  49:14 60:19 61:22
  62:18,19 65:6
  67:6,17 80:6
schedule 76:18
schedule-type 76:18
second 47:23 67:7
  67:15
see 9:7,8 12:23
  14:18 15:4 19:9
  23:15 29:14 33:10
  35:5 44:12 48:4
  50:17,17 84:4
seeing 12:4 35:4
seeking 58:22
seem 74:16 85:14
seemed 53:11
seems 45:5 78:20
  79:13
seen 9:9 12:10
self-sufficient 83:3
sense 78:24 85:15
sent 3:17 19:17
sentence 60:19
  62:18 75:17
separate 79:24
  80:16
sequence 40:19
series 2:15

serious 83:2 84:19
seriously 77:19
services 5:14 24:19
set 36:9
several 4:24 21:14
  25:19
sexual 36:21 50:9
  51:22
shared 13:9,12,12
sheet 29:21 80:19
  88:15
sheets 74:16,19
  76:18,23
she'd 42:15 43:4
shifts 20:8
shipping 6:16 7:2
  49:23 50:4 64:4,5
  64:16,24 65:14,18
  66:6,11,21 67:1,2
  67:10,16 68:6,16
  77:1,3,4,8
shirt 81:20
shocked 53:12
  77:13
shop 4:20 5:2 6:14
  7:10,19 10:17
  13:14 20:7 23:11
  24:3 32:1 35:7,13
  35:22 36:2,4,7
  44:13 67:12 69:11
  69:13,18,20 70:14
  71:2,18,23 73:2
  76:12 82:8
short-term 78:18
  79:14
show 33:15,20
shown 33:3 34:2,2,5
sick 72:22
sign 30:5,12,15
signed 30:13 36:19
  88:21
similar 16:15
simple 20:19
simply 61:23 70:11
since 9:9 10:1,5,13
  27:7 71:2
sincere 52:6
sit 85:1
sitting 42:19
situation 46:20 47:1
  53:3 58:10,24
  70:17 77:23
six 6:2
slab 7:19,22,24 8:6
Snyder 1:3 11:13
  12:3 13:2 15:9
  17:17,23,24 18:2

18:7,15,18 20:15
  21:8 24:1 25:8,13
  26:19 27:4 29:17
  35:24 54:2,7 78:9
  85:21 87:14
Snyder's 2:10 12:12
  36:17,20 37:12
  56:19 67:20 77:11
  81:22 83:12 85:10
solution 49:4 65:3
  65:18 66:4
solutions 62:6
some 2:17 6:12 7:7
  7:17,21 8:1 12:17
  12:21 14:5 17:13
  20:23 21:20 23:5
  23:7,23 24:7
  25:20 47:1,10
  51:17 64:1,7
  65:23 68:9 71:8
  74:14 76:13,20
  78:22 80:3,14
  81:23 83:4 84:2
somebody 22:23
  32:14 46:7 69:6
  70:10
somehow 47:6
  73:21
someone 20:24 23:8
  28:6,6 29:9 34:15
  34:17 59:11 68:12
something 14:6
  18:4 20:24 21:5
  22:23,24 23:1
  30:14 35:6 37:3
  37:19 38:12 41:12
  41:13,24 42:7,10
  42:17 44:4 46:12
  47:18 51:20 54:10
  54:14 59:11 64:21
  69:4,6,8 70:11
  72:9,22 78:13,14
  78:15 83:5 84:5
sometime 10:14
  12:24,24
sometimes 20:21
  21:4 70:19
somewhat 7:12
  65:20
somewhere 55:7
soon 38:2,21 39:5,9
  40:8
sorry 4:4 6:4 9:12
  11:8,9 12:6 13:17
  17:6,9 18:13 25:9
  26:23 30:9,10
  31:18 36:4 43:2

Snyder
Gregory Buragino

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

Page 98

| | | | | |
|---|---|---|---|---|
| 45:10 46:1,2 | 19:13 20:14 34:22 | **take** 8:3 31:11 | 54:2,7 55:17 56:2 | **thorough** 43:17 |
| 51:15 54:4,11,13 | 43:6 50:9,24 | 47:23 52:13 56:13 | 56:18 62:20,21 | 77:16 |
| 54:18 55:4 62:4 | **states** 1:1 79:20 | 60:17 62:18 72:22 | 64:3,23 66:5 | **though** 38:7 |
| 64:9,10 66:16 | **stayed** 9:15,19 | 74:3,22 75:17 | 67:20 68:7,20 | **thought** 15:18 41:8 |
| 72:13 | **Stenotype** 89:9 | 77:19 80:5,13 | 69:1,10 70:21 | 41:15 43:10 47:8 |
| **sort** 76:15 78:24 | **stepped** 73:8 | **taken** 1:10 17:2 | 74:21 75:1,6,8,9 | 52:4 61:7 77:15 |
| **sounded** 28:1 | **steps** 31:11 | 25:20 89:8 | 75:12,19 84:5 | 80:3 81:15 85:16 |
| **sounds** 30:6 37:6 | **sticker** 34:18 | **taking** 2:8,9 3:2 | 87:14 | **thoughts** 51:22 52:3 |
| 42:17 | **still** 10:9 45:19 46:8 | 68:11 | **Terri's** 24:15 25:2 | 52:15 56:18,23 |
| **speak** 39:8 | 48:2 63:5 64:2 | **talents** 85:5 | 35:15 66:11 71:24 | 57:9 |
| **speaking** 13:7 21:7 | 66:9 74:7 79:10 | **talk** 38:24 40:22 | 72:17 83:24 84:2 | **threatened** 62:22 |
| 40:12 56:19 80:5 | 81:16 | **talked** 19:3 28:7,9 | **TERRY** 1:3 | 79:11 |
| **specific** 22:22 24:12 | **stop** 41:7,11,12,22 | 40:14 49:17 76:20 | **testified** 2:4,12 | **three** 43:17 |
| 25:16 30:22 31:20 | 42:14 43:4 47:2 | 83:23 | **testify** 81:23 84:10 | **through** 4:21 14:5 |
| 38:9 42:16 51:24 | 47:20 56:3 | **talking** 19:1 33:8 | **testimony** 3:12 44:8 | 42:18 |
| 56:20 63:9 67:11 | **stopped** 42:11 | 35:15 46:17 68:22 | 45:23 63:13 78:9 | **throughout** 5:19 |
| 67:23 78:4 83:17 | **stops** 43:4 | 73:18 | 87:1 89:11 | 8:12 67:1 73:3 |
| **specifically** 2:22 5:5 | **straight** 53:23,24 | **tape** 62:20 | **their** 22:17 24:14 | **Thursday** 75:18 |
| 16:17,20 19:2 | **Street** 1:19,23 | **tasks** 33:3,15,21 | 74:19 82:14 83:10 | **tie** 27:16 |
| 21:2,9 22:18 | **struggling** 73:20 | 34:6 | 84:21,22 85:5 | **till** 16:8 |
| 24:20,22 25:7,12 | **sub** 73:2 | **TAYLOR** 1:18 | **theirs** 25:15 | **time** 2:17 6:17 7:10 |
| 28:18,24 29:4,20 | **subject** 15:12 | **technically** 75:14 | **themselves** 20:22 | 8:15 15:18 17:7 |
| 29:21 31:13 32:4 | **suit** 89:14 | 75:15 | **thing** 20:23 45:6 | 21:6,22 22:12 |
| 37:1 39:1,13 | **supervisor** 6:24 7:2 | **TELEPHONE** 1:18 | 46:7 78:18 79:8 | 24:10,11,14 26:1 |
| 40:21 41:3 42:1 | 7:4 11:4,12 13:16 | **Telephonic** 1:9 | 79:13 82:18 | 29:10 30:6 32:3 |
| 43:21 44:3 46:11 | 74:14 | **tell** 5:1 15:7 17:4 | **things** 7:20 23:2,2,5 | 33:7,24 34:10 |
| 46:14 48:11 49:24 | **supervisors** 6:20 | 18:6,14 19:3,16 | 23:7,7 34:20 | 35:15 36:1 37:11 |
| 50:5 51:3 52:15 | 7:2,3 13:8,12 20:9 | 20:1,4 26:16 | 42:20 44:16,20,20 | 43:10 48:14,17 |
| 55:24 56:6,23 | 20:9,10 23:11,14 | 34:13 37:15 38:5 | 45:2 59:13,22 | 49:2,8 57:4,13 |
| 58:14,15 59:14 | 23:15,16,16,17,21 | 39:7,12,14,18,24 | 71:12 74:23 77:7 | 58:2,18 66:11,24 |
| 60:23 61:15 62:10 | 23:24 26:3,4,5 | 42:4,11 48:16 | 78:16 81:8 82:19 | 67:5 68:2 70:15 |
| 63:21 64:5,16 | 72:24 73:16 74:18 | 52:24 53:16,22,22 | 83:23 | 74:16,19,21 75:1 |
| 65:1,14 66:17 | 83:3 | 54:1,6 61:8 64:1 | **think** 11:18 12:4,10 | 76:7,17,17,23 |
| 67:18 69:15 70:16 | **suppliers** 9:1 | 66:2 68:17,18 | 14:6 16:18 18:1,2 | 77:3 80:24 82:9 |
| 71:13,14,24 72:6 | **support** 36:1,4,6,7 | 74:9 75:19 85:8 | 20:23 21:2 23:4 | 83:20 84:14 85:2 |
| 72:24 73:5 77:2 | **suppose** 19:14 | 85:18 | 23:13 24:18 27:24 | 85:18 |
| 78:21 80:2,11 | **supposed** 11:1 16:1 | **telling** 10:10 30:17 | 27:24 31:16,16 | **timely** 24:9 |
| 82:7 | 23:5 77:22 78:17 | 52:6 55:12,18 | 33:19 35:1,9,11 | **times** 2:20 22:11 |
| **specifics** 21:12,13 | **sure** 3:3 11:15,17 | 75:6,8 76:3 | 37:7 38:23 41:1 | 24:6,24 25:3,5 |
| 37:22 38:3 40:18 | 12:21 15:6 17:3 | **tempered** 57:10 | 42:6,6,9 44:11,13 | 55:3 82:18 83:17 |
| 65:21 | 17:19 18:24 19:23 | **tenure** 8:12 73:4 | 44:15,22 47:2,9 | **timing** 80:2 |
| **speculate** 62:1 | 22:16 33:7,13 | **term** 73:8 79:5 | 48:18,19 49:3,4 | **title** 6:22,24 17:9,10 |
| **speculation** 70:2 | 40:24 41:2 43:9 | **terminated** 75:12 | 50:7,10 52:11,22 | 77:8 |
| **spent** 67:4 | 46:6 50:2 52:9 | **terms** 6:5 69:2 73:9 | 53:11,14,19,21,23 | **titled** 87:11,13 |
| **spoke** 10:4 51:23 | 55:14 57:9,14,15 | 81:5,6 | 57:21,22 58:8,8 | **today** 2:9 3:12 42:1 |
| **staff** 36:1 | 59:1,6 60:16 61:2 | **Terri** 2:10 11:13 | 58:10,14 59:4,5,5 | 49:12 50:3 79:7 |
| **stamped** 14:17 | 77:20 78:17 79:9 | 12:3,12 13:2,13 | 59:18 60:12,13 | **together** 8:24 9:18 |
| 87:10,12,14,15 | 79:18 | 13:14 15:9 17:16 | 62:12 63:12 64:6 | 26:5,8 39:4 |
| **stand** 56:10 | **surprised** 53:14 | 17:20 19:6 21:8,9 | 64:11 65:6,13 | **told** 16:2,8 19:6 |
| **standard** 31:21 | 77:13 | 22:14 23:1 24:1 | 66:2 69:7,9,24 | 20:3 28:15 29:2 |
| **STARGATT** 1:18 | **surrounding** 36:17 | 25:8,12 26:19 | 70:17,19 73:21 | 30:8,11 39:15,17 |
| **started** 8:13 74:18 | 87:13 | 29:17 32:7 33:6 | 75:3,14,15,15,24 | 39:18 40:1 61:9 |
| 82:9 | **sworn** 2:3 89:7 | 35:8,24 36:17,20 | 77:17,22 78:12,14 | 75:1,4,9 76:2 |
| **state** 3:8 89:1 | **system** 17:15 21:22 | 37:12,23 40:8,10 | 79:4,6 80:7 83:23 | 83:15 84:3,4 |
| **stated** 19:5 34:15 | 24:3,3 | 41:5 45:18 46:17 | 84:16,24 85:4,13 | **top** 29:14 |
| 34:17 | | 47:13 49:10,18 | **thinking** 20:4 57:4 | **topic** 50:1 |
| **statement** 11:23 | **T** | 50:8,24 51:23 | **third** 42:22 | **touch** 9:5,6,15,19 |