Snyder
Gregory Buragino

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

Page 99

| | | | | |
|---|---|---|---|---|
| **track** 17:15 76:17 | **unacceptable** 26:18 | 67:1 | 15:1 19:16 20:4,5 | **word** 15:15 44:19 |
| **trained** 33:11,22 | 87:11 | **victim** 78:1 79:2,17 | 20:20 21:16,24 | 53:2,13 59:2 |
| **training** 17:16 | **uncomfort** 46:24 | **view** 53:5 | 22:6 23:9,20 24:5 | 78:10 |
| 33:13 | **uncomfortable** | **visibly** 54:2,7 | 25:14 28:9 35:19 | **worded** 31:20 |
| **transcribed** 89:9 | 43:20 44:23 45:8 | **voice** 54:1,6,16 | 35:20 36:22 37:17 | **wording** 31:19 |
| **transcript** 89:11 | 45:15,19 46:18 | | 37:19 38:14,19 | **words** 28:1,11,22 |
| **transcription** 89:9 | 47:5,6,14 48:2 | **W** | 40:24 42:10 44:10 | 32:5 40:15 41:11 |
| **transfer** 64:3 65:5 | **under** 16:3 89:10 | **Wait** 43:2 56:17 | 46:23 47:3 48:8 | 41:14 42:9,13,16 |
| 69:2,11 70:22 | **understand** 2:17,23 | **wall** 34:19 | 52:2,7 53:10 55:8 | 44:17,19 53:20 |
| **transferred** 65:18 | 19:20,21 57:5 | **want** 13:11 14:8,22 | 57:10,12 59:1 | 67:10 81:10 |
| 68:21 | 66:24 | 21:12 30:12 31:7 | 60:17,23 61:12 | **work** 3:19,23 8:17 |
| **transferring** 64:23 | **understanding** | 31:11 38:5,16 | 63:16 64:5,14 | 8:19,22,24 9:16 |
| **translate** 3:5 | 11:19 19:13,21 | 42:4,7,24 43:5 | 65:10 67:4 70:5 | 9:23 12:12,16 |
| **transpired** 71:21,22 | 45:4 65:17 71:22 | 45:13 46:8 47:2 | 73:15,20 74:1 | 13:13,14,14 18:3 |
| **treated** 9:23 | **understood** 74:12 | 47:18 48:16,20,21 | 78:12 79:4,6,8 | 21:4 26:18 27:5 |
| **tried** 43:11,14,16 | **Unfortunately** 85:1 | 48:23,24 50:24 | 80:10,17 82:11 | 32:21,22 34:12 |
| 85:4 | **UNITED** 1:1 | 55:2,17 56:20 | 84:23 | 46:8 51:14,16,20 |
| **trouble** 84:17 | **unless** 2:22 83:2,4 | 57:18 64:21 69:11 | **went** 5:7,8,10 14:5 | 57:7 62:21 87:12 |
| **true** 10:3 11:23 | **until** 4:18 5:20 | 70:13,20 78:13 | 15:21 17:22 38:19 | **worked** 3:21 4:12 |
| 15:22 17:1,19 | 84:16 | 79:9 | 74:14 83:18 | 4:14,21 9:18 17:5 |
| 21:5 22:8 34:22 | **untrue** 78:13,14 | **wanted** 15:24 34:14 | **were** 3:17 4:13,15 | 57:6,8 68:17 |
| 34:23 35:2,6 | **unusual** 29:9 | 38:11,12 40:8 | 4:17 5:17 6:12 7:7 | 80:24 |
| 52:10,11 53:5 | **upset** 54:3,8 75:19 | 42:14 43:1,1,3 | 7:17 8:18 9:13,22 | **working** 3:18 4:10 |
| 75:14 89:11 | **USA** 1:6 | 44:13 47:20 50:11 | 10:16,18,24 12:2 | 4:13 12:11 35:21 |
| **trust** 37:2,14,18 | **usage** 16:5 | 53:24 57:22 58:6 | 12:22 13:7,17 | 43:20 44:10,23 |
| 81:18 | **use** 53:14 59:2 89:9 | 64:12 65:21 70:11 | 14:1 16:1,1,9 18:4 | 45:19 46:18 47:14 |
| **truth** 52:6 | **used** 44:17 53:19 | 70:17 74:10 | 19:4 20:7 22:4 | 47:21 48:2 78:2 |
| **try** 16:10,17 22:16 | 73:2,10 78:10 | **wanting** 30:5 | 24:12 29:1,2,3,24 | 78:10 84:22 85:3 |
| 33:12 42:18 45:3 | 79:4 | **wants** 31:7 39:23 | 30:20 31:4 33:13 | **worry** 71:12 |
| 47:11 58:4 85:2 | **using** 53:18 | 70:19 | 33:23 34:10 35:7 | **wouldn't** 14:4 22:11 |
| **trying** 19:20 23:13 | **usually** 31:16 | **warning** 26:22,23 | 40:1,15 44:15,16 | 23:6 32:20,20 |
| 30:14 44:20 45:7 | **utilize** 6:8 24:19 | 27:15,19,20,21 | 49:5 51:22 52:16 | 46:9 70:7 78:6 |
| 53:3,23 59:21 | 85:5 | 28:1,5,14 29:1,2,3 | 52:16 53:23 56:5 | 83:6 |
| 66:22 74:2,17 | | 29:5,10 30:1 | 56:18,21,23 57:9 | **wound** 74:7 |
| 78:8 84:7 | **V** | 82:20 | 58:22 59:3,21 | **write** 50:8,10,11 |
| **Tuesday** 50:14 | **v** 1:5 | **warnings** 29:7 | 60:15 64:10 67:8 | 80:17 |
| **turn** 26:9 36:8 | **vacation** 72:22 73:1 | 82:17,17 | 67:11 68:16,19 | **write-up** 26:19,23 |
| 50:12 | **vacations** 76:18 | **Warren** 57:21,22 | 71:8 72:8 74:1,24 | 27:10,13 28:6 |
| **two** 3:22 14:1 26:11 | **vaguely** 50:4 | 58:23 60:5,20 | 76:11,22,24 80:3 | 30:24 31:6,7,10 |
| 32:8 43:15 48:14 | **valid** 21:3 | 61:1 62:10,11,12 | 80:5 82:1,17,18 | 31:21,22 |
| 62:21 63:2 79:22 | **value** 52:13 80:14 | 65:7,21 67:19,24 | 82:19,19 83:2,22 | **write-ups** 31:3 |
| 80:16 85:3,6 | **various** 6:18 34:9 | 71:16 79:21,21 | 85:6 89:8 | **writing** 28:7 31:9 |
| **type** 4:8 20:23 | **verbal** 27:19 28:2 | 80:12 | **weren't** 15:24 71:11 | 38:13 40:1,13,14 |
| 31:12,17 71:9,10 | 82:17,19,20 | **Warren's** 80:3 | 84:14 | 49:13 55:14,16 |
| 74:23 81:17,18,20 | **verification** 16:5 | **wasn't** 8:7 10:8 | **West** 1:19 | 65:7 69:1,4,8 |
| 83:1 | **versus** 28:6 | 17:6 22:7,11 24:9 | **we've** 9:19 | 71:16 84:14 |
| **typed** 31:13,15,17 | **very** 18:9 21:24 | 30:13 35:1 70:7 | **while** 8:19,22 12:11 | **written** 26:21,23 |
| **types** 85:7 | 30:22 31:20 51:11 | 84:1,3,12,14 | **whole** 13:14 36:1 | 27:15,20,21 28:2 |
| **typical** 78:1 | 53:11,23,24 55:8 | 85:18 | 82:20 | 28:5,16,24 29:2,3 |
| **typist/clerical** 68:7 | 58:5,8 59:21 | **watching** 51:3 | **WILCOX** 1:23 | 29:5,7,10,24 31:7 |
| **typist/clerk** 35:24 | 77:23 81:2,4,11 | **way** 24:12 31:6 | **Wilmington** 1:10,16 | 43:15 61:13 64:15 |
| | 81:15 82:6 83:2 | 40:16 47:4 48:7 | 1:20,23 | 65:19 82:17 84:11 |
| **U** | 84:19 85:3,4,17 | 48:10 57:3 81:7 | **witness** 2:2 44:8 | **wrong** 43:2 44:19 |
| **uh-huhs** 3:5 | 85:19 | 81:21 | 89:12 | 50:8 |
| **ultimately** 49:4 | **vet** 52:14 | **week** 15:22 | **witnessed** 76:1 | **wrote** 28:13 34:18 |
| 65:23 70:8 74:24 | **vice-president** 5:13 | **weigh** 22:23 23:2 | **woman** 57:6 | 35:3 37:1,17,20 |
| 82:15 | 5:15,18 6:13 22:4 | **well** 8:4 9:17 13:24 | **wondering** 37:3,9 | 38:15 41:23 42:2 |

Snyder
Gregory Buragino

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

45:10 46:1,2
51:15 54:4,11,13
54:18 55:4 62:4
64:9,10 66:16
72:13
**sort** 76:15 78:24
**sounded** 28:1
**sounds** 30:6 37:6
42:17
**speak** 39:8
**speaking** 13:7 21:7
40:12 56:19 80:5
**specific** 22:22 24:12
25:16 30:22 31:20
38:9 42:16 51:24
56:20 63:9 67:11
67:23 78:4 83:17
**specifically** 2:22 5:5
16:17,20 19:2
21:2,9 22:18
24:20,22 25:7,12
28:18,24 29:4,20
29:21 31:13 32:4
37:1 39:1,13
40:21 41:3 42:1
43:21 44:3 46:11
46:14 48:11 49:24
50:5 51:3 52:15
55:24 56:6,23
58:14,15 59:14
60:23 61:15 62:10
63:21 64:5,16
65:1,14 66:17
67:18 69:15 70:16
71:13,14,24 72:6
72:24 73:5 77:2
78:21 80:2,11
82:7
**specifics** 21:12,13
37:22 38:3 40:18
65:21
**speculate** 62:1
**speculation** 70:2
**spent** 67:4
**spoke** 10:4 51:23
**staff** 36:1
**stamped** 14:17
87:10,12,14,15
**stand** 56:10
**standard** 31:21
**STARGATT** 1:18
**started** 8:13 74:18
82:9
**state** 3:8 89:1
**stated** 19:5 34:15
34:17
**statement** 11:23

19:13 20:14 34:22
43:6 50:9,24
**states** 1:1 79:20
**stayed** 9:15,19
**Stenotype** 89:9
**stepped** 73:8
**steps** 31:11
**sticker** 34:18
**still** 10:9 45:19 46:8
48:2 63:5 64:2
66:9 74:7 79:10
81:16
**stop** 41:7,11,12,22
42:14 43:4 47:2
47:20 56:3
**stopped** 42:11
**stops** 43:4
**straight** 53:23,24
**Street** 1:19,23
**struggling** 73:20
**sub** 73:2
**subject** 15:12
**suit** 89:14
**supervisor** 6:24 7:2
7:4 11:4,12 13:16
74:14
**supervisors** 6:20
7:2,3 13:8,12 20:9
20:9,10 23:11,14
23:15,16,16,17,21
23:24 26:3,4,5
72:24 73:16 74:18
83:3
**suppliers** 9:1
**support** 36:1,4,6,7
**suppose** 19:14
**supposed** 11:1 16:1
23:5 77:22 78:17
**sure** 3:3 11:15,17
12:21 15:6 17:3
17:19 18:24 19:23
22:16 33:7,13
40:24 41:2 43:9
46:6 50:2 52:9
55:14 57:9,14,15
59:1,6 60:16 61:2
77:20 78:17 79:9
79:18
**surprised** 53:14
77:13
**surrounding** 36:17
87:13
**sworn** 2:3 89:7
**system** 17:15 21:22
24:3,3

_____
**T**
_____

**take** 8:3 31:11
47:23 52:13 56:13
60:17 62:18 72:22
74:3,22 75:17
77:19 80:5,13
**taken** 1:10 17:2
25:20 89:8
**taking** 2:8,9 3:2
68:11
**talents** 85:5
**talk** 38:24 40:22
**talked** 19:3 28:7,9
40:14 49:17 76:20
83:23
**talking** 19:1 33:8
35:15 46:17 68:22
73:18
**tape** 62:20
**tasks** 33:3,15,21
34:6
**TAYLOR** 1:18
**technically** 75:14
75:15
**TELEPHONE** 1:18
**Telephonic** 1:9
**tell** 5:1 15:7 17:4
18:6,14 19:3,16
20:1,4 26:16
34:13 37:15 38:5
39:7,12,14,18,24
42:4,11 48:16
52:24 53:16,22,22
54:1,6 61:8 64:1
66:2 68:17,18
74:9 75:19 85:8
85:18
**telling** 10:10 30:17
52:6 55:12,18
75:6,8 76:3
**tempered** 57:10
**tenure** 8:12 73:4
**term** 73:8 79:5
**terminated** 75:12
**terms** 6:5 69:2 73:9
81:5,6
**Terri** 2:10 11:13
12:3,12 13:2,13
13:14 15:9 17:16
17:20 19:6 21:8,9
22:14 23:1 24:1
25:8,12 26:19
29:17 32:7 33:6
35:8,24 36:17,20
37:12,23 40:8,10
41:5 45:18 46:17
47:13 49:10,18
50:8,24 51:23

54:2,7 55:17 56:2
56:18 62:20,21
64:3,23 66:5
67:20 68:7,20
69:1,10 70:21
74:21 75:1,6,8,9
75:12,19 84:5
87:14
**Terri's** 24:15 25:2
35:15 66:11 71:24
72:17 83:24 84:2
**TERRY** 1:3
**testified** 2:4,12
**testify** 81:23 84:10
**testimony** 3:12 44:8
45:23 63:13 78:9
87:1 89:11
**their** 22:17 24:14
74:19 82:14 83:10
84:21,22 85:5
**theirs** 25:15
**themselves** 20:22
**thing** 20:23 45:6
46:7 78:18 79:8
79:13 82:18
**things** 7:20 23:2,2,5
23:7,7 34:20
42:20 44:16,20,20
45:2 59:13,22
71:12 74:23 77:7
78:16 81:8 82:19
83:23
**think** 11:18 12:4,10
14:6 16:18 18:1,2
20:23 21:2 23:4
23:13 24:18 27:24
27:24 31:16,16
33:19 35:1,9,11
37:7 38:23 41:1
42:6,6,9 44:11,13
44:15,22 47:2,9
48:18,19 49:3,4
50:7,10 52:12,22
53:11,14,19,21,23
57:21,22 58:8,8
58:10,14 59:4,5,5
59:18 60:12,13
62:12 63:12 64:6
64:11 65:6,13
66:22 69:7,9,24
70:17,19 73:21
75:3,14,15,15,24
77:17,22 78:12,14
79:4,6 80:7 83:23
84:16,24 85:4,13
**thinking** 20:4 57:4
**third** 42:22

**thorough** 43:17
77:16
**though** 38:7
**thought** 15:18 41:8
41:15 43:10 47:8
52:4 61:7 77:15
80:3 81:15 85:16
**thoughts** 51:22 52:3
52:15 56:18,23
57:9
**threatened** 62:22
79:11
**three** 43:17
**through** 4:21 14:5
42:18
**throughout** 5:19
8:12 67:1 73:3
**Thursday** 75:18
**tie** 27:16
**till** 16:8
**time** 2:17 6:17 7:10
8:13 15:18 17:7
21:6,22 22:12
24:10,11,14 26:1
29:10 30:6 32:3
33:7,24 34:10
35:15 36:1 37:11
43:10 48:14,17
49:2,8 57:4,13
58:2,18 66:11,24
67:5 68:2 70:15
74:16,19,21 75:1
76:7,17,17,23
77:3 80:24 82:9
83:20 84:14 85:2
85:18
**timely** 24:9
**times** 2:20 22:11
24:6,24 25:3,5
55:3 82:18 83:17
**timing** 83:2
**title** 6:22,24 17:9,10
77:8
**titled** 87:11,13
**today** 2:9 3:12 42:1
49:12 50:3 79:7
**together** 8:24 9:18
26:5,8 39:4
**told** 16:2,8 19:6
20:3 28:15 29:2
30:8,11 39:15,17
39:18 40:1 61:9
75:1,4,9 76:2
83:15 84:3,4
**top** 29:14
**topic** 50:1
**touch** 9:5,6,15,19

Snyder                 v.                 CitiSteel, USA, Inc.
Gregory Buragino         C.A. # 04-970-JJF          June 16, 2006

Page 99

| | | | |
|---|---|---|---|
| **track** 17:15 76:17 | **unacceptable** 26:18 | 67:1 | 15:1 19:16 20:4,5 | **word** 15:15 44:19 |

track 17:15 76:17
trained 33:11,22
training 17:16
  33:13
transcribed 89:9
transcript 89:11
transcription 89:9
transfer 64:3 66:5
  69:2,11 70:22
transferred 65:18
  68:21
transferring 64:23
translate 3:5
transpired 71:21,22
treated 9:23
tried 43:11,14,16
  85:4
trouble 84:17
true 10:3 11:23
  15:22 17:1,19
  21:5 22:8 34:22
  34:23 35:2,6
  52:10,11 53:5
  75:14 89:11
trust 37:2,14,18
  81:18
truth 52:6
try 16:10,17 22:16
  33:12 42:18 45:3
  47:11 58:4 85:2
trying 19:20 23:13
  30:14 44:20 45:7
  53:3,23 59:21
  66:22 74:2,17
  78:8 84:7
Tuesday 50:14
turn 26:9 36:8
  50:12
two 3:22 14:1 26:11
  32:8 43:15 48:14
  62:21 63:2 79:22
  80:16 85:3,6
type 4:8 20:23
  31:12,17 71:9,10
  74:23 81:17,18,20
  83:1
typed 31:13,15,17
types 85:7
typical 78:1
typist/clerical 68:7
typist/clerk 35:24

**U**

uh-huhs 3:5
ultimately 49:4
  65:23 70:8 74:24
  82:15

unacceptable 26:18
  87:11
uncomfort 46:24
uncomfortable
  43:20 44:23 45:8
  45:15,19 46:18
  47:5,6,14 48:2
under 16:3 89:10
understand 2:17,23
  19:20,21 57:5
  66:24
understanding
  11:19 19:13,21
  45:4 65:17 71:22
understood 74:12
Unfortunately 85:1
UNITED 1:1
unless 2:22 83:2,4
until 4:18 5:20
  84:16
untrue 78:13,14
unusual 29:9
upset 54:3,8 75:19
USA 1:6
usage 16:5
use 53:14 59:2 89:9
used 44:17 53:19
  73:2,10 78:10
  79:4
using 53:18
usually 31:16
utilize 6:8 24:19
  85:5

**V**

v 1:5
vacation 72:22 73:1
vacations 76:18
vaguely 50:4
valid 21:3
value 52:13 80:14
various 6:18 34:9
verbal 27:19 28:2
  82:17,19,20
verification 16:5
versus 28:6
very 18:9 21:24
  30:22 31:20 51:11
  53:11,23,24 55:8
  58:5,8 59:21
  77:23 81:2,4,11
  81:15 82:6 83:2
  84:19 85:3,4,17
  85:19
vet 52:14
vice-president 5:13
  5:15,18 6:13 22:4

67:1
victim 78:1 79:2,17
view 53:5
visibly 54:2,7
voice 54:1,6,16

**W**

Wait 43:2 56:17
wall 34:19
want 13:11 14:8,22
  21:12 30:12 31:7
  31:11 38:5,16
  42:4,7,24 43:5
  45:13 46:8 47:2
  47:18 48:16,20,21
  48:23,24 50:24
  55:2,17 56:20
  57:18 64:21 69:11
  70:13,20 78:13
  79:9
wanted 15:24 34:14
  38:11,12 40:8
  42:14 43:1,1,3
  44:13 47:20 50:11
  53:24 57:22 58:6
  64:12 65:21 70:11
  70:17 74:10
wanting 30:5
wants 31:7 39:23
  70:19
warning 26:22,23
  27:15,19,20,21
  28:1,5,14 29:1,2,3
  29:5,10 30:1
  82:20
warnings 29:7
  82:17,17
Warren 57:21,22
  58:23 60:5,20
  61:1 62:10,11,12
  65:7,21 67:14,20
  71:16 79:21,21
  80:12
Warren's 80:3
wasn't 8:7 10:8
  17:6 22:7,11 24:9
  30:13 35:1 70:7
  84:1,3,12,14
  85:18
watching 51:3
way 24:12 31:6
week 15:22
weigh 22:23 23:2
well 8:4 9:17 13:24

15:1 19:16 20:4,5
  20:20 21:16,24
  22:6 23:9,20 24:5
  25:14 28:9 35:19
  35:20 36:22 37:17
  37:19 38:14,19
  40:24 42:10 44:10
  46:23 47:3 48:8
  52:2,7 53:10 55:8
  57:10,12 59:1
  60:17,23 61:12
  63:16 64:5,14
  65:10 67:4 70:5
  73:15,20 74:1
  78:12 79:4,6,8
  80:10,17 82:11
  84:23
went 5:7,8,10 14:5
  15:21 17:22 38:19
  74:14 83:18
were 3:17 4:13,15
  4:17 5:17 6:12 7:7
  7:17 8:18 9:13,22
  10:16,18,24 12:2
  12:22 13:7,17
  14:1 16:1,1,9 18:4
  19:4 20:7 22:4
  24:12 29:1,2,3,24
  30:20 31:4 33:13
  33:23 34:10 35:7
  40:1,15 44:15,16
  49:5 51:22 52:16
  52:16 53:23 56:5
  56:18,21,23 57:9
  58:22 59:3,21
  60:15 64:10 67:8
  67:11 68:16,19
  71:8 72:8 74:1,24
  76:11,22,24 80:3
  80:5 82:1,17,18
  82:19,19 83:2,22
  85:6 89:8
weren't 15:24 71:11
  84:14
West 1:19
we've 0:19
while 8:19,22 12:11
whole 13:14 36:1
  82:20
WILCOX 1:23
Wilmington 1:10,16
  1:20,23
witness 2:2 44:8
  89:12
witnessed 76:1
woman 57:6
wondering 37:3,9

word 15:15 44:19
  53:2,13 59:2
  78:10
worded 31:20
wording 31:19
words 28:1,11,22
  32:5 40:15 41:11
  41:14 42:9,13,16
  44:17,19 53:20
  67:10 81:10
work 3:19,23 8:17
  8:19,22,24 9:16
  9:23 12:12,16
  13:13,14,14 18:3
  21:4 26:18 27:5
  32:21,22 34:12
  46:8 51:14,16,20
  57:7 62:21 87:12
worked 3:21 4:12
  4:14,21 9:18 17:5
  57:6,8 68:17
  80:24
working 3:18 4:10
  4:13 12:11 35:21
  43:20 44:10,23
  45:19 46:18 47:14
  47:21 48:2 78:2
  78:10 84:22 85:3
worry 71:12
wouldn't 14:4 22:11
  23:6 32:20,20
  46:9 70:7 78:6
  83:6
wound 74:7
write 50:8,10,11
  80:17
write-up 26:19,23
  27:10,13 28:6
  30:24 31:6,7,10
  31:21,22
write-ups 31:3
writing 28:7 31:9
  38:13 40:1,13,14
  49:13 55:14,16
  65:7 69:1,4,8
  71:16 84:14
written 26:21,23
  27:15,20,21 28:2
  28:5,16,24 29:2,3
  29:5,7,10,24 31:7
  43:15 61:13 64:15
  65:19 82:17 84:11
wrong 43:2 44:19
  50:8
wrote 28:13 34:18
  35:3 37:1,17,20
  38:15 41:23 42:2

Snyder
Gregory Buragino

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
June 16, 2006

Page 100

| | |
|---|---|
| 42:16 46:11,15<br>48:13 51:1,4<br>52:14 55:7,20<br>56:10,11 63:19<br>67:24 71:20 | 5:20,22,24 6:1<br>8:10 10:14 15:11<br>24:11 26:20 27:5<br>27:13,18 28:15<br>29:13,17 36:19<br>37:13 49:17 52:19<br>56:14 57:18 |

**Y**

yard 7:20,22,24 8:6
yeah 9:14 25:10
  33:18 35:10 39:20
  46:6 48:5 49:24
  50:22 59:1,10
  61:3 64:18,20
  66:5,17
year 5:14 9:18
  10:11,11
years 4:13,18 7:11
  43:17 57:8 81:1
YOUNG 1:18

**0**

04-970-JJF 1:5

**1**

1 14:9,10,13 50:18
  87:10
10 36:19
10th 72:1
100 17:12 35:20,23
1000 1:19
12th 15:11
12:00 36:23 37:4,5
  37:6,12
12:30 1:11
13 32:8 81:1
1330 1:23
14 87:10
1509 1:10,16
16 1:11
16th 89:6
17th 1:19
186-RPR 89:17
19 5:4
19801 1:23
19806 1:16
19899-0391 1:20
1990 4:14
1994 4:18 5:2
1997 5:7

**2**

2 26:12,13 50:17,17
  50:18 87:4,11
2:40 86:11
2000 5:13,17
2002 32:8
2003 4:14,21 5:19

2004 4:7 32:9
2006 1:11 89:6
2008 89:18
26 87:12
28 27:5,13 28:9,12
  28:15
28th 27:18

**3**

3 29:13 36:10,11
  87:13
3rd 26:20 29:17,23
302 1:24
31 89:18
36 87:14
391 1:20

**4**

4 51:7,8 87:15
4/9 60:19 64:18
40 66:13,16

**5**

51 87:16

**6**

655-0477 1:24

**7**

7:30 16:5,8
76 87:5

**8**

8 52:19
8th 36:23 37:13
  49:10,17,23 50:15
8:45 75:18

**9**

9 56:14 57:18
9th 64:8,12,17
9:15 60:20
97 5:8
98 5:8

B- 0403

Wilcox & Fetzer, Ltd.    Professional Court Reporters    (302)655-0477



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Snyder

## v.

# Citi Steel, USA, Inc.

## C.A. # 04-970-JJF

Transcript of:

Randolph Harris

June 8, 2006

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B- 0404

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TERRY L. SNYDER,                    )
                                    )
            Plaintiff,              )
                                    )   Civil Action
                                    )   No. 04-970-JJF
        Vs.                         )
                                    )
CITI STEEL USA, INC.,               )
                                    )
            Defendant.              )

        Deposition of RANDOLPH HARRIS taken pursuant
to notice at the law offices of Margolis Edelstein, 1509
Gilpin Avenue, Wilmington, Delaware, beginning at 9:59 a.m.
on Thursday, June 8, 2006, before Allen S. Blank, Registered
Merit Reporter and Notary Public.

APPEARANCES:
        LORI A. BREWINGTON, ESQUIRE
        MARGOLIS EDELSTEIN
        1509 Gilpin Avenue
        Wilmington, DE 19801

            For - Plaintiff

        MARGARET M. DiBIANCA, ESQUIRE
        YOUNG, CONAWAY, STARGATT & TAYLOR
        1000 West Street
        Wilmington, DE 19801
            For - Defendant

ALSO PRESENT:
        TERRY L. SNYDER
                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com

                                        B-0405

Snyder                                    v.                    Citi Steel, USA, Inc.
Randolph Harris              C.A. # 04-970-JJF                        June 8, 2006

Page 2

1
2                 RANDOLPH HARRIS,
3         the deponent herein, having first been
4         duly sworn on oath, was examined and
5         testified as follows:
6                 EXAMINATION
7    BY MS. BREWINGTON:
8    Q    Hi, Randolph. How are you?
9    A    How are you doing?
10   Q    I'm doing good.
11            I have the privilege of taking your deposition
12   today regarding Terry Snyder's discrimination action against
13   Citi Steel. Have you ever been deposed before?
14   A    Yes.
15   Q    Okay. And when were you deposed?
16   A    Norfolk.
17   Q    Norfolk, Virginia?
18   A    Yes.
19   Q    What was the nature of your deposition?
20   A    We had a guy that got hurt on the job.
21   Q    Was that job Citi Steel?
22   A    No.
23   Q    What job was that?
24   A    Norfolk Steel.

Page 3

1    Q    And did you testify on behalf of Norfolk Steel?
2    A    Yes.
3    Q    So you're pretty familiar with the deposition
4    procedure, me asking questions, you answering the questions?
5    A    Yes.
6    Q    I'm going to ask you a series of questions.
7    Hopefully I will be asking them one at a time. All I ask is
8    that you allow me to finish the question before you answer.
9            If at any time you don't understand the
10   question or need me to repeat it, just simply ask me and
11   I'll ahead and do that for you.
12           If at any time you need to take a break, just
13   let me know. If you need to use the phone, feel free.
14           The court reporter is here. He will be taking
15   down everything that you say. It's very important that your
16   answers are clear and audible on the system. So I ask that
17   you say yes or no and not uh-huh or huh-uhs because they
18   don't show up too clear on the record.
19           At times, Citi Steel's attorney will object to
20   some of the questions that are asked. And that is entirely
21   appropriate. However, I ask that you still answer the
22   question unless Molly DiBianca specifically instructs you
23   not to answer the question.
24           Do you understand these instructions?

Page 4

1    A    Yes.
2    Q    Okay. What did you do in preparation for your
3    deposition testimony today?
4    A    Meaning --
5    Q    Meaning did you look at any documents in preparation
6    for your testimony? Did you speak with anyone?
7    A    No, I didn't look at any documents.
8    Q    Did you speak with anyone?
9    A    I met with Molly yesterday.
10   Q    How old are you?
11   A    Forty-eight.
12   Q    And where do you reside?
13   A    Newark.
14   Q    Newark, Delaware?
15   A    Yes.
16   Q    And with whom do you reside?
17   A    Maria Perez.
18   Q    Who is Maria Perez?
19   A    She is my fiance'.
20   Q    And when did you get engaged?
21   A    Three years ago.
22   Q    Is that 2004 or 2003?
23   A    The latter part of 2003.
24   Q    Have you ever been married?

Page 5

1    A    Yes.
2    Q    To whom were you married?
3    A    Carolyn Mayberry.
4    Q    And when were you married?
5    A    When?
6    Q    When.
7    A    '85. 1985.
8    Q    How long were you married?
9    A    About five years.
10   Q    And you were divorced, you got divorced?
11   A    Yes.
12   Q    And what were the circumstances surrounding your
13   divorce?
14   A    Working all the time.
15   Q    Who was working all the time?
16   A    I was.
17   Q    Were you working at Citi Steel?        B- 0406
18   A    No.
19   Q    Where were you working?
20   A    At the time, it was Intercoastal Steel.
21   Q    Repeat that for me.
22   A    At the time, it was Intercoastal Steel.
23   Q    Thank you.
24           Where did you attend high school?

2 (Pages 2 to 5)

Snyder
Randolph Harris

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 6

1   A   **West Virginia.**
2   Q   What school?
3   A   **Norfolk.**
4   Q   And when did you graduate?
5   A   **1976.**
6   Q   I'd like to go back to a question regarding I guess
7   a little bit of your family history. Do you have any
8   children?
9   A   **Yes.**
10  Q   How many children do you have?
11  A   **One.**
12  Q   How old is he or she?
13  A   **Thirteen.**
14  Q   Did you graduate from high school?
15  A   **Yes.**
16  Q   In 1976? Is that when you graduated from high
17  school?
18  A   **Yes.**
19  Q   And do you have a college degree?
20  A   **35 credits toward my college degree. No.**
21  Q   And where did you receive your 35 credits towards
22  your college degree?
23  A   **Delaware Technical Community College.**
24  Q   And are you currently in school?

Page 8

1   Q   And who makes that determination?
2   A   **Depending on what the classes are, it goes through**
3   **the president of the company who decides with the support of**
4   **human resources.**
5   Q   And who is the president of the company?
6   A   **Present or past?**
7   Q   Let me ask you, who was the president of the company
8   while Terry Snyder was employed there? If you'd like, I can
9   give you the dates of her employment.
10  A   **Yes.**
11  Q   August of 2001 through April of 2003.
12  A   **Warren Beiger.**
13  Q   And who is the current president of the company?
14  A   **Jeff Bradley.**
15  Q   And what happened to Warren Beiger in terms of why
16  was he no longer the president?
17  A   **I don't know.**
18  Q   Did you take any sexual harassment courses while at
19  Del Tech?
20  A   **No. Excuse me. Rephrase that. In the human**
21  **resources class, there was a chapter on sexual harassment**
22  **and business law.**
23  Q   When did you take the human resources class?
24  A   **I can't recall.**

Page 7

1   A   **No.**
2   Q   Were you in school to receive your associate's
3   degree?
4   A   **Yes.**
5   Q   And what was your major?
6   A   **Management information systems.**
7   Q   What does that entail?
8   A   **Computers.**
9   Q   Was that paid for by Citi Steel?
10  A   **Some of the classes were.**
11  Q   Which classes were paid for by Citi Steel?
12  A   **I can't remember.**
13  Q   Who determined which classes would be paid for by
14  Citi Steel and which would not?
15  A   **At the time, under the current policy, any classes**
16  **that employees enroll in that's job related and they pass**
17  **with a C or better, Citi Steel paid them reimbursement.**
18  Q   And that's Citi Steel's tuition reimbursement
19  policy?
20  A   **Yes.**
21  Q   And is it fair to say that human resources makes the
22  determination of what classes are paid for and what classes
23  are not?
24  A   **No.**

Page 9

1   Q   What years were you in college at Delaware Tech?
2   A   **From the latter part of '98 to 2003, I believe.**
3   Q   Would you have taken the sexual harassment class in
4   the beginning of your college career?
5   A   **I can't recall.**
6   Q   Do you recall whether it was towards the end of your
7   college career in 2003?
8   A   **I can't recall.**
9   Q   But you do recall that it was a Del Tech course in
10  human resources. Did you give me the title?
11  A   **And business law.**
12  Q   Human resources and business law?
13  A   **Yes. It was the fundamentals of management.**
14  Q   Okay.
15  A   **And business law.**
16  Q   Fundamentals of management and business law?
17  A   **Principles of management. I'm sorry.**
18  Q   Principles of management and business law?
19  A   **Yes.**
20  Q   And it was in that class that you had a sexual
21  harassment class? It was in that course that you had a
22  sexual harassment class?
23  A   **A chapter that was related.**
24  Q   Okay. Did you provide information about this course

3 (Pages 6 to 9)

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Snyder                                v.                    Citi Steel, USA, Inc.
Randolph Harris                   C.A. # 04-970-JJF              June 8, 2006

Page 10

1  to Citi Steel for tuition reimbursement?
2  A   Not in detail about that. Just a course itself.
3  The class itself.
4  Q   Did you tell them or did you provide a document?
5  A   I had to provide a transcript of my grades.
6  Q   And did you receive tuition reimbursement for that
7  course?
8  A   Yes.
9  Q   Do you recall generally what you learned in that
10 course with respect to sexual harassment?
11 A   There were several case studies. And I don't
12 remember in detail.
13 Q   Do you remember generally what the case studies were
14 about?
15 A   Related to --
16 Q   What were they related to? What were they about?
17 A   Case studies of abuse, should I say, abuse in the
18 workplace, discrimination in the workplace, discrimination
19 toward religion, ethnic background.
20 Q   Did you enjoy taking that class?
21 A   Yes.
22 Q   Did you learn anything?
23 A   Yes.
24 Q   What did you learn?

Page 11

1  A   Well, I learned that you have to respect others in
2  the workplace as well as in social living.
3  Q   As well as in social living? Is that what you said?
4  A   Yes.
5  Q   Is that something that you weren't aware of before?
6  A   We had an idea. We have a policy of sexual
7  harassment that I read when I first came to Citi Steel,
8  which is part of their procedure manual.
9  Q   And I'll ask you questions about the sexual
10 harassment policy.
11     Are you currently employed at Citi Steel?
12 A   Yes.
13 Q   In what capacity?
14 A   General manager.
15 Q   And were you a general manager between the dates of
16 August 2001 and April 2003?
17 A   No.
18 Q   What was your position during that time?
19 A   General supervisor.
20 Q   And what is the difference between a general manager
21 and a general supervisor?
22 A   A general supervisor is a direct responsibility of
23 the front line supervisors.
24 Q   And a general manager?

Page 12

1  A   A general manager is a responsibility of the
2  managers and the front line supervisors indirectly.
3  Q   Okay. So as I understand it, you're directly
4  responsible for the front line employees and the supervisors
5  when you're in the role of a general supervisor?
6  A   Yes.
7  Q   And with the general manager, you're responsible for
8  the managers, the front line managers, is that correct?
9  A   Yes.
10 Q   As well as indirectly the supervisors?
11 A   Yes.
12 Q   Okay. I want to ask you specifically about the time
13 period when Terry Snyder was employed with Citi Steel.
14 Okay?
15     And I indicated to you before that it was
16 between August of 2001 to April of 2003, is that correct?
17 A   I don't remember the dates.
18 Q   I can represent to you that those are the dates?
19 A   Yes.
20 Q   Okay. And you indicated to me that that's when you
21 were a general supervisor, correct?
22 A   Yes.
23 Q   Were you Terry's general supervisor?
24 A   I shared that responsibility.

Page 13

1  Q   So your answer is, yes, you did?
2  A   But with another general supervisor.
3  Q   And who was that?
4  A   Dennis Ford.
5  Q   Is it fair to say that you and Dennis Ford were on
6  equal levels in terms of your status with Citi Steel?
7  A   Titles, yes.
8  Q   Titles. Okay.
9      When were you hired at Citi Steel?
10 A   June 1990.
11 Q   1990?
12 A   Yes.
13 Q   Do you recall who hired you?
14 A   Don Lamar.
15 Q   Is that a male or a female?
16 A   Male.
17 Q   Is he still employed with Citi Steel?
18 A   No.
19 Q   Do you know why he is no longer employed?
20 A   He left for a better opportunity.
21 Q   Did you take any training while working for Citi
22 Steel?
23 A   Yes.
24 Q   Could you tell me about your training?

B- 0408

4 (Pages 10 to 13)

Snyder
Randolph Harris

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 14

1  **A  Supervisory training.**
2  Q  And what does supervisory training consist of?
3  **A  Leadership, organization, planning, staffing through**
4  **outside contractors.**
5  Q  When you started with Citi Steel in 1990, did you
6  start as a supervisor, general supervisor?
7  **A  No.**
8  Q  Why don't you take me through your employment at
9  Citi Steel in terms of your titles and the years, if you can
10  remember that?
11      So you started working in 1990. And you were
12  hired as a --
13  **A  Melting supervisor, a front line supervisor.**
14  Q  Okay.
15  **A  And from '90 to '94, I was promoted to general**
16  **supervisor. Until 2005, I believe, I was promoted to**
17  **general manager. I forget the dates.**
18  Q  Okay. Did you take any sexual harassment training
19  while at Citi Steel?
20  **A  Yes.**
21  Q  Tell me about that?
22  **A  We had a law firm, I really can't remember the**
23  **details, but we had a law firm come in and go over with the**
24  **supervisors about sexual harassment, discrimination.**

Page 15

1  Q  Do you remember when this was?
2  **A  No.**
3  Q  Is it fair to say that you were in the general
4  supervisor capacity?
5  **A  Yes.**
6  Q  So then it would be between the years of 1990 and
7  2005?
8  **A  Yes.**
9  Q  Was it before or after Terry Snyder's employment
10  ended with Citi Steel?
11  **A  Before.**
12  Q  Did you attend this class while Terry Snyder was
13  employed with Citi Steel?
14  **A  I don't recall.**
15  Q  What types of things did you learn in your sexual
16  harassment training?
17  **A  I would say mostly respecting the females that**
18  **worked in the plant.**
19  Q  And what does that mean to you, respecting the
20  females that worked in the plant?
21  **A  Well, certain things that you don't say or do. And**
22  **if a sexual harassment complaint is brought to you, how you**
23  **go about reporting it.**
24  Q  Okay. What are some examples of things that you

Page 16

1  shouldn't say or do?
2  **A  I can't say in detail. But just being a gentleman.**
3  **Period.**
4  Q  What is being a gentleman mean to you?
5  **A  Respecting people's space and respecting people as a**
6  **person and respecting people's beliefs.**
7  Q  And based on your training that you took part in,
8  what is the proper procedure for reporting sexual
9  harassment?
10  **A  It's reported to the supervisor if a general**
11  **supervisor is not available. And from -- once that is**
12  **established to the next person in line would be the HR**
13  **person if the general supervisor or general manager is not**
14  **available. And then at that time, if it's reported to the**
15  **general supervisor or general manager, it is taken to HR.**
16  Q  And what happens after that?
17  **A  It's investigated.**
18  Q  Who investigates it?
19  **A  HR.**
20  Q  And then what?
21  **A  Then it's a thorough investigation with the parties**
22  **involved. And then a decision is made based on the evidence**
23  **or the witnesses.**
24  Q  Is a decision made as to who is telling the truth?

Page 17

1      MS. DiBIANCA: I object to the extent that it
2  calls for him to speculate as it is an HR decision. Go
3  ahead and answer.
4      THE WITNESS: Would you repeat the question?
5  BY MS. BREWINGTON:
6  Q  Is the decision based on who is telling the truth?
7  **A  It's based on evidence that's provided.**
8  Q  Okay. But is it to determine who is telling the
9  truth based on the evidence?
10  **A  Yes. If the evidence is clearly that there is**
11  **wrongdoing.**
12  Q  Does Citi Steel have a sexual harassment policy?
13  **A  Yes.**
14  Q  Tell me what you know about Citi Steel's sexual
15  harassment policy?
16  **A  If anyone feels that they are being sexually**
17  **harassed to the point where they cannot perform their**
18  **duties, they are to report it to their immediate supervisor**
19  **or directly to HR in a written complaint.**
20  Q  And what does sexual harassment mean to you?
21  **A  To me? Disrespecting maybe male or female verbally,**
22  **physically or even gestures.**
23  Q  Or even what?
24  **A  Gestures.**

B- 0409

Wilcox & Fetzer, Ltd.                    Professional Court Reporters                    (302)655-0477

Snyder                                                    v.                              Citi Steel, USA, Inc.
Randolph Harris                              C.A. # 04-970-JJF                              June 8, 2006

Page 18

1   Q   Oh, gestures?
2   A   Yes.
3   Q   Okay. You mentioned disrespecting more than once.
4   Could you describe for me what you mean by disrespecting?
5   A   Verbally disrespecting somebody's space. It could
6   mean a lot of things. Depending on what the situation is.
7       For instance, if I just started going through
8   your papers, then I feel like I'm disrespecting your space
9   without your, you know, okay to do that.
10  Q   Okay. Is that sexual harassment, in your opinion?
11  A   No.
12  Q   What is sexual harassment, in your opinion?
13  A   Unwanted touching, unwanted remarks.
14  Q   Anything else that's sexual harassment to you
15  besides unwanted touching and unwanted remarks?
16  A   I can't think of anything else.
17  Q   Have you ever violated any of Citi Steel's policies
18  or procedures?
19      MS. DiBIANCA: I'll object as to form. Go
20  ahead and answer.
21      THE WITNESS: Could you repeat that question?
22  BY MS. BREWINGTON:
23  Q   My question is, have you ever violated any of Citi
24  Steel's policies and procedures?

Page 19

1   A   Managing? Policies and procedures are when
2   everything to me is perfect. Okay. That's their
3   guidelines. And as a manager, you're paid to manage the
4   situation at hand. So I guess, for instance, I can give you
5   an example of where I may have not abided by their policy
6   but managed the situation.
7   Q   Okay. Before you do that, can you answer the
8   question?
9   A   I don't quite understand the question. You said
10  have I ever violated any of Citi Steel's policies or
11  procedures?
12  Q   Yeah.
13  A   That's a broad statement. Because we have technical
14  policies and procedures that are in place that's written.
15  However, that doesn't cover the situation at hand.
16  Q   Okay. So have you ever violated the policies and
17  procedures that are written?
18  A   Yes.
19  Q   Okay.
20  A   But they have been changed after it's been justified
21  that that procedure no longer accommodates the situation.
22  Q   Okay.
23  A   When I say that from a technical standpoint.
24  Q   I'm going to ask you. You'll have an opportunity to

Page 20

1   explain to me everything. Okay. So you have violated Citi
2   Steel's policies and procedures, correct?
3       MS. DiBIANCA: I'm just going to restate my
4   objection as to form. I think that's very vague. Go ahead.
5   BY MS. BREWINGTON:
6   Q   You can answer.
7   A   Yes.
8   Q   And could you tell me when, if you can remember
9   when, you violated Citi Steel's policies or procedures?
10  A   From an operating standpoint, no, I can't. Because
11  at certain times, again, if you're in a technical situation
12  and you're dealing with hot metal, there are procedures and
13  guidelines that you're supposed to follow for certain
14  situations. However, it doesn't accommodate the situation
15  at hand because it's not written. So once that's been
16  violated, then you go back and you rewrite the policy and
17  procedure from an operation or technical standpoint.
18  Q   So from a technical standpoint, you have violated
19  policies and procedures, as I understand it, correct?
20  A   That was written, yes.
21  Q   And then they were rewritten, the policies and
22  procedures?
23  A   Yes.
24  Q   Do you want to give me an example of that?

Page 21

1   A   Yes. From an operating standpoint?
2   Q   Yes.
3   A   Okay. For instance, you're not supposed to throw a
4   bag of sand in the ladle, you're supposed to use a pipe to
5   sand the ladle with.
6       However, if you have steel flowing
7   uncontrollably, then sometimes you have to throw a bag of
8   sand to prepare to get the steel into the vessel without
9   doing any damage to any equipment. So that would be
10  violating the Citi Steel policy.
11  Q   And was that changed?
12  A   Yes.
13  Q   Okay.
14  A   We had a contingency plan for emergency situations
15  which was changed.
16  Q   Is that the only instance that you can recall of
17  violating policy or procedure?
18  A   At this time, yes.
19  Q   Where did you work prior the Citi Steel?
20  A   Norfolk, Virginia.
21  Q   And what was the place called where you worked?
22  A   Originally, it was Intercoastal Steel.
23  Q   Okay.
24  A   Then it became Norfolk Steel.

B-0410

6 (Pages 18 to 21)

Snyder                              v.                    Citi Steel, USA, Inc.
Randolph Harris              C.A. # 04-970-JJF                June 8, 2006

Page 22

1    Q   And how long did you work for both Intercoastal
2    Steel and Norfolk Steel, approximately?
3    A   **Seven to maybe ten years combined total of both.**
4    Q   And why did you leave there?
5    A   **Better opportunity and the plant shut down.**
6    **However, I was offered a position in another part of the**
7    **plant.**
8    Q   Were you ever disciplined at Intercoastal Steel or
9    Norfolk Steel?
10   A   **No.**
11   Q   And where did you work prior to Intercoastal Steel?
12   A   **I was in the Marine Corps. In the Reserves.**
13   Q   So were you in the Marine Corps full-time?
14   A   **I was in the Reserves. Yes, I did serve some time**
15   **full-time.**
16   Q   Okay. Was that right before Citi Steel? I mean
17   right before Intercoastal Steel?
18   A   **Yes.**
19   Q   Were you ever disciplined in the Marine Corps?
20   A   **No.**
21   Q   How long did you serve in the Marine Corps?
22   A   **Six years. Both active and reserve duty.**
23   Q   That includes both?
24   A   **Yes.**

Page 23

1    Q   And were you discharged?
2    A   **Yes.**
3    Q   Honorably?
4    A   **Yes.**
5    Q   And why did you leave?
6    A   **Excuse me?**
7    Q   Why did you leave?
8    A   **The Marine Corps?**
9    Q   Um-hmm.
10   A   **I had served my time.**
11   Q   Did you have any jobs prior to the Marine Corps?
12   A   **Yes.**
13   Q   Okay. Tell me about those, if you can remember?
14   A   **I was a bag boy in the summer right after I got out**
15   **of high school.**
16   Q   Like at a grocery store?
17   A   **Yeah.**
18   Q   What else?
19   A   **Dishwasher at a restaurant, waiter.**
20   Q   Anything else you can remember?
21   A   **No.**
22   Q   Have you ever been arrested?
23   A   **No.**
24   Q   Have you ever been involved in any other type of

Page 24

1    litigation as a plaintiff or a defendant?
2    A   **Yes. There was one other now that you -- I forgot**
3    **to mention to you earlier. The Tony Fuhr case. That was a**
4    **litigation.**
5    Q   Hold on one second. T-o-n-y, Tony?
6    A   **Tony, yeah.**
7    Q   Last name?
8    A   **Fuhr.**
9    Q   F-u-r?
10   A   **H-r.**
11   Q   F-u-h-r. Tony Fuhr.
12   A   **Tony Fuhr case.**
13   Q   Okay. Tell me about that.
14   A   **He had gotten burned severely because he had stepped**
15   **into some hot water in the plant and eventually ended up**
16   **expiring.**
17   Q   When was that?
18   A   **About three years ago.**
19   Q   What was your involvement in that case?
20   A   **I was one of the first people to get to him. Some**
21   **words was exchanged.**
22   Q   Words were exchanged between you and someone?
23   A   **Yeah, between him and I.**
24   Q   Okay. What words were exchanged?

B-0411

Page 25

1    A   **He said, I don't want to die.**
2    Q   And what did you say?
3    A   **It's going to be okay.**
4    Q   And did you testify to that or something?
5    A   **Yes.**
6    Q   Were you involved in that case in any other way?
7    A   **No.**
8    Q   Terry Snyder was employed with Citi Steel, as I
9    discussed earlier, between August of 2001 and April of 2003.
10   And most of my questions are going to be about that time
11   period unless I specifically tell you that it's not. Is
12   that understood?
13   A   **Yes.**
14       MS. DiBIANCA: Most or all? All the questions
15   are going to be about that time period unless you say
16   otherwise?
17       MS. BREWINGTON: Let's say all.
18   BY MS. BREWINGTON:
19   Q   All the questions are going to be about that unless
20   I say not specifically that time period. Okay?
21       What was Terry Snyder's job title?
22   A   **She was a clerk, administrative clerk.**
23   Q   And what did she do as an administrative clerk?
24   A   **Well, what she was supposed to do was run the**

7 (Pages 22 to 25)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Snyder                                    v.                    Citi Steel, USA, Inc.
Randolph Harris                    C.A. # 04-970-JJF                    June 8, 2006

Page 26

1  reports, run errands, pick up mail, take care of time
2  sheets.
3  Q  Anything else?
4  A  Graphing and charting of production activities.
5  SJP's.
6  Q  What are SJP's?
7  A  Safe job procedures. Update, change accordingly.
8  ISO procedures, filing of any crane reports, forklift
9  reports, or should I say mobile equipment reports, filing.
10  Q  Filing, general filing?
11  A  General filing. And assisting Dennis and myself in
12  the duties that was assigned to her.
13  Q  Work-related duties, correct?
14  A  Yes.
15  Q  Was she responsible for doing any of your personal
16  errands?
17  A  No. These were business errands.
18  Q  So personal errands were not in her job description?
19  A  Not for me, no.
20  Q  Were they in her job description for others?
21  A  No.
22  Q  And you indicated earlier that she was supposed to
23  do these things, is that correct?
24  A  Yes.

Page 27

1  Q  Did she not do those things?
2  A  Not fully.
3  Q  Do you want to elaborate?
4  A  Yes. There was some times that there was some
5  things that she was supposed to have been doing that didn't
6  get done.
7  Q  Who did them if she didn't do them fully?
8  A  Dennis and myself.
9  Q  And when did, in your opinion, when did she not
10  fully do her job? Was that from 2001 to 2003?
11  A  I'd say probably about the latter part of 2003, I
12  would guess.
13  Q  The latter part of 2003. Terry's employment ended
14  in April of 2003. So do you mean the latter part of 2003,
15  she wasn't employed?
16  A  Okay. I should rephrase that. The latter part of
17  2002. I'm sorry. The latter part of 2002. It's been a
18  long time.
19  Q  Yeah. And I understand that. Okay.
20     Where did she work? What department?
21  A  In the melt shop.
22  Q  Tell me about the melt shop. What is the melt shop?
23  A  It's where we recycle scrap into liquid metal and
24  then it is treated. It's treated and cast or solidified.

Page 28

1  Q  How many employees are in the melt shop? At that
2  time, yes.
3  A  During the time that she was employed?
4  Q  Yes.
5  A  About 70 operation employees.
6  Q  And how many clerk/typists were there?
7  A  One.
8  Q  Was that Terry?
9  A  In the melt shop.
10  Q  Yes.
11  A  Yes.
12  Q  How many other departments does Citi Steel have?
13  A  Departments within the melt shop or in the plant
14  itself?
15  Q  Well, we can get do that. But my question was the
16  plant itself.
17  A  Now or past?
18  Q  Everything is relevant in terms
19  of when Terry Snyder was employed there.
20  A  There is a lot of departments there.
21  Q  Are there?
22  A  Yes.
23  Q  Between like 10 and 15?
24  A  I'd be afraid to say. I would be speculating.

B-0412

Page 29

1  Q  Okay. How many employees? Do you know?
2  A  Employees total at Citi Steel at that time?
3  Q  Um-hmm.
4  A  Four hundred. Between that time, four hundred.
5  Q  How do you know?
6  A  Because I get a sheet that lists how many employees
7  during that time and how many departments but I have never
8  actually counted the departments and I look at the total of
9  the amount of employees that we employ.
10  Q  Okay. Now, you talked about whether I wanted to
11  know departments within the melt shop, is that correct?
12  A  Yes.
13  Q  Are there departments within the melt shop?
14  A  Yes.
15  Q  Okay. Tell me about that?
16  A  You have the 6900 department, which is salary,
17  supervisors and salary personnel, non-exempt.
18     You have the furnace department, which is
19  operation employees at the electric arc furnace.
20     You have the maintenance employees. You have
21  the casting department and you have the refractory
22  department.
23  Q  Refractory?
24  A  Refractory department.

8 (Pages 26 to 29)

Snyder
Randolph Harris

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 30

1   Q   All these departments are within the melt shop?

2   A   Yes.

3       MS. DiBIANCA:  Can I ask, what was the one

4   between maintenance and refractory?

5       MS. BREWINGTON:  Casting.

6       MS. DiBIANCA:  Thanks.

7   BY MS. BREWINGTON:

8   Q   There are several different departments in the melt

9   shop but there is also several departments at Citi Steel,

10  correct?

11  A   Yes.

12  Q   Can someone in the furnace department do the job of

13  someone in the maintenance department?

14  A   Should I say they assist the maintenance department

15  on certain jobs.  We try to be multi task.

16  Q   Okay.  That's kind of what I was getting at.  I was

17  trying to figure out if you talked to one another.  Are you

18  in the same vicinity?

19  A   Yes.

20  Q   And where is the shipping department in relation to

21  the melting department?

22  A   You have to cross over Philadelphia Pike because

23  there is -- the department, the way that they are

24  operationally designed, there are departments on one side of

Page 31

1   Philadelphia Pike and there is departments on the other side

2   of Philadelphia Pike.  It's just the way it was engineered.

3   Because it's an old plant.  However, it's one plant.  Even

4   though we have two different, you know, sides of the road.

5   Q   Do you know which departments are on one side and

6   which departments are on the other?

7   A   Yes.

8   Q   Okay.  Can you tell me?

9   A   You have the -- what we call the plate mill and

10  shipping department on the plate mill side.  And you have

11  the scrap yard, melt shop and slab yard on the other side of

12  Philadelphia Pike.

13  Q   Do you know anything about the shipping department?

14  A   Meaning --

15  Q   Do you know what they do?  Do you know how many

16  people are in there?  Do you interact with them?

17  A   Yes.

18  Q   Okay.  Tell me about that?

19  A   Not to the point of knowing their duties in detail.

20  But know what their shipping status is for the goals of tons

21  to be shipped out and that they have to work on rail cars,

22  we have shipment by rail cars, by trucks.  And it's a much

23  nicer environment to work in.

24  Q   Why is that?

Page 32

1   A   Because of, you know, you have the noise and the

2   heat and the dust that's in the melt shop.  The shipping

3   area is more of a clean area.  Less dangerous.

4   Q   Would you want to work in the shipping department as

5   opposed to the melt shop?

6       MS. DiBIANCA:  Objection to the extent it calls

7   for speculation.  You can go ahead and answer.

8       THE WITNESS:  That would be a vacation for me.

9   BY MS. BREWINGTON:

10  Q   So is your answer yes?

11  A   Would I want to?

12  Q   That was my question.

13  A   No.

14  Q   But it would be a vacation?

15  A   Because of my technical experience, shipping would

16  be somewhat not as -- let's see.  Let me say it this way.

17  Q   Okay.

18  A   If I was 55 years old, yes, I'd want to go work in

19  shipping.

20  Q   Why is that?

21  A   Because it's more of a -- it's not as -- shall I say

22  it's not as physically demanding from an operational

23  standpoint.

24  Q   Do you see any other benefits of working in

Page 33

1   shipping?

2   A   Yes.  They get a higher incentive plan than we do.

3   They have more possibilities of hitting their incentive plan

4   from a financial standpoint than we do in the melt shop.

5   Q   Why is that?

6   A   Because we have much more broader equipment, massive

7   equipment that is probably a lot older than it is in

8   shipping whereas all they have to do is worry about the

9   cranes, the rail cars and the trucks that they load.

10  Q   Do you know whether there is overtime work in the

11  shipping department?

12  A   Yes.

13  Q   Yes, you do know, yes, there is overtime?

14  A   Yes, there is overtime in shipping.  Probably more

15  than -- possibly more than any other department.

16  Q   Why is that?  Do they have more work?

17  A   Yes.  It's more demanding because of the shipments

18  that's going out on the trucks.

19  Q   And are there reports to be run in shipping?

20  A   Yes.

21  Q   ISO reports?

22  A   Yes.

23  Q   Would there be graphing and charting?

24  A   Yes.

B- 0413

9 (Pages 30 to 33)

Snyder
Randolph Harris

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 34

1   Q   What are some of the differences between the
2   shipping department and the melting department for an
3   employee, not necessarily a supervisor?
4   A   Some of the differences?
5         MS. DIBIANCA: Do you have a specific job in
6   mind, specific employee in mind?
7         MS. BREWINGTON: A typist, a clerk.
8         THE WITNESS: Wait a minute. Repeat your
9   question, please.
10  BY MS. BREWINGTON:
11  Q   Does the shipping department have clerks and
12  typists?
13  A   Yes.
14  Q   What are some of the differences between a typist
15  and a clerk in the melt shop versus a typist or clerk in the
16  shipping department?
17  A   I would say that there is not much of a difference.
18  Q   Are there any differences?
19  A   Probably tracking shipments versus tracking steel
20  produced. ISO procedures are different. However, it's the
21  same format.
22  Q   How are they different?
23  A   Because it is based on the activity that goes on
24  within the shipping department, you know. It's like, you

Page 35

1   know, it's the same format but you just have different
2   duties that entail how you would do certain things, you
3   know. But the clerk/typist position would be the same.
4   Q   Okay.
5   A   Because the supervisors are giving you the
6   information on what the procedures are and all the
7   clerk/typists do is just type them up.
8   Q   I'm trying to understand this.
9         The procedures in the melting shop, are they
10  different than the procedures in the shipping?
11  A   The same format.
12  Q   Same format. What do you mean by that?
13  A   You have a format that's followed, for instance, the
14  department had the responsibilities, the procedure
15  requirement, who are to follow the procedure. So you have
16  the same format. It's the same document, should I say.
17  It's the same document with different duties on the document
18  form.
19  Q   Different duties on the procedure form?
20  A   Yes. That may be -- okay. Like, for instance, a
21  melting supervisor is not going to have the same duties as a
22  shipping supervisor. Okay?
23  Q   Okay.
24  A   But the clerk/typist would be the same because all

Page 36

1   you're doing is typing up information. Now do you
2   understand what I'm trying to say?
3   Q   I think so.
4         Can a person in the melting shop clerk/typist
5   position transfer to the shipping position and know what to
6   do or would they require some training?
7         MS. DiBIANCA: I'm just going to object to the
8   extent that it calls for speculation. Go ahead and answer,
9   though.
10        THE WITNESS: Repeat that question, please.
11  BY MS. BREWINGTON:
12  Q   My question is, would a clerk/typist in the melting
13  shop know what to do in the shipping department or will they
14  need some training of some sort?
15  A   We had a clerk/typist who went to shipping and
16  performed very well.
17  Q   Who was that person's name?
18  A   Ann Marie.
19  Q   Ann Marie --
20  A   Ann Marie Leninger, I think her name is. I forget.
21  She used to be our clerk/typist in the melt shop.
22  Q   Is she still employed?
23  A   To my knowledge, yes.
24  Q   When was she a clerk/typist in the melting shop?

Page 37

1   A   I don't remember.
2   Q   Was it before Terry Snyder?
3   A   Yes. Yes.
4   Q   And she transferred to shipping?
5   A   Yes.
6   Q   Do you know why she transferred to shipping?
7   A   Because she wanted -- she wanted to get in the
8   shipping department. Actually, I think it was because of
9   some physical reasons but I don't know. I mean I'm just
10  speculating.
11  Q   Does a clerk/typist have to do physical job, a
12  physical job?
13  A   No. This was a sickness that she had, from what I
14  understand, with her briefly, she had some kidney problems,
15  I believe, and she wanted to go to shipping.
16  Q   Do you know what would be the benefit of working in
17  shipping with the kidney problems?
18  A   No. That was something that she wanted to do.
19  Q   Did she tell you that that's what she wanted to do?
20  A   In a casual conversation. But I don't remember
21  exactly. I mean I see her every once in a while now and I
22  ask her how she is doing. Prior to way back, when I used to
23  see her, I should say. I don't see her much now. And she
24  said she was doing okay.

B-0414

10 (Pages 34 to 37)

Snyder
Randolph Harris

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 38

1  Q   How old was Ann Marie Leninger when she was your
2  clerk/typist, approximately?
3  A   Thirty maybe.
4  Q   All right. And you said she transferred to the
5  shipping department, correct?
6  A   Yes.
7  Q   Do you know whether she had any training in the
8  shipping department?
9  A   Fundamentally, the responsibilities are pretty much
10 the same if you're typing. I mean that's the way I would
11 look at it.
12 Q   I don't understand. What's your answer? Do you not
13 know whether she had any formal training?
14 A   No, I don't know.
15 Q   While Terry Snyder was employed, there were two
16 supervisors in the melting shop, is that correct?
17 A   Two supervisors?
18 Q   General supervisors.
19 A   Yes.
20 Q   And that's yourself and Dennis Ford, is that
21 correct?
22 A   Yes.
23 Q   Is Dennis Ford still with Citi Steel?
24 A   No.

Page 39

1  Q   Was he terminated?
2  A   It was a mutual dismissal.
3  Q   Why was he dismissed?
4  A   I don't know the details.
5  Q   What do you know about it?
6  A   Other than the fact that he had went on vacation and
7  prior to that with my promotion, he just come back and said
8  he didn't want to work there any more.
9  Q   Did he say that to you?
10 A   Not directly. He had left me a voice mail that he
11 would probably be leaving Citi Steel and he would take care
12 of it when he got back from vacation, off vacation.
13 Q   Was he upset that you got a promotion and he didn't?
14 A   I wouldn't know.
15 Q   When was that?
16 A   Excuse me?
17 Q   When was that?
18 A   When he left?
19 Q   Well, you mentioned that he went on vacation and it
20 was around the time when you got promoted.
21 A   Yes.
22 Q   That he was terminated or that he was dismissed. I
23 don't want to put words in your mouth. I just want to know
24 around what time that was?

Page 40

1  A   It was October of 2005.
2  Q   I think that's when you were -- 2005, you were the
3  general manager?
4  A   Yes.
5  Q   Okay. Did you get along with Dennis Ford?
6  A   Meaning --
7  Q   Let me ask you this. What is your understanding of
8  the term get along with?
9      MS. DiBIANCA: Objection as to form. Pretty
10 vague. Go ahead and answer.
11     THE WITNESS: Repeat that question.
12 BY MS. BREWINGTON:
13 Q   I used the term get along with.
14 A   Okay.
15 Q   And I think you weren't sure of what I meant.
16 A   Um-hmm.
17 Q   So I'm asking you what your understanding is of
18 getting along with someone.
19 A   Being able to communicate, talk about things, both
20 on and off the job. If you have a relationship with
21 somebody on the job, you deal with them on the job
22 but you may not deal with them off the job. Because you
23 don't have to. So to me, getting along would be able to get
24 along with somebody at any time.

Page 41

1  Q   Okay. So based on that definition, would you say
2  you did get along with Dennis Ford?
3  A   Off the job, yes.
4  Q   Okay. Off the job, you got along with him, correct?
5  A   Yes.
6  Q   Did you get along with him on the job?
7  A   We had differences of opinion.
8  Q   What differences of opinion did you have?
9  A   Well, he has a strong background in steel technical
10 and I have a strong background in operations. And we did
11 not always agree on certain things that we needed to do.
12 Q   Would you argue?
13 A   Sometimes.
14 Q   Would you argue at work?              B- 0415
15 A   Sometimes, yes.
16 Q   Would other people see you argue?
17 A   Other people wouldn't see us. But I'm sure that
18 they probably heard us.
19 Q   Were you loud?
20 A   Sometimes, yes. Because we work in a loud
21 environment.
22 Q   Were you loud because you had to be loud or were you
23 loud because of tempers?
24 A   Sometimes both.

11 (Pages 38 to 41)

Snyder                                  v.                    Citi Steel, USA, Inc.
Randolph Harris              C.A. # 04-970-JJF                        June 8, 2006

Page 42

1  Q   Okay.  Did you yell?
2  A   Yes.
3  Q   Did he yell at you?
4  A   Yes.
5  Q   Were you or Dennis ever disciplined for yelling?
6  A   At each other?
7  Q   Um-hmm.
8  A   Disciplined meaning what?
9  Q   Written up for unprofessional behavior or
10 reprimanded for unprofessional conduct?
11 A   No.
12 Q   Who did you report to at the time of Terry Snyder's
13 employment?
14 A   Greg Buragino.
15 Q   And what was Greg's role?
16 A   Vice-president of operations.
17 Q   Now, was Greg responsible for not only the melting
18 shop, but all the other departments, too?
19 A   The plate mill, somewhat indirectly.  I'm not sure
20 what his role was in the plate mill.
21 Q   Okay.  What about the other department?  Was he the
22 vice-president of all the other departments?
23 A   He was the vice-president of the melt shop or should
24 I say operations.  When you talk about other departments, he

Page 43

1  was the vice-president of operations.  You have an
2  engineering department, a maintenance department, finance
3  department and you have an operations department, which is
4  operations, production, producing the tons and get them out
5  the door.  So he was the vice-president of operations.  I
6  wouldn't know what his role was as far as the other
7  departments.
8  Q   Is he still employed with Citi Steel?
9  A   No.
10 Q   Did I ask you earlier why not or do you know why
11 not?
12 A   No, I did not -- I was not involved in his
13 department of the plant other than him telling me that he
14 was looking for a better opportunity.
15 Q   Did you like Greg Buragino?
16 A   Yes.
17 Q   Did you spend time with him outside of work?
18 A   Occasionally, yes.
19 Q   What types of things would you spend time with him
20 doing?
21 A   Usually going to dinner with clients.  We went to a
22 seminar one time together.  Convention.
23 Q   Anything else?
24 A   Normally it was pretty much just work-related

Page 44

1  activities.
2  Q   Pretty much work or all the time work?
3  A   It was work related.
4  Q   Okay.  Are there any other times that you can recall
5  besides going to dinner with clients, seminars together and
6  a convention?
7  A   No.
8  Q   So is it your testimony today that you haven't spent
9  any other time with him outside of work except for going to
10 dinner with clients, seminars and a convention?
11 A   During this time period?
12 Q   Well, we're talking about when Terry Snyder was
13 employed.
14 A   Yes.
15 Q   2001 to 2003?
16 A   Right.
17 Q   Okay.  Let's go outside of that time period.
18 A   Yes.
19 Q   From 2003 to present.
20 A   Yes.
21 Q   When?
22 A   I went to Cleveland about a month ago to an Iron and
23 Steel Society Convention.  And we had dinner.  No, we didn't
24 have dinner, we had lunch.  And that was about three weeks

Page 45

1  ago.
2      Him and I also done -- he done some consulting
3  with me from -- let's see.  I think it may have been from
4  August I believe of last year until February of this year.
5  I forget.  I think it was about six or seven months.  He did
6  some consulting for me.
7  Q   Some consulting for you.  Personal consulting?
8  A   No.  It was business consulting.
9  Q   So you as a Citi Steel employee hired him to do some
10 consulting?
11 A   Citi Steel hired him to do some consulting and I was
12 his direct contact.
13 Q   And that was in August of 2005 until about February
14 of 2005?
15 A   2006.
16 Q   Oh, 2006.  Yes.  Of course.
17     And then the other contact with him was in May
18 of 2006?
19 A   Yeah.
20 Q   When you were in Cleveland?              B-0416
21 A   Yes.
22 Q   About a month ago?
23 A   Yes, it was about a month ago, I believe.
24 Q   And you had lunch with him at a convention?

12 (Pages 42 to 45)

Snyder
Randolph Harris

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 46

1    A   Yes. And we spent some time at the convention
2    looking at some projects and new technology.
3    Q   Would you consider him a friend?
4    A   Yes.
5    Q   Did you consider him a friend while Terry Snyder was
6    employed?
7    A   No. I considered him my boss.
8    Q   Okay. Were you involved in the interview process
9    with Terry Snyder?
10    A   Yes.
11    Q   In what way?
12    A   To interview to see if she would meet the criteria
13    for what Dennis and I were looking for in the melt shop
14    along with Jason Bender, I believe, during that time.
15    Q   And did she meet your criteria?
16    A   At the time, she interviewed well.
17    Q   Did she temp for you for a while?
18    A   I don't remember.
19    Q   You don't remember whether it was for a while or you
20    don't remember whether or not she temp'd?
21    A   I don't know whether she temp'd. We may have hired
22    through a temp agency. I know we do do that. But I'm not
23    for sure. It's been a long time.
24    Q   If you did hire her through a temp agency, is it

Page 47

1    your normal practice to see how the temp works with you
2    before hiring them?
3    A   Yes. Or until we fill the vacancy through someone
4    that we are looking for to exceed or meet the criteria that
5    we are looking for.
6    Q   Okay. But temping with you would give you an
7    opportunity to see how they work, how they do the job?
8    A   Yes.
9    Q   And then if you like them, you hire them?
10    A   Yes.
11    Q   And both you and Dennis Ford were involved in the
12    hiring process?
13    A   We interviewed her. The decision to hire her was a
14    group decision. And I guess what I need to do is give you
15    some of our interviewing, how we go through the interviewing
16    process.
17    Q   Please. Okay.
18    A   We get an employee. They are interviewed by the
19    department, the department heads. And then at that time, we
20    go to a conference with the people or department heads. And
21    then we send an e-mail or phone call or meet with HR. And
22    at that time, HR does a background check, which consists of
23    drug tests, police background, you know, and that
24    information is not filtered through us. And then I think

Page 48

1    they look at the physical abilities, a physical to see
2    whether or not the person can, you know, do the work that's
3    required for that particular job.
4    Q   Okay. How was an employee's performance evaluated
5    at Citi Steel?
6    A   You mean how meaning --
7    Q   You were a general supervisor at the time of Terry
8    Snyder's employment, correct?
9    A   Yes.
10    Q   How was her performance evaluated?
11    A   Well, it was based on attendance, work performance
12    and ability to get along with -- ability to get along with
13    others.
14    Q   Are employees given performance evaluations?
15    A   Yes. Some employees are. Normally what happens,
16    the hourly employees normally get a cost of living raise
17    unless they exceed the position of that job. And then what
18    we try to do is for people who are aggressive, fast learners
19    and want to improve their performance, when there are job
20    openings that come about, they are posted for different
21    positions. And for supervisors, they are appraised by the
22    general supervisor on paper normally on appraisals.
23    Q   So are there written performance evaluations that
24    are given to the employees?

Page 49

B-0417

1    A   Yes.
2    Q   Okay. Is that on an annual basis?
3    A   For supervisors, yes.
4    Q   What about for clerk/typists?
5    A   I can't remember. I can't remember.
6    Q   So you can't remember whether it's on an annual
7    basis or you can't remember whether they receive performance
8    evaluations?
9    A   Written performance evaluations, appraisals, I don't
10    remember whether or not hourly employees are given that. We
11    are doing that now. I mean I can say we are doing it now
12    because I'm doing it, appraisal sheets.
13    Q   But you're saying you can't remember whether you did
14    it in 2001?
15    A   No.
16    Q   Let me finish the question. Between 2001 and 2003?
17    A   No.
18    Q   Do you know whether you were supposed to do it
19    between 2001 and 2003? And when I say it, I'm talking about
20    the performance evaluations.
21    A   I'm not for sure. I know for supervisors, yes.
22    They are appraised because I have done those. That I am
23    sure of.
24    Q   And you have also done typists and clerk performance

13 (Pages 46 to 49)

Snyder                                           v.                    Citi Steel, USA, Inc.
Randolph Harris                          C.A. # 04-970-JJF                    June 8, 2006

Page 50

1   evaluations, too, is that correct?
2   **A   I don't remember.**
3   Q   Have you done hourly employee evaluations?
4   **A   Now?**
5   Q   Now.
6   **A   Yes.**
7   Q   Okay. Is it your opinion or is it your recollection
8   that Terry never received a performance evaluation?
9   **A   I'm not for sure.**
10  Q   Do you recall ever writing a performance evaluation?
11         MS. DiBIANCA: I'll say asked and answered. Go
12  ahead and answer.
13         THE WITNESS: I'm not for sure.
14  BY MS. BREWINGTON:
15  Q   Would you be the person who would write it or would
16  it be Dennis Ford?
17  **A   We both would probably write it and Greg would**
18  **get -- would probably review it.**
19  Q   Okay. How does Citi Steel deal with unsatisfactory
20  job performance of its employees?
21  **A   Well, we try to counsel employees.**
22  Q   Okay. I'm going to stop you right there and ask you
23  about counseling. Okay? And then you can continue. I'll
24  ask you the question. But tell me about this counseling.

Page 51

1   **A   What we do is normally, if a supervisor sees that an**
2   **employee is not meeting the standards or criteria for that**
3   **particular job, they will talk to that person to try to**
4   **improve that person's performance or motivate them or to**
5   **find out if there is anything that's going on in their life,**
6   **the reason why they can't perform the task that's put in**
7   **front of them or are there any issues that are interfering**
8   **with you doing your job. And then at that time, if it is**
9   **required, there may be some documentation, depending on if**
10  **this supervisor is there or see that it needs to be taken a**
11  **step further and then they involve another supervisor**
12  **afterwards.**
13  Q   Is there any documentation of the verbal counseling
14  session?
15  **A   Some. Depending on how severe it is. Supervisors**
16  **don't always document because they feel the severity is not**
17  **there because sometimes the employees do tell them that they**
18  **have personal issues going on.**
19  Q   Does the supervisor document the verbal counseling
20  session in the file or notate it anywhere?
21  **A   Yes. It's noted. When there is a second supervisor**
22  **involved.**
23  Q   Okay. So as I understand it, although the employee
24  may not receive a document of the verbal counseling session,

Page 52

1   there would be one in the file if another supervisor is
2   involved?
3   **A   It's not in the file. It's noted and documented.**
4   **So that if it's not improved, then it's reviewed again.**
5   Q   Where is it noted and documented?
6   **A   Usually in your personal handbook. You let the**
7   **employee know that you're going to document, that you have**
8   **had this conversation.**
9   Q   Okay. So the supervisors take it upon themselves to
10  personally document it, they don't send a document down to
11  HR?
12  **A   No.**
13  Q   And I think you have answered this. But if you
14  haven't -- oh, let's go back. I think I stopped you.
15         Unsatisfactory performance. You mentioned
16  verbal counseling. What else?
17  **A   Repeat the question, please.**
18  Q   How does Citi Steel deal with unsatisfactory job
19  performance? And you mentioned verbal counseling. Is there
20  anything else?
21  **A   Yes. Verbal counseling and written warnings after**
22  **the situation has gotten out of control or beyond the fact**
23  **that you can't motivate or improve. And from there,**
24  **additional written warnings. And normally after that,**

Page 53

1   **depending on the attendance and the work performance, they**
2   **are normally dismissed.**
3   Q   Is there a written policy outlining this verbal
4   counseling to written warning to second written warning?
5   **A   No. It gives you the opportunity to manage the**
6   **situation. And HR handles those things. Once the file has**
7   **been sent to HR for formal documentation.**
8   Q   Okay. And the written warnings would be in the HR
9   file, is that correct?
10  **A   I'm not for sure. Only if it's a formal document**
11  **that's indicating a person's performance is failing or**
12  **deteriorating.**
13  Q   And when you as a supervisor talk with your
14  employees, giving them a verbal warning or a written
15  warning, do you usually give these disciplinary actions
16  shortly after they commit the infraction? Do you
17  understand?
18  **A   Go ahead.**
19  Q   I just want to explain if you don't understand. My
20  question is, is it your policy as a supervisor to I guess
21  distribute these verbal warnings or talk with the employees
22  soon after they have a problem with their performance?
23  **A   If there is no improvement from the verbal warning,**
24  **yes. Over a period of -- you try to manage, 30 to 45 days**

B-0418

14 (Pages 50 to 53)

Snyder
Randolph Harris

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 54

1  maybe. If you see no improvement, then you follow with a
2  written warning. So we try to be prompt on giving the
3  warnings for the infractions.
4      Q   Okay. So you try to be prompt on giving the
5  warnings for the infractions. That's with respect to verbal
6  warnings and written warnings?
7      A   Yes.
8      Q   Okay.
9          MS. DiBIANCA: Should we break? It's 11:20.
10         MS. BREWINGTON: Yeah, if you would like a
11  break, that's fine.
12         (A brief recess was taken.)
13  BY MS. BREWINGTON:
14     Q   Did you ever verbally counsel Terry Snyder about her
15  performance?
16     A   Yes.
17     Q   And when was that?
18     A   I don't remember. It was during that period that
19  she was there.
20     Q   Okay. She began her employment in August of 2001.
21  Okay. So the first year of her employment would have been
22  from August 2001 to August of 2002. Do you recall
23  counseling her during that time?
24     A   I don't know the exact dates or time period.

Page 55

1      Q   Would it have been towards the end of her
2  employment, closer to the end of her employment?
3      A   She got a written warning at the end of her
4  employment. Somewhat toward the end of her employment.
5      Q   Had you counseled her before that time?
6      A   Yes.
7      Q   Do you know approximately how many months before
8  that time?
9      A   No.
10     Q   Do you know how many times you counseled her before
11  that written warning?
12     A   No.
13     Q   Was it more than once?
14     A   Yes.
15     Q   Was it more than twice?
16     A   It was several times.
17     Q   More than four?
18     A   I don't remember. It was several times.
19     Q   What's your idea of several?
20     A   Like three. Three, four times. You know, three or
21  four times, I guess.
22     Q   What did you counsel her about, verbal counseling?
23     A   Mostly her attendance in the beginning. First,
24  second counselings.

Page 56

1      Q   First her attendance and then what?
2      A   The first or second time, it was probably her
3  attendance. And then later it was her work performance.
4      Q   So, in your opinion, her attendance was an issue
5  with you?
6      A   Yes.
7      Q   What about her attendance was the problem?
8      A   She was always -- well, she had started -- I don't
9  want to say always. She started coming in to work late,
10  leaving early.
11     Q   Anything else?
12     A   And calling off.
13     Q   Now, she wasn't always like this? You said this
14  started at some point?
15     A   Yes. In the beginning, she was prompt and attentive
16  at work. And after about a year or so, I guess, her
17  performance started deteriorating as well as her attendance.
18     Q   So would you say it was around 2002, the latter part
19  of 2002?
20     A   Yes. Because it was 2003 when she left, right?
21     Q   Um-hmm.
22     A   Yeah, 2002.
23     Q   So that's when her performance issues began.
24         You mentioned that she was calling off,

Page 57

1  correct?
2      A   Yes.
3      Q   Did she give you or anyone a reason why she was
4  calling off?
5      A   The thing that sticks in my mind the most is her
6  mother, they were going to condemn her mother's house and
7  she had some work with the contractors that she needed to
8  get done.
9      Q   And did she have to take off more than one day for
10  that?
11     A   Yes.
12     Q   Any other reasons why she called off from work?
13     A   It was always related to things that she had to go
14  to Court with her mother and she wasn't feeling good.
15     Q   So was she sick sometimes? Is that why she called
16  off?
17     A   I don't know.
18     Q   Did she give you a reason?
19     A   Sometimes she talked to Dennis Ford. She would call
20  him; and, if she couldn't get ahold of me, sometimes she
21  would leave me a voice mail indicating that she wouldn't be
22  in today because she wasn't feeling good.
23     Q   Did you provide her with FMLA paperwork?
24     A   Excuse me?

B-0419

Wilcox & Fetzer, Ltd.          Professional Court Reporters          (302)655-0477

Snyder                          v.                      Citi Steel, USA, Inc.
Randolph Harris          C.A. # 04-970-JJF                    June 8, 2006

Page 58

1    Q    Federal Medical Leave Act paperwork?
2    A    No.
3    Q    Why not?
4    A    She would have had to go through HR to get that.
5    Q    Did you instruct her to go to HR for FMLA paperwork?
6    A    No. I do remember when she had an operation on her
7    nose. She had started missing time before that. And we had
8    agreed to let her have off during vacation at the end of
9    Christmas, I think, which was 2002. Yeah. The latter part
10   of the 2002.
11   Q    Did Terry bring in doctor's notes when she missed
12   time off from work?
13   A    In the beginning, no. At the end, after the
14   counseling, after we had started telling her that she was
15   missing too much time, I do recall, I believe, Dennis Ford
16   had mentioned to me that she had started bringing in
17   doctor's notes.
18   Q    So when you say in the beginning, do you mean prior
19   to the writeup in March of 2003?
20   A    Yes.
21   Q    Okay. So between 2001 when she started and March of
22   2003, she didn't bring in any doctor's notes?
23   A    Excuse me?
24   Q    I'm sorry.

Page 59

1         She was hired in August of 2001. And the
2    writeup happened in March of 2003. Between that time, did
3    she bring in any doctor's notes for missed time off?
4    A    Yes.
5    Q    Okay. And Terry was written up in March of 2003, is
6    that correct?
7    A    I don't remember. I do know she was written up. I
8    don't remember the time.
9    Q    For what reason was she written up?
10   A    It's been so long, actually, I forgot.
11   Q    What do you remember about the writeup?
12   A    I remember that Greg Buragino, Dennis Ford and
13   myself discussed a writeup with her.
14   Q    Who actually drafted the writeup?
15   A    Dennis Ford and myself had conversated about some
16   documentation that we had had and at that time we sent the
17   information to Greg Buragino. And I'm not for sure, I
18   believe Greg or HR.
19   Q    You didn't draft the writeup?
20   A    No. I don't remember whether or not I drafted it or
21   not.
22   Q    Is it your testimony you may have drafted the
23   writeup?
24   A    No. I don't remember.

Page 60

1    Q    Your testimony is you don't remember but you may
2    have?
3    A    No. I don't remember.
4    Q    Okay. You don't remember whether or not you did?
5    A    Right. Whether or not I wrote the writeup or
6    drafted the writeup.
7    Q    Okay. You mentioned documentation that you and
8    Greg -- no, not Greg. You and Dennis Ford had. What
9    documentation did you have?
10   A    The times that we had counseled her together.
11   Q    So that's in writing?
12   A    Yeah. It was notes. We normally kept notes on a
13   note pad from our daily book that we had counseled an
14   employee on a certain date and time.
15   Q    And you gave it to HR?
16   A    We gave it to Greg Buragino. I'm not sure if we
17   actually gave it to him. We had written through
18   communication that we had talked to her through
19   documentation.
20   Q    Okay. Did you initiate the idea of a writeup?
21   A    Meaning --
22   Q    Meaning was it your -- did you prompt Dennis Ford to
23   do a writeup with you?
24   A    No.

B-0420

Page 61

1    Q    How did that come about?
2    A    Dennis had said that -- and I really can't remember
3    everything. But he felt that we needed to do something
4    about this. Her attendance and her performance.
5    Q    And what did you say?
6    A    I said, you're justifiably right or you're right, we
7    need to do something about it.
8    Q    So is it your opinion it was Dennis' idea to write
9    her up?
10        MS. DiBIANCA: Let me object to the extent that
11   it mischaracterizes the witness' prior testimony. Go ahead
12   and answer.
13        THE WITNESS: Would you repeat that question,
14   please?
15        MS. BREWINGTON: I don't really know what it
16   was.
17   BY MS. BREWINGTON:
18   Q    I think I asked you whether you thought it was
19   Dennis' idea to write Terry Snyder up.
20   A    Dennis had mentioned to me that we needed to do
21   something about her performance.
22   Q    So Dennis prompted this discussion about Terry's
23   performance; is that fair to say?
24   A    Well, we had discussions prior to, which I may

16 (Pages 58 to 61)

Snyder
Randolph Harris

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 62

1  have prompted or he may have prompted and we never done
2  anything. So he come to me afterwards and said, we need to
3  do something.
4  Q   Okay. Do you recall what the final incident was
5  that led to this discussion between yourself and Ford?
6  A   No.
7  Q   Was Terry ever written up prior to March 3rd, 2003?
8  A   I don't remember.
9  Q   If she was written up prior to that time, would that
10 documentation be located in her personnel file?
11 A   Formally, yes.
12 Q   Prior to 2002, prior to the end of 2002, were you
13 generally happy with Terry's performance?
14 A   No.
15 Q   Okay. Why not?
16 A   I felt that she could have been a little faster
17 about learning the job duties. As I stated, she started out
18 pretty good and there were certain things that she didn't
19 know how to do. She was asking some of the front line
20 supervisors to do certain things on how to do certain charts
21 and graphs that she had said she knew how to do.
22 Q   So were you concerned because she was asking
23 questions about how to do her job?
24 A   I was concerned that it was basic and that she

Page 63

1  should have knew how to do it.
2  Q   She should have knew how to do it because she was
3  trained?
4  A   Because she, in the interview, said that she had the
5  skills to do that, basic skills of Excel.
6  Q   But then she asked the supervisors how to do it; is
7  that what you're saying?
8  A   Yes. Some things they had came to me and complained
9  about to me and complained about it and said she wasn't
10 doing it right and they had to tell her over and over again
11 how to do it.
12 Q   I specifically asked you about prior to late 2002.
13 Did you write her up at that time?
14 A   No. Because I felt that with her asking, it would
15 improve her performance going into the latter part of 2002.
16 And there was some other things that crippled the situation
17 with her attendance. And then it becomes her performance.
18 Q   Do you think she could have done her job a lot
19 faster if she wasn't doing personal things for you?
20     MS. DiBIANCA: I'll object as to foundation.
21 But go ahead. You can answer.
22     THE WITNESS: Excuse me?
23     MS. DiBIANCA: Actually, I'm going to object to
24 the whole question. Go ahead and answer.

Page 64

1      THE WITNESS: Would you repeat that question?
2  BY MS. BREWINGTON:
3  Q   Do you think she could have done her job a lot
4  faster if she wasn't doing personal things for you?
5      MS. DiBIANCA: And I'll still object because he
6  has already asked and answered that she was not doing
7  personal things for him.
8      MS. BREWINGTON: And I'm going to ask him to
9  answer the question.
10     THE WITNESS: Personal things like what? I
11 don't know what you're talking about personal things.
12 BY MS. BREWINGTON:
13 Q   So is your answer, no, then?
14 A   Company business. Company duties.
15 Q   What about company duties?
16 A   That's what she was doing, company duties, not
17 personal things for me.
18 Q   Okay. Do you have relatives that live in Virginia?
19 A   I have a nephew that lives in Virginia.
20 Q   What's his name?
21 A   Dan.
22 Q   What's Dan's last name?
23 A   Harris.
24 Q   Did you ever get him Pittsburgh Steelers tickets?

B- 0421

Page 65

1  A   He has gotten me tickets before. We have gotten
2  each other tickets, yes.
3  Q   Did you have Terry Snyder involved in getting or
4  give Pittsburgh Steeler tickets to your nephew, Dan Harris?
5  A   I don't recall.
6  Q   Do you not recall because that didn't happen?
7  A   I don't recall. I don't remember. I mean we have
8  been to several Steeler games.
9  Q   Okay. You have been to several Steeler games. But
10 do you know whether you have had Terry Snyder involved in
11 distributing of the tickets to Dan?
12 A   Not that I can recall. If it was off work, if she
13 was on her way home or something like that, if she was on
14 her way out, if I had her mail something at the end of the
15 day, I don't remember. I don't know.
16 Q   Is the Pittsburgh Steelers anything to do with work?
17 A   Yes.
18 Q   How so?
19 A   Because a lot of times the tickets are for guys who
20 is going to meet other clients or whatever at the game.
21 Q   Is Dan one of your clients?
22 A   He is a steelworker and he works for Chapparel
23 Steel.
24 Q   And was he going to meet one of Citi Steel's

17 (Pages 62 to 65)

Page 66

1 clients?

2   **A  Yes. He have met Dan Evans, who is a salesperson**

3   **for Citi Steel, at games.**

4   Q  So did you ask Terry Snyder to deliver or mail

5 tickets to Dan Harris for Citi Steel?

6      MS. DiBIANCA: I'm going to object. Asked and

7 answered.

8      THE WITNESS: Excuse me?

9 BY MS. BREWINGTON:

10   Q  My question was, did you ask Terry Snyder to mail or

11 send tickets to Dan Harris for Citi Steel?

12   **A  If she was going on a mail run to the office to drop**

13 **some mail off, it could have possibly been. I don't**

14 **remember. I mean, you know, we have sent mail out. It**

15 **could have been in the mail, in her mail run to drop off at**

16 **the front office for the mail person to pick up or if she is**

17 **going out to lunch, drop off in the mailbox. I don't know.**

18   Q  Did you send Terry Snyder to an outside post office

19 to mail these Pittsburgh tickets?

20      MS. DiBIANCA: I'm going to object again

21 because he has testified now about four times that he does

22 not recall ever sending the tickets and you now want the

23 details.

24      MS. BREWINGTON: And he can answer.

Page 67

1      THE WITNESS: If she went to -- excuse me

2 again? What did you say?

3      MS. BREWINGTON: I'm going to ask the court

4 reporter to read back my last question, if you could.

5      (The reporter read back the previous question.)

6      THE WITNESS: I don't recall if it was in the

7 mail run for her to take to the hill to drop the mail off.

8 And if she went out on her way and put it in a regular

9 mailbox, I don't know. I don't recall. It could have been

10 in the mail run.

11 BY MS. BREWINGTON:

12   Q  And is it your testimony that you gave Dan Harris

13 these tickets relating to business with Citi Steel?

14   **A  Yeah. He is a steelworker.**

15   Q  Does he work for Citi Steel?

16   **A  No, he doesn't.**

17   Q  Okay.

18   **A  But he do meet some of Citi Steel's salespeople or**

19 **clients that I deal with at the football games.**

20   Q  Did he take a Citi Steel salesperson or anyone

21 related to Citi Steel to the Pittsburgh game?

22   **A  No. It was a salesperson. Not a Citi Steel**

23 **salesperson but a salesperson that services Citi Steel.**

24   Q  Was anyone at Citi Steel aware, besides yourself,

Page 68

1 that you were mailing these tickets to Dan Harris?

2   **A  Not that I'm aware of.**

3   Q  Did you ever give Terry your personal credit card?

4   **A  I think once she had asked me to loan her some money**

5 **because her mother or something was sick. She had to get**

6 **some medicine for her mother. I forget what it is.**

7   Q  And you gave her your credit card?

8   **A  No, I gave her a MAC card, I think it was.**

9   Q  You gave her your MAC card?

10   **A  Yeah, I believe it was. I forget what it was. It**

11 **was either some money for a credit card or something. I**

12 **forget.**

13   Q  Do you know if you gave her your pin number?

14   **A  No, I don't remember.**

15   Q  Do you know how much money you gave her?

16   **A  No, I don't remember.**

17   Q  Do you know when this was?

18   **A  No, I don't remember.**

19   Q  Were you under the instruction of Citi Steel when

20 you gave these tickets to Dan Harris?

21   **A  Under the instruction to Citi Steel.**

22   Q  Of Citi Steel. Did Citi Steel tell you to give

23 these tickets to Dan Harris?

24   **A  No. No. They wasn't Citi Steel tickets, it was a**

Page 69

1 **client that came in who was going to meet Dan and another**

2 **client from Chapparel Steel at the game.**

3      MS. BREWINGTON: I'd like to have this marked

4 as Harris 1.

5      (Harris Deposition Exhibit No. 1 was marked for

6 identification.)

7 BY MS. BREWINGTON:

8   Q  I have put in front of you what has been marked as

9 Harris 1. What is this document?

10   **A  It looks like the subject is unacceptable attendance**

11 **and work performance.**

12   Q  And who was this written to?

13   **A  It's to Terry Snyder.**

14   Q  And the date?

15   **A  March 3, 2003.**

16   Q  And is this the writeup that we previously

17 discussed?

18   **A  Can I read through this?**

19   Q  You sure can. Take your time. Let me know when you

20 have had an opportunity to review it.

21   **A  Okay.**

22   Q  Does this document help to refresh your recollection

23 about the writeup?

24   **A  Yes.**

B-0422

18 (Pages 66 to 69)

Snyder                                    v.                    Citi Steel, USA, Inc.
Randolph Harris                   C.A. # 04-970-JJF                      June 8, 2006

Page 70

1   Q   Okay. My first question is, you see the date that's
2   indicated March 3rd, 2003, at the top?
3   A   Yes.
4   Q   Okay. And do you see at the bottom, it says, Terry
5   refused to sign - D Ford, 03-11-03. Terry refused to sign,
6   due to poor work performance. Randolph Harris. 3-11-03.
7   Do you see where it says that?
8   A   Yes.
9   Q   My question is, why was this given to Terry on
10  March 11, 2003?
11  A   **I don't remember when it was given to her. It's**
12  **dated, you know, March 11th. I mean March 3rd.**
13  Q   Is it your opinion that you gave it to her on
14  March 3rd?
15  A   **I'm not for sure.**
16  Q   Do you know why you wrote, Terry refused to sign --
17          MS. DiBIANCA: Objection.
18  BY MS. BREWINGTON:
19  Q   Due to poor work performance, Randolph, 3-11-03?
20          MS. DiBIANCA: I object as to foundation. I
21  don't think that's been established yet.
22          THE WITNESS: Would you repeat the question?
23  BY MS. BREWINGTON:
24  Q   Yes. Is that your signature down there?

Page 71

1   A   Yes.
2   Q   Okay. My question is, why did you date this on
3   3-11-03?
4   A   It probably was discussed and it probably got to --
5   if it was from Greg Buragino, by the time we were able to
6   get together or discuss or whatever, she may have been at
7   work or Dennis may have been off or I may have been off. I
8   don't know.
9   Q   Okay. So did you discuss it on 03-11-03?
10  A   I don't remember. It's been so long, I don't
11  remember. But my signature is dated 3-11-03.
12  Q   Okay. Have you ever given a writeup before?
13  A   Yes.
14  Q   Okay. Do you usually sign off on your writeups?
15  A   Yes.
16  Q   Do you sign off on the writeups on the date that
17  they are given?
18  A   Yes. I try to. I mean, you know, as prompt as I
19  can be on the date that it gets to my desk. If it sets on
20  somebody's desk it gets to my desk, I try to date it
21  when it gets to my desk.
22  Q   Okay. Is this the date that it got to your desk?
23  A   I would assume, yes, probably, 3/11.
24  Q   You had a discussion with Terry Snyder concerning

Page 72

1   this writeup, is that correct?
2   A   Yes.
3   Q   Who was involved in the discussion?
4   A   Dennis Ford and Greg Buragino.
5   Q   Okay. It's fair to say that this did not come to
6   your desk until March 11, 2003, correct?
7          MS. DiBIANCA: Objection.
8   BY MS. BREWINGTON:
9   Q   I believe that's what you just testified to but we
10  can read it back.
11  A   Excuse me. What was the question?
12  Q   My question was, is it fair to say this document did
13  not come to your desk until March 11, 2003?
14  A   I would say that I probably reviewed it prior to
15  that. But to make it official, I probably dated it after
16  the discussion with her.
17  Q   Great. Okay. So you dated it after the discussion
18  with Terry Snyder?
19  A   Yes. After she had refused to sign it, I had to.
20  Because I put it on there. Terry refused to sign.
21  Q   So the writeup is officially dated March 3rd, 2003,
22  at the top, correct, but it wasn't given to Terry until
23  March 11, 2003, on or about?
24  A   I don't remember when it was discussed with Terry.

Page 73

1   I think we all are, prior to that, it was discussed on that
2   date. And then in order for it to go to the personnel file,
3   we must have it signed by the both of us. And it's signed.
4   Q   So is it your testimony that you had a discussion
5   with her on March 3rd, 2003?
6   A   It's been so long, I don't know. I do know that we
7   had a discussion and it had to be in between March 3rd and
8   March 11th.
9   Q   Okay. I'd like to direct your attention to I'll say
10  it's the second paragraph. It starts with, during 2002.
11  A   Yes.
12  Q   Okay. It indicates that, during 2002, you missed
13  13 days, is that correct?
14  A   Yes.                          B- 0423
15  Q   Does it indicate that? It does?
16  A   It says, during 2002, you missed 13 days.
17  Q   Was Terry Snyder written up in 2002 for missing
18  13 days?
19  A   Well, formally, no, that I can remember. It was
20  done by Dennis and I don't know anything about it. I don't
21  know. I did not write her up for -- during 2002 for missing
22  time.
23  Q   Why not write her up in 2002 if it was such a
24  problem?

19 (Pages 70 to 73)

Snyder                              v.                    Citi Steel, USA, Inc.
Randolph Harris              C.A. # 04-970-JJF                  June 8, 2006

Page 74

1    A    Well, if I'm not mistaken, Terry had some medical
2    issues that she was taking off work and during some of the
3    time she was bringing a doc's excuse. But I'm not sure but
4    I would be certain these are 13 days without a doc's excuse.
5    Q    Okay. But why not write her up in 2002 for these
6    13 days?
7    A    Well, normally what we try to do is manage employees
8    to improve their attendance because it's hard to replace
9    someone, you know, and you try to improve the skills of the
10   person that you're dealing with in those positions.
11   Q    For the record, and just so it's clear, is it your
12   testimony that not any of these 13 days were missed due to
13   doctors' appointments or because she was ill?
14        MS. DiBIANCA: I want to object. I think
15   you're mischaracterizing the witness' prior testimony.
16   BY MS. BREWINGTON:
17   Q    Okay. You can answer.
18   A    Excuse me. What was the question?
19   Q    All right. I guess we are going to be here all day.
20        I believe you mentioned earlier that you're
21   pretty sure that none of these 13 days were doctor's
22   appointments or related to any illness?
23        MS. DiBIANCA: I'm going to object for the same
24   reason.

Page 75

1    BY MS. BREWINGTON:
2    Q    Is that correct? What did you say? Why don't I ask
3    you that?
4    A    What I said was that she was missing time and
5    probably, and I can't confirm, but these 13 days was
6    probably without a doc's excuse.
7    Q    Okay. Would you put absences on a writeup that were
8    excused with a doctor's note?
9    A    Repeat that.
10   Q    Would you put, as a supervisor, missed days that
11   were excused by a doctor's note on a writeup?
12   A    Well, it depends on the situation. Past attendance,
13   whether or not we tried to see, you know, I mean if a person
14   got an illness or bandages from an accident or whatever,
15   then I can't say. But just to go and get a doc's excuse and
16   bring it in, that you just can't confirm or if it looks improper,
17   I can't say.
18   Q    Okay. You note that, since 2003, she missed two
19   days. In the same sentence. Do you see where it says that?
20   A    Yes.
21        MS. DiBIANCA: I just have to interject for one
22   moment. I'm really not trying to be a pest. But when
23   you're saying you note, would you write, he testified that
24   he does not recall if he drafted this. So I just want that

Page 76

1    to be clear in your questioning.
2         MS. BREWINGTON: Okay. That's fine.
3         Let me ask him. And that's fine.
4    BY MS. BREWINGTON:
5    Q    Does Greg Buragino have a record of Terry Snyder's
6    attendance?
7    A    He has access to it.
8    Q    He has access to it?
9    A    Yes.
10   Q    Do you provide Greg Buragino with information
11   concerning her absences?
12   A    I'm sure Dennis or myself did.
13        MS. BREWINGTON: I did ask a question, though.
14   I think I asked a question. Can you read back my question?
15        (The previous question was read back by the
16   reporter.)
17   BY MS. BREWINGTON:
18   Q    I'm looking at where it indicates this year, you
19   have already placed two days.
20        This would be two days since January 1st, 2003,
21   is that correct?
22   A    Yes.
23   Q    Is that excessive, in your opinion?
24   A    Yes. Because statistically, she would be missing

Page 77

1    one day a month. That's 12 days a year.
2    Q    Okay. How many sick days is Terry Snyder entitled
3    to?
4    A    I'm not really for sure what the sick policy
5    entails. It's been changed several times.
6    Q    Do you know approximately?
7    A    No.
8    Q    How many personal days is Terry Snyder allowed to
9    have?
10   A    I don't know. It's based on whether or not the
11   holiday falls on a Saturday or Sunday within the calendar
12   year.
13   Q    Do you recall whether either of these two days was
14   when she was sick?
15   A    No, I don't.
16   Q    Do you know whether either of these two days she had
17   a doctor's appointment?
18   A    No, I don't.
19   Q    You can actually put this document to the side. But
20   I'm going to go back to it.
21        MS. BREWINGTON: If I could have that marked as
22   Harris 2.
23        (Harris Deposition Exhibit No. 2 was marked for
24   identification.)

B-0424

20 (Pages 74 to 77)

Snyder                                              v.                    Citi Steel, USA, Inc.
Randolph Harris                            C.A. # 04-970-JJF                      June 8, 2006

Page 78

1  BY MS. BREWINGTON:
2   Q   Have you had an opportunity to review the document?
3   A   No, I haven't. I'm reading it now.
4   Q   Okay.
5   A   Okay.
6   Q   Do you know whether one of these two missed days was
7  February 26, 2003?
8   A   February 26, 2003? That's what it states here.
9  Vacation day on February 26, 2003.
10  Q   So is that one of the dates that was included in
11  the you have already missed two days?
12  A   I'm not sure. I am not sure.
13  Q   Is it your normal policy to include an approved day
14  on a writeup?
15         MS. DiBIANCA: Asked and answered. Go ahead
16  and answer.
17         MS. BREWINGTON: I'm asking him if it's his
18  normal policy to include that. I don't believe I have asked
19  that.
20         THE WITNESS: It all depends on the frequency
21  of it. If it happens more than normal or more than the
22  other employees.
23  BY MS. BREWINGTON:
24  Q   What's normal?

Page 79

1   A   Three, four times a year on average compared to the
2  other employees within a given year.
3   Q   So just so I understand it. Although a supervisor
4  may approve a day, they may still include that on the
5  writeup?
6   A   It depends on their past performance. If we see a
7  pattern or, you know, people continuously asking for days
8  off or leaving early.
9   Q   Is that fair?
10  A   We try to manage as fair as we can. Depending on
11  what the situation is.
12  Q   Do you know if anyone told Terry she would be
13  written up if she took this day off, February 26, 2003?
14  A   I don't recall.
15  Q   Okay. Back to the writeup.
16         In the next paragraph, it indicates, you have
17  been shown how to perform tasks repeatedly and you have
18  required additional instruction, is that correct?
19  A   Yes. That's what I stated earlier about asking
20  supervision for direction.
21  Q   Who has repeatedly shown her how to perform tasks?
22  A   Myself, Rick M, Dennis Ford, Rich Joslin.
23  Q   Rich Joslin?
24  A   Yes.

Page 80

1   Q   Is there anyone else?
2   A   Mike English may also have been involved.
3   Q   What tasks are we talking about when it says here
4  that you have been shown how to perform tasks repeatedly?
5   A   Monitoring production charts, graphing production
6  charts, finding information that's related to SJP's.
7   Q   Tell me what that is?
8   A   Safe job procedures.
9   Q   So finding safe job procedures?
10  A   Yes.
11  Q   The drafting of the production charts, what
12  information does she use to draft the production charts?
13  A   To graph the production charts.
14  Q   What information does she use to graph the
15  production charts?
16  A   There is different reports that you have to run to
17  pull the numbers off the report.
18  Q   Who runs these reports?
19  A   She does. With the help of the supervisors.
20  Q   So she needs the assistance of the supervisors to
21  run these reports?
22  A   She needs the assistance of the supervisors. These
23  are things that was required within her job description
24  because she always needed help from the supervisors.

Page 81

1  Because she didn't write the information down on some of the
2  reports. The reports are somewhat scattered. So you have
3  to know different places to get the reports.
4   Q   Okay. Did she get information about these reports
5  from other employees in the melting shop?
6   A   What do you mean information?
7   Q   The ISO reports. Is that what we're talking about?
8   A   The production reports.
9   Q   What about production reports?
10  A   The production reports, she needed to get the
11  information from different areas out of the system like Citi
12  Pro for the production reports and take the numbers and put
13  them in an Excel sheet and graph them.
14  Q   Did other people have to put this information in the
15  system? How does this information generate itself?
16  A   It generates itself from the input from other people
17  on the previous days or weeks of the reports.
18  Q   So, as I understand it, other people put this
19  information into the computer and then she runs the reports
20  on it?
21  A   Yes.
22  Q   Is it fair to say that her job is dependent on other
23  people doing their job?
24  A   No. Let me correct that. Because the report that's

B- 0425

21 (Pages 78 to 81)

Snyder
Randolph Harris

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 82

1  inputted by other people, she can run that report up until
2  that point. Okay.
3  Q   I don't understand.
4  A   Okay. Let me clarify yesterday's information is put
5  in the report, put into the system by somebody else. She
6  comes in the next day, runs the report.
7  Q   But what if that person doesn't put in the
8  information?
9  A   The information is checked by the shift supervisor
10  this night to make sure all information is in before she
11  comes in at 7:00 o'clock in the morning and that information
12  is in the system. Otherwise, we can't put prior information
13  from yesterday's into the system. That's the reason why the
14  shift supervisory has to make sure it's all there.
15  Q   Do all the shift supervisors always make sure that
16  all the information is in?
17  A   Yes.
18  Q   Did Terry ever have to send out requests for any of
19  this information so she could do her job?
20  A   Sometimes.
21  Q   So it wasn't always in?
22  A   Different information, though. Not the particular
23  information that we are talking about.
24  Q   Tell me about that.

Page 83

1  A   It would be like alloy additions, which was part of
2  her job. She could get that put in any time during the week
3  as long as it was in before month end.
4  Q   And what aspect of her job did she depend on others
5  to do their job?
6  A   That was one of the aspects of making sure that the
7  alloy additions got put into the system.
8  Q   Alloy additions?
9  A   Yes.
10  Q   How about the ISO's?
11  A   No. That was strictly her job. She was qualified
12  to do that. She took ISO classes to do that.
13  Q   How about standard report stop cards?
14  A   Yeah, stop cards, she needed to put that information
15  in. She did not have to wait on information from the
16  supervisors. However, she would send a reminder out for the
17  supervisors to fill out their stop cards.
18  Q   Could she do her job if they didn't fill out their
19  stop cards? Could she run her reports?
20  A   That wasn't on a report. The stop cards wasn't on a
21  report.
22  Q   Okay.
23  A   Okay. She would get the stop cards and had a spread
24  sheet, well, Joe Blow did two stop cards today. So she

Page 84

1  could still run her report. It doesn't make any difference
2  whether or not the guy gave her any stop cards or not.
3  Q   How would she know who did stop cards if they didn't
4  give them to her?
5  A   She knew the names of the supervisors who were
6  supposed to be filling out the stop cards.
7  Q   And what happens if the supervisors don't fill out
8  the stop cards?
9  A   Then when she put it in the system it is going to
10  show up as zero.
11  Q   So then that would be sufficient?
12  A   That would be sufficient, to give it to -- pass it
13  to Dennis and myself that the supervisors haven't been
14  sending out stop cards or haven't been doing stop cards
15  because there would be a zero by his name.
16  Q   Would that be accurate?
17  A   It doesn't have to be accurate. We just need to be
18  basing his performance on whether or not he is filling the
19  stop cards out or not. So that was a different situation
20  for the information.
21        MS. BREWINGTON: Off the record.
22        (Discussion held off the record.)
23        MS. BREWINGTON: Harris 3.
24        (Harris Deposition Exhibit No. 3 was marked for

Page 85

1  identification.)
2        MS. DiBIANCA: Where is the second page to
3  this?
4        MS. BREWINGTON: I don't know.
5        MS. DiBIANCA: This is part of the ones I
6  admitted.
7        MS. BREWINGTON: Okay.
8        MS. DiBIANCA: I have the second page. Do you
9  want it?
10        MS. BREWINGTON: You can certainly give it to
11  him so he can see it.
12        MS. DiBIANCA: For the record, do we need to
13  call it then Snyder -- part of the Snyder exhibit, do you
14  think?
15        MS. BREWINGTON: If you want to. That's fine.
16  I didn't realize it was two. I don't know what happened.
17        MS. DiBIANCA: That's okay. Just note that it
18  goes -- there is a second page. So why don't you look at
19  that one.
20        MS. BREWINGTON: We can make copies of it, if
21  you like.
22        MS. DiBIANCA: That's fine.
23  BY MS. BREWINGTON:
24  Q   Can you tell me what this is?

B-0426

22 (Pages 82 to 85)

Snyder                                          v.                    Citi Steel, USA, Inc.
Randolph Harris                        C.A. # 04-970-JJF                       June 8, 2006

Page 86

1    A    I don't know.  It's not directed to me.  I don't
2    know what this is.
3    Q    Is it an e-mail?
4    A    Yes, it's an e-mail.
5    Q    Is it an e-mail from Carmella Patrone?
6    A    Yes.
7    Q    Is it an e-mail from Carmella Patrone to Terry
8    Snyder?
9    A    Yes.
10   Q    Is it dated March 12th, 2003?
11   A    Yes.
12   Q    Is the subject miscellaneous?
13   A    Yes.
14   Q    Okay.  I'd like to direct your attention to the
15   first paragraph, starting with anyway.  If you could read
16   that for me.
17   A    Anyway, I didn't --
18   Q    You don't have to read it out loud.
19   A    Okay.
20   Q    Have you read it?
21   A    Let me finish.  Excuse me.
22   Q    I'm sorry.
23        MS. DiBIANCA:  Off the record.
24        (Discussion held off the record.)

Page 87

1    BY MS. BREWINGTON:
2    Q    Have you had an opportunity to review that
3    paragraph?
4    A    The first part, yes.
5    Q    In this e-mail, Carmella Patrone indicates, quote, I
6    didn't read carefully that it was Greg who went around
7    asking everyone about you.
8         Is that correct?  Does it indicate that in the
9    e-mail?
10   A    Yes.  I guess I can assume that.
11   Q    Did Greg ask you about Terry's performance?
12   A    Yes.
13   Q    When was that?
14   A    I forget.  I don't know.  After we had talked a
15   couple times.  I forget when it was.
16   Q    Was it after the writeup in March of 2003?
17   A    I don't remember.
18   Q    Did Greg ask anyone else about Terry's job
19   performance?
20   A    I don't know.  I wasn't around when Greg asked him.
21   I don't know if he did or not.
22   Q    The last sentence, does it indicate that Carmella
23   wrote in an e-mail, quote, also, you can't do your job if
24   other people don't provide you with the necessary

Page 88

1    information you need, i.e., physical inventory numbers?
2    A    That's what it reads.
3    Q    What are the physical inventory numbers?
4    A    Those are numbers that you go out and take inventory
5    of what's on hand at the month end and you have about three
6    days to do that.
7    Q    Who does that?
8    A    Terry was involved in it.  Dennis Ford and as well
9    as myself and Dan Elliott.
10   Q    So Terry provides these inventory numbers?
11   A    Terry goes out and takes inventory out in the shop.
12   Q    Would you disagree with Carmella's statement that
13   Terry can't do her job if other people don't provide her
14   with the necessary information that she needs?
15   A    It all depends on what information it is.  Because
16   you have so many items that you take inventory on.  And even
17   if she had half of the items or a certain amount of items
18   that could be reviewed and what's not in there, then you
19   could go back out and finish it up.  So I don't know what
20   she is talking about.
21   Q    But I'm just asking you, in your opinion, whether
22   this statement is true?
23   A    Partially.
24   Q    Can you tell how it's partially true?

B-0427

Page 89

1    A    That's what I just said.
2    Q    Can you be more specific, though?
3    A    Okay.  You have items out in the shop for inventory
4    purposes.  Okay.  Terry is involved in the inventory.  Or
5    Dennis Ford.  Even myself.  Go out and you take inventory of
6    what's out there.  You turn your numbers in to Terry or
7    either we put them in, however her and Carmello were putting
8    the numbers in.
9         You run the copy off, printed copy.  You can
10   see what items are missing or doesn't look right in the
11   inventory.  That's how you check it.  Then you go back out,
12   you check again.  May it be what she was doing or what
13   Dennis Ford was doing or what I was doing.  Then you
14   continue to run the numbers to see whether or not you made
15   any mistakes or not or miscounted something or invoices that
16   would come in that wasn't being properly filed away.
17   Q    Okay.  So she can run the report but it may not have
18   the information in it?
19   A    Yes.
20   Q    Because others -- wait.  Let me finish.  Because I
21   want to understand this.
22        She can run the report but it may not have
23   information in it because others haven't given her physical
24   inventory numbers?

23 (Pages 86 to 89)

Snyder                                    v.                        Citi Steel, USA, Inc.
Randolph Harris              C.A. # 04-970-JJF                          June 8, 2006

Page 90

1    A   Yes.
2    Q   Okay. The physical inventory numbers in the last
3    sentence there, does that refer to receipts?
4    A   Some, yes.
5    Q   Is that receipts from the storeroom and the trucks?
6    A   Yes. Receipts that probably could have got to her
7    that was put on her desk, got lost or she didn't properly
8    file them in the right place. There is several places to
9    get the receipts from.
10   Q   Is the supervisor supposed to put them in her box?
11   A   Sometimes the individuals, if it's direct contact
12   like truck drivers that's coming through, they will leave
13   them on her desk, you know.
14   Q   But are they supposed to give them to her?
15   A   Yes. If she is in her office, yes.
16   Q   Do they always give them to her?
17   A   Sometimes we had some discrepancies.
18   Q   Sometimes they didn't?
19   A   Yes.
20   Q   Did the physical inventory numbers also consist of
21   usage?
22   A   Yes.
23   Q   Did the physical inventory numbers also consist of
24   left over?

Page 91

1    A   I don't understand what you mean left over.
2    Q   It's something that's counted by the three of you,
3    so is left over counted by you, Dennis Ford -- oh, strike
4    that.
5        MS. DiBIANCA: Do you need a minute?
6        MS. BREWINGTON: No.
7    BY MS. BREWINGTON:
8    Q   Are leftovers counted by Carmello, Dennis Ford and
9    Terry?
10   A   No. Carmello is not -- Carmello is not involved in
11   counting leftovers.
12   Q   Okay.
13   A   And I don't really quite understand what you mean
14   when you say leftovers.
15   Q   Okay. We'll come back to that after I have had an
16   opportunity to break.
17       MS. BREWINGTON: If I could have this marked as
18   Harris 4.
19       (Harris Deposition Exhibit No. 4 was marked for
20   identification.)
21   BY MS. BREWINGTON:
22   Q   Have you had an opportunity to review it?
23   A   I just breezed through it a little bit.
24   Q   I'll represent to you that these are various e-mails

Page 92

1    that Terry Snyder has sent to different employees at Citi
2    Steel while she was employed there. And I'm not going to go
3    through each and every e-mail. I just want to ask you some
4    questions about this.
5        The first e-mail is in bold, I believe, all
6    caps. STOP CARDS PLEASE!!!!!!!! THANK YOU. TERRI.
7        I guess I want to know why Terry needed these
8    stop cards or did Terry need stop cards?
9    A   I can see this is March and I guess it's probably
10   prior to some of the conversations that we have had with her
11   about performance. You see, the stop cards should come to her
12   from the melters to start the spread sheet as we talked
13   about. But all she had to do was put in whether or not they
14   were turned in, the amount of stop cards, if any at all, and
15   they passed that information to Dennis and myself.
16   Q   On the second e-mail, can you read there for me out
17   loud?
18   A   Mike. Please place six stop cards on my desk. They
19   are located in the bottom drawer on the filing cabinet
20   behind my chair.
21   Q   And read the writing and everything.
22   A   Mike. He stated he is not turning any in.
23   Q   That was the written part?
24   A   Yeah.

Page 93

1    Q   Who is Mike? Do you know what Mike she might be
2    referring to or whoever might be referring to?
3    A   It's Mike English.
4    Q   Did Mike turn in his time cards?
5    A   Stop cards.
6    Q   Stop cards. I'm sorry.
7        MS. DiBIANCA: Objection. Just as to the time
8    period.
9        THE WITNESS: Yes.
10   BY MS. BREWINGTON:
11   Q   Yes?
12   A   Yes, he turned in stop cards.
13   Q   Did he have a problem or issue with turning in stop
14   cards?
15   A   I am not aware if it was shop talk. He never told
16   me he wasn't turning any stop cards in.
17   Q   Did Terry tell you he wasn't turning in stop cards?
18   A   I don't recall.
19   Q   Did Mike English report to you?
20   A   Yes.
21   Q   The third page here is marked P-0271. Put a dash in
22   there.
23       Do you recall getting this e-mail?
24   A   I don't recall. It's been a while.

B- 0428

24 (Pages 90 to 93)

Snyder
Randolph Harris

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 94

1    Q    Are two stop cards per supervisor supposed to be
2    turned in weekly?
3    A    We try to do two weekly, two a week. Two per week.
4    Q    And the crew meeting forms are also supposed to be
5    turned in?
6    A    At least once a week, if we are having them.
7    Sometimes if guys are called off and we are short, we don't
8    do it.
9    Q    Okay. Did that occur?
10    A    Sometimes.
11    Q    And sometimes it didn't?
12    A    Yes, sometimes it didn't.
13    Q    I take you to P-0282. If you could read that e-mail
14    for me out loud?
15    A    This is a reminder (which you all may have received
16    an individual e-mail already several times) that upper
17    management does not want anyone sitting on any procedures.
18    We are going to get audited shortly, so please get in touch
19    with me if you're unable to locate a procedure, do not be
20    shy as many people has had to have them reprinted, but I
21    must get some kind of feedback from you to know exactly
22    where we stand with each one. Please do not hesitate me --
23    Q    Do not ignore?
24    A    Do not ignore me. I'm only trying to do my job.

Page 95

1    Q    Finish, please.
2    A    Thank you all for your time and cooperation.
3    Q    Finish it.
4    A    Terri.
5    Q    Thank you.
6        Who did she send this memo to, or this e-mail?
7    A    Casters, melters, Jimmy Rineer, Zalota, Stanley
8    Zalota, John Gimmy and myself.
9    Q    And who is casters?
10    A    Casters were, at the time, caster supervisors.
11    Q    So casters, melters Rineer, Jim -- no, Rineer, Jim
12    Rineer?
13    A    Yes.
14    Q    So casters, melters, Rineer, Zalota and Stanley are
15    all supervisors?
16    A    Yes.
17    Q    Okay. Is it fair to say in this e-mail she is
18    requesting management to help her out with the procedures?
19    A    Oh, yeah. We probably -- what we do is we inform
20    her to send e-mails out to management to remind them of
21    things.
22    Q    Okay. And this e-mail is dated January 7th, 2003,
23    is that correct?
24    A    I see January 27th.

B-0429

Page 96

1    Q    What did I say, January 7th? Sorry. January 27th,
2    2003, is that correct?
3    A    Yes.
4    Q    And is it true that this e-mail was sent out before
5    Terry Snyder was written up?
6    A    I don't recall. I'd have to look at the dates.
7    Q    Okay. Let's go back to the writeup.
8    A    I know she probably was counseled prior to the
9    writeup, the official writeup. So she probably was
10    counseled prior --
11    Q    I didn't ask that, though.
12        MS. DiBIANCA:    Let him finish the answer.
13        MS. BREWINGTON:    I can let him finish.
14    Certainly.
15        THE WITNESS:    I feel confident she was
16    counseled prior to January 27th. Because I see all these
17    e-mails dated from January until March of that time period
18    where she was asked to improve her performance.
19    BY MS. BREWINGTON:
20    Q    And my question was, was this e-mail sent out prior
21    to her writeup in March of 2003?
22    A    Yes.
23    Q    The people that we just mentioned, casters, melters,
24    Rineer, Zalota and Stanley, were they in a higher pay grade

Page 97

1    than Terry Snyder?
2    A    Excuse me. Repeat that question.
3    Q    Were they in higher pay grade than Terry Snyder?
4    Were they paid more than she was?
5    A    Yes.
6    Q    Were they considered supervisors?
7    A    Yes.
8    Q    Were they her supervisor?
9    A    Were they her supervisors? No. But they could
10    request that she do work for them.
11    Q    Okay. Back to the writeup. It's Harris 1.
12    A    Yes.
13    Q    Okay.
14    A    What did you just say, Harris --
15    Q    Back to the writeup.
16        MS. DiBIANCA:    There should be a sticker on it.
17        THE WITNESS:    Yes.
18    BY MS. BREWINGTON:
19    Q    In this memo or in the writeup of March 3rd, 2003,
20    that's when it's dated at the top, it indicates, you have
21    been using the phone too much with regard to personal
22    matters. Per company policy, you are not permitted to use
23    the company phone for personal reasons unless you have an
24    emergency.

25 (Pages 94 to 97)

Snyder
Randolph Harris

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 98

1  What is Citi Steel's policy on personal phone
2  calls?
3    A  You try to limit personal phone calls as much as
4  possible during your work period.
5    Q  Is that a written policy?
6    A  I'm not for sure. I don't recall.
7    Q  So personal phone calls are allowed, is that
8  correct?
9    A  As long as it's not being abused excessively.
10   Q  And in this writeup, it says, quote, using the phone
11  too much.
12       What constitutes using the phone too much?
13   A  If you're on the phone for two hours at a time, I
14  would say that that's too much.
15   Q  Was Terry on the phone two hours at a time?
16   A  There were times that she was on the phone a lot. I
17  didn't time her on the phone. There was times that she was
18  on the phone a lot. There was complaints from other
19  supervisors that they were trying to call her and never
20  could get through to her, they would come through in passing
21  and she would be on the phone.
22   Q  Were these personal phone calls that she was on the
23  phone with or were they work related?
24   A  I don't know. I couldn't decipher whether it was

Page 99

1  personal phone calls or work-related phone calls. She
2  didn't have a lot of contacts where she needed to be calling
3  people that was related to work.
4    Q  Did she ask permission to use the phone for personal
5  reasons?
6    A  No. Not to my knowledge. To me.
7    Q  She may have asked Dennis Ford?
8    A  Yeah.
9    Q  Have you ever written anyone else up for using the
10  phone for personal reasons?
11   A  Not formally but I have documented in the past and
12  have counseled employees about excessive use of the phone.
13   Q  With who?
14   A  Mainly a lot of operators, you know, because there
15  are phones in their areas that they need to use for
16  emergency and I have talked to several people on several
17  occasions about excessive use of phone.
18   Q  Who.
19   A  I really can't remember or recall. But I'll try to
20  give you some names. A lot of guys are not even there
21  anymore. I can't recall.
22   Q  Was Terry entitled to a lunch break?
23   A  Yes.
24   Q  What were her hours of operation? Do you recall?

Page 100

1    A  We normally tried to flex with Terry as much as we
2  could.
3    Q  Okay. Did she have regular hours?
4    A  Yeah. Her regular scheduled hours were from 7:00 to
5  3:00. However, she felt that she would do better from 6:00
6  to 2:00, I believe.
7    Q  Okay. And when you say you tried to flex her hours,
8  what does that mean?
9    A  Well, a lot of times if people have things to do,
10  like, in her case, she said her mother had these
11  contractors, she was missing time, we would allow her to
12  come in, you know, sometimes I recall her coming in on the
13  evening and maybe on the weekend a couple times.
14   Q  Would she send you an e-mail about that?
15   A  I don't recall. I would tell her to talk to Dennis.
16  Just like if she went to him, he would tell her to talk to
17  me. To make sure that we were, you know, in agreement that
18  neither one of us had anything that needed to be done that
19  was high priority for that day or whatever.
20   Q  Okay. Did she send e-mails to you concerning her
21  lunch? Let me be more specific, if I could.
22       Asking to go to lunch?
23   A  Yes, I remember a couple of e-mails she sent that
24  she wanted to leave the plant site to go to lunch.

Page 101

1    Q  Did she have to let you know that she wanted to
2  leave to go to lunch?
3    A  Well, a lot depended on what time it was. Sometimes
4  people that go to lunch, they leave, you know, 10:30,
5  quarter to 11:00, 11:00 o'clock, you know, at least we know
6  that she was out of the building or out of the plant. We
7  wouldn't be concerned about, well, where is she at because
8  we didn't want anything to happen to her as far as her
9  getting hurt or falling down the steps or something, not
10  knowing where she is at.
11   Q  Did she have to send e-mails about her lunch to you?
12   A  No.
13   Q  Did she do it as a courtesy to you?
14   A  Sometimes, she did.
15   Q  Did she normally remain seated at her desk for
16  lunch?
17   A  Sometimes. Her and Carmello. She would eat lunch
18  with Carmello sometimes. I can recall that.
19   Q  At her desk?
20   A  Yes.
21   Q  Is that allowed?
22   A  Yes.
23   Q  Is she allowed to use the phone on her lunch break?
24   A  Yes.

B-0430

26 (Pages 98 to 101)

Snyder
Randolph Harris

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 102

1  Q   Who's responsible for monitoring the phone usage?
2  A   I believe HR.
3  Q   Okay. Back to the writeup.
4      It indicates, quote, you have stated that
5  someone put a sticker on your car and wrote graffiti about
6  you on a wall. Following investigations, we concluded that
7  there is no evidence that these things happened at Citi
8  Steel.
9      Do you recall this incident?
10 A   Somewhat, yes.
11 Q   What do you recall about this incident?
12 A   I remember her coming to me telling me that somebody
13 had -- first she came and said that somebody had pasted
14 something on her car in the parking lot, a sticker.
15 Q   Do you remember when this was?
16 A   No. I forget whether it was in the morning. For
17 some reason, I want to believe it was in the morning because
18 when she reported it, after we had investigated it, we
19 didn't find anything and we felt that maybe somebody in her
20 neighborhood or somebody just where she was parked early in
21 the morning could have put it on her car.
22 Q   And you indicated that she came to you. Did she
23 call you on the phone or did she come to your office?
24 A   I believe she came to my office or either I seen her

Page 103

1  in the hallway. I forget.
2  Q   And tell me what was said?
3  A   She was upset that somebody had put something on her
4  car and that somebody was writing stuff on the wall about
5  her.
6  Q   We'll get to the wall thing. I just want you to
7  stick with this --
8  A   That's what she said to me in the hallway.
9  Q   Oh. I'm sorry. Okay. These two things happened at
10 the same time?
11 A   Yes.
12     MS. DiBIANCA: Just let him finish.
13     MS. BREWINGTON: Okay.
14     THE WITNESS: She said that somebody was
15 writing stuff on the wall about her. And at the time, you
16 know, I had asked around, did anybody see anything within
17 the shop. Then I took it to HR. Okay. And then at that
18 time, Terry, myself and I believe it was Jerry Downie met in
19 HR and had a discussion.
20 BY MS. BREWINGTON:
21 Q   Okay. You indicated you took it to HR. Who did you
22 talk to?
23 A   Jerry Downie.
24 Q   And what did you say to Jerry Downie?

Page 104

1  A   I told him what she had told me that, somebody had
2  put something on her car. And she did show me a piece of
3  bag, sticker or something that somebody had written on. I
4  really couldn't make out what it was. It was some kind of a
5  brown bag or sticker like somebody just put something on her
6  car. I don't know.
7  Q   Did it have writing on it?
8  A   Yeah, but I couldn't understand what it was. At
9  least I don't remember what it was anyway.
10 Q   And so she presented to you you said a bag, is that
11 correct?
12 A   It was a piece of paper, a bag, a piece of paper
13 that was folded up where she had balled it up I guess from
14 being angry. And she said it was stuck on her car. And you
15 couldn't really read what it was. But I took it to HR
16 anyway.
17 Q   Okay. I'm trying to understand what it was that was
18 on her car. Was it a sticker?
19 A   It was a brown paper bag that somebody had stuck on
20 her car. She brought it to me. I don't know what it was.
21 I mean it was -- she had brought to me.
22 Q   How did it stick on her car?
23 A   I don't know. I didn't see it on her car.
24 Q   And there was writing on the bag?

Page 105

1  A   Yeah. Somewhat. But I couldn't understand what it
2  was.
3  Q   Did you tell her to take the sticker off her car,
4  put it in a baggy and give it to you?
5  A   No, I don't recall that.                B-0431
6  Q   What happened in HR?
7  A   We had the discussion. I told them that I had
8  investigated it in the shop and nobody had seen anything.
9  Then I think shortly after him and Terry talked and what we
10 were going to do was move her to another location in the
11 parking lot and she refused.
12 Q   You were going to have her park somewhere else?
13 A   Yes. To where the guard could be able to monitor
14 the car.
15 Q   Did she say why she didn't want to move her car?
16 A   No. I wasn't there for that. Jerry
17 had just informed me that he had offered her another parking
18 space where a guard could see her car and she refused it.
19 Q   And you indicated you did an investigation?
20 A   Yeah, as much as I could with the information that I
21 had.
22 Q   Tell me what you did?
23 A   I went out and asked a couple of guys out on the
24 floor that had came in on that shift, did they see anything.

27 (Pages 102 to 105)

Snyder
Randolph Harris

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 106

1   Q   Now, are you talking about the sticker or the
2   graffiti?
3   A   Both.
4   Q   And who did you talk to?
5   A   I forget. I forget. I mean it's been so long.
6   Q   What else did you do besides talk to a couple of
7   guys on the floor?
8   A   I told Terry. I went back to Terry and told her I
9   really didn't find out anything and we need to take it to
10  HR. And we did.
11  Q   Was Terry written up for false accusations?
12  A   No. Not that I'm aware of, no.
13  Q   Was it your opinion that these were false
14  accusations?
15  A   No, I did not know one way or the other. I just
16  couldn't find any evidence of what had happened.
17  Q   But you did find some evidence with the paper bag,
18  is that correct, or whatever was crumbled?
19  A   Evidence that had happened on Citi Steel property.
20  Q   Okay. Did you see any graffiti on the building or
21  anywhere?
22  A   I don't remember, no. I don't remember.
23  Q   Have you told me everything you can remember about
24  the graffiti?

Page 107

1   A   Yes. To the best of my knowledge.
2       MS. BREWINGTON: I think we should take a
3   break.
4       (Recessed for lunch at 1:04 p.m.)
5       AFTER NOON RECESS
6       1:57 p.m.
7   BY MS. BREWINGTON:
8   Q   Mr. Harris, was there a problem at some point with
9   the tiles on the floor in the melt shop?
10  A   Yes.
11  Q   What was the problem?
12  A   We had a water leak from the roof and it had came
13  through the ceiling and we had damaged some tiles on the
14  floor.
15  Q   Was it everywhere or was it just in a certain
16  section?
17  A   Certain areas.
18  Q   More than one area?
19  A   Within the hallway, it was spotted. Maybe an area
20  about one foot by a foot and then maybe two, three foot
21  down, there may have been another area. Something like
22  that.
23  Q   And what did the water do to the tiles?
24  A   It caused them to come loose.

Page 108

1   Q   Did that cause a safety issue?
2   A   It could have been, yes.
3   Q   Did you report that to anyone?
4   A   Verbally before, I had mentioned to the facilities
5   department that we needed to get the tiles removed and we
6   tried to remove them as they started to coming loose so that
7   it wouldn't become a tripping hazard.
8   Q   Who did you talk to in facilities?
9   A   It may have been Barry -- I forget his last name.
10  He is no longer there. He was the facilities supervisor
11  then, I believe.
12  Q   So was it the facilities supervisor, whoever that
13  may have been?
14  A   Yeah, somebody in facilities. I forget who it was.
15  Q   Did you send an e-mail?
16  A   I can't recall.
17  Q   Do you know around the time that this was? Was it
18  in early 2003?
19  A   It could have been. Because the offices were
20  deteriorating, you know. We had budget money set aside to
21  make the repairs.
22  Q   How long had it been that way?
23  A   Well, you mean the tiles or the condition of the
24  office?

Page 109

1   Q   Good question. The tiles.
2   A   The tiles, I don't know. In certain spots, they
3   would deteriorate because the offices was old, you know.
4       (Harris Deposition Exhibit No. 5 was marked
5   for identification.)
6   BY MS. BREWINGTON:
7   Q   You have in front of you what has previously been
8   marked as Harris 5. Could you tell me what this document
9   is?
10  A   It's an e-mail to Jim Ryan, a copy to myself and
11  Dennis Ford from Terry Snyder.
12  Q   And what's the date?
13  A   January 7, 2003, 10:47 a.m.
14  Q   And could you read the contents of the e-mail for
15  me?
16  A   Mr. Ryan. I thought it would be best to let you
17  know before someone gets hurt. The floor up here in the
18  metal shop office is coming apart tile by tile. I for one
19  tripped but caught myself. The next employee may not.
20  Thanks for your time. Terry.
21  Q   Okay. Who is Mr. Ryan?
22  A   At the time, he was the safety manager.
23  Q   And what is he now?
24  A   He is the HR person. He was also an assistant

B-0432

28 (Pages 106 to 109)

Snyder                                    v.                    Citi Steel, USA, Inc.
Randolph Harris              C.A. # 04-970-JJF                         June 8, 2006

Page 110

1   somewhat to the HR person also during this time.
2   Q    That he was safety manager?
3   A    Yes.
4   Q    Did it bother you that Terry sent this e-mail?
5   A    No, not really. I mean -- no.
6   Q    When you say not really, do you mean it kind of sort
7   of did? I don't know.
8   A    No, it didn't bother me.
9   Q    It didn't bother you.
10       We have previously talked about Harris 1, which
11  is the writeup.
12  A    Okay.
13  Q    Did Terry Snyder ever confront you about this
14  writeup?
15  A    Yes.
16  Q    Now, I believe the writeup was sometime between
17  March 3rd, 2003, and March 11, 2003. Is that fair to say?
18  A    Yes.
19  Q    Was this confrontation after that time?
20  A    After this?
21  Q    Yes.
22  A    Yes. On her behalf.
23  Q    Meaning she confronted you?
24  A    Yes. And confrontational.

Page 111

1   Q    I'm asking. You can tell me all about it. We are
2   getting there. I just want to get the time frame.
3        Do you know how long after the writeup that you
4   had a confrontation, so to speak?
5   A    No.
6   Q    Would it have been a week?
7   A    I don't remember. I don't recall.
8   Q    Was it less than six months?
9   A    Yes.
10  Q    Less than three months?
11  A    Within, yes, somewhere during that time period.
12  Q    Was anyone else present during this, for lack of a
13  better word, confrontation?
14  A    No.
15  Q    Where did it take place?
16  A    In my office.
17  Q    Was it during the workday?
18  A    Yes.
19  Q    In the morning, in the afternoon?
20  A    I don't remember.
21  Q    Tell me what happened?
22  A    She came in, she slammed my door. She reached
23  across my desk and she started to saying some things and I
24  said, what are you talking about. I don't understand, you

Page 112

1   know. We went over this. It was confrontational but I
2   don't remember the exacts words that was said.
3   Q    Do you remember anything that was said?
4   A    It wasn't making any sense to me what she was
5   saying.
6   Q    Is that something you remember, that it wasn't
7   making any sense to you?
8   A    Yes. Because I thought that we had settled our
9   situation with Greg, Dennis and myself.
10  Q    Did you say anything back to her?
11  A    I don't remember.
12  Q    You don't remember whether you said anything back to
13  her or you don't remember what you said?
14  A    I don't remember what I said.
15  Q    Okay.
16  A    I'm sure I questioned what she was talking about.
17  Q    Did she tell you that Ford told her that it was your
18  idea to write her up?
19  A    I'm not for sure. I'm not for sure at the time.
20  Q    Did you apologize to her at some point later after
21  the writeup?
22       MS. DiBIANCA: Objection as to vague, as to the
23  time frame.
24       THE WITNESS: Could you repeat the question?

Page 113

1   BY MS. BREWINGTON:
2   Q    My question is, did you apologize to her at some
3   point later about the writeup?
4   A    I don't recall.
5   Q    Would you have apologized about the writeup?
6   A    Well, I probably would have tried to motivate her in
7   the sense to put the writeup behind her, to move forward to
8   try to improve her performance.
9   Q    But as far as apologizing, you would not have
10  apologized?
11       MS. DiBIANCA: Objection to the extent it calls
12  for speculation. Go ahead and answer.
13       THE WITNESS: I don't know whether or not it
14  would have been directly. I don't know. I can't recall.
15  BY MS. BREWINGTON:
16  Q    Did you tell her that you issued the writeup because
17  you wanted her to understand your authority over her?
18  A    No.
19  Q    Do you know where that may have come from, that
20  allegation?
21  A    No. That's not the way I manage.
22  Q    Back to the writeup, Harris 1.
23  A    Yes.
24  Q    Do you see where it indicates, quote, you have

29 (Pages 110 to 113)

Page 114

1  complained about being afraid of heights? If you cannot
2  tolerate heights and feel endangered, please contact me
3  immediately.
4        Do you see where it says that?
5  A  Yes.
6  Q  Okay. How long had she complained about her fear of
7  heights?
8  A  I --
9  Q  Let me ask you this. Let me strike that and say,
10 did she complain of her fear of heights to you?
11 A  Yes.
12 Q  And then let me go back and ask you, how long had
13 she complained of her fear of heights? And reminding you
14 that she began working in 2001.
15 A  I don't recall the exact time.
16 Q  Was it within the first year of her working there?
17 A  I don't recall. I can say the incident that I found
18 out that she was afraid of heights, I don't remember the
19 time period, was when we were walking across a catwalk to
20 the melt shop and she put her hands on the back of my
21 shoulder and said she was afraid of heights.
22 Q  Okay. Is that where this is coming from?
23 A  And Dennis had informed me that the same incident
24 happened with him.

Page 115

1  Q  Does she have to walk up a catwalk to get to the
2  melting shop?
3  A  Yes.
4  Q  And is this the same place where she put her hand on
5  your shoulder?
6  A  No.
7  Q  Okay. Tell me. Tell me where.
8  A  We were doing inventory and she had to walk to the
9  caster floor to get to the melt shop office. She come up
10 the stairway. There is an area of about five foot from the
11 top of the stairway to the office. The incident of the time
12 that we were walking across the catwalk over to the caster
13 department, that's when we found out that she was afraid of
14 heights and we didn't know whether or not she was playing,
15 joking, whatever, at that incident with me. And I discussed
16 that with Dennis afterwards and he said that the same
17 incident had happened to him. As a matter of fact, he was a
18 few steps behind Terry and I was in front of Terry and she
19 was in the middle.
20 Q  Okay. Did Dennis Ford have the same situation with
21 her? What did he tell you about her fear of heights?
22 A  He didn't say he had the same situation in detail.
23 He just said that she was walking across the catwalk with
24 him and she had put her hands on him also.

Page 116

1  Q  Do you believe she put her hands on you in a sexual
2  way?
3  A  From my thoughts, no.
4  Q  Did Dennis Ford tell you that she put her hands on
5  him in a sexual way?
6  A  We never discussed that.
7  Q  How many catwalks are there? That might be a stupid
8  question. Is it just one?
9  A  It's one long stretch of catwalk.
10 Q  Did she have to walk this catwalk since the
11 beginning of 2001?
12 A  Yes, on several occasions.
13 Q  Is that where her job is, she has to walk --
14 A  Yes, it's part of her job.
15 Q  Okay. And she obviously walked there every day, is
16 that correct?
17 A  I wouldn't say every day up that path.
18 Q  Is there another way to get there?
19 A  The way that I told you coming up the stairway, you
20 had about five foot of catwalk into the office.
21 Q  Okay. I'm not understanding why being afraid of
22 heights is on a writeup. Is being afraid of heights against
23 company policy?
24 A  No. But it requires people to perform certain

Page 117

1  duties walking in this area. And it's not an unsafe area or
2  catwalk.
3  Q  Did she not walk it because of her fear of heights?
4  A  Well, she had walked it several times. This is the
5  reason why we have -- we were surprised that she was holding
6  onto us or me at that time after the discussion. And when
7  Dennis had brought it to my attention that she had grabbed
8  him also walking in that direction.
9  Q  Did Terry Snyder inform you of her fear of heights
10 from the beginning when she was hired in 2001?
11 A  No. To my knowledge, no.
12 Q  In 2001, were you aware that she had a fear of
13 heights?                                              B- 0434
14 A  No.
15 Q  When did you first become aware of her fear of
16 heights?
17 A  During the period of -- I forget exactly when but it
18 was on an inventory because she had -- we were doing
19 inventory and it was one of the first times that she had
20 participated in actually going out on the floor doing
21 inventory. And so I don't remember or recall.
22 Q  But that was your first time. And then there was a
23 separate occasion when she held onto you, is that correct?
24 A  Repeat that, please.

30 (Pages 114 to 117)

Snyder
Randolph Harris

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 118

1  Q   Okay. The first time was when you guys were doing
2  inventory that you learned of her fear of heights, is that
3  correct?
4  A   That was during the same incident.
5  Q   Oh, okay. So all that was one time?
6  A   Yes.
7  Q   Did you have Terry Snyder's personal phone number?
8  A   Yes. Access to her personal phone number.
9  Q   Did you ever call her at home?
10  A   Once.
11  Q   What did you call her at home for?
12  A   To tell her that she didn't need to come in to work
13  that day.
14  Q   How did you have access to her personal telephone
15  number?
16  A   We have a list of all employees' personal phone
17  numbers for emergency phone numbers; and, if there is a
18  breakdown or a major maintenance problem, to be able to call
19  the employees off work.
20  Q   Did you call her at any other time besides this one
21  time that you are telling me about?
22  A   I don't recall of any other times.
23  Q   Did you instruct her to call you on your personal
24  phone?

Page 119

1  A   Yes. As a courtesy, we give all employees access to
2  the supervisors.
3  Q   What does that mean, access to the supervisors?
4  A   Well, we have a procedure where, if you're going to
5  be off, you call the guard and get a call-off number. We
6  change our guards more than most companies do. As a
7  courtesy, we asked the employees to call the supervisors'
8  offices. If they can't get ahold of anybody, then you can
9  call them at home and let them know that you have a problem
10  and you won't be in to work. We do that as a courtesy.
11  Q   So the only time Terry was instructed to call you
12  was when she was calling off from work?
13  A   Yes. As a courtesy. And we tell all employees.
14  This is before we had cell phones.
15  Q   She would call your home number, then?
16  A   Yes. Because we had pagers.
17  Q   And I was thinking cell phones.
18      So going back to you having her personal
19  number. That was her personal home number?
20  A   Yes. That was in the system, yes.
21  Q   And she had your personal phone number, home number?
22  A   Yes.
23  Q   You mentioned calling Terry Snyder one time at home
24  to tell her she didn't have to come in to work that day. Do

Page 120

1  you recall when that was?
2  A   No, I don't.
3  Q   Did you call other employees at their home?
4  A   Yes.
5  Q   Who have you called at home?
6  A   Oh, I can give you a list. At any given time,
7  operators to call off, tell them not to come in to work. At
8  least probably every employee in the melt shop at one time
9  or another.
10  Q   You would call them at home?
11  A   Yes.
12  Q   Did you ever talk about your personal life with
13  Terry Snyder?
14  A   Personal meaning --
15  Q   Anything not related to work. Did you ever discuss
16  things that are personal to you and not work related?
17  A   I think we all had discussions. Dennis, myself,
18  Terry. Even with other supervisors in a group and probably
19  in passing, if you stand at the copier, you know, you may
20  say something, you know, I got something to do today or I'm
21  going to dinner today or I got family coming in this weekend
22  or numerous things that you talk about among your
23  co-workers.
24  Q   Do you think it's a problem discussing your personal

Page 121

1  life at work?
2  A   It depends on what it's related to.
3  Q   And what do you mean by that?
4  A   I wouldn't discuss, if I was having problems in my
5  relationship or if somebody in my family had AIDS, you know
6  what I mean, there is some things you just don't discuss
7  that's personal.
8  Q   How would you describe your relationship with Terry
9  Snyder?
10  A   Fairly good as far as giving her days off or buying
11  lunch for the office or whatever. I mean things that office
12  people try to do to keep harmony in the office.
13  Q   Would you say you had a pretty good relationship
14  with her?
15  A   On my behalf, yes, I thought I had a pretty good
16  relationship with her.
17  Q   And on her behalf?
18  A   I guess I wouldn't be here if it was. I mean I
19  don't know how she feels. I can't answer that.
20  Q   We are here today because she has alleged that you
21  sexually harassed her. What is your feeling as to why she
22  would accuse you of sexual harassment?
23      MS. DiBIANCA:  I'm just going to object to the
24  extent that that requires speculation.

Page 122

1    THE WITNESS: Could you repeat the question?
2    MS. BREWINGTON: He can repeat it for you.
3    (The previous question was read back by the
4    reporter.)
5    THE WITNESS: I don't know.
6    (Harris Deposition Exhibit No. 6 was marked for
7    identification.)
8    BY MS. BREWINGTON:
9    Q   Have you had an opportunity to review what has
10   previously been marked as Harris 6?
11   A   Yes.
12   Q   Could you tell me what this document is?
13   A   This is a document that I do recall that my printer
14   was broke down and I forwarded this printer paper to her
15   printer in her office and it was printed off.
16   Q   What is it?
17   A   It is a principles of management, managing diversity
18   in the workplace.
19   Q   Is it a report?
20   A   Yes. It's a term paper that I wrote.
21   Q   So were you in school on November 10th of 2001?
22   A   Yes.
23   Q   And you were taking a managing diversity in the
24   workplace course?

Page 123

1    A   Principles of management.
2    Q   Principles of management?
3    A   212.
4    Q   And the topic of your term paper was Managing
5    Diversity in the Workplace, is that correct?
6    A   Yes.
7    Q   And that is your name in the center of the cover
8    page?
9    A   Yes.
10   Q   Did you ask Terry Snyder to do anything with this
11   document?
12   A   No. It was left on her printer in the evening and
13   she probably got it that morning coming in. Because I
14   printed it out before I left because I was having problems
15   with my printer on my way to school. As a matter of fact, I
16   had to mail this to my instructor because my printer
17   wouldn't work at work.
18   Q   Did you use her computer to type this paper?
19   A   Possibly. If she wasn't there, yes. If she wasn't
20   there. I could have put it on mine or put it on a disc
21   because a lot of times I did work at home and translated it
22   to a disc and went to work to print it off. Depending on
23   how late I was up that night.
24   Q   And why would you use her computer as opposed to

Page 124

1    yours?
2    A   I can't get on her computer under her log word. I
3    have to log in as myself under her computer. We have that
4    diversity there to do that.
5    Q   Do you have a computer at your desk?
6    A   Yes.
7    Q   Why wouldn't you do the paper at your desk, at your
8    computer?
9    A   Because my computer could have been down or the
10   printer could not have been working and I can go to another
11   station and log on. We have that flexibility. All
12   supervisors. My shift supervisor worked off of her computer
13   on the back turns.
14   Q   Did you ask Terry to proofread this document?
15   A   I don't recall. I do know that sometimes, you know,
16   when you are doing documents and if you're on your way out
17   at the end of the day, all professors will tell you to have
18   other people to proofread your documents. I would never do
19   this during her work stay.
20   Q   So you didn't instruct her to read this document
21   while at work?
22   A   I don't recall.
23   Q   Did you ask her to read this document at home?
24   A   I don't recall. She may have had access to it that

Page 125

1    morning because it probably printed off of her printer.
2    Q   Okay.
3    A   If I did this on her printer, which was from a disc.
4    Q   Do you remember talking to her about this at all?
5    A   I don't recall. She may have asked me. She has
6    asked me several times about work that I do, you know, she
7    has been in my office. She has heard me probably calling
8    the school, letting them know I got to cancel classes.
9    Q   Why is she cancelling your classes for you?
10   A   No, she don't cancel my classes.
11   Q   Oh, okay. What is she doing, then?
12   A   She may have been in my office during the time that
13   I was calling the school, walked in and said, hey, I won't
14   be at class today, we got a breakdown or something, you
15   know.
16   Q   Okay. Do you know whether she formatted this
17   document for you?
18   A   No. No, she didn't do this. I formatted this
19   document.
20   Q   Did Terry type this document?
21   A   No. Not to my knowledge, no. I typed this. She
22   may have had access to it. If I inserted the disc and I was
23   working on her computer, it could have went to another file.
24   No, she did not type this.

B-0436

32 (Pages 122 to 125)

Snyder
Randolph Harris

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 126

1    Q    If this document was on her hard drive at home,
2    would you be able to explain that?
3    A    If she got the disc off my office, out of my office.
4    If the disc was removed. Because I had my briefcase at
5    work. Her office is one door down from mine. It's open all
6    the time and I keep all my discs at work because that's how
7    we do our work at school, off discs.
8    Q    And why would she take your disc?
9    A    I don't say she did.
10   Q    Do you know of any reason why she would take your
11   disc?
12        MS. DiBIANCA: Objection. To the extent it
13   calls for speculation, I'll object.
14        THE WITNESS: Excuse me.
15   BY MS. BREWINGTON:
16   Q    I said, do you know why she would take your disc?
17   Do you have any reason?
18   A    No.
19   Q    So you have no reason to believe she would take your
20   disc?
21   A    I would hope not.
22   Q    Has Terry ever stolen anything from Citi Steel?
23   A    I don't know of that.
24   Q    We talked about a sexual harassment class that you

Page 127

1    took early on in the deposition. Do you remember that?
2        MS. DiBIANCA: Objection to the extent that it
3    mischaracterizes his prior testimony.
4        THE WITNESS: Excuse me?
5        MS. DiBIANCA: Lori, just because it wasn't a
6    class. I think he testified that it was a chapter in the
7    class.
8        MS. BREWINGTON: But he took -- right. I
9    understand that. That day, he took the class on sexual
10   harassment. Like the whole class, it wasn't called that.
11   But that day, the class was on sexual harassment, as I
12   understood it.
13       THE WITNESS: Case studies, yes, chapters.
14   BY MS. BREWINGTON:
15   Q    So you discussed in class sexual harassment on one
16   day?
17   A    Yes.
18   Q    But the title of the course was principles of
19   management and business, is that correct?
20   A    Yes. And business law.
21   Q    Okay. So in your principles of management and
22   business class, you took part in one particular class on
23   sexual harassment, is that correct?
24   A    I can't recall. But, yes.

Page 128

1    Q    Okay. Did you tell Terry Snyder about this class?
2    A    Sometimes she would ask me, you know, how was class
3    going in passing, you know. And we would talk, you know.
4    If I had to leave early, I'd say, hey, look, I got to get
5    out of here, I have a class today. I don't know how full
6    the discussion was as far as detail.
7    Q    Did you tell Terry Snyder about this particular
8    class?
9    A    I don't recall.
10   Q    Did you apologize to her after you took this class
11   regarding the way you treated her?
12   A    Treated her meaning --
13   Q    Sexually harassed?                    B-0437
14   A    No.
15   Q    Did you tell her you had feelings for her?
16   A    No. That I'm aware of, no. No.
17   Q    You're not aware of whether you told her you had
18   feelings for her?
19   A    No, I never told her I had feelings for her.
20   Q    Did you have feelings for Terry?
21   A    No.
22   Q    Did you offer her the opportunity to work any
23   overtime?
24   A    From time to time, Dennis and I had discussed that

Page 129

1    if she couldn't get some things done, like if we were
2    getting ready to be audited for ISO procedures and if she
3    was behind, she could work the weekend.
4    Q    Who works in the melting shop on the weekend?
5    A    Dennis Ford, myself, maintenance. And if we were
6    operating, all the employees will be in the melt shop.
7    Q    So some Saturdays everybody is there?
8    A    During that period, I'd say probably about 60 or
9    70 percent of the time, we were working weekends.
10   Q    And that period, do you mean the period of Terry's
11   employment?
12   A    2000, 2004. Between 2000 and 2004.
13   Q    Okay.
14        (Harris Deposition Exhibit No. 7 was marked for
15   identification.)
16   BY MS. BREWINGTON:
17   Q    Have you had an opportunity to read what I have put
18   in front of you as Harris 7, the written portion?
19   A    No, I haven't read that. I only read the e-mail.
20   Q    Okay. If you could read for me the bottom portion,
21   the written portion.
22        Have you had an opportunity to review it?
23   A    Yes.
24   Q    Can you understand the handwriting?

33 (Pages 126 to 129)

Snyder                                    v.                           Citi Steel, USA, Inc.
Randolph Harris                    C.A. # 04-970-JJF                          June 8, 2006

Page 130

1   A   Some, yes.
2   Q   Could you read that for me?
3   A   Had an interview for part-time job on 4-1-03.
4   Tuesday - Well as 4-3-03, 4-2-03, Wednesday, Thursday.
5   Thursday, Randolph came in to me and told me not to tell but
6   he and Tic were talking. They needed help in the melt shop
7   maintenance. Now they want me to offer -- now they want to
8   offer me overtime. He told me Tic is going to ask Trier.
9   Trier may approach me. Act surprised. Informed Randolph I
10  had just had an interview for part-time job. He said he
11  will miss me. And if I leave, please don't go, I need you
12  here for your glow.
13  Q   Who is that person that you mentioned? I see Tic
14  here. And then there is another person.
15  A   Trier.
16  Q   How do you spell that?
17  A   T-r-i-e-r.
18  Q   T-r-i-e-r. Okay.
19      Who is Tic?
20  A   He is -- at that time, he was the mechanical
21  supervisor.
22  Q   So in April of 2003, he was the mechanical
23  supervisor?
24  A   Yes.

Page 131

1   Q   And who is Trier? I don't know if I'm saying that
2   right. T-r-i-e-r. Who is that?
3   A   He is the general supervisor of maintenance at that
4   time.
5   Q   Did you discuss with either Trier or Tic overtime
6   for Terry Snyder?
7   A   Terry's name did not come up actually in the
8   overtime conversation.
9   Q   Tell me about the overtime conversation.
10  A   Tic had indicated that he needed some help with his
11  time sheets, filing and catching up on some maintenance
12  items for input information.
13  Q   Did you talk with Terry about this overtime?
14  A   She had mentioned to me that she was having some
15  financial problems because her mother's house, as I had
16  indicated earlier, was condemned and that she needed some
17  overtime or something and I had mentioned to her that Tic
18  may come up and talk to her about helping him. If she
19  wanted to work, she could go down and talk to him and
20  volunteer.
21  Q   Did you tell her not to tell?
22  A   I don't recall that.
23  Q   Did Terry inform you that she had just had an
24  interview for a part-time job?

Page 132

1   A   No.
2   Q   Did you tell her that you were going to miss her if
3   she leaves?
4   A   No.
5   Q   Did you say to her, please don't go, I need you here
6   for your glow?
7   A   No, I don't recall any of that.
8   Q   Was the overtime a secret?
9   A   No.
10  Q   If Terry's performance was so poor, why ask her to
11  work overtime?
12  A   Again, we are trying to motivate her to improve her
13  performance and at the time we felt that maybe if she went
14  down and worked with Tic or Trier, that it would motivate
15  her.
16  Q   Did you say at the time we felt that way?
17  A   Yes.
18  Q   Who is we?
19  A   Dennis Ford and I.
20  Q   Had Terry previously worked with maintenance?
21  A   She has done some things with them, pick up their
22  checks, put the crane reports in their boxes or mail run
23  from the hill. She would bring it down and put it in
24  maintenance's boxes.

Page 133

1   Q   Did she work on payroll for maintenance?
2   A   Yeah, she did some payroll if they wasn't caught up.
3   She had done some work for maintenance, I believe. Or their
4   support person, clerical person was on vacation or out or
5   whatever. We try to interact.
6   Q   Did you or Dennis Ford receive complaints from
7   maintenance about her performance?
8   A   Yes.
9   Q   Okay. What was that?
10  A   Not exactly her performance, other than the fact
11  that she was just hanging around wasting time.
12  Q   And when was that?
13  A   That probably had to be about I guess the same time
14  or early on from January of '03 into -- into '03, I suppose.
15  I don't know for sure.
16  Q   And she was still asked to do overtime for
17  maintenance despite her hanging around?
18  A   Short-handed at the time, if their clerical person
19  was on vacation, she probably could have got some things
20  done.
21  Q   Was their clerical person on vacation then?
22  A   I'm not for sure.
23  Q   Who was their clerical person?
24  A   I believe it may have been Linda Dare.

B-0438

34 (Pages 130 to 133)

Snyder
Randolph Harris

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 134

1    Q    Do you guys hire temps to do clerical duties for
2    you?
3    A    Yes, we have.
4    Q    Why not hire a temp to do the clerical things in
5    maintenance?
6    A    At that time, of the 35 or 36 steel plants had shut
7    down. We were trying to help out in other departments as
8    much as we could to keep from -- keep costs down to the
9    point where we would take care of employees that was already
10   there working.
11        (Harris Deposition Exhibit No. 8 was marked for
12   identification.)
13   BY MS. BREWINGTON:
14   Q    Have you had an opportunity to review the document I
15   put before you?
16   A    Yes.
17   Q    Have you ever seen this document before?
18   A    No.
19   Q    Do you recognize the handwriting on this document?
20   A    No, not really.
21   Q    Do you know whose document this is based on
22   reviewing it?
23   A    It says, I, Terry L. Snyder. I'm assuming this is
24   her document. It's signed by her.

Page 135

1    Q    Okay. I'll represent to you that Terry Snyder
2    reported allegations that you sexually harassed her to Citi
3    Steel on April 8th of 2003. Based on the date of this
4    document here. Did you ever touch Terry Snyder in any way?
5    A    To remove her hair from my desk.
6    Q    Tell me about that?
7    A    I was working at my desk and she had came in behind
8    my right shoulder and her hair had come down overtop of me
9    on a piece of paper and I politely moved it and slid my
10   chair over. She said, oh, something about her hair, she had
11   a wrapper that she wraps it up in.
12   Q    How many times did that happen?
13   A    I only remember one time that it happened to the
14   point where I have had to actually move it with my hand.
15   Q    Could you have asked her to move her own hair?
16        MS. DiBIANCA: Objection to the extent it calls
17   for speculation. Go ahead and answer.
18        THE WITNESS: Would you repeat the question?
19   BY MS. BREWINGTON:
20   Q    Could you have asked her to remove her own hair?
21   A    At the time, I guess it was my instinct that when it
22   got in my way, that I automatically moved it and slid away.
23   Q    Do you know when that was?
24   A    I don't recall.

Page 136

1    Q    Go ahead.
2    A    It was probably early, the latter part of maybe
3    2002, mid 2002 maybe.
4    Q    Okay. Is there something that triggers that time
5    frame in your mind?
6    A    Yes. After I was informed that she had filed a
7    complaint on me on sexual harassment because I didn't think
8    that there was anything about that. It was just a gesture
9    where it had gotten in the way because we were going over
10   some papers. I forget what it was. And her hair had come
11   down and I moved it out of the way.
12   Q    So it was sometime after you learned that she had
13   filed a sexual harassment case that you moved her hair out
14   of your way?
15   A    No, this was before.
16   Q    Oh, it was before?
17   A    It was before she had filed a sexual harassment.
18   Q    I guess my question was, you mentioned -- and maybe
19   we are on different pages. But I thought you mentioned that
20   this incident with the hair, you moving it out of your way,
21   was sometime in mid 2002?
22   A    Somewhere around there, I believe.
23   Q    And my question was, is there something in your
24   memory that prompted you to know that it was 2002 or mid

Page 137

1    2002?
2    A    Well, because I do remember, it was in the
3    summertime, because she had on a short-sleeved -- a
4    sleeveless -- sleeveless top like, you know. So I do know
5    it was hot.
6    Q    Okay. Did Terry wear a fire jacket?
7    A    Sometimes.
8    Q    Not all the time?
9    A    No.
10   Q    What's a fire jacket?
11   A    It's a green jacket that's required when you go on
12   the furnace floor. But if you're in the office, you're not
13   required to have it on.
14   Q    Did you ever rub Terry's cheek?
15   A    No.
16   Q    Did you ever run your hand down her hair and tell
17   her how good it looks?
18   A    No.
19   Q    Did you ever touch yourself in front of her?
20   A    Excuse me?
21   Q    Did you ever touch yourself in front of her?
22        MS. DiBIANCA: I'll object to the extent that
23   it's vague.
24        THE WITNESS: No.

B-0439

35 (Pages 134 to 137)

Snyder
Randolph Harris

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 138

1  BY MS. BREWINGTON:
2    Q   Do you understand my question?
3    A   **No. Repeat the question, please.**
4    Q   Okay. If you need me to explain what I mean by
5  touch yourself --
6    A   **Explain, please.**
7    Q   Did you ever touch your private parts in front of
8  her?
9    A   **No.**
10   Q   Did you tell her that you wanted to take her out for
11  a beer?
12   A   **No.**
13   Q   Did you tell her that you wanted to take her away
14  for the weekend?
15   A   **No.**
16   Q   Were you aware that Terry went away on the weekends
17  at any point?
18   A   **We all discussed about going away on the weekends.**
19  **If Dennis was going home on the weekend or if I was going**
20  **out of town on the weekend, the holidays or she may have**
21  **said she was going out on the weekend, Friday, 2:00, 2:30,**
22  **3:00 o'clock, we are leaving the office. General**
23  **conversation.**
24   Q   So is your testimony that you don't remember a

Page 139

1  specific time but you're saying that may have happened?
2    A   **Yeah, it could have happened.**
3    Q   Have you asked her out on a date?
4    A   **No.**
5    Q   Have you ever dated anyone that you have worked
6  with?
7    A   **No.**
8    Q   Have you ever slept with anyone that you have worked
9  with?
10   A   **I don't recall.**
11   Q   You don't recall whether you slept with anybody that
12  you worked with?
13   A   **Yeah. Years and years ago. You're talking about**
14  **the Marine Corps, my first job I ever had. I don't recall.**
15   Q   Do you recall whether you slept with anyone at Citi
16  Steel?
17   A   **No, I have never slept with anyone at Citi Steel.**
18   Q   How about at Intercoastal Steel? Did you sleep with
19  anyone at Intercoastal Steel?
20       MS. DiBIANCA: How far along are we going to go
21  down this track?
22       MS. BREWINGTON: I don't know. I'll let you
23  know.
24       THE WITNESS: I don't recall.

Page 140

1  BY MS. BREWINGTON:
2    Q   Who is Sam Lang?
3    A   **He is an operator on the furnace floor.**
4    Q   Is the furnace floor in the melting shop?
5    A   **Yes.**
6    Q   Are you his supervisor?
7    A   **I'm his supervisor's supervisor.**
8    Q   You're his supervisor's supervisor. Okay.
9    A   **Present. Present.**
10   Q   Okay. Did you have sexual relations with Sam Lang's
11  girlfriend?
12   A   **Sexual relations meaning --**
13   Q   Intercourse.
14   A   **No.**
15   Q   Did you have oral sex with Sam Lang's girlfriend?
16   A   **No.**
17   Q   Did you kiss Sam Lang's girlfriend?
18   A   **No.**
19   Q   Did you touch Sam Lang's girlfriend?
20   A   **No.**
21   Q   Who is Sam Lang's girlfriend?
22   A   **I don't know.**
23   Q   Who is Sam Lang's ex-girlfriend?
24       MS. DiBIANCA: Objection to the extent that it

Page 141

1  is vague.
2       THE WITNESS: Would you repeat the question?
3  BY MS. BREWINGTON:
4    Q   Well, let me strike that and ask you if you have
5  slept with Sam Lang's ex-girlfriend?
6    A   **No.**
7    Q   Your answer, no, do you know who Sam Lang's
8  ex-girlfriend is?
9    A   **I know of an associate of his. I don't know of any**
10  **girlfriends of his. I know of a young lady who said that**
11  **she knew Sam Lang.**
12   Q   Who is that?
13   A   **A young lady named Trish.**
14   Q   Did you ever stand in the doorway to Terry Snyder's
15  office and stare at her?
16   A   **No.**
17   Q   Were there times when you would stand in her
18  doorway?
19   A   **Sometimes I would be in her doorway getting reports**
20  **off the copier.**
21   Q   But you wouldn't be staring at her?
22   A   **No.**
23   Q   Did you sniff Terry Snyder in order to smell her
24  perfume?

B- 0440

36 (Pages 138 to 141)

Snyder                                              v.                          Citi Steel, USA, Inc.
Randolph Harris                          C.A. # 04-970-JJF                      June 8, 2006

Page 142

1    **A    Excuse me?**

2    Q    Did you sniff Terry Snyder in order to smell her

3    perfume?

4    **A    No.**

5    Q    Where is the copier located?

6    **A    There is a printer, I'm sorry, a printer in her**

7    **office where the reports come off. And the copier is**

8    **located outside my office door. I'm sorry. It's a printer.**

9    Q    Okay. Did you ask Terry to wear a dress with no

10   panties when she came in to work on January 11, 2003?

11   **A    No.**

12   Q    Now, I have asked you a series of questions. And if

13   I could quickly refresh your memory, touching Terry Snyder,

14   touching her hair, rubbing her cheek, asking her to wear a

15   dress with no panties. In your opinion, would any of these

16   things be considered sexual harassment?

17   **A    I guess it depends on the location and the situation**

18   **of where you're at.**

19   Q    Okay. Tell me about that.

20   **A    If it's off the job, if I'm with -- if I'm with my**

21   **friend or if you're in a relationship, I don't know. I mean**

22   **as far as work, yes, it would be sexual harassment.**

23   Q    Okay. So those things that I mentioned would be

24   considered sexual harassment, in your opinion?

Page 143

1    MS. DiBIANCA: Can you repeat the things that

2    you're talking about? I'm sorry. This is very unclear,

3    that question.

4    MS. BREWINGTON: Okay.

5    BY MS. BREWINGTON:

6    Q    I mentioned several things to you. And I mentioned

7    touching, stroking hair, asking someone to wear a dress with

8    no panties, taking her out for a beer, telling her you

9    wanted to go away for the weekend.

10   My question is, in your opinion, are any of

11   these things considered sexual harassment?

12   MS. DiBIANCA: And I'm going to object again.

13   Would you mind splitting them into individual questions

14   instead of the grouping them together?

15   MS. BREWINGTON: I can.

16   MS. DiBIANCA: I think that might help.

17   MS. BREWINGTON: Okay.

18   BY MS. BREWINGTON:

19   Q    Would rubbing someone's cheek be considered sexual

20   harassment?

21   **A    Yes.**

22   Q    Stroking their hair?

23   **A    If they had something -- I don't know what you mean**

24   **stroking. Removing something from their hair?**

Page 144

1    Q    I guess what I mean is touching their hair.

2    Touching another person's hair.

3    **A    Well, in the case that when her hair was on my desk**

4    **and I removed her hair, I wouldn't consider that as sexual**

5    **harassment.**

6    Q    Would you consider any other circumstances sexual

7    harassment?

8    **A    Yes, if I -- I would say if you just go and touch**

9    **somebody's hair while they are in their space, yes. If I**

10   **got up and started rubbing your hair, yes.**

11   Q    What about touching yourself in front of another

12   person, would that be considered sexual harassment?

13   MS. DiBIANCA: Let me object just to the extent

14   that it's vague.

15   MS. BREWINGTON: Let me be more specific.

16   BY MS. BREWINGTON:

17   Q    Touching your genitals in front of another person?

18   **A    Touching meaning scratching?**

19   Q    Well, I'll ask you. Is scratching your genitals in

20   front of another person sexual harassment?

21   **A    No.**

22   Q    Is touching your genitals in some other way sexual

23   harassment?

24   **A    Yes.**

B-0441

Page 145

1    Q    In what way?

2    **A    I guess you would have to actually, in order to**

3    **understand it, you would have to do it, the gestures that**

4    **you make, you know, with your body movements, you know.**

5    Q    Asking someone out on a date, is that sexual

6    harassment?

7    **A    No.**

8    Q    How about asking someone out on a date repeatedly,

9    is that sexual harassment, in your opinion?

10   **A    You mean in the workplace or away from the**

11   **workplace?**

12   Q    We are talking about work.

13   **A    Okay. I wouldn't say sexual harassment. I would**

14   **say harassment. If the person tells you to stop.**

15   Q    Okay. How about sniffing a person to smell their

16   perfume, do you consider that sexual harassment?

17   **A    I guess it depends on how far in their space you**

18   **are, the person's space. I mean if I walked into the room**

19   **and I started sniffing, you know, I wouldn't consider that**

20   **sexual harassment. If you're getting up close to somebody**

21   **and you're sniffing, yes, I would consider that probably**

22   **harassing somebody.**

23   Q    How about asking someone to wear a dress with no

24   panties when she came to work, would that be considered

37 (Pages 142 to 145)

Page 146

1  sexual harassment?
2  A  Yes, I would probably consider that as harassment.
3  Q  Did you tell Terry Snyder that if she wanted to be
4  treated like a lady, she should act like a lady?
5  A  I don't remember.  I mean, you know, we have had
6  conversations.  I don't remember.  I don't recall.
7  Q  Did you think Terry didn't act like a lady?
8  A  Meaning --
9  Q  Well, meaning did you think that Terry did not act
10 like a woman should?
11 A  The confrontations, my personal opinion.  However,
12 it's not about me, it's about Citi Steel.  There were times
13 that the way she talked, her language, in the confrontation
14 that I had with her, with several other people had with her,
15 I guess you could say it's not lady-like.
16 Q  Several people had confrontations with Terry Snyder?
17 A  Yes.
18 Q  Who else had confrontations with Terry Snyder?
19 A  Dennis Ford, Jeff Blauvelt, Rich Joslin and Mike
20 English.
21 Q  And how do you know that these people had
22 confrontations with Terry Snyder?
23 A  Because it was brought to my attention through them
24 and in some instances by second parties.

Page 147

1  Q  And who were the second parties?
2  A  Employees and I forget who.  I know there was an
3  incident with Jeff Blauvelt and a salesperson.
4  Q  Was Terry involved?
5  A  Yes.
6  Q  And could you tell me about that?
7  A  She walked into his office and cussed him out in
8  front of a salesperson.
9  Q  Okay.  Terry cussed Jeff Blauvelt out in front of a
10 salesperson?
11 A  Yes.
12 Q  What did she say to him?
13 A  I don't know the details.  She got very
14 disrespective in front of the salesperson.
15 Q  Were you present at that time?
16 A  No, I wasn't.
17 Q  Did Jeff tell you about this?
18 A  Yes.
19 Q  So you weren't aware of the contents of the
20 conversation?
21 A  I vaguely remember some of the things that he told
22 me.  And it's been a while.  His recommendation was is that
23 she was embarrassing because she belittled him in front of a
24 salesman.

Page 148

1  Q  Was Terry verbally counseled as a result of this?
2  A  Yes.
3  Q  By whom?
4  A  Dennis Ford and myself.
5  Q  Was it in a meeting?
6  A  Yes.  Sort of informal.
7  Q  Did you make any documents of this?
8  A  Well, after talking to Jeff and getting Terry to
9  apologize, we felt that we could move forward.  Sometimes
10 you don't document every incident.  You try to be as
11 manageable as you can.
12 Q  Did Terry apologize?
13 A  I don't know.  Jeff didn't complain about it
14 anymore.  I'm not sure if she did.
15 Q  Did you instruct her to apologize?
16 A  I asked the both of them to work it out and Jeff had
17 informed me that everything would be okay and I left it at
18 that.
19 Q  Do you believe in reincarnation?
20    MS. DiBIANCA:  Are you serious?
21    MS. BREWINGTON:  Dead serious.
22    THE WITNESS:  Excuse me?
23 BY MS. BREWINGTON:
24 Q  Do you believe in reincarnation?

Page 149

1  A  Do I have to answer that?
2    MS. DiBIANCA:  You might as well.
3    THE WITNESS:  No.
4  BY MS. BREWINGTON:
5  Q  Okay.  Did you meet with Jerry Downie and Greg
6  Buragino concerning Terry's allegations of sexual
7  harassment?
8  A  Yes.
9  Q  And when was that?  Well, let me help you by saying
10 that she reported the allegations on April 8th, 2003.
11 A  Yes.
12 Q  Would it have been that same day or shortly
13 thereafter?
14 A  The same day.
15 Q  Okay.
16 A  That it was reported.
17 Q  Were you at work that day?
18 A  No.
19 Q  Where were you?
20 A  I was having lunch with my girlfriend, my fiance',
21 and business.  I forget what it was.  But it was a little
22 bit of both.
23 Q  I'm sorry?
24 A  It was a little bit of both, business and lunch.

B-0442

38 (Pages 146 to 149)

Snyder
Randolph Harris

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 150

1    Q    But you weren't at work that whole day?

2    A    No.

3    Q    Were you at lunch when you got a phone call?

4    A    Yes.

5    Q    Who called you?

6    A    Jerry Downie.

7    Q    Did he call you on your cell phone?

8    A    Yes.

9    Q    And what did he say to you?

10   A    He said to me that I need to report to the plant

11   immediately, we have a problem. And I said to him -- I'm

12   trying to remember off the top of my head. Usually when

13   that happens, the first thing I ask is, have we got a

14   fatality or have somebody got badly hurt. He said, no, and

15   you need to report to the company immediately to personnel.

16   Q    And did you do that?

17   A    Yes.

18   Q    Were you concerned about what this was related to?

19   A    Yes. I was concerned that it could have been that

20   we had some bad news, that the plant was going to shut down

21   or something because, as I had indicated, we had about,

22   during the prior years, there were plants that were shutting

23   down. So that was the first thing that was on my mind.

24   Q    Was there anything else on your mind?

Page 152

1    Q    Okay. Do you recall anything else from that first

2    meeting?

3    A    There was -- he had asked me questions. He asked me

4    had I had a relationship with Terry, had I slept with Terry.

5    And that was about it.

6    Q    And what did you respond?        B- 0443

7    A    I said, no.

8    Q    Okay. Did Downie tell you that you should come

9    clean in the meeting?

10   A    No. He told me that if there was anything that I

11   feel like I need to talk to him about, I should. He seen

12   that I was upset. I left work that day, went home. I

13   called my childhood priest and had a talk with him. Then I

14   met with upper level management the next morning.

15   Q    And the next morning would be April 9th, 2003?

16   A    Yes.

17   Q    Who did you meet with that morning?

18   A    It was in the latter part of the morning. It was

19   Jerry Downie, Warren Beiger and Greg Buragino.

20   Q    And Beiger was who? I know I asked you that

21   previously. But I don't remember.

22   A    He was the president.

23   Q    And you said you met in the latter part of the

24   morning?

Page 151

1    A    No.

2    Q    Okay. So did you leave lunch and go meet with Jerry

3    Downie?

4    A    Yes.

5    Q    And would this have been some time after noon?

6    A    Yes.

7    Q    And what happened during that meeting? Before you

8    answer what happened, who was present?

9    A    Jerry Downie and I forget who else.

10   Q    But there may have been someone else?

11   A    Yes. That was the first meeting.

12   Q    Okay. And what was discussed during that meeting?

13   A    He told me that Terry had filed a formal complaint

14   that she had been sexually harassed by me.

15   Q    And what were your thoughts?

16   A    I felt like I had been raped.

17   Q.   And why is that?

18   A    Because my credibility and my character and my

19   integrity was being questioned.

20   Q    And how did you respond?

21   A    Actually, I felt empty.

22   Q    Did you respond to him?

23   A    I didn't know what to say. And he informed me that

24   I had to meet with upper level management the next morning.

Page 153

1    A    Um-hmm.

2    Q    Did you go to work in the morning?

3    A    Yes. I had to stop at my office.

4    Q    You went to the melting shop?

5    A    Yeah. To my office, yes.

6    Q    And then you stopped work and went to the meeting?

7    A    Yes.

8    Q    And what was discussed in the meeting?

9    A    They asked me the same thing. Was there any

10   relationship with Terry, had I been sleeping with her or

11   anything. And I told them, no. They asked me had I

12   disrespected her in any other way. I said I couldn't recall

13   of any time that I ever disrespected her other than, you

14   know, from time to time people do raise their voice and

15   that's about it, you know.

16   Q    Was anything else discussed in that meeting?

17   A    That they would be doing a full investigation and

18   that in the meantime they wanted to get to the bottom of

19   this and that if there was any evidence, on my behalf, that

20   I would probably be terminated.

21   Q    Did they tell you that there were any type of tapes?

22   A    Yes, they did mention that there was some tapes.

23   And they said that she had some tapes. And I said, well, I

24   would be more than glad to sit down and listen to them.

39 (Pages 150 to 153)

Snyder                                          v.                          Citi Steel, USA, Inc.
Randolph Harris                    C.A. # 04-970-JJF                              June 8, 2006

Page 154

1  Q   Did they say anything else about the tapes?
2  A   Well, they said that when they listened to the
3  tapes, that they would make their decisions pretty much on
4  whether or not my career would cease until then.
5  Q   And how did the meeting end?
6  A   They assured me that they would be fair in making
7  their decision, both on Terry's and my behalf, and that they
8  would do a full investigation to make sure that the truth is
9  put on the table.
10 Q   And was there any discussion of transferring Terry
11 at that time?
12 A   No. Not with me directly.
13 Q   Who discussed it?
14 A   I'm not for sure. I think that was an HR issue. I
15 mean they wanted to make sure that neither her or I were in
16 a hostile environment.
17 Q   Nobody discussed anything with you at that point?
18 A   No. Not in reference to transferring her.
19 Q   And we are talking about April 9th, in that meeting?
20 A   April 9th, yeah.
21 Q   Did you write any correspondence to anyone at Citi
22 Steel concerning these allegations after April 9th, 2003?
23 A   What do you mean? Excuse me.
24 Q   Did you write an e-mail or any document about the

Page 155

1  incident?
2  A   I'm not for sure. Only if I was to give a report to
3  somebody within the company. I'm not for sure.
4  Q   Were you asked to give a report?
5  A   No more than a few statements here and there. I
6  don't really recall of anything. No more than what the
7  three officers of the company and I discussed. I don't
8  remember whether or not I had to give a written report or
9  anything. I don't recall.
10 Q   Were there times when you were alone with Terry in
11 the office?
12 A   Yeah, there was a few times. In my office.
13 Q   I guess I'm trying to understand. Again, it's a
14 setup type issue. There is Terry's office and there is your
15 office.
16 A   No, there is Terry's office, okay, and there was
17 another office.
18 Q   Is it next to Terry's?
19 A   Yes.
20 Q   Okay.
21 A   And then it's my office. And then it's Dennis
22 Ford's office.
23 Q   Okay.
24 A   And then on the other side of Terry's office there

Page 156

1  is another office.
2  Q   Okay. Now, in the section that you just described
3  to me from Dennis Ford to the office next to Terry on the
4  other side, were you alone with her in that area? You
5  indicated like you just indicated you were alone in your
6  office. Were you ever alone in that area?
7  A   When you call alone, you mean with the doors closed
8  or the doors open?
9  Q   No, I just mean the two of you and no one else?
10 A   Yeah, there has been times that I have been in the
11 office with each person that I named. We have been in the
12 office by ourselves. With somebody else. There has always
13 been times when Terry may have been in the office with one
14 of the other people that share an office. So, yes, I would
15 say there was some times that I was in the office with Terry
16 by ourselves.
17 Q   When you say office, you mean the melting shop or do
18 you mean the section we just discussed?
19 A   Yes.
20 Q   There were times?
21 A   Yes.
22 Q   In a week, approximately how many times?
23 A   I don't know. I mean it's during the course of the
24 day. I could be in and out. I'm not in the office all day.

Page 157

1  I'm in and out of the office. I'm not in all day. I may be
2  in my office 20 minutes, leave and gone for an hour, making
3  my rounds. I may be in my office for two hours and then
4  gone for an hour, hour and a half.
5  Q   So we talked about that you and Terry were sometimes
6  in the office alone. Can you give me an approximation of
7  how often in a day you would be alone?
8  A   No.
9  Q   How about a week?                          B- 0444
10 A   I can't give you that answer.
11 Q   Would it be like more than 10 times?
12 A   In a week? I don't know. Because sometimes the way
13 my office is, I wouldn't even know whether or not she is in
14 her office.
15 Q   I understand what you're saying. I guess what I
16 mean is, were there times when you recognized that you and
17 her were in the office and there was nobody else around?
18 A   Yes.
19 Q   Okay. And I guess, on average, can you give me an
20 approximation of how many times a week that would happen,
21 more than 10?
22 A   I don't know. I mean I wasn't -- I'm not monitoring
23 it. I think that's a -- I couldn't tell you that.
24 Q   But you can say that there were times that you guys

40 (Pages 154 to 157)

Snyder
Randolph Harris

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 158

1  were alone?
2  **A   Yes.**
3       MS. BREWINGTON:  Off the record.
4       (Discussion held off the record.)
5       (A brief recess was taken.)
6  BY MS. BREWINGTON:
7  Q   Do you recall a conversation you had with Terry
8  concerning this dress with no panties question?
9  **A   I remember her yelling something at me one time**
10 **during the confrontation after the thing vaguely and I was**
11 **asking her, I said, what are you talking about or something,**
12 **I believe.  She was saying a lot of stuff that day when she**
13 **came into my office and was yelling and screaming.  There**
14 **was something about the cat incident and that Dennis had**
15 **told her that I had written her up.  It was just a lot of**
16 **things.  And I told her, I said, I don't know what you're**
17 **talking about, you know, or what's going on.**
18 Q   So that was all in one incident, what you just
19 described as her coming to you and discussing the panties,
20 wearing a dress with no panties and Dennis Ford and you
21 mentioned something else?
22 **A   She was yelling and screaming.**
23 Q   And the cat?
24 **A   Yeah, and the cat.  So it was just a number of**

Page 159

1  **things.  And I asked her, what are you talking about, you**
2  **know.  And she had slammed my door and I had got up to open**
3  **the door to let anyone else know that was in the office that**
4  **maybe I need a witness in here for what was going on.**
5  Q   When did that happen?
6  **A   I forget.  It was shortly after her writeup, I**
7  **believe, and she had even discussed a writeup, why did you**
8  **write me up or something.  And I told her to put the writeup**
9  **behind her, to use it as a motivator to improve and, you**
10 **know, it's not like she was losing her job, you know, it was**
11 **just a writeup to try to get her more involved in what was**
12 **going on.**
13 Q   Okay.  So was it in March of 2003 or after that
14 date?
15 **A   I think it was sometime in April, I believe.**
16 Q   Oh, in April?
17 **A   I believe, yeah.**
18 Q   Was it towards the end -- sorry.
19 **A   Because all of that was involved.  And, you know, I**
20 **see April was her last employment and I think it may have**
21 **been sometime during that time.  I think it may have been in**
22 **March, late March, I believe.  Shortly after the writeup.**
23 Q   Okay.  What did she say to you about wearing a dress
24 with no panties?

Page 160

1  **A   She had made that statement and I -- I asked her and**
2  **she was screaming and hollering and I said, what are you**
3  **talking about?**
4  Q   She had made what statement, though?
5  **A   That -- what did she say?  You shouldn't have wrote**
6  **me up and she -- I do remember she said that I'm a -- I'm a**
7  **ghetto bitch and I ain't to be f'd with.**
8  Q   Okay.
9  **A   And from there, it sort of like, what are you**
10 **talking about.  And she went on talking about some panties**
11 **or something.  I don't know what she said.  And then she**
12 **said something about the cat and why are you writing me up.**
13 **It was very confusing for me.**
14 Q   About the panties.  When she said that, did you ask
15 her why she said that?
16 **A   I'm not sure what I said because it kind of caught**
17 **me off guard.**
18 Q   Did you tell her that you didn't say that?
19 **A   I asked her, what are you talking about.**
20 Q   Okay.  Did you get a witness?  You said you opened
21 the door because you --
22 **A   I'm not for sure.  I don't know what happened after**
23 **that.  Because when I got up and opened the door, I believe**
24 **she stormed out of the office.  And it was like, what's her**

Page 161

1  **problem.  To myself, you know.**
2  Q   Were you upset by that conversation?
3  **A   Yeah.  Yeah.**
4  Q   Did you talk to her about it later?
5  **A   Well, I wanted to give her some time to cool down.**
6  **I think there was a few days in there that I told her that I**
7  **don't understand what she is talking about and she had**
8  **indicated to me that with some medication or something she**
9  **was taking and didn't really remember what she said.  I**
10 **forget.  But, you know, I -- I forget.  It's been a while.**
11 Q   Okay.  Did you have a conversation with Terry about
12 whether or not you have ever been rude to her?
13 **A   I don't recall.  I'm sure with all the employees**
14 **that I deal with from time to time, if we have a heated**
15 **discussion, you know, I normally go back and try to follow**
16 **up, you know, to let them know that it's only a motivator to**
17 **try to get people to do what we need to do.**
18 Q   Did you ever apologize to Terry for being rude to
19 her?
20 **A   I probably apologized to her maybe for raising my**
21 **voice.**
22 Q   Okay.  Did you apologize to her for anything else
23 that you can remember?
24 **A   No.  Because sometimes, you know, I try to be a**

41 (Pages 158 to 161)

Snyder                                                              Citi Steel, USA, Inc.
Randolph Harris              C.A. # 04-970-JJF                         June 8, 2006

Page 162

1  pretty good supervisor at apologizing to employees when we
2  have conflict.
3    Q   You indicated you apologized for yelling at her, is
4  that correct?
5    A   Yes, I think I did. I think I yelled at Terry a
6  couple times.
7    Q   And you apologized for that?
8    A   I think on one occasion, I did.
9    Q   Did you apologize for being rude to her?
10   A   If that's being rude. I'm not sure if I said the
11  word rude. But I said, you know, if I yelled at you, I
12  apologize, but there is things that we need to do. Maybe
13  something in that fashion. Or work that we got to get done.
14   Q   Okay.
15       (Harris Deposition Exhibit No. 9 was marked for
16  identification.)
17  BY MS. BREWINGTON:
18   Q   I have placed in front of you what has previously
19  been marked as 9. Please let me know when you have had an
20  opportunity to review it?
21   A   Okay.
22   Q   What is this document?
23   A   This looks like a document from my son's -- my
24  stepson's computer at home. Because it's got

Page 163

1  killabite@aol.com.
2    Q   That's his e-mail account?
3    A   Yes.
4    Q   Do you have an e-mail account?
5    A   No. Only at work.
6    Q   Is that why you e-mailed it from his account?
7    A   Yeah, from home.
8    Q   And the date on this is April 8th, 2003?
9    A   Yeah.
10   Q   At 7:19 p.m.?
11   A   Right.
12   Q   And it's to Jerry Downie?
13   A   Yes.
14   Q   And the subject is Terry Snyder meeting?
15   A   Yes.
16   Q   Okay. Did you provide any other documentation to
17  Jerry Downie other than this e-mail right here about this
18  incident?
19   A   No. I think this is it. As I told you before, I
20  wasn't even sure that I had even put out any report.
21   Q   Right. I'd like to, in the interest of time, talk
22  about specific things in this exhibit. If you would like to
23  add on or anything like that, please feel free. But I want
24  to direct your attention to certain statements.

Page 164

1    A   Okay.
2    Q   In the e-mail. If you look at the second paragraph,
3  the second sentence --
4    A   Right.
5    Q   It indicates, Jerry. I have never intentionally
6  touched Terry or asked her out.
7        Is that statement true?
8    A   Yes.
9    Q   Now, have you unintentionally touched Terry?
10   A   You know, if we are in the hallway and I brushed by
11  her or something like that or she brushed by me, you know,
12  or the fact that I moved her hair from my desk, you know,
13  that day, not to just intentionally touch her, no.
14   Q   Would she say anything to you if you unintentionally
15  touched her?
16   A   I would expect her to.
17   Q   But you don't recall a specific incident?
18   A   No.                                            B-0446
19   Q   Did you unintentionally ask her out?
20   A   No.
21   Q   The next sentence says, Marie, Jeff, Danny and
22  myself were out having dinner at a steakhouse in Newark.
23       Did you invite Terry Snyder to that steakhouse
24  with you?

Page 165

1    A   No. And what had happened, she had came into the
2  office and asked Danny. Danny had stopped in and I believe
3  Danny had left and told her to meet Jeff and myself at the
4  steakhouse. And Maria was off that day. So Maria joined
5  us. Danny is our salesperson or client. And while we were
6  having dinner, Terry came in. Danny, the salesperson,
7  noticed her at the bar. And he said to her, do you mind --
8  that's the young lady that you guys work with, right? I
9  said, I don't know. I said, yep, that looks like her. Jeff
10  said, yeah. So Danny said, would you mind if we invite her
11  over for a drink. I said, it is up to you guys. So she
12  came over and joined Maria and I and Jeff and Danny. And
13  after about 15 minutes, Maria and I left.
14   Q   Did you eat at Chili's this night?
15   A   This is not a Chili's. This was at Bugaboo's, I
16  believe.
17   Q   Okay. Did you have a drink at Chili's prior to
18  dinner at Bugaboo's?
19   A   No. I think her and Danny had a drink at Chili's.
20  Her and Danny went to Chili's. Her, Danny and Jeff, I
21  think, went to Chili's afterwards.
22   Q   Oh, okay.
23   A   Afterwards. And Maria and I went home.
24   Q   Okay. So how did Terry know that you were meeting

42 (Pages 162 to 165)

Snyder

v.

Citi Steel, USA, Inc.

Randolph Harris

C.A. # 04-970-JJF

June 8, 2006

Page 166

1  at Bugaboo's for dinner?

2      MS. DiBIANCA:  I will object to that.  It calls

3  for speculation, if it does.

4      THE WITNESS:  Excuse me.

5  BY MS. BREWINGTON:

6   Q   I asked you how did Terry know that you and others

7  were meeting at Bugaboo Creek?

8   A   Okay.  Terry's office, there was a three-way phone

9  line.  It was her number, my number and Dennis Ford's

10  number.  And I often think about this, how did she know.

11      Now, sometimes salespeople come in and she

12  hears us talking, she stands in the office.  If we are in

13  there talking and we are in the middle of the conversation,

14  she stands at the door.  Now, I'm assuming that either she

15  overheard it, which I don't know, or maybe it was just a

16  coincidence or that she could have picked up the phone on

17  the conversation that we were meeting at Bugaboo's.

18   Q   Do you mean like press the button and open up a

19  three-way?

20   A   Yes.

21   Q   Do you know for sure that Jeff didn't invite her to

22  Bugaboo?

23   A   No, I'm not for sure.

24   Q   But you know that you didn't invite her?

Page 167

1   A   No.

2   Q   The next sentence I'm not as worried about but we

3  can go ahead and read it.  It indicates, I have never been

4  anywhere with Terry or even been alone with her other than

5  the office at work.

6      The next sentence I want to ask you about.  The

7  three years Terry has worked at Citi Steel, I called her

8  house maybe three times.

9      Now, earlier in the deposition, you indicated

10  one time.  Does this refresh your recollection?

11   A   It could have been a couple times.  You know, I mean

12  I was thinking in terms of the one time.  I know that I

13  called and told her.  There was a couple times, I believe,

14  that I called and got her voice mail and hung up and she

15  ended up calling back.  So I don't really -- I mean it's

16  been a long time.  I mean I said once.  It could have been

17  twice, you know.

18   Q   Okay.  The next sentence I want to ask you about.

19  It's the second sentence or maybe the third sentence from

20  the bottom indicates, the times that I called her house was

21  to ask her where she had put certain files that she worked

22  on.

23      Okay.  Is it fair to say that you called her at

24  home on more than one occasion; is that fair to say?

Page 168

1   A   Yeah.

2   Q   Okay.  Is it also fair to say that you have called

3  her at home regarding certain files that she had worked on?

4   A   Yes.  To refresh my memory, yes.

5   Q   And you also called her at home to let her know she

6  didn't need to come into work?

7   A   Yes.

8   Q   Okay.  The next paragraph, the last sentence, reads,

9  that's why I made the statement to you, I don't recall

10  accusations of me taking -- sorry.  Accusation of me talking

11  to her about some panties and wearing a dress.

12      My question is -- and if you could read this

13  paragraph to yourself.

14   A   Where are you at?

15   Q   Okay.  I'm at the third paragraph.

16   A   Okay.

17   Q   The last sentence.

18   A   Okay.  Yeah.

19   Q   It says, that's why I made the statement to you, I

20  don't recall accusations of me talking to her about some

21  panties and wearing a dress.

22   A   Yeah.

23   Q   Did you make a statement to Jerry Downie that you

24  don't recall accusations of me talking to her about panties

Page 169

1  and wearing a dress?

2   A   Yeah.  Other than comments that she had made, and I

3  forget reference to a Boga party or something.  And if

4  that's what she was talking about.  And I explained that to

5  Jerry Downie.

6   Q   Why did you tell Jerry Downie that you didn't recall

7  accusations?

8   A   Because I didn't.

9   Q   Is that something you would have remembered?

10   A   I would like to think so.  But I didn't recall it.

11   Q   Now, I understand you're saying that you don't

12  recall it.  My question to you is, did you discuss wearing a

13  dress with no panties with Terry?

14   A   No.

15   Q   Okay.  In the second paragraph from the bottom of

16  the page, it reads, homework issue.  I have asked her to

17  proofread a paper and nothing more.  I have worked on her

18  computer after she was supposed to be gone and she came back

19  because she forgot something.

20      Did you ask her to proofread your paper?

21   A   I told you that earlier in the statement, that on

22  the way out at the end of the day, if we are walking out,

23  yes, her and Dennis both.  And I told you that.

24   Q   Did you ask her to proofread the paper that we

43 (Pages 166 to 169)

Page 170

1  just --
2  A  No.
3  Q  What paper did you ask her to proofread?
4  A  There was a couple things where I had sketched some
5  things on paper and even some of the reports that I do for
6  upper level management, I have asked her to proofread them.
7  Q  Did you ask her to proofread anything related to
8  school work?
9  A  I could have on the way out. Possibly. If her and
10  Dennis and I was walking out together. Because Dennis have
11  read some stuff. And he would jokingly say, look at this,
12  to Terry or something, if it happened.
13  Q  And would that be related to work?
14  A  Both.
15  Q  No, when you asked her to proofread school work, is
16  that something personal?
17  A  Yes.
18  Q  I want to play you a tape and ask you to listen to
19  it. If at any time you don't understand and need me to
20  rewind or stop, certainly let me know that.
21      MS. DiBIANCA: Can we go off the record just
22  one second?
23      (Discussion held off the record.)
24  BY MS. BREWINGTON:

Page 171

1  Q  Have you listened to any tapes of conversations
2  between you and Terry Snyder?
3  A  No.
4  Q  Like I said, I'd like to play you a portion of a
5  tape. And then we can talk about it. If you need me at any
6  time to stop it or can't hear or something. I mean you'll
7  listen to the tape and then let me know your thoughts.
8  Okay?
9      (The tape was played for the witness.)
10  Q  Do you need me to rewind or anything? Would you
11  like me to?
12  A  Some of it I couldn't understand. I understand I
13  apologized for something, which I told you that earlier in
14  the statement.
15  Q  Just some preliminaries. Do you recognize the
16  voices on the tapes?
17  A  Yes. It's Terry's voice and it sounds like mine in
18  the background.
19  Q  Do you recall that conversation?
20  A  Yes, vaguely. I don't know when it was. But, yeah,
21  vaguely.
22  Q  Do you know approximately when it was?
23  A  No.
24  Q  Was it during the month of her termination?

Page 172

1  A  I wouldn't know. I wouldn't even know.
2  Q  Do you recall laughing during this conversation?
3  A  Well, probably. Not laughing but probably smiling
4  like what are you talking about, you know.
5  Q  Did you deny saying to Terry that you should wear a
6  dress with no panties?
7  A  Repeat that.
8  Q  Did you deny saying to Terry that she should wear a
9  dress with no panties?
10  A  Yes, I denied that.
11  Q  Did you deny it that day?
12  A  I asked her what was she talking about, I believe.
13  Q  Did you tell her you didn't say that?
14  A  I don't know what I said. I just asked her what are
15  you talking about.
16  Q  Did you apologize to Terry Snyder?
17  A  If she said I was being rude to her, I probably
18  said, hey, you know, I apologize for yelling at you or
19  whatever. I mean that's what was on the tape. She said I
20  was yelling at her.
21  Q  Do you recall her saying that she didn't mind the
22  yelling, that it was your job to yell?
23  A  No, I don't remember that.
24  Q  You didn't hear that part?

Page 173

1  A  No, probably not.
2  Q  Have you ever taken any sexual enhancement drugs?
3  A  No.
4      MS. DiBIANCA: I'm going to say on the record
5  that I think that borders on harassment as does the earlier
6  religious questions. That being said, please answer the
7  question.
8      THE WITNESS: Excuse me. Would you repeat it?
9  BY MS. BREWINGTON:
10  Q  I said, have you ever taken any sexual enhancement
11  drugs?
12  A  No.
13  Q  Have you ever been to counseling for emotional
14  problems?
15  A  No.
16      MS. BREWINGTON: I don't have anything further
17  at this time.
18      MS. DiBIANCA: Okay. I will. I did have a few
19  questions but I'm going to need a few minutes to just look
20  over them. So if we could go on break again but I won't be
21  more than just a few minutes.
22      MS. BREWINGTON: Okay.
23      (A brief recess was taken.)
24      EXAMINATION

B-0448

44 (Pages 170 to 173)

Snyder
Randolph Harris

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 174

1  BY MS. DiBIANCA:
2  Q  Mr. Harris, in 2003, if you know, how long had you
3  been employed at Citi Steel?
4  A  Since 1990. 2003. That's 10, 13 years.
5  Q  Okay. And during that time, had you had any
6  disciplinary problems at Citi Steel?
7  A  Me personally?
8  Q  Yes. Had you been disciplined?
9  A  No.
10  Q  Any complaints in your personnel file about you?
11  A  None that I'm aware of.
12  Q  So it's fair to say that you could be characterized
13  as a good employee during that time?
14  A  Yes.
15  Q  You and Mr. Ford. Let's talk about that
16  relationship for a moment. Is it fair to characterize that
17  relationship as you and Mr. Ford did not get along very
18  well? Could you give me a better explanation of that?
19  A  No, we did not get along when it came to some issues
20  in the shop.
21  Q  Did Mr. Buragino at one or many times intervene
22  between you and Mr. Ford as far as instructing you to
23  improve your relationship?
24  A  Yes.

Page 175

1  Q  Can you tell me about that?
2  A  Greg had informed the both of us that we brought a
3  lot of knowledge to Citi Steel and that it was healthy to
4  disagree. However, we must keep the best interests of Citi
5  Steel, to share thoughts and come up with a better
6  conclusion. And I felt that we did that. However, Dennis
7  mostly always disagreed.
8  Q  And whose idea was it for the disciplinary writeup
9  that we looked at today? I believe it was marked as Harris
10  1.
11  A  The writeup to Terry?
12  Q  Yes.
13  A  Dennis had came to me and said that we need to do
14  something about the situation at hand. And I supported his
15  decision because I felt that he was right. It was getting
16  out of control.
17  Q  Was it a joint decision? Is that fair?
18  A  Yes, it was a joint decision.
19  Q  And did you seek the guidance of Mr. Buragino in
20  making that decision?
21  A  Yes.
22  Q  I would represent to you that Ms. Snyder during her
23  deposition testified that Mr. Ford told Ms. Snyder that the
24  writeup had been your idea. Do you have any idea why

Page 176

1  Mr. Ford would have said that?
2  A  Probably because of our relationship of not getting
3  along.
4  Q  And you testified about this a little earlier. I'd
5  like to have you expand on it, though.
6      Did Ms. Snyder seek you out after the writeup
7  to ask you about the writeup?
8  A  Yes.
9  Q  And can you tell me about that?
10  A  That was the day that she had came into my office
11  when she was raising her voice at me. She had made several
12  comments and I had asked her what is she talking about. And
13  that's when I had told her that the writeup was -- should be
14  somewhat of a motivation to get her to improve her
15  performance to be a part of the Citi Steel team.
16  Q  Was that the same day that the tape that we listened
17  to today was made?
18  A  It sounds like it was. Because she appeared to,
19  right after the writeup, she came into my office and she
20  slammed the door behind her and she was yelling and
21  screaming some things that didn't make sense to me.
22  Q  Was this the first time she had yelled and screamed
23  at you?
24  A  No.

B-0449

Page 177

1  Q  Can you recall any other times?
2  A  Yes. During some of the times of the conflict with
3  some of the other supervisors, I had informed her that she
4  needs to respect a management team at Citi Steel and she
5  somewhat got a little out of control and cussing and saying
6  some things that they didn't respect her, that they wasn't
7  doing what she had informed them or asked them to do.
8  Because of other duties took priorities. And if they wasn't
9  reacting fast enough to what she needed because she wanted
10  to leave at the end of the day or didn't want to work on the
11  weekends, she would get upset.
12  Q  Would you characterize these times as her -- was she
13  being respectful during these times?
14  A  In an office environment and working around a lot of
15  men and around a lot of heat for the guys that's working in
16  the heat, statistically, you know that heat has a tendency
17  to have people's mental state of anger rise faster than in a
18  normal environment.
19      So, yes, she was very disrespectful sometimes.
20  Even though she wasn't in the heated environment area.
21  Q  Was she more disrespectful than other employees in
22  that environment?
23  A  Yes. At times.
24  Q  Okay. Would you say that she was aggressive?

45 (Pages 174 to 177)

Snyder
Randolph Harris

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 8, 2006

Page 178

1   A  Yes.

2   Q  Confrontational?

3   A  Yes.

4   Q  Do you believe that you ever did or said anything to

5   Miss Snyder or directed at Miss Snyder that was sexually

6   inappropriate?

7   A  No, I don't think I ever said anything to Ms. Snyder

8   that was inappropriate other than the fact to improve her

9   appearance.

10  Q  And that was it?

11  A  If she feels it was inappropriate, she had stated

12  early on that she felt that that was inappropriate, that I

13  shouldn't be somewhat pushing her to get her job done.

14  Q  But in your opinion, was that inappropriate?

15  A  No.

16  Q  The day that Ms. Snyder tendered her allegations, I

17  believe it was April 7th?

18      MS. BREWINGTON:  8th.

19      MS. DiBIANCA:  8th.  April 8th.

20  BY MS. DiBIANCA:

21  Q  You testified that you met with someone from upper

22  management.  Could you just expound upon that a little for

23  me?

24  A  The day, that day or the next?  Oh, yeah, that day.

Page 179

1   I met with Jerry Downie after I got the phone call and we

2   met on plant site.  That evening, I think Jerry knew that I

3   was really hurt and discouraged about what had happened and

4   he had asked me to meet him out that evening for a beer.

5   However, I found out later that Jerry didn't drink.  And I

6   felt that my credibility was very much in question and I

7   felt that I had been raped and robbed of my character.

8       Jerry said to me, we all have done things that

9   we are ashamed of and we are off plant site, you can admit

10  if you have had any wrongdoing.  And I said, no, I have not

11  done anything wrong.  And he asked me were there any

12  pictures of Terry and I out together.  I told him, no.  He

13  asked me had I ever slept with Terry.  I told him, no.  And

14  at that time, he said to me that the investigation would be

15  further and we would meet with upper management the next day

16  and at that time no decision has been made about my career

17  at Citi Steel.

18  Q  Okay.  Could you have been transferred to shipping?

19      I can rephrase that if that's not clear.  Do

20  you want me to rephrase it?

21  A  No.

22  Q  Okay.

23  A  My skills is more in a production area.  However,

24  shipping would have been an area where I could do that job

Page 180

1   but the skills that were needed in the melt shop were more

2   than what would be required in a shipping area.

3   Q  And you have been doing this steel work for how

4   long?

5   A  Approximately since I have started to now.  About

6   25 years.

7   Q  The tape that was played earlier.  What did that

8   tape demonstrate, in your opinion?

9   A  That I felt that I was being entrapped for

10  allegations or whatever toward me as a payback for the

11  writeup or whatever.  And, again, I must say I felt like I

12  had been raped.

13  Q  Did you know that you were being recorded at the

14  time?

15  A  No, I did not.

16  Q  Is this the first time you have heard the tape was

17  today?

18  A  Yes.

19  Q  And is it your testimony that you believe that it's

20  possible Ms. Snyder made these allegations as a way of

21  getting back at you for the writeup?

22  A  Yes.

23  Q  Do you have any other thing that makes you think

24  that?

Page 181

1   A  Because I did read the deposition I think of the

2   last case from the EEOC, I believe it was.  And that it was

3   stated that Terry had stated that Mr. Ford had said that I'm

4   the one that initiated the writeup.

5   Q  Did her behavior change after the writeup?

6   A  Yes.

7   Q  And can you tell me how it changed?

8   A  It got worse.

9   Q  Tell me how?

10  A  She was very confrontational, very defensive.  She

11  was hard to get along with.  She was having confrontations

12  with some of the other supervisors.  And she was very

13  uncooperative.

14  Q  Do you understand there to be a difference between

15  inappropriate behavior and sexual harassment?  Can there be

16  a difference between the two?

17  A  Yes.

18  Q  Can you explain to me at all what or in any way the

19  difference?

20  A  Inappropriate behavior is -- would be trying to

21  provoke someone into making passes at you sexually or

22  whatever or just inappropriate behavior about the way you

23  carry yourself.  Sexual harassment to me is unwanted

24  touching, consistently making comments about a person's

B-0450

46 (Pages 178 to 181)