Snyder
Carmella Patrone

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 19, 2006

Page 71

| | | | | |
|---|---|---|---|---|
| **tell** 5:1,16,22 6:15 | 20:24 21:4,8 | **told** 11:19 12:12,18 | 36:16 39:23 40:7 | 61:24 |
| 7:6 11:7,12,13 | 23:24 24:5 25:2 | 13:3,7 14:21 | 40:9,19 61:24 | **wanted** 3:6 12:10 |
| 13:23 23:8,11 | 29:16,18 30:7 | 15:14 16:6,7 17:8 | **understood** 48:14 | 16:15 21:6 40:17 |
| 24:13 25:6 29:14 | 36:11 37:6,21 | 18:2 22:14 23:15 | **UNITED** 1:1 | 40:18 52:14 |
| 31:9 34:22 35:6,9 | 38:22 43:17,20 | 23:17,19 24:19,23 | **unless** 3:22 5:15 | **warned** 38:19 39:2 |
| 36:20,21 39:10,14 | 44:19 45:6 46:8 | 25:21 26:5,9 | **until** 5:3 54:21,24 | **warning** 53:5,5 |
| 39:17 44:8 47:17 | 47:9,17 49:13,15 | 27:22 28:4 29:19 | 55:3,7 59:1 | **wasn't** 5:3 11:20 |
| 48:19 49:2 50:8 | 50:6,12 51:1 53:1 | 29:21,22 36:16 | **unusual** 51:1 | 15:3 20:18 21:8 |
| 52:1,7,22 53:16 | 54:10 55:10,11 | 37:7 40:16,19,22 | **unusually** 59:22,23 | 24:16 25:2,4 |
| 53:22 54:1,7 55:9 | 56:1,21 58:3 | 50:21 52:19 54:7 | **update** 10:3,7 | 35:23 36:13,17 |
| 56:12 57:4 60:15 | 60:13,22 61:5,6,8 | 56:15 61:2 | **updated** 8:12 17:5 | 47:23 52:24 61:4 |
| 60:19 | 62:3 | **tomorrow** 37:11 | **upset** 27:17 52:20 | **waves** 59:13 |
| **telling** 17:9 36:5 | **thinking** 17:18 26:6 | **top** 17:4 38:3,12 | 52:23 53:16,18 | **way** 13:4,23 15:6 |
| **temp** 4:21 35:3 42:2 | 47:8 53:9 | **toward** 23:24 | 54:18,20 55:6,7 | 21:16 28:11 36:9 |
| **temper** 57:6,7 | **third** 13:15 16:23 | **towards** 57:18 60:7 | 57:3,4 | 43:16 45:19 60:17 |
| **temps** 45:4 | 33:4 45:23 | **train** 18:8,9 19:4 | **USA** 1:6 | 60:19 62:3 |
| **tend** 3:15 | **though** 19:4 28:15 | 21:19 47:1,2 | **usage** 7:5,17 8:12 | **ways** 6:21 17:13 |
| **term** 25:14 | 32:11 39:6 | **trained** 46:19 | 8:18 10:3,7,10 | **Wear** 29:10 |
| **terminated** 26:7 | **thought** 12:5 17:12 | **training** 17:4,6 18:6 | 12:15 14:2 | **wearing** 29:24 |
| **termination** 54:22 | 20:18 25:11 30:2 | 18:15 45:2 46:20 | **usages** 7:18 | **Wednesday** 11:22 |
| 55:3 | 30:6 37:1,3 53:22 | 47:7 | **use** 9:8 10:12 64:9 | 38:6 |
| **terms** 6:10 | 56:9 60:23 | **transcribed** 64:9 | **used** 25:14 | **week** 12:9 26:14 |
| **Terry** 1:3 2:12 5:17 | **three** 4:21 7:8 33:8 | **transcript** 64:11 | **usually** 38:20 62:4 | **weeks** 21:1 46:24 |
| 7:2 8:4,5,15 10:14 | 33:13 38:20 40:11 | **transcription** 64:9 | | **well** 6:10 8:17 9:2 |
| 11:15 13:5,18,20 | 54:1,5 | **transfer** 40:14 | **V** | 13:13 15:14 19:3 |
| 15:14 16:6,17 | **through** 4:19 6:21 | **translated** 3:1 | **v** 1:5 | 19:12,23 20:24 |
| 18:6 19:2 21:21 | 6:24 8:19 17:19 | **trouble** 46:20 | **various** 8:9 15:4 | 34:22,24 39:16 |
| 21:23 22:14,17 | 18:10,11 21:6 | **true** 11:20 12:8 | 56:22 | 43:5 46:16 49:18 |
| 23:8 24:2 27:17 | 36:3,4,7 45:4 | 13:14 64:11 | **Vendor's** 17:5 | 50:19 52:23 53:18 |
| 31:12,18,21 32:3 | 54:15 | **try** 3:10,12 17:14 | **verbally** 2:22 | 55:1,11 56:8 |
| 33:18,23 34:12,19 | **till** 12:18 20:8 | 23:12 25:3 | **verification** 12:15 | 58:20 62:2 |
| 38:3 39:21 40:7 | **time** 3:10,10,14 | **trying** 9:16,18 | **verifications** 14:3 | **went** 12:7 13:13 |
| 40:22 41:24 42:23 | 4:23 5:17,19 6:1,4 | 16:22 17:13,22 | **verifies** 10:10 | **were** 4:23 5:23 |
| 44:5,8,9,11 45:2,3 | 7:12 10:1 12:5 | 34:17 37:13 59:2 | **verify** 8:12 10:12 | 12:11,11,19 16:16 |
| 45:5 47:11 48:9 | 17:11 18:12,16 | 59:6 | **very** 7:15 23:19 | 16:20 17:20 18:4 |
| 52:1 60:22 | 19:19 21:17,21 | **turn** 44:24 | 24:13 45:1 51:4 | 18:6,15,24 20:21 |
| **Terry's** 9:19 10:9 | 23:16,17,19 24:13 | **turn-over** 7:14 | 52:21 55:12,13 | 21:21,23 22:4 |
| 13:10 17:20 18:20 | 24:18 25:7,17,19 | **two** 6:21 17:10 18:9 | 57:11 59:24 61:5 | 24:18 25:11 30:14 |
| 18:21 42:17 58:1 | 25:21 26:4,6,11 | 20:24 26:24 27:2 | **voluntary** 40:15 | 31:18,19 37:13 |
| **testified** 2:6,17 3:5 | 26:15 27:22 28:1 | 27:3 33:1 34:23 | **Vurgino** 11:17 53:6 | 38:18 39:1 40:19 |
| **testifying** 2:22 | 33:3,4 34:18 35:3 | 38:9 40:13 42:11 | 53:11 54:2 | 40:22 41:2 43:21 |
| **testimony** 4:5,8 | 35:6 36:13 37:15 | 46:4,24 49:4 53:1 | | 43:24 44:8 45:2,7 |
| 45:1 64:11 | 37:18 41:5,7 | **type** 57:12,24 58:4 | **W** | 47:2,6 51:19,20 |
| **Thank** 44:20,21 | 42:19,22 44:9 | 59:3,4 60:6 61:23 | **walk** 44:5 | 52:12,14 53:19 |
| **their** 6:22 20:4 51:5 | 46:12,12 47:10,24 | | **walked** 38:20 | 56:19 59:14 64:8 |
| 51:16 | 53:20,21 58:24 | **U** | **walking** 44:13 | **weren't** 10:18 12:10 |
| **thing** 7:15 20:6 | 59:1,21 60:7 | **uncomfortable** | **wall** 44:9,10,11 | 41:5 53:18 |
| 36:14 38:24 48:20 | **times** 3:19 27:5,8,10 | 35:21 36:23 | **want** 6:9,10 12:2 | **West** 1:17 |
| 49:8 52:15 59:13 | 28:8 33:8,13 44:4 | **under** 12:13 50:20 | 13:5 15:9 16:4 | **whatsoever** 15:7 |
| 59:14 | 44:7 49:18 56:13 | 64:9 | 21:13 23:11,12,16 | **While** 44:13 |
| **things** 9:17 10:1 | 62:3 | **undergo** 3:7 | 27:6 28:20 30:2 | **whole** 25:7 36:13 |
| 16:16 19:6 24:20 | **Timing** 19:19 | **understand** 3:11,23 | 31:4 35:6,10 | 38:23 49:23 |
| 47:6 49:4,19 53:2 | **title** 5:5 10:17 | 9:16,19 10:6 15:3 | 36:12,14,15,20,22 | **WILCOX** 1:21 |
| 56:14,19,22 57:13 | **today** 2:12 4:5,8 | 23:22 26:24 29:19 | 36:23 38:12 44:4 | **Wilmington** 1:9,14 |
| 57:24 58:5,9 59:4 | 48:24 | 33:16 34:17 36:2 | 47:10 58:17,17 | 1:17,22 |
| **think** 13:14 15:15 | **together** 33:4,7 | 36:3,6 59:6 61:18 | 59:9,11,12,13,17 | **winter** 24:5,6 27:10 |
| 19:16,21 20:12,24 | 37:12 46:23 | **understanding** | 59:19 60:17 61:18 | 47:12,14,16,19,19 |

Snyder
Carmella Patrone

v.
C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 19, 2006

Page 72

| | | |
|---|---|---|
| wintertime 23:24 26:6,8 | **10:10** 1:9 | **9** |
| **wish** 15:8,10 16:5 17:11 | **1000** 1:17 | **9th** 38:6 |
| **witness** 2:4 31:4 40:1,3 64:12 | **11** 62:16 | |
| **witnessed** 55:21 | **12th** 11:22 | |
| **women** 60:20 | **12:05** 62:8 | |
| **wondering** 37:6 59:2,7 | **125-RPR** 64:18 | |
| **word** 29:8,8 35:4 36:24 50:14 55:3 | **1330** 1:22 | |
| **words** 21:13 28:20 52:12 | **1509** 1:9,14 | |
| **work** 18:4,5 22:21 27:15,16 29:9,23 41:19,20 46:10,15 46:17 47:18 49:2 50:19 51:2,7 | **19** 1:10 | |
| | **19th** 64:6 | |
| | **19801** 1:14,17,22 | |
| | **2** | |
| | **2** 31:2 48:1 57:11 62:12,16 | |
| | **2001** 24:3 47:18,19 | |
| **worked** 5:2 31:20 | **2002** 47:19,20 | |
| **working** 10:21 22:24 | **2002/2003** 47:22 | |
| **workload** 17:13 | **2003** 11:22 24:4,6 26:8,9 27:10 31:16 32:16,18,23 33:24 38:6 39:22 41:17 42:1,18,20 47:20 52:2 53:7,7 59:2 | |
| **work-related** 43:7 56:19 | | |
| **worried** 55:11 | | |
| **wouldn't** 60:18 61:10 | | |
| **write-up** 52:2 53:12 | **2005** 5:11 | |
| **writing** 44:9,10 | **2006** 1:10 48:24 64:7 | |
| **written** 11:14 52:9 53:5 | **2008** 64:19 | |
| **wrong** 30:15 38:19 39:1,19 50:23 52:13 55:3 56:9 | **210** 57:23 | |
| | **3** | |
| | **3** 37:24 38:1 62:17 | |
| **www.wilfet.com** 1:24 | **3/12/03** 62:16 | |
| | **302** 1:23 | |
| | **31** 62:16 64:19 | |
| | **37** 62:17 | |
| **X** | **4** | |
| **X** 62:10,14 | **4/7/03** 62:16 | |
| | **4/9/03** 62:17 | |
| **Y** | **44** 62:12 | |
| **yard** 6:21 | **6** | |
| **year** 5:4,8 24:1 26:7 27:10 | **60** 62:12 | |
| **years** 4:14,20 | **61** 62:12 | |
| **YOUNG** 1:16 | **63** 62:19 | |
| **your's** 20:4 | **64** 62:20 | |
| | **655-0477** 1:23 | |
| **0** | **7** | |
| **04-970-JJF** 1:5 | **7th** 31:16 33:24 34:1 | |
| **1** | **7:14** 38:20 | |
| **1** 11:4 45:20 62:16 | **7:15** 38:21 | |
| **10** 57:22 | **7:30** 12:15,18 | |
| **10th** 32:16,23 39:22 42:18 | | |

B-0501



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Snyder
## v.
# CitiSteel, USA, Inc.

## C.A. # 04-970-JJF

---

## Transcript of:

## Edward Vouras

## September 6, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B- 0502

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TERRY L. SNYDER,                        )
                                        )
            Plaintiff,                  )
                                        )   Civil Action
v.                                      )   No. 04-970-JJF
                                        )
CITISTEEL, USA INC.,                    )
                                        )
            Defendant.                  )

            Deposition of EDWARD VOURAS, taken
pursuant to notice at the law offices of Young Conaway
Stargatt & Taylor, LLP, The Brandywine Building, 1000
West Street, 17th Floor, Wilmington, Delaware,
beginning at 10:15 a.m., on Wednesday, September 6,
2006, before Terry Barbano Burke, RMR-CRR and Notary
Public.

APPEARANCES:

            LORI A. BREWINGTON, ESQUIRE
            MARGOLIS EDELSTEIN
               1509 Gilpin Avenue
               Wilmington, Delaware  19801
               For the Plaintiff

            MARGARET M. DiBIANCA, ESQUIRE
            YOUNG CONAWAY STARGATT & TAYLOR LLP
               The Brandywine Building - 17th Floor
               Wilmington, Delaware  19801
               For the Defendant

ALSO PRESENT:
            TERRY L. SNYDER

            WILCOX & FETZER
   1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477
                  www.wilfet.com                    B-0503

Snyder                                      v.                      CitiSteel, USA, Inc.
Edward Vouras                        C.A. # 04-970-JJF              September 6, 2006

Page 2

1           EDWARD VOURAS,
2       the deponent herein, having first been
3       duly sworn on oath, was examined and
4       testified as follows:
5   BY MS. DiBIANCA:
6   Q.   If you want to go ahead and state your name
7   for the record.
8   A.   Edward Vouras.
9   Q.   Just for the court reporter, if you want to
10  spell your last name for me too.
11  A.   V-O-U-R-A-S.
12  Q.   What's your date of birth?
13  A.   11-7-42.
14  Q.   And your current address?
15  A.   Current address?
16  Q.   Yes.
17  A.   Rockford Tower, Seven Rockford Road, K-25,
18  Wilmington, Delaware, 19806.
19  Q.   Have you ever been deposed before?
20  A.   Who?
21  Q.   Have you ever had a deposition like this
22  before?
23  A.   No.
24  Q.   So I'll just give you real quick, Lori's

Page 3

1   probably explained a little bit to you, just some sort
2   of ground rules.
3           You're going to speak and I'm going to
4   speak, but we don't speak at the same time, that way
5   the court reporter can take down all of our questions
6   and answers.  Probably as important to that is if you
7   are going to answer yes, you want to answer yes instead
8   of shaking your head, instead of uh-huh, because she
9   can't get those down.  Everything we say is going to be
10  in words and we will let each other finish.  If you
11  don't understand a question that I ask, just ask me to
12  clarify and I will.
13          If you need a break at any time, we'll
14  take one.  If you're in the middle of answering a
15  question, go ahead and answer it and then we will take
16  a break.  But other than that, it's pretty straight
17  forward.
18          How long have you been at Rockford
19  Tower?
20  A.   I'd say 15 years, 18 years.
21          I need a break.
22  Q.   Are you currently employed?
23  A.   Self-employed.
24  Q.   Doing what?

Page 4

1   A.   The restaurant Kozy Korner and I'm a gambler.
2   Q.   Do you gamble in Atlantic City primarily?
3   A.   Right.
4   Q.   Do you have a residence in Atlantic City?
5   A.   Yes.
6   Q.   Where is that?
7   A.   Ocean Club.
8   Q.   How much time do you spend there?
9   A.   Four, five, six days a week.  Whenever.
10  Q.   Did you finish?
11  A.   Yes.
12  Q.   Are you married?
13  A.   No.  Single.
14  Q.   Have you ever been married?
15  A.   Yes.
16  Q.   And to whom?
17  A.   Amber Reed Dunlap.
18  Q.   And when was that?
19  A.   When I was 22, 23.
20  Q.   Do you have any children?
21  A.   Yes.
22  Q.   Who are your children?
23  A.   Terry Snyder.
24  Q.   Any other children?

Page 5

1   A.   No.
2   Q.   Do you give Miss Snyder any kind of financial
3   support?
4   A.   When she needs it, yes, I do.
5   Q.   When was the last time?
6   A.   I think it was three days ago.
7   Q.   The last time before that?
8   A.   I'd say a month ago.
9   Q.   How many times this year do you think?
10  A.   Beg your pardon?
11  Q.   How many times this year do you think, 2006?
12  A.   I would say every other week.
13  Q.   For a total of how much, can you estimate?
14  A.   I don't keep track because that's my daughter.
15  Q.   How much at a time do you give?
16  A.   200, 300, and two cartons of cigarettes.
17  Q.   And that's about every two weeks?
18  A.   Right.
19  Q.   And that's been for how long?
20  A.   For quite a while.
21  Q.   Longer than 2006?
22  A.   Longer than what?
23  Q.   Longer than 2006?
24  A.   Yes.

B-0504

2 (Pages 2 to 5)

Snyder
Edward Vouras

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
September 6, 2006

Page 6

1   Q.   Do you think more than five years?  That would
2   be 2001.
3   A.   Off and on, whenever.  Whenever I go see her I
4   always give her some.  If she don't ask me, I give it
5   to her anyway.  I know she needs it.
6   Q.   How often do you see your daughter?
7   A.   Every couple of weeks, once a month.  I talk
8   to her, though, in between.
9   Q.   Did you do anything to prepare for today's
10  deposition?
11  A.   Did I do anything to prepare for it?
12  Q.   Yes.
13  A.   No.
14  Q.   Go over any documents or anything like that?
15  A.   No.  Don't have any documents.
16  Q.   Have you discussed this lawsuit with your
17  daughter?
18  A.   What do you mean, discuss it?  In what way?
19  Q.   Well, do you know what this lawsuit is about?
20  A.   She told me.  That's it.
21  Q.   What did she tell you?
22  A.   She told me that some Randolph, whatever his
23  name is, was bothering her.  Now not recently, but I'm
24  talking about in the past she told me.  That's what

Page 7

1   you're talking about, right?
2   Q.   Either --
3   A.   You ain't talking about like today?
4   Q.   Why don't we start with the past.
5   A.   You are talking about the past?
6   Q.   Yes.
7   A.   That's how I know about it.
8   Q.   Okay.
9   A.   And she called me when she got the job the
10  first week and she said this Randolph, you know, he's
11  my supervisor, whatever, and right away he wanted to
12  take her out to dinner on a Saturday for a drink or
13  dinner or whatever, to discuss.
14          I said, Terry, why would he want to take
15  you out the first week or second week, whatever, to
16  discuss what, the policies, what kind of bull shit?
17          So anyway, that was that.
18          But then later on, she called me and said
19  that he was like bothering her, caressing her hair.
20  Q.   Caressing her hair?
21  A.   Caressing or like, you know, (indicating).
22  And she was a little bit distressed, a little bit
23  upset.  And I said -- I mean she was in a state of
24  where she just got this job, this and that, and she

Page 8

1   didn't know how to -- I says, Terry, I says, James's
2   your boyfriend, that guy's married or has a fiance,
3   whatever, he shouldn't be doing that.
4          I asked her, you're not teasing, that
5   and that?  And she said, no, I don't do that shit, and
6   I know she doesn't.
7          Anyway, I said, if he keeps it up, I
8   gave her the idea to go to Radio Shack and get a tape
9   recorder.  And I said, tape the guy, and if he keeps it
10  up.
11          So anyway, I don't know, a week, two
12  weeks, three weeks later, she went ahead and did that.
13  She went and got a tape.  And then she told me that she
14  said something -- I think she said -- I'm not
15  positive -- she said something to the supervisor, his
16  supervisor.  I don't know who the guy is, Harris, I
17  think the guy's name is Harris.  You know, must have
18  said something to Mr. Harris, she must have said
19  something, because she told me that the next time that
20  Randolph seen her in the office he says, made a comment
21  where, you didn't have to say that or something.  And
22  then he made a comment to her, I remember, he said, I
23  guess you're taping me too, he mentioned that.  I'm
24  going by what she said to me now, Terry.  Those are the

Page 9

1   things that I recall.  And I'm going back when it
2   started and everything.
3   Q.   So she told you right away as soon as
4   Miss Snyder started working at CitiSteel, she told you
5   right away that Mr. Harris, her supervisor, was asking
6   her out?
7   A.   Not Harris.  Randolph.
8   Q.   Randolph Harris is her supervisor.
9   A.   Oh, that's his last name?
10  Q.   Yes.
11  A.   Who's the supervisor?  Ain't Harris the
12  supervisor?
13          MS. SNYDER:  There's another one that he
14  is referring to.
15          THE WITNESS:  I'm referring to Randolph's
16  supervisor.
17          MS. BREWINGTON:  You guys can't talk.
18          Sorry, Molly.
19          THE WITNESS:  It's whoever Randolph's
20  supervisor was, and I'm thinking it was Harris.  That
21  is Randolph?
22  BY MS. DiBIANCA:
23  Q.   Yes.
24  A.   That goes to show you, I don't even, whatever.

3 (Pages 6 to 9)

Snyder                                v.                        CitiSteel, USA, Inc.
Edward Vouras                    C.A. # 04-970-JJF               September 6, 2006

Page 10

1   I'm going by what she's telling me when she called me,
2   when she was distraught and like she was practically
3   crying on the phone.
4   Q.   And that was when she first started?
5   A.   Yeah, way back, whatever, yeah, the original.
6        When I heard her voice cracking and this
7   and that, I said, honey, if he just keeps it up just go
8   get a tape.
9   Q.   So you told her that right away?
10  A.   Yeah. When she called the second time and
11  told me. If I remember it was the second time because
12  the first time I remember he asked her out right away
13  when she started working, and then a month went by --
14  see, I don't recall the time, you know. I'm just
15  generalizing. I don't know if I'm correct or what. I
16  don't write something down or nothing because I don't
17  think anything like that was going to come up to this.
18  I didn't dream something like this.
19        So when she called again and her voice
20  and this and that practically, you know, crying,
21  because she gets emotional, she's sensitive, I said,
22  honey, I says, just go get a tape on this guy. I said,
23  what's he doing? Is he married? I don't know if he
24  had a fiance, because she told me I think he was

Page 11

1   getting married or had a fiance. What's he hitting on
2   her for, or it seems like he was, you know.
3   Q.   So the second phone call, it could have been
4   more than the second phone call, but we'll say we think
5   it was the second time she told you about it?
6   A.   Second or third time.
7        MS. BREWINGTON: I'm going to object.
8   You can answer.
9        MS. DiBIANCA: Object?
10       MS. BREWINGTON: I'm going to object.
11       MS. DiBIANCA: On what?
12       MS. BREWINGTON: On form. We'll say the
13  second time. That mischaracterizing.
14  BY MS. DiBIANCA:
15  Q.   Let me ask you, was it the second time that
16  she called you that she talked about Mr. Harris with
17  you that you recommended the tape?
18  A.   I wouldn't say the second. It would be the
19  third because I was getting disgusted, I was getting --
20  I was getting emotional because she was getting
21  emotional, and the way she sounded on the phone she was
22  getting upset. And that's my daughter and so I don't
23  think it was the second time.
24        I'm easy going, I bend, and this and that

Page 12

1   and I wouldn't say go get this and that. It had to be
2   like the third time, maybe fourth time. I don't recall
3   because it was way back. It isn't like I jumped, said
4   that. I probably didn't even think of her right away.
5        But for me to say that, go get a tape, it
6   had to be an accumulation of a couple of phone calls or
7   three phone calls.
8        MS. DiBIANCA: For a minute, on the
9   record, I need to ask Miss Snyder to stop indicating,
10  shaking her head and whatnot. It is just a little bit
11  distracting to me.
12       MS. SNYDER: Okay.
13       MS. DiBIANCA: I know it is hard not to
14  do.
15       THE WITNESS: I'm not looking at her.
16       MS. DiBIANCA: For me it is hard.
17       MS. SNYDER: I do that all the time. I'm
18  sorry.
19       THE WITNESS: Like I said, it wasn't,
20  like I said, the second call, it had to be the third,
21  fourth call because she's calling me and telling me.
22  She's getting emotional and then I said, honey, just go
23  get a tape.
24  BY MS. DiBIANCA:

Page 13

1   Q.   How about instead of trying to guess at the
2   number of times that you talked to her, how about a
3   time period, from the first time that she called you
4   and talked to you about Mr. Harris until the time that
5   you spoke to her and recommended she get the tape?
6   A.   I'd say --
7        MS. BREWINGTON: I'm going to object as
8   asked and answered. He said he didn't remember.
9        MS. DiBIANCA: I didn't ask.
10       MS. BREWINGTON: He did state that he
11  didn't recall.
12       MS. DiBIANCA: Recall the number of times
13  on the phone.
14       MS. BREWINGTON: Or the date.
15       THE WITNESS: I don't know any time thing
16  because whenever she started working back then, you
17  know. So you have your records whenever she started
18  working, but like I said, if I knew it was going to
19  come to this, I would keep, I would get a pencil and
20  paper and keep a diary of that stuff.
21  BY MS. DiBIANCA:
22  Q.   Let's say do we think it was less than six
23  months?
24  A.   I would say it was, I would say yes.

4 (Pages 10 to 13)

B-0507

Snyder                              v.                    CitiSteel, USA, Inc.
Edward Vouras              C.A. # 04-970-JJF              September 6, 2006

Page 14

1        (Phone interruption.)
2   BY MS. DiBIANCA:
3   Q.   So he said he thought it was less than six
4   months?
5   A.   Actually I would say less than six months
6   because she called me more than, like I said, it wasn't
7   the second time she called me and told me, third or
8   fourth. It had to be several times, three, four, five
9   times maybe. And then when she was calling me, I'm
10  getting upset myself that she's upset, that that guy is
11  making her upset. So I recommended that.
12  Q.   You think maybe less than two months is a
13  better estimate?
14  A.   No, I wouldn't say that. I'd say it is more
15  than that. It was more than that because -- it had to
16  be more than that.
17  Q.   Should we say four to six?
18       MS. BREWINGTON: I'm going to object.
19       MS. DiBIANCA: There's no grounds to
20  object.
21       MS. BREWINGTON: Because you're trying to
22  pigeonhole him in.
23       MS. DiBIANCA: I am not.
24       THE WITNESS: You did say up to six

Page 15

1   months?
2   BY MS. DiBIANCA:
3   Q.   Yes.
4   A.   We will leave it at that. Because now you
5   start going two months, two to four and this and that.
6   It is one question pertaining to that time period and I
7   will give it to you like that, you know. I'll try to
8   be broad with you and say six months because I don't
9   recall. I can't pinpoint it for you.
10  Q.   Why don't we jump ahead to, it would have been
11  April of 2003, that's when Terry's employment with
12  CitiSteel ended.
13       Can you tell me about that time period?
14       MS. BREWINGTON: Objection to form.
15       MS. DiBIANCA: Objection to form as to
16  what exactly?
17       MS. BREWINGTON: Exactly do you want to
18  know from him? That's very vague. Can you tell me
19  about that time period, what do you want to know about
20  that time period?
21       MS. DiBIANCA: Are we being contentious?
22       MS. BREWINGTON: Not contentious, but can
23  you help him out? Does he know what that means?
24       MS. DiBIANCA: We are talking about a

Page 16

1   very narrow subject here.
2        MS. BREWINGTON: Can you be more
3   specific?
4   BY MS. DiBIANCA:
5   Q.   For the record, going forward, everything I'm
6   discussing with you today is about one limited topic.
7   The limited topic is going to be Terry Snyder's
8   employment at CitiSteel and the events surrounding her
9   employment at CitiSteel. If I ask you a question and
10  you're not sure what it is relating to, we can assume
11  going forward that it's relating only to that limited
12  topic.
13       So in the month of April 2003, can you
14  tell me about any of the events relating to Terry
15  Snyder's employment at CitiSteel.
16  A.   Terry Snyder's what?
17  Q.   Her employment at CitiSteel?
18  A.   I can't recall. I don't recall any time
19  because I'm 63 years old and my memory is -- what do
20  you call it? -- I got my mind on business and this and
21  that. I also have my mind on my daughter. But when
22  she's calling me and telling me this, this, that, I
23  don't have no clue what time, what month, what year.
24  Q.   So did she continue to call you after she

Page 17

1   started her employment, did she continue to call you
2   after the time that you recommended her going to Radio
3   Shack and getting a tape recorder? Did she call you
4   after that about her employment?
5   A.   What do you mean by her employment?
6   Q.   About Mr. Harris.
7   A.   Yeah, about the situation we're talking about,
8   yeah. That's it.
9   Q.   Did she continue to call you? For how long?
10  A.   Just when she needed to.
11  Q.   Which was how often?
12  A.   What do you mean how often?
13  Q.   Every day?
14  A.   Of course not every day. I wouldn't even
15  answer the phone if she called me, I wouldn't answer
16  the phone if she called me every day.
17  Q.   Was it every week?
18  A.   I have no idea.
19  Q.   Is there any reason that you're not able to
20  recall?
21  A.   Because I don't know how many times she
22  called.
23  Q.   Would you say it was more often than every
24  other month?

5 (Pages 14 to 17)

Page 18

1   A.   She called whenever she called. I answered
2   whenever the phone rang. I don't keep no time track.
3        Like I said to you, if I knew it was
4   going to come down to this, I would have got this pen
5   right here and I would have kept a diary, phone
6   records, everything. I'm 63 years old.
7   Q.   What did she say?
8   A.   And I'm not doing it on purpose. Okay? I'm
9   63. I'm being honest with you. And I do forget a lot
10  of things now. Before I didn't.
11       I know you're younger than I am. You
12  can remember a lot of things. Our brain is okay. As
13  we get older we're going to start forgetting and I'm
14  not saying that I got Alzheimers, but I do forget.
15  Q.   Okay.
16  A.   Do you understand? Because I play cards. I
17  know how to play cards, but I come to be where I do
18  forget a lot. Not playing cards, but a lot of stuff in
19  the past.
20       But this I do remember and I only
21  remember so much. I only talked to her so long and I
22  only hear what I want to hear from her where it
23  pertains to her because I worry about her. I get
24  emotional with her, she gets emotional. That's it.

Page 19

1   But I cannot go into what you're saying because it is
2   all trivial to me. Because I got other things on my
3   mind. I do have her on my mind and I do worry about
4   her and I don't want nobody bothering her and I got
5   emotional when she called me about this guy.
6        And when she did it two, three, four,
7   five times, it could be eight times, but I think it was
8   four or five times, I said, Terry, because she started
9   breaking up on the phone, which means she was crying,
10  and she was getting like I am getting right now. So
11  she was getting hyper.
12       I says, Honey, go to Radio Shack, get a
13  tape on this guy. It is not like I scammed anything or
14  I told her to go do anything, look, we can make some
15  money with this guy. Forget about all these ideas
16  whatever you're pertaining to, whatever you're trying
17  to drill out of anything, make anything. I'm going by
18  what she did, what she told me and to the best of my
19  knowledge.
20       Like I said, I'm 63. So don't go into
21  the detail April this, that, months, this and that. I
22  generalize six months. Now you come down to two to
23  four, this and that, trying to pinpoint me. Pinpoint
24  me to what? I cannot because I'm 63.

Page 20

1        MS. DiBIANCA: Lori, does your witness
2   need to take a break maybe for a minute?
3        THE WITNESS: No, I'm fine, honey. I'm
4   fine. You can keep asking me questions. I don't need
5   it, honey.
6        Don't forget, you're younger than I,
7   she's younger, she's younger (indicating). Our brain
8   retains everything. As we get older we forget, and
9   that's the way I'm getting. I'm forgetting and I'm not
10  doing it on purpose on this session.
11       MS. DiBIANCA: Let the record reflect
12  that the witness is pointing and his voice is raised.
13  BY MS. DiBIANCA:
14  Q.   Now, what I'd like to do is continue on.
15  A.   Show the record that I'm pointing.
16       MS. BREWINGTON: He was pointing at the
17  table. He wasn't pointing at you.
18       THE WITNESS: I'm not pointing. I'm
19  pointing to everybody because you're all younger than I
20  am and their brain waves retain things. Mine is
21  getting a little bit fuzzy, okay? I'm not saying I got
22  Alzheimer's, but I feel that I'm not retaining like I
23  used to retain, and I'm not talking about this
24  individual situation here. I'm talking about other

Page 21

1   things.
2        MS. BREWINGTON: I want her to ask these
3   questions so this can move as smoothly as possible.
4        THE WITNESS: I'm trying to explain to
5   her and I don't want her to keep drilling me because I
6   don't recall.
7        MS. BREWINGTON: If you don't recall, she
8   wants you to say I don't recall.
9        THE WITNESS: It is not that I'm
10  irritated because she keeps going over and over the
11  same things, and to me it's just repetition and it's
12  like I'm supposed to give her an exact date how many
13  times, how many times did I see my daughter, how many
14  times did I give her money, this and that. Listen, you
15  know, I'm trying to do the best here and I don't want
16  to keep being repetitious because I don't know.
17       MS. BREWINGTON: Yes.
18       THE WITNESS: That's it. But I'm fine.
19  I don't need no break. I'm in control.
20       Next question.
21  BY MS. DiBIANCA:
22  Q.   Did Terry Snyder call you relating to the end
23  of her employment at CitiSteel?
24  A.   When she was done, I think she did, yeah. I

B-0508

6 (Pages 18 to 21)

Snyder
Edward Vouras

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
September 6, 2006

Page 22

1  guess she had to, yeah.
2     Q.   Do you recall anything about that
3  conversation?
4     A.   No.
5     Q.   Did she call you in the days or the week
6  leading up to her termination?
7     A.   No, I can't. She might have, but I can't
8  recall.
9     Q.   And then after she left CitiSteel, do you
10  recall what her mental state was at that point as far
11  as her emotions went?
12     A.   She wasn't happy.
13     Q.   Can you give me any details, examples?
14     A.   No, no, because like I said, I don't see her.
15  I just talk to her on the phone and then I can tell by
16  her voice, whatever. I go by that, do you know what I
17  mean?
18     Q.   And did she express to you that she was -- I
19  don't want to mischaracterize -- maybe not doing well,
20  that's what you said?
21     A.   She was down. She was down.
22     Q.   And did you give her any advice?
23     A.   Yeah. I said you got to just stick in there.
24  I mean that's the way it is out there. I said you got

Page 23

1  to do the best, you got to take care of yourself. I
2  think I might have said take care of yourself and FU
3  everybody else. I said you got to take care of
4  yourself. Take care of yourself, get up, get your
5  esteem up. She had low esteem, I remember that.
6  Because I was talking to her trying to get her up a
7  little bit, kidding around with her, trying to kid
8  around with her.
9     Q.   Did she take your advice?
10     A.   Well, she tries to do the best. She lost a
11  little weight. I told her, go out there, do something,
12  what you call it, get your mind whatever, and get
13  your esteem up. Because she always downs herself.
14     Q.   And then did you ever discuss that with her
15  boyfriend, Mr. Tobin?
16     A.   Who's that, James?
17     Q.   Yes.
18     A.   I don't know his last name. Did I discuss it?
19     Q.   Yes.
20     A.   I don't think so. I don't talk to him much.
21  He is a good boy, but I mean I just don't, he's
22  working, whatever.
23     Q.   What about Terry's mom, did you talk to her
24  about it at all?

Page 24

1     A.   No.
2     Q.   Do you communicate with her or not often?
3     A.   Who, the mother?
4     Q.   Yes.
5     A.   Hello, good-bye.
6     Q.   Then when did she tell you or how did you come
7  to find out about her filing a lawsuit?
8     A.   That I can't recall. I can't recall.
9     Q.   Did she tell you that she had filed it, gone
10  to the EEOC, the Equal Employment Opportunity
11  Commission?
12     A.   Yes, some initials. I don't even know what
13  they are. She gave me those initials. I said, What's
14  that? She had to explain to me because I don't know
15  about that.
16     Q.   When did she tell you about that, do you know?
17     A.   I don't know. I have no idea.
18     Q.   Do you recall if she had told you that she had
19  already gone to the EEOC or that she was going to go to
20  the EEOC?
21     A.   I think she was going and I asked her what's
22  that mean? What's that place? She told me.
23     Q.   What did she tell you that it was?
24     A.   I don't even know. I mean she told me, but I

Page 25

1  still don't know. I don't want to know.
2            She did say they take care of something,
3  employment.
4     Q.   Equal?
5     A.   Yes, equal employment, something like that.
6  That's it.
7            MS. DiBIANCA: Do you have questions,
8  Lori?
9            MS. BREWINGTON: No.
10  BY MS. DiBIANCA:
11     Q.   Let's talk about when she told you over the
12  course of time, not one specific discussion, but over
13  the course of time when she talked to you about
14  Mr. Harris, what did she say Mr. Harris was doing?
15     A.   What I said to you at the beginning.
16     Q.   I will just make sure I got you right, which
17  was asking her out to dinner or drinks?
18     A.   Yeah. This is the first week.
19     Q.   Okay.
20     A.   I remember that. When she went into the
21  place. Then he wanted to take her out Saturday,
22  whatever, and like so he can explain policy, I guess?
23  What the hell he wants to do, explain policy? And she
24  said no.

B-0509

7 (Pages 22 to 25)

Snyder                                    v.                    CitiSteel, USA, Inc.
Edward Vouras                     C.A. # 04-970-JJF             September 6, 2006

Page 26

1    Q.   And also --
2    A.   Then I --
3    Q.   Sorry. Go ahead.
4    A.   I think he might have, I think she said -- I'm
5    not positive. But I think he tried taking her out a
6    couple of times. That I'm pretty sure about that. I'm
7    not juicing it up, but I'm retaining it because it's
8    been so long. I didn't know it was going to come down
9    to all this stuff.
10   Q.   And then I think you said earlier about him
11   touching her hair?
12   A.   Yeah, he came over -- he leans over when she's
13   working and he's leaning over. Because I said, well,
14   what do you mean touching your hair? He was like
15   caressing it, you know (indicating). I said, is he
16   touching you any other place, or something like that,
17   or whatever? I don't recall what she said. I would
18   think not, you know. Just her hair. But he would lean
19   over her. She's at the desk, she's like trapped. I
20   guess she wants to say more to him but that's her boss.
21   She was a little -- not scared. She's got a job, she's
22   happy she's got a job. She don't want to say nothing
23   to whatever, I guess.
24   Q.   Him touching her hair, did that continue on or

Page 27

1    was that for a limited --
2    A.   I don't know about that because I remember
3    that one time she told me. It could have, but I don't
4    recall her saying it to me.
5    Q.   Were there other things that you remember her
6    saying?
7    A.   The first time when he was doing that, when he
8    started, I said, Is this guy married? Does he have a
9    wife? I don't know whether she said a fiance, they
10   bought a new house or are buying a new house. I do
11   remember something like that. And I said, why is he
12   whatever?
13         And then -- but then I do recall later
14   on when I'm going to hit on a thing now, when Terry did
15   or reported it to his supervisor, then nothing like
16   happened. Well, like I said to you before, I'm
17   repeating it again, he came into her office and says,
18   Terry, you didn't have to do that. I do remember those
19   statements that she made to me that he said. He said
20   you don't have to do all this. I guess you're taping
21   me too. And she did have the tape with her, you know.
22   It's a coincidence that he said that. And evidently he
23   kept it up, you know, whatever. And then I think I
24   made a comment where I think his boss, his supervisor

Page 28

1    and him are good friend. That's why he don't take any
2    action. Like if he's been there five, seven years,
3    whatever. I don't know how long he's been there, if
4    he's there that long, and evidently he might have tried
5    to put a hit -- not say hit. With other temp girls
6    that have come in there, evidently that's his style,
7    whatever he's doing, then I guess if he's been in that
8    position five, seven years, him and his boss are tight
9    and his boss don't give a shit, you know. That I do
10   remember, you know. That's what it seemed like.
11   Because no action was taken on it.
12         Or even in the past or something maybe
13   transferring him over to another spot or something.
14   That's when I remembered they wanted, later on, later
15   on after all this stuff, they wanted to transfer Terry,
16   but then she wouldn't take a transfer.
17         But I remember she said I would take a
18   transfer if they wrote their names or something, or if
19   they signed some papers and they wouldn't do it or
20   something like that, to that effect.
21   Q.   Terry told you this?
22   A.   Yes, something to that effect.
23   Q.   Did you recommend that she take any other
24   action?

B-0510

Page 29

1    A.   No. See, because when she called me about
2    these situations, I would be like two minutes, three
3    minutes, because I'd be at the poker table and I'd be
4    talking to her. So there was no long conversations.
5         Now, when I'd come home, I would talk to
6    her like five, ten minutes, and that's it. But most of
7    the time when she called me I'm going, uh-huh, uh-huh,
8    it was like a fast thing. So these were things that
9    stand out in my mind.
10        Other than that, there was no other
11   important thing that I could remember pertaining to
12   this fellow and to her, the relationship with her. It
13   is just what I'm telling you is what I remember, her
14   telling me about this guy.
15        I don't think I said anything. I go
16   over there to talk to him to come see him, this and
17   that, but I said what good is that going to do. Like
18   leave my daughter alone and is she going to blow the
19   job.
20   Q.   Do you always play on the same days?
21   A.   Play where?
22   Q.   I'm sorry, poker, do you always play on the
23   same days of the week, like Monday, Wednesday,
24   Tuesdays?

8 (Pages 26 to 29)

Snyder
Edward Vouras

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
September 6, 2006

Page 30

1   A.   I play any time I want.

2   Q.   Not a regular?  Like my grandfather goes on

3   Tuesday.

4   A.   No routine.  Any time I want.

5   Q.   Are you taking any kind of medicine or

6   anything that would have prevented you from not

7   testifying honestly?  I didn't ask you that in the

8   beginning.

9   A.   Say it again.

10  Q.   Are you taking or have you taken any kind of

11  medicine or any other --

12  A.   Medicine?

13  Q.   -- that would prevent you from testifying

14  honestly today?

15  A.   Testifying?

16  Q.   Today here.

17  A.   Oh, no.  I don't take no Xanax.  The only

18  thing I take is Lipitor, Zocor for cholesterol is the

19  only medicine and 20 vitamins a day I take.

20        MS. DiBIANCA:  That's all I have.

21        COURT REPORTER:  Reading and signing?

22        MS. BREWINGTON:  Yes.

23        (Witness excused.)

24        (The deposition concluded at 10:55 a.m.)

Page 32

REPLACE THIS PAGE
WITH THE ERRATA SHEET
AFTER IT HAS BEEN
COMPLETED AND SIGNED
BY THE DEPONENT

Page 31

1

2           I N D E X

3   DEPONENT:  Edward Vouras          PAGE

4     Examination by Ms. Brewington     2

5           E X H I B I T S

6   (There were no exhibits marked for identification.)

7

    ERRATA SHEET/DEPONENT'S SIGNATURE     PAGE 32

8

    CERTIFICATE OF REPORTER          PAGE 33

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Page 33

1   State of Delaware    )
                        )
2   New Castle County    )

3           CERTIFICATE OF REPORTER

4
        I, Terry B. Burke, RMR-CRR and Notary Public,
5   do hereby certify that there came before me on
    Wednesday, September 6, 2006, the deponent herein,
6   EDWARD VOURAS, who was duly sworn  by me and thereafter
    examined by counsel for the respective parties;
7   that the questions asked of said deponent and the
    answers given were taken down by me in Stenotype notes
8   and thereafter transcribed by use of computer-aided
    transcription and computer printer under my direction.

9
        I further certify that the foregoing is a true
10  and correct transcript of the testimony given at said
    examination of said witness.

11
        I further certify that I am not counsel,
12  attorney, or relative of either party, or otherwise
    interested in the event of this suit.

13

14

15

16         Terry Barbano Burke, RMR-CRR
17         Certification No. 233-RPR
18         (Expires January 31, 2008)

19

20  DATED:

21

22

23                                  B-0511

24

9 (Pages 30 to 33)

Snyder
Edward Vouras

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
September 6, 2006

Page 34

**A**

able 17:19
about 5:17 6:19,24
  7:1,3,5,7 11:5,16
  13:1,2,4 15:13,19
  15:19,24 16:6,14
  17:4,6,7,7 18:23
  19:3,5,15 20:23
  20:24 22:2 23:23
  23:24 24:7,15,16
  25:11,13 26:6,10
  27:2 29:1,14
accumulation 12:6
action 1:5 28:2,11
  28:24
Actually 14:5
address 2:14,15
advice 22:22 23:9
after 16:24 17:2,4
  22:9 28:15 32:5
again 10:19 27:17
  30:9
ago 5:6,8
ahead 2:6 3:15 8:12
  15:10 26:3
ain't 7:3 9:11
alone 29:18
already 24:19
always 6:4 23:13
  29:20,22
Alzheimers 18:14
Alzheimer's 20:22
Amber 4:17
another 9:13 28:13
answer 3:7,7,15
  11:8 17:15,15
answered 13:8 18:1
answering 3:14
answers 3:6 33:7
anything 6:9,11,14
  10:17 19:13,14,17
  19:17 22:2 29:15
  30:6
anyway 6:5 7:17
  8:7,11
APPEARANCES
  1:13
April 15:11 16:13
  19:21
around 23:7,8
asked 8:4 10:12
  13:8 24:21 33:7
asking 9:5 20:4
  25:17
assume 16:10
Atlantic 4:2,4

**B**

attorney 33:12
Avenue 1:15
away 7:11 9:3,5
  10:9,12 12:4
a.m 1:11 30:24

**B**

B 31:5 33:4
back 9:1 10:5 12:3
  13:16
Barbano 1:12 33:16
before 1:12 2:19,22
  5:7 18:10 27:16
  33:5
Beg 5:10
beginning 1:11
  25:15 30:8
being 15:21 18:9
  21:16
bend 11:24
best 19:18 21:15
  23:1,10
better 14:13
between 6:8
birth 2:12
bit 3:1 7:22,22
  12:10 20:21 23:7
blow 29:18
boss 26:20 27:24
  28:8,9
bothering 6:23 7:19
  19:4
bought 27:10
boy 23:21
boyfriend 8:2 23:15
brain 18:12 20:7,20
Brandywine 1:10
  1:18
break 3:13,16,21
  20:2 21:19
breaking 19:9
Brewington 1:14
  9:17 11:7,10,12
  13:7,10,14 14:18
  14:21 15:14,17,22
  16:2 20:16 21:2,7
  21:17 25:9 30:22
  31:4
broad 15:8
Building 1:10,18
bull 7:16
Burke 1:12 33:4,16
business 16:20
buying 27:10

**C**

call 11:3,4 12:20,21

16:20,24 17:1,3,9
21:22 22:5 23:12
called 7:9,18 10:1
  10:10,19 11:16
  13:3 14:6,7 17:15
  17:16,22 18:1,1
  19:5 29:1,7
calling 12:21 14:9
  16:22
calls 12:6,7
came 26:12 27:17
  33:5
cards 18:16,17,18
care 23:1,2,3,4 25:2
caressing 17:19,20
  7:21 26:15
cartons 5:16
Castle 33:2
CERTIFICATE
  31:8 33:3
Certification 33:17
certify 33:5,9,11
children 4:20,22,24
cholesterol 30:18
cigarettes 5:16
CitiSteel 1:7 9:4
  15:12 16:8,9,15
  16:17 21:23 22:9
City 4:2,4
Civil 1:5
clarify 3:12
Club 4:7
clue 16:23
coincidence 27:22
come 10:17 13:19
  18:4,17 19:22
  24:6 26:8 28:6
  29:5,16
comment 8:20,22
  27:24
Commission 24:11
communicate 24:2
COMPLETED
  32:6
computer 33:8
computer-aided
  33:8
Conaway 1:10,18
concluded 30:24
contentious 15:21
  15:22
continue 16:24 17:1
  17:9 20:14 26:24
control 21:19
conversation 22:3
conversations 29:4
correct 10:15 33:10

counsel 33:6,11
County 33:2
couple 6:7 12:6 26:6
course 17:14 25:12
  25:13
court 1:1 2:9 3:5
  30:21
cracking 10:6
crying 10:3,20 19:9
current 2:14,15
currently 3:22

**D**

D 31:2
date 2:12 13:14
  21:12
DATED 33:20
daughter 5:14 6:6
  6:17 11:22 16:21
  21:13 29:18
day 17:13,14,16
  30:19
days 4:9 5:6 22:5
  29:20,23
Defendant 1:8,19
Delaware 1:2,11,16
  1:19,23 2:18 33:1
deponent 2:2 31:3
  32:7 33:5,7
deposed 2:19
deposition 1:9 2:21
  6:10 30:24
desk 26:19
detail 19:21
details 22:13
diary 13:20 18:5
DiBIANCA 1:17
  2:5 9:22 11:9,11
  11:14 12:8,13,16
  12:24 13:9,12,21
  14:2,19,23 15:2
  15:15,21,24 16:4
  20:1,11,13 21:21
  25:7,10 30:20
dinner 7:12,13
  25:17
direction 33:8
discuss 6:18 7:13,16
  23:14,18
discussed 6:16
discussing 16:6
discussion 25:12
disgusted 11:19
distracting 12:11
distraught 10:2
distressed 7:22
DISTRICT 1:1,2

documents 6:14,15
doing 3:24 8:3
  10:23 18:8 20:10
  22:19 25:14 27:7
  28:7
done 21:24
down 3:5,9 10:16
  18:4 19:22 22:21
  22:21 26:8 33:7
downs 23:13
dream 10:18
drill 19:17
drilling 21:5
drink 7:12
drinks 25:17
duly 2:3 33:6
Dunlap 4:17

**E**

E 31:2,5
each 3:10
earlier 26:10
easy 11:24
EDELSTEIN 1:15
Edward 1:9 2:1,8
  31:3 33:16
EEOC 24:10,19,20
effect 28:20,22
eight 19:7
either 7:2 33:12
emotional 10:21
  11:20,21 12:22
  18:24,24 19:5
emotions 22:11
employed 3:22
employment 15:11
  16:8,9,15,17 17:1
  17:4,5 21:23
  24:10 25:3,5
end 21:22
ended 15:12
equal 24:10 25:4,5
ERRATA 31:7 32:4
ESQUIRE 1:14,17
esteem 23:5,5,13
estimate 5:13 14:13
even 9:24 12:4
  17:14 24:12,24
  28:12
event 33:12
events 16:8,14
ever 2:19,21 4:14
  23:14
every 5:12,17 6:7
  17:13,14,16,17,23
everybody 20:19
  23:3

Snyder
Edward Vouras

v.

C.A. # 04-970-JJF

CitiSteel, USA, Inc.
September 6, 2006

Page 35

everything 3:9 9:2
  16:5 18:6 20:8
evidently 27:22
  28:4,6
exact 21:12
exactly 15:16,17
examination 31:4
  33:10
examined 2:3 33:6
examples 22:13
excused 30:23
exhibits 31:6
Expires 33:18
explain 21:4 24:14
  25:22,23
explained 3:1
express 22:18

**F**

far 22:10
fast 29:8
feel 20:22
fellow 29:12
FETZER 1:23
fiance 8:2 10:24
  11:1 27:9
filed 24:9
filing 24:7
financial 5:2
find 24:7
fine 20:3,4 21:18
finish 3:10 4:10
first 2:2 7:10,15
  10:4,12 13:3
  25:18 27:7
five 4:9 6:1 14:8
  19:7,8 28:2,8 29:6
Floor 1:11,18
follows 2:4
foregoing 33:9
forget 18:9,14,18
  19:15 20:6,8
forgetting 18:13
  20:9
form 11:12 15:14
  15:15
forward 3:17 16:5
  16:11
four 4:9 14:8,17
  15:5 19:6,8,23
fourth 12:2,21 14:8
friend 28:1
from 13:3 15:18
  18:22 30:6,13
FU 23:2
further 33:9,11
fuzzy 20:21

**G**

gamble 4:2
gambler 4:1
gave 8:8 24:13
generalize 19:22
generalizing 10:15
gets 10:21 18:24
getting 11:1,19,19
  11:20,20,22 12:22
  14:10 17:3 19:10
  19:10,11 20:9,21
Gilpin 1:15
girls 28:5
give 2:24 5:2,15 6:4
  6:4 15:7 21:12,14
  22:13,22 28:9
given 33:7,10
go 2:6 3:15 6:3,14
  8:8 10:7,22 12:1,5
  12:22 19:1,12,14
  19:20 22:16 23:11
  24:19 26:3 29:15
goes 9:24 30:2
going 3:3,3,7,9 8:24
  9:1 10:1,17 11:7
  11:10,24 13:7,18
  14:18 15:5 16:5,7
  16:11 17:2 18:4
  18:13 19:17 21:10
  24:19,21 26:8
  27:14 29:7,17,18
gone 24:9,19
good 23:21 28:1
  29:17
good-bye 24:5
grandfather 30:2
ground 3:2
grounds 14:19
guess 8:23 13:1 22:1
  25:22 26:20,23
  27:20 28:7
guy 8:9,16 10:22
  14:10 19:5,13,15
  27:8 29:14
guys 9:17
guy's 8:2,17

**H**

H 31:5
hair 7:19,20 26:11
  26:14,18,24
happened 27:16
happy 22:12 26:22
hard 12:13,16
Harris 8:16,17,18
  9:5,7,8,11,20

11:16 13:4 17:6
  25:14,14
having 2:2
head 3:8 12:10
hear 18:22,22
heard 10:6
hell 25:23
Hello 24:5
help 15:23
her 6:3,4,5,8,23
  7:12,19,19,20 8:4
  8:8,20,22 9:5,6,8
  10:6,9,12,19 11:2
  12:4,10,15 13:2,5
  14:11 16:8,17
  17:1,2,4,5 18:21
  18:22,23,23,24
  19:3,4,4,14 21:2,5
  21:5,12,14,23
  22:6,10,11,14,15
  22:16,22 23:6,6,7
  23:8,11,14,23
  24:2,7,21 25:17
  25:21 26:5,11,18
  26:19,20,24 27:4
  27:5,17,21 29:4,6
  29:12,12,13
herself 23:13
him 14:22 15:18,23
  23:20 26:10,20,24
  28:1,8,13 29:16
  29:16
hit 27:14 28:5,5
hitting 12:3
home 29:5
honest 18:9
honestly 30:7,14
honey 10:7,22
  12:22 19:12 20:3
  20:5
house 27:10,10
hyper 19:11

**I**

idea 8:8 17:18
  24:17
ideas 19:15
identification 31:6
important 3:6 29:11
INC 1:7
indicating 7:21 12:9
  20:7 26:15
individual 20:24
initials 24:12,13
instead 3:7,8 13:1
interested 33:12
interruption 14:1

irritated 21:10

**J**

James 23:16
James's 8:1
January 33:18
job 7:9,24 26:21,22
  29:19
juicing 26:7
jump 15:10
jumped 12:3
just 2:9,24 3:1,11
  7:24 10:7,7,14,22
  12:10,22 17:10
  21:11 22:15,23
  23:21 25:16 26:18
  29:13

**K**

keep 5:14 13:19,20
  18:2 20:4 21:5,16
keeps 8:7,9 10:7
  21:10
kept 18:5 27:23
kid 23:7
kidding 23:7
kind 5:2 7:16 30:5
  30:10
King 1:23
knew 13:18 18:3
know 6:5,19 7:7,10
  7:21 8:1,6,11,16
  8:17 10:14,15,20
  10:23 11:2 13:15
  13:15,17 15:7,18
  15:19,23 17:21
  18:11,17 21:15,16
  22:16 23:18 24:12
  24:14,16,17,24
  25:1,1 26:8,15,18
  27:2,9,21,23 28:3
  28:9,10
knowledge 19:19
Korner 4:1
Kozy 4:1
K-25 2:17

**L**

L 1:4,21
last 2:10 5:5,7 9:9
  23:18
later 7:18 8:12
  27:13 28:14,14
law 1:10
lawsuit 6:16,19
  24:7
leading 22:6

lean 26:18
leaning 26:13
leans 26:12
leave 15:4 29:18
left 22:9
less 13:22 14:3,5,12
let 3:10 11:15 20:11
Let's 13:22 25:11
like 2:21 6:14 7:3
  7:19,21 10:2,17
  10:18 11:2 12:2,3
  12:19,20 13:18
  14:6 15:7 18:3
  19:10,13,20 20:14
  20:22 21:12 22:14
  25:5,22 26:14,16
  26:19 27:11,15,16
  28:2,10,20 29:2,6
  29:8,17,23 30:2
limited 16:6,7,11
  27:1
Lipitor 30:18
Listen 21:14
little 3:1 7:22,22
  12:10 20:21 23:7
  23:11 26:21
LLP 1:10,18
long 3:18 5:19 17:9
  18:21 26:8 28:3,4
  29:4
Longer 5:21,22,23
look 19:14
looking 12:15
Lori 1:14 20:1 25:8
Lori's 2:24
lost 23:10
lot 18:9,12,18,18
low 23:5

**M**

M 1:17
made 8:20,22 27:19
  27:24
make 19:14,17
  25:16
making 14:11
many 5:9,11 17:21
  21:12,13,13
MARGARET 1:17
MARGOLIS 1:15
marked 31:6
married 4:12,14 8:2
  10:23 11:1 27:8
maybe 12:2 14:9,12
  20:2 22:19 28:12
mean 6:18 7:23
  17:5,12 22:17,24

Snyder

Edward Vouras

v.

C.A. # 04-970-JJF

CitiSteel, USA, Inc.

September 6, 2006

Page 36

23:21 24:22,24
  26:14
**means** 15:23 19:9
**medicine** 30:5,11,12
  30:19
**memory** 16:19
**mental** 22:10
**mentioned** 8:23
**middle** 3:14
**might** 22:7 23:2
  26:4 28:4
**mind** 16:20,21 19:3
  19:3 23:12 29:9
**Mine** 20:20
**minute** 12:8 20:2
**minutes** 29:2,3,6
**mischaracterize**
  22:19
**mischaracterizing**
  11:13
**Miss** 5:2 9:4 12:9
**Molly** 9:18
**mom** 23:23
**Monday** 29:23
**money** 19:15 21:14
**month** 5:8 6:7 10:13
  16:13,23 17:24
**months** 13:23 14:4
  14:5,12 15:1,5,8
  19:21,22
**more** 6:1 11:4 14:6
  14:14,15,16 16:2
  17:23 26:20
**most** 29:6
**mother** 24:3
**move** 21:3
**much** 4:8 5:13,15
  18:21 23:20
**must** 8:17,18
**myself** 14:10

**N**

**N** 31:2
**name** 2:6,10 6:23
  8:17 9:9 23:18
**names** 28:18
**narrow** 16:1
**need** 3:13,21 12:9
  20:2,4 21:19
**needed** 17:10
**needs** 5:4 6:5
**new** 27:10,10 33:2
**next** 8:19 21:20
**nobody** 19:4
**Notary** 1:12 33:4
**notes** 33:7
**nothing** 10:16 26:22

27:15
**notice** 1:10
**number** 13:2,12

**O**

**oath** 2:3
**object** 11:7,9,10
  13:7 14:18,20
**Objection** 15:14,15
**Ocean** 4:7
**Off** 6:3
**office** 8:20 27:17
**offices** 1:10
**often** 6:6 17:11,12
  17:23 24:2
**Oh** 9:9 30:17
**okay** 7:8 12:12 18:8
  18:12,15 20:21
  25:19
**old** 16:19 18:6
**older** 18:13 20:8
**once** 6:7
**one** 3:14 9:13 15:6
  16:6 25:12 27:3
**only** 16:11 18:20,21
  18:22 30:17,18
**Opportunity** 24:10
**original** 10:5
**other** 3:10,16 4:24
  5:12 17:24 19:2
  20:24 26:16 27:5
  28:5,23 29:10,10
  30:11
**otherwise** 33:12
**out** 7:12,15 9:6
  10:12 15:23 19:17
  22:24 23:11 24:7
  25:17,21 26:5
  29:9
**over** 6:14 21:10,10
  25:11,12 26:12,12
  26:13,19 28:13
  29:16

**P**

**PAGE** 31:3,7,8 32:3
**paper** 13:20
**papers** 28:19
**pardon** 5:10
**parties** 33:6
**party** 33:12
**past** 6:24 7:4,5
  18:19 28:12
**pen** 18:4
**pencil** 13:19
**period** 13:3 15:6,13
  15:19,20

**pertaining** 15:6
  19:16 29:11
**pertains** 18:23
**phone** 10:3 11:3,4
  11:21 12:6,7
  13:13 14:1 17:15
  17:16 18:2,5 19:9
  22:15
**pigeonhole** 14:22
**pinpoint** 15:9 19:23
  19:23
**place** 24:22 25:21
  26:16
**Plaintiff** 1:5,16
**play** 18:16,17 29:20
  29:21,22 30:1
**playing** 18:18
**point** 22:10
**pointing** 20:12,15
  20:16,17,18,19
**poker** 29:3,22
**policies** 7:16
**policy** 25:22,23
**position** 28:8
**positive** 8:15 26:5
**possible** 21:3
**practically** 10:2,20
**prepare** 6:9,11
**PRESENT** 1:20
**pretty** 3:16 26:6
**prevent** 30:13
**prevented** 30:6
**primarily** 4:2
**printer** 33:8
**probably** 3:1,6 12:4
**Public** 1:12 33:4
**purpose** 18:8 20:10
**pursuant** 1:10
**put** 28:5

**Q**

**question** 3:11,15
  15:6 16:9 21:20
**questions** 3:5 20:4
  21:3 25:7 33:7
**quick** 2:24
**quite** 5:20

**R**

**Radio** 8:8 17:2
  19:12
**raised** 20:12
**Randolph** 6:22 7:10
  8:20 9:7,8,21
**Randolph's** 9:15,19
**rang** 18:2
**Reading** 30:21

**real** 2:24
**reason** 17:19
**recall** 9:1 10:14
  12:2 13:11,12
  15:9 16:18,18
  17:20 21:6,7,8
  22:2,8,10 24:8,8
  24:18 26:17 27:4
  27:13
**recently** 6:23
**recommend** 28:23
**recommended**
  11:17 13:5 14:11
  17:2
**record** 2:7 12:9
  16:5 20:11,15
**recorder** 8:9 17:3
**records** 13:17 18:6
**Reed** 4:17
**referring** 9:14,15
**reflect** 20:11
**regular** 30:2
**relating** 16:10,11
  16:14 21:22
**relationship** 29:12
**relative** 33:12
**remember** 8:22
  10:11,12 13:8
  18:12,20,21 23:5
  25:20 27:2,5,11
  27:18 28:10,17
  29:11,13
**remembered** 28:14
**repeating** 27:17
**repetition** 21:11
**repetitious** 21:16
**REPLACE** 32:3
**reported** 27:15
**reporter** 2:9 3:5
  30:21 31:8 33:3
**residence** 4:4
**respective** 33:6
**restaurant** 4:1
**retain** 20:20,23
**retaining** 20:22
  26:7
**retains** 20:8
**right** 4:3 5:18 7:1
  7:11 9:3,5 10:9,12
  12:4 18:5 19:10
  25:16
**RMR-CRR** 1:12
  33:4,16
**Road** 2:17
**Rockford** 2:17,17
  3:18
**routine** 30:4

**rules** 3:2

**S**

**S** 31:5
**same** 3:4 21:11
  29:20,23
**Saturday** 7:12
  25:21
**saying** 18:14 19:1
  20:21 27:4,6
**says** 8:1,1,20 10:22
  19:12 27:17
**scammed** 19:13
**scared** 26:21
**second** 7:15 10:10
  10:11 11:3,4,5,6
  11:13,15,18,23
  12:20 14:7
**see** 6:3,6 10:14
  21:13 22:14 29:1
  29:16
**seemed** 28:10
**seems** 11:2
**seen** 8:20
**Self-employed** 3:23
**sensitive** 10:21
**September** 1:11
  33:5
**session** 20:10
**seven** 2:17 28:2,8
**several** 14:8
**Shack** 8:8 17:3
  19:12
**shaking** 3:8 12:10
**SHEET** 32:4
**SHEET/DEPON...**
  31:7
**shit** 7:16 8:5 28:9
**show** 9:24 20:15
**SIGNATURE** 31:7
**signed** 28:19 32:6
**signing** 30:21
**Single** 4:13
**situation** 17:7 20:24
**situations** 29:2
**six** 4:9 13:22 14:3,5
  14:17,24 15:8
  19:22
**smoothly** 21:3
**Snyder** 1:4,21 4:23
  5:2 9:4,13 12:9,12
  12:17 21:22
**Snyder's** 16:7,15,16
**some** 3:1 6:4,22
  19:14 24:12 28:19
**something** 8:14,15
  8:18,19,21 10:16

Snyder                              v.                          CitiSteel, USA, Inc.
Edward Vouras                   C.A. # 04-970-JJF                September 6, 2006

Page 37

| | | | | |
|---|---|---|---|---|
| 10:18 23:11 25:2 | talk 6:7 9:17 22:15 | 10:11,12,14 11:5 | 14:10,10,11 | 12:15,19 13:15 |
| 25:5 26:16 27:11 | 23:20,23 25:11 | 11:6,13,15,23 | USA 1:7 | 14:24 20:1,3,12 |
| 28:12,13,18,20,22 | 29:5,16 | 12:2,2,17 13:3,3,4 | use 33:8 | 20:18 21:4,9,18 |
| soon 9:3 | talked 11:16 13:2,4 | 13:15 14:7 15:6 | used 20:23 | 30:23 33:10 |
| sorry 9:18 12:18 | 18:21 25:13 | 15:13,19,20 16:18 | | words 3:10 |
| 26:3 29:22 | talking 6:24 7:1,3,5 | 16:23 17:2 18:2 | _____ | working 9:4 10:13 |
| sort 3:1 | 15:24 17:7 20:23 | 25:12,13 27:3,7 | **V** | 13:16,18 23:22 |
| sounded 11:21 | 20:24 23:6 29:4 | 29:7 30:1,4 | v 1:6 | 26:13 |
| speak 3:3,4,4 | tape 8:8,9,13 10:8 | times 5:9,11 13:2,12 | vague 15:18 | worry 18:23 19:3 |
| specific 16:3 25:12 | 10:22 11:17 12:5 | 14:8,9 17:21 19:7 | very 15:18 16:1 | wouldn't 11:18 12:1 |
| spell 2:10 | 12:23 13:5 17:3 | 19:7,8 21:13,13 | vitamins 30:19 | 14:14 17:14,15 |
| spend 4:8 | 19:13 27:21 | 21:14 26:6 | voice 10:6,19 20:12 | 28:16,19 |
| spoke 13:5 | taping 8:23 27:20 | Tobin 23:15 | 22:16 | write 10:16 |
| spot 28:13 | Taylor 1:10,18 | today 7:3 16:6 | Vouras 1:9 2:1,8 | wrote 28:18 |
| stand 29:9 | teasing 8:4 | 30:14,16 | 31:3 33:6 | www.wilfet.com |
| Stargatt 1:10,18 | tell 6:21 15:13,18 | today's 6:9 | V-O-U-R-A-S 2:11 | 1:24 |
| start 7:4 15:5 18:13 | 16:14 22:15 24:6 | told 6:20,22,24 8:13 | | |
| started 9:2,4 10:4 | 24:9,16,23 | 8:19 9:3,4 10:9,11 | _____ | _____ |
| 10:13 13:16,17 | telling 10:1 12:21 | 10:24 11:5 14:7 | **W** | **X** |
| 17:1 19:8 27:8 | 16:22 29:13,14 | 19:14,18 23:11 | want 2:6,9 3:7 7:14 | X 31:2,5 |
| state 2:6 7:23 13:10 | temp 28:5 | 24:18,22,24 25:11 | 15:17,19 18:22 | Xanax 30:17 |
| 22:10 33:1 | ten 29:6 | 27:3 28:21 | 19:4 21:2,5,15 | |
| statements 27:19 | termination 22:6 | topic 16:6,7,12 | 22:19 25:1 26:22 | _____ |
| STATES 1:1 | Terry 1:4,12,21 | total 5:13 | 30:1,4 | **Y** |
| Stenotype 33:7 | 4:23 7:14 8:1,24 | touching 26:11,14 | wanted 7:11 25:21 | yeah 10:5,5,10 17:7 |
| stick 22:23 | 16:7,14,16 19:8 | 26:16,24 | 28:14,15 | 17:8 21:24 22:1 |
| still 25:1 | 21:22 27:14,18 | Tower 2:17 3:19 | wants 21:8 25:23 | 22:23 25:18 26:12 |
| stop 12:9 | 28:15,21 33:4,16 | track 5:14 18:2 | 26:20 | year 5:9,11 16:23 |
| straight 3:16 | Terry's 15:11 23:23 | transcribed 33:8 | wasn't 12:19 14:6 | 16:19 18:6 28:2,8 |
| Street 1:11,23 | testified 2:4 | transcript 33:10 | 20:17 22:12 | Young 1:10,18 |
| stuff 13:20 18:18 | testifying 30:7,13 | transcription 33:8 | waves 20:20 | younger 18:11 20:6 |
| 26:9 28:15 | 30:15 | transfer 28:15,16 | way 3:4 6:18 10:5 | 20:7,7,19 |
| style 28:6 | testimony 33:10 | 28:18 | 11:21 12:3 20:9 | |
| subject 16:1 | their 20:20 28:18 | transferring 28:13 | 22:24 | _____ |
| suit 33:12 | thing 13:15 27:14 | trapped 26:19 | Wednesday 1:11 | **Z** |
| supervisor 7:11 | 29:8,11 30:18 | tried 26:5 28:4 | 29:23 33:5 | Zocor 30:18 |
| 8:15,16 9:5,8,11 | things 9:1 18:10,12 | tries 23:10 | week 4:9 5:12 7:10 | |
| 9:12,16,20 27:15 | 19:2 20:20 21:1 | trivial 19:2 | 7:15,15 8:11 | _____ |
| 27:24 | 21:11 27:5 29:8 | true 33:9 | 17:17 22:5 25:18 | **0** |
| support 5:3 | think 5:6,9,11 6:1 | try 15:7 | 29:23 | 04-970-JJF 1:6 |
| supposed 21:12 | 8:14,17 10:17,24 | trying 13:1 14:21 | weeks 5:17 6:7 8:12 | |
| sure 16:10 25:16 | 11:4,23 12:4 | 19:16,23 21:4,15 | 8:12 | _____ |
| 26:6 | 13:22 14:12 19:7 | 23:6,7 | weight 23:11 | **1** |
| surrounding 16:8 | 21:24 23:2,20 | Tuesday 30:3 | well 6:19 22:19 | 10:15 1:11 |
| sworn 2:3 33:6 | 24:21 26:4,4,5,10 | Tuesdays 29:24 | 23:10 26:13 27:16 | 10:55 30:24 |
| | 26:18 27:23,24 | two 5:16,17 8:11 | went 8:12,13 10:13 | 1000 1:10 |
| _____ | 29:15 | 14:12 15:5,5 19:6 | 22:11 25:20 | 11-7-42 2:13 |
| **T** | thinking 9:20 | 19:22 29:2 | were 27:5 29:8 31:6 | 1330 1:23 |
| T 31:5 | third 11:6,19 12:2 | | 33:7 | 153:20 |
| table 20:17 29:3 | 12:20 14:7 | _____ | West 1:11 | 1509 1:15 |
| take 3:5,14,15 7:12 | though 6:8 | **U** | we'll 3:13 11:4,12 | 17th 1:11,18 |
| 7:14 20:2 23:1,2,3 | thought 14:3 | uh-huh 3:8 29:7,7 | we're 17:7 18:13 | 18 3:20 |
| 23:4,9 25:2,21 | three 5:6 8:12 12:7 | under 33:8 | whatnot 12:10 | 19801 1:16,19,23 |
| 28:1,16,17,23 | 14:8 19:6 29:2 | understand 3:11 | while 5:20 | 19806 2:18 |
| 30:17,18,19 | tight 28:8 | 18:16 | wife 27:9 | |
| taken 1:9 28:11 | time 3:4,13 4:8 5:5 | UNITED 1:1 | WILCOX 1:23 | _____ |
| 30:10 33:7 | 5:7,15 8:19 10:10 | until 13:4 | Wilmington 1:11,16 | **2** |
| taking 26:5 30:5,10 | | upset 7:23 11:22 | 1:19,23 2:18 | 2 31:4 |
| | | | witness 9:15,19 | 20 30:19 |
| | | | | 200 5:16 |
| | | | | 2001 6:2 |
| | | | | 2003 15:11 16:13 |

Snyder
Edward Vouras

v.
C.A. # 04-970-JJF

CitiSteel, USA, Inc.
September 6, 2006

Page 38

**2006** 1:12 5:11,21
      5:23 33:5
**2008** 33:18
**22** 4:19
**23** 4:19
**233-RPR** 33:17

_____3_____

**300** 5:16
**302** 1:24
**31** 33:18
**32** 31:7
**33** 31:8

_____6_____

**6** 1:11 33:5
**63** 16:19 18:6,9
     19:20,24
**655-0477** 1:24

B- 0516



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Snyder

# v.

# CitySteel, USA Inc.

### C.A. # 04-970-JJF

---

### Transcript of:

### Cynthia L. Wright, LPCMH

### September 6, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

Snyder
Cynthia L. Wright, LPCMH

v.
C.A. # 04-970-JJF

CitySteel, USA Inc.
September 6, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TERRY L. SNYDER,                          )
                                          )
            Plaintiff,                    )
                                          )   Civil Action
v.                                        )   No. 04-970-JJF
                                          )
CITISTEEL, USA INC.,                      )
                                          )
            Defendant.                    )

        Deposition of CYNTHIA L. WRIGHT, LPCMH,
taken pursuant to notice at the law offices of Young
Conaway Stargatt & Taylor, LLP, The Brandywine
Building, 1000 West Street, 17th Floor, Wilmington,
Delaware, beginning at 10:55 a.m., on Wednesday,
September 6, 2006, before Terry Barbano Burke, RMR-CRR
and Notary Public.

APPEARANCES:

            LORI A. BREWINGTON, ESQUIRE
            MARGOLIS EDELSTEIN
              1509 Gilpin Avenue
              Wilmington, Delaware   19801
              For the Plaintiff

            MARGARET M. DiBIANCA, ESQUIRE
            YOUNG CONAWAY STARGATT & TAYLOR LLP
              The Brandywine Building - 17th Floor
              Wilmington, Delaware   19801
              For the Defendant

                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                  (302) 655-0477
                  www.wilfet.com                    B-0518

Page 2

1       CYNTHIA L. WRIGHT, LPCMH,
2    the deponent herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5  BY MS. DiBIANCA:
6    Q.  Good morning.
7    A.  Hello.
8    Q.  Would you like to go ahead and say and spell
9  your name for the record for us.
10   A.  Cynthia, C-Y-N-T-H-I-A, L. Wright,
11  W-R-I-G-H-T.
12   Q.  You are employed by?
13   A.  New Perspectives, Incorporated. It's a
14  private practice.
15   Q.  What do you do?
16   A.  I'm a licensed professional counselor of
17  mental health.
18   Q.  How long have you been doing that?
19   A.  At New Perspectives or total?
20   Q.  Just generally.
21   A.  16 years.
22   Q.  Before New Perspectives, you worked?
23   A.  Concord Wellness Center. It was also a
24  private practice. I was there for about two years and

Page 3

1  then prior to that, I was at a mental health agency in
2  Carneys Point, New Jersey, for ten years, The
3  Healthcare Commons.
4    Q.  At New Perspectives, can you just describe
5  what you do?
6    A.  I'm sorry, a therapist. I see adult clients
7  individually, and that's what I have been doing pretty
8  much for 16 years. I do adults in individual therapy.
9  Some group therapy, but not at New Perspectives.
10       Concord Wellness Center was the same
11  private practice, group practice. It disbanded.
12  That's why I ended up at New Perspectives.
13   Q.  How did the patients get to you? Are they
14  referred?
15   A.  Uh-huh.
16   Q.  Who are they referred by?
17   A.  Insurance companies or family physicians or
18  word of mouth.
19   Q.  And do you know why we're here today?
20   A.  To talk about Terry Snyder.
21   Q.  Yes. But only briefly because it's my
22  birthday today.
23   A.  Good. Happy birthday.
24       MS. DiBIANCA: I am going to go ahead and

Page 4

1  move this in as Wright 1.
2       (Wright-1 was marked for identification.)
3  BY MS. DiBIANCA:
4    Q.  What I have handed you are the documents that
5  Terry Snyder produced during discovery.
6    A.  Uh-huh.
7    Q.  So she had apparently kept some of her
8  records, and can you tell me --
9    A.  Actually, this was sent to another lawyer. I
10  never sent Terry. Clients don't get their records. So
11  it was sent obviously to another attorney.
12   Q.  Mr. Neuberger?
13   A.  Yes, it was a long time ago. I don't remember
14  who it was sent to, but I don't think I gave it to
15  Terry. Yes, these are mine.
16   Q.  Did you want to actually take a minute to look
17  at them? I want you to have as much time as you need
18  to look at them.
19   A.  (Pause.)
20   Q.  In part what I do want to do is actually just
21  have you explain them to me.
22   A.  Explain what? I'm going to read them?
23   Q.  No. We don't want to be silly about it.
24       Let me ask you this: Do you recall just

Page 5

1  from memory Terry?
2    A.  Uh-huh.
3    Q.  Tell me just from your memory what you recall.
4    A.  Well, I liked her. She was a very strong
5  individual, appeared strong. She had a big presence
6  about her, but definitely struggling with a lot of
7  issues. Obviously that's why she came. I was just
8  looking at -- I think I was wrong. I might have
9  written that wrong, past one and a half years. Because
10  I know when I first saw her, she just had left
11  CitiSteel and she came to see me because of anxiety,
12  depression, being out of work. She was really upset.
13       And then I think that was basically the
14  focus of our treatment, trying to help her control the
15  anxiety and panic.
16       I remember her being pretty paranoid for
17  the first couple of weeks, maybe even months, looking
18  back at my notes, just worried about what was going to
19  happen because she had quit the CitiSteel under
20  circumstances where she was really worried, you know,
21  that they might -- she was worried that somebody was
22  going to come after her or harm her in some way, just
23  kind of overwhelmed with, you know, a big company and
24  her feeling that she was harassed and them not

2 (Pages 2 to 5)

Snyder                                           v.                    CitySteel, USA Inc.
Cynthia L. Wright, LPCMH              C.A. # 04-970-JJF              September 6, 2006

Page 6

1  believing her.
2         I think at the time her boyfriend was
3  also an employee there in a different area, but was
4  worried for him as well, like that it was going to
5  reflect badly on him if he were involved some way. I
6  know that was a big conflict with the two of them, just
7  what was going on with Terry.
8         Just feeling worried like not knowing
9  what was going to happen with the outcome, I think it
10  was the unemployment, that was what brought her. She
11  had an unemployment hearing.
12         She was real worried about seeing her
13  employer, her former employer, being really scared
14  about him just in general, just scared about that.
15         She felt it was, she was wrongly
16  terminated. I guess that was part of the unemployment
17  hearings because she -- they stated she quit, but she
18  felt she was forced to leave because she was being
19  transferred or being put in a place where she didn't
20  want to be, so that's why she left.
21         So in her view it wasn't that she quit
22  because she wanted to quit. She left because they were
23  putting her in a place where she wasn't comfortable.
24         And I think the issues with the sexual

Page 7

1  harassment allegation, that was not resolved.
2  Q.   When, you mean by the time --
3  A.   Well, when she was still there, she felt like
4  they didn't believe her and nothing was changing and
5  she was scared. And again, so that's pretty much why
6  she sought treatment at the time that I saw her, which
7  was April of '03.
8  Q.   April of '03?
9  A.   That's the first date I saw her, April 28th
10  was our initial assessment.
11         Do you want me to just keep talking?
12  I'm not sure.
13  Q.   Let me see if I can back up and get a few
14  specifics.
15  A.   Uh-huh.
16  Q.   So we have April 28 was her first day. Do we
17  know how she came to find you or how she was referred
18  to you?
19  A.   It looks like the referral form here -- she
20  called in herself on the 22nd of April and she was
21  referred by her primarily care doctor, Dr. Goodman.
22  And typically when a doctor says I think you should go
23  to counseling, they say mostly it's like look in your
24  provider list and see what provider's around. I'm not

Page 8

1  sure, it doesn't say specifically that he -- well,
2  because she had Blue Cross and we're on the provider
3  list for Blue Cross, so that's pretty much how that
4  works. If your family doctor says you should look into
5  counseling, they just look on their list of providers
6  and make phone calls until somebody can schedule.
7         And her reason when she called, the
8  reason for the appointment was sexually harassed by
9  supervisor, depressed, very down, life has stopped,
10  can't resume normal activities.
11  Q.   And then we're just going to say for the
12  record that that's --
13  A.   That's on the patient information form from
14  Concord Wellness Center.
15  Q.   And that's marked as Plaintiffs 643 and
16  Exhibit Page 12. Goodness knows I'll never remember
17  that.
18         We talked a bit about paranoia, anxiety.
19  Was depression part of that as well?
20  A.   Definitely, yes. If I can read the little
21  checklist. She reported depressed mood, irritability,
22  sleep disturbance, difficulty concentrating.
23  Q.   What page are you on?
24  A.   I'm on my Page 3.

Page 9

1  Q.   Okay, exhibit Page 3, great.
2  A.   Decrease in sex drive. Decrease in appetite.
3  At the time she was on a diet, but she apparently had,
4  her weight had fluctuated so that wasn't really --
5  because of the current circumstances.
6         And possibly she was a little manic when
7  I saw her. Spending spree. Not sure if she was
8  bipolar. I think it was more the circumstances. She
9  reported anxiety, that definitely had increased
10  recently because of the work stress. I did write down
11  here that she seemed extremely more than just worried,
12  but like bordering paranoia, about neighbors, scared to
13  be alone. She was worried about the ex-employer
14  retaliating. That's what I couldn't think of,
15  retaliating.
16         And as the weeks went on as we talked,
17  you know, she was having some nightmares. And I did, I
18  think on the diagnosis page, I ruled out PDSD. No, I
19  didn't. That was something I think in my notes,
20  posttraumatic stress disorder. She was exhibiting some
21  symptoms of that afterwards, just avoiding situations,
22  avoiding being out, not wanting to go a certain way
23  because she didn't want to run into anybody by chance
24  that she worked with. Again, she didn't want to be

3 (Pages 6 to 9)

Snyder                                      v.                        CitySteel, USA Inc.
Cynthia L. Wright, LPCMH           C.A. # 04-970-JJF                  September 6, 2006

Page 10

1   alone.
2   Q.   You did rule that out?
3   A.   Yeah. I think I ruled that out on my -- when
4   I say rule out, I mean I don't have to like write that
5   down after every note, but in my diagnosis later I
6   think I was going to rule that out. I didn't write it
7   in my first treatment request on the insurance form
8   where I have to give a diagnosis.
9        She was really suffering at that point.
10  That's why I had recommended she get a medication
11  evaluation.
12  Q.   Did she?
13  A.   Yes. And Dr. Goodman, her primary care
14  doctor. She was more comfortable with him, so she
15  didn't go to a psychiatrist, which, you know, that's a
16  personal preference. I usually recommend a
17  psychiatrist, but if the person's already really upset
18  and it's going to be hard enough to get them in to see
19  a doctor, if the family doctor's comfortable
20  prescribing psychotropics then that's fine. So it
21  looks like she did, probably maybe after the third
22  session. I'm just looking on my treatment form. But
23  by the sixth -- eighth session, I have to do another
24  treatment plan review, and so it was written on there

Page 11

1   that she was already on Lexapro, Remeron and Xanax from
2   Dr. Goodman.
3   Q.   So that would have been 6-10-03?
4   A.   Yes, uh-huh.
5   Q.   And that's Page 13 of the exhibit.
6        So Dr. Goodman at that point was
7   prescribing?
8   A.   Yes, the psychotropics.
9   Q.   And just really quickly for the record,
10  Lexapro, Xanax, they do what?
11  A.   Lexapro's an antidepressant. Remeron is an
12  antidepressant, also a sleep aid, and a Xanax is an
13  anxiolytic, antianxiety medication.
14  Q.   So you had recommended to her that she should
15  get a medication evaluation?
16  A.   Yes. Because of the symptoms. And these were
17  new. She hadn't reported any problems in the past with
18  all the symptoms I just checked off. I mean on the
19  checklist it has absent, present and past.
20  Q.   Right.
21  A.   There are like a couple in the past that she
22  had been depressed a little bit in the past, but like
23  really none of these, the anxiety wasn't an issue, all
24  the other difficulty, concentrating, sleep disturbance,

Page 12

1   none of those seemed to have been a problem for her in
2   the past that she could recall.
3        But they definitely were affecting her
4   level of functioning at the time I saw her. That's why
5   I recommended she get an evaluation from a psychiatrist
6   or a medical doctor for that medication.
7   Q.   You did explain already why it would be
8   beneficial for someone to go to their family doctor,
9   that's who they're comfortable with.
10  A.   She was already really anxious. It was hard
11  for her to even come to see me, so she was comfortable
12  with her family doctor and he was obviously comfortable
13  with prescribing those medications. Some doctors will
14  say, you know, I'd prefer that you see a psychiatrist
15  and that's just I think a personal preference for the
16  family physician.
17  Q.   So did she indicate that she didn't want to
18  see a psychiatrist or that she --
19  A.   I don't recall. I think I gave her the
20  option. I said typically people, you know, you can see
21  a psychiatrist or you can see your family doctor. It
22  just was a preference.
23        I don't recall if I pushed the
24  psychiatrist because we did, we did have a psychiatrist

Page 13

1   at our office. She might have stated that she'd rather
2   go to Dr. Goodman, but I don't remember writing that
3   down anywhere.
4   Q.   That's fine.
5        And then where we see 6-10-03, and at
6   that point she is on some medication.
7   A.   Uh-huh.
8   Q.   Do you recall if she was, if the medication
9   was helping her?
10  A.   It was, but there was an issue with, she
11  wasn't always compliant. Again, just her reservations
12  about taking medication and a lot of people have that.
13  They don't want to have to take them forever and,
14  again, just sometimes her concern and her paranoia
15  about the whole situation. I think that just kind of
16  impacted her decision making, like, oh, I don't want to
17  be on these meds forever, I don't want to be relying on
18  them, but I did recommend that she be compliant. If
19  she was going to take the medication, she needed to
20  take the meds prescribed, not like every now and then.
21        And so we did, because I looked back on
22  some of this, and I do remember us talking about that.
23        She would, she understood that, and
24  stuck with the medication. But there have been times

4 (Pages 10 to 13)

Snyder                                    v.                         CitySteel, USA Inc.
Cynthia L. Wright, LPCMH        C.A. # 04-970-JJF              September 6, 2006

Page 14

1  where she wasn't sure. Yes, like on the notes I'm
2  looking at, June 3rd of '03. My notes here from the
3  session. We were talking about pros and cons of
4  medication. Her ambivalence about taking it. She
5  wanted to feel in control without relying on the meds.
6  And at that time she hadn't been compliant with taking
7  it every day. She was just like trying it out. A lot
8  of people do that too.
9           But then she realized with the anxiety
10  and just her moods going up and down that the
11  medication would definitely be beneficial.
12          It seemed like in June there was a
13  couple of triggers to her anxiety. I'm looking that
14  she saw a co-worker and then she saw someone who she
15  thought was her co-worker, a former co-worker driving
16  behind her and that freaked her out. You know, she got
17  really anxious, she'd be crying. Okay, if you're
18  looking at my Page 19, my notes. June 30th. We talked
19  about sticking to the medications, because it
20  definitely would help. She had agreed to continue
21  taking her medication as prescribed after she had seen
22  this person who she felt was a co-worker. She would
23  just get really paranoid thinking that people were
24  following her, and that's not uncommon for people who

Page 15

1  are really anxious, that kind of fine line between
2  worry and fear and paranoia. It all kind of blurs
3  together.
4     Q.    Then did you see a change, a real significant
5  change in her at any point? I guess I should not say
6  change as much as I should say improvement?
7     A.    I wouldn't say like significant. I'm thinking
8  huge. I mean there was -- the paranoia and the anxiety
9  definitely decreased by the end of the summer. I'm
10  looking here, my Page 20, she was hoping to find
11  another job because at that point I mean she had been
12  out of work for a couple of months and I believe she
13  was not getting unemployment. And she really wanted to
14  get back to work. She wanted to start something new
15  and so her functioning was improving that she wasn't as
16  anxious, she wasn't as tearful. She was functioning a
17  little bit better at home.
18          I think there is this one part where
19  she -- in July 28th in '03 when she was -- we were
20  focusing on interviews and job search skills and she
21  was pursuing a computer course, that she was hoping to
22  learn some new skills or improve her skills so she
23  could get a job. And that actually I don't think, she
24  didn't get the scholarship because financially she was

Page 16

1  having, you know, obviously she wasn't making any
2  money, so finances were an issue. I don't think she
3  was able to complete the course because she didn't have
4  the money to do that, and that really upset her too.
5           But she was taking her medication at that
6  point still. I was keeping track of that. So that
7  July 28th. She was continuing to take her meds as
8  prescribed. Still anxious and tense. She had had
9  periods of times where, you know, her mood was more
10  stable. I'd say that whole summer she was pretty up
11  and down. But as far as improvement, definitely there
12  was some improvement with the medication, just coming
13  and talking about, you know, how to cope better, you
14  know, talking with her mom, talking with her boyfriend.
15  She was resuming her exercising on a regular basis.
16  Still was having an issue being alone at night. Didn't
17  like that.
18          9-11-03, my notes say that she had been
19  extremely anxious and paranoid and depressed. By the
20  past two weeks after she had had contact with her
21  lawyer regarding an arbitration meeting with her
22  ex-employer -- I mean she didn't even meet with the
23  ex-employer, just having that meeting with the lawyer,
24  again, set her off. Got really anxious again.

Page 17

1           And we talked about how to calm herself
2  down and get ahold of her thoughts, you know, the
3  irrational thoughts that she would have about the
4  retaliation and fear of her former employer.
5           Talk about increasing social supports.
6  She had a friend who would kind of get her out of the
7  house.
8           It looks like we talked again about her
9  family doctor knowing what was going on and that she
10  was having regular contact with him because he was
11  prescribing the meds.
12          Because at that point her symptoms or the
13  depression and anxiety were definitely increasing.
14     Q.    They were increasing in September?
15     A.    Yes, after the incident with her lawyer.
16     Q.    How long do you think it increased before it
17  went back to where it was like in July?
18     A.    Well, it looks like -- if I saw her the 11th
19  of September, she said it had been going on for two
20  weeks prior. So I'd say like the end of August. It
21  looks like my notes are saying that she still was
22  pretty depressed and anxious.
23          She was avoiding things. That was the
24  end of September. It looks like it took about a month.

5 (Pages 14 to 17)

B- 0523

Snyder                                           v.                              CitySteel, USA Inc.
Cynthia L. Wright, LPCMH              C.A. # 04-970-JJF                September 6, 2006

Page 18

1  It looks like October 7th, focus on managing stress and
2  feeling relief that there will be no court date or
3  meeting for at least the next six months. So that kind
4  of calmed her down for a while.
5  Q.   Little did she know, the wheels of justice.
6  A.   And then there are some issues going on with
7  her boyfriend. They were kind of on again/off again.
8  That was causing some stress too.
9  Q.   Did they live together at that time?
10  A.   No. They never lived together that I was
11  aware of. She always lived with her mother. She would
12  stay with him but she lived with her mom. I think she
13  had always lived with her mom.
14      It looks like mid-October she was
15  feeling a little bit better, getting more support from
16  her boyfriend, feeling like she was better able to
17  focus. She had some job interviews. She was going to
18  the gym, trying to be more productive.
19      And then at that time -- see, I'm
20  telling you, every time she was getting a grip,
21  something else would happen. Then her cousin attempted
22  suicide and the next two months they weren't sure if he
23  was the one person that jumped off the bridge. I mean
24  they weren't -- they never found the body.

Page 19

1      So that happened October through
2  November, and then I stopped seeing her October because
3  of insurance and financial limitations. I mean she was
4  feeling better, you know, with like the job issue.
5  Obviously there were stresses going on with family, but
6  I mean she was feeling -- it says on the 16th of
7  October, feel able to cope, you know, with what was
8  going on with her cousin, the family issues, because
9  her boyfriend was supportive, her mother, and she had a
10  pretty strong support system with her extended family.
11  Q.   So October/November was the period where there
12  was obviously the stress of the cousin?
13  A.   Uh-huh.
14      And then the end of October we talked
15  about Blue Cross and Blue Shield was going to be
16  discontinuing their benefits. I think she wasn't
17  eligible for them any more and she was going to call me
18  to reschedule something once she was able to -- her dad
19  helped her out I think with paying the fee. And
20  unfortunately part of being in a private practice, we
21  didn't have sliding scale fees, couldn't afford to do
22  that.
23      But I talked with her on the phone, but
24  it looks like our last session where I saw her was the

Page 20

1  28th of October.
2      And then in July -- I'm sorry, in
3  January of '04, we had scheduled an appointment and she
4  canceled it. And it looks like February 12th and
5  February 19th of '04 we met and I do not have those
6  notes. I don't know where those notes ended up.
7      You know what? Wait a minute. I am
8  sorry, you're typing everything I'm saying out loud. I
9  was at Concord Wellness Center until May. So she saw
10  me two more times. I don't know what happened to those
11  notes.
12  Q.   After the new year started in '04?
13  A.   Yeah. Unless I gave a copy of these to her
14  lawyer before that. And then we didn't meet in
15  November, January -- I mean November and December we
16  didn't meet. So it might have been that that's when
17  the lawyer, the attorney got these records.
18      And then I think I told you when I left
19  Concord Wellness Center we, all the therapists there
20  took their charts with them because the practice was
21  like done. Like we all went our own ways and I had all
22  my clients charts at my house because there was no
23  other place to store them and they got damaged in the
24  flood. All of them are gone.

Page 21

1      So fortunately I had this much. Well, I
2  did have, my schedule books were in a different
3  location, so that's how I got all my dates, because I
4  keep my schedule book, schedule books for years and
5  years.
6      So apparently that's why I don't have the
7  notes reflected, I don't have these progress notes for
8  February because it was -- that was after the lawyer
9  had already gotten this, and then I didn't see her any
10  more.
11  Q.   Just so I make sure, we have starting in April
12  steady through the summer, October, nothing in November
13  and December.
14  A.   Yeah. She canceled an appointment in January,
15  so I didn't see her even though we had one scheduled.
16  So, yeah, November, December, January did not see her.
17  February I did. I saw her two times. And then March,
18  the end of March she scheduled. And she was improving.
19  I remember thinking she was a little bit more
20  confident. I know she was babysitting. I don't know
21  if she had a job. I know she was at a placement agency
22  or temp agency and trying to get work, but I don't
23  recall in February if she was working at that time.
24  But the anxiety obviously was less because I hadn't

6 (Pages 18 to 21)

Snyder                                v.                        CitySteel, USA Inc.
Cynthia L. Wright, LPCMH        C.A. # 04-970-JJF              September 6, 2006

Page 22

1  been seeing her.
2      Q.   Would she still be on the medicine?  That was
3  prescribed by Dr. Goodman so she could have been.  Do
4  you recall if she was?
5      A.   The last time -- and I do remember seeing that
6  on my notes -- the last time that you saw her, which
7  was October 28th, she needed to refill her medication
8  because she hadn't had any the past five days.  And
9  that could have had something to do with, again, why
10  she was really tense and tired and not able to focus.
11  I'm reading that from my notes.  And I did, I wrote on
12  here that she needs to, that Terry would call and get
13  her medication refilled.
14     Q.   So at that point she's still --
15     A.   She was still being prescribed.
16     Q.   And then do you remember anything about the
17  two February visits?
18     A.   Like I said, I remember her, you know, seeming
19  not quite as anxious.  Pretty much the paranoia, the
20  real worry about what's going to happen, that had
21  stopped at the end of the fall.  I know she was looking
22  for a job.  She was still living at home, still with
23  the boyfriend kind of on and off again.  I mean it
24  didn't seem like anything had changed a whole lot.  But

Page 23

1  I don't recall if she had gotten a job.  I don't think
2  she did.  I think she was going to be receiving
3  Medicaid and that's when she was going to, you know,
4  start up treatment, counseling again.  But just didn't
5  and then just kind of dropped out.  As is with a lot of
6  clients in private practice, I don't call people.  Like
7  at an agency you have to call.  You really don't have
8  to, and if the client isn't interested -- I mean she
9  wasn't being mandated to come so I don't keep checking
10  up on people.  After she didn't show, I probably made
11  one phone call, sent her a little form letter saying we
12  didn't hear from you, so I didn't hear from her.  And
13  we didn't meet any more.
14         But then when I left Concord Wellness
15  Center, which was in May -- well, May I began, in May I
16  began at New Perspective.  So I ended April of 2004 at
17  Concord Wellness Center and then picked up with the
18  clients that followed me to New Perspectives.  And
19  those who didn't, I sent letters saying this is where I
20  am, here's my phone number and address.
21         And so she did call me, it says here, my
22  last contact I had with Terry -- I'm reading my little
23  letter that I gave to you, that the last phone call I
24  had -- and I keep track of phone calls just on a piece

Page 24

1  of paper that I have in my desk that I returned this
2  message on October 15th of '04 at New Perspectives.
3  And she said, you know, does your office take Medicaid,
4  and I said yes.  And she was going to call me when her
5  Medicaid kicked in and she could arrange to get to her
6  office, and then she never did.
7         So I pretty much didn't see her that
8  whole, except for two times in February.
9         But she did know where I was at New
10  Perspectives and I had planned on seeing her, but it
11  just never worked out.
12     Q.   Do you remember, did she discuss with you the
13  condition, what was making her upset, her feelings
14  about -- obviously she discussed her feelings.
15     A.   Uh-huh.
16     Q.   But did she discuss the factual part of her
17  employment at CitiSteel?
18     A.   About the sexual harassment?
19     Q.   Right.
20     A.   I remember talking, because we did talk a lot
21  about that in the beginning.  I remember she said one
22  incident was -- I don't know who -- I forget who "he"
23  was.
24     Q.   His name is Randolph?

Page 25

1      A.   Yes, Randolph.  Now it's coming back,
2  Randolph.
3         That he, I don't want to say pinched her
4  ass, but he touched her butt.  I'm sorry, I said a bad
5  word.  And she said something to him and he just kind
6  of laughed it off.
7         And there was another time where he kind
8  of propositioned her.  He basically asked her out, go
9  out for a drink or something, and she thought that was
10  really inappropriate.
11         She was really intimidated by him.  I
12  just remember that feeling, that she was really -- it
13  really scared her and upset her.  And she's not a small
14  person.  So I don't know if she kind of portrays
15  herself as anybody can kind of take a joke or you can
16  say whatever you want, I don't know, she can hold her
17  own.  But I know she was really scared, she was really
18  upset that she had reported that to I guess a boss,
19  that he had touched her inappropriately when she walked
20  by, and another time when he kind of asked her out for
21  a drink or something to that effect.
22         And it was just kind of brushed off,
23  don't worry about it.  I think she had told her
24  boyfriend and he was really upset about it.

7 (Pages 22 to 25)

Snyder                                          v.                    CitySteel, USA Inc.
Cynthia L. Wright, LPCMH            C.A. # 04-970-JJF              September 6, 2006

Page 26

1   And then I don't recall like how, like
2   the chain of events that led to her --
3   Q.   Leaving there?
4   A.   Yeah. There was some movement. I don't know,
5   they were putting her somewhere else in a different
6   office. She might have, she might have -- that might
7   have been when they moved her, I think when she
8   complained about what Randolph had done and didn't feel
9   comfortable there and wanted something like done about
10  it. And they weren't -- I don't know if they weren't
11  going to do something about it or they were going to
12  put her like in a completely different office where she
13  wasn't comfortable, she just didn't -- that wasn't the
14  job that she wanted.
15          I know that sounds all kind of
16  wishy-washy, but I know it seemed kind of abrupt that
17  all of a sudden she was no longer at the desk that she
18  was used to sitting at, and that's why she felt like
19  I'm just going to have to leave because she kind of
20  felt like they were pretty much pushing her out, making
21  her life miserable by being in this other position.
22  Like I said, I don't recall -- I don't know if it was
23  in the factory part, like where the big heavy steel
24  area is, the hard hat area.

Page 27

1           I know there is a big reason why -- she
2   didn't want to be in this other place. She was
3   comfortable. She just wanted something done about what
4   Randolph had done and nothing was done. So that's kind
5   of what I remember.
6   Q.   Then would you say -- so she has anxiety, or
7   I'll say anxiety, but meaning all the things you talked
8   about, anxiety, depression, paranoia, all of them
9   lumped together --
10  A.   Uh-huh.
11  Q.   -- she had anxiety about the issues that she
12  had with Randolph, and then also I think you talked
13  about sort of the company sort of would be out to get
14  her?
15  A.   Well, because it was a big company and, you
16  know, good old boys kind of atmosphere and a lot of
17  men. She was like one of the only women that worked
18  there. I mean it is a steel factory. You know, there
19  weren't a whole lot of females around.
20          It was kind of intimidating, even though
21  her boyfriend worked there, she never saw him because
22  he was in the plant. He was in the office area.
23          She was worried that no one believed
24  her. Obviously they didn't, in her opinion, because

Page 28

1   they didn't do any changing other than putting her
2   somewhere else where she didn't really understand why
3   they put her there. It made her miserable. She was
4   just really depressed and upset, and then when she
5   finally did quit -- and I don't know what -- I don't
6   recall if she -- somebody said something to her that
7   made her think that they were going to do something,
8   but she felt that, that these big guys were going to,
9   you know, retaliate or retaliate against her boyfriend
10  who was still there. Because apparently she knew some
11  stuff that had happened that wasn't real legitimate and
12  felt worried about that.
13          So, you know, obviously as her therapist
14  I'm going to believe what she says. There's no reason
15  for me not to believe what she says. She was pretty
16  anxious. I mean she was not doing well for a long time
17  when we first started meeting. She was really -- her
18  level of functioning really was low, barely getting to
19  appointments and --
20  Q.   Did she have a hard time getting to
21  appointments?
22  A.   Yeah. I mean she would call. There was some.
23  Even if you look, June she canceled, July she canceled.
24  August she canceled twice. September she canceled.

Page 29

1   Well, she canceled once and didn't show once. So I
2   mean her attendance was a little iffy and that
3   sometimes had to do with just feeling really anxious
4   and not wanting to leave her house.
5           Like I said, told you about the two
6   instances where actually she ran into a co-worker I
7   think in the gym and then another time she thought she
8   saw a co-worker, somebody who looked like a co-worker
9   in the car behind her.
10          And those two times -- I mean that just
11  set her off. Then she got real paranoid and didn't
12  want to be alone and that would definitely escalate her
13  symptoms.
14          Am I answering the question?
15  Q.   Absolutely, yes.                       B-0525
16  A.   Am I talking too much?
17  Q.   We're almost done, actually.
18  A.   I really did like Terry. She had a lot going
19  on and I felt she was trying really hard to get back on
20  track and she wanted to work. She wanted to be
21  productive. Because she had always been productive,
22  always been a good employee and worked all the time,
23  you know, from her work history, being out of a job and
24  feeling so incapacitated because of her fear. And

8 (Pages 26 to 29)

Snyder
Cynthia L. Wright, LPCMH

v.
C.A. # 04-970-JJF

CitySteel, USA Inc.
September 6, 2006

Page 30

1  having I guess the arbitration or the unemployment
2  hearing hanging over her head and knowing that she had
3  this lawsuit, that really scared her too. I mean she
4  was worried. She was trying to put that stuff kind of
5  compartmentalize it, put it down so she could focus on
6  getting another job.
7        Like I said, that really interfered with
8  her ability to focus and get another job.
9    Q.   Did she have other things that were stressors?
10 I mean obviously we've got the work situation.
11   A.   Uh-huh.
12   Q.   The ex-employer. Were there other things that
13 were causing her, I mean lots of things cause stress,
14 but --
15   A.   Her boyfriend, I wouldn't say it was major
16 stress. It was like that was the history of their
17 relationship. Like up and down and up and down. It
18 wasn't like dramatic like she'd come in crying if they
19 had a fight. The work was the number one issue, the
20 stressors.
21        She lived at home with her mom, had a
22 good relationship with her. And her dad, had a fairly
23 good relationship with him. Had contact with him. It
24 was basically the finances she was really upset that

Page 32

1  I'm not sure. People get hooked on that easy.
2        MS. DiBIANCA: Lori, do you have
3  anything?
4        MS. BREWINGTON: I have a few, I think.
5        MS. DiBIANCA: I will go ahead and say
6  I'm done holding onto any things that pop up during
7  Lori's questions.
8  BY MS. BREWINGTON:
9    Q.   Can I show you Page 25, on 10-24-03, and it
10 says, A, and it's circled. Is that action, is that for
11 action?
12   A.   It's either about or at.
13   Q.   Or assessment? It is at, okay.
14   A.   N is narrative, A is affect, P is plan.
15   Q.   Can you read that for me?
16   A.   Her mood was elevated, talkative, silly,
17 tangential, superficially cheerful and joking. Joking
18 around to avoid feeling sad or angry.
19   Q.   Is that what she told you or is that --
20   A.   That's my impression of her affect. My
21 assessment.
22        So, yeah, that's the A's in the little
23 format of how I write my notes. The N is just kind of
24 the narrative. And I write too much in my notes. This

Page 31

1  she couldn't get a job and she really wanted that. I
2  remember when I looked at my notes, I remember that
3  computer course that she was really psyched about
4  taking, because it was going to help her, you know, get
5  a job and then she couldn't -- she couldn't afford to
6  take the class. They didn't give her the scholarship.
7  That's when she started -- she was babysitting here and
8  there for a girlfriend. And that was pretty much her
9  only source of income.
10       I would say definitely the job was like
11 the number one stressors.
12   Q.   Trazodone, would that be something that --
13   A.   That's an antidepressant. It's really not a
14 good antidepressant. Mind you, I'm not a psychiatrist.
15 I don't know how much weight you can put on, my
16 opinion. But I know the psychiatrist that I have
17 worked with say that they use it more as a sleep aid.
18 It is an antidepressant but it doesn't do much for the
19 mood. It does help with sleep. People are usually
20 prescribed that because they can't sleep. It is not as
21 bad as other sleeping meds.
22   Q.   It doesn't have the side effects or the
23 addiction or whatnot?
24   A.   I am not sure it's quite as bad as Ambien.

Page 33

1  is the bad thing I guess. Or good depending on how you
2  look at it. But the N is the narrative. What we
3  talked about, what the issue was.
4        The A is the affect or assessment of her
5  affect. Her mood, what was she presenting.
6        So a lot of times -- and like I said,
7  she's very dramatic. I don't know if she still is.
8  But I remember her being very dramatic and animated and
9  talkative and sometimes she would come in and she would
10 be absolutely not that. So there was definite shifts
11 in whether her mood was elevated where she was kind of
12 up and sometimes she'd be really silly and she would
13 just like kind of talk about everything and anything
14 and nothing at all. It was hard to keep her on task.
15   Q.   But was that because she was hiding like pain
16 or was that just you think her personality?
17   A.   That's what my opinion was I guess at that
18 point that she was trying to avoid feeling sad because
19 this was regarding her cousin. Her cousin's apparent
20 suicide and that the body hadn't been located yet. So
21 the fact that she was acting silly and joking, I
22 thought that was just a front.
23   Q.   You mentioned earlier that Terry Snyder, and I
24 don't want to put words in your mouth, so correct me if

Snyder
Cynthia L. Wright, LPCMH

v.

C.A. # 04-970-JJF

CitySteel, USA Inc.
September 6, 2006

Page 34

1  I am wrong, that Terry Snyder seemed like a person to
2  hold her own?
3  **A. Uh-huh.**
4  Q.   Is that a fair assessment?
5  **A. Uh-huh.**
6  Q.   Tell me why you feel that way.
7  **A. She just has like a big personality. The**
8  **first time I met her I was like wow. She's just a big**
9  **person, beautiful big hair, and I just remember certain**
10 **people you just remember the first time you met them.**
11 **She had like a bright hot pink sweat, you know, those**
12 **like Velcro --**
13      MS. DiBIANCA:  Jumpsuit.
14      THE WITNESS:  Yes, jumpsuit.  Big hair.
15 She was just like big and had -- I'm not going to say
16 she was loud.  She had a nice speaking voice,
17 confident.  But yet it is superficial.
18 BY MS. BREWINGTON:
19 Q.   That's what I was going to ask you about.
20 **A. It didn't seem real. It seemed too much.**
21 Q.   So my question is, then, did it surprise you
22 that she was intimidated by Randolph Harris or that she
23 was somehow paranoid or anxious about CitiSteel?
24 **A. Did it surprise me? Well, I guess that's when**

Page 35

1  **I thought, wow, she really is not as strong as she**
2  **projects herself. That she's really very fragile. And**
3  **obviously that was my first impression when she's**
4  **telling me all this stuff about this employer, and then**
5  **the next couple of times I see her, I'm like wow, she's**
6  **really very insecure and worried and not very**
7  **confident.**
8      **I mean she tries to be confident. I'm**
9  **not saying she isn't, but it was just my impression**
10 **that she just, you know, this really knocked her off**
11 **her feet. Like wow, this has never happened. Where I**
12 **guess, you know, she had always, you know, been pretty**
13 **strong and independent and could take care of herself**
14 **and this really knocked her for a loop. And that**
15 **people would say that she's making this up and that**
16 **really got her upset, and then I think that turned**
17 **into, wow, like she was kind of doubting herself or**
18 **second guessing, well, what should I do now? No one's**
19 **believing me and she was really intimidated by them.**
20 Q.   As a therapist, are you trained to determine
21 whether -- this might sound crazy because I'm not sure
22 what I'm trying to get at -- whether what the person is
23 telling you is consistent with a diagnosis of anxiety
24 or depression?  Or is it more of you take it for face

Page 36

1  value?  Do you understand my question?  I guess what
2  I'm trying to ask is, were you able to assess whether
3  there was any genuineness to Miss Snyder?
4  **A. Oh, I thought she was genuine. Like I**
5  **believed her. I didn't think this was just fabricated.**
6  **I mean she -- whether that's just because I had a**
7  **positive transference, you know, I liked her, she was a**
8  **likeable person. She was very interesting. And she**
9  **was really, you know, showed me emotion and I saw**
10 **the ups and the downs. So I believed her.**
11     **So take that for what it's worth.**
12 **That's part of just something you can't explain. It's**
13 **like following your gut. I believed that, wow, she was**
14 **really in a lot of pain. I don't feel like she was**
15 **like this malingerer who was fabricating all this and**
16 **making up how paranoid she was. Because she was**
17 **really -- she appeared to me to be struggling**
18 **emotionally with this, really just how she talked, how**
19 **she presented herself, kind of her changes in mood when**
20 **we were talking about certain things. Her confidence.**
21 **So as far as your training, you just get to, you learn**
22 **about it as you meet with more clients. I mean that's**
23 **kind of how you get better at therapy, just seeing**
24 **people and seeing what's consistent with anxiety and**

Page 37

1  **pain. Paranoia versus making it up. And I didn't feel**
2  **like she was making it up. I think she was genuinely**
3  **really freaked out about this. Why? I mean she just**
4  **was. I didn't question why. Why did that man upset**
5  **you so much? It just was very upsetting to her because**
6  **she felt no one was believing her, no one was behind**
7  **her with this and that it was all her, not -- she**
8  **really felt ganged up on.**
9      MS. BREWINGTON:  I am finished.
10 BY MS. DiBIANCA:
11 Q.   Just what I get out of that is you believed
12 that she sincerely held her emotions, that her emotions
13 were true to her?
14 **A. Uh-huh.**
15 Q.   Were you looking at the truthfulness of the
16 reasons behind those emotions or just the emotions?
17 **A. Well, my focus was helping her to control the**
18 **anxiety and the panic so she could get out of her**
19 **house, she could get back to getting a job and being a**
20 **productive person. Because at that point that I saw**
21 **her she wasn't. She was a mess. Even though when she**
22 **came in all big and wild, I mean that was just kind of**
23 **bells and whistles to kind of get you to look over here**
24 **to see -- not so you see I'm really scared, really**

10 (Pages 34 to 37)

Snyder                                                    v.                                    CitySteel, USA Inc.
Cynthia L. Wright, LPCMH                      C.A. # 04-970-JJF                    September 6, 2006

Page 38

1   anxious.
2         The first impressions, that's why we
3   have these rule outs of the diagnosis, it can change.
4   When people get more comfortable with you and tell you
5   what they're really thinking, it doesn't always happen.
6   It rarely happens in the first session, that they can
7   tell you. I don't expect people to just tell me
8   everything even though I got all these questions that I
9   ask. It is hard to talk about a lot of things,
10  especially when you're feeling vulnerable and they
11  don't know who I am.
12        Am I going to judge them, am I going to
13  treat them differently? Obviously it is my job. I'm
14  not. But people still feel very vulnerable when they
15  come in.
16  Q.   And then did she talk to you at all about
17  another lawsuit that she had been or was currently
18  involved in, or was that the only legal issue?
19  A.   I don't remember. I don't remember.
20  Q.   And then do you remember if she discussed her
21  mother, whether her mother had a history of depression
22  issues?
23  A.   I know with the family history, I don't recall
24  her mom having depression. I don't remember. I really

Page 39

1   don't remember. I know the family dynamics were stuff
2   that her mom and dad never married, and it was kind of
3   an interesting, you know, family dynamic. They
4   remained close, but like never together.
5         I did see her mom once in the waiting
6   room. Small little woman. Not what I pictured like
7   Terry's mom to be. She seemed a little anxious. As we
8   talked, her mom, you know, probably had some depression
9   or anxiety in there, but nothing that I recall as
10  talking a whole lot about.
11        MS. DiBIANCA: I think that's all I have.
12        COURT REPORTER: Reading and signing?
13        MS. DIBIANCA: You have the option of
14  what's called reading and signing. It's generally a
15  good idea, though most people don't take the offer.
16        THE WITNESS: To read everything I just
17  said?
18        MS. DiBIANCA: You do. You have that
19  option and they will send you a transcript and then if
20  there's something that you think is, usually it's
21  spelling errors mostly. But if you feel there's
22  something in there that you in fact misstated somehow,
23  you have the ability to correct it at that time.
24        Or you can just do what's called waiving

Page 40

1   and you don't have to, they won't send you a transcript
2   and you'll say she got most of it.
3         THE WITNESS: Would the transcript be
4   something I could keep for myself or no?
5         MS. DiBIANCA: Yes.
6         THE WITNESS: I would like that.
7         MS. DiBIANCA: She will read, and then do
8   you want it to go to you?
9         MS. BREWINGTON: We will send it to you.
10        MS. DiBIANCA: It will go to Lori's
11  office and she will send it to you. By the time the
12  slow lawyers get it and we forward it, you have about
13  two weeks, so it won't be too painful to read. It
14  should be pretty short.
15        (Witness excused.)
16        (The deposition concluded at 12:05 p.m.)
17
18
19
20
21
22
23
24

Page 41

1              I N D E X
2   DEPONENT: Cynthia L. Wright, LPCMH       PAGE
3       Examination by Ms. DiBianca          2, 27
        Examination by Ms. Brewington         32
4
5          E X H I B I T S

    DEFENDANT'S DEPOSITION EXHIBITS          MARKED
6
    Wright-1   Records                   4
7
    ERRATA SHEET/DEPONENT'S SIGNATURE        PAGE 41
8
    CERTIFICATE OF REPORTER                  PAGE 42
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

B-0528

11 (Pages 38 to 41)

Snyder
Cynthia L. Wright, LPCMH

v.
C.A. # 04-970-JJF

CitySteel, USA Inc.
September 6, 2006



Page 42

1
2
3
4        REPLACE THIS PAGE
5        WITH THE ERRATA SHEET
6        AFTER IT HAS BEEN
7        COMPLETED AND SIGNED
8        BY THE DEPONENT
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 43

1    State of Delaware    )
                         )
2    New Castle County    )
3
            CERTIFICATE OF REPORTER
4
         I, Terry B. Burke, RMR-CRR and Notary Public,
5    do hereby certify that there came before me on
     September 6, 2006, the deponent herein, CYNTHIA L.
6    WRIGHT, LPCMH, who was duly sworn by me and thereafter
     examined by counsel for the respective parties;
7    that the questions asked of said deponent and the
     answers given were taken down by me in Stenotype notes
8    and thereafter transcribed by use of computer-aided
     transcription and computer printer under my direction.
9
         I further certify that the foregoing is a true
10   and correct transcript of the testimony given at said
     examination of said witness.
11
         I further certify that I am not counsel,
12   attorney, or relative of either party, or otherwise
     interested in the event of this suit.
13
14
15
16         Terry Barbano Burke, RMR-CRR
17         Certification No. 233-RPR
18         (Expires January 31, 2008)
19
20   DATED:
21
22
23
24

B- 0529

12 (Pages 42 to 43)

Wilcox & Fetzer, Ltd.        Professional Court Reporters        (302)655-0477

Snyder
Cynthia L. Wright, LPCMH

v.

C.A. # 04-970-JJF

CitySteel, USA Inc.
September 6, 2006

Page 44

| A | | | | |
|---|---|---|---|---|
| **ability** 30:8 39:23 | **allegation** 7:1 | 32:18 | **beneficial** 12:8 | 35:13 |
| **able** 16:3 18:16 | **almost** 29:17 | **arrange** 24:5 | 14:11 | **Carneys** 3:2 |
| 19:7,18 22:10 | **alone** 9:13 10:1 | **asked** 25:8,20 43:7 | **benefits** 19:16 | **Castle** 43:2 |
| 36:2 | 16:16 29:12 | **ass** 25:4 | **better** 15:17 16:13 | **cause** 30:13 |
| **about** 2:24 3:20 | **already** 10:17 11:1 | **assess** 36:2 | 18:15,16 19:4 | **causing** 18:8 30:13 |
| 4:23 5:6,18 6:12 | 12:7,10 21:9 | **assessment** 7:10 | 36:23 | **Center** 2:23 3:10 |
| 6:14,14 8:18 9:12 | **always** 13:11 18:11 | 32:13,21 33:4 | **between** 15:1 | 8:14 20:9,19 |
| 9:13 13:12,15,22 | 18:13 29:21,22 | 34:4 | **big** 5:5,23 6:6 26:23 | 23:15,17 |
| 14:3,4,19 16:13 | 35:12 38:5 | **atmosphere** 27:16 | 27:1,15 28:8 34:7 | **certain** 9:22 34:9 |
| 17:1,3,5,8,24 | **Ambien** 31:24 | **attempted** 18:21 | 34:8,9,14,15 | 36:20 |
| 19:15 22:16,20 | **ambivalence** 14:4 | **attendance** 29:2 | 37:22 | **CERTIFICATE** |
| 24:14,18,21 25:23 | **angry** 32:18 | **attorney** 4:11 20:17 | **bipolar** 9:8 | 41:8 43:3 |
| 25:24 26:8,9,11 | **animated** 33:8 | 43:12 | **birthday** 3:22,23 | **Certification** 43:17 |
| 27:3,8,11,13 | **another** 4:9,11 | **August** 17:20 28:24 | **bit** 8:18 11:22 15:17 | **certify** 43:5,9,11 |
| 28:12 29:5 31:3 | 10:23 15:11 25:7 | **Avenue** 1:15 | 18:15 21:19 | **chain** 26:2 |
| 32:12 33:3,13 | 25:20 29:7 30:6,8 | **avoid** 32:18 33:18 | **Blue** 8:2,3 19:15,15 | **chance** 9:23 |
| 34:19,23 35:4 | 38:17 | **avoiding** 9:21,22 | **blurs** 15:2 | **change** 15:4,5,6 |
| 36:20,22 37:3 | **answering** 29:14 | 17:23 | **body** 18:24 33:20 | 38:3 |
| 38:9,16 39:10 | **answers** 43:7 | **aware** 18:11 | **book** 21:4 | **changed** 22:24 |
| 40:12 | **antianxiety** 11:13 | **A's** 32:22 | **books** 21:2,4 | **changes** 36:19 |
| **abrupt** 26:16 | **antidepressant** | **a.m** 1:11 | **bordering** 9:12 | **changing** 7:4 28:1 |
| **absent** 11:19 | 11:11,12 31:13,14 | | **boss** 25:18 | **charts** 20:20,22 |
| **absolutely** 29:15 | 31:18 | B | **boyfriend** 6:2 16:14 | **checked** 11:18 |
| 33:10 | **anxiety** 5:11,15 | **B** 41:4 43:4 | 18:7,16 19:9 | **checking** 23:9 |
| **acting** 33:21 | 8:18 9:9 11:23 | **babysitting** 21:20 | 22:23 25:24 27:21 | **checklist** 8:21 11:19 |
| **action** 1:5 32:10,11 | 14:9,13 15:8 | 31:7 | 28:9 30:15 | **cheerful** 32:17 |
| **activities** 8:10 | 17:13 21:24 27:6 | **back** 5:18 7:13 | **boys** 27:16 | **circled** 32:10 |
| **actually** 4:9,16,20 | 27:7,8,11 35:23 | 13:21 15:14 17:17 | **Brandywine** 1:10 | **circumstances** 5:20 |
| 15:23 29:6,17 | 36:24 37:18 39:9 | 25:1 29:19 37:19 | 1:18 | 9:5,8 |
| **addiction** 31:23 | **anxiolytic** 11:13 | **bad** 25:4 31:21,24 | **Brewington** 1:14 | **CitiSteel** 1:7 5:11 |
| **address** 23:20 | **anxious** 12:10 14:17 | 33:1 | 32:4,8 34:18 37:9 | 5:19 24:17 34:23 |
| **adult** 3:6 | 15:1,16 16:8,19 | **badly** 6:5 | 40:9 41:3 | **Civil** 1:5 |
| **adults** 3:8 | 16:24 17:22 22:19 | **Barbano** 1:12 43:16 | **bridge** 18:23 | **class** 31:6 |
| **affect** 32:14,20 33:4 | 28:16 29:3 34:23 | **barely** 28:18 | **briefly** 3:21 | **client** 23:8 |
| 33:5 | 38:1 39:7 | **basically** 5:13 25:8 | **bright** 34:11 | **clients** 3:6 4:10 |
| **affecting** 12:3 | **anybody** 9:23 25:15 | 30:24 | **brought** 6:10 | 20:22 23:6,18 |
| **afford** 19:21 31:5 | **anything** 22:16,24 | **basis** 16:15 | **brushed** 25:22 | 36:22 |
| **after** 5:22 10:5,21 | 32:3 33:13 | **beautiful** 34:9 | **Building** 1:11,18 | **close** 39:4 |
| 14:21 16:20 17:15 | **anywhere** 13:3 | **before** 1:12 2:22 | **Burke** 1:12 43:4,16 | **come** 5:22 12:11 |
| 20:12 21:8 23:10 | **apparent** 33:19 | 17:16 20:14 43:5 | **butt** 25:4 | 23:9 30:18 33:9 |
| 42:6 | **apparently** 4:7 9:3 | **began** 23:15,16 | | 38:15 |
| **afterwards** 9:21 | 21:6 28:10 | **beginning** 1:11 | C | **comfortable** 6:23 |
| **again** 7:5 9:24 | **APPEARANCES** | 24:21 | **call** 19:17 22:12 | 10:14,19 12:9,11 |
| 13:11,14 16:24,24 | 1:13 | **behind** 14:16 29:9 | 23:6,7,11,21,23 | 12:12 26:9,13 |
| 17:8 18:7 22:9,23 | **appeared** 5:5 36:17 | 37:6,16 | 24:4 28:22 | 27:3 38:4 |
| 23:4 | **appetite** 9:2 | **being** 5:12,16 6:13 | **called** 7:20 8:7 | **coming** 16:12 25:1 |
| **against** 28:9 | **appointment** 8:8 | 6:18,19 9:22 | 39:14,24 | **Commons** 3:3 |
| **again/off** 18:7 | 20:3 21:14 | 16:16 19:20 22:15 | **calls** 8:6 23:24 | **companies** 3:17 |
| **agency** 3:1 21:21,22 | **appointments** 28:19 | 23:9 26:21 29:23 | **calm** 17:1 | **company** 5:23 |
| 23:7 | 28:21 | 33:8 37:19 | **calmed** 18:4 | 27:13,15 |
| **ago** 4:13 | **April** 7:7,8,9,16,20 | **believe** 7:4 15:12 | **came** 5:7,11 7:17 | **compartmentalize** |
| **agreed** 14:20 | 21:11 23:16 | 28:14,15 | 37:22 43:5 | 30:5 |
| **ahead** 2:8 3:24 32:5 | **arbitration** 16:21 | **believed** 27:23 36:5 | **canceled** 20:4 21:14 | **complained** 26:8 |
| **ahold** 17:2 | 30:1 | 36:10,13 37:11 | 28:23,23,24,24 | **complete** 16:3 |
| **aid** 11:12 31:17 | **area** 6:3 26:24,24 | **believing** 6:1 35:19 | 29:1 | **COMPLETED** |
| | 27:22 | 37:6 | **car** 29:9 | 42:7 |
| | **around** 7:24 27:19 | **bells** 37:23 | **care** 7:21 10:13 | **completely** 26:12 |

Snyder
Cynthia L. Wright, LPCMH

v.

C.A. # 04-970-JJF

CitySteel, USA Inc.
September 6, 2006

Page 45

compliant 13:11,18
  14:6
computer 15:21
  31:3 43:8
computer-aided
  43:8
Conaway 1:10,18
concentrating 8:22
  11:24
concern 13:14
concluded 40:16
Concord 2:23 3:10
  8:14 20:9,19
  23:14,17
condition 24:13
confidence 36:20
confident 21:20
  34:17 35:7,8
conflict 6:6
cons 14:3
consistent 35:23
  36:24
contact 16:20 17:10
  23:22 30:23
continue 14:20
continuing 16:7
control 5:14 14:5
  37:17
cope 16:13 19:7
copy 20:13
correct 33:24 39:23
  43:10
counsel 43:6,11
counseling 7:23 8:5
  23:4
counselor 2:16
County 43:2
couple 5:17 11:21
  14:13 15:12 35:5
course 15:21 16:3
  31:3
court 1:1 18:2
  39:12
cousin 18:21 19:8
  19:12 33:19
cousin's 33:19
co-worker 14:14,15
  14:15,22 29:6,8,8
crazy 35:21
Cross 8:2,3 19:15
crying 14:17 30:18
current 9:5
currently 38:17
Cynthia 1:9 2:1,10
  41:2 43:5
C-Y-N-T-H-I-A
  2:10

**D**
D 41:1
dad 19:18 30:22
  39:2
damaged 20:23
date 7:9 18:2
DATED 43:20
dates 21:3
day 7:16 14:7
days 22:8
December 20:15
  21:13,16
decision 13:16
Decrease 9:2,2
decreased 15:9
Defendant 1:8,19
DEFENDANT'S
  41:5
definite 33:10
definitely 5:6 8:20
  9:9 12:3 14:11,20
  15:9 16:11 17:13
  29:12 31:10
Delaware 1:2,11,16
  1:19,23 43:1
depending 33:1
deponent 2:2 41:2
  42:8 43:5,7
deposition 1:9
  40:16 41:5
depressed 8:9,21
  11:22 16:19 17:22
  28:4
depression 5:12
  8:19 17:13 27:8
  35:24 38:21,24
  39:8
describe 3:4
desk 24:1 26:17
determine 35:20
diagnosis 9:18 10:5
  10:8 35:23 38:3
DiBIANCA 1:17
  2:5 3:24 4:3 32:2
  32:5 34:13 37:10
  39:11,13,18 40:5
  40:7,10 41:3
diet 9:3
different 6:3 21:2
  26:5,12
differently 38:13
difficulty 8:22
  11:24
direction 43:8
disbanded 3:11
discontinuing 19:16

discovery 4:5
discuss 24:12,16
discussed 24:14
  38:20
disorder 9:20
DISTRICT 1:1,2
disturbance 8:22
  11:24
doctor 7:21,22 8:4
  10:14,19 12:6,8
  12:12,21 17:9
doctors 12:13
doctor's 10:19
documents 4:4
doing 2:18 3:7
  28:16
done 20:21 26:8,9
  27:3,4,4 29:17
  32:6
doubting 35:17
down 8:9 9:10 10:5
  13:3 14:10 16:11
  17:2 18:4 30:5,17
  30:17 43:7
downs 36:10
Dr 7:21 10:13 11:2
  11:6 13:2 22:3
dramatic 30:18
  33:7,8
drink 25:9,21
drive 9:2
driving 14:15
dropped 23:5
duly 2:3 43:6
during 4:5 32:6
dynamic 39:3
dynamics 39:1

**E**
E 41:1,4
earlier 33:23
easy 32:1
EDELSTEIN 1:15
effect 25:21
effects 31:22
eighth 10:23
either 32:12 43:12
elevated 32:16
  33:11
eligible 19:17
emotion 36:9
emotionally 36:18
emotions 37:12,12
  37:16,16
employed 2:12
employee 6:3 29:22
employer 6:13,13

17:4 35:4
employment 24:17
end 15:9 17:20,24
  19:14 21:18 22:21
ended 3:12 20:6
  23:16
enough 10:18
ERRATA 41:7 42:5
errors 39:21
escalate 29:12
especially 38:10
ESQUIRE 1:14,17
evaluation 10:11
  11:15 12:5
even 5:17 12:11
  16:22 21:15 27:20
  28:23 37:21 38:8
event 43:12
events 26:2
every 10:5 13:20
  14:7 18:20
everything 20:8
  33:13 38:8 39:16
examination 41:3,3
  43:10
examined 2:3 43:6
except 24:8
excused 40:15
exercising 16:15
exhibit 8:16 9:1
  11:5
exhibiting 9:20
EXHIBITS 41:5
expect 38:7
Expires 43:18
explain 4:21,22
  12:7 36:12
extended 19:10
extremely 9:11
  16:19
ex-employer 9:13
  16:22,23 30:12

**F**
fabricated 36:5
fabricating 36:15
face 35:24
fact 33:21 39:22
factory 26:23 27:18
factual 24:16
fair 34:4
fairly 30:22
fall 22:21
family 3:17 8:4
  10:19 12:8,12,16
  12:21 17:9 19:5,8
  19:10 38:23 39:1

39:3
far 16:11 36:21
fear 15:2 17:4 29:24
February 20:4,5
  21:8,17,23 22:17
  24:8
fee 19:19
feel 14:5 19:7 26:8
  34:6 36:14 37:1
  38:14 39:21
feeling 5:24 6:8
  18:2,15,16 19:4,6
  25:12 29:3,24
  32:18 33:18 38:10
feelings 24:13,14
fees 19:21
feet 35:11
felt 6:15,18 7:3
  14:22 26:18,20
  28:8,12 29:19
  37:6,8
females 27:19
FETZER 1:22
few 7:13 32:4
fight 30:19
finally 28:5
finances 16:2 30:24
financial 19:3
financially 15:24
find 7:17 15:10
fine 10:20 13:4 15:1
finished 37:9
first 2:2 5:10,17 7:9
  7:16 10:7 28:17
  34:8,10 35:3 38:2
  38:6
five 22:8
flood 20:24
Floor 1:11,18
fluctuated 9:4
focus 5:14 18:1,17
  22:10 30:5,8
  37:17
focusing 15:20
followed 23:18
following 14:24
  36:13
follows 2:4
forced 6:18
foregoing 43:9
forever 13:13,17
forget 24:22
form 7:19 8:13 10:7
  10:22 23:11
format 32:23
former 6:13 14:15
  17:4

Snyder
Cynthia L. Wright, LPCMH

v.
C.A. # 04-970-JJF

CitySteel, USA Inc.
September 6, 2006

Page 46

fortunately 21:1
forward 40:12
found 18:24
fragile 35:2
freaked 14:16 37:3
friend 17:6
from 5:1,3 8:13
    11:1 12:5 14:2
    18:15 22:11 23:12
    23:12 29:23
front 33:22
functioning 12:4
    15:15,16 28:18
further 43:9,11

**G**

ganged 37:8
gave 4:14 12:19
    20:13 23:23
general 6:14
generally 2:20
    39:14
genuine 36:4
genuinely 37:2
genuineness 36:3
getting 15:13 18:15
    18:20 28:18,20
    30:6 37:19
Gilpin 1:15
girlfriend 31:8
give 10:8 31:6
given 43:7,10
go 2:8 3:24 7:22
    9:22 10:15 12:8
    13:2 25:8 32:5
    40:8,10
going 3:24 4:22
    5:18,22 6:4,7,9
    8:11 10:6,18
    13:19 14:10 17:9
    17:19 18:6,17
    19:5,8,15,17
    22:20 23:2,3 24:4
    26:11,11,19 28:7
    28:8,14 29:18
    31:4 34:15,19
    38:12,12
gone 20:24
good 2:6 3:23 27:16
    29:22 30:22,23
    31:14 33:1 39:15
Goodman 7:21
    10:13 11:2,6 13:2
    22:3
Goodness 8:16
gotten 21:9 23:1
great 9:1

grip 18:20
group 3:9,11
guess 6:16 15:5
    25:18 30:1 33:1
    33:17 34:24 35:12
    36:1
guessing 35:18
gut 36:13
guys 28:8
gym 18:18 29:7

**H**

H 41:4
hair 34:9,14
half 5:9
handed 4:4
hanging 30:2
happen 5:19 6:9
    18:21 22:20 38:5
happened 19:1
    20:10 28:11 35:11
happens 38:6
Happy 3:23
harassed 5:24 8:8
harassment 7:1
    24:18
hard 10:18 12:10
    26:24 28:20 29:19
    33:14 38:9
harm 5:22
Harris 34:22
hat 26:24
having 2:2 9:17
    16:1,16,23 17:10
    30:1 38:24
head 30:2
health 2:17 3:1
Healthcare 3:3
hear 23:12,12
hearing 6:11 30:2
hearings 6:17
heavy 26:23
held 37:12
Hello 2:7
help 5:14 14:20
    31:4,19
helped 19:19
helping 19:3 37:17
her 4:7 5:4,6,10,14
    5:16,22,22,24 6:1
    6:2,10,12,13,21
    6:23 7:4,6,9,16,21
    8:7 9:4,7 10:13
    11:14 12:1,3,4,11
    12:12,19 13:9,11
    13:14,14,16 14:4
    14:10,13,15,16,16

14:21,24 15:5,15
    15:22 16:4,5,7,9
    16:14,14,15,20,21
    16:24 17:2,4,6,8
    17:12,15,18 18:4
    18:7,11,12,13,16
    18:21 19:2,8,9,9
    19:10,18,19,23,24
    20:13 21:9,15,16
    21:17 22:1,6,7,13
    22:18 23:11,12
    24:1,4,5,7,10,13
    24:13,14,16 25:3
    25:4,8,8,13,13,16
    25:19,20,23 26:2
    26:5,7,12,20,21
    27:14,21,24,24
    28:1,3,3,6,7,9,13
    28:17 29:2,4,9,11
    29:12,23,24 30:2
    30:3,8,13,15,21
    30:22,22 31:4,6,8
    32:16,20 33:4,5,8
    33:11,14,16,19,19
    34:2,8 35:5,10,11
    35:14,16 36:5,7,9
    36:10,19,20 37:5
    37:6,7,7,12,12,13
    37:17,18,21 38:20
    38:21,24 39:2,5,8
herself 7:20 17:1
    25:15 35:2,13,17
    36:19
hiding 33:15
him 6:4,5,14 10:14
    17:10 18:12 25:5
    25:11 27:21 30:23
    30:23
history 29:23 30:16
    38:21,23
hold 25:16 34:2
holding 32:6
home 15:17 22:22
    30:21
hooked 32:1
hoping 15:10,21
hot 34:11
house 17:7 20:22
    29:4 37:19
huge 15:8

**I**

idea 39:15
identification 4:2
iffy 29:2
impacted 13:16
impression 32:20

35:3,9
impressions 38:2
improve 15:22
improvement 15:6
    16:11,12
improving 15:15
    21:18
inappropriate
    25:10
inappropriately
    25:19
INC 1:7
incapacitated 29:24
incident 17:15
    24:22
income 31:9
Incorporated 2:13
increased 9:9 17:16
increasing 17:5,13
    17:14
independent 35:13
indicate 12:17
individual 3:8 5:5
individually 3:7
information 8:13
initial 7:10
insecure 35:6
instances 29:6
insurance 3:17 10:7
    19:3
interested 23:8
    43:12
interesting 36:8
    39:3
interfered 30:7
interviews 15:20
    18:17
intimidated 25:11
    34:22 35:19
intimidating 27:20
involved 6:5 38:18
irrational 17:3
irritability 8:21
issue 11:23 13:10
    16:2,16 19:4
    30:19 33:3 38:18
issues 5:7 6:24 18:6
    19:8 27:11 38:22

**J**

January 20:3,15
    21:14,16 43:18
Jersey 3:2
job 15:11,20,23
    18:17 19:4 21:21
    22:22 23:1 26:14
    29:23 30:6,8 31:1

31:5,10 37:19
    38:13
joke 25:15
joking 32:17,17
    33:21
judge 38:12
July 15:19 16:7
    17:17 20:2 28:23
jumped 18:23
jumpsuit 34:13,14
June 14:2,12,18
    28:23
just 2:20 3:4 4:20
    4:24 5:3,7,10,18
    5:22 6:6,8,14,14
    7:11 8:5,11 9:11
    9:21 10:22 11:9
    12:15,22
    13:11,14,15 14:7
    14:10,23 16:12,23
    21:11 23:4,5,24
    24:11 25:5,12,22
    26:13,19 27:3
    28:4 29:3,10
    32:23 33:13,16,22
    34:7,8,9,10,15
    35:9,10 36:5,6,12
    36:18,21,23 37:3
    37:5,11,16,22
    38:7 39:16,24
justice 18:5

**K**

keep 7:11 21:4 23:9
    23:24 33:14 40:4
keeping 16:6
kept 4:7
kicked 24:5
kind 5:23 13:15
    15:1,2 17:6 18:3,7
    22:23 23:5 25:5,7
    25:14,15,20,22
    26:15,16,19 27:4
    27:16,20 30:4
    32:23 33:11,13
    35:17 36:19,23
    37:22,23 39:2
King 1:23
knew 28:10
knocked 35:10,14
know 3:19 5:10,20
    5:23 6:6 7:17 9:17
    10:15 12:14,20
    14:16 16:1,9,13
    16:14 17:2 18:5
    19:4,7 20:6,7,10
    21:20,20,21 22:18

Snyder                                    v.                        CitySteel, USA Inc.
Cynthia L. Wright, LPCMH              C.A. # 04-970-JJF              September 6, 2006

Page 47

| | | | | |
|---|---|---|---|---|
| 22:21 23:3 24:3,9 | 30:17,18,18 31:10 | **making** 13:16 16:1 | **miserable** 26:21 | **nice** 34:16 |
| 24:22 25:14,16,17 | 33:6,13,15 34:1,7 | 24:13 26:20 35:15 | 28:3 | **night** 16:16 |
| 26:4,10,15,16,22 | 34:8,11,12,15 | 36:16 37:1,2 | **Miss** 36:3 | **nightmares** 9:17 |
| 27:1,16,18 28:5,9 | 35:5,11,17 36:4 | **malingerer** 36:15 | **misstated** 39:22 | **none** 11:23 12:1 |
| 28:13 29:23 31:4 | 36:13,14,15 37:2 | **man** 37:4 | **mom** 16:14 18:12 | **normal** 8:10 |
| 31:15,16 33:7 | 39:4,6 40:6 | **managing** 18:1 | 18:13 30:21 38:24 | **Notary** 1:12 43:4 |
| 34:11 35:10,12,12 | **likeable** 36:8 | **mandated** 23:9 | 39:2,5,7,8 | **note** 10:5 |
| 36:7,9 38:11,23 | **liked** 5:4 36:7 | **manic** 9:6 | **money** 16:2,4 | **notes** 5:18 9:19 14:1 |
| 39:1,3,8 | **limitations** 19:3 | **March** 21:17,18 | **month** 17:24 | 14:2,18 16:18 |
| **knowing** 6:8 17:9 | **line** 15:1 | **MARGARET** 1:17 | **months** 5:17 15:12 | 17:21 20:6,6,11 |
| 30:2 | **list** 7:24 8:3,5 | **MARGOLIS** 1:15 | 18:3,22 | 21:7,7 22:6,11 |
| **knows** 8:16 | **little** 8:20 9:6 11:22 | **marked** 4:2 8:15 | **mood** 8:21 16:9 | 31:2 32:23,24 |
| | 15:17 18:5,15 | 41:5 | 31:19 32:16 33:5 | 43:7 |
| **L** | 21:19 23:11,22 | **married** 39:2 | 33:11 36:19 | **nothing** 7:4 21:12 |
| **L** 1:4,9 2:1,10 41:2 | 29:2 32:22 39:6,7 | **May** 20:9 23:15,15 | **moods** 14:10 | 27:4 33:14 39:9 |
| 43:5 | **live** 18:9 | 23:15 | **more** 9:8,11 10:14 | **notice** 1:10 |
| **last** 19:24 22:5,6 | **lived** 18:10,11,12,13 | **maybe** 5:17 10:21 | 16:9 18:15,18 | **November** 19:2 |
| 23:22,23 | 30:21 | **mean** 7:2 10:4 | 19:17 20:10 21:10 | 20:15,15 21:12,16 |
| **later** 10:5 | **living** 22:22 | 11:18 15:8,11 | 21:19 23:13 31:17 | **number** 23:20 |
| **laughed** 25:6 | **LLP** 1:10,18 | 16:22 18:23 19:3 | 35:24 36:22 38:4 | 30:19 31:11 |
| **law** 1:10 | **located** 33:20 | 19:6 20:15 22:23 | **morning** 2:6 | |
| **lawsuit** 30:3 38:17 | **location** 21:3 | 23:8 27:18 28:16 | **most** 39:15 40:2 | **O** |
| **lawyer** 4:9 16:21,23 | **long** 2:18 4:13 | 28:22 29:2,10 | **mostly** 7:23 39:21 | **oath** 2:3 |
| 17:15 20:14,17 | 17:16 28:16 | 30:3,10,13 35:8 | **mother** 18:11 19:9 | **obviously** 4:11 5:7 |
| 21:8 | **longer** 26:17 | 36:6,22 37:3,22 | 38:21,21 | 12:12 16:1 19:5 |
| **lawyers** 40:12 | **look** 4:16,18 7:23 | **meaning** 27:7 | **mouth** 3:18 33:24 | 19:12 21:24 24:14 |
| **learn** 15:22 36:21 | 8:4,5 28:23 33:2 | **Medicaid** 23:3 24:3 | **move** 4:1 | 27:24 28:13 30:10 |
| **least** 18:3 | 37:23 | 24:5 | **moved** 26:7 | 35:3 38:13 |
| **leave** 6:18 26:19 | **looked** 13:21 29:8 | **medical** 12:6 | **movement** 26:4 | **October** 18:1 19:1,2 |
| 29:4 | 31:2 | **medication** 10:10 | **much** 3:8 4:17 7:5 | 19:7,14 20:1 |
| **Leaving** 26:3 | **looking** 5:8,17 | 11:13,15 12:6 | 8:3 15:6 21:1 | 21:12 22:7 24:2 |
| **led** 26:2 | 10:22 14:2,13,18 | 13:6,8,12,19,24 | 22:19 24:7 26:20 | **October/November** |
| **left** 5:10 6:20,22 | 15:10 22:21 37:15 | 14:4,11,21 16:5 | 29:16 31:8,15,18 | 19:11 |
| 20:18 23:14 | **looks** 7:19 10:21 | 16:12 22:7,13 | 32:24 34:20 37:5 | **off** 11:18 16:24 |
| **legal** 38:18 | 17:8,18,21,24 | **medications** 12:13 | **myself** 40:4 | 18:23 22:23 25:6 |
| **legitimate** 28:11 | 18:1,14 19:24 | 14:19 | | 25:22 29:11 35:10 |
| **less** 21:24 | 20:4 | **medicine** 22:2 | **N** | **offer** 39:15 |
| **Let** 4:24 7:13 | **loop** 35:14 | **meds** 13:17,20 14:5 | **N** 32:14,23 33:2 | **office** 13:1 24:3,6 |
| **letter** 23:11,23 | **Lori** 1:14 32:2 | 16:7 17:11 31:21 | 41:1 | 26:6,12 27:22 |
| **letters** 23:19 | **Lori's** 32:7 40:10 | **meet** 16:22 20:14,16 | **name** 2:9 24:24 | 40:11 |
| **level** 12:4 28:18 | **lot** 5:6 13:12 14:7 | 23:13 36:22 | **narrative** 32:14,24 | **offices** 1:10 |
| **Lexapro** 11:1,10 | 22:24 23:5 24:20 | **meeting** 16:21,23 | 33:2 | **oh** 13:16 36:4 |
| **Lexapro's** 11:11 | 27:16,19 29:18 | 18:3 28:17 | **need** 4:17 | **okay** 9:1 14:17 |
| **licensed** 2:16 | 33:6 36:14 38:9 | **memory** 5:1,3 | **needed** 13:19 22:7 | 32:13 |
| **life** 8:9 26:21 | 39:10 | **men** 27:17 | **needs** 22:12 | **old** 27:16 |
| **like** 2:8 6:4,8 7:3,19 | **lots** 30:13 | **mental** 2:17 3:1 | **neighbors** 9:12 | **once** 19:18 29:1,1 |
| 7:23 9:12 10:4,21 | **loud** 20:8 34:16 | **mentioned** 33:23 | **Neuberger** 4:12 | 39:5 |
| 11:21,22 13:16,20 | **low** 28:18 | **mess** 31:7 | **never** 4:10 8:16 | **one** 5:9 15:18 18:23 |
| 14:1,7,12 15:7 | **LPCMH** 1:9 2:1 | **message** 24:2 | 18:10,24 24:6,11 | 21:15 23:11 24:21 |
| 16:17 17:8,17,18 | 41:2 43:6 | **met** 20:5 34:8,10 | 27:21 35:11 39:2 | 27:17,23 30:19 |
| 17:20,21,24 18:1 | **lumped** 27:9 | **mid-October** 18:14 | 39:4 | 31:11 37:6,6 |
| 18:14,16 19:4,24 | | **might** 5:8,21 13:1 | **new** 2:13,19,22 3:2 | **one's** 35:18 |
| 20:4,21,21 22:18 | **M** | 20:16 26:6,6,6 | 3:4,9,12 11:17 | **only** 3:21 27:17 |
| 22:24 23:6 26:1,1 | **M** 1:17 | 35:21 | 15:14,22 20:12 | 31:9 38:18 |
| 26:9,12,18,20,22 | **made** 23:10 28:3,7 | **Mind** 31:14 | 23:16,18 24:2,9 | **onto** 32:6 |
| 26:23 27:17 29:5 | **major** 30:15 | **mine** 4:15 | 43:2 | **opinion** 27:24 31:16 |
| 29:8,18 30:7,16 | **make** 8:6 21:11 | **minute** 4:16 20:7 | **next** 18:3,22 35:5 | 33:17 |

Snyder
Cynthia L. Wright, LPCMH

v.

C.A. # 04-970-JJF

CitySteel, USA Inc.
September 6, 2006

Page 48

**option** 12:20 39:13
  39:19
**other** 11:24 20:23
  26:21 27:2 28:1
  30:9,12 31:21
**otherwise** 43:12
**out** 5:12 9:18,22
  10:2,3,4,6 14:7,16
  15:12 17:6 19:19
  20:8 23:5 24:11
  25:8,9,20 26:20
  27:13 29:23 37:3
  37:11,18
**outcome** 6:9
**outs** 38:3
**over** 30:2 37:23
**overwhelmed** 5:23
**own** 20:21 25:17
  34:2

**P**

**P** 32:14
**page** 8:16,23,24 9:1
  9:18 11:5 14:18
  15:10 32:9 41:2,7
  41:8 42:4
**pain** 33:15 36:14
  37:1
**painful** 40:13
**panic** 5:15 37:18
**paper** 24:1
**paranoia** 8:18 9:12
  13:14 15:2,8
  22:19 27:8 37:1
**paranoid** 5:16
  14:23 16:19 29:11
  34:23 36:16
**part** 4:20 6:16 8:19
  15:18 19:20 24:16
  26:23 36:12
**parties** 43:6
**party** 43:12
**past** 5:9 11:17,19,21
  11:22 12:2 16:20
  22:8
**patient** 8:13
**patients** 3:13
**Pause** 4:19
**paying** 19:19
**PDSD** 9:18
**people** 12:20 13:12
  14:8,23,24 23:6
  23:10 31:19 32:1
  34:10 35:15 36:24
  38:4,7,14 39:15
**period** 19:11
**periods** 16:9

**person** 14:22 18:23
  25:14 34:1,9
  35:22 36:8 37:20
**personal** 10:16
  12:15
**personality** 33:16
  34:7
**person's** 10:17
**Perspective** 23:16
**Perspectives** 2:13
  2:19,22 3:4,9,12
  23:18 24:2,10
**phone** 8:6 19:23
  23:11,20,23,24
**physician** 12:16
**physicians** 3:17
**picked** 23:17
**pictured** 39:6
**piece** 23:24
**pinched** 25:3
**pink** 34:11
**place** 6:19,23 20:23
  27:2
**placement** 21:21
**Plaintiff** 1:5,16
**Plaintiffs** 8:15
**plan** 10:24 32:14
**planned** 24:10
**plant** 27:22
**point** 3:2 10:9 11:6
  13:6 15:5,11 16:6
  17:12 22:14 33:18
  37:20
**pop** 32:6
**portrays** 25:14
**position** 26:21
**positive** 36:7
**possibly** 9:6
**posttraumatic** 9:20
**practice** 2:14,24
  3:11,11 19:20
  20:20 23:6
**prefer** 12:14
**preference** 10:16
  12:15,22
**prescribed** 13:20
  14:21 16:8 22:3
  22:15 31:20
**prescribing** 10:20
  11:7 12:13 17:11
**presence** 5:5
**present** 11:19
**presented** 36:19
**presenting** 35:5
**pretty** 3:7 5:16 7:5
  8:3 16:10 17:22
  19:10 22:19 24:7

26:20 28:15 31:8
  35:12 40:14
**primarily** 7:21
**primary** 10:13
**printer** 43:8
**prior** 3:1 17:20
**private** 2:14,24
  3:11 19:20 23:6
**probably** 10:21
  23:10 39:8
**problem** 12:1
**problems** 11:17
**produced** 4:5
**productive** 18:18
  29:21,21 37:20
**professional** 2:16
**progress** 6:7
**projects** 35:2
**propositioned** 25:8
**pros** 14:3
**provider** 7:24 8:2
**providers** 8:5
**provider's** 7:24
**psyched** 31:3
**psychiatrist** 10:15
  10:17 12:5,14,18
  12:21,24,24 31:14
  31:16
**psychotropics**
  10:20 11:8
**Public** 1:12 43:4
**pursuant** 1:10
**pursuing** 15:21
**pushed** 12:3
**pushing** 26:20
**put** 6:19 26:12 28:3
  30:4,5 31:15
  33:24
**putting** 6:23 26:5
  28:1
**p.m** 40:16

**Q**

**question** 29:14
  34:21 36:1 37:4
**questions** 32:7 38:8
  43:7
**quickly** 11:9
**quit** 5:19 6:17,21,22
  28:5
**quite** 22:19 31:24

**R**

**ran** 29:6
**Randolph** 24:24
  25:1,2 26:8 27:4
  27:12 34:22

**rarely** 38:6
**rather** 13:1
**read** 4:22 8:20
  32:15 39:16 40:7
  40:13
**reading** 22:11 23:22
  39:12,14
**real** 6:12 15:4 22:20
  28:11 29:11 34:20
**realized** 14:9
**really** 5:12,20 6:13
  9:4 10:9,17 11:9
  11:23 12:10 14:17
  14:23 15:1,13
  16:4,24 22:10
  23:7 25:10,11,12
  25:13,17,17,24
  28:2,4,17,18 29:3
  29:18,19 30:3,7
  30:24 31:1,3,13
  33:12 35:1,2,6,10
  35:14,16,19 36:9
  36:14,17,18 37:3
  37:8,24,24 38:5
  38:24
**reason** 8:7,8 27:1
  28:14
**reasons** 37:16
**recall** 4:24 5:3 12:2
  12:19,23 13:8
  21:23 22:4 23:11
  26:1,22 28:6
  38:23 39:9
**receiving** 23:2
**recently** 9:10
**recommend** 10:16
  13:18
**recommended**
  10:10 11:14 12:5
**record** 2:9 8:12
  11:9
**records** 4:8,10
  20:17 41:6
**referral** 7:19
**referred** 3:14,16
  7:17,21
**refill** 22:7
**refilled** 22:13
**reflect** 6:5
**reflected** 21:7
**regarding** 16:21
  33:19
**regular** 16:15 17:10
**relationship** 30:17
  30:22,23
**relative** 43:12
**relief** 18:2

**relying** 13:17 14:5
**remained** 39:4
**remember** 4:13
  5:16 8:16 13:2,22
  21:19 22:5,16,18
  24:12,20,21 25:12
  27:5 31:2,2 33:8
  34:9,10 38:19,19
  38:20,24 39:1
**Remeron** 11:1,11
**REPLACE** 42:4
**reported** 8:21 9:9
  11:17 25:18
**REPORTER** 39:12
  41:8 43:3
**request** 10:7
**reschedule** 19:18
**reservations** 13:11
**resolved** 7:1
**respective** 43:6
**resume** 8:10
**resuming** 16:15
**retaliate** 28:9,9
**retaliating** 9:14,15
**retaliation** 17:4
**returned** 24:1
**review** 10:24
**Right** 11:20 24:19
**RMR-CRR** 1:12
  43:4,16
**room** 39:6
**rule** 10:2,4,6 38:3
**ruled** 9:18 10:3
**run** 9:23

**S**

**S** 41:4
**sad** 32:18 33:18
**same** 3:10
**saw** 5:10 7:6,9 9:7
  12:4 14:14,14
  17:18 19:24 20:9
  21:17 22:6 27:21
  29:8 36:9 37:20
**saying** 17:21 20:8
  23:11,19 35:9
**says** 7:22 8:14 19:6
  23:21 28:14,15
  32:10
**scale** 19:21
**scared** 6:13,14 7:5
  9:12 25:13,17
  30:3 37:24
**schedule** 8:6 21:2,4
  21:4
**scheduled** 20:3
  21:15,18

Snyder                          v.                    CitySteel, USA Inc.
Cynthia L. Wright, LPCMH        C.A. # 04-970-JJF     September 6, 2006

Page 49

| | | | | |
|---|---|---|---|---|
| scholarship 15:24 | sixth 10:23 | steel 26:23 27:18 | talk 3:20 17:5 24:20 | 37:21 38:8 39:15 |
| 31:6 | skills 15:20,22,22 | Stenotype 43:7 | 33:13 38:9,16 | thought 14:15 25:9 |
| search 15:20 | sleep 8:22 11:12,24 | sticking 14:19 | talkative 32:16 33:9 | 29:7 33:22 35:1 |
| second 35:18 | 31:17,19,20 | still 7:3 16:6,8,16 | talked 8:18 9:16 | 36:4 |
| see 3:6 5:11 7:13,24 | sleeping 31:21 | 17:21 22:2,14,15 | 14:18 17:1,8 | thoughts 17:2,3 |
| 10:18 12:11,14,18 | sliding 19:21 | 22:22,22 28:10 | 19:14,23 27:7,12 | through 19:1 21:12 |
| 12:20,21 13:5 | slow 40:12 | 33:7 38:14 | 33:3 36:18 39:8 | time 4:13,17 6:2 7:2 |
| 15:4 18:19 21:9 | small 25:13 39:6 | stopped 8:9 19:2 | talking 7:11 13:22 | 7:6 9:3 12:4 14:6 |
| 21:15,16 24:7 | Snyder 1:4 3:20 4:5 | 22:21 | 14:3 16:13,14,14 | 18:9,19,20 21:23 |
| 35:5 37:24,24 | 33:23 34:1 36:3 | store 20:23 | 24:20 29:16 36:20 | 22:5,6 25:7,20 |
| 39:5 | social 17:5 | Street 1:11,23 | 39:10 | 28:16,20 29:7,22 |
| seeing 6:12 19:2 | some 3:9 4:7 5:22 | stress 9:10,20 18:1 | tangential 32:17 | 34:8,10 39:23 |
| 22:1,5 24:10 | 6:5 9:17,20 12:13 | 18:8 19:12 30:13 | task 33:14 | 40:11 |
| 36:23,24 | 13:6,22 15:22 | 30:16 | Taylor 1:10,18 | times 13:24 16:9 |
| seem 22:24 34:20 | 16:12 18:6,8,17 | stresses 19:5 | tearful 15:16 | 20:10 21:17 24:8 |
| seemed 9:11 12:1 | 26:4 28:10,22 | stressors 30:9,20 | tell 4:8 5:3 34:6 | 29:10 33:6 35:5 |
| 14:12 26:16 34:1 | 39:8 | 31:11 | 38:4,7,7 | tired 22:10 |
| 34:20 39:7 | somebody 5:21 8:6 | strong 5:4,5 19:10 | telling 18:20 35:4 | today 3:19,22 |
| seeming 22:18 | 28:6 29:8 | 35:1,13 | 35:23 | together 15:3 18:9 |
| seen 14:21 | somehow 34:23 | struggling 5:6 | temp 21:22 | 18:10 27:9 39:4 |
| send 39:19 40:1,9 | 39:22 | 36:17 | ten 3:2 | told 20:18 25:23 |
| 40:11 | someone 12:8 14:14 | stuck 13:24 | tense 16:8 22:10 | 29:5 32:19 |
| sent 4:9,10,11,14 | something 9:19 | stuff 28:11 30:4 | terminated 6:16 | total 2:19 |
| 23:11,19 | 15:14 18:21 19:18 | 35:4 39:1 | Terry 1:4,12 3:20 | touched 25:4,19 |
| September 1:12 | 22:9 25:5,9,21 | sudden 26:17 | 4:5,10,15 5:1 6:7 | track 16:6 23:24 |
| 17:14,19,24 28:24 | 26:9,11 27:3 28:6 | suffering 10:9 | 22:12 23:22 29:18 | 29:20 |
| 43:5 | 28:7 31:12 36:12 | suicide 18:22 33:20 | 33:23 34:1 43:4 | trained 35:20 |
| session 10:22,23 | 39:20,22 40:4 | suit 43:12 | 43:16 | training 36:21 |
| 14:3 19:24 38:6 | sometimes 13:14 | summer 15:9 16:10 | Terry's 39:7 | transcribed 43:8 |
| set 16:24 29:11 | 29:3 33:9,12 | 21:12 | testified 2:4 | transcript 39:19 |
| sex 9:2 | somewhere 26:5 | superficial 34:17 | testimony 43:10 | 40:1,3 43:10 |
| sexual 6:24 24:18 | 28:2 | superficially 32:17 | their 4:10 8:5 12:8 | transcription 43:8 |
| sexually 8:8 | sorry 3:6 20:2,8 | supervisor 8:9 | 19:16 20:20 30:16 | transference 36:7 |
| SHEET 42:5 | 25:4 | support 18:15 | therapist 3:6 28:13 | transferred 6:19 |
| SHEET/DEPON... | sort 27:13,13 | 19:10 | 35:20 | Trazodone 31:12 |
| 41:7 | sought 7:6 | supportive 19:9 | therapists 20:19 | treat 38:13 |
| she'd 13:1 14:17 | sound 35:21 | supports 17:5 | therapy 3:8,9 36:23 | treatment 5:14 7:6 |
| 30:18 33:12 | sounds 26:15 | sure 7:12 8:1 9:7 | thing 33:1 | 10:7,22,24 23:4 |
| Shield 19:15 | source 31:9 | 14:1 18:22 21:11 | things 17:23 27:7 | tries 35:8 |
| shifts 33:10 | speaking 34:16 | 31:24 32:1 35:21 | 30:9,12,13 32:6 | triggers 14:13 |
| short 40:14 | specifically 8:1 | surprise 34:21,24 | 36:20 38:9 | true 37:13 43:9 |
| show 23:10 29:1 | specifics 7:14 | sweat 34:11 | think 4:14 5:8,13 | truthfulness 37:15 |
| 32:9 | spell 2:8 | sworn 2:3 43:6 | 6:2,9,24 7:22 9:8 | trying 5:14 14:7 |
| showed 36:9 | spelling 39:21 | symptoms 9:21 | 9:14,18,19 10:3,6 | 18:18 21:22 29:19 |
| side 31:22 | Spending 9:7 | 11:16,18 17:12 | 12:15,19 13:15 | 30:4 33:18 35:22 |
| SIGNATURE 41:7 | spree 9:7 | 29:13 | 15:18,23 16:2 | 36:2 |
| SIGNED 42:7 | stable 16:10 | system 19:10 | 17:16 18:12 19:16 | turned 35:16 |
| significant 15:4,7 | Stargatt 1:10,18 | | 19:19 20:18 23:1 | twice 28:24 |
| signing 39:12,14 | start 15:14 23:4 | **T** | 23:2 25:23 26:7 | two 2:24 6:6 16:20 |
| silly 4:23 32:16 | started 20:12 28:17 | T 41:4 | 27:12 28:7 29:7 | 17:19 18:22 20:10 |
| 33:12,21 | 31:7 | take 4:16 13:13,19 | 32:4 33:16 35:16 | 21:17 22:17 24:8 |
| sincerely 37:12 | starting 21:11 | 13:20 16:7 24:3 | 36:5 37:2 39:11 | 29:5,10 40:13 |
| sitting 26:18 | State 43:1 | 25:15 31:6 35:13 | 39:20 | typically 7:22 12:20 |
| situation 13:15 | stated 6:17 13:1 | 35:24 36:11 39:15 | thinking 14:23 15:7 | typing 20:8 |
| 30:10 | STATES 1:1 | taken 1:10 43:7 | 21:19 38:5 | |
| situations 9:21 | stay 18:12 | taking 13:12 14:4,6 | third 10:21 | **U** |
| six 18:3 | steady 21:12 | 14:21 16:5 31:4 | though 21:15 27:20 | uh-huh 3:15 4:6 5:2 |

Snyder
Cynthia L. Wright, LPCMH

v.

C.A. # 04-970-JJF

CitySteel, USA Inc.
September 6, 2006

Page 50

| | | | |
|---|---|---|---|
| 7:15 11:4 13:7 | wasn't 6:21,23 9:4 | 29:20,23 30:10,19 | 13 11:5 |
| 19:13 24:15 27:10 | 11:23 13:11 14:1 | worked 2:22 9:24 | 1330 1:23 |
| 30:11 34:3,5 | 15:15,16 16:1 | 24:11 27:17,21 | 15th 24:2 |
| 37:14 | 19:16 23:9 26:13 | 29:22 31:17 | 1509 1:15 |
| uncommon 14:24 | 26:13 28:11 30:18 | working 21:23 | 16 2:21 3:8 |
| under 5:19 43:8 | 37:21 | works 8:4 | 16th 19:6 |
| understand 28:2 | way 5:22 6:5 9:22 | worried 5:18,20,21 | 17th 1:11,18 |
| 36:1 | 34:6 | 6:4,8,12 9:11,13 | 19 14:18 |
| understood 13:23 | ways 20:21 | 27:23 28:12 30:4 | 19th 20:5 |
| unemployment 6:10 | Wednesday 1:11 | 35:6 | 19801 1:16,19,23 |
| 6:11,16 15:13 | weeks 5:17 9:16 | worry 15:2 22:20 | _____ |
| 30:1 | 16:20 17:20 40:13 | 25:23 | **2** |
| unfortunately | weight 9:4 31:15 | worth 36:11 | 2 41:3 |
| 19:20 | well 5:4 6:4 7:3 8:1 | wouldn't 15:7 30:15 | 20 15:10 |
| UNITED 1:1 | 8:19 17:18 21:1 | wow 34:8 35:1,5,11 | 2004 23:16 |
| Unless 20:13 | 23:15 27:15 28:16 | 35:17 36:13 | 2006 1:12 43:5 |
| until 8:6 20:9 | 29:1 34:24 35:18 | Wright 1:9 2:1,10 | 2008 43:18 |
| ups 36:10 | 37:17 | 4:1 41:2 43:6 | 22nd 7:20 |
| upset 5:12 10:17 | Wellness 2:23 3:10 | Wright-1 4:2 41:6 | 233-RPR 43:17 |
| 16:4 24:13 25:13 | 8:14 20:9,19 | write 9:10 10:4,6 | 25 32:9 |
| 25:18,24 28:4 | 23:14,17 | 32:23,24 | 27 41:3 |
| 30:24 35:16 37:4 | went 9:16 17:17 | writing 13:2 | 28 7:16 |
| upsetting 37:5 | 20:21 | written 5:9 10:24 | 28th 7:9 15:19 16:7 |
| USA 1:7 | were 6:5,22 11:16 | wrong 5:8,9 34:1 | 20:1 22:7 |
| use 31:17 43:8 | 12:3 14:3,23 | wrongly 6:15 | _____ |
| used 26:18 | 15:19 16:2 17:13 | wrote 22:11 | **3** |
| usually 10:16 31:19 | 17:14 18:7 19:5 | www.wilfet.com | 3 8:24 9:1 |
| 39:20 | 21:2 26:5,11,20 | 1:24 | 3rd 14:2 |
| _____ | 28:7,8 30:9,12,13 | W-R-I-G-H-T 2:11 | 30th 14:18 |
| **V** | 36:2,20 37:13,15 | | 302 1:23 |
| v 1:6 | 39:1 43:7 | **X** | 31 43:18 |
| value 36:1 | weren't 18:22,24 | X 41:1,4 | 32 41:3 |
| Velcro 34:12 | 26:10,10 27:19 | Xanax 11:1,10,12 | _____ |
| versus 37:1 | West 1:11 | | **4** |
| very 5:4 8:9 33:7,8 | we're 3:19 8:2,11 | **Y** | 4 41:6 |
| 35:2,6,6 36:8 37:5 | 29:17 | yeah 10:3 20:13 | 41 41:7 |
| 38:14 | we've 30:10 | 21:14,16 26:4 | 42 41:8 |
| view 6:21 | whatnot 31:23 | 28:22 32:22 | _____ |
| visits 22:17 | wheels 18:5 | year 20:12 | **6** |
| voice 34:16 | while 18:4 | years 2:21,24 3:2,8 | 6 1:12 43:5 |
| vulnerable 38:10,14 | whistles 37:23 | 5:9 21:4,5 | 6-10-03 11:3 13:5 |
| _____ | whole 13:15 16:10 | Young 1:10,18 | 643 8:15 |
| **W** | 22:24 24:8 27:19 | | 655-0477 1:23 |
| Wait 20:7 | 39:10 | **0** | _____ |
| waiting 39:5 | WILCOX 1:22 | 03 7:7,8 14:2 15:19 | **7** |
| waiving 39:24 | wild 37:22 | 04 20:3,5,12 24:2 | 7th 18:1 |
| walked 25:19 | Wilmington 1:11,16 | 04-970-JJF 1:6 | _____ |
| want 4:16,17,20,23 | 1:19,23 | _____ | **9** |
| 6:20 7:11 9:23,24 | wishy-washy 26:16 | **1** | 9-11-03 16:18 |
| 12:17 13:13,16,17 | witness 34:14 39:16 | 1 4:1 | |
| 25:3,16 27:2 | 40:3,6,15 43:10 | 10-24-03 32:9 | |
| 29:12 33:24 40:8 | woman 39:6 | 10:55 1:11 | |
| wanted 6:22 14:5 | women 27:17 | 1000 1:11 | |
| 15:13,14 26:9,14 | word 3:18 25:5 | 11th 17:18 | |
| 27:3 29:20,20 | words 33:24 | 12 8:16 | |
| 31:1 | work 5:12 9:10 | 12th 20:4 | |
| wanting 9:22 29:4 | 15:12,14 21:22 | 12:05 40:16 | |



**WILCOX & FETZER LTD.**

## In the Matter Of:

# Snyder

## v.

# Citi Steel, USA, Inc.

## C.A. # 04-970-JJF

---

## Transcript of:

## James W. Ryan

## June 15, 2006

---

Wilcox & Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: lhertzog@wilfet.com
Internet: www.wilfet.com

B- 0537

Snyder
James W. Ryan

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 15, 2006

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

TERRY L. SNYDER,                    )
                                    )
            Plaintiff,              )
                                    ) Civil Action
v.                                  ) No. 04-970-JJF
                                    )
CITI STEEL USA, INC.,               )
                                    )
            Defendant.              )

            Deposition of JAMES W. RYAN taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 11:10 a.m., on Thursday, June 15, 2006,
before Kurt A. Fetzer, Registered Diplomate Reporter
and Notary Public.

APPEARANCES:

        LORI A. BREWINGTON, ESQ.
        MARGOLIS EDELSTEIN
            1509 Gilpin Avenue
            Wilmington, Delaware  19801
            For the Plaintiff

        MARGARET M. DiBIANCA, ESQ.
        YOUNG CONAWAY STARGATT & TAYLOR LLP
            The Brandywine Building - 17th Floor
            Wilmington, Delaware  19801
            For the Defendant

    ALSO PRESENT:
        TERRY L. SNYDER

            WILCOX & FETZER
1330 King Street -  Wilmington, Delaware 19801
            (302) 655-0477
            www.wilfet.com          B-0538

Snyder                                    v.                    Citi Steel, USA, Inc.
James W. Ryan                      C.A. # 04-970-JJF                  June 15, 2006

Page 2

1          JAMES W. RYAN,
2      the deponent herein, having first been
3      duly sworn on oath, was examined and
4      testified as follows:
5              EXAMINATION
6   BY MS. BREWINGTON:
7   Q.  Good morning, Jim.
8   **A.  Good morning.**
9   Q.  My name is Lori Brewington and I represent
10  Terry Snyder in an action against CitiSteel.
11         I'm going to ask you several questions,
12  not that many hopefully.  I will try to ask them one
13  at a time and if you answer the question, we will just
14  assume that you understood the question.
15         If for any reason you need me to repeat it
16  or explain it, just let me know.
17  **A.  I will.**
18  Q.  Have you ever testified in a deposition before?
19  **A.  Yes.**
20  Q.  And when was that?
21  **A.  Last year and the year before.**
22  Q.  Was it with respect to a CitiSteel matter?
23  **A.  Yes.**
24  Q.  And what matter was that?

Page 4

1   **A.  I met with my attorney.**
2   Q.  Did you do anything else?
3   **A.  No.**
4   Q.  Did you review any documents?
5   **A.  No.**
6   Q.  And could you please state your name for the
7   record?
8   **A.  James W. Ryan, R-y-a-n.**
9   Q.  And where do you currently work?
10  **A.  CitiSteel.**
11  Q.  And how long have you worked there?
12  **A.  Sixteen years.**
13  Q.  And what is your current job title?
14  **A.  Manager - human resources.**
15  Q.  What was your job title prior to being manager
16  of human resources?
17  **A.  Manager - health and safety.**
18  Q.  And what years were you the manager of health
19  and safety?
20  **A.  1999 to 2004.**
21  Q.  Is it fair to say that you were the manager of
22  health and safety while Terry Snyder was employed?
23  **A.  Yes, it is.**
24  Q.  And what were you prior to manager of health

Page 3

1   **A.  Let's see.  The matter of Fuhr, F-u-h-r, versus**
2   **CitiSteel.**
3   Q.  F-u-h-r?
4   **A.  F-u-h-r.**
5   Q.  Is that a person?
6   **A.  It's a person.**
7   Q.  And the other matter that you referenced?
8   **A.  I can't remember.**
9   Q.  If at any time you need to take a break, just
10  let me know and we will take a break.
11         The court reporter is here and he will be
12  taking down your answers to the questions.  It's very
13  important that you use yes and no as opposed to
14  uh-huhs or uh-uhs because they don't show up too clear
15  on the record.
16         At times CitiSteel's attorney may object
17  to some of the questions that I ask and that is
18  entirely proper.  All I ask is that you answer the
19  question unless she specifically instructs you not to
20  answer the question.
21         Do you understand?
22  **A.  I understand.**
23  Q.  What did you do in preparation for your
24  deposition testimony today?

Page 5

1   and safety?
2   **A.  Manager - employee relations.**
3   Q.  Were you anything prior to manager of employee
4   relations?
5   **A.  Supervisor - employee relations and safety.**
6   Q.  Okay.  I'll represent to you that Terry Snyder
7   was employed with CitiSteel from August 2001 through
8   April of 2003.  And as you said before, it is fair to
9   say that you were the manager of health and safety at
10  that time?
11  **A.  Yes.**
12  Q.  All of my questions will be based from that
13  time, unless I say otherwise.  So just so that it's
14  clear, I'm asking you questions with respect to when
15  you served CitiSteel as manager of health and safety.
16  Okay?
17  **A.  Right.  Got it.**
18  Q.  Who is Jerry Downie?
19  **A.  He's the former director of human resources at**
20  **CitiSteel.**
21  Q.  Who is the current director of human resources?
22  **A.  There is no one.**
23  Q.  Are you essentially doing his previous job?
24  **A.  I am, yes.**

B-0539

2 (Pages 2 to 5)

Snyder
James W. Ryan

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 15, 2006

Page 6

1    Q.   What's the reason why there's no director?
2    A.   It's felt there's no need for someone in that
3    position.
4    Q.   And when did Jerry Downie leave?
5    A.   August 2004.
6    Q.   And why did he leave?
7    A.   He resigned.  He retired.
8    Q.   Did he give a reason as to why he was
9    resigning?
10   A.   None that he shared with me, no.
11   Q.   Were you transferred into his position?
12   A.   Yes.
13   Q.   Did you have to apply for it or anything like
14   that?
15   A.   Yes.  I interviewed with the president of the
16   company for it.
17   Q.   And who is the president of the company?
18   A.   Mr. Shu.
19   Q.   Is he currently the president?
20   A.   No, he's not.
21   Q.   Who is the current president?
22   A.   Jeff Bradley.
23   Q.   How many employees did CitiSteel have?  I say
24   did because we're talking about that time period when

Page 7

1    you served as the manager of safety.
2    A.   About 350.
3    Q.   And how many departments approximately?
4    A.   Maybe fifteen.
5    Q.   And how many locations does CitiSteel have?
6    A.   Just one.
7    Q.   Now, CitiSteel has about fifteen departments.
8    Is one of the departments the melting shop?
9    A.   Yes, it is.
10   Q.   And another one would be the shipping
11   department?
12   A.   Yes.
13   Q.   And another one would be the plate mill?
14   A.   Yes.
15   Q.   What are some of the other departments?  And
16   it's okay if you can't remember all fifteen.
17   A.   Administration, facilities, maintenance are
18   some examples.
19   Q.   Okay.  And where is the shipping department
20   located in relationship to the melting shop?
21   A.   The shipping department is located on the
22   Delaware River side of Philadelphia Pike.
23        The melt shop is on the opposite side of
24   Philadelphia Pike from that.

Page 8

1    Q.   And how about the plate mill?
2    A.   The plate mill is also on the Delaware River
3    side of Philadelphia Pike, next to shipping.
4    Q.   What is on the side, what else besides the
5    melting shop is on that side?
6    A.   A contractor called International Mill Service
7    has its own building on that side.
8    Q.   Anything else?
9    A.   The scrap yard is on that side.
10   Q.   Anything else?
11   A.   That's about it.
12   Q.   And what is the shipping department responsible
13   for?
14   A.   Shipping plates.
15   Q.   Is that all they're responsible for?
16   A.   Yes.
17   Q.   And what are some of the titles of the
18   positions in the shipping department?
19   A.   Warehouse attendant.
20   Q.   What does the warehouse attendant do?
21   A.   Various activities in support of shipping
22   plates, housekeeping, operating a forklift, general
23   housekeeping.
24   Q.   Is there anyone else in the shipping department

Page 9

1    besides the warehouse attendant?
2    A.   A shipper-checker-loader.
3    Q.   Are those three separate --
4    A.   That's one position with three words.
5    Q.   Thank you.
6        And tell me what the shipper-checker-
7    loader does.
8    A.   Identifies piles of plates to be loaded onto
9    trucks or railcars for shipment and assists crane
10   operators in loading them.
11   Q.   Is there anyone else besides the warehouse
12   attendant and the shipper-checker-loader?
13   A.   Allocator.
14   Q.   What does the allocator do?
15   A.   The allocator identifies piles of plate and the
16   bills of lading that accompany them for the shipper-
17   checker-loaders to put onto the trucks.
18   Q.   Is there anyone else?
19   A.   Expediter.
20   Q.   Okay.
21   A.   And that operates as a temporary supervisor,
22   coordinates locomotive movements, truck movements with
23   outgoing shipments.
24   Q.   Anyone else?

B- 0540

3 (Pages 6 to 9)

Snyder                                    v.                        Citi Steel, USA, Inc.
James W. Ryan                      C.A. # 04-970-JJF                    June 15, 2006

Page 10

1    A.  Supervisor.
2    Q.  What does a supervisor do?
3    A.  Much the same as the expediter, except they
4    have responsibility for timekeeping and discipline.
5    Q.  Okay. Anyone else?
6    A.  Clerk/typist.
7    Q.  What do they do?
8    A.  Clerical duties in support of shipping
9    operations.
10   Q.  What are some of the clerical duties?
11   A.  Answering phones, filing, typing memos, faxing,
12   communicating with employees and truckers
13   occasionally.
14   Q.  So far we have answering phones, filing, typing
15   memos, faxing, communication with employees and
16   trucks?
17   A.  Truckers.
18   Q.  Truckers?
19   A.  Drivers.
20   Q.  Drivers. Is there anything else that they do?
21   A.  There might occasionally be other duties, but
22   those are the bulk of them.
23   Q.  When Terry Snyder was employed in August 2001
24   through April of 2003, who served as the clerk/typist

Page 11

1    in the shipping department?
2    A.  I can't remember.
3    Q.  Was there someone that you just can't remember
4    their name or you don't know whether there was anyone
5    there?
6    A.  I believe there was an incumbent if not at the
7    time Terry was there then perhaps just before or just
8    after, but I can't remember who it was.
9    Q.  Are there reports that the clerk/typist would
10   run in the shipping department?
11   A.  I believe so, yes.
12   Q.  What type of reports would they run?
13   A.  They would probably do reports on shipping
14   activity, tons shipped per shift per week.
15   Q.  And could you tell me how they would run these
16   reports?
17   A.  Probably type them in Word or Excel and then
18   print them out.
19   Q.  And how would the clerk/typist get the info for
20   the reports?
21   A.  From the supervisor.
22   Q.  Is it like a document that's given to the
23   clerk/typist? Is it verbally, is the information
24   verbally given?

Page 12

1    A.  It could be either verbally or written or a
2    combination.
3    Q.  How many employees are in the shipping
4    department?
5    A.  I think about 35.
6    Q.  And how many employees are in the melting shop?
7    A.  About a hundred.
8    Q.  Does the melting shop clerk/typist position
9    differ from the clerk/typist position in the shipping
10   department?
11   A.  No, it doesn't.
12   Q.  Is it the exact same?
13   A.  As far as the duties, yes.
14   Q.  As far as something else is it different?
15   A.  The nature of the information they're dealing
16   with because it's a different process, yes.
17   Q.  Tell me how it's a different process.
18   A.  As far as the melt shop produces slabs from scrap and
19   other inputs.
20       The shipping department takes finished
21   plates and puts them together as loads and puts them
22   on vehicles to be taken out of the plant.
23   Q.  I'm trying to understand the nature of the
24   different processes between the two departments.

B-0541

Page 13

1        I guess I'm trying, I'm definitely trying
2    to compare the two, the melting department or the melt
3    shop and the shipping department. Now, does the
4    clerk/typist position require any training?
5    A.  On-the-job training, yes.
6    Q.  So how long would the training be?
7    A.  I would guess between one and three weeks.
8    Q.  And would that be required of someone that
9    worked in the melt shop and then went over to the
10   shipping department, the same one-to-three-week
11   training?
12   A.  They probably would require less training
13   because they already, if they're already in the
14   company they know the procedures and policies.
15   Q.  So less training but some training?
16   A.  Yes.
17       MS. BREWINGTON: Can you mark that as Ryan
18   1, please?
19       (Ryan Deposition Exhibit No. 1 was marked
20   for identification.)
21   BY MS. BREWINGTON:
22   Q.  I have just placed in front of you Ryan 1. I
23   want to give you a chance to review the document and
24   then I want to ask you a question about it.

4 (Pages 10 to 13)

Snyder                                    v.                    Citi Steel, USA, Inc.
James W. Ryan                       C.A. # 04-970-JJF                  June 15, 2006

Page 14

1   A. Go ahead.
2   Q. First tell me what that document is.
3   A. It's an e-mail sent by Terry Snyder to me.
4   Q. When was it sent?
5   A. January 7th, 2003.
6   Q. And what are the contents of this e-mail?
7   A. In this e-mail she communicated to me that she
8   thought the floor needed repair and it was a safety
9   hazard.
10  Q. Did the floor need repair?
11  A. I don't know if it did or not.
12  Q. Why don't you know? Because you don't
13  remember?
14  A. Because I didn't visually inspect it.
15  Q. Do you know whether it was a safety hazard?
16  A. No, I don't.
17  Q. What was your response to this e-mail?
18  A. I communicated with Randolph Harris and Dennis
19  Ford and told them to look at it and if it
20  needed repair, they should repair it.
21  Q. Would that be something that they would do
22  themselves?
23  A. Yes, it would. Or they would direct someone to
24  do it.

Page 15

1   Q. Who would be the someone?
2   A. Either their employees or facilities'
3   employees.
4   Q. Do you know whether it was ever repaired?
5   A. It was, but I couldn't tell you when.
6   Q. Do you know who repaired it?
7   A. No, I don't.
8   Q. Did you respond to Terry Snyder?
9   A. I think I did, but I can't recall affirmatively
10  that I did get back to her.
11  Q. Were you concerned about the tile?
12  A. Yes, I was concerned.
13  Q. Did you follow up with Randolph Harris or
14  Dennis Ford to make sure it was completed?
15  A. I don't recall having done so, no.
16  Q. You can put that to the side.
17       Are employees' performances evaluated on a
18  regular annual basis at CitiSteel?
19  A. Yes.
20  Q. Now, is that all employees?
21  A. It's salaried employees only.
22  Q. So is it fair to say that Randolph Harris is a
23  salaried employee?
24  A. Yes.

Page 16

1   Q. And he was given an annual performance
2   evaluation?
3   A. I couldn't swear to that because I haven't
4   seen, I haven't looked in his file to see if he
5   received them every year.
6   Q. But that would be the policy?
7   A. But that would be the policy, yes.
8   Q. And Terry Snyder is not a salaried employee,
9   correct?
10  A. Yes, she is.
11  Q. She is. Okay. And she would also have or
12  should have also had performance evaluations completed
13  on an annual basis?
14  A. Yes.
15  Q. And in terms of disciplinary actions, could you
16  tell me what CitiSteel's policy is with respect to
17  when corrective actions are given to employees?
18  A. Generally if there's a discipline problem they
19  receive two verbal warnings and if the problem
20  persists, then they receive a written warning.
21  Q. And when is the verbal warning given in
22  relationship to, for lack of a better word, bad
23  activity?
24  A. Soon after the bad activity takes place.

Page 17

1   Q. And with respect to the verbal warnings, I
2   understand that they're verbally given to the
3   employees. Is that correct?
4   A. Yes.
5   Q. Is there any documentation of the verbal
6   warning placed in the file or documented by the
7   supervisor?
8   A. Normally the supervisor documents the verbal
9   warning in the file they keep in the department.
10  Q. Is it their own personal file on the employee?
11  A. Either their own personal file or there's a
12  central file they share on employees.
13  Q. And then is there another file in human
14  resources?
15  A. Yes.
16  Q. And when an individual is terminated, do the
17  files somehow come together or no?
18  A. Not always, no.
19  Q. What happens to that one file that's near the
20  supervisor?
21  A. They either keep them or they discard it.
22  Q. So they throw that away?
23  A. Sometimes.                          B-0542
24  Q. Is there a policy on that?

5 (Pages 14 to 17)

Snyder                                              v.                              Citi Steel, USA, Inc.
James W. Ryan                                C.A. # 04-970-JJF                              June 15, 2006

Page 18

1   A.  No.
2   Q.  And they're allowed to just throw files away?
3   A.  Yes.
4   Q.  What is CitiSteel's policy on sexual
5   harassment?
6   A.  It's not tolerated.
7   Q.  And how do you ensure that it's not tolerated?
8   A.  If any allegations of harassment are made
9   they're promptly and thoroughly investigated and
10  conclusions are given to the alleged recipient of the
11  harassment.
12  Q.  Is the alleged recipient ever transferred as a
13  result of alleging sexual harassment?
14  A.  They could be.
15  Q.  In what circumstances would they be
16  transferred?
17  A.  In circumstances in which an appropriate
18  position is available.
19  Q.  I'm sorry?  I didn't hear that.
20  A.  In circumstances in which an appropriate
21  position would be available for them.
22  Q.  Is that the only situation where an individual
23  would be transferred, is if there's an appropriate
24  position available?

Page 19

1   A.  It's very rarely come up so I'm not sure I
2   could respond to that question.
3   Q.  Based on your experience, how many individuals
4   have been transferred that you can remember after
5   alleging sexual harassment?
6   A.  None.
7   Q.  Does that include Terry Snyder?
8   A.  Yes.  Because she never changed jobs.
9   Q.  Was she offered a transfer?
10  A.  Yes, she was.
11  Q.  Is there anyone else that you offered a
12  transfer to after they alleged sexual harassment?
13  A.  Not that I recall.
14  Q.  I guess I'm trying to understand why would
15  CitiSteel transfer an employee that alleged sexual
16  harassment?
17  A.  To put them in a work environment where they
18  were removed from the alleged harasser.
19  Q.  Does CitiSteel take into consideration the
20  desires of the actual alleged recipient of the
21  harassment?
22       MS. DiBIANCA:  Are we still on 2001-2003?
23       MS. BREWINGTON:  Yes.
24  A.  Could you rephrase the question, please?

Page 20

1   Q.  I guess I want to know in a situation where you
2   have an alleged recipient of harassment and she comes
3   to you and claims harassment and you offer a transfer
4   to another position, does CitiSteel take into account
5   the wants or the needs of the actual alleged recipient
6   of the harassment?
7   A.  The company representative is certainly willing
8   to listen to the wishes and needs of the victim of
9   alleged harassment.
10  Q.  Does that affect the decision in any way?
11  A.  If it's possible to affect it.  The options
12  available may be limited as far as remedial transfers.
13       MS. BREWINGTON:  If I could have that
14  marked as Ryan 2.
15       (Ryan Deposition Exhibit No. 2 was marked
16  for identification.)
17  BY MS. BREWINGTON:
18  Q.  I want to give you an opportunity to review
19  that document and just let me know when you have had
20  an opportunity, if you can.
21  A.  (Reviewing document)  All done.
22  Q.  Okay.  Have you ever seen that document before?
23  A.  Yes.
24  Q.  And when was that?

B-0543

Page 21

1   A.  At the time of the investigation.
2   Q.  Okay.  The date of this document is April 8th,
3   2003.  Do you know what it is?
4   A.  It appears to be a statement written by Terry
5   about her interaction with Mr. Harris.
6   Q.  Since the date is April 8, 2003, would you
7   agree that it was probably written on that same date?
8   A.  Probably, yes.
9   Q.  And you saw this document around that same
10  time?
11  A.  Yes.
12  Q.  Do you recall whether you saw it the same day,
13  April 8th, 2003?
14  A.  No, I don't.
15  Q.  And tell me how you came to view this document.
16  A.  In reviewing the case with Mr. Downie.
17  Q.  And did you happen to meet with Mr. Downie and
18  others to discuss this case?
19  A.  I met with Mr. Downie to discuss it.  No one
20  else.
21  Q.  At any time?  It was just you, any time you met
22  it was between you and Mr. Downie?
23  A.  Correct.
24  Q.  And is it fair to say that the first time you

6 (Pages 18 to 21)

Snyder                                        v.                    Citi Steel, USA, Inc.
James W. Ryan                        C.A. # 04-970-JJF                    June 15, 2006

Page 22

1   learned of Ms. Snyder's allegations were around this
2   time, April 8, 2003?
3   **A. That would be fair, yes.**
4   Q. And what happened during the meeting with
5   Mr. Downie and yourself?
6   **A. To my recollection, he informed me of the**
7   **allegation. He allowed me to review this document and**
8   **I think that was all.**
9   Q. Did Mr. Downie say anything to you?
10  **A. My recollection is he just told me that Terry**
11  **was alleging harassment and gave me the name of the**
12  **alleged harasser and showed this thing to me.**
13  Q. Excuse me?
14  **A. Showed me this document.**
15          MS. BREWINGTON: Can we go off the record
16  for two seconds?
17          (Discussion off the record.)
18  BY MS. BREWINGTON:
19  Q. You just finished telling me what he told you?
20  **A. Yes.**
21  Q. Do you recall anything that you told him?
22  **A. I don't think I told him much of anything.**
23  Q. Was there a discussion of what you guys were
24  going to do to handle the situation?

Page 23

1   **A. I think he mentioned that he was going to meet**
2   **with Terry and wanted me to be present as a witness,**
3   **but other than that, no.**
4   Q. Did he say why he wanted you to be present as a
5   witness?
6   **A. I think he wanted a witness present so there**
7   **would be someone else who could relate what happened**
8   **in the meeting.**
9   Q. And did you meet with Terry Snyder?
10  **A. Yes, with Mr. Downie.**
11  Q. I want to go back to that. We're not going to
12  get there yet.
13          Before you met with Terry Snyder and
14  Mr. Downie, do you recall Downie ever saying that he
15  wanted to keep the dust down?
16  **A. Keep the dust down?**
17  Q. He wanted to keep the dust down?
18  **A. In relation to what?**
19  Q. I don't know actually. I believe, and I
20  haven't yet taken Downie's deposition, but I believe
21  it was with respect to the tapes and with respect to
22  not getting the word out about the sexual harassment,
23  but I don't know.
24  **A. I don't recall him saying that, no.**

Page 24

1   Q. Do you know whether or not he wanted to keep
2   the dust down?
3   **A. To my knowledge, he didn't express any desire**
4   **to me to keep the dust down, no.**
5   Q. Do you remember a discussion with Mr. Downie
6   about tapes, tape recordings?
7   **A. I remember a discussion between Terry and**
8   **Mr. Downie in our meeting about tapes, yes.**
9   Q. Do you remember anything prior to that
10  meeting --
11  **A. No.**                                    B-0544
12  Q. -- about tapes?
13  **A. No.**
14  Q. When you met with Mr. Downie, did the idea of
15  transferring Ms. Snyder come up in conversation?
16  **A. No.**
17  Q. Can you tell me when is the first time that
18  this notion of transferring Ms. Snyder came up in
19  conversation?
20  **A. In the meeting with Mr. Downie and Terry.**
21  Q. Was that the first time you heard of
22  transferring?
23  **A. Yes, it was.**
24  Q. So I'm clear, the first time you heard about

Page 25

1   this transferring was when Jerry Downie actually said
2   it in the meeting?
3   **A. Correct.**
4   Q. So you weren't involved in the decision to
5   offer Terry a transfer?
6   **A. No, I was not.**
7   Q. Do you know who was involved in that decision?
8   **A. Mr. Downie and I would have to guess as to who**
9   **the other parties were because he didn't mention them.**
10  Q. Go ahead and guess for me.
11  **A. Mr. Harris and Mr. Weiss, who is the general**
12  **supervisor of shipping.**
13  Q. Okay. Why would you guess that Mr. Weiss was
14  involved?
15  **A. Because someone would have to inform him that**
16  **we had somebody to possibly fill the position of**
17  **clerk/typist.**
18  Q. And why would you guess that Mr. Harris was
19  involved?
20  **A. Because it involved his employee and taking an**
21  **action that would remove her from his department.**
22  Q. Do you know why they wanted to transfer Terry
23  Snyder?
24  **A. My guess is it was an equivalent position to**

7 (Pages 22 to 25)

Snyder                                    v.                          Citi Steel, USA, Inc.
James W. Ryan                      C.A. # 04-970-JJF                        June 15, 2006

Page 26

1  the one she was holding at that time and it was open
2  and it would serve the purpose of moving her to an
3  area where there would be no interaction with her
4  alleged harasser.
5  Q.  Did she at any time express to you or anyone
6  else that you know of that she did not want to
7  transfer?
8  A.  In the meeting with Downie she told us that she
9  would not be interested in transferring.
10  Q.  Did she have the option of going back to her
11  own job if she did not want to transfer?
12  A.  No.
13  Q.  Why not?
14  A.  Because of the circumstances surrounding her
15  interaction with the alleged harasser.
16  Q.  Meaning what?
17  A.  Meaning it was clear, I believe it was clear to
18  Downie that she would not be willing to continue
19  working in that area with the alleged harasser there.
20  Q.  So was it the belief that Ms. Snyder didn't
21  want to go back to her position?
22  A.  No.
23  Q.  Can you kind of explain that to me again then?
24  A.  I believe Downie's view was that Terry and the

Page 27

1  other person involved could not work effectively in
2  the same area together.
3  Q.  So Terry and Mr. Randolph Harris could not work
4  in the same area?  Is that what you're saying?
5  A.  Yes.
6  Q.  Did Terry also report to Dennis Ford at that
7  time?
8  A.  Yes.
9  Q.  Could she have worked with Dennis Ford?
10      MS. DiBIANCA:  I'll object to the extent
11  that it calls for speculation.
12      But you can go ahead and answer.
13  A.  She could have changed her reporting
14  relationship so that she only was responsible to
15  Dennis, yes, but it still would have involved working
16  in close proximity to the person she had a problem
17  with.
18  Q.  Did she tell you or anyone that she wanted to
19  keep her job?
20  A.  Yes, she did.
21  Q.  Did she tell you that she didn't mind working
22  in the melt shop, continuing to work in the melt shop?
23  A.  Yes, she said that.
24  Q.  Did she say that to you and Jerry Downie?

Page 28

1  A.  Yes, she did.
2  Q.  Was that in that final meeting on April 10th,
3  2003?
4  A.  Yes, it was.
5  Q.  So is it fair to say that it was Downie that
6  made the decision that Terry could either transfer to
7  shipping or be terminated?
8  A.  Yes, it is.
9  Q.  And you don't know who he consulted in making
10  that decision?
11  A.  No.  Because I didn't discuss with him who he
12  discussed it with before he came to that conclusion.
13  Q.  And how do you feel about that decision?
14  A.  How do I feel about it?
15  Q.  Yes.
16  A.  I thought it was fair.
17  Q.  Does the shipping department have ISO reports?
18  A.  Yes.
19  Q.  Are they different than the melting shop
20  reports?
21  A.  Only to the extent, again, that the processes
22  they describe are different.
23  Q.  The processes that they describe?
24  A.  But the format, the way they're laid out, the

Page 29

1  way they're produced looks the same, but the work
2  being done is totally different.
3  Q.  Was this position in the shipping department
4  posted?
5  A.  No.
6  Q.  Why not?
7  A.  I believe at the time he had the discussion
8  with Terry it was soon --
9  Q.  I'm sorry.  Who is "he"?
10  A.  Jerry.
11  Q.  Okay.  Go ahead.
12  A.  At the time it was posted, at the time we had
13  the discussion with Terry, it was soon after the job
14  was vacated so there had been no opportunity to post
15  it.
16  Q.  And who was in that position previously?
17  A.  I think it was someone named Dawn.  I can't
18  remember her last name.
19  Q.  And are positions at CitiSteel generally
20  posted?
21  A.  Yes.
22  Q.  At the time, and I'm talking about April 2003,
23  how many clerks were in the shipping department?  Do
24  you know?

B-0545

8 (Pages 26 to 29)

Wilcox & Fetzer, Ltd.              Professional Court Reporters              (302)655-0477

Snyder
James W. Ryan

v.

C.A. # 04-970-JJF

Citi Steel, USA, Inc.
June 15, 2006

Page 30

1   A.   None.
2   Q.   None. And is that because Dawn had left?
3   A.   Correct.
4   Q.   If that's the right name?
5   A.   Yes.
6   Q.   And we don't know how long she had been gone?
7   A.   Not long, but I can't tell you the exact amount
8   of time.
9   Q.   What's "not long" in your opinion?
10  A.   A week or two.
11  Q.   I want to turn specifically to this meeting on
12  April 10th, 2003.
13       Before we get to that, one more thing I
14  want to talk to you about is do you recall following
15  Terry Snyder to the melt shop the day prior? That
16  would have been April 9, 2003.
17  A.   No.
18  Q.   Do you recall going to the melt shop on April
19  9, 2003?
20  A.   No.
21  Q.   Is there a human resources department near the
22  melt shop?
23       Oh, I'm sorry. Is there a human resources
24  department near the melt shop?

Page 31

1   A.   No.
2   Q.   Do you recall going to the hill to see Terry on
3   April 10, 2003?
4        MS. DiBIANCA: Objection to the extent
5   that the hill, there's no foundation for what that is.
6        You can answer, if you understand.
7   Q.   Do you know what the hill is?
8   A.   Yes.
9   Q.   My question was: Do you recall going to the
10  hill to see Terry on April 10, 2003?
11  A.   Yes, if that's the correct date. I can't
12  remember the exact date.
13  Q.   I understand. But you remember going to the
14  hill?
15  A.   I do.
16  Q.   Tell me about that.
17  A.   Jerry Downie asked me to act as a witness in a
18  meeting with Terry. I met with Terry and Jerry in his
19  office that day.
20  Q.   Now, that's not the meeting that I was about to
21  ask you about, is it, the April 10th, 2003 meeting, or
22  is it?
23  A.   I think it is.
24  Q.   Okay. How many times did you meet with Terry

Page 32

1   Snyder?
2   A.   I think twice.
3   Q.   Is one the time when you were going to the
4   hill?
5   A.   I think both meetings were there.
6   Q.   Were on the hill?
7   A.   Yes.
8   Q.   All right. Can you tell me about the first
9   meeting, what you remember about the first meeting?
10  A.   I believe that Jerry asked me to go to his
11  office. I went to his office. Terry appeared there.
12       At that point I believe he offered her the
13  transfer to shipping and --
14  Q.   And that was the first time that you heard
15  about this offer to transfer?
16  A.   Yes. Yes.
17  Q.   And what else happened in the meeting?
18  A.   I believe she said that she wasn't interested
19  and then Jerry and she arranged another meeting and
20  then she left.
21  Q.   Okay. And that took place on the hill?
22  A.   I think it took place in another building, in
23  the plant personnel office near the main gate of the
24  plant.

Page 33

1   Q.   Now, after that meeting where did Terry go?
2   A.   I assume she went home. I don't know where she
3   went.
4   Q.   What's on the hill?
5   A.   Administrative offices.
6   Q.   Is your office on the hill?
7   A.   Now it is.
8   Q.   But in 2003?
9   A.   It was in the plant personnel office.
10  Q.   That's not on the hill?
11  A.   That's not on the hill, no.
12  Q.   So why were you on the hill?
13  A.   Because Mr. Downie asked me to attend the
14  meeting there.
15  Q.   So the meeting was on the hill?
16  A.   Right.
17  Q.   Is that generally where meetings are held?
18  A.   Meetings are held in a number of places.
19  That's one of them.
20  Q.   Let's go to this final meeting.
21       You said you went with her twice?
22  A.   Yes.
23  Q.   We're talking about the second meeting and we
24  know that occurred on April 10, 2003. That was her

B- 0546

9 (Pages 30 to 33)

Snyder                                v.                    Citi Steel, USA, Inc.
James W. Ryan                  C.A. # 04-970-JJF                  June 15, 2006

Page 34

1   last date of employment.
2   A.  Yes.
3   Q.  Tell me who was present at that meeting.
4   A.  Myself, Terry and Jerry Downie.
5   Q.  Did you say anything during that meeting?
6   A.  I don't recall saying anything, no.
7   Q.  Did you take notes during that meeting?
8   A.  I think I did.
9   Q.  Where are those notes?
10  A.  I don't know.
11  Q.  Did you give them to anyone?
12  A.  I believe I gave them to Mr. Downie.
13  Q.  Were tapes discussed in that meeting?
14  A.  I think they were.
15  Q.  What do you remember about the tapes?
16  A.  I think Terry told us in a meeting that she had
17  made recordings of Mr. Harris and also of Mr. Downie's
18  meeting with her.
19  Q.  Was that the first time you heard of the tapes?
20  A.  I think she made reference to them in the first
21  meeting also.
22  Q.  Did anyone request to hear the tapes?
23  A.  I think Mr. Downie requested to hear them.
24  Q.  Do you know what he said to her?

Page 35

1   A.  I can't remember his exact words, no.
2   Q.  Do you know if Terry responded to him when he
3   asked about the tapes?
4   A.  I think she said that she would let him hear
5   them, but I don't recall what she might have said
6   about them after that.
7   Q.  Did you or Downie allow Ms. Snyder to have
8   someone else in the meeting with you guys?
9   A.  No.
10  Q.  Do you recall her requesting to have someone
11  else in the meeting?
12  A.  Yes.
13  Q.  And who did she request to have in the meeting?
14  A.  Her father.
15  Q.  And why wasn't she allowed to have someone else
16  in the meeting with her?
17  A.  Her father was not an employee of the company
18  and as an outside party Mr. Downie felt it wasn't
19  appropriate to invite him to the meeting.
20  Q.  Tell me what was discussed at that meeting.
21  A.  Which meeting?
22  Q.  The second meeting.
23  A.  The second meeting?
24  Q.  April 10, 2003, the last meeting.

Page 36

1   A.  To the best of my recollection, I believe
2   Mr. Downie asked Terry again if she would consider
3   taking the clerk/typist job in shipping. Terry said
4   no, she would not.
5   Q.  Did she say why?
6       MS. DiBIANCA:  I'm sorry. Were you
7   finished with your answer?
8       THE WITNESS:  Yes.
9       MS. DiBIANCA:  Okay.
10  A.  Did she say why? She made some statement to
11  the effect of people get lost back there, but I don't
12  recall her saying anything else.
13  Q.  People get lost back there?
14  A.  Yes.
15  Q.  Do you know what she was talking about?
16  A.  No.
17  Q.  Did anyone ask her what she was talking about?
18  A.  No one did.
19  Q.  Did you wonder what she was talking about?
20  A.  Yes.
21  Q.  But you didn't ask her?
22  A.  No.
23  Q.  Did either of you offer to remove the
24  disciplinary write-up from her file?

Page 37

1   A.  No.
2   Q.  Did either of you explain to Terry why she was
3   being transferred to shipping?
4   A.  I believe Mr. Downie did.
5   Q.  And what did Mr. Downie say?
6   A.  To the best of my recollection, he said that
7   she was being moved to get her -- it was an equivalent
8   position, it paid the same, roughly the same duties
9   and it was a way of getting her away from her alleged
10  harasser.
11  Q.  Did Terry Snyder ask you why she should leave
12  the job she loved in order to protect the harasser?
13  A.  Yes.
14  Q.  Did you guys respond to her?
15  A.  Mr. Downie did, yes.
16  Q.  And what did Mr. Downie say?
17  A.  I think what he said was it was the only option
18  we had available given the open positions we had at
19  the time.
20  Q.  Did she express to you and Mr. Downie that she
21  wanted to go back to work?
22  A.  Yeah, she did.
23  Q.  Did she ask why she was being shipped to
24  shipping when she didn't do anything wrong?

B- 0547

10 (Pages 34 to 37)

Snyder                                          v.                              Citi Steel, USA, Inc.
James W. Ryan                          C.A. # 04-970-JJF                        June 15, 2006

Page 38

1    A. I think she asked that question, yes.
2    Q. And what was the response?
3    A. The one I just gave you.
4    Q. Okay. Did either of you tell Ms. Snyder that
5    her job in the melting shop was being eliminated?
6         MS. DiBIANCA: I'm going to object to the
7    extent that it calls for him to speculate outside of
8    the time frame of the meeting.
9         MS. BREWINGTON: Well, I'm asking him in
10   that meeting. These are questions directly related to
11   the meeting.
12        MS. DiBIANCA: Okay.
13   A. I don't recall it being said, no.
14   Q. Was Terry Snyder escorted off the grounds that
15   day?
16   A. I remember she left. I don't recall anyone
17   following her or going with her.
18   Q. So you didn't escort her off the property?
19   A. I don't remember doing that, no.
20   Q. Is that something that's done when someone is
21   terminated, escorting someone off the grounds?
22   A. Sometimes, depending on the nature of the
23   separation.
24   Q. Was Ms. Snyder terminated because she didn't

Page 40

1    available to her.
2    Q. Oh, because the melting shop was no longer
3    available?
4    A. Right.
5    Q. Why wasn't the melting shop no longer
6    available?
7         MS. DiBIANCA: I think it's been asked and
8    answered several times.
9         You can go ahead and answer again, if you
10   would like.
11        MS. SNYDER: I have been asked several
12   questions over and over.
13   A. For the reasons previously stated, that it was
14   felt Terry and this other person shouldn't be working
15   in the same area.
16   Q. When does CitiSteel change the security code?
17   A. When you say, "security code," what do you
18   mean?
19   Q. I think I mean this code to get into the
20   building.
21   A. "The building" being the building on the hill?
22   No?
23   Q. I'm going to take a break and get more
24   information about that and come back to that.

Page 39

1    accept the transfer?
2    A. In our view Ms. Snyder resigned.
3    Q. Could you explain that?
4    A. She was offered basically the position she was
5    in in another area and refused to report to work.
6    Q. Okay. And she was offered a transfer, correct?
7    A. Yes.
8    Q. And she didn't accept the transfer, correct?
9    A. Yes. Correct.
10   Q. And what happened to her as a result?
11   A. She effectively resigned her position.
12   Q. Did anyone ask her to leave the grounds?
13   A. She actually suggested that she leave the
14   grounds and Mr. Downie agreed with her.
15   Q. And did he agree because she -- do you know why
16   he agreed?
17   A. That would be speculation on my part, but I
18   suspect it was because she didn't want to go back to
19   work and they had nothing more to discuss.
20   Q. She didn't want to go back to work?
21   A. Right.
22   Q. She didn't want to go back to the melting shop?
23   Is that what you're saying?
24   A. No. She didn't want to return to the work

Page 41

1    A. Okay.
2         MS. BREWINGTON: Don't let me forget that.
3    BY MS. BREWINGTON:
4    Q. I will get more information and then I will ask
5    you about it because I really don't know, I didn't
6    know there were several different codes or anything.
7    A. Okay.
8    Q. This April 10, 2003 meeting, did Terry Snyder
9    tape this conversation?
10   A. In the meeting I recall she said she was taping
11   it at the time.
12   Q. Did you see a tape recorder?
13   A. I did not see a tape recorder if she had one.
14        MS. BREWINGTON: If I could have that
15   marked as Ryan 3.
16        (Ryan Deposition Exhibit No. 3 was marked
17   for identification.)
18   BY MS. BREWINGTON:
19   Q. I'm going to give you an opportunity to review
20   what I just put in front of you. It has been
21   previously marked as Ryan 3, I believe.
22   A. (Reviewing document) Okay.
23   Q. If you could read for me out loud the last
24   sentence of the second, the two last sentences -- the

11 (Pages 38 to 41)

Snyder                                          v.                    Citi Steel, USA, Inc.
James W. Ryan                          C.A. # 04-970-JJF                      June 15, 2006

---

Page 42

1  second-to-last sentence and the last sentence in the
2  second paragraph beginning with "Terri."
3  **A.  "Terri then turned the tape recorder back on**
4  **and left it on.  She took it from the tabletop and put**
5  **it in her pocket."**
6  Q.  Does that refresh your recollection in terms of
7  whether she had, whether you saw her with the tape
8  recorder?
9  **A.  Yes.**
10  Q.  And is it fair to say that she had the tape
11  recorder on the tabletop?
12  **A.  Yes.**
13  Q.  And that she then put it in her jacket?
14  **A.  Yes.**
15  Q.  Is it also fair to say that you and Downie were
16  aware that the tape recorder was turned back on?
17  **A.  Yes.**
18  Q.  I would like to play a recording for you, if I
19  could.
20  MS. BREWINGTON:  Go off the record.
21  (A brief recess was taken during which a
22  tape recording was played.)
23  BY MS. BREWINGTON:
24  Q.  Did Downie ask you to escort her off the

---

Page 43

1  premises?
2  **A.  He may have.  I don't recall him saying it.**
3  Q.  You have had an opportunity to listen to the
4  tape that I played.  Do you recognize the voices on
5  the tape?
6  **A.  Yes.**
7  Q.  And who are they?
8  **A.  Terry Snyder and Jerry Downie.**
9  Q.  Does that tape accurately reflect the meeting
10  of April 10, 2003?
11  **A.  Yes.**
12  Q.  And you were present during that meeting?
13  **A.  Correct.**
14  Q.  But your voice is not on the tape?
15  **A.  No.**
16  Q.  And do you recall Downie saying that he was
17  willing to remove the March 3rd write-up?
18  **A.  Now that I have heard it, yes.**
19  Q.  And do you recall that Terry Snyder asked for
20  CitiSteel to put the information about the transfer in
21  writing and that she will consider it?
22  **A.  I don't recall that detail, but now that I hear**
23  **it on the tape I do recall.**
24  Q.  Do you recall Downie stating that he wouldn't

---

Page 44

1  put it in writing?
2  **A.  Again, my memory is refreshed by hearing that,**
3  **but prior to hearing the tape I wouldn't recall that.**
4  Q.  You do recall based upon listening to the tape?
5  **A.  Yes.**
6  Q.  Do you recall why he wouldn't put it in
7  writing?
8  **A.  No.**
9  MS. BREWINGTON:  I would just like to go
10  off the record.
11  (Discussion off the record.)
12  (A brief recess was taken.)
13  MS. BREWINGTON:  I don't have anything
14  further.
15  MS. DiBIANCA:  I have a couple, very,
16  very, very brief.
17  BY MS. DiBIANCA:
18  Q.  When did you become aware that the tape was
19  recording during the meeting on April 10th?  Were you
20  aware the whole time?
21  **A.  I believe it was sometime after she had**
22  **started, but I couldn't tell you exactly how much had**
23  **been recorded before I became aware of it.**
24  Q.  And the tape that was played, does that

B- 0549

---

Page 45

1  accurately reflect the entire meeting or is that a
2  portion of the meeting?
3  **A.  It sounds to me like a portion of the meeting.**
4  Q.  Earlier we discussed or Ms. Brewington asked
5  you about the disciplinary policy at CitiSteel.  And I
6  believe is it correct it was your testimony that there
7  were two verbal warnings given and then a written
8  warning?
9  **A.  That's correct.**
10  Q.  And was your answer reflecting for the time
11  period of Ms. Snyder's employment?
12  **A.  Yes.**
13  Q.  And how would you have known that at that time?
14  **A.  From discussions with Mr. Downie.**
15  Q.  Okay.  So unofficially you knew that but not
16  officially in your role as manager of health and
17  safety?
18  **A.  Correct.**
19  Q.  You testified about the transfer decision and
20  your testimony was that you believed, I think you
21  might have said speculated that Mr. Harris and/or
22  Mr. Weiss was somehow involved in that decision.  Is
23  that correct?
24  **A.  Correct.**

12 (Pages 42 to 45)

---

Snyder                                                    v.                          Citi Steel, USA, Inc.
James W. Ryan                                    C.A. # 04-970-JJF                              June 15, 2006

Page 46

1    Q.   Would they have been involved in the decision
2    or would they have been involved in knowing about
3    Mr. Downie's decision?
4    A.   **They would have been involved in knowing about**
5    **Mr. Downie's decision.**
6    Q.   Would they have, either Mr. Harris or Mr. Weiss
7    have decision-making authority to make that decision?
8    A.   **No.**
9    Q.   When Ms. Snyder requested to have her father
10   present at the meeting with Mr. Downie, were you
11   present when she made that request?
12   A.   **Yes.**
13   Q.   And that was on April 9th?
14   A.   **To the best of my recollection, yes.**
15   Q.   And did you respond to that request?
16   A.   **No.**
17   Q.   Did Mr. Downie respond to that request?
18   A.   **Yes.**
19   Q.   And what was his response?
20   A.   **His response was that no, the father could not**
21   **be in the meeting.**
22   Q.   Did you have an opinion of Ms. Snyder, whether
23   she was a good employee at the time of her employment?
24   A.   **Yes, I had an opinion.**

Page 47

1    Q.   And what was that opinion?
2    A.   **That she was not a good employee.**
3    Q.   Can you give me any specific characteristics or
4    examples as to why?
5    A.   **Yes. She spent excessive time talking to other**
6    **employees, socializing on the job. She spent**
7    **excessive time walking around the plant for the**
8    **purposes of socializing rather than following her**
9    **directions.**
10       **She spent excessive time trying to develop**
11   **personal relationships with other employees both**
12   **within her department and outside her department. She**
13   **made numerous irrational requests not related to her**
14   **job performance of me and also of others.**
15   Q.   Can you give me an example of that?
16   A.   **Asking for blank forms more than was necessary.**
17   Q.   And what about Mr. Harris, during this time
18   frame did you have an opportunity to form an opinion
19   of Mr. Harris?
20   A.   **Yes, I did.**
21   Q.   And what was that opinion?
22   A.   **That he was a good employee.**
23   Q.   Do you know how long he had been employed at
24   the time of the investigation?

Page 48

1    A.   **About twelve years.**
2    Q.   And do you know if he had during those twelve
3    years any complaints or write-ups, disciplinary
4    problems prior to Ms. Snyder's allegations?
5    A.   **None that I'm aware of, no.**
6    Q.   Did he have a reputation for honesty?
7    A.   **Yes, he did.**
8    Q.   Do you consider him an honest person?
9    A.   **Yes, I do.**
10       MS. DiBIANCA:  That's all I have.
11   BY MS. BREWINGTON:
12   Q.   You mentioned that Ms. Snyder was not a good
13   employee.  Is that correct?
14   A.   **That's correct.**
15   Q.   Is that based on your own personal knowledge?
16   A.   **It's based on my personal knowledge and also**
17   **the observations of others.**
18   Q.   And what others are you speaking of?
19   A.   **Mr. Downie.**
20   Q.   So did Downie personally observe these things
21   and tell you about them?  Let me be specific.
22       Excessive time talking with other
23   employees?
24   A.   **That was observed by Mr. Ford, Mr. Harris and**

Page 49

1    **Mr. Buragino and relayed to Mr. Downie by them.**
2    Q.   How about walking around the plant socializing?
3    A.   **I observed that myself.**
4    Q.   Did you ever say anything to her about walking
5    around the plant socializing?
6    A.   **No.**
7    Q.   Did you say anything to her manager?
8    A.   **No.**
9    Q.   Why not?
10   A.   **Because I didn't know at the time if she was**
11   **carrying out what she was supposed to be carrying out**
12   **or she was doing this on her own.**
13   Q.   So you didn't know if she was working or not?
14   Is that what you're saying?
15   A.   **Yes.**
16   Q.   You also mentioned that she was not a good
17   employee because she spent excessive time trying to
18   develop personal relationships?
19   A.   **Yes.**
20   Q.   Is that based on your personal knowledge?
21   A.   **Yes.**
22   Q.   Tell me about that.
23   A.   **She spent excessive time talking to the nurse**
24   **who worked near the area I did.**

13 (Pages 46 to 49)