LEXSEE 2002 US DIST LEXIS 9358

**MAGDA BRENLLA, Plaintiff, - against - LASORSA BUICK PONTIAC
CHEVROLET, INC., JOHN LASORSA, Defendants.**

**00 Civ. 5207 (JCF)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK**

*2002 U.S. Dist. LEXIS 9358; 146 Lab. Cas. (CCH) P34,546; 82 Empl. Prac. Dec.
(CCH) P41,083; 7 Wage & Hour Cas. 2d (BNA) 1688*

**May 28, 2002, Decided
May 28, 2002, Filed**

**DISPOSITION:** **[*1]** Defendants' motion for judgment as matter of law or for new trial denied. Defendants' motion to set aside or reduce award of front pay and plaintiff's motion to increase award both denied, and jury's finding on front pay adopted. Plaintiff's motion for prejudgment interest on back pay award and for attorneys' fees and costs granted, and motion for judgment as matter of law or for new trial on denied.

**COUNSEL:** For MAGDA BRENLLA, plaintiff: Michael J. Volpe, Clifton, Budd & DeMaria, L.L.P., New York, NY.

**JUDGES:** JAMES C. FRANCIS IV, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** JAMES C. FRANCIS IV

**OPINION:**

   OPINION AND ORDER

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

   In this action, the plaintiff alleges that the defendants violated the Americans with Disabilities Act (the "ADA"), *42 U.S.C. § 12101* et seq., the New York State Human Rights Law (the "NYSHRL"), *N.Y. Exec. Law § 290* et seq., the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq., and the Family and Medical Leave Act (the "FMLA"), *29*

*U.S.C. § 2601* **[*2]** et seq., when defendant John LaSorsa fired her from LaSorsa Buick Pontiac Chevrolet, Inc. The case was tried before me on consent of the parties pursuant to *28 U.S.C. § 636*(c), and the jury returned a verdict in favor of the plaintiff, finding the defendants liable under the FMLA and awarding her $ 150,000 in back pay and benefits, $ 70,000 in front pay, and $ 100,000 in liquidated damages, for a total of $ 320,000.

   The defendants now move pursuant to Rules 50 and 59 of the Federal Rules of Civil Procedure to set aside the jury verdict as against the weight of the evidence and for judgment as a matter of law, and to set aside the award of front pay or in the alternative to reduce the amount to $ 21,600.

   The plaintiff has also filed a post-trial motion. She seeks attorneys' fees, costs, and litigation expenses pursuant to *29 U.S.C. § 2617*(a)(3), prejudgment interest on her back pay award, and three additional years of front pay totaling $ 210,000. The plaintiff further seeks judgment as a matter law finding that she was disabled under the ADA, the NYSHRL, and the NYCHRL or a new trial on that issue as well as a new trial to determine **[*3]** whether she was terminated in violation of these laws.

Background

   In March 1997, Mr. LaSorsa hired Ms. Brenlla to be the comptroller at his car dealership, LaSorsa Buick Pontiac Chevrolet, Inc. (Tr. 23-25). n1 She was paid $ 1,100 a week and was given a company car as a fringe

2002 U.S. Dist. LEXIS 9358, *3; 146 Lab. Cas. (CCH) P34,546;
82 Empl. Prac. Dec. (CCH) P41,083; 7 Wage & Hour Cas. 2d (BNA) 1688

benefit. (Tr. 25, 93). There were three other women who worked in the back office with Ms. Brenlla: the office manager, Dolores O'Gorman, and two clerical workers, Parvati Brijmahal, and Koowarie, who was only identified by her first name. (Tr. 141-42, 170-73).

n1 "Tr." refers to the transcript from the trial held on February 11, 13, and 14, 2002.

In October 1998, Ms. Brenlla underwent a quadruple bypass operation. (Tr. 29). Subsequent to her discharge from the hospital, she had to be readmitted after suffering congestive heart failure with atrial fibrillation. (Tr. 65-66). Ms. Brenlla's daughter informed Mr. LaSorsa that the plaintiff would be out of work for some time. (Tr. 30). Three months after she had initially taken medical [*4] leave, and after she was given medical clearance by her doctor, Ms. Brenlla indicated to Mr. LaSorsa that she was ready to come back to work on a part-time basis. (Tr. 32). During her absence, Ms. O'Gorman, the office manager, assumed most of Ms. Brenlla's responsibilities. (Tr. 142).

Starting the week of January 18, 1999, Ms. Brenlla came to work for a few hours a day, but was not paid for her services. (Tr. 34). On January 22, she notified Mr. LaSorsa that she wanted to return to full-time employment. (Tr. 34-35). The following Monday, January 25, when Ms. Brenlla was to resume her position, Mr. LaSorsa fired her. (Tr. 35).

Mr. LaSorsa claimed that it was during a meeting he had with Ms. Brenlla on January 25 that he decided to terminate and to consolidate the positions of office manager and comptroller. (Tr. 37, 44). According to Mr. LaSorsa, Ms. Brenlla complained during this meeting that none of the employees were coming to her for financial information. (Tr. 45). Mr. LaSorsa testified that "the employees weren't going to her, especially the management, for information, from what she told me, and I had time to reflect and to realize that the office ran smoothly for the time [*5] that she was out, and at that moment I decided to combine those two positions." (Tr. 45-46). He further maintained that he did not think about consolidating the office manager and comptroller positions until this meeting (Tr. 37, 44), although Ms. O'Gorman testified that Mr. LaSorsa had told her that he was considering combining the two positions prior to January 25. (Tr. 162).

Ms. Brenlla countered that she never made any complaint to Mr. LaSorsa about employees not asking her for financial information and that it was prohibited for employees to disclose such information other than to Mr. LaSorsa. (Tr. 156-57). She also stated that Mr. LaSorsa told her that he was discharging her because he was combining the office manager and comptroller jobs. (Tr. 101, 152).

During Ms. Brenlla's tenure at LaSorsa Buick she was never issued any written warnings regarding her work performance; in fact, her salary was increased by $ 75 per week in 1998 when she took on additional job responsibilities. (Tr. 26-28; Exh. 1).

Since Ms. Brenlla's termination, Ms. O'Gorman has performed the responsibilities of comptroller and office manager except for three tasks -- taking cash, posting the receipt books, [*6] and reconciling parts and service -- which she used to do as office manager but are now the responsibility of two of the administrative assistants. (Tr. 203-04). Ms. O'Gorman testified that she does not perform these tasks because it would be inappropriate for the same employee both to receive money and to record how much was received. (Tr. 203). She further stated that in April 1999, she asked Mr. LaSorsa for additional help to do clerical work. In response, Joan Ayuso was hired later that month. (Tr. 206-07).

Following her termination, Ms. Brenlla secured employment at B & L Toyota as an office manager where she was paid $ 800 a week. (Tr. 143-44). She stayed there for three months until she voluntarily left for another office manager position at Westchester Toyota. (Tr. 105, 143-45). At Westchester Toyota, Ms. Brenlla was paid $ 800 a week but was not entitled to health benefits because she did not work there long enough. (Tr. 145). After two months, she was fired because of unsatisfactory performance. (Tr. 145). In February 2000, she found another job at Riverdale Chrysler as a bookkeeper for $ 600 a week. (Tr. 146). However in September 2001, she was laid off, presumably because [*7] of the downturn in the economy. (Tr. 105-06). She continued to look for employment, but as of the trial date she had not been successful. (Tr. 148).

On February 14, 2002, the jury returned a verdict in favor of the plaintiff only with regard to the FMLA claims. It awarded her $ 150,000 in back pay and benefits, $ 70,000 in front pay, and $ 100,000 in liquidated damages.

2002 U.S. Dist. LEXIS 9358, *7; 146 Lab. Cas. (CCH) P34,546;
82 Empl. Prac. Dec. (CCH) P41,083; 7 Wage & Hour Cas. 2d (BNA) 1688

Discussion

A. Judgment as a Matter of Law and New Trial

Judgment as a matter of law may be granted under Rule 50 only if "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Galdieri-Ambrosini v. National Realty & Development Co., 136 F.3d 276, 289 (2d Cir. 1998)* (citations omitted) (alterations in original). The court must view the evidence in the light most favorable to the party opposing the motion and must defer to all of the jury's credibility determinations and reasonable inferences. *Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000);* **[*8]** *Raniola v. Bratton, 243 F.3d 610, 616 (2d Cir. 2001); Caruolo v. John Crane, Inc., 226 F.3d 46, 51 (2d Cir. 2000); Galdieri-Ambrosini, 136 F.3d at 289.* On a Rule 50 motion, the court "may not weigh the credibility of witnesses or otherwise consider the weight of the evidence." *Caruolo, 226 F.3d at 51* (citing *Galdieri-Ambrosini, 136 F.3d at 289).* Indeed, "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves, 530 U.S. at 151* (citation omitted).

The standard for granting a new trial under Rule 59 is less stringent. "Unlike a motion for judgment as a matter of law, a trial judge considering a motion for a new trial is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner." *United States v. Landau, 155 F.3d 93, 104 (2d Cir. 1998)* (internal quotations and citation omitted). Accordingly, "'a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict.'" *Caruolo, 226 F.3d at 54* **[*9]** (quoting *Landau, 155 F.3d at 104).* A new trial is warranted if the court "is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." *Caruolo, 226 F.3d at 54* (internal quotations and citation omitted).

The jury's verdict as to each of the claims may now be judged against these standards.

B. FMLA Claims

The defendants move for a new trial or judgment as a matter of law on the FMLA claims. The jury found that the defendants had violated two provisions of the FMLA: first, that they had failed to reinstate Ms. Brenlla to an equivalent position and second, that they had retaliated against her for exercising her rights under the FMLA.

1. Denial of Benefits

To have made out a prima facie case for the denial of benefits, the plaintiff must have demonstrated:

> (1) that she is an "eligible employee" under the FMLA; (2) that defendants constitute an employer under the FMLA; (3) that she was entitled to leave under the FMLA; (4) that she gave notice to defendants of her intention to take leave; and (5) that defendants denied her benefits to which she was entitled by the FMLA.

**[*10]** *Santos v. Knitgoods Workers' Union, Local 155, 1999 U.S. Dist. LEXIS 9036, No. 99 Civ. 1499, 1999 WL 397500,* at *3 (S.D.N.Y. June 15, 1999)* (citations omitted). The only element contested by the defendants is the last, namely whether the plaintiff was denied a benefit to which she was entitled.

There are several provisions of the statute that prescribe benefits. For example, covered employers must grant employees who have worked for twelve months up to twelve weeks leave each year for "a serious health condition that makes the employee unable to perform the functions of such employee." *29 U.S.C. § 2612(a)(1).* The benefit at issue here is set forth in *29 U.S.C. § 2614(a)(1),* which requires that an employee who takes FMLA-covered leave "be restored by the employer to the position of employment held by the employee when the leave commenced; or . . . to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." n2 Despite this provision, the FMLA does not entitle employees out on leave to unqualified reinstatement; termination ends the right to reinstatement, provided that the employee **[*11]** would have been discharged had she not taken leave. *29 C.F.R. § 825.216(a)(1).* n3 "This is so because the FMLA does not entitle an employee taking

FMLA leave to any greater rights than employees who have not taken such leave." *Santos, 1999 U.S. Dist. LEXIS 9036, 1999 WL 397500*, at *3 (footnote omitted); see also *29 U.S.C. § 2614*(a)(3) ("Nothing in *[29 U.S.C. § 2614]* shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."). Conversely, "employers cannot use the taking of FMLA leave as a negative factor in employment action." *29 C.F.R. § 825.220(c)*.

n2 The plaintiff does not specify under what section of the FMLA her claim arises. Some courts have found that a failure to reinstate claim can be brought under *29 U.S.C. § 2614*(a), see *Hale v. Mann, 219 F.3d 61, 68 (2d Cir. 2000); Chaffin v. John H. Carter Co., Inc., 179 F.3d 316, 319 (5th Cir. 1999)*, whereas others have found that *29 U.S.C. § 2614*(a) only describes certain benefits and that any cause of action for failure to reinstate must be brought under *29 U.S.C. § 2615*(a)(1), which bars employers from "interfering with, restraining, or denying the exercise of or the attempt to exercise, any right provided under [the FMLA]." See *O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1352 (11th Cir. 2000); King v. Preferred Technical Group, 166 F.3d 887, 891 (7th Cir. 1999); Mann v. Mass. Correa Electric, J.V., 2002 U.S. Dist. LEXIS 949, No. 00 Civ. 3559, 2002 WL 88915*, at *5-6 (S.D.N.Y. Jan. 23, 2002); *Santos, 1999 U.S. Dist. LEXIS 9036, 1999 WL 397500*, at *3. Under either provision the analysis is the same.

[*12]

n3 Section 825.216 reads:

Are there any limitations on an employer's obligation to reinstate an employee?

(a) An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment. For example:

(1) If an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to continue FMLA leave, maintain group health plan benefits and restore the employee cease at the time the employee is laid off, provided the employer has no continuing obligations under a collective bargaining agreement or otherwise. An employer would have the burden of proving that an employee would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration.

*29 C.F.R. § 825.216.*

The defendants argue that **[*13]** Ms. Brenlla could not be reinstated because the comptroller position no longer existed and there was no other comparable position available. They maintain that legitimate business concerns motivated consolidation of the responsibilities of the comptroller with those of the office manager, all of which were being performed by Ms. O'Gorman while Ms. Brenlla was on leave. (Memorandum of Law in Support of Defendants' Motion to Set Aside the Jury Verdict ("Def. Memo.") at 3-5). The defendants also contend that they underwent a reduction in force when the two positions were combined. They maintain that the subsequent hiring of a clerical worker, Ms. Ayuso, was not to replace Ms. Brenlla, but to fill the position of an employee who had left in 1998. (Def. Memo. at 4-5). None of the defendants' arguments, however, warrant either judgment as a matter of law or a new trial.

There was ample evidence to support the jury's conclusion that Ms. Brenlla's termination and the consolidation of positions were not motivated by

Case 1:04-cv-00970-JJF     Document 101-4     Filed 01/16/2007     Page 5 of 181

Page 5
2002 U.S. Dist. LEXIS 9358, *13; 146 Lab. Cas. (CCH) P34,546;
82 Empl. Prac. Dec. (CCH) P41,083; 7 Wage & Hour Cas. 2d (BNA) 1688

legitimate business concerns. First, although the defendants claim that the termination arose from their desire to "save [the] plaintiff's salary" (Def. Memo. at 3), it is unclear [*14] what if any financial benefits the defendants reaped from the consolidation. Contrary to the defendants' contention, there was not a reduction in force; Joan Ayuso was hired three months after the plaintiff was discharged. (Tr. 206-07). Although the defendants maintain that Ms. Ayuso replaced a clerical worker, Dawn Clemenza, who had left sometime before July 1998 (Def. Memo. at 4-5), this explanation strains credulity since Ms. Clemenza's position had been left vacant for almost a year. In addition, there was evidence that after Ms. Clemenza's departure, her responsibilities were divided up among the remaining four workers such that her position no longer existed. (Tr. 219-20, 91-92; Exh. 1). n4

n4 Mr. LaSorsa's credibility was further undermined by his statement that he decided to consolidate the positions and reduce his back office staff from four to three people during a fifteen minute meeting with Ms. Brenlla. (Tr. 45-46). On its face such a statement seems unbelievable: business decisions to reduce the administrative staff by twenty-five percent usually result from more careful consideration. Additionally, Ms. O'Gorman testified that Mr. LaSorsa had considered the consolidation before the meeting with Ms. Brenlla. (Tr. 162).

[*15]

Second, even if Mr. LaSorsa reduced the payroll by replacing a managerial position with a clerical one, there is no evidence that this was part of any business plan or that this restructuring would have taken place had Ms. Brenlla not taken leave. See 29 C.F.R. § 825.216(a)(1) (if employee is discharged while on leave, "an employer would have the burden of proving that an employee would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration"); Kosakow v. New Rochelle Radiology Associates, P.C., 88 F. Supp. 2d 199, 209-10 (S.D.N.Y. 2000) ("The burden is on the employer to prove that the employee is not entitled to reinstatement of her job because her job would have been eliminated during that same period, even if she had not taken leave."), vacated on other grounds, 274 F.3d 706, 733 (2d Cir. 2001). Indeed, the temporal proximity

between the plaintiff's request to be reinstated and the defendants' decision to terminate her employment clearly supports the conclusion that Ms. Brenlla was terminated because she took FMLA-covered leave. See Santos, 1999 U.S. Dist. LEXIS 9036, 1999 WL 397500, [*16] at *4 ("the coincidence of timing between the taking of leave and the termination of her employment -- eighteen days -- do [sic] present circumstantial support for a causal-relationship claim"); see also Merli v. Bill Communications, Inc., 2002 U.S. Dist. LEXIS 4530, No. 01 Civ. 0359, 2002 WL 424649, at *6 (S.D.N.Y. March 18, 2002).

Third, if the plaintiff's firing had been part of a legitimate business plan, some consideration would have gone into deciding who was best suited for the new consolidated position. There was no evidence that any assessment of Ms. Brenlla's or any other employee's qualifications ever took place. Nor was there any indication that her past performance was deficient. Cf. Hodges v. General Dynamics Corp., 144 F.3d 151, 166 (1st Cir. 1998) (legitimate business reason where plaintiff was transferred and subsequently terminated because of realignment of staff caused by reduction in force that took place before plaintiff took FMLA-related leave and plaintiff's poor job performance); Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995) (no violation of ADEA where plaintiff was terminated as part of reduction in force but was [*17] not reassigned based on his performance and abilities as compared to other candidates). In fact, the evidence supports the conclusion that Ms. Brenlla's leave of absence was the sole determining factor in Mr. LaSorsa's decision to consolidate the positions and to decline to consider her for the new position. Cf. Hodgens, 144 F.3d at 166; Ilhardt v. Sara Lee Corp., 118 F.3d 1151, 1157 (7th Cir. 1997) (employee not entitled to reinstatement where position was eliminated as part of reduction in force in June but was allowed to continue working until she took maternity leave in October); Lacey-Manarel v. Mothers Work, Inc., 2002 U.S. Dist. LEXIS 5541, No. 01 Civ. 0235, 2002 WL 506664, at *2 (S.D.N.Y. March 29, 2002) (no violation of FMLA where plaintiff fired while on maternity leave because undisputed evidence that prior to termination defendant undertook substantial reorganization prompted by legitimate business considerations); Kosakow, 88 F. Supp. 2d at 210-11 (legitimate business reason where company suffering financial losses and plaintiff was only part-time technician not cross-trained in related fields); see also

2002 U.S. Dist. LEXIS 9358, *17; 146 Lab. Cas. (CCH) P34,546;
82 Empl. Prac. Dec. (CCH) P41,083; 7 Wage & Hour Cas. 2d (BNA) 1688

*Woroski v. Nashua Corp., 31 F.3d 105, 109 (2d Cir. 1994)* **[*18]** (no violation of ADEA where dismissal of two plaintiffs occurred as part of legitimate business-motivated downsizing of 298 employees; employees not replaced after termination; and remaining employees in departments were 40 or older and had greater seniority).

Finally, even the caselaw relied upon by the defendants does not support their position. In the cited cases, the employers had documented financial losses that resulted in either large-scale terminations or the dismissal of an employee with lesser qualifications. See *O'Connor, 200 F.3d at 1351, 1354-55* (where employer was undergoing multi-phase reduction in force due to two years of economic losses, no FMLA violation when employee on FMLA leave terminated along with 190 other employees); *Kosakow, 88 F. Supp. 2d at 210-11* (legitimate business reason where company suffered financial losses). None of these factors is present in this case.

Because the jury verdict with regard to liability for denial of benefits under the FMLA is neither seriously erroneous nor against the weight of the evidence, the defendants' motion for judgment as a matter of law or for a new trial is denied.

### 2. Retaliation **[*19]**

The jury also found the defendants liable for retaliating against the plaintiff for having taken leave covered by the FMLA. Section 2615 prohibits employers from engaging in three types of activities: (1) they shall not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the FMLA, *29 U.S.C. § 2615*(a)(1); (2) they may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA, *29 U.S.C. § 2615*(a)(2); and (3) they cannot:

> discharge or in any other manner discriminate against any individual because such individual . . . has filed any charge . . . related to [the FMLA] . . . has given, or is about to give, any information in connection with any inquiry or proceeding relating to any right provided under [the FMLA] or . . . has testified, or is about to testify, in any inquiry or proceeding relating to any right provided

under [the FMLA].

*29 U.S.C. § 2615*(b). Prior to being terminated, Ms. Brenlla did not oppose any practice of the defendants nor was she in any way connected **[*20]** with any claim, inquiry, or proceeding against the defendants. Therefore, any retaliation claim in this case falls under section 2615(a)(1). See *Mann, 2002 U.S. Dist. LEXIS 9499, 2002 WL 88915,* at *6 (retaliation claim may be brought under *29 U.S.C. § 2615*(a)(1)); see also *Bachelder v. America West Airlines, Inc., 259 F.3d 1112, 1124 (9th Cir. 2001); King, 166 F.3d at 891; Hodgens, 144 F.3d at 160.* But see *O'Connor, 200 F.3d at 1352* (retaliation claims are brought under § 2615(a)(2), not § 2615(a)(1)); *Merli, 2002 U.S. Dist. LEXIS 4530, 2002 WL 424649,* at *5 (interpreting retaliation claim as having been brought under *29 U.S.C. §§ 2615*(a)(2) & (b) where plaintiff did not identify particular FMLA provision violated and where plaintiff was fired after requesting FMLA-covered leave but neither opposed any practice of the employer nor was connected with any charge or inquiry prior to filing action); *Bond v. Sterling, Inc., 77 F. Supp. 2d 300, 301 (N.D.N.Y. 1999)* (implicitly accepting plaintiff's argument that *29 U.S.C. § 2615*(a)(2) applies to retaliatory **[*21]** discharge claim where no indication that plaintiff opposed any unlawful practice of employer).

The Second Circuit has not addressed what legal framework applies to FMLA retaliatory discharge claims brought under § 2615(a)(1), and there is a split among the circuit courts about whether the McDonnell Douglas burden shifting analysis governs. Compare *Chaffin, 179 F.3d at 319* (McDonnell Douglas analysis applies in retaliatory discharge in claim under § 2615(a)(1)), n5 *King, 166 F.3d at 892, Hodgens, 144 F.3d at 160,* and *Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997),* with *Bachelder, 259 F.3d at 1125* (McDonnell Douglas framework does not apply to retaliatory discharge claims under *29 U.S.C. § 2615*(a)), and *Mann, 2002 U.S. Dist. LEXIS 949, 2002 WL 88915,* at *6. It is unnecessary to resolve the issue in this case because regardless of whether the McDonnell Douglas framework is employed, the result is the same.

n5 The court in Chaffin incorrectly attributes the requirement not to "interfere with, restrain, or deny the exercise of . . . any right provided under" the FMLA to *29 U.S.C. § 2615*(a)(2) instead of subsection (a)(1).

[*22]

Under the McDonnell Douglas analysis, the plaintiff must first establish a prima case of discrimination by demonstrating that: (1) she engaged in a protected activity; (2) she was adversely affected by an employment decision; and (3) there is a causal connection between the protected activity and the adverse action. See *Chaffin, 179 F.3d at 319; King, 166 F.3d at 892; Hodgens, 144 F.3d at 161; Morgan, 108 F.3d at 1325.* Once accomplished, the burden shifts to the defendant to produce evidence "that the adverse employment actions were taken 'for a legitimate, nondiscriminatory reason.'" *St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-07, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)* (quoting *Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)).* "This burden is one of production, not persuasion; it 'can involve no credibility assessment.'" *Reeves, 530 U.S. at 142* (quoting *St. Mary's Honor Center, 509 U.S. at 509).* Despite this shift of the burden of production to the defendant, "the ultimate [*23] burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *530 U.S. at 143* (quoting *Burdine, 450 U.S. at 253*) (emphasis supplied).

If the defendant provides evidence of legitimate, nondiscriminatory reasons for its action, the plaintiff must "'prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" Id. (quoting *Burdine, 450 U.S. at 253*). Pretext can be demonstrated "'by showing that the employer's proffered explanation is unworthy of credence.'" Id. (quoting *Burdine, 450 U.S. at 256*). Additionally, the trier of fact "may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.'" Id. (quoting *Burdine, 450 U.S. at 255, n.10*).

In contrast to the First, Fifth, Seventh, and Tenth Circuits, the Ninth Circuit, along with at least one decision in the Southern District of New York, has [*24] found that the McDonnell Douglas analysis does not apply to retaliatory discharge claims brought under section 2615(a)(1). *Bachelder, 259 F.3d at 1125; Mann, 2002 U.S. Dist. LEXIS 949, 2002 WL 88915,* at *6. n6

Under this theory, a plaintiff "must [only] show that (1) she participated in FMLA-protected activity and (2) the decision to terminate her employment was motivated by her participation in the protected activity." *Mann, 2002 U.S. Dist. LEXIS 949,* [WL] at *7; see also *Bachelder, 259 F.3d at 1125* (plaintiff in retaliatory discharge claim under § 2615(a)(1) "need only prove by a preponderance of the evidence that her taking of FMLA-protected leave constituted a negative factor in the decision to terminate her"). Because the plaintiff satisfies the more rigorous McDonnell Douglas analysis as described below, she also has established liability under the standard enunciated in Bachelder and Mann.

n6 Unlike sections 2615(a)(2) & (b), section 2615(a)(1) does not specifically refer to discriminatory intent. However, there is an implementing regulation that bars employers from "discriminating against employees . . . who have used FMLA leave," *29 C.F.R. § 825.220(c),* but does not specify to which section or subsection of the FMLA it applies. As a consequence, courts have interpreted section 2615(a)(1) as requiring discriminatory intent on the basis of *29 C.F.R. § 825.220(c).* The Bachelder and Mann decisions criticize this approach and maintain that the regulations should not be used to impose an intent requirement where one clearly does not exist in the statute. *Bachelder, 259 F.3d at 1124; Mann, 2002 U.S. Dist. LEXIS 949, 2002 WL 88915,* at *6.

[*25]

The defendants concede that the plaintiff set forth a prima facie case. They claim, rather, that she has failed to establish pretext. As discussed above, the defendants argue that the plaintiff was fired for legitimate business reasons arising from a corporate restructuring. For many of the same reasons previously mentioned, the defendants' position is without merit.

There was sufficient and credible evidence to support the jury's conclusion that Mr. LaSorsa's reason for firing Ms. Brenlla was pretextual, based on the incredibility of Mr. LaSorsa's testimony that he wanted to "save plaintiff's salary" where he later hired Ms. Ayuso; the absence of any business plan to support the restructuring; Ms. Brenlla's satisfactory work history; and the temporal proximity between the request for reinstatement and the

2002 U.S. Dist. LEXIS 9358, *25; 146 Lab. Cas. (CCH) P34,546;
82 Empl. Prac. Dec. (CCH) P41,083; 7 Wage & Hour Cas. 2d (BNA) 1688

termination. Accordingly, the defendants' motion to set aside the jury verdict and for judgment as a matter of law or a new trial is denied.

C. Disability Discrimination

The plaintiff moves for judgment as a matter of law or a new trial to determine whether she was disabled under the ADA, the NYSHRL, and the NYCHRL and for a new trial to establish whether she was terminated **[*26]** in violation of these laws. (Plaintiff's Memorandum of Law in Support of her Motion for Attorney's Fees, Costs, and Litigation Expenses, Prejudgment Interest, Additional Front Pay and Judgment as a Matter of Law and/or New Trial ("Pl. Memo.") at 12). The defendants did not respond to this portion of the plaintiff's motion.

1. The ADA

The ADA prohibits employment discrimination "against a qualified individual with a disability because of the disability of such individual." *42 U.S.C. § 12112*(a). In order to establish that the plaintiff has a qualifying disability under the ADA, she must show that she suffers from "a physical or mental impairment that substantially limits one or more of the major life activities." *42 U.S.C. § 12102*(2)(A). This requires a three-step approach: first, the plaintiff must demonstrate that she suffers from a "physical or mental" impairment; second, she must prove that the function she claims is impaired amounts to a "major life activity;" and third, she must show that the specified impairment "substantially limits" that major life activity. See *Bragdon v. Abbott, 524 U.S. 624, 631, 141 L. Ed. 2d 540, 118 S. Ct. 2196 (1998);* **[*27]** *Colwell v. Suffolk County Police Department, 158 F.3d 635, 641 (2d Cir. 1998).*

The strongest rebuttal to the plaintiff's motion comes from the third prong of the analysis. Ms. Brenlla claims that as a result of her cardiac condition, she was substantially impaired in the major life activities of walking and standing, both of which have been recognized as major life activities. *29 C.F.R. § 1630.2(i)* ("major life activities means functions such as . . . walking"); *Colwell, 158 F.3d at 642* ("We have identified other 'major life activities,' including, but not limited to, 'sitting, standing, lifting, or reaching.'"). Under the EEOC regulations, an individual is "substantially limited" if she is:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*29 C.F.R. § 1630.2(j)(1)* **[*28]** . The regulations also list the following factors that should be considered in determining whether an individual is substantially limited: "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *29 C.F.R. § 1630.2(j)(2)*; see *Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 871-72 (2d Cir. 1998)* (applying factors).

Ms. Brenlla presented some evidence that she had difficulty walking and standing, which usually occurred when she engaged in these activities for longer periods of time. (Tr. 66-67 (limited in her ability to climb stairs and walk), 81 (cannot walk for long periods of time, jog, or stand for long periods), 108 (not able to walk long distances and needs cane to walk upstairs)). However, there was no testimony about the expected duration of the restrictions or their long term impact. Therefore, it was not erroneous for the jury to conclude that these limitations did not constitute a significant restriction.

2. State and City Disability Discrimination Claims

Disability under the NYSHRL **[*29]** is defined as "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions." *N.Y. Exec. Law § 292(21)*. To qualify as a disability, these conditions must either "prevent[] the exercise of a normal bodily function or [be] demonstrable by medically accepted clinical or laboratory diagnostic techniques." Id.; see also *Epstein v. Kalvin-Miller International, Inc., 100 F. Supp. 2d 222, 229 (S.D.N.Y. 2000); State Division of Human Rights v. Xerox Corp., 65 N.Y.2d 213, 218-19, 491 N.Y.S.2d 106, 109, 480 N.E.2d 695 (1985).* The Second Circuit has found that the

Case 1:04-cv-00970-JJF    Document 101-4    Filed 01/16/2007    Page 9 of 181

Page 9

2002 U.S. Dist. LEXIS 9358, *29; 146 Lab. Cas. (CCH) P34,546;
82 Empl. Prac. Dec. (CCH) P41,083; 7 Wage & Hour Cas. 2d (BNA) 1688

term "disability" in the NYSHRL should be construed more broadly than the definition in the ADA. *Reeves v. Johnson Controls World Services, Inc., 140 F.3d 144, 154 (2d Cir. 1998)*. This is because the second definition of disability in the NYSHRL does not require any showing of limitation of a particular activity or function. Id.

Here, the jury was entitled to conclude that the plaintiff did not show by a preponderance of the evidence that her condition prevented her from exercising a body function. Although limited in **[*30]** some areas, she was not precluded from exercising any normal body function. The plaintiff also did not satisfy the alternative prong of the definition of disability because she failed to show that the diagnosis of congestive heart failure and atrial fibrillation lasted beyond her hospitalization. Under the NYCHRL, disability is defined as "any physical, medical, mental or psychological impairment, or a history or record of such impairment." N.Y.C. Admin. Code § 8-102(16)(a). "Physical, medical or psychological impairment" is described as "an impairment of any system of the body; including, but not limited to . . . the cardiovascular system." N.Y.C. Admin. Code § 8-102(16)(b)(1). Because the standard for disability under the NYCHRL is coextensive with that under the NYSHRL, see *Barr v. New York City Transit Authority, 2002 U.S. Dist. LEXIS 2968,* No. 99- CV-7927, *2002 WL 257823,* at *8 (E.D.N.Y. Feb. 20, 2002); *Hopkins v. Digital Equipment Corp., 1998 U.S. Dist. LEXIS 15762, 1998 U.S. Dist. LEXIS No. 93 Civ. 8468, 1998 WL 702339,* at *14 (S.D.N.Y. Oct. 8, 1998), the plaintiff's motion for judgment as a matter of law or a new trial on the NYCHRL claim is also denied.

### D. Front Pay

The defendants also move to set aside the jury's **[*31]** award of front pay. They argue that she failed to mitigate her damages because she found comparable employment at Westchester Toyota but was terminated for performance reasons. In the alternative they claim that her front pay award should be reduced to $ 21,600, which represents the difference between her compensation at LaSorsa Buick and Westchester Toyota over a one-year period. (Def. Memo. at 7). The plaintiff moves to increase the front pay award. She maintains that the award of $ 70,000 represents only one year of front pay and that it should be increased threefold because she would have retired at 67 not 65 years old due to financial considerations. (Pl. Memo at 8-10).

The jury's determination regarding front pay is considered an advisory verdict, see *Epstein v. Kalvin-Miller International, Inc., 2000 U.S. Dist. LEXIS 17311,* No. 96 Civ. 8158, *2000 WL 1761052,* at *1-2 (S.D.N.Y. Nov. 29, 2000), because, as an equitable remedy, it is only awarded at the discretion of the court. See *Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1182 (2d Cir. 1996)* (Title VII); *Sharkey v. Lasmo, 15 F. Supp. 2d 401, 404 (S.D.N.Y. 1998)* (ADEA), vacated on other grounds, *214 F.3d 371 (2d Cir. 2000);* **[*32]** see also *Nichols v. Ashland Hospital Corp., 251 F.3d 496, 503-04 (4th Cir. 2001)* (FMLA); *Thorson v. Gemini, Inc., 205 F.3d 370, 384 (8th Cir.)* (FMLA), cert. denied, *531 U.S. 871, 148 L. Ed. 2d 117, 121 S. Ct. 172 (2000).* Front pay "represents compensation for future losses that the plaintiff would not suffer but for the discriminatory acts of the defendant," *Rivera v. Baccarat, Inc., 34 F. Supp. 2d 870, 877 (S.D.N.Y. 1999),* and serves to make a discharged employee whole where she has "no reasonable prospect of obtaining comparable alternative employment." *Padilla v. Metro-North Commuter Railroad, 92 F.3d 117, 126 (2d Cir. 1996)* (ADEA) (quoting *Whittlesey v. Union Carbide Corp., 742 F.2d 724, 729 (2d Cir. 1984)).* Front pay should not, however, be awarded where the calculation method is too speculative. *Sagendorf-Teal v. County of Rensselaer, 100 F.3d 270, 277 (2d Cir. 1996) (Section 1983); Whittlesey, 742 F.2d at 728 (ADEA).*

The framework for awarding front pay in Title VII employment discrimination cases is instructive here. See *Miller v. AT & T Corp., 250 F.3d 820, 838 (4th Cir. 2001)* **[*33]** (FMLA case applying analysis under Title VII); *Thorson v. Geminin, Inc., 96 F. Supp. 2d 882, 890-91 (N.D. Iowa 1999)* (same), aff'd, *205 F.3d 370 (8th Cir.),* cert. denied, *531 U.S. 871, 148 L. Ed. 2d 117, 121 S. Ct. 172 (2000); Viereck v. City of Gloucester City, 961 F. Supp. 703, 709 (D.N.J. 1997)* (same). In Title VII cases, where there is a statutory requirement to mitigate damages, see *42 U.S.C. § 2000e-5(g)(1),* courts require the plaintiff to have exercised reasonable diligence in obtaining subsequent employment before awarding back pay, but the burden is on the defendant to demonstrate that suitable work existed and that the plaintiff made no reasonable effort to find it. See *Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 53 (2d Cir. 1998).* A similar analysis applies to awards of front pay. n7 See *Id. at 53-54; Epstein v. Kalvin-Miller International, Inc., 139*

Case 1:04-cv-00970-JJF    Document 101-4    Filed 01/16/2007    Page 10 of 181

Page 10

2002 U.S. Dist. LEXIS 9358, *33; 146 Lab. Cas. (CCH) P34,546;
82 Empl. Prac. Dec. (CCH) P41,083; 7 Wage & Hour Cas. 2d (BNA) 1688

*F. Supp. 2d 469, 482 (S.D.N.Y. 2001).*

n7 Because the award of front pay is equitable, courts may tailor the period for which front pay is calculated -- and, thus, the size of the award -- to the extent of the plaintiff's efforts to find comparable employment.

**[\*34]**

The defendants first argue that Ms. Brenlla is not entitled to any front pay because she voluntarily left B & L Toyota and was fired from Westchester Toyota due to her poor performance. Voluntarily leaving suitable employment can only decrease a front pay award if it is the result of the failure to exercise reasonable diligence, see *Barbour v. Medlantic Management Corp., 952 F. Supp. 857, 864-65 (D.D.C. 1997)* (awarding front pay in Section 1981 claim), or if there are no compelling or justifiable reasons for having left the job. See *Reiner v. Family Ford, Inc., 146 F. Supp. 2d 1279, 1288 (M.D. Fla. 2001)* (Title VII case awarding backpay); see also *Brady v. Thurston Motor Lines, Inc., 753 F.2d 1269, 1273, 1278 (4th Cir. 1985)* (same). In this case, the plaintiff left B & L Toyota and started working almost immediately at Westchester Toyota, where she was paid a comparable salary. Because she certainly displayed reasonable diligence, her resignation alone does not preclude front pay. Cf. *Reilly v. Cisneros, 835 F. Supp. 96, 99 (W.D.N.Y. 1993)* (Title VII plaintiff not entitled to back or front pay where he fails to remain **[\*35]** in labor market, fails to accept substantially similar employment, fails diligently to search for alternative work or voluntarily quits alternative employment without good reason).

Termination from subsequent employment can also limit an award of front pay. In ruling on a back pay award, the Sixth Circuit found that an award should only be denied where the employee's discharge from interim employment was the result of "gross" or "egregious" misconduct or where the discharge for cause was due to her willful violation of company rules. *Thurman v. Yellow Freight Systems, Inc., 90 F.3d 1160, 1169 (6th Cir. 1996)* (plaintiff in Title VII and Section 1981 case entitled to back pay where discharge from interim employment was result of negligence that caused accident, not gross or egregious misconduct or willful violation of company rules); see also *Brady, 753 F.2d at 1276-79* (plaintiffs not awarded back pay in Title VII

case where they willfully violated rules at subsequent employment). The defendants did not present any evidence that Ms. Brenlla's termination was the result of misconduct. The only mention of the reason why she was discharged from Westchester **[\*36]** Toyota was that her employer did "not like [her] performance there." (Tr. 145; see also Tr. 105). This is insufficient to establish that she was fired because of gross, egregious, or willful misconduct. See *Epstein, 139 F. Supp. 2d at 482* (in Title VII case defendant has burden to prove that plaintiff did not exercise reasonable diligence sufficient to deny front pay award). Accordingly, Ms. Brenlla's termination from Westchester Toyota does not preclude front pay.

Ms. Brenlla clearly exercised reasonable diligence in securing comparable employment; even after she was fired from Westchester Toyota, she obtained a bookkeeping position at Riverdale Chrysler. (Tr. 105). Moreover, she has "no reasonable prospect of obtaining comparable alternative employment" at least in the near future owing to the downturn in the economy. *Padilla, 92 F.3d at 126.* She has continued to interview and look for employment without success since her termination from Riverdale Chrysler. Nevertheless, there is nothing in the record to indicate that Ms. Brenlla will not be able to secure employment within the year. An award of $ 70,000, equivalent to her yearly salary at **[\*37]** LaSorsa Buick, is appropriate because any greater award would be unreasonable and unduly speculative. See *Epstein, 139 F. Supp. 2d at 485* (where jury's analysis was sound and award reasonable, "Court will not disturb the jury's front or back pay awards"). Therefore, both the defendants' and the plaintiff's motions regarding front pay are denied, and I adopt the jury's finding that an award of $ 70,000 is appropriate.

E. Prejudgment Interest

The plaintiff next moves for an award of prejudgment interest on her back pay award. Under the FMLA,

Any employer who violates section 2615 of [the FMLA] shall be liable . . .

(A) for damages equal to

(i) the amount of

(I) any wages, salary,

2002 U.S. Dist. LEXIS 9358, *37; 146 Lab. Cas. (CCH) P34,546;
82 Empl. Prac. Dec. (CCH) P41,083; 7 Wage & Hour Cas. 2d (BNA) 1688

employment benefits or other compensation denied or lost to such employee by reason of the violation; . . .

(ii) the interest on the amount described in clause (i) calculated at the prevailing rate; and

(iii) an additional amount as liquidated damages.

29 U.S.C. § 2617(a)(1). The defendants urge the Court to consider several equitable factors enumerated in *Wickham Contracting Co. v. Local Union No. 3, International Brotherhood of Electrical Workers, AFL-CIO, 955 F.2d 831 (2d Cir. 1992),* **[*38]** and deny the plaintiff prejudgment interest. However, the court in Wickham was faced with a claim under the Labor Management Relations Act, *29 U.S.C. §§ 141*-197, which, in contrast to the FMLA, does not specially mandate prejudgment interest. See *id. at 833* ("The LMRA is silent on the subject of prejudgment interest."); cf. *McDonnell v. Miller Oil Co., 134 F.3d 638, 640 (4th Cir. 1998)* (trial court awarded prejudgment interest pursuant to *29 U.S.C. § 2617(a)(1)* even though jury's award was only nominal); *Churchill v. Star Enterprises, 3 F. Supp. 2d 625, 627 (E.D. Pa. 1998)* (noting that trial court imposed statutory prejudgment interest), aff'd, *183 F.3d 184 (3d Cir. 1999).* n8 Therefore, prejudgment interest shall be awarded.

n8 Factors taken into consideration by courts in employment actions brought under other statutes, such as section 1983 or Title VII, are similarly unavailing because such laws do not specifically provide for prejudgment interest. See *Gierlinger v. Gleason, 160 F.3d 858, 873 (2d Cir.*

*1998)* (Section 1983 employment action); *Clarke v. Frank, 960 F.2d 1146, 1153 (2d Cir. 1992)* (Title VII).

**[*39]**

The plaintiff argues that the Court should use *28 U.S.C. § 1961* to calculate the interest rate and compound the interest annually. Although section 1961 governs awards of postjudgment interest, courts have often applied this rate when awarding prejudgment interest in employment discrimination cases. *Robinson v. Instructional Systems, Inc., 80 F. Supp. 2d 203, 208 (S.D.N.Y. 2000)* (Title VII); *Losciale v. Port Authority of New York and New Jersey, 1999 U.S. Dist. LEXIS 11990, No. 97 Civ. 0704, 1999 WL 587928, at *10 (S.D.N.Y. Aug. 4, 1999)* (ADEA). In light of this precedent and because the defendants have not raised any objection, prejudgment interest shall be awarded at the rate prescribed by *28 U.S.C. § 1961,* compounded annually. n9 See *Saulpaugh v. Monroe Community Hospital, 4 F.3d 134, 145 (2d Cir. 1993)* (compounding interest); *Robinson, 80 F. Supp. 2d at 208.*

n9 In calculating the prejudgment interest, the backpay award should be divided pro rata over a two year period, from January 25, 1999, when the plaintiff was terminated by Mr. LaSorsa, to February 14, 2002, when the jury reached its verdict, before applying the annual United States Treasury bill rate referred to in *28 U.S.C. § 1961.* See *Robinson, 80 F. Supp. 2d at 208.*

**[*40]**

F. Attorneys' Fees, Costs, and Expenses

Finally, Ms. Brenlla moves for attorneys' fees, costs, and expenses as follows:

| Attorney | Hours Expended | Hourly Rate | Total |
|---|---|---|---|
| Michael J. Volpe | 98.69 | $ 345 | $ 34,048.05 |
| George F. Brenlla | 62.01 | $ 270 | $ 16,742.70 |
| Daniel C. Moreland | 16.67 | $ 270 | $ 4,500.90 |

2002 U.S. Dist. LEXIS 9358, *40; 146 Lab. Cas. (CCH) P34,546;
82 Empl. Prac. Dec. (CCH) P41,083; 7 Wage & Hour Cas. 2d (BNA) 1688

| Attorney | Hours Expended | Hourly Rate | Total |
|---|---|---|---|
| Shaffin A. Datoo | 126.20 | $ 175 | $ 22,085.00 |
| Total | | | $ 77,376.65 |

| Cost/Expense Incurred | Amount |
|---|---|
| Filing Fee for Complaint | $ 150.00 |
| Photocopies | $ 546.24 |
| Messenger Service | $ 12.50 |
| Transcripts | $ 1,244.40 |
| Secretarial Overtime | $ 87.11 |
| Computerized Legal Research | $ 493.67 |
| Defendants' Financial Report | $ 112.00 |
| Witness and Subpoena Fees | n10 $ 2,920.00 |
| Total | $ 5,560.92 |

n10 The plaintiff had initially requested $ 3,160 in witness and subpoena fees but subsequently revised the amount because the process server reduced its fee by $ 245. (Plaintiff's Reply Memorandum of Law in Further Support of Her Motion for Attorney's Fees, Costs, and Litigation Expenses, Prejudgment Interest, Additional Front Pay and Judgment as a Matter of Law and/or New Trial ("Pl. Reply Memo.") at 6;

Exh. 4 to Affidavit of Michael J. Volpe dated March 29, 2002 ("March 29, 2002 Volpe Aff.") attached to Pl. Reply Memo.)

**[*41]**

(Billing Records dated March 4, 2002 ("March 4 Billing Records") attached as Exh. A to Affidavit of Michael J. Volpe dated March 5, 2002). While the defendants do not dispute that the plaintiff is entitled to fees and costs, they contend that an award for the full amount requested

Case 1:04-cv-00970-JJF    Document 101-4    Filed 01/16/2007    Page 13 of 181

Page 13

2002 U.S. Dist. LEXIS 9358, *41; 146 Lab. Cas. (CCH) P34,546;
82 Empl. Prac. Dec. (CCH) P41,083; 7 Wage & Hour Cas. 2d (BNA) 1688

would be unjust. To support their argument, the defendants maintain that (1) a lower more reasonable billing rate should be used due to the plaintiff's failure to provide proof of the attorneys' actual rates; (2) the legal bill is filled with "questionable entries, duplicative tasks, and excessive time billed for the tasks performed;" (3) the plaintiff failed to submit an invoice for the claimed legal research and subpoena fees; and (4) the costs for serving subpoenas were excessive. (Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Attorney Fees, Costs, Litigation Expenses, Prejudgment Interest and Additional Front Pay ("Def. Opp. Memo.") at 1-4).

Under the FMLA, a successful plaintiff is entitled to a "reasonable attorney's fee, reasonable expert witness fees, and other costs of the action to be paid by the defendant." *29 U.S.C. § 2617*(a)(3). To determine [*42] reasonable attorneys' fees, the court first calculates the "lodestar" amount by multiplying the number of hours reasonably expended by the appropriate hourly rates for attorneys. See *Hensley v. Eckerhart, 461 U.S. 424, 433, 76 L. Ed. 2d 40, 103 S. Ct. 1933 (1983).* "The district court should exclude excessive, redundant or otherwise unnecessary hours." *Quaratino v. Tiffany & Co., 166 F.3d 422, 425 (2d Cir. 1999)* (citing *Hensley, 461 U.S. at 433-35, 440).* While the lodestar can then be adjusted in light of factors such as the results obtained, *Hensley, 461 U.S. at 434,* "there is . . . a strong presumption that the lodestar figure represents a reasonable fee." *Quaratino, 166 F.3d at 425* (citation and internal quotation omitted).

1. Reasonable Rates

Without any legal basis, the defendants claim that the plaintiff's attorneys' billing rates are unsupported by actual billing records and that they should therefore be reduced to $ 225-250 for Mr. Volpe, $ 175-200 for Mr. Brenlla and Mr. Moreland, and $ 150 for Mr. Datoo. This argument is without merit. First, in their reply papers, the plaintiff's attorneys [*43] provided documentation for their billing rates. n11 Second, the rates charged by plaintiff's counsel are not excessive for such a case.

     n11 Indeed, it appears from Clifton Budd & DeMaria's billing records that Mr. Datoo bills out at $ 190 not $ 175. (Billing Records attached as Exh. 2 to March 29, 2002 Volpe Aff.; Pl. Reply Memo. at 2 n.1).

In order to determine reasonable rates, a court must consider rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson, 465 U.S. 886, 896 n.11, 79 L. Ed. 2d 891, 104 S. Ct. 1541 (1984).* The relevant "community" is the district in which the court sits. See *Luciano v. Olsten Corp., 109 F.3d 111, 115 (2d Cir. 1997).*

Here, Mr. Volpe is a partner with twelve years of experience litigating cases involving labor and employment law; Mr. Brenlla and Mr. Moreland, senior associates, have each had eight years litigating civil rights cases; and Mr. Datoo, a junior associate, [*44] has had two years of litigation experience. Their rates -- $ 345, $ 270 and $ 175, respectively -- fall within the reasonable range given their tenure. See, e.g., *Marisol A. v. Giuliani, 111 F. Supp. 2d 381, 386-87 (S.D.N.Y. 2000)* ($ 375 per hour for lead attorney, $ 350 per hour for attorneys with more than 15 years experience, $ 230-250 per hour for attorneys with 7-9 years experience); *Ward v. New York City Transit Authority, 1999 U.S. Dist. LEXIS 9621, No. 97 Civ. 8550, 1999 WL 446025,* at *10 (S.D.N.Y. June 28, 1999)* ($ 300 for experienced litigator in civil rights action); *Altman v. Port Authority of New York and New Jersey, 879 F. Supp. 345, 353 (S.D.N.Y. 1995)* (finding that "the range of rates charged for [representation in employment discrimination cases] by lawyers who practice in the metropolitan area [were] $ 175 to $ 375 per hour").

2. Time Expended

The defendants detail several instances in which the time expended by plaintiff's counsel was allegedly excessive. First, they argue that it was unnecessary to expend two and one-half hours drafting an EEOC complaint that was ultimately not used. Mr. Brenlla has submitted an affidavit explaining [*45] that the two and one-half hour entry on June 14, 1999 for drafting an EEOC complaint and filing the charge consisted of one-half hour drafting the complaint on June 14 and two hours on June 22 accompanying the plaintiff to a meeting with an EEOC investigator who reviewed the charge and prepared a standard form for Ms. Brenlla. (Affidavit of George F. Brenlla dated March 28, 2002 ("Brenlla Aff."), PP 2-4, attached as Exh. B to Pl. Reply Memo.). This is a reasonable explanation, and the time spent completing these tasks was not excessive.

The defendants next argue that Mr. Volpe and Mr.

2002 U.S. Dist. LEXIS 9358, *45; 146 Lab. Cas. (CCH) P34,546;
82 Empl. Prac. Dec. (CCH) P41,083; 7 Wage & Hour Cas. 2d (BNA) 1688

Brenlla performed duplicative tasks when they both reviewed the defendants' response to the EEOC charge of discrimination and spent an excessive amount of time looking over the two and one-half page document. Moreover, Mr. Brenlla's entry pre-dates the creation of the document. Again, the plaintiff has provided a reasonable explanation for the time spent. Mr. Brenlla's entry for reviewing the July 16, 1999 position statement should have been dated July 30, 1999, not June 30. (Brenlla Aff., P 5). He looked over the two page document, which had 45-pages of exhibits attached, for just over an hour. (Pl. **[*46]** Reply Memo. at 4). Mr. Volpe, who was to try the case, also spent two hours looking over the document and holding a conference with Mr. Brenlla to discuss the document. Neither of these entries appears excessive or duplicative.

The defendants' third complaint concerns the two hours spent by Mr. Brenlla drafting allegedly routine interrogatories. Two hours to draft specifically tailored interrogatories was not excessive.

Similarly, the defendants argue that it was both duplicative and excessive for Mr. Brenlla to spent over five and one-half hours and Mr. Moreland over eight hours drafting and researching proposed voir dire questions and jury instructions. n12 This expenditure of time was justified by the results. Plaintiff's counsel submitted thorough proposed instructions with caselaw on the substantive law governing the claims.

> n12 Mr. Brenlla also spent part of the five and one-half hours reviewing the defendants' proposed voir dire questions. (Entry for GFB on 02/01/02 in March 4 Billing Records).

The defendants **[*47]** next maintain that plaintiff's counsel held excessively long conferences ranging from one to eight hours for a total of thirty to thirty-five hours. (Def. Opp. Memo. at 3 (citing to entries from February 5-7, 2002)). The defendants fail to recognize that most of these entries also included other tasks such as preparing witnesses, drafting correspondence, and preparing trial exhibits. (March 4 Billing Records). Additionally, it is not surprising that the week before trial counsel would spent a significant amount of time conferring about strategy. Accordingly, the time spent was not excessive.

Finally, the defendants contend that it was unnecessary for a senior associate to perform certain non-legal tasks, specifically, traveling to the courthouse to pay the filing fee and making telephone calls to the process server. While the amount of time spent accomplishing these tasks seems reasonable, they need not have been done by an attorney. The one and one-half hours spent performing this work should only be compensated at $ 75 per hour instead of $ 270, and the award should accordingly be reduced by $ 292.50. See *Marisol A., 111 F. Supp. 2d at 388* ($ 75 rate for paralegal **[*48]** services).

### 3. Costs

The defendants make two objections to the plaintiff's application for costs. They allege that the plaintiff failed to submit an invoice for the claimed legal research and subpoena fees and that it is "inconceivable" that plaintiff's counsel spent over $ 3,000 to serve six subpoenas in the Bronx. (Def. Opp. Memo. at 4). In her Reply Memorandum the plaintiff submitted invoices and receipts for the legal research performed and the witness and subpoena fees. (March 29, 2002 Volpe Aff., Exh. 3). The fees break down as follows: $ 805 for service of seven subpoenas (March 29, 2002 Volpe Aff., Exh. 4), $ 110 for service of the complaint on Mr. LaSorsa (March 29, 2002 Volpe Aff., P 22), and $ 2,000 for a consultation with Dr. Nicholas Golden, who testified at trial. (Pl. Reply Memo. at 6, 7 n.3; March 29, 2002 Volpe Aff., Exh. 4). Because these costs are documented and reasonable, they will be awarded.

### 4. Additional Fees and Costs

The plaintiff also makes a supplementary application for fees and costs of $ 14,411.08 incurred from March 5 through March 29 as follows:

| Attorney | Hours Expended | Hourly Rate | Total |
|---|---|---|---|
| George F. Brenlla | 3.50 | $ 270 | $ 945.00 |

2002 U.S. Dist. LEXIS 9358, *48; 146 Lab. Cas. (CCH) P34,546;
82 Empl. Prac. Dec. (CCH) P41,083; 7 Wage & Hour Cas. 2d (BNA) 1688

| Attorney | Hours Expended | Hourly Rate | Total |
|---|---|---|---|
| Daniel C. Moreland | 4.18 | $ 270 | $ 1,128.60 |
| Shaffin A. Datoo | 60.18 | $ 175 | $ 10,531.50 |
| Total | | | $ 12,605.10 |

**[*49]**

| Cost/Expense Incurred | Amount |
|---|---|
| Photocopies | $ 42.76 |
| Messenger Service | $ 25.09 |
| Transcripts | $ 413.01 |
| Computerized Legal Research | $ 1,325.12 |
| Total | $ 1,805.98 |

(March 29, 2002 Volpe Aff., PP 12-16 & Exh. 1). The defendants have not submitted any response to the application. The request is fully documented and reasonable and shall be granted.

Conclusion

For the reasons stated above, the defendants' motion for judgment as a matter of law or a new trial on the FMLA claims is denied. Their motion to set aside or reduce the award of front pay and the plaintiff's motion to increase this award are both denied, and the jury's finding on front pay is adopted. The plaintiff's motion for prejudgment interest on the back pay award is granted. Her motion for attorneys' fees and costs is granted in the

amount of $ 97,056.15, and her motion for judgment as a matter of law or a new trial on the ADA, the NYSHRL, and the NYCHRL claims is denied.

Plaintiff's counsel shall promptly submit on notice a proposed judgment consistent with this Opinion and Order.

SO ORDERED.

JAMES C. FRANCIS IV

UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York **[*50]**

May 28, 2002

LEXSEE

**BETH CLEGG, Appellant v. FALCON PLASTICS INC; TIMOTHY LEVERS;
RICHARD NUGENT**

**No. 05-1826**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*174 Fed. Appx. 18; 2006 U.S. App. LEXIS 8576*

**February 14, 2006, Argued
April 6, 2006, Opinion Filed**

**NOTICE:** **[**1]** RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA. D.C. Civil 03-cv-01562. District Judge: The Honorable Thomas M. Hardiman.

**COUNSEL:** Edward A. Olds, Esq. (Argued), Pittsburgh, PA, Counsel for Appellant.

Jana P. Grimm, Esq. (Argued), Phillip J. Binotto, Jr., Esq., Eckert, Seamans, Cherin & Mellott, Canonsburg, PA; -AND- Allan W. Brown, Esq., Eckert, Seamans, Cherin & Mellott, Pittsburgh, PA, Counsel for Appellees.

**JUDGES:** Before: SCIRICA, Chief Judge, BARRY and FISHER, Circuit Judges.

**OPINION BY:** BARRY

**OPINION:** **[*21]** BARRY, Circuit Judge

The District Court granted summary judgment or dismissals to the defendants on Beth Clegg's Title VII hostile work environment and retaliation claims and related state law claims. She now appeals. We have jurisdiction under *28 U.S.C. § 1291*. We will affirm in part, reverse in part, and remand for further proceedings.

**I.**

The facts, viewed in the light most favorable to Clegg, n1 are as follows. Clegg began working for Falcon **[**2]** Plastics, Inc. ("Falcon") in 2001. In April 2002, she was transferred to the Shipping & Receiving department to work as Timothy Levers' assistant. At some point prior to September 2002, Clegg and Levers began corresponding via email, often through their personal email addresses and home computers.

> n1 In evaluating the evidence in the context of a summary judgment motion, we "take the facts in the light most favorable to the nonmoving party . . . and draw all reasonable inferences in [her] favor." *Doe v. County of Centre, 242 F.3d 437, 446 (3d Cir. 2001).*

During the fall of 2002, Clegg was "very stressed out in terms of working," and had "absolutely no social life." (*Id.* at 164.) Levers frequently told her that she needed to "get a life," and Clegg began to think that "yeah, maybe I do need to start taking some time for myself and kicking back a little bit . . . ." (*Id.* at 165.) Shortly thereafter, Clegg sent Levers an email (from her home computer to his home computer), which read: **[**3]**

> Was just sitting here thinking that we can talk about our kids and sports while we're at work. Let's spice it up a little bit. Let's make it more interesting. Talk d _ _ _y to me. Have to go for now. Please respond,

174 Fed. Appx. 18, *21; 2006 U.S. App. LEXIS 8576, **3

Lizzy

(*Id*. at 164.)

Clegg claims that she meant her statement to "Talk d_ _ _y" as a joke, and that Levers should have known it was a joke. Levers, however, did not so interpret Clegg's email, and sent her a "filthy" email in response. Clegg claims that she deleted the email and, accordingly, was unable to produce it during discovery; however, there is no dispute that Levers did, in fact, respond to her in a sexually explicit manner. Clegg also claims that Levers sent eight or nine emails following this one, asking her to respond to his email "in a graphic way." She initially sent some responses to Levers' emails (including one in which she said that his email "knocked my socks off"), but "slowly phased it out" until it finally "got to the point where I just totally eliminated responding, e-mailing[,] any association whatsoever via Internet." (*Id*. at 170, 169.) When Levers mentioned the email at work, she allegedly told him that she was "totally [**4] shocked when [she] read his response," and that she "was not expecting something like that. I said that was not my intent." (*Id*. at 172, 168.)

Clegg claims that from September 2002 through January 2003, Levers subjected her to sexually harassing conduct, despite the fact that she clearly "tried to get across to leave me alone." (*Id*. at 171.) For example, over a week and one-half to two week period, Levers would come up behind her while she was sitting at her desk and rub her back and neck. He made her take evening rides around the [*22] plant in a golf cart to deliver end of the day reports. During these rides, he would touch her leg, pull her towards him, and go around turns to make her "sway over into him." (*Id*. at 186.) He would also make repeated comments to her along the lines of: "Come on Beth, we would be like the Brady Bunch. We would be so good together." (*Id*. at 188.) He left a rose in her desk drawer. When she left their office to walk through the warehouse and after she left work, he would call her and ask if she missed him. He once called her at home at 1:00 am, and hung up when she answered.

On January 2, 2003, Clegg received an email from Levers, which [**5] read:

By the time you read this email I will be a thousand miles away from here. Sike, just joking. You could only wish.

You need to run a stock status report and do the weekly billing and take the packing slips up to Phyllis ASAP. If you need any help call me at home or on my cell phone. . . . Don't be afraid to call. There's not a whole lot happening this week. You should be alright, if not i'm here for you as always. I'm here for you for anything.

How did you like that Steeler game yesterday. Not bad uh. We had a good time. We missed the comeback because we left early. I would have much rathered have taken you, but...

Have you checked your e-mail at home since Saturday night. I wrote you an e-mail and I just need to know if you received it, read it and what you thought about it. What are you doing for lunch today. If you call me I can meet you somewhere for lunch. Or maybe you need another week away from me. And oh by the way i'll bet you look beautiful today, but i'm sure I won't be the only one to tell you that today or anyday. I won't bother you anymore. If you need me you know what to do. I hope you have a great day. Read your e-mail when you get home if you haven't [**6] already and respond.

(*Id*. at 171-72.)

Clegg spent time with Levers outside of work on at least two occasions between September and January. On the first occasion, Clegg and Levers went out to a bar together after work. n2 During the course of the evening, they drank and played pool. Levers repeatedly "leaned up against" her while they were playing pool, rubbed his leg against hers while they were sitting on the bar stools, and put his hand on her outer thigh. At the end of the evening, Levers leaned through her car window and tried to kiss her. He asked her if she wanted to get more drinks or if she wanted him to follow her home. Eventually, he left.

n2 Clegg testified that she agreed to go with him because he "hounded" her to go. (*Id*. at 179.)

In November, Clegg again spent time with Levers outside of work. Clegg had obtained six tickets to a Pittsburgh/West Virginia football game from Levers, was unable to find someone to use the sixth ticket, and gave the ticket to Levers. The day of [**7] the game, Clegg, her parents, her children, and Levers drove together to the game and went out to dinner after the game. Levers did not make any sexual comments or sexual advances toward Clegg, although he called her during his drive home to "touch base, say hey, hello."

On January 27, 2003, Clegg reported the sexual harassment to Richard Nugent, president and CEO of Falcon. She told him that she "did not want to be [Levers'] girlfriend" and that things were "getting [*23] way out of control." (*Id.* at 196.) She also told him about the back rubs and the emails from Levers. Nugent told Clegg that Levers did not have the authority to fire her, and told her to report any further harassment immediately. Nugent then called Levers into his office, informed him of Clegg's allegations, and advised him that sexual harassment would not be tolerated. Falcon's Human Resources Director, Angelo Morascyzk, was also present at this meeting. Levers told Nugent that "there was no sexual issues going on," and denied sending a sexually oriented email to Clegg. n3

        n3 Levers later admitted that he sent Clegg the sexually explicit email.

**[**8]**

Over the next month, Nugent and/or Morascyzk met with Clegg at least fifteen times. Many of these meetings were at Clegg's insistence. She "was forced to repeatedly return to Nugent, questioning him why 'we are not going to have the meeting or what is going on with it.'" (*Id.* at 192-93.) On February 3, Clegg reported to Nugent that Levers was trying to set her up to make her look bad, and doing everything he could to make her life miserable. Although Clegg concedes that the sexual advances stopped in January, when she reported them to Nugent, she claims that Levers began harassing her in other ways. He told the work crew "not to help [her] in any way, shape or form." (*Id.* at 204.) He took away work duties that she had performed well in the past. He stopped giving her information on new customers. He accused her of not giving him phone messages and "not writing down

pick ups for truck loads on the pamphlets." *Id.* He stopped communicating with her, began excluding her from lunches with sales reps, and took over one of her main duties, negatively impacting her future at Falcon, at least in her view.

Clegg repeatedly complained to Nugent and Morascyzk about Levers' behavior. [**9] During at least one of her meetings with Nugent, he asked her what she wanted the company to do, and whether she wanted to be transferred to another department. Clegg said that she did not wish to be transferred. She did ask to be moved to another dock (i.e. a different work station), but this request was denied. n4

        n4 Falcon claims (and Clegg does not dispute) that moving her to that dock would have been impractical (because there were no phones or computers there) and ineffectual (because she still would have been reporting to Levers).

Nugent and Morascyzk continued to speak to Levers and insisted that he begin communicating with Clegg, but Clegg did not feel that the situation was improving. On March 6, 2003, she found a tape recorder in Levers' desk. The tape in the recorder allegedly contained a recording of her telephone conversation with her lawyer. n5 Clegg reported this to Nugent, who told Clegg that it was not illegal to tape someone's conversations, and that she should return the tape recorder because [**10] taking personal property could be considered theft.

        n5 The tape containing the alleged recording of her phone conversation is either missing or the voices have been recorded over.

Clegg left work after this incident, and submitted a letter from her doctor to Falcon stating that she would be out on medical leave from March 10 through March 31. On March 25, Falcon sent Clegg a letter offering her a lateral transfer. On March 26, Nugent and Morascyzk met with Levers, gave him a formal written reprimand, and informed him that "any negative treatment of [Clegg] by you will be deemed retaliatory on your part and will not be tolerated. If any such retaliation or negative treatment

toward Beth [*24] Clegg occurs on your part, you will [be] immediately discharged from your employment with the company." (*Id.* at 397.) Clegg did not respond to the letter offering her a transfer. She never returned to work.

Clegg filed a complaint in the United States District Court for the Western District of Pennsylvania. The complaint [**11] alleged: (1) Title VII sexual harassment and retaliation claims against Falcon; (2) a Pennsylvania Equal Rights Amendment claim against Falcon, Levers, and Nugent; (3) an invasion of privacy claim against Falcon, Levers, and Nugent; (4) a battery claim against Levers; and (5) a Pennsylvania Human Relations Act claim against Falcon. The District Court granted dismissals or summary judgment to the defendants on all counts except the battery and invasion of privacy claims against Levers, which were dismissed without prejudice a month later. This appeal followed.

## II.

We exercise plenary review over the District Court's decision to grant summary judgment, and must "view the facts in the light most favorable to [Clegg]. If a reasonable jury could find for her, we must reverse." *Jensen v. Potter, 435 F.3d 444, 448 (3d Cir. 2006).*

### A. The Title VII Hostile Work Environment Claim

A plaintiff can establish a violation of Title VII by proving that discrimination based on sex created a hostile or abusive work environment. *Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986).* n6 Not all workplace conduct that may be described [**12] as harassment, however, rises to the level of a hostile work environment. The harassment must be "sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment." *Id. at 67* (internal quotations omitted). "The plaintiff must subjectively perceive the environment to be hostile or abusive, and conditions must be such that a reasonable person would have the same perception." *Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 715 (3d Cir. 1997).* We use a totality of the circumstances test to determine whether the threshold level of severity and pervasiveness has been reached, and consider such factors as the severity of the harassment, the frequency of the harassment, and the degree of abuse. *Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).*

n6 "Employer liability under the Pennsylvania Human Relations Act follows the standards set out for employer liability under Title VII." *Knabe v. Boury Corp., 114 F.3d 407, 410 n.5 (3d Cir. 1997)* (citing *Hoy v. Angelone, 456 Pa. Super. 596, 691 A.2d 476 (Pa. Super. Ct. 1997); West v. Philadelphia Elec. Co., 45 F.3d 744 (3d Cir. 1995)* (utilizing Title VII standards in case involving PHRA hostile work environment claim)). Therefore, our Title VII analysis applies equally to Clegg's PHRA claim.

[**13]

The District Court found that there was no genuine issue of material fact as to Clegg's hostile work environment claim because Clegg "failed to set forth evidence sufficient to show that the alleged harassment was so 'severe and pervasive' as to 'alter the conditions of her employment . . . .'" (*Id.* at 14.) We find that, in coming to this conclusion, the District Court erred by failing to consider several of the allegations of sexual harassment which allegedly occurred before Clegg reported the harassment to management, and failed to consider Levers' facially-neutral conduct that occurred after she reported [*25] the sexual harassment to management (the "post-reporting conduct").

Facially neutral acts can form the basis of a Title VII hostile work environment claim, as long as they are motivated by gender-based discrimination. *See Durham Life Ins. Co. v. Evans, 166 F.3d 139, 148 (3d Cir. 1999), Andrews v. City of Philadelphia, 895 F.2d 1469, 1485 (3d Cir. 1990).* Falcon argues, however, that the post-reporting conduct should not be considered because it was not motivated by gender, but rather by Levers' anger at Clegg for reporting his prior conduct [**14] to management. *See Berry v. Delta Airlines, 260 F.3d 803, 809 (7th Cir. 2001)* ("Title VII may impose liability on an employer for the creation or toleration of a hostile work environment motivated purely by the plaintiff's filing of a complaint of sexual harassment, [but] this is a form of retaliation rather than sexual harassment, and it must be argued as such."). Clegg, on the other hand, argues that the post-reporting conduct was motivated by gender, *i.e.* by anger at her for rebuffing his advances.

Ultimately, the motivation behind the post-reporting

conduct is a question best left to the jury to decide. A jury could find that the post-reporting conduct was motivated by Clegg's complaint to management and, thus, to be disregarded for purposes of a sexual harassment/hostile work environment claim. Alternatively, a jury could agree with Clegg, and find that the conduct was motivated by gender because it was related to Clegg's spurning Levers' sexual advances.

Although we believe it is a close question, Clegg has presented sufficient evidence to establish a genuine issue of material fact as to whether, considering the post-reporting conduct in conjunction with **[**15]** the allegations of sexual harassment that pre-dated Clegg's complaint to management, Clegg was exposed to a hostile work environment. n7

n7 Falcon also contends that "Clegg cannot recover for harassment because she welcomed the conduct about which she now complains." Appellee's Br. at 23. "In order to constitute harassment, the conduct must be unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." *Bales v. Wal-Mart Stores, Inc., 143 F.3d 1103, 1108 (8th Cir. 1998)*. In this regard, the relevant inquiry is whether the victim "by her conduct, indicated that the alleged sexual advances were unwelcome." *Meritor Sav. Bank, 477 U.S. at 68*. Falcon points to Clegg's email to Levers asking him to talk dirty to her as evidence that Clegg indicated, by her conduct, that Levers' advances were welcome. Clegg claims that her email to Levers was intended as a joke. We believe that "the inherently subjective question of whether particular conduct was indeed unwelcome presents difficult problems of proof and turns primarily on credibility determinations which are inappropriate for summary judgment." *Morton v. Ford, 162 F. Supp. 2d 1228, 1239 (D. Kan. 2001)*. While Clegg's conduct may raise a question as to whether Levers' conduct was unwelcome, it does not prove as a matter of law that Clegg invited what

allegedly followed. Whether what followed was unwelcome should be determined by a jury after assessing the evidence and the credibility of the witnesses.

**[**16]**

Summary judgment would nonetheless have been appropriate if Falcon could not have been held liable, as a matter of law, for Levers' actions. An employer is generally liable for the acts of a supervisory employee whose sexual harassment of a subordinate has created a hostile work environment. When no tangible employment action has been taken against the subordinate, n8 however, an employer can avoid **[*26]** liability for supervisory conduct by asserting an affirmative defense showing that it "had exercised reasonable care to avoid harassment and to eliminate it when it might occur, and that the complaining employee had failed to act with like reasonable care to take advantage of the employer's safeguards and otherwise to prevent harm that could have been avoided." *Faragher v. City of Boca Raton, 524 U.S. 775, 805, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)*; see also *Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)*. Because no tangible employment action was taken against Clegg, this affirmative defense-known as the *Faragher/Ellerth* defense-is potentially available to Falcon.

n8 The Supreme Court has defined a tangible employment action as "a significant change in employment status," often, but not always, resulting in economic injury. *Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761-62, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998)*; see also *Faragher v. City of Boca Raton, 524 U.S. 775, 808, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)*. "A tangible employment action [is] also defined by reference to a non-exclusive list of possible actions: 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Suders v. Easton, 325 F.3d 432, 434 (3d Cir. 2003)* (quoting *Ellerth, 524 U.S. at 761*).

[**17]

We cannot say, as a matter of law, that Falcon prevailed on its affirmative defense. Reasonableness is a paradigm question of fact, and material facts are in dispute. That Falcon immediately informed Levers of its policy against harassment, met with Levers and Clegg often, and offered to transfer Clegg to another department provides evidence that Falcon acted reasonably to avoid further harassment. But Clegg asserts that Falcon only acted at her repeated insistence. She further contends that Nugent eventually appeared "annoyed" with the situation and "would go the other way" when he saw her coming. (App. at 196-97, 203.) And when Clegg complained that Levers had been taping her conversations, Nugent "cussed" at her, questioned her job performance, and stated that both she and Levers should be fired. (*Id.* at 141, 206-07.) In light of these facts, a jury could determine Falcon did not act with sufficient diligence to avoid further harassment.

As for Clegg, she waited approximately four months before reporting Levers' offensive conduct, and, we note, did not report much of the conduct that she later alleged in her complaint and her deposition. A delay in reporting may support a [**18] finding that an employee failed to take advantage of safeguards. *See Cardenas v. Massey, 269 F.3d 251, 267 (3d Cir. 2001).* In *Cardenas,* however, we ultimately found that the plaintiff's significant delay in reporting the harassment was not necessarily unreasonable. *Cardenas, 269 F.3d at 267* ("In these circumstances, Cardenas' reluctance to file a formal complaint for fear of aggravating the situation or branding himself a troublemaker might not have been unreasonable."). Here, as in *Cardenas,* the reasonableness of the delay in reporting is a question of fact for a jury to decide.

Clegg's refusal to accept a lateral transfer to another position (with similar pay and responsibilities) is also potential evidence of her failure to take advantage of safeguards or to otherwise prevent harm that could have been avoided. *See Cardenas, 269 F.3d at 267.* A jury could determine, however, that a victimized employee should not be forced to transfer to another position, and that a refusal to do so under the facts of the case was not unreasonable.

Accordingly, the grant of summary judgment on Clegg's hostile work environment claim will be [**19] reversed.

## B. The Title VII Retaliation Claim

To establish retaliation under Title VII, Clegg must show that:

[*27] "(1) she engaged in activity protected by Title VII; (2) [Falcon] took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."

*Robinson v. City of Pittsburgh, 120 F.3d 1286, 1299 (3d Cir. 1997)* (quoting *Nelson v. Upsala College, 51 F.3d 383, 386 (3d Cir. 1995)).* Falcon argues, and the District Court found, that Clegg "failed to present evidence sufficient to establish an adverse employment action." (*Id.* at 15.) We agree and, indeed, have already found that no tangible employment action was taken against Clegg, much less one that was "adverse.".

A constructive discharge can count as an adverse employment action for retaliation purposes. *See Durham Life Ins. Co. v. Evans, 166 F.3d 139, 156 & n.11 (3d Cir. 1999).* Moreover, "harassment that is severe or pervasive enough to create a hostile work environment" can count as the requisite adverse employment action. *Jensen v. Potter, 435 F.3d at 449.* [**20] Clegg has established neither.

To find constructive discharge, we "need merely find that the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984).* In other words, Clegg was required to show that the discrimination she alleges surpassed a "threshold of intolerable conditions." *Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 169 (3d Cir. 2001)* (internal quotations omitted). "Intolerability . . . is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign-that is, whether [she] would have had no choice but to resign." *Connors v. Chrysler Financial Corp., 160 F.3d 971, 976 (3d Cir. 1998)* (internal citations omitted).

The conduct alleged by Clegg would not compel a

174 Fed. Appx. 18, *27; 2006 U.S. App. LEXIS 8576, **20

reasonable person to resign. "[We] note that [Clegg] cannot rely on many of the factors commonly cited by employees who claim to have been constructively discharged. [Clegg] was never threatened with discharge; n9 nor did her employer ever urge [**21] or suggest that she resign or retire. . . . Similarly, [Clegg's] employer did not demote her or reduce her pay or benefits. [Clegg] was not involuntarily transferred to a less desirable position . . . . She was not even given unsatisfactory job evaluations . . . ." *Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161-62 (3d Cir. 1993)*. Furthermore, Clegg refused Falcon's offer to transfer to another position and "never advised [her employer] that she would feel compelled to leave if changes [in her circumstances] were not made." *Id.* In *Clowes*, we noted that "a reasonable employee will usually explore such alternative avenues thoroughly before coming to the conclusion that resignation is the only option." *Clowes, 991 F.2d at 1162*.

> n9 Clegg did testify that Nugent once threatened to terminate her, but it does not appear that she took this as a serious threat, and she does not rely on it to support her constructive discharge claim.

Nor was the alleged retaliatory [**22] harassment -- the post-reporting conduct -- sufficiently severe and pervasive to establish an adverse employment action. In *Jensen*, where we first recognized the possibility that retaliatory harassment could constitute an adverse employment action, we explained that such harassment has to be so severe and pervasive that it creates a hostile work environment. *Jensen, 435 F.3d at 449*. Put simply, the post-reporting [**28] conduct alleged by Clegg does not rise to this level. Accordingly, the District Court's grant of summary judgment to Falcon on Clegg's retaliation claim will be affirmed.

## C. The Intrusion Upon Seclusion Claim

Clegg claims that her seclusion was intruded upon when Levers secretly tape recorded her private conversation. To maintain an intrusion upon seclusion claim under Pennsylvania law, a plaintiff must show that (1) there was an intentional intrusion; (2) upon the solitude or seclusion of the plaintiff, or his or her private affairs or concerns; and (3) that the intrusion was substantial; and (4) highly offensive to the ordinary reasonable person. *See Larsen v. Philadelphia*

*Newspapers, Inc., 375 Pa. Super. 66, 543 A.2d 1181, 1186-87 (Pa. Super. Ct. 1988)*. [**23] n10

> n10 The District Court granted summary judgment to Falcon and Nugent on Clegg's intrusion upon seclusion claim and subsequently dismissed the claim against Levers without prejudice so that Clegg could pursue it in state court. Clegg does not challenge the dismissal on appeal.

Summary judgment for Falcon and Nugent was appropriate because Falcon and Nugent were not vicariously liable for Levers' conduct. Under the doctrine of respondeat superior, an employer can only be held liable for the conduct of a employee if the employee was acting within the scope of his or her employment. "For an act to be within the scope of employment it must: 1) be the kind the actor was employed to perform; 2) occur substantially within the authorized time and space limits and 3) it must be actuated, at least in part, by a desire to serve the master." *Tucker v. Merck & Co., 2003 U.S. Dist. LEXIS 7672, at *39-40 (E.D. Pa. 2003)* (citing *Shuman Estate v. Weber, 276 Pa. Super. 209, 419 A.2d 169, 173 (Pa. Super. Ct. 1980))*. [**24] Levers' taping of Clegg's conversation was certainly not the kind of act that he was employed to perform, nor can it realistically be argued that he was motivated by a desire to serve Falcon. Thus, his action was outside the scope of his employment and Falcon cannot be held vicariously liable.

Clegg argues that "the acts of an agent can be ratified by inaction which manifests consent," and that "a jury could draw the inference from the evidence that Nugent either approved or at least ratified Levers' conduct" when he initially told her that it was not illegal to tape someone's conversations and that her taking the tape recorder could be considered theft. This argument is undermined by the fact that Nugent clearly expressed to Clegg that the company did not give anybody permission to record her, and Levers was given a "formal written reprimand" for taping the conversation. n11 Given these undisputed facts, no reasonable jury could conclude that Nugent or Falcon approved or ratified any taping of Clegg's phone conversation. Summary judgment was, therefore, appropriate.

174 Fed. Appx. 18, *28; 2006 U.S. App. LEXIS 8576, **24

n11 Levers received a letter, which stated:

> [Falcon] cannot and will not tolerate or condone the tape recording of an employees (sic) conversation, without his or her prior consent and approval. . . . The tape recording of an employee's conversation without the employee's consent is considered a serious act of misconduct . . . . Any further actions of this nature will result in your immediate termination from the Company.

(*Id*. at 328.)

[**25]

### III.

We will affirm that part of the District Court's order granting summary judgment [*29] and/or dismissals to defendants on Clegg's Title VII retaliation claim, Pennsylvania Equal Rights Amendment claim, n12 and intrusion upon seclusion claim against Nugent and Falcon. We will reverse, however, with respect to her Title VII hostile work environment claim and Pennsylvania Human Relations Act claim, and remand for further proceedings consistent with this opinion.

> n12 Clegg has not challenged on appeal the dismissal of her claim under the *Pennsylvania Equal Rights Amendment*.

LEXSEE 106 F. SUPP. 2D 479

**ANNGELA COOPER, Plaintiff, -against- WYETH AYERST LEDERLE, INTERNATIONAL CHEMICAL WORKERS UNION LOCAL 143C, and RICHARD DUMAS, Defendants.**

**98 Civ. 1865 (CM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*106 F. Supp. 2d 479; 2000 U.S. Dist. LEXIS 9541; 141 Lab. Cas. (CCH) P10,791*

**June 9, 2000, Decided**

**SUBSEQUENT HISTORY:** **[**1]** As Amended August 25, 2000.

**DISPOSITION:** AHP's motion granted and all federal claims against it dismissed; Union's motion to dismiss Plaintiff's claim for discriminatory failure to carry out its duty of fair representation granted; Court declines to exercise supplemental jurisdiction over Cooper's remaining state law claims against AHP and Dumas.

**COUNSEL:** Kim E. Greene, Esq., Deiley, Dautel & Mooney, LLP, Albany, NY, for Plaintiff.

David R. Jewell, Esq., Orrick, Herrington & Sutcliffe, LLP, New York, NY, for AHP, Defendant.

Robert Lowrey, Esq., Randall Vehar, Esq., General Counsel, International Chemical Workers Union Council, Akron, OH, for Local 143, Defendant.

Patricia McConnell, Esq., Meyer, Suozzi, English & Klein, P.C., Mineola, NY, for Local 143, Defendant.

Eugene Zinbarg, New York, NY, for Dumas, Defendant.

**JUDGES:** Colleen McMahon, U.S.D.J.

**OPINION BY:** Colleen McMahon

**OPINION:** [*481]

AMENDED MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR

SUMMARY JUDGMENT AND DISMISSING THE CASE

McMahon, J.:

Plaintiff Anngela Cooper brings sex discrimination and sexual harassment claims under Title VII, *42 U.S.C. § 2000e* et seq., against her former **[**2]** employer, Defendant American Home Products Corporation ("AHP") (sued here as Wyeth Ayerst Laboratories) n1 and her former union, Defendant International Chemical Workers Union Local 143C ("Union") and a state law sexual harassment claim against her former supervisor, Defendant Richard Dumas. She also joins a state law employment claim against AHP.

> n1 American Home Products has been sued as Wyeth Ayerst Lederle. The Court sua sponte deems the caption amended to substitute the name American Home Products for Wyeth Ayerst Lederle, and the Defendant employer will be referred to as American Home Products, or AHP, hereafter.

Both the Defendant employer American Home Products, which has been charged with failure to protect Plaintiff against sexual harassment by her supervisor, and the Defendant Union, which has been charged with discriminatory breach of its duty of fair representation, have moved for summary judgment.

For the reasons stated below, AHP's motion is

106 F. Supp. 2d 479, *481; 2000 U.S. Dist. LEXIS 9541, **2;
141 Lab. Cas. (CCH) P10,791

granted and all federal claims against it are **[\*\*3]** dismissed. The Union's motion to dismiss Plaintiff's claim for discriminatory failure to carry out its duty of fair representation is also granted. The Court declines to exercise supplemental jurisdiction over Cooper's remaining state law claims against AHP and Dumas. **[\*482]**

I. STATEMENT OF FACTS

Viewed most favorably to Plaintiff, the non-moving party, the facts are as follows:

Plaintiff is an African-American woman who began working at Wyeth Ayerst Lederle (the predecessor in interest to and currently a subsidiary of AHP) in Pearl River, New York in 1977. n2 Defendant Union Local 143C served as representative for all bargaining unit employees. Plaintiff had been a member of Local 143C from 1977-1988 and rejoined in March 1996. (Def. Union's 56.1 Stmt.) The Union operated pursuant to a Collective Bargaining Agreement ("CBA") with AHP.

> n2 For a brief period between 1979 and 1980, Cooper left the Pearl River facility to serve in the U.S. Army. (Def. Union's 56.1 Stmt.) She returned to the facility in November 1980. (O'Brien Aff. at 4.)

**[\*\*4]**

Plaintiff joined the Liquids and Ointments Department ("L&O" or "Department 260"), on or about November 14, 1990, as an Operator I on Shift C, a night shift. (Pl. Admissions P5.) At that time, Richard Dumas worked on the same shift as an Operator II, a non-supervisory position. (O'Brien Aff. P22.) On or about May 18, 1992, Dumas transferred from Shift C to Shift B, a day shift, and he and Plaintiff did not work the same shift for three years, until April 1995. (Pl. Admissions PP 6-8.)

On or about April 10, 1995, Plaintiff transferred to Shift B and was again on shift with Dumas, who at that time held the position of Senior Operator, L&O. (Pl. Admissions P18-19; O'Brien Aff. Ex. C.) While AHP characterizes this as a non-supervisory position, in that Dumas has no hire-fire-promote-demote-discipline power, it is undisputed that a Senior Operator, L&O, directed the work of Operators I and II. (O'Brien Aff.

P30.) On or about June 19, 1995, Dumas temporarily assumed the duties of Supervisor, L&O, and seven months later he was formally promoted to that position. (Pl. Admissions P21.) Plaintiff was promoted to the position vacated by Dumas in February 1996. (Pl. Admissions P29.) Dumas made **[\*\*5]** the promotional recommendation. (Gibberman Dep. at 21, 116.)

Sometime during the period when Plaintiff and Dumas were not working the same shift, they began a sexual relationship. At various times, Plaintiff or her counsel have alleged that the relationship began as early as March 1993, i.e. three years prior to March 1996 (Minter Letter of June 20, 1996) or as late as February 1995. (Tr. of Cooper's Test. before Workers' Comp. Bd., Mar. 26, 1998 at 15, attached to O'Brien Aff. at Ex. P.) Plaintiff has also characterized, or caused her counsel to characterize, the relationship in diametrically opposing ways: as both consensual (Minter Letter, supra.) and coerced, (Letter of Bert Pepper, MD, attached to Cooper Aft at Exh C). n3 While this changeability bears on Plaintiff's credibility, it is not relevant for purposes of this motion. Whenever and however it started, it appears that Plaintiff stopped having sex with Dumas in or about March 1996, almost immediately after he promoted her into his old job. It is the post-sexual relationship behavior that is at issue in this suit.

> n3 Dumas has also been inconsistent in his recollection of the relationship. In papers before this Court he states that he had a "brief intimate relationship" with Cooper and that he ended the relationship. (Dumas Aff. at P 5.) Before the Worker's Comp Board he stated that he had sex, but not relationship, with Cooper. Earlier, in conversations with Joanne Rose, he denied ever having a relationship with her. (Gibberman Dep. at 86.)

**[\*\*6]**

Dumas thereafter began harassing Plaintiff, by bumping his body into hers, calling her names, demanding sex from her, depriving her of overtime activities, assigning her to menial tasks and threatening to have her fired. (Cooper Aff. PP26-28.) Commencing in April 1996, approximately one month after the harassment began, Plaintiff complained to at least five Union shop stewards about Dumas. (Cooper Aff. PP29, 32, 52, 54.) Her complaints included claims that Dumas

106 F. Supp. 2d 479, *483; 2000 U.S. Dist. LEXIS 9541, **6;
141 Lab. Cas. (CCH) P10,791

[*483] was assigning her and others in her work area menial tasks, that she was not being fairly awarded overtime hours and that Dumas was showing her disrespect. On at least one occasion, Plaintiff told shop steward Michael Youhas that Dumas was "talking dirty" to her, although she never told Youhas what words Dumas used. (Youhas Dep. at 73.) Youhas asked Dumas whether he was harassing Plaintiff, asked if any of her co-workers could corroborate her story, and walked into the department several times in order to try to catch Dumas "in the act." Everyone denied Cooper's allegations. Unable to corroborate Plaintiff's story, Youhas did not file a grievance and referred Plaintiff to AHP's EEO personnel. (Youhas Dep. at 59, 84-85, 110.) [**7] It is undisputed that Cooper did not tell Youhas anything about her sexual history with Dumas.

On May 24, 1996, following what she deemed a particularly egregious incident of physical contact, Plaintiff went to Joanne Descher-Rose, the Human Resources Manager at the facility, and complained that Dumas was "harassing" and "disrespecting" her. (Descher-Rose Dep. at 27-9.) Cooper did not mention her prior sexual relationship with Dumas or give Descher-Rose any information that would have placed her complaint in the "sexual harassment" context. Descher-Rose recorded in her notes that Plaintiff had raised a Union, not an EEO issue. (Descher-Rose Dep. at 115; PX 98.) Descher-Rose nevertheless spoke to both Dumas and his supervisor, Gary Muscarella, about Plaintiff's complaints of unfair treatment in work assignments. Dumas and Muscarella told her that Plaintiff was experiencing serious performance problems. (Descher-Rose Dep. at 59-60.)

Plaintiff obtained medical leave from the plant nurse immediately after her interview with Descher-Rose. When she returned to work on June 3, bearing a doctor's note that established treatment for stress and anxiety, Plaintiff met with Descher-Rose once [**8] again. Descher-Rose told Cooper that she was having performance problems and suggested that further complaints should be handled through the Union. (Descher-Rose Dep. at 60.) Again, Plaintiff did not enlighten Descher-Rose about the matters that would have alerted Descher-Rose to the sexual aspect of the situation. Instead, she became upset and asked for another disability leave. Descher-Rose refused to grant her request and sent her back to work, under Dumas' supervision. (Descher-Rose Dep. at 61.)

No sooner had Plaintiff arrived back at work than Dumas presented her with a disciplinary Interview Record, in which he alleged that Cooper had committed six serious violations of company rules during the week of May 21. Shop steward Youhas represented Plaintiff when Dumas presented the Interview Record to her. Youhas was concerned that the Interview Record had been given in retaliation for Plaintiff's prior complaints about Dumas, but he took no action other than to ask Dumas if he was retaliating - which Dumas of course denied. (Youhas Dep. at 107.)

At Cooper's request, the Union filed a grievance on her behalf concerning the Interview Record. Despite Youhas' prior investigation into [**9] "sexual harassment," and his concerns about retaliation, the grievance referred neither to sexual harassment nor to retaliation. Cooper, stressed, went again to the company nurse, who again placed her on medical leave and assisted Plaintiff in drafting a letter to report the harassment to AHP. (Burke Dep. at 38-9; Cooper Dep. at 28-52.) Plaintiff revised the letter Burke drafted for her, typed it and mailed it on June 11 to Stephen White, the Plant Manager, with copies to Charles Hildenbrand, Director of Consumer Health Products, Joanne Descher-Rose, and Robert Glover, President of the Local Union. The letter stated as follows:

> I, Anngela Cooper, am a Senior Operator in department # 620. My immediate supervisor is Richard Dumas. [*484]
>
> The purpose of this letter is to advise management of a situation I'm confronted with an a daily basis. I have been consistently harassed for the past 6 to 7 weeks. Due to this its [sic] been difficult to maintain my normally high productivity at work. It has been a constant interference, also creating problems in my personal life.
>
> I brought this to the attention of C. Hildenbrand Director of Consumer Health Products, J. Descher Rose - Human [**10] Resources and Robert Glover - Union president, verbally. To this date, it is still unresolved. Because of emotional, mental and physical harassment, I feel intimidated at this time I'm scared [sic].

106 F. Supp. 2d 479, *484; 2000 U.S. Dist. LEXIS 9541, **10;
141 Lab. Cas. (CCH) P10,791

At this point I'd like to resume my normal activities at work without feeling threaten [sic]. I'm hoping you can address this matter immediately.

(Cooper Letter, June 11, 1996, O'Brien Aff. at Ex. F.)

Although the letter obviously contained allegations of serious and disturbing harassment, it again failed to mention the key background facts: a prior sexual relationship that had ended and subsequent requests for sexual favors that were rejected.

However, while on medical leave, Cooper also hired a lawyer, Rachel Minter, who provided the missing piece of the puzzle. In a letter to Plant Manager White dated June 20, 1996, Minter alleged that her client had been subjected to "qui pro quo sexual harassment (i.e., retaliation for withholding sexual favors)" by Dumas. She further stated:

Ms. Cooper alleges that her immediate supervisor, Richard Dumas, issued the disciplinary notice without just cause and withdrew overtime in retaliation for (1) her unilateral termination, [**11] in or about March of this year, of a three-year romantic relationship over Dumas' objections; and (2) her complaint, on or about April 29, 1996, that Dumas had given inappropriate directives to employees regarding a contaminated product...

(Minter Letter, June 20, 1996, O'Brien Aff. at Ex. G.)

There is no evidence in this record that AHP management (as opposed to the Union) had any specific information about the sexual nature of the harassment prior to the sending of Ms. Minter's letter.

Plaintiff was cleared by her physician to return to work, without restrictions, on June 23. She returned to work on June 24. AHP ordered Dumas to have another employee present whenever he gave Plaintiff an assignment, and Dumas complied with that directive. (Cooper Dep. at 282-23.) However, Plaintiff perceived that Dumas was still harassing her (Cooper Dep. at 282-86), and she again reported to the plant nurse, who sent her to Clifford Gibberman, AHP's Director of Labor Relations, for assistance, (Cooper Dep. at 294-95).

Gibberman testified that he suggested that Plaintiff transfer out of Department 620, although he did not specify any position that Plaintiff might take. Although he had [**12] read Minter's letter, Gibberman continued to insist that Cooper's problems related to performance, not harassment. (Gibberman Dep. at 60-68.) Gibberman inquired about any prior relationship between Plaintiff and Dumas, and learned that there had been a sexual relationship (although Dumas initially denied it). He also learned that a former supervisor had been aware of this relationship when he recommended Dumas for promotion. n4 Nonetheless, Gibberman deferred any investigation into Plaintiff's sexual harassment [*485] allegations to Descher-Rose. (Gibberman Dep. at 81, 85-87.)

n4 Dumas was formally promoted in or about February 1996; he received the title "acting supervisor" in July 1995. The record does not indicate whether the former supervisor was aware of the sexual relationship between Dumas and Cooper in July 1995, or not until February 1996.

Plaintiff's Step 1 grievance meeting was held on June 27, 1996. Plaintiff was represented by Shop Steward Michael Rambin; Muscarella and Dumas attended for the company. [**13] The meeting was truncated before all six of Plaintiff's alleged rules violations had been discussed, and Muscarella denied the grievance at the first level. (Muscarella Dep. at 150-53.) However, Muscarella told Rambin that the company had offered to tear up the Interview Record if Plaintiff would bid out of Department 620 and urged her to do so. (Cooper Aff. P 62.) Plaintiff refused, saying that she had done nothing wrong and ought not be penalized. Rambin then directed her to return to work under Dumas' supervision. (Id. P 63.) Instead, Plaintiff went to the one place where her complaints had been heard - Nurse Burke - and was immediately sent home on medical suspension. She did not return to work at the Pearl River facility again. (Cooper Aff. PP60-63; Burke Dep. at 50 and Ex. 3.) Therefore, Dumas could not have committed any acts of sexual harassment toward Plaintiff after June 27, 1996. (Pl. Admissions P88.)

Plaintiff, now acting primarily through her lawyers, pursued her grievances against AHP. In early August 1996, Arthur J. Corrado, Esq., Director and Counsel Labor Relations Department of the Wyeth-Ayerst

106 F. Supp. 2d 479, *485; 2000 U.S. Dist. LEXIS 9541, **13;
141 Lab. Cas. (CCH) P10,791

Division of AHP responded to Minter's June 20 letter. (O'Brien Aff. [**14] Ex. I.) Corrado indicated that an internal investigation had failed to substantiate Plaintiff's allegations of retaliation and unwarranted discipline. However, Corrado advised Minter that AHP would permit Plaintiff to invoke certain medical "bumping rights" under the Union contract, which would enable her to transfer to "a more satisfactory position" upon her return from medical leave. He did not specify any position for which she would be eligible (O'Brien Aff. Ex. I), Neither Cooper nor her attorney made any inquiry as to what positions would be available.

However, at some point, Union President Glover and Labor Relations Officer Gibberman had a conversation about Plaintiff's job options. The two parties to that conversation sharply dispute what was said. Glover testified that Gibberman informed him that only two positions would be available to Cooper, both of which would result in a demotion; Gibberman claims to have said nothing of the sort and avers that Plaintiff could have transferred to any position for which she was qualified and had sufficient plant-wide seniority, even if the position was not vacant. (Gibberman Dep. at 97-100; Glover Dep. at 98-103.) Glover testified that [**15] he relayed Gibberman's proposal of allowing Cooper to invoke medical bumping rights - at or above her current pay rate - to Attorney Minter. (Glover Dep. at 99.) Neither man thought about whether any position would require Cooper to come back into contact with Dumas, which she greatly feared, and which her doctor indicated would be medically harmful to her. (Glover Dep. 102; Gibberman Dep. 102.)

Cooper also wished to pursue her Union grievance. She retained new counsel, who wrote to Gibberman to ask that the attorney be allowed to accompany her client to the Union grievance meeting and that Dumas be excluded. (Greene letter to Gibberman, Dec. 9, 1996.) Gibberman, an AHP management employee, refused to allow Plaintiff's attorney to attend the grievance meeting. He informed the attorney that if Cooper failed to participate in the grievance process as outlined in the Collective Bargaining Agreement, AHP would assume that it had been withdrawn with prejudice. (Gibberman Dep. Ex. 64-65.) Gibberman did not directly address the request to exclude Dumas from the grievance. However, AHP has a policy of permitting an accused employee to attend a sexual harassment grievance hearing and to confront [**16] his accusers. (Gibberman Dep. at 105.)

Attorney Greene wrote Gibberman again on January 2, 1997, reiterating that [*486] Plaintiff could not be in Dumas' presence. (Gibberman Dep. Ex. 66.) In a letter dated January 20, Gibberman again declined to address whether Dumas would be allowed to attend the grievance meeting. (Gibberman Dep. Ex. 67.) However, he indicated that the grievance could proceed without the Plaintiff being present. (Id.) Plaintiff did not acknowledge this possibility. The Step 2 hearing was never held.

Attorney Greene also responded to Corrado's August letter. On December 13, 1996, Attorney Greene advised Corrado in writing of the risk facing her client if she had to confront Dumas. Greene also wrote, "The company has failed to take any action whatsoever to address the situation," despite knowledge of Cooper's complaints. (O'Brien Aff. Ex. J.) Greene rejected the transfer offer on behalf of her client, saying that, based on her discussions with Glover, it would constitute a demotion and would inappropriately punish Cooper rather than her harasser. (Id.) Corrado did not respond.

On January 23, 1997, Attorney Greene wrote Corrado a letter in which she alleged that [**17] the company's failure to take any meaningful steps to redress Plaintiff's complaints meant that she had been "constructively discharged." (O'Brien Aff. Ex. K) Plaintiff herself never wrote a letter of resignation. She would later testify that she herself did not resign and did not feel compelled to do so (Cooper Dep. at 311-14), statements that Defendants find highly significant, but that are in fact both highly ambiguous and virtually meaningless, in light of Plaintiff's contention that she was "discharged" and her lawyer's January 23 letter to Corrado so stating.

On January 31, Corrado responded to Attorney Greene's last letter, reiterating AHP's belief that Cooper's allegations could not be substantiated but again offering her "bumping rights" to an unspecified position. The letter concluded, "Please have Ms. Cooper directly contact her Human Resources Department to arrange for the retrieval of her personal belongings and surrendering any company property in her possession." (O'Brien Aff. Ex. M.) Other than making this indirect acknowledgment that Plaintiff did not plan to return to work, Corrado never responded to Cooper's contention that she had been constructively discharged. [**18] (Id.)

The next day, on February 1, 1997, Dumas was

disabled in an automobile accident. His employment with AHP ended six months later, pursuant to a company policy that required the termination of any non-Union employee who did not return to work after six months' medical disability leave. (O'Brien Aff. PP51-52.) Kenneth O'Brien, AHP's Senior Director and Counsel for Labor and Employment, advised Attorney Greene that Dumas had been terminated and offered to restore Plaintiff to her former position without regard to her claims against AHP. (Pl. Admissions P116.) Plaintiff elected not to return, ostensibly because AHP would not commit never to rehire Dumas. She was formally terminated after thirty months of medical disability leave, on December 28, 1998, again pursuant to company policy and the CBA. (O'Brien Aff. PP54-55 and Ex. L and O.)

On June 19, 1997, Plaintiff filed a charge of discrimination with the EEOC. This was within 180 days of her alleged constructive discharge by AHP, but nearly a year after her last day at work and the last possible act of sexual harassment by Dumas. Cooper named both AHP and Local 143 as respondents in her charge. She alleged race discrimination, [**19] sex discrimination and retaliation. She particularized her charges as follows: constructive discharge due to quid pro quo and hostile environment sexual harassment, race and sex discrimination and retaliation. She alleged that she was subjected to physical and verbal abuse and threats by her supervisor, that she was subjected to unwarranted disciplinary action when she complained, that she was forced into a disability leave as a result, that neither the company nor the union took any action to resolve the situation and [*487] that Plaintiff had been given the choice to either accept a demotion or return to work under Dumas. The last discriminatory act was alleged to have taken place on January 31, 1997. The EEOC issued a right to sue letter with respect to the charge on January 13, 1998. The right to sue letter listed only AHP as Respondent, although the charge on its face had named the Union as well.

## II. PROCEDURAL HISTORY

This action was commenced on March 16, 1998. An Amended Complaint was filed on April 22, 1998. All three Defendants moved under Rule 12(b)(6) to dismiss the Amended Complaint; the Union moved in the alternative for summary judgment. The Hon. Barrington D. Parker granted [**20] the motions in part and denied them in part: he dismissed Plaintiff's claims of race

discrimination under §§ 1981 and 1985 without leave to replead; he denied the motions to dismiss on the basis that the charge was never filed with the New York State Division of Human Rights, so that the 300 day statute of limitations was inapplicable; he granted the Union's motion to dismiss all claims asserted against it under state law, on the authority of *Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 100 L. Ed. 2d 410, 108 S. Ct. 1877 (1988);* and he otherwise denied the Union's motion for summary judgment on the ground that there were disputed issues of fact concerning a number of material issues. See *Cooper v. Wyeth Ayerst Lederle, et al., 34 F. Supp. 2d 197 (S.D.N.Y. 1999).* Following a period of protracted and contentious discovery, all three Defendants have moved for summary judgment.

### III.    AHP'S    MOTION    FOR    SUMMARY JUDGMENT

#### A. Standard

It is well established that summary judgment is appropriate where the parties' submissions "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as [**21] a matter of law." *Fed.R.Civ.P. 56(c).* See *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* In ruling on a motion for summary judgment, the court must resolve all ambiguities and draw all inferences in favor of the non-moving party. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* However, to defeat summary judgment, the non-moving party must go beyond the pleadings and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* For a Plaintiff in a discrimination case to survive a motion for summary judgment, he or she must offer "concrete particulars" to substantiate the claim. See *Meiri v. Dacon, 759 F.2d 989 (2d Cir. 1985)* cert. denied, *474 U.S. 829, 88 L. Ed. 2d 74, 106 S. Ct. 91 (1985).*

#### B. AHP's Motion to Dismiss Federal Causes of Action

There remain three claims against AHP sounding in Federal law: (1) sexual harassment and ratification of harassment [**22] under Title VII (First Cause of Action), *42 U.S.C. § 2000e* et seq.; (2) retaliation under

Title VII (Eighth Causes of Action), *42 U.S.C. § 2000e-3*(a); and (3) constructive discharge under Title VII (Tenth Cause of Action). *42 U.S.C. § 2000e-2*(a)(1). Plaintiff has also asserted a claim for prevailing party attorney's fees under *42 U.S.C. § 2000e-5*(k) (Twelfth Cause of Action).

**1. Sexual Harassment Claim Barred as Untimely**

AHP, acknowledging that there are factual disputes concerning Plaintiff's contention that she was sexually harassed, moves for summary judgment on the ground that Plaintiff's EEOC charge was untimely. It is undisputed that the last discrete act of [***488**] sexual harassment directed toward Plaintiff took place more than 300 days prior to the filing of Plaintiff's charge. Nonetheless, Plaintiff contends that her charge is timely, either because the date of the last act of discrimination was the date that she deemed herself constructively discharged (which, for purposes of this motion, the Court will fix at January 23, 1997, the date of Attorney Greene's last [****23**] letter), or because AHP's seven month long refusal to offer her adequate redress for her claims amounted to a continuing violation that extended into the timely period for filing a charge.

Title VII requires that a claimant file a charge of discrimination with the EEOC within 180 days of an alleged unlawful employment action, or within 300 days if the claimant files in a work-sharing State. See *42 U.S.C. § 2000e-5*. Because this requirement is treated as a statute of limitations, failure to file a timely EEOC charge will result in the dismissal of an action brought on the same claim. See *Butts v. City of New York Dept. of Housing Preservation and Development, 990 F.2d 1397, 1401 (2d Cir. 1993)*. Judge Parker previously determined that the 300 day period is the applicable limitations period in this case, because there was a Work-Sharing Agreement between the EEOC and the New York State Department of Human Rights New York in place at the time Plaintiff filed her charges with the EEOC. See *Cooper v. Wyeth Ayerst Lederle, 34 F. Supp. 2d 197, 200 (S.D.N.Y. 1999)*. Therefore, all acts of discrimination that occurred prior [****24**] to 300 days before Plaintiff filed her charge are time-barred (unless they are revived under the so-called continuing violation theory). And if all acts of discrimination occurred prior to 300 days before Plaintiff filed her charge, then AHP is entitled to summary judgment.

There is no question that Plaintiff failed to file her charge within 300 days of the last possible act of sexual harassment by Dumas, which is June 27, 1996. Three hundred days prior to June 19, 1997 is August 24, 1996. By that point, Plaintiff was out on medical leave, so no further acts of harassment could take place.

To overcome the time bar, Plaintiff attempts to transform her complaint into a continuing violation. She charges, in essence, that AHP did nothing, or at least not enough, to redress her sexual harassment complaint during the 300 day period - and, indeed, prior to that period, going back to the spring of 1996, when AHP (whether through her rather vague May complaint to Descher-Rose and/or her somewhat more specific June letters to White) first became aware of Plaintiff's complaints. Plaintiff argues that AHP's inaction in the face of her serious complaint - its desultory investigation, its refusal [****25**] to allow her to grieve her charge without Dumas' (the accused) being present, and its insistence that she, rather than Dumas, accept a transfer (one that she believed would result in a demotion) -- constituted ongoing and continuous discrimination against her in violation of Title VII. In other words, Plaintiff argues that employer inaction in the face of a complaint transforms an otherwise discrete act of discrimination into a continuing violation, because the employer's inaction was a continuation of her supervisor Dumas' discriminatory conduct. And, if the discrimination was a continuing violation, the statute of limitations does not begin to run until the last discriminatory act in completed. See *Gomes v. Avco Corp., 964 F.2d 1330, 1333 (2d Cir. 1992)*.

AHP responds that Title VII prohibits actions, not inaction, and that Plaintiff ought not be allowed to revive an untimely complaint simply by alleging that her employer did not address her complaints in a sufficiently thorough or satisfactory way. AHP further argues that a continuing violation cannot be made out by alleging that the effects of the harassment and the harassment itself were part of one continuous [****26**] policy.

I reject Plaintiff's creative attempt to extend the continuing violation doctrine, [***489**] and I find her Title VII sexual harassment complaint to be time barred.

The Second Circuit has limited the application of the continuing violation doctrine to cases where there is (1) proof of a specific ongoing discriminatory policy or practice (such as discriminatory seniority lists or employment tests), or (2) where specific and related

106 F. Supp. 2d 479, *489; 2000 U.S. Dist. LEXIS 9541, **26;
141 Lab. Cas. (CCH) P10,791

instances of discrimination are permitted by an employer to continue unremedied for so long as to amount to a discriminatory policy or practice. See *Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 713 (2d Cir. 1996); Cornwell v. Robinson, 23 F.3d 694, 703-704 (2d Cir. 1994).* AHP is thus wrong in asserting that an employer's inaction could never result in liability; where inaction amounts to an ongoing policy of discrimination, an employer could be found liable under a continuing violation theory. However, discrete discriminatory acts -- or discrete instances of discriminatory inaction -- not related to a discriminatory policy are not a continuing violation. See *Lambert v. Genesee Hospital, 10 F.3d 46, 53 (2d Cir. 1993)* [**27] (citing *Stoller v. Marsh, 221 U.S. App. D.C. 22, 682 F.2d 971, 975 (D.C. Cir. 1982).* Cornwell itself demonstrated an appropriate application of the continuing violations doctrine. There, discrimination continued unremedied for a period of years after the employer was put on notice of the first instances of harassment. Incidents of harassment ceased for a period of time, largely because the employee was on sick leave as a result of the incidents. But the harassment started anew when the Plaintiff returned to work and did not end until the day Cornwell was finally driven from the workplace. *Cornwell, 23 F.3d at 704.* The Second Circuit held that these facts made out a continuing hostile work environment, as well as an ongoing policy of harassment that constituted a continuing wrong. The statute of limitations was thus held to begin to run on the date the harassment finally ended, which was the date Cornwell left her job.

In her brief, Cooper argues that the date of her constructive discharge (see discussion below) is the date of the last discriminatory act for the purpose of a continuing violation. The holding of Cornwell makes clear, however, [**28] that a continuing violation encompasses not the effects of the harassment, but only the underlying acts themselves. Thus, under Cornwell, the last date that Plaintiff experienced any sexual harassment must be deemed the last date any discriminatory act could have taken place for the purposes of establishing a continuing violation. And that day was her last day on the job - June 27, 1996. n5

n5 Cooper claims that she was constructively discharged much later than her last date at the workplace. (See section III.B.3, infra.)

It is undisputed that Cooper made her first complaints - to the Union - in April 1996; her first complaint to AHP (albeit without any mention of sex) in May; and her first specific complaint to the employer about sexual harassment in mid-June. The last possible act of sexual harassment or retaliation occurred on or prior to June 27, which was Cooper's last day on the job. Thus, applying the Cornwell analysis, Plaintiff at most makes out a claim that AHP engaged in a continuing [**29] violation of her rights under Title VII up to the day she left the job, June 27, 1996. There could be no continuing violation during the time Plaintiff was on sick leave, because she never returned to the workplace, so the harassment did not resume, as it did in Cornwell.

To the extent Plaintiff is suggesting that AHP's failure to conduct a sufficiently vigorous investigation, or to propose a remedy that she believed would be appropriate in the circumstances, represents a continuation of Dumas' harassment and retaliation, I reject the argument. Plaintiff's novel continuing violation argument has been made before, and rejected, in a [*490] lengthy and scholarly opinion by Judge Gertner of the District of Massachusetts. See *Ruffino v. State Street Bank and Trust Co., 908 F. Supp. 1019 (D. Mass. 1995).* In Ruffino, the plaintiff, like Cooper, left her job to take medical disability leave due to sexual harassment, and later informed her employer that her physician advised against her returning until the conditions that upset her were alleviated. Nonetheless, she did not allege any specific conduct during the limitations period that was sufficient to support her claim [**30] for hostile environment. Instead, she urged that the employer's failure to conduct more than a perfunctory investigation, or to remedy conditions that were causing her distress, contributed to the hostile environment in which she was compelled to work (or, more precisely, to which she felt she could not return).

Judge Gertner rejected Ruffino's efforts to revive her stale claims, because she had not alleged and could not allege that actionable harassment had continued as a result of the employer's inaction. She held that the sexual harassment of the plaintiff by Ruffino's supervisor effectively ended when she accepted a transfer to another position within the employer bank, and had not continued up to or beyond the limitations period. Further, the plaintiff was unable to identify any specific harassing behavior that occurred after her transfer. Ruffino was able to identify behavior that might qualify as retaliatory,

Case 1:04-cv-00970-JJF    Document 101-4    Filed 01/16/2007    Page 32 of 181

Page 9
106 F. Supp. 2d 479, *490; 2000 U.S. Dist. LEXIS 9541, **30;
141 Lab. Cas. (CCH) P10,791

but, as Judge Gertner noted, retaliation is a separate claim, even where - as in Ruffino's case (and Cooper's) - there is a factual and legal intersection between the underlying claims of harassment and the retaliation.

In rejecting the continuing violations theory, Judge **[\*\*31]** Gertner distinguished *Maturo v. National Graphics, Inc., 722 F. Supp. 916 (D. Conn. 1989),* the case Cooper relies on to support her argument that AHP's inaction gave rise to a continuing violation. In Maturo, the harassment had continued into the limitations period as a result of the employer's failure to investigate or to remedy ongoing race discrimination that the court concluded was not an "isolated slur" but rather a "campaign of harassment." *Ruffino, 908 F. Supp. at 1040* (discussing Maturo). Indeed, the harassment escalated after the employer failed to respond, which ultimately made plaintiff's working conditions intolerable. Thus, the District Court in Connecticut found a continuing violation - a finding that is completely consistent with the Second Circuit's subsequently announced Cornwell doctrine, and not at all applicable to the facts before me.

I do not necessarily agree with AHP that the last act of retaliation in this record was the receipt of the Interview Record on June 3, 1996. However, to the extent Plaintiff is contending that AHP's refusal to let her grieve without Dumas' being present constitutes an act of retaliation, **[\*\*32]** it cannot be used to resurrect her previous sexual harassment or retaliation claims, because it is a separate and discrete (albeit related) incident within the meaning of the. Cornwell doctrine. Thus, I reject Plaintiff's suggestion that her sexual harassment claims, or indeed any of her claims grounded in actions that occurred prior to August 24, 1996, are timely under the continuing violation doctrine. This bars Plaintiff from pursuing redress under Title VII for her claim of sexual harassment in the workplace and for her claim for retaliation in connection with the issuance of the Interview Record, as all the acts underlying those two claims predate the 300-day limitations period.

### 2. Allegations of Discrimination and Retaliation in the Grievance Process Fail

Plaintiff contends that AHP discriminated and/or retaliated against her when it failed to respond to her request that she be allowed to grieve her Interview Record without Dumas' being present. Plaintiff contends that the manner in which AHP carried out the grievance process was itself a violation of Title VII. This claim is

**[\*491]** not time barred because the grievance process at issue continued until after August 24, 1996. However, **[\*\*33]** the claim is not supported by the evidence.

To make out a prima facie case of discrimination under Title VII, a plaintiff must show that she is (1) a member of the protected class, (2) qualified for and satisfactorily performing her job, (3) subjected to an adverse employment decision, and that (4) this adverse decision occurred under circumstances giving rise to an inference of discrimination. See *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir.1994).* Once the plaintiff has proven a prima facie case of discrimination, the burden shifts to the defendant to show a valid, non-discriminatory reason for its action. See *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993).* As AHP points out, Plaintiff has neither alleged that AHP's procedures for dealing with employee grievances are discriminatory nor offered so much as a scintilla of evidence from which a trier of fact could conclude that similarly situated males were treated differently from Cooper when their grievances were processed. n6 Therefore, **[\*\*34]** to the extent that her claims about the grievance procedure sound in discrimination, I must grant summary judgment for the Defendants.

> n6 Because Plaintiff's race-based claims were dismissed by Judge Parker, I limit my discussion to her gender discrimination claims. However, the record contains no evidence of preferred treatment of Caucasians, either.

Plaintiff's contention that AHP's refusal to bar Dumas from the grievance hearing constitutes retaliation likewise fails. To make out a claim of retaliation under Title VII, an employee must show: (1) participation in a protected activity known to defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action. See *Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998).* The right to file and pursue a grievance is a protected activity within the meaning of Title VII and an employer's refusal to process a grievance is a recognized form of **[\*\*35]** retaliation under § 704(a) of Title VII. See *42 U.S.C. § 2000e-3*(a); *Johnson v. Palma, 931 F.2d 203, 208 (2d*

106 F. Supp. 2d 479, *491; 2000 U.S. Dist. LEXIS 9541, **35;
141 Lab. Cas. (CCH) P10,791

*Cir. 1991)* (holding that a union's refusal to process a grievance unless the employee withdrew his New York State DHR complaint made out a prima facie case of retaliation). A causal connection may be established "indirectly by showing that the protected activity was followed closely by discriminatory treatment, or through other evidence such as disparate treatment of fellow employees through evidence of retaliatory animus directed against a plaintiff by the defendant." *DeCintio v. Westchester County Medical Center, 821 F.2d 111, 115* (2d Cir.) (citations omitted) cert. denied, *484 U.S. 965, 98 L. Ed. 2d 395, 108 S. Ct. 455 (1987)*. Once the plaintiff has made out a prima facie case of retaliation, the burden shifts to the defendant "to articulate a 'legitimate, nondiscriminatory reason' for its actions.'" *Taitt v. Chemical Bank, 849 F.2d 775, 777 (2d Cir. 1988)* (citations omitted).

As regards the Step 1 grievance, I find no evidence of animus or discriminatory treatment. Cooper **[\*\*36]** argues that the manner in which the proceeding was carried out is itself evidence of AHP's animus, but the facts do not support this assertion. Attorney Minter requested that a grievance be filed in response to the issuing of the Interview Letter. (Minter Letter to Glover, June 20, 1996.) In the written grievance, Cooper requested that the Interview Record be removed and that Cooper be "made whole." In her own averment to this Court, Plaintiff notes that she went to the Step 1 grievance meeting on June 27, 1996, at which Dumas was present. (Cooper Aff. P 60.) According to her account, the meeting ended after fifteen **[\*492]** minutes at the initiative of Muscarella. There is no evidence whatever that Dumas' presence at that meeting was irregular or that it constituted discriminatory treatment (i.e. that a male grievant would have been able to proceed without the accused being present). Nor is there any evidence that Plaintiff herself was adversely affected by his presence. Rather, the evidence put forth by Plaintiff is that she became upset at the meeting because she was dissatisfied with the remedy offered her at that time, which was to "bid out of the department." (Id.) n7 That Plaintiff **[\*\*37]** was dissatisfied with the results of the Step I grievance process is simply not evidence that it was carried out in a manner that was discriminatory or retaliatory.

n7 Plaintiff also asserts that the fact that she was not given the written grievance until after the

meeting constitutes evidence that she was treated differently from white males. (Id. at P 84.) Of course, Rambin testified that he gave Cooper the written grievance during his meeting with her immediately prior to the hearing. However, assuming Plaintiff's version of the facts to be correct, Rambin testified that the reason he did not give Cooper the written grievance form until the day of the hearing was that Cooper was on sick leave, an undisputed fact. (Rambin Dep. at 80 attached to Vehar Aff. Ex. P-21.)

After Cooper hired Attorney Greene, she sought to pursue the grievance to Step 2. In her first letter to Gibberman concerning the grievance, Greene indicated that Cooper's doctors had advised her that she could not confront Dumas. **[\*\*38]** (Greene Letter to Gibberman, Dec. 9, 1996 attached to Greene Aff. Ex. C.) The letter also included Greene's request that she, as Cooper's attorney, would be permitted to attend the grievance.

In response to Greene's request to be present, Gibberman wrote:

> It is the position of the Company that Mr. Glover President of Local 143c UFCW is the legal and appropriate representative according to our collective bargaining agreement. Mr. Glover has always represented the members of the Union in a competent and professional manner.

(Gibberman Letter to Greene, Dec. 20, 1996.)

Gibberman further stated that if Cooper did not participate in the grievance process as required under the CBA, AHP would assume that the grievance had been withdrawn. (Id.) He made no mention of whether Dumas would be present at the grievance. However, other evidence suggests that it was company policy to allow the accused to be present (Gibberman Dep. at 105), and drawing all inferences in the Plaintiff's favor, I will assume that AHP would have proceeded in accordance with its policy.

Greene's next letter made explicit that Cooper should be entitled to attend the grievance without Dumas' being **[\*\*39]** present, and that Cooper "should not have to risk suffering additional emotional injury in order to preserve her rights." (Greene Letter to Gibberman, Jan. 2, 1997.)

106 F. Supp. 2d 479, *492; 2000 U.S. Dist. LEXIS 9541, **39;
141 Lab. Cas. (CCH) P10,791

Greene further stated that she did not wish to supplant Glover at the hearing, but rather be present to advise her client.

Gibberman's response indicated that the Union would not allow Greene to be present, as the CBA "makes no provision whatsoever for either representation or participation in this process by any party other than the Union or the grievant." (Gibberman Letter to Greene, Jan. 20, 1997.) However, this time Gibberman noted that the grievance could proceed without Cooper's being present, and suggested that Cooper "meet with her Union representative to assist with their preparation of the grievance." (Id.) He made clear that without Cooper's participation, "It would be incumbent upon the Union to proceed without her as is contractually permissible." (Id.) Gibberman made perfectly clear in his last letter to Greene that Cooper could pursue her grievance, that she could meet with a Union representative at the off-site facility, and that the Union was free to involve Greene in any of its preparation for [**40] the grievance. (Id.) [*493]

With respect to the issue of Dumas' presence, there is no evidence in the record to raise any inference that Cooper was treated any differently from male employees who had filed grievances, or that this decision was reached because she was asserting her rights. As noted above, AHP contends that Dumas' presence was a matter of a company policy that those accused of harassment be given the opportunity to hear their accusers. (Gibberman Dep. at 105.) In his deposition testimony, Gibberman allowed that, in theory, exceptions to the policy could be made. But the admitted fact that an exception was never considered in Cooper's case does not give rise to an inference of either discrimination or retaliation in the absence of evidence that other grievants (particularly males) received exceptions. (Id.) Gibberman's refusal even to address the issue of Dumas' presence in his letters to Greene is not, as Cooper contends, a denial of her rights to pursue the grievance. Cooper continued to maintain a right to pursue her grievance; she just did not have the right to set all the conditions for how that grievance would proceed.

Because Cooper still could have pursued [**41] her grievance, even without being present, then as a matter of law, Gibberman's refusal to exclude Dumas from the Step 2 grievance could not have constituted retaliation.

3. Constructive Discharge Claim

Cooper's remaining federal claim is for constructive discharge (Tenth Cause of Action) under 42 U.S.C. § 2000e-2(a)(1). Plaintiff contends that, because of AHP's refusal to deal with her allegations in an appropriate way or to assure her of a harassment-free environment, she was constructively discharged, effective January 23, 1997, when Attorney Greene wrote Corrado to that effect. She notes that, where constructive discharge is claimed, the statute of limitations runs from the date when Plaintiff was constructively discharged. See Draper v. Coeur Rochester, 147 F.3d 1104, 1998 U.S. App. LEXIS 13847 (9th Cir. 1998) ("in constructive discharge cases periods of limitations begin to run on the date of resignation.") As her charge was filed within six months of her alleged constructive discharge, Cooper contends that all her claims are timely. Insofar as Plaintiff's constructive discharge claim is concerned, she is correct.

AHP offers [**42] several reasons why Plaintiff's allegations of constructive discharge do not get her past the time bar. First, they contend, Plaintiff never resigned from her position, which is the sine qua non of a constructive discharge claim. See Pena v. Brattleboro Retreat, 702 F.2d 322, 325 (2d Cir. 1983). AHP acknowledges that Attorney Greene's January 23 letter mentioned constructive discharge, but claims that this letter was at most a threat to resign, as evidenced by the fact that Plaintiff testified that she did not resign between the commencement of her disability leave (in June 1996) and her receipt of her discharge letter from AHP (in December 1998). AHP also contends that Attorney Greene's letter cannot be deemed a resignation in that Plaintiff originally contended that she was constructively discharged when she received Corrado's letter on January 30, 1997. n8

n8 I fail to see how Plaintiff's expert's damages calculation constitutes some sort of admission by Plaintiff that she was terminated in June 1996.

[**43]

This is a silly argument. Plaintiff has indeed been inconsistent in her position concerning when she was constructively discharged. However, Attorney Greene's January 23 letter clearly states that Plaintiff considers herself to have been constructively discharged as of that date, and Corrado's January 31 response, in which he invites Plaintiff to arrange to pick up her personal

Case 1:04-cv-00970-JJF    Document 101-4    Filed 01/16/2007    Page 35 of 181

Page 12

106 F. Supp. 2d 479, *493; 2000 U.S. Dist. LEXIS 9541, **43;
141 Lab. Cas. (CCH) P10,791

property and turn in her company property, indicates that AHP viewed Plaintiff as having resigned. The fact that the "letter of resignation" was sent by an attorney rather than Plaintiff herself is of no moment.  **[*494]**

Nor, I find, is the fact that Plaintiff testified that she did not "resign" during her medical leave persuasive. The question, directed to a lay witness who might well not understand the relationship between resignation and constructive discharge, does not squarely contradict the text of Attorney Greene's letter. n9

> n9 Cooper testified as follows:
>
> Q. Ms Cooper, when did your employment with Lederle end?
> A. I don't --
> Q. Let me rephrase that. You stopped working at Lederle on June 27, 1996; is that correct?
> A. Exactly.
> Q. And were you on medical leave for some period of time?
> A. Yes. Disability.
> Q. Did there then come a time the company terminated your employment with them?
> A. I think there is an agreement in the contract where it says if you stay out a certain time, I think, two and a half years, if you don't return, you are considered terminated.
> Q. Were you terminated on those grounds?
> A. Are you asking --
> Q. Did you receive anything from anybody?
> A. Yes.
> Q. Did you resign in the interim?
> A. No.

(Cooper Dep. at 318-19, attached to O'Brien Aff. at Exh. Q.)

**[**44]**

Finally, AHP's self-serving behavior subsequent to the January 1997 correspondence, including its unilateral sending of a letter of termination in December 1998, does

nothing to negate the legal effect of the earlier letters. Thus, I find that Plaintiff's claim of constructive discharge is not time barred. n10

> n10 Plaintiff seems to assume, *sub silentio,* that all her claims are timely if this claim is timely. Under Cornwell, I must disagree.

The question then becomes whether Plaintiff has offered some evidence from which a reasonable juror could conclude that AHP "deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Spence v. Maryland Cas. Co., 995 F.2d 1147, 1156 (2d Cir. 1993).* See also *Stetson v. NYNEX Serv. Co., 995 F.2d 355, 360 (2d Cir. 1993)* (constructive discharge requires showing work conditions "so intolerable that [the plaintiff] was forced **[**45]** into an involuntary resignation.") (quoting *Pena v. Brattleboro Retreat, 702 F.2d 322, 325 (2d Cir. 1983)).* It is the Plaintiff's burden to demonstrate that she had no alternative to resignation. See *Pena 702 F.2d at 325.* I conclude that she has not offered any evidence from which a reasonable juror could conclude that her working conditions were in fact intolerable.

When Plaintiff resigned, she had been out of the workplace for more than seven months, and therefore could not have been experiencing intolerable working conditions. The only purportedly intolerable aspect of her situation was the prospect that she might have to come back to work under Dumas. But it is undisputed that AHP's offer to Plaintiff would not have required her to return to work under Dumas. AHP offered her the opportunity to transfer elsewhere in the plant.

The issue, therefore, is whether Plaintiff has offered any evidence from which a reasonable juror could find that the work conditions to which she would have returned would have been so intolerable as to compel her to resign. This, it seems turns on two questions: (1) would a transfer have involved a demotion; and (2) assuming **[**46]** arguendo that it did, would that fact alone be enough to make her post-transfer work environment intolerable under the standards applied in the Second Circuit?

AHP contends that its standing offer to Plaintiff to move into any position for which she was qualified and

Case 1:04-cv-00970-JJF    Document 101-4    Filed 01/16/2007    Page 36 of 181

Page 13

106 F. Supp. 2d 479, *494; 2000 U.S. Dist. LEXIS 9541, **46;
141 Lab. Cas. (CCH) P10,791

had adequate plant-wide seniority, without regard to whether the position was vacant at the time, indicates that Plaintiff was not required to return to work under Dumas. If [*495] the evidence on this point were undisputed, AHP would be absolutely correct. Title VII does not convey upon an employee the absolute right to demand that a workplace dispute be resolved in a way that is most attractive to her. Title VII simply requires that the remedial action taken be reasonably calculated to end the sexual harassment. See *Snell v. Suffolk County, 782 F.2d 1094, 1103-04 (2d Cir. 1986)* (applying reasonableness standard to employer's attempt to remedy racially hostile work environment). See also *Landgraf v. USI Film Prods., 968 F.2d 427, 429 (5th Cir. 1992)* (holding that although the harasser remained in the plaintiff's work area after the transfer, a "technical" transfer was sufficient remedial action. [**47] ) And there is no requirement that the remedy include punishing the co-worker responsible for the sexual harassment. *Id. at 430.*

On this record, however, the facts concerning AHP's offer to Plaintiff are not clear. Indeed, there is a factual dispute between Gibberman and Glover concerning what was or was not said between them about her transfer situation. (And, of course, none of what Gibberman or Glover said was reduced to writing.) Glover testified that Gibberman told him that there were only two possible positions into which Cooper could transfer. One was a labor grade four, which Glover testified would have been a demotion for Plaintiff, since it was a lower-paying job. (Glover Dep. appended to Greene Aff. as Ex J at 98-103.) The second was a job as Pharmaceutical Operator, labor grade thirteen, which was one grade below Cooper's prior job as Senior Operator, grade fourteen. Glover testified that this job would have been at the same or a slightly lower hourly rate. Gibberman testified that his discussion with Glover on the transfer options was much more general and that no specific position was identified because Plaintiff never got back to him on the issue of [**48] transfer. (Gibberman Dep. at 101.) Gibberman and Glover both testified that they did not discuss whether Plaintiff would be required to have any contact with Dumas as a result of the transfer.

If this were all the Court had to go on, AHP's motion for summary judgment would have to be denied. However, AHP points out (and it is undisputed) that Plaintiff refused even to consider transfer as an alternative to resignation, and declined to explore what

positions might be available with AHP. (AHP Reply Mem. at 4.) AHP further argues that Cooper's refusal precludes her from making a constructive discharge claim. I agree. An employee who fails to explore alternative avenues offered by her employer before concluding that resignation is the only option cannot make out a claim of constructive discharge. See *Gumbs v. Hall, 51 F. Supp. 2d 275, 282 (W.D.N.Y. 1999)* (employee not constructively discharged where she rejected employer's offer of a lower-ranking position). See also *Leson v. ARI of Connecticut, Inc., 51 F. Supp. 2d 135 (D. Conn. 1999); Clowes v. Allegheny Valley Hospital, 991 F.2d 1159, 1161 (3d Cir.), cert. denied, 510 U.S. 964, 126 L. Ed. 2d 374, 114 S. Ct. 441 (1993); [**49] Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir. 1987).*

The state of the record is as follows: Arthur Corrado wrote to Plaintiff's attorney, Rachel Minter, on August 2, 1996, and offered to allow Plaintiff to exercise medical "bumping rights" to move to a different position. Corrado did not indicate what positions were available, but he advised her that the medical opinion she submitted was "sufficient to invoke bumping rights to another position under our established procedures," a move which would "enable Ms. Cooper to transfer to a more satisfactory position upon her return from medical leave." (Corrado Letter to Minter, Aug. 2, 1996, attached to O'Brien Aff. at Ex. I.) He urged Minter "to encourage [Cooper] to accept such a transfer as an amicable resolution of this matter." (Id.) However, neither Plaintiff nor her attorneys (Minter or, later, Greene) ever asked management to clarify what positions might be available to her under the [*496] bumping procedure. (Greene Letter to Corrado, Dec. 13, 1996 attached to O'Brien Mf. at Ex. J.) Instead, Plaintiff, through her attorney, took the position that any offer of transfer was not an acceptable resolution, [**50] since Dumas, not Cooper, was the wrongdoer:

> In your letter to Ms. Minter of August 2, 1996 you offered Ms. Cooper the option of invoking the contractual bumping procedures to obtain another position at the Pearl River facility. However, any such move would constitute a demotion for Ms. Cooper and an additional act of retaliation against her for having complained about illegal and discriminatory conduct... An appropriate response to this situation would be to

106 F. Supp. 2d 479, *496; 2000 U.S. Dist. LEXIS 9541, **50;
141 Lab. Cas. (CCH) P10,791

> transfer and otherwise punish the harasser.
> Mr. Dumas, not Ms. Cooper, who is the
> victim of Mr. Dumas' and the company's
> illegal conduct. Consequently, we reject
> this option.

(Id.) (emphasis added)

There is no indication on this record that Plaintiff ever attempted to clarify what her options were with regard to a transfer.

Ms. Greene's conclusory statement that any transfer would constitute a "demotion" is incorrect, both as a matter of fact -- based on Glover's testimony that at least one of the available jobs was at Cooper's pay rate -- and as a matter of law. Although in some instances courts have found transfers that constitute a demotion may also constitute a constructive discharge, such a finding **[**51]** cannot be based upon the employee's subjective preference for one position over another. See *Gray v. York Newspapers, Inc., 957 F.2d 1070 (3d Cir.1992)* (employee's subjective interpretation that continued employment would be uncomfortable and demeaning and would lead to demotion or termination in the future does not constitute a constructive discharge); *Jett v. Dallas Independent School Dist., 798 F.2d 748 (5th Cir.1986)* (transfer from athletic director/head football coach to freshman football and track coach with significant loss of coaching responsibilities was not so intolerable that a reasonable person would have felt compelled to resign). Rather, the proposed job must be of such a nature that a reasonable person would resign rather than accept one of the offered positions. See *Clowes, 991 F.2d 1159* (a reasonable employee will usually explore alternative avenues thoroughly before concluding that resignation is the only option). Cooper's evidence here falls far short of satisfying that requirement.

While there is a dispute over what Glover and Gibberman said to each other at one point about Plaintiff's options, there is no dispute **[**52]** whatever that Plaintiff simply refused to consider the transfer option -- or any option that, in her view, penalized her and did not penalize Dumas. Indeed, she did not even inquire to see if a transfer really would result in her demotion (i.e. require her to work at a lower hourly wage) or could be arranged laterally. Under the law in this Circuit, a transfer, while not Cooper's preferred method of handling the matter, would have been a "reasonable step" to remove the allegedly intolerable fact of working with Dumas (assuming, as I do for purposes of this motion, that working with Dumas was medically contraindicated and, hence, "intolerable"). See *Torres v. Pisano, 116 F.3d 625, 638 (2d Cir. 1997)* (holding that the employer's remedial action is subject to a reasonableness standard, taking into account the facts of the case and the gravity of the harassment.) An acceptance of a transfer to another department would have placed her in an area and environment where none of the conditions or experiences she complained of would have been present. Thus, a reasonable person would have taken some steps to determine if, in her mind, the new position would be satisfactory and **[**53]** would place her outside the reach of Dumas' allegedly intolerable behavior. Cooper's subjective feelings that any transfer would demean and demote her simply do not qualify as intolerable working conditions. **[*497]**

The problem with Plaintiff's argument (and with the position she took vis-a-vis AHP on this point) is that there is a very real difference between claims of discrimination/retaliation and claims of constructive discharge where issues of transfer are concerned. See *Richardson v. New York Dep't of Correctional Service, 180 F.3d 426 (2d Cir. 1999)* (reversing grant of summary judgment on retaliatory harassment claim but affirming summary judgment on constructive discharge claim). Transferring a complaining employee rather than her harasser could be considered as evidence that the employer has failed or refused to correct discrimination in the workplace, or is engaging in retaliation. See *Richardson, 180 F.3d at 444* (plaintiff made prima facie showing of retaliation where she was transferred to a position requiring contact with inmate Population immediately after she filed EEOC charges); *De la Cruz v. City of New York City Human Resources Admin. & Dep't of Social Servs., 82 F.3d 16, 21 (2d Cir. 1996)* **[**54]** (deeming transfer to comparable position with no change in pay but different job responsibilities to constitute adverse employment decision). But the only thing an employer must do to defeat a claim of constructive discharge is provide a working environment that is not "intolerable." See *Pena, 702 F.2d at 325*. This, as the Second Circuit has held repeatedly, is a very low threshold. Put conversely, a working environment can be far from perfect and yet will not be held to be intolerable. See *Martin v. Citibank, 762 F.2d 212, 221 (2d Cir. 1985)* (citing cases). Because Plaintiff herself refused to explore the employer's proposed remedy for the situation she found intolerable, I must grant AHP's motion for

Case 1:04-cv-00970-JJF     Document 101-4     Filed 01/16/2007     Page 38 of 181

Page 15
106 F. Supp. 2d 479, *497; 2000 U.S. Dist. LEXIS 9541, **54;
141 Lab. Cas. (CCH) P10,791

summary judgment dismissing the Tenth Cause of Action. n11

      n11 The parties have not briefed what to this Court seems the most interesting issue of all: whether a person who is not working can claim that her work environment is so inhospitable as to require her to resign. Beginning on June 27, 1996, Plaintiff did not have a work environment. Cooper's claim is, in essence, that the work environment she anticipated encountering upon her return to AHP would be hostile, because she would have to either work for Dumas (which, accepting Plaintiff's version of the facts, was medically contraindicated) or accept a position which she considered a demotion.

      It seems to this Court that there is a certain degree of speculativeness in such a claim. The Second Circuit has made it exceedingly difficult for a Plaintiff who is working in uncomfortable conditions to make out a constructive discharge claim. See *Pena, 702 F.2d 322; Richardson, 180 F.3d 426; Martin, 762 F.2d 212.* It is hard to see how a person who is not working at all, and who therefore is not experiencing any uncomfortable conditions, can succeed on this most disfavored of all causes of action. However, the dismissal of this claim on other ground means that this question can be deferred for another day.

**[**55]**

C. State Claims Against AHP

Having dismissed all the federal claims against AHP, I decline to exercise jurisdiction over the state claims brought by Plaintiff.

IV.  DEFENDANT UNION'S MOTION FOR SUMMARY JUDGMENT

Plaintiff's remaining claim against the Union alleges that, through its failure adequately to pursue her grievance, the Union breached its duty of fair representation and discriminated against her on the basis of sex in violation of Title VII. The Union moves for summary judgment based on two grounds: (1) that the Plaintiff failed to exhaust the Union's internal grievance

and appeal procedures; (2) that union is not an employer and cannot be held liable for AHP's failure to prevent or remedy the discriminatory conduct of an employee; and (3) that even if the Union were liable under Title VII, Plaintiff's claim is time barred.

In response, Plaintiff argues (1) that her membership in the Union was a requirement of her employment and that she therefore did not voluntary assume the obligations of Union membership, including any obligations to exhaust grievance procedures, and (2) that the Union had an **[*498]** affirmative duty under Title VII to prevent and redress discrimination.  **[**56]**

A. Duty of Fair Representation Claim

It is well established that a union's breach of its duty of fair representation may render it liable under Title VII. See *Goodman v. Lukens Steel Co., 482 U.S. 656, 667-69, 96 L. Ed. 2d 572, 107 S. Ct. 2617 (1987)* (a union violates Title VII and § 1981 if it intentionally fails to assert discrimination grievances on behalf of plaintiff); *Morris v. Amalgamated Lithographers of America, Local One, 994 F. Supp. 161, 169 (S.D.N.Y. 1998)* (citations omitted). An alleged breach of the duty of fair representation ("DFR") can be challenged before the National Labor Relations Board or in a separate lawsuit. Title VII provides a proper foundation for a DFR lawsuit in two situations: (1) where a plaintiff alleges that the union has failed to assist in the processing of a grievance grounded in an employer's underlying discrimination; and/or (2) where the underlying grievance does not involve actionable discrimination, but the union itself acted discriminatorily in failing to prosecute the grievance. See Barbara Lindemann & Paul Grossman, Employment Discrimination Law 881 (3d. Ed. 1997); *Perugini v. Safeway Stores, 935 F.2d 1083 (9th Cir. 1991)* **[**57]** (reversing district court's summary judgment in favor of union on grounds that plaintiff raised a triable issue of whether the union's failure to challenge employer's discriminatory pregnancy policy was a breach of DFR and whether the union itself acted discriminatorily toward plaintiff.) Plaintiff's claim here falls under both of these two theories. She alleges both that the Union failed and refused to file a sexual harassment grievance on her behalf and that it acted discriminatorily in prosecuting the grievance she did file.

1. Duty to Exhaust Administrative Remedies

Defendant Union first contends that Plaintiff lacks

106 F. Supp. 2d 479, *498; 2000 U.S. Dist. LEXIS 9541, **57;
141 Lab. Cas. (CCH) P10,791

standing to maintain her claims because she failed to exhaust internal Union remedies for the alleged defalcations of her local leaders. This defense lacks merit.

The Union relies principally on the Third Circuit's recent decision in *Anjelino v. New York Times Co., 200 F.3d 73 (3d Cir. 1999),* which held that plaintiffs who brought claims against the union under Title VII, the Labor Management Relations Act ("LMRA") and the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA") were required to exhaust the internal administrative remedies [**58] before bringing suit in federal court. In affirming the district court's dismissal of the Title VII claim, the Third Circuit noted, without any analysis or citations to case law, that "the appellants' failure to exhaust internal administrative remedies negatively impacts their ability to prove the Union liable under Title VII...." *Anjelino, 200 F.3d at 96.* The only case law cited by the Third Circuit for the proposition that plaintiffs are required to exhaust internal union remedies before filing suit against the union involved the LMRA or LMRDA. None involved Title VII claims. n12

n12 The additional authority submitted by the Union, *Raiola v. Union Bank, 47 F. Supp. 2d 499 (S.D.N.Y. 1999), Hart v. Canadian Imperial Bank, 43 F. Supp. 2d 395 (S.D.N.Y. 1999)* involved the enforcement of employees' agreements with their employers to bring all employment disputes -- including those arising under Title VII -- to mandatory arbitration. There is no arbitration clause at issue here. The only other case cited by the Union in support of this proposition is *Seidner v. Delair, et al., 1990 U.S. App. LEXIS 14240 (6th Cir. 1990),* an unpublished opinion of five paragraphs (similar to our Circuit's summary orders) that cannot be relied on as precedent. Nonetheless, I have read it, and there is no indication therein that the pro se Plaintiff who brought the Title VII complaint against his union ever filed a charge with the EEOC. Therefore, the fact that he also failed to exhaust his union's internal grievance procedure is of no moment -- his claim was dismissed for failure to meet the statutory prerequisite to a Title VII claim.

[**59] [*499]

Based on this short reference in Anjelino, and the large body of National Labor Relations Act ("NLRA"),

LMRA and LMRDA cases that require internal exhaustion, the Union argues that the Cooper's claim against the Union should be dismissed because Cooper failed to pursue and/or appeal the internal union grievance, and instead sought a right-to-sue letter from the EEOC. I find this argument unpersuasive.

It is well settled that a Union member cannot sue on a standard fair representation claim brought under the NLRA, LMRA or LMRDA unless she first exhausts the Union's internal grievance procedure. See *29 U.S.C. § 411*(a)(4); *Clayton v. International Automobile Workers, 451 U.S. 679, 692, 68 L. Ed. 2d 538, 101 S. Ct. 2088 (1981); Maddalone v. Local 17, United B'hood of Carpenters and Joiners of America, 152 F.3d 178 (2d Cir. 1998)* (plaintiff required to exhaust administrative remedies before bringing claim under LMRA). The exhaustion requirement can be excused only by futility. *Clayton, 451 U.S. at 696.*

It is equally well settled, however, that Title VII creates an independent statutory right in favor [**60] of employees, including union members, and that a union member need not pursue any separate contractual or statutory remedies before resorting to Title VII. See *Alexander v. Gardner-Denver Co., 415 U.S. 36, 39 L. Ed. 2d 147, 94 S. Ct. 1011 (1974).* n13 Plaintiff argues that requiring her to exhaust the Union's appeals process before bringing a Title VII claim against the Union impermissibly burdens her right to the separate statutory remedy under Title VII.

n13 Of course, Alexander involved a union member's Title VII claim against his employer, not his union.

In *Donaldson v. Taylor Prod. Div., 620 F.2d 155, 158-59 (7th Cir. 1980),* the Seventh Circuit held that failure to exhaust internal union grievance procedures is no defense to a breach of fair representation brought against a union under Title VII. The plaintiff in Donaldson brought a case of discriminatory discharge against his former employer for discriminatory discharge, and against his union for a beach of DFR [**61] based on the union's failure to pursue his grievance against the employer to the arbitration stage. He claimed that the union failed to represent him because of his race. After a trial, the district court granted dismissal of the claims against the union defendant, which plaintiff argued on

Case 1:04-cv-00970-JJF     Document 101-4     Filed 01/16/2007     Page 40 of 181

Page 17
106 F. Supp. 2d 479, *499; 2000 U.S. Dist. LEXIS 9541, **61;
141 Lab. Cas. (CCH) P10,791

appeal had been grounded on plaintiff's failure to exhaust internal union remedies. The Seventh Circuit noted that "there is no exhaustion requirement under either Title VII or § 1981." *Donaldson, 620 F.2d at 158.* (citing *Waters v. Wisconsin Steel Works of Int'l Harvester Co., 502 F.2d 1309 (7th Cir. 1974)* cert. denied, *425 U.S. 997, 48 L. Ed. 2d 823, 96 S. Ct. 2214 (1976)).* The Seventh Circuit noted that the district court's reliance on the exhaustion requirement related to dismissal of any general claims of a duty of fair representation against the union, but not to the race discrimination claim. Id. The court went on to uphold the district court's dismissal on the ground that plaintiff had failed to make out a prima facie case of racial discrimination.

While the Second Circuit has yet to speak on this narrow question, I am persuaded by [**62] the Seventh Circuit's reasoning. It appears clear from the Supreme Court's holding in Alexander, as well as the plain language of Title VII § 411(a)(4), that a plaintiff bringing a breach of fair duty claim under Title VII is under no duty to exhaust internal procedures prior to bringing a Title VII claim. As the Seventh Circuit noted in Donaldson, in a case involving a general claim of breach of DFR,

> The point of the exhaustion requirement is that a union should have a right to attempt to satisfy disgruntled members, [*500] and a court should know just what the union did or did not do with respect to the complaint before trying to decide if fair representation really was denied and what relief would be just in the circumstances. Id. [620 F.2d] at 158 (citing *Baldini v. Local Union No. 1095, 581 F.2d 145 (7th Cir. 1978)).*

Where a plaintiff alleges that the union's behavior during the processing of the internal remedy was itself discriminatory, requiring her to continue to pursue what she alleges is a discriminatory process would not serve the purpose articulated by the Donaldson court. I therefore agree with Plaintiff that failure to exhaust the union [**63] appeal is not defense to her DFR claim under Title VII.

This ruling is unquestionably confusing. Indeed, the entire concept of permitting a union member to sue her Union for breach of the duty of fair representation (an LMRA concept) under Title VII is confusing, in that it makes what is essentially the same claim subject to two radically different statutory schemes, each with its own statute of limitations and exhaustion doctrine. However, Congress in its wisdom has decreed that it shall be thus, so courts like this one must be particularly careful in making rulings that distinguish between challenges to fair representation under LMRA and Title VII.

2. Statute of Limitations

The appropriate statute of limitations for a fair representation claim under Title VII is 300 days. See *Morris, 994 F. Supp. at 164.* n14 A claim for breach of DFR accrues when plaintiff first knew, or should have known, of the union's failure to adequately pursue her claim. See *Santos v. District Council, 619 F.2d 963, 969 (2d Cir.1980)* ("cause of action accrue[s] no later than the time when plaintiffs knew or reasonably should have known that such a breach [of the duty [**64] of fair representation] had occurred, even if some possibility of nonjudicial enforcement remained"). As with the claim against AHP, the limitations period thus began on August 24, 1996. Any alleged incidents that occurred prior to August 24, 1996, can overcome the time bar only if Plaintiff can show that they constituted a continuing violation under Cornwell.

> n14 Where plaintiffs bring DFR claims under the NLRA, the statute of limitations is six months. See *DelCostello v. Teamsters, 462 U.S. 151, 169-71, 76 L. Ed. 2d 476, 103 S. Ct. 2281 (1983).*

Cooper's Complaint describes, in considerable detail, a number of actions and inactions allegedly committed by the Union during the period from April 1996 (before the time limitations period) through early January 1997 (after the time limitations period): multiple failures by shop stewards to investigate her complaints about Dumas in a meaningful way during April. May and June of 1996; the failure by shop steward Rambin, who drafted Plaintiff's [**65] grievance concerning the Interview Record, to ferret out the true nature of her complaint; the Union's failure to file another grievance alleging sexual harassment even after it received Minter's June 20 letter and was formally made aware of the allegation; the closing of the Step 1 grievance hearing before all the evidence had been received; the failure to press AHP to

process her Step 2 grievance without Dumas' being present; and the Union's failure to press AHP to transfer Dumas rather than Plaintiff. As noted above, these incidents give rise to two DFR claims: (1) failure to file a grievance alleging sexual harassment and retaliation despite her complaints of such behavior; and (2) failure to process the grievance that it did file in an appropriate and non-discriminatory fashion.

I turn first to whether the first claim is time-barred.

Viewing the facts most favorably to Plaintiff, the Union was placed on notice that Plaintiff believed her supervisor was sexually harassing her in the workplace on [*501] June 20, 1996 (when Minter used those words in her communication to Plant Manager White). n15 And, as noted above, the last conceivable instance of sexual harassment at work took place [**66] no later than June 27, 1996. Under the Union's Collective Bargaining Agreement, § 7.14, grievances alleging a breach of the CBA's anti-discrimination clause had to be filed within 30 business days of the incident in order to be timely. (Rambin Aff. Ex. N, at 20.) Thirty business days after June 27, 1996 was August 9, 1996. Therefore, assuming arguendo that the Union breached its duty of fair representation by failing to file a grievance alleging sexual harassment and retaliation on Plaintiff's behalf, the breach occurred more than 300 days prior to the filing of Plaintiff's charge on June 17, 1997. So, necessarily, did any failure by the Union to investigate Cooper's allegations properly, so it could determine whether or not to file such a grievance. n16

n15 According to the evidence, certain Union representatives may have been aware of both a sexual relationship between Plaintiff and Dumas and harassing behavior by even earlier. For example, Michael Youhas, a shop steward, testified at his deposition that Plaintiff complained to him of sexual harassment during the period March-June 1996. However, for purposes of this motion, I am going to push the last date for filing a grievance back as far as I can. Even doing so, the date falls outside the 300-day limitations period, which begins on August 24, 1996.

[**67]

n16 In any event, these allegedly inadequate investigations - such as Youhas' tactics of walking into the Department where Plaintiff and Dumas worked in order to try to catch Dumas in the act of harassment, or his statement to Plaintiff that he could not be with her eight hours a day monitoring for harassment, or Michael Rambin's failure to investigate specifically for sexual harassment while he represented her - all took place in May and June of 1996, and are time-barred for that reason as well.

The fact that Plaintiff filed an EEOC charge within 300 days of her alleged constructive discharge is irrelevant to the timeliness of the charge of failure to file a sexual harassment grievance, because that discrete act long predated her alleged constructive discharge. Moreover, the Union was not her employer. It cannot discharge an employee. Union liability under Title VII to a member who is not also an employee of the Union is limited to failing to discharge its duty of fair representation. Plaintiff cannot bootstrap her theoretically separate claim against the Union onto a timely claim against [**68] the employer in order to avoid the time bar.

Neither, I conclude, can Plaintiff bootstrap her claim for failure to file a sexual harassment grievance onto the second aspect of her DFR claim - failure to pursue the grievance in a non-discriminatory manner - in order to avoid the statute of limitations. The Union's alleged failure to file a sexual harassment/retaliation grievance is a wholly separate act from any discriminatory failure to prosecute the grievance that was filed. Those two claims are theoretically, factually and logically distinct. The underlying incidents therefore do not constitute a continuing violation within the meaning of Cornwell.

Plaintiff's contentions concerning the processing of her June 11 grievance appear to be that the Union neither protested the employer's proffered solution (which she believed would constitute a demotion) and obtained a better one for her, nor took steps to process her grievance in a way she could endure (i.e., without Dumas). I conclude that this aspect of Plaintiff's claim is not time barred, because the various actions cited by Plaintiff in support of this claim either took place after August 24, 1996 or extended into that period [**69] (e.g. the Union's suspension of the grievance). The processing of

106 F. Supp. 2d 479, *501; 2000 U.S. Dist. LEXIS 9541, **69;
141 Lab. Cas. (CCH) P10,791

the grievance was a single violation, and it logically falls under Cornwell as a continuing violation.

### 3. Breach of Duty of Fair Representation

Having disposed of the limitations issues, I now turn to whether the Union is entitled to summary judgment on the merits **[*502]** of Plaintiff's remaining fair representation claim. I conclude that it is.

To make out a prima facie case of a breach of the duty of fair representation under a Title VII claim based on gender demonstration, Plaintiff must demonstrate "(1) that the Union Defendants breached their duty of fair representation by allowing an alleged breach to go unrepaired and (2) that the Union Defendants' actions were motivated by gender animus." *Doolittle v. Ruffo, 1996 U.S. Dist. LEXIS 4032, 88-C V-1175, 1996 WL 159850* at *4 (N.D.N.Y. March 27, 1996) (citing *Ross v. Communication Workers of Am., Local 1110, 1995 U.S. Dist. LEXIS 7959, No. 91 Cv. 6367, 1995 WL 351462* at *7 (S.D.N.Y. June 9, 1995), aff'd, *1996 U.S. App. LEXIS 2911, 1996 WL 80688 (2d Cir. 1996)).* See also *Vaca v. Sipes, 386 U.S. 171, 190, 17 L. Ed. 2d 842, 87 S. Ct. 903 (1967)* (holding that plaintiff must show **[**70]** that the union's conduct was "arbitrary, discriminatory, or in bad faith."); *Gavenda v. Orleans County, 1997 U.S. Dist. LEXIS 1527,* at *19, 95- CV-0251, 1997 WL 65870* at *5 (PAREN); *Morris v. Amal. Lithographers of America, Local One, 994 F. Supp. 161, 169 (S.D.N.Y. 1997)* (applying the same standard to a claim of race discrimination). Applying the two-prong test to these facts, it seems clear that summary judgment is warranted in this case.

The undisputed facts show that Plaintiff failed and refused to participate in a Step 2 grievance hearing for some months following her departure from the workplace, and that the Union put the pending grievance on "hold" during that period of time. This "hold" extended into the limitations period. However, there is absolutely no evidence in the record that the grievance was placed on hold due to Plaintiff's gender, or that male grievants who were on leave or otherwise unable to attend hearings were treated any differently than she was. Thus, no rational trier of fact could conclude that the delay in processing her grievance to Step 2 constituted sexually discriminatory unfair representation.

On December 9, Plaintiff made her extraordinary, if understandable, **[**71]** request to have the accused (Dumas) barred from the Step 2 hearing and to permit her counsel to be present. AHP refused to permit Attorney Greene to attend the hearing. Plaintiff has not pointed to any provision in the CBA that allows outside counsel to be present at an internal grievance proceedings, and she has proffered no evidence that male grievants were allowed to bring their attorneys to such proceedings. In the absence of such evidence, no rational trier of fact could conclude that the Union's alleged failure to protest the employer's refusal to proceed in the presence of outside counsel constituted a discriminatory act in breach of its fair representation duty.

As for Dumas' presence, the most favorable evidence to Plaintiff's position is that Glover raised the issue with Gibberman, who responded, "Bob, you pick who you're going to bring and I'm going to pick who I'm going to bring." (Glover Dep. at 43-45.). Glover conceded that the Union did not make any further effort to persuade Gibberman to process the grievance without Dumas being present, and Gibberman (representing management) indicated that it was company policy to permit Dumas to attend the hearing.

However, Plaintiff **[**72]** does not suggest that the Union had any contractual or statutory right to dictate who management could or could not bring to the grievance. Nor does Plaintiff offer any evidence to suggest that the Union had ever battled management any harder when a male grievant made a similar request. As Plaintiff cites no basis for the Union's being able to compel management to handle matters in a manner she found acceptable, the Court construes her argument with respect to the Step 2 grievance hearing as, "You should have fought harder for me." She offers no evidence that the reason the Union did not try to obtain an exception for her case was gender-based. Glover testified, and Gibberman advised Plaintiff's **[*503]** attorney, that it was possible for a Union official to represent a member at a grievance hearing without the member's being physically present. See Section III B. 2., supra. All that was required was that Plaintiff request in writing that the hearing be held in this manner. (Glover Dep. at 137.) Thus, Plaintiff, or at least her attorney, was aware of what was required if she wished to pursue the grievance without having to be in Dumas' presence. I conclude that in the absence of any **[**73]** proof that the Union had denied her any right in the grievance process, and thus that its actions resulted in her discrimination claim going unremedied, no rational trier of fact could conclude that

106 F. Supp. 2d 479, *503; 2000 U.S. Dist. LEXIS 9541, **73;
141 Lab. Cas. (CCH) P10,791

the Union had failed in its duty to represent Plaintiff fairly.

4. Plaintiffs' Obligations under the Union Constitution and the Ellerth Defense

The Union makes an additional argument that also raises an issue of apparent first impression in this Circuit. It notes that the Union's Constitution expressly forbids sex discrimination. It then contends that Cooper's failure to avail herself of the internal union grievance procedure, and thereby to alert senior Union officials to possible sex discrimination of Union officials at the local level, insulates the Union from liability for the unauthorized acts of the local officers and stewards, under the reasoning of *Faragher v. City of Boca Raton, 524 U.S. 775, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998)* and *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998).* The Union's analysis of this issue is confusing and tends to conflate with its position on exhaustion of internal [**74] administrative union remedies. The interesting and novel issue, however, is whether the holdings of Faragher and Ellerth can be extended to shield a Union from DFR liability under Title VII.

The Plaintiff in Ellerth sued her former employer under Title VII on the ground that it was liable for the sexual harassment she endured from her former supervisor, harassment that went unreported to anyone in the Burlington management hierarchy. Although the employer was not on notice of the supervisor's behavior, plaintiff nonetheless argued that the employer was vicariously liable for the harassment. The district court granted summary judgment for Burlington on the ground that it did not know of the harassment. The district court also noted that the plaintiff had failed to take advantage of Burlington's internal complaint procedures. The Seventh Circuit reversed in an en banc decision encompassing a range of views about what standard should be applied to the vicarious liability of employers. Applying common law agency principles to determine employer liability, the Supreme Court held:

an employer is subject to vicarious liability to a victimized employee for an actionable [**75] hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment

action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence. The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Ellerth, 524 U.S. at 765* (emphasis added). n17

n17 The Court applied the same holding to the facts of Faragher, decided the same day, which involved the liability of the City of Boca Raton for sexual harassment carried out by city lifeguards. Faragher, U.S. at 796.

The Court upheld the Seventh Circuit's reversal of summary judgment and remanded the case to [**76] determine whether [*504] Burlington could prove the affirmative defense. *Id. at 766.*

The Faragher- Ellerth rule is an affirmative defense to liability, separate and apart from any requirements that an employee exhaust administrative remedies before filing suit. To analogize the affirmative defense to the union (as representative) relationship to the employee (as member of the union), a court would have to examine whether a union could argue as an affirmative defense that the union exercised reasonable care to prevent and correct sexual harassment, and that the employee/member unreasonably failed to take advantage of the available preventative measures.

Here, the Union points out that its constitution, which governs internal union policies and procedures, expressly prohibits sexual harassment. n18 The Union thus argues that, given these anti-discrimination provisions, if Cooper had concerns that the local Union's failure to bring and/or pursue the grievance was discriminatory or retaliatory, she was bound to give

106 F. Supp. 2d 479, *504; 2000 U.S. Dist. LEXIS 9541, **76;
141 Lab. Cas. (CCH) P10,791

notice to the Union hierarchy (i.e. management beyond the local level) of her complaint. n19 Further, because the Union constitution expressly forbids it members, [**77] including its officers, from discriminating against a member based on sex, the Union argues that any such discrimination by members or officers of the local would be ultra vires acts, not within the scope of their authority. Because Cooper failed to appeal to a higher level within the Union, and because the national Union was not put on notice of the alleged harassment, the Union contends that the principles of Faragher-Ellerth provide them with an affirmative defense to vicarious liability.

> n18 The Union Constitution provides that "No person shall be refused membership or discriminated against because of nationality, race, color, sex, or religious belief." (1994 Uniform Local Union Constitution and By-Laws of the Int'l Chemical Workers Union, Art. III, § 2., attached to Vehar Aff. at Exh. 9.).

> n19 The Union has not briefed the Court on what level of management would have been the appropriate level to receive notice of Cooper's claim. Even if the Union is correct that Ellerth could be applied to a union, there is plenty of evidence in the record that most of the senior management at the local level was aware of and involved in Cooper's complaint.

[**78]

Cooper was unquestionably a member of the Union, at least from March 1996, which predates her complaints against the Union in this matter. She was, therefore, bound to utilize the appeal/protest procedure. On the record before me, there is no evidence that Cooper ever advised the Local management or its parent that anyone at the Local was failing and refusing to process her grievance against AHP and Dumas, or otherwise breaching the duty of fair representation, because of her race or her gender. n20 Cooper did file an unfair labor charge against the Local in November 1996, on the ground that the Local had failed to process her grievance. That charge, however, was withdrawn in February 1997.

> n20 The Union has not briefed the Court on what level of management would have been the

appropriate level to receive notice of Cooper's claim. Of course, there is evidence in the record that most of the senior management at the Local (Youhas and Glover both served on the Union Executive Board) was aware of and involved in Cooper's complaint about the AHP proposal to remedy the alleged harassment.

[**79]

On the record before me, it would appear the Union might have a supportable affirmative defense. But because I am dismissing the case on other grounds, I need not address this fascinating and novel application of Ellerth. n21

> n21 In another case involving an equally novel application of agency principles to Union liability under Title VII, Judge Coar of the Northern District of Illinois analyzed a union's ability to mount an affirmative defense to a charge that it was jointly liable with the employer for a racially hostile work environment. See *EEOC v. Foster Wheeler Constructors, Inc., et al., 1999 U.S. Dist. LEXIS 10610, 1999 WL 507191,* No. 98 C 1601 (N.D. Ill. July 6, 1999). In that case, the Plaintiff-Intervenor complained of a racially hostile work environment and alleged that the Union was responsible for the hostile environment because it had allowed portable toilets to be left covered with racially offensive graffiti and had not taken effective steps to remove the graffiti and prevent its recurrence. *EEOC, 1999 WL 507191* at *1. The EEOC took up the Plaintiff-Intervenor's claims and sued both the employer and the union on the grounds that: the supervisor of the facility served concurrently as supervisor and union shop steward; he had actual knowledge of the offensive graffiti; and he did nothing to remedy the situation. The Union moved for summary judgment on the grounds that the EEOC had failed to demonstrate that the union's conduct had been intentional and/or that the supervisor was acting within the scope of his actual or apparent authority.

> Judge Coar rejected the EEOC's attempt to analogize its theory of "joint control" by the union and employer to the doctrine of "joint employer" liability under Title VII. Citing *Goodman v.*

106 F. Supp. 2d 479, *504; 2000 U.S. Dist. LEXIS 9541, **79;
141 Lab. Cas. (CCH) P10,791

*Lukens, 482 U.S. 656, 665-67, 96 L. Ed. 2d 572, 107 S. Ct. 2617 (1987)* the court reasoned that because unions can only be held liable under Title VII where their behavior "contributes or intentionally acquiesces" to the discrimination, a union cannot be made liable under simple application of the "joint employer" theory; liability rested on whether the supervisor's inaction and acquiescence could be imputed to the union. On the facts before him, Judge Coar concluded that there was a dispute as to whether the supervisor was the agent of the union with responsibility for responding to complaints about working conditions (i.e., the shop steward), and therefore denied the union's motion for summary judgment. He found it unnecessary to address whether the Ellerth standard for insulating employers from liability applied.

[**80]  [*505]

Defendant Union's motion for summary judgment is granted and the claims against it dismissed.

V. CLAIM AGAINST DUMAS

The remaining claim against Richard Dumas is a single alleged violation of the New York Human Rights Law § 296(6), for aiding and abetting liability. Having declined to exercise supplemental jurisdiction over AHP's state law claims, I also decline to exercise jurisdiction over the claim against Dumas.

This constitutes the decision and order of this Court.

Dated: August 25, 2000

Colleen McMahon

U.S.D.J.

LEXSEE 1997 U.S. DIST. LEXIS 20810

**KATHRYN COOPER-NICHOLAS, Plaintiff, v. CITY OF CHESTER, Pennsylvania, et al., Defendants.**

**CIVIL ACTION No. 95-6493**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1997 U.S. Dist. LEXIS 20810*

**December 29, 1997, Decided**
**December 30, 1997, Filed, Entered**

**DISPOSITION:** **[*1]** Motions of defendants GRANTED IN PART AND DENIED IN PART. SUMMARY JUDGMENT ENTERED on Counts I and II in favor of the City of Chester, Chester Economic Development Authority, Chester Redevelopment Authority, and Thomas Jackson and against Kathryn Cooper-Nicholas to the extent that sex discrimination and sexual harassment under Title VII is alleged. SUMMARY JUDGMENT DENIED on Counts I and II to the extent that retaliation under Title VII is claimed. SUMMARY JUDGMENT ENTERED on Counts III, IV, and V in favor of the City of Chester, Chester Economic Development Authority, Chester Redevelopment Authority, and Thomas Jackson and against Kathryn Cooper-Nicholas.

**COUNSEL:** For KATHRYN COOPER-NICHOLAS, PLAINTIFF: LANIER E. WILLIAMS, PHILADELPHIA, PA USA.

For CITY OF CHESTER, PENNSYLVANIA, DEFENDANT: WILLIAM F. HOLSTEN, II, HOLSTEN & WHITE, MEDIA, PA USA. PAOLA F. TRIPODI, HOLSTEN & WHITE, MEDIA, PA USA.

For CHESTER REDEVELOPMENT AUTHORITY, THOMAS JACKSON, CHESTER ECONOMIC DEVELOPMENT AUTHORITY, DEFENDANTS: JEFFREY P. HOYLE, HOLSTEN & WHITE, MEDIA, PA USA. ANDREW J. BELLWOAR, MEDIA, PA USA.

**JUDGES:** LOWELL A. REED, JR., J.

**OPINION BY:** LOWELL A. REED, JR.

**OPINION:**

**MEMORANDUM**

**Reed, J.** **[*2]**

**December 29, 1997**

Plaintiff Kathryn Cooper-Nicholas ("Cooper-Nicholas") has claimed various federal and state constitutional deprivations as well as federal statutory violations committed by the City of Chester ("City"), the Chester Economic Development Authority ("CEDA"), Chester Redevelopment Authority ("Redevelopment Authority"), n1 and Thomas Jackson ("Jackson"), arising from her employment at the Redevelopment Authority. Cooper-Nicholas has also claimed breach of contract under state law. This Court has original jurisdiction pursuant to *28 U.S.C. § 1331* and supplemental jurisdiction over the state law claims pursuant to *28 U.S.C. § 1367*.

n1 The City of Chester, through its mayor, on October 13, 1994, passed a resolution terminating the authority of the Redevelopment Authority to administer funds, namely the Urban Development Action Grant ("UDAG") and the State Enterprise Zone repayment funds. (Def. Ex. D). In April of 1995, the City of Chester established a new agency, the CEDA, to administer the UDAG funds. (See Mem. of Def. CEDA at unnumbered

1997 U.S. Dist. LEXIS 20810, *2

page 6).

[*3]

Currently before the court are two motions for summary judgment: one by the City of Chester (Document No. 27) and the other by the CEDA, Redevelopment Authority, and Jackson (Document No. 28). For the following reasons, I will grant in part and deny in part these motions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This case is the companion of another case, Monica J. Washington v. City of Chester, et al. (No. 96-4033), the pending motions for summary judgment of which will also be disposed of in a separate ruling today. The defendants, the incidents, and the factual underpinnings of these cases are striking similar. In fact, the counsel for the parties in both cases are the same and the briefing of the parties is identical in numerous parts.

Cooper-Nicholas was hired as a Deputy Executive Director of the Redevelopment Authority in March of 1993, pursuant to an oral employment agreement. The parties intended to put this agreement into writing but never did so. As part of her duties, Cooper-Nicholas wrote proposals, administered the community development grants, and served as Equal Employment Opportunity ("EEO") Officer.

During her employment, Cooper-Nicholas claims that Thomas [*4] Jackson, the then Executive Director of the Redevelopment Authority, made sexual comments about female employees. These comments were: (1) Jackson told an employee, Karen Spellman, on three occasions, a story about a sorority sister of Cooper-Nicholas who had tried to rape him in college; (2) Jackson made comments about another employee, Monica Elam, that "she's a CW," n2 "she just has to have my body," and "look how she's watching me;" (3) Jackson talked about Elam's hair and clothes and her relationship with her fiance, Jackson would question Elam's sleeping arrangement with her fiance, told her that she was fornicating, and that he would marry them; (4) Jackson stated, at a house warming celebration, that Elam would never have a nice place like the guest of honor because Elam had a live-in boyfriend who kept all his assets in his name, and that "whoremongers like you (Elam) will never get things like this;" (5) Jackson told

Monica Washington, the Legal Services Specialist at the Redevelopment Authority, that his secretary, Andrea Lee, was "doing the wild thing" at lunch; (6) Jackson commented on Elam having a baby out of wedlock; and (7) Jackson commented about Lee wearing skirts [*5] with slits and he also called her a "whoremonger."

> n2  Apparently, the memorandum of Cooper-Nicholas explains that this stands for "crotch-watcher."

Cooper-Nicholas outlined a host of grievances regarding the conduct of Jackson in a memorandum to the Board of Directors on October 11, 1994. Her grievances included that Jackson assigned unfair salaries to female employees, mismanaged the staff and various projects, did not deliver her employment contract as promised, and made offensive and vulgar comments to female employees. Cooper-Nicholas asked that she be given authority over all staff. Cooper-Nicholas presented her grievances to the Board of Directors on October 27, 1994. The next day, Jackson terminated her employment on the purported grounds that the Redevelopment Authority lost funding monies from the Urban Development Action Grant ("UDAG"). Jackson ordered that Cooper-Nicholas be escorted by police out of the building.

Cooper-Nicholas filed a charge with the Equal Employment Opportunity Commission ("EEOC"). [*6] After receiving a Notice of Right to Sue from the EEOC, Cooper-Nicholas instituted this lawsuit alleging sex discrimination and sexual harassment in violation of Title VII, *42 U.S.C. § 2000e* (Count I), and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. §§ 951-963 (Count II), denial of equal protection and procedural due process in violation of the United States Constitution pursuant to *42 U.S.C. § 1983* ("Section 1983") (Counts III, IV), and breach of contract in violation of state law (Count V).

Upon the filing of a motion to dismiss by the defendant City of Chester, this Court dismissed the City of Chester from the claims alleged pursuant to Section 1983. (Document No. 18).

## II. LEGAL STANDARD

Summary judgment is proper only when "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91* [*7] *L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* A disputed factual matter is a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id. at 248.* The court must make its determination after considering the facts and all reasonable inferences drawn from them in the light most favorable to the nonmoving party. *477 U.S. at 255-56.* The nonmoving party must produce evidence to support its position, and may not rest upon bare assertions, conclusory allegations, or suspicions. *Fireman's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982).*

## III. ANALYSIS

### A. Hostile Work Environment Sexual Harassment

Five elements must be proven to support a hostile work environment claim under Title VII: (1) the employee suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. *Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990).* My analysis **[*8]** will focus on the second and third elements only.

Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment does not violate Title VII. *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993).* The totality of the circumstances must be considered, including the frequency of the discriminatory conduct, its severity, whether its physically threatening or humiliating or a mere offensive utterance, and whether it reasonably interferes with an employee's work performance. Id.

With respect to the regular and pervasive requirement of the second element, the evidence presented involves the following opprobrious statements made by Jackson: (1) Jackson told an employee, Karen

Spellman, on three occasions, a story about a sorority sister of Cooper-Nicholas who had tried to rape him in college (Dep. of Spellman at 47-49); (2) Jackson made comments about Monica Elam that "she's a CW," "she just has to have my body," and "look how she's watching me" (Dep. of Cooper-Nicholas at 315); (3) Jackson talked about Elam's hair and clothes and her relationship with her fiance, Jackson questioned Elam's sleeping arrangement **[*9]** with her fiance, told her that she was fornicating, and that he would marry them; (4) Jackson stated, at a house warming celebration, that Elam would never have a nice place like the guest of honor because Elam had a live-in boyfriend who kept all his assets in his name, and that "whoremongers like you (Elam) will never get things like this;" (Pl. Exs. 9, 10); (5) Jackson told Monica Washington that his secretary, Andrea Lee, was "doing the wild thing" at lunch; (6) Jackson commented on Elam having a baby out of wedlock; (7) Jackson commented about Lee wearing skirts with slits and referred to her as a "whoremonger" (Dep. of Cooper-Nicholas at 316); and (8) Jackson referred to women in his church who "chased" men as "temple whores." (Dep. of Cooper-Nicholas at 313-14). n3 In an affidavit accompanying her EEOC charge, Cooper-Nicholas wrote that the comments of Jackson "were made in the office, generally at office functions like birthday parties or a housewarming party during office time. He also talked out loud within the earshot of me . . . ." (Pl. Ex. 9). In a letter to Jackson announcing her official resignation, Karen Spellman wrote that she "often found [herself] feeling very **[*10]** uncomfortable when [Jackson] made embarrassing, vulgar, and inappropriate comments during business meetings." (Pl. Ex. 15).

n3 In her brief, Cooper-Nicholas does not cite to or attach any specific deposition testimony to support her claims that these comments by Jackson were made. Instead, she cites to an affidavit of her counsel, Lanier E. Williams, Esq. who states that he attended the depositions of Kathryn Cooper-Nicholas, Monica Washington, Jennifer Knox, Karen Spellman, and Andrea Lee and that the statements attributed to them in the briefs are "either actual statements or substantially the actual statements made by them." (Pl. Ex. 3).

This is not a proper manner to defend against a motion for summary judgment under the standards set forth in *Federal Rule of Civil*

*Procedure 56(c)*. There is no way for the Court to properly evaluate these statements without examining the context in which they were said. Evening considering these statements as true and accurate, however, my analysis will show that they do not create a hostile work environment.

**[*11]**

While these comments are unprofessional, offensive, and callow, they, in isolation or collectively, do not rise to the level of unlawfulness within the purview of Title VII. These comments span nineteen months and thus cannot be considered frequent or chronic. Also, these comments are not sufficiently severe to create a hostile work environment. Unlike in other cases involving hostile work environments, there is no evidence here of physical touching by Jackson of himself or others, and no extensive inquiries into the sex life of Cooper-Nicholas or any other employee, n4 no comments about the physical sexual anatomy of Cooper-Nicholas or any other employee, n5 no physically threatening conduct, no displaying calendars of nude females or viewing photographs of persons in sexual positions, n6 no displaying sexual objects on desks, n7 and no simulating sexual acts in the workplace. n8

n4 *Rufo v. Metropolitan Life Ins. Co., Civ. No. 96-6376, 1997 WL 732859,* at *3 (E.D. Pa. Nov. 4, 1997) (denying summary judgment for defendant where unwelcome physical contact included the co-worker touching plaintiff's breast as well as his own genitals).

**[*12]**

n5 *Taylor v. Cameron Coca-Cola Bottling Co., 1997 U.S. Dist. LEXIS 12114, Civ. No. 96-1122, 1997 WL 719106,* at *5 (W.D. Pa. Mar. 27, 1997) (finding genuine issue of material fact as to whether the alleged discrimination against plaintiff was pervasive and regular where co-worker commented about size of plaintiff's breast and her sex life with her husband, measured bra strap of another female employee, told of dirty jokes weekly, showed pornographic pictures and calendars containing pictures of the naked, upper body of women, and commented about female employees' legs).

n6 See *Bennett v. Corroon & Black Corp., 845 F.2d 104, 106 (5th Cir. 1988)* (finding that cartoons depicting plaintiff engaged in crude sexual activities created hostile work environment).

n7 Andrews, 895 at 1486 (evidence to be considered in determining whether work environment was hostile includes name calling, pornography, displaying sexual objects on desk, disappearance of plaintiffs' case files and work product, anonymous phone calls, and destruction of other property).

n8 See *Harley v. McCoach, 928 F. Supp. 533, 539 (E.D. Pa. 1996)* (evidence that male workers "openly displayed pornographic magazines, wore tee-shirts depicting sexually explicit messages, simulated various sexual acts in the workplace, intentionally passed gas in [plaintiff's] presence, and spread rumors concerning sexual liaisons involving [plaintiff], . . . rubbed his genitals against [plaintiff's] backside, . . . repeatedly put his arm around her and called her "Sweetheart," . . . slid the raffle ticket down the front of his pants, . . . [and] operated the forklifts in such a manner as to place [plaintiff] in harm's way").

**[*13]**

Moreover, as defendants point out, Cooper-Nicholas has submitted no evidence that the comments were made to her directly or that she was the subject of those comments. To the contrary, Cooper-Nicholas admits that Jackson never referred to her in an offensive manner, never made any sexual overtures toward her, and never suggested that they date or have sexual relations of any kind. (Dep. of Cooper-Nicholas at 317). While case law recognizes that offensive statements made to a female other than the plaintiff can contribute to creating a hostile work environment, n9 the plaintiff in those cases had herself been a target of the discriminatory conduct at some point and the evidence of such conduct toward other female employees was used only to bolster the plaintiff's case. Cooper-Nicholas has disclosed no case, and I have found none, where a plaintiff presents evidence of sexually offensive conduct directed at other female employees as the sole basis for plaintiff's hostile environment claim.

n9 See *Andrews, 895 F.2d at 1485* ("The pervasive use of derogatory and insulting terms relating to women generally and addressed to female employees personally may serve as evidence of a hostile environment."); *Barbetta v. Chemlawn Servs. Corp., 669 F. Supp. 569, 572 (W.D.N.Y. 1987)* ("While some of these incidents were not directed specifically at [plaintiff], and others were not witnessed by her, they are all evidence of a hostile and sexually offensive working environment.").

[*14]

Cooper-Nicholas argues that the comments in this case were similar to those under scrutiny in Farpella-Crosby v. Horizon Health Care, where the Court of Appeals for the Fifth Circuit found that comments of the director of the nursing home were severe and pervasive. *97 F.3d 803, 806 (5th Cir. 1996).* In that case, the director inquired about plaintiff's sexual activity frequently, approximately two or three times a week, and made offensive comments to plaintiff, some in front of co-workers. Id. Farpella-Crosby can be distinguished from the fact pattern *sub judice.* First, there is no evidence that the comments of Jackson were made with such regularity as was the situation in Farpella-Crosby. Second, unlike in our case, the plaintiff in Farpella-Crosby was the direct target of the sexually discriminatory and offensive conduct.

I conclude that a factfinder could not reasonably characterize the comments of Jackson as severe, pervasive, or regular. In addition, Cooper-Nicholas has not met the subjective standard of proving that she was detrimentally affected by the alleged comments. There is no evidence that Cooper-Nicholas was upset by the incidents at the time of [*15] any occurrence or during her employment period or that her work performance was affected in any way.

Because Cooper-Nicholas has failed to present a triable question of fact on two essential elements of her prima facie case for hostile work environment, summary judgment is mandated. Accordingly, I will grant summary judgment in favor of defendants and against Cooper-Nicholas on the Title VII claim to the extent that it alleges sex discrimination and harassment. Courts have uniformly held that the PHRA should be interpreted consistent with Title VII. *Clark v. Commonwealth of*

*Pennsylvania, 885 F. Supp. 694, 714 (E.D. Pa.1995).* Accordingly, having granted summary judgment on Cooper-Nicholas' Title VII claim for sex discrimination and harassment, I will dismiss her PHRA claim to the extent that it alleges sex discrimination and harassment.

Jackson should not feel vindicated by this Court's decision, however. While the comments made by Jackson may not fall within the purview of Title VII in this instance, his conduct casts a dark shadow on his professional character.

B. Retaliation

Nowhere in the Second Amended Complaint of Cooper-Nicholas is a cause of action for retaliation [*16] under Title VII expressly raised. n10 Count I is entitled, "Title VII - Sex Discrimination and Sexual Harassment," and there is no mention of retaliation therein. Under the factual allegation section of the second amended complaint, however, there are detailed allegations that Jackson further retaliated against Cooper-Nicholas when he terminated her employment. (Second Amended Complaint PP 27, 28, 32, 33, 35). Despite the inartful drafting, if not blatant blunder on the part of plaintiff and her counsel to plead a separately labelled cause of action for retaliation, I am reminded that the purpose of pleadings is to provide proper notice to defendants. See *Frazier v. SEPTA, 785 F.2d 65, 68 (3d Cir. 1986).* Given that defendants extensively briefed this issue in their memoranda, I can clearly assume that defendants were not prejudiced by the lack of notice. Fortunately for Cooper-Nicholas, I will therefore analyze the retaliation claim on its merits as the parties have.

n10 The original complaint and the first amended complaint of Cooper-Nicholas also do not contain a labelled cause of action for retaliation.

[*17]

Title VII also makes it unlawful for an employer to discriminate against an employee "because [the employee] has opposed any practice made an unlawful practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *42 U.S.C. § 2000e-3*(a). To establish a prima facie case of discriminatory retaliation, a plaintiff must

demonstrate that (1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action. *Nelson v. Upsala College, 51 F.3d 383, 386 (3d Cir. 1995).* Once the prima facie case has been established, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employment action in question. *Quiroga v. Hasbro, Inc., 934 F.2d 497, 501* (3d Cir.), cert. denied, *502 U.S. 940, 116 L. Ed. 2d 327, 112 S. Ct. 376 (1991).* After this, the plaintiff must then demonstrate that the employer's explanation is pretextual. See *Waddell v. Small Tube* **[*18]** *Prods., Inc., 799 F.2d 69, 73 (3d Cir. 1986).*

The Court of Appeals for the Third Circuit does not require a formal letter of complaint to an employer or the EEOC as the only acceptable indicia of protected conduct. See *Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995)* (citing *Sumner v. United States Postal Serv., 899 F.2d 203, 209 (2d Cir. 1990)* allowing informal protests of discriminatory practices such as complaints to management and expressing support of coworkers who have filed formal charges)). Under this lenient standard, it is clear that Cooper-Nicholas engaged in protected activity. As EEO Officer of the Redevelopment Authority, she took actions on behalf of other employees who were complaining about Jackson's offensive conduct. For example, Cooper-Nicholas on several occasions confronted Jackson that his comments made at the office violated EEO laws and presented him with complaints of sexual harassment by several female employees. (Cooper-Nicholas EEOC Charge - Pl. Ex. 9). She also submitted a grievance memorandum to the Board of Directors that contained fifteen allegations detailing what Cooper-Nicholas considered incidents of unfair, mismanagement **[*19]** on the part of Jackson. Although the crux of her grievance memorandum dealt with Jackson's management style, one charge in particular can be characterized as protected activity within the meaning of Title VII. Cooper-Nicholas complained therein that "Mr. Jackson often made vulgar remarks to employees of a sexual nature in violation of the [Redevelopment Authority's] Sexual Harassment Policy. Mr. Jackson repeatedly used vulgar language of sexual nature towards Ms. Elam and Ms. Lee, in the presence of other staff members and at staff birthday parties. He often commented on their sexual activities, living arrangements with the opposite sex, and even called them 'whoremongers.'" (Def. Ex. G) (Pl. Ex. 21).

Defendants argue that Cooper-Nicholas did not have a reasonable belief that she was being subjected to sexual harassment by Jackson. The law on this issue, correctly stated, is that "a plaintiff need not prove the merits of the underlying discrimination complaint, but only that she was acting under a good faith, reasonable belief that a violation existed." *Griffiths v. CIGNA Corp., 988 F.2d 457, 468 (3d Cir. 1993)* (internal quotations omitted). I find, as a matter of law, that **[*20]** Cooper-Nicholas, after receiving complaints from several female employees in her capacity as EEO Officer and after hearing what she perceived to be offensive comments made by Jackson, she acted under a good faith, reasonable belief that Jackson was engaging in unlawful practices.

Proceeding to the next element, it is undisputed that the termination of Cooper-Nicholas constitutes an adverse action within the meaning of the prima facie case for retaliation.

A causal connection can be demonstrated when adverse action closely follows protected activity, thereby justifying the inference of retaliatory motive. *Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989),* cert. denied, *493 U.S. 1023, 107 L. Ed. 2d 745, 110 S. Ct. 725 (1990); Woods v. Bentsen, 889 F. Supp. 179, 187 (E.D. Pa. 1995)* ("Other courts generally hold that if at least four months pass after the protected action without employer reprisal, no inference of causation is created.")

The evidence before the Court reveals that Cooper-Nicholas submitted a grievance to the Board of Directors on October 11, 1994 and delivered her grievance at the Board meeting held on October 27, 1994. The next day, October 28, 1994, **[*21]** Jackson terminated her employment. Given the temporal proximity of the allegedly retaliatory action, I find that Cooper-Nicholas has presented sufficient evidence to create a genuine issue of material fact regarding her prima facie case for retaliation.

The only argument defendants make to defeat the retaliation claim pertains to the lack of good faith on the part of Cooper-Nicholas, as discussed above. Defendants do not bring to the attention of this Court any recitation of a legitimate, nondiscriminatory reason for the termination of Cooper-Nicholas. Despite this shortfall, after reviewing the evidence of the record, I find that this burden of the analysis is satisfied by the stated reason of

Jackson in his termination letter to Cooper-Nicholas that she was terminated due to loss of UDAG funding. n11

> n11 In the termination of employment letter to Cooper-Nicholas from Jackson on October 28, 1994, he wrote:
>
>> As you know, the Chester Redevelopment Authority is experiencing reorganization due to loss of the Urban Development Action Grant (UDAG) miscellaneous proceeds.
>>
>> As a result of the City Council action involving the UDAG miscellaneous proceeds, a major thrust of this office, economic development - handled by you, must be cutback. Concomitantly, you are laid off from the Redevelopment Authority at the close business [sic] on Friday, October 28, 1994.
>>
>> . . . .
>
> (Pl. Ex. 23).

 **[*22]**

The final part of this burden shifting analysis requires Cooper-Nicholas to present sufficient evidence showing that this explanation is pretextual. To show that the stated reason is pretextual, Cooper-Nicholas submits her letter of appeal to the Board where she claims that her salary was paid primarily out of a different budget from the UDAG, which had an administrative surplus of $ 606,000.00. (Pl. Ex. 25). Despite the far from fleshed out nature of Cooper-Nicholas' brief on this issue, and the scant evidence presented, I find that she has presented, albeit scarcely, a material fact in dispute as to her retaliation charge sufficient to survive a motion for summary judgment.

C. Denial of Equal Protection

To bring a successful claim under Section 1983 for denial of equal protection, Cooper-Nicholas must prove the existence of purposeful discrimination in that she received different treatment than other similarly-situated employees at the Redevelopment Authority. See *Keenan v. City of Philadelphia, 983 F.2d 459, 465 (3d Cir. 1992)* (citing *Andrews v. Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990)).* Specifically, Cooper-Nicholas must prove that any disparate treatment **[*23]** was based on her gender. Id.

In her Second Amended Complaint, Cooper-Nicholas alleges that she protested to Jackson that "he was hiring men with lesser experience and education than similarly-situated females but was paying the men a higher salary than the females." (Second Amended Complaint P 21). The brief submitted by Cooper-Nicholas in defense against the motions for summary judgment does not address this issue. Cooper-Nicholas presents no evidence that similarly situated employees were treated differently than she. n12 In fact, she was the only employee at the Redevelopment Authority in the position of Deputy Executive Director. Absent any evidence or even argument in support of this claim, I find that summary judgment is mandated in favor of defendants on Count III.

> n12 Buried in her grievance memorandum to the Board of Directors, Cooper-Nicholas complains of the unfair salary differences among three recently hired staffpersons, Mr. Standback, Mr. DiPietro, and Mrs. Spellman. She concludes, "it is my belief that because she is a woman she received an unfair salary." (Def. Ex. F); (Pl. Ex. 20). Even assuming her denial of equal of protection claim is founded on this belief (she does not argue that it is), the evidence is glaringly insufficient. It is conclusory and, more important, does not pertain to Cooper-Nicholas. Cooper-Nicholas cannot base her claim that *she* was denied equal protection of the law on the treatment received by others.

 **[*24]**

D. Denial of Procedural Due Process

Cooper-Nicholas alleges that defendants violated her rights to procedural due process of the law. Termination of employment requires procedural due process only where the individual has a property interest in continued employment. See *Curry v. Pennsylvania Turnpike Comm'n, 843 F. Supp. 988, 990 (E.D. Pa. 1994)* (citing

*Board of Regents v. Roth, 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972)).* To have such an interest, the individual must have a claim of entitlement to continued employment which typically arises from a statute, ordinance or contract. Id. The existence of a property interest in public employment is decided according to state law. *Cooley v. Pennsylvania Housing Fin. Agency, 830 F.2d 469, 471 (3d Cir. 1987)* (citing *Bishop v. Wood, 426 U.S. 341, 48 L. Ed. 2d 684, 96 S. Ct. 2074 (1976)).*

As a general rule, public employees in Pennsylvania have at-will status. Id. State agencies in Pennsylvania may not limit their ability to discharge employees freely, and thus may not grant a property interest in employments, absent an explicit legislative grant of authority. *Scott v. Philadelphia Parking Auth.,* **[*25]** *402 Pa. 151, 166 A.2d 278, 280-83 (Pa. 1960).* In Banks v. Redevelopment Authority of the City of Philadelphia, the district court held that the Philadelphia Redevelopment Authority "had no power to create rules which would prevent dismissal at will." *416 F. Supp. 72, 74 (E.D. Pa. 1976),* aff'd, *556 F.2d 564 (3d Cir. 1977),* cert. denied, *434 U.S. 929 (1977).*

Under the prevailing case law, and in recognition that Cooper-Nicholas never had a written employment contract with any of the defendants, she cannot now claim a property interest in her employment at the Redevelopment Authority. Therefore, there is no evidence from which a reasonable jury could find that Cooper-Nicholas was denied procedural due process of the law. Accordingly, I will enter summary judgment on Count IV in favor of defendants.

### E. Breach of Contract

As mentioned above, there is no common law cause of action against an employer for termination of an at-will employment relationship. *Krajsa v. Keypunch, Inc., 424 Pa. Super. 230, 622 A.2d 355, 358 (Pa. Super. 1993).* For the same reasons just outlined above, Cooper-Nicholas cannot show any evidence in support of her breach of contract claim. Summary **[*26]** judgment will be likewise granted here.

### F. CEDA / City of Chester

The CEDA and City of Chester make last ditch arguments that they are not proper defendants. I reject both of these arguments. The City of Chester argues that it was never made aware of any alleged sexual harassment by Jackson and thus there was nothing it could have done to prevent such conduct from continuing. The City of Chester cites to no case law in support of the proposition that it should be excused from liability on this basis. The CEDA argues that it did not exist as an entity at the time of the events giving rise to this lawsuit, that it did not employ the Cooper-Nicholas or Jackson, and that it was established under a separate law than the law establishing the Redevelopment Authority.

"Failure to hold a successor employer liable for the discriminatory practices of its predecessor could emasculate the relief provisions of Title VII by leaving the discriminatee without a remedy or with an incomplete remedy." *EEOC v. MacMillan Bloedel Containers, Inc., 503 F.2d 1086, 1091 (6th Cir. 1974); Milner v. National Sch. of Health Tech., 73 F.R.D. 628, 631 (E.D. Pa. 1977).* There are several factors to **[*27]** consider in determining the successorship of two entities that would render the successor liable for the acts done by its predecessor. n13 The factors of "sameness" between entities, as enumerated in MacMillan and Milner, are present here. Cooper-Nicholas presents evidence that the CEDA had notice of the alleged discriminatory practices of Jackson and that Cooper-Nicholas had filed a charge with the EEOC. (Pl. Exs. 39, 40). Having reviewed the resolution passed by the City of Chester creating the CEDA and designating its responsibilities, I find that both the CEDA and the Redevelopment Authority had similar obligations to administer funding, including the UDAG monies. (Pl. Exs. 2, 43). Furthermore, evidence has been presented, and CEDA does not contest, that CEDA employed eight individuals who had worked at the Redevelopment Authority. (Pl. Ex. 43). Accordingly, I conclude that, as a matter of law, CEDA is the successor entity of the Redevelopment Authority for the purpose of this case.

n13 These factors include "1) whether the successor company had notice of the charge, 2) the ability of the predecessor to provide relief, 3) whether there has been a substantial continuity of business operations, 4) whether the new employer uses the same plant, 5) whether he uses the same or substantially the same work force, 6) whether he uses the same or substantially the same supervisor personnel, 7) whether the same jobs exist under substantially the same working

conditions, 8) whether he uses the same machinery, equipment and methods of production and 9) whether he produces the same product." *MacMillan, 503 F.2d at 1094.*

[*28]

### IV. CONCLUSION

In light of the foregoing, I will enter summary judgment in favor of defendants on Counts III, IV, and V. I will enter summary judgment in favor of defendants on Counts I and II to the extent that these Counts allege sex discrimination and harassment. However, I will allow the claim of retaliation in Counts I and II to go forward.

An appropriate Order will follow.

### ORDER

**AND NOW**, on this 29th day of December, 1997, upon consideration of the motion of the City of Chester for summary judgment (Document No. 27) and the motion of defendants Chester Economic Development Authority, Chester Redevelopment Authority, and Thomas Jackson for summary judgment (Document No. 28), and responses of all parties thereto, as well as the pleadings, depositions, affidavits, and admissions on file, and for the reasons set forth in the foregoing memorandum, it is hereby **ORDERED** that the motions of defendants are **GRANTED IN PART AND DENIED IN PART** in accordance with the following:

1. **SUMMARY JUDGMENT** is hereby **ENTERED** on **Counts I and II** in favor of the City of Chester, Chester Economic Development Authority, Chester Redevelopment [*29] Authority, and Thomas Jackson and against Kathryn Cooper-Nicholas to the extent that sex discrimination and sexual harassment under Title VII is alleged.

2. **SUMMARY JUDGMENT** is hereby **DENIED** on **Counts I and II** to the extent that retaliation under Title VII is claimed.

3. **SUMMARY JUDGMENT** is hereby **ENTERED** on **Counts III, IV, and V** in favor of the City of Chester, Chester Economic Development Authority, Chester Redevelopment Authority, and Thomas Jackson and against Kathryn Cooper-Nicholas.

**IT IS FURTHER ORDERED** that the parties shall submit a joint report to the Court no later than **January 20, 1998** as to the status of settlement. If the parties need the assistance of the Court in facilitating settlement negotiations, the report should so indicate. Otherwise, the parties should be prepared to have the case listed for trial.

**LOWELL A. REED, JR., J.**

LEXSEE 2000 US DIST. LEXIS 3698

**NOREEN DAYES, Plaintiff, -against- PACE UNIVERSITY and VICTOR JABAR a/b/a ABDUL JABAR, individually and as Director of Building and Grounds of Pace University, Defendants.**

**98 Civ. 3675 (WHP)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2000 U.S. Dist. LEXIS 3698; 82 Fair Empl. Prac. Cas. (BNA) 1121*

**March 22, 2000, Decided**
**March 24, 2000, Filed**

**DISPOSITION:** **[*1]** Defendants' motion for an order, pursuant to *Fed. R. Civ. P. 56*, granting them summary judgment and dismissing the complaint granted.

**COUNSEL:** Henry L. Saurborn, Jr., Esq., Kaiser Saurborn & Mair, P.C., New York, New York, for Plaintiff.

Robert N. Holtzman, Esq., Kramer Levin Naftalis & Frankel, LLP, New York, New York, for Defendants.

**JUDGES:** WILLIAM H. PAULEY III, U.S.D.J.

**OPINION BY:** WILLIAM H. PAULEY III

**OPINION:**

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

Presently before the Court is defendants' motion for an order, pursuant to *Fed. R. Civ. P. 56*, granting them summary judgment and dismissing plaintiff's complaint alleging claims for sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, as amended, *42 U.S.C. § 2000e*, et seq. For the reasons set forth below, the motion is granted.

Background

Except where otherwise indicated, the following facts are undisputed. Plaintiff is a current employee of defendant Pace University ("Pace") and holds the position of Office Coordinator/Secretary of the Buildings and Grounds Department. (Defs.' 56.1 Stmt. P 1) Plaintiff has held this position since her initial hire in 1993. **[*2]**

As Office Coordinator/Secretary, plaintiff's duties include, among other things, answering telephone calls, filing, processing work orders, data entry and typing. (Defs.' 56.1 Stmt. P 2; Dep/Dayes/22) From the time of her hire until approximately January 1996, plaintiff's supervisor was Bill Link ("Link"), who was the Director of the Buildings and Grounds Department at Pace's Manhattan campus. (Defs.' 56.1 Stmt. P 3) During this time frame, plaintiff was happy in her position; she had no complaints concerning her workplace and did not experience any harassment. (Defs.' 56.1 Stmt. P 3; Dep/Dayes/23)

In February 1995, defendant Victor Jabar ("Jabar") was hired by Pace as the Assistant Director of the Buildings and Grounds Department. (Defs.' 56.1 Stmt. P 4) When Link was promoted in or about January 1996, Jabar succeeded him in the position of Director of Buildings and Grounds. (Pl.'s 56.1 Stmt. PP 3, 4; Defs.' 56.1 Stmt. P 4) Upon his promotion to the Director position in or around January 1996, Jabar became plaintiff's direct supervisor. (Defs.' 56.1 Stmt. P 4)

According to plaintiff, after Jabar joined her department in February 1995, he and a co-worker, Edward MacGrath ("MacGrath"), **[*3]** subjected her to sexually offensive comments and behavior. (Pl.'s 56.1

Case 1:04-cv-00970-JJF    Document 101-4    Filed 01/16/2007    Page 56 of 181

Page 2

2000 U.S. Dist. LEXIS 3698, *3; 82 Fair Empl. Prac. Cas. (BNA) 1121

Stmt. P 5) Specifically, plaintiff alleges that Jabar often shouted at her, but did not treat male employees in a similar fashion. (Pl.'s 56.1 Stmt. P 8; Dep/Dayes/73-74) On a number of occasions, Jabar allegedly asked plaintiff out for drinks after work; however, plaintiff declined his invitations. (Dep/Dayes/48-50) In addition, plaintiff alleges that Jabar stared at her (Dep/Dayes/76); asked plaintiff whether she wanted to marry Tarak Patolia, a former Pace employee (Dep/Dayes/33); asked plaintiff whether she wanted to marry another co-worker (Dep/Dayes/76); suggested that plaintiff had "dressed up" because their Department head, Dennis MacDougall, was visiting their office (Dep/Dayes/76); suggested that they could have spent a weekend together in Florida after learning they had both vacationed there at the same time; (Dep/Dayes/81); commented once about the split in her skirt (Dep/Dayes/104-05); and, on March 1, 1996, pulled his chair close to hers, placed his hand on her back, and stated, "Does sitting too close to you make you uncomfortable?" (Dep/Dayes/104) Jabar denies these allegations. n1

> n1 Plaintiff's Local Rule 56.1 Statement focuses almost exclusively on Jabar and does not make any specific allegations concerning MacGrath. Instead, plaintiff simply parenthetically remarks "(personal questions, rudeness)" in describing MacGrath's alleged conduct. (Pl.'s 56.1 Stmt. P 18)

**[\*4]**

Plaintiff was reluctant to complain about Jabar's conduct. (Pl.'s 56.1 Stmt. P 17) Plaintiff first took action shortly after the alleged incident on March 1, 1996, when Jabar "invaded her personal space" (Pl.'s 56.1 Stmt. P 17) by placing his hand on her back. At that point, plaintiff contacted Dennis MacDougall ("MacDougall"), Director of Physical Plant, who oversaw the buildings and grounds operations at Pace. (Pl.'s 56.1 Stmt. P 18; Defs.' 56.1 Stmt. P 5) In or around March 1996, plaintiff met with MacDougall and complained about Jabar's shouting, his habit of asking inappropriate personal questions, and other behavior. She also told MacDougall about MacGrath's conduct. (Pl.'s 56.1 Stmt. P 18)

In or around April 1996 (the record is unclear as to the precise date) MacDougall spoke with Jabar and told him that plaintiff was uncomfortable with his behavior.

(Defs.' 56.1 Stmt. P 7; Dep/MacDougall/26-27) n2 Sometime after meeting with MacDougall, plaintiff also met with Dionne Brown ("Brown") from Pace's Human Resources Department. n3 Plaintiff complained to Brown that she was being sexually harassed by Jabar. (Pl.'s 56.1 Stmt. P 26) Brown referred plaintiff to Evelyn Santana ("Santana"), **[\*5]** who handled sexual harassment complaints at Pace. (Pl.'s 56.1 Stmt. P 26) Santana, in turn, relayed plaintiff's complaint to Yvonne Ramirez, Pace's Director of Human Resources, and to Bette Valentino, Pace's affirmative action officer. (Pl.'s 56.1 Stmt. P 28)

> n2 Plaintiff attempts to create the appearance of a factual dispute by suggesting that MacDougall never spoke to Jabar at this time. See Pl.'s Mem. at 8. This is not an inference that may reasonably be drawn from the record. MacDougall testified that he spoke to Jabar in response to a detailed message that plaintiff left with his secretary on April 10, 1996 concerning Jabar's alleged misconduct. See Dep/MacDougall/26-27.

> n3 The record is again unclear as to when this meeting took place. Brown estimated that the meeting took place between July 1996 and February 1997. (Dep/Brown/19)

After her meetings with MacDougall and Brown, plaintiff concedes that she experienced no further incidents of sexual harassment. (Defs.' 56.1 Stmt. P 9; Pl.'s 56.1 **[\*6]** Stmt. P 1, n.1; Dep/Dayes/149) Plaintiff did not meet with anyone in the Human Resources Department again until February 1997. (Defs.' 56.1 Stmt. P 10)

Pace has a grievance procedure that is printed in its employee handbook, along with the University's policy prohibiting sexual harassment. (Defs.' 56.1 Stmt. P 13) Plaintiff received a copy of the University's handbook upon her hire. Id.

In or around July 1996, Jabar issued a year-end performance appraisal for plaintiff in which he rated her work as "Exceeds Requirements" in ten out of fourteen categories. (Defs.' Ex. E) For the other four categories,

2000 U.S. Dist. LEXIS 3698, *6; 82 Fair Empl. Prac. Cas. (BNA) 1121

plaintiff received three ratings of "Meets Requirements" and one rating of "Superior." Id.

In September 1997, Jabar once again rated plaintiff's overall performance for the preceding twelve months. This time, Jabar rated plaintiff's job performance in a number of categories on a scale of 1 to 4. (Defs.' Ex. C) Plaintiff's average score was 2.6. Under Pace's rating system, a score of "3" corresponds to "competent" while a "2" means "fair", which is further defined as falling "short of established expectations and displaying a need for improvement in most areas." Id. A score **[*7]** of "1" means that an employee's performance is "consistently erratic and/or falls below what is expected for producing appropriate results." Id.

Discussion

A. Summary Judgment Standard

Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial, and the moving party is entitled to judgment as a matter of law. See *Fed. R. Civ. P. 56(c)*. The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. See *Grady v. Affiliated Cent., Inc., 130 F.3d 553, 559 (2d Cir. 1997)*. In determining whether the movant has met this burden, the Court must resolve all ambiguities and draw all permissible factual inferences in favor of the party opposing the motion. See *Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1187 (2d Cir. 1987)*.

If the moving party meets its burden, the burden then shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*. The non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct.1348, 1355, 89 L. Ed. 2d 538 (1986).* **[*8]** Where it is apparent that no rational finder of fact "could find in favor of the non-moving party because the evidence to support its case is so slight", summary judgment should be granted. *Gallo v. Prudential Residential Services, Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir. 1994).*

B. Hostile Environment

1. Sufficiently Severe or Pervasive Workplace Conditions

Defendants argue that the conduct plaintiff attributes to Jabar is not sufficiently severe or pervasive as to create a hostile work environment within the purview of Title VII. This Court agrees.

To establish a hostile work environment claim, a plaintiff must show: "(1) that the 'workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [her] work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer.'" *Richardson v. N.Y.S. Department of Correctional Services, 180 F.3d 426, 436 (2d Cir. 1999)* (quoting *Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997)* (citation and internal quotation omitted).

Whether an environment **[*9]** is "hostile" or "abusive" depends on the totality of circumstances. See *Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993)*. Courts must consider a variety of factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris, 510 U.S. at 23, 114 S. Ct. at 371;* accord *Quinn v. Green Tree Credit Corp., 159 F.3d 759, 767-68 (2d Cir. 1998)*. These factors must be evaluated from both a subjective and an objective viewpoint. See *Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998); Harris, 510 U.S. at 21-22, 114 S. Ct. at 370.*

Title VII is not a "general civility code." *Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 118 S. Ct. 998, 1002, 140 L. Ed. 2d 201 (1998).* To be actionable, the conduct in question must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive **[*10]** working environment." *Harris, 510 U.S. at 21, 114 S. Ct. at 370.* As a general matter, "isolated remarks or occasional episodes of harassment will not merit relief under Title VII . . . the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." *Tomka v. Seiler Corp., 66 F.3d 1295, 1304 n.5 (2d Cir. 1995)* (citations omitted); see, e.g., *Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998)* (two alleged incidents involving an explicit sexual remark and inappropriate, deliberate touching did not

2000 U.S. Dist. LEXIS 3698, *10; 82 Fair Empl. Prac. Cas. (BNA) 1121

establish hostile work environment).

Although a plaintiff need not present a list of specific acts in order to survive summary judgment, see *Torres v. Pisano, 116 F.3d 625 (2d Cir. 1997)*, a plaintiff must at least allege incidents which could reasonably be viewed as emblematic of a hostile working environment. For example, in *Torres*, the plaintiff alleged that she was harassed "constantly" but she could only provide dates and circumstances of a few instances. Those instances, however, involved extremely vulgar and racially offensive language, insulting remarks **[*11]** about the plaintiff's body and crude sexual propositions. See *Torres, 116 F.3d at 628*. The Second Circuit held that the absence of specific details did not warrant summary judgment. As *Torres* makes clear, courts must carefully consider the totality of the circumstances, even where the plaintiff has not provided concrete and specific details.

Considering the totality of the circumstances here and construing all factual inferences in plaintiff's favor, the teasing and discrete incidents of boorish behavior attributed to Jabar are not sufficiently severe or pervasive as to alter the terms and conditions of plaintiff's employment. The handful of comments that plaintiff describes are interspersed over a one-year period and uniformly mild in tone. Less severe incidents such as the type at issue here "must be sufficiently continuous and concerted in order to be deemed pervasive." *Carrero v. New York City Housing Auth., 890 F.2d 569, 577 (2d Cir. 1989);* accord *Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000).* A jury could not reasonably make that finding based on the evidence presented by plaintiff. Compare *Quinn, supra, 159 F.3d at 767-68;* **[*12]** *Holtz v. Rockefeller & Co., Inc., 1999 U.S. Dist. LEXIS 17682, 1999 WL 1043866,* at *5 (S.D.N.Y. Nov. 17, 1999) (96 Civ. 9484 (WK)) (alleged acts including leering, having hand touched, and comments about older men and married men did not establish a prima facie hostile work environment case), with *Romero v. Howard Johnson Plaza Hotel, 1999 U.S. Dist. LEXIS 15264, 1999 WL 777915,* at *1-2 (S.D.N.Y. Sept. 29, 1999) (97 Civ. 3706 (WHP)) (plaintiff subjected to a steady stream of sex-laden vulgarities, physical assaults and threats stated hostile work environment claim).

Plaintiff attempts to create an appearance of pervasiveness by asserting that "the conduct to which I was subjected and about which I was complaining occurred regularly and over many months." Pl.'s Dec. P 2. However, the assertion that the offensive conduct occurred "regularly" is conclusory, and is not otherwise supported in the record. It therefore is afforded no weight in opposition to defendants' summary judgment motion. See *Nolan v. Epifanio, 1998 U.S. Dist. LEXIS 15139, 1998 WL 665131,* at *2-3 (S.D.N.Y. Sept. 28, 1998) (96 Civ. 2562 (JSR)); *Quiros v. Ciba-Geigy Corp., 7 F. Supp. 2d 380, 385 (S.D.N.Y. 1998); Eng v. Beth Israel Medical Center, 1995 U.S. Dist. LEXIS 11155, 1995 WL 469704,* **[*13]** at *3 (S.D.N.Y. Aug. 7, 1995) (93 Civ. 3605 (RPP)).

Accordingly, this Court finds that plaintiff's allegations are insufficient as a matter of law to establish a hostile working environment under Title VII. However, even if plaintiff could establish this threshold element of her prima facie case, summary judgment would still be warranted based on defendants' invocation of the affirmative defense outlined in *Faragher* and *Burlington Indus. v. Ellerth, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).*

2. Affirmative Defense: Failure to Pursue Corrective Opportunities

The second element of a plaintiff's prima facie case requires proof that the conduct which created the hostile situation can be imputed to the employer. See *Distasio v. Perkin Elmer Corp., 157 F.3d 55, 63 (2d Cir. 1998).* When the harasser is a supervisor, as is the case here, the employer is presumed liable. See *Faragher, 524 U.S. at 806-07, 118 S. Ct. at 2292-93.*

An employer may rebut that presumption if it can prove, as an affirmative defense, "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing **[*14]** behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth, 524 U.S. at 765, 118 S. Ct. at 2270;* see also *Faragher, 524 U.S. at 807, 118 S. Ct. at 2292-93.* No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. See *Ellerth, 524 U.S. at 765, 118 S. Ct. at 2270; Faragher, 524 U.S. at 807-08, 118 S. Ct. at 2293.*

It is undisputed that Pace has a grievance procedure set forth in its employee handbook, along with the University's policy prohibiting sexual harassment.

2000 U.S. Dist. LEXIS 3698, *14; 82 Fair Empl. Prac. Cas. (BNA) 1121

"Although not necessarily dispositive, the existence of an anti-harassment policy with complaint procedures is an important consideration in determining whether the employer has satisfied the first prong of this defense." *Caridad v. Metro-North Commuter Railroad, 191 F.3d 283, 295 (2d Cir. 1999);* accord *Fierro v. Saks Fifth Avenue, 13 F. Supp. 2d 481, 491 (S.D.N.Y. 1998).* **[*15]**

The record also establishes that Pace responded promptly to plaintiff's complaints. In or around March 1996, plaintiff met with MacDougall and aired her complaints about Jabar. (Pl.'s 56.1 Stmt. P 18) Thereafter, MacDougall told Jabar that plaintiff was uncomfortable with his behavior. MacDougall specifically mentioned the March 1, 1996 incident where Jabar allegedly placed his hand on plaintiff's back, and he advised Jabar to give plaintiff "some space." (Dep/MacDougall/27) Thereafter, plaintiff experienced no further incidents of harassment. Under these circumstances, Pace has met the first element of its affirmative defense. n4

> n4 Although plaintiff takes issue over how certain personnel in the Human Resources Department responded to her complaint after March 1996, these quibbles lead nowhere since Pace had already caused the alleged harassment to cease.

Pace has also established the second element of the defense, i.e., that plaintiff unreasonably delayed in availing herself of available corrective opportunities. **[*16]** According to plaintiff, Jabar began harassing her in February 1995 when he joined her department. (Pl.'s 56.1 Stmt. P 5) However, it was not until the March 1, 1996 back-touching incident that plaintiff finally "approached Pace's Human Resources Department to see what they could do to put an end to the harassment I was experiencing." Pl.'s Dec. P 3. Plaintiff's one-year delay in bringing her complaint to the attention of management was unreasonable as a matter of law. See *Barua v. Credit Lyonnais-U.S. Branches, 1998 U.S. Dist. LEXIS 20338, 1998 WL 915892,* at *5 (S.D.N.Y. Dec. 30, 1998) (97 Civ. 7991 (JSR)); *Fierro, 13 F. Supp. 2d at 492-93.*

C. Retaliation

Plaintiff also alleges that after she complained about Jabar's sexual harassment, Jabar retaliated against her by: (1) creating a "cold" atmosphere between them; (2) documenting her job attendance; (3) delegating assignments to student aides; and (4) issuing an unsatisfactory performance evaluation. None of these claims has merit.

As a threshold matter, none of the retaliatory acts plaintiff alleges are actionable under Title VII, which extends only to "materially adverse" changes in the terms and conditions of employment. **[*17]** See *Richardson, 180 F.3d at 446* (relying on *Crady v. Liberty Nat'l Bank and Trust Co., 993 F.2d 132, 136 (7th Cir. 1993)).* A "materially adverse" change in working conditions is "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Crady, 993 F.2d at 136.* The acts on which plaintiff relies do not rise above this level. See, e.g., *Valentine v. Standard & Poor's, 50 F. Supp. 2d 262,* (S.D.N.Y. Jun. 24, 1999) (97 Civ. 0005 (SS))(negative evaluations alone, without any accompanying adverse result, are not actionable), aff'd, *F.3d    , 2000 U.S. App. LEXIS 1859, 2000 WL 232048* (2d Cir. Feb. 8, 2000); *Erickson v. Elco Textron, Inc., 1997 U.S. Dist. LEXIS 7960, 1997 WL 311537,* at *5 (N.D.Ill. Jun. 6, 1997) (95 Civ. 50328)(giving plaintiff the "cold shoulder" not actionable); *Henriquez v. Times Herald Record, 1997 U.S. Dist. LEXIS 18760, 1997 WL 732444,* *5 (S.D.N.Y. Nov. 25, 1997) (96 Civ. 6176 (SHS))* (increased workload and criticism of job performance not actionable), aff'd, *165 F.3d 14 (2d Cir. 1998).*

The inordinate span of time between plaintiff's initial complaint about Jabar's conduct in **[*18]** March 1996 and her unsatisfactory performance review in September 1997 provides further grounds for dismissal with respect to that alleged retaliatory act. See *Adeniji v. Administration for Children Services, NYC, 43 F. Supp. 2d 407, 433 (S.D.N.Y. 1999)* (no causal connection possible given 11 month gap), aff'd, *201 F.3d 430 (2d Cir. 1999).*

Conclusion

For these reasons, defendants' motion for an order, pursuant to *Fed. R. Civ. P. 56,* granting them summary judgment and dismissing the complaint is granted. The Clerk of the Court shall enter judgment accordingly and close this case.

Dated: March 22, 2000

2000 U.S. Dist. LEXIS 3698, *18; 82 Fair Empl. Prac. Cas. (BNA) 1121

New York, New York                        WILLIAM H. PAULEY III

   SO ORDERED:                        U.S.D.J.

LEXSEE 2002 U.S. DIST. LEXIS 21040

**VALERIE D. HARRIS, Plaintiff, VS. CITY OF CARROLLTON, a Governmental, Municipality; RAVI SHAH, Individually and as Agent for the City of Carrollton; Gary HEUBACH, Individually and as Agent of the City of Carrollton; SAMUEL DRUM, Individually and as Agent for the City of Carrollton; RAY JACKSON, Individually and as Agent for the City of Carrollton; and CHRIS SIMONS, Individually and as Agent for the City of Carrollton, Defendants.**

CIVIL ACTION NO. 3:01-CV-1249-M

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

*2002 U.S. Dist. LEXIS 21040*

**October 30, 2002, Decided
October 30, 2002, Filed**

**SUBSEQUENT HISTORY:** **[*1]** Accepting Order of November 27, 2002, Reported at: *2002 U.S. Dist. LEXIS 23044.*

**DISPOSITION:** Magistrate recommended that defendants' motion for summary judgment be granted, and plaintiff's claims against all defendants dismissed.

**COUNSEL:** For VALERIE D HARRIS, plaintiff: Brenda G Hansen, Attorney at Law, Hansen & Associates, Fort Worth, TX USA.

For CITY OF CARROLLTON, RAVI SHAH, GARY HEUBACH, SAMUEL DRUM, RAY NMI JACKSON, CHRIS SIMONS, defendants: Patrick J Maher, Attorney at Law, Shannon Gracey Ratliff & Miller, Fort Worth, TX USA.

For CITY OF CARROLLTON, defendant: Ralph Clayton Hutchins, Attorney at Law, Carrollton City Attorney's Office, Carrollton, TX USA.

For CITY OF CARROLLTON, RAVI SHAH, GARY HEUBACH, SAMUEL DRUM, RAY NMI JACKSON, CHRIS SIMONS, defendants: James R Jordan, Attorney at Law, Shannon Gracey Ratliff & Miller, Dallas, TX USA.

**JUDGES:** Wm. F. Sanderson, Jr., United States Magistrate Judge.

**OPINION BY:** Wm. F. Sanderson, Jr.

**OPINION:**

REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

Pursuant to the District Court's Standing Order of Reference filed on September 12, 2001, and the provisions of *28 U.S.C. § 636*(b)(1)(B) and (C) came on to be considered Defendants' Motion for Summary Judgment filed on August 15, 2002. The **[*2]** findings, conclusions, and recommendations of the magistrate judge, as evidenced by his signature thereto, are as follows:

FINDINGS AND CONCLUSIONS:

*I. Factual Background*

Valerie Harris (hereinafter referred to as "Plaintiff" or "Harris") brought suit against Defendants City of Carrollton ("City"), Ravi Shah, Gary Heubach, Samuel Drum, Ray Jackson, and Chris Simons (collectively referred to as "Defendants") alleging that she was subjected to a hostile work environment on the basis of sex discrimination, to wit: sexual harassment, and that she was retaliated against for filing a sexual harassment

Case 1:04-cv-00970-JJF   Document 101-4   Filed 01/16/2007   Page 62 of 181

Page 2
2002 U.S. Dist. LEXIS 21040, *2

claim in violation of Title VII of the Civil Rights Act of 1964 as amended, *42 U.S.C. § 2000e et. seq.* (hereinafter "Title VII"). Harris alleged that this conduct resulted in her being constructively discharged as an employee of the City. Harris further alleged that she was also retaliated against and constructively discharged for the exercise of her free speech rights in violation of the First and Fourteenth Amendments and *42 U.S.C. § 1983* ("Section 1983"). n1 The record reflects that Harris has satisfied all administrative **[*3]** prerequisites to filing a claim under Title VII, including filing a charge with the Equal Employment Opportunity Commission ("EEOC"), receiving a right-to-sue letter from the EEOC, and filing suit within ninety days thereafter. n2

n1 Previously, on July 10, 2002, the District Court filed its Order Accepting with Modification the Report of Recommendation of the undersigned. In that order, the District Court accepted, with modification, the undersigned's recommendations regarding the dismissal of the following causes of action brought by Harris: her Title VII claims against the individual Defendants in their individual capacities; her Federal Whistleblower claim brought pursuant to *5 U.S.C. § 2302*(b)(8); and her RICO claims, and, further, ordered the dismissal of each.

n2 Plaintiff's complaint contains numerous allegations of fact relating to conduct which occurred while she was employed by the City, attributable to the individual defendants as well as others, including non-party employees of the City. Although such allegations must be accepted as true in the context of a Rule 12(b) motion, when a party moves for summary judgment the opposing party may no longer rest on her pleadings, but must come forward with competent evidentiary materials that establish a genuine issue of fact. *See Anderson v. Liberty Lobby, Inc., infra.* Therefore, the magistrate judge addresses only those claims set out in Plaintiff's complaint on which summary judgment evidence is presented. *See Solo Serve Corp. v. Westowne Assoc., 929 F.2d 160, 164 (5th Cir. 1991)*("while [a party opponent] may use the affidavits filed by [the movant] to satisfy [its] burden, only evidence- not argument, not facts in the complaint- will satisfy [the party opponent's] burden.").

**[*4]**

*II. Analysis*

*Summary Judgment--Standard of Review*

To prevail on a motion for summary judgment, the moving party has the initial burden of showing that there is no genuine issue of any material fact and that judgment should be entered as a matter of law. *FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2509-10, 91 L. Ed. 2d 202 (1986).* The materiality of facts is determined by substantive law. *Anderson v. Liberty Lobby, 477 U.S. at 248, 106 S. Ct. at 2510.* An issue is "material" if it involves a fact that might affect the outcome of the suit under governing law. *See Burgos v. Southwestern Bell Telephone Co., 20 F.3d 633, 635 (5th Cir. 1994)*(citing *Anderson, 477 U.S. at 248, 106 S. Ct. at 2510*). Once the moving party has made an initial showing, the party opposing the motion for summary judgment may not merely rely on her pleadings, but must come forward with competent evidentiary materials that establish a genuine fact issue. *Anderson, 477 U.S. at 256-257, 106 S. Ct. at 2514;* **[*5]** *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1355-56, 89 L. Ed. 2d 538 (1986).* Neither conclusory allegations nor hearsay statements are competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler, 73 F.3d 1322, 1325 (5th Cir. 1996)*(citation omitted). The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports the opponent's claim. *Ragas v. Tennessee Gas Pipeline Co., 136 F.3d 455, 458 (5th Cir. 1998)*(citation omitted). The court must resolve any factual controversies in favor of the non-moving party. *Richter v. Merchants Fast Motor Lines, Inc., 83 F.3d 96, 98 (5th Cir. 1996)*(citation omitted). Thus, in reviewing all of the evidence, the court must consider it in a light most favorable to Mrs. Harris' claims, drawing all factual inferences therefrom and making all credibility determinations related therefrom in her favor. However, summary judgment will be granted "against a party who fails to make **[*6]** a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

Case 1:04-cv-00970-JJF    Document 101-4    Filed 01/16/2007    Page 63 of 181

Page 3
2002 U.S. Dist. LEXIS 21040, *6

bear the burden of proof at trial." *Celotex Corp. v. Catrett, 477 U.S. at 322.*

In this case, Plaintiff has failed to respond to Defendants' instant motion. Although Plaintiff's failure to respond does not permit the court to enter a "default" summary judgment, *Eversley v. Mbank Dallas, 843 F.2d 172, 174 (5th Cir. 1988),* it does, however, permit the court to accept Defendants' evidence as undisputed. *See id.* (noting that when the nonmovant submits no summary judgment response, the factual allegations of the movant are properly taken as true); *Tutton v. Garland Indep. Sch. Dist., 733 F. Supp. 1113, 1117 (N.D. Tex. 1990).* In failing to respond to Defendants' motion Harris has not only failed to demonstrate the existence of genuine issues of fact, but also has failed to identify contradicting evidence in the record and to articulate the precise manner in which that evidence supports her claims. *Ragas v. Tennessee Gas Pipeline Co., supra.*

*III. Applicable Law*

*A. Title VII*

Title VII **[*7]** of the Civil Rights Act of 1964 prohibits covered employers from discriminating against "any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2*(a)(1) (1994). Title VII's prohibition of sex (gender) discrimination includes sexual harassment. *See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64-67, 106 S. Ct. 2399, 2404-06, 91 L. Ed. 2d 49 (1986).*

*1. Plaintiff's Hostile Work Environment Claim*

In order to demonstrate an actionable sexual harassment claim based on a theory of hostile work environment, a plaintiff must show: (1) that she belongs to a protected class, (2) that she was subjected to unwelcome sexual harassment, (3) that the harassment was based on sex, (4) that the harassment affected a term, condition, or privilege of employment, and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action. *Green v. Adm'rs. of the Tulane Educ. Fund, 284 F.3d 642, 655 (5th Cir. 2002)*(citing *Mota v. Univ. of Tex. Houston Health Science Ctr., 261 F.3d 512, 523 (5th Cir. 2001)).* **[*8]** In order to state a cause of action under Title VII, sexually objectionable conduct must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *See DeAngelis v. El Paso Mun. Police Officers Ass'n, 51 F.3d 591, 593 (5th Cir.), cert. denied, 516 U.S. 974, 133 L. Ed. 2d 403, 116 S. Ct. 473 (1995)*(citing *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22, 114 S. Ct. 367, 370-71, 126 L. Ed. 2d 295 (1993)).* Further, such conduct must be both objectively and subjectively offensive (i.e., perceived by the victim as well as by a reasonable person to be both hostile and abusive). *Shepherd v. Comptroller of Public Accounts of Tex., 168 F.3d 871, 874 (5th Cir.), cert. denied, 528 U.S. 963, 120 S. Ct. 395, 145 L. Ed. 2d 308 (1999)*(citing *Harris v. Forklift Sys., Inc., supra).*

"Whether an environment is hostile or abusive depends on a totality of circumstances, focusing on factors such as the frequency of the conduct, the severity of the conduct, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct **[*9]** unreasonably interferes with an employee's work performance." *Weller v. Citation Oil & Gas Corp., 84 F.3d 191, 194 (5th Cir.), cert. denied, 519 U.S. 1055, 117 S. Ct. 682, 136 L. Ed. 2d 607 (1997)*(citing *Harris v. Forklift Sys., Inc., supra).*

The summary judgment evidence before the court presents two situations which arguably relate to Plaintiff's hostile work environment claim. The first pertains to conduct exhibited by a co-worker, Paul Cooper ("Cooper"). Plaintiff began her employment on or about May 28, 1999 (Defs.' App. Ex. B ["Pl.'s Aff."] at P2). Thereafter, Plaintiff was trained by Cooper for about a two-week period (Defs'. App. Ex. A ("Pl.'s Dep.") at 009). The remarks attributed to Cooper are not described with any specificity, except as they appear in Plaintiff's complaint- i.e., "Plaintiff was subjected to numerous sexually explicit comments and actions from Cooper." Following the two-week training period, the excerpts from Plaintiff's deposition suggest that Cooper continued to make offensive comments, as a result of which Harris complained to Kathryn Usrey, an employee of the City's Human Resource Department in October 1999 ( **[*10]** *Id.* at 009-011). However, no action was taken since Cooper ended his employment with the City in November when he failed his plumbing test.

The second situation involved Defendant Chris Simons ("Simons"). Harris loaned him her code book to study for his plumbing test (*Id.* at 025). Harris considered the book to be valuable because it had notes which she

had entered in it (*Id.* at 038). When Simons did not return the code book to Harris and she inquired as to its whereabouts, Simons responded by using the "F" word in describing Harris' missing code book (*Id.* at 025; 038). There is no evidence that Harris reported this incident to a supervisor or to a Human Resource Department employee.

Neither the conduct of Cooper nor the remarks attributed to Simons constitute evidence from which a fact-finder could find that Harris was subjected to a hostile work environment which was so severe or pervasive as to alter the conditions of her employment. *See Faragher v. City of Boca Raton, 524 U.S. 775, 786-88, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998)*(citation and internal quotation marks omitted) ("simple teasing, offhand comments, and isolated incidents (unless **[*11]** extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."). The conduct attributed to Cooper is conclusory in the extreme, thus foreclosing a fact-finder's ability to weigh the totality of the circumstances in which his remarks were made. Dispositive of this element of a hostile work environment claim is the fact that the summary judgment materials contain no evidence that either Cooper's conduct or remarks were of an extreme nature so as to affect a term or condition of Harris' employment. *See Faragher, 524 U.S. at 788, 118 S. Ct. at 2284* ("... it [is] clear that conduct must be *extreme* to amount to a change in the terms and conditions of employment."). In point of fact, she continued her employment until June 2000, more than 7 months after Cooper's employment with the City ended. The single incident with Simons, relating to the lost code book, likewise fails to create a genuine issue of fact. Aside from the fact that Harris has neither shown the approximate date on which the incident occurred nor that she complained about the same to a City representative, instances of offensive conduct must be "more than episodic; **[*12]** they must be sufficiently continuous and concerted in order to be deemed pervasive." *Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2nd Cir.1997)*(citation and internal quotation marks omitted).

*2. Plaintiff's Retaliation Claim*

To prove a claim for retaliation, Harris is required to establish that: (1) she engaged in a protected activity, (2) she suffered an adverse employment action n3, and (3) that such adverse employment action was motivated by

animus inspired by, or causally linked to, the protected conduct. *Chaney v. New Orleans Public Facility Mgmt., Inc. 179 F.3d 164, 167 (5th Cir.), cert. denied, 529 U.S. 1027, 120 S. Ct. 1439, 146 L. Ed. 2d 327 (2000); see also Long v. Eastfield College, 88 F.3d 300, 304 (5th Cir. 1996)*(describing the third element of a *prima facie* retaliation case as a "causal link") (citation omitted); *Mota, supra, 261 F.3d at 519.* Protected activity is defined as opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting, or participating in any investigation, proceeding, or hearing under Title VII. *42 U.S.C. § 2000e-3*(a)(2001) **[*13]** ; *see also Long v. Eastfield College, 88 F.3d at 304.*

> n3 Adverse employment actions include only ultimate employment decisions such as "hiring, granting leave, discharging, promoting, or compensating." *Walker v. Thompson, 214 F.3d 615, 629 (5th Cir. 2000).*

In her complaint Harris alleges that she was retaliated against for making complaints with respect to alleged sexual harassment and because her husband filed a complaint with the Texas Board of Plumbing Examiners with respect to irregularities in plumbing inspections by the City, including forged initials on inspection tickets.

The summary judgment evidence favorable to Harris is decidedly more lacking in substance. Although she testified that her husband lodged a complaint with the State board in January or February 2000 (Pl.'s Dep. at 016-17), there is no competent evidence in the summary judgment record to show *when* a formal or informal complaint was received by the board. Clearly this is an important factor **[*14]** since in order to be a basis for a claim of retaliation, the City or its representatives would have to have been aware of the existence of a complaint made to the State board. n4

> n4 The Plaintiff's affidavit to the board (Defs.' App. Ex. B) is dated November 27, 2000, approximately 5 months after she terminated her employment with the City.

In describing the retaliation to which she was

subjected as a result of her complaints, Harris stated that "they" (presumably some of the named Defendants) would not answer her radio requests for assistance, that she was excluded from meetings, nobody spoke to her, she no longer went to lunch or had coffee with members of the inspection department, and that she received dirty looks (*Id.* at 029-30).

The Defendants contend that Plaintiff cannot sustain her claim because she resigned her position and, as such, she therefore did not suffer an adverse employment decision. It is undisputed that Plaintiff submitted her letter of resignation by leaving the same on Gary Heubach's [*15] desk on or about June 9, 2000 (*See* Pl.'s Dep. at 030-33). Therefore, Harris cannot show the existence of a genuine issue of fact on the second element of a retaliation claim, to wit: that an adverse employment action, unless she can show that a fact-finder could conclude that her resignation constituted a constructive discharge.

To establish a constructive discharge, a plaintiff "must offer evidence that the employer made the employee's working environment so intolerable that a reasonable employee would feel compelled to resign." *Ward v. Bechtel Corp., 102 F.3d 199, 202 (5th Cir.1997)*(quoting *Barrow v. New Orleans S.S. Ass'n., 10 F.3d 292, 297 (5th Cir. 1994))*. n5 In support of such a claim, a plaintiff must show a greater severity of pervasiveness of harassment than the minimum required to prove a hostile working environment. *See Landgraf v. U.S.I. Film Prods., 968 F.2d 427* (5th Cir.), *aff'd, 511 U.S. 244, 114 S. Ct. 1483, 128 L. Ed. 2d 229 (1994).*

n5 *Barrow* lists seven factors to be considered in determining whether an employee's resignation constitutes a constructive discharge. *See also* n.20 at 297.

**[*16]**

None of the conduct which Harris described in her deposition (*see, e.g.*, Pl.'s Dep. at 029-30), comes close to approximating the type of conduct from which a fact-finder could find that she was constructively discharged as an employee of the City. n6 Therefore, Defendants are entitled to summary judgment on Plaintiff's claim that they retaliated against her.

n6 Neither hostility nor ostracism constitute, or rise to the level of, an adverse employment decision. *Mattern v. Eastman Kodak Co., 104 F.3d 702, 707* (5th Cir.), *cert. denied, 522 U.S. 932, 118 S. Ct. 336, 139 L. Ed. 2d 260 (1997)*("hostility from fellow employees...does not constitute [an] ultimate employment decision."); *Gagnon v. Sprint Corp., 284 F.3d 839, 850 (8th Cir. 2002)*("ostracism and rudeness by supervisors and co-workers do not rise to the level of an adverse employment action."), Pet. for cert. filed Aug. 20, 2002 (No. 02-295).

Because Plaintiff has not proffered evidence of a constructive [*17] discharge, her resignation forecloses her ability to prove an action for retaliation under Title VII. It is therefore unnecessary to address her Section 1983 claim under the First and Fourteenth Amendments, to wit: that the complaint filed by her husband with the Texas Board of Plumbing Examiners constituted protected speech of Plaintiff, since she suffered no adverse employment action at the hand of any Defendant.

*III. Recommendation*

For the foregoing reasons, it is recommended that the District Court **GRANT** Defendants' motion for summary judgment and that the District Court enter its judgment **DISMISSING WITH PREJUDICE** all of Plaintiff's claims against all Defendants.

A copy of this recommendation will be transmitted to counsel for the parties.

**SIGNED** this 30th day of October, 2002.

Wm. F. Sanderson, Jr.

United States Magistrate Judge

NOTICE

In the event that you wish to object to this recommendation, you are hereby notified that you must file your written objections within ten days after being served with a copy of this recommendation. Pursuant to *Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415 (5th Cir. 1996)(en banc)* a **[*18]** party's failure to file written objections to these proposed findings of fact and conclusions of law within such ten day period may bar a

2002 U.S. Dist. LEXIS 21040, *18

*de novo* determination by the district judge of any finding of fact or conclusion of law and shall bar such party, except upon grounds of plain error, from attacking on appeal the unobjected to proposed findings of fact and conclusions of law accepted by the District Court.

LEXSEE

**JEANNETTE KRIZMAN, Plaintiff, v. AAA MID-ATLANTIC, INC., Defendant.**

**CIVIL ACTION NO. 06-402**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2006 U.S. Dist. LEXIS 74647*

**October 12, 2006, Decided**

**COUNSEL:** **[*1]** For JEANNETTE KRIZMAN, Plaintiff: A. MICHELLE CAMPBELL, LEAD ATTORNEY, ROBERT T. VANCE, JR., LEAD ATTORNEY, LAW OFFICES OF ROBERT T. VANCE, JR., PHILADELPHIA, PA.

For AAA MID-ATLANTIC, INC., Defendant: DANIEL P. O'MEARA, LEAD ATTORNEY, JENNIFER T. NOCITO, MONTGOMERY MCCRACKEN WALKER & RHOADS, LPP, PHILADELPHIA, PA.

**JUDGES:** Robert F. Kelly, Sr. J.

**OPINION BY:** Robert F. Kelly

**OPINION:**

MEMORANDUM

**ROBERT F. KELLY, Sr. J.**

Plaintiff, Jeannette Krizman ("Krizman"), brings this suit against Defendant, AAA Mid-Atlantic Inc. ("AAA"), alleging discrimination in violation of Title VII of the Civil Rights Act of 1964. *42 U.S.C. §§ 2000e- 2000e-15 (2000).* She alleges that AAA, through its employees, discriminated against her because she was of Haitian birth. Specifically, Krizman claims that she was treated differently than other similarly situated employees, was subjected to harassment in the form of a hostile work environment, and was ultimately constructively discharged. AAA has filed a Motion for Summary Judgment on all claims averred by Krizman. After careful review of the record, this Court grants AAA's Motion for Summary Judgment on all claims.

**[*2] I. BACKGROUND**

AAA Mid-Atlantic Inc. is a not-for-profit corporation that provides a wide array of services and products to its members and customers in the automotive, travel, insurance, and financial areas. AAA's human resources department handles various types of issues for the corporation including payroll and benefits processing for all employees. Krizman was employed in AAA's human resources department.

A naturalized U.S. citizen, Krizman was born in Haiti, but has lived in the U.S. since 1972. She began working for AAA in November 1997, as a File Clerk. Krizman was promoted twice within her first eighteen months of employment; to a File Clerk II in November 1998, and then to the position of Secretary for Compensation and Benefits in May 1999. She applied for a position as a Human Resources Coordinator under the supervision of Ms. Theresa Reese in January, 2001. Ms. Reese interviewed Krizman and ultimately decided to hire her for the position of a Payroll Analyst. Ms. Reese is African American.

As a Payroll Analyst, Krizman's duties included collecting time sheets, inputting figures into the payroll system, entering paid time off requests, and inputting new hire and promotion **[*3]** data. She was also responsible for entering the proper tax codes into employee's files so that accurate records and tax withholdings could be maintained for employees living or working in Philadelphia and subject to the city wage tax. The tax setup task did not involve tax analysis, rather it was a data entry function.

AAA reorganized its internal operations in 2002.

2006 U.S. Dist. LEXIS 74647, *3

Prior to the reorganization, the human resources department consisted of two groups, one to service the insurance group and the other devoted to the corporate group. Krizman's group serviced the Mid-Atlantic Insurance Group's employees. With the combination of the two groups, the workload for all human resources employees increased. Krizman was promoted in October 2002, in recognition of this additional responsibility.

The situations giving rise to this Complaint all occurred after AAA reorganized its human resources operations. Prior and subsequent to the reorganization, Krizman distributed confidential cost center reports, which included salary information, to vice-presidents in the insurance group. After the restructuring, she assumed the duty of distributing these reports to the corporate group's vice presidents [*4] as well. In March 2003, approximately five months after she assumed this new duty, Krizman delivered the cost center reports to unauthorized low level employees in the corporate group, not the vice presidents. Ms. Reese received numerous complaints from the vice-presidents about the severity of this error who expressed deep concern about properly addressing Krizman's action to avoid future occurrences. Consequently, a written warning was issued, but Krizman did not receive a copy.

Krizman complained shortly after the reorganization that her workload was too much to handle, so Ms. Reese temporarily assigned some of the duties to another employee, Ms. Carol Belgum. After the work was reassigned, Krizman complained to Ms. Reese that she was not providing her with enough assistance to complete her job. Krizman was informed by Mr. Conley, Director of Human Resources, and Ms. Reese that the position was a one person job. They could not divert anymore of her work to other employees. Krizman was expected to complete the remaining tasks assigned. Kizman has not claimed that she was assigned an inordinate amount of work, rather she stated that she was taking long hours to finish her tasks. [*5] (Krizman Dep. 114-16). She believed that the job was too much for one person to handle. After Krizman's resignation, Ms. Belgum assumed all of Krizman's tasks in addition to her own responsibilities.

Krizman felt Ms. Reese demeaned her in various ways and made derogatory comments. Ms. Reese would shout any remark about the work Krizman was performing from across the room instead of coming to

her cubicle, which was within close proximity to Ms. Reese's office. Krizman complained to Mr. Conley that if he just listened, since his office was right next door to Ms. Reese's, he would hear the things that she was complaining about. (Krizman Dep. 135). Additionally, Krizman was offended by Ms. Reese coming to her desk to talk to her or ask her questions instead of calling her on the telephone or emailing her. Krizman considered this demeaning because she felt unable to say to Ms. Reese that she did not have time to answer her question, or she was in a rush, or she had to meet someone. Krizman disliked Ms. Reese's management style and her tone of voice. Ms. Reese also frequently said to Krizman that she could not understand her or she could not hear her. Ms. Reese also said things like, "don't [*6] come to my office," "I don't want you to do it this way," and "this is your job now." (Krizman Dep. 35). Krizman felt these comments were not fair and believes they were made because she was born in Haiti.

In April 2003, Ms. Reese received an email from the director of payroll, Mr. Robert Deissroth highlighting deficiencies he observed in Krizman's work. (Def. Mem. Ex. F). While Mr. Deissroth was not responsible for Krizman, she did impact him as he was ultimately responsible for the payroll. He was concerned that she was seeking excessive assistance from other groups, and she seemed to lack basic knowledge about payroll tax. Ms. Reese scrutinized Krizman's work more closely thereafter, and found that some of the concerns raised were warranted. Ms. Reese counseled Krizman, provided one-on-one guidance on tasks she was having difficulty with, and directed her to utilize other employees as resources for additional questions she might have.

In September 2003, Ms. Reese and Mr. Conley met with Krizman to discuss their concerns with her performance. Specifically, Krizman's failure to process promotional increases and final payments, and her failure to issue live checks for a special request [*7] were addressed. Krizman erroneously issued the checks as direct deposits, and AAA had to pay the fee to stop payment. Ms. Reese also requested that Krizman send her drafts of her email responses to employees' questions before they were sent, as she was concerned that Krizman was not providing thorough responses. These issues were addressed in Krizman's 2003 annual appraisal, where she received an overall rating of 2.65, reflecting that she had not consistently met job standards the previous year.

2006 U.S. Dist. LEXIS 74647, *7

AAA converted to an automated payroll system during 2004. Employees began entering their time sheets directly, which substantially reduced the amount of data Krizman was required to enter. The focus of her job moved towards reviewing, auditing, and correcting payroll reports generated by the system. Krizman and the other payroll processors received only limited group training on the new system. She had difficulties reconciling the reports, so Ms. Reese provided assistance to her in auditing the reports which were time sensitive

On August 30, 2004, Mr. Conley and Ms. Reese met with Krizman again to discuss the problems associated with her performance. They made available options to address [*8] her complaints of having an excessive workload and their need to have this job completed by one employee. This discussion was summarized in an email Ms. Reese sent to Krizman on September 1, 2004. (Def. Mem. Ex. M). In the email, Ms. Reese reiterated the three options that Krizman was presented with regarding her employment. She could: (1) "[r]emain in [her] current position and perform at the expected levels," (2) transition into an HR Support position which carried with it a salary reduction of $ 300 and less responsibility, or (3) she could elect to resign and sign a release entitling her to collect ten weeks of pay. ( Id.). Krizman chose to remain in her position. Ms. Reese and Mr. Conley continued to monitor Krizman's work, instituted bi-weekly status meetings to assess her progress, and advised Krizman on the steps that needed to be taken for her to become proficient in her position.

However, Krizman informed Mr. Conley two weeks later on September 15, 2004, that she now intended to resign. Mr. Conley requested a written notice of resignation, which she provided to him on September 20, 2004. Krizman worked for AAA for the two week period following her notice of resignation. [*9]

## II. STANDARD OF REVIEW

Pursuant to *Rule 56(c) of the Federal Rules of Civil Procedure*, granting summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. This Court must ask "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S. Ct.*

*2505, 91 L. Ed. 2d 202 (1986)*. The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party. *Anderson, 477 U.S. at 249*. A factual dispute is material only if it might affect the outcome of the suit under governing law. *Id. at 248*.

The non-moving party must go beyond the [*10] pleadings and present "specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*. Similarly, the non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989)*. The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Tziatzios v. United States, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996)*. Further, the non-moving party has the burden of producing evidence to establish each prima facie element of its claim. *Celotex, 477 U.S. at 322-23*. If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper. *Id. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987)*.

## III. DISCUSSION

In this action, relief is sought under Title VII, *42 U.S.C. § 2000e-* 2000e-15, for national origin employment [*11] discrimination. Krizman states in her. Complaint that she was treated differently because of her Haitian heritage. She claims that the disparate treatment manifested itself in a hostile working environment severe enough to compel a reasonable person to resign. Because she was subjected to a hostile work environment, her resignation was forced and not voluntary. This constitutes a constructive discharge which is an unlawful employment action under the Act, and she believes, entitles her to relief under the Act. This Court disagrees.

Under the Civil Rights Act, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any

Case 1:04-cv-00970-JJF    Document 101-4    Filed 01/16/2007    Page 70 of 181

Page 4
2006 U.S. Dist. LEXIS 74647, *11

individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin[.]" *42 U.S.C. § 2000e-2*. The Act defines employer as "a person engaged in an industry affecting commerce who has fifteen or more employees[.]" *42 U.S.C. § 2000e*. The unlawful act language has been interpreted as something done by an employer that bears a discriminatory [*12] animus manifesting itself in a challenged action against an employee. *Lewis v. Univ. of Pittsburgh, 725 F.2d 910, 914 (3d Cir. 1983)*. A plaintiff must show that the alleged unlawful action taken by the employer bore discriminatory animus against her in order to establish employment discrimination. Id.

Discriminatory animus can be proven through circumstantial evidence. The courts apply a burden shifting framework, articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*, when intent is proven through circumstantial evidence. First, a plaintiff establishes the prima facie elements of the discrimination claim. *Id. at 802*. Next, if the plaintiff meets the elements of the claim, the burden is 'shifted to the defendant to articulate a legitimate non-discriminatory reason for rejecting the employee. Id. Finally, should the defendant carry that burden, the plaintiff gets another opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but rather were just a pretext for discrimination. *Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*. [*13] The McDonnell Douglas framework applies to the present claims. However, it will not be utilized beyond the first step as Krizman has failed to establish either of her prima facie cases.

An individual disparate treatment claim requires a showing of an adverse employment action, most frequently a termination, which Krizman cannot demonstrate. See *Gray v. York Newspapers, Inc., 957 F.2d 1070, 1079 (3d Cir. 1992)*. The elements that Krizman must show are that: (1) she is a member of a protected class, (2) she is qualified for the position in question, (3) she was either not hired for or was fired from the position (suffered an adverse employment action), and (4) the circumstances "give rise to an inference of unlawful discrimination such as might occur when the position is filled by a person not of the protected class. *Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999)*. Applying the foregoing analysis to this case at hand, this Court finds that Krizman has not met her burden of establishing her prima facie case. While Krizman has shown that she was born in Haiti, and that she has performed her position satisfactorily, she has not shown [*14] that she was not hired or fired. She resigned, and this fact will preclude her from establishing her prima facie case. Additionally, as will be seen in the discussion of the hostile work environment claim, the facts of this case do not give rise to an inference of unlawful discrimination under the Act.

A voluntary resignation is not an adverse employment action. However, a voluntary resignation prompted by a working environment so hostile that a reasonable employee subjected to it would feel compelled to resign will be considered a constructive discharge, which is an adverse employment action. See *Goss v Exxon Office Sys. Co., 747 F.2d 885, 887 (3d Cir. 1984)*. Since Krizman alleges a constructive discharge, this Court must focus its attention on the underlying basis for that claim and therefore must discuss whether a hostile work environment existed at AAA. Failure to establish a hostile work environment will preclude Krizman from establishing a constructive discharge. Consequently, if she cannot demonstrate that her resignation was forced, she has not established that AAA committed an adverse employment action against her. Therefore, failure to establish a hostile [*15] workplace will render this individual disparate treatment claim moot. After careful consideration, this Court finds that Krizman has not established a prima facie case of a hostile work environment, and therefore AAA is entitled to prevail as a matter of law.

An employer who knowingly permits the existence of harassing conditions so intolerable that a reasonable person subjected to them would feel compelled to resign, can be found to have constructively discharged an employee who voluntarily resigned. See *Gray, 957 F.2d at 1079*; *Goss, 747 F.2d at 888*. The law does not permit an employee's subjective perceptions to govern a claim of constructive discharge, rather an objective standard is applied to determine whether an employer knowingly permitted such conditions. See *Jones v. Sch. Dist. of Phila., 19 F. Supp. 2d 414, 419 (E.D. Pa. 1998)*; see also *Gray, 957 F.2d at 1083*. Employees are protected from calculated efforts to pressure them into resignation, but they are not guaranteed a stress free workplace. *Gray, 957 F.2d at 1083*. Overzealous supervision is not a basis

upon which constructive discharge [*16] can be founded. *Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1162 (3d Cir. 1993)*. A plaintiff fails to establish the necessary factual predicate for constructive discharge, however, when they cannot demonstrate a hostile working environment. *Konstantopoulos v. Westvaco Corp., 112 F.3d 710, 718-19 (3d Cir. 1997)*.

Krizman fails to establish a constructive discharge because she cannot show that AAA subjected her to a severely hostile work environment. A workplace that is permeated by severe and pervasive discriminatory intimidation, ridicule, and insult is one in violation of Title VII. *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)*. The severity and pervasiveness of the discrimination is determined by looking at the totality of the circumstances including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it interferes with the employee's work performance." *Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)*.

A prima facie case for hostile working environment [*17] requires that Krizman show: (1) she suffered intentional discrimination based on her national origin, (2) which was pervasive and regular, (3) and detrimentally affected her, and (4) this discrimination would detrimentally affect a reasonable person of the same national origin in that position, and (5) respondeat superior liability existed. *Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996)*.

With respect to the first element, Krizman has not shown that she suffered intentional discrimination based on her national origin. The Supreme Court has said that when a workplace is permeated with discriminatory intimidation, ridicule, and insult Title VII has been violated. See *Harris, 510 U.S. at 21*. In this case, the record shows that Krizman was not subjected to intimidation, ridicule, or insult because she was born in Haiti. When AAA took actions against her those actions were based on her job performance. AAA did not try insult or ridicule her, rather they offered critiques of her job performance. The record shows they considered her an asset, as she had been promoted often during her many years with the organization. The actions Krizman [*18] claims give rise to discrimination, are all related to her job performance. AAA took disciplinary action when

errors occurred, but they also provided assistance and coaching to help her develop the skills necessary to adequately perform her position. Any treatment that Krizman was subjected to was the result of her job performance and not her national origin.

Krizman was issued a written warning for distributing confidential reports to low level employees. AAA did this because she had failed to perform an important part of her job properly. Krizman admitted that she distributed the confidential cost center reports to the low level employees who received them. (Krizman Dep. 66-75). Ms. Reese and Mr. Conley issued a written warning for this incident because the vice-presidents of the group were very upset that this information had been divulged. Krizman has not alleged that they issued the written warning for any reason other than that. This Court finds nothing in the record which shows that this warning was issued because she was born in Haiti. Krizman was subjected to discipline for performing her job incorrectly.

No derogatory, intimidating, or insulting remarks or comments were [*19] made about Krizman according to the record. In Aman, the Third Circuit found that two black employees who were falsely accused of favoritism, had documents stolen from them, and were frequently referred to as "another one," "one of them," and "poor people," by white employees, had produced sufficient evidence to survive summary judgment. *85 F.3d at 1078, 1082*. In the present case, Krizman admits that "Ms. Reese did not make any derogatory statements regarding [Krizman's] national origin." (Pl. Mem. 14). Rather, Krizman alleges that Ms. Reese's habit of talking to her from across the room or at her desk is the equivalent of derogatory statement like those found in Aman. (Krizman Dep. 34-36). The record shows that Krizman was unhappy with Ms. Reese's style of management, and would have preferred that she used more passive communication devices like email. ( Id.). However, talking to an employee either at her desk or from across the room is not an intentionally discriminatory remark or comment.

Regarding the second element, AAA's actions were not regular or pervasive and were not based on her national origin. Disciplinary actions occurred when issues arose [*20] with Krizman's performance that required a formal response. The Third Circuit has stated that reasonably exacting standards of job performance do not create a hostile work environment. *Clowes, 991 F.2d at*

*1161*. Ms. Reese required Krizman to submit drafts before sending email responses to employees because she had determined that Krizman's responses might be lacking. Ms. Reese was concerned, and as Krizman's supervisor she was ultimately responsible for Krizman's work. Krizman alludes that this step might have been instituted because Ms. Reese found it difficult to understand her, but Krizman does not claim that Ms. Reese looked over her email responses because she is of Haitian heritage. The record also shows that other errors had occurred. Krizman processed a request for paper bonus checks incorrectly as direct deposits, and this required a cancellation and reissue. (Conley Dep. 43-45). After these incidents, Ms. Reese began to scrutinize Krizman's performance. The record shows that this was a justified response, as Krizman was not performing her job properly. Nothing in the record shows that Krizman's national origin prompted these actions, and discipline was only **[*21]** instituted when Krizman did not perform her duties in accordance with the standards.

The third element requires that Krizman establish that she was detrimentally affected by the above noted conduct. Whether an employee has been detrimentally affected by an employer's action is a subjective question. However, Krizman has not alleged any emotional damage from AAA's actions. (Krizman Dep. 146). She claims that she was detrimentally effected by Ms. Reese's managerial style and the lack of adequate assistance in performing her job functions. Giving Krizman the benefit of all reasonable inference, this Court presumes that she has shown that the actions of AAA have detrimentally affected her.

In regards to the fourth element, Krizman has not established that a reasonable person of the same national origin subjected to a similar situation would have been detrimentally affected. As stated previously, when a working environment is so hostile that a reasonable employee subjected to it feels compelled to resign, the courts will consider the voluntary action to be a constructive discharge. See *Goss, 747 F.2d at 887*. This Court finds that a reasonable person of Haitian heritage, **[*22]** would not have resigned from AAA under these circumstances.

Krizman was not pressured to resign her position. Constructive discharge typically involves threats of termination or suggestions to resign. See ***Clowes, 991 F.2d at 1161***. The email Ms. Reese sent Krizman on September 1, 2004, was not a threat intended to force Krizman to resign. The email outlined alternatives available to address Krizman's complaints. She had stated that she was overburdened in this role and she felt the workload was too much for one person. AAA could only devote one employee to the job. As a way to accommodate Krizman, AAA offered her the option of moving into another role within the organization. The email outlined three choices: she could stay in her current role and perform all associated tasks; she could transfer to a different position, which had an accompanied $ 300 pay decrease; or if those options were not satisfactory, she could resign and AAA would provide her with a severance. (Krizman Dep. 104-05; Def. Mem. Ex. M Cite). The options presented in the email sent to Krizman are not analogous to a threat of termination or suggestion to resign.

Krizman may have believed she was being **[*23]** encouraged to resign, however an employee's subjective perceptions do not govern constructive discharge claims. See *Jones, 19 F. Supp. 2d at 419*. Objectively, nothing about her position or the options presented to her would lead a reasonable person to think that their only alternative was to resign. Quite the contrary, Ms. Reese and Mr. Conley seem to have shown a willingness to help her improve in her job or find a position suitable for her needs. They found a less rigorous position for her and worked to maintain her salary at the level it was as best they could within the pay ranges. (Conley Dep. 71-74). This Court can infer that AAA wanted to retain Krizman in a role most appropriate for her, and not pressure resignation.

The final element necessary to establish a prima facie harassment hostile work environment claim is respondeat superior liability. Because Krizman has failed to establish the preceding elements of a hostile work environment claim, discussion of this is unnecessary.

In conclusion, Krizman has failed to establish a prima facie case of hostile working environment. Failure to establish a hostile work environment precludes her from claiming that she **[*24]** was constructively discharged, which it turn precludes her ability to establish the adverse employment action necessary for the prima facie case of individual disparate treatment. Consequently, AAA is entitled to summary judgment as a matter of law on all claims. Accordingly, this Court grants AAA's Motion for Summary Judgment on all


2006 U.S. Dist. LEXIS 74647, *24

claims.

We therefore enter the following Order.

**ORDER**

**AND NOW**, this 12th day of October, 2006, upon consideration of Defendant's Motion for Summary Judgment pursuant to *Rule 56 of the F.R.C.P.* (Doc. Nos. 8, 9) and Plaintiff's response thereto, it is hereby **ORDERED** that Defendant's **MOTION** on all claims is **GRANTED**.

BY THE COURT:

/s/ Robert F. Kelly, Sr. J.

LEXSEE 2006 US DIST. LEXIS 43996

**FRANCES LIGNORE, Plaintiff, v. HOSPITAL UNIVERSITY OF PENNSYLVANIA, Defendant.**

**CIVIL ACTION NO. 04-5735**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2006 U.S. Dist. LEXIS 43996*

**June 27, 2006, Decided**
**June 28, 2006, Filed; June 28, 2006, Entered**

**COUNSEL:** **[*1]** FRANCES LIGNORE, Plaintiff, Pro se, NORWOOD, PA.

For HOSP UNIV OF PENN, Defendant: GENE M. LINKMEYER, JACOBS LAW GROUP, PC, PHILADELPHIA, PA; NEIL J. HAMBURG, HAMBURG & GOLDEN PC, PHILADELPHIA, PA.

**JUDGES:** Gene E.K. Pratter, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Gene E.K. Pratter

**OPINION:**

**MEMORANDUM AND ORDER**

Gene E.K. Pratter, J.

June 27, 2006

Pro se Plaintiff Frances Jean Lignore seeks redress for incidents that allegedly occurred while she was employed by the Hospital of the University of Pennsylvania ("HUP"). Based on Ms. Lignore's sparse complaint, n1 testimony during her deposition, and portions of the Philadelphia Commission on Human Relations ("PCHR") record, HUP identified three state law claims made by Ms. Lignore and moves for dismissal of each of those claims in the motion for partial summary judgment that is now before the Court, along with Ms. Lignore's response. n2

n1 While neither party has challenged this Court's subject matter jurisdiction, the Court notes that because Ms. Lignore's claims involving gender discrimination and overtime compensation can be interpreted to involve questions of federal law under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.* and the Fair Labor Standards Act of 1938, *29 U.S.C. § 201 et seq.*, this Court has federal question subject matter jurisdiction under *28 U.S.C. § 1331* as well as supplemental jurisdiction over her state claims pursuant to *28 U.S.C. § 1367*.

[*2]

n2 HUP seeks only partial summary judgment at this time. Thus, the Court does not address Ms. Lignore's allegations concerning federal claims.

The three state law claims addressed in the HUP motion derive from Ms. Lignore's allegations of HUP's denial of overtime wages, unlawful retaliation, and sexual discrimination. While Ms. Lignore has labored to describe offensive, inappropriate, and unprofessional behavior, even taking the allegations of the conduct she describes as true, n3 as a matter of law HUP's motion must be granted.

n3 HUP does not concede that the alleged actions actually occurred.

# I. FACTUAL BACKGROUND

The Court has reviewed the evidence provided by the parties. HUP's evidence primarily consists of a deposition of the Plaintiff, portions of the PCHR record, portions of the Equal Employment Opportunity Commission (EEOC) record, various letters concerning the claims in this case and the marriage [*3] certificate of Ms. Lignore's alleged antagonist, Ms. Bogacki. n4 Ms. Lignore attached to her bare-bones letter response opposing summary judgment a performance review, letters of recommendation ostensibly written by HUP employees, as well as several other letters and notes which are of little or no relevance to this case. Ms. Lignore also took a deposition of Ms. Robin Hartigan, a current HUP employee. n5

n4 The Court notes that in light of Ms. Lignore's pro se status it has declined to consider HUP's contention based on the PCHR and EEOC file as well as references in the employment termination letter that Ms. Lignore was fired for allegedly making threatening comments about Ms. Bogacki. Admissibility of this evidence is at least questionable, see, e.g., *Cambra v. The Restaurant School, No. 04-2688, 2005 U.S. Dist. LEXIS 26231 (E.D. Pa. Nov. 1, 2005)*, and a plaintiff represented by counsel may well have sought to strike at least some of this evidence from the record at the summary judgment stage. The fact that one litigant is proceeding without counsel behooves opposing counsel to be especially reserved in handling the record, lest anyone get the impression that the pro se status operated to fundamentally change the outcome of the case.

[*4]

n5 This case reflects the many challenges that civil litigation conducted by a pro se litigant -- especially litigation concerning emotional personal experiences -- present to the litigant herself or himself, to the opposing party, and to the Court. Numerous efforts to facilitate Plaintiff's retention of counsel proved unsuccessful, as have efforts to persuade Plaintiff to accept and follow the obligation to employ more conventional procedures for conducting the litigation. Her use of a letter asserting the justness of her claims but without citation to pleadings or admissible evidence to oppose the subject motion is an example. Nonetheless, the Court has endeavored to extend to Plaintiff every arguably available indulgence so that her pro se status will not be a debilitating impediment to a full and fair evaluation of her rights and obligations. Thus, the Court did not impose upon Ms. Lignore the obligations imposed upon counsel with respect to the proper form for opposing summary judgment motions. However, leniency extended to pro se litigants is not limitless, and neither the Court nor the opponent is obliged to tailor claims from whole cloth for a pro se plaintiff or to cast aside all procedural rules or substantive caselaw.

[*5]

Ms. Lignore began employment with the Trustees of the University of Pennsylvania at the Hospital, on June 23, 1999. She worked as an Administrative Assistant in HUP's Department of Neurosurgery. Mary Ellen Bogacki was Ms. Lignore's supervisor at HUP. Ms. Lignore's employment was terminated effective July 1, 2002. Following her termination, she filed a charge with the PCHR/EEOC on August 28, 2002. The PCHR conducted an investigation which the EEOC subsequently reviewed. In the spring of 2003 Ms. Lignore signed a Release settling any claims against HUP for overtime wages. By the fall of 2004, the PCHR had completed its investigation and the EEOC had concluded its review of the PCHR findings. Ms. Lignore then contacted her Congressmen who in turn inquired with the EEOC about the claim. Ms. Lignore next filed her complaint in this Court on December 13, 2004.

As far as is pertinent to the pending motion, Ms. Lignore alleges in her complaint (1) that Ms. Bogacki slid her finger under Ms. Lignore's right shoulder bra strap and insisted that Ms. Lignore step into her office so Ms. Bogacki could hide the strap by bobby-pinning it to her dress; (2) that Ms. Bogacki elbowed Plaintiff in the [*6] chest while leering at her; (3) that Ms. Bogacki repeatedly asked Plaintiff questions about her personal life and asked whether her 13 year old daughter dated and commented that Plaintiff would be lucky if her daughter

were gay; (4) that Ms. Bogacki asked Plaintiff to go to a gay bar; and (5) that she asked Ms. Lignore if she was homophobic. n6 Similar allegations arise elsewhere in the record. In her letter response to HUP's motion, as well as in her deposition, Ms. Lignore also claimed that Ms. Bogacki told her that "all thirteen year old girls consider sucking dick, kissing" and that "[m]aybe I will be lucky and my daughter will be a lesbian." At her deposition, Ms. Lignore further asserted that she was discriminated against because she was heterosexual, and she "wasn't playing [Ms. Bogacki's] game." Ms. Lignore stated that Ms. Bogacki "just had it out for me because she knew that I - I totally made it clear that I did not want to be bothered with her." The PCHR file contains the same allegations as well as accusations of Ms. Bocagcki "[s]tanding very close to the Complainant and brushing against her buttocks, hips or breasts." The harassment questionnaire in the PCHR file **[*7]** filled out by Ms. Lignore included the allegations that Ms. Bogacki was "constantly touching my arm or accidentally brushing up against my body."

> n6 The dates of these alleged occurrences is difficult to glean from the record. The complaint itself includes the date "5/02" at the beginning of the paragraph describing the bra strap incident. Details of the allegations that Ms. Lignore attached to the complaint state that the comments made about Ms. Lignore's daughter also occurred in May, 2002. The same attachments indicate that the question about being homophobic occurred in June, 1999 and that harassment about taking sick leave occurred in June, 2001. However, the information in the PCHR questionnaire indicates that the bra strap incident took place in June, 2001 and the PCHR "Statement of Particulars" simply states that the alleged sexual harassment began in 1999. Predictably, HUP argues that several of these allegations are time barred. See note 15, infra.

Ms. Lignore also testified at her deposition **[*8]** that Ms. Bogacki "was deliberately cheating me out of my overtime" by not allowing her to take lunch. Answering a question on her harassment questionnaire regarding whether her employment status was in any way threatened for not going along with the harassment, Ms. Lignore referred to the lack of overtime pay and Ms.

Bogacki's harassing her about a doctor's note after Ms. Lignore claimed sick leave while Ms. Bogacki reportedly insisted that she take family medical leave instead of sick time. The PCHR file also describes Ms. Lignore's charge to the Commission as including accusations of retaliation by Ms. Bogacki for Ms. Lignore's attempt to avoid further alleged harassment. The allegations of retaliatory actions include an increased work load, having to deal with more difficult patients, Ms. Bogacki "trashing" the Plaintiff's desk, Ms. Bogacki giving Ms. Lignore a late evaluation, and Ms. Bogacki calling Ms. Lignore to attend long meetings just before quitting time.

In Ms. Lignore's letter response to HUP's motion she again explained her allegations, but she failed to reference any legal authority at all, or respond to HUP's motion in any substantive way. Ms. Lignore had, however, **[*9]** deposed Ms. Robin Hartigan, a HUP employee, who claims also to have also filed a sexual harassment complaint against Ms. Bogacki. Ms. Hartigan testified that Ms. Bogacki made sexual remarks to her that she found extremely offensive and that Ms. Bogacki touched her shoulders at times and touched the tags on her clothing, but "never touched [her] in any sexual areas of [her] body." Additionally, Ms. Hartigan stated that Ms. Bogacki would continually stare at her breasts and that she felt that after she complained about the offensive behavior, "there [was] retaliation going on," although she did not specify what type of retaliation occurred. n7 Ms. Lignore presented no other factual response to the Motion, and submitted no legal arguments, leaving the Court with essentially only Plaintiff's pleading, her recitation of her experiences and her view that she has a meritorious claim.

> n7 The alleged remarks included Ms. Bogacki asking Ms. Hartigan if she "spread them for every guy" she goes out with, and upon observing a doctor enter his office in a "grumpy" mood, Ms. Bogacki allegedly suggested that Ms. Hartigan "go take care of him" and proceeded to gyrate her hips. Although Ms. Lignore may believe the Hartigan episodes have some role to play in this litigation and the reference to them in this Memorandum is reluctantly included so that Ms. Lignore will not erroneously conclude that the Court was unaware of her discovery activities, this Hartigan deposition and a letter attached to Ms. Lignore's response also from Ms. Hartigan,

are not relevant to this case and present other evidentiary failings. Ms. Hartigan began working at HUP in February, 2003, well after Ms. Lignore had already been dismissed. Ms. Lignore's attempted reliance on this "evidence" is, however, an example of this pro se litigant's insufficient understanding of legal requirements. Presumably expecting the Court to recognize the inappropriateness of the Hartigan "evidence," HUP declined to address this deposition testimony in its motion.

**[*10]**

## II. DISCUSSION

### A. Legal Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *FED. R. CIV. P. 56(c)*. An issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. A factual dispute is 'material' if it might affect the outcome of the case under governing law. Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing **[*11]** out to the district court that there is an absence of evidence to support the non-moving party's case." *Id. at 325*. After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *FED. R. CIV. P. 56(e)*. Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, 477 U.S. at 322*. Under *Rule 56*, the Court

must view the evidence presented in the motion in the light most favorable to the opposing party. *Anderson, 477 U.S. at 255*.

"Due to an understandable difference in legal sophistication, a complaint drafted by a pro se litigant must be held to a less exacting standard than a complaint drafted by trained counsel." *Lopez v. Brown, 2005 U.S. Dist. LEXIS 26715, *6 (D.N.J. Nov. 4, 2005)* (citing *Haines v. Kerner, 404 U.S. 519, 520-21, 92 S. Ct. 594, 30 L. Ed. 2d 652 (1972)*. **[*12]** However, "while pro se complaints are entitled to liberal construction, the plaintiff must still set forth facts sufficient to survive summary judgment." *Ezeiruaku v. United States, 2000 U.S. Dist. LEXIS 17046, *10 (E.D. Pa. Nov. 29, 2000)* (citing *Shabazz v. Odum, 591 F. Supp. 1513 (M.D. Pa. 1984))*.

### B. Overtime Wages

HUP states in its motion that Ms. Lignore's first state claim is that "she was denied overtime wages while employed by Defendant The Trustees of the University of Pennsylvania." Based on unchallenged documentary evidence and supporting caselaw, HUP has shown that there is no genuine dispute concerning whether Ms. Lignore has settled all disputes concerning overtime wages.

HUP contends that Ms. Lignore's claim concerning overtime wages was settled when she received $ 1,329.86 of allegedly unpaid overtime wages and Ms. Lignore agreed to release other related claims in a document dated May 19, 2003. The Release letter itself, which Ms. Lignore admits she signed, states:

> Your return to me of the signed duplicate of this letter will mean that in return for $ 1329.86 (gross amount) you [Ms. Lignore] will voluntarily agree **[*13]** to give up any claims you might have against the University for overtime pay, including but not limited to, any claims under the Pennsylvania Wage and Hour Law, the Pennsylvania Wage Payment and Collection Law, and the Fair Labor Standards Act. Signing this letter also means that you acknowledge that apart from the overtime or other wages which we have agreed to pay you, there is no additional overtime or other wages that

Case 1:04-cv-00970-JJF     Document 101-4     Filed 01/16/2007     Page 78 of 181

Page 5
2006 U.S. Dist. LEXIS 43996, *13

you     worked     without     appropriate
compensation.

HUP correctly points out that in Pennsylvania "[a] signed release is binding upon the parties unless executed and procured by fraud, duress, accident or mutual mistake." *Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d 885, 892 (3d Cir. 1975)* (citing *Kent v. Fair, 392 Pa. 272, 140 A.2d 445 (Pa.1958)*). "The natural and ordinary meaning of the language of the release demonstrates the intention of the parties and will prevail unless one of the parties unequivocally proves that the release is invalid." *Reed v. SmithKline Beckman Corp., 569 F. Supp. 672, 674 (E.D. Pa. 1983)* (citing *Sears, Roebuck & Co. v. Jardel Co., 421 F.2d 1048, 1051 (3d Cir.1970)).* **[*14]**

Therefore, as HUP has argued, if Ms. Lignore is held to the Release she cannot "subsequently seek both the benefit of the settlement and the opportunity to continue to press the claims [s]he agreed to settle." *Melendez v. Horizon Cellular Telephone Co., 841 F. Supp. 687, 691 (E.D. Pa. 1994)* (quoting *Kirby v. Dole, 736 F.2d 661, 664 (11th Cir. 1984)*). Courts have rejected the idea that "an aggrieved employee who freely settles his or her unliquidated demand with the employer . . . may reciprocate by suing the same defendant at a later date on the same cause of action, merely because the employee grows dissatisfied with the payment for which he or she settled." *Kirby, 736 F.2d at 664* (quoting *Strozier v. General Motors Corp., 635 F.2d 424, 426 (5th Cir. 1981)*).

Even though her response to this aspect of HUP's motion is interpreted generously, Ms. Lignore failed to address this argument in any substantive fashion. Her response only re-states the allegations that "[Ms. Bogacki] falsified my timesheets, cheating me out of overtime pay." At her deposition Ms. Lignore testified that she still had not been paid for **[*15]** all of her missed lunch periods (which HUP has reasonably interpreted as an overtime claim here) because Ms. Bogacki would not allow her to write "no lunch" on her time sheets. However, inasmuch as Ms. Lignore has failed to present any evidence at all to cast doubt on the validity of the Release, HUP's motion will be granted concerning Ms. Lignore's claim for overtime wages.

**C. Sexual Harassment** n8

n8 In its motion, HUP referred to federal discrimination case law based on the correct assessment that the state and local statutes and ordinances are governed by the same standards as the federal law. *Joseph v. Continental Airlines, 126 F. Supp. 2d 373, 376 (E.D. Pa. 2000)*; see also *Lepore v. LanVision Sys., 113 Fed. Appx. 449, 452 (3d Cir. Oct. 19, 2004)* (citing *Gomez v. Allegheny Health Servs., 71 F.3d 1079, 1083-84 (3d Cir. 1995)* ("Claims arising under the [Pennsylvania Human Relations Act, *43 Pa Const. Stat. § 951 et seq.*] are governed by the same legal standard as that applied to Title VII [of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.*]."))

**[*16]**

### 1. Retaliation

HUP states in its motion that Ms. Lignore's second state claim "alleges that the University's decision to discharge her . . . in July 2002 was unlawful retaliation." HUP has accurately concluded based on the record and applicable caselaw that "there can be no illegal retaliation here because Plaintiff only raised issues of sexual discrimination and filed with the PCHR/EEOC **after** the University discharged her . . . . "

As HUP has argued, "to advance a prima facie case of retaliation, a plaintiff must show that: (1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action *after or contemporaneous with* the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." *Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000)* (emphasis added).

HUP also points out that in *Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997)*, a case involving allegations of sexual harassment, the court stated that the facts showed that "much of what [Plaintiff] characterizes as retaliation for **[*17]** her EEOC complaint is in fact alleged to have occurred before she filed the complaint." *Id. at 1301*. Accordingly, the court of appeals affirmed the district court's grant of judgment as a matter of law on the retaliation claims. *Id. at 1304*.

Here, Ms. Lignore stated in her deposition that she never reported any of the alleged discriminatory conduct

to the EEOC or any state or local agency or official until after she was discharged. She was fired on July 1, 2002, and she filed her charge with the PCHR on August 28, 2002. Again, even giving her response to HUP's motion the most lax interpretation, Ms. Lignore has completely failed to mount any substantive counter argument. Concerning retaliation, Ms. Lignore stated in her response to the HUP motion that "[Ms. Bogacki] finally retaliated and had her Business Administrator, Peter Dolhancryk fire me after I returned from my vacation." She also explained in her deposition that she thought it would be "silly" to go to human resources because Ms. Bogacki was talking to an individual in human resources "about how to terminate me." These allegations notwithstanding, HUP has correctly identified that all [*18] of the alleged discrimination and allegedly retaliatory events happened before Ms. Lignore verbalized, much less filed, her complaint. Therefore, Ms. Lignore cannot establish a causal connection between her charges and the allegedly retaliatory conduct. Thus, the Court will dismiss all state claims of retaliation stated in any of Plaintiff's pleadings.

### 2. Quid Pro Quo Sexual Harassment

In addressing the sexual harassment claim, HUP also argues that additional allegations found in an attachment to the complaint n9 concerning actions taken by Ms. Bogacki should be dismissed because they are not based on Ms. Lignore's gender, and because Plaintiff has failed to allege that the male staff was treated any differently. The PCHR record n10 also includes similar allegations to these claims referenced by HUP, but the PCHR record describes them as "retaliation." These allegations termed as retaliation in the PCHR record include the deprivation of overtime pay, harassment for taking sick leave, an increased work load, having to deal with more difficult patients, "trashing" the Plaintiff's desk, giving Ms. Lignore a late evaluation, and calling Ms. Lignore to long meetings just before quitting [*19] time. Furthermore, Ms. Lignore alleges in her response to HUP's motion, and without any evidentiary support, that Ms. Bogacki "filed a false police report that I would kill her or have someone kill her." The record contains no copy of any such report -- false or otherwise. For the present purposes the Court notes that such allegations of harassment conceivably could constitute a "quid pro quo" sexual harassment claim, and so the Court will discuss these allegations in that context.

n9 Again indicative of Ms. Lignore's lack of legal counsel, she attached to her complaint correspondence she sent to a lawyer, apparently as part of an effort to secure counsel for this case. While the letter is arguably a privileged communication, HUP has made reference to it at least insofar as it helps to comprehend the possible claims Ms. Lignore believes she has. The Court will permit consideration of this document only as an aid in that effort.

n10 See note 4, supra.

A quid pro quo sexual harassment claim requires [*20] evidence of unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature and evidence that (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual. *Iyer v. Everson, 382 F. Supp. 2d 749, 758 (E.D. Pa. 2005)* (citing *Bonenberger v. Plymouth Township, 132 F.3d 20, 27 (3d Cir. 1997)*).

Thus, Ms. Lignore's various allegations of "retaliation" could be an attempt to articulate a claim based on her perception that her rejection of Ms. Bogacki's supposed advances led to these events. However, because the record is devoid of evidence other than Ms. Lignore's conjecture that rejection of Ms. Bogacki's supposed advances affected employment decisions, her sexual harassment claim fails as a quid pro quo claim as well. Thus, the Court dismisses all state law claims as may be quid pro quo sexual harassment.

### 3. Hostile Work Environment Sexual Harassment

HUP states in its motion that Ms. Lignore's third state [*21] claim is "that she suffered sexual discrimination in the form of same-sex harassment from her former married female supervisor." HUP has successfully established that the record is devoid of evidence that Ms. Lignore was discriminated against because of her sex, but even if it could be established that the alleged actions occurred because of Ms. Lignore's gender, HUP has accurately identified that the allegations of sexual harassment, if taken as true, do not amount to such severe or pervasive conduct as to be actionable.

As HUP has recognized, employment discrimination claims under Pennsylvania law follow federal standards, and to establish unlawful discrimination due to harassment under Title VII a plaintiff must show that: (1) she suffered intentional discrimination because of her race or sex; (2) the discrimination was severe or pervasive; n11 (3) the discrimination detrimentally affected the plaintiff; (4) a reasonable person would have been detrimentally affected by such discrimination; and (5) the existence of respondeat superior liability. *Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999).*

> n11 *Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir. 1999)*, uses the phrase 'pervasive and regular', but as the Third Circuit Court of Appeals has recently explained, "the Supreme Court's standard is 'severe or pervasive.'" *Jensen v. Potter, 435 F.3d 444, 449 at n. 3 (3d Cir. 2006)* (citing *Pa. State Police v. Suders, 542 U.S. 129, 133, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004).*

[*22]

To determine whether a work environment is sufficiently hostile or abusive such that it constitutes intentional sex discrimination, courts look at the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)* (citation omitted).

As an initial matter, the Supreme Court has held that "nothing in Title VII necessarily bars a claim of discrimination 'because of . . . sex' merely because the plaintiff and the defendant (or the person charged with acting on behalf of the defendant) are of the same sex." *Oncale v. Sundowner Offshore Servs., 523 U.S. 75, 79, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998).* Here the impediment is not that the conduct was undertaken by a person of the same gender as the Plaintiff, but rather the motion is meritorious because Ms. Lignore failed to present evidence -- or a dispute over evidence -- that would show that she suffered any discrimination because of her [*23] sex. Despite repeated opportunities to do so, she has not offered any evidence other than her own conclusory interpretive allegations that she was sexually

harassed and that Ms. Bogacki sexually harassed other women. n12 As HUP highlights, Ms. Lignore has also never alleged that the male staff was treated any differently than she was. Ms. Lignore also states candidly, that "I couldn't figure it out because I knew Mary Ellen was married." See *Lee v. Comhar, No. 05-1781, 2006 U.S. Dist. LEXIS 30618 at *9 (E.D. Pa. May 18, 2006)* (Plaintiff failed to prove hostile work environment sexual harassment allegations involved discrimination because of his sex when he offered only vague allegations of a co-worker's homosexuality, and no evidence that he was treated differently than other employees on account of his gender). HUP correctly points out that "[v]erbal and physical harassment, no matter how unpleasant and ill-willed, is simply not prohibited by Title VII if not motivated by the plaintiff's gender (or membership in other protected groups)." *Koschoff v. Henderson, 109 F. Supp. 2d 332, 346 (E.D. Pa. 2000)* (citations omitted). Ms. Lignore's allegations [*24] are simply insufficient to constitute a gender-based harassment claim.

> n12 Likewise, Ms. Lignore has failed to offer any evidence other than conjecture in support of her allegations that could be interpreted as claiming she was discriminated against on the basis of her sexual orientation. Of course, Title VII does not apply to sexual orientation discrimination. *Bibby v. Phila. Coca Cola Bottling Co., 260 F.3d 257, 261 (3d Cir. 2001).* But, as HUP points out, such discrimination is prohibited by the Fair Practices Ordinance of the Philadelphia Code. See *Devlin v. City of Philadelphia, 580 Pa. 564, 586, 862 A.2d 1234 (Pa. 2004).* Thus, HUP additionally argues that claims of discrimination based on sexual orientation are also barred for failure to exhaust administrative remedies because such claims were not made in Ms. Lignore's administrative filings. As with every legal argument put forward in HUP's motion, Ms. Lignore has again failed to respond to this point, but the Court need not address this argument due to the conclusion that Ms. Lignore has failed to offer any evidence of discrimination based on sexual orientation.

[*25]

Furthermore, these incidents of purportedly

Case 1:04-cv-00970-JJF    Document 101-4    Filed 01/16/2007    Page 81 of 181

Page 8
2006 U.S. Dist. LEXIS 43996, *25

harassing behavior directed against Ms. Lignore which Ms. Lignore (but no other witness) repeats at each opportunity but does not document otherwise, are not sufficiently severe or pervasive, an element that is also required in order for a plaintiff to state a claim under Title VII. Controlling precedent makes clear that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)* (citation omitted). While Ms. Lignore may have viewed the various alleged comments and actions as offensive or unprofessional, individually or collectively they are insufficient to create a factual issue as to whether Plaintiff was subject to a hostile work environment based on sexual harassment.

Focusing on the allegations of physical contact, while the alleged elbowing, "brushing up" n13 and slipping of Ms. Bogacki's finger under Ms. Lignore's bra strap could conceivably amount to annoying, overly familiar or informal, or even offensive behavior, "[m]ore [*26] intimate or more crude physical acts--a hand on the thigh, a kiss on the lips, a pinch of the buttocks--may be considered insufficiently abusive to be described as "severe" when they occur in isolation." *Hostetler v. Quality Dining, Inc., 218 F.3d 798, 808 (7th Cir. 2000)* (citations omitted). For example, in *Burnett v. Tyco Corp., 203 F.3d 980, 981-82 (6th Cir. 2000)*, the court held that the plaintiff failed to show harassment sufficiently severe as to constitute a hostile work environment when she alleged that the personnel manager for her employer placed a pack of cigarettes under her bra strap, remarked she "lost her cherry," and after she wore a Christmas sweater that read "Deck the Malls" the manager stated "dick the malls, dick the malls, I almost got aroused." Noting the severity of the cigarette pack incident that might constitute a battery, the court held that "under the totality of the circumstances, a single battery coupled with two merely offensive remarks over a six-month period does not create an issue of material fact as to whether the conduct alleged was sufficiently severe to create a hostile work environment." *Id. at 985.* [*27] n14

n13 While the PCHR "Statement of Particulars" describes Ms. Lignore's allegations against Ms. Bogacki to include "[s]tanding very close to plaintiff and brushing against her

buttocks, hips or breasts," Ms. Lignore, in her PCHR harassment questionnaire described Ms. Bogacki's actions as "accidentally brushing up against my body."

n14 Likewise, in the context of alleged same-sex sexual harassment, the court in *Morgan v. Massachusetts General Hosp., 901 F.2d 186, 192-193 (1st Cir. 1990)*, held that conduct was not severe or pervasive where a gay co-worker engaged in a bumping incident, stood next to plaintiff in the restroom and "peeped" at his "privates," "hung around him a lot," and asked the plaintiff to dance at a Christmas party.

Although Ms. Lignore's allegations, assumed to be true for present purposes, would amount to inappropriate and annoying conduct, under the totality of the circumstances, Ms. Bogacki's alleged actions were not so pervasive or severe so as to alter a term [*28] of Ms. Lignore's employment. As HUP has identified, the alleged five actions stated in Ms. Lignore's complaint span a period of three years of full time employment. HUP has correctly concluded that such a rate of occurrence is insufficient to be considered "pervasive" and likewise not sufficiently severe to state a claim under Title VII. See, e.g., *Bowman v. Shawnee State Univ., 220 F.3d 456 (6th Cir. 2000)* (affirming grant of summary judgment; incidents where female superior rubbed male employee's shoulders, grabbed employee's buttocks, and placed finger on employee's chest were not sufficiently severe or pervasive to create a hostile work environment); *Adusumilli v. City of Chicago, 164 F.3d 353 (7th Cir.1998)* (affirming grant of summary judgment; incidents where co-employees teased plaintiff, made sexual jokes aimed at her, repeatedly stared at her chest, and on four occasions made unwelcome contact with her arm, fingers, and buttocks were not sufficiently severe or pervasive to create a hostile work environment); *Bacone v. Phila. Hous. Auth., No. 01-419, 2003 U.S. Dist. LEXIS 8818, *14 (E.D. Pa. May 7, 2003)* ("one incident [*29] of offensive touching and one incident where [co-worker] briefly exposed herself to [Plaintiff] were reprehensible, they were not severe so as to alter a term of his employment."); *Saidu-Kamara v. Parkway Corp., 155 F. Supp. 2d 436, 438 (E.D. Pa. 2001)* (granting summary judgment where defendant asked plaintiff out on dates on several occasions, directed sexual innuendo toward her, and, at least one time, touched her breasts and buttocks);

*Bonora v. UGI Utilities, Inc.*, No. 99-5539, 2000 U.S. Dist. LEXIS 15172, *11 (E.D. Pa. Oct. 18, 2000) (granting summary judgment where defendant touched plaintiff's waist on one occasion; brushed his buttocks against hers on two to four occasions; and looked at her chest during a meeting on one occasion).

Employment discrimination law does not provide a remedy for every unsavory interaction occurring in the course of one's employment. Therefore, while Ms. Lignore may not be alone in seeing the reported conduct as distasteful, vulgar, and unprofessional, the behavior alleged by Ms. Lignore on the part of Ms. Bogacki does not amount to hostile work environment sexual harassment. n15 Therefore, the Court dismisses **[*30]** all state law claims related to hostile work environment sexual harassment.

n15 HUP also claims that Ms. Lignore's complaint includes allegations of actions that occurred in June of 1999, and that because her PCHR charge was not filed until over 300 days later on August 28, 2002, those particular claims cannot be the basis of the her claim. See *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 109-110, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002). While Ms. Lignore does indicate in her harassment questionnaire and her attachment to the complaint, that certain alleged actions took place more than 300 days prior to filing her PCHR claim, her complaint could be generously interpreted as identifying events that took place over a more ambiguous time period. See note 6, supra. Notwithstanding such latitude concerning the issue of timeliness, as stated above, even when taken as true and not time barred, Ms. Lignore's allegations fail as a matter of law.

## III. CONCLUSION

For the reasons discussed above, the **[*31]** Court grants the Defendant's motion for partial summary judgment. An appropriate Order consistent with this Memorandum follows.

BY THE COURT:

S/ Gene E.K. Pratter

UNITED STATES DISTRICT JUDGE

### ORDER

Gene E.K. Pratter, J.

AND NOW, this 27th day of June, 2006, upon consideration of Defendant's Motion for Partial Summary Judgment (Docket No. 17), and the response thereto (Docket No. 18), it is hereby ORDERED that Defendant's Motion is GRANTED.

IT IS FURTHER ORDERED that judgment is entered in the Defendant's favor and against Plaintiff on all state law claims involving payment of overtime wages, unlawful retaliation, and sexual harassment.

The parties shall submit to the Court, in writing, their respective assessment as to what claims remain to be resolved in this case and the date by which they will be ready to try this case.

BY THE COURT:

S/ Gene E.K. Pratter

UNITED STATES DISTRICT JUDGE

FOCUS - 38 of 74 DOCUMENTS

**LISA MACKIE n/k/a LISA SWALLEY, Plaintiff, vs. U.S. MANUFACTURING, INC., and GLOBAL RESOURCES RECOVERY ORGANIZATION, INC., Defendants.**

**No. C03-85-LRR**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF IOWA, CEDAR RAPIDS DIVISION**

*2005 U.S. Dist. LEXIS 17301*

**June 29, 2005, Decided**

**NOTICE:** [*1] NOT FOR PUBLICATION

**PRIOR HISTORY:** *Mackie v. United States Mfg., 219 F.R.D. 639, 2004 U.S. Dist. LEXIS 494 (N.D. Iowa, 2004)*

**COUNSEL:** For Lisa Mackie, now known as Lisa Swalley, Plaintiff: Glenn L Johnson, Patricia L Hoffman-Simanek, Shuttleworth & Ingersoll, Cedar Rapids, IA.

For U.S. Manufacturing, Inc, Defendant: Mark D Sherinian, Sherinian & Walker, PC, West Des Moines, IA; Sharon K Malheiro, Davis Brown Koehn Shors & Roberts, Des Moines, IA.

For Global Resources Recovery Organization, Inc., Defendant: Mark D Sherinian, Sherinian & Walker, PC, West Des Moines, IA; Sharon K Malheiro, Davis Brown Koehn Shors & Roberts, Des Moines, IA.

**JUDGES:** LINDA R. READE, JUDGE.

**OPINION BY:** LINDA R. READE

**OPINION:**

**ORDER**

**TABLE OF CONTENTS**

I.    INTRODUCTION    AND    PROCEDURAL BACKGROUND

II. FACTUAL BACKGROUND

III. LEGAL ANALYSIS

    A. Sex Discrimination
    B. **Hostile** Work Environment
    C. Assault and Battery
    D. Retaliation

IV. CONCLUSION

*I.    INTRODUCTION    AND    PROCEDURAL BACKGROUND*

The matter before the court is Defendants' Motion for Summary Judgment (docket no. 51). The motion is resisted.

On July 7, 2003, Plaintiff Lisa Mackie n/k/a/ Lisa Swalley ("Swalley") filed a Complaint against Defendants U.S. Manufacturing, Inc. ("USM"), Global Resources Recovery Organization, [*2] Inc. ("Global Resources"), Larry Schacterle ("Schacterle"), and Troy Grover ("Grover"). Swalley invokes this court's jurisdiction pursuant to *28 U.S.C. § 1331*, on the basis this lawsuit raises a federal question. As authority, Swalley relies on Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. §§ 2000e et seq.* Swalley also invokes this court's supplemental jurisdiction pursuant to *28 U.S.C. § 1367(a)* over her state law claims.

Swalley's Complaint alleges four counts. Count I alleges USM, Global Resources, Grover and Schacterle

discriminated against her on the basis of her sex and sexually harassed her by creating a **hostile** work environment in violation of Title VII. Count II alleges USM, Global Resources, Grover and Schacterle discriminated against her on the basis of her sex and sexually harassed her by creating a **hostile** work environment in violation of the *Iowa Civil Rights Act* ("ICRA"). Count III alleges Grover committed assault when he attempted to kiss Swalley. Count IV alleges Schacterle committed battery when he approached Swalley from behind and put his hands on her waist without **[*3]** her permission.

On August 15, 2003, USM and Global Resources filed an Answer to Swalley's Complaint. On October 1, 2003, Schacterle filed an Answer to Swalley's Complaint. On October 10, 2003, Grover filed an Answer to Swalley's Complaint. n1 Also on October 10, 2003, Grover filed a motion to dismiss Count I against him because he cannot be held personally liable under Title VII.

> n1 On September 19, 2003, Swalley moved the court to enter a default judgment against Grover. On October 1, 2003, the Clerk of Court entered default as to Grover. On October 2, 2003, the court held the motion for default judgment in abeyance pending disposition of the case against the remaining defendants. On October 10, 2003, Grover appeared through counsel and moved to set aside the entry of default. On January 9, 2004, the court granted Grover's motion to set aside his default.

On January 29, 2004, Swalley filed an Amended and Substituted Complaint (the "Amended Complaint"). The Amended Complaint realleges Counts I through IV of **[*4]** the Complaint and added two Counts: (1) Count V alleges USM, Global Resources, Grover and Schacterle violated Title VII by retaliating against her after she reported the alleged discrimination based on her sex and the allegedly **hostile** work environment; and (2) Count VI alleges USM, Global Resources, Grover and Schacterle violated ICRA by retaliating against her after she reported the alleged discrimination based on her sex and the allegedly **hostile** work environment.

On March 15, 2004, USM and Global Resources filed an Answer to Swalley's Amended Complaint. On

March 16, 2004, the court granted Grover's motion to dismiss Count I against him. On March 25, 2004, Grover filed an Answer to Swalley's Amended Complaint.

On June 24, 2004, Swalley and Grover filed a stipulation of dismissal in which Swalley dismissed with prejudice all claims against Grover. On June 25, 2004, Swalley and Schacterle filed a stipulation of dismissal in which Swalley dismissed with prejudice all claims against Schacterle. Therefore, the only remaining defendants are USM and Global Resources ("Defendants").

On December 20, 2004, Defendants filed the pending Motion for Summary Judgment. On February 14, 2005, Swalley **[*5]** resisted such Motion. On March 21, 2005, Defendants filed a reply. n2

> n2 On March 31, 2005, the court denied Swalley's motion to file a surreply.

On June 29, 2005, the court held a telephonic hearing on the Motion for Summary Judgment. Attorneys Tricia Hoffman-Simanek and Glenn Johnson appeared on Swalley's behalf. Attorney Sharon Malheiro appeared on behalf of USM. Mark Sherinian appeared on behalf of Global Resources. At the end of the hearing, the court indicated this written ruling would follow.

## II. FACTUAL BACKGROUND n3

> n3 The factual background is comprised of the parties' undisputed material facts. Where the facts are disputed, the court sets forth each party's allegations.

On or about June 3, 2002, Swalley began working for USM as the Director of Strategic Planning/Development. n4 Swalley was responsible for team building **[*6]** issues for USM. Loran R. Balvanz is the President of USM. William DeJong, USM's CEO, was Swalley's immediate supervisor. Swalley was part of a management team which included Schacterle; Swalley and Schacterle hold equally high positions within USM. Grover performed work at USM. The parties dispute whether Grover was an employee of USM or an independent contractor. Swalley asserts Grover was USM's employee; Defendants contend Grover was

merely an independent contractor. Other relevant employees of USM include Larry Pemberton, a shop floor worker at USM, Paul Gray, a member of management at USM, and Steve Pickens, the shop floor manager supervisor. None of Pemberton, Gray and Pickens holds a supervisory role over Swalley.

> n4 Swalley maintains she also worked for Global Resources, which she alleges is USM's sister company. Defendants contend Swalley never worked for Global Resources.

Swalley contends she began to experience difficulties in the workplace in August 2002. n5 Grover asked Swalley what type of **underwear [*7]** she was wearing. Swalley contends Grover asked her on at least five occasions what type of **underwear** she was wearing and asked her on a number of occasions if she was wearing a pair of thong **underwear;** Defendants contend Grover asked Swalley only once what type of **underwear** she was wearing - whether she was wearing a thong pair of **underwear.** Grover told Swalley he could see the outline of her body when the sun would shine on her dress. Swalley contends Grover commented about the name of her then-boyfriend, Kevin Swalley, and asked, "Kevin Swalley, is that like swallow, does that mean that you swallow?" Swalley further asserts DeJong was present when Grover made the comment linking Kevin's name with the word "swallow." Defendants deny such statement was ever made and, if it was, Defendants contend DeJong did not take any action following the statement because he believed Swalley was not offended by comments like this. Defendants maintain DeJong believed Swalley found them to be somewhat funny and acceptable and was not informed otherwise by Swalley. Swalley asserts Grover asked her whether the "HQN" on her license plate stood for "highly qualified nymph." Defendants contend Grover does [*8] not recall making such a statement. Swalley alleges Grover made belittling comments, such as referring to Swalley as "Bill's personal assistant," calling her "just a secretary," and making disparaging "blonde" comments to Swalley in front of other employees. Swalley contends DeJong was present and did nothing when Grover belittled her except to direct Swalley to tell Grover to "knock it off." Defendants contend Grover does not recall making such comments. Swalley contends Grover told her that "your ass looks nice in those pants" and said "ooh" beforehand.

Defendants assert Grover does not recall making such a statement. Swalley contends that in late August 2002, she complained to DeJong about Grover's **underwear** comments, comments about her backside, and the sundress comment. Swalley further asserts she told DeJong the comments were inappropriate and made her feel uncomfortable. Swalley maintains DeJong did nothing in response to her complaints but to state, "Troy was acting like an idiot." Defendants contend Swalley did not complain to DeJong about the comments until October 9, 2002. In late August 2002, Grover tried to kiss Swalley once, but she told him she was not interested and **[*9]** he never tried to kiss her again.

> n5 Unless otherwise indicated, the record is unclear as to what date the alleged comments or actions occurred.

Also in August 2002, Pemberton left a note on Swalley's desk that said, "Lisa, I need to see you, come see me as soon as possible." When Swalley found the note, she spoke to Pemberton, who told her a rumor was circulating that she and Grover were having an affair and her job was in jeopardy as a result. The parties dispute whether the alleged affair would or only might result in Swalley's termination from USM. Swalley maintains Pemberton told her the alleged affair would result in her termination; Defendants contend Pemberton said the alleged affair might result in her termination. Swalley did not think the note was urgent or appropriate. Subsequently, Swalley spoke to DeJong and Balvanz about Pemberton's note and remarks. Swalley received their assurance they were pleased with her work and her job was not in jeopardy. As a result of the incident, Swalley was not allowed **[*10]** on the manufacturing floor of the plant. It is undisputed Swalley did not work on the manufacturing floor. The parties do, however, dispute whether Swalley had other legitimate reasons for passing through the manufacturing floor. Swalley contends she needed to go onto the manufacturing floor for the following reasons: (1) to work with Pickens regarding the safety area of the shop in an effort to update the company's safety program; (2) to help Gray with inventory; (3) to reach the break room that had soda and vending machines; (4) to restock the soda and vending machines in the break room once a week; and (5) to access a storage room for toiletries. Defendants contend that while Swalley may have wished to go onto the

manufacturing floor to get to the break room for soda or to a storage room for toilet paper, her job did not require her to do so and it was merely for her convenience.

Swalley alleges that in September 2002 she informed DeJong she was uncomfortable working with Grover in a one-on-one situation. Defendants contend the first time Swalley informed anyone in management, including Balvanz, DeJong, and her Human Resources Representative, about being uncomfortable or allegedly [*11] harassed at work was on October 9, 2002.

Swalley asserts that on October 7, 2002, Schacterle came up from behind her in a copy room and put his hands around her waist; Defendants deny the incident occurred. Swalley asserts she told DeJong about the incident shortly afterward and DeJong did nothing except to inform Swalley to tell Schacterle to "knock it off" if his actions made her uncomfortable. Defendants contend Swalley did not inform anyone in management, including Balvanz, DeJong and her Human Resources Representative, about her belief that she was the object of harassment or discrimination until October 9, 2002.

On October 8, 2002, Swalley was in a management meeting with DeJong and Grover. Swalley contends that during the meeting Grover stated, "I know how you can increase sales. You can go to our customer and say, 'I'll show you this breast if you buy this much product and I'll show you both breasts if you buy this much product.'" Defendants deny the exact quote alleged by Swalley but admit Grover made a statement that he knew how the team could increase sales and motioned at his chest. DeJong did not reprimand Grover following the comment. Defendants contend Swalley did [*12] not express any concerns about the comment to DeJong either during the meeting or later in the day and DeJong did not think Swalley was offended by the comment. After Grover's conduct at the meeting, DeJong intended to speak with Grover about his actions and comments but he never did so. It was possible for DeJong to summon Grover immediately at the end of the meeting to talk to him about his actions, but he did not do so. Defendants allege DeJong did not speak with Grover because he got caught up in other events.

On October 9, 2002, Schacterle made a statement to Swalley regarding whether she was wearing crotchless pantyhose. Swalley contends the conversation went thus: when Swalley exited the restroom, Grover, Schacterle and Pickens were standing in a semi-circle. Schacterle

called Swalley over to the group and, when she arrived, he indicated the men had been talking about her. Schacterle revealed a statement Grover apparently made earlier akin to "We've been thinking about you all day. We just have to know, are those crotchless pantyhose you have on?" Swalley responded by calling the men "pigs" and walked away. Grover then stated, "she's a bitch." Defendants deny that Schacterle [*13] made the exact comment alleged by Swalley but admit Schacterle made a statement to Swalley that Grover had told him she was wearing crotchless pantyhose. Defendants admit Grover said Swalley was a "bitch" but contend he muttered it as she walked away so the comment was probably not loud enough for her to hear. Subsequently, Swalley informed DeJong about the incident. Swalley contends DeJong stated, "Frankly, Lisa, I don't know how you've put up with it as long as you have." Swalley further alleges she told DeJong that the company needed to implement sexual harassment training, to which DeJong responded, "Those guys don't need sexual harassment training; they know the difference between right and wrong." Defendants deny DeJong made such statements to Swalley. Defendants assert DeJong informed Swalley that he would immediately investigate her complaint. DeJong told Swalley he would speak to Grover and Schacterle about their actions. Swalley contends DeJong did not guarantee her the environment would be safe and free from inappropriate conduct. DeJong suggested Swalley take the rest of the day off. DeJong then called Schacterle and Grover into his office and spoke to them about the incident [*14] outside the restroom. DeJong asked them to provide written documentation regarding what had occurred. DeJong spoke with Balvanz about the incident.

On October 10, 2002, Swalley returned to work. That morning, DeJong and Swalley had a meeting about the alleged harassment and Swalley told DeJong she was concerned about returning to work. DeJong asked Swalley what USM could do to enable her to continue working at USM. Swalley told DeJong that Grover's conduct on October 7, 2002, when he suggested using cleavage to increase sales, bothered her. Swalley stated she found one or more of Grover's comments during her employment unacceptable. DeJong offered to terminate Grover and Schacterle so Swalley would continue working at USM. At that time, Swalley did not terminate her position with USM but, at DeJong's suggestion, she decided to take the rest of the week off. DeJong told Swalley she would be paid for her time away from work.

On October 11, 2002, Balvanz called Swalley at home. Swalley contends that during the phone call, Balvanz instructed her to return to work on October 14, 2002; Defendants assert Balvanz merely suggested and encouraged her to return to work on that date. During [*15] the same conversation, Balvanz told Swalley, "someone once told me that the reason men wear ties around their necks is because they would look too stupid with them around their penis[es]." Swalley contends Balvanz also said "men are stupid, now, I'm not trying to make excuses for these guys but men are stupid." Swalley further contends she told Balvanz she did not appreciate such comments, especially given the circumstances.

On October 13, 2002, Swalley called DeJong at home and told him she had decided not to return to USM. On October 14, 2002, Swalley returned to work to pick up her personal belongings. As Swalley packed up her belongings, she told DeJong that Grover had tried to kiss her in August. Swalley did not tell DeJong about the incident until she had made her decision to leave USM. Swalley contends she did not inform DeJong earlier of Grover's attempt to kiss her because she already had talked to DeJong about Grover's inappropriate communication at work and nothing had been done about it and because she believed Grover and Balvanz were close friends. Defendants maintain Swalley did not inform DeJong of any inappropriate conduct on Grover's part prior to October 9, 2002. Swalley [*16] contends DeJong also told her he understood why she was leaving and if similar incidents had happened to his wife, he would tell his wife to sue the company and if he were in her situation, he would be very mad. Defendants deny DeJong made such a statement. During the conversation, DeJong told Swalley if she needed a letter of recommendation, to let him know. Swalley contends she believed DeJong would include favorable information about her work performance in the letter of recommendation. DeJong had told Swalley on more than one occasion that she was an "A" player on the team and he thought she did an excellent job.

On October 16, 2002, DeJong wrote Schacterle a disciplinary letter reprimanding him for his actions and warning him that any further violation of USM's sexual harassment policy would result in additional action from USM, including his possible termination. That same date, DeJong wrote Grover a disciplinary letter reprimanding him for his actions, explaining Grover is expected to comply with USM's sexual harassment policy even though he is only a contractor, and warning him that any further violations of USM's sexual harassment policy would result in additional action [*17] from USM, including termination of his consulting agreement with USM.

Also on October 16, 2002, Balvanz wrote a letter to Swalley in which he encouraged her to return to work, assured her that if she returned, USM would consider her time away a paid leave of absence and told her, "I view you as a true asset to our team at U.S. Manufacturing, and would like to see you return to your position here." Balvanz apologized for the anecdote he had told her regarding men wearing ties on their penises and explained he told her the story because he had heard it during sexual harassment training. Balvanz informed Swalley that Grover and Schacterle had been disciplined and that any further comments or actions, including any retaliatory comments or actions directed at Swalley, would result in their immediate dismissal. Swalley did not respond to Balvanz's letter.

For several weeks after she left her employment, Swalley sought counseling from her pastor. Swalley also received treatment from Dr. Akbar, a psychiatrist located in Waterloo, and received counseling from Ms. Clemons, a counselor at Dr. Akbar's office. n6 Swalley contends she eventually agreed to take anti-depressants as a result of her [*18] treatment with Dr. Akbar.

n6 The parties have not provided to the court the first names of Dr. Akbar or Ms. Clemons or the name of the pastor with whom Swalley sought Counseling.

On November 20, 2002, Swalley filed with the Iowa Civil Rights Commission (the "ICRC") a complaint alleging sex discrimination, which was subsequently cross-filed with the Equal Employment Opportunity Commission (the "EEOC").

Some time after Swalley filed her complaint with the ICRC, Swalley asked DeJong to write her a letter of recommendation. n7 On February 28, 2003, Defendants' attorney wrote a letter to Swalley's attorney, stating she had advised DeJong to write a letter only confirming the dates of Swalley's employment, her salary and job title. If such a letter was agreeable to Swalley, she was to respond to the letter through her attorney. Swalley never

responded to Defendants' offer to write a letter verifying her employment.

> n7 The parties do not indicate on what approximate date Swalley made the request.

**[*19]**

On April 28, 2003, Swalley filed with the ICRC a complaint alleging retaliation, which was subsequently cross-filed with the EEOC. On or about June 27, 2003, Swalley received a right-to-sue letter from the ICRC. On or about July 18, 2003, Swalley received a right-to-sue letter from the EEOC.

### III. LEGAL ANALYSIS

Summary judgment is appropriate only when the record, viewed in the light most favorable to the nonmoving party, shows there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; *Carter v. Ford Motor Co., 121 F.3d 1146, 1148 (8th Cir. 1997)* (citing *Yowell v. Combs, 89 F.3d 542, 544 (8th Cir. 1996)*). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman, 953 F.2d 394, 395 (8th Cir. 1992)* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*). A fact is material when it is a fact that "might affect the outcome of the suit under the governing law." *Rouse v. Benson, 193 F.3d 936, 939 (8th Cir. 1999)*. **[*20]** In considering a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., 475 U.S. at 587.* Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Id.*

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel, 953 F.2d at 394* (citing *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*). Once the moving party has successfully carried its burden under *Rule 56(c)*, the nonmoving party has an affirmative burden to go beyond the pleadings and, by depositions, affidavits or otherwise, designate "specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242,*

*248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* The nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson, 477 U.S. at 248.* **[*21]**

The Eighth Circuit Court of Appeals "'has repeatedly cautioned that summary judgment should seldom be granted in the context of employment actions, as such actions are inherently fact based.'" *Keathley v. Ameritech Corp., 187 F.3d 915, 919 (8th Cir. 1999)* (quoting *Hindman v. Transkrit Corp., 145 F.3d 986, 990 (8th Cir. 1998)*).

"'Summary judgment should not be granted unless the evidence could not support any reasonable inference of discrimination.'" *Id.* (quoting *Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1156 (8th Cir. 1999)* (internal quotation marks and other citations omitted)).

### A. Sex Discriminatio n8

> n8 Swalley appears to make separate claims of (1) sex discrimination and (2) sexual harassment based on **hostile** work environment in both Counts I and II of her Amended Complaint. The parties do not specifically address Swalley's sex discrimination claims in their briefs regarding summary judgment. However, it is clear Defendants move for summary judgment on all claims presented and wish the court to dismiss the case in its entirety. The facts relevant to Swalley's sex discrimination claims are already before the court. Therefore, the court will address Swalley's sex discrimination claims to determine whether there exist any genuine issues of material fact for trial. *See Stone Motor Co. v. Gen. Motors Corp., 400 F.3d 603, 607 (8th Cir. 2005)* ("A district court may grant summary judgment sua sponte if 'the losing party was on notice that she had to come forward with all of her evidence.'") (quoting *Celotex Corp v. Catrett, 477 U.S. 317, 326, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*).

**[*22]**

Counts I and II of the Amended Complaint allege Defendants discriminated against Swalley on the basis of her sex by banning her from going out onto the manufacturing floor of the plan due to her gender. Count I alleges a violation of Title VII; Count II alleges a

violation of ICRA. As a preliminary matter, the court notes that in considering Swalley's sex discrimination claims, the court generally will make no distinction between claims based on federal law and comparable claims based on state law. This is appropriate because the Iowa Supreme Court has recognized that federal precedent is applicable to discrimination claims under the ICRA, *Iowa Code chapter 216. See Vivian v. Madison, 601 N.W.2d 872, 873 (Iowa 1999)* ("The ICRA was modeled after *Title VII of the United States Civil Rights Act*."). Iowa courts, therefore, traditionally turn to federal law for guidance in evaluating the ICRA. *King v. Iowa Civil Rights Comm'n, 334 N.W.2d 598, 601 (Iowa 1983).* Thus, the court addresses both claims based on sex discrimination together. *See Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1048-49 (8th Cir. 2005)* ("Because the Iowa Civil **[*23]** Rights Act mirrors federal law, the analysis [under Title VII] also disposes of the ICRA claims.") (citing *Mercer v. City of Cedar Rapids, 308 F.3d 840, 845 (8th Cir. 2002)*).

There are two methods by which a plaintiff can demonstrate intentional discrimination based on sex under Title VII and ICRA. First, the plaintiff may provide "direct evidence of conduct or statements by persons involved in the decision-making process, which indicate a discriminatory attitude was more likely than not a motivating factor in the employer's decision." *Id. at 1046* (citing *Price Waterhouse v. Hopkins, 490 U.S. 228, 258, 104 L. Ed. 2d 268, 109 S. Ct. 1775 (1989)*).

> If there is direct evidence of sex discrimination, the burden rests with the employer to show that it more likely than not would have made the same decision without consideration of the illegitimate factor. [*Price Waterhouse, 490 U.S. at 258.*] Evidence of the employer's motives for the action, and whether the presence of a [sic] mixed motives defeats the plaintiff's claim, is a trial issue, not intended for summary judgment. *Griffith v. City of Des Moines, 387 F.3d 733, 735 (8th Cir. 2004).* **[*24]**

*Id.* Second, if the plaintiff has no direct evidence of discrimination, the plaintiff may present indirect evidence of discrimination, employing the framework originally set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). Id.* "The *McDonnell Douglas* framework exists to provide discrimination plaintiffs a way to prove their case when they do not have explicit, inculpatory evidence of discriminatory intent." *Id.* (citations and internal quotation marks omitted). Under the *McDonnell Douglas* burden-shifting analysis, a plaintiff must first establish a prima facie case of sex discrimination. *Id.* (citing *Shannon v. Ford Motor Co., 72 F.3d 678, 682 (8th Cir. 1996)*). If the plaintiff succeeds in making a prima facie showing of discrimination, the burden shifts to the employer to "proffer a legitimate, nondiscriminatory reason for the adverse action." *Id.* (citing *Shannon, 72 F.3d at 682*). "'This is a burden of production not proof. The [employer] need not persuade the court, it must simply provide evidence sufficient to sustain a judgment in its favor.'" *Id.* (quoting *Krenik v. County of Le Sueur, 47 F.3d 953, 958 (8th Cir. 1995)*). **[*25]** If the employer meets its burden of production, the burden shifts back to the plaintiff to prove the employer's "'proffered reason is pretextual and that intentional discrimination was the true reason for the [employer's] actions.'" *Id.* (quoting *Krenik, 47 F.3d at 958*, in turn citing *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993)*).

Swalley has no direct evidence of discrimination; thus, her sex discrimination claims are evaluated under the *McDonnell Douglas* burden-shifting analysis. *See id.* "To establish a prima facie case of sex discrimination, [the plaintiff] must demonstrate she: (1) is a member of a protected class; (2) was qualified to perform her job; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated persons of the opposite sex." *LaCroix v. Sears, Roebuck, & Co., 240 F.3d 688, 693 (8th Cir. 2001).* The Eighth Circuit Court of Appeals has recognized adverse employment actions in the context of sex discrimination claims include:

> tangible changes in duties or working conditions that result in a material employment disadvantage. It includes actions such **[*26]** as termination, cuts in pay or benefits, and changes that affect an employee's future career prospects, or disadvantage or interfere with the employee's ability to do his or her job. It may also include a transfer to a less

Case 1:04-cv-00970-JJF     Document 101-4     Filed 01/16/2007     Page 90 of 181

Page 8
2005 U.S. Dist. LEXIS 17301, *26

desirable position because that position afforded little opportunity for salary increases or advancement.

*MacGregor v. Mallinckrodt, Inc., 373 F.3d 923, 930 & n.5 (8th Cir. 2004)* (holding the district court's instruction to the jury correctly exemplifies adverse employment action for purposes of a claim of sex discrimination). Adverse employment action does not include mere inconvenience, an alteration of job responsibilities or loss of status and prestige when salary and position remain the same. *Id. at 930*.

In this case, Swalley contends the adverse employment action was that she "was banned from going onto the manufacturing floor of the plant due to her gender." Amended Complaint at 9. It is undisputed Swalley did not work on the manufacturing floor. Thus, viewing the facts in the light most favorable to Swalley, the court finds Swalley would go onto the manufacturing floor of the plant for the following reasons: (1) **[*27]** to work with Pickens regarding the safety area of the shop in an effort to update the company's safety program; (2) to help Gray with inventory; (3) to reach the break room that had soda and vending machines; (4) to restock the soda and vending machines in the break room once a week; and (5) to access a storage room for toiletries. While the alleged ban may have inconvenienced Swalley or altered her job responsibilities, such action does not amount to a tangible change in her duties or working conditions that resulted in a material employment disadvantage. *See MacGregor, 373 F.3d at 930*. There is no evidence Swalley was reprimanded for failing to perform her safety, inventory or restocking duties or that she received a cut in pay or benefits for failing to perform those duties. In other words, the alleged ban did not amount to an adverse employment action. Thus, Swalley has failed to establish an essential element of a prima facie case of sex discrimination: that she suffered an adverse employment action. *See LaCroix, 240 F.3d at 693*. Because Swalley has failed to show even a prima facie case of sex discrimination, the court need not apply the full **[*28]** burden-shifting analysis of *McDonnell Douglas. See Kratzer, 398 F.3d at 1046*.

The court finds there are no genuine issues of material fact regarding Swalley's sex discrimination claims and Defendants n9 are entitled to judgment as a matter of law. Therefore, the court grants summary judgment in Defendants' favor on Swalley's sex discrimination claims contained in Counts I and II of Swalley's Amended Complaint.

> n9 Because the court must construe all facts in the light most favorable to Swalley, *see Matsushita Elec. Indus. Co., 475 U.S. at 587*, the court assumes for purposes of deciding Defendants' Motion for Summary Judgment that Swalley worked for both USM and Global Resources.

### B. Hostile Work Environment

Counts I and II of Swalley's Amended Complaint also allege she suffered sexual harassment based on a **hostile** work environment. Again, in considering Swalley's **hostile** work environment claims, the court generally will make no distinction between claims based on federal **[*29]** law and comparable claims based on state law. Therefore, the court addresses both claims based on **hostile** work environment together. *See Kratzer, 398 F.3d at 1048-49*.

Swalley's **hostile** work environment claims are evaluated under the *McDonnell Douglas* burden-shifting analysis. *See Erenberg v. Methodist Hosp., 357 F.3d 787, 792 (8th Cir. 2004)* (citing *Breeding, 164 F.3d at 1156; Hoover v. Norwest Private Mortgage Banking, 632 N.W.2d 534, 542 (Minn. 2001)*).

> To establish a prima facie case on a **hostile** work environment sexual harassment claim, the Plaintiff must prove: (1) that she was a member of a protected group, (2) the occurrence of unwelcome harassment, (3) a causal nexus between the harassment and her membership in the protected group, (4) that the harassment affected a term, condition, or privilege of employment, and (5) that the employer knew or should have known of the harassment and failed to take prompt and effective remedial action.

*Id.* (citing *Carter v. Chrysler Corp., 173 F.3d 693, 700 (8th Cir. 1999)*). The nexus requirement relating the

harassment to the plaintiff's [*30] sex "forces a plaintiff to prove she was the target of harassment because of her sex and that the offensive behavior was not merely non-actionable, vulgar behavior." *Pedroza v. Cintas Corp. No. 2, 397 F.3d 1063, 1068 (8th Cir. 2005)*. The Eighth Circuit Court of Appeals has recognized the "distinction [between actionable and non-actionable behavior] exists because 'Title VII does not prohibit all verbal or physical harassment in the workplace' and is not 'a general civility code for the American workplace.'" *Id.* (quoting *Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998))*. "Consequently, to succeed on a **hostile** work environment claim under Title VII, a plaintiff must show 'that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "discrimina[tion] . . . because of . . . sex."'" *Id.* (quoting *Oncale, 523 U.S. at 81*, in turn quoting *42 U.S.C. § 2000e-2(a)(1))* (alterations and omissions in original). In order to be actionable,

> the harassment must be both objectively and subjectively offensive, such that a reasonable person would [*31] consider it to be **hostile** or abusive, and courts make this determination by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Erenberg, 357 F.3d at 792* (quoting *Breeding, 164 F.3d at 1158*, in turn quoting *Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998))* (quotation marks omitted). "'Conduct that is not **severe or pervasive** enough to create an objectively **hostile** or abusive work environment - an environment that a reasonable person would find **hostile** or abusive - is beyond Title VII's purview.'" *Id.* (quoting *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993))*. "'Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.'" *Id.* (quoting *Breeding, 164 F.3d at 1158*). Furthermore, "'sporadic use of abusive language, gender-related jokes, and occasional teasing [*32] are the ordinary tribulations of the workplace, and as such, they do not amount to actionable harassment.'" *Id. at 792-93* (quoting *Breeding, 164 F.3d at 1159*). Merely offensive, unprofessional or immature conduct does not rise to the level of actionable harassment capable of establishing a prima facie case of **hostile** work environment. *Henthorn v. Capitol Communications, Inc., 359 F.3d 1021, 1027 (8th Cir. 2004)*. The conduct must be extreme, "not merely rude or unpleasant." *Alagna v. Smithville R-II Sch. Dist., 324 F.3d 975, 980 (8th Cir. 2003)* (citing *Faragher, 524 U.S. at 788*; *Duncan v. Gen. Motors Corp., 300 F.3d 928, 934 (8th Cir. 2002))*.

In this case, the parties agree Swalley has met the first three elements of her claims: (1) Swalley is a member of a protected group; (2) she suffered unwelcome harassment; and (3) the harassment was based on her sex. *See Erenberg, 357 F.3d at 792-93*. n10 Thus, the parties' dispute focuses on the last two elements of the prima facie case of **hostile** work environment: (4) whether the harassment affected a term or condition of Swalley's employment; [*33] and (5) whether Defendants failed to take prompt and remedial action once they knew or should have known about the harassment. *See id.*

> n10 Defendants assume Swalley has met the first three elements only for purposes of their Motion for Summary Judgment. Defendants reserve the right to contest the second element (i.e., that the harassment was unwelcome) at trial in the event they do not prevail on their Motion.

The Eighth Circuit Court of Appeals recently has addressed several **hostile** work environment claims under Title VII in which it concluded the statements and conduct were insufficient to demonstrate the harassment affected a term or condition of the plaintiff's employment, the fourth element of a prima facie case of **hostile** work environment. First, the Eighth Circuit Court of Appeals concluded a plaintiff's **hostile** work environment claim failed because although her supervisor's "comments and actions were inappropriate, immature and unprofessional, they did not cross the high threshold required to support [*34] a claim of sexual harassment" where the evidence showed: (1) the plaintiff's supervisor's requests she go out with him were repetitive and annoying but not lewd or threatening; (2) her supervisor did not touch her

inappropriately or make sexual comments about her in her presence; (3) the plaintiff's supervisor's phone calls to her in the middle of the night asking her out and expressing interest in her did not contain sexual propositions; and (4) although her supervisor's conduct made her uncomfortable, the plaintiff was able to continue to perform her assignments and his actions did not result in a change to her work status. *Henthorn, 359 F.3d at 1027-28.*

Second, the Eighth Circuit Court of Appeals **affirmed** the district court's grant of summary judgment in the employer's favor where the plaintiff alleged a **hostile** work environment based on the following facts: (1) she was called "Malibu Barbie" by coworkers on two or three occasions; (2) other employees exchanged backrubs in the workplace; (3) other employees told sexual jokes in the workplace; and (4) a female coworker placed her hands on male employees' shoulders, arms and backs. *Erenberg, 357 F.3d at 792-93.* [*35] The court determined the behaviors the plaintiff complained of, in the moderate amounts she alleged they occurred, "[did] not show that hers was a workplace 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently **severe or pervasive** to alter the conditions of [her] employment and create an abusive working environment.'" *Id. at 793* (quoting *Harris, 510 U.S. at 21*).

Third, the Eighth Circuit Court of Appeals determined a plaintiff's claim for **hostile** work environment failed as a matter of law where: (1) male employees made derogatory comments to the plaintiff; (2) she was called offensive names; (3) men received preferable treatment; and (4) male workers stared at female employees while they worked. *Kratzer, 398 F.3d at 1047-48.* Without addressing whether the facts constituted actionable conduct, the court determined the plaintiff's subjective belief she was not harassed was fatal to her Title VII sexual harassment claim. *Id.*

Fourth, the Eighth Circuit Court of Appeals **affirmed** the district court's grant of summary judgment in the employer's favor where the plaintiff alleged a **hostile** work environment [*36] on the following three events: (1) the plaintiff's supervisor asked him to watch pornographic movies together and to masturbate to relieve stress; (2) his supervisor again mentioned pornographic movies; suggested the plaintiff would advance within the company if he watched the movies

and performed sex acts on the supervisor; his supervisor kissed him on the mouth, grabbed his buttocks and reached for his genitals; and (3) the plaintiff's supervisor briefly grabbed plaintiff's thigh during a meeting. *LeGrand v. Area Res. for Cmty. & Human Servs., 394 F.3d 1098, 1102 (8th Cir. 2005).* Specifically, the court found "none of the three incidents was physically violent or overtly threatening" and, although the actions and statements were "manifestly inappropriate," the court held "the three isolated incidents, which occurred over a nine-month period, were not so **severe or pervasive** as to poison [the plaintiff's] work environment." *Id. at 1102-03.*

Fifth, the Eighth Circuit Court of Appeals determined a plaintiff's claim for **hostile** work environment failed as a matter of law where: (1) the plaintiff's supervisor made regular references to "old ladies"; (2) [*37] her supervisor did not allow her to participate in a training session because it was "too hard to train old ladies"; (3) her supervisor once commented that the plaintiff "didn't have the right parts" to fill in shifts; and (4) a coworker once commented that women were lazy and were not needed at the jail (where the plaintiff worked). *Peterson v. Scott County, 406 F.3d 515, 524 (8th Cir. 2005).* Specifically, the court held, "these appear to be the type of isolated incidents, teasing and offhand comments which, while offensive, do not reach the level of harassment." *Id.* (citing *Gipson v. KAS Snacktime Co., 171 F.3d 574, 579-80 (8th Cir. 1999); Wallin v. Minn. Dep't of Corr., 153 F.3d 681, 688 (8th Cir. 1998)).*

The Eighth Circuit Court of Appeals has determined "pervasive sexual innuendo and repetitive offensive touching" are sufficient to establish a **hostile** work environment. *Baker v. John Morrell & Co., 382 F.3d 816, 828 (8th Cir. 2004); see, e.g., Eich v. Bd. of Regents for Cent. Mo. State Univ., 350 F.3d 752, 755-56 (8th Cir. 2003)* (finding conduct sufficiently severe when plaintiff was frequently [*38] touched in numerous suggestive ways and was subject to simulated sex acts); *Beard v. Flying J, Inc., 266 F.3d 792, 797 (8th Cir. 2001)* (affirming judgment for plaintiff where a coworker brushed, rubbed and flicked her breasts and pointed to his crotch); *Howard v. Burns Bros., Inc., 149 F.3d 835, 838 (8th Cir. 1998)* (describing a co-employee constantly making sexual innuendos, brushing up against plaintiff and telling lewd jokes with gestures); *Smith v. St. Louis Univ., 109 F.3d 1261, 1262-63 (8th Cir. 1997)* (reversing

summary judgment for the employer where plaintiff faced consistent ridicule and derogatory comments about women, even though they were not sexually explicit); *Hathaway v. Runyon, 132 F.3d 1214, 1217-18 (8th Cir. 1997)* (finding a jury reasonably ruled for plaintiff when she was subject to two instances of offensive touching, followed by constant snickering and guttural noises from two other employees).

In one recent case, the Eighth Circuit Court of Appeals **affirmed** the trial court's denial of summary judgment in favor of the employer and **affirmed** the jury's award based, in part, on a **hostile** work environment [*39] claim. *Baker, 382 F.3d at 828-29.* The evidence presented at trial regarding the plaintiff's **hostile** work environment claim included the following: (1) the plaintiff was subjected to sexual and other derogatory remarks and sexual conduct by coworkers on a daily basis during the nearly seventeen years she worked for the employer; (2) one coworker threw boxes full of meat at her which hit her on several occasions; (3) the plaintiff's foreperson refused to investigate any of her complaints regarding her coworkers' conduct and exacerbated the problem by forcing the plaintiff to wait long periods of time to use the bathroom even though she had a medical condition which required her to frequently need to use the bathroom; male coworkers were allowed to use the bathroom as soon as they asked to do so; (4) the plaintiff repeatedly complained to her union representatives and her foreperson's supervisor but the harassment continued; (5) the plaintiff suffered from anxiety, depression and hypertension due to the harassment and she experienced panic attacks as a result; n11 (6) the plaintiff began seeing a psychiatrist for her physical and mental distress resulting from the harassment [*40] she experienced daily at work. *Id. at 819-27.* The Eighth Circuit Court of Appeals had "little difficulty concluding the evidence was sufficient to support the jury's verdict [regarding **hostile** work environment]. The lengthy factual recitation . . . chronicles years of blatant sexual harassment leaving no doubt [the plaintiff] was subjected to conduct so **severe and pervasive** as to create an objectively **hostile** and abusive work environment." *Id. at 828-29.*

n11 "Showing some tangible psychological condition is not necessary to make out a **hostile** work environment claim, but it may be taken into account." *Shaver v. Indep. Stave Co., 350 F.3d*

716, 722 (8th Cir. 2003)* (citing *Harris, 510 U.S. at 22-23*).

Likewise, the Eighth Circuit Court of Appeals reversed the district court's order granting the employer's motion for summary judgment on the plaintiff's **hostile** work environment claim where the evidence showed: (1) the chair of her department repeatedly [*41] made harassing or discriminatory comments to the plaintiff based on her gender, including calling her and other female anesthesiology residents by their first names while referring to the male residents as "doctor"; (2) male residents informed the plaintiff the chair had told them he hired her to fill his female quota in order to avoid discrimination charges; (3) male residents told her "you girls are here because it's about time he hired some good looking girls"; (4) the chair and male residents at various times told the plaintiff she was attractive, a "beautiful young lady," and should consider modeling; (5) the chair referred to her and another female resident as the "anesthesiology babes"; (6) the chair complained several times he was "stuck with [the plaintiff] again" and "had to work with another female resident"; (7) in the operating room and in the doctor's lounge, the chair asked the plaintiff why she had gone into medicine rather than nursing or getting married, why she was so assertive and why she polished her nails; (8) the chair opined to her that women ought to be married and home nursing babies and compared her unfavorably to the wife of another doctor who stayed home [*42] to raise their children; (9) the chair suggested to the plaintiff that she would not be able to find a husband because of her age and medical training; (10) the chair altered his rotation schedule so he would be around the plaintiff so he could subject her to additional ridicule; (11) the plaintiff was hospitalized twice as a result of the stress from the chair's harassment; and (12) she suffered emotional trauma and frequent crying because of the harassment. *St. Louis Univ., 109 F.3d 1261.*

The court finds the harassment Swalley experienced was not sufficiently **hostile** or abusive to be actionable. Swalley bases her **hostile** work environment claims on the following allegations: (1) Grover attempted to kiss her once; (2) Schacterle put his hands on her waist once; (3) Pemberton left a note on her desk stating he needed to speak with her as soon as possible; (4) Balvanz recounted to Swalley a joke he heard during sexual harassment training about men wearing neckties on their penises; and

(5) Grover made sexual and gender-based comments to her on several occasions. The court finds these allegations are akin to the cases in which the Eighth Circuit Court of Appeals has **[*43]** deemed the evidence insufficient to show harassment. The court believes the conduct was offensive and unprofessional. However, the conduct was merely tinged with offensive sexual connotations rather than being objectively **hostile,** based on the frequency, severity and content of the statements. *See Pedroza, 397 F.3d at 1068*; *Erenberg 357 F.3d at 792.* The court finds the behaviors Swalley complains of, in the moderate amounts she alleges they occurred, "do not show that hers was a workplace 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently **severe or pervasive** to alter the conditions of [Swalley's] employment and create an abusive working environment.'" *Erenberg, 357 F.3d at 793* (quoting *Harris, 510 U.S. at 21*). Furthermore, Swalley's contention that "DeJong did not guarantee the environment would be safe and free from inappropriate conduct" does not create a genuine issue of material fact for trial. *See Pedroza, 397 F.3d at 1068* (recognizing "'Title VII does not prohibit all verbal or physical harassment in the workplace' and is not 'a general civility code for **[*44]** the American workplace'") (quoting *Oncale, 523 U.S. at 80*). Thus, even viewing the facts in the light most favorable to Swalley, the court finds Swalley has failed to establish an essential element of a prima facie case of **hostile** work environment: that the harassment affected a term, condition or privilege of her employment. *See id. at 792.* Because Swalley has failed to show even a prima facie case of sexual harassment, the court need not apply the full burden-shifting analysis of *McDonnell Douglas. See Kratzer, 398 F.3d at 1046.*

Defendants have demonstrated there are no genuine issues of material fact regarding Swalley's **hostile** work environment claims and they are entitled to judgment as a matter of law, which Swalley has failed to rebut. Therefore, the court grants summary judgment in Defendants' favor on Swalley's **hostile** work environment claim contained in Counts I and II of Swalley's Amended Complaint.

### C. Assault and Battery

Count III alleges Grover committed assault against her when he attempted to kiss her; Count IV alleges Schacterle committed battery against her when he placed his hands around her waist. Both Counts allege **[*45]**

Defendants created an atmosphere which allowed the assault and battery and Grover and Schacterle committed the state common law torts while acting in the scope of their employment. Swalley did not state whether she intended to dismiss those Counts in their entirety when she dismissed Grover and Schacterle from the case. Defendants moved for summary judgment on Counts III and IV, alleging there is no genuine issue of material fact and they are entitled to judgment as a matter of law as to Swalley's assault and battery claims. Swalley did not resist Defendants' Motion as it related to Counts III and IV. Therefore, the court will determine whether summary judgment is appropriate.

Defendants contend the remedies provided by ICRA are exclusive and preempt any state common law tort claims which are based on the same conduct and which, in light of the pleadings, require the plaintiff to prove discrimination in order to prevail. *See Greenland v. Fairtron Corp., 500 N.W.2d 36, 38 (Iowa 1993).* n12 Furthermore, Defendants contend that, unless they commanded or expressly authorized the alleged assault and battery, they are not responsible for the intentional torts committed by **[*46]** an employee against another employee. *See Nelson v. Winnebago Indus., Inc., 619 N.W.2d 385, 387-88 (Iowa 2000).* It is undisputed Defendants did not command or expressly authorize the alleged assault and battery.

> n12 Because the court's jurisdiction over these state law claims is based on its supplemental jurisdiction found in *28 U.S.C. § 1367(a)*, the court must look to Iowa law regarding ICRA's preemption of common law claims, assault, battery, and the extent of an employer's vicarious liability for an employee's alleged commission of those torts. *See Catipovic v. Peoples Cmty. Health Clinic, Inc., 401 F.3d 952, 957 n.7 (8th Cir. 2005)* (recognizing the district court entertained the plaintiff's state tort claim pursuant to its supplemental jurisdiction and thus applied state substantive law to the merits of the claim).

The court finds Defendants' arguments to be persuasive. Defendants have demonstrated there is no genuine issue of material fact as to whether **[*47]** they are liable as to Counts III and IV. Thus, even if Swalley did not intend to dismiss Counts III and IV against Defendants when she dismissed Grover and Schacterle,

the court finds it appropriate to grant summary judgment in Defendants' favor as to Counts III and IV of Swalley's Amended Complaint. *See Fed. R. Civ. P. 56(e)* (requiring the nonmoving party to go beyond the pleadings and, by depositions, affidavits or otherwise, designate "specific facts showing that there is a genuine issue for trial" once the moving party has met its burden of demonstrating there are no genuine issues of material fact).

### D. Retaliation

Counts V and VI of the Amended Complaint allege retaliation. Count V alleges a violation of Title VII; Count VI alleges a violation of ICRA. Again, in considering Swalley's retaliation claims, the court generally will make no distinction between claims based on federal law and comparable claims based on state law. Therefore, the court addresses both claims based on retaliation together. *See Kratzer, 398 F.3d at 1048-49*.

Like her claims based on sex discrimination and **hostile** work environment, Swalley's **[*48]** retaliation claims are evaluated under the *McDonnell Douglas* burden-shifting analysis. *Erenberg, 357 F.3d at 793*. "To establish a prima facie case for retaliation, the Plaintiff must show that (1) she filed a charge of harassment or engaged in other protected activity; (2) her employer subsequently took an adverse employment action against her; and (3) the adverse action was causally linked to the protected activity." *Id.* Each alleged retaliatory action must be so adverse it created a material change in the plaintiff's employment: "a change in salary, benefits, or responsibilities" is sufficient to establish an actionable retaliation claim. *Henthorn, 359 F.3d at 1028*. While an adverse employment action in the context of a retaliation claim may be something other than termination, "not everything that makes an employee unhappy is an actionable adverse action." *Baker, 382 F.3d at 829* (quotation and quotation marks omitted). "'Changes in duties or working conditions that cause no materially significant disadvantage . . . are insufficient to establish the adverse conduct required to make a prima facie case.'" *Id.* (quoting **[*49]** *Harlston v. McDonnell Douglas Corp., 37 F.3d 379, 382 (8th Cir. 1994)*). Thus, the Eighth Circuit Court of Appeals determined a reasonable jury could conclude that a negative reference to a potential employer constitutes an adverse employment action on which a plaintiff may base an actionable retaliation claim. *Id. at 829-30* (citing *St. Louis Univ., 109 F.3d at 1266*). However, the Eighth Circuit

Court of Appeals determined the loss of status and prestige resulting from a change in a supervisor's staff, while maintaining the same salary and position, does not constitute an actionable adverse employment action. *Id. at 830* (citing *Ledergerber v. Stangler, 122 F.3d 1142 (8th Cir. 1997)*). "An inference of a causal connection between a charge of discrimination and termination can be drawn from the timing of the two events." *Peterson, 406 F.3d at 524* (citing *Smith v. Riceland Foods, Inc., 151 F.3d 813, 818 (8th Cir. 1998)*; *St. Louis Univ., 109 F.3d at 1266*). However, generally "more than a temporal connection is required to present a genuine factual issue on retaliation." *Id.* (citing **[*50]** *Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999)* (en banc)).

In this case, viewing the facts in the light most favorable to Swalley, the court finds Swalley filed a complaint with the ICRC and EEOC and reported the alleged sex discrimination and **hostile** work environment to management. Defendants concede for purposes of their Motion for Summary Judgment that Swalley reasonably believed she was reporting harassing behavior when she talked to management on October 9, 2002, and, therefore, that she was engaged in a protected activity. n13 *See Erenberg, 357 F.3d at 793*. Therefore, the dispute focuses on the second and third elements of the prima facie case of retaliation: (2) whether Defendants took adverse employment action against Swalley; and (3) whether such adverse employment action was causally linked to Swalley's reporting of the alleged sex discrimination and **hostile** work environment to management. *See id.*

> n13 Defendants assert Swalley did not report to management any sex discrimination or **hostile** work environment prior to October 9, 2002; Swalley contends she informed management of the alleged sex discrimination and **hostile** work environment prior to that date. In deciding a motion for summary judgment, the court must construe all disputed facts in favor of the non-moving party. *Matsushita Elec. Indus. Co., 475 U.S. at 587*. Therefore, the court will assume Swalley reported the alleged sex discrimination and **hostile** work environment as she contends.

**[*51]**

The Eighth Circuit Court of Appeals has addressed several retaliation claims filed pursuant to Title VII. First, the Eighth Circuit Court of Appeals concluded a

plaintiff's retaliation claim failed where she alleged her employer refused to test her for a particular job and later offered to test her in exchange for dropping her complaint with the ICRC. *Kratzer, 398 F.3d at 1048.* The Eighth Circuit Court of Appeals determined the plaintiff failed to demonstrate (1) her employer took adverse employment action against her and (2) any causal link between her complaint to the ICRC and the alleged adverse employment action. *Id.* Specifically, the court held the plaintiff presented no evidence the failure to test was related to her complaint with the ICRC. *Id.* Furthermore, the court found the employer's offer to test her in exchange for dismissing the ICRC complaint was an inadmissible settlement offer. *Id.*

Second, the Eighth Circuit Court of Appeals determined a plaintiff's retaliation claim failed where the adverse employment actions, several verbal and written warnings, three-day suspension and eventual termination, were not causally connected to the grievance [*52] she filed at work and her complaint to management. *Erenberg, 357 F.3d at 793.* Specifically, the court noted the plaintiff received at least four warnings that her work performance was unsatisfactory before she complained about the alleged **hostile** work environment. *Id.*

The Eighth Circuit Court of Appeals has held prima facie claims of retaliation sufficient in other circumstances. For example, where the plaintiff, an interim employee, complained of discrimination on November 20 and she was terminated on December 4, the court determined the timing established causation sufficient to prove a prima facie claim of retaliation. *Peterson, 406 F.3d at 524-25.* Furthermore, the court noted the employer had written on his calendar for November 20 a note to call someone regarding the dismissal of an interim employee, *Id. at 525.* There was no evidence any interim employee other than the plaintiff was dismissed around the time the plaintiff was discharged. *Id.* Thus, the Eighth Circuit Court of Appeals determined the fact finder should decide whether the note more likely referred to the plaintiff or some other employee and held the plaintiff [*53] proved a prima facie case of retaliation. *Id.*

In a case in which the Eighth Circuit Court of Appeals reviewed the jury verdict in favor of the plaintiff, the court found the plaintiff demonstrated her supervisor became antagonistic towards her because her complaint to the ICRC reflected badly on the supervisor's job

performance. *Baker, 382 F.3d at 830.* Specifically, the supervisor limited her bathroom and other breaks, added to her job duties, refused to provide her with necessary job assistance, repeatedly yelled at her for making mistakes, withheld privileges granted to other employees and attempted to dissuade her from making further complaints. *Id.* The Eighth Circuit Court of Appeals held the "retaliatory changes in working conditions constituted significant and material disadvantages sufficient to support the retaliation claim." *Id.*

In this case, Swalley has failed to demonstrate Defendants took adverse employment action against her. Viewing the facts regarding Swalley's retaliation claim in the light most favorable to Swalley, the court finds the following: (1) when she informed management of Pemberton's note, she was banned from the manufacturing [*54] floor of the plant; (2) Grover belittled her privately and in front of others after she rebuffed Grover's attempt to kiss her; and (3) when she asked for a letter of recommendation, she expected an exemplary letter of recommendation but instead was offered a letter simply verifying her employment. First, regarding the ban from the manufacturing floor, the court finds such action did not constitute an adverse employment action. n14 *See Baker, 382 F.3d at 829* (recognizing changes in duties or working conditions that cause no materially significant disadvantage are insufficient to establish the adverse conduct required to make a prima facie case of retaliation). Second, with regard to Swalley's contention Grover began belittling her in private and in front of others after she rebuffed his advances, the court finds such conduct does not create an actionable adverse employment action: Grover's conduct is not so adverse it created a material change in Swalley's employment. *See Henthorn, 359 F.3d at 1028; see also Baker, 382 F.3d at 829* (holding not everything that makes an employee unhappy is an actionable adverse action). Finally, the undisputed [*55] material facts show Swalley was not promised a letter of recommendation in any particular form and she was not promised an exemplary letter rather than a simple letter verifying Swalley's employment. An employer has no duty to write letters of recommendation; letters verifying employment (rather than reciting the employee's work performance) are often standard practice. This is not a situation in which the employer provided a negative reference to a potential employer. *See Baker, 382 F.3d at 829-30* (citing *St. Louis Univ., 109 F.3d at 1266*). Therefore, the court finds DeJong's failure to write the letter of

recommendation Swalley wished he had written was not an adverse employment action.

> n14 The court previously found the alleged ban does not constitute adverse employment action for purposes of proving Swalley's sex discrimination claim. The court now finds it also does not constitute adverse employment action for purposes of proving Swalley's retaliation claim.

Swalley also [*56] alleges she was constructively discharged from her employment in retaliation for her complaints regarding the alleged sex discrimination and sexual harassment. "'Constructive discharge is but one incident by which an employee can demonstrate an adverse [employment] action.'" *Tatum v. City of Berkeley, 408 F.3d 543, 551 (8th Cir. 2005)* (quoting *MacGregor, 373 F.3d at 928*) (alterations in original). "Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable, thereby forcing her to quit." *Baker, 382 F.3d at 829* (citing *Klein v. McGowan, 198 F.3d 705, 709 (8th Cir. 1999)*). Whether the conditions are intolerable is judged objectively rather than based on the subjective feelings of the employee. *Id.* (citing *Gartman v. Gencorp Inc., 120 F.3d 127, 130 (8th Cir. 1997)*). "First, the conditions created by the employer must be such that a reasonable person would find them intolerable. Second, 'the employer's actions must have been taken with the intention of forcing the employee to quit.'" *Id.* (internal citations omitted). If the employer denies [*57] making a conscious effort to force the employee to quit, the court must hold the employer to have intended the reasonably foreseeable consequences of the employer's actions. *Id.* (citing *Hukkanen v. Int'l Union of Operating Eng'rs Hosting & Portable Local No. 101, 3 F.3d 281, 285 (8th Cir. 1993)*). "Finally, 'to act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly'; therefore, 'an employee who quits without giving [her] employer a reasonable chance to work out a problem has not been constructively discharged.'" *Id.* (quoting *West v. Marion Merrell Dow, Inc., 54 F.3d 493, 498 (8th Cir. 1995)*).

The undisputed material facts show DeJong asked Swalley what USM could do to keep her as an employee and he offered to terminate Grover and Schacterle so she could keep working for USM without being harassed. Additionally, after Swalley quit, Balvanz wrote a letter to her in which he stated that if she returned to work by October 21, 2002, her time away would be considered paid leave. n15 The court cannot say a reasonable person would find the conditions Defendants created to be intolerable. Furthermore, [*58] the court cannot say Defendants' actions were taken with the intention of forcing Swalley to quit. On the contrary, the evidence shows DeJong and Balvanz tried to work with Swalley so she could continue to work for USM without being harassed. The court finds this is a case in which Swalley quit without giving Defendants a reasonable chance to work out the problem. *See id.* (quoting *West, 54 F.3d at 498*). Therefore, the court finds Swalley's constructive discharge claim fails due to the absence of an adverse employment action.

> n15 Swalley contends she believed she was terminated when Balvanz told her to return to work on October 14, 2002 and she did not do so. The court finds Swalley's belief she was terminated does not amount to constructive discharge. First, Swalley already had quit her job before Balvanz asked her to return to work. Furthermore, in light of the other evidence regarding DeJong's and Balvanz's statements to Swalley in mid-October 2002, a reasonable person would not find Defendants created intolerable working conditions by asking Swalley to return to work and they did not intend to force Swalley to quit.

[*59]

Even viewing the facts in the light most favorable to Swalley, the court finds Swalley has failed to prove an essential element of a prima facie case of retaliation: that Defendants took adverse employment action against her. *See Erenberg, 357 F.3d at 793*. Because Swalley has failed to show even a prima facie case of retaliation, the court need not apply the full burden-shifting analysis of *McDonnell Douglas. See Kratzer, 398 F.3d at 1046*.

Defendants have demonstrated there are no genuine issues of material fact regarding Swalley's retaliation claims and they are entitled to judgment as a matter of law, which Swalley has failed to rebut. Therefore, the court grants summary judgment in Defendants' favor on Counts V and VI of Swalley's Amended Complaint.

### IV. CONCLUSION

2005 U.S. Dist. LEXIS 17301, *59

For the foregoing reasons, **IT IS HEREBY ORDERED:**

(1) Defendants' Motion for Summary Judgment (docket no. 51) is **GRANTED.**

(2) Plaintiff's Complaint is **DISMISSED** with prejudice.

(3) All court costs are assessed against Plaintiff.

**SO ORDERED.**

**DATED** this 29th day of June, 2005.

**LINDA R. READE**
**JUDGE, U. S. DISTRICT COURT**
 **[*60] NORTHERN DISTRICT OF IOWA**

LEXSEE

**MARY GRACE MAURIZIO, Plaintiff, v. FOX CHAPEL FOODS, INC.; t/d/b/a FOX CHAPEL COMMUNITY SUPERMARKET, PAUL ROSENBERG AND HOWARD ROSENBERG, Defendants.**

**02:04cv1168**

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

**2006 U.S. Dist. LEXIS 62926**

**September 5, 2006, Decided**
**September 5, 2006, Filed**

**COUNSEL:** [*1] For MARY GRACE MAURIZIO, Plaintiff: Douglas C. Hart, Leech, Tishman, Fuscaldo & Lampl, Pittsburgh, PA; Manning J. O'Connor, II, Leech Tishman Fuscaldo & Lampl, LLC, Pittsburgh, PA.

For FOX CHAPEL FOODS, INC., trading and doing business as FOX CHAPEL COMMUNITY SUPERMARKET, PAUL ROSENBERG, HOWARD ROSENBERG, Defendants: Daniel W. Cooper, Cooper & Lepore, Carnegie, PA.

**JUDGES:** Terrence F. McVerry, United States District Court Judge.

**OPINION BY:** Terrence F. McVerry

**OPINION:**

**MEMORANDUM OPINION AND ORDER**

Presently before the Court is the MOTION FOR SUMMARY JUDGMENT, with brief in support, filed by Defendants Fox Chapel Foods, Inc., t/d/b/a Fox Chapel Community Supermarket, Paul Rosenberg and Howard Rosenberg *(Document Nos. 12 and 13),* the RESPONSE AND BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT filed by Plaintiff *(Document Nos. 19 and 20),* and the REPLY BRIEF filed by Defendants *(Document No. 22).*

After careful consideration of Defendants' Motion, the filings in support and opposition thereto, the memoranda of the parties, the relevant case law, and the record as a whole, the Court finds that there is not sufficient record evidence upon which a reasonable jury could return [*2] a verdict for Plaintiff, Mary Grace Maurizio ("Plaintiff"), on her claims of gender discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA") and on her claims of retaliation under the Family Medical Leave Act ("FMLA"). Therefore, the Court will grant Defendants' motion for summary judgment as to all federal and state claims which allege gender discrimination under Title VII and the PHRA and as to all claims of retaliation under the FMLA. The Court will also dismiss without prejudice the additional pendent state claims of negligent supervision and intentional infliction of emotional distress alleged by Plaintiff, Mary Grace Maurizio.

**PROCEDURAL BACKGROUND**

Plaintiff brought this lawsuit on August 5, 2004, by filing a seven-count Complaint in which she alleges that her former employer, Defendants Fox Chapel Foods, Inc., t/d/b/a Fox Chapel Community Supermarket, Paul Rosenberg and Howard Rosenberg (collectively referred to as "Defendants") wrongfully terminated her employment and engaged in other acts of gender discrimination in violation of Title VII and that the Defendants wrongfully terminated her employment [*3] and engaged in other retaliatory acts because she exercised her rights under the FMLA. Additionally, Plaintiff alleges violations of Pennsylvania state law which include discrimination under the PHRA, negligent supervision, and intentional infliction of emotional

distress.

Defendants have filed the instant motion for summary judgment in which they contend that Plaintiff is unable to establish a *prima facie* case of discrimination under Title VII or retaliation under the FLMA. In the alternative, Defendants contend that assuming *arguendo* that Plaintiff could state a *prima facie* case under either Title VII or the FMLA, summary judgment should still be granted in their favor because there is no evidence that Defendants' articulated legitimate, non-discriminatory reason for Plaintiff's discharge (i.e., misconduct) was false and/or that Plaintiff's gender or FMLA leave was the real reason for her termination.

## BACKGROUND

The facts relevant to this discussion, and viewed in the light most favorable to Plaintiff, are as follows. In October of 1996, Plaintiff was hired as a cashier at the Food Gallery store in Fox Chapel, Pennsylvania. All bargaining unit employees of the [*4] Food Gallery were represented by United Food & Commercial Workers Union ("UFCW"), Local 23. (Stmt of Undisputed Material Facts, P2).

In November 1999, Fox Chapel Foods, Inc., t/d/b/a Fox Chapel Community Supermarket, n1 purchased the store and retained all bargaining unit employees, including the Plaintiff, who was employed as a part-time clerk assigned to the produce department. During her entire period of employment with Food Gallery and Fox Chapel Community Supermarket, Plaintiff was a member of the bargaining union represented by UFCW, Local 23. (*Id.* at P 4.) The terms and conditions of employment for all bargaining unit employees at Fox Chapel Community Supermarket were covered by a Collective Bargaining Agreement ("CBA") between UFCW Local 23 and Fox Chapel Foods, Inc., effective as of February 17, 1998 and terminating February 19, 2005. (*Id.* at P 6.)

> n1 Defendants Paul Rosenberg and Howard Rosenberg have respective ownership interests of fifty percent (50%) and twenty-five percent (25%) of the Fox Chapel Community Supermarket.

[*5]

From December 17, 2001 to April 22, 2002, Plaintiff was on FMLA maternity leave. (*Id.* at P 35.) Within thirty (30) days from February 17, 2002, pursuant to the CBA, Fox Chapel Foods was required to create another full-time position. (*Id.* at P 36.) Paul Rosenberg elected to place the full-time position in the produce department to make it easier for Plaintiff to qualify for the position as she needed dependent health care coverage for her newborn child. (*Id.* at P 38.) A store employee called Plaintiff and told her about the posting of the full-time position in produce. Plaintiff was awarded the full-time position and upon her return from maternity leave, she received both wage and benefit increases under the CBA.

A few days prior to September 4, 2003, Paul Rosenberg was in the store and saw Plaintiff "leaving" the store fifteen (15) minutes before the end of her shift. n2 (*Id.* at P 8.) He was subsequently told that she had not taken her fifteen (15) minute break. (*Id.*) Paul Rosenberg did not say anything to Plaintiff or admonish her in any way on that day. (*Id.* at P 9.)

> n2 Paul Rosenberg testified in his deposition that he saw Plaintiff leaving the store; however, in her deposition, Plaintiff testified that she was not leaving the store, but rather she was shopping in the store.

[*6]

Later that day when Paul Rosenberg saw General Manager Bill Nau ("Nau"), he told him that at the next managers' meeting, Nau was to tell the managers to schedule all employee breaks in the middle of the work shift. (*Id.* at P 10.)

Article 9.4 of the CBA provides as follows:

Rest Periods.

Employees scheduled to work six (6) or more hours per day, but less than eight (8) hours, shall receive one (1) rest period of twenty (20) minutes. Employees scheduled to work eight (8) hours a day shall receive two (2) fifteen (15) minute rest periods, the first to occur in the morning and the second in the afternoon, or the first in the afternoon and the second

in the evening for employees who are working a late schedule. Rest periods will be granted as near to the middle of each work shift as possible. Employees scheduled to work four (4) or more hours per day, but less than six (6) hours, shall receive one (1) fifteen (15) minute rest period.

CBA, Def's Ex. C.

On September 4, 2003, Nau held a store managers meeting at which time he told all managers to schedule all employee breaks in the middle of scheduled work shifts. (*Id.* at P 11).

Plaintiff came to work on September 4, 2003 at [*7] approximately 2 P.M. and shortly after arriving was told by the produce manager of the mid-shift break policy. (*Id.* at P 13.) Immediately after being told of the policy, Plaintiff went onto the store page system and paged Assistant Store Manager, Renee Sager, and then went to the back room area where Sager and Nau were present. (*Id.* at P 15.) Plaintiff was clearly upset by the break policy and asked to speak to Paul Rosenberg in private, but her request was denied.

Nau attempted to calm Plaintiff down and explained to her that the break policy applied to all employees, the meeting was not about her, and other topics were discussed at the meeting. (*Id.* at P 16.) Nau permitted Plaintiff to return to work and did not issue any discipline to her for her conduct. (*Id.* at P 17.)

Paul Rosenberg later arrived at the store and learned that Plaintiff was upset by the break policy. He went over to her in the produce department and told her that the meeting was not about her. (*Id.* at P18.) As Paul Rosenberg turned to go towards the front of the store, the Plaintiff followed behind him and stated in a loud manner that she was "tired of you (Paul Rosenberg) turning your back [*8] on me" and that she was tired of "you (Paul Rosenberg) harassing me (Plaintiff)." (Pl's depo at 28.) This confrontation occurred on the store sales floor where customers were present. (Statement of Undisputed Material Facts, at P 20.)

After the confrontation, Plaintiff asked permission to leave work and go home, which request was granted. No discipline was issued to Plaintiff as a result of the confrontation. Plaintiff "punched out" and waited outside,

in front of the store, until her boyfriend came to pick her up.

When her boyfriend arrived, they both re-entered the store and Plaintiff, by her own admission, was in an "upset state." (Pl's depo. at 44.) She again began yelling at Paul Rosenberg and stated:

"a) Don't turn your back on me;

b) You are an evil man; and

c) That the plaques honoring the Rosenberg family were lies and should be taken down."

(Stmt of Undisputed Material Facts, at P 22.) n3 Plaintiff was then told to leave the building with her boyfriend, which she did. That evening, Plaintiff was called and told she was being placed on indefinite suspension. (*Id.* at P 23.)

> n3 Defendants also contend that Plaintiff yelled "that she would tell customers not to shop in the store," but Plaintiff denies ever making that statement.

[*9]

Plaintiff attended a grievance session on October 2, 2003, held in the rear of the store. She was represented by Union Representative Sue Riley and Store Union Steward Joe Pogel. (*Id.* at P 24.) During the grievance session, Plaintiff became irritated and again yelled at Paul Rosenberg that he was an evil man and that she did not know what hate was until she met Paul Rosenberg. n4 (*Id.* at P 25.)

> n4 Defendants also contend that Plaintiff again yelled "that she would tell customers not to shop in the store," but Plaintiff denies ever making that statement.

Union Representative Sue Riley stopped the meeting due to the conduct of Plaintiff and asked Plaintiff to leave the meeting. (*Id.* at P 26.) On that same day, Plaintiff's

indefinite suspension was converted to a discharge. Subsequently, the grievance filed on behalf of Plaintiff was withdrawn by Local 23.

Plaintiff contends that not only was her employment wrongfully terminated "because of her status as a female, but [she] was also subjected [*10] to a hostile working environment while employed by Fox Chapel Foods." Pl's Br. at 8. She also contends that her employment was wrongfully terminated in retaliation for her taking leave under the FMLA and that upon her return to work from maternity leave, her wages, benefits, and schedule were adversely affected.

### STANDARD OF REVIEW

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, the Court's task is not to resolve disputed issues of fact, but to determine whether there exist any factual issues to be tried. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-49, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion. *Williams v. Borough of West Chester,* 891 F.2d 458, 460 (3d Cir. 1989) (*citing Liberty Lobby,* 477 U.S. at 249). Further, the non-moving [*11] party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Id.* (*citing Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). Distilled to its essence, the summary judgment standard requires the non-moving party to create a "sufficient disagreement to require submission [of the evidence] to a jury." *Liberty Lobby,* 477 U.S. at 251-52.

### DISCUSSION

As stated above, Plaintiff claims that she was terminated from her employment because of her "status as a female" and in retaliation of her exercising her rights under the FMLA; that prior to her termination, she was subjected to a hostile work environment because of her "status as a female;" and that the terms of her employment were adversely affected in retaliation of her exercising her rights under the FMLA rights. Defendants

respond that they are entitled to summary judgment because (i) Plaintiff cannot make out a *prima facie* case under Title VII and/or the FMLA and (ii) assuming that Plaintiff could make out a *prima facie* case under either Title VII or FMLA, Defendants had a legitimate nondiscriminatory business [*12] reason for terminating her employment. The task of the Court is not to second-guess employment decisions, but is instead to determine whether the employment decisions were motivated by an illegal discriminatory purpose. *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 525-27 (3d Cir. 1992), *cert. denied,* 510 U.S. 826, 114 S. Ct. 88, 126 L. Ed. 2d 56 (1993).

A. Prima Facie Case Under Title VII

As stated above, Plaintiff claims that she was subjected to an unlawful termination and a hostile work environment because of her "status as female." Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). n5 In a Title VII lawsuit, if a plaintiff cannot produce direct evidence of discrimination, then she must utilize the familiar *McDonnell Douglas* formulation n6 regarding the appropriate burdens of proof and allocation of production of evidence.

n5 Pennsylvania courts generally interpret the PHRA in accordance with its federal counterparts. *See Kelly v. Drexel Univ.,* 94 F.3d 102, 104 (3d Cir. 1996). Therefore, the disposition of Plaintiff's Title VII claim applies with equal force to her PHRA discrimination claim.

[*13]

n6 *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

1. *Claims of Unlawful Termination*

In order to prevail on her claim of unlawful termination, Plaintiff must prove that (i) she is a member

of a protected class; (ii) her employment was terminated; (iii) she was qualified for the position from which she was terminated; and (iv) the circumstances under which she was terminated give rise to an inference of unlawful sex discrimination. *Keller v. Orix Credit Alliance,* 130 F.3d 1101, 1103 (3d Cir. 1997). Should the Plaintiff make this showing, a presumption of discrimination is created and the burden shifts to the Defendants to articulate some legitimate, nondiscriminatory reason for their decision. *Fuentes,* 32 F.3d 759 at 763; *Weldon v. Kraft, Inc.,* 896 F.2d 793, 797 (3d Cir. 1990).

The employer need only produce sufficient evidence to enable a factfinder to conclude that the action taken was motivated by a nondiscriminatory purpose. *Fuentes,* 32 F.3d at 763. If the defendant is able to clear this relatively [*14] low hurdle, the presumption evaporates and the onus is again on the plaintiff, who bears the ultimate burden of showing, by a preponderance of the evidence, that the defendant's proffered reason(s) were a pretext for discrimination. *Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 522 (3d Cir. 1992). The plaintiff can either prove this directly, by showing that discriminatory considerations motivated the defendant's actions, or indirectly, by showing that the rationale provided by the defendant is unworthy of credence. *Josey,* 996 F.2d 632 at 638; *Weldon,* 896 F.2d at 797.

At trial, a Title VII plaintiff must prove both that the employer's reason was false and that discrimination was the real reason for the discharge. *Fuentes,* 32 F.3d at 763. However, the United States Court of Appeals for the Third Circuit has held that the plaintiff's burden is not as onerous when attempting to survive a summary judgment motion. In such situations, the plaintiff need only demonstrate that there are disputed factual issues concerning either (1) whether the proffered reason for the discharge is false, or (2) whether an invidious [*15] discriminatory reason was more likely than not a motivating or determinative cause for the discharge. *Torre v. Casio, Inc.,* 42 F.3d 825, 830 (3d Cir. 1994); *Fuentes,* 32 F.3d at 764.

For the purpose of this motion, the court will assume that Plaintiff has satisfied the first three elements of her *prima facie* Title VII unlawful termination claim. The Court finds, however, that Plaintiff has not established the fourth element of her unlawful termination claim. The record is completely void of any evidence sufficient to raise an inference that gender was a factor in the decision to terminate Plaintiff's employment.

It is undisputed that on the afternoon of September 4, 2003, Plaintiff loudly "confronted" Paul Rosenberg on the store sales floor. Further, it is also undisputed that during the grievance session held on October 2, 2003, Plaintiff again became irate and loudly yelled at Paul Rosenberg, telling him, *inter alia,* that he was "evil" and that she "did not know what hate was until she met" him.

After reviewing the record in this case, the Court concludes that Plaintiff has not offered sufficient evidence from which a reasonable fact finder [*16] could conclude that Plaintiff's termination was based on her gender, rather than her misconduct. Because Defendant has presented uncontested evidentiary facts which establish that the Plaintiff's termination was the result of her misconduct, the Court finds that Plaintiff is unable to establish the fourth prong of a *prima facie* case of unlawful termination under Title VII.

However, assuming *arguendo* that Plaintiff could establish a *prima facie* case of unlawful termination, the Court finds and rules that summary judgment for the Defendants would still be warranted because Plaintiff cannot establish that the legitimate, nondiscriminatory reason articulated by Defendants for the discharge of Plaintiff was pretextual.

Defendants contend that they had a "legitimate, non-discriminatory reason for the discharge of the Plaintiff. Her persistent outrageous conduct on the sales floor of the supermarket and at the subsequent grievance session violates the fundamental standard of conduct expected from employees toward the owner and chief operating officer of the business; her employer." Defs' Br. at 16. "Her conduct on September 4, 2003 and October 2, 2003 constitutes unacceptable [*17] conduct in support of discharge by any rational standard applied to the American workplace." Defs' Reply at 2.

Insubordination and/or misconduct is a legitimate, non-discriminatory cause for termination. *See Johnson v. Resources for Human Development,* 878 F. Supp. 35, 38 (E.D. Pa. 1995). An employer is not subject to liability under Title VII for terminating an employee based on a belief that the employee was insubordinate or otherwise acted improperly even if that belief was incorrect or the result of a flawed investigation. *See Fuentes,* 32 F.3d at 765 (the issue is "whether discriminatory animus motivated the employer, not whether the employer is

wise, shrewd, prudent, or competent").

Therefore, under the final prong of the *McDonnell Douglas* analysis, the burden shifts back to Plaintiff to produce sufficient evidence to withstand summary judgment on the ultimate issue of pretext. *See McDonnell Douglas,* 411 U.S. at 802. Plaintiff must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve Defendants' articulated legitimate reason or (2) believe than an invidious discriminatory [*18] reason was more likely than not a motivating factor or determinative cause of Plaintiff's termination. In other words, Plaintiff must demonstrate such "weaknesses, implausibilities, inconsistencies, incoherencies, or contractions" in Defendants' proffered legitimate reasons that a "reasonable fact finder could rationally find them unworthy of credence and hence infer that the proffered nondiscriminatory reason did not actually motivate" the action taken by Defendants. *Fuentes,* 32 F.3d at 764-65 (*quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen,* 983 F.2d 509, 531 (3d Cir. 1992)).

In response, Plaintiff argues that "other male employees of Fox Chapel Foods were not terminated despite engaging in conduct that a reasonable factfinder could find to be more worthy of termination." Pl's Br. at 10. In support of her contention, Plaintiff directs the Court to incidents involving Charles Wilson, Benny Miller, and Ryan Newfield, three (3) male employees whom Plaintiff contends were similarly situated to her, yet disciplined more leniently than her.

The first comparator identified by Plaintiff is Charles Wilson ("Wilson"). Wilson was given a one-day suspension [*19] after he engaged in an "argument" with Harry Clark, a store manager, in the back room of the store. However, unlike Mr. Wilson, Plaintiff was not disciplined after her confrontation in the back room with Renee Sanger and Nau, nor was she disciplined after her first confrontation with Paul Rosenberg on the sales floor. Rather, Plaintiff was initially disciplined after her re-entry into the store and she again confronted Paul Rosenberg, the store owner, on the sales floor. Plaintiff's employment was not terminated until October 2, 2003, when she again verbally attacked Paul Rosenberg during the grievance session.

In a separate and unrelated incident, Wilson was caught stealing cigarettes from the store and "he was allowed to voluntarily resign rather than to be terminated for employee theft." Pl's Br. at 11. Plaintiff contends that she "was never afforded any such opportunity." *Id.* However, during her deposition, Plaintiff admitted that she too was actually offered the opportunity to resign, but she elected not to and proceeded forward with the grievance session. n7

n7 Plaintiff testified during her deposition as follows:

"[B]efore this meeting I was under recommendation from Sue Riley that why don't I take their -- they proposed that I quit and they told me -- they told Sue that they would not contest my unemployment if I would just quit and they would put down lack of work for me as my reason so I could collect my unemployment; and I would not quit. . . ." Pl's Depo. at 52.

[*20]

Next, Plaintiff points to an incident which allegedly involved Benny Miller ("Miller"), who according to Plaintiff was not terminated despite being caught smoking marijuana on the store's premises. The summary judgment record demonstrates, however, that Miller was never caught smoking marijuana on the store's premises and the only incident involving Benny Miller occurred in November 2003; one month after Plaintiff's discharge on October 2, 2003. *See* Nau Depo. at 88-90; and Affidavits from Benny Miller and Harry Clark.

Lastly, Plaintiff points to an incident which involved Ryan Newfield ("Newfield"), which resulted in Newfield being afforded a "last chance agreement" rather than termination. The summary judgment record reflects that Newfield was disciplined because he had been on his personal cell phone in the store for an extended amount of time, and employees are not supposed to get telephone calls while in the store. Nau Depo. at 81.

Upon review of the summary judgment record, the Court finds that the record reflects that incidents involving the "male employees" in no way involve the same or similar conduct as that exhibited by Plaintiff. As the Court discussed in the context [*21] of the *prima facie* case, Plaintiff's evidence of discrimination is insufficient as a matter of law. Plaintiff has not

demonstrated that similarly situated individuals were treated differently than her with regard to similar conduct. The record is devoid of any evidence from which a reasonable fact-finder could find that Defendants' reason for Plaintiff's termination was her gender and not her misconduct.

### 2. Claims of Hostile Environment

In order to prevail on her claims of hostile work environment, Plaintiff must prove that (1) she suffered intentional discrimination because of her gender; (2) the discrimination was severe or pervasive; n8 (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present. *Jensen v. Potter,* 435 F.3d 444, 449 (3d Cir. 2006).

> n8 Historically, cases from the Third Circuit have often phrased this element as requiring "pervasive and regular" harassment. However, our appellate court recently acknowledged that the difference between its own formulation of this element and that of the United States Supreme Court, which requires "severe or pervasive" harassment, is significant, and that the latter must control. *See Jensen v. Potter,* 435 F.3d 444, 449 n. 3 (3d Cir. 2006) (internal citations omitted).

[*22]

In determining whether an environment is sufficiently hostile or abusive, courts must look to the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton,* 524 U.S. 775, 787-88, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998). The conduct "must be extreme to amount to a change in the terms and conditions of employment." *Id.*

As the United States Supreme Court has emphasized, Title VII is not a "'general civility code'" and thus, "does not provide a cause of action for 'ordinary tribulations of the workplace.'" *Faragher v. Boca Raton,* 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998) (internal quotations omitted).

Plaintiff alleges that Paul Rosenberg and Howard Rosenberg created a hostile work environment towards her because of her "status of a female." Speculations, generalities, and gut feelings, however genuine, do not allow for an inference of discrimination to be drawn when they are not supported by specific facts.

Plaintiff contends that the conduct of Paul Rosenberg and [*23] Howard Rosenberg created a hostile work environment. For example, she alleges that the following comments were harassing and disparaging:

> "a. Paul Rosenberg told her that Joe Pogel, Store Union Steward, should be the one involved in union problems and not her.
>
> b. Paul Rosenberg told her he wishes his stores were not unionized.
>
> c. Paul Rosenberg told her that if she could not handle certain produce department duties, he would get Mike Busick, Company Produce Supervisor, to come and help her.
>
> d. She heard Paul Rosenberg make an indirect comment about her, as she was some distance behind him and he was speaking to his brother stating 'what the f # @* does she want, her cake and eat it too.'
>
> e. Howard Rosenberg told her not to get involved in the union matter."

(Stmt of Undisputed Mat. Facts, at P 57).

Further, Plaintiff alleges that Paul Rosenberg would continuously watch over and scrutinize her work, and, "at times when Plaintiff's presence was fully known to him, where (sic) Paul Rosenberg would make comments and/or have discussions with other employees regarding the Plaintiff as though she was not even there." Pl's Br. at 13.

The Court finds and [*24] rules that the conduct Plaintiff alleges simply does not reflect the extreme

conduct necessary to transform "the ordinary tribulations of the workplace" into a legally cognizable hostile work environment claim. Both the Supreme Court and our appellate court have held that "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious)" are not actionable under Title VII. Instead, the harassing behavior must be 'sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment'." *Abramson v. William Paterson College of New Jersey,* 260 F.3d 265, 280 (3d Cir. 2001) (*quoting Faragher v. City of Boca Raton,* 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662); *Pennsylvania State Police v. Suders,* 542 U.S. 129, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004).

Plaintiff also contends that "her investigation" revealed that male employees were being paid more than female employees. However, the summary judgment record clearly demonstrates that this was not the case. For example, Plaintiff testified in her deposition that a male employee (Charles Wilson) "bragged" that he had been hired at $ 6.50. While the male employee may have made such a statement, the record evidence [*25] reflects that Mr. Wilson was hired by Defendants on October 21, 2000 at $ 5.35 an hour. Additionally, the record reflects that a female employee, Ellen Liberatore, was hired by Defendants on August 20, 2000, at $ 6.50 an hour and Carol Francis was hired by Defendants on February 23, 2001 at $ 5.35 an hour.

Moreover, James Slivosky, current Area Director for UFCW, Local 23, submitted an Affidavit in which he states that "no employee of Fox Chapel Community Market made any claim to me that male employees were being hired in at wages higher than female employees." Def's Ex. G.

The Court finds and rules, after considering the evidence in its totality, that the summary judgment record is utterly devoid of any evidence which demonstrates that Defendants' conduct created a hostile work environment; rather Plaintiff relies upon her own "unsupported assertions, conclusory allegations, or mere suspicions." Such unsubstantiated speculation is not sufficient to withstand summary judgment. *Podobnik v. U.S. Postal Serv.,* 409 F.3d 584, 594 (3d Cir. 2004).

Overall, aside from her mere speculation and conclusory allegations, Plaintiff has not provided any competent evidence that [*26] could lead a reasonable fact finder to believe that gender was a factor in the

treatment she received from Defendants. Because Plaintiff's opposition filing does little more than re-allege the factually unsupported allegations contained in her pleadings, Plaintiff has not established the existence of a genuine issue of material fact that would defeat Defendants' motion for summary judgment on her claims of unlawful termination and hostile work environment brought under Title VII.

B. Prima Facie Case Under FMLA

The FMLA provides up to twelve workweeks of unpaid leave during a twelve-month period for certain family reasons and any serious health condition that makes the employee unable to perform the functions of his or her position. 29 U.S.C. § 2612(a)(1). The statute expressly prohibits an employer from retaliating against an employee for exercising his or her FMLA rights. 29 U.S.C. § 2615(a)(2).

To establish a *prima facie* case of retaliation under the FMLA, Plaintiff must establish that (1) she took an FMLA leave, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to her [*27] leave. *Conoshenti v. Public Serv. Elec. & Gas Co.,* 364 F.3d 135, 146 (3d Cir. 2004). Once a plaintiff makes out a *prima facie* case, the usual *McDonnell Douglas* burden shifting framework is implicated. *See Weston v. Pennsylvania,* 251 F.3d 420, 432 (3d Cir. 2001). Accordingly, the plaintiff bears the initial burden of presenting a *prima facie* case.

Similar to her Title VII claims, the Court finds that Plaintiff has simply failed to present any evidence to show that Defendants engaged in any retaliatory conduct toward Plaintiff as a result of the exercise of her FMLA rights.

As stated *supra,* the Court finds and rules that Plaintiff's conduct on September 4, 2003, and October 2, 2003, provides a sufficient basis for her termination. "The FMLA is not a shield to protect employees from legitimate disciplinary action by their employers if their performance is lacking in some manner unrelated to their FMLA claim." *Cohen v. Pitcairn Trust Co.,* 2001 U.S. Dist. LEXIS 10876, at *9 (E.D. Pa. 2001).

Plaintiff also contends that upon her return from FMLA leave, her wage and benefits were adversely affected. However, the summary [*28] judgment record does not support this contention. As a result of Plaintiff

being awarded the full-time position upon her return from leave, she received the following wage and benefit increases under the CBA:

> a) a wage increase from $ 8.30 to $ 8.90 per hour;
>
> b) Dependent Health Care coverage;
>
> c) a guarantee of 40 hours scheduled Monday through Saturday;
>
> d) increased pension contributions;
>
> e) placement on a full-time seniority list ahead of all part-time employees.

(Stmt of Undisputed Mat. Facts, at P 43.)

In response, Plaintiff alleges that upon her return from leave she "lost her assistant manager" position to Michael Sullivan. Interestingly, the position of assistant manager is a non-bargaining unit position by the terms of the CBA; yet, during all times of her employment, Plaintiff was a member of the bargaining unit represented by UFCW, Local 23. (*Id.* at P 48). Plaintiff testified in her deposition that she "was management outside of the agreement." (Pl Depo. at 114.)

The record evidence demonstrates, however, that at all times relevant to this litigation, the sole representatives of UFCW Local 23 were Sue Riley, Business Representative [*29] of Local 23 and/or Joe Pogel, Store Union Steward. Further, Plaintiff never filed any grievance on behalf of any employee at the store and she did not attend any grievance meetings. (*See* Affidavit of Scott Moberg.)

Plaintiff also contends that upon her return from FMLA leave, Paul Rosenberg told managers that she was not allowed to work overtime. However, Plaintiff testified during her deposition that she was denied overtime "at all times. I mean, both times. It was before and it was after" she gave birth. (*See* Pl's Depo. at 147-48.) Although Plaintiff never filed a grievance on this issue, she testified that she "made it known." (*Id.* at 148.) The Court finds that there is no evidence which demonstrates that Plaintiff was denied overtime in retaliation for her exercise of rights under the FMLA.

Lastly, Plaintiff complains that "upon her return from

FMLA leave [] her schedule was changed without her knowledge and that she was no longer permitted to work on scheduled days off, which also adversely affected her income." Pl's Br. at 18. Again, however, the record evidence belies Plaintiff's complaints. For example, Plaintiff acknowledged in her deposition that Defendants [*30] accommodated her schedule because of child care arrangements, *to wit*:

> They worked with me on that schedule because of my baby-sitter, which I thought was great. I mean, before this, before my son was born, I was 6 to 2, as I stated, and then one day a week was 6 to 12 or 6 to 1; and on Sundays, depending on how long Dan needed me, I would work 6 to 12, sometimes 6 to 2, 6 to 11, something like that. . . .
> The company worked with me on my child care availability.

(Pl's Depo. at 78.)

When Plaintiff returned from FMLA leave, her full-time schedule required her to work Monday nights, although before her leave she did not work any evenings. During her deposition, Plaintiff acknowledged that Section 9.7 of the CBA specifies that full-time employees shall not be required to work more than three (3) nights in any one week and that night work shall be rotated among full-time employees. n9 Plaintiff also confirmed that, although she was not happy about working nights, when she was made aware of Section 9.7 of the CBA, "it was agreed that [she] would work that one night a week."

---

n9 Section 9.7 of the CBA provides as follows:

9.7 Night Work

Where the Employer designates a shift for full-time employees providing for night work, full-time employees shall not be required to work more than three (3) nights in any one week. Night work shall be rotated among full-time employees. All hours of work scheduled after 6:00 p.m., shall be considered night work. This does not apply to regularly scheduled night

crew.

Exh. C., CBA, Section 9.7.

[*31]

Overall, aside from her mere speculation and conclusory allegations, Plaintiff has not provided any competent evidence that could lead a reasonable fact finder to believe that Defendants' took any retaliatory action against Plaintiff as a result of her FMLA leave. Accordingly, summary judgment will be granted to Defendants' on Plaintiff's retaliatory claims under the FMLA.

## C. State Law Pendent Claims For Negligent Supervision and Intentional Infliction of Emotional Distress

Plaintiff also alleges violations under Pennsylvania state law for negligent supervision and intentional infliction of emotional distress. The Court of Appeals for the Third Circuit has held that if the federal counts of a complaint are dismissed then the district court should "ordinarily refrain from exercising jurisdiction [over the state law claims] in the absence of extraordinary circumstances." *Tully v. Mott Supermarkets, Inc.,* 540 F.2d 187, 195-96 (3d Cir. 1976). *See also Borough of West Mifflin v. Lancaster,* 45 F.3d 780, 788 (3d Cir. 1995) ("Under Gibbs jurisprudence, where the claims over which the district court has original jurisdiction are dismissed before [*32] trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.") Given that Defendants' motion will be granted on the federal claims in this case, and given that there are no extraordinary circumstances which would warrant the exercise of jurisdiction over the pendent state law claims, the Court will decline to exercise supplemental jurisdiction. Accordingly, Plaintiff's claims for negligent supervision and intentional infliction of emotional distress under Pennsylvania state law will be dismissed without prejudice. *Angst v. Mack Trucks, Inc.,* 969 F.2d 1530 (3d Cir. 1992) (once all federal claims have been dropped from the case, the case should either be dismissed or transferred to the Pennsylvania Court of Common Pleas pursuant to 42 Pa. Cons. Stat. Ann. § 5103(b)).

## CONCLUSION

Viewing the facts in the light most favorable to Plaintiff, the Court finds that she has failed (i) to establish a *prima facie* case of gender discrimination and (ii) to establish sufficient evidence from which [*33] a reasonable fact finder could rationally find that Defendants' articulated reasons for its employment actions were unworthy of credence, or that the decision to terminate Plaintiff was motivated by a discriminatory reason. Where a plaintiff cannot show such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in defendant's reasons for its action, summary judgment is required. *See Fuentes,* 32 F.3d at 765. Accordingly, summary judgment will be granted as to Plaintiff's claims of gender discrimination.

Likewise, Plaintiff has failed to establish a prima facie case of violations of the FMLA. Accordingly, summary judgment will be granted as Plaintiff's claims that Defendants retaliated against her in violation of the FMLA.

Plaintiff's claims for negligent supervision and intentional infliction of emotional distress will be dismissed without prejudice. An appropriate order follows.

McVerry, J.

## ORDER OF COURT

AND NOW, this 5th day of September, 2006, in accordance with the foregoing Memorandum Opinion, it is hereby **ORDERED, ADJUDGED AND DECREED** as follows:

1. The Motion for Summary Judgment filed by Defendants is **GRANTED** [*34] as to all claims of alleged unlawful termination and discrimination in violation of Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act;

2. The Motion for Summary Judgment filed by Defendants is **GRANTED** as to all claims of alleged retaliation in violation of the Family Medical Leave Act;

3. The Pennsylvania state law claims for negligent supervision and intentional infliction of emotional distress are dismissed without prejudice forthwith; and

4. The Clerk shall docket this case closed.

LEXSEE 2006 U.S. APP. LEXIS 21448

**EDWARD F. MORRISON, Appellant v. CARPENTER TECHNOLOGY CORP.**

**No. 05–1922**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*2006 U.S. App. LEXIS 21448*

**March 30, 2006, Argued**
**August 22, 2006, Filed**

**NOTICE:** [*1] RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal from the United States District Court for the Eastern District of Pennsylvania. (D.C. Civil No. 03–cv–06102). District Judge: Hon. James K. Gardner. *Morrison v. Carpenter Tech. Corp., 2005 U.S. Dist. LEXIS 2777 (E.D. Pa., Feb. 22, 2005)*

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former employee appealed the United States District Court for the Eastern District of Pennsylvania's order granting defendant employer's motion for summary judgment on his hostile work environment claim under Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e* et seq., and the Pennsylvania Human Relations Act, *43 Pa. Stat. Ann. § 951* et seq., and his retaliation claim under Title VII, *42 U.S.C.S. § 1981*, and the PHRA.

**OVERVIEW:** The instant court first found that the employee could not prevail on his claim for hostile work environment because there was no basis for employer liability. The instant court reasoned that the record evidence demonstrated that the employer took prompt and adequate remedial action and the remedial action effectively stopped the alleged harassment. Conversely, there was no record evidence to support the employee's conclusory assertion that the employer's remedial action was nothing more than a "sham." The remedial action included an extensive investigation involving interviews of dozens of employees and several departmental meetings at which management reviewed the company's policy against harassment. Next, the instant court found that the employee failed to demonstrate the elements of his retaliation claim. The instant court reasoned that the employee did not iden-

tify, much less establish, any harm or injury produced by the corrective performance review. The review did not result in any economic loss to the employee or any change to the terms of his employment.

**OUTCOME:** The judgment was affirmed.

**CORE TERMS:** discovery, drawing, depositions, summary judgment, retaliation, harassment, cardboard, hostile work environment, remedial action, summary judgment motion, materially, legal counsel, corrective, protected activity, quotation, deadline, drums, reasonable employee, causal connection, additional time, adverse action, advancement, retaliatory, favorable, waste material, inappropriate, departmental, appearance, interviews, manager

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Standards > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*
[HN1] See *Fed. R. Civ. P. 56(f)*.

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*
*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*
[HN2] *Fed. R. Civ. P. 56(f)* explicitly provides that a party seeking additional time for discovery must file an affidavit setting forth why the time is needed. The United States Court of Appeals for the Third Circuit has made clear that, in all but the most exceptional cases, failure to comply with the Rule 56(f) is fatal to a claim of insufficient discovery on appeal. The purpose of the affidavit is to ensure that the nonmoving party is invoking the protection of Rule 56(f) in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition. An affidavit bears indicia of evidentiary reliability

that is lacking in arguments made by counsel in the course of advocacy.

***Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview***
***Civil Procedure > Summary Judgment > Supporting Materials > Affidavits***
[HN3] Beyond the requirement of an affidavit, a party seeking additional time for discovery must identify with specificity what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained.

***Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview***
***Civil Procedure > Summary Judgment > Supporting Materials > Affidavits***
[HN4] Courts generally do not grant relief under *Fed. R. Civ. P. 56(f)* if the purported need for the additional factual information is attributable to the movant's own lack of diligence during the discovery period.

***Civil Procedure > Summary Judgment > Appellate Review > Standards of Review***
***Civil Procedure > Summary Judgment > Standards > General Overview***
[HN5] An appellate court reviews the district court's order granting summary judgment de novo, applying the same standard as the district court. Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. On a motion for summary judgment, a court looks at all facts in a light most favorable to the non–moving party.

***Civil Procedure > Summary Judgment > Supporting Materials > Affidavits***
[HN6] Summaries of interviews, which were not attached to an affidavit or authenticated in an affidavit, cannot serve as the basis for summary judgment. *Fed. R. Civ. P. 56(e)*.

***Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Burdens of Proof > Employee Burdens***
***Labor & Employment Law > Discrimination > Harassment > Racial Harassment > Hostile Work Environment***
[HN7] To prevail on a claim for a hostile work environment under Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act, a plaintiff must show that: (1) he suffered intentional discrimination because of his race; (2) the discrimination was severe or

pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present.

***Labor & Employment Law > Discrimination > Actionable Discrimination***
***Labor & Employment Law > Discrimination > Title VII of the Civil Rights Act of 1964 > General Overview***
[HN8] The analysis under Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably.

***Labor & Employment Law > Discrimination > Retaliation > Burdens of Proof***
***Labor & Employment Law > Discrimination > Retaliation > Elements > General Overview***
[HN9] To establish a claim of retaliation, a plaintiff must show that: (1) s/he engaged in protected employee activity; (2) the employer took adverse action after or contemporaneous with the protected activity; (3) the action would have been materially adverse to a reasonable employee in the plaintiff's position; and (4) there was a causal connection between the protected activity and the adverse action.

***Labor & Employment Law > Discrimination > Retaliation > Elements > Adverse Employment Actions***
[HN10] The United States Supreme Court held that the Title VII anti–retaliation provision extends beyond workplace–related or employment–related acts and harms, but, at the same time, covers only those retaliatory actions that would have been materially adverse to a reasonable employee or job applicant. Under the new standard articulated in Burlington, courts must consider both the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position.

***Labor & Employment Law > Discrimination > Retaliation > Elements > Adverse Employment Actions***
[HN11] The Title VII anti–retaliation provision protects an individual from retaliation that produces an injury or harm. In other words, the challenged action must be materially adverse, which in the context of a retaliation claim means that it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. The United States Supreme Court emphasized the importance of applying an objective standard to measure the level of alleged harm in order to avoid uncertainties and unfair discrepancies. Whether a retaliatory action is sufficiently serious to meet the materiality and reasonableness requirements depends upon the particular circumstances.

*Labor & Employment Law > Discrimination > Retaliation > Elements > Causal Link*

[HN12] In the context of a retaliation claim, where the temporal proximity between the protected activity and the adverse action is not so close as to be unduly suggestive, courts have recognized that timing plus other evidence may be an appropriate test.

**COUNSEL:** Ellis M. Saull, Esq. (Argued), King of Prussia, PA, Counsel for Appellant.

G. Thompson Bell, III, Esq. (Argued), Stevens & Lee, Reading, PA; John F. Ward, Esq., Stevens & Lee, King of Prussia, PA, Counsel for Appellee.

**JUDGES:** BEFORE: SMITH and COWEN, Circuit Judges, and THOMPSON * , District Judge.

> * Honorable Anne E. Thompson, Senior United States District Judge for the District of New Jersey, sitting by designation.

**OPINION BY:** COWEN

**OPINION:** COWEN, Circuit Judge.

Edward F. Morrison appeals the District Court's order granting Carpenter Technology Corporation's ("Carpenter") motion for summary judgment on his claim for hostile work environment under Title VII of the Civil Rights Act of 1964, as amended, *42 U.S.C. § 2000e to-17*, and the Pennsylvania Human Relations Act ("PHRA"), *43 Pa. Cons. Stat. Ann. §§ 951–963*, [*2] and his retaliation claim under Title VII, *42 U.S.C. § 1981*, and the PHRA. Morrison also appeals the District Court's two orders denying his motions for leave to take five depositions outside of the discovery period. For the reasons stated below, we will affirm.

I.

Because we write only for the benefit of the parties, we recite only those facts necessary to our analysis. Morrison, an African–American, is a former employee of Carpenter. During the course of his thirty years of employment with Carpenter, Morrison worked in several different positions, including that of wire and trash collector in the Bar Finishing Department. In this latter position, Morrison was responsible for collecting waste material from large drums and depositing it into city–owned dumpsters.

Shortly after assuming the position, Morrison began experiencing several problems associated with the presence of inappropriate waste material in the drums. He reported the problems to his department manager and two shift coordinators. He also complained to management about an incident involving a spewing soda can which he found in one of the drums. In a signed and sworn statement, [*3] Morrison indicated to management that he believed a Carpenter employee had planted the soda can in one of the drums in order to harm him.

In response to the inappropriate waste material complaint, Area Manager Joseph Pieja conducted waste management presentations at several departmental meetings. In addition, Carpenter conducted a random inspection of all trash and scrap receptacles in buildings seventy–three and ninety–seven, and found no evidence of inappropriate mixing of materials. With regard to the spewing soda can incident, Pieja discussed the matter with Morrison and conducted an investigation, but found no evidence to support his claim.

On April 26, 2002, Morrison found a large cardboard drawing of a man who had an upraised noose around his neck. The drawing was perched on a locker near the thoroughfare used largely for trash and wire material handling. Morrison immediately reported the incident to Area Manager Todd Eckert. Morrison indicated to management that he believed the drawing to be a representation of himself because the man depicted in the drawing allegedly had the facial features of an African–American, such as a broad nose and full lips.

Upon receipt of the [*4] report, Eckert related the matter to Tom Reed, Director of Employee Relations, who instructed Neil Culp, Jr., the manager of the Bar Finishing Department, to investigate the incident. As part of that investigation, Culp interviewed twenty-four employees in the Bar Finishing Department, none of whom indicated that they believed the drawing to be a depiction of Morrison. Culp held departmental meetings for each of the three shifts of employees, at which he reviewed Carpenter's policy against workplace harassment and its internal rules prohibiting the posting of unauthorized materials. At the meetings, the employees were given a copy of Carpenter's Harassment and Discrimination Policy and were asked to sign a form acknowledging their receipt of the policy.

In addition, Donald Keim, Manager of Carpenter's Health, Safety and Asset Protection Department, conducted interviews of two contractors and eighteen employees, seven of whom had been interviewed by Culp. Like Culp, Keim found no indication that the drawing was intended to be directed at Morrison.

By letter dated June 15, 2002, Jennie Rodriguez, Carpenter's Manager of Employment Diversity and Employee Relations Specialist, informed [*5] Morrison that Carpenter had concluded its investigation of the card-

board drawing incident and had found no evidence of racial harassment connected to the drawing.

Meanwhile, Morrison reported the drawing incident to the Reading Police Department. On the same day, Dennis Brown, Carpenter's Staff Attorney, contacted Officer Chlebowski of the Police Department and asked that the Police Department use him as a point of contact during its investigation. The Reading Police Department never contacted Morrison or Brown regarding the incident, but, instead, closed the case on the very next day.

On August 22, 2002, Morrison received a Corrective Performance Review for allegedly disruptive behavior associated with making a complaint found to be without substance and for failing to report the complaint directly to his manager.

On March 10, 2003, Morrison filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission. After an investigation, the EEOC issued a Dismissal and Notice of Suit Rights letter.

On July 1, 2003, Morrison bid on, and was awarded, the position of bar wash operator, which resulted [*6] in a 34% pay increase. Morrison continued to work for Carpenter in that position until his retirement, which was effective April 1, 2004.

II.

On September 24, 2003, Morrison filed a *pro se* complaint against Carpenter alleging a claim for hostile work environment under Title VII and PHRA, and a retaliation claim under Title VII, *42 U.S.C. § 1981*, and the PHRA.

On January 6, 2004, during a preliminary telephone settlement conference, the United States Magistrate Judge urged Morrison to retain the services of legal counsel. On February 3, 2004, during the Rule 16 status conference, the District Court also urged Morrison to retain legal counsel. At the end of the Rule 16 status conference, the District Court, with the agreement of the parties, set numerous deadlines, including a discovery deadline of March 31, 2004. The District Court memorialized the deadlines in an order entered on February 6, 2004.

When the discovery period ended on March 31, 2004, Morrison still had not retained counsel. During the discovery period, Morrison served Carpenter with a single request for production of documents.

On May 14, 2004, legal counsel entered an appearance on behalf [*7] of Morrison. Two weeks later, Carpenter filed a motion for summary judgment.

On June 11, 2004, approximately two and a half months after the end of the discovery period and nearly one month after counsel had entered his appearance, Morrison filed a motion seeking leave to take the depositions of five Carpenter employees in order to respond to Carpenter's summary judgment motion. Morrison asserted that he had recently retained legal representation, and, with the aid of legal counsel, determined that he could not properly respond to the motion for summary judgment without the information he expected to obtain as a result of the depositions. Morrison claimed that each of the proposed deponents "possesses vital information regarding the important occurrences that led the Plaintiff to file his Complaint." (App. at 134.)

One week later, the District Court denied Morrison's motion to permit discovery. The District Court reasoned that Morrison had failed to seek an extension of time prior to the expiration of the discovery deadline and had waited almost one month from the date of counsel's initial appearance to file the discovery motion.

On August 12, 2004, Morrison filed a second motion [*8] seeking to depose the same five individuals mentioned in the first discovery motion. On August 25, 2004, the District Court granted Carpenter's unopposed request for a continuance of trial, and rescheduled trial for January 10, 2005. On January 5, 2005, the District Court denied Morrison's second motion for leave to take the depositions. The parties were not called for trial during the week of January 10, 2005. Instead, in an order entered February 23, 2005, the District Court granted Carpenter's motion for summary judgment on all counts.

III.

Morrison argues that the District Court erred in denying his two motions seeking leave to take the depositions of five Carpenter employees. As noted above, Morrison claims that the proposed deponents possess information that would have been essential to his opposition to Carpenter's summary judgment motion.

In seeking leave to take the depositions, Morrison did not expressly invoke the protections of Federal *Rule 56(f)*, which provides that [HN1] "[s]hould it appear from the affidavits of a party opposing the [summary judgment] motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, [*9] the court may refuse the application for judgment or may order a continuance to permit . . . depositions to be taken . . . ." *Fed. R. Civ. P. 56(f)*. However, because he sought to take the depositions outside of the discovery period in order to obtain additional facts to support his opposition to Carpenter's summary judgment motion, we conclude that the procedures set forth in *Rule 56(f)* apply. *Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 510–11 (3d*

*Cir. 1994*). We review the District Court's denial of his motions under an abuse of discretion standard. *Id.*

[HN2] *Rule 56(f)* explicitly provides that a party seeking additional time for discovery must file an affidavit setting forth why the time is needed. *Id.* "We have made clear that, in all but the most exceptional cases, failure to comply with the *Rule 56(f)* is fatal to a claim of insufficient discovery on appeal." *Bradley v. United States, 299 F.3d 197, 207 (3d Cir. 2002); Radich v. Goode, 886 F.2d 1391, 1393 (3d Cir. 1989)* ("This circuit generally requires that a party file a *Rule 56(f)* affidavit in order to preserve the issue for appeal. [*10] "). "The purpose of the affidavit is to ensure that the nonmoving party is invoking the protection of *Rule 56(f)* in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition." *Id. at 1394* (citation and internal quotation marks omitted). An affidavit bears indicia of evidentiary reliability that is lacking in arguments made by counsel in the course of advocacy. *Id. at 1394-95.*

[HN3] Beyond the requirement of an affidavit, a party seeking additional time for discovery "must identify with specificity 'what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained.'" *Lunderstadt v. Colafella, 885 F.2d 66, 71 (3d Cir. 1989)* (quoting *Dowling v. City of Philadelphia, 855 F.2d 136, 140 (3d Cir. 1988)).*

Here, Morrison did not submit a *Rule 56(f)* affidavit with either of his two motions seeking additional time to conduct discovery. Instead, he relied only upon his counsel's unsworn arguments made in the course of advocacy.

Moreover, even if we were inclined to excuse Morrison's failure to satisfy the affidavit [*11] requirement, his motions fail for two other significant reasons. First, Morrison allowed the agreed-upon two-month discovery period to lapse without making any attempt to take any of the depositions. In addition, he failed to seek an extension of the discovery period in order to retain counsel. [HN4] We generally do not grant relief under *Rule 56(f)* if the purported need for the additional factual information is attributable to the movant's own lack of diligence during the discovery period. *See Lunderstadt, 885 F.2d at 71-72.* Second, in his motions prepared by legal counsel, Morrison failed to identify the particular information he sought to obtain as a result of the depositions. Morrison's mere statements identifying the elements of his claims and the theories of his case do not satisfy the requirement of specifying the particular information he expected to uncover. *See Pastore, 24 F.3d at 511.*

Under the foregoing circumstances, we cannot conclude that the District Court abused its discretion in declining to grant Morrison's motions seeking the belated discovery.

IV.

[HN5] We review the District Court's order granting summary judgment *de novo*, applying [*12] the same standard as the District Court. *Id. at 511.* Summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* On a motion for summary judgment, we look at all facts in a light most favorable to the non-moving party. *Morton Int'l, Inc. v. A.E. Staley Mfg. Co., 343 F.3d 669, 680 (3d Cir. 2003).* n1

> n1 Morrison objects to Carpenter's submission, with its summary judgment motion, of summaries of interviews that Carpenter conducted as part of its investigation concerning the cardboard drawing incident. We agree that the [HN6] summaries, which were not attached to an affidavit or authenticated in an affidavit, cannot serve as the basis for summary judgment. *See Fed. R. Civ. P. 56(e).* Nevertheless, the actual details of the summaries were immaterial to the issues in the summary judgment motion. Carpenter relied upon the summaries to support its general observation that none of the interviewees found the cardboard drawing to be a depiction of Morrison. (App. at 82-83.) That same observation was made in Rodriguez's letter to Morrison dated June 13, 2002, which Morrison himself submitted to the District Court in support of his opposition to Carpenter's motion for summary judgment. (App. at 205.)

[*13]

A.

[HN7] To prevail on a claim for a hostile work environment under Title VII and the PHRA, n2 Morrison must show that: (1) he suffered intentional discrimination because of his race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected him; (4) the discrimination would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present. *Jensen v. Potter, 435 F.3d 444, 449 (3d Cir. 2006).*

> n2 [HN8] The analysis under Title VII and the PHRA is identical, as Pennsylvania courts have construed the protections of the two acts inter-

changeably. *Weston v. Pennsylvania, 251 F.3d 420, 426 n.3 (3d Cir. 2001).*

Viewing all of the facts and the reasonable inferences therefrom in the light most favorable to Morrison, we conclude that Morrison cannot prevail on his claim for hostile work environment because there is no basis for employer liability. The record evidence demonstrates that Carpenter took prompt [*14] and adequate remedial action and the remedial action effectively stopped the alleged harassment. *See id. at 453* ("In order to establish employer negligence, the plaintiff must show that management knew or should have known about the harassment, but failed to take prompt and adequate remedial action. An effective remedy–one that stops the harassment–is adequate per se." (citations and internal quotation marks omitted)). Conversely, there is no record evidence to support Morrison's conclusory assertion that Carpenter's remedial action was nothing more than a "sham." The remedial action included an extensive investigation involving interviews of dozens of employees and several departmental meetings at which management reviewed the company's policy against harassment. Neither Carpenter's counsel's telephone call to the Police Department nor Carpenter's ultimate failure to identify the culprit behind the cardboard drawing shows that Carpenter's overall remedial action was less than genuine.

Because *respondeat superior* liability does not apply, we conclude that the District Court properly granted Carpenter's motion for summary judgment as to the hostile work environment [*15] claim. In light of our conclusion, we need not, and do not, consider whether Morrison satisfied the other prongs of his hostile work environment claim.

B.

[HN9] To establish a claim of retaliation, a plaintiff must show that: (1) s/he engaged in protected employee activity; (2) the employer took adverse action after or contemporaneous with the protected activity; (3) the action would have been materially adverse to a reasonable employee in the plaintiff's position; and (4) there was a causal connection between the protected activity and the adverse action. *Burlington N. & Santa Fe Ry. Co. v. White, -- U.S.--, 126 S. Ct. 2405, 2409, 165 L. Ed. 2d 345 (2006); Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001).*

In *Burlington*, [HN10] the Supreme Court held that the Title VII anti–retaliation provision extends beyond workplace–related or employment–related acts and harms, but, at the same time, covers only those retaliatory actions that would have been materially adverse to a reasonable employee or job applicant. *126 S. Ct. at 2409.* Under the new standard articulated in *Burlington,* we must consider both "the materiality of the challenged [*16] action and the perspective of a reasonable person in the plaintiff's position." *Id. at 2416.*

The *Burlington* Court explained that [HN11] "[t]he anti–retaliation provision protects an individual . . . from retaliation that produces an *injury or harm.*" *Id. at 2414* (emphasis added). In other words, "the challenged action [must be] materially adverse, which in th[e] context [of a retaliation claim] means that it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id. at 2415* (citation and internal quotation marks omitted). The Court also emphasized the importance of applying an objective standard to measure the level of alleged harm in order to avoid uncertainties and unfair discrepancies. *Id.* Whether a retaliatory action is sufficiently serious to meet the materiality and reasonableness requirements "depend[s] upon the particular circumstances." *Id.*

Viewing all of the facts and the reasonable inferences therefrom in the light most favorable to Morrison, we agree with the District Court that Morrison failed to demonstrate the elements of his retaliation claim. Carpenter [*17] does not seriously dispute that Morrison engaged in protected activity when he made complaints to management about racial harassment stemming from the cardboard drawing incident which occurred on April 26, 2002. However, Morrison cannot establish the second and third elements of his retaliation claim based upon the corrective performance review he received in August 2002. n3 He does not identify, much less establish, any harm or injury produced by the corrective performance review. The review did not result in any economic loss to Morrison or any change to the terms of his employment, and the record is devoid of any facts bearing upon the significance of the single corrective performance review on his professional advancement at Carpenter. *See id. at 2415–16* (indicating that a retaliatory action might be materially adverse if it has an effect on "the employee's professional advancement [which] might well deter a reasonable employee from complaining about discrimination"). If anything, the record indicates that the review was not materially adverse to Morrison's professional advancement as he was awarded a new position and a 34% pay increase on July 1, 2003.

n3 Because Morrison did not raise the issue of constructive discharge before the District Court, the issue is waived.

[*18]

In addition, the record contains no evidence to show a causal connection between Morrison's complaints of racial harassment and the corrective performance review. Morrison received the corrective performance review almost four months after he made his complaint about the cardboard drawing incident. The timing of the incidents is not sufficiently close to be "unduly suggestive," and there is no "other evidence" suggesting a causal connection. *Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003)* ("[HN12] [W]here the temporal proximity [between the protected activity and the adverse action] is not so close as to be unduly suggestive, we have recognized that timing plus other evidence may be an appropriate test.") (citation and internal quotation marks omitted).

For these reasons, we conclude that the District Court properly granted Carpenter's summary judgment motion. n4

     n4 As a result of our disposition of this case, we need not reach Morrison's third issue on appeal regarding a jury demand.

[*19]

For the foregoing reasons, the judgment of the District Court entered on February 23, 2005, will be affirmed.

FOCUS - 9 of 67 DOCUMENTS

**SANDRA POWELL, Plaintiff v. UNITED INSURANCE COMPANY, Defendant**

**Case No. 04C0829**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF WISCONSIN**

*2006 U.S. Dist. LEXIS 40644*

**June 16, 2006, Filed**

**COUNSEL:** **[*1]** For Sandra Powell, Plaintiff: Nola Hitchcock Cross, Cross Law Firm, Milwaukee, WI; Shannon D McDonald, Cross Law Firm SC, Milwaukee, WI.

For United Insurance Company, Defendant: Bernard J Bobber, Foley & Lardner LLP, Milwaukee, WI.

**JUDGES:** LYNN ADELMAN, District Judge

**OPINION BY:** LYNN ADELMAN

**OPINION:**

### DECISION AND ORDER

Plaintiff Sandra Powell sues her former employer, defendant United Insurance Company, under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e et seq.*, alleging that defendant maintained a sexually hostile work environment throughout her employment and that defendant retaliated against her by terminating her employment after she complained. Before me now is defendant's motion for **summary judgment.** n1 I have jurisdiction pursuant to *28 U.S.C. § 1331.*

> n1 defendant also moves for leave to file an oversize reply brief, which motion I will grant.

### I. FACTS & BACKGROUND

Plaintiff worked for defendant as a sales representative from 1998 **[*2]** until February 2004 when defendant discharged her. As a sales representative, plaintiff served policyholder clients in her district by answering their questions, reviewing their policies, assisting with their claims and collecting their premium payments on a monthly basis. When plaintiff collected her clients' monthly premiums, she visited them personally and then recorded the transactions in a hand-held computer device provided by defendant. Any premiums that a sales representative failed to collect from policyholders in a given month were known as "arrears."

As a sales representative, plaintiff spent a majority of her work time "out in the field" in direct contact with potential customers and policyholders within her assigned territory. However, defendant required sales representatives to appear at the office twice per week at designated times in order to turn in monies collected and to reconcile the status of the accounts of their customers. One of these office visits required plaintiff to be in the office for only 30-45 minutes. During the other office visit, defendant required the sales representatives to participate in a meeting led by a District Manager.

Defendant hired Sam **[*3]** Johnson in early 2001 as a District Manager. As a District Manager, Johnson supervised a staff of sales managers, including Carolyn Minley who in turn supervised sales representatives, including plaintiff. Plaintiff claims that beginning in July 2001, Johnson sexually harassed her. For example, she claims that in one instance he asked her if she "messed around" and that he put his hand on the inside of her knee between her legs while they were sitting in a parked car in front of a client's home. In another instance, Johnson rubbed his leg against plaintiffs leg while they were seated at a restaurant with a group of coworkers. In still another instance, Johnson attempted to rub plaintiff's shoulders and then poked her in the ribs. Plaintiff also claims that Johnson took her to his home where he

"unbutton[ed] his clothes, [took] his shirt off and stuff." (Rashada Dep. P 55.) Further, plaintiff alleges that over a period of two years, Johnson made several sexual comments to her. She states that in addition to asking her if she messed around, he called her "his girl." He also referred to two female sales representatives as "his soldiers." He further commented about the number of children [*4] plaintiff had and stated that "we know what you like to do." In reference to one of his sexual encounters, he stated that he caught "something," presumably a sexually transmitted disease, from a young woman and laughed when other sales representatives referred to him as "dripping." He stated that plaintiff and her daughter had big butts. He told plaintiff that she looked like she "could suck a mean one" and that she needed to get with a real man like him. He also made references to plaintiff getting "banged." (Powell Dep. at 198.) He made noises like "mmm, mmm, mmm" when plaintiff walked in the office. (Id. at 188.) Plaintiff also states that she heard Johnson make sexual comments to other staff members such as Minley. For example, in response to a question about what Minley had in her mouth, Johnson answered, "the same thing [she] had in [her] mouth last night." (Id. at 193.) Plaintiff also states that she witnessed Johnson permit other female employees to engage in inappropriate conduct in the office such as sitting in a chair facing him with her legs spread while rubbing her thighs.

It appears that office administrator Cynthia Bonnell and Sales Manager Jameel Rashada [*5] n2 were aware of some of these incidents either through their own observations or because of plaintiff's complaints. For example, plaintiff complained to Bonnell and Rashada concerning Johnson touching her leg in the car. Rashada also saw Johnson put his hands on plaintiff's shoulders and heard Johnson comment on the fact that he "knew what [plaintiff] likes to do with all of those children." (Rashada Dep. at 72-73.) At some point, Rashada spoke to Regional Vice President William Patrick, Johnson's boss, about Johnson's behavior. Rashada claims that Johnson then began to "mess" with him by doing "little things to pick at me." (Id. at 84.)

n2 Jameel Rashada is male.

On December 2, 2003, plaintiff claims that Johnson called her and asked if she was going to report him for making some sexual statements a few weeks previously.

Plaintiff claims that she told Johnson that she would have to call him back and that, in response, Johnson accused her of stealing money from defendant. Johnson claims that he called [*6] plaintiff and asked her about her unacceptably high arrears, which were the worst among all the sales representatives in the Milwaukee office. In that phone call, Johnson claims that he told plaintiff that, in his experience, arrears in such high amounts reflected either one of two possibilities -- that the agent was not working or that the agent was stealing the premium payments. In any case, plaintiff became upset and began crying. Plaintiff spoke to a coworker that evening and the coworker persuaded plaintiff that Johnson was preparing to fire her.

On December 3, plaintiff called defendant's Human Resources Department, spoke with Human Resources Manager Carla Johnson, n3 and complained about Johnson's behavior that plaintiff believed was sexual harassment, including that Johnson had said she "could suck a mean one," made comments about her rear end and more generally, that Johnson made comments having a sexual overtone and that he sometimes **touched** female employees while in the office. n4

n3 Sam Johnson and Carla Johnson are not related.

n4 Carla Johnson and her boss, Vice President of Human Resources Ken Oehler, investigated plaintiff's claims, but obtained no corroborating evidence. In letters dated January 6, 2004 and February 16, 2004, they informed plaintiff of the results of the investigation.

[*7]

Later that day, Johnson called plaintiff into his office, presumably to finish the conversation from the previous night. n5 Bonnell also attended the meeting. During the meeting, Johnson asked plaintiff about the status of her arrears. Plaintiff became upset and began to cry because she believed that Johnson was accusing her of stealing. Because the meeting was not accomplishing anything, Johnson ended it by telling plaintiff that she could do whatever she felt she had to do -- in terms of continuing her employment or resigning, and instructed her to leave her hand-held computer on her desk when she left the office. Plaintiff, however, claims that Johnson did not give her the option of voluntarily leaving her

employment and informed her that he would have someone else complete her accounts because she was replaceable.

> n5 There is no evidence in the record that Johnson knew about plaintiff's complaint to Human Resources when he called her into his office on December 3, 2003.

As plaintiff walked out of Johnson's [*8] office, she stated "I just got fired." Bonnell responded by telling plaintiff that Johnson had never said she was fired and that plaintiff "did not get fired." (Bonnell Dep. at 38.) When plaintiff returned home later that day, she called Carla Johnson to ask if she was fired. Carla Johnson checked into plaintiff's claim by calling Johnson and asking about the status of plaintiff's employment. Johnson told Carla Johnson that he did not fire plaintiff, but noted that he had spoken with her about her unacceptable arrears. Two days later, Carla Johnson spoke with plaintiff and told her that she was not fired and that she should report back to work. Plaintiff reported back to work and worked her regular schedule for the rest of December 2003 and January 2004.

In early February, 2004, defendant approved plaintiff's request for an extended vacation to begin on February 9, 2004. On February 5, 2004, plaintiff attended a meeting with Johnson and Minley. According to Johnson, the purpose of the meeting was to determine whether plaintiff was going to quit or return to work after her extended vacation as there were rumors floating around the office indicating that plaintiff did not intend to [*9] return. n6 During the meeting, Johnson questioned plaintiff regarding whether she was going to quit or return to work after her extended vacation. Plaintiff told Johnson and Minley that she had no intention of quitting and that she would speak with Johnson on February 10, 2004. Although Johnson continued to press the issue, plaintiff refused to answer Johnson's questions about whether she was quitting or not. She told Johnson that she just wanted to go on vacation. Johnson responded by saying "well, go on, take your vacation" and by telling plaintiff to leave behind the company's hand-held computer. (Minley Dep. at 91.) However, Johnson continued to demand an answer from plaintiff. Plaintiff did not answer. Instead, she asked Johnson if she was fired. To plaintiff's inquiry concerning whether Johnson had just terminated her, Johnson stated, "This is my

office, that is my computer, leave it here and get out of my office." (Powell Dep. at 238.) Later, as plaintiff was gathering her belongings from her cubicle, Johnson told plaintiff to "get out of my office before I throw you out on your butt." (Id. at 239.) Plaintiff left the office.

> n6 For example, in December 2003, plaintiff informed Minley and other coworkers that she was thinking about resigning and in January 2004, she prepared a resignation letter.

[*10]

Although plaintiff believed that Johnson terminated her employment, she wanted to let Johnson "cool off for a couple hours before she spoke with him regarding her termination. She "wanted to clarify that [Johnson] was actually firing [her]." (Powell Dep. at 239.) She testified that she thought she may not have "under[stood] what he was saying," and that she decided she needed to "make for sure what his actions are." (Id. at 240.) When she went back to clarify the situation, she discovered that defendant changed the security pass code on the office doors. In plaintiff's view, this confirmed that she was terminated. Despite plaintiff's belief that she was fired on February 5, 2004, plaintiff returned to the office once in each of the subsequent two weeks she was supposed to be on vacation to pick up her weekly paycheck.

Minley did not take any steps to reassign plaintiff's customers or district after the February 5 meeting because she assumed that plaintiff would return to work after her vacation. Moreover, even though defendant has a variety of required procedures to follow when a sales representative's employment terminates -- either by resignation or through involuntary [*11] termination -- defendant did not initiate any of the required procedures in relation to plaintiff until on or after February 25, 2004, at which time defendant sent plaintiff a letter terminating her employment for failing to return to work after her vacation.

Additional facts will be stated in the course of the decision.

## II. SUMMARY JUDGMENT STANDARD

A motion for **summary judgment** may be granted only when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.

*Fed. R. Civ. P. 56(c)*. "Material" facts are those facts that might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. A dispute over such facts is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. Id. The movant bears the burden of establishing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; see also *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. If the moving party meets its **[\*12]** burden, the nonmoving party then must present specific facts showing that there is a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson, 477 U.S. at 255*.

### III. DISCUSSION

### A. Hostile Work Environment Claim

Title VII forbids an employer from discriminating "against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." *42 U.S.C. § 2000e-2(a)(1)*. In the present case, plaintiff contends that defendant discriminated against her because of her sex by maintaining a hostile work environment. In order to prevail on such a claim, plaintiff must establish that: (1) she was subjected to unwelcome sexual harassment; (2) the harassment was based on her sex; (3) the sexual harassment unreasonably interfered with her work performance by creating an intimidating, hostile or offensive work environment that affected seriously the **[\*13]** psychological well-being of the plaintiff; and (4) there is a basis for employer liability. *McPherson v. City of Waukegan, 379 F.3d 430, 437-38 (7th Cir. 2004)*. For purposes of **summary judgment,** defendant concedes the first two elements. However, defendant argues that it is entitled to **summary judgment** on plaintiff's hostile work environment claim because plaintiff cannot establish that defendant maintained a hostile work environment or that there is a basis for employer liability.

To prove that a hostile work environment existed, plaintiff must establish that she was subjected to conduct so **severe or pervasive** as to alter the conditions of her employment and create an abusive working environment. *Hilt-Dyson v. City of Chi., 282 F.3d 456, 462 (7th Cir. 2002)*(citing *Faragher v. City of Boca Raton, 524 U.S. 775, 786, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)*). "Harassment need not be both **severe and pervasive** to impose liability; one or the other will do." *Hostetler v. Quality Dining, Inc., 218 F.3d 798, 808 (7th Cir. 2000)*. Further, to qualify as hostile, the work environment must be "'both objectively and subjectively offensive, one that a reasonable **[\*14]** person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" *Hilt-Dyson, 282 F.3d at 463* (quoting *Faragher, 524 U.S. at 787*).

In the present case, the parties agree that plaintiff perceived the workplace to be hostile. Thus, I need only consider whether the work environment was objectively hostile. In determining whether a reasonable person would find the work environment hostile, I must consider all the circumstances cumulatively, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening and/or humiliating or merely offensive, and whether the harassment unreasonably interferes with an employee's work." *Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 975-76 (7th Cir. 2004)*; see also *Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 444 (7th Cir. 1994)*(stating that all incidents of harassment should be considered "cumulatively in order to obtain a realistic view of the work environment"). In evaluating whether statements and conduct are severe, physically threatening or intimidating, I must take into consideration the context in which **[\*15]** the statements and conduct occurred. See *Baskerville v. Culligan Int'l Co., 50 F.3d 428, 431 (7th Cir. 1995)*(stating that "remarks [that are] innocuous or merely mildly offensive when delivered in a public setting might acquire a sinister cast when delivered in the suggestive isolation of a hotel room"). Further, statements and actions that are not directed at the plaintiff are objectively less offensive than conduct and statements that are directed at the plaintiff. *Gleason v. Mesirow Fin., Inc., 118 F.3d 1134, 1144 (7th Cir. 1997)*(stating that "the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff").

Title VII "does not mandate admirable behavior from employers," and thus "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" will not amount to a hostile work environment. *Haugerud v.*

*Amery Sch. Dist.*, 259 F.3d 678, 693 (7th Cir. 2001); see also *Baskerville*, 50 F.3d at 431 (noting that "[a] handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant [*16] barrage"). In fact, "many employees have to put up with some amount of rude, arrogant, or boorish behavior at work." *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002). As the Seventh Circuit has stated:

> Drawing the line [between vulgar behavior and sexually harassing behavior] is not always easy. On one side lie sexual assaults; other **physical** contact, whether amorous or hostile, for which there is no consent express or implied, uninvited sexual solicitations, intimidating words or acts, obscene language or gestures, pornographic pictures. On the other side lies the occasional vulgar banter, tinged with sexual innuendo, or coarse or boorish workers.

*Baskerville*, 50 F.3d at 430-31. Using this standard, courts have concluded that statements that "could [easily] be repeated on primetime television" do not trigger Title VII liability. Id.

Moreover, conduct involving **physical** contact as opposed to verbal behavior increases the severity of the harassment. *Worth v. Tyer*, 276 F.3d 249, 268 (7th Cir. 2001). However, some forms of contact "although . . . uncomfortable for the person **touched,** are relatively [*17] minor" such as "[a] hand on the shoulder, a brief hug, or a peck on the **cheek.**" *Hostetler*, 218 F.3d at 808. Further, "even more intimate or more crude **physical** acts -- a hand on the thigh, a kiss on the lips, a pinch of the buttocks-may be considered insufficiently abusive to be described as 'severe' when they occur in isolation." Id.

Although plaintiff claims that she was offended by several of Johnson's comments, not all of the comments implicate Title VII. For example, plaintiff alleges that Johnson referred to two female sales representatives as "his soldiers" and referred to plaintiff as "his girl" and made noises like "mmm, mmm, mmm" when plaintiff walked in the office. However, these statements are not objectively threatening, harsh or abusive and arguably cannot even be characterized as vulgar and thus they are not the type that could trigger Title VII liability. See

*Baskerville*, 50 F.3d at 431 (comments that "could [easily] be repeated on primetime television" are not the type that trigger Title VII liability).

With respect to Johnson's other comments, including that he knew "what [plaintiff] like[d] to do," that plaintiff and [*18] her daughter had big butts, that plaintiff "could suck a mean one," that plaintiff needed a real man, that plaintiff needed to get "banged" and that he caught "something" from a young woman, these are more clearly vulgar banter. However, these statements are not severe because they are not physically threatening or intimidating as the majority of them were made in public places such as the center of defendant's office. See *Baskerville*, 50 F.3d at 430 (noting that statements that are "mildly offensive when delivered in a public setting might acquire a sinister cast when delivered in the suggestive isolation of a hotel room"). Indeed, these statements appear to be only "occasional vulgar banter, tinged with sexual innuendo," *Baskerville*, 50 F.3d at 430-31, and are no worse than statements that the Seventh Circuit has concluded were insufficient to establish a hostile work environment in other cases, cf. *McPherson*, 379 F.3d at 439 (finding all conduct prior to sexual assault insufficient to establish a hostile work environment despite comments about plaintiff's bra, comments about plaintiff in lingerie shown in a magazine, proposition [*19] to plaintiff that supervisor would make a 'house call' when she was sick and the supervisor pulling back the tank top worn by plaintiff); *Patt v. Family Health Sys., Inc.*, 280 F.3d 749, 754 (7th Cir. 2002)(holding that eight sex-related comments, including that "the only valuable thing to a woman is that she has breasts and a vagina" were insufficient to establish a hostile work environment); *Pryor v. Seyfarth, Shaw, Fairweather & Geraldson*, 212 F.3d 976, 977 (7th Cir. 2000)(holding that several comments suggesting male boss would like to see his female secretary in sexually provocative outfits were insufficient to create objectively hostile work environment). Furthermore, these statements were not pervasive. They occurred over the course of two years of employment during which plaintiff was not required to be in the office everyday and thus had no contact with Johnson. See *Baskerville*, 50 F.3d at 431 (explaining that "[a] handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage").

Moreover, Johnson's **physical** contact with plaintiff

also was not **severe or pervasive.** **[*20]** Plaintiff alleges that Johnson **touched** her on three occasions in two years. First she claims that he put his hand on the inside of her knee after asking if she wanted to "mess around." Second, she claims that he rubbed his leg against hers during lunch at a restaurant with coworkers. Finally, she claims that he rubbed her shoulders and poked her in the ribs when she objected to the shoulder rub. n7 Although, as stated above, touching increases the severity of the harassment, *Worth, 276 F.3d at 268*, in the present case, the **physical** contact was minor as it did not involve intimate body parts. See *Hostetler, 218 F.3d at 808* (noting that "a hand on the shoulder, a brief hug or a peck on the **cheek**" are relatively minor incidents of touching); *DiCenso v. Cisneros, 96 F.3d 1004, 1009 (7th Cir. 1996)*(concluding that plaintiff did not establish a **hostile environment when physical** contact did not involve an intimate body part). Moreover, there is no indication in the record that the touching was threatening, intimidating or humiliating as the events occurred in a public setting, the office and in front of a client's home. *Hilt-Dyson, 282 F.3d at 463* **[*21]** (explaining that "an employee's claim must be evaluated in light of the social context in which events occurred"). Finally, Johnson only **touched** plaintiff three times over a course of two years and thus these events were not pervasive. *Hostetler, 218 F.3d at 808* (concluding that if minor touching incidents are "few and far between" they typically will not support a **hostile environment** claim).

———————————————————

n7 To support her harassment claim, plaintiff also notes that Johnson took plaintiff to his home during working hours and undressed. However, I cannot consider this evidence in determining whether to grant **summary judgment** as the only evidence of this event in the record is hearsay. See *Morrow v. Wal-Mart Stores, 152 F.3d 559, 563 (7th Cir. 1998)*(stating that "hearsay is inadmissible in **summary judgment** proceedings to the same extent that it is inadmissible in a trial"). The only evidence in the record about this event is in the deposition of Rashada, who testified that plaintiff told him she was in Johnson's car "and he stopped by his house. . . Then she said he went into another room which was his bedroom and . . . she said he asked her to come here. And then she said when she go to the room he started unbuttoning his clothes, taking his shirt and stuff off." (Rashada Dep. at 55.)

Rashada's testimony is offered for the truth of the matter asserted and thus is hearsay.

———————————————————

**[*22]**

Further, although plaintiff alleges that she witnessed Johnson permit other female employees to engage in inappropriate sexually tinged conduct in the office and overheard Johnson make an inappropriate comment to Minley, these events are not severe because they were not directed at plaintiff. *Gleason, 118 F.3d at 1144* (stating that "the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff.") Moreover, nothing in the record indicates that this conduct was pervasive.

Finally, when considering these events cumulatively, n8 I cannot conclude that plaintiff establishes that her work environment was objectively hostile. None of the statements or **physical** contact were severe. Rather, the statements amount to vulgar banter, tinged with sexual innuendo and the **physical** contact was minor. Neither the statements nor the **physical** contact was physically threatening or intimidating. Further, the comments and the **physical** contact were not so pervasive as to create a **hostile environment** as the record indicates that these events occurred sporadically over the course of two years. Accordingly, defendant is entitled to **summary [*23] judgment** on this claim. n9

———————————————————

n8 Defendant argues that the equitable doctrine of laches bars plaintiff from relying on conduct occurring outside the relevant period of limitations, 300 days, to support her hostile work environment claim. However, I need not consider this argument because even considering all the evidence set forth by plaintiff to support her claim, she cannot establish that her work environment was objectively hostile.

n9 Because plaintiff cannot establish that her work environment was hostile, I do not need to consider whether there is a basis for employer liability.

———————————————————

**B. Retaliation Claim**

Under Title VII, unlawful retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination. *42 U.S.C. § 2000e-3(a)*. To prevail on a claim of unlawful retaliation, plaintiff must establish that: (1) she engaged in statutorily-protected expression; (2) she suffered an adverse employment action; and (3) there **[*24]** was a causal link between the protected expression and the adverse action. *Culver v. Gorman & Co., 416 F.3d 540, 545 (7th Cir. 2005)*.

In the present case, the parties do not dispute that plaintiff engaged in statutorily-protected expression. Additionally, it is undisputed that defendant terminated plaintiff's employment and thus she suffered an adverse employment action. See *Rhodes v. Ill. Dep't of Transp., 359 F.3d 498, 504 (7th Cir. 2004)*(stating that an adverse employment action is a "significant change in the claimant's employment status such as . . . discharge"). The real issue in this case is whether plaintiff can establish a causal link between her complaints and the termination. She contends that if defendant terminated her on February 5, 2004, she has presented sufficient evidence to establish a causal link between her complaint and the termination. She does not dispute that if defendant terminated her on February 25, 2004 she would be unable to establish a causal link. Thus, before turning to the causation question, I must determine whether plaintiff was terminated on February 5, 2004 or February 25, 2004.

Two factors are necessary to establish **[*25]** the date on which the termination occurred. First, there must be a final, ultimate, non-tentative decision to terminate the employee. *Flannery v. Recording Indus. Ass'n of Am., 354 F.3d 632, 637 (7th Cir. 2004)*. Second, the employer must give the employee "unequivocal" notice of its final termination decision. *Id.* (citing *Dvorak v. Mostardi Platt Assocs., Inc., 289 F.3d 479, 486 (7th Cir. 2002))*. Both elements are necessary to establish the date on which the termination occurred. Id. n10 Notice is not unequivocal if the employee is unsure of his employment status after receiving the notice. See *Dvorak, 289 F.3d at 486* (stating that plaintiff's request for clarification as to his employment status tends to show that any notice he might have received of his termination was not all that unequivocal).

n10 Although this test is most often used in the context of statute of limitations issues in

discrimination cases, see, e.g., *Flannery, 354 F.3d at 642*, the Seventh Circuit has also used it to determine the date of a termination in other contexts, see *Dvorak, 289 F.3d at 486* (using this test to establish when a termination occurred in order to determine what information the employer had about the employee's performance as of the date of the termination). Accordingly, it is the appropriate test to use in the present case.

**[*26]**

With respect to the first element, no reasonable jury could conclude that defendant made a "non-tentative decision" to terminate plaintiff as of February 5, 2004. First, it is undisputed that defendant continued to pay plaintiff weekly for two weeks after February 5, 2004, the period during which she was supposed to be on vacation. This is so even though vacation time for sales representatives at United is not "accrued" and therefore is not paid out in cash when an agent terminates employment. (Oehler Decl. P 27.) Plaintiff presents no evidence to the contrary. Second, neither plaintiff's supervisor, Minley, nor anyone else at United, reassigned plaintiff's accounts to any other sales representative during the two weeks that plaintiff was on vacation. Third, even though defendant has a variety of required procedures to follow when a sales representative's employment terminates, defendant did not initiate any of the required procedures in relation to plaintiff until on or after February 25, 2004. (Oehler Decl. P 28.) Again, plaintiff present no evidence to the contrary.

Moreover, with respect to the second element, no reasonable jury could conclude that defendant gave plaintiff "unequivocal" **[*27]** notice of her termination on February 5, 2004. First, although Johnson told plaintiff to leave her hand-held computer in his office and sales representatives must leave computers in the office if they are fired, sales representatives are also required to leave their computer at the office when they leave on vacation. (Minley Dep. at 21.) Johnson also instructed plaintiff to leave her hand-held computer on the desk when she left the office on December 3, 2003, and plaintiff was not terminated after the December 3, 2003 meeting. Further, although Johnson told plaintiff to "Get out of my office before I throw you out on your butt," he never stated that plaintiff was fired. Moreover, even though plaintiff believed that she was terminated at the February 5, 2004 meeting, she was unsure. She testified

that she returned to the office a couple of hours later to talk to Johnson after he had "cool[ed] off." She "wanted to clarify that [Johnson] was actually firing [her]." (Powell Dep. at 239.) She testified that she thought to herself, "Maybe I didn't understand what he was saying" and that she needed to "make for sure what his actions are." (Id. at 240.) See *Dvorak, 289 F.3d at 486* [*28] (stating that plaintiff's request for clarification as to his employment status tends to show that any notice he might have received of his termination was not all that unequivocal). Thus, under these circumstances, no reasonable jury could conclude that the office meeting provided unequivocal notice of termination.

Plaintiff, however, argues that she was notified of her termination by the fact that, when she returned to United later on February 5, 2004, the security codes were changed and she could not get in. Although the record contains testimony that security codes are changed when an employee is terminated, the mere fact that the codes were changed is not "unequivocal" notice of termination. Indeed, defendant could have had other reasons for changing the security codes. Furthermore, plaintiff did not treat the change of security codes as an unequivocal notice of termination. As noted previously, she returned to the office during each of the next two weeks to pick up her paycheck. Thus, no reasonable jury could conclude that defendant gave plaintiff unequivocal notice of her termination on February 5, 2004.

Accordingly, I conclude that defendant did not terminate plaintiff until [*29] February 25, 2004. Because plaintiff presents no evidence indicating that there is a causal connection between her complaint and her termination on February 25, 2004, I will grant **summary judgment** to defendant on the retaliation claim. However, even if I were to conclude that plaintiff was terminated on February 5, 2004, I would still conclude that defendant is entitled to **summary judgment** on the retaliation claim because plaintiff fails to establish a causal connection between her complaint n11 and the termination.

n11 Only the December 3, 2003 complaint made to Human Resources is relevant in determining whether a causal connection exists. Although plaintiff subsequently filed an EEOC charge on January 14, 2004, she presents no evidence that Johnson knew about the EEOC charge when he allegedly terminated her on

February 5, 2004 and thus she cannot establish a causal connection between the EEOC charge and the termination. See *Holmes v. Potter, 384 F.3d 356, 362 (7th Cir. 2004)*("Usually, an employer's lack of knowledge about a protected [activity] rings a death knell for discrimination claims.").

[*30]

"A causal link between the protected expression and an adverse employment action may be established by showing that the protected conduct was a substantial or motivating factor in the employer's decision." *Culver, 416 F.3d at 545*. "A motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." Id. There are two types of permissible evidence that may be used to establish a causal connection between the protected activity and the adverse employment action. First, there is direct evidence, i.e., evidence that, if believed by the trier of fact, would prove the fact in question "without reliance on inference or presumption." *Walker v. Glickman, 241 F.3d 884, 888(7th Cir. 2001)*. Direct evidence "essentially requires an admission by the decisionmaker that his actions were based upon the prohibited animus." *Radue v. Kimberly-Clark Corp., 219 F.3d 612, 616 (7th Cir. 2000)*.

Plaintiff presents no direct evidence that Johnson terminated her in retaliation for filing a complaint with Human Resources and thus plaintiff must rely on circumstantial evidence, i.e. [*31] , evidence that allows a jury to infer intentional discrimination by the decisionmaker. *Gorence v. Eagle Food Ctrs., Inc., 242 F.3d 759, 762 (7th Cir. 2001)*. Circumstantial evidence includes "suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group." *Rudin v. Lincoln Land Cmty. College, 420 F.3d 712, 720 (7th Cir. 2005)*. Circumstantial evidence must point directly to a discriminatory reason for the employer's action. *Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 939 (7th Cir. 2003)*.

With respect to circumstantial evidence, "mere temporal proximity between the filing of the charge of discrimination and the action alleged to have been in retaliation for that filing will rarely be sufficient in and of itself to create a triable issue." *Stone v. City of Indianapolis Pub. Utils. Div., 281 F.3d 640, 644 (7th Cir. 2002)*; see also *Lang v. Ill. Dep't of Children & Family*

*Servs., 361 F.3d 416, 419 (7th Cir. 2004)*(same). "Stray workplace remarks" may "qualify as . . . evidence of discrimination" only if plaintiff can "show that **[*32]** the remarks were related to the employment decision in question." *Cianci v. Pettibone Corp., Beardsley Piper Div., 152 F.3d 723, 727 (7th Cir. 1998).*

Plaintiff contends that she has established a causal connection because of the close temporal proximity of her December 2003 complaint and the termination in February 2004. However, this two month delay between the protected activity and the allegedly retaliatory conduct is too attenuated to create a suspicion of a causal connection. See, e.g., *Contreras v. Suncast Corp., 237 F.3d 756, 765 (7th Cir. 2001)*(declining to find a causal connection based solely on a 26 day temporal relation between protected conduct and allegedly retaliatory action); *Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 511 (7th Cir. 1998)*(noting that as the time between the protected activity and adverse action increases, the suspicion of causation weakens).

Plaintiff also claims that Johnson's statements evidence a causal connection between the complaint and the termination. For example, she points out that a few days after her December complaint Johnson stated that "the next person that complains, he's going **[*33]** to write them up, and he's going to personally take care of them (Pl.'s Dep. at 207), and notes that on several occasions Johnson stated that plaintiff was replaceable. Further, plaintiff presents evidence that Johnson "messed" with another employee, who had previously complained about Johnson, by doing "little things to pick at [him]." (Rashada Dep. at 84.)

However, the fact that Johnson indicated plaintiff could be replaced does not supply a reasonable inference that she was fired in retaliation for her complaint. In fact, the record indicates that Johnson made similar statements before he knew that plaintiff complained. Moreover, plaintiff presents no other evidence indicating that these comments were made contemporaneously with or were otherwise related to her termination. See, e.g., *Cullen v. Olin Corp., 195 F.3d 317, 323 (7th Cir. 1999)*(holding that stray workplace comments unrelated to the alleged discriminatory employment decision are not sufficient to support an inference of discrimination). Vague comments about plaintiff being "replaceable" do not indicate that

Johnson terminated plaintiff because she complained. Further, Johnson's statement indicating **[*34]** that he would write up the next person that complains also does not indicate that defendant's motive for firing plaintiff nearly two months later was retaliatory as there is no evidence that this statement related to the termination. This two month delay is too attenuated to create a suspicion of a causal connection. See, e.g., *Markel v. Bd. of Regents of Univ. of Wis. Sys., 276 F.3d 906, 910 (7th Cir. 2002)*(holding that statements made two months before termination were not contemporaneous and therefore did not constitute circumstantial evidence). Finally, the fact that Johnson "messed" with another employee after that employee complained does not evidence his intent to terminate plaintiff for complaining about his sexual misconduct. The undisputed evidence indicates that Johnson did not terminate the other employee for complaining and thus no reasonable jury could infer an intent to terminate plaintiff for engaging in similar conduct. Accordingly, plaintiff's evidence does not point directly to a discriminatory reason for Johnson's actions. See *Adams, 324 F.3d at 939* (noting that circumstantial evidence "must point directly to a discriminatory **[*35]** reason for the employer's action")(emphasis added). Thus, defendant is also entitled to **summary judgment** on the retaliation claim because plaintiff cannot establish a causal connection between the February 5, 2004 termination and her complaint to the Human Resources Department.

**IV. CONCLUSION**

For the foregoing reasons,

**IT IS ORDERED** that defendant's motion for leave to file an oversize reply brief is **GRANTED.**

**IT IS FURTHER ORDERED** that defendant's motion for **summary judgment** is **GRANTED** and this case is **DISMISSED.**

Dated at Milwaukee, Wisconsin this     day of June, 2006.

LYNN ADELMAN

District Judge

LEXSEE

**TERESA SILVER, Plaintiff-Appellant, v. GENERAL MOTORS CORPORATION, Defendant-Appellee.**

**No. 99-2121**

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

**2000 U.S. App. LEXIS 17752**

**May 4, 2000, Argued**
**July 24, 2000, Decided**

**NOTICE:** [*1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: 2000 U.S. App. LEXIS 26461.

**PRIOR HISTORY:** Appeal from the United States District Court for the District of Maryland, at Baltimore. J. Frederick Motz, Chief District Judge. (CA-98-3148-JFM).

**DISPOSITION:** AFFIRMED.

**COUNSEL:** ARGUED: Joseph Thomas Mallon, Jr., Baltimore, Maryland, for Appellant.

Alison Buell Marshall, JONES, DAY, REAVIS & POGUE, Washington, D.C., for Appellee.

ON BRIEF: David A. Harak, Baltimore, Maryland, for Appellant.

Jacqueline M. Holmes, JONES, DAY, REAVIS & POGUE, Washington, D.C., for Appellee.

**JUDGES:** Before MURNAGHAN and TRAXLER, Circuit Judges, and Jerome B. FRIEDMAN, United States District Judge for the Eastern District of Virginia, sitting by designation.

**OPINION:** PER CURIAM:

Teresa Silver filed this suit against General Motors Corp. ("GM") on September 17, 1998, alleging sexual harassment and retaliation under § 706(n) of the Civil Rights Act of 1964, as amended. n1 42 U.S.C. § 2000e-5(f). The district court granted GM's motion for summary judgment on July 20, 1999. On appeal, Silver has abandoned [*2] her Title VII retaliation claim, and thus appeals only the district court's grant of GM's motion for summary judgment on her Title VII sexual harassment claim. Finding no error in the court's ruling, we affirm.

> n1 In her opposition to GM's motion, Silver voluntarily dismissed her state law claim for intentional infliction of emotional distress.

I.

GM hired Silver to work at its plant in Shreveport, Louisiana in 1983, and she worked there until 1995, when she asked for a transfer to Baltimore. On June 12, 1995, the transfer was approved, and she began work at the Baltimore plant. While working at the Baltimore plant, Silver acknowledges that she received a copy of the Local Agreement between the Local United Auto Workers ("UAW") and the Baltimore plant. Silver was assigned to the motor line that was supervised by David Rawlings. Rawlings testified that, while employed by GM, he had received a pamphlet informing him that "GM would not tolerate any sexual harassment in their facilities." He also testified that [*3] he knew and understood that certain specific sexual conduct was

inappropriate in the workplace. However, he also stated that he was never offered any instruction or training classes pertaining to sexual harassment, nor was sexual harassment discussed in any of the meetings he attended.

Silver claims that Rawlings started harassing her on her first day in the Baltimore plant, by making a comment that he liked southern women. She testified that throughout the time period from June 1995 until November 1996, Rawlings repeatedly told her that it would cost her a night out with him if she ever expected to receive equal treatment. She further testified that Rawlings made comments to her such as "your husband isn't massaging you right, you need a full body massage," "you sure are a good looking woman," and "does your husband tell you how good you are in bed?" She claims that Rawlings continuously brushed up against her even though she had asked him to stop and told him that this behavior offended her. She testified that he would also come up behind her while she was working on the assembly line, lean over her and press his pelvis area into her buttocks, and make sexually explicit remarks. [*4] She testified that whenever she asked for a day off, he would tell her "it's going to cost you" and ask her to go out on a date with him. For purposes of summary judgment, GM did not dispute the fact that Rawlings' alleged conduct was sufficiently severe and pervasive and adversely affected Silver's ability to perform her job so as to constitute actionable harassment.

During this period, Silver complained twice to her union representative, Roland Pack, regarding certain "discrimination" in which she believed Rawlings was engaging. On her first day of work, she asked Rawlings to have the air guns with which she worked lowered. He did not act on her request immediately, and Silver complained to Pack. Pack addressed her concern promptly, and the air guns were lowered. Some time later, Silver complained to Pack that her work gloves were too large and that Rawlings refused to order gloves in her size. Pack investigated the situation and brought her a box of twelve dozen gloves in her size.

Silver testified that she reported Rawlings' alleged offensive sexual behavior and comments to her alternate committeemen, Pack and Kip Wirtz, on several occasions during the period from June 1995 to [*5] November 1996. She was unable to recall the exact dates of any of her complaints to Pack and Wirtz, except that they occurred at some point between June 1995 through October 1996. There is no record of any calls from Silver regarding sexual harassment during that period.

Silver claims that Pack and Wirtz told her that she could not file a grievance against Rawlings because "that's not the way we do things here in Baltimore," and that in order to file a grievance, she had to go through the union. She also testified that they did not tell her about a UAW EEO official she could contact regarding her complaints. A telephone number for the EEO official appeared in the collective bargaining agreement between GM and the UAW which Silver admits that she possessed but states that she did not read. Silver never contacted the EEO official regarding her complaints of sexual harassment.

On November 8, 1996, Silver did not report to work. When she returned on November 11, 1996, Silver presented a prescription bottle to Rawlings, stating that she did not have a doctor's note. Rawlings told her that he would mark her absence as unexcused, because a doctor's note was required by company policy for [*6] an excused absence. Silver stated that she would have the doctor fax a note, and Rawlings allegedly replied that a fax was insufficient. Neither a doctor's note nor a fax were received on Silver's behalf. Silver placed a committee call to Wirtz to contest Rawlings' decision to mark the absence as unexcused. While she was meeting with Wirtz and Henry Addington, a GM manager responsible for addressing attendance issues, on November 13, 1996, Silver broke down in tears and reported Rawlings' sexual harassment.

Silver testified that she complained to Rawlings' supervisors, Addington and Patricia Morga, sometime during September or October of 1996. She could not recall the exact dates that these complaints were made. While Morga testified that "to the best of her recollection," she first met with Silver in October 1996, the remainder of her testimony establishes that she was first informed of Silver's complaint when Wirtz brought it to her attention following his meeting with Silver on November 13, 1996. Notably, Morga stated that during her meeting with Silver regarding her complaint, Silver "started talking about a doctor's note," referring to the conflict over her November 8, 1996 absence. [*7] Morga also testified that only a "few days" elapsed between her first discussion with Silver and Rawlings' November 21, 1996 termination.

Addington called William Daniels, the UAW EEO

Page 2

representative assigned to the plant. The next morning, on November 14, 1996, GM began an investigation of Silver's complaint. GM suspended Rawlings on November 15, 1996, pending the outcome of the investigation. During the investigation, Sherri Alexander told the investigators that Rawlings had fired her after she repeatedly refused to go on dates with him, although she never filed a complaint with GM regarding this harassment. Another woman, Vanessa Porter, reported general harassment by Rawlings which was not specifically sexual in nature. On November 21, 1996, GM discharged Rawlings due to the results of the investigation that had commenced one week prior.

Silver brought this action against GM on September 17, 1998, alleging sexual harassment and retaliation in violation of Title VII. GM filed a motion for summary judgment on May 19, 1999. On July 20, 1999, the district court granted GM's motion for summary judgment. This appeal follows.

II.

An appeal from a grant of summary judgment is reviewed [*8] de novo. See Runnebaum v. NationsBank of Maryland, N.A. , 123 F.3d 156, 163 (4th Cir. 1997). Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). To survive a properly supported motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 9 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). If the evidence produced by the non-moving party is "merely colorable, or is not significantly probative," summary judgment is proper. Anderson , 477 U.S. at 249-50.

III.

In its motion for summary judgment, GM conceded that Mr. Rawlings sexually harassed Silver. Silver suffered no tangible employment action; therefore, GM may avoid vicarious liability from its supervisor's sexual harassment of Silver if it establishes the affirmative defense stated by the Supreme Court in [*9] Faragher v. City of Boca Raton, 524 U.S. 775, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998), and Burlington Indus. v. Ellerth,

524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998). In order to establish this affirmative defense, GM must prove by a preponderance of the evidence the following: (1) it exercised reasonable care to prevent and promptly correct any sexually harassing behavior; and (2) that Silver unreasonably failed to take advantage of any preventative or corrective opportunities provided by GM, or to avoid harm otherwise. See Faragher, 524 U.S. at 806-08; Burlington, 524 U.S. at 764-65. The district court held that GM met its burden to establish these two elements because (1) GM acted reasonably to prevent harassment to Silver; and (2) Silver unreasonably failed to take advantage of the procedure in place at GM for reporting sexual harassment. Silver challenges both of these holdings on appeal.

A.

The district court held, as a matter of law, that GM "acted reasonably to prevent sexual harassment to [Silver]." Silver has raised the following challenges to this holding: 1) Silver argues that GM's investigation [*10] of Rufus Alexander's allegations against Rawlings demonstrates a failure to exercise reasonable care; and 2) Silver argues that GM's dissemination of its sexual harassment policy was ineffectual and unreasonable.

This Court has stated that "the law requires reasonableness, not perfection" in developing, implementing, and enforcing sexual harassment policies and procedures. See Brown v. Perry , 184 F.3d 388, 397 (4th Cir. 1999). In Brown, we held that "the employer must act reasonably, and thus any policy adopted by the employer must be both reasonably designed and reasonably effectual." Id. at 396. An employer's policy may not be deemed unreasonable merely because it proves to be unsuccessful in preventing harassment towards a particular victim, as "the law requires an employer to be reasonable, not clairvoyant or omnipotent." Id.

Silver argues that in 1994 GM did not respond properly to the complaint made by Rufus Alexander about Rawlings' conduct in 1993. Silver also argues that because GM concluded in 1997 that Rawlings' conduct in 1993 was sufficient cause to terminate him, GM failed to exercise reasonable care in 1994 when responding [*11] to the complaint. Considering the facts in Brown and the relevant standards, GM acted reasonably as a matter of law. Sherri Alexander, the alleged victim, never complained to anyone at GM, at any time, about

Rawlings' alleged sexual harassment. The sole complaint came from Sherri Alexander's father, Rufus Alexander, six months after she had last worked for GM. According to Mr. Alexander, Cook took the complaint "very seriously" and promptly confronted Rawlings with it. Rawlings denied the allegations of harassment, and identified specific performance problems that warranted Ms. Alexander's poor evaluation.

Based on these facts, Cook determined that no further action was warranted, and he informed Mr. Alexander of this conclusion. Mr. Alexander elected not to pursue the complaint any further. Under these circumstances, as in Brown, when an employer decides to respect the employee's wishes and not pursue a complaint, despite the fact that this does not comport with company policy, such action may still be considered reasonable. See id. This Court recognizes that "sometimes, as in this case, an employer's reasonable attempt to prevent future harm will be frustrated by events [*12] that are unforeseeable and beyond the employer's control," id., such as the victim's decision not to report or pursue a claim.

Silver also asserts that Rawlings did not know what sexual harassment was, and that in light of Mr. Alexander's allegations, GM should have provided Rawlings with additional pamphlets or sent him to a training class pertaining to sexual harassment. In accordance with the precedent established in Brown, GM was under no duty to take disciplinary action or provide additional materials to Rawlings. See id. Further, the facts indicate that Rawlings had been provided with GM's sexual harassment policy previously. Rawlings testified that he had already received a copy of GM's harassment policy, and he understood that "GM would not tolerate any sexual harassment in their facilities." n2 Silver alleges that GM's response to Mr. Alexander's complaint was unreasonable because GM later concluded that the allegation was sufficient cause for discharge. However, the law does not require "clairvoyance" or "omnipotence." See id. Accordingly, "a good faith investigation of alleged harassment may satisfy the 'prompt and adequate' response standard even if the [*13] investigation turns up no evidence of harassment . . . . Such an employer may avoid liability even if a jury later concludes that in fact harassment occurred." Harris v. L&L Wings, Inc., 132 F.3d 978, 984 (4th Cir. 1997).

n2 While Rawlings may not have

known the legal definition of sexual harassment, see Rawlings Dep., at 13, 18, he did understand what specific conduct was inappropriate and not tolerated in the workplace. See id. at 46, 47.

The district court held that GM had a "widely-known" sexual harassment policy, and that Silver's allegations to the contrary "do not withstand the evidence in this case." Silver claims that "Rawlings never received what [GM] now claims to have been its sexual harassment policy" and that "[Silver] was unaware that [GM] had a sexual harassment policy." However, both Rawlings and Silver testified that they received copies of GM's sexual harassment policy. The district court held that Silver had knowledge of GM's policy against sexual harassment [*14] and of the procedures for raising a complaint. She admitted that she received materials regarding sexual harassment, and she stated that she was aware that "it was GM's policy that they would not tolerate sexual harassment." The district court also held that "Rawlings had attended antiharassment training at GM" and that "he understood 'very well' the contents of the antiharassment pamphlet that he had received, including that the behavior he was accused of was inappropriate." Thus, the district court correctly concluded that GM satisfied the first prong of the affirmative defense, as the facts demonstrate that GM acted reasonably, and that GM's antiharassment policy was "reasonably designed and reasonably effectual." Brown, 184 F.3d at 396.

B.

With regard to the second element of the affirmative defense, the district court held that Silver "unreasonably failed to take advantage of [GM's] procedures for reporting sexual harassment." The evidence establishes that Silver failed to complain to anyone about Rawlings' behavior until November 13, 1996, seventeen months after the alleged harassment began. Silver, however, claims that she did notify GM and/or the union [*15] that Rawlings was harassing her prior to November 13, 1996. Silver relies on: 1) her own testimony; 2) portions of the testimony of Patricia Morga; and 3) hearsay testimony of a third party with no personal knowledge of the relevant events. n3 The district court held that none of this evidence created a genuine issue of material fact regarding the timing of Silver's complaints to GM.

n3 The district court held that the testimony of Susan Matulevich, R.N. was hearsay and that it was inconsistent with Silver's own version of events. Matulevich stated in her deposition that Bob Collins told her that Silver had complained to management "from day one" of Silver's employment in Baltimore. Collins had no personal knowledge of Silver's alleged complaints. Silver argues that Collins' testimony is a "statement by [GM's] agent or servant concerning a matter within the scope of ... employment," and is thus not hearsay under Federal Rule of Evidence 801(d)(2)(D). Collins was working for GM's Personnel Department as a "Disability Case Manager" and was assigned to Silver's disability claim. Collins, however, testified that it was not his responsibility to receive or investigate sexual harassment complaints, and that he had no idea when or to whom Silver first complained. He personally stated that his knowledge was only based on hearsay.

[*16]

It is "well established that [a] genuine issue of material fact is not created where the only issue of fact is to determine which of two conflicting versions of plaintiff's testimony is correct." S.P. v. The City of Takoma Park, 134 F.3d 260, 273 n.12 (4th Cir. 1998). Further, Silver's vague allegations, unsupported by other evidence in the record, cannot defeat a properly supported motion for summary judgment. See, e.g., Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960 (4th Cir. 1996). While Silver did testify that she repeatedly reported Rawlings' conduct to her alternate committeemen from June 1995 through November 1996, she also stated the following when asked if she had made any committee calls between October 1995 and October 1996: "I don't recall exactly, okay? I don't recall exactly. I would speculate and say yes, but I'm just going to say I don't recall, but I don't want to say something that I'm not real positive."

In addition to her vague and conflicting statements, the district court stated that Silver's assertions regarding the timing of her complaints directly conflict with her contemporaneous statements to [*17] her therapist Diane

Ollson. On November 18, 1996, Silver told Ollson that she had reported Rawlings' sexual harassment "one week ago to the Union." She also told Ollson that she met with Wirtz and Addington on November 13, 1996, and that she met with Morga during that same week. Silver also told Ollson that she had not complained earlier because she was embarrassed and scared. Similarly, Rick Rainer, an hourly employee who worked beside Silver, testified that he told Silver to complain to someone about Rawlings' inappropriate comments, but her response was that she was afraid to do so.

The specific complaints Silver made before November of 1996 concerned the incidents with the work gloves and the air gun - neither of which relate to sexual harassment, and both of these incidents were resolved to her satisfaction. There are no union records showing that Silver ever complained about sexual harassment prior to November 13, 1996, and the union officials all testified that they had no notice of any such harassment until she complained to Wirtz and Addington on November 13, 1996. In sum, the testimony of sixteen union and management witnesses and six hourly employees, as well as Silver's [*18] statements to her therapist and GM's records, all reflect that Silver did not complain of sexual harassment by Rawlings until November 13, 1996.

Silver relies on Morga's testimony that "to the best of [her] recollection" she first met with Silver in October 1996, however, Morga also stated that only a "few days" elapsed between the time she met with Silver and Rawlings' termination. She also stated that during her meeting with Silver regarding her complaint, Silver spoke about a doctor's note, referring to the conflict over her November 8, 1996 absence. Viewing Morga's testimony as a whole, it is consistent with the evidence that Silver did not complain until November 13, 1996. Therefore, the district court correctly concluded that GM satisfied the second prong of the affirmative defense, as Silver unreasonably failed to take advantage of the procedures for reporting sexual harassment; hence, GM cannot be held vicariously liable for Rawlings' harassment of Silver.

IV.

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

LEXSEE 2006 U.S. DIST. LEXIS 43998

**LATANYA M. STEPHENSON v. CITY OF PHILADELPHIA, et al.**

**CIVIL ACTION NO. 05-1550**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2006 U.S. Dist. LEXIS 43998*

**June 27, 2006, Decided**
**June 28, 2006, Filed**

**COUNSEL:** **[\*1]** For LATANYA M. STEPHENSON, Plaintiff: JONATHAN J. JAMES, JAMES & JARRETT, PHILADELPHIA, PA; MICHAEL C. SCHWARTZ, JAMES, JARRETT & SCHWARTZ, PHILADELPHIA, PA.

For CITY OF PHILADELPHIA, PRESS GROOMS, DEPUTY COMMISSIONER, PHILADELPHIA PRISON SYSTEM, DAVID K. ADAMS, WARDEN, PHILADELPHIA PRISON SYSTEM, WILLIAM E. LAWTON, CAPTAIN, PHILADELPHIA, PRISON SYSTEM, THOMAS COSTELLO, COMMISSIONER, PHILADELPHIA, PRISON SYSTEM, LOUIS GIORLA, MAJOR, PHILADELPHIA PRISON SYSTEM, Defendants: PATRICIA A. SIEMIONTKOWSKI, CITY OF PHILADELPHIA LAW DEPT, PHILADELPHIA, PA.

**JUDGES:** THOMAS N. O'NEILL, JR., J.

**OPINION BY:** THOMAS N. O'NEILL, JR.

**OPINION:**

MEMORANDUM

O'NEILL, J.

Plaintiff, Latanya M. Stephenson, a former Philadelphia Prison System Correctional Officer, filed a complaint on April 5, 2005, alleging that defendants -- the City of Philadelphia, her former employer; Press Grooms, a former Philadelphia Prison System Deputy Commissioner; David Adams, a former Philadelphia Prison System Warden; William Lawton, a former Philadelphia Prison System Captain (now Deputy Warden); Thomas Costello, a former Philadelphia Prison System Commissioner; and Louis Giorla, a former Philadelphia Prison System Major (now **[\*2]** Warden) -- engaged in gender discrimination, sexual harassment, and retaliation, in violation of Title VII of the Civil Rights Act, *42 U.S.C. § 2000e et seq.*, the Pennsylvania Human Relations Act, *43 P.S. § 955 (a)* and *(d)*, and the Philadelphia Fair Practices ordinance, 9 Phila. Code § 1101 et seq. Before me now is defendant's motion for summary judgment and plaintiff's response thereto.

BACKGROUND

Latanya Stephenson's complaint arises out of her employment as a correctional officer with the Philadelphia Prison System from August 1991 to February 2002. Upon completion of her training at the PPS Academy in August 1991, Stephenson worked at Holsmberg Prison for several years. After several short-term PPS positions, Stephenson began working at Alternative and Special Detention in 1997 and received a promotion to the rank of sergeant in 1998. In her complaint and her deposition, Stephenson has identified ten alleged incidents of discrimination, harassment, or both, that occurred during her employment at PPS.

I. First Incident: Failure to Provide Back-up

Stephenson alleges that sometime between August and December, 1991, **[\*3]** she became involved in an altercation with a male prisoner. Stephenson called for assistance, but her co-workers did not arrive. Stephenson claims that two co-workers later told her that she would receive assistance in similar situations if she "gave into

certain advances." Stephenson did not describe the effect this comment had upon her and did not mention any discussion with superior officers concerning this incident.

II. Second Incident: Instruction to "Play Cards Right" According to Stephenson, in 1999, her supervisors, including Captain William Lawton, began making harassing public comments to Stephenson approximately three to four times per week. Specifically, Stephenson recalled that Lawton told Stephenson that she "could go real far in the prisons if [she] played her cards right." Relying upon her work experience in the prison system, Stephenson interpreted this comment as suggesting that she could advance her career if she "slept around." Stephenson did not report this incident as required by PPS's policy on sexual harassment, even though she signed a memo acknowledging receiving and understanding the policy.

III. Third Incident: Abandoning her Post

Stephenson [*4] alleged that in 1999 she received a disciplinary write-up for abandoning her post. Wanting to gain experience in incident investigation, Stephenson requested and received permission from her supervisor, Lieutenant Edmonds, to accompany another sergeant in the investigation of a prisoner injury in another area of the prison. After Stephenson left to investigate the incident, Edmonds wrote-up Stephenson for abandoning her post. Stephenson complained about the write-up to the ASD warden, Warden Legesse, who then discarded the write-up. Without mentioning specific instances, Stephenson claims that other male sergeants routinely received permission to accompany one another on investigations.

IV. Fourth Incident: Stephenson's Uniform

In 2000, Stephenson's supervisors began assigning her to work at the "600 " building, a satellite center of ASD. Prison policy requires correctional officers to wear civilian clothes when working at the "600" building. When an officer initially reports for duty at ASD, the officer must wear a correctional officer uniform. If a supervisor sends the officer to work at "600," the supervisor usually permits the officer to remain in ASD uniform. Stephenson [*5] alleges that when she received such unscheduled assignments to "600" supervisors demanded that she change out of her work uniform and into civilian dress. In one particular instance,

Stephenson's immediate supervisor, Lieutenant Patricia Howard, relayed to Stephenson specific orders from Lawton for Stephenson to return home to change into civilian clothes and then report for duty at "600." The next day, Lawton commented to fellow supervisors, and in front of Stephenson, that "Steve [Stephenson] was looking pretty good down at 600 [yesterday]." Stephenson did not report this incident in accordance with the PPS's sexual harassment policy.

V. Fifth Incident: Denial of Request for Personal Leave

Stephenson claims that in 2000 her supervisors treated her requests for leave differently from requests made by male sergeants. Stephenson alleges that her supervisors publicly refused her requests for leave, whereas such denials customarily occurred in private between the employee and supervisor. Further, supervisors often required Stephenson, but not other male sergeants, to provide specific and detailed reasons for requesting leave. According to Stephenson, supervisors consistently [*6] granted male employees' leave requests on short notice, including requests made on the day of desired leave. On one particular occasion, Lawton refused to grant Stephenson leave to attend a meeting with her daughter's teacher on September 6, 2000. Stephenson attributed this refusal to the general pattern of delay and scrutiny her leave requests received even though, according to Stephenson, Lawton granted similar requests for "everyone else." Stephenson claims that she raised concerns about her alleged unfair treatment with supervisors. In one instance, another supervisor, Major Louis Giorla, refused to overturn Lawton's denial of her request for leave. Stephenson pursued the matter further with the warden on duty, and the warden laughed in her face.

VI. Sixth Incident: Attack by Co-worker

Following these above incidents, on September 18, 2000 Stephenson filed a complaint alleging gender discrimination with the Equal Employment Opportunity Commission and the Philadelphia Commission on Human Relations. Stephenson claims that after filing that complaint her supervisors failed to administer proper discipline against a co-worker, Correctional Officer Linda Burnette, after she [*7] threatened Stephenson during work. After an inmate attacked her, Burnette criticized her co-workers for failing to come to her aid. Angered, Burnette accosted Stephenson and other

co-workers. Stephenson claims she tried to calm Burnette, who responded with obscenity and violence, including throwing a set of keys in Stephenson's direction and bumping Stephenson with her chest.

Following the incident, Stephenson spoke with her supervisors, Lawton and Warden David Adams, about possible disciplinary measures against Burnette. Stephenson claims that during this discussion Lawton pushed her, pointed his finger in her face, and announced that suspending Burnette would require suspending Stephenson because both parties were involved in the altercation. According to Stephenson, Adams initially laughed at Lawton's actions and then advised Stephenson to file a report about Burnette's conduct. Stephenson did so and received an invitation to attend the disciplinary hearing for Burnette. Stephenson claims she refused to attend the hearing because hearing administrators refused to search Burnette before the hearing. Stephenson feared for her safety because Burnette allegedly made threats against **[*8]** her before the hearing and Burnette allegedly had a history of violence.

Another employee, Sergeant Joseph Murray, also filed a report against Burnette arising out of the same incident. Stephenson alleges that prison administrators never conducted a disciplinary hearing about Murray's report of Burnette's violence against him. According to Stephenson, she gathered from her years of experience working in the PPS that retribution for challenging prison officer hierarchy would come "sooner or later."

### VII. Seventh Incident: Conjunctivitis

In 2001, Stephenson contracted conjunctivitis and, as a result, exhausted her sick leave, leaving her no choice but to come to work still infected. At work, co-workers noticed Stephenson's condition and kept their distance. However, Stephenson's supervisors, Lawton and Giorla, did get close enough to deny Stephenson's request to use personal time to leave work. Stephenson finally did leave work and the records indicated she left "sick."

### VIII. Eighth Incident: The Betty Boop Pen

In 2001, Adams returned from a trip to Disney World with souvenir pens for his co-workers. Stephenson alleges that Adams selected pens with Disney characters **[*9]** that reminded him of particular staff members. When Adams distributed his gifts publicly to Stephenson, her co-workers got a big laugh seeing Stephenson receive

her gift -- a Betty Boop pen. Stephenson alleges that this public presentation of a gift embarrassed and humiliated her.

### IX. Ninth Incident: Emergency Card

According to Stephenson, in 2002 she sent a memo to Giorla asking him to remove her address from her emergency contact card, which supervisors stored in a central file accessible to all correctional officers. Stephenson claims she feared that Burnette, who had access to the emergency card, would use the information to retaliate against her for reporting Burnette's violent behavior in 2001. According to Stephenson, the emergency cards of all other sergeants provide only a phone number, not an address. Giorla denied Stephenson's request and threatened to write up Stephenson if she removed the card from the file.

### X. Tenth Incident: Separation from Employment

In December 2001, following an outdoor pursuit of an escapee, Stephenson became ill a few days before her scheduled vacation. Stephenson claimed that she called in sick but the supervisor on duty, **[*10]** Lieutenant Donna Johnson, failed to record her call. Stephenson claims that she notified Johnson of the error. Johnson agreed to take responsibility for the erroneous record but warned Stephenson that Lawton intended to write her up for being absent without leave regardless of Johnson's error. Distraught about this disciplinary action and distressed due to an overall perception of retaliation, Stephenson decided not to return to work following the advice of her physician. She contacted appropriate PPS personnel to request time off under the Family Medical Leave Act. Stephenson did receive a temporary grant of FMLA leave but failed to submit proper paperwork to secure final approval, even after PPS sent her a letter advising her of the need for documentation for final approval of FMLA leave. Without proper leave granted, PPS concluded that Stephenson had abandoned her position and separated her from her employment. n1 Stephenson claims that her psychiatrist failed to send to PPS paperwork supporting her request for FMLA leave. Further, Stephenson claims that her depression and anxiety prevented her from contacting her psychiatrist or PPS to discuss the delay in production of this documentation **[*11]** for FMLA leave. Stephenson filed another complaint with EEOC and PCHR on April 8, 2002 alleging retaliation for her initial complaint.

n1 Defendants do not define or discuss the effects of an employment separation and they do not distinguish it from other employment actions such as unpaid leave or termination. Presumably, under PPS policy, a separated employee can apply for reinstatement because defendants noted that Stephenson did not do this. Presumably, separation means an employee does not receive compensation, benefits, or work assignments, but does not terminate the employment relationship.

STANDARD OF REVIEW

*Rule 56(c) of the Federal Rules of Civil Procedure* provides, in relevant part, that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter **[\*12]** of law." *Fed. R. Civ. P. 56(c)* (2005). The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions . . . which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).* After the moving party has filed a properly supported motion, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e)* (2005).

I must determine whether any genuine issue of material fact exists. An issue is genuine if the fact finder could reasonably return a verdict in favor of the non-moving party with respect to that issue. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).* An issue is material only if the dispute over the facts "might affect the outcome of the suit under the governing law." Id. In making this determination, I must view the facts in the light most favorable to the non-moving party, and the non-moving party **[\*13]** is entitled to all reasonable inferences drawn from those facts. Id. However, the nonmoving party may not rest upon the mere allegations or denials of the party's pleading. See *Celotex, 477 U.S. at 324.* The non-moving party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.

*Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).* If the evidence for the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson, 477 U.S. at 249-50* (citations omitted).

DISCUSSION

I. Title VII

Defendants argue that Stephenson has failed to present actionable claims under Title VII for sex discrimination, retaliation, individual liability, and sexual harassment via a hostile work environment. Defendants argue that the discrimination claim must fail because she cannot show that she suffered an adverse employment action or that she has suffered less favorable treatment than similarly situated employees of a non-protected **[\*14]** class. Defendants further argue that Stephenson cannot establish a retaliation claim because: (1) Stephenson's separation was not an adverse employment action; (2) even if it were, it lacks causal connection to her protected activity, i.e. filing an EEOC complaint; and (3) defendants had a legitimate non-retaliatory reason for separating Stephenson from employment. Furthermore, defendants argue that Title VII claims against individual defendants must fail because Title VII only recognizes claims against employers, not individuals. Finally, defendants argue that Stephenson did not suffer severe and pervasive treatment sufficient to constitute a hostile work environment and, even assuming a hostile workplace environment existed, the City has a viable affirmative defense against respondeat superior liability.

Stephenson fails to respond to defendants' arguments addressing gender-based discrimination and individual liability under Title VII. See *42 U.S.C. § 2000e-2(a)* (listing "unlawful employment practice[s] for an *employer*" (emphasis added)); *Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1078 (3d Cir. 1996)* (en banc) **[\*15]** (holding "that Congress did not intend to hold individual employees liable under Title VII"); see, e.g., *Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 183-84 (3d Cir. 1997)* citing *Sheridan, 100 F.3d at 1077* (dismissing plaintiff's Title VII claims against individual supervisors). Accordingly, I will grant summary judgment in favor of defendants with respect to those claims and will discuss only the parties' arguments concerning liability for the employer City of Philadelphia for retaliation and the hostile work environment.

A. Retaliation

The City of Philadelphia first argues that Stephenson cannot establish a prima facie case for retaliation because her separation does not qualify as adverse employment action and she has failed to demonstrate a sufficient causal connection between the separation and Stephenson's protected activity. Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees . . . because [an employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *42 U.S.C. § 2000e-3(a)* **[*16]** *(2006)*. Under the familiar burden shifting framework for retaliation claims, Stephenson must first establish a prima facie case of retaliation, which once established "creates a presumption that the employer unlawfully discriminated against the employee." *Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 252-54, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*; *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. Once a plaintiff has established a prima facie case of retaliation, "the burden shifts to the [employer] 'to articulate some legitimate, [non-retaliatory] reason for'" taking adverse employment action. *Burdine, 450 U.S. at 253, 254-55* quoting *McDonnell Douglas, 411 U.S. at 802*. An articulation of a legitimate non-retaliatory reason removes the presumption of retaliation and the burden then shifts back to the plaintiff to show that the employer's stated reasons for its adverse employment action "were a pretext for [retaliation]". *Burdine, 450 U.S. at 253, 256*; *McDonnell Douglas, 411 U.S. at 802*.

1. Prima Facie Case

"In order to succeed on a claim **[*17]** of discriminatory retaliation, a plaintiff must demonstrate that: (1) [she] engaged in conduct protected by Title VII; (2) the employer took adverse action against [her]; and (3) a causal link exists between [her] protected conduct and the employer's adverse action." *Charlton v. Paramus Board of Education, 25 F.3d 194, 201 (3d Cir. 1994)* (internal citations and quotations omitted). The City of Philadelphia does not dispute that Stephenson engaged in protected activity under Title VII when she filed a complaint with the EEOC and PHRC against her supervisors at PPS on September 18, 2000.

a. Adverse Employment Action

The City argues that Stephenson did not suffer any adverse employment action after she filed the complaint. To show adverse employment action, "plaintiff must show that a reasonable employee would have found the challenged action [an employer's retaliatory conduct] materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. and Santa Fe Ry. Co. v. White, No. 05-259, 548 U.S.     , 126 S. Ct. 2405, 165 L. Ed. 2d 345, 2006 U.S. LEXIS 4895, *5, slip op. at 13 (Jun. 22, 2006)*. PPS contends **[*18]** that it merely "separated" Stephenson from her employment because she abandoned her position when she failed to report for duty as scheduled in January 2001, to request a leave of absence, and to submit proper documentation to support her request for FMLA leave. Three aspects of the separation support the opposite conclusion: (1) the decision to separate came from the employer; (2) the action concluded Stephenson's employment with PPS; (3) she no longer received scheduled work shifts, benefits, or pay. Because such consequences would ordinarily dissuade a reasonable employee from making a discrimination charge, I find that the separation constitutes a materially adverse action.

Stephenson also contends that PPS subjected her to a materially adverse action when it exposed Stephenson to the risk of attack from Burnette by ignoring Stephenson's request that PPS discipline Burnette and denying, without explanation, Stephenson's request to remove her address from her emergency card. However, the Supreme Court has held that "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work **[*19]** and that all employees experience." *White, 548 U.S.     , 2006 U.S. LEXIS 4895 at *27, slip op. at 13*. Because Stephenson only makes allegations about the fear and anxiety she felt from Burnette, but does not point to specific instances where Burnette threatened her safety after their initial confrontation, she has not demonstrated treatment beyond petty slights or minor annoyances. Furthermore, because Stephenson has not presented objective evidence of threats to her safety, her employer's conduct here would not dissuade a reasonable person from reporting Title VII violations. Concerning the discipline of Burnette and Stephenson's emergency card, there is no genuine issue of material fact as to whether a reasonable employee would

find PPS's treatment of Stephenson a materially adverse action.

Stephenson also has characterized the separation as a constructive discharge. Although a constructive discharge could constitute an adverse employment action, Stephenson has not sufficiently supported this claim. To establish a claim of constructive discharge, Stephenson must show that "the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to [*20] them would resign." *Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984)*. Even accepting Stephenson's claim that she left PPS to safeguard her own mental health, she has not demonstrated how the threat to her safety posed by Burnette, the indifference her supervisors showed to her concerns, and Howard's erroneous report of her AWOL status created a sufficiently intolerable condition that would force a reasonable person to resign. See *Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084, 1084-85 (3d Cir. 1996)* (finding a constructive discharge where an employee's "decision to leave was reasonable based upon the history of discriminatory treatment," which included continuous, public, racist harassment). There is no genuine issue of material fact as to whether Stephenson was constructively discharged. Thus, only Stephenson's separation from PPS constitutes conduct an employee would find materially adverse, and I will not consider further claims of retaliation regarding other PPS actions.

b. Causal Connection

The City also argues that Stephenson cannot establish a causal connection between her protected activity and her separation [*21] from PPS. With the exception of very close temporal proximity, "the mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997)*; see also *Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001)* ("The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" (internal citation omitted)). Nevertheless, an employee can establish causal connection by presenting evidence of a pattern of the employer's antagonistic behavior and inconsistent explanations of adverse employment action in the period between protected activity and adverse employment action. See *Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3d Cir. 1997)* ("[A] plaintiff can establish a link between his or her protected behavior and subsequent discharge if [*22] the employer engaged in a pattern of antagonism in the intervening period."); *Woods v. Bentsen, 889 F. Supp. 179, 188 (E.D. Pa. 1995)* ("[A]dverse employment action, occurring a significant period of time following the exercise of rights afforded under Title VII, does not create an inference of causation in the absence of other evidence.").

Here, the City argues that Stephenson's failure to report for assigned shifts, her failure to produce FMLA documentation, and her failure to contact PPS about her leave all led to her separation from employment. While the mere fact that adverse employment action occurred after protected activity does not create a causal connection, Stephenson has presented evidence of a pattern of antagonistic behavior and inconsistent explanations. With respect to antagonism, Stephenson presented evidence that PPS initially ignored Stephenson's concerns about Burnette, denied her protection at Burnette's disciplinary hearing, dismissed Murray's complaint about Burnette contrary to PPS practice concerning employee complaints, denied without stated reason her request to redact her emergency card, and ignored an error in her attendance record. With [*23] respect to inconsistency, Stephenson has presented evidence suggesting that employees customarily receive a full disciplinary hearing regarding her AWOL status, whereas she claims that she did not receive similar process. Although the separation order indicates that she "did not report for [her] hearing," I find that a genuine issue of material fact exists regarding the causal connection between Stephenson's protected activity and her separation from PPS.

Because the other alleged incidents -- Stephenson's perceived indifference by PPS to her safety, the failure to discipline Burnette, the denial of permission to edit her emergency card, and the alleged constructive discharge -- do not constitute adverse employment action, I need not discuss their causal connection to Stephenson's protected activity or consider them in any further analysis of her retaliation claim.

Case 1:04-cv-00970-JJF    Document 101-4    Filed 01/16/2007    Page 136 of 181

Page 7
2006 U.S. Dist. LEXIS 43998, *23

2. Legitimate Non-Retaliatory Reason

After a plaintiff establishes a prima facie case, the burden shifts to the defendant employer "to rebut the presumption [of retaliation]. . . by producing evidence . . . [of] a legitimate, non-[retaliatory] reason" for the adverse employment action. *Burdine, 450 U.S. at 254*; **[*24]** see also *McDonnell Douglas, 411 U.S. at 802*. Defendant's burden is relatively light; an employer need only articulate a legitimate, non-retaliatory reason, but does not need to persuade the court that such reason actually motivated the decision; consequently,. *Burdine, 450 U.S. at 254-55*; *McDonnell Douglas, 411 U.S. at 802*; see also *Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)* ("The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."). The City points to legitimate, non-retaliatory reason for separating Stephenson: Stephenson's two month absence from work combined with her failure to provide appropriate FMLA documentation or contact PPS regarding the matter. Thus, I find that the City has articulated a legitimate, non-retaliatory reason for separating Stephenson.

3. Pretext

The burden shifts back to plaintiff to persuade the court by a preponderance of the evidence that the employer is using the proffered reasons as a pretext for the actual discriminatory **[*25]** reasons that motivated the retaliatory action. *Burdine, 450 U.S. at 256*; *McDonnell Douglas, 411 U.S. at 802*. Stephenson appears to argue that PPS's reasons are a pretext for retaliation against her for her EEOC complaint because PPS did not follow proper procedure for separating her from employment and PPS has retained employees who had more significant records of being AWOL than Stephenson's. To prove pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes, 32 F.3d at 764*. Accordingly, Stephenson "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them

'unworthy of credence.'" *Fuentes, 32 F.3d at 764* quoting *Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)*. **[*26]** Furthermore, "factors such as the defendant's credibility, the timing of an employee's dismissal, and the employer's treatment of the employee could raise an inference of pretext which would make summary judgment for the employer inappropriate." *Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638-39 (3d Cir. 1993)*.

Here, Stephenson alleges that PPS failed to provide her with a proper disciplinary hearing regarding her separation and argues that this procedural deficiency demonstrates that retaliation for filing the EEOC complaint, not PPS's stated reasons, motivated the separation. However, as Stephenson acknowledges, she never contacted PPS about the problems concerning her FMLA documentation, even after PPS sent her a letter about this problem. PPS's initial approval of her FMLA leave and its efforts to grant final approval of the leave suggest that PPS eventually resorted to separation solely because Stephenson failed to contact PPS or provide appropriate documentation. Because no presented evidence contradicts PPS's stated reasons for the separation, they are not pretextual for underlying retaliatory motives. Stephenson also points to PPS's retention of an **[*27]** employee, Lawton, who several decades ago had unexcused absences from work allegedly more egregious than Stephenson's. While Stephenson may find her employer's forgiveness of her supervisor's past disciplinary problems "ironic" or even suspicious, evidence of one distant occurrence is not sufficient to discredit the City's stated reasons for Stephenson's separation or to raise a genuine material issue of fact regarding pretext. Thus, I will grant defendant's motion for summary judgment on Stephenson's retaliation claim.

B. Hostile Work Environment

The City argues that Stephenson has not presented evidence of harassment sufficiently "severe or pervasive [as] to alter the conditions of employment and create a hostile work environment." *Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)*. To support a hostile work environment claim based upon gender, Stephenson must show that: (1) she suffered intentional discrimination because of gender; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the

discrimination would detrimentally affect a reasonable woman in her position; and (5) respondeat [*28] superior liability existed. See *Jensen v. Potter, 435 F.3d 444, 449 n.3 (3d Cir. 2006)* (noting that the second factor requires "severe or pervasive" harassment according to the Supreme Court in *Pa. State Police v. Suders, 542 U.S. 129, 133, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004)*); *Andrews v. City of Philadelphia, 895 F.2d 1469, 1482 (3d Cir. 1990)* (listing the five factors for a hostile work environment claim). While discrete acts of harassment may not constitute a hostile work environment, a pattern of discriminatory and facially neutral acts can collectively give rise to an actionable claim for a hostile work environment. *Nat'l R.R. Passenger Corp. v Morgan, 536 U.S. 101, 116, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002)*; see also *Andrews, 895 F.2d at 1486, n.3* ("The intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit . . . . A more fact intensive analysis will be necessary where the actions are not sexual by their very nature."). "'[B]ecause discrimination is often masked in more subtle forms, it is often difficult to discern discriminatory animus'; therefore, [*29] 'with respect to certain conduct, the intent to discriminate can be inferred.'" *Benny v. Commonwealth of Pa., Dep't of Corrections, 400 F. Supp. 2d 831, 836 (W.D. Pa. 2005)* quoting *Hartman v. Sterling, Inc., 2003 U.S. Dist. LEXIS 18140, No. 01-CV-2630, 2003 WL 22358548, at *4 (E.D. Pa. September 10, 2003)* (internal quotations and citations omitted).

Whether severe or pervasive treatment exists depends upon a consideration of a totality of circumstances, including: "(a) the frequency of the harassment, (b) its severity, (c) whether it is physically threatening or humiliating or merely an offensive utterance, (d) whether it unreasonably interferes with employee's work performance, and (e) its effect on an employee's psychological well being." *Hawk v. Americold Logistics, LLC, 2003 U.S. Dist. LEXIS 3445, No. 02-3528, 2003 WL 929221, at *4 (E.D. Pa. Mar. 6, 2003)* citing *Harris v. Forklift Sys., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)*; see also *Clegg v. Falcon Plastics, Inc., 174 Fed. Appx. 18, 2006 U.S. App. LEXIS 8576, No. 05-1826, 2006 WL 887937, at *4 (3d Cir. Apr. 6, 2006)* citing *Harris, 510 U.S. at 23* ("[W]hether the threshold level of severity and pervasiveness has been reached [*30] . . . [depends upon the totality of circumstances including such] factors as

the severity of the harassment, the frequency of the harassment, and the degree of abuse."); *Abramson v. William Paterson Coll. of N. J., 260 F.3d 265, 280 (3d Cir. 2001)* (applying Harris factors to the fourth prong of the Andrews test). However, the Supreme Court has instructed "that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)* (internal quotations omitted).

1. Gender-Based Discrimination

Here, Stephenson has not presented evidence of gender-based treatment. "Title VII does not prohibit all verbal or physical harassment in the workplace; it prohibits discrimination because of sex." *Reyes v. McDonald Pontiac GMC Truck, Inc., 997 F. Supp. 614, 618 (D.N.J. 1998)*. Stephenson's complaint about receiving a Betty Boop pen from Disney World does not rise to an actionable level of gender-based harassment because it does not involve insulting language [*31] degrading women, pornographic images in the workplace, or sexual objects placed in her work space. See *Andrews, 895 F.2d at 1486* (determining that discrimination based upon gender can include derogatory and insulting language targeting women, placing pornographic images in work areas, and placing sexual objects on a plaintiff's desk). Although Lawton allegedly told her she could "go far if she played her cards right," no evidence supports her desired inference that "playing cards" meant "be[ing] sexy and flirt[ing]." Stephenson fails to offer evidence beyond mere allegations that her gender motivated her employer's strict enforcement of the uniform policy in the "600" building. In the absence of circumstances suggesting gender-based treatment, Stephenson cannot demonstrate that her employer discriminated against her on the basis of gender in scrutinizing her leave requests and refusing to allow her to use personal leave when she contracted conjunctivitis.

2. Severe or Pervasive

Even accepting that an inference of gender-based conduct exists, Stephenson fails to provide sufficient evidence beyond the allegations in her complaint to show severe and pervasive [*32] treatment. Stephenson presents nine specific occurrences over nineteen months in support of her claim of a hostile work environment. n2

2006 U.S. Dist. LEXIS 43998, *32

However, these incidents collectively lack the frequency to constitute a hostile work environment claim. See *Saidu-Kamara v. Parkway Corp., 155 F. Supp. 2d 436, 440 (E.D. Pa. 2001)* (finding four incidents of unwelcome comments and touching "at best demonstrated sporadic and isolated incidents of harassment"); *Calloway v. E.I. DuPont de Nemours and Co, 2000 U.S. Dist. LEXIS 12642, No. 98-669-SLR, 2000 WL 1251909, at *6 (D. Del. Aug. 8, 2000)* (calling over a dozen incidents of minor, but unwelcome, comments and gestures in a two month period "sporadic"); *Cooper-Nicholas v. City of Chester, Pa., 1997 U.S. Dist. LEXIS 20810, No. 95-6493, 1997 WL 799443, at *3 (E.D. Pa. Dec. 30, 1997)* (finding eight alleged incidents of unwelcome comments over nineteen months neither "frequent or chronic").

n2 I will not credit Stephenson's unsubstantiated allegations that discriminatory treatment occurred "all the time."

 **[*33]**

Similarly, although the alleged comments about Stephenson "playing [her] cards right" or "looking pretty good" may breach customary workplace etiquette, but they do not rise to the level of severity sufficient to create a hostile work environment. See *Shramban v. Aetna, 262 F. Supp. 2d 531, 536 (E.D. Pa. 2003)* (finding recurrent jokes and comments with alleged sexual and xenophobic overtones insufficiently severe to create a hostile work environment); *Calloway, 2000 U.S. Dist. LEXIS 12642, 2000 WL 1251909, at *5* (finding that "sporadic, unwelcome conduct and disparaging utterances" did not rise to the level of severe and pervasive treatment sufficient to make summary judgment inappropriate).

While Stephenson has presented one instance in which a co-worker, Linda Burnette, threatened her with violence, she cannot point to any further specific instances where Burnette posed a risk to her safety as a result of an employer decision. Stephenson also presents no evidence concerning the extent to which the alleged hostile work environment impeded her ability to work. See *Gautney v. Amerigas Propane, Inc., 107 F. Supp. 2d 634, 644 (E.D. Pa. 2000)* (finding no severe **[*34]** and pervasive treatment where plaintiff did not present evidence of physical contact, physical intimidation, or conduct that interfered with work performance); *Cooper-Nicholas, 1997 U.S. Dist. LEXIS 20810, 1997*

*WL 799443, at *3* (noting that the absence of physical threats weighs against finding severe and pervasive conduct).

Despite having seen a psychiatrist, Stephenson also fails to present any evidence of the psychological effects of the work environment and merely relies upon her allegations of physical and psychological effects. See *Grazioli v. Genuine Parts Co. 409 F. Supp. 2d 569, 578-79 (D.N.J. 2005)* (finding triable issue of fact where employee presented letter from a counselor as evidence of psychological harm); *Anderson v. DeLuxe Homes of PA, Inc., 131 F. Supp. 2d 637, 646-47 (M.D. Pa. 2001)* (finding evidence of psychological effects upon plaintiff where allegations supported by documentation from her physician).

Thus, Stephenson has not presented sufficient evidence to create a genuine issue of material fact as to whether she endured severe and pervasive treatment sufficient to support a hostile work environment claim.

3. Subjective and Objective  **[*35]**  Effect

The City argues that Stephenson did not suffer detrimental effects from her treatment while working at PPS and that a reasonable woman in her position would not suffer detrimental effects. Under the Andrews test, "[t]he third factor is a subjective inquiry of whether the particular plaintiff was demonstrably injured[, and] . . . the fourth factor injects a requirement of objectivity: it ensures that employers are held liable only when the work environment is hostile from the standpoint of a reasonable person." *Suders v. Easton, 325 F.3d 432, 441-42 (3d Cir. 2003)* citing *Andrews, 895 F.2d at 1483*. To demonstrate subjective injury, Stephenson alleges that she suffered adverse psychological and physical effects as a result of her employer: (1) denying her request to use personal leave; (2) commenting about her appearance in civilian clothes; (3) giving her a cartoon character pen of Betty Boop. Because Stephenson has not presented evidence of her physical or psychological injuries arising from this treatment, she has failed to demonstrate sufficiently the subjective detrimental effects to constitute a hostile work environment claim.  **[*36]**

To show the detrimental objective effects of this treatment, Stephenson relies upon her claim that the severity and pervasiveness of the harassment would create a hostile work environment for any reasonable, similarly situated employee. As discussed above,

Stephenson has failed to show severe and pervasive treatment. Even if she had, she offers no evidence of how such a work environment adversely impacted other female sergeants in ASD. Compare *Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 600 (M.D. Pa. 2002)* (concluding that objective test not met where plaintiff failed to adduce evidence showing the frequency, severity, or impact upon plaintiff's work performance) with *Mertig v. Milliken & Michaels of Delaware, Inc., 923 F. Supp. 636, 646-47 (D. Del. 1996)* (finding that plaintiff met burden to defeat defendant's motion for summary judgment where plaintiff presented specific instances of subjective effects of harassment and corroborating testimony from other employees similarly situated to plaintiff); see also *West v. Phila. Elec. Co., 45 F.3d 744, 757 (3d. Cir. 1995)* (finding evidence of harassment of other employees on the **[*37]** basis of membership ion a protected class relevant to plaintiff's hostile work environment claim); *Daniels v. Essex Group, Inc., 937 F.2d 1264, 1275 (7th Cir. 1991)* (finding evidence of discriminatory treatment of other employees, in addition to plaintiff, "help[ed] to fulfill the objective standard of a hostile work environment"). Stephenson has not presented evidence of subjective and objective effects sufficient to give rise to a genuine issue of material fact.

Because Stephenson has not raised genuine issues of material fact regarding any of the first four elements of the *Andrews* test for a hostile work environment, I need not address respondeat superior liability and I will grant defendant's motion for summary judgment.

II. Pennsylvania Human Relations Act (PHRA) and Philadelphia Fair Practices Ordinance (PFPO)

The City argues both that Stephenson failed to demonstrate either employer or individual liability under the PHRA and that Stephenson failed to demonstrate

employer liability under the PFPO. Because Stephenson has failed to respond to arguments concerning individual liability under the PHRA or employer liability under the PFPO, I will grant **[*38]** summary judgment on these issues.

The City also argues that because Stephenson cannot succeed in her Title VII claims, her claims under the PHRA must likewise fail. I agree. "The proper analysis under Title VII and the Pennsylvania Human Relations Act is identical, as Pennsylvania courts have construed the protections of the two acts interchangeably." *Weston v. Pennsylvania, 251 F.3d 420, 426 n.3 (3d Cir. 2001)*; see also *Cooper-Nicholas, 1997 U.S. Dist. LEXIS 20810, 1997 WL 799443, at *4*. Because Stephenson has not presented evidence to show a genuine issue of material fact in her Title VII claim, she also cannot prevail in her PHRA claim. Defendant's motion for summary judgment will be granted.

An appropriate order follows.

ORDER

AND NOW, this 27th day of June 2006, upon consideration of defendants' motion for summary judgment, plaintiff's response, and for the reasons set forth in the accompanying memorandum, it is ORDERED that defendants' motion for summary judgment is GRANTED. Judgment is entered in favor of defendants, City of Philadelphia, Press Grooms, David Adams, William Lawton, Thomas Costello, and Louis Giorla, and against plaintiff, Latanya M. Stephenson. **[*39]**

s/ Thomas N. O'Neill, Jr.

J.

24 of 192 DOCUMENTS

**ELVA STEWART-GROVE, Plaintiff-Appellant, v. ALPHA CONSTRUCTION CO., Defendant-Appellee.**

**No. 96-1221**

**UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT**

*1997 U.S. App. LEXIS 36113*

**December 19, 1997 *, Submitted**

\* After an examination of the briefs and the record, we have concluded that oral argument is unnecessary, and the appeal is submitted on the briefs and record. See Fed. R. App. P. 34(a); Cir. R. 34(f).

**December 19, 1997, Decided**

**NOTICE:** **[\*1]** RULES OF THE SEVENTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: *1997 U.S. App. LEXIS 39746.*

**PRIOR HISTORY:** Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 94 C 4046. Harry D. Leinenweber, Judge.

**DISPOSITION:** AFFIRMED.

**JUDGES:** Before Hon. THOMAS E. FAIRCHILD, Circuit Judge, Hon. WALTER J. CUMMINGS, Circuit Judge, Hon. DANIEL A. MANION, Circuit Judge.

**OPINION:**

*ORDER*

Elva Stewart-Grove filed a lawsuit under Title VII of the Civil Rights Act, *42 U.S.C. § 2000e,* alleging that she was sexually harassed by two of Alpha Construction Co.'s ("Alpha") employees. Stewart-Grove was represented by counsel in the district court but appears pro se on appeal. Because we agree that Stewart-Grove

has failed to demonstrate a genuine issue of material fact as to whether she was subjected to a hostile work environment or as to whether she suffered a retaliatory discharge, we affirm the judgment of the district court in favor of the defendant.

Alpha is an outdoor construction company which primarily performs tasks such as asphalt paving, sewer and water installation, and excavations. Alpha's **[\*2]** paving season generally runs from spring to late fall each year. Rather than keep year-round employees who perform paving activities, Alpha contacts the International Operating Engineers Union, Local 150 each spring and requests a certain number of operating engineers, generally those who worked for Alpha the previous paving season. The operating engineers may choose to return to Alpha but are not obligated to, and are then laid off at the end of each paving season. Stewart-Grove worked as an operating engineer, specifically an asphalt roller, for Alpha Construction Co. ("Alpha") from 1980 to 1983 and then returned to Alpha in the spring of 1992. n1 Alpha called her back for the 1993 paving season and she returned. Stewart-Grove claims that two of Alpha's employees, a fellow asphalt roller, Winston Sawyer, and her supervisor, Walter Edwards, sexually harassed her.

n1 Although Alpha states that Stewart-Grove worked seasonally,

Stewart-Grove stated in her deposition that she worked "pretty much" year-round. R. 25, Exh. A at 14.

[*3]

In her deposition, Stewart-Grove elaborated upon the alleged instances of **sexual harassment** by Sawyer. She stated that upon her return to work in the spring of 1993, she was assigned by Edwards to operate the breakdown roller. Sawyer was unhappy because he had operated the breakdown roller for many years and wanted to continue doing so, but his request was denied. According to Stewart-Grove, Sawyer's dissatisfaction with his assignment led him to attempt to undermine her professional reputation. n2 He also bumped her roller when they were assigned to work as tandem breakdown roll operators on a highway paving project, and told her on one occasion that he would "kick her black ass." On another paving project in which Stewart-Grove and Sawyer worked together, she stated that he did not service his equipment appropriately and that she was forced to do so on his behalf. Stewart-Grove acknowledged that she was paid for whatever overtime she incurred in doing Sawyer's work. Finally, during one conversation between Stewart-Grove and Sawyer, he stated that he believed that she should stay home with the kids and not take a man's job. On September 27, 1993, Stewart-Grove sent Alpha a letter [*4] complaining that Sawyer had bumped her roller with his roller, sexually harassed her and insulted her. Fred Marshall, Alpha's field superintendent and general manager, asked Stewart-Grove's direct supervisor, Edwards, to look into it. For the next several days, Marshall asked Stewart-Grove how things were going and she responded "fine."

n2 For example, Stewart-Grove alleges that Sawyer falsely blamed her for mistakes on the job, that he would "do things" to her equipment so that it did not run correctly and would cause her to be yelled at by her supervisor, would use her equipment without her permission, and would take extended breaks forcing her to work more.

At Edward's direction, Sawyer apologized to Stewart-Grove several days later but refused to sign a written apology as she requested. Stewart-Grove met with Marshall and Bruce Arquilla, a vice-president at Alpha, on November 5, 1993, to discuss her problems with Sawyer. Although stating that she and Sawyer were not getting along, she failed to describe the [*5] specific allegations of **sexual harassment** by Sawyer. Stewart-Grove left work on November 18, 1993, complaining of illness and did not return. She states that her husband called in sick for her the next day but is not sure if he did the following day. Although she asserts that she was not able to work again until January or February 1994, her doctor released her to work on December 6, 1993. Alpha's paving season ended on December 8, 1993, and Stewart-Grove received unemployment compensation from December 1993 to April 1994. She was asked by Alpha to return for the 1994 paving season but did not.

On November 24, 1993, Alpha received a letter from Stewart-Grove in which she complained that her supervisor, Walter Edwards, had sexually harassed her. The incidents of harassment included Edwards asking her out to dinner a couple of times a month, asking her to wear a dress without **panties,** grabbing her hand and rubbing her palm in a suggestive manner, telling her to feel his crotch and stopping by her house uninvited to deliver a paycheck. Stewart-Grove claims that the **sexual harassment** by both Sawyer and Edwards during the 1993 paving season created a hostile working environment and that [*6] she suffered retaliatory discharge as a result of her complaints to Alpha regarding her alleged harassers. n3

n3 Although Stewart-Grove asserted in her response to the motion for summary judgment that she also was subjected to quid pro quo **sexual harassment,** this has not been briefed on appeal nor does the record indicate any facts which would support such a claim.

We review the grant of summary judgment de novo and view the record and all inferences drawn therefrom in the light most favorable to Stewart-Grove, the nonmoving party. *Saxton v. American Tele. and Tele. Co., 10 F.3d 526, 532 (7th Cir. 1993).* Under Title VII, an employer is prohibited from discriminating against an employee based on sex. *42 U.S.C. § 2000e-2*(a)(1). Gender discrimination includes **sexual harassment.** See *Meritor*

*Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-66, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986); Jansen v. Packaging Corp. of Am., 123 F.3d 490 (7th Cir. 1997).* Stewart-Grove alleges that the **sexual harassment** by [**\*7**] Sawyer and Edwards created a hostile working environment. "To maintain a claim of a hostile work environment, [the plaintiff] must allege conduct that was 'sufficiently **severe or pervasive** to alter the conditions of [her] employment and create an abusive work environment.'" *Koelsch v. Beltone Elec. Corp., 46 F.3d 705, 708 (7th Cir. 1995)* (quoting *Meritor, 477 U.S. at 67)).*

Accepting all of Stewart-Grove's allegations as true, Sawyer's conduct simply did not reach the severity necessary to be actionable under Title VII. See *Skouby v. Prudential Ins. Co., 1997 U.S. App. LEXIS 33682,* No. 96-4100, slip op., at 7 (7th Cir. Nov. 26, 1997) (stating that unwelcome sexual references, drawings alluding to love and marriage, and pictures of provocatively dressed women were not enough to create a hostile work environment); *Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430-31 (7th Cir. 1995)* (stating the several offensive gestures and comments were not sufficient to demonstrate hostile work environment); *Saxton, 10 F.3d at 534* (stating that an unwanted rubbing of the plaintiff's thigh, a forced kiss and an attempted grab by the alleged harasser were not enough to create a hostile work environment). [**\*8**] Stewart-Grove conceded in her deposition that Sawyer never made any sexual demands on her; rather, he "just gave [her] a hard time." R.25, Exh. A at 114. None of her other allegations indicate that he sexually harassed her. See Equal Employment Opportunity Commission Guidelines, *29 C.F.R. § 1604.11(a)* (defining **sexual harassment** as "verbal or physical conduct of a sexual nature" that unreasonably interferes with the individual's work performance). Although Stewart-Grove alleges that Sawyer remarked that she should stay at home with the kids and leave the paving job to the men, this is not sufficient to demonstrate the existence of a hostile work environment. See *Saxton, 10 F.3d at 533* ("'relatively isolated' instances of non-severe misconduct will not support a hostile environment claim") (internal citation omitted).

Even assuming Sawyer's actions did create a hostile working environment, Stewart-Grove has failed to show that Alpha was negligent in dealing with her complaints. See *Jansen, 123 F.3d at 493-94.* After being notified of Stewart-Grove's problems with Sawyer, his supervisor

had him apologize to her for his conduct. Edwards also temporarily reassigned Stewart-Grove [**\*9**] to another position for two weeks during October. Further, at the plaintiff's request, a meeting with Alpha's management was held in which she was given the opportunity to voice her concerns. However, when asked at the meeting to elaborate on her complaints, she did not.

Stewart-Grove's allegations against Walter Edwards, her supervisor, are more serious. Even assuming that the actions alleged created a hostile working environment, Alpha may only be held liable for them if it was negligent in discovering or remedying the harassment. *Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997)* ("Sometimes we need not decide whether particular conduct or comments crossed the line and were actionable . . . . because even if a plaintiff . . . can establish a hostile environment based on her sex, it does not necessarily follow that her employer is liable"). This negligence standard, however, is based on the assumption of prompt reporting. *Jansen, 123 F.3d at 502 n.11.* Stewart-Grove admitted that none of Edward's alleged misconduct took place in front of any witnesses. She also admitted that she did not make anyone at Alpha aware of the alleged misconduct by Edwards until [**\*10**] she sent a letter to Alpha on November 19, 1993, the day after she left early because she was ill. November 18, 1993 was Stewart-Grove's last day of the season as Bruce Arquilla, Alpha's vice-president, sent her a letter on November 19, 1993, indicating that she was being laid-off for the year because she had failed to call in sick, and they assumed she would not be returning to work. n4 The record does not support, nor does Stewart-Grove assert, that Arquilla had received Stewart-Grove's November 19 letter of complaint about Edwards prior to the lay-off.

> n4 Alpha's assumption that she would not be returning was not unreasonable given that the last day of their paving season was December 8, 1993, and Alpha's managers had told Stewart-Grove during the November 5, 1993, meeting with her that the season was ending. Indeed, Alpha engaged in only six days of paving between November 18 and December 8, 1993.

Edwards was Stewart-Grove's supervisor; thus, the level of care exercised by Alpha in ensuring that such

claims **[*11]** are appropriately addressed may be heightened. See *Jansen, 123 F.3d at 511.* However, on the record in this case, even viewing the facts in the light most favorable to Stewart-Grove, we cannot conclude that Alpha was negligent in responding to her complaints against Edwards. The record contains no evidence that Stewart-Grove complained to anyone about Edwards until November 19, 1993, the same day on which Arquilla sent the lay-off letter. Upon receiving Stewart-Grove's letter of complaint, Alpha hired a lawyer to investigate her claims, but Stewart-Grove refused to speak with him. Stewart-Grove's failure to notify her superiors at Alpha at an earlier time as well as the lack of any evidence indicating that Alpha should have known of the alleged **sexual harassment** by Edwards precludes a finding of negligence on Alpha's part. See *Perry, 126 F.3d at 1014* (concluding that employer was not negligent in discovering or remedying the alleged **sexual harassment** when the plaintiff did not complain until after she quit and no evidence was proffered that the employer should have known of the harasser's conduct).

Finally, we conclude that Stewart-Grove's claim of retaliatory discharge is **[*12]** without merit. In order to state a prima-facie case of retaliation, Stewart-Grove must show that: "1) she engaged in protected activity under Title VII; 2) she suffered an adverse employment action subsequent to her participation; and 3) there exists a causal connection between the adverse employment action and her participation on protected activity." *Koelsch, 46 F.3d at 708.* First, we doubt that Stewart-Grove suffered an adverse employment action. Stewart-Grove was laid off, as were other workers, just three weeks before the end of the paving season and she received unemployment compensation, again, as did the other laid off workers. Although Alpha requested her return in the spring, she declined in favor of another position. Stewart-Grove also has failed to show that a causal connection exists between the alleged adverse employment action and the fact that she complained to Alpha about Sawyer and Edwards. Although she complained about Sawyer's conduct prior to being laid off, she did not complain about Edwards' conduct until after she was laid off. She points to no evidence which would lead us to infer that she was fired as a result of her allegations against Sawyer. She also **[*13]** did not file her charge with the Equal Employment Opportunity Commission until December 1, 1993. Accordingly, Stewart-Grove's claim of retaliatory discharge fails and summary judgment for the defendant is proper.

AFFIRMED.

LEXSEE

**WANDA G. TAYLOR, Appellant, v. BRANDYWINE SCHOOL DISTRICT, Appellee.**

**No. 05-4803**

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

*2006 U.S. App. LEXIS 24643; 99 Fair Empl. Prac. Cas. (BNA) 27*

**September 11, 2006, Submitted Under Third Circuit LAR 34.1(a)
September 29, 2006, Filed**

**NOTICE:** **[*1]** RULES OF THE THIRD CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** On Appeal From the United States District Court For the District of Delaware. (D.C. Civ. No. 03-cv-814). District Judge: Honorable Joseph J. Farnan, Jr. *Taylor v. Brandywine Sch. Dist., 2005 U.S. Dist. LEXIS 23160 (D. Del., Oct. 7, 2005)*

**COUNSEL:** WANDA G. TAYLOR, Appellant, Pro se, Wilmington, DE.

For BRANDYWINE SCHOOL DISTRICT, Appellee: William L. Doerler, White & Williams, Wilmington, DE.

**JUDGES:** Before: BARRY, CHAGARES AND COWEN, CIRCUIT JUDGES.

**OPINION:** PER CURIAM

Wanda G. Taylor, acting pro se, appeals from an order of summary judgment in favor of Brandywine School District ("School District") in her action for racial discrimination in employment under Title VII of the Civil Rights Act, *42 U.S.C. §§ 2000a-2000h-6*. Taylor is an African-American female who was employed as a secretary at Springer Middle School in Wilmington, Delaware, from 1972 until 2002. She alleges that she was denied promotions and ultimately constructively discharged on the basis of her race and as retaliation for having complained of discriminatory treatment and

harassment. **[*2]**

The District Court for the District of Delaware granted summary judgment to the School District on September 30, 2005, holding that some of Taylor's claims were time barred, that she had failed to satisfy her burden to demonstrate a prima facie case of racial discrimination for those that were not time barred, and that she had not demonstrated constructive discharge. The District Court concluded in the alternative that even if Taylor had established a prima facie case, the School District had put forth a legitimate, non-discriminatory rationale for her discharge that Taylor had not shown to be pretextual.

Taylor timely appealed. The School District moves for summary affirmance under Third Circuit L.A.R. 27.4 on the basis that the Taylor had failed to present any substantial question in her brief. After considering the parties briefs, we will affirm the grant of summary judgment for the reasons stated below.

I.

Taylor began working as a clerk in the New Castle School District in 1972. In 1981, after the New Castle School District was partially merged into the Brandywine School District, Taylor began working as a clerk in the Brandywine District. In 1985, she was promoted to Attendance **[*3]** Clerk, and in 1990, she was promoted to Secretary. In 1995, she was promoted to Guidance Secretary at Springer Middle School ("Springer"), a position in which she also performed duties normally associated with an Attendance Clerk.

In May 2000, Taylor sent a letter to Ned Brown,

2006 U.S. App. LEXIS 24643, *3; 99 Fair Empl. Prac. Cas. (BNA) 27

then-Principal of Springer, alleging that she had suffered racially discriminatory and disrespectful treatment by certain co-workers. In June 2000, she sent a letter to Dr. Joseph P. DeJohn, then-Superintendent of the School District, asking him to address the complaints raised in her letter to Brown and alleging that she had been discriminated against with respect to promotion and pay. On or before August 29, 2000, Taylor met with DeJohn, Michael Gliniak, who had replaced Brown as the Principal at Springer, and Donald Fantine, then-Assistant Superintendent of Operations, to discuss her concerns. After this meeting, she wrote a letter to DeJohn expressing her satisfaction with the results of the meeting and stating that "[s]ince Mr. Gliniak has been acting principal at Springer Middle School, I can see the improvement of the working atmosphere."

Beginning in November 2000, Gliniak received several complaints [*4] from parents and other Springer employees regarding Taylor's allegedly rude behavior. Gliniak met several times with Taylor to address these concerns, repeatedly emphasizing the need to treat parents and other staff members with courtesy and respect. Gliniak also offered to restructure Taylor's job or move the location of her office in order to help ameliorate the problems, but Taylor elected to preserve the status quo. On November 12, 2001, Gliniak reprimanded Taylor for taking orders for her home business while at school.

Sometime in late 2001 or early 2002, a student told Taylor that a teacher had made inappropriate comments to her and that she was uncomfortable attending his class. When Taylor told her to report the teacher's behavior to the Assistant Principal, the student said that she did not feel comfortable doing so because the Assistant Principal had made sexual comments to her. Taylor did not immediately report this incident, and later reportedly refused to provide investigators with a full account of what the student had told her and when.

Taylor sent a letter to the President of the School Board dated March 14, 2002, tendering her resignation "due to personal reasons. [*5] " The letter was stamped "received" on March 15, 2002. On March 15, 2002, when she went to work, Taylor was presented with a termination notice by Gliniak and instructed to clean out her desk and exit the building. Taylor stated in her deposition that she submitted a letter of resignation that day backdated to March 14 in the hopes that the School Board would accept her resignation and she would be

able to preserve her benefits. Her retirement effective March 15 was approved by the School Board on March 22, 2002.

On April 19, 2002, she filed a charge with the Delaware Department of Labor ("DDOL"), alleging racial discrimination and retaliation. On February 28, 2003, DDOL concluded that there was "no reasonable cause to believe that [the School District] engaged in an unlawful employment practice" in violation of state law. On June 11, 2003, the Equal Opportunity Employment Commission ("EEOC") adopted DDOL's findings and issued a right to sue letter and position statement finding that Taylor had been paid according to state salary guidelines based on position, experience, and training, and that there was no evidence of retaliation. The only secretary at Springer who received a higher [*6] salary was the principal's secretary, who had a greater level of training than Taylor. The EEOC also concluded that Taylor had violated School District policy by failing to report the allegation of sexual harassment, and by failing to cooperate with investigators by providing a complete account of her conversations with the student.

On October 7, 2003, Taylor filed a complaint in the District Court for racial discrimination, retaliation, constructive discharge, and hostile work environment. Upon the School District's motion for summary judgment, the District Court held that Taylor's claims predicated on events occurring before June 23, 2001, were time barred because she had not demonstrated a continuous violation. With respect to later events, the District Court found that Taylor had not established a prima facie case of racial discrimination because she had not established that similarly situated employees were treated more favorably, or that any adverse employment actions she suffered gave rise to an inference of racial discrimination. The District Court further found that even if she had established a prima facie case of racial discrimination, the School District had legitimate, [*7] non-discriminatory reasons for terminating her employment. Specifically, the School District had produced evidence demonstrating that Taylor had violated School Board Policy and state law by failing to promptly report a student's complaint of sexual harassment, and that she had failed to cooperate with the Delaware State Police investigating the claim, both of which were grounds for termination of employment. The District Court found that Taylor had not satisfied her burden to prove that these legitimate reasons were

2006 U.S. App. LEXIS 24643, *7; 99 Fair Empl. Prac. Cas. (BNA) 27

pretextual.

The District Court also found Taylor's claims of discrimination in salary unsubstantiated by the record. The School District had produced evidence showing that Taylor was paid according to the standard salary schedule for secretaries, and that during fiscal years 2000-01 and 2001-02, Taylor was in fact the highest paid Attendance/Guidance secretary of all similarly situated Attendance/Guidance secretaries in the School District. The District Court additionally rejected Taylor's constructive discharge claim because she had not satisfied her burden to show that working conditions were so unpleasant or difficult because of racial animus that a reasonable person **[*8]** in her position would resign.

The District Court also granted summary judgment to Brandywine School District on Taylor's retaliation claim. The District Court found that there was no causal connection between the allegedly retaliatory action - her forced retirement - and the protected activity - complaining about her salary and treatment by co-workers nearly two years previously. The District Court found in the alternative that the School District had offered a legitimate reason for the decision to terminate Taylor, which was her failure to comply with school policy and state law regarding the sexual harassment complaint. According to the District Court, "[n]othing in the record suggests that the School District invoked this policy or inconsistently applied it to Ms. Taylor as a pretext for retaliation."

II.

On appeal, Taylor argues that the District Court erred in finding claims predicated on events occurring before June 23, 2001, time barred because her claims were based on continuing violations. She also argues that the District Court erred in granting summary judgment to the School District on her retaliation claim because she had demonstrated that adverse employment actions, **[*9]** including lack of promotions and inadequate pay, were taken against her due to her complaints about racial discrimination, and that the School District's stated reasons for adverse employment actions against her were pretextual. She argues that the District Court also erred in granting summary judgment to the School District on her constructive discharge claims because she presented evidence, such as the termination letter signed by Michael Gliniak, demonstrating that her workplace was so hostile that a reasonable person would have had no

choice but to resign. Finally, she argues that she alleged sufficient evidence to create a prima facie case for racial discrimination in pay, because she had shown that she was not the highest paid secretary in the School District. n1

> n1 The School District argues in its briefs that because the only claims raised by Taylor before DDOL and EEOC were retaliation and racial discrimination in pay, Taylor has failed to satisfy the exhaustion requirement for her other claims. However, Taylor's racial discrimination and constructive discharge claims are fairly within the scope of the EEOC charge. See *Waiters v. Parsons, 729 F.2d 233, 238 (3d Cir. 1984)*. Accordingly, we will consider every issue decided by the District Court and raised in Taylor's appeal. We have jurisdiction under *28 U.S.C. § 1291* to review the District Court's grant of summary judgment. See *Tomasso v. Boeing Co., 445 F.3d 702, 705 n.3 (3d Cir. 2006)*. We review an order granting summary judgment de novo, viewing the evidence in the light most favorable to the non-moving party, in this case, Taylor. Id.

**[*10]**

We consider first whether the District Court erred in determining that Taylor's claims predicated on events before June 23, 2001, were time barred. Title VII requires a claimant to file a charge with the EEOC within 300 days of the allegedly unlawful employment practice if the claimant has filed a parallel proceeding with a state agency. *42 U.S.C. § 2000e-5(e)(1)*. Taylor first filed a claim for racial discrimination and retaliation with the DDOL on April 19, 2002.

A plaintiff may pursue an action for a continuing violation stretching back before the 300-day period, however, if she can show that at least one discriminatory act occurred during the 300-day period, and that the harassment or discrimination was part of a continuing pattern of discrimination, as opposed to isolated or sporadic acts of intentional discrimination. *Rush v. Scott Specialty Gases, Inc., 113 F.3d 476, 481 (3d Cir. 1997)*. Taylor has not met this burden, however, because she has

Case 1:04-cv-00970-JJF    Document 101-4    Filed 01/16/2007    Page 147 of 181

Page 4
2006 U.S. App. LEXIS 24643, *10; 99 Fair Empl. Prac. Cas. (BNA) 27

not demonstrated a pattern or practice of discrimination.

As discussed in more detail below, Taylor has not convincingly described even one incident of racially motivated harassment or discrimination [*11] at work. She alleges that she was denied promotions, but denial of a promotion is generally a discrete event whose consequences are immediate and permanent and require a prompt response under Title VII. See *id. at 484*. In this case, Taylor has failed to name any specific job for which she applied and was rejected. She attests to a general feeling that she was being passed over for promotions, but does not provide evidence of what those positions were, when they were available, and whether she applied for them. Accordingly, we agree with the District Court that Taylor does not demonstrate a pattern or practice of continuing discrimination allowing her to avoid the 300-day time limit.

Narrowing our consideration to events occurring after June 23, 2001, we also agree with the District Court's grant of summary judgment to the School District on Taylor's racial discrimination claim. In order to establish a prima facie case of racial discrimination, a claimant must demonstrate that (1) she is a member of a protected class; (2) she was qualified for the position she held or sought; (3) she suffered an adverse employment action; and (4) similarly situated persons who are [*12] not members of the protected class were treated more favorably, or that the circumstances of her termination give rise to an inference of discrimination. *Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999)*. Taylor has met the first two criteria because she is African-American and the record establishes that she was qualified for the position of Guidance/Attendance secretary, which she had been performing since 1995.

Viewing the evidence in the light most favorable to Taylor, she has not alleged evidence sufficient to support an inference that the School District took an adverse employment decision based on any illegal discriminatory criterion. *O'Connor v. Consol. Coin Caterers, Corp., 517 U.S. 308, 312, 116 S. Ct. 1307, 134 L. Ed. 2d 433 (1996)*. Taylor alleges that her resignation amounts to an adverse employment action in the form of constructive discharge. See *42 U.S.C. § 2000e-2(a)(1)*; **Clowes v. Allegheny Valley Hosp., 991 F.2d 1159, 1161 (3d Cir. 1993)**. The record demonstrates that Taylor did not write and deliver her resignation letter until Gliniak had given her a termination letter. Taylor backdated [*13] the letter in

order to preserve her benefits, and the School Board accepted her resignation effective March 15, 2002, awarding her all accrued benefits as if she had retired. We note also that Gliniak had previously suggested to Taylor in a memo that she retire or transfer. See **Clowes, 991 F.2d at 1161** (noting that successful constructive discharge claims often involve employees that were asked to resign or threatened with firing).

To establish constructive discharge, Taylor must put forth evidence that the School District, by illegal discriminatory acts, "knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1084 (3d Cir. 1996)* (quoting *Goss v. Exxon Office Sys. Co., 747 F.2d 885, 888 (3d Cir. 1984))*. She has failed to satisfy this burden. Simply put, there is no evidence that whatever friction arose between Taylor and her employer was the result of racial animus. Cf. *Spulak v. K-Mart Corp., 894 F.2d 1150, 1154 (10th Cir. 1990)* (finding evidence sufficient to support constructive discharge [*14] where employee resigned in order to preserve retirement benefits because employee had been singled out "for unduly harsh and discriminatory treatment" over minor infractions that employer normally overlooked).

The record demonstrates that on several occasions, Gliniak discussed with Taylor complaints he had received regarding her rude treatment of parents and other employees. Gliniak offered her a chance to restructure her job in order to address some of the concerns, but Taylor's allegations that Gliniak harassed her or held her to a higher standard are not convincing. For example, Taylor says that Gliniak harassed her by stopping into her office every morning and subjecting her to higher degree of scrutiny, but she also says that he complimented her work frequently. She says that Gliniak permitted other staff members to speak to her rudely, but she does not provide an example of an instance in which this occurred. She also complains that he failed to discipline the school nurse after Taylor reported to him that the nurse was mishandling student files, and allowed other employees to loaf while she was working.

These bare and unsubstantiated allegations are not sufficient to meet [*15] Taylor's burden. As the Principal, Gliniak had a duty to address the complaints of parents and staff members - there is no evidence that he failed to address complaints received about other staff

Case 1:04-cv-00970-JJF    Document 101-4    Filed 01/16/2007    Page 148 of 181

Page 5

2006 U.S. App. LEXIS 24643, *15; 99 Fair Empl. Prac. Cas. (BNA) 27

members or subjected Taylor to a different standard. We cannot infer racial animus simply from the fact that he was doing his job. See *Jones, 198 F.3d at 414* ("Overall, the circumstances of this case . . . reflect a situation in which the employer should have been able to take adverse employment actions against the employee without fear of being embroiled in an expensive lawsuit.").

We next consider whether the District Court erred in finding that Taylor had failed to establish a prima facie case of racial discrimination with respect to her allegations that she was denied promotions, training, and pay. *42 U.S.C. § 2000e(a)*. Although Taylor argues that she has met her burden because she has demonstrated that some secretaries in the School District made more money than she, the relevant question is whether she was paid less than those similarly situated. The facts demonstrate that Taylor's salary complied with the District's seniority tables and pay [*16] grades, and met or exceeded those of her peers who were similarly situated. n2 Secretaries who made more than Taylor either had a higher degree of training or were serving in positions with higher pay grades. Furthermore, of the three secretaries in Taylor's pay grade making higher salaries than she, two were African-American.

> n2 The record also demonstrates that Taylor received regular bonuses and raises. In 2000 and 2001, for example, she received 3% bonuses for excellent attendance, and in 2001, she received a 3% plus $ 550 raise of salary.

Although Taylor complains that she was denied promotions to available positions for which she was qualified, her testimony on this topic is too vague to create an inference of discrimination. She is unable to name specific dates when positions were available, seems unaware whether positions were advertised, and does not appear to have actually applied for any of available position. Her complaints about denial of training are equally vague and unsubstantiated.

Accordingly, [*17] Taylor has not established a material question of fact whether she was discriminated against with respect to pay, promotions, training, or any other employment decisions. Because we agree with the District Court that Taylor has failed to demonstrate that

adverse employment actions were taken against her in this regard, we need not address whether the School District provided a legitimate non-discriminatory reason for any adverse actions.

The District Court also granted summary judgment to the School District on Taylor's retaliation claim. Taylor devotes most of her brief to arguing that she was not promoted and ultimately discharged as retaliation for having raised complaints of racial discrimination and poor working conditions in May and June of 2000 with her letters to Ned Brown (then Principal of Springer) and Joseph DeJohn (Superintendent of Brandywine Schools). In order to establish a prima facie case of retaliation, Taylor must show that (1) she engaged in a protected activity; (2) she suffered adverse action by the employer either after or contemporaneously with the protected activity; and (3) there is a causal connection between the adverse action and the protected activity. [*18] *Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)*.

Assuming Taylor's complaints to administrators about racial discrimination were protected activity, see *42 U.S.C. § 2000e-3(a)*, and assuming she did suffer adverse action, Taylor has failed to demonstrate any causal connection between those complaints and her discharge nearly two years later. Rather, the record demonstrates that her initial complaints were amicably resolved by the meeting between Taylor, DeJohn, Donald Fantine (then Assistant Superintendent of Operations), and Gliniak (who had replaced Brown as Principal of Springer) at the end of August 2000. After the meeting, Taylor wrote a letter to DeJohn expressing her satisfaction with the results of the meeting and with Gliniak as the new Principal at Springer. Taylor's resignation did not occur until about eighteen months later, and there is no evidence that it was precipitated by her complaints in 2000, nor is there evidence of racial animus surrounding the events leading to her resignation.

Even if Taylor were able to satisfy the prima facie test for retaliation, she cannot satisfy her burden to prove by a preponderance [*19] of the evidence that the School District's proffered non-discriminatory reason for her discharge was pretextual. In order to meet this burden, Taylor must adduce some evidence from which a factfinder would conclude "(1) that retaliatory animus played a role in the employer's decision making process and (2) that it had a determinative effect on the outcome of that process." *Krouse, 126 F.3d at 501*.

2006 U.S. App. LEXIS 24643, *19; 99 Fair Empl. Prac. Cas. (BNA) 27

The School District claims that it was prepared to discharge Taylor because she violated school policy and state law by failing to immediately report a student's complaint of sexual harassment. The record establishes that a female student approached Taylor several times beginning in January 2002 to complain about a teacher who was "harassing" her. Taylor told her to talk to the Assistant Principal about being removed from the class, but the student told her he too had made sexual remarks to her and she did not feel comfortable approaching him. Taylor did not report either allegation until the student approached her again several months later. Taylor also allegedly refused to talk to the State Trooper investigating the allegations against the teacher. She claims, however, [*20] that she was never approached by any police officer or investigator.

Viewing the evidence in the light most favorable to Taylor, we will assume that the student's initial complaint about the teacher was too vague to amount to an accusation of sexual harassment, and we will credit Taylor's statement that she was never approached by investigators. Even so, by Taylor's own admission, the student told her that the Assistant Principal had made harassing sexual comments to her in January, and she did not report them, in violation of school policy, which requires investigation of every allegation of sexual harassment. There is no direct or circumstantial evidence that the School District's proffered reason for terminating Taylor was pretextual, or that racial animus was a likely motivating factor. See *Krouse, 126 F.3d at 500-01*. Accordingly, the School District was entitled to summary judgment on Taylor's retaliation claim.

III.

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor of Brandywine School District. In light of our disposition, the School District's motion for summary affirmance is denied as moot.

LEXSEE 2000 US DIST LEXIS 20539

**LAURA L. WALKER, Plaintiff, vs. WERNER ENTERPRISES, INC., Defendant.**

**8:98CV374**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEBRASKA**

*2000 U.S. Dist. LEXIS 20539*

**March 14, 2000, Decided**
**March 14, 2000, Filed**

**DISPOSITION:** [*1] Defendant's motion for summary judgment granted and Separate judgment entered.

**COUNSEL:** LAURA L. WALKER, plaintiff, Pro se, Papillion, NE.

For WERNER ENTERPRISES, INC., defendant: Roger J. Miller, MCGRATH, NORTH LAW FIRM, Omaha, NE.

For WERNER ENTERPRISES, INC., defendant: Amy E. Wallace, GRAY, CARY LAW FIRM, Palo Alto, CA.

**JUDGES:** WILLIAM G. CAMBRIDGE, United States District Judge.

**OPINION BY:** WILLIAM G. CAMBRIDGE

**OPINION:**

MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's motion for summary judgment (filing 34). After carefully considering the pleadings, briefs n1, evidence, and case law, the Court finds that the motion should be granted.

n1 Werner Enterprises suggests that Plaintiff's response to the summary judgment motion was not timely submitted and should not be considered. The defendant appears to have miscalculated the deadline, however. Ms. Walker's brief was indeed delivered on time.

Werner's motion was filed on November 30,

1999, and a copy of the motion and the brief in support thereof were mailed to Ms. Walker on that date. Under this Court's local procedural rules, "an opposing brief may be delivered and served no later than twenty days after service of the motion and supporting brief." NELR 56.1(b). When a party is permitted or required to do something within a prescribed period after service of a document upon that party, and the document is served by mail, three days are added to the prescribed period. *Fed. R. Civ. P. 6(e)*. This is known colloquially as the "mailbox rule." As a result, Ms. Walker had until December 23, 1999, to submit her opposition brief to the Court. The "received" stamp on her brief indicates it was delivered to the Clerk's Office on December 23, and it therefore is timely.

[*2]

I. BACKGROUND

In her complaint, Ms. Walker alleges a number of violations of Title VII of the Civil Rights Act of 1964 as amended *(42 U.S.C. § 2000e, et seq.), 42 U.S.C. § 1981,* and the Nebraska Fair Employment Practice Act (*Neb. Rev. Stat. § 48-1101,* et seq.) by her former employer, Werner Enterprises. Specifically, she claims she was subjected to sexual harassment and discrimination, a hostile working environment, and retaliation for complaining about her treatment.

Werner Enterprises is a large truckload carrier of general commodities, headquartered in Omaha, Nebraska. The company employs more than 7,000 drivers and 1,300 office support personnel nationwide. In September 1996,

Case 1:04-cv-00970-JJF    Document 101-4    Filed 01/16/2007    Page 151 of 181

Page 2
2000 U.S. Dist. LEXIS 20539, *2

Ms. Walker was hired as a receptionist in the company's executive suite. She worked for the company slightly less than three months, and claims she was constructively discharged because of the sexual harassment and hostile working environment created by her supervisor and other employees.

Ms. Walker's immediate supervisor was executive assistant Donna Ingram. Ms. Walker, Ms. Ingram, and other employees socialized once or twice a week after [*3] work, and discussed their personal lives during these outings. At some point during the first four to six weeks of her employment at the company, Ms. Walker confided to Ms. Ingram that she had worked as an exotic dancer in clubs in the Omaha area before joining Werner. n2 Thereafter, Ms. Ingram asked Ms. Walker on three consecutive days in late October, 1996, if she would dance at a male co-worker's birthday party. Ms. Walker declined. Upon Ms. Walker's refusal to perform at the party, Ms. Ingram allegedly commented that if certain Werner executives were to learn about Ms. Walker's past as an exotic dancer, it could have an adverse effect on her employment with Werner.

> n2 Ms. Walker did not include this information on her job application because she felt it was not relevant to the clerical position for which she applied, and did not discuss this portion of her work history with her coworkers, except for Ms. Ingram.

Soon after Ms. Walker denied her request to perform, Ms. Ingram informed the company's human resources [*4] director of Ms. Walker's prior employment as a dancer, ostensibly to alert him to potential problems with male employees perhaps recognizing Ms. Walker from her club performances. Ms. Walker believes Ms. Ingram told other employees as well of Ms. Walker's exotic dancing, despite Ms. Walker's request that the information be held in confidence.

One day after work in early November, n3 Ms. Walker, Ms. Ingram, and several other Werner employees visited the Pheasant Run tavern in Millard. Ms. Walker admits that she overindulged and became intoxicated. She saw, at the tavern, a former patron of her dance performances, and recalls greeting him with a hug. She does not remember if she told others in her group about her work as a dancer or how she knew this gentleman.

Over the course of the evening, one of the male employees in the group allegedly attempted to kiss her twice, but she rebuffed his advances.

> n3 The record is not clear as to when this occurred, but it evidently was shortly or immediately prior to November 11.

[*5]

On the afternoon of November 11, this male employee sent Ms. Walker an e-mail message which reportedly informed her that his birthday was approaching and inquired as to what she planned to do for him. The message allegedly contained lewd suggestions of potential celebratory activities. n4 The sender telephoned Ms. Walker three times that afternoon to ask if she had read his message and to learn her response. The company has a record of those calls, and used that information when confronting the employee after Ms. Walker complained about the e-mail message. See Def.'s Evid. in Supp. of Mot. for Summ. J., Dep. of Laura Walker, Ex. N, Att. E (filing 36).

> n4 Ms. Walker immediately deleted this message from her computer. The company was unable to resurrect the message, so no one but the sender and the recipient know exactly what it said, but the sender has admitted that it was inappropriate.

Werner Enterprises has a policy prohibiting sexual harassment which is contained in the handbook given to all employees [*6] upon hiring:

**Sexual Harassment**

With respect to sexual harassment, Werner Enterprises prohibits:

> 1) Unwelcome sexual advances; requests for sexual favors; and all other verbal or physical conduct of a sexual or otherwise offensive nature, especially where:
> * Submission to such conduct is made, either explicitly or implicitly, a term or condition of employment;
> * Submission to or rejection of such

conduct is used as the basis for decisions affecting an individual's employment; or
* Such conduct has the purpose or effect of creating an intimidating, hostile, or offensive working environment.

2)  Offensive comments, jokes, innuendoes, posters, calendars, photos, computer screens, or other sexually-oriented statements.

**Complaint Procedure**

Each member of management is responsible for creating an atmosphere free of discrimination and harassment, sexual or otherwise. Furthermore, employees are responsible for respecting the rights of their co-workers.

If you experience any job-related harassment based on your sex, or another factor, or believe you have been treated in an unlawful, discriminatory manner, promptly report the incident to your supervisor, who will [*7] report the incident to the Director of Human Resources. An investigation will be conducted under the direction of the Director of Human Resources and appropriate action will be taken. If you believe it would be inappropriate to discuss the matter with your supervisor, report it directly to the Human Resources Department, which will undertake an investigation. Your complaint will be kept confidential to the maximum extent possible.

If the Company determines that an employee has been harassing another employee, appropriate disciplinary action will be taken against the offending employee.

Werner Enterprises prohibits any form of retaliation against any employee for filing a bona fide complaint under this policy or for assisting in a complaint investigation. However, if, after investigating any complaint of harassment

or unlawful discrimination, it is determined that an employee has provided false information regarding the complaint, disciplinary action may be taken against the individual who provided the false information.

Walker Dep., Ex. G, at 20.

On November 18, the male employee admitted having sent an improper message to Ms. Walker. He was warned in writing to immediately [*8] cease all contact with Ms. Walker, as the company would not tolerate harassing conduct. He abided by that directive for the rest of Ms. Walker's tenure with Werner, and Ms. Walker agrees that the company's handling of the matter was appropriate.

Ms. Walker also alleges that in addition to the three requests to dance for a birthday party, Ms. Ingram made other harassing comments alluding to her past as a dancer. One was an unsolicited statement along the lines of "with your talent and my connections, we could make a lot of money." Walker Dep. 99:8-100:3. Another was in response to Ms. Walker's expression of interest in a marketing position with the company, to which Ms. Ingram replied, "You need a degree for that. You can't just flirt with the customers, sleep with them, and expect them to use us as their carrier." Walker Dep. 93:21-94:11. These comments, combined with Ms. Walker's belief that Ms. Ingram told other employees about the exotic dancing and her perception that other employees gossiped about her and went out of their way to "check her out" after learning of her past, created what Ms. Walker characterizes as a hostile work environment.

She complained to a supervisor n5 [*9] on November 13, 1996, about all of these instances of alleged sexual harassment. As noted above, the company resolved the e-mail matter first, and then turned its attention to the allegations regarding Ms. Ingram. The human resources director met with Ms. Ingram on November 18 to discuss Ms. Walker's claims. Ms. Walker, aware that the company was conducting its investigation into her complaint that day, took the day off. In the meeting about Ms. Walker's allegations, Ms. Ingram concurred with Ms. Walker's assessment that she was a demanding supervisor, in part because Ms. Walker had been with the company only two months and was still learning the job. However, she denied having told

other employees about Ms. Walker's dancing. She indicated that her sole reason for having earlier informed the human resources director of Ms. Walker's previous employment as a dancer was to avert problems that might arise as a result of male employees paying undue attention to Ms. Walker. She further stated that Ms. Walker herself had spoken openly of her past and the fact that she recognized certain Werner employees from her days as a dancer. Walker Dep., Ex. N, Att. F.

n5 The person to whom Ms. Walker submitted her complaint was actually a benefits supervisor. This individual was working in the hiring section on a short-term basis at the time Ms. Walker applied for a job, and had interviewed and hired her, so Ms. Walker felt comfortable dealing with her.

**[*10]**

The following day, Ms. Ingram, the human resources director, and the supervisor to whom Ms. Walker had initially submitted her harassment complaint met with Ms. Walker and her husband. The company officials agreed that Ms. Ingram and Ms. Walker should return to their respective jobs and put this issue behind them. Ms. Walker took the rest of the day off. At either this meeting or a subsequent one, Ms. Walker expressed her opinion that Ms. Ingram should receive the same punishment for her actions that the male employee received for sending the inappropriate e-mail. She suggested, in the alternative, that Ms. Ingram be required to attend training in either management or sexual harassment. The company dismissed her suggestions and indicated that it considered the matter resolved.

However, on November 21, the human resources director again met with Ms. Walker and offered her the opportunity to transfer within the company to a job that would perhaps be more acceptable to her. Ms. Walker reviewed Various job postings, but did not express interest in any of them. She stated that she enjoyed all aspects of her receptionist position except for working for Ms. Ingram.

The next incident occurred **[*11]** on December 2, 1996. Ms. Walker's son had suffered an asthma attack the previous night, and she made a medical appointment for him that afternoon. She was told that she could leave work early to take him to that appointment only if she

could arrange for someone to cover her duties at the front desk in her absence. Ms. Walker was unable to find a substitute, and became upset. She telephoned her husband, who took the position that her family should come before her work, and advised her to quit her job if Ms. Ingram refused to permit her to take time off for the doctor's appointment.

Ms. Walker then returned her office keys to Ms. Ingram and announced her intention to end her employment with the company at that time. Ms. Ingram immediately arranged a meeting for the two of them with the human resources director, who suggested that Ms. Ingram be flexible, if possible, about permitting Ms. Walker to attend to her family's needs, but also suggested that Ms. Walker think about her priorities and whether she was in fact able to work an 8:00 to 5:00 job. Ms. Ingram then allowed Ms. Walker to leave work for the medical appointment, with the understanding that Ms. Walker would consider whether **[*12]** she wanted to continue her employment with the company and advise them of her decision the following day. On December 3, however, Ms. Walker did not return to work and did not call, so she was deemed to have resigned effective December 2, 1996.

She filed a charge of sex discrimination, retaliation, and constructive discharge with federal and state officials in February 1997. The Nebraska Equal Opportunity Commission found insufficient evidence to support her allegations, and the U.S. Equal Employment Opportunity Commission issued a right-to-sue letter on April 30, 1998. Ms. Walker filed this lawsuit on July 29, 1998. Her attorney subsequently withdrew from the case, so Ms. Walker has proceeded pro se since May 1999. Werner Enterprises has moved for summary judgment on the grounds that Ms. Walker cannot establish a prima facie hostile working environment or retaliation claim, and that even if she could, the company took prompt remedial action upon becoming aware of her complaint.

## II. SUMMARY JUDGMENT STANDARD

The question before the district court is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as **[*13]** to any material fact and that the moving party is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; see, e.g., *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50,*

*91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Morgan v. Rabun, 128 F.3d 694, 696 (8th Cir. 1997),* cert. denied, *523 U.S. 1124, 140 L. Ed. 2d 947, 118 S. Ct. 1809 (1998); Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992); St. Paul Fire & Marine Ins. Co. v. FDIC, 968 F.2d 695, 699 (8th Cir. 1992).*

Summary judgment is an extreme and treacherous device, which should not be granted unless the moving party has established a right to a judgment with such clarity as to leave no room for controversy, and unless the other party is not entitled to recover under any discernible circumstances. *Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir. 1980).* In ruling on a motion for summary judgment, the district court must view the facts in the light most favorable to the party opposing the **[*14]** motion and give that party the benefit of all reasonable inferences to be drawn from the record. Id.; Widoe v. District No. 111 Otoe County Sch., 147 F.3d 726, 728 (8th Cir. 1998); *Ghane v. West, 148 F.3d 979, 981 (8th Cir. 1998).* Even if the district court is convinced that the moving party is entitled to judgment, the exercise of sound judicial discretion may dictate that the motion should be denied, so the case may be fully developed at trial. *McLain v. Meier, 612 F.2d 349, 356 (8th Cir. 1979); Franklin v. Lockhart, 769 F.2d 509, 510 (8th Cir. 1985).*

Essentially, the test is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc., 477 U.S. at 251-52.* Moreover, although under *Federal Rule of Civil Procedure 56* due deference must be given to the rights of litigants to have their claims adjudicated by the appropriate finder of fact, equal deference must be given under Rule 56 to the rights of those defending against such claims to have a just, speedy and inexpensive determination **[*15]** of the action where the claims have no factual basis. *Celotex Corp. v. Catrett, 477 U.S. at 327.*

The court's role is simply to determine whether the evidence in the case presents a sufficient dispute to place before the jury.

> At the summary judgment stage, the court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter. Rather, the court's function is to determine whether a dispute about a material fact is genuine . . . . If reasonable minds could differ as to the import of the evidence, summary judgment is inappropriate.

*Quick v. Donaldson Co., Inc., 90 F.3d 1372, 1376-77 (8th Cir. 1996)* (internal citations omitted). See also *Bell v. Conopco, Inc., 186 F.3d 1099, 1101 (8th Cir. 1999)* (court's function is not to weigh the evidence to determine truth of any factual issue).

A genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, meaning a reasonable jury could return a verdict for either party. *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co., 49 F.3d 399, 401 (8th Cir. 1995).* **[*16]**

The Eighth Circuit Court of Appeals has repeatedly cautioned that summary judgment should seldom be granted in the context of employment, actions, as such actions are inherently fact-based. *Chock v. Northwest Airlines, Inc., 113 F.3d 861, 862 (8th Cir. 1997); Hardin v. Hussmann Corp., 45 F.3d 262, 264 (8th Cir. 1995).* "Summary judgments should be sparingly used and then only in those rare instances where there is no dispute of fact and where there exists only one conclusion." *Johnson v. Minnesota Historical Soc'y, 931 F.2d 1239, 1244 (8th Cir. 1991)* (citing *Hillebrand v. M-Tron Indus., Inc., 827 F.2d 363, 364 (8th Cir. 1987),* cert. denied, *488 U.S. 1004, 102 L. Ed. 2d 774, 109 S. Ct. 782 (1989)).* "Because discrimination cases often turn on inferences rather than on direct evidence, [the court must be] particularly deferential to the nonmovant." *Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1205 (8th Cir. 1997)* (citing *Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994)).* Such deference, however, will not preclude the entry of summary judgment when the facts of **[*17]** the case warrant it.

To withstand a motion for summary judgment, the nonmoving party must submit "sufficient evidence supporting a material factual dispute that would require resolution by a trier of fact." *Austin v. Minnesota Mining & Mfg. Co., 193 F.3d 992, 994 (8th Cir. 1999)* (quoting *Hase v. Missouri Div. of Employment Sec., 972 F.2d 893, 895 (8th Cir. 1992),* cert. denied, *508 U.S. 906 (1993)).* Put another way, the plaintiff must substantiate her allegations with sufficient probative evidence to permit a finding in her favor "on more than mere speculation,

conjecture, or fantasy." *Moody v. St. Charles County, 23 F.3d 1410, 1412 (8th Cir. 1994)* (quoting *Gregory v. City of Rogers, Ark., 974 F.2d 1006, 1010 (8th Cir. 1992)*, cert. denied, *507 U.S. 913, 122 L. Ed. 2d 661, 113 S. Ct. 1265 (1993))*.

### III. ANALYSIS

#### A. Hostile work environment

Title VII of the Civil Rights Act of 1964 provides that "it shall be an unlawful employment practice for an employer. . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with **[*18]** respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2*(a)(1). The United States Supreme Court has made clear that the statute covers more than "'terms' and 'conditions' in the narrow contractual sense." *Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78, 140 L. Ed. 2d 201, 118 S. Ct. 998 (1998)*. Harassing conduct that is so severe or pervasive as to alter the conditions of an individual's employment and create an abusive working environment violates Title VII. *Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)*.

In *Faragher v. City of Boca Raton, 524 U.S. 775, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998)*, the Supreme Court shed further light on the scope of hostile work environment claims. In so doing, the Court provided a synopsis of the evolution of its decision-making process on such claims:

> In thus holding that environmental claims are covered by [Title VII], we drew upon earlier cases recognizing liability for discriminatory harassment **[*19]** based on race and national origin. . ., just as we have also followed the lead of such cases in attempting to define the severity of the offensive conditions necessary to constitute actionable sex discrimination under the statute. See, e.g., *Rogers v. EEOC, 454 F.2d 234, 238* [(5th Cir. 1971), cert. denied, *406 U.S. 957 (1972)]* ("Mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not sufficiently alter terms and conditions of employment

to violate Title VII).<1> See also *Daniels v. Essex Group, Inc., 937 F.2d 1264, 1271-1272 (C.A.7 1991); Davis v. Monsanto Chemical Co., 858 F.2d 345, 349 (C.A.6 1988)*, cert. denied, *490 U.S. 1110, 109 S. Ct. 3166, 104 L. Ed. 2d 1028 (1989); Snell v. Suffolk County, 782 F.2d 1094, 1103 (C.A.2 1986);* 1 B. Lindemann & P. Grossman, Employment Discrimination Law 349, and nn. 36-37 (3d ed. 1996) (hereinafter Lindemann & Grossman) (citing cases instructing that "discourtesy or rudeness should not be confused with racial harassment" and that "a lack of racial sensitivity does not, alone, amount to actionable **[*20]** harassment").

> <1> Similarly, Courts of Appeals in sexual harassment cases have properly drawn on standards developed in cases involving racial harassment. See, e.g., *Carrero v. New York City Housing Auth., 890 F.2d 569, 577 (C.A.2 1989)* (citing *Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1189 (C.A.2 1987)*, a case of racial harassment, for the proposition that incidents of environmental sexual harassment "must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive"). Although racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment.

*Faragher, 524 U.S. at 786-87.*

This reflects the Court's perception that Title VII is intended to prohibit only the most egregious conduct rather than every offensive slight. Title VII is not "a general civility code," *id. at 788,* and is not meant to make actionable "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, [*21] gender-related jokes, and occasional teasing," Id. (quoting B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992)). Rather, courts must look at all the circumstances, keeping in mind that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Id. (internal citation omitted). Title VII was not designed to create a federal remedy for all offensive language and conduct in the workplace. *Scusa v. Nestle U.S.A. Co., Inc., 181 F.3d 958, 967 (8th Cir. 1999).* The conduct must be extreme in order to amount to a change in the terms and conditions of one's employment. *Faragher, 524 U.S. at 788.*

To state a claim of a sexually hostile work environment, the plaintiff must establish five elements: (1) membership in a protected group; (2) the occurrence of unwelcome harassment in the workplace; (3) a causal nexus between the harassment and membership in the protected group, in other words that the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer [*22] knew or should have known of the harassment and failed to take prompt and effective remedial action. *Carter v. Chrysler Corp., 173 F.3d 693, 700 (8th Cir. 1999); Bales v. Wal-Mart Stores, Inc., 143 F.3d 1103, 1106 (8th Cir. 1998).*

In this case, there is no dispute that Ms. Walker is a member of a protected class, so the focus turns to the remaining elements of a prima facie case. Behavior that constitutes harassment is unwelcome if it is "uninvited and offensive." *Bales, 143 F.3d at 1108* (citing *Quick v. Donaldson Co., 90 F.3d at 1378).* Here, Ms. Walker contends that Ms. Ingram's behavior and comments were uninvited and offensive. Werner, on the other hand, argues that Ms. Walker's past as a dancer belies her "welcomeness" argument, as demonstrated by her willingness to dance on stage in a bikini for tips and endure suggestive comments and propositions from male customers. While the Supreme Court has held that "a complainant's sexually provocative speech or dress" is relevant to determining whether he or she found particular conduct unwelcome, *Meritor Sav. Bank, 477 U.S. at 69,* such evidence is simply [*23] part of the totality of the circumstances to be considered. See *Burns v. McGregor Elec. Ind., Inc., 955 F.2d 559, 565 (8th Cir. 1992).* An exotic dance club is a far cry from a professional office environment, and Ms. Walker's assertion n6 that she expected to be treated professionally at Werner and comported herself accordingly is also to be considered. For purposes of this motion, I find that Ms. Walker has established this element of the claim.

> n6 At her deposition, Ms. Walker testified as follows:
>
> > Q: How was [having people at Werner know of your past as a dancer] more upsetting than the attention you would get from men in the clubs or men that would ask you to have private parties and things like that?
> > A: Because I would expect it at the club. You know, I -- that was the time and place. I wanted to be treated professionally. That's why I didn't dance anymore. That's why I wanted to be in an office place. It's different because it was inappropriate at that time or place.
>
> Walker Dep. 162:10-19 (filing 36).

**[*24]**

Whether the harassment was motivated by her gender is the next question to be addressed. Harassment alleged to be because of sex need not be explicitly sexual in nature. *Carter v. Chrysler Corp., 173 F.3d at 701.* Neither must all instances of harassment be stamped with signs of overt discrimination in order to be relevant under Title VII, as long as they are part of a course of conduct which is tied to evidence of discriminatory animus. Id. The critical issue is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed. *Oncale v. Sundowner Offshore Servs., 523 U.S.*

at 80 (quoting *Harris v. Forklift Sys., Inc., 510 U.S. 17, 25, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993))*. As the Supreme Court pointed out in Oncale:

> Harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex. A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated [*25] by general hostility to the presence of women in the workplace.

*523 U.S. at 80.*

In the present case, no one is alleging that Ms. Ingram's conduct was motivated by sexual desire. Nevertheless, there is no evidence that Ms. Ingram treated any of the male employees as cavalierly as she treated Ms. Walker. Rather, it appears that Ms. Ingram's comments and behavior were motivated by her knowledge of Ms. Walker's previous employment and the assumptions she made about Ms. Walker because of that employment. For purposes of this motion, I find that Ms. Walker has established the third element of her prima facie case.

The fourth element is where Ms. Walker's claim must fail. To survive the challenge to her claim, Ms. Walker must demonstrate that the alleged harassment was so severe or pervasive that it altered a term, condition, or privilege of her employment at Werner Enterprises. *Scusa, 181 F.3d at 966.* The legal analysis of the severity of the harassment has two prongs, requiring the plaintiff to demonstrate both an objectively hostile work environment and a subjective perception of an abusive or hostile environment. *Delph v. Dr. Pepper Bottling Co. of Paragould, Inc., 130 F.3d 349, 354 (8th Cir. 1997).* [*26] "The conduct complained of must have been 'severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive --' if the plaintiff is to succeed." Id. (quoting *Harris v. Forklift Sys., Inc., 510 U.S. at 21).* An "objectively hostile or abusive work environment" occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter

the conditions of the victim's employment and create an abusive working environment." *White v. Honeywell, Inc., 141 F.3d 1270, 1275 (8th Cir. 1998)* (quoting Harris at 21). Also, the employee must subjectively perceive the environment as abusive or the conduct complained of "cannot be said to have 'actually altered the conditions of the victim's employment, and there is no Title VII violation.'" *Delph, 130 F.3d at 354* (quoting Harris at 21-22).

Whether a hostile environment existed can be determined only by looking at all the circumstances, which "include the frequency of the discriminatory conduct; its severity; whether it is physically [*27] threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *White, 141 F.3d at 1275* (quoting Harris at 23). Thus, "evidence of a hostile environment must not be compartmentalized, but must instead be based on the totality of circumstances of the entire hostile work environment." *Delph, 130 F.3d at 355* (quoting *Gillming v. Simmons Indus., 91 F.3d 1168, 1172 (8th Cir. 1996)).* "A work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it 'into a series of discrete incidents.'" *Hathaway v. Runyon, 132 F.3d 1214, 1222 (8th Cir. 1997)* (quoting *Burns v. McGregor Elec. Indus., Inc., 955 F.2d at 564).* "Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing . . . and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Oncale, 523 U.S. at 82.*

These standards, when properly applied, serve to "filter out complaints attacking the [*28] ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Faragher, 524 U.S. at 788.* "We have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment[.]" Id.

"Evidence of a general work atmosphere [] -- as well as evidence of specific hostility directed toward the plaintiff -- is an important factor in evaluating the claim [of a hostile work environment]." *White, 141 F.3d at 1276* (quoting *Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987)).* In the present case, there are essentially four instances of allegedly sexually hostile occurrences during the three months Plaintiff was

employed with the company, and most of those appear to have occurred in the late October-early November 1996 time frame. Although Ms. Walker concedes the e-mail incident was satisfactorily dealt with, it nevertheless is evidence of the general atmosphere in the workplace. Ms. Walker specifically complains about the three comments or groups of comments made by Ms. Ingram regarding: (1) dancing at a co-worker's birthday [*29] party; (2) not being qualified for the marketing position; and (3) using Ms. Walker's dancing talent and Ms. Ingram's contacts to make money. She alleges that these actions, combined with the tension she sensed in the workplace after her history as a dancer became known, rendered her working conditions so intolerable that she had no choice but to quit her job. *Klein v. McGowan, 198 F.3d 705, 709 (8th Cir. 1999).*

While Ms. Ingram admits to being a tough supervisor, and while her comments, even if intended to be jokes, were in bad taste, they do not, however, rise to the level of the severe and pervasive harassment prohibited by Title VII. As noted above, this Court is not to weigh the evidence or make credibility determinations. Those responsibilities are left to the jury. The Court is, however, expected to make a considered decision as to whether the plaintiff has established a genuine issue of fact entitling her to a trial of her claims.

When Ms. Walker's allegations are studied in light of the case law on hostile environment claims, it becomes clear that Werner is entitled to summary judgment. An issue of fact as to an isolated comment or instance of hostility [*30] does not constitute a hostile working environment. Even when combined with the other episodes of alleged sexually motivated hostility, the totality of the circumstances does not lend itself to the conclusion that the Werner Enterprises executive suite is an intolerable place to work. "Even if a plaintiff demonstrates discriminatory harassment, Title VII only reaches such conduct if it is severe or pervasive enough to alter the conditions of employment." *Carter v. Chrysler Corp., 173 F.3d at 701.* Sporadic or casual comments or acts are unlikely to support a hostile environment claim. *Id. at 702.* "More than a few isolated incidents of harassment must have occurred" before Title VII's sanctions will be triggered. *Johnson v. Bunny Bread Co., 646 F.2d 1250, 1257 (8th Cir. 1981).*

As the Eighth Circuit Court of Appeals noted recently in finding that a plaintiff who demonstrated three instances of alleged racial harassment had failed to establish the existence of a hostile working environment:

> Our cases upholding hostile work environment liability have invariably presented far more hostile or abusive circumstances. See, e.g., *Bailey v. Runyon, 167 F.3d 466, 470 (8th Cir. 1999)* [*31] (repeated unwelcome sexual advances); *Hathaway v. Runyon, 132 F.3d 1214, 1222 (8th Cir. 1997)* (physical sexual overtures followed by eight months of intimidating snickers); *Delph, 130 F.3d at 352* (intimidation plus "a steady barrage of racial name-calling"); *Ways v. City of Lincoln, 871 F.2d 750, 755 (8th Cir. 1989)* (evidence included fifty examples of racial harassment); *Hall v. Gus Constr. Co., 842 F.2d 1010, 1012 (8th Cir. 1988)* (incessant verbal abuse and offensive physical touching); *Gilbert v. City of Little Rock, 722 F.2d 1390, 1394 (8th Cir. 1983)* ("more than a few isolated incidents of harassment must have occurred"), cert. denied, *466 U.S. 972, 104 S. Ct. 2347, 80 L. Ed. 2d 820 (1984).* [The supervisor's] alleged behavior in December 1990 and January 1991, though undeniably offensive and rude, was not so severe that a reasonable person would find the terms or conditions of [Plaintiff's] work environment had been altered.

*Gipson v. KAS Snacktime Co., 171 F.3d 574, 579-80 (8th Cir. 1999).*

This decision is not meant to minimize the effects of the [*32] conduct to which Ms. Walker was subjected. She has described the anxiety and stress she experienced as a result of the events at the office, but those allegations simply do not rise to the level of the type of severe and pervasive harassment that a reasonable person would find so abusive and hostile that it actually alters the conditions of her employment.

The final element to be considered on the hostile working environment claim is the remedial action, if any, taken by the employer. n7 Again, the evidence does not support this part of the prima facie case. The evidence

establishes that Ms. Walker complained in writing to a supervisor on November 13, 1996, about the e-mail incident and Ms. Ingram's comments, as well as her betrayal of Ms. Walker's confidence regarding the exotic dancing job and her general demeaning attitude toward Ms. Walker. The supervisor reported those incidents to the human resources director, pursuant to the policy stated in Werner's employee handbook. As discussed in Section I above, the company resolved the matter of the lewd e-mail message to Ms. Walker's satisfaction by reprimanding the sender. The human resources director then spoke to Ms. Ingram, five [*33] days after the complaint was submitted, about Ms. Walker's allegations. She denied most of the accusations. Without corroboration of the alleged statements, the company was faced with the word of one employee against another. The human resources director spoke to both women and encouraged them to make an effort to develop a better working relationship. Two days later, the human resources director suggested that Ms. Walker consider transferring to other available positions within the company if she felt she could not work with Ms. Ingram. Ms. Walker reviewed some job openings, but declined to pursue them because she liked the position she had and believed she could tolerate Ms. Ingram's supervision. The company considered the matter resolved at that point and took no further action on her complaint.

> n7 In Faragher and Ellerth, the Supreme Court set out the elements of the affirmative defense to be used by employers facing vicarious liability for a supervisor's harassment of an employee, when the employee suffered no tangible employment action:
>
> > When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence . . . . The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.
>
> *Burlington Ind., Inc. v. Ellerth, 524 U.S. 742, 765, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998).*

In light of my decision on the merits of the motion, I will not reach this issue. However, from the analysis of the remedial action element of the prima facie case, it appears that the same evidence would favor the affirmative defense.

[*34]

It seems apparent that there can be no serious dispute that the company's actions on Ms. Walker's complaint were prompt, and remedial to the extent reasonably possible. Werner investigated and acted upon the allegations within eight days of them being made. Everyone agrees that the e-mail matter was handled satisfactorily. The company then attempted to place Ms. Walker in a job of her choice which would remove her from contact with Ms. Ingram, but Ms. Walker refused to transfer.

An employer has many options for exercising its remedial obligations, including: taking disciplinary action to stop the harassment; transferring the alleged harasser to a different area where he or she would not come in contact with the complainant; scheduling the individuals involved on different shifts; putting a signed written warning or reprimand in personnel files; or placing the offending employee on probation pending any further complaints. *Hathaway v. Runyon, 132 F.3d 1214, 1224 (8th Cir. 1997).* The law does not require an employer to fire the alleged harasser. Id.; *Barrett v. Omaha Nat'l Bank, 726 F.2d 424, 427 (8th Cir. 1984).* Placing a disciplinary letter in [*35] the alleged harasser's file is a prompt remedial action, "reasonably calculated to end the harassment." Id.

*Henderson v. Heartland Press, Inc.*, 65 F. Supp. 2d 991, 1000 (N.D. Iowa 1999).

Despite Ms. Walker's feelings of having been wronged, the company is under no legal obligation to give her the satisfaction she seeks. The real issue here appears to be Ms. Walker's desire to punish Ms. Ingram for her behavior and comments. As noted in the cases cited in the previous paragraph, the victim of alleged sexual harassment is not in a position to dictate the employer's personnel decisions. Werner's resolution of the harassment complaint submitted by Ms. Walker, through counseling Ms. Ingram and offering to transfer Ms. Walker, appears to have been prompt and adequate, which is all that it is required. Ms. Walker has submitted no evidence to the contrary, so she has not met the fifth element of the prima facie case.

In this vein, Ms. Walker has not established that she was constructively discharged. A constructive discharge occurs when an employer deliberately renders an employee's working conditions intolerable, thereby causing her to end her employment. The **[*36]** employer's actions must have been intended to force the employee to quit; in other words, the employee's resignation must be a reasonably foreseeable consequence of the employer's discriminatory actions. *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 890 (8th Cir. 1998). Moreover, the intolerability of the working conditions is judged by an objective standard, requiring the plaintiff to demonstrate that a reasonable person would have been unable to tolerate the working conditions. Id. (citing *Allen v. Bridgestone/Firestone, Inc.*, 81 F.3d 793, 796 (8th Cir. 1996)). Finally, the employee "has an obligation not to assume the worst and not to jump to conclusions too quickly. An employee who quits without giving [her] employer a reasonable chance to work out a problem has not been constructively discharged." Id. (quoting *Summit v. S-B Power Tool*, 121 F.3d 416, 421 (8th Cir. 1997)).

Nothing in the evidence would support the charge that working conditions in the Werner executive suite were intolerable. As discussed above, these were isolated incidents that were quickly addressed by management. Moreover, the working conditions are to **[*37]** be viewed from the perspective of a reasonable person. Ms. Walker, however, admits she is sensitive and tends to "take everything personally." Walker Dep. 81:8-11; 115:24-116:4. Hypersensitivity to difficult working

conditions is not the same as intolerable working conditions, and will not validate a claim of constructive discharge.

**B. Retaliation**

Title VII also prohibits an employer from retaliating against an employee because that individual "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *42 U.S.C. § 2000e-3*(a). The analytical framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), is applied to retaliation claims under Title VII. First, the plaintiff must establish a prima facie case of retaliation. The defendant then must rebut the prima facie case by demonstrating that it had a legitimate, non-discriminatory reason for its actions. Finally, the plaintiff is entitled to show that the employer's articulated **[*38]** reason is actually a pretext for discrimination.

To establish a prima facie case of retaliation, the plaintiff must show that (1) she filed a charge of harassment or engaged in other protected activity; (2) her employer subsequently took an adverse employment action against her; and (3) the adverse action was causally linked to the protected activity. *Scusa, 181 F.3d at 968*. In the present case, Ms. Walker alleges that after she complained to Werner's human resources department about the sexual harassment she was experiencing, the company failed to pay her for two hours of overtime, someone tampered with her computer in the course of attempting to retrieve the lewd e-mail message, Ms. Ingram refused to give her information necessary to perform her job, and one of the executives ignored her when she reminded him of an appointment and he asked another receptionist at the front desk to place a telephone call for him.

Ms. Walker's adherence to the complaint procedure set out in Werner's employee handbook constitutes protected activity, so she has met the first prong of the test. However, she is unable to demonstrate that she suffered an adverse employment action. "The **[*39]** employment action must have had a materially adverse impact on the terms or conditions of employment." *Sims v. Health Midwest Physician Serv. Corp.*, 196 F.3d 915, 921 (8th Cir. 1999). There is little in the record to support Ms. Walker's allegations in this regard. If these four

instances of alleged retaliatory conduct are true, they may constitute inconvenience, or a minor disruption in her job conditions, but they do not rise to the level of an adverse employment action because Ms. Walker suffered no decrease in her title, salary, or benefits. See *Scusa, 181 F.3d at 968-69.* As discussed above, Ms. Walker's resignation was by choice rather than by force, so it is not a materially adverse employment action. Moreover, the Eighth Circuit Court of Appeals has held that ostracism and disrespect by supervisors does not rise to the level of the adverse employment action intended to be actionable under Title VII. *Manning v. Metropolitan Life Ins. Co., Inc., 127 F.3d 686, 692 (8th Cir. 1997).* "Although actions short of termination may constitute an adverse employment action within the meaning of the statute, 'not everything that makes an employee **[*40]** unhappy is an actionable adverse action.'" Id. (quoting *Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997)).*

Because Ms. Walker's retaliation claim falters at this step of the analysis, I need not consider the remaining elements of the prima facie case, or the issue of pretext.

## IV. CONCLUSION

As the plaintiff is unable to demonstrate a genuine dispute as to any material fact that would require submission to a jury, the defendant's motion for summary judgment will be granted on each of her claims.

IT IS ORDERED:

1. Defendant's motion for summary judgment (filing 34) is granted; and

2. Separate judgment will be entered.

DATED this 14th day of March 2000.

BY THE COURT

WILLIAM G. CAMBRIDGE

United States District Judge

LEXSEE 2003 U.S. DIST. LEXIS 13406

**KELLIE R. WATSON, Plaintiff, v. HOME DEPOT USA, INC., Defendant.**

**Case No. 01 C 1517**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

*2003 U.S. Dist. LEXIS 13406*

**July 31, 2003, Decided**
**July 31, 2003, Filed; August 1, 2003, Docketed**

**SUBSEQUENT HISTORY:** Affirmed by *Watson v. Home Depot USA, Inc., 2004 U.S. App. LEXIS 12179 (7th Cir. Ill., June 18, 2004)*

**DISPOSITION:** [*1] Home Depot's Motion for Summary Judgment granted as to Counts I and II. Watson's action dismissed in its entirety.

**COUNSEL:** For Kellie R Watson, PLAINTIFF: Michael P Bregenzer, Kirkland & Ellis, Chicago, IL USA.

For Kellie R Watson, PLAINTIFF: Theodore C Jennings, Piper Rudnick, Chicago, IL USA.

For Kellie R Watson, PLAINTIFF: Joseph P Lewand, Berg, Lewand & Berg, Chicago, IL USA.

For Kellie R Watson, PLAINTIFF: Dean M Athans, Fitzgerald & Cross, Chicago, IL USA.

Kellie R Watson, PLAINTIFF, Pro se, Chicago, IL USA.

For Home Depot USA, Inc, A Delaware Corporation, DEFENDANT: Tracey Lynne Truesdale, Matthew James Straub, Ogletree, Deakins, Murphy, Smith & Polk, PC, Chicago, IL USA.

For Home Depot USA, Inc, A Delaware Corporation, Arthur Blank, Victor W Terrell, an Individual, Mark Baker, Ron Johnston, Jay Owens, Jay Tippierconnic, Michell William, Jennifer Vargas, Bob Gill, John Sffereno, Kevin Pierce, Al Stermer, DEFENDANTS: Cheryl Blackwell Bryson, Rachel Ellen Lutner, Dawn Michelle Cutlan, Duane Morris LLC, Chicago, IL USA.

For Home Depot USA, Inc, A Delaware Corporation, DEFENDANT: Carol A Poplawski, Ogletree Deakins Nash Smoak & Stewart, Chicago, IL [*2] USA.

**JUDGES:** Harry D. Leinenweber, Judge, United States District Court.

**OPINION BY:** Harry D. Leinenweber

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Plaintiff Kellie R. Watson ("Watson") filed a six-count Second Amended Complaint against Home Depot U.S.A., Inc. ("Home Depot") and its former employee, Victor W. Terrell ("Terrell"). In her complaint, Watson asserted claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), *42 U.S.C. § 2000e et seq.* (Counts I and II), and a claim of negligent hiring and retention (Count III) against Home Depot. She also asserted state law claims of assault (Count IV), battery/rape (Count V), and intentional infliction of emotional distress (Count VI) against Terrell. On February 4, 2002, the Court dismissed Count III for lack of subject matter jurisdiction and on October 25, 2002, the Court dismissed Counts IV through VI because Watson had failed to serve Terrell with a copy of the complaint. Home Depot now moves for summary judgment on Counts I and II, Watson's only remaining claims. For the following reasons, the Court grants the motion and dismisses this action in its entirety.

### I. BACKGROUND

2003 U.S. Dist. LEXIS 13406, *2

**A. Local *Rule 56.1* [\*3]  Responses**

Local *Rule 56.1* of the United States District Court for the Northern District of Illinois ("Local *Rule 56.1*") establishes procedures that both the moving and opposing parties must follow in filing and responding to a motion for summary judgment. Under Local *Rule 56.1*, the moving party must submit a statement of material facts with "references to the affidavits, parts of the record, and other supporting materials relied upon." Local Rule 56.1(a)(3). In turn, the opposing party must file "a response to each numbered paragraph in the moving party's statement," and, in the case of disagreement, provide specific references to supporting evidentiary material. Local Rule 56.1(b)(3)(A). If the opposing party wishes to present additional facts that require the denial of summary judgment, it must do so in a concise statement that is also supported by citations to the record. Local Rule 56.1(b)(3)(B).

Although Watson, who now proceeds *pro se*, is entitled to a more lenient standard in some instances, she is not released from compliance with procedural rules. *Jones v. Phipps, 39 F.3d 158, 163 (7th Cir. 1994).* Indeed, Home Depot provided Watson with the required [\*4] "Notice to Pro Se Litigants Opposing Summary Judgment," which explains the purpose of summary judgment, Watson's obligations to respond to Home Depot's motion, and the consequences of not doing so. *See* Local *Rule 56.2*. Despite receiving this notice, Watson's submissions do not conform to two critical requirements set forth in Local Rule 56.1(b). First, she fails to file any response to Home Depot's *Rule 56.1* Statement of Material Facts (the "56.1 Statement") as required by Local Rule 56.1(b)(3). If the opposing party does not controvert the moving party's statement of material facts, those facts are deemed to be admitted for the purposes of the motion. Local Rule 56.1(b)(3)(B); *Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003).* As a result, all of Home Depot's *Rule 56.1* facts that are supported by the record must be deemed admitted.

Second, none of the facts set forth by Watson in a document titled List of Facts refer appropriately to admissible supporting evidence. Indeed, only paragraphs 1, 6, and 10 even cite to a supporting document. Paragraph 1 cites to a "forensic Report," but the only document that fits this description gives no support to the contentions [\*5] in paragraph 1. Paragraph 6 merely refers the Court to "see attached," which is of little

guidance given the numerous documents that Watson has attached to her List of Facts. Nevertheless, a review of the attached documents does not reveal any support for Paragraph 6. Paragraph 10 directs the Court to the attached "Employee Statements," which Home Depot correctly argues are inadmissible. These statements are interviewer's notes of conversations with third parties and are, therefore, double hearsay. *Dority v. City of Chicago*, 2001 U.S. Dist. LEXIS 15736, No. 98 C 4893, 2001 WL 1155286, at \*2 (N.D. Ill. Sept. 28, 2001). The documents themselves could perhaps be admissible and self-authenticating under the business records exception to the hearsay rule, *see FED. R. EVID. 803(6)*, but there is no evidence that these exhibits meet the requirements of *Rule 803(6)*. Moreover, the third parties' statements contained in the documents are hearsay and cannot be considered for their truth. Any facts set forth in a 56.1 Statement that are "not properly supported by the record evidence must be disregarded." *Naughton v. Sears, Roebuck & Co.*, 2003 U.S. Dist. LEXIS 2331, No. 02 C 4761, 2003 WL 360085, at \*1 (N.D. Ill. [\*6] Feb. 18, 2003).

As a result of Watson's failure to respond to Home Depot's statement of facts and her failure to set forth additional facts in compliance with Local *Rule 56.1*, the Court draws the background facts of this case from Home Depot's 56.1 Statement. The Court will not, however, consider any evidence adduced by Home Depot that is inadmissible pursuant to *Federal Rule of Evidence 412*.

**B. Facts**

*1. Watson's Employment and Orientation*

In August 1999, Home Depot hired Watson as a sales associate for its North Avenue store in Chicago, Illinois. Shortly after being hired, Watson participated in Home Depot's orientation program, which lasted for about two weeks. Like all Home Depot employees, Watson received Copies of Home Depot's Respect, Harassment/Discrimination, Equal Employment Opportunity, and Open Door Policies as well as training on those polices. The Harassment/Discrimination Policy prohibits harassment or discrimination and states that "anyone who condones or fails to take appropriate action to address a violation of Home Depot's harassment/discrimination policy will be subject to disciplinary action up to and including termination." It further "prohibits [\*7] retaliation against any associate who comes forward to report harassment and/or

discrimination." The policy emphasizes the importance of reporting any harassing or disrespectful behavior and sets forth resources that an employee may use if they feel that the policy has been violated. These resources include contacting a member of management, the Store Manager, District Manager, Human Resource Manager, or Division Vice President of Human Resources, or using the Alert Line, a phone line that enables employees to report harassment anonymously. Watson also participated in a Respect for All People training program, which further addressed workplace harassment and discrimination issues and which again informed employees about procedures available at Home Depot for resolving harassment or discrimination concerns.

A few months after hiring Watson, Home Depot transferred her to the Pro Sales Department, where her responsibilities included building relationships with and selling products to industrial, commercial, and other business customers. She appears to have performed her job satisfactorily and received a raise on July 3, 2000.

### 2. The Performance Notice

In the afternoon of [*8] July 13, 2000, however, Watson received an Associate Performance Notice (the "Performance Notice") for allegedly violating company policies or procedures. According to the Performance Notice, Watson's supervisors in the Pro Sales Department, Terrell, who served as Assistant Store Manager, and Ford Neubert ("Neubert"), the Department Supervisor, found Watson in a friend's car in the Home Depot parking lot while she was supposed to be at her desk. Terrell and Neubert prepared the Performance Notice, which warned Watson to stay at her desk in the future and Terrell asked Watson to "clock out and go home." The Performance Notice was placed in Watson's file, but Home Depot took no further disciplinary action for this incident. Indeed, despite the fact that Watson had only worked for part of that day, Home Depot paid her for a full shift.

### 3. Events After July 13, 2000

Watson's relationship with Home Depot changed swiftly in the wake of the parking lot incident. Before leaving the store on July 13, she complained to Co-Store Manager, Al Stermer, about the confrontation and about being sent home for the day. Watson also contacted Home Depot's Midwest Region Human Resources Manager, [*9] James Owens ("Owens"), that day to complain that Terrell had belittled her and disciplined her unfairly.

According to a sworn statement that Watson submitted to Home Depot on July 24, 2000, and which Home Depot attaches as an exhibit to its 56.1 Statement, on July 14, Watson learned that her work schedule had been changed. Instead of working Monday to Friday from 8:00 a.m. to 5:00 p.m., she was now expected to work on the weekends with two weekdays off. As a single mother, Watson found this change burdensome and also complained about it to Owens.

On July 20, 2000, Owens called Jay Tippieconnic ("Tippieconnic"), the Store Manager, to tell him that Watson had complained about a write-up she received. The next day, after a week of confusion about Watson's new schedule, Tippieconnic met with Watson to discuss the entire situation. During their conversation, Watson broke down and explained that the situation went beyond the write-up. She described how on April 6, 2000, Terrell had followed her home during lunch, had asked to come into her apartment, and had then forced her into having sex with him. In Watson's statement, she alleges that she also described Terrell's poor treatment of [*10] her, but it is unclear what poor treatment she described. After hearing Watson's story, Tippieconnic sent Watson home, telling her he would pay her for the rest of that day and for the weekend and assuring Watson that he would have Michelle Williams ("Williams"), a Loss Prevention Specialist with whom Watson appeared to be comfortable, contact her over the weekend. Tippieconnic next called Owens and District Manager Ron Johnston to set up a meeting with Watson for the following Monday. Over the weekend, he spoke with Watson twice, reassuring her that Home Depot would not abandon her.

The following Monday, Owens, Williams, and Tippieconnic waited to meet with Watson. Watson arrived several hours late, and handed them the sworn statement in which she detailed her interactions with Terrell prior to, including, and after the alleged April 6 sexual encounter. Watson stated that Terrell had kissed her on January 27, 2000, while they were having lunch together, and that he continued to flirt with her throughout February and March 2000. She also contended that during those months, Terrell failed to support her professionally, yelled at her at work, and was physical with her, at times grabbing [*11] her arm to move her from one spot to another. Watson stated that

she complained to Terrell about his behavior and that he promised to improve. On April 6, however, Watson alleged that during her lunch hour, Terrell followed her home and, despite being told not to come into her apartment, entered Watson's home and raped her repeatedly. After the alleged rape, Watson stated that Terrell had become increasingly hostile toward her. Watson conceded that she was in a friend's car when Terrell and Neubert issued the Performance Notice. She claimed, however, that the friend was also her customer and had asked Watson to walk with her to explain Home Depot's credit and sales programs. She asserted that Terrell had punished her for the parking lot incident and changed her schedule in retaliation for Watson's refusal to engage in a sexual relationship with him.

After reading Watson's statement, Owens attempted to ask Watson questions about what she had written. Watson refused to provide additional information or to answer his questions and replied that everything she had to say was in the statement itself. Watson did express concern that she would be terminated and that Terrell would harm her, [*12] however, Owens assured Watson that Home Depot would immediately begin a complete investigation of her allegations and that she would not lose her job. He also asked Watson to think about whether she wished to continue to work at the North Avenue store, or whether she would prefer to be transferred elsewhere. During the investigation, Home Depot placed Watson on paid administrative leave and suspended Terrell.

### 4. The Investigation

At the end of July, Watson contacted the Chicago Police Department to report the April 6 incident. Meanwhile, as promised, Owens began the investigation of Watson's claim. Together with EEO Specialist Doris Stephenson ("Stephenson") and Associate Relations Manager Chris Nichols ("Nichols"), Owens interviewed twenty-one people, including Terrell, Home Depot managers, supervisors, and employees, and non-Home Depot personnel whom Watson had identified as witnesses. None of the relevant witnesses corroborated Watson's allegations that Terrell had acted inappropriately toward her or had mistreated her. Owens, Stephenson, and Nichols interviewed Terrell twice, once on July 27 and again on August 9. Terrell denied all of Watson's allegations regarding [*13] inappropriate behavior. He denied ever having visited Watson's home

and contended that he was at his apartment on April 6 at the time of the alleged assault. Although Watson had described Terrell as leaving her apartment at 5:15 p.m. on April 6, Terrell's landlady told Home Depot that she had spoken with Terrell between 4:30 p.m. and 5:00 p.m. that day. Watson's landlord also contested Watson's allegation that he had met Terrell when Terrell was entering Watson's apartment on April 6. The landlord showed Owens, Nichols, and Stephenson a copy of his own calender that indicated that he was not at Watson's apartment building that afternoon.

With regard to the parking lot incident, the investigation team spoke with Deborah Crawford, who confirmed that she was with Watson in the parking lot on July 13 when Watson was reprimanded. They also spoke with Neubert, who told the investigators that Watson had become angry, yelled and threw the Performance Notice at Terrell when Terrell reprimanded her.

Owens also investigated Watson's allegations that Terrell had changed her schedule to punish her for not engaging in a sexual relationship with him. Ivan Justiano, an associate in the North Avenue [*14] store, told the investigation team that he was in charge of writing Watson's schedule and that he had previously scheduled her to work weekends. Owens reviewed all of Watson's time and payroll records and found no support for Watson's claim that she worked a set weekday schedule and never worked weekends.

Finally, Tippieconnic told the investigators that prior to July 21, 2000, Watson had never complained about Terrell and stated that he had been unaware of any of the events described in Watson's statement. Throughout the investigation, Watson repeatedly refused to discuss her statement with Owens or with any other members of the investigation team.

### 5. After the Investigation

On August 18, 2000, Home Depot concluded its investigation and determined that Watson's allegations of sexual harassment could not be substantiated. Despite its findings, Home Depot offered Watson the option of transferring to a different store in the same position and at the same pay. Home Depot also transferred Terrell to another store on July 31, 2000, so that Watson could remain at the North Avenue location if she wished. Instead of returning to Home Depot, however, Watson requested an unpaid [*15] medical leave of absence due

to depression and temporary psychological distress, which Home Depot granted. Home Depot provided Watson with its medical leave policy, which explained that her employment would be terminated if she did not return to work after a one-year absence. After Watson failed to return to work upon expiration of her medical leave (not prior to the expiration as Home Depot contends), Home Depot sent Watson a letter explaining that she was terminated from active employment.

Just prior to taking medical leave, on August 15, 2000, Watson filed a charge with the Equal Employment Opportunity Commission (the "EEOC") alleging that she had been sexually harassed, raped, and suspended by Terrell and asserting a Title VII claim based on her sex. The EEOC issued a Right to Sue Notice on December 29, 2000 and on March 2, 2001, Watson timely filed her complaint in this Court. She filed her second amended complaint on October 10, 2001.

## II. DISCUSSION

### A. Summary Judgment

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue [*16] as to any material fact and that the moving party is entitled to a judgment as a matter of law." *FED. R. CIV. P. 56(c)*. A fact is "material" if it could affect the outcome of the suit under the governing law; a dispute is "genuine" where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*.

The burden is initially upon the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. In assessing the movant's claim, the court must view all the evidence and any reasonable inferences that may be drawn from that evidence in the light most favorable to the nonmovant. *Miller v. Am. Family Mut. Ins. Co., 203 F.3d 997, 1003 (7th Cir. 2000)*. Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations" contained in its pleading, but rather "must set forth specific facts showing that there is a genuine issue for trial." *FED. R. CIV. P. 56(e)*; *Becker v. Tenenbaum-Hill Assoc., Inc., 914 F.2d 107, 110 (7th Cir.*

*1990)*; [*17] *Schroeder v. Lufthansa German Airlines, 875 F.2d 613, 620 (7th Cir. 1989)*. It "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. Accordingly, summary judgment is mandatory "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex, 477 U.S. at 322*. In such a situation, there can be "'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id. at 323*.

### B. Counts I and II - Title VII Violation

Title VII forbids any workplace discrimination with respect to "compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a)(1)*. In her complaint, Watson alleges that Home [*18] Depot subjected her to tangible employment action (Count I) and hostile work environment harassment (Count II). In *Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998)* and *Faragher v. City of Boca Raton, 524 U.S. 775, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998)*, however, the Supreme Court abandoned the distinction between *quid pro quo* harassment and hostile environment harassment for vicarious liability purposes. *Ellerth, 524 U.S. at 760-65*; *Faragher, 524 U.S. at 807*. Instead, the Court created a distinction between "cases in which the supervisor takes a tangible employment action against the subordinate and those in which he does not." *Molnar v. Booth, 229 F.3d 593, 600 (7th Cir. 2000)*. The Supreme Court explained that an employer was vicariously liable "to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee" where "the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Faragher, 524 U.S. at 807-08*; [*19] *Ellerth, 524 U.S. at 765*. In cases where the supervisor took no tangible employment action, however, the Supreme Court permitted the defending employer to raise an affirmative defense to liability or damages. *Faragher, 524 U.S. at 807*; *Ellerth, 524 U.S. at 765*.

In other words, as a result of *Faragher* and *Ellerth*, if Watson is able to demonstrate that Terrell created an actionable hostile environment *and* took tangible employment actions against her, she establishes that Home Depot is vicariously liable for Terrell's actions and the inquiry is at an end. If, on the other hand, Watson demonstrates that she endured an actionable hostile environment but fails to establish that Terrell took any tangible employment actions against her, Home Depot may raise the affirmative defense.

Home Depot focuses its argument on whether Terrell took any tangible employment actions against Watson and not on whether he created a hostile work environment. Indeed, if the evidence is viewed, as it must be, in the light most favorable to Watson, *Miller, 203 F.3d at 1003*, a reasonable jury could find that Terrell's alleged actions [*20] constituted sexual harassment or created a hostile environment. As a result, the Court will turn directly to the threshold issue of whether Watson suffered any tangible employment actions.

### 1. Tangible Employment Action

In *Ellerth*, the Supreme Court explained that a tangible employment action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Ellerth, 524 U.S. at 761*. In her complaint, Watson alleges that Terrell: 1) failed to give Watson adequate support in her job; 2) assigned Watson to excessive check out duties; 3) interfered with Watson's ability to perform her job by harassing her; 4) wrongfully accused her of violating store policies; 5) suspended her; 6) changed her work schedule; and 7) terminated her.

In its Memorandum in Support of Its Motion for Summary Judgment, Home Depot argues that all of these actions, if true, are either insufficiently adverse to be considered tangible job actions or are unsupported by the record. Apart from this blanket statement, Home Depot does not [*21] specifically address Watson's allegation that Terrell wrongfully accused her of violating store policies. But standing alone, a false accusation does not rise to the level of an adverse action. *Szymanski v. County of Cook*, 2002 U.S. Dist. LEXIS 21802, No. 01 C 9588, 2002 WL 31509780, at *8 (N.D. Ill. May 8, 2002). Home Depot does address the remaining alleged actions. The Court need not walk through each allegation, however,

because in her Memorandum in Support of Its Motion for Dismissal of Summary Judgment ("Response"), Watson fails to address any of Home Depot's arguments. Indeed, she does not even mention several of the alleged employment actions and merely reiterates that her work schedule changed and that she was terminated. Moreover, due to Watson's failure to respond to Home Depot's 56.1 Statement, she has admitted facts that are fatal to her claims, including the work schedule and termination claims. She does not contest: 1) that check out duties were part of her responsibilities in the Pro Sales Department; 2) that she was not suspended for the parking lot incident and that she was paid for the remainder of her shift that day; 3) that Owens' review of her time cards indicated that she [*22] had worked weekend days throughout her time at Home Depot; and 4) that Home Depot terminated Watson for failing to return from medical leave pursuant to company policy and that Terrell had been transferred to another Home Depot at the time Watson was terminated. Watson has failed to meet her burden of establishing that there is a genuine issue for trial as to whether Terrell took tangible employment action against her.

### 2. Affirmative Defense

Because Watson has failed to demonstrate that Terrell took a tangible employment action against her, Home Depot may raise the affirmative defense to liability or damages set forth in both *Faragher* and *Ellerth*. To defend itself successfully, Home Depot must establish: (a) that it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that Watson unreasonably failed to take advantage of any preventive or corrective opportunities provided by Home Depot or to avoid harm otherwise. *Faragher, 524 U.S. at 807*; *Ellerth, 524 U.S. at 765*.

### a. Home Depot's Exercise of Reasonable Care

To avoid liability, Home Depot must first demonstrate that it exercised [*23] "reasonable care to prevent and correct promptly any sexually harassing behavior." *Faragher, 524 U.S. at 807*; *Ellerth, 524 U.S. at 765*. The existence of "an appropriate anti-harassment policy will often satisfy this first prong, because Title VII is designed to encourage the creation of anti-harassment policies and effective grievance mechanisms." *Shaw v. Autozone, Inc.,  180 F.3d 806, 811 (7th Cir. 1999)*(internal citations and quotation marks omitted). In this case, it is undisputed that Home Depot had numerous

written policies in place throughout Watson's employment prohibiting sexual harassment. These policies included a Harassment/Discrimination Policy, a Respect Policy, and an Equal Employment Opportunity Policy. While the Harassment/Discrimination Policy could have been more tailored to address sexual harassment specifically, it stated clearly that "Home Depot does not tolerate harassment or discrimination" based on sex and directed employees to complain about conduct they found offensive, harassing or disrespectful.

These policies also established multiple procedures for employees to follow in the event that they experienced [*24] any harassment, thereby permitting employees to bypass the harassing supervisor in the complaint process. These procedures included contacting various managers, human resources personnel, or using the Alert Line, a phone line that enabled employees to report harassment anonymously. Home Depot also maintained an Open Door Policy, which emphasized that supervisors' doors were "always open" and that if a Department Supervisor or Assistant Manager could not help an employee, the problem "should be taken" up the chain of command. The Open Door Policy also reminded employees that the Human Resource Manager "is always available to help you with concerns and issues." Watson acknowledges that she received copies of these policies and underwent extensive training on the policies and procedures during her orientation.

Home Depot also acted swiftly and decisively to correct the harassment once it learned of Watson's allegations. After his initial meeting with Watson, Tippieconnic, the Store Manager, immediately gave her the weekend off with pay. He also set up a meeting the following Monday to discuss Watson's allegations. At that meeting, Owens assured Watson that Home Depot would investigate [*25] her allegations and offered Watson the choice of continuing to work at the North Avenue store, or of being transferred elsewhere with the same pay and position. Home Depot also immediately placed Watson on paid administrative leave and suspended Terrell. It then proceeded to do a thorough and extensive investigation of Watson's claims. Even though the investigation failed to substantiate Watson's allegations of sexual harassment, Home Depot transferred Terrell to another store so that Watson could remain at the North Avenue store if she wished. It also granted Watson's request for a one-year unpaid medical leave of absence.

In spite of these actions, Watson still contends that Home Depot did not take reasonable care to prevent and correct the harassment "until after the fact." The undisputed evidence establishes, however, that Home Depot had promulgated its policies and procedures regarding harassment before Watson began at Home Depot and before any alleged harassment occurred. Watson also appears to argue that Home Depot failed to correct the harassment by reneging on alleged promises to relocate her to another apartment and to assist her in dealing with the rape. Yet she places [*26] this argument in a paragraph dealing with her negligent retention claim, which the Court has dismissed. Moreover, she fails to adduce any evidence to support her contention that Home Depot made these promises. There is certainly nothing in the company policies to suggest that such actions are part of Home Depot standard procedures as Watson appears to suggest.

Regardless, the facts establish that Home Depot took reasonable steps to prevent sexual harassment and that, when faced with allegations of harassment, also took extensive steps to correct the violation. As a matter of law, Home Depot has satisfied the first prong of the *Ellerth/Faragher* affirmative defense.

**b. Watson's Unreasonable Failure to Report Harassment**

Home Depot must also establish that Watson "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher, 524 U.S. at 807*; *Ellerth, 524 U.S. at 765*. According to Watson, the harassment began when Terrell kissed her on January 27, 2000. It continued through February and March 2000 when Terrell flirted with her, failed to give her professional [*27] support, yelled at her, and was physically aggressive with her. On April 6, Terrell allegedly raped her repeatedly. Despite her escalating problems with Terrell, Watson did not complain to anyone until she spoke to Owens on July 21, 2000. Home Depot argues that given Watson's knowledge of the harassment policies and procedures, that her delay in complaining about Terrell's behavior was unreasonable.

In her Response, Watson argues that she failed to complain about the harassment because she feared Terrell. It is, of course, asking a great deal to require a victim of sexual harassment to come forward and reveal what they have endured to their employer. But as the

Supreme Court explained, "a victim has a duty to use such means as are reasonable under the circumstances to avoid or minimize [] damages." *Faragher, 524 U.S. at 806* (internal citations and quotation marks omitted). This duty exists even if the employee fears confrontation, unpleasantness or retaliation in return for speaking out. *Shaw, 180 F.3d at 813*. In this case, Home Depot had established a variety of reasonable mechanisms for employees to report harassment, including the anonymous tip **[*28]** line and open-door policy, that permitted employees to bypass the offending supervisor in reporting the harassment. Moreover, even if the alleged rape made Watson's fears of Terrell reasonable, she endured several months of harassment prior to the rape without alerting Home Depot. During this time, Watson complained directly to Terrell about his behavior and he promised to improve. When those promises proved hollow, Watson still chose not to use Home Depot's mechanisms for reporting the harassment.

"While proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." *Faragher, 524 U.S. at 807-808*. Watson's failure to use Home Depot's procedures to report *any* of the harassment she allegedly suffered, despite her knowledge of those procedures, was unreasonable. Home Depot has satisfied the second element of the affirmative defense and, as a result, the Court grants summary judgment on Counts **[*29]** I and II in its favor.

**CONCLUSION**

For the reasons set forth above, Home Depot's Motion for Summary Judgment is **granted** as to Counts I and II. Watson's action is **dismissed in its entirety.**

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge

United States District Court

Date: July 31, 2003

**JUDGMENT IN A CIVIL CASE**

Decision by Court. This action came before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Home Depot's Motion for Summary Judgment is granted as to Counts I and II. Watson's action is dismissed in its entirety.

Date: 7/31/2003

LEXSEE 2000 US DIST. LEXIS 7133

**MICHELLE WOODWARD, Plaintiff, v. AMERITECH MOBILE COMMUNICATIONS, INC., d/b/a AMERITECH CELLULAR SERVICES, Defendant.**

**CAUSE NO. IP 98-0744-C H/G**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF INDIANA, INDIANAPOLIS DIVISION**

*2000 U.S. Dist. LEXIS 7133*

**March 20, 2000, Decided**

**NOTICE:** [*1]  NOT FOR PUBLICATION

**DISPOSITION:** ACS's motion for summary judgment granted in part and denied in part, and its motion to strike granted in part and denied in part.

**COUNSEL:** For WOODWARD, MICHELLE, plaintiff: JOHN H HASKIN, HASKIN LAUTER COHEN & LARUE, INDIANAPOLIS, IN.

For AMERITECH, defendant: KIM F EBERT, OGLETREE DEAKINS NASH SMOAK & STEWART, INDIANAPOLIS, IN.

**JUDGES:** DAVID F. HAMILTON, JUDGE, United States District Court, Southern District of Indiana.

**OPINION BY:** DAVID F. HAMILTON

**OPINION:** ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S MOTION TO STRIKE

Plaintiff Michelle Woodward has sued defendant Ameritech Mobile Communications, Inc., which does business as "Ameritech Cellular Services" ("ACS" in this opinion) for violating Title VII of the Civil Rights Act of 1964. Woodward alleges that while she was employed at the ACS store in Beech Grove, Indiana, her supervisor and other male co-employees sexually harassed her. ACS has moved for summary judgment on the merits of Woodward's claims and has moved to strike numerous portions of plaintiff's submissions in opposition to summary judgment. As explained below, ACS's motion for summary judgment is granted in part and denied in part, and its motion to strike is also granted in part and denied in part.

*Local Rule 56.1 and the Motion to Strike*

Motions for summary judgment are common in modern federal civil practice. They can serve [*2] an essential function by avoiding trials that would be pointless, where the court can tell before trial that one side or the other must lose even if that side receives the benefit of all disputes in the evidence and all reasonable inferences from the evidence. See *Mason v. Continental Illinois Nat'l Bank, 704 F.2d 361, 367 (7th Cir. 1983)* (describing "gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained"). In such cases, motions for summary judgment offer an efficient way to resolve a case in accordance with law, without the expense and effort of a trial. See *Celotex Corp. v. Catrett, 477 U.S. 317, 327, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)* (summary judgment is not a "disfavored procedural shortcut" but "an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"), quoting *Fed. R. Civ. P. 1.*

Too easily, however, a motion for summary judgment can turn into a massive paper trial that only adds delay and expense because material facts are plainly in dispute. See *Waldridge v. American Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994)* [*3] ("because summary judgment is not a paper trial, the district court's role in

deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe").

In this fairly typical sexual harassment case, the motion for summary judgment has not served its intended purpose except at the margins of the case. The briefs on the summary judgment motion itself total 71 pages. These are supplemented by 75 pages of statements of assertedly material facts. The defendant submitted 150 assertedly material facts. The plaintiff responded to those and added 91 more assertions of fact. See S.D. Ind. Local Rule 56.1 (describing format for factual assertions).

Those documents were followed by defendant's motion to strike plaintiff's entire factual response. The briefs on that motion to strike total 68 pages. As the most telling symptom of the problem, defendant filed with its motion to strike a motion for leave to file an oversize brief (40 pages) in support of the motion to strike. The court denied that request.

To make matters worse, the pending motion for summary judgment is actually the second go-round in this case. The defendant initially submitted [*4] a motion for summary judgment and plaintiff responded. The parties then agreed to have the defendant withdraw its initial motion so the parties could take the deposition of witness Roger Armstrong. They did so, and then started over with a fresh summary judgment motion.

This is a case that should be tried to a jury in three or perhaps four days. The court recognizes that each day of a jury trial requires more days of attorney preparation, but preparing a motion for summary judgment also requires a sizable investment of time, especially with the elaborate documentation required by Local Rule 56.1 since the revisions that took effect on January 1, 1999. The summary judgment papers in this case put essentially the entire case on paper and ask the court to rule on a motion for judgment as a matter of law on the record of a paper trial, complete with far more evidentiary objections than the court would encounter in a typical jury trial.

That is a permissible use of a summary judgment motion, but one may fairly wonder about whether it makes sense to do so. See *Grace v. Ansul, Inc., 61 F. Supp. 2d 788, 796-98 (N. D. Ill. 1999)* (illustrating cost-benefit analysis of filing [*5] motions for summary judgment in employment discrimination cases).

## I. *The Roger Armstrong "Affidavit"*

Defendant ACS has moved to strike as evidence an "affidavit" that witness Roger Armstrong never signed. Armstrong was the assistant store manager in the ACS store where plaintiff Woodward worked. He has since left defendant's employ.

When preparing plaintiff's response to defendant's initial motion for summary judgment, a lawyer for plaintiff talked with Armstrong and prepared an affidavit for his signature. The lawyer mailed the draft affidavit to Armstrong and asked him to sign it and return it to the lawyer. Armstrong never did, but he later testified that he *thought* he had signed the affidavit and mailed it. Armstrong Dep. at 233, 245. After an understandable tempest arose over the unsigned affidavit in the briefing on the original motion, the court authorized a belated deposition of Armstrong. After the deposition, the parties agreed they should rework their earlier summary judgment papers.

Plaintiff tries to establish the admissibility of the unsigned affidavit by pointing out that Armstrong "has never testified that he did not make the statements attributed [*6] to him. With the exception of ...specific statements either recanting or modifying bits of his affidavit testimony, Armstrong let his affidavit testimony stand." Pl. Br. at 13. That's not the way summary judgment practice works, and plaintiff's references to "affidavit testimony" turn the facts upside down. A statement that a lawyer attributes to a witness in a distinctly unsworn conversation does not become admissible as substantive evidence merely because a witness has never (under oath) denied making it. Nor is an unsigned and unsworn draft affidavit "testimony" -for any purpose.

In summary judgment practice, where the non-moving party (almost always the plaintiff) must come forward with evidence sufficient to carry her burden of proof on any issue raised by the moving party, the non-moving party must often persuade non-party witnesses to provide affidavits voluntarily. The alternative is the compulsory process of a deposition under subpoena, but that is by far the more expensive alternative.

The delicate dance between attorney and the witness from whom he needs an affidavit sometimes breaks down, as it did in this case. Ultimately, however, the fact

remains that Armstrong did **[*7]** not sign a sworn affidavit on the subjects plaintiff needed. The court authorized a deposition of Armstrong. At the risk of sounding overly simplistic, there were in fact at least two simple ways for plaintiff's counsel to obtain admissible evidence from Armstrong on the subjects covered by the draft affidavit. One simple way would have been to ask Armstrong about his recollection of the relevant subjects. Another simple way, and one that would have focused more on the draft affidavit the parties are debating now, would have been to ask Armstrong about that affidavit, sentence by sentence or paragraph by paragraph. If he had confirmed any sentence in his testimony, that testimony would have had the effect of making the drafted sentence (or at least its contents) admissible. Although Armstrong's deposition took a full day, he apparently was not asked those questions. The defendant's motion to strike the Armstrong "affidavit" is hereby granted.

II. *Other Issues on the Motion to Strike*

As an initial point, the court reminds both parties that it is not proper to make extended arguments about the merits of a case in a statement of material facts or response thereto. This may be a **[*8]** creative way to circumvent the page limits of a summary judgment brief, but it is also contrary to Local Rule 56.1, which requires the moving party to set forth "numbered sentences with the contents of each sentence limited as far as practicable to a *single factual proposition*." S.D. Ind. Local Rule 56.1(f)(1) (1999) (emphasis added). n1 The asserted facts must be supported with appropriate evidence. The opposing party may respond to those assertions with contrary statements of fact supported by citations to relevant evidence. The opposing party may also submit a statement of additional material facts, again using the same format (numbered paragraphs of one sentence containing a single factual proposition) and citations to appropriate evidence. See S.D. Ind. Local Rule 56.1(c)(1) & (f)(1) (1999).

n1 The 1999 amendments to Local Rule 56.1 generated some early problems, See *Pike v. Caldera, 188 F.R.D. 519 (S. D. Ind. 1999)* (Tinder, J.), so additional amendments were adopted effective January 1, 2000. The motion in this case was briefed under the 1999 version of the rule, so the court cites and applies that

version.

**[*9]**

Defendant ACS has objected to many of Woodward's responses to ACS's statement of material facts. Although the court questions the overall importance of expending a large amount of time and effort (35 pages in the second, shortened version of the brief) objecting to an opposing party's inadequate responses, it is prudent to address ACS's objections briefly.

A. *Plaintiff's "Immateriality" Responses*

Plaintiff responded to 22 of ACS's statements of material fact by stating: "This does not state a material issue of fact." See Responses PP 12-16, 21, 26-27, 30, 61-62, 108-09, 111, 119, 125, 139, 141-42, 148-150. ACS argues these responses are improper because they fail to controvert ACS's statements, as required by Local Rule 56.1(g). ACS has therefore asked the court to deem as undisputed the facts as presented by ACS.

A party's response of "immaterial" to an opposing party's statement of fact is a pointless response. It does not controvert the statement of fact. It essentially concedes that the fact is undisputed, at least for purposes of the motion. The briefs provide ample opportunity to show (not merely to claim) that asserted facts are immaterial. In addition, when a party **[*10]** differentiates between assertions of material facts to which it "agrees" (at least for purposes of the motion) and those it claims are "immaterial," it only invites confusion. The court therefore grants ACS's motion to strike Woodward's responses to paragraphs 12-16, 20-21, 26-27, 30, 61-62, 108-09, 111, 119, 125, 134, 139, 141-42, and 145-48 of ACS's statement of material facts. Those facts are deemed undisputed for purposes of the motion. Materiality is determined below with respect to the underlying motion.

B. *Plaintiff's "lack of first-hand knowledge" Responses*

Plaintiff responded to paragraphs 42, 45, 111-13, 114, 117, 129-30, of ACS's statement of material facts by stating she has no first-hand knowledge of the information contained in the statement of fact. Woodward's response to ACS's statement of fact 113 is a good example of the incorrect way to respond to an opposing party's statement of material fact. Statement of

Fact 113 states: "[ACS area manager Don] Terry also advised [store manager Curt] Law not to investigate the alleged incidents himself, but to turn it over to ACS personnel who specialized in such claims, namely Carolyn Borsini. (Terry Affidavit P14). **[*11]** " Woodward provided the following response:

> Plaintiff has no first-hand knowledge as to any discussions that Terry and Law may have had. If Terry instructed Law not to investigate, however, then either Law disregarded Terry's instruction or Law lied in his deposition about conducting an investigation, since defendant has insisted that Law conducted an investigation after Woodward complained the first time about harassment. See Statements No. 34, 35, 38, 40, 42 above.

First, a party cannot raise a genuine issue of material fact by merely denying knowledge of the fact the moving party has asserted, and supported with evidence, is an undisputed material fact. If the opposing party has no evidence with which to dispute the fact, the fact should be treated as undisputed. Second, a party's arguments about the evidence belong in a brief and not in a response to a statement of fact. ACS's motion to strike Woodward's responses to paragraphs 42, 45, 111-13, 114, 117, and 129-30 is therefore granted.

### C. *Repetitive Statements*

ACS has also moved to strike paragraphs 151-53, 156, 160-62, 167, 178, 181, 186, 192, 197, 200, 203, and 222 of Woodward's statement of additional **[*12]** material facts on the ground that they merely repeat statements of fact already established in ACS's statement of material fact. The court denies this motion for two reasons. First, as shown by the voluminous filings in this case, summary judgment practice under the revised form of Local Rule 56.1 is complicated enough in trying to determine which facts are *disputed*. There is utterly no point in spending time arguing over how many times an *undisputed* fact is stated.

Second, and more fundamental, a party opposing a motion for summary judgment is entitled to a fair opportunity to present the relevant evidence in a coherent narrative. Local Rule 56.1 in its current form forces both sides to present material facts in the somewhat artificial

format of numbered paragraphs of one sentence each. The reader ordinarily reads the paragraphs in order, however, so some degree of repetition may assist the reader in understanding the overall account of the facts that the party is trying to present.

### D. *Other Objections*

In addition to the above objections, defendant ACS has also moved to strike an additional 60 or so of Woodward's responses or additional statements on the grounds that **[*13]** Woodward did one of the following: (1) failed to cite the record to support the factual assertion; (2) incorrectly cited the record; (3) agreed with ACS's statement but added additional argument; (4) neither agreed with nor disputed ACS's statement but provided argument; or (5) impermissibly referred the court to previous responses. ACS has also asked the court to strike Woodward's entire statement of material facts contained in her response brief. ACS's motion is denied with respect to these matters.

It is entirely appropriate, of course, for either side to respond to an assertion of a material fact or an assertion that a fact is disputed by pointing out that the assertion is not supported by the cited evidence. Without neglecting responsibilities to parties in other pending cases, however, the court simply does not have the time to provide a written ruling on each individual objection here. To expect the court to do so would turn the purpose of Local Rule 56.1 on its head. Instead of working to narrow and identify the disputed facts, the parties have succeeded in greatly expanding the effort needed to evaluate whether Woodward has presented a genuine issue of material fact for trial. **[*14]** The parties should be confident in the court's ability to distinguish among factual assertions supported by the record, factual assertions not supported by the record, and an argument that does not belong in a statement of material facts. The court has simply disregarded any argument or any factual assertion that is not supported by the record. The court now turns to ACS's motion for summary judgment.

### *Summary Judgment Standard*

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to See whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* However, summary judgment is not a substitute for a jury's determination

2000 U.S. Dist. LEXIS 7133, *14

about credibility or about whether a reasonable inference should be drawn from circumstantial evidence of a person's intentions. Under *Rule 56(c) of the Federal Rules of Civil Procedure*, the court should grant summary judgment if and only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. See *Fed. R. Civ. P. 56(c)*; *Pafford v. Herman, 148 F.3d 658, 665 (7th Cir. 1998).* [*15]

On a motion for summary judgment, the moving party must first come forward and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, that the parties believe demonstrate the absence of a genuine issue of material fact. *Fed. R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* Where the moving party has met the threshold burden of supporting the motion, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." *Fed. R. Civ. P. 56(e).*

In determining whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to and draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); Haefling v. United Parcel Service, Inc., 169 F.3d 494, 497 (7th Cir. 1999).* However, the existence of "some alleged factual dispute between the parties," or "some metaphysical doubt" does not create a genuine issue of fact. *Piscione v. Ernst & Young, L.L. P., 171 F.3d 527, 532 (7th Cir. 1999).* [*16] Rather, the proper inquiry is whether a rational trier of fact could reasonably find for the party opposing the motion with respect to the particular issue. See, *e.g., Vitug v. Multistate Tax Comm'n, 88 F.3d 506, 512 (7th Cir. 1996).*

Although intent and credibility are critical issues in employment discrimination cases, there is no special rule of civil procedure that applies only to them. See, *e. g., Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1396 (7th Cir. 1997).* In employment discrimination cases, as in all cases, the court must carefully view the evidence in the record in the light reasonably most favorable to the non-moving party and determine whether there is a genuine issue of material fact. *Undisputed Facts*

For purposes of ACS' motion for summary judgment, the following facts are either undisputed or reflect the record in the light reasonably most favorable to Woodward, the non-moving party.

Defendant Ameritech Mobile Communications, Inc., which does business as "Ameritech Cellular Services" or "ACS," is a separate corporation whose stock is owned by Ameritech Corporation. ACS provides, markets and sells paging and cellular [*17] services and products. ACS has retail stores, commonly referred to as Ameritech Communications Centers, at which it sells its cellular services and products. ACS hired Michelle Woodward on or about September 29, 1997, as a Customer Service Representative. Her job responsibilities included helping customers with cellular telephone billing problems, making changes to customer cellular accounts, reviewing for errors the daily paperwork produced by ACS sales associates, and correcting any errors found.

To prepare for her job, Woodward participated in a new employee orientation on September 29, 1997, at which she received written materials outlining ACS's policies and procedures. See Woodward Dep. at 23-29, Woodward Dep. Ex. 5-10. Among the materials Woodward received was ACS's *Code of Business Conduct*, which contained ACS's Discrimination and Harassment Policy, and included a specific sexual harassment reporting mechanism. Woodward signed an acknowledgment form stating that she had read the *Code of Business Conduct*, understood it, and agreed to abide by it. Also among the documents Woodward received at the orientation were ACS's Equal Employment Opportunity policy statements. [*18] Woodward signed an acknowledgment stating she had received copies of these policy statements and had been informed about ACS's commitment to affirmative action. ACS also provided Woodward with a *Team Ameritech Orientation Book* that included a detailed description of ACS's sexual harassment policy. Again, Woodward signed an acknowledgment form stating she had received a copy of the orientation book. Woodward also attended a two-day sexual harassment training in February 1998. Armstrong Dep. at 59-61, 91-93, 98-100, 260-261.

In early November 1997, ACS assigned Woodward to work full time in its new Beech Grove retail store. The entire time Woodward worked in the Beech Grove store, Curt Law served as the store's manager and Roger Armstrong served as the assistant manager. At all relevant times, Woodward's co-workers in the Beech Grove store were Stacy Harris, Kevin Kennison, Kevin

Zaleski, Eric Fisher, and Steffan Lawler. Because the Beech Grove store was a relatively small retail facility and Woodward did not have a private office away from the sales floor, she could generally hear everything that occurred around her.

In late 1997, Woodward overheard a "very offensive" conversation [*19] between sales associates Kevin Kennison and Kevin Zaleski. Kennison and Zaleski "were on speaker phone with another associate from another store talking about things they wanted to do to a woman outside in an alley or something." Sales associates Stacy Harris and Eric Fisher and his wife were also present for a portion of the conversation. Woodward Dep. at 69; Fisher Aff. P4. Fisher and his wife heard Kennison and Zaleski talking on the phone and found the conversation to be "personal, but sexual in nature, and ...inappropriate for the work setting." Fisher Aff. P3. Once Armstrong discovered what was going on, he hung up the speaker phone and told Kennison and Zaleski that their behavior would not be tolerated. Armstrong Dep. at 162-63. Immediately after Armstrong hung up the phone, the associate from the other store called back, and Armstrong spoke to him about his behavior. *Id.* at 220. That night, Woodward complained to Armstrong about the conversation. Woodward Dep. at 70.

Manager Curt Law was not at the store at the time of the speaker phone conversation, Law Dep. at 27, but Fisher reported the conversation to Law. Fisher Aff. P4. Upon Law's request, Woodward reviewed the [*20] incident with him and told him that she was offended by it. Within a couple of days of the incident, Law investigated the incident by calling each person present on the day of the incident into his office, one by one, to discuss the matter. Law Dep. at 26; Woodward Dep. at 69. As a result of the investigation, Law gave both Zaleski and Kennison oral warnings for using inappropriate language during working hours on a store phone and reiterated ACS's sexual harassment policy as part of that warning. Law Dep. at 24-25. These oral warnings were not recorded in Zaleski's and Kennison's personnel files because Law believed they were primarily "listeners" and not active participants in the conversation. *Id.* at 28-29.

The next incident occurred shortly after the speaker phone conversation. Woodward, who was pregnant, was lying on a couch near her desk trying to recover from morning sickness when she overheard Curt Law telling a sexual joke to Steffan Lawler and other persons. See Woodward Dep. at 71-75. Although Woodward could not remember at her deposition the specific contents of the joke, Woodward testified that she sat up and interrupted the joke, saying "hey guys, I didn't know this [*21] was going to go on anymore." Law sarcastically replied: "I wasn't aware that it bothered you so much," to which Woodward stated, "wasn't that what was [sic] the last meeting was about?" Again, Law replied in a sarcastic manner: "okay guys we need to stop it now, we don't want to offend Shelly."

The next incidents that Woodward complains of involved her co-worker Steffan Lawler. Woodward Dep. at 85-87. Lawler wrote love poems, sometimes taking the form of words to a love song, on his computer, printed them out, and laid them on Woodward's desk. The notes, numbering three or four, appeared within a few days of each other in late December 1997 or January 1998. These poems did not have sexual connotations. Woodward simply threw them away and did not report to anyone that she had received them.

Later in January 1998, when Woodward told Lawler that she was cold and asked him to turn down the cold air, Lawler responded by asking Woodward if she had a "THO." See Woodward Dep. at 87-91. Woodward interpreted this as Lawler asking her if she had a "titty hard on." Woodward did not report this comment to anyone, but when Lawler used the term the same day or maybe a day or two later, [*22] she told Armstrong about it. Armstrong shook his head and said he would address it.

Woodward had other problems with Lawler. She testified he would "come up" and rub her shoulders, and she would tell him "get away from my space. This is my area. I don't want you in it." *Id.* at 92. Woodward chose to address these incidents herself and did not report them to anyone. On March 7, 1998, Lawler came up to Woodward, grabbed her face and attempted to kiss her. *Id.* at 89; Fisher Aff. P6. When Woodward pushed him away, Lawler stated "how could he resist with those THOs." Woodward immediately reported the incident to Armstrong, who then asked Lawler about the incident. Woodward Dep. at 89, 94. When Armstrong asked Lawler if he had made the reported statement, Lawler responded: "you tell me. Look at them." When asked at her deposition whether there was ever any ACS management follow-up to this incident, Woodward

responded: "I don't know. None that I was involved in." *Id*. at 95.

Later in the same day, Woodward was speaking with Armstrong at her desk about the problems she had been having at work and about how she wanted it to stop. See Woodward Dep. at 58-60. Kevin Zaleski was standing **[*23]** nearby eating a Twinkie. At some point, Zaleski went below the front of Woodward's desk and she heard him making moaning noises. When Zaleski emerged in front of Woodward's desk, he had cream from the Twinkie smeared all over his face around his mouth area, and he said something to the effect of "oh that was so good" in a very "breathy" manner.

Armstrong witnessed this event and testified that Woodward became upset after the incident. Armstrong Dep. at 137, 206. Armstrong told Zaleski something to the effect of "this has to stop" and "it's gone on too long." Woodward Dep. at 61. Woodward then left the room and went to the restroom. Armstrong then directly addressed both Zaleski's actions and Lawler's actions, warning against further inappropriate behavior, stating that ACS's policy on sexual harassment was zero tolerance and violations could result in suspension or firing pending investigation. Armstrong Dep. at 138, 141, 267, 269, 278-79, 305, 313-14. Armstrong also admonished the other employees because they had laughed at Zaleski's behavior with the Twinkie. *Id*. at 269-70, 278-79, 305. In response, Lawler made the comment in front of everyone that if he "ever got fired or suspended **[*24]** from Ameritech for sexual harassment, then, yes, you would know what it definitely would be when [he] left." *Id*. at 140. Armstrong immediately told Lawler not to make such comments. *Id*. The next day, Armstrong again spoke to Lawler about his behavior. *Id*. at 289-90.

The night of the Twinkie incident, Woodward called Maryanne Lasley, her trainer and an employee at ACS's Greenwood facility. Woodward Dep. at 62. Woodward told Lasley about her experiences at the Beech Grove store and asked Lasley for advice. *Id*. at 62-63. Woodward shared that she was having problems with Law because he was "frequently joking and was one of the guys, so to speak," and Woodward "didn't feel like he was doing anything to make [the] store atmosphere more professional." *Id*. at 65. Lasley stated that she would talk to her manager (Mickey Hart) about Woodward filling in for her while she was on vacation to get Woodward out of the atmosphere at the Beech Grove store.

At some point within a week of the Twinkie incident, Lawler came up to Woodward twice during the day. See Woodward Dep. at 98-102. The first time he said "he didn't know if he could stop himself." The second time he said **[*25]** "you'll see harassment when I leave here." Woodward reported these comments to Law. Another time, Lawler came up to Woodward's desk "and did a kickbox" on her stomach and asked Woodward what she would do if she lost her baby because of him. Later the same day or the next day, Lawler again approached Woodward and feigned a kickbox. Woodward did not immediately report these incidents to anyone because she "was scared to," but she later reported the incidents to Don Terry, ACS's Area Manager.

Also during the day on March 7, 1998, the day of the Twinkie incident, Law stated something to the effect of "oh, guys, I have a great joke about a condom to tell." Woodward Dep. at 75; Law Dep. at 84. Woodward "started to kind of break in" and Law looked at her and said sarcastically "oh, that [is] if it wouldn't offend Shelly." Woodward responded "well, I guess it's already been proven that I can't stop you."

Earlier, during sometime in February 1998, Woodward had overheard Law make an unkind comment of a sexual nature about one of Law's superiors (nick-named the "butt-pirate") and his administrative assistant. The administrative assistant had come to the Beech Grove store to help Woodward **[*26]** with some computer work. After she left, Law stated something to the effect that the assistant must "squeal like a pig" when she and the "butt pirate" had sex. See Woodward Dep. at 77-79. Woodward also testified that she believed Law used the "F word," but she was "not positive." Armstrong was also present when Law made this comment and Woodward later complained to Armstrong about the comment, but she never mentioned it to Law or anyone else.

On March 10, 1998, Woodward called Fisher, told him about the March 7, 1998, incidents involving Zaleski and Lawler, and said she was still upset about the incidents. *Id*. at 66-67, 95-96. Woodward also told Fisher she planned to consult an attorney. *Id*. at 66. Fisher then immediately contacted Law and informed him of Woodward's complaints. Law Dep. at 65-66.

Although Law was at work the day of the Twinkie incident, he testified that the first time he heard about the incident was on March 10, 1998, when Eric Fisher told

him about it. *Id.* at 64-66. Law did not discipline Zaleski for his behavior regarding the Twinkie incident. *Id.* at 68. After talking with Fisher, Law called his superior, Area Manager Don Terry, and informed him **[*27]** of Woodward's complaints and that she planned to sue. Terry Aff. P14. Terry advised Law to report the problem immediately to Human Resources. Law Dep. Ex. 6; Terry Aff. P14. Law then contacted Human Resources, who put him in touch with ACS's EEO Manager Carolyn Borsini. Law Dep. at 76. Law also paged Armstrong at home and asked him about what had occurred on March 7, 1998, after Law had left the store. Armstrong Dep. at 86, 124-26, 204.

On March 11, 1998, Woodward complained to Law about the incidents involving Zaleski and Lawler on March 7, 1998. She told Law she had consulted an attorney because she believed Law was doing "nothing" about the incidents and was therefore not taking appropriate action. Woodward Dep. at 67-69; Law Dep. at 71-72. She also complained about "everything that had happened over the past couple of months at the store." Woodward Dep. at 68. Law asked Woodward what it would take to make her "satisfied in this manner." *Id.* He said something to the effect of "what if I could guarantee it would stop," and Woodward replied "that's not good enough. I have heard that before." *Id.* Law then arranged for Woodward to speak with the company's EEO representative, **[*28]** Carolyn Borsini, but Woodward told Borsini that she would not discuss any incidents of alleged harassment or participate in the investigation on her attorney's advice. *Id.* at 110; Borsini Aff. P3. Despite Woodward's refusal to cooperate, Borsini initiated an investigation. Borsini Aff. P4. She conducted interviews of the staff at the Beech Grove store, and determined that a written warning needed to be issued to Law and to Lawler. Borsini Aff. P5.

At some point after her conversation with Law, Woodward spoke with Don Terry about the activities at the Beech Grove store. See Woodward Dep. at 107-19. She recounted everything that had happened at the store, and he replied "that's your side of the story." She later contacted him a second time to request a transfer to a different store. She recounted the activities at the Beech Grove store, told him she needed a transfer because she was scared to go back to the store, that she didn't need that stress level when she was pregnant, and that her blood pressure was extremely high. Terry denied her request. Woodward then contacted the ACS human

resource department and requested a transfer, but her request was also denied.

After this second **[*29]** denial of a transfer, Woodward contacted her attorney, who advised her to get a written statement from Terry explaining the reasons for the denial of her transfer request. Woodward then called Terry and asked him to put in writing the reasons her transfer was denied. Terry called Woodward back and told her that her transfer to the Greenwood store was granted. Woodward Dep. at 119-120.

Woodward's doctor advised her to take a blood pressure monitor with her to work because her "blood pressure was so high" when she was at work. *Id.* at 143. Her doctor also told her that if her blood pressure didn't go down, Woodward would have to be put on bed rest because high blood pressure could cause Woodward to lose her baby. *Id.* at 144.

Woodward filed her EEOC charge on March 25, 1998, two days after she had been transferred to the Greenwood store. She does not claim she experienced further harassment there. Woodward's customer service job was later relocated to Illinois. ACS offered her a position there, but Woodward declined. There is no claim of retaliation in this case. *Discussion*

Title VII makes it an unlawful employment practice for an employer "to fail or refuse to hire or to **[*30]** discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2*(a)(1). Sexual harassment is actionable under Title VII if it is sufficiently severe or pervasive to alter the conditions of the victim's employment and to create an abusive working environment. *Meritor Sav. Bank v. Vinson, 477 U.S. 57, 67, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986).* I. *Severity of Harassing Conduct*

Whether sexual harassment is sufficiently severe of pervasive to be actionable under Title VII is viewed both from a subjective and objective standpoint. *Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993).* Thus, Woodward must show that she believed her work environment was sexually hostile and that her belief was objectively reasonable. *Id.*

There are sufficient facts in the record to permit a

2000 U.S. Dist. LEXIS 7133, *30

reasonable jury to find that Woodward subjectively believed her work environment was sexually hostile. Regarding the issue [*31] of whether her work environment was objectively hostile, the Supreme Court explained in *Oncale v. Sundowner Offshore Services, Inc.* that the issue "should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all of the circumstances.'" *523 U.S. 75, 81, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998),* quoting *Harris, 510 U.S. at 23.* This analysis includes considering "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Wilson v. Chrysler Corp., 172 F.3d 500, 510 (7th Cir. 1999),* quoting *Harris, 510 U.S. at 23.*

There are no clear lines defining what is and is not actionable sexual harassment because the determination of whether a work environment is objectively hostile is very fact sensitive. As ACS points out in its brief, the "occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers" does not always create a sexually hostile environment. *Baskerville v. Culligan International Co., 50 F.3d 428, 430 (7th Cir. 1995).* [*32] ACS has cited several Seventh Circuit decisions holding that specific conduct in the workplace fell short of creating a hostile environment as a matter of law. See *Cowan v. Prudential Ins. Co. of America, 141 F.3d 751 (7th Cir. 1998)* (affirming summary judgment for employer when alleged incidents were sporadic and not physically threatening, and some of the alleged incidents were not sexual in nature); *Baskerville, 50 F.3d at 430* (affirming summary judgment for employer where supervisor referred to plaintiff as "pretty girl" and made a few isolated off-color comments, but never touched or physically threatened plaintiff or invited her to have sex with him); *Koelsch v. Beltone Electronics Corp., 46 F.3d 705, 706-07 (7th Cir. 1995)* (no actionable harassment when company president rubbed his foot on plaintiff's leg on one occasion, grabbed her buttocks on a separate occasion, made one sexually suggestive comment, and twice asked her to accompany him for drinks or dinner); *Saxton v. American Telephone and Telegraph Co., 10 F.3d 526, 528 (7th Cir. 1993)* (no actionable harassment when supervisor touched and kissed plaintiff [*33] in a bar, "lurched" at her while taking a walk in a park, and then refused to speak to her after she rebuked his advances); *Rennie v. Dalton, 3 F.3d 1100, 1108 (7th Cir. 1993)* (supervisor's off-color jokes and conversations

regarding the relative merits of strip bars not actionable); *Weiss v. Coca-Cola Bottling Co. of Chicago, 990 F.2d 333, 337 (7th Cir. 1993)* (summary judgment for employer upheld when one co-worker asked plaintiff for dates, called plaintiff a "dumb blond," put his hand on her shoulder several times, placed "I love you" signs in her work areas, and attempted to kiss her in a bar).

Woodward has testified she was subjected to actions and comments similar to those the Seventh Circuit considered in these decisions. These decisions show that some rude and sexually-charged comments, touches, or actions may not be actionable by themselves. Woodward, however, has presented evidence that she was subjected to conduct that seems to be a combination of all these cases.

While a few off-color comments alone might not be actionable, the combination of off-color comments and jokes, physically threatening actions, repeated unwelcome love notes, [*34] imitations of a sex act, and an attempt to steal a kiss, all within a four month period -especially despite repeated complaints to management and assurances from management that the work environment would be improved -could in combination be deemed objectively hostile. The Seventh Circuit has specifically cautioned that "a court must be careful to evaluate the 'isolated' incidents cumulatively in order to obtain a realistic view of the work environment." *Doe v. R.R. Donnelley & Sons Co., 42 F.3d 439, 444 (7th Cir. 1994),* quoting *Dey v. Colt Construction & Development Corp., 28 F.3d 1446, 1454 (7th Cir. 1994).*

In addition, in many of the Seventh Circuit opinions ACS cites, the plaintiff was harassed by only a single person in the workplace. Woodward has offered evidence that several male ACS employees among a very small staff engaged in the harassing conduct. While it might be possible to avoid a single harassing individual at work in other situations, Woodward did not have that option.

Looking at the evidence in the light reasonably most favorable to Woodward, a reasonable jury could conclude the alleged incidents were sufficiently severe or pervasive [*35] to constitute a hostile work environment.

## II. *ACS's Liability for Co-worker Harassment*

Once a Title VII plaintiff establishes that her work environment was both subjectively and objectively hostile, she must also establish a basis for employer

2000 U.S. Dist. LEXIS 7133, *35

liability. An employer is liable for its employees' sexually harassing behavior only when the employer has been negligent in discovering or remedying the harassment. See *Faragher v. City of Boca Raton, 524 U.S. 775, 779, 141 L. Ed. 2d 662, 118 S. Ct. 2275 (1998);* accord, *McKenzie v. Illinois Dep't of Transportation, 92 F.3d 473, 480 (7th Cir. 1996).* Thus, an employer may be held liable "only if, knowing or having reason to know of the misconduct, the employer unreasonably fails to take appropriate corrective action." *Guess v. Bethlehem Steel Corp., 913 F.2d 463, 465 (7th Cir. 1990).*

Woodward has come forward with evidence that would allow a reasonable jury to find that ACS acted unreasonably in discovering and/or remedying the harassment of Woodward. ACS argues it acted reasonably because, after most of the incidents, the employees responsible for the offensive conduct received oral **[*36]** warnings. On this record, however, a reasonable jury could conclude that *repeated ineffective* oral warnings were an unreasonable response to these incidents. Woodward has presented evidence of numerous incidents over a four month period. Some of these incidents involved physical touching or physical threats. Others involved off-color jokes, conversations, and comments, and one involved imitation of a sex act.

Additionally, these incidents took place in a small office, with a staff of less than ten people. Although ACS contends it was unaware of some of the incidents, a reasonable jury could find that ACS had reason to know of the incidents because of the close office quarters and Woodward's earlier complaints. Considering the office atmosphere and the alleged participation of ACS management in the offensive conduct, a reasonable jury could find that ACS acted unreasonably in addressing and or discovering Woodward's claims. III. *ACS' Liability for Supervisor Harassment*

The general rule is that an employer is vicariously liable for a supervisor's harassment of a subordinate. *Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 765, 141 L. Ed. 2d 633, 118 S. Ct. 2257 (1998).* **[*37]** When a supervisor does not take a "tangible employment action" against the victim, however, a defendant employer may raise an affirmative defense. *Id.* Because Woodward has not claimed that she suffered any tangible employment action here, ACS is entitled to assert the *Ellerth* affirmative defense.

To establish the first element of the defense, ACS must show it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." *Id.* Because ACS can be vicariously liable only for the conduct of its supervisors (as opposed to conduct of Woodward's co-workers), Law's conduct as a supervisor must be separated from that of Woodward's co-workers. Thus, the question is whether ACS exercised reasonable care to prevent and promptly correct Law's alleged harassing behavior.

"While not required as a matter of law, the existence of an appropriate anti-harassment policy will often satisfy this first prong." *Shaw v. Autozone, Inc., 180 F.3d 806, 811 (1999)* (internal citation omitted), citing *Scrivner v. Socorro Independent School Dist., 169 F.3d 969, 971 (5th Cir. 1999).* It is undisputed that ACS adopted a *Code of Business Conduct* **[*38]** containing a Discrimination and Harassment Policy and a specific harassment reporting mechanism. Woodward Dep. Ex. 6. It is also undisputed that Woodward received a copy of this policy and signed a statement acknowledging her receipt of the policy. Woodward Dep. Ex. 7. Woodward also received at least one copy of ACS's booklet entitled *Expanding Our Horizons: Affirmative Action and Equal Employment*, which also contained a detailed statement of ACS's sexual harassment policy and reporting procedure. See Woodward Dep. Ex. 9. Woodward also signed an acknowledgment stating that she had received this booklet and that she had been informed about ACS's commitment to affirmative action. Woodward Dep. Ex. 8. These undisputed facts show that as a matter of law, ACS exercised reasonable care to prevent sexual harassment. See *Shaw, 180 F.3d at 811-12* (employer exercised reasonable care to prevent sexual harassment where it promulgated its sexual harassment policy, plaintiff received the policy, and plaintiff acknowledged receiving the policy).

"The first prong of the affirmative defense also requires [ACS] to prove that it exercised reasonable care to respond to the sexual **[*39]** harassment." *Id. at 812.* Before an employer can reasonably respond to sexual harassment, it must have knowledge of the harassment. ACS's Discrimination and Harassment Policy stated: "If you have complaints of discrimination or harassment, report such conduct to your supervisor. *If this is not appropriate*, call the Human Resources representative responsible for equal employment opportunity." Woodward Dep. Ex. 7 (emphasis added). The policy therefore provided two harassment reporting

mechanisms: (1) notifying a supervisor, or (2) calling the appropriate Human Resources representative.

The problem here is that there is no evidence that Woodward reported Law's harassing behavior to the appropriate human resources representative. ACS could not respond reasonably to Law's harassing behavior if Woodward failed to inform anyone in human resources about his conduct. The ACS harassment policy gave employees an alternative reporting mechanism when it would be "inappropriate" for an employee to report harassing conduct *of* her supervisor *to* the same supervisor. Because Woodward maintains that Law's conduct was part of the problem at the Beech Grove store, it would **[*40]** be "inappropriate" for her to complain only to him about his conduct and not complain to someone else with supervisory authority over him. Because Woodward failed to report Law's conduct to the appropriate human resources representative, ACS's "response (to do nothing beyond its reasonable attempts to prevent sexual harassment) was reasonable." *Shaw, 180 F.3d at 812-13.*

The second prong of the *Ellerth* affirmative defense requires ACS to show that Woodward "unreasonably failed to take advantage of any preventive or corrective opportunities provided by [ACS] or to avoid harm otherwise." *Ellerth, 524 U.S. at 765.* Evidence that an employee unreasonably failed to use any complaint procedure provided by the employer will normally satisfy the employer's burden under the second element of the defense. *Id.*

As noted above, Woodward failed to use the alternative (and appropriate) complaint procedure provided by ACS. In addition, once Law notified ACS EEO representative Carolyn Borsini about Woodward's complaints, Woodward told Borsini that on her attorney's advice, she would not discuss any incidents of alleged harassment or participate in the investigation. **[*41]** Borsini Aff. P4. Woodward's failure to report Law's conduct to a human resources representative and her refusal to participate in Borsini's investigation satisfy ACS's burden under the second prong of the *Ellerth* affirmative defense.

In light of the above evidence, as a matter of law, ACS is not vicariously liable for Law's conduct. Summary judgment is therefore granted to ACS on this issue. This decision, however, does not change the fact that Law's conduct is relevant to Woodward's harassment

claim against ACS under a negligence theory of liability. This case presents an unusual set of circumstances because Woodward has alleged that the actions of her supervisor, along with the actions of her co-workers, resulted in a hostile working environment. In this situation, ACS could theoretically be held liable on two grounds: (1) vicarious liability, and (2) negligence. Although ACS is entitled to summary judgment on the theory of vicarious liability for Law's actions, Law's alleged participation in the harassing conduct and his alleged failure to remedy the harassing conduct must be considered in conjunction with the actions of Woodward's co-workers for purposes of evaluating ACS's **[*42]** liability under a negligence theory. IV. *Punitive Damages*

The Civil Rights Act of 1991 expanded the remedies available to a plaintiff under Title VII by providing that employers who are found to have intentionally discriminated against an employee may be subject to punitive damages. *42 U.S.C. § 1981a*(a)(1). To recover punitive damages, a plaintiff must show the employer "acted with malice or with reckless indifference to the federally protected rights of an aggrieved individual." *42 U.S.C. § 1981a*(b)(1).

In *Kolstad v. American Dental Association*, the Supreme Court addressed the circumstances in which a court may award punitive damages under *Title VII. 527 U.S. 526, 119 S. Ct. 2118, 144 L. Ed. 2d 494 (1999).* The Court held that punitive damages could be awarded in a Title VII action without a showing of egregious or outrageous discrimination by the employer. *119 S. Ct. at 2124.* A Title VII plaintiff must show, however, that the employer discriminated "in the face of a perceived risk that its actions [would] violate federal law." *119 S. Ct. at 2125.*

The Court also explained that, before a Title VII plaintiff can recover **[*43]** punitive damages from her employer, there must be basis upon which liability can be imputed to the employer. *Id.* at 2126. Thus, "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employers' good-faith efforts to comply with Title VII.'" *Id.* at 2129, quoting *Kolstad v. American Dental Ass'n, 139 F.3d 958, 974 (D. C. Cir. 1998)* (Tatel, J., dissenting). The Supreme Court remanded the *Kolstad* case for determination of whether the employer had made

a good faith effort to comply with Title VII.

The Supreme Court did not specifically define in *Kolstad* what constitutes a "good faith effort" to comply with Title VII. The Court did note, however, that the existence of a written sexual harassment policy could be evidence of such a good faith effort. *Kolstad, 119 S. Ct. at 2129,* citing *Harris v. L & L Wings, Inc., 132 F.3d 978, 983-84 (4th Cir. 1997).*

Although the Seventh Circuit has yet to apply the *Kolstad* "good faith effort" standard, a recent Tenth Circuit **[*44]** opinion provides some guidance on the issue. In *E.E.O.C. v. Wal-Mart Stores, Inc., 187 F.3d 1241, 1248 (10th Cir. 1999),* the Tenth Circuit noted that "the extent to which an employer has adopted antidiscrimination policies and educated its employees about the requirements of the ADA is important in deciding whether it is insulated from vicarious punitive liability." *Id. at 1248.* Despite the employer's adoption of such a policy, the court found in *Wal-Mart* that the employer had failed to educate employees about its antidiscrimination policy. *Id. at 1248-49.*

As explained above, the undisputed facts show here that ACS established and promulgated a sexual harassment policy containing two different complaint mechanisms. Woodward received at least one copy of this policy and signed forms acknowledging her receipt of the policy. ACS also trained its employees about the policy, as evidenced by Woodward's attendance at a two-day training regarding the policy in February 1998. Despite this training, Woodward failed to follow the policy's reporting mechanism because she did not notify the appropriate human resources employee about Law's

**[*45]** behavior. In light of this evidence, a reasonable jury could not conclude that ACS failed to make a "good faith effort" to comply with the requirements of Title VII. Summary judgment is therefore granted to ACS on the issue of punitive damages.

### Conclusion

For the foregoing reasons, ACS's motion to strike is GRANTED with respect to the Armstrong "affidavit" and Woodward's responses to paragraphs 12-16, 20-21, 26-27, 30, 61-62, 108-09, 111, 119, 125, 134, 139, 141-42, and 145-148, as well as her responses to paragraphs 42, 45, 111-113, 114, 117, and 129-130 of ACS's statement of material facts. ACS's motion to strike is DENIED in all other respects.

ACS's motion for summary judgment is DENIED with respect to its liability under Title VII for co-worker harassment, but summary judgment is GRANTED to ACS on the issue of vicarious liability for supervisor harassment and on the issue of punitive damages. The court will conduct a scheduling conference on April 27, 2000, at 4:30 p. m. to set a new trial date.

So ordered.

Date: March 20, 2000

DAVID F. HAMILTON, JUDGE

United States District Court

Southern District of Indiana