LEXSEE



Analysis
As of: Mar 05, 2007

**DARRYL L. DAGEN, Plaintiff, -against- CFC GROUP HOLDINGS LTD., ET AL., Defendants.**

**00 Civ. 5682 (CBM)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**2004 U.S. Dist. LEXIS 6582**

**April 12, 2004, Decided**
**April 13, 2004, Filed**

**SUBSEQUENT HISTORY:** Costs and fees proceeding at, Motion granted by, in part, Motion denied by, in part Dagen v. CFC Group Holdings Ltd., 2004 U.S. Dist. LEXIS 6839 (S.D.N.Y., Apr. 20, 2004)

**PRIOR HISTORY:** Dagen v. CFC Group Holdings Ltd., 2003 U.S. Dist. LEXIS 20029 (S.D.N.Y., Nov. 7, 2003)

**DISPOSITION:** [*1] Plaintiff's motion for judgment as matter of law, new trial, or relief from judgment denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff former president sued defendant employer for breach of contract, intentional interference with contractual relations, unjust enrichment, and failure to pay wages pursuant to state law. The jury rendered a verdict for the employer on the president's claims. The president moved to set aside the verdict, Fed. R. Civ. P. 50(b)(1)(c), for a new trial, Fed. R. Civ. P. 59(e), or for relief from judgment, Fed. R. Civ. P. 60(b)(6).

**OVERVIEW:** The court's refusal to allow the publication of exhibits during testimony and exclusion of uncertified transcripts was not an extraordinary circumstance warranting judgment as a matter of law or a new trial given the court's wide latitude in determining whether evidence was admissible and controlling the mode and order of evidence presentation. The president was not entitled to a new trial on the grounds that the verdict was contrary to the evidence presented because evidence that he spent business time locating a personal apartment, did not close any sales during his tenure, and stole a company check was sufficient to support the jury's verdict. Moreover, there was nothing inconsistent about the jury's verdict because the fact that the employer did not prove by a fair preponderance of the credible evidence that the president breached the contract or his fiduciary duties did not necessarily mean that the president proved that the employer constructively discharged him, breached the contract, or owed him damages. In addition, the president had failed to complain of a possible inconsistency in the jury charges, thus he waived any argument regarding the jury charges.

**OUTCOME:** The motion for judgment as a matter of law, a new trial, or relief from judgment was denied.

**CORE TERMS:** matter of law, new trial, constructively discharged, juror, directed verdict, breached, inconsistency, conversation, extraordinary circumstances, breach of contract, uncertified, sheer, tapes, fiduciary

duties, reimbursement, counterclaims, internally inconsistent, inconsistent verdicts, extraordinary relief, entitled to judgment, closing arguments, entering judgment, sound discretion, jury verdict, moving party, fair minded, tape-recorded, miscarriage, conjecture, quotation

**LexisNexis(R) Headnotes**

*Civil Procedure > Trials > Judgment as Matter of Law > Directed Verdicts*
[HN1] Under Fed. R. Civ. P. 50(b)(1)(C), a court is permitted to enter judgment as a matter of law where a party renews its motion after a trial. Procedurally and technically, a motion under Fed. R. Civ. P. 50(b) is a motion for a directed verdict which may not be granted on any ground not specifically raised in an earlier motion at the close of all the evidence.

*Civil Procedure > Summary Judgment > Evidence*
*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Criminal Law & Procedure > Juries & Jurors > Province of Court & Jury > Factual Issues*
[HN2] Motions for judgment as a matter of law must be considered against the backdrop of the Seventh Amendment's command that no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law. U.S. Const. amend. VII. Because fact issues are within the jury's province, the court must give deference to all credibility determinations made by the jury and to all reasonable inferences from the evidence the jury might have drawn in favor of the nonmoving party. In short, the court cannot substitute its judgment for that of the jury. Accordingly, a court may not award judgment as a matter of law unless (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise or conjecture, or (2) there is such an overwhelming amount of evidence in favor of the nonmovant that reasonable and fair minded persons could not arrive at a verdict against it. Weakness in the evidence does not justify judgment as a matter of law; as with summary judgment, the evidence must be such that a reasonable juror would have been compelled to accept the view of the moving party. These standards illustrate that a party seeking to

overturn a verdict based on the sufficiency of the evidence bears a very heavy burden.

*Civil Procedure > Judicial Officers > Judges > Discretion*
*Civil Procedure > Trials > Judgment as Matter of Law > General Overview*
*Civil Procedure > Judgments > Relief From Judgment > Motions for New Trials*
[HN3] A motion for a judgment as a matter of law under Fed. R. Civ. P. 50(b) may be joined with a motion for a new trial after an earlier trial by jury under Fed. R. Civ. P. 59(e). The decision to grant a new trial under the Rule is committed to the sound discretion of the trial judge. The trial judge's discretion, however, is limited to extraordinary circumstances where, based on the weight of the evidence, the jury's verdict is seriously erroneous or a miscarriage of justice.

*Civil Procedure > Judgments > Relief From Judgment > Extraordinary Circumstances*
[HN4] Under Fed. R. Civ. P. 60(b)(6), a court may relieve a party from a final judgment, order, or proceeding for any reason justifying relief from the operation of the judgment. The Rule is designed to strike a balance between the interest of fairness and finality of judgments. Fed. R. Civ. P. 60 motions are addressed to the sound discretion of the trial court. However, in light of the fact that courts should not lightly reopen final judgments, Fed. R. Civ. P. 60(b) motions are extraordinary relief that can be granted only upon a showing of exceptional circumstances.

*Civil Procedure > Trials > Judgment as Matter of Law > General Overview*
*Labor & Employment Law > Wrongful Termination > Remedies > Compensatory Damages*
[HN5] The provisions of Fed. R. Civ. P. 50(b) proscribe a court from entering judgment as a matter of law on any ground not specifically raised in an earlier motion for a directed verdict at the close of all the evidence.

*Civil Procedure > Trials > Closing Arguments > General Overview*
*Evidence > Procedural Considerations > Preliminary Questions > Admissibility of Evidence > General Overview*

*Evidence > Testimony > Examination > Cross-Examination > General Overview*

[HN6] District courts have wide latitude to determine whether evidence is admissible and in controlling the mode and order of its presentation to promote the effective ascertainment of the truth. Fed. R. Evid. 611(a).

*Evidence > Authentication > General Overview*
*Evidence > Demonstrative Evidence > Recordings*
*Evidence > Documentary Evidence > Writings > Transcripts & Translations > General Overview*

[HN7] Before a transcript can be introduced to aid jurors in following a recorded conversation, the original recording and transcript must be properly authenticated.

*Civil Procedure > Trials > Jury Trials > Verdicts > Inconsistent Verdicts*
*Civil Procedure > Trials > Jury Trials > Verdicts > Special Verdicts*
*Civil Procedure > Judgments > Relief From Judgment > General Overview*

[HN8] In certain circumstances, a court retains authority, even in a civil case, to allow an apparently inconsistent verdict to stand. When confronted with a potentially inconsistent jury verdict, the court must adopt a view of the case that resolves any seeming inconsistency. Before a trial court may set aside a special verdict as inconsistent and remand the case for a new trial, it must make every attempt 'to reconcile the jury's finding, by exegesis if necessary. This role stems from the Seventh Amendment's obligation on courts not to recast factual findings of the jury and is based on the notion that juries are not bound by what seems inescapable logic to judges.

*Civil Procedure > Pleading & Practice > Motion Practice > Time Limitations*
*Civil Procedure > Trials > Jury Trials > Jury Instructions > Objections to Instructions*
*Civil Procedure > Trials > Jury Trials > Verdicts > Inconsistent Verdicts*

[HN9] An objection to inconsistent verdicts raised for the first time in a post-trial motion is untimely and procedurally barred.

**COUNSEL:** For Plaintiff: Chaim B. Book, Moskowitz & Book, LLP, New York, NY.

For Defendants: Steven M. Hecht, Lowenstein Sandler PC, New York, NY.

**JUDGES:** CONSTANCE BAKER MOTLEY, United States District Judge.

**OPINION BY:** CONSTANCE BAKER MOTLEY

**OPINION:**

**MEMORANDUM OPINION AND ORDER**

**MOTLEY, J.**

**BACKGROUND**

This action arises out of the employment of plaintiff, Darryl L. Dagen, by defendants CFC Group Holdings and CFC Securities.

In November of 1998, plaintiff and defendants entered into an agreement pursuant to which plaintiff agreed to serve as the President and Managing Director of CFC's new Hong Kong affiliate, CFC Securities Asia, until June of 2001. The contract provided that CFC would pay Dagen $ 300,000 per year, a bonus representing a percentage of CFC Asia's annual revenue earnings, $ 7,000 per month as an apartment allowance, relocation costs, travel costs to visit his family, in addition to providing him insurance and a pension. According to Dagen, during the tenure of his employ, Boris Merkenich, the principal owner of all CFC companies, "made unreasonable constraints on plaintiff's [*2] ability to build the business in Hong Kong," Pl.'s Complaint at 42, by, *inter alia,* canceling his lease and his cellular phone, removing his signatory status on CFC's bank account, limiting his expenditures on client development, and allowing him to use only one recruiting firm. He maintains that Merkenich strategically pushed plaintiff out of the company, culminating in the constructive termination of his employment in July of 2000.

In August of 2001, plaintiff commenced this action charging defendants with breach of contract, intentional interference with contractual relations, unjust enrichment and failure to pay wages pursuant to New York Labor Law Article § 190 et seq. He seeks financial compensation totaling the wages, bonuses, and benefits he claims he is entitled to under the contract had defendants not constructively discharged him.

Defendants present a strikingly different version of the events motivating this lawsuit. They claim that Dagen fraudulently induced CFC into hiring him by misrepresenting his qualifications for the position, utterly failed to perform the job responsibilities contemplated by the contract, collected company funds for personal expenditures, [*3] stole a company check and overpaid himself for a full month's wages when he worked for only two weeks, and walked off the job nearly a year before having satisfied his two-year contractual obligation. Accordingly, defendants counterclaimed for breach of contract, fraudulent inducement to contract, negligent misrepresentation, conversion, and breach of fiduciary duty.

The case was tried before a jury from November 10th through November 19th, 2003. The evidence offered by Dagen to substantiate his claims included his own testimony, the testimony of Steven Domney of CFC Securities, and a wide range of exhibits. Although the court permitted Dagen to play audio tapes to the jury, the contents of which were conversations between Dagen and Merkenich which Dagen recorded by wearing a concealed wire, the court barred Dagen from publishing uncertified transcripts Dagen created of the tape's conversations because doing so was inconsistent with the Best Evidence Rule, Fed. R. Evid. 1002. See Order, November 13, 2003. Further, while the court barred both parties from publishing exhibits to the jurors during the presentation of testimony, the court allowed [*4] them to publish exhibits during summation and further instructed the jurors that they were free to request and inspect all matters admitted into evidence during deliberations.

Before the case went to the jury, plaintiff made a motion for a directed verdict on defendants' counterclaims. The court reserved decision on the motion. See Transcript at 9, lines 9-12 (Nov. 19, 2003).

After an hour and a half of deliberating, the jury rendered a verdict for plaintiff on defendants' counterclaims and for defendants on plaintiff's claims. More specifically, the jury found that Dagen did not prove that 1) defendants constructively discharged him, 2) defendants breached the employment contract, 3) Merkenich and CFC Asia interfered with the contractual relationship between Dagen and CFC Group and CFC Securities, or 4) he sustained damages as a result of defendants' conduct. They also found that defendants did not prove that 1) Dagen breached the employment

agreement or his fiduciary duties by walking off the job before he had fulfilled the contract's term or 2) Dagen breached the contract, unjustly enriched himself, or acted fraudulently or negligently by failing to close any sales, abusing [*5] the expense reimbursement policy, or cashing a company check.

On December 18, 2003, plaintiff moved the court to set aside the verdict, Fed. R. Civ. P. 50(b)(1)(C), grant a new trial, Fed. R. Civ. P. 59(e), or grant relief from judgment, Fed. R. Civ. P. 60(b)(6), on the grounds that the court erred in limiting the publication of exhibits to closing arguments, the court erred in disallowing plaintiff the opportunity to publish his self-made transcripts of the tape-recorded conversations to the jury, defendants did not offer any witnesses, Merkenich made an admission in one of the tape-recorded conversations, and the jury's verdict was internally inconsistent.

## STANDARD OF REVIEW FOR JUDGMENT AS A MATTER OF LAW, NEW TRIAL, OR RELIEF FROM JUDGMENT

### A. Judgment As a Matter of Law

[HN1] Fed. R. Civ. P. 50(b)(1)(C) permits a court to enter judgment as a matter of law where a party renews its motion after a trial. Procedurally and technically, a motion under Rule 50(b) is a motion for a directed verdict which may not be granted on any [*6] ground not specifically raised in an earlier motion at the close of all the evidence. Doctor's Assocs., Inc. v. Weible, 92 F.3d 108, 112 (2d Cir. 1996).

[HN2] Motions for judgment as a matter of law must be considered against the backdrop of the Seventh Amendment's command that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. Olin Corp. v. Insurance Co. of North America, 221 F.3d 307, 320 (2d Cir. 2000). Because fact issues are within the jury's province, the court "must give deference to all credibility determinations made by the jury and to all reasonable inferences from the evidence the jury might have drawn in favor of the nonmoving party." Vasbinder v. Ambach, 926 F.2d 1333, 1339 (2d Cir. 1991). In short, the court cannot "substitute its judgment for that of the jury." LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 429 (2d Cir. 1995) (citations omitted). Accordingly, a court may not

award judgment as a matter of law unless 1) there is such a complete absence of evidence supporting the verdict that the jury's [*7] findings could only have been the result of sheer surmise or conjecture, or 2) there is such an overwhelming amount of evidence in favor of the nonmovant that reasonable and fair minded persons could not arrive at a verdict against it. Galdieri-Amrbrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998) (quoting Cruz v. Local Union No. 3 of the IBEW, 34 F.3d 1148, 1154 (2d Cir. 1994) (internal quotation marks omitted). "Weakness in the evidence does not justify judgement as a matter of law; as with summary judgment, the evidence must be such that 'a reasonable juror would have been compelled to accept the view of the moving party." This is Me, Inc., v. Taylor, 157 F.3d 139, 142 (2d Cir. 1998) (quoting Piesco v. Koch, 12 F.3d 332, 341, 343 (2d Cir. 1993)). These standards illustrate that "[a] party seeking to overturn a verdict based on the sufficiency of the evidence bears a very heavy burden." Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998). See also Barbara Lavin-McEleney, 239 F.3d 476, 479 (2d Cir. 2001) (the moving party faces a "high [*8] bar.").

**B. New Trial**

[HN3] A motion for a judgment as a matter of law under Rule 50(b) may be joined, as here, with a motion for a new trial after an earlier trial by jury under Fed. R. Civ. P. 59(e). The decision to grant a new trial under the Rule is "committed to the sound discretion of the trial judge." Metromedia Co. v. Fugazy, 983 F.2d 350, 363 (2d Cir. 1992), cert denied, 508 U.S. 952, 113 S. Ct. 2445, 124 L. Ed. 2d 662 (1993). The trial judge's discretion, however, is limited to extraordinary circumstances where, based on the weight of the evidence, the jury's verdict is seriously erroneous or a miscarriage of justice. United States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993); Piesco v. Koch, 12 F.3d at 344; Purnell v. Lord, 952 F.2d 679, 686 (2d Cir. 1992).

**C. Relief from, Judgment**

[HN4] Fed. R. Civ. P. 60(b)(6) provides that a court may relieve a party from a final judgment, order, or proceeding for any reason justifying relief from the operation of the judgment. The Rule was designed to strike a balance [*9] between the interest of fairness and finality of judgments. Williams v. N.Y. City Dep't of Corrections, 219 F.R.D. 78, 84 (S.D.N.Y. 2003) (citations omitted). Rule 60 motions are addressed to the sound discretion of the trial court. Mendell In Behalf of Viacom, Inc. v. Gollust, 909 F.2d 724, 731 (2d Cir. 1990). However, in light of the fact that courts should not lightly reopen final judgments, Rule 60(b) motions are extraordinary relief that can be granted only upon a showing of exceptional circumstances, Nemaizer v. Baker, 793 F.2d 58, 61 (2d Cir. 1986). By definition, such circumstances are rare. Velez v. Vassallo, 203 F. Supp.2d 312, 333 (S.D.N.Y. 2002).

**DISCUSSION**

The court begins its analysis by noting that while Dagen made a motion at the close of all the evidence for a directed verdict on defendants' counterclaims, he did not make a parallel motion for directed verdict on his claims. Because [HN5] Fed. R. Civ. P. 50(b) proscribes a court from entering judgment as a matter of law on any ground not specifically raised in an earlier motion for a directed verdict at [*10] the close of all the evidence, Doctor's Assocs. Inc., 92 F.3d at 112, Dagen is not entitled to judgment as a matter of law on his claims for breach of contract, constructive discharge, and damages. Nevertheless, the court addresses each of plaintiff's arguments as to why he is entitled to either judgment as a matter of law or a new trial in turn, concluding that his arguments are insufficient to warrant the court in awarding him relief under either Rule 50(b) or Rule 59(e).

Dagen's first argument is that the court erred in prohibiting both parties from publishing exhibits to the jury until closing arguments and barred plaintiff from publishing uncertified transcripts of the tapes he created. [HN6] District courts have wide latitude to determine whether evidence is admissible and in controlling the mode and order of its presentation to promote the effective ascertainment of the truth, Fed. R. Evid. 611(a). Manley v. AmBase Corp., 337 F.3d 237, 247 (2d Cir. 2003) (quoting Meloff v. New York Life Ins. Co., 240 F.3d 138, 148 (2d Cir. 2001) (citations omitted). [HN7] Before a transcript can be introduced to aid jurors in following [*11] a recorded conversation, the original recording and transcript must be properly authenticated. Breezy Point Co-op., Inc. v. Cigna Property and Cas. Co., 868 F. Supp. 33 (E.D.N.Y. 1993). Thus, the court's refusal to allow the publication of exhibits during testimony and exclusion of uncertified transcripts is a far cry from the kind of extraordinary circumstances necessary to warrant judgment as a matter of law or a

new trial.

Dagen also seeks judgment as a matter of law, a new trial, or relief from judgment on the grounds that defendants did not present any testimony and the jurors allegedly heard defendant Merkenich make a statement to the effect that defendants had a continuing obligation to pay plaintiff. In effect, Dagen seeks relief on the grounds that the verdict is contrary to the evidence presented.

During the trial, the jury heard evidence that Dagen spent ample business time locating his personal apartment; Merkenich encouraged plaintiff to improve his work performance and earn money for CFC the day before Dagen claims he was constructively discharged; Dagen did not close any sales during the tenure of his employ; he stole a company check and overpaid himself [*12] in July of 2000; the contract did not provide for CFC to secure Dagen's residential lease, pay for his cell phone, or maintain his licenses, all of which Dagen cites as evidence that defendants constructively discharged him; Dagen included personal items in expenses he submitted to CFC for reimbursement; and the employment contract in question does not entitle Dagen to many of the items he claims as damages, including, for example, an equity stake in CFC Securities Asia or reimbursement for unused vacation time. Judged in light of this evidence, it was not sheer conjecture for the jury to conclude that plaintiff was neither constructively discharged or entitled to damages. Also, the evidence presented was not so overwhelmingly in favor of Dagen that a reasonable and fair minded jury could not have reached a verdict against him. Because there was a legally sufficient basis for the jury's verdict, the court declines to set aside its verdict by entering judgment as a matter of law. Similarly, because the jury's conclusion was not seriously erroneous or a miscarriage of justice, the court declines to grant a new trial.

Finally, Dagen seeks relief on the grounds that the jury's verdict [*13] was internally inconsistent. He argues that because the jury did not find that defendants proved that Dagen breached the contract or his fiduciary duties by walking off the job, then the jury should have found that Dagen was entitled to compensation as if he had worked for defendants for the full term of the contract.

Plaintiff's argument is sheer sophistry. There is nothing inconsistent about the jury's conclusion. That defendants did not prove by a fair preponderance of the credible evidence that plaintiff Dagen breached the contract or his fiduciary duties does not necessarily mean that Dagen proved that defendants constructively discharged him, breached the contract, or owe him damages.

Even if, however, the court could detect a kernel of inconsistency in the jury verdict in question, plaintiff would not be entitled to judgment as a matter of law or a new trial on this basis. [HN8] "In certain circumstances, a court retains authority, even in a civil case, to allow an apparently inconsistent verdict to stand." City of Los Angeles v. Heller, 475 U.S. 796, 806, 106 S. Ct. 1571, 1576, 89 L. Ed. 2d 806 (Stevens, J. dissenting) citing United States v. Powell, 469 U.S. 57, 105 S. Ct. 471, 83 L. Ed. 2d 461 (1984) [*14] (reaffirming general rule that inconsistent verdicts can stand), Harris v. Rivera, 454 U.S. 339, 345, 102 S. Ct. 460, 464, 70 L. Ed. 2d 530 (1981) ("Inconsistency in verdict is not a sufficient reason for setting it aside"). When confronted with a potentially inconsistent jury verdict, the court must adopt a view of the case that resolves any seeming inconsistency. Turley v. Police Dep't, 167 F.3d 757, 760 (2d Cir. 1999). "Before a trial court may set aside a special verdict as inconsistent and remand the case for a new trial, it must make every attempt 'to reconcile the jury's finding, by exegesis if necessary.'" Id., citing Gallick v. Baltimore & Ohio R.R., 372 U.S. 108, 119, 83 S. Ct. 659, 9 L. Ed. 2d 618 (1963). "This role stems from the Seventh Amendment's obligation on courts not to recast factual findings of the jury and is based on the notion that juries are not bound by what seems inescapable logic to judges." Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 497 (2d Cir. 1995) (internal citations and quotations omitted).

Moreover, the verdict sheet given to the jury in this case contained [*15] questions that were taken, almost verbatim, from plaintiff's and defendants' proposed jury charges. The court made very few changes to the questions the jurors were directed to answer, all of which were relatively minor and either requested or approved by the parties. Given the failure of plaintiff's to complain of a possible inconsistency before the jury was charged, plaintiff waived the argument. Laborde v. City of New York, 1999 U.S. Dist. LEXIS 642, 1999 WL 38253 at 7 (S.D.N.Y. Jan. 27, 1999) [HN9] ("An objection to inconsistent verdicts raised for the first time in a post-trial motion is untimely and procedurally barred"). See also Denny v. Ford Motor Co., 42 F.3d 106, 111 (2d Cir.

1994); Lavoie v. Pacific Press & Shear Co., 975 F.2d 48, 54 (2d Cir. 1992).

Finally, the above discussion illustrates that the court would be remiss in exercising its "grand reservoir of equitable power" under Rule 60(b)(6) by granting Dagen relief from judgment. Nothing about the trial or the jury's verdict suggests that the requisite "extraordinary circumstances" are present to justify the extraordinary relief sought here.

**CONCLUSION**

Plaintiff's motion for judgment [*16] as a matter of law, a new trial, or relief from judgment is **DENIED.**

**SO ORDERED.**

Dated: April 12, 2004

CONSTANCE BAKER MOTLEY

United States District Judge

LEXSEE



Analysis
As of: Mar 05, 2007

**MINERVA MARINE, INC., Plaintiff, v. JAMES SPILIOTES, individually, and WORLDWIDE MARINE SERVICES, INC., Defendants. JAMES SPILIOTES, individually, and WORLDWIDE MARINE SERVICES, INC., Third-Party Plaintiffs v. ANDREAS MARTINOS, individually, Third-Party Defendant.**

**Civ. No. 02-2517 (WHW)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY**

**2006 U.S. Dist. LEXIS 13922**

**March 13, 2006, Decided**
**March 13, 2006, Filed**

**NOTICE:** [*1]  NOT FOR PUBLICATION

**PRIOR HISTORY:** Minerva Marine, Inc. v. Spiliotes, 2006 U.S. Dist. LEXIS 13939 (D.N.J., Mar. 13, 2006)

**CORE TERMS:** third-party, vessel, counterclaim, ship, summary judgment, cargo, captain, motion to strike, deposition testimony, mate, onboard, personal knowledge, deposition, port captain, port, independent contractor, stricken, terminal, invoice, inspection, tariff, sentence, weigh, surveyor, malicious use, self-serving, defamation, admissible, genuine issue, hearsay

**COUNSEL:** For MINERVA MARINE, INC., Plaintiff, ANDREAS MARTINOS, individually, ThirdParty Defendant: PAMELA LYNN SCHULTZ, FREEHILL HOGAN & MAHAR LLP, JERSEY CITY, NJ US; MICHAEL FERNANDEZM FREEHILL, HOGAN & MAHAR, NEW YORK, NY.

For JAMES SPILIOTES, individually, WORLDWIDE MARINE SERVICES, INC., Defendants: RONALD BETANCOURT, BETANCOURT, VAN HEMMEN & GRECO, RED BANK, NJ; TODD PATRICK KENYON, BETANCOURT, VAN HEMMEN, GRECO & KENYON, RED BANK, NJ.

For JAMES SPILIOTES, WORLDWIDE MARINE SERVICES, INC., ThirdParty Plaintiffs, Counter Claimants: RONALD BETANCOURT, BETANCOURT, VAN HEMMEN & GRECO, RED BANK, NJ,

**JUDGES:** William H. Walls, United States Senior District Judge.

**OPINION BY:** William H. Walls

**OPINION: Walls, District Judge**

Plaintiff Minerva Marine, Inc. ("Plaintiff" or "Minerva") moves for partial summary judgment on Defendants/Third-Party Plaintiffs James Spiliotes ("Spiliotes") and Worldwide Marine Services, Inc.'s ("WWM") (together, "Defendants/Third-Party Plaintiffs") counterclaims for: violation of the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1, et seq., (first counterclaim); defamation (third counterclaim); tortious [*2] interference (fourth counterclaim); malicious use of process (fifth counterclaim); intentional infliction of emotional distress (sixth counterclaim); and negligent infliction of emotional distress (seventh counterclaim). Plaintiff and Defendants/Third-Party Plaintiffs have also filed several

motions to strike in connection with the Plaintiff's motion for partial summary judgment. The motions are decided without oral argument pursuant to Fed.R.Civ.P. 78.

## FACTS AND PROCEDURAL BACKGROUND

Some of the factual background in this matter has been set forth in this Court's April 5, 2005 Opinion, which granted in part and denied in part the Defendants/Third-Party Plaintiffs' motion for summary judgment on the Plaintiff's first claim for defamation, and granted the Defendants/Third-Party Plaintiffs' motion for summary judgment on the Plaintiff's second claim for injurious falsehood. Minerva Marine, Inc. v. Spiliotes, et al, 2005 U.S. Dist. LEXIS 41854, No. 02-2517, slip op. at 1 (D.N.J. April 4, 2005). For purposes of this motion, the Court will again present the circumstances of the case, incorporating those facts particularly relevant to the Plaintiff's present motion.

Minerva is a Liberian corporation, [*3] operating with an office and place of business in Voula, Greece. Minerva is in the business of managing ships that transport materials and cargo to various ports. Andreas Martinos ("Martinos") is the managing director of Minerva. Before he formed Minerva, Marlins operated, along with his family, Thenamaris Ship Management, Inc. ("Thenamaris"), a Greek ship operating company.

Captain James Spiliotes, a resident of Cliffside Park, New Jersey, is an officer and director of WWM, a New Jersey corporation with an office and place of business also located in Cliffside Park, New Jersey. WWM is a company formed by Spiliotes in 1985 for the purpose of providing surveying and other services to the marine industry. The corporation allows Spiliotes to offer his maritime skills in a shoreside capacity.

From 1998 to 2001, WWM was frequently retained by Minerva to protect Minerva's vessels and owner's interests while Minerva's vessels were in port. WWM was primarily hired to attend to Minerva's ships while docked in ports in the northeastern United States. The precise nature of the employment relationship between Spiliotes, WWM and Minerva, however, is one of the primary facts in dispute in this [*4] case, particularly with respect to the CEPA counterclaim (first counterclaim). Spiliotes contends that he was a "port captain" or employee of Minerva, while Minerva contends that he was a "vessel agent" or independent contractor.

This action arises from events that took place on September 26, 2001, on board the Plaintiff's vessel, the M/T Minerva Julie ("the "Minerva Julie"). On that day, just a few weeks after the September 11 terrorist attacks on the World Trade Center, the Minerva Julie was docked at the IMTT terminal in Bayonne, New Jersey. Spiliotes, acting in the scope of his employment and on behalf of WWM, was a vessel agent for the Plaintiff while the Minerva Julie was docked in Bayonne. n1 The vessel was discharging its cargo of unleaded gasoline. While Spiliotes was onboard the vessel, he asked Chief Officer Kyriakos Tsingis when the discharge would be completed. The parties dispute the substance of Tsingis's answer. Plaintiff contends that Tsingis said that the discharge would be completed between 1955 and 2000 hours and that he could not increase the pressure on the lines because some of the cargo might leak causing an explosion or fire. Spiliotes claims that Tsingis [*5] said that the discharge would be completed in 2000 hours unless he puts a bomb on the ship and blows it up.

> n1 For purposes of this factual background, the Court has described Spiliotes as a "vessel agent" for Minerva, but this label bears no influence on this Court's determination of the actual relationship between Spiliotes and Minerva.

After Tsingis answered Spiliotes, there is some dispute over what happened next between Spiliotes and the Master of the vessel, Vasilios Kazepis. There is no dispute that after this, Spiliotes left the vessel and informed IMTT Port Security that Tsingis had threatened to blow up the ship. Port Security, in turn, informed the Federal Bureau of Investigations, the United States Coast Guard, and the Bayonne Police Department. Tsingis was arrested by the Bayonne Police, released later that night, and departed with the vessel. After Tsingis was arrested but before he returned to the vessel, the Master of the vessel fired Spiliotes.

Minerva filed suit in the District of New Jersey [*6] against Spiliotes and WWM, alleging claims of defamation and injurious falsehood. The basis for these claims was a statement made by Spiliotes to IMTT Port Security, that Tsingis had threatened to blow up the vessel with a bomb, and six additional statements contained in a letter from Spiliotes to the Coast Guard, suggesting that Minerva was employing "individuals with

terrorist affiliations or who are terrorist sympathizers," and that Minerva should be punished for employing such people. Minerva Marine, Inc. v. Spiliotes, et al, 2005 U.S. Dist. LEXIS 41854, No. 02-2517, slip op. at 3 (D.N.J. April 4, 2005). On August 2, 2002, Defendants/Third-Party Plaintiffs filed their answer to the complaint, including counterclaims against Minerva and a third-party complaint against Martinos.

After Minerva filed its complaint against Spiliotes and WWM, Spiliotes and/or their agents proceeded to forward copies of the complaint to the *International Shipping Gazette TradeWinds* (" *TradeWinds*"). On August 16, 2002, *TradeWinds* published an article titled "US agent sues Martinos over bomb threat." The article states that Martinos was being sued by Spiliotes for $ 110 million, after Spiliotes had been fired for [*7] reporting a Minerva crew member's alleged anti-American threats. According to the article, Minerva said that Spiliotes's "account of what happened was fabricated." The article also states that, according to Minerva, Spiliotes came on board the Minerva Julie and started verbally abusing Tsingis and insisted that he speed up the discharge process. The article adds that when Tsingis refused to speed up the discharge process, Spiliotes maliciously filed a false report to terminal security. On October 18, 2002, *TradeWinds* published a second article titled "Minerva denies it is a Martinos company." The article stated, *inter alia*, that Spiliotes lied about the Chief Mate's comments.

Spiliotes alleges that Minerva and/or Martinos have engaged in conduct that has caused him harm. Primarily, Spiliotes alleges that Minerva retaliated against him by firing him for reporting threatening statements to IMTT Port Security. Additionally, Spiliotes alleges that Minerva has contacted other ship owners and instructed them not to hire him; threatened him with legal action to prevent him from cooperating in the criminal case against Tsingis; filed a baseless lawsuit against him; and defamed him [*8] in *TradeWinds*. According to Spiliotes, Minerva's conduct has had a severe negative effect on his emotional state and life, causing him to suffer from anxiety and depression, for which he has had to seek psychological treatment. These allegations are disputed by Minerva.

Spiliotes claims that since 2001, his work as a vessel's agent has significantly declined. Before September of 2001, he received seven jobs from UK P&I Club, but has only received one job since. He adds that he received one or two jobs a year from Ranger Marine before 2001, but has only received one job from them since September of 2001.

On August 7, 2003, Spiliotes and WWM filed a second amended answer with counterclaims against Minerva, and a third-party claim against Martinos. n2 The counterclaims against Minerva were for violation of the New Jersey Conscientious Employee Protection Act (first counterclaim); defamation (second counterclaim); defamation (third counterclaim); interference with perspective economic advantage (fourth counterclaim); malicious use of process (fifth counterclaim); intentional infliction of emotional distress (sixth counterclaim); negligent infliction of emotional distress (seventh [*9] counterclaim); breach of contract (eighth counterclaim); unjust enrichment (ninth counterclaim); quantum meruit (tenth counterclaim); and an alter ego claim against Martinos (eleventh counterclaim). n3 Plaintiff now moves for partial summary judgment on the first, third, fourth, fifth, sixth and seventh counterclaims, on the grounds that there are no genuine issues of material fact. Both parties have submitted motions to strike testimony in connection with the motion for summary judgment.

> n2 A first amended answer with counterclaims and a third-party claim was filed on July 22, 2003.

> n3 The second counterclaim was withdrawn with prejudice by the Defendants/Third-Party Plaintiffs on June 18, 2004.

## SUMMARY JUDGMENT STANDARD

Summary judgment will be granted if the record establishes that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is genuine only "if the evidence is such that [*10] a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A factual dispute is material if, under the substantive law, it would affect the outcome of the suit. Id. at 248.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary

judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. Id.

Once the moving party has met this burden, the burden then shifts to the opposition to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). [*11] The non-moving party must prove beyond a "mere scintilla" of evidence that a genuine issue of material fact exists. Big Apple BMW v. BMW of N. Am., 974 F.2d 1358, 1363 (3d Cir.1992). Moreover, "a party cannot rely upon self-serving conclusions, unsupported by specific facts in the record." LaResca v. AT&T, 161 F. Supp. 2d 323, 327 (D.N.J.2001) (citing Celotex Corp., 477 U.S. at 322-23). Nor may a party simply "replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990) (citing Anderson, 477 U.S. at 249).

Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Serbin v. Bora Corp., 96 F.3d 66, 69 n. 2 (quoting Celotex, 477 U.S. at 322). "If the non-movant's evidence on any essential element of the claims asserted is merely 'colorable' or is 'not significantly probative, [*12] ' the court must enter summary judgment in favor of the moving party." Heffron v. Adamar of New Jersey, Inc., 270 F. Supp. 2d 562, 569 (D.N.J. 2003) (citing Anderson, 477 U.S. at 249-50.).

The evidence need not be in a form that would be admissible at trial. Celotex, 477 U.S. at 324. But Fed.R.Civ.P. 56(e) provides that affidavits opposing summary judgment motions must "be made on personal knowledge," and hearsay within such affidavits or testimony may be considered, but only where the hearsay declarant can be produced at trial to offer his or her statements in admissible form. E.g., Rossi v. Standard Roofing, Inc., 156 F.3d 452, 470 n. 13 (3d Cir. 1998); Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1235 n. 9 (3d Cir. 1993).

At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly [*13] supported motion for summary judgment. Id. at 247-48. In determining whether there exists a material issue of disputed fact, however, the facts and the inferences to he drawn from the facts are to be viewed in the light most favorable to the nonmoving party. Curley v. Klem, 298 F.3d 271, 277 (3d Cir. 2002).

### DISCUSSION

Before turning to the Plaintiff's motion for partial summary judgment, this Court must address the various motions to strike that have been filed by both parties.

### I. Motions to Strike

Defendants/Third-Party Plaintiffs have moved to strike the depositions of Elias Katsaros and Andreas Spiridonakos, and the affidavit of Michael Fernandez concerning the Declaration of James Baker (the "Baker Declaration") from the Plaintiff's papers in support of its motion for summary judgment. Plaintiff has moved to strike the Baker Declaration and various sections of the "Declaration of James Spiliotes in Opposition to Plaintiff's Motion for Partial Summary Judgment" (the "Spiliotes Declaration").

### A. Defendants/Third-Party Plaintiffs' Motion to Strike Plaintiffs Deposition of Elias Katsaros

Defendants/Third-Party Plaintiffs [*14] move to strike the deposition testimony of Captain Elias Katsaros ("Katsaros"), submitted by the Plaintiff in support of its motion for summary judgment, on the grounds that Katsaros was never designated an expert witness under Rules 702, 703 and 705 of the Federal Rules of Evidence. According to Defendants/Third-Party Plaintiffs, the Plaintiff did not file an expert report for Katsaros by the November 3, 2003 deadline for submission of expert reports, as set by Magistrate Judge Wigenton.

Defendants/Third-Party Plaintiffs argue that Katsaros is clearly being used as an expert witness within the meaning of Fed.R.Evid. 702, not as a lay witness. Specifically, they argue that Katsaros never had any knowledge of the relationship between Spiliotes and Minerva, nor did he possess knowledge of the events onboard the Minerva Julie during the September 24 through 26, 2001 time period. Rather, they argue that Katsaros is being used to provide expert testimony on the general role of a protective agent for a vessel owner. They note that his testimony covers the following: Katsaros's qualifications and work history; the formation of his company, Maritime Endeavors; the definition of a protective [*15] agent; the services provided by such agents; the services provided by Maritime Endeavors as protective agent; the forms and lists Maritime Endeavors provides to owners; what is meant by the phrase "smooth and quick turn around" of the vessel; when Marine Endeavors stays onboard vessels; and special discounts Maritime Endeavors provides owners. (Plaintiff's Supplemental Local Rule 56.1 Statement of Undisputed Material Facts ("Supplemental SUMF") at PP170-84).

Plaintiff, on the other hand, argues that Katsaros's deposition testimony is that of a lay witness. According to Plaintiff, one of the issues in this case is the role that Spiliotes performed for Minerva. Plaintiff contends that Spiliotes was a typical vessel agent, while Defendant/Third-Party Plaintiff argues that Spiliotes was a port captain. Plaintiff intends to use the deposition testimony of Katsaros, based on his own personal knowledge and experience, to show that the services Spiliotes provided to Minerva were merely those of a vessel agent, not of a port captain. Plaintiff notes that Katsaros has not been provided any facts, data or anything else upon which to render an opinion, and readily acknowledges that Katsaros [*16] had no knowledge of the events that took place on board the Minerva Julie in September of 2001. Rather, Katsaros is testifying as to his own personal knowledge concerning the role of a vessel agent.

Plaintiff argues that Katsaros's testimony is critical because it establishes that all of the functions provided by WWM to Minerva (which Spiliotes relies upon in arguing that he was a port captain or otherwise an integral part of Minerva) are commonplace for an owner's protective agent. In other words, Plaintiff wants to use Katsaros's testimony to show that there is nothing special and integral about the services WWM provided to Minerva

that would have given rise to an employment relationship.

Having reviewed the testimony of Katsaros, this Court concludes that Katsaros is being used to testify as an expert in contravention of the requirements of Fed.R.Evid. 701. Rule 701 of the Federal Rules of Evidence contains the requirements for lay witness opinion testimony, and provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception [*17] of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed.R.Evid. 701. The rule was amended in 2000 to include subsection (c), which states that lay opinions may "not [be] based on scientific, technical or other specialized knowledge within the scope of Rule 702." Fed.R.Evid. 701. The question here is whether Katsaros's testimony falls under Fed.R.Evid. 701(c)'s definition of "specialized knowledge," which would require this court to exclude his testimony on the grounds that it is expert testimony.

Since 2000, relatively few cases have construed the scope of subsection (c). One of the cases addressing this matter that has been cited by the Plaintiff is Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd., 320 F.3d 1213 (11th Cir. 2003). That case involved a contract dispute over the amount due to a ship repair company for repairs that it made to a ship. At issue was whether the District Court properly permitted ship repairer's employees to testify as lay witnesses. [*18] The employees testified that the charges were fair and reasonable and in line with similar services provided by similar operations. Following an extensive review of the 2000 amendment to Fed.R.Evid. 701 and the accompanying advisory committee notes, the Circuit concluded that the testimony was permissible, as it was of a type traditionally and properly considered lay witness testimony, and was not based on specialized knowledge subject to Fed.R.Evid. 702. 320 F.3d at 1223.

In permitting the evidence, the Circuit placed particular emphasis on the advisory committee's note to Rule 701, concerning testimony of business owners and officers. The relevant portion of the Committee notes reads:

> most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. See, e.g., Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiffs owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day [*19] affairs of the business). Such opinion testimony is admitted not *because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. The amendment does not purport to change this analysis.*.

Fed.R.Evid. 701 advisory committee's note (emphasis added). The Circuit read this comment to mean that opinion testimony by business owners and officers is one of the prototypical areas intended to remain undisturbed.

There is an important distinction to be drawn between Tampa Bay and this case, however. In Tampa Bay, the issue was whether the Court could permit the testimony of witnesses who were all involved in the process of determining the final invoice price for the ship repairs. After offering their testimony as to how the charges were determined, each witness was asked whether the charges were fair and reasonable in the context of the ship industry. Tampa Bay, 320 F.3d at 1217-21. The Circuit found this testimony permissible because the testimony was of a type traditionally considered permissible lay witness testimony, [*20] not based on specialized knowledge subject to Rule 702. Unlike the employees in Tampa Bay, Katsaros has not perceived firsthand any of the events that are involved in this case. As a result, Katsaros is merely offering specialized knowledge that is within the scope of expert testimony. Because Katsaros has not been properly admitted as an expert witness, the motion to strike his testimony is granted.

**B. Defendants/Third-Party Plaintiffs' Motion to Strike Plaintiff's Deposition of Andreas Spiridonakos**

Defendants/Third-Party Plaintiffs have also moved to strike the deposition of Andreas Spiridonakos ("Spiridonakos") on the grounds that Plaintiff has failed to submit an expert disclosure report for this witness, in violation of Fed.R.Civ.P. 26. Defendants/Third-Party Plaintiffs contend that Spiridonakos had no knowledge of Spiliotes's relationship with Thenamaris or with Minerva, yet Plaintiff intends to use Spiridonakos's deposition testimony as expert testimony that covers: his work history and qualifications; the general role and duties of port captains; the general role of vessel and charterer's agent; the role of an owner's representative; the employment status of [*21] such representatives; special payment arrangements; the reporting requirements of an agent or representative; and the role of a representative with respect to cargo discharge. (Supplemental SUMF at PP157-163).

Plaintiff argues that Spiridonakos's deposition testimony is being used to rebut Spiliotes's argument that he was forced to create WWM by Thenamaris, and that WWM was basically a shell corporation for Thenamaris and Minerva. According to Plaintiff, Spiridonakos trained Spiliotes as a surveyor and employed him, and has knowledge of the formation of WWM. Spiridonakos has testified that he had various conversations with Spiliotes concerning the formation of WWM, and what type of work Spiliotes was performing, but at no point did Spiliotes ever tell Spiridonakos that he was a port captain for Thenamaris or that Spiliotes formed a shell company for Thenamaris. (Supplemental SUMF at PP166-67).

Having reviewed the testimony of Spiridonakos, the Court concludes that while the majority of his testimony objected to by Defendants/Third-Party Plaintiffs conforms with the requirements of lay opinion testimony under Fed.R.Evid. 701, some of his testimony more appropriately qualifies [*22] as expert testimony under Fed.R.Evid. 702. For example, in paragraph 163 of the Plaintiff's Supplemental Local Rule 56.1 Statement, Spiridonakos was asked a hypothetical question during his deposition, concerning what obligations an owner's representative has to the managers or owners of a ship if a vessel's chief officer is removed from a ship.

(Spiridonakos Dep. at 192:6-9). Spiridonakos responded that the owner's representative has an obligation to inform the owner immediately. (Spiridonakos Dep. at 192:10-14). Spiridonakos also responded to a question about whether an owner's representative had any right to interfere in a vessel's discharge. (Spiridonakos Dep. at 192:15 - 193:19).

These questions and answers concerned hypothetical facts, not facts gleaned from Spiridonakos's personal perception. But a lay witness may not answer hypothetical questions. See Teen-Ed, Inc. v. Kimball International, Inc., 620 F.2d 399, 404 (3d Cir. 1980) (essential difference between lay testimony and expert testimony is that expert may answer hypothetical questions); 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 701.03[4][a], at 701-21 to 701-22 (2d [*23] ed. 2004) ("Lay witnesses are limited to testifying to opinions gleaned from factual information that they personally perceived."). As Defendants/Third-Party Plaintiffs have noted, Spiridonakos has not been admitted to testify as an expert in this case. For this reason, the Court will disregard Spiridonakos's statements referenced in paragraph 103 of the Plaintiff's Supplemental Local Rule 56.1 Statement, as well as any other statements that qualify as expert testimony under Fed.R.Evid. 702, but will permit statements that conform to the requirements of lay witness testimony under Fed.R.Evid. 701. Defendants/Third-Party Plaintiffs motion to strike the testimony of Spiridonakos is granted in part, and denied in part.

### C.    Plaintiff's    Motion    to    Strike Defendants/Third-Party Plaintiffs' Declaration of James Baker; Defendants/Third-Party Plaintiffs' Motion to Strike the Fernandez Affidavit Concerning James Baker

Defendants/Third-Party Plaintiffs have submitted the Baker Declaration in opposition to the Plaintiff's motion for summary judgment. James Baker is a claims adjuster for UK P&I Club from 1980 to 1994, and claims to have knowledge of Spiliotes's relationship with Thenamaris, [*24] the shipping company owned by the Martinos family before the formation of Minerva. The Baker Declaration supports the Defendants/Third-Party Plaintiffs' claim that Spiliotes was an employee of Minerva - an issue that is in dispute.

Plaintiff moves to strike Defendants/Third-Party Plaintiffs' Baker Declaration on the grounds that it fails to comply with Fed.R.Civ.P. 56(c)'s requirements for affidavits submitted in opposition to a motion for summary judgment. Fed.R.Civ.P. 56(e) provides that when affidavits are used to support or oppose a summary-judgment motion, they "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters staled therein." Fed.R.Civ.P. 56(e). "These rules are mandatory." 10B Wright & Miller, Federal Practice & Procedure § 2738 at 328 (2005).

In support of its motion to strike the Baker Declaration, Plaintiff has submitted an affidavit of their attorney, Michael Fernandez (the "Fernandez Affidavit"). Paragraphs 5 through 7 of the Fernandez Affidavit recount Fernandez's version of a telephone conversation he allegedly had with Baker [*25] on June 14, 2004, and paragraphs 10 through 12 of the declaration recount a telephone conversation he allegedly had with Baker on July 19, 2005. Plaintiff wishes to use the statements made by Baker during these telephone conversations to support its argument that the Baker Declaration is not based on personal knowledge.

Defendants/Third-Party Plaintiffs contest the Fernandez Affidavit and have moved to strike it from the record on the grounds that the statements constitute hearsay, in violation of the requirement of Rule 56(c) that supporting affidavits "set forth facts as would be admissible in evidence." Fed.R.Civ.P. 56(e). The Court finds, however, that the statements are admissible as statements against interest. Fed.R.Evid. 804(b)(3).

Returning to the Baker Declaration, Plaintiff argues that it should be stricken because Baker lacks personal knowledge of Spiliotes's relationship with Thenamaris. In paragraph 4 of the Baker Declaration, Baker avers,

> I was aware that [Spiliotes] was primarily working for Thenamaris, a Greek shipowner, with whom I understood he had a special working relationship. Based on my conversations with Spiliotes during those years, I believed [*26] that James Spiliotes was Thenamaris' local port captain for their tankers calling on the North East Coast of the United States.

(Baker Declaration at P4). The first sentence violates the personal knowledge requirement of Fed.R.Civ.P. 56(c), as Baker merely states that he was "aware" that Spiliotes worked for Thenamaris. See Steelman v. Carper, 124 F.Supp.2d 219, 228 n.25 (D.Del. 2000) (court could not accept affiant's statement that was based on his "personal awareness" rather than upon personal knowledge). Baker fails to provide any basis for his knowledge that Spiliotes worked for Thenamaris or that they had a special working relationship, other than what he had heard directly from Spiliotes. See Visser v. Packer En'g Assoc., 924 F.2d 655, 659 (7th Cir. 1991) (inferences and opinions must be grounded in observation or other first-hand personal experience).

The second sentence also fails to satisfy the personal knowledge requirement of Fed.R.Civ.P. 56(e), as Baker's use of the word "believed" underscores his lack of personal knowledge concerning Spiliotes's relationship with Thenamaris. See Hlinka v. Bethlehem Steel Corp., 863 F.2d 279, 282 (3d Cir. 1988) [*27] (use of the word "believe" insufficient to aver personal knowledge); 10B Wright & Miller, Federal Practice & Procedure § 2738 at 350 (2005). Because these statements fail the personal knowledge requirements of Fed.R.Civ.P. 56(e), they must be stricken from the record. The remaining three paragraphs of the Declaration are irrelevant. Plaintiff's motion to strike the Baker Declaration is granted.

### D. Plaintiff's Motion to Strike Portions of Defendants/Third-Party Plaintiffs' Declaration of James Spiliotes

The Spiliotes Declaration contains 73 paragraphs, some of which are quite lengthy. Plaintiff has moved to dismiss 42 of the 73 paragraphs contained in the Spiliotes Declaration, and has offered three potential reasons as to why each paragraph should be dismissed. n4 First, Plaintiff claims the paragraphs violate the requirements of Fed.R.Civ.P. 56(e), that affidavits must be based on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall affirmatively show that the affiant is competent to testify. Second, Plaintiff argues that the statements constitute self-serving conclusions "unsupported by specific facts in the record." Heffron, 270 F.Supp.2d at 574-75 [*28] ("in order to defeat a properly supported motion for summary judgment, a plaintiff cannot simply rely on "vague", "self serving" statements which are unsupported by specific facts in the record.") (citations omitted). Third, Plaintiff

argues that the statements are barred by the "sham affidavit" doctrine, in that Spiliotes's Declaration statements contradict his earlier deposition testimony. See Baer v. Chase, 392 F.3d 609, 625-26 (3d Cir. 2004) (trial court will disregard an affidavit submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's earlier testimony, unless there is a good faith basis for the contradiction).

n4 Defendants/Third-Party Plaintiffs have mistakenly repeated numbers 32 through 37 in the Spiliotes Declaration. While the last numbered paragraph is 68, there are in fact 73 paragraphs. Defendants/Third-Party Plaintiffs have submitted an Amended Spiliotes Declaration to correct this error.

A careful review of the Spiliotes Declaration [*29] shows that it is also replete with inappropriate factual assertions and legal conclusions, in violation of Local Civil Rule 7.2(a). That rule provides in pertinent part: "Affidavits shall be restricted to statements of facts within the personal knowledge of the affiant. Argument of the facts and the law shall not be contained in affidavits." L.Civ.R. 7.2(a). "Such argumentative and speculative statements are limited to briefs, and should not be included in sworn submissions to this Court." Resolution Trust Co. v. Fidelity & Deposit Co., 1998 U.S. Dist. LEXIS 3431, at *4 (D.N.J. Jan. 27, 1998). This Court will not consider any argumentative or speculative portions of Captain Spiliotes's Declaration, nor will it consider any portions that violate the requirements of Fed.R.Civ.P. 56(e).

Because the Spiliotes Declaration contains 73 paragraphs that cover a broad range of subjects, the Court will neither attempt to summarize the declaration, nor engage at this point in a lengthy analysis to determine which paragraphs should and which should not be stricken from the declaration. To give some context to Spiliotes's Declaration statements, the Court will consider the motion [*30] to strike Spiliotes's statements, as the need arises, during the summary judgment analysis.

## II. Plaintiff's Motion for Partial Summary Judgment

### A. First Counterclaim: Violation of CEPA

Defendants/Third-Party Plaintiffs have alleged in

their rust counterclaim that Minerva violated CEPA, N.J.S.A. 34:19-1, et seq., by firing Spiliotes in retaliation for: disclosing the Chief Mate's threatening statements and behavior; cooperating with law enforcement authorities in their investigation into the Chief Mate's threatening statements and behavior; and complying with the official legal notices sent to Spiliotes by the Bayonne City Municipal Court. (Second Amended Answer with Counterclaim and Third-Party Claims ("Answer with Counterclaims") at P90). Plaintiff now moves for summary judgment on the first counterclaim.

**1. Legal Standard**

CEPA was "enacted in 1986 to encourage employees to notify authorities of any and all illegal or unethical work-place activities conducted by an employer." DaBronzo v. Roche Vitamins, Inc., 232 F.Supp.2d 306, 310 (D.N.J. 2002). N.J.S.A. 34:19-3 provides:

> An employer shall not take any retaliatory action [*31] against an employee because the employee does any of the following:
>
> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, ally shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, in the case of an employee who is a licensed or certified health care professional, reasonably believes constitutes improper quality of patient care; or
>
> (2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient,

customer, employee, former employee, retiree or pensioner of the employer or any governmental entity;

> b. Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into [*32] any violation of law, or a rule or regulation promulgated pursuant to law by the employer, or another employer, with whom there is a business relationship, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, in the case of an employee who is a licensed or certified health care professional, provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into the quality of patient care; or
>
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care;
>
> (2) is fraudulent or criminal, including [*33] any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity; or
>
> (3) is incompatible with a clear mandate of

public policy concerning the public health, safety or welfare or protection of the environment.

N.J.S.A. 34:19-3. "CEPA protects an employee who believing that the public interest overrides the interest of the organization he serves, publicly blows the whistle if the organization is involved in a corrupt, illegal, fraudulent, or harmful activity." DaBronzo, 232 F.Supp.2d at 310-11 (citations omitted) (internal quotations omitted).

The issue here is whether Spiliotes is a protected employee within the definition of CEPA. Plaintiff contends, and has offered substantial evidence to prove, that Spiliotes was not employee of Minerva, but rather was an independent contractor serving as a vessel's agent and marine surveyor employed by his own company, WWM. Plaintiff argues that because independent contractors are not covered by CEPA, summary judgment [*34] must be granted against Defendants/Third-Party Plaintiffs on the first counterclaim. Defendants/Third-Party Plaintiffs acknowledge that independent contractors are not covered by CEPA, but argue that an application of the facts of this case to the case law on this subject shows that there are genuine issues of material facts concerning Minerva's and Spiliotes's working relationship that precludes summary judgment.

DaBronzo employed a twelve part lest to determine if the plaintiff was an employee or an independent contractor of the defendant. There, both the plaintiff and the defendant agreed that Pukowsky v. Caruso, 312 N.J. Super. 171, 711 A.2d 398 (App. Div. 1998) provided the appropriate test for determining whether the plaintiff was an independent contractor. The Court noted that while there are several tests in the employment law context that address whether an individual is an employee or an independent contractor, "the Pukowsky factors largely encompass the factors enunciated in most settings." n5 DaBronzo, 232 F.Supp.2d at 316 n. 11. Under Pukowsky, the twelve factors for consideration are:

(1) the employer's right to [*35] control the means and manner of employee's performance; (2) the kind of occupation, supervised or unsupervised; (3) skill; (4) who furnishes equipment and workplace;

(5) the length of time individual has worked for the company employer; (6) the method of payment; (7) manner of termination of the work relationship; (8) does the individual accrue annual leave; (9) is the work the individual performs an integral part of the "employer's" business; (10) does the individual accrue retirement benefits; (11) does the "employer" pay social security taxes; and (12) the intention of the parties.

Pukowsky, 312 N.J. Super. at 182-83 (citing Franz v. Raymond Eisenhardt & Sons, Inc., 732 F.Supp. 521, 528 (D.N.J. 1990)). These factors are based on common law agency principles. Id. at 182.

n5 The Pukowsky test was established by federal courts interpreting analogous federal statutes that do not adequately define the term "employee." Kounelis v. Sherrer, 396 F.Supp.2d 525, 532 (D.N.J. 2005) (citing Chrisanthis v. County of Atlantic, 361 N.J.Super. 448, 825 A.2d 1192 (App. Div. 2003). The test was formulated in the Third Circuit in E.E.O.C. v. Zippo Mfg. Co., 713 F.2d 32, 37 (3d Cir. 1983), where the Circuit defined the term "employee" in the context of the Federal Age Employment Discrimination Act.

[*36]

Defendants/Third-Party Plaintiffs challenge the use of the Pukowsky factors to determine whether Spiliotes was an employee of Minerva. Rather, they argue that MacDougall v. Weichert, 144 N.J. 380, 677 A.2d 162 (1996), a New Jersey Supreme Court decision, contains the appropriate test. In MacDougall, the plaintiff was engaged as a salesperson for the defendant real estate firm, Weichert. The plaintiff acknowledged that he was neither an employee nor a partner, but was a "Sales Associate with an independent contractor status, with no rights of [worker's] compensation, salary, pension, sick leave, sick pay, or other attributes of an employee relationship." 144 N.J. at 389. Plaintiff was also an elected member of the local municipal governing council. As a member of the council, plaintiff voted for a parking ordinance that was opposed by a client of Weichert. Plaintiff was then terminated by Weichert, and plaintiff

sued Weichert under the tort of wrongful discharge.

At issue was whether MacDougall was an employee of Weichert for purposes of raising a wrongful discharge claim under Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 417 A.2d 505 (1980). [*37] On summary judgment, the trial court found that MacDougall was an independent contractor, meaning he was not protected under the wrongful discharge doctrine. On appeal, the Appellate Division affirmed the trial court's grant of summary judgment. 144 N.J. at 388.

The Supreme Court of New Jersey reversed and remanded the case, finding that there were material issues of subsidiary facts concerning the relationship between the parties that were unresolved by the record. n6 144 N.J. at 389. Specifically, the Court found several facts suggesting that Weichert exerted substantial control over MacDougall, including the fact that MacDougall worked in an office maintained by Weichert; a Weichert manager supervised MacDougall's work; Weichert required MacDougall to take its training program; and that Weichert shared the commission profits. 144 N.J. at 389. The Supreme Court noted that "the categorization of a working relationship depends not on the nominal label adopted by the parties, but rather on its salient features and the specific context in which the rights and duties that inhere in the relationship are ultimately determined." 144 N.J. at 388-89. [*38] It added, "the critical issue is whether the elements of control and dependence coupled with the absence of any employment protection predominate over factors that favor an independent contractor status." 144 N.J. at 389.

n6 The Supreme Court expressed concern that MacDougall did not present the issue of his employment status on appeal until he filed his reply brief, raising the possibility that the question of employment was not fully presented. 144 N.J. at 390.

Defendants/Third-Party Plaintiffs argue that MacDougall applies because " DaBronzo presents an overly formalistic traditional analysis and does not take account of the modern day realities of the employer-employee relationship." (Defendants/Third Party Plaintiffs' Opp. at 11). Specifically, Defendants/Third-Party Plaintiffs take issue with the factors that assess duration, payment method, annual leave, retirement benefits, social security tax, and workplace. n7 Instead, Defendants/Third-Party Plaintiffs want the focus [*39] on the elements of control and dependence.

n7 Defendants/Third-Party Plaintiffs also suggest that public policy favors a finding that Spiliotes is an employee with a CFPA remedy. (Defendants/Third-Party Plaintiffs' Opposition to Plaintiff's Motion for Summary Judgment at p. 10). Defendants/Third-Party Plaintiffs have cited no cases, however, where a Court determined that a worker was an employee under CEPA for public policy reasons.

The basis for their argument is a New Jersey Superior Court case, cited by MacDougall, which slates that "innovative variations on traditional employment relationships should not necessarily affect the consequences of the functional relationship between the parties." Crowe v. M&M/Mars, 242 N.J. Super. 592, 598, 577 A.2d 1278 (App. Div.), cert. denied 122 N.J. 387, 585 A.2d 389 (1990). However, MacDougall merely cited Crowe for the proposition that "whether or not a person is dubbed an employee can have many [legal] consequences... The answer to the employment [*40] question properly varies with the varying consequences of the determination, and the public policies engaged." Crowe, 242 N.J. Super at 598.

The Court finds that MacDougall is not at odds with the Pukowsky factors, as applied by DaBronzo. MacDougall and Pukowsky both place a premium on assessing the employer's control, and both call for analysis of factors favoring independent contractor status. Moreover, the Pukowsky factors test incorporates most of the factors contained in other tests used for determining whether a worker is an employee or an independent contractor. DaBronzo, 232 F.Supp.2d at 316 n. 11. In spite of their argument to the contrary, Defendants/Third-Party Plaintiffs have not cited any case law suggesting that the factors of duration, payment method, annual leave, retirement benefits, social security tax, and workplace should not be taken into consideration. Nor does this Court find a compelling reason why those factors should not be considered. Indeed, the Pukowsky "test represents a 'hybrid' approach combining the traditional common law focus on the defendant's right to control the alleged employee's [*41]

efforts with the more contemporary emphasis on the economic realities of the relationship between the parties." Kurdyla v. Pinkerton Sec., 197 F.R.D. 128, 133 (D.N.J. 2000).

Nor does this Court accept Defendants/Third-Party Plaintiffs attempt to distinguish DaBronzo. Although there are some factual discrepancies, they are immaterial to the point at issue. DaBronzo provides a useful framework under CEPA for determining when a worker is an employee, and when he is an independent contractor. MacDougall, on the other hand, addressed the issue of whether a real estate agent was an employee for purposes of a wrongful discharge claim. The issue here is whether Spiliotes was an employee under a CEPA claim, not under a wrongful discharge claim. For all these reasons, the Court finds that DaBronzo provides the appropriate framework for determining whether Spiliotes was an independent contractor of Minerva.

Having determined that DaBronzo provides the appropriate analysis, the next step is to apply the Pukowsky factors to determine if Spiliotes was an employee or independent contractor of Minerva. "Whether an individual is an employee or an independent contractor [*42] is a question of law to be determined by the court in the absence of a disputed issue of material fact." DaBronzo, 232 F.Supp.2d at 315-16 (citations omitted). Absolute and clear-cut unanimity of all twelve factors is not required in order to determine non-employee status. See Chrisanthis v. County of Atlantic, 361 N.J. Super. 448, 465, 825 A.2d 1192 (App. Div. 2003). Moreover, the presence or absence of some factors without a reasoned balance will not preclude the granting of summary judgment. Id. (citing Carney v. Dexter Shoe Co., 701 F.Supp. 1093, 1098-99 (D.N.J. 1988).

## 2. Analysis under Pukowsky factors

a. Factor 1 - Employer's right to control the means and manner of employee's performance

### i. Legal Standard

The first factor requires this Court to assess Minerva's right to control the means and manner of Spiliotes's performance. "The employer's right to control the 'means and manner' of the employee's performance is generally agreed to be one of the most probative factors." DaBronzo, 232 F.Supp.2d at 316 (citations omitted).

"The first factor is entitled to this added weight because, [*43] under the common law of agency, an employer-employee relationship exists if the purported employee controls or has the right to control both the result to be accomplished and the manner and means by which the purported employee brings about that result." Eisenberg v. Advance Relocation & Storage, Inc., 237 F.3d 111, 114 (2d Cir. 2000) (citations omitted) (internal quotations omitted). In describing the distinction between a servant (employee) and an independent contractor, the Second Restatement of Agency states the following:

> The important distinction is between service in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to accomplish results err to use care and skill in accomplishing results. Those rendering service but retaining control over the mariner of doing it are not servants.

Restatement (Second) of Agency § 220(1) cmt. a (1958).

### ii. Plaintiff's Argument and Supporting Evidence

According to the Plaintiff, the evidence indicates that Spiliotes, not Minerva, possessed the right to control the means and manner of his performance. Plaintiff first notes that [*44] Spiliotes had no written employment contract that gave Minerva the right to control his performance, unlike other Minerva employees who had written contracts. (Plaintiff's Local Rule 56.1 Statement of Undisputed Material Facts ("PSUMF") at P105, 116). Additional probative evidence of Spiliotes's independent contractor status is that he was the principal of his own company WWM, that had its own office and employees, and provided surveying and other marine services as "Ships Agents & Brokers" and "Marine Technical & Environmental Consultants/Surveyors. (PSUMF at PP4, 6-31). Moreover, WWM's holding itself out as an expert in the industry is evidenced by its advertising literature and reports offering WWM's "expert and professional opinion." (PSUMF at PP24-29; Supplemental SUMF at P189).

Plaintiff claims that Minerva's lack of control over Spiliotes is also evidenced by Spiliotes's testimony that he was an expert; he knew his job; no one ever told him how to perform his job; he did not have any guidelines,

instruction manuals or operation manuals to follows; and that he could come and go from the vessels whenever he desired. (PSUMF at PP70-74, 115). Moreover, Spiliotes admitted that [*45] he had "managerial responsibility" over the allocation of work at WWM, and without any consultation with Minerva or any other shipowner, would hire on behalf of WWM: employees, outside contractors, and consultants. (PSUMF at PP11-13, 22-23). Spiliotes only received limited instructions from Minerva to cooperate for a "smooth transfer," and Spiliotes testified that such language provided him with the authority to observe "everybody" on board the vessel and to intervene or stop any action he saw that was wrong. (Supplemental SUMF at PP206-207).

Finally, Plaintiff rejects the argument by Spiliotes that because WWM acted "in accordance with [Minerva's] instructions," Spiliotes was controlled. (Spiliotes Declaration at P21). According to Plaintiff, Defendants/Third-Party Plaintiffs fail to mention that such language is identical to language that WWM routinely provides to other customers. (Supplemental SUMF at P186).

Viewed in its entirety, Plaintiff's evidence is sufficient for the Plaintiff to carry its burden to show that Minerva lacked control over Spiliotes. The evidence suggests that Spiliotes had the authority to control how his jobs were completed on Minerva's behalf, and does [*46] not indicate that Minerva controlled the "means and manner" of how he performed his tasks. The burden now shifts to Defendants/Third-Party Plaintiffs to show that there is a genuine issue of material fact concerning Minerva's lack of control over Spiliotes.

### iii. Defendants/Third-Party Plaintiffs' Rebuttal

Defendants/Third-Party Plaintiffs dispute several paragraphs from the Plaintiffs Local Rule 56.1 Statement, offered to show that Minerva lacked control over Spiliotes. First, Defendants/Third-Party Plaintiffs dispute paragraph 105, which states that Spiliotes effectively admitted that he had no written contract with Minerva, and instead relied upon an "oral contract" formed with a dead man named Captain Selementas, an employee of Thenamaris. In response to paragraph 105 of the Plaintiff's Local Rule 56.1 Statement, Defendants/Third-Party Plaintiffs cite paragraphs 7 through 15 of the Spiliotes Declaration, which describe why Spiliotes created WWM, how he moved from Thenamaris to Minerva, what his responsibilities were,

and what his title was. However, it is unclear to this Court how paragraphs 7 through 15 of the Spiliotes Declaration dispute the Plaintiff's statement that [*47] Spiliotes had no written employment contract with Minerva. Indeed, there is no mention of any contract in paragraphs 7 through 15 whatsoever. Defendants/Third-Party Plaintiffs have failed to raise a genuine issue with respect to the fact that Spiliotes did not have an employment contract with Minerva. n8 The Court will also disregard Defendants/Third-Party Plaintiffs disputes of paragraphs 10, 18, 19, 20, 24, 27 and 74 of the Plaintiff's Local Rule 56.1 Statement, as those disputes are immaterial.

> n8 Plaintiff has also moved to strike paragraphs 7, 9, 10, 12, 13 and 15 of the Spiliotes Declaration. The Court will refrain from considering the motion to strike at this point, given that the paragraphs fail to create a genuine issue with respect to the fact that Spiliotes did not have a written employment contract with Minerva.

Defendants/Third-Party Plaintiffs dispute Plaintiff's general claims that Minerva lacked control over Spiliotes. On the contrary, they argue that Minerva exerted substantial control over [*48] Spiliotes, and that Spiliotes was completely dependent upon them. Defendants/Third-Party Plaintiffs claim that Spiliotes had standard assignments from Minerva that he was required to perform on every Minerva ship, and that Minerva's operations managers gave Spiliotes specific instructions to perform these tasks. Spiliotes reported back to Minerva that he performed his assigned duties "in accordance with [Minerva's] instructions." (Spiliotes Declaration at PP16-22). They also claim that Spiliotes received instructions from Minerva's operations department for additional assignments that periodically arose, and have provided examples of such situations. (Spiliotes Declaration at PP19-33).

Defendants/Third-Party Plaintiffs have provided evidence to show the extent to which Spiliotes relied on Minerva for his livelihood. As a result of this reliance, they contend that Minerva exerted a great deal of control over their relationship as well as over Spiliotes in performance of his job. This manifested itself in that: Minerva required Spiliotes to have his own company while working for Minerva; Minerva controlled how,

when, and what they paid Spiliotes; and Minerva sometimes required that [*49] Spiliotes guarantee their local financial obligations. (Spiliotes Declaration at PP34-48).

Defendants/Third-Party Plaintiffs reiterate that merely because Spiliotes worked for Minerva through his company WWM, that alone is not evidence that he was an independent contractor. MacDougall, 144 N.J. at 388-89. Defendants/Third-Party Plaintiffs also argue that the various job descriptions Spiliotes used - ship's agent, owner's agent, owner's protective agent, surveyor, port captain, etc. - are in effect meaningless. (Spiliotes Declaration at PP22-23). In addition, they cite the testimony of Captain Vezyrtzis, a Minerva employee, and of James Baker, a claims adjuster with UK P&I Club, as additional evidence that Spiliotes had a special relationship with Minerva. n9 (Spiliotes Declaration at Exh. M; Baker Declaration at PP1-4). Finally, Defendants/Third-Party Plaintiffs argue that Minerva required Spiliotes to have his own company while working for its own benefit, in order to avoid United States regulations, to have the appearance of independence and objectivity when they used Spiliotes's reports in defending claims of third-parties, and to allow Minerva to submit part [*50] of the cost for Spiliotes's work to insurers for reimbursement. (Spiliotes Declaration at P12).

n9 As discussed earlier, however, the Baker Declaration is stricken and will not be considered on this motion for summary judgment. (See Section I.C, supra).

As discussed in section I.B, supra, Plaintiffs have moved to strike several paragraphs from the Spiliotes Declaration, which underlie Defendants/Third-Party Plaintiffs contention that Spiliotes was controlled by Minerva. These motions to strike must be addressed before this Court can determine whether there is a genuine issue of material fact concerning Minerva's lack of control over Spiliotes.

*iv. Plaintiff's Motion to Stripe Spiliote's Declaration* n10

n10 The cited paragraphs refer to the Amended Spiliotes Declaration, not the original

Spiliotes Declaration. ( See fn. 4, supra).

[*51]

Plaintiff moves to strike several statements from the Spiliotes Declaration that Defendants/Third-Party Plaintiffs have cited to support their argument that Spiliotes was controlled by Minerva. The first group of statements are paragraphs 16 through 19 and 22, which Defendants/Third-Party Plaintiffs have cited to show that Spiliotes received specific instructions from Minerva. Those paragraphs read as follows:

P16 - Contrary to Minerva's assertion that I was a 'free agent' on their ships with discretion to do whatever I wanted, I had specific instructions and assignments from Minerva's operations department.

P17 - There were standard assignments that I had to accomplish for every Minerva ship I worked onboard. These assignments came from Minerva's operations department. They included assisting the captain, officers and crew with safe and efficient cargo operations; interacting with the terminal, cargo receivers, charterers and charterer's agents as necessary; ascertaining the quantity of cargo onboard prior to and at the completion of discharge; observing cargo discharge rates and rail pressures during the discharge; preventing the loss of the liquid cargo; recording [*52] all relevant times; protesting all discrepancies; and issuing proper certificates at completion of discharge of cargo.

P18 - Pursuant to my specific instructions from Minerva's operations department, my typical work onboard Minerva vessels either in port or at a lighterage anchorage consisted of the following: I met the ship on arrival and I immediately met with the master and chief mate. I assisted the master and chief mate with preliminary arrival issues, such as clearing the ship with U.S Customs and other port officials. After those issues were resolved, my primary duties concerning the discharge of

2006 U.S. Dist. LEXIS 13922, *52

the cargo began. I inspected and gauged the cargo tanks along with the vessel's chief mate and the terminal's and/or cargo receiver's surveyors ("cargo interests"). Along with the chief mate, I performed all necessary calculations to ascertain the quantity of cargo onboard to ensure the amount corresponded to the amount loaded at the load port. Once those figures were determined and agreed upon with cargo interests, I made a general inspection of the main deck prior to commencement of discharge. In particular, I inspected the mooring lines to determine they were secure; I ensured [*53] that all scuppers were plugged to prevent an accidental spill; and, most importantly, I ensured that the cargo hose connection from the ship's manifold to the terminal was satisfactory. Also prior to the commencement of discharge, I checked with cargo interests to obtain their instructions concerning shore line displacement procedures. I then waited along with the chief mate for the terminal to instruct us to commence discharge and, when they did, I monitored the initial discharge to ensure it was proceeding safely and efficiently. During the initial discharge, I would monitor the cargo discharge pressure in the cargo control room as well as at the ship's manifold on deck. I also made another round on the main deck during the initial discharge to ensure everything was still in good order i.e. the mooring lines, cargo hose connection, scupper plugs, etc. Throughout the discharge, which could take anywhere from twenty-four hours or more, I was generally about on deck and in the cargo control room to ensure all aspects of the discharge went efficiently and safely. In this regard, I observed and recorded the discharge rates, rail pressures, relevant times, etc. and I attended to any cargo [*54] related issues that arose along with the chief mate and other deck officers. Those issues generally entailed switching shore cargo tanks, suspending the discharge (for the ship's and/or terminal's purposes), issuing protests, etc. As the completion of discharge neared, I assisted the chief mate with stripping the slip's tanks of cargo. Once that was accomplished, I inspected the cargo tanks with the cargo interests. We gauged each tank to determine whether any cargo was remaining onboard. I then assisted the master in making preparations to sail, including preparing proper certificates. I did not depart until the vessel's last mooring line was aboard the ship and the vessel actually sailed.

P19 - In no sense was I simply a vessel husbandry agent as Minerva would have this Court believe. What I did with my job for Minerva and what a husbandry agent does are simply not the same thing. As set forth above, I was **actually** an integral member of Minerva's operations department working aboard Minerva vessels while they were discharging cargo in New Jersey and other ports in the North East. Everything I did onboard Minerva vessels was done pursuant to my specific instructions [*55] from Minerva's operations department. I was their eyes, ears, legs and arms in the North East and at terminals in New Jersey in particular.

P22 - In the beginning of my working for Minerva, I had numerous telephone calls with Captain Vezyrtzis concerning my standard assignments and instructions and what they expected of me when I worked as their representative onboard their vessels. As I testified at my deposition:

Q. But in the first instance Minerva told you what to do?

A. The first thing Minerva instruct me, told me what to do, and then after that they knew what I was doing and they didn't instruct me more. But the first couple of years I would say they would send from the telephone instructions what to do there on that ship.

* * *

Q. Right. Right. But when you're doing, you know, our job on board the ship, say like going aboard the Minerva Julie to do the protection job on the discharge -

A. Protection job, what's that?

Q. You know, to supervise the discharge of the ship.

A. Yes.

Q. All right. Minerva doesn't tell you how to do that, do they?

A. Well, Minerva knows that I know how to do that.

Q. Right.

A. However, [*56] they tell me be careful, they tell me what to be careful. They tell me look, watch the pressure don't go higher than this or make sure that all the lines on the ship that stop it to so much pressure, to withstand so much pressure. The give me instructions. I didn't do it myself, no.

Q. Where did they give you these instructions, did they write them to you?

A. Most of it by phone.

Q. Most of it by phone. So you have nothing in writing about instructions like that?

A. I may have some. I don't know. I don't know. I may have some.

Q. All right. But your brochure says that you're an expert, that you know how to do all these things?

A. Yes, I know how to do all these things.

Q. So you don't need anybody to tell you how to do that?

A. But that's their ships and they tell me how to do it. That's their ships. They are careful what I was doing on the ship. I was their port captain but they would instruct me on how to do it, how to do things.

(Spiliotes Declaration at Exhibit A, 712, 722-24).

Plaintiff makes several arguments as to why paragraphs 16 through 19 and 22 should be stricken. First, Plaintiff argues that the statements contained [*57] in these paragraphs, are merely self-serving statements by Spiliotes not based on any evidence in the record." See Heffron, 270 F.Supp.2d at 574-75 ("in order to defeat a properly supported motion for summary judgment, a plaintiff cannot simply rely on "vague", "self serving" statements which are unsupported by specific facts in the record.") (citations omitted). Specifically, Plaintiff argues that there is no evidence in the record to support Spiliotes's Declaration that he received specific instructions from Minerva's operations department.

Defendants/Third-Party Plaintiffs contest the motion to strike by arguing that Spiliotes did in fact testify that he received instructions from Minerva. (Spiliotes Deposition at pp. 711-712, 722-725). However, the cited deposition testimony is insufficient to support Spiliotes's statements contained in paragraphs 16 through 19, as the deposition testimony merely states that he received instructions from Minerva, but does not specify from whom within Minerva he received instructions. Paragraphs 16 through 19, on the other hand, specify that he received instructions from Minerva's Operations Department.

The deposition testimony [*58] also lacks the specificity of the instructions described in paragraphs 17 and 18 of Spiliotes's declaration. For example, Spiliotes testified in his deposition that "they tell me what to be careful. They tell me look, watch the pressure don't go higher than this or make sure that all the lines on the ship that stop it to so much pressure, to withstand so much pressure. They give me instructions." (Spiliotes Deposition at 722). He also testified that he was instructed on how to repair the radar. (Spiliotes Deposition at 722). By contrast, paragraph 18 of the declaration states that Spiliotes met the ship on arrival,

and he immediately met the Master and Chief Mate; he assisted the Master and Chief Mate with preliminary arrival issues, such as clearing the ship with U.S. Customs and other port officials; he inspected and gauged the cargo tanks along with the vessel's Chief Mate and the terminal's and/or cargo receiver's surveyors, etc. (Spiliotes Declaration at P19). Paragraph 17 of the Declaration contains even more detailed instructions. In short, the cited deposition testimony does not create a sufficient foundation for paragraphs 16 through 19 of the Spiliotes Declaration because [*59] the testimony does not identify who gave Spiliotes the instructions, what instructions he was given, when they were supposedly given, and under what circumstances they were given. Because paragraphs 16 through 19 lack the support of any evidence in the record, Plaintiff's motion to strike paragraphs 16 through 19 of the Spiliotes Declaration is granted.

Paragraph 22 of the Spiliotes Declaration states that Spiliotes had numerous calls with Captain Vezyrtzis concerning his assignments and instructions. While the deposition testimony included in paragraph 22 states that Spiliotes received instructions, it does not specify that he received instructions from Captain Vezyrtzis. Defendants/Third-Party Plaintiffs have not challenged the motion to strike paragraph 22 in their opposition to the motion to strike, and they have failed to cite any other testimony in support of the paragraph. Plaintiff's motion to strike paragraph 22 is granted.

Plaintiff next challenges the statements that are the basis for Defendants/Third-Party Plaintiffs' claim that Spiliotes received instructions from Minerva's operations department for additional assignments that periodically arose. (Spiliotes Declaration [*60] at PP19-33). Plaintiff moves to strike paragraphs 19, 22 through 26, and 28 through 30 of the Spiliotes Declaration. n11

> P23 - In addition to receiving instructions for my standard assignments, I also received instructions from Minerva's operations department for additional assignments that periodically arose.
>
> P24 - For example, I would often be tasked with certain duties and assignments from the operations department when Minerva vessels had to be inspected by the United States Coast Guard to obtain what

is known as a Tanker Vessel Examination Letter or TVEL. (Spiliotes Declaration at Exh. D).

P25 - I was instructed to meet with the vessel's master prior to the Coast Guard's inspection, and to review with him the status of various items that the Coast Guard was going to check. I was instructed to review with the master the status of various documents that had to be copied for the Coast Guard including the vessel's Certificate of Financial Responsibility, SOLAS documents, class certificates and ISM documents. I was instructed to review with the master the status of various logs, manuals and certificates that had to be made available including the ship's log, oil [*61] record books and SOLAS manuals. I was instructed to review with the master the status of publications that were required to be in the wheelhouse including the U.S. Coast Pilot, Tide-Tables and recent Notices to Mariners. I was instructed to discuss and ensure with the master that all pre-arrival tests and inspections had been performed and logged including the emergency steering gear tests and standby emergency generator test. I was instructed to discuss and ensure with the master that other testing was periodically performed and logged as part of the ship's normal policies and procedures, including pressure testing of cargo lines, cargo pump tests, fire pump tests and IGS tests. I was instructed to review with the master various vessels log books to make sure they were kept properly such as the vessel's log, dangerous cargo manifest and oil record book. And, I was instructed to review with the master what he should expect during the actual inspection - what documents the Coast Guard was likely going to review, what ship's equipment the Coast Guard was likely going to test and what ship's equipment the Coast Guard was likely going to visually inspect.

P26 - Minerva also instructed [*62] me to

be present during the Coast Guard's TVE inspections so I was available to report to the operations department any issues that arose and to address them in accordance with their instructions. For instance, I was aboard the Minerva vessel the AMPHITRITE in New York when it failed its initial Coast Guard TVE inspection in September, 2000. The vessel failed the initial inspection, among other reasons, because one of the lifeboat brakes was frozen and the boat could not be lowered. (Coast Guard's Vessel Boarding Reports - Exhibit E). I called Minerva to report the situation and to get their instructions on how to deal with it (including to report the vessel's master who had misinformed me before the inspection that he had recently successfully lowered the lifeboat when, in fact, it had not been lowered for six months). As I testified at my deposition:

Q. Can you tell us your involvement - well, did Minerva - did the U.S. Coast Guard perform any TVEs on Minerva vessels when they called on the East Coast of the U.S.?

A. Yes, they do that on a yearly basis.

Q. Did you have any involvement in those tanker vessel examinations or TVEs?

A. Yes.

Q. Can you describe [*63] for us the extent of the involvement you had?

A. I talk to the captain first, day before usually before the TVE, and I ask him if the lifeboats are okay to be lowered and if the motors are running, and if they don't, I always do it from the boat that time. I ask him also if all entries are made. He told me yes, yes. For example, this ship, on the AMPHITRITE, I'm talking about now, he said yes, we have everything under control, we lower the lifeboats a couple days ago, the lifeboats go down. I said you

make entries in the logbook. Yes, of course, I did. So the next day the Coast Guard come aboard to perform a TVE and he started with the fire drill. The crew was very slow. And then after the fire drill, he went over to do the boat drill. He tried to lower one of the lifeboats, I think it was a starboard - port lifeboat or starboard, I don't remember which one, and the lifeboat did not go down. So I look at the captain, I said look, you told me that a couple of days ago you lowered. He says you know what, he says, these lifeboats haven't gone down for six months. So if he was telling me that night before I was going to have another fire [and boat drill] the night before, you know, [*64] I think the lifeboats go down. So when I see that, I call Minerva. That's what I was there for, that's what my job was for, that's what a port captain does. I didn't tell the captain anything. I called Minerva, I told Minerva. I talked to Captain Dallaris and I said the ship was detained...

(Spiliotes Declaration at Exh. A. 690-92)

P28 - At times, Minerva would call me to instruct me to contact the Coast Guard and get their permission to allow Minerva's vessels to enter port with an expired TVEL. For instance, in July, 2001, Minerva instructed me to obtain the Coast Guard's permission to allow the Minerva vessel the MINERVA ALEXANDRA to enter port and commence discharge with an expired TVEL. I did so and obtained the Coast Guard's approval. (Spiliotes Declaration at Exh. F).

P29 - As another example, I would often receive instructions from Minerva concerning getting fuel, known as bunkers, or fresh water for Minerva ships. For instance, attached as Exhibit G hereto are fax instructions I received from the operations departments in September, 1998 concerning fuel and fresh water for the Minerva vessel SEAMUSIC III.

P30 - To the extent that problems arose [*65] onboard Minerva's ships, I would contact the operations department to report the situation and to seek their instructions. As I testified at my deposition:

Q. Give me an example, a specific example of something that they instructed you specifically to do on board the Minerva Julie on September 24th - September 26th, 2001.

A. Well, we didn't have any problems there except the incident with the chief mate.

Q. All right.

A. So if you had any problem - excuse me, Mr. Russo, if we have any problem, I call them up and they tell me look, do this, do that, you know.

Q. If you have a problem you call them up.

(Spiliotes Declaration at Exh. A, 724-25).


   n11 The Court will not revisit paragraphs 19 and 22, which have already been addressed.


   Plaintiff argues that the statements contained in these paragraphs are merely self-serving statements by Spiliotes not based on any evidence in the record. Defendants/Third-Party Plaintiffs respond to this argument by stating that Spiliotes was [*66] on the receiving end of the instructions for many years, and as a result, has extensive firsthand personal knowledge to make these statements. According to Defendants/Third-Party Plaintiffs, "[Spiliotes] personally spoke to Minerva, he personally sent and received correspondence to and from them, and he personally performed the duties Minerva instructed him to undertake...." (Defendants' Opp. to Motion to Strike at p. 12). They add that Captain Vezyrtzis confirmed this in his deposition by stating, "Spiliotes was cooperative with the office to the extent that whatever were asked of him

were - - were being asked of him, whatever job...." (Vezyrtzis Deposition at 178:23-25). Defendants/Third-Party Plaintiffs have also cited several passages from Spiliotes's own deposition testimony to show that he received specific instructions from Minerva - the same passages cited in support of paragraphs 16 through 19 of Spiliotes's Declaration.

   Defendants/Third-Party Plaintiffs have failed to cite any testimony or evidence in support of paragraphs 23 and 25. Paragraph 24 states that Spiliotes was often tasked with certain duties from the operations department. However, there is no testimony to [*67] support this statement, and the fax submitted as an exhibit in support of this statement merely indicates that WWM was asked on one occasion to arrange a Coast Guard inspection for the Minerva Zen. The second document submitted in support of paragraph 24 is an invoice for co-ordination of a Coast Guard inspection, but the document does not indicate that he was instructed to coordinate the inspection by Minerva. This evidence is insufficient to support Defendants/Third-Party Plaintiffs' claim that he was *often* tasked with certain duties and assignments from the operations department when Minerva vessels had to be inspected by the United States Coast Guard. Plaintiff's motion to strike paragraphs 23, 24, and 25 is granted.

   Paragraph 26 of Spiliotes's Declaration includes Spiliotes's own deposition testimony as evidence to support the statement. The first sentence lacks the support of any evidence in the record, however. It is also based on inadmissible hearsay, as Spiliotes has not identified a declarant that instructed him to be present at the TVE inspections. The remainder of paragraph 26 is admissible, as it is supported by the evidence in the record. Plaintiff's motion to strike [*68] is granted with respect to the first sentence of paragraph 26, and denied with respect to the remainder.

   Exhibit F, submitted in support of paragraph 28, contains a letter from the United States Coast Guard to WWM, granting permission for the Minerva Alexandra to enter the Port of New York with an expired Tank Vessel Examination letter and to commence cargo operations. This exhibit does not support the central tenet of his statement in paragraph 28 - that Minerva called him to instruct him to contact the Coast Guard to obtain the permission letter. Plaintiff's motion to strike paragraph 28 is granted.

Spiliotes declares in paragraph 29 that he would often receive instructions from Minerva requesting that he obtain fuel, known as bunkers, or fresh water for Minerva ships. In support of this statement, Defendants/Third-Party Plaintiffs include an exhibit containing a fax from Minerva to WWM with the request for these provisions. (Spiliotes Declaration at Exh. G). Again, this single fax is insufficient to support Spiliotes's claim that he "would *often* receive instructions from Minerva." (Spiliotes Declaration at P29) (emphasis added). Moreover, the fax is dated from August of [*69] 1998, presumably just after Spiliotes was asked to work for Minerva. (Spiliotes Declaration at PP10, 12). This is in line with Spiliotes's statement that for the first couple of years, Minerva would send him telephone instructions about what to do on the ship, but afterwards, Minerva knew what he was doing and "didn't instruct [Spiliotes] more." (Spiliotes Deposition at 711-12). Plaintiff's motion to strike paragraph 29 is granted.

The Court does not accept the Plaintiff's argument that paragraph 30 of the Spiliotes Declaration lacks support in the record. Spiliotes has submitted deposition testimony to support his statement that if problems arose onboard the ship, he would contact the operations department to report the situation. The testimony merely suggests it hypothetical - that if a problem were to arise, Spiliotes would contact the operations department. Plaintiff's motion to strike paragraph 30 is denied.

In support of its claim that Minerva control led its relationship with Spiliotes, Defendants/Third Party Plaintiffs cite paragraphs 34 through 48 of the Spiliotes Declaration to show that Minerva required Spiliotes to have his own company while working for Minerva; to [*70] show that Minerva controlled how, when, and what they paid Spiliotes; and to show that Minerva sometimes required that Spilotes guarantee their local financial obligations. (Spiliotes Declaration at PP34-48). Plaintiff moves to strike paragraphs 34, 35, and 37 through 47 of the Spiliotes Declaration. n12 Those paragraphs are as follows:

> P34 - I was extremely dependent on my job with Minerva for my livelihood. As can be seen from the above table listing my work onboard Minerva vessels in my area of responsibility, I was constantly working onboard Minerva vessels to make a living. During the winter months, my

work onboard Minerva vessels would almost be non-stop apparently because of the need for home heating fuel oil in the Northeast - as can be seen from the above table for the months of December, 2000 through April, 2001.

P35 - I have read Minerva's Rule 56.1 Statement submitted with their motion and, in particular, paragraph 147 where they list my income. Minerva, however, did not list my income after 2002, which shows how dependent I was on my employment with Minerva to make a living - I have had virtually no income since being fired by Minerva in September, 2001. [*71]

P37 - To the extent I had income in 2002 after I was fired by Minerva in September, 2001, it was primarily due to money Minerva paid me after I was fired that had been due me for some time. As I testified at my deposition:

Q. Okay. Okay. These are 1099s for Worldwide Marine for 2002. Now this is closer in time, right?

A. Yes, sir. Yes, sir.

* * *

Q. The first page of this exhibit, the 1099 for Worldwide, Worldwide paid you $ 24,000 -

A. Right.

* * *

Q. Well, what did they pay you $ 24,000 for?

A. For the work for - I did for them from before because Minerva own me a lot of money when they fire me. They give me 2001, at the end of 2001 they pay me.

(Spiliotes Declaration at Exhibit A, 505-06).

P38 - I did some on-the-side work for a couple of other shipowners sporadically at times. I also received work from a P&I club concerning marine insurance matters. However, I did not have the special working relationship with them that I had with Minerva. As I testified at my deposition (382):

Q. Right. So you were offering port captain services for everybody -

A. To supplement my income, yes.

Q. -correct, [*72] including Minerva and Thenamaris?

A. Minerva and Thenamaris I had a special deal with.

(Spiliotes Declaration at Exhibit A, 382, 410-16).

P39 - Minerva allowed me to do this side work to supplement my income from Minerva. Minerva, however, required that it not interfere with my work onboard their ships. If I had instructions to work on a Minerva vessel and another owner or the P&I club called and wanted me, I would have to turn them down so I could work the Minerva vessel.

P40 - As a result of my dependency on Minerva, Minerva exerted a great deal of control over our relationship in addition to the control they exercised over me in the performance of my job discussed above.

P41 - Minerva, like Thenamaris, required that I have my own company Worldwide while working for them.

P42 - Minerva controlled what they paid

me. My list of rates on my brochure did not apply to Minerva. As Captain Vezyrtzis testified:

Q. And Worldwide Marine is a protective agent, is you position; correct?

A. Yes.

Q. And you were talking about these fees that the charterer's agents sometimes charged you and you talked about their tariff; is that right? [*73]

A. Yes, there are some tariffs.

Q. And what's your understanding of a tariff?

A. A tariff is a tariff.

Q. What is a tariff?

A. I writes the cost for - the service that they are providing.

Q. Now I'd like you to take a look at the document that we've marked as Exhibit E [(Worldwide Marine's tariff)], please.

A. Yes.

Q. And take a look at page 2.

A. Yes.

Q. And on page 2, what does it read at the very top of the left-hand column.

A. Schedule of agency fee, charges for vessels calling United States ports.

Q. And there are 15 items; is that right?

A. Yes.

Q. And in each of those items Worldwide Marine lists the fee for performing the specific duties described in those items?

A. Well, some of these, yes; some of these not. Anyway, he gives an idea of what we're going to pay.

Q. Okay. Well, the document speaks for itself, but he does on page 2 list the fees for various services; isn't that right?

A. Yes.

Okay.

Q. These fees listed on page 2 for the various services did not apply when Thenamaris and Minerva used Capt. Spiliotes' services; isn't that right?

A. Yes, we had [*74] a special agreement.

(Spiliotes Declaration at Exhibit B, 497-98).

P43 - Minerva controlled what they paid me. My list of rates on my brochure did not apply to Minerva. As Captain Vezyrtzis testified:

Q. And Worldwide Marine is a protective agent, is you position; correct?

A. Yes.

Q. And you were talking about these fees that the charterer's agents sometimes charged you and you talked about their tariff; is that right?

A. Yes, there are some tariffs.

Q. And what's your understanding of a tariff?

A. A tariff is a tariff?

Q. What is a tariff?

A. I writes the cost for - the service that they are providing.

Q. Now I'd like you to take a took at the document that we've marked as Exhibit E [(Worldwide Marine's tariff)], please.

A. Yes.

Q. And take a look at page 2.

A. Yes.

Q. And on page 2, what does it road at the very top of the left-hand column.

A. Schedule of agency fee, charges for vessels calling United States ports.

Q. And there are 15 items; is that right?

A. Yes.

Q. And in each of those items Worldwide Marine lists the fee for performing the specific duties described [*75] in those items?

A. Well, some of these, yes; some of these not. Anyway, he gives an idea of what we're going to pay.

Q. Okay. Well, the document speaks for itself, but he does on page 2 list the fees for various services; isn't that right?

A. Yes.

Okay.

Q. These fees listed on page 2 for the various services did not apply when Thenamaris and Minerva used Capt. Spiliotes' services; isn't that right?

A. Yes, we had a special agreement.

(Spiliotes Declaration at Exhibit B, 497-98).

P44 - Minerva controlled how much they paid me. In addition to not paying me for

certain services at all, Minerva required I discount my attendance rate. That is, my normal daily rate of $ 750 was cut to $ 100 starting on the third day of my attendance onboard Minerva vessels. As I testified at my deposition:

> ...This is for two days or part thereof, $ 100. I was charging them $ 1,500 for two days or part thereof and after I would charge them $ 100 per day. Other companies I would charge them much more.

(Spiliotes Declaration at Exhibit A, 383-84).

P45 - Minerva controlled how I billed them. Captain Vezyrtzis required that in addition [*76] to an invoice for my attendance, I had to send Minerva a separate invoice for the ROB survey I would perform at the completion of discharge. Captain Vezyrtzis also told me to deduct the ROB survey fee from the attendance fee amount on the attendance invoice. As Captain Vezyrtzis, testified at his deposition:

Q. Are you now referring to TKR 1419 [(a Worldwide Marine's ROB survey fee invoice)]?

A. MIN 275. He has given these services for the ROB according to our agreement free of charge, as per his documents. And according to our agreement he was going to issue this - this additional invoice for our own reasons, for Minerva Marine's own reasons, and he is not entitled to this amount of $ 688.90 as per invoice - invoice 1419A/2000.

* * * Q. And that was the agreement you had with Capt. Spiliotes, that the flat rate attendance fee would include the cost of an ROB survey; is that right?

A. Yes.

Q. Captain Spiliotes also sent you a separate invoice for the ROB survey; correct?

A. On our request and agreement.

Q. And you requested that he send you this separate ROB survey invoice; that's right?

A. Yes, this was our agreement. He agreed to it - [*77] we asked him and he said yes, we will do it.

(Spiliotes Declaration at Exhibit B, 358-60).

P46 - Minerva controlled if they paid me at all. Many of my ROB survey fee charges were never paid by Minerva. Captain Vezyrtzis would always tell me once Minerva got paid from their P&I club, they would pay me. The few times I asked about the status of payment, Captain Vezyrtzis would tell me they were still waiting for the club to pay and to wait a little longer. I am claiming these outstanding ROB surveys fees in this lawsuit and I understand from what has been learned in discovery that the P&I club paid Minerva for these fees long ago, even when Captain Vezyrtzis was telling me otherwise. (Attached as Exhibit K hereto is one of my outstanding ROB surveys invoices obtained in discovery from Minerva, which Minerva stamped "PAID" (when it was not) and submitted to their P&I club for reimbursement.)

P47 - Those times they did pay me, Minerva controlled when they paid me. Minerva would normally pay me months after I worked onboard their vessels. All I could do to hope to get paid was to send them friendly reminders. (Attached as Exhibit L hereto is one such reminder I sent in [*78] June, 2001).

> n12 Note that the referenced paragraphs are contained in the Amended Spiliotes Declaration.

Plaintiff argues that these paragraphs should be stricken for the following reasons: they are self-serving statements that lack any evidentiary support in the record; they violate Fed.R.Civ.P. 56(e); and they violate the sham affidavit doctrine. ( See section I.D, supra).

At the outset, the Court notes that paragraph 38 is directly supported by Spiliotes's deposition testimony,

and will be permitted. Plaintiff's motion to strike paragraph 38 is denied.

Defendants/Third-Party Plaintiffs have failed to cite any facts that support paragraphs 39, 40 and 42, however. Plaintiff's motion to strike paragraphs 39, 40 and 42 is granted.

Plaintiff argues that paragraphs 34, 35 and 37 are self-serving conclusions unsupported by specific facts in the record. Defendant has not responded to this charge in their opposition to the motion to strike. The Court notes, however, that Defendants/Third-Party [*79] Plaintiffs have submitted several tax returns of WWM covering the years 1998 to 2003. The tax returns due show a dramatic decline in income from 2001 to 2002. The tax returns do not indicate, however, what accounted for the loss in income, nor do they account from where WWM lost income. Without more, the tax returns are insufficient to support Spiliotes's statement that he was extremely dependent on Minerva for his livelihood. Plaintiff's motion to strike paragraphs 34, 35 and 37 is granted.

Plaintiff argues that paragraph 41 should be stricken because it is based on inadmissible hearsay, and would not be capable of being admitted at trial. Specifically, Plaintiff argues that the statement is based on Spiliotes's deposition testimony, concerning an alleged conversation he had in 1985 with a now deceased Thenamaris employee named Selementas, who allegedly hired Spiliotes secretly. The deposition testimony is as follows:

The Captain Selementas, when he hire me, he told me that we used to have an office in New York and we close the office because we didn't pay the taxes to the IRS. Now we hire you and we don't want to make the same mistake like we did with Transworld, the previous [*80] company. So, when I use the company, which is Worldwide Marine, as a shell company for us, you going to work for us as a port captain and you going to do everything on the ship, we want to use you on every ship comes to the states - - excuse me, I take that back. Every ship comes to the East Coast of the United States, but we can't give you no written contract because if we give you a written contract, maybe the

same thing happen to use like before like Transworld. Okay.

I agree to it because I needed the job, it was a good job, you know, and I needed a job and agreed to it.

(Spiliotes Deposition at 407-408). Defendants/Third-Party Plaintiffs do not dispute that paragraph 41 is based on Spiliotes's deposition testimony concerning Selementas's statements, and even cite it to show that Spiliotes has consistently testified concerning this issue. Defendants/Third-Party Plaintiffs have not denied that Selementas is now deceased.

The issue here is whether paragraph 41 would be admissible at trial, as required by Fed.R.Civ.P. 56(c). Paragraph 41, standing alone, does not constitute hearsay, as it does not constitute an out of court statement offered to prove the truth of [*81] the matter asserted. See Fed.R.Evid. 801. The underlying deposition upon which paragraph 41 is based, however, does constitute hearsay. Fed.R.Evid. 801, 802. Because Spiliotes's deposition testimony serves as the basis for his statements in paragraph 41, that paragraph will only be admitted if Spiliotes's deposition testimony can be reduced to admissible evidence at trial.

Spiliotes's deposition testimony constitutes hearsay within hearsay, as Spiliotes has recounted what he was told by Captain Selementas. Captain Selementas allegedly made certain statements to Spiliotes, and those statements are now being offered by Spiliotes to prove the truth of the matter asserted: that Spiliotes was directly employed by the Martinos family. Spiliotes's deposition statements are not, as Defendants/Third-Party Plaintiffs argue, "operative facts," as the statements are being offered for their truth. Defendants/Third-Party Plaintiff have not proposed any other hearsay exceptions that may apply, nor has this Court been able to find any.

Inadmissible hearsay can be considered in an affidavit in opposition to summary judgment, however, if the hearsay declarant can be produced at trial to [*82] offer his or her statements in admissible form. See Rossi, 156 F.3d at 470 n. 13. Here, Plaintiff has alleged that Captain Selementas is now deceased. Defendants/Third-party Plaintiffs have not contested that Captain Selementas is deceased. Because he is dead, his statements cannot he admitted at trial.

It follows that paragraph 41 would be inadmissible at trial, as it is based on inadmissible hearsay, and the declarant cannot be produced to testify. Defendants/Third-Party Plaintiffs have not cited any other facts in the record to support his assertion that Minerva required him to have his own company Worldwide while he worked for them. n13 Plaintiff's motion to strike paragraph 41 is granted.

n13 Defendants/Third-Party Plaintiffs have cited additional deposition testimony by Spiliotes to show that Spiliotes has consistently testified that he was required to operate his own company while working for Thenamaris. (Defendants' Local Rule 56.1 Statement of Undisputed Material Facts ("DSUMF") at P27). The statements contained in those excerpts of Spiliotes's deposition are too vague, however, to support the proposition that Thenamaris required Spiliotes to operate his own company while working for them.

[*83]

Several paragraphs contain only parts that must be stricken from the record. Specifically, the first sentence of paragraph 43, the first two sentences of paragraph 44, and the first sentence of paragraph 45 must all be stricken, as they constitute self-serving conclusions that are not supported by specific facts in the record. The remainder of the paragraphs are supported by the cited deposition testimony, however. Plaintiff's motion to strike paragraphs 43, 44 and 45 are granted in part and denied in part.

Plaintiff has also moved to strike paragraph 46 on the grounds that it contains self-serving conclusions to the effect that Minerva exerted "control" over Spiliotes, but is unsupported by specific facts in the record. The paragraph states that Minerva controlled if Spiliotes was paid at all. In support of this statement, Defendants/Third-Party Plaintiffs have submitted an exhibit, which contains an invoice submitted to Minerva, that was stamped "paid." Spiliotes contends that he was never, in fact, paid. (Spiliotes Declaration at Exh. K). This exhibit, standing alone, is insufficient to support the assertions made in paragraph 46. Plaintiff's motion to strike paragraph 46 is [*84] granted.

Plaintiff also moves to strike paragraph 47 on the grounds that it contains self-serving conclusions to the effect that Minerva exerted "control" over Spiliotes, but is unsupported by specific facts in the record. The paragraph states that Minerva controlled when Spiliotes was paid, and that all he could do to got paid was submit friendly reminders. In support of this paragraph, Defendants/Third-Party Plaintiffs have submitted one of those reminders that Spiliotes sent to Minerva. (Spiliotes Declaration at Exh. L). The exhibit, standing alone, is insufficient to support the assertions made in paragraph 47. Plaintiff's motion to strike paragraph 47 is granted.

Defendants/Third-Party Plaintiffs have also argued that Minerva forced Spiliotes to set up WWM. (Spiliotes Declaration at P12, Exh. 9). Plaintiff moves to strike paragraph 12, which reads as follows:

P12 - After Minerva was set up, Captain Vezyrtzis called me on the telephone and offered me the same job I had with Thenamaris with Minerva. I agreed. As with Thenamaris, Minerva required that I operate my own company Worldwide while working for them. As I testified at my deposition:

A. I do many things [*85] there. The Minerva mostly and Thenamaris, I do everything, just name it. I was their representative on the East Coast.

Q. All right.

A. Any time they need something they call me.

Q. Whose representative?

A. Minerva and Thenamaris.

Q. Okay.

A. Any time they needed something, was me. They didn't need nobody else here because they had - before they used to have an office here. I don't know if you're aware of that. Thenamaris used to have an office here before called Transworld. So because they didn't want to pay the taxes, the IRS was after them, the closed the

office. I don't know if - excuse me, and then they got me.

Q. You're going beyond my question.

A. No, I'm not going. This is port captain job.

Q. I want to know -

A. I'm trying to answer you know. This is part of the port captain job. They hired me with my company to do their business.

(Spiliotes Declaration at Exh. A, 372-73).

Plaintiff argues that paragraph 12 should be stricken because it is based on inadmissible hearsay. Moreover, Plaintiff claims that the only basis for the third sentences is that Spiliotes is relating back to the conversation he allegedly [*86] had with a man from Thenamaris in 1995 who is now deceased. Although Defendants/Third-Party Plaintiffs argue that these statements constitute "operative facts," it is clear that the statements are being offered to prove the truth of the matter asserted: that Spiliotes was directly employed by Minerva.

With regard to the first sentence, the statement may be admissible as a statement of a party-opponent under Fed.R.Evid. 801(d)(2)(D). That rule states that a statement is not hearsay if the statement is offered against a party and is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Fed.R.Evid. 801(d)(2)(D). If the statement falls under any hearsay exceptions, then it should he considered at the summary judgment stage.

Captain Vezyrtzis testified that he was the Manager of the Operations Department at Minerva Marine. (Declaration of Ronald Betancourt in Opposition to Minerva's Motion for Summary Judgment at Exh.5, p.10). Moreover, Captain Vezyrtzis testified that he had appointed Worldwide Marine to attend Minerva vessels, and that he met with Spiliotes to discuss the terms [*87] of his retention by Minerva Marine. n14 ( Id. at Exh.5, pp. 68, 481). These statements are sufficient to find that Captain Vezyrtzis was an agent of Minerva, and that he made these statements concerning a matter within the scope of his employment, during the existence of the

relationship. It is this Court's determination that Captain Vezyrtzis's statements would he admissible under the exception for admissions of a party opponent. The third sentence of paragraph 12, however, is inadmissible because it lacks the support of specific evidence in the record. Plaintiff's motion to strike paragraph 12 is granted in part and denied in part.

> n14 This statement is also sufficient to defeat Plaintiff's argument that the paragraph should be stricken on the grounds that there is no evidence that Captain Vezyrtzis ever discussed what the terms of Spiliotes's agreement with Minerva were. (Plaintiff's Motion to Strike at p. 6).

*v. Analysis*

Having granted much of the Plaintiff's motion to strike, the Court must now [*88] determine whether the Defendants/Third-Party Plaintiffs' remaining arguments are sufficient to carry their burden to create a genuine issue of material fact with respect to the issue of control. After striking multiple paragraphs from Spiliotes's Declaration, there is little left to support Defendants/Third-Party Plaintiffs argument that Spiliotes was controlled by Minerva.

Defendants/Third-Party Plaintiffs give several examples of times when unexpected problems arose with Minerva's ships that required Spiliotes to report to Minerva to seek instructions on how to resolve the problems. (Spiliotes Declaration at PP26, 30-33). They also provide an example of a time when Spiliotes was instructed to go to Maine to handle an inspection on board one of Minerva's ships. (Spiliotes Declaration at P27). That Spiliotes occasionally ran into problems that required him to contact Minerva to seek instructions, or that he was occasionally instructed to handle an inspection, however, is insufficient to create a genuine issue of fact that Spiliotes was not controlled. Indeed, Spiliotes's testimony indicates the contrary: for the most part, he was unsupervised. Spiliotes testified that he was an expert [*89] who knew his job, that no one ever told him how to perform his job, and that he was generally unsupervised by Minerva. (PSUMF at PP70-71, 73-74). Spiliotes's testimony that he occasionally received instructions from Minerva is insufficient for a reasonable jury to conclude that Minerva controlled the means and manner of his performance.

Defendants/Third-Party Plaintiffs also provide evidence to show that Spiliotes had a special relationship with Minerva, and that Spiliotes was dependent on Minerva for his livelihood. (Spiliotes Declaration at P36, 38, 48 excerpted portions of PP43-45; Vezyrtzis Deposition at pp. 32-33, 66-68). However, the fact that Spiliotes may have had a special relationship with Minerva, or that he was dependent upon Minerva for his livelihood, are insufficient to show that Minerva controlled Spiliotes. On the balance, the first factor weighs in favor of the Plaintiff.

b. Factor 2 - The kind of occupation, supervised or unsupervised

According to the Plaintiff, Spiliotes's testimony confirms that Spiliotes was neither directly nor indirectly supervised by Minerva, a factor that points to independent contractor status. (PSUMF at PP70-77). Moreover, Captain [*90] Vezyrtzis, a Minerva employee, testified that no one at Minerva supervised the way Spiliotes performed his services. (PSUMF at P75). Plaintiff also cites the geographical distance between Spiliotes in New Jersey and Minerva in Greece as evidence that he was not supervised. (PSUMF at P76). See Community for Creative Non-Violence v. Reid, 490 U.S. 730, 752, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989) (a factor weighing against the determination that the defendant was an employee was the fact that the defendant was in Baltimore, and could not be supervised from Washington given the geographic distance).

Although Defendants/Third-Party Plaintiffs dispute paragraphs 74 through 76 of the Plaintiffs Local Rule 56.1 Statement, those disputes are immaterial. Moreover, the Court has granted the Plaintiff's motion to strike much of the evidence cited by Defendants/Third-Party Plaintiffs to show that Spiliotes was supervised. The remaining evidence merely indicates that Spiliotes was once instructed by Vezyrtzis to go to Maine, and was once instructed by Minerva to repair a radar, but provides no indication that Spiliotes's work was supervised by Minerva. (Spiliotes Declaration at PP27, 33). The [*91] second factor weighs in favor of the Plaintiff.

c. Factor 3 - Skill

According to Plaintiff, Spiliotes has admitted that while he didn't want to "brag," "[he] know[s] more things than a lot of experts out there." (PSUMF at P72). He adds, "Maybe I am an expert. You know, there are many experts but I don't want to brag." Id. Moreover, WWM held itself out as having "vast experience and knowledge" and offering a "full range of services" to the maritime industry. (PSUMF at PP24-29).

Defendants/Third-Party Plaintiffs argue that the question is not just whether Spiliotes was skilled - but rather, whether Minerva's employees lacked the skill that caused Minerva to go out and seek Spiliotes's services. They offer evidence to show that Minerva's crew was in fact capable of performing the services that were provided by Spiliotes.

The relevant inquiry, however, is where Spiliotes obtained his skills, not whether Minerva was capable of performing Spiliotes's services. See Mulzet v. R.L. Reppert, Inc., 54 Fed.Appx. 359, 360-61 (3d Cir. 2002) (businesses seek the assistance of independent contractors for many reasons; the question is from whom the employee acquired [*92] his skills). According to Vezyrtzis's testimony, Minerva did not train Spiliotes to perform his job. (PSUMF at P75). Factor three weighs in the Plaintiff's favor.

d. Factor 4 - Who furnishes the equipment and the workplace

Plaintiff argues that WWM had its own office in New Jersey and supplied its own furniture, fax machines, telephones, automobile, letterhead/stationery, business cards and similar items (PSUMF at 15-17). Defendants/Third-Party Plaintiffs argue that Spiliotes's workplace was predominantly onboard Minerva's vessels, and that while onboard, he had full access to and used much of Minerva's equipment. (PSUMF at PP34, 54-56).

Plaintiff has moved to strike paragraphs 54 and 55, which state that all the equipment Spiliotes used aboard the ships belonged to Minerva, and that Spiliotes even wore a Minerva uniform at times while on the ship's deck. Paragraphs 54 and 55 read:

P54 - Captain Gianniou also declared that "Minerva did not provide or pay WWM for any equipment." (See Affidavit of Michael Fernandez Exhibit 43 P17.) However, all the equipment I used aboard ship was Minerva's. I had full access to the Minerva's shipboard computers and I sued them [*93] for all my computer needs. I used the vessel's telephone and VHF radio.

I used the vessel's ullage tapes and past to measure the cargo aboard. I do not even own an ullage tape. The surveyors/agents for the terminal, vessel charterers, cargo receivers, etc. were not allowed to use the ship's computer, telephone and VHF as I was, nor were they provided with the ship's equipment to measure and otherwise survey the cargo. They used their own equipment.

P55 - I even wore a Minerva uniform at times while on the ship's deck - Minerva's white company overall's used by their shipboard deck officers. Minerva did not provide the surveyors/agents for the terminal, vessel charterers, cargo receivers, etc. with their company overalls.

Plaintiff argues that the contents of paragraphs 54 and 55 should be stricken as self-serving and for failing to comply with Fed.R.Civ.P. 56(c). Specifically, Plaintiff argues that Spiliotes has no personal knowledge as to whether Minerva provided surveyors or agents for the terminal, vessel charterers, cargo receivers, etc. with uniforms or permitted them to use the ship's computer, telephone, VHF or other materials onboard.

The Court finds that Spiliotes [*94] has not made a satisfactory showing that he has personal knowledge with respect to who was given access to the ship's computer, telephone and VHF, as well as who was provided with company overalls. These decisions effectively amount to company policy, and Spiliotes has not made a showing that he has personal knowledge of management issues concerning Minerva. Plaintiff's motion to strike is granted with respect to the sixth and seventh sentence of paragraph 54, and the second sentence of paragraph 55.

The remaining parts of paragraphs 54 and 55, as well as paragraph 56, are sufficient, nevertheless, to show that Spiliotes was furnished his equipment and workplace by Minerva. Factor four weighs in the Defendants/Third-Party Plaintiffs' favor.

c. Factor 5 - Length of time the individual has worked for the company employer

Plaintiff argues that from 1998 to 2001, WWM was appointed only as needed, and was not engaged to attend on all of Minerva's vessels calling on the East Coast

during that time frame, as alleged by Spiliotes. (PSUMF at P113). Spiliotes also provided services to other entities during this time frame. (PSUMF at P136). Moreover, Spiliotes admitted that ship's agents [*95] are appointed as necessary by vessel owners. (PSUMF at P102).

To contradict Plaintiff's claim that Spiliotes worked for Minerva on a limited basis, Defendants/Third-Party Plaintiffs argue that Spiliotes was employed by the Martinos family for over 15 years. (Spiliotes Declaration at PP6-14). Even if that is accepted as true, it still does not create an issue of the fact that Spiliotes worked non-exclusively for Minerva from 1998 to 2001, and even then, only on an as needed basis. n15 Factor five weighs in the Plaintiff's favor.

> n15 The Court will not consider the Plaintiff's motion to strike the paragraphs cited by Defendants/Third-Party Plaintiffs. Even if those paragraphs are accepted as true, the outcome remains the same.

f. Factor 6 - Method of payment

Plaintiff argues that all payments from Minerva went directly to WWM, based upon WWM's submission of invoices. (PSUMF at PP58-62). Additionally, Spiliotes and other employees at WWM were paid by WWM based upon the amount of work they performed, and [*96] received 1099 forms from WWM. (PSUMF at PP10, 14, 21-23). Spiliotes never reported or claimed in his personal (state or federal) tax filings any wages, salary, or anything else from Minerva. (PSUMF at PP32-35).

Defendants/Third-Party Plaintiffs dispute several of these statements. First, Defendants/Third-Party Plaintiffs dispute paragraphs 58 and 59 of the Plaintiff's Local Rule 56.1 Statement. Paragraph 58 states that WWM was paid by Minerva based upon the handwritten rates offered by WWM to Minerva as trey appeared in WWM's advertising brochure. (PSUMF at P58). Paragraph 59 states that all services performed by WWM were paid consistent with the agreed rate schedule contaned in the Agency Tariff. (PSUMF at P59). To counter these paragraphs, Defendants/Third-Party Plaintiffs cite paragraph 40 of the Spiliotes Declaration, which explains the billing practice between WWM and Minerva, based on their agreement. n16 (Spiliotes Declaration at P40). It

is not clear to this Court how paragraph 40 of the Spiliotes Declaration disputes paragraphs 58 and 59 of the Plaintiff's Local Rule 56.1 Statement. The Court will consider paragraphs 58 and 59. Although Defendants/Third-Party Plaintiffs [*97] dispute paragraphs 10, 34 and 35 of the Plaintiffs' Rule 56.1 Statement as well, the Court does not find these disputes material.

n16 As discussed earlier, the first sentence of paragraph 40 is stricken from the record. ( See section II.A.1.d, supra).

Defendants/Third-Party Plaintiffs agree that the monies paid to Spiliotes by Minerva were paid through WWM, but argue that Spiliotes was required to operate his own company. (Spiliotes Declaration at PP36-47). As previously mentioned, the Court will not consider Defendants/Third-Party Plaintiffs' conclusory assertions that Minerva controlled its relationship with Spiliotes, and required it to operate WWM. ( See section II.A.1.d, supra). Factor six weighs in Plaintiff's favor.

g. Factor 7 - Manner of termination of the work relationship

Plaintiff notes that Spiliotes never received a termination letter from Minerva. Rather, it argues that after September of 2001, Minerva was never again appointed as a protective agent or Remaining on Board [*98] (ROB) surveyor by Minerva, and there was no obligation to do so since WWM was only appointed on a cases by case basis. (PSUMF at P125). Plaintiff adds that this is consistent with Spiliotes's statement to the press that he and WWM were only hired on an as needed basis to represent a shipping company's interest in port and that he was a shipping agent. (PSUMF at P102). Although Defendants/Third-Prty Plaintiffs dispute the paraphrasing of the *Newark Star Ledger* article in paragraph 102, and the summary of Martinos's deposition testimony in paragraph 125, the Court finds those disputes to be immaterial.

Plaintiff also argues that WWM recognized that Minerva never guaranteed any future assignments, as evidenced by the following statement that appeared on the cover of reports created for Minerva by WWM:

We are very appreciative of your

continued business and if we may be of any further assistance regarding any aspect of the shipping industry we will be more than happy to render our services. (PSUMF at P92)

Additionally, WWM invoices contain the printed language: "serving to serve again." (PSUMF at P8).

Defendants/Third-Party Plaintiffs argue that the Plaintiff has [*99] mischaracterized the circumstances of Spiliotes's termination. Specifically, they claim that Spiliotes returned to the Minerva Julie after going to the Bayonne Police station on the night in question, and he was met on the pier by the Master and fired on orders from Martinos. (Spiliotes Declaration at P58). The paragraph cited by Defendants/Third-Party Plaintiffs, however, does not dispute the fact that Spiliotes never received a termination letter, and was simply not retained on future assignments. Factor seven weighs in favor of the Plaintiff.

h. Factor 8 - Whether the worker accrues annual leave

Plaintiff cites Spitiotes's own testimony that he never received any vacation, insurance, disability or workers compensation benefits from Minerva. (PSUMF at P67). This factor is not disputed by Defendants/Third-Party Plaintiffs. Factor 8 weighs in the Plaintiff's favor.

i. Factor 9 - Is the work the individual performs an integral part of the employer's business

To show that Spiliotes's work was not integral to Minerva's business, Plaintiff first argues that Minerva routinely appointed ship agents such as WWM on a cases by case basis to ensure that their vessels were properly [*100] serviced and looked after in ports throughout the world. (PSUMF at PP50-56). Moreover, Plaintiff has statistics to show that WWM was appointed only 39% of the time for vessels calling on the east coast, and only 46% of the time for vessels calling in the northeast. Plaintiff also argues that Captain Katsaros, another port captain has readily admitted that he was simply a vessel's agent, and by no means a port captain employed by Minerva. (PSUMF at PP120-123). They also cite cases to show that it is a well-established principle of U.S. maritime law that work done by ship agents does not make them employees but rather that they are always regarded by courts as independent contractors.

Plaintiff's argument on this point confuses the issues, and fails to address the specific question of whether Spiliotes's work is integral to Minerva's business. The evidence, in fact, suggests that ship's agents are integral to Minerva's business, as ship owners need someone to protect their interests and the vessel's interests while their vessels are in port. (PSUMF at PP50-56). Cf. DaBronzo, 232 F.Supp.2d at 317 (removal of asbestos was a unique skill unrelated to, and not an integral [*101] part of, the vitamin business). Factor 9 weighs in favor of the Defendants/Third-Party Plaintiffs.

j. Factor 10 - Does the individual accrue retirement benefits

There is no dispute that Spiliotes did not accrue retirement benefits from Minerva. Factor 10 weighs in Plaintiff's favor.

k. Factor 11 - Does the "employer" pay social security taxes

There is also no dispute that Minerva did not pay social security taxes for Spiliotes. Factor 11 weighs in Plaintiff's favor.

l. Factor 12 - The intention of the parties

Plaintiff argues that the evidence overwhelmingly establishes that the parties always intended that Spiliotes would be an independent contractor, and that Spiliotes consistently represented himself as an agent for WWM. Plaintiff cites a laundry list of evidence to support this claim: WWM advertised itself as a Ship's Agent and Marine Technical and Environmental Consultant/Surveyor (PSUMF at PP24-29); the signed personal federal tax returns from Spiliotes indicating that he was either a pensioner, retired, or a ship's agent (PSUMF at PP32-35); certified statements made by Spiliotes to the U.S. Coast. Guard indicating that he was employed by WWM (PSUMF at PP36-38); [*102] sworn deposition testimony from Spiliotes, and a verified bill of particulars, from a lawsuit related to a car accident in 1998, indicating that he was employed by WWM (PSUMF at PP39-41); records of the Hellenic Chamber of Commerce indicating that Spiliotes was the Vice-President of WWM (PSUMF at P45); and a Credit Card application to Citibank indicating that Spiliotes was employed by WWM (PSUMF at P46). Additional evidence shows that Spiliotes was serving as a vessel's agent while employed by WWM: in a fax dated

September 21, 2001 from Spiliotes, WWM confirmed, "We are please to attend as owners agent for the above named vessel." (PSUMF at P80); IMTT port in Bayonne listed Spiliotes as an owner's agent (PSUMF at P83); IMTT's gate log and visitors log contained handwritten entries by Spiliotes that he was a surveyor/agent for WWM (PSUMF at PP84-85); Spiliotes's business card stating that he was acting as "owners/vessels agent" for the call of the Minerva Julie at IMTT (PSUMF at P86); Spiliotes identified himself to others at IMTT as a ships agent for WWM (PSUMF at P87-88); the charterer's agent also understood that Spiliotes was acting as an owner's agent (PSUMF at P89); the Bayonne [*103] Police Department's report of September 26, 2001, identifying Spiliotes as a ships agent (PSUMF at P90); a signed statement by Spiliotes submitted to the Bayonne Police department, dated September 26, 2001 representing himself as a "ships agent and broker" (PSUMF at P91); a cover letter and report issued to Minerva by WWM stating, "We are very appreciative of your continued business and if we may be of any further assistance regarding any aspect of the shipping industry we will be more than happy to render our services," and a report signed by Captain Spiliotes as "independent marine and cargo surveyor/consultant." (PSUMF at P92-93). Plaintiff cites additional evidence showing that Spiliotes has continuously portrayed himself as a ship's agent. (PSUMF at P99-102). Plaintiff also cites evidence to show that Spiliotes never was a port captain, never held himself out as a port captain, and never suggested that he worked for Minerva. (PSUMF at PP71, 112, 114-115, 117, 118, 119, 124).

Plaintiff has again confused the issues. The issue is not whether Spiliotes held himself out as an employee or port captain of Minerva, but whether the parties intended that Spiliotes would be an employee [*104] of Minerva. Defendants/Third-Party Plaintiffs are correct in arguing that the label adopted by the parties is of nominal value in determining their relationship. MacDougall, 144 N.J. at 388 ("categorization of a working relationship depends not on the nominal label adopted by the parties, but rather on its salient features and the specific context in which the rights and duties that inhere in the relationship are ultimately determined."). Although Plaintiff's evidence adds some color to their argument, the labels used by Spiliotes tells this Court little about how he actually viewed his relationship with Minerva.

Defendants/Third-Party Plaintiffs, on the other hand,

argue that the evidence shows that Spiliotes believed he had a special relationship with Minerva. (Spiliotes Declaration at PP12- 9, 50-56, 64). Taking into account their evidence that is not subject to the motion to strike, however, Defendants/Third-Party Plaintiffs' evidence is likewise insufficient in helping this Court determine the intent of the parties.

The Court finds that neither party's evidence is probative of the parties' intentions. On the balance, factor twelve does not weigh in favor of [*105] either party.

### 3. Conclusion

Assuming all of the factors of the Pukowsky test, and viewing the evidence in a light most favorable to the Defendants/Third-Party Plaintiffs, this Court finds as a matter of law that Spiliotes was an independent contractor of Minerva. It follows that Defendants/Third-Party Plaintiffs cannot sustain a claim against Minerva pursuant to CEPA. Although Plaintiff moves for attorney fees under section 34:19-6 of CEPA, the Court reserves judgment on this issue pending resolution of the case. Plaintiff's motion for summary judgment on Defendants/Third-Party Plaintiffs' first counterclaim is granted. n17

n17 Having found summary judgment in favor of Plaintiff on the first counterclaim, the Court need not consider Plaintiff's alternative argument for summary judgment of the CEPA claim under the doctrines of *In Pari Delicto*, Equitable Estoppel, or Unclean Hands.

### B. Third Counterclaim: Defamation

Defendants/Third-Party Plaintiffs have alleged that contrary to the results [*106] of their investigation of the incident on September 26, 2001, Minerva and/or their agents maliciously and falsely told a reporter for *TradeWinds* that Spiliotes's version of the events was fabricated, and that Spiliotes had insisted that the Chief Mate of the Minerva Julie "speed up the discharging process" dangerously and in violation of terminal regulations, and that Spiliotes later filed a false report to terminal security. (Answer with Counterclaims at PP106-107). Defendants/Third-Party Plaintiffs add that Minerva later falsely told a *TradeWinds* reporter that Spiliotes lied about the Chief Mate's comments. ( Id. at

108). To succeed on a defamation claim under New Jersey law, Defendants/Third-Party Plaintiffs must prove that a false and defamatory statement of fact about Spiliotes was made, that Plaintiffs knew or should have known it was false, and that it was communicated to third parties, causing damages. Arista Records, Inc. v. Flea World, Inc., 356 F.Supp.2d 411, 424 (D.N.J. 2005).

Plaintiff now moves for summary judgment on several grounds. First, Plaintiff argues that Defendants/Third-Party Plaintiffs and/or their agents forwarded copies of, [*107] *inter alia*, Minerva's complaint to *TradeWinds*, which led to the publication of the two articles. (Pl's Br. at p. 20; PSUMF at P128). This fact is undisputed by Defendants/Third-Party Plaintiffs. Plaintiff claims that Defendants/Third-Party Plaintiffs cannot now bring a claim of defamation when in fact they instigated the publication. Rogozinski v. Airstream by Angell, 152 N.J. Super. 133, 151, 377 A.2d 807 (Law Div. 1977) ("When the publication of defamatory matter has been invited, instigated or procured by one defamed, or by someone acting on his behalf, he generally cannot be heard to complain of the resulting injury....particularly, when it is elicited for the purposes of predicating an action thereon....") (citations omitted).

The Court finds that by forwarding Minerva's complaint to *TradeWinds*, Defendants/Third-Party Plaintiffs both instigated and consented to the publication of the alleged defamatory material. Under the Restatement's definition of consent in defamation actions, a plaintiff consents to the making of defamatory statements if the plaintiff "knows the exact language" that the defendant will use in those statements or "has reason to [*108] know that" such language "may be defamatory." Restatement (Second) of Torts § 583 (1977).

To determine whether or not Defendants/Third-Party Plaintiffs consented to the publication, the Court must compare the allegations in the Plaintiff's complaint to the alleged defamatory statements published in *TradeWinds* that are cited as the basis for the defamation cause of action in the third counterclaim. The following are excerpts of paragraphs 15 and 16 of Minerva's complaint:

15. After continuing his abusive behavior and insisting that unsafe measures be taken during discharge, Spiliotes was

asked by Chief Officer Tsingis to leave the vessel. Spiliotes then became infuriated, left the vessel and *falsely and maliciously* informed IMTT Port Security that Chief Officer Tsingis had threatened to blow up the vessel with a bomb.

16. As a result of the *false accusations* of Spiliotes, Chief Officer Tsingis was arrested on September 26, 2001...

(Pl's Complaint at PP15-16) (emphasis added). Plaintiff's complaint clearly alleges that Spiliotes lied. These statements must be compared to the third counterclaim, which alleges that Spiliotes was defamed because [*109] Minerva and/or their agents maliciously and falsely told a reporter for *TradeWinds* that Spiliotes's version of the events was fabricated (Counterclaim at P106); maliciously and falsely told a reporter for *TradeWinds* that Spiliotes insisted the Chief Mate "speed up the discharge process," and when the Chief Mate refused to do so, that Spiliotes maliciously filed a false report to terminal security (Counterclaim at P107); and that Minerva again later maliciously and falsely told a reporter for *TradeWinds* that Spiliotes lied about the Chief Mate's comments (Counterclaim at P108). The Court finds that the language in the complaint is sufficiently similar to the language of the alleged defamatory remarks cited in the counterclaims, such that by furnishing the complaint to *TradeWinds*, Defendants/Third-Party Plaintiffs "[knew] the exact language" that would be used or at the very least "had reason to know" that such language "may be defamatory." See Restatement (Second) of Torts § 583 (1977). In other words, Defendants/Third-Party Plaintiffs consented to the publication of these statement.

Defendants/Third-Party Plaintiffs now attempt to argue that there are additional [*110] statements made in the *TradeWinds* article that constitute defamation. Specifically, the October 22, 2002 *TradeWinds* article states, "Minerva maintains that Spiliotes lied about the chief mate's comments, possibly to settle an old score," and adds that Spiliotes had a history of disputes with crew members. (Pl's Br. at Exh. 70). The August 16, 2002 article states: "Minerva's lawyers have said they believe Spiliotes had an old score to settle with Tsingis." (Pl's Br. at. Exh. 70). Plaintiff argues that they could not have reasonably anticipated these statements being published because they are not in Minerva's complaint.

The problem with this argument is that the Defendants/Third-Party Plaintiffs did not specifically reference these statements in their third counterclaim, nor did they give any indication that there were additional defamatory statements apart from the ones they specifically referenced. To the extent that Defendants/Third-Party Plaintiffs seek to rely on statements not mentioned in the third counterclaim as the basis for its defamation claim, the Court will not now consider them. See Minerva Marine, Inc. v. Spiliotes, et al, 2005 U.S. Dist. LEXIS 41854, No. 02-2517, slip op. at 8 (D. N.J. April 4, 2005) [*111] (refusing to consider additional defamatory statements where Court was "not convinced that the allegations in the Complaint [were] sufficient to put defendants on notice that any and every defamatory statement that they may have made about plaintiff regarding the underlying incident at any point in time is now the subject of this action.").

Because the Court fords that Defendants/Third-Party Plaintiffs instigated and consented to publication, there is no need to consider the Plaintiff's alternative arguments for summary judgment on the third counterclaim. Plaintiff's motion for summary judgment on Defendants/Third-Party Plaintiffs' third counterclaim is granted.

## C. Fourth Counterclaim: Tortious Interference with Prospective Economic Advantage

Plaintiff moves for summary judgment on the fourth counterclaim on the grounds that Defendants did not allege and cannot prove any reasonable expectation of, or interference with, their business advantage. The Third Circuit has recognized that the Supreme Court of New Jersey has identified the four elements of a prima facie case for tortious interference with economic opportunities: (1) a reasonable expectation of [*112] economic advantage to plaintiff, (2) interference done intentionally and with malice, (3) causal connection between the interference and the loss of prospective gain, and (4) actual damages. Varrallo v. Hammond Inc., 94 F.3d 842, 848 (3d Cir. 1996) (citing Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 751-52, 563 A.2d 31 (1989)). The Third Circuit noted that "although the New Jersey courts continue to read Printing Mart as setting out a four-part prima facie case . . . several panels of this court have read in a fifth element: defendant's knowledge of plaintiff's expected advantage." Varrallo, 94 F.3d at 848 n.9 (citations

omitted).

Plaintiff's first argument is that Defendants/Third-Party Plaintiffs have failed to allege facts showing an existing or prospective economic or contractual relationship, as required to sustain a cause of action. See Eli Lilly & Co. v. Roussel Corp., 23 F.Supp.2d 460, 494 (D.N.J. 1998) ("a plaintiff asserting a tortious interference claim must allege facts that show an existing or prospective economic or contractual relationship."). The fourth counterclaim states, [*113] in relevant part, as follows:

> 112. Defendants had a protectable interest in their relationships with other ship owners and operators enuring to their commercial benefit.

> 113. Plaintiff wrongfully and unethically interfered with those relationships with malice and with the intent to inflict harm on defendants without justification or excuse.

(Answer with Counterclaims at PP112-1]3). By arguing that the fourth counterclaim fails to allege a cause of action, however, Plaintiff has effectively moved to dismiss the counterclaim under Fed.R.Civ.P. 12(b)(6). While the Court acknowledges that the fourth counterclaim fails to state a claim, see Storis v. GERS Retail Sys., 1995 U.S. Dist. LEXIS 7614, at *14-15 (D.N.J. 1995) (granting motion to dismiss because plaintiff failed to allege specific prospective contracts that were interfered with by the defendant), the Court declines to rule on the motion to dismiss at this time, and will instead rule on the merits.

Plaintiff argues that Defendants/Third-Party Plaintiffs have not created a genuine issue as to interference, damages, or causation. To show that Defendants/Third-Party Plaintiffs have no evidence [*114] to support the fourth counterclaim, Plaintiff argues the following: the fourth counterclaim is based in large part on the second counterclaim (defamation) which was voluntarily dismissed by defendants with prejudice after Minerva obtained an affidavit directly rebutting allegations made therein (PSUMF at PP132-135); during his deposition, Spiliotes testified that WWM performed work for companies other than Minerva such as

Thenamaris, Ranger Marine, and the U.K. P&I Club (PSUMF at P136); no specific computation as to damages has been provided or calculated by Defendants/Third-Party Plaintiffs (PSUMF at P137, 141-148); Thenamaris ceased appointing WWM before the incident on board the Minerva Julie based upon a communication forwarded by Spiliotes to that Company in July of 2001, stating in part, do not "bother calling me again for this vessel or any other vessel that you are the operator." (PSUMF at 138-139); and Minerva obtained affidavits from both Ranger Marine and Thomas Miller of the U.K. P&I Club that those companies have and will continue to appoint WWM and have not been influenced in any way not to appoint WWM. (PSUMF at 140-141). n18

> n18 Defendants/Third-Party Plaintiffs dispute paragraphs 135-137, 139, and 142-145 of the Plaintiffs Local Rule 56.1 Statement. The Court will not address these disputes, however, because even if those disputes are genuine, Defendants/Third-Party Plaintiffs' evidence is still insufficient to sustain a cause of action for tortious interference.

[*115]

Defendants/Third-Party Plaintiffs cite paragraphs 60 through 66 of the Spiliotes Declaration to support a cause of action for tortious interference with prospective economic advantage. n19 Generally, those paragraphs indicate that the number of jobs Spiliotes received from UK P&I Club and Ranger Marine diminished substantially after September of 2001. Plaintiff has moved to strike paragraph 63, however, which states the following:

> P63 - The timing of this work, the unusual circumstances surrounding the owner's request that I leave earlier than anticipated and Minerva's immediate knowledge and timely use of it in this lawsuit for their summary judgment motion, leaves me no doubt that Minerva and/or their agents were involved in its beginnings so Minerva could use it to attempt to defeat my claim for tortious interference.

(Spiliotes Declaration at P63). Plaintiff argues that

Page 33

paragraph 63 equates to self-serving speculation and opinion that is not based on personal knowledge and should be stricken. This Court agrees. The statements in this paragraph, pertaining to Spiliotes's discharge from his employment for the UK P&I Club, are purely speculative and are insufficient [*116] to satisfy the personal knowledge requirement of Fed.R.Civ.P. 56(e). Moreover, Defendants/Third-Party Plaintiffs have cited nothing from the record to support these allegations. Plaintiff's motion to strike paragraph 63 is granted.

> n19 Paragraph 64, which contains a quotation from the Baker Declaration, has already been stricken.

The remaining paragraphs, 60 through 62 and 65 to 66, are insufficient to create a genuine issue as to the interference and causation requirements of tortious interference with prospective economic advantage. The paragraphs merely indicate that Spiliotes has received less work from two companies. Although Spiliotes's tax returns may be sufficient to give some indication of damage, there is nothing in the record to suggest that the Plaintiff intentionally interfered with Spiliotes's economic advantage, or that any such interference caused the decline. Contrary to Defendants/Third-Party Plaintiffs argument, it would not be reasonable for this Court to infer that Spiliotes's decline [*117] in employment was a result of Plaintiff's intentional interference with malice, or that any such interference caused the decline. Plaintiff's motion for summary judgment on Defendants/Third-Party Plaintiffs' fourth counterclaim is granted.

**D. Fifth Counterclaim: Malicious Use of Process**

Plaintiff moves for summary judgment on the fifth counterclaim on the grounds that, *inter alia*, a malicious use of process claim cannot be asserted as a counterclaim. Defendants/Third-Party Plaintiffs' malicious use of process counterclaim alleges that Minerva maliciously filed its complaint, without any basis in fact or law, with the sole motivation to harass, embarrass and injure the Defendants/Third-Party Plaintiffs. n20 (Answer with Counterclaims at P21).

> n20 The Court will not entertain Defendants/Third-Party Plaintiffs' eleventh-hour

attempt to recast their "malicious use of process" counterclaim as a "malicious abuse of process" claim. (Opp. Br. at pp. 21-24). The heading for the fifth counterclaim clearly states "malicious use of process," and the elements described therein suggest a malicious use of process claim. (Second Amended Answer with Counterclaims at pp. 21-22).

[*118]

To succeed on malicious use of process claim, a party must show the existence of a special grievance, that the suit complained of was brought without reasonable or probable cause, that it was actuated by malice, and that it terminated favorably to the party asserting the claim. Major League Baseball Promotion Corp. v. Colour-Tex, Inc., 729 F.Supp. 1035, 1054 (D.N.J. 1990) (citing Penwag Property Co. v. Landau, 76 N.J. 595, 598, 388 A.2d 1265 (1978)). If the primary suit has not been terminated, the party defending the malicious use of process claim is entitled to judgment as a matter of law. Id. A simple extension of these principles is that a claim for malicious use of process cannot be asserted as a counterclaim. Id. (citing Kotok Bldg. v. Charvine Co., 183 N.J. Super, 101, 107, 443 A.2d 260 (Law Div.1981)).

On April 4, 2005, this Court granted in part and denied in part the Defendants' Motion for Summary Judgment on the Plaintiff's first count, and granted the motion for summary judgment on the second count. The Plaintiff's suit is still pending. Since the Defendants/Third-Party Plaintiffs have asserted malicious use [*119] of process as a counterclaim while the primary suit is still pending, Plaintiff is entitled to judgment as a matter of law on the fifth counterclaim. Plaintiff's motion for summary judgment on Defendants/Third-Party Plaintiffs' fifth counterclaim is granted.

**E. Sixth Counterclaim: Intentional Infliction of Emotional Distress**

Defendants/Third-Party Plaintiffs' sixth counterclaim alleges that the lawsuit was filed to induce Spiliotes to refuse to cooperate with the criminal prosecution of Minerva's agent, and as a result, has inflicted severe emotional distress on Spiliotes. To prove a claim of intentional infliction of emotional distress under New Jersey law, a party must prove that the opposing party engaged in outrageous conduct that was the proximate

cause of the claimant's severe distress. Buckley v. Trenton Saving Fund Society, 111 N.J. 355, 366, 544 A.2d 857 (1988). The conduct in question must have been done with the intention both to do the act and to produce emotional distress, or it must have been done recklessly in deliberate disregard for the high probability that emotional distress would follow. Id. In addition, "the conduct must be 'so outrageous [*120] in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. (quoting Restatement of Torts (Second) § 46, comment d (1965)). The touchstone of this tort is the extreme and uncommon nature of the actor's conduct. Major League Baseball Promotion Corp., 729 F.Supp. at 1054 (citations omitted). The conduct must have been so severe that no reasonable man could be expected to endure it. Id. (citations omitted).

In support of its motion for summary judgment on this counterclaim, Plaintiff cites Major League Baseball Promotion Corp., where this District held that mere evidence of the institution of legal proceedings is insufficient to support a finding that the resulting mental distress was so severe that no reasonable man could be expected to endure it. Major League Baseball Promotion Corp., 729 F.Supp. at 1054-55 (citing Buckley, 111 N.J. at 367-69, 544 A.2d 857; Figured v. Paralegal Tech Serves., 231 N.J.Super. 251, 254-56, 555 A.2d 663 (App. Div. 1989); Restatement of Torts (Second) § [*121] 46, comment g (1965) ("The actor is never liable ... where he has done no more than insist upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress.")). This case is distinguished, however, in that Defendants/Third-Party Plaintiffs have alleged that Minerva "threatened to file a baseless lawsuit" against Spiliotes to induce him to refuse to cooperate in a criminal prosecution of Minerva's agent. In other words, Defendants/Third-Party Plaintiffs have alleged that Minerva has done "more than" merely "insist upon his legal rights in a permissible way." The Court finds that an action for intentional infliction of emotional distress cannot lie where, as here, a party has merely threatened legal action against an individual to prevent them from cooperating in a criminal investigation. A party has the right to resort to the Court for alleged grievances.

Even if this Court were to permit such an action, apparently, a lawyer who did not represent Minerva but a different entity made the threat. To show that Minerva threatened Spiliotes with a lawsuit, Defendants/Third-Party Plaintiffs cite paragraph 73 of the Spiliotes [*122] Declaration, which Plaintiff has moved to strike. The paragraph reads as follows:

> P73 - Minerva's and/or Martinos' conduct has had a severe negative effect on my emotional state and life. Minerva and/or Martinos contacted other ship owners and instructed them not to hire me, threatened me with legal action in an effort to procure my refusal to cooperate further with the criminal case against the Chief Mate, filed a baseless lawsuit against me, and defamed me in *Tradewinds Magazine*. These actions ruined me professionally, financially and emotionally. I no longer work in the profession I love. Financially, I have earned virtually no income since these events. Further, I have been emotionally traumatized by plaintiff's actions. I suffer from depression and anxiety for which I have had to seek psychological treatment.

(Spiliotes Declaration at P73). The Court finds, however, that this paragraph is replete with baseless, conclusory allegations that are not supported by the record. This paragraph is insufficient to support their claim for intentional infliction of emotional distress.

Alternatively, paragraph 142 of the Defendants/Third-Party Plaintiffs' Local Rule [*123] 56.1 Statement states that Tsingis' attorney, John Smith, informed Spiliotes at several hearings that a defamation claim and a criminal counterclaim would be filed against him. (DSUMF at P142). It adds that Captain Spiliotes understood these comments to be threats. Id. The Court notes, however, that the Defendants/Third-Party Plaintiffs' Local Rule 56.1 Statement, the Spiliotes Declaration, and the Declaration of John Smith all indicate that he was retained to represent Tsingis. (DSUMF at P143; Spiliotes Declaration at P173; Declaration of John Smith at P7). Defendants/Third-Party Plaintiffs have not offered any evidence which suggests that John Smith represented or was retained by Minerva. It goes without saying that there can be no claim of intentional infliction of emotional distress against Minerva unless there is some evidence that Minerva or its

agents engaged in outrageous conduct that was the proximate cause of the claimant's severe distress. Defendants/Third-Party Plaintiffs, have proffered no such evidence. Accordingly, Plaintiff's motion for summary judgment on Defendants/Third-Party Plaintiffs' sixth counterclaim is granted.

### F. Seventh Counterclaim: Negligent Infliction [*124] of Emotional Distress

The seventh counterclaim asserts that by threatening to file a false and baseless lawsuit against Spiliotes to induce him to refuse to cooperate, it was foreseeable that Spiliotes would suffer severe emotional distress. "Negligent infliction of emotional distress is negligent conduct that is the proximate cause of emotional distress in a person to whom the actor owes a duty to exercise reasonable care." Major League Baseball Promotion Corp., 729 F.Supp. at 1055 (citing Decker v. Princeton Packet, Inc., 116 N.J. 418, 420, 561 A.2d 1122 (1989)).

Plaintiff again argues that Defendants/Third-Party Plaintiffs have no evidence to show that Minerva threatened Spiliotes to prevent him from testifying against Tsingis. This Court agrees. For the same reasons this Court provided in granting summary judgment on the intentional infliction of emotional distress counterclaim (sixth counterclaim), the Court likewise finds that Defendants/Third-Party Plaintiffs have no evidence to create a genuine issue of fact on the negligent infliction of emotional distress counterclaim. Plaintiff's motion for summary judgment on Defendants/Third-Party [*125] Plaintiffs' seventh counterclaim is granted.

### CONCLSION

It is on this 13th day of March, 2006,

ORDERED that Defendants/Third-Party Plaintiffs' Motion to Strike Plaintiff's Deposition of Elias Katsaros is GRANTED; and it is further

ORDERED that Defendants/Third-Party Plaintiffs' Motion to Strike Plaintiff's Deposition of Andreas Spiridonakos is GRANTED in part, DENIED in part; and it is further

ORDERED that Defendants/Third-Party Plaintiff's Motion to Strike the Fernandez Affidavit concerning James Baker is DENIED; and it is further

ORDERED that Plaintiff's Motion to Strike

Defendants/Third-Party Plaintiffs' Declaration of James Baker is GRANTED; and it is further

ORDERED that Plaintiff's Motion to Strike the Declaration of James Spiliotes is GRANTED in part, DENIED in part, and DISMISSED in part as moot; and it is further ORDERED that Plaintiff's Motion for Summary Judgment with respect to the First, Third, Fourth, Fifth, Sixth and Seventh Counterclaims is GRANTED.

The Court reserves judgment on Plaintiff's motion for attorneys' fees under section 34:19-6 of CEPA pending resolution of the case.

### s/William H. Walls

United States Senior District Judge

### [*126] ORDER

Walls, District Judge

It is on this 13th day of March, 2006,

ORDERED that Defendants/Third-Party Plaintiffs' Motion to Strike Plaintiff's Deposition of Elias Katsaros is GRANTED; and it is further

ORDERED that Defendants/Third-Party Plaintiffs' Motion to Strike Plaintiff's Deposition of Andreas Spiridonakos is GRANTED in part, DENIED in part; and it is further

ORDERED that Defendants/Third-Party Plaintiff's Motion to Strike the Fernandez Affidavit concerning James Baker is DENIED; and it is further

ORDERED that Plaintiff's Motion to Strike Defendants/Third-Party Plaintiffs' Declaration of James Baker is GRANTED; and it is further

ORDERED that Plaintiff's Motion to Strike the Declaration of James Spiliotes is GRANTED in part, DENIED in part, and DISMISSED in part as moot; and it is further ORDERED that Plaintiff's Motion for Summary Judgment with respect to the First, Third, Fourth, Fifth, Sixth and Seventh Counterclaims is GRANTED.

The Court reserves judgment on Plaintiff's motion for attorneys' fees under section 34:19-6 of CEPA pending resolution of the case.

2006 U.S. Dist. LEXIS 13922, *126

**s/William H. Walls**                                        United States Senior District [*127]  Judge

LEXSEE



Cited
As of: Mar 05, 2007

**Demarko Steele, Plaintiff v. Officer James Jennings, et al., Defendants**

**Case No. 2:04-CV-189**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION**

**2005 U.S. Dist. LEXIS 18703**

**August 31, 2005, Decided
August 31, 2005, Filed**

**DISPOSITION:** [*1] Defendant's motion to strike. (Doc. # 36) GRANTED. Defendant's motion for summary judgment. (Doc. # 14) GRANTED in part and DENIED in part. Steele's motion for summary judgment. (Doc. # 15) DENIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff high school student sued defendant police officer under 42 U.S.C.S. § 1983, alleging that the officer violated the student's constitutional rights by arresting the student without probable cause and using excessive force in effecting the arrest. The student and the officer cross-moved for summary judgment.

**OVERVIEW:** The officer responded to a fight at the school where the student, with numerous others, was a spectator, and the officer directed the student twice to leave the school grounds as requested by a school administrator. Instead, the student continued walking toward the school and the officer arrested the student and allegedly used excessive force in escorting the student to the police car. The court first held that, despite the student's assertion that he was unlawfully arrested for exercising his right to freedom of speech, no unconstitutional retaliation was shown since the student failed to show that he engaged in any protected speech.

Further, once the student did not leave the school grounds despite the officer's orders, the officer had probable cause to arrest the student for criminal trespass. However, the student asserted that the officer tightly grabbed his neck and repeatedly slammed his head into the police car, while the officer maintained that he made a normal arrest without any use of excessive force, and thus factual issues remained concerning whether the officer used force and, if so, whether that force was excessive.

**OUTCOME:** The officer's motion for summary judgment was granted in part with regard to retaliatory arrest and arrest without probable cause, but the officer's motion and the student's cross-motion were otherwise denied.

**CORE TERMS:** summary judgment, cruiser, arrest, excessive force, probable cause, neck, custody, motion to strike, arrested, walking, scene, grabbed, front, retaliation, partial, twice told, fight, crowd, genuine issue of material fact, used excessive force, authentication, reasonableness, authenticate, admissible, deposition, seizure, school property, disturbance, escorted, teenagers

**LexisNexis(R) Headnotes**

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*

*Civil Procedure > Summary Judgment > Standards > Appropriateness*

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*

[HN1] Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). A court must therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case.

*Civil Procedure > Summary Judgment > Evidence*

*Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview*

*Civil Procedure > Summary Judgment > Standards > Genuine Disputes*

[HN2] In viewing summary judgment evidence, a court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Consequently, the central issue is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. However, in ruling on a motion for summary judgment, the district court is not obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim.

*Civil Procedure > Summary Judgment > Evidence*

*Civil Procedure > Summary Judgment > Opposition > General Overview*

*Evidence > Relevance > Relevant Evidence*

[HN3] Although a party must produce evidence in support of its opposition to a motion for summary judgment, not all types of evidence are permissible. For example, hearsay evidence cannot be considered on a motion for summary judgment. Additionally, the United States Court of Appeals for the Sixth Circuit holds that only admissible evidence may be considered by a trial court in ruling on a motion for summary judgment.

Admissible evidence is defined as evidence that is relevant and of such a character that the court should receive it. Fed. R. Evid. 401 defines relevant evidence as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

*Evidence > Authentication > General Overview*

*Evidence > Procedural Considerations > Preliminary Questions > Admissibility of Evidence > General Overview*

*Evidence > Relevance > Relevant Evidence*

[HN4] Authentication is a special aspect of relevancy concerned with establishing the genuineness of evidence and is a condition precedent to admissibility. Fed. R. Evid. 901(a).

*Civil Procedure > Summary Judgment > Opposition > General Overview*

*Evidence > Procedural Considerations > Objections & Offers of Proof > Objections*

*Evidence > Procedural Considerations > Preliminary Questions > Admissibility of Evidence > General Overview*

[HN5] Evidence that is neither authenticated nor admissible may be considered by a district court considering a motion for summary judgment unless the opposing party affirmatively raises the issue of the defect. The burden is on the opposing party to object to the improper evidence; failure to object constitutes a waiver.

*Civil Procedure > Summary Judgment > Opposition > General Overview*

*Civil Procedure > Summary Judgment > Standards > Appropriateness*

*Evidence > Authentication > General Overview*

[HN6] Simply because defendants produced documents does not make them authentic--production does not equate to authentication. The failure to authenticate a document properly precludes its consideration on a motion for summary judgment. Unauthenticated exhibits are not proper evidence for opposing or supporting a summary judgment motion.

*Civil Procedure > Summary Judgment > Supporting Materials > Affidavits*

*Evidence > Authentication > General Overview*
[HN7] To be admissible for summary judgment purposes, documents must be authenticated by and attached to an affidavit that meets the requirements of Fed. R. Civ. P. 56(e).

*Civil Rights Law > Section 1983 Actions > Scope*
*Governments > Local Governments > Police Power*
[HN8] Pursuant to 42 U.S.C.S. § 1983, a plaintiff must prove that: (1) there was a deprivation of a right secured by the United States Constitution and (2) the deprivation was caused by a person acting under of color of state law.

*Civil Rights Law > Section 1983 Actions > Elements > Protected Rights*
*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom*
[HN9] The elements of a 42 U.S.C.S. § 1983 First Amendment retaliation claim are as follows: (1) the plaintiff engaged in a constitutionally protected activity; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two--that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Constitutional Law > Bill of Rights > Fundamental Freedoms > Freedom of Speech > Scope of Freedom*
[HN10] The First Amendment protects speech that may be fairly characterized as constituting a matter of public concern. In order to conclude that speech addresses a matter of public concern, a court must be able to fairly characterize the expression as relating to any matter of political, social, or other concern to the community.

*Constitutional Law > Bill of Rights > Fundamental Rights > Search & Seizure > Scope of Protection*
*Criminal Law & Procedure > Search & Seizure > Search Warrants > Affirmations & Oaths > General Overview*
*Criminal Law & Procedure > Search & Seizure > Search Warrants > Probable Cause > General Overview*
[HN11] See U.S. Const. amend. IV.

*Civil Rights Law > Section 1983 Actions > Law Enforcement Officials > Arrests*

*Constitutional Law > Bill of Rights > Fundamental Rights > Search & Seizure > Probable Cause*
*Criminal Law & Procedure > Arrests > Probable Cause*
[HN12] It is well established that any arrest without probable cause violates the Fourth Amendment. In order for a wrongful arrest claim to succeed under 42 U.S.C.S. § 1983, a plaintiff must prove that the police lacked probable cause.

*Constitutional Law > Bill of Rights > Fundamental Rights > Search & Seizure > Probable Cause*
*Criminal Law & Procedure > Arrests > Probable Cause*
*Criminal Law & Procedure > Search & Seizure > Search Warrants > Probable Cause > Personal Knowledge*
[HN13] For probable cause to arrest to exist, the facts and circumstances within the officer's knowledge must be sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense. Put simply, a police officer has probable cause if there is a fair probability that the individual to be arrested has either committed or intends to commit a crime. Whether there exists a probability of criminal activity is assessed under a reasonableness standard based on an examination of all facts and circumstances within an officer's knowledge at the time of an arrest. Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction. The existence of probable cause is a jury question, unless there is only one reasonable determination that is possible.

*Civil Procedure > Trials > Jury Trials > Province of Court & Jury*
*Constitutional Law > Bill of Rights > Fundamental Rights > Search & Seizure > Probable Cause*
*Criminal Law & Procedure > Search & Seizure > Seizures of Persons*
[HN14] The Fourth Amendment requires probable cause for both seizures and arrests. The relevant inquiry thus becomes whether it would be clear, to a reasonable officer facing the specific factual situation involved, that there was not probable cause to seize or arrest an individual. If there is more than one reasonable determination possible, the matter is a jury question.

*Constitutional Law > Bill of Rights > Fundamental Rights > Search & Seizure > Scope of Protection*
*Criminal Law & Procedure > Search & Seizure > Seizures of Persons*
*Criminal Law & Procedure > Sentencing > Corrections, Modifications & Reductions > Eligibility, Circumstances & Factors*

[HN15] A seizure within the meaning of the Fourth Amendment occurs when, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

*Criminal Law & Procedure > Criminal Offenses > Property Crimes > Burglary & Criminal Trespass > General Overview*

[HN16] See Ohio Rev. Code Ann. § 2921.11.

*Constitutional Law > Bill of Rights > Fundamental Rights > Search & Seizure > Scope of Protection*
*Criminal Law & Procedure > Criminal Offenses > Miscellaneous Offenses > Resisting Arrest > Excessive Force*
*Criminal Law & Procedure > Arrests > Reasonable Force*

[HN17] All claims that law enforcement officers have used excessive force--deadly or not--in the course of an arrest, investigatory stop, or other seizure of a free citizen should be analyzed under the Fourth Amendment and its reasonableness standard. Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. A reviewing court should pay particular attention to the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. In evaluating an excessive force claim, the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. Moreover, the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation.

*Constitutional Law > Bill of Rights > Fundamental Rights > Search & Seizure > Scope of Protection*
*Criminal Law & Procedure > Arrests > Reasonable Force*
*Criminal Law & Procedure > Search & Seizure > Seizures of Persons*

[HN18] It is well established in the Sixth Circuit that the gratuitous use of force on a suspect who has already been subdued is unconstitutional. However, not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment.

*Civil Rights Law > Immunity From Liability > Local Officials > Customs & Policies*

[HN19] Where a defendant asserts the defense of qualified immunity, the United States Court of Appeals for the Sixth Circuit directs: first, that the court considers whether, on the plaintiff's facts, has there been a violation; second, that the court considers whether that violation involved clearly established constitutional rights of which a reasonable person would have known.

**COUNSEL:** For Demarko Steele, a minor, by his mother Tina Brown, Plaintiff: James Donald McNamara, Columbus, OH.

For Officer James Jennings, City of Columbus Ohio, Defendants: Paula Jennings Lloyd, Columbus City Attorney's Office, Columbus, OH.

**JUDGES:** Magistrate Judge Abel. GREGORY L. FROST, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** GREGORY L. FROST

**OPINION:**

### OPINION & ORDER

In this 42 U.S.C. § 1983 action, Plaintiff Demarko Steele ("Steele") alleges that Defendant James Jennings ("Defendant"), n1 a police officer for the City of Columbus, violated his First and Fourth Amendment rights. Both sides move for partial summary judgment. (Docs. ## 14, 15). Additionally, Jennings moves the Court for an order striking several exhibits Steele offered in support of his motion for partial summary judgment. (Doc. # 36). The parties have completed briefing the motions, and the motions are therefore ripe for the Court's review.

n1 The Court's April 22, 2005 Order dismissed all of Steele's claims against Defendant City of Columbus with prejudice. (Doc. # 30).

[*2]

## BACKGROUND

Steele was a sixteen (16) year old freshman at Marion Franklin High School on March 24, 2003. (Steele Dep. 7; Doc. # 1 at P2). When school concluded on that day, he grabbed his backpack and headed out the front door to nowhere in particular. (Steele Dep. at 8, 9, 13, 33). He saw a "big scuffle" and noticed that some kids had gotten into a fight. Id. at 13. He stood about twenty (20) yards from the fight. Id.

Officer Bobo ("Bobo") was the special duty officer assigned to the high school that day. (Bobo Dep. 4). He requested assistance after the fights broke out at the school, and Defendant responded to that request. (Def. Dep. 8-10; Bobo Dep. 4-5). Upon approaching the school in his police cruiser, Defendant observed a large group of teenagers on the front lawn directly in front of the main entrance yelling and screaming. (Def. Dep. 11). Bobo was in the middle of the group attempting to separate two individuals. Id. Bobo estimated the crowd to be about fifty (50). (Bobo Dep. 6). Teenagers were all over the area and in the front lawn. (Def. Dep. at 13). After observing the scene but before exiting his cruiser, Defendant requested additional backup. [*3] Id. at 14. Defendant was aware that the police had previously dealt with shootings, thefts, and other incidents of violence at the school. Id. at 58. Defendant then exited his cruiser and began helping quell the disturbance. Id.

Additional officers, including Sergeant Alex Behnen ("Behnen"), a supervisor, arrived at the scene and aided in dissipating the disturbance. Id. at 19-20. Behnen spoke with Brad Chamberlain ("Chamberlain"), one of the school's administrators, and then told Defendant and the other officers on the scene to order the students to leave school property. Id. at 20-21, 25. Chamberlain agreed with the decision to tell the students to leave. (Chamberlain Aff. P7). Defendant then began walking through the crowd, yelling at the students to leave school property. Id at 21, 24, 27, 33.

Steele heard Defendant telling everyone to leave the school grounds. (Steele Dep. 13). Nevertheless, he started heading towards the school. Id.; (Def. Dep. 46, 48). Defendant approached him and twice told him to leave the premises. (Steele Dep. 13). Steele continued walking in the direction of the school. Id. The two exchanged words, although the content [*4] of their conversation is unclear. Defendant then escorted Steele to his cruiser and placed him in the back of the car.

The parties' versions of how Defendant escorted Steele diverge at this point. Steele's complaint alleges that Defendant: (1) used excessive force against him; (2) lacked probable cause to arrest him; and (3) arrested him in retaliation for his exercising his First Amendment rights. (Doc. # 1). Defendant denies Steele's excessive force and retaliation claims, and asserts that he had probable cause to place Steele in custody. (Doc. # 14). Both parties move for partial summary judgment. (Doc. ## 14, 15).

## STANDARD OF REVIEW

[HN1] Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court must therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element [*5] that is essential to that party's case. See Muncie Power Prods., Inc. v. United Techs. Auto., Inc., 328 F.3d 870, 873 (6th Cir. 2003) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)).

[HN2] In viewing the evidence, the Court must draw all reasonable inferences in favor of the nonmoving party, which must set forth specific facts showing that there is a genuine issue of material fact for trial. Id. (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)); Hamad v. Woodcrest Condo. Ass'n, 328 F.3d 224, 234 (6th Cir. 2003). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Muncie, 328 F.3d at 873 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)). Consequently, the central issue is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Hamad, 328 F.3d at 234-35

(quoting *Anderson*, 477 U.S. at 251-52). [*6] However, in ruling on a motion for summary judgment, "a district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989).

### DISCUSSION

### I. DEFENDANT'S MOTION TO STRIKE

Preliminarily, the Court must rule on Defendant's motion to strike exhibits 2, 3, 4, and 6 that Steele submitted in support of his motion for partial summary judgment. (Doc. # 36). Steele filed a response in opposition (Doc. # 42), to which Defendant replied. (Doc. # 43).

Exhibit 2 is the a one-page document entitled "Investigative Summary." The author is not identified, although it appears to summarize an internal affairs investigation of Defendant that started after Charles Clark, Steele's grandfather, complained to the police department about Defendant's treatment of Steele. However, it is clear that the document does not constitute the entire summary, but rather is only one page of the summary.

[HN3] Although a party must produce evidence in support of its opposition to a motion for summary judgment, not all types of evidence are permissible. [*7] *McQuain v. Ebner Furnaces, Inc.*, 55 F. Supp. 2d 763, 769-770 (N.D. Ohio 1999). For example, "hearsay evidence cannot be considered on a motion for summary judgment." *Wiley v. United States*, 20 F.3d 222 at 225-26. Additionally, the Sixth Circuit has held "'it is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment.'" *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (quoting *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988)). Admissible evidence is defined as "evidence that is relevant and of such a character . . . that the court should receive it." (Black's Law Dictionary 235 (pocket ed. 1996)). Federal Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." [HN4] Authentication is a special aspect of relevancy concerned with establishing the genuineness of evidence and is a condition precedent to admissibility.

Fed. R. Evid. 901(a) [*8] and advisory committee's notes.

[HN5] Evidence that is neither authenticated nor admissible "may be considered by the district court unless the opposing party affirmatively raises the issue of the defect. The burden is on the opposing party to object to the improper evidence; failure to object constitutes a waiver." *McQuain*, 55 F. Supp. 2d at 770. Defendants have objected here. (Doc. # 36).

Defendant asserts that Exhibit 2 lacks foundation and constitutes inadmissible hearsay. (Doc. # 36 at 2). Steele counters that the document is admissible because Defendant provided the document to him during discovery. (Doc. # 42 at 1). [HN6] Simply because the Defendants produced the documents does not make them authentic - production does not equate to authentication. "The failure to authenticate a document properly precludes its consideration on a motion for summary judgment." *Robinson v. Bodoff*, 355 F.Supp.2d 578, 582 (D. Mass. 2005) (striking all exhibits that were submitted without affidavits and were not self-authenticating). Unauthenticated exhibits are not proper evidence for opposing or supporting a summary judgment motion. As such, the Court cannot consider it [*9] and the Court **GRANTS** Defendant's motion to strike Exhibit 2. *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994); (Doc. # 36).

Exhibit 3 purports to be the actual audiotape of the interview of Defendant by the police department's internal affairs bureau. Defendant raises the same arguments - lack of foundation and authentication - to which Steele offers the same response - the Defendant produced the tape, therefore it must be authentic. (Doc. # 36 at 2; Doc. # 42 at 1). Likewise, the Court responds uncreatively - specifically, the Court **GRANTS** Defendant's motion to strike Exhibit 3 for lack of authentication. (Doc. # 36).

Exhibit 4 purports to be a transcript of Exhibit 3, the tape recording. The Court **GRANTS** Defendant's motion to strike this exhibit for the same reasons the Court struck the audiotape. The transcript was prepared by someone in Steele's counsel's office. (Doc. # 42 at 1; Doc. # 22 at P2). In an apparent attempt to authenticate the transcript, Steele's counsel submitted an affidavit that states, in relevant part "Exhibit 4 is a transcript, prepared by my office and which I believe to be accurate, of the tape which is Exhibit [*10] 3." (Doc. # 22 at P2). This

affidavit fails to identify the individual who prepared the transcript, and to establish the basis for his belief that the transcript is accurate. Accordingly, because the affidavit fails to comport with Fed. R. Civ. P.56(e), which requires the affidavit to be based on personal knowledge. Additionally, the transcript is not authenticated. The Court **GRANTS** the Defendant's motion to strike Exhibit 4. n2 (Doc. # 36).

> n2 Steele's counsel invites the Court authenticate the transcript itself by listening to the tape and reviewing the transcript. (Doc. # 42 at 1). This is not the Court's job.

Finally, Defendant moves to strike Exhibit 6. That exhibit consists of medical records from Steele's visit to the emergency room on the day of the incident as well as pictures of Steele. Defendant argues that the Court should strike this exhibit because Steele failed to authenticate them and it contains hearsay. (Doc. # 36 at 3). Steele counters that he provided [*11] Defendant with this information in discovery, therefore ostensibly arguing that the exhibit is authentic. (Doc. # 42 at 2).

Once again, Defendant's arguments prevail. [HN7] To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e). *Starks-Umoja v. Fed. Express Corp.,* 341 F. Supp. 2d 979, 983 (D. Tenn. 2003) (quoting Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2722 (1998)). Steele failed to provide such an affidavit, and thus the Court **GRANTS** Defendant's motion to strike Exhibit 6. (Doc. # 36).

In short, the Court **GRANTS** Defendants' motion to strike in its entirety. n3 (Doc. # 36). As a consequence, Exhibits 2, 3, 4, and 6 to Steele's Motion for Partial Summary Judgment (also relied upon by Steele in his response in opposition to Defendant's motion for partial summary judgment) are **STRICKEN** from the record.

> n3 The Court notes that Steele, upon learning of Defendant's motion, could have moved the Court for leave to file authenticating affidavits, or could have attempted to file them as a response to Defendant's motion, but Steele elected not to take either option.

[*12]

## II. FIRST AMENDMENT CLAIMS

Steele's first claim is that Defendant "may have" arrested him in retaliation for his exercising his First Amendment rights. n4 (Doc. # 1 at P13). Defendant moves for summary judgment on this claim, arguing that Steele's Complaint fails to allege that he was engaged in protected speech and that such speech was the reason that Defendant arrested him. (Doc. # 14 at 12). Steele responds by arguing that he believes that Defendant arrested him because he did not like what Steele said to him immediately before the arrest. (Doc. # 21 at 15).

> n4 The Court may examine the First Amendment claim before turning to the Fourth Amendment claim because the issue of probable cause to arrest is not determinative of the First Amendment claim. *Bakos v. City of Olmsted Falls,* 73 Fed. Appx. 152, 158 (6th Cir. 2003)

Steele's claim that Defendant violated his First Amendment rights is brought [HN8] pursuant to 42 U.S.C. § 1983, under which Steele must prove that: [*13] (1) there was a deprivation of a right secured by the Constitution and (2) the deprivation was caused by a person acting under of color of state law. *Wittstock v. Mark A. Van Sile, Inc.* 330 F.3d 899, 902 (6th Cir. 2003). Because the Defendant is a municipal police officer, there is no dispute over the second component. Defendant argues, however, that Steele has not proved a constitutional deprivation.

[HN9] The elements of a § 1983 First Amendment retaliation claim are as follows: (1) the plaintiff engaged in a constitutionally protected activity; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two - that is, the adverse action was motivated at least in part by the plaintiff's protected conduct. *Thaddeus-X v. Blatter,* 175 F.3d 378, 394 (6th Cir. 1999).

Defendant asserts that Steele failed to establish the first element - that he was engaged in protected speech. (Doc. # 14 at 12, Doc. # 32 at 14). [HN10] The First Amendment protects speech that may be "fairly

characterized as constituting a matter of public [*14] concern." *Chappel v. Montgomery County Fire Protection Dist. No. 1,* 131 F.3d 564, 573 (6th Cir. 1997). In order to conclude that speech addresses a matter of public concern, the Court "must be able to fairly characterize the expression as relating to any matter of political, social, or other concern to the community." *Id.* at 574 (citation omitted).

Steele testified in his deposition that Defendant twice told him to leave the school grounds. (Steele Dep. 13). Steele and Alston nevertheless continued to walk towards the school. *Id.* According to Steele, Defendant started walking towards him and saying "You need a friend? you look lonely." n5 *Id.* at 14. Alston told Steele not to say anything in response. *Id.* Steele told Alston that he was "not going to stoop to [Defendant's] level." *Id.* Defendant then asked Steele what he had said, and shortly thereafter Defendant took Steele into custody. *Id.*

n5 In contrast, Defendant testified in his deposition:

> Q: Why don't you just tell me the conversation you had with [Steele] as best as you can remember. If you have quotes, great; but if you don't, give me the gist of it.
> A: The gist of it was, why are you still here; why are you standing here? Response from him was that his friends were in the cruiser or in the wagon. Response from me: You need to get new friends. They're trouble. You need to get out of here. Response from him: I don't recall exactly what he said. And then physical response from him, he turned away from me and walked towards the [school] building.

Jennings Dep. 45-46.

For the purposes of the instant motion, the Court will view the facts in a light most favorable to Steele as the non-moving party on the First Amendment claim.

[*15]

Steele neglects to argue that his speech dealt with a matter of public concern. (Doc. # 21 at 15-16). For sure, the content of Steele's speech at issue precludes such an argument - Steele's comments did not relate to any matter of political, social, or other concern to the community. Hence, Steele has failed to establish the first element of his retaliation claim, and the Court thus concludes that Defendant is entitled to summary judgment on that claim. (Doc. # 14).

### III. FOURTH AMENDMENT CLAIMS

Steele asserts three separate claims under the Fourth Amendment. First, Steele claims that Defendant arrested him without probable cause. (Doc. # 1 at P13; Doc. # 15 at 1). Second, Steele maintains that Defendant used excessive force against him in effectuating the arrest. *Id.* Steele's excessive force claim consists of two sub-parts. n6 Specifically, Steele asserts that Defendant grabbed his neck when escorting him to the cruiser. n7 *Id;* Doc. # 21 at 13. Steele also claims that Defendant slammed his head on the trunk of the police cruiser. (Doc. # 1 at P13; Doc. # 21 at 13).

N6 Steele's Complaint also references excessive force in terms of alleging that Defendant "jerked [Steele's] backpack off of his shoulder and onto the ground," "shoved and pulled [Steele] to the police cruiser," and "grabbed [Steele]." (Doc. # 1 at PP6, 14). Defendant moved for summary judgment on those claims, but Steele did not respond to Defendant's motion regarding those claims. (Docs. # # 14, 15). Therefore, Steele waived those claims. *See Packer v. City of Toledo,* 1 Fed. Appx. 430, 434 (6th Cir. 2001); *see also Smith v. Thornburg,* 136 F.3d 1070, 1081 (6th Cir 1998).

[*16]

n7 Steele's affidavit contradicts his deposition testimony regarding his excessive force claim involving his neck. Accordingly, the Court will only rely on Steele's deposition testimony and will disregard Steele's affidavit. *See Reid v. Sears, Roebuck and Co.,* 790 F.2d 453, 460 (6th Cir.1986).

In contrast, Defendant denies that he arrested Steele, and instead maintains that he seized him with the intention of arresting him. (Doc. # 32 at 7, 8). Defendant further argues that he had probable cause to seize Steele, denies using excessive force when escorting him to the cruiser and handcuffing him, and denies slamming Steele's head on the cruiser. (Doc. # 14 at 12-15; Doc. # 31 at 10, 11).

Although Defendant declined to move for summary judgment on Steele's excessive force claim relating to his head, Steele did move for summary judgment on that claim. (Doc. # 14 at 16; Doc. # 15 at 1, 22). Accordingly, the Court now turns to an examination of the cross motions for summary judgment on Steele's Fourth Amendment claims.

### A. Arrest without probable cause

The Fourth Amendment [*17] states in pertinent part that [HN11] "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. [HN12] "It is well established that any arrest without probable cause violates the Fourth Amendment." *Thacker v. City of Columbus,* 328 F.3d 244, 255 (6th Cir. 2003) (citing *Crockett v. Cumberland Coll.,* 316 F.3d 571, 580 (6th Cir. 2003)). Furthermore, in order for a wrongful arrest claim to succeed under § 1983, Steele must prove that the police lacked probable cause. *Feathers v. Aey,* 319 F.3d 843, 851 (6th Cir. 2003).

[HN13] For probable cause to arrest to exist, the "facts and circumstances within the officer's knowledge [must be] sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Crockett, 316 F.3d at 580 (citing Michigan v. DeFillippo,* 443 U.S. 31, 37, 61 L. Ed. 2d 343, 99 S. Ct. 2627 (1979)); *see Hinchman v. Moore,* 312 F.3d 198, 204 (6th Cir. 2002) (citing [*18] *Criss v. City of Kent,* 867 F.2d 259, 262 (6th Cir. 1988)). Put simply, "A police officer has probable cause if there is a fair probability that the individual to be arrested has either committed or intends to commit a crime." *Fridley v. Horrighs,* 291 F.3d 867, 872 (6th Cir. 2002) (internal quotation and citations omitted). Whether there exists a probability of criminal activity is assessed under a reasonableness standard based on "'an examination of all facts and circumstances within an officer's knowledge at

the time of an arrest.'" *Crockett,* 316 F.3d at 580 (quoting *Estate of Dietrich v. Burrows,* 167 F.3d 1007, 1012 (6th Cir. 1999)). "Probable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams,* 407 U.S. 143, 149, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972). The existence of probable cause is a jury question, unless there is only one reasonable determination that is possible. *Crockett,* 316 F.3d at 581; *Gardenhire v. Schubert,* 205 F.3d 303, 315 (6th Cir. 2000).

Initially, the parties disagree about whether [*19] Defendant arrested Steele. Defendant predictably posits that he took custody of Steele with the intention of arresting him, but exercised his discretion and decided not to arrest him. n8 (Doc. # 31 at 10, 11; Doc. # 32 at 7, 8). Just as predictably, Steele counters that Defendant's actions equated to an arrest. (Doc. # 15 at 1, 7, 8). In this instance, this is a distinction without a difference because [HN14] the Fourth Amendment requires probable cause for both seizures and arrests. The relevant inquiry thus becomes whether it would be clear, to a reasonable officer facing the specific factual situation involved in the instant case, that there was not probable cause to seize or arrest Steele. If there is more than one reasonable determination possible, the matter is a jury question.

n8 Undoubtedly, Defendant seized Steele by placing him in the back of the locked police cruiser. *See United States v. Kendricks,* 127 Fed. Appx. 836, 841-842 (6th Cir. 2005) (stating [HN15] "A 'seizure' within the meaning of the Fourth Amendment occurs when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."). Morever, Defendant testified that Steele was not free to leave. (Def. Dep 54, 64).

[*20]

A brief review of the facts is necessary to frame the probable cause inquiry. Bobo requested assistance after fights broke out at the school, and Defendant responded to that request. (Def. Dep. 8-10; Bobo Dep. 4-5). Upon approaching the school, Defendant observed a large group of teenagers on the front lawn directly in front of the main entrance yelling and screaming. (Def. Dep. 11). Bobo was in the middle of the group attempting to

separate two individuals. *Id.* Bobo estimated the crowd to be about fifty (50). (Bobo Dep. 6). Teenagers were all over the area and in the front lawn. (Def. Dep. at 13). After observing the scene but before exiting his cruiser, Defendant requested additional backup. *Id.* at 14. Defendant was aware that the police had dealt with shootings, thefts, and other incidents of violence at the school before. *Id.* at 58. Defendant then exited his cruiser and began helping quell the disturbance. *Id.*

Additional officers, including Sergeant Alex Behnen ("Behnen"), a supervisor, arrived at the scene and aided in dissipating the disturbance. *Id.* at 19-20. Behnen spoke with Brad Chamberlain ("Chamberlain"), one of the school's administrators, and then [*21] told Defendant and the other officers on the scene to order the students to leave school property. *Id.* at 20-21, 25. Chamberlain agreed with the decision to tell the students to leave. (Chamberlain Aff. P7). Defendant then began walking through the crowd, yelling at the students to leave school property. *Id.* at 21, 24, 27, 33.

Steele heard Defendant telling everyone to leave the school grounds. (Steele Dep. 13). Nevertheless, he started heading towards the school. *Id.;* (Def. Dep. 46, 48). Defendant approached him and twice told him to leave the premises. (Steele Dep. 13). Steele continued walking in the direction of the school. *Id.* Defendant then escorted Steele to his cruiser and placed him in the back of the car. n9

> n9 The Court will address Steele's excessive force claims *infra.*

Defendant asserts that because Steele failed to heed his warnings to leave, he had probable cause to take Steele into custody under Ohio Revised Code § 2921.11, Ohio's criminal trespass [*22] statute. (Def. Dep. 32, 48, 54-55, 70). That statute provides:

> [HN16] (A) No person, without privilege to do so, shall do any of the following:
>
> (1) Knowingly enter or remain on the land or premises of another;
>
> (2) Knowingly enter or remain on the land or premises of another, the use of which is lawfully restricted to certain persons,

purposes, modes, or hours, when the offender knows the offender is in violation of any such restriction or is reckless in that regard;

> (3) Recklessly enter or remain on the land or premises of another, as to which notice against unauthorized access or presence is given by actual communication to the offender, or in a manner prescribed by law, or by posting in a manner reasonably calculated to come to the attention of potential intruders, or by fencing or other enclosure manifestly designed to restrict access;
>
> (4) Being on the land or premises of another, negligently fail or refuse to leave upon being notified by signage posted in a conspicuous place or otherwise being notified to do so by the owner or occupant, or the agent or servant of either.
>
> (B) It is no defense to a charge under this section that the land or premises involved [*23] was owned, controlled, or in custody of a public agency...
>
> (D) Whoever violates this section is guilty of criminal trespass, a misdemeanor of the fourth degree.
>
> (E) As used in this section, "land or premises" includes any land, building, structure, or place belonging to, controlled by, or in custody of another, and any separate enclosure or room, or portion thereof.

Defendant told the crowd to disperse after Behnen spoke with Chamberlain. (Chamberlain Aff. P7). Steele admitted that Defendant twice told him to leave school grounds. (Steele Dep. 13). Steele did not own the property at issue. Steele further testified that he disregarded Defendant's warnings by walking towards the school. *Id.* Defendant took custody of Steele with the intent of arresting him for criminal trespassing. (Def. Dep. 54-55).

Given this evidence, the Court concludes that

Defendant had probable cause to seize or arrest Steele. Defendant knew that shootings and violence had occurred at the high school before. Defendant had also witnessed a fight on school grounds. Defendant twice told Steele to leave school premises, but Steele responded by walking towards the school. Under these facts and circumstances, [*24] a prudent person would believe that Steele "has committed, is committing or is about to commit" criminal trespassing. Consequently, the Court **GRANTS** Defendant's motion for summary judgment on Steele's claim for arrest without probable cause. (Doc. # 14).

### B. Excessive Force

As previously stated, Steele asserts two excessive force claims - one involving his neck and one involving his face and head. Steele argues that Defendant grabbed him by his neck and took him to the cruiser. Steele continues that Defendant then struck his face and head into the trunk of the cruiser several times. Defendant denies both of these claims, but moves for summary judgment only on Steele's excessive force claim for his neck. (Doc. # 14 at 17). In contrast, Steele moves for summary judgment on both of his excessive force claims. (Doc. # 15 at 1).

The Supreme Court has held that [HN17] "all claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor,* 490 U.S. 386, 395, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989). "Determining [*25] whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation omitted). A reviewing court "should pay particular attention to 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Kostrzewa v. City of Troy,* 247 F.3d 633, 639 (6th Cir. 2001) (quoting *Graham,* 490 U.S. at 396). In evaluating an excessive force claim, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham,* 490 U.S. at 396. Moreover, "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving [*26] -- about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

[HN18] It is well established in the Sixth Circuit that the gratuitous use of force on a suspect who has already been subdued is unconstitutional. *McDowell v. Rogers,* 863 F.2d 1302, 1307 (6th Cir. 1988). However, "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham,* 490 U.S. at 396 (citation and quotation omitted).

### 1. Neck

Regarding his neck, Steele testified that Defendant "grabbed [him] by his neck with one hand" and took him to the police car. (Steele Dep. 14, 53). According to Steele, Defendant grabbed him so hard he had imprints of Defendant's fingernails on his neck. *Id.* at 50-51. Defendant denies grabbing Steele's neck, stating that he took hold of Steele like he would have any other individual. (Def. Dep. 50-51). Defendant also testified at his deposition that he did not do anything that would have scratched or marked Steele's neck. *Id.* at 74-75. In addition, after Defendant placed Steele in the cruiser, Chamberlain spoke with Steele. (Chamberlain [*27] Aff. P9; Steele Dep. 16). Chamberlain looked directly at Steele and did not see any "bruises, scrapes, or marks on [Steele's] face or any part of his body." (Chamberlain Aff. P9).

Defendant admits that Steele did not resist him when he took him into custody. (Def. Dep. 53). Additionally, the severity of the crime at issue, trespassing, may fairly be characterized as low. Finally, Defendant did not state that Steele posed an immediate threat to the safety of the officers or others - Steele was not carrying any weapons and did not resist once Defendant took him into custody. However, a genuine issue of material fact exists as to whether Defendant exerted any force on Steele by grabbing his neck. Given these facts, the Court cannot ascertain whether Defendant used force at all, and if he did, whether the use of force was reasonable or excessive. Consequently, the Court **DENIES** both parties' motions for summary judgment on this claim. (Doc. # 14; Doc. # 15).

### 2. Head

Lastly, Steele asserts that after Defendant had escorted him to the cruiser, Defendant used excessive force against him in violation of the Fourth Amendment by repeatedly "slamming" his head into the cruiser's [*28] trunk. (Doc. # 1 at PP6, 13; Steele Dep. 14). Defendant denies Steele's allegation. (Doc. # 14 at 17).

A genuine issue of material fact therefore exists as to whether Defendant exerted any force against Steele at all. This, of course, prevents the Court from determining whether the force was excessive or reasonable under the circumstances. As such, the Court **DENIES** Steele's motion for summary judgment on this claim. (Doc. # 15).

### IV. QUALIFIED IMMUNITY

[HN19] Defendant asserts the defense of qualified immunity. (Doc. # 14 at 17-18). The Sixth Circuit directs: "First, the Court considers whether, on the plaintiff's facts, has there been a violation. Second, the Court considers whether that violation involved 'clearly established constitutional rights of which a reasonable person would have known.'" *Hoover v. Radabaugh,* 307 F. 3d 460, 465 (6th Cir. 2002) (quoting *Dickerson v. McClellan,* 101 F.3d 1151, 1158 (6th Cir. 1996)).

Because the Court cannot determine whether Defendant violated Steele's Fourth Amendment right to be free from the use of excessive force, the Court cannot address Defendant's qualified immunity defense.

### CONCLUSION [*29]

In brief, the Court **GRANTS** Defendant's motion to strike. (Doc. # 36). The Court **GRANTS** in part and **DENIES** in part Defendant's motion for summary judgment. (Doc. # 14). The Court **DENIES** Steele's motion for summary judgment. (Doc. # 15). Hence, Steele's Fourth Amendment excessive force claims regarding his head and neck are the only claims remaining for trial.

**IT IS SO ORDERED.**

8/31/05

**GREGORY L. FROST**

**UNITED STATES DISTRICT JUDGE**

# End Of LexisNexis® Get & Print Report

**Session Name:**      **GP010305**
**Date:**              **March 05, 2007**
**Client:**            **900001.0010**